## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. JKB-16-0363 |
| | ) | |
| GERALD THOMAS JOHNSON, | ) | |
| | ) | |
| a/k/a "Geezy," et al., | ) | |
| | ) | |
| Defendants. | ) | |

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS
### (ECF 178–180, 184–88, 190–95, 199–208, 211–221, 227, 236, 239–40, 243)

The United States of America, by and through counsel, submits this response to the following pretrial motions in this case:

## TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND ...................................................3

II. STATEMENT OF FACTS.................................................................................................4

    a.  The History, Structure, and Membership of the BGF Greenmount Regime .......................5

    b.  The May 2, 2013 Murder of Moses Malone .......................................................................7

    c.  The Defendants ..................................................................................................................11

III. ARGUMENT .......................................................................................................................20

    a.  Motions for Severance by Kenneth Faison (ECF 179), Kenneth Jones (ECF 192), Marquise McCants (ECF 201), and Gerald Johnson (ECF 217) .......................................................20

    b.  Motions to Suppress Evidence and Statements .................................................................26

        i. Motion to Suppress Fruits of Search Warrant Executed at 2204 Guilford Avenue on May 31, 2006, by Kenneth Jones (ECF 190) ...................................................................26

        ii. Motion to Suppress Fruits of Warrantless Arrest and Search of Kenneth Jones on April 11, 2011, by Kenneth Jones (ECF 194) .................................................................26

        iii. Motion to Suppress Out-of-Court and In-Court Identifications by Government Witnesses, by Kenneth Jones (ECF 193) ........................................................................32

iv.  Motion to Suppress a Series of Recorded and Non-Recorded Calls in November and December 2013, by Kenneth Jones (ECF 195) ...............................................................42

v.  Motion to Suppress Fruits of Search Warrant on 1716 Latrobe Street on April 26, 2013, by Wesley Brown (ECF 227) .......................................................................43

vi.  Motion to Suppress Fruits of May 2013 Tracking Warrant and Subsequent Search of Cell Phone, by Wesley Brown (ECF 221) .......................................................47

vii.  Motion to Suppress Wesley Brown's Statement to Law Enforcement Officers on May 14, 2013, by Wesley Brown (ECF 200) .................................................56

viii.  Motions to Suppress Fruits of 2013 State Wiretap, by Gerald Johnson (ECF 216) and Kenneth Jones (ECF 187) ....................................................................56

ix.  Motion to Suppress Fruits of Search Warrants Executed on 1520 Madison Avenue and a 2010 Hyundai on November 7, 2013, by Gerald Johnson (ECF 214) ...................64

x.  Motion to Suppress Fruits of Warrantless Search of Gerald Johnson on June 30, 2016, by Gerald Johnson (ECF 215) ..........................................................................71

xi.  Motion to Suppress Fruits of Search Warrant Executed on Cell Phone Seized from Kenneth Faison on November 15, 2016, by Kenneth Faison (ECF 180) .........................79

xii.  Motion to Suppress Social Media Evidence Collected Pursuant to Search Warrants, by Gerald Johnson (ECF 213), Kenneth Jones (ECF 191), and Marquise McCants (ECF 211) ...............................................................................................................83

xiii.  Motion to Suppress Fruits of 2016/2017 Federal Wiretap, by Marquise McCants (ECF 205) .........................................................................................................94

xiv.  Motions to Suppress "Exigent Circumstances Search Warrant" and to Suppress Electronic Evidence Resulting from Use of Cell Site Simulator, by Marquise McCants (ECF 212 & 240) .............................................................................................97

xv.  Motion to Suppress Evidence Seized from 5617 Pioneer Drive, by Marquise McCants (ECF 202) ..........................................................................................112

xvi.  Motion to Suppress Fruits of Warrantless Search of Honda Accord Parked at 5617 Pioneer Drive on February 5, 2017, by Marquise McCants (ECF 204) .........................114

xvii.  Motion to Suppress Statements, by Marquise McCants (ECF 203) .....................115

c.  Motion to Dismiss Count One, by Marquise McCants (ECF 199) ....................................116

d.  Motion for Disclosure of Evidence Pursuant to Federal Rule of Evidence 404(b) by Kenneth Jones (ECF 188) and Marquise McCants (ECF 206) ........................................120

e.  Motion for Disclosure of Evidence Pursuant to Federal Rule of Evidence 609 by Kenneth Jones (ECF 188) and Marquise McCants (ECF 206) ........................................................120

f.  Motions to Adopt Motions of Other Defendants by Joseph Bonds (ECF 183), Marquise McCants (ECF 207), Gerald Johnson (ECF 218), Norman Handy (ECF 219), Wesley Brown (ECF 220), and Kenneth Jones (ECF 185) ............................................................123

g.  Motions for Leave to File Additional Motions by Kenneth Jones (ECF 186) and Marquise McCants (ECF 208) ........................................................................................124

## I.   INTRODUCTION AND PROCEDURAL BACKGROUND

Last November, a federal grand jury for the District of Maryland returned a seven-count Superseding Indictment[1] charging nine members of the Black Guerilla Family (BGF) with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count One), and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count Two).  ECF 40.  The Superseding Indictment also charges two of the defendants—Gerald Thomas Johnson and Wesley Jamal Brown—with conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count Three), and murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Four).  Counts Three and Four are based on the May 2, 2013 murder of nineteen-year-old state's witness Moses Malone.  In connection with that murder, Brown is also charged with using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Five).  Finally, Johnson is charged with one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841 (Count Six), and one count of possession of ammunition by a felon, in violation of 18 U.S.C. § 922(g) (Count Seven).  Counts Six and Seven are based on Johnson's arrest by

---

[1] The original indictment, which was returned on July 13, 2016, charged Johnson with a single count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841.  ECF 9.

Baltimore Police officers on June 30, 2016.

The defendants have filed a total of forty-four pretrial motions in the case that remain outstanding.[2]  These consist of a motion *in limine* to preclude the admission of state guilty pleas, motions for severance, motions to suppress statements and tangible evidence, a motion to dismiss Count One of the Superseding Indictment, motions for disclosure of evidence pursuant to Federal Rules of Evidence 404(b) and 609, motions to adopt the motions of other defendants, and motions for leave to file additional motions.

A motions hearing is scheduled for October 10 and 11, 2017.  Trial is scheduled for November 13, 2017 through January 12, 2018.  As of this filing, all nine defendants are proceeding to trial.

## II.   STATEMENT OF FACTS

The defendants in this case are members of the Black Guerilla Family's Greenmount Avenue Regime, formerly known as the Young Guerilla Family, or YGF.  Between 2005 and the present, the BGF Greenmount Regime has been arguably the most violent set of the most violent gang in Baltimore.  Its members are responsible for numerous murders, non-fatal shootings, robberies, and assaults, and they also have engaged in high-volume, street-level narcotics trafficking.  They have committed these crimes, or nearly all of them, within a relatively small neighborhood in the heart of central Baltimore, blocks away from the city's main train station, its arts district, and two of its leading universities.

---

[2] Not counted in this tally are (1) McCants' motions for the disclosure of informants and co-conspirator statements, *see* ECF 197 & 198, which he later successfully moved to withdraw, *see* ECF 238 & 241, (2) a motion to suppress evidence filed by Brown, *see* ECF 196, which he later corrected, *see* ECF 221, and (3) motions for extensions of time filed by Bonds and Hunter, *see* ECF 183, 209, 230, which have been granted, *see* ECF 210, 224, 235.  Four of the outstanding motions—those filed by Harvey—were filed two weeks past the deadline set by the Court.  *See* ECF 231–34.  The government will address those motions in a subsequent filing.

In the section that follows, we summarize the history, structure, and membership of the BGF Greenmount Regime, as well as the May 2013 murder of a state's witness named Moses Malone that was committed in furtherance of the gang.  We then discuss some, but by no means all, of the wide-ranging criminal activity in which the defendants engaged.[3]  Additional facts pertaining to specific motions are discussed in the "Argument" section of this response.

### a.  The History, Structure, and Membership of the BGF Greenmount Regime

BGF, also known as "Jamaa" (the Swahili word for "family"), is a criminal gang operating in prisons and on the streets of various cities, including Baltimore, throughout the United States. Founded in California in the 1960s, BGF appeared in the Maryland correctional system in the 1990s.  In the 2000s, as more BGF members completed their prison sentences and returned to the community, they began applying the same paramilitary structure that allowed them to thrive in Maryland's prison system to the streets of Baltimore.  As in the prison system, BGF organized its members into "regimes" or "bubbles" corresponding to particular regions or neighborhoods.  On the streets, BGF members enriched themselves through drug trafficking, robbery, extortion, and counterfeiting, and committed murder and other acts of violence in order to intimidate—or eliminate—witnesses and rivals.

BGF regimes are organized and controlled by a hierarchy of ranking members, which typically consists of a Commander, or "C"; a Lieutenant Commander, or "LTC"; and various subordinate "Ministers," including Ministers of Justice, Defense, Education, and Finance; as well as other ranks, such as a Sergeant at Arms and Field Marshal.  Each subordinate has specialized

---

[3] This is by no means a complete discussion, as, for safety reasons, we have not named or alluded to witnesses whose identities have not been disclosed.  Pursuant to the Court's amended scheduling order, the government will not identify such witnesses until October 30, 2017, the agreed-upon deadline for disclosure of *Jencks* material.

responsibilities, such as the administration of discipline, the collection of dues, and the defense of the regime against rival gangs and drug traffickers.

BGF members are required, at least in theory, to follow a code of conduct, sometimes referred to as the "22s and 33s." These are the rules by which all BGF members are governed. They include, for example, a rule requiring the payment of dues to the gang, a rule against stealing from the gang, a rule against revealing the gang's secrets, a rule against homosexuality, a rule against fleeing from combat, and a rule against "snitching," or cooperating with law enforcement. With respect to many of these rules, violations are punishable by death.

For approximately the last 12 years, the BGF Greenmount Regime has occupied the territory immediately north, south, and west of Greenmount Cemetery. During the early years in which it operated, the gang consisted mostly of younger individuals, many of whom lived in the 2200, 2300, and 2400 blocks of Barclay Street and Guilford Avenue. During this time period, the organization called itself the Young Guerilla Family, or YGF. Five of the defendants in this case— Gerald Johnson, David Hunter, Kenneth Jones, Kenneth Faison and Joseph Bonds—were original members of YGF. Multiple witnesses will testify that Johnson, also known as "Geezy," was the recognized leader of the gang.

Between mid-2005 and mid-2007, YGF members sold narcotics throughout the Greenmount corridor under the supervision of Johnson and others. They also committed armed robberies, both inside and outside their territory. Over time, members of the gang committed multiple murders and shootings in order to expand YGF's territory and influence and enhance their own status within the gang. These included, among many others, the July 20, 2005 murder of Dante Jordan by David Hunter, as well as the January 9, 2007 murder of Gregory Rochester by Kenneth Jones, both of which are alleged as overt acts in furtherance of the racketeering conspiracy

6

charged in Count One.

By mid-2007, senior BGF leaders, or "Bushmen," became concerned that YGF and its members were engaged in unnecessary violence, thereby subjecting their BGF counterparts to unwanted scrutiny from law enforcement.  To address this concern, BGF's leadership issued an ultimatum:  YGF and its members could either "shut down," or, alternatively, they could embrace BGF's rules and structure by becoming full-fledged members of the gang.

Following this ultimatum, nearly all YGF members took the BGF oath, resulting in a merger between the affiliated gangs.  But the merger had little effect on the structure and leadership of YGF, and it failed to stem the violence committed by members of the gang.  Following the murder, Johnson remained an authority figure in the Greenmount Regime.  Johnson, Hunter, Bonds, and Faison all continued dealing drugs.  Faison and others committed additional armed robberies, including three in one night in January 2010.  And rather than heeding the 2007 ultimatum and refraining from unnecessary violence, Hunter and Jones committed additional murders and shootings, as the primary enforcers for the gang.

Between 2008 and 2013, a cadre of younger individuals, many of whom had family ties to YGF, took the BGF oath and became members of the Greenmount Regime.  These included four of the defendants in this case:  Wesley Brown, Montel Harvey, Norman Handy, and Marquise McCants.  Over time, this younger faction of the gang became increasingly violent and increasingly independent, culminating in a bloody dispute with the more senior members of the gang that unfolded during the summer of 2013.

### b.  The May 2, 2013 Murder of Moses Malone

The BGF Greenmount Regime is believed to be responsible for dozens of murders and shootings over the last 12 years.  This prosecution, however, focuses on a much smaller universe

of violent crimes, including, most notably, the 2013 murder of nineteen-year-old Moses Malone. The murder of Malone, which was committed by Brown and authorized by Johnson, is the only act of violence that is charged substantively as a murder (and conspiracy to commit murder) in furtherance of the BGF Greenmount Regime.

At the trial of this matter, the evidence will show that on March 23, 2013, Malone was the victim of a robbery and shooting committed by Handy and another individual in the 2400 block of Greenmount Avenue.  During the robbery, Handy and his accomplice took a cell phone and a small amount of cash from Malone's pockets.  They then attempted to steal Malone's sneakers, but Malone broke free and began to walk across the street.  As Malone was crossing the street, Handy pointed a revolver in his direction and fired a shot into the ground.  The bullet hit the ground, ricocheted, and grazed the toes of Malone's left foot.

Malone was initially reluctant to cooperate with the police, but approximately three weeks later, he participated in a recorded interview with Detectives Dawnyell Taylor and Glen Jackson at BPD's Eastern District Headquarters.  During the interview, Malone completed a photo array in which he identified Handy as the person who robbed and shot him on March 23.  He then completed a second array, in which he identified Johnson.  In the "comments" section for the array including Johnson, Malone wrote as follows:  "He got ranked so I'm guessn [sic] he sent them at me.  Pluz [sic] last nite [sic] somebody told me to watch out cuz [sic] I had some stacks on me head.  And said be died [sic] by summertime.  BGF."

On April 20, 2013, based on the information Malone provided during the interview summarized above, Detective Jackson obtained an arrest warrant for Handy.  Later that day, a patrol officer saw Handy exit a residence at 2466 Greenmount Avenue and placed him under arrest. Following Handy's arrest, a team of officers led by Detective Jackson executed a search warrant

at 2466 Greenmount Avenue, in an attempt to locate the .38 caliber revolver that Handy had used in connection with the shooting of Malone.  During the search of the residence, Detective Jackson left a copy of the search warrant affidavit—which, inexplicably, had not been sealed or redacted—on a kitchen table inside the home.  The affidavit contained multiple paragraphs summarizing the information that Malone had provided regarding Handy's involvement in the March 23 robbery and shooting.

The evidence will show that after the search warrant was executed, one of the residents of 2466 Greenmount Avenue took possession of the search warrant affidavit that Detective Jackson had left in the house.  It was then conveyed to Johnson, who issued a "green light" authorizing the murder of Malone.

On April 23, 2013, BPD officers decided to place Malone into their witness relocation program.  They noted in their case file that following Handy's arrest, Malone had "been receiving threats from the BGF organization stating that they are going to kill him for getting their member arrested."   In light of these threats, the officers transported Malone to a safe house outside of Baltimore City.  Malone stayed at the safe house for several days, but on April 30, 2013, he was evicted by BPD for violating program rules.  Later that day, BPD officers placed Malone in handcuffs and transported him to a shelter in downtown Baltimore.

Within 24 hours, Malone had left the shelter and returned to the Greenmount Avenue corridor.  By the morning of May 1, he was staying with a female associate at 650 Cokesbury Avenue.   On the evening of May 1, Malone left the residence to pick up some food at a neighborhood carryout.  As he returned from the carryout, he called a friend on his cell phone and indicated that he had just returned, or was about to return, to the house.

At some point that night, BGF member Trevon White (a/k/a "Country") learned of

Malone's whereabouts and alerted fellow members of the gang.  A witness (W-1) will testify that early on the morning of May 2, White ran into W-1's residence and asked to use W-1's cell phone. During the call, which W-1 overheard, White said something to the effect of, "the one who got your brother … Cokesbury."  Minutes later, Malone was shot multiple times in the head with a .22 caliber handgun in the 600 block of Cokesbury Avenue.

At the trial of this matter, the government will establish through toll records and additional testimony that the number dialed by White comes back to a cell phone belonging to Wesley Brown, Handy's half-brother.  W-1 will testify that following the murder, W-1 overheard a conversation in which Brown claimed responsibility for murdering Malone.  This is consistent with testimony by a second witness (W-2), who has already testified during a state court proceeding.   W-2 will testify that in the days following Malone's murder, Brown asked for W-2's assistance in disposing of a .22 caliber handgun.   According to W-2, Brown explained that the handgun was "dirty" because he had used it to shoot a witness who was testifying against his brother, *i.e.*, Handy. Brown further told W-2 that the shooting had occurred on Cokesbury Avenue, and that he had given the witness "all headshots."

Following this conversation, W-2 attempted to obtain the .22 caliber handgun from Brown, with the intent of turning it over to law enforcement.  (W-2 was cooperating at the time.)  By the time W-2 got back in touch with Brown, however, he had disposed of the handgun through another individual.   Investigators have recovered text messages from Brown's cell phone (which they searched last summer, pursuant to a warrant) that corroborate W-2's testimony about the sale of the gun.  Specifically, on May 12, 2013, Brown and a third party had the following exchange:

THIRD PARTY:        Yo he wanna know what he buying and how much

BROWN:              22 cobra 250

BROWN:              It hold 10

THIRD PARTY:     Ard [alright]

In addition to the evidence discussed above, investigators have obtained historical cell site location information for Brown's cell phone.  The data show that during the time period of Malone's murder (between 12:00 and 1:00 a.m. on May 2, 2013), Brown's cell phone was hitting off a tower at Mother Seton Academy, approximately one and a half blocks from the location where Malone was shot to death.

### c.   The Defendants

In the sections that follow, we provide a high-level summary of each defendant's role in the BGF Greenmount Regime and some, but not all, of the criminal activities in which they participated.[4]  These summaries should be read as a whole, while keeping in mind that for purposes of a RICO conspiracy, the defendants will be held accountable not only for their own criminal conduct, but also for the pattern of racketeering activity that they *agreed* would be committed in furtherance of BGF.

### i.   _Gerald Johnson (a/k/a "Geezy," a/k/a "Gzy Tha Prince")_

Johnson was a founding member of YGF who led the gang until it merged into BGF in mid-2007.  The evidence will show that he was actively involved in the discussions preceding the merger, and that following the merger, he was cultivated as a future leader of BGF.

At various points between 2009 and 2013, Johnson served as the Commander, or "C," of the BGF Greenmount Regime.  He was uniquely positioned within the Regime, in that he maintained relationships with older, YGF-era members, such as Hunter, Jones, Faison, and Bonds,

---

[4] Again, we have refrained from discussing certain evidence to maintain the security of our witnesses.  At trial, we intend to present evidence of crimes and occurrences that are not referenced below.

as well as with younger, post-YGF-era members, such as Brown, Harvey, Handy and McCants. Although multiple individuals held the title of "C" during the time period covered by the indictment, none rivaled Johnson in terms of their influence in the gang.

Johnson exercised his influence in various ways.  First, he distributed narcotics on an everyday basis at both the wholesale and retail levels.  At the wholesale level, he employed gang members and civilians alike to sell his product.  At the retail level, he personally distributed or possessed with intent to distribute drugs on multiple occasions, most recently during a traffic stop executed by BPD on June 30, 2016.  Following that arrest, ATF downloaded the contents of Johnson's cell phone pursuant to a search warrant.  These included text messages, as well as video and social media evidence, showing that Johnson was actively distributing drugs (and engaged in various other criminal activities) throughout the spring of 2016.

Further, throughout the time period covered by the indictment, Johnson used his influence as a leader of the BGF Greenmount Regime to order the commission of multiple acts of violence, including but not limited to the 2007 murder of Gregory Rochester (which was carried out by Jones in a stash house used by Johnson), as well as the 2013 murder of Malone, discussed in detail above. Johnson also committed acts of violence with his own hand, including an attempted shooting of two individuals who packaged drugs in his stash house in December 2006, as well as a robbery and assault outside a strip club in January 2012.

### ii.  *Wesley Brown (a/k/a "Wes," a/k/a "Shike White")*

Brown was a younger, but still influential member of the BGF Greenmount Regime. Beginning as early as the fall of 2012, he supplied heroin, cocaine and marijuana to multiple street-level distributors.  The drug-related evidence against Brown includes dozens of text messages recovered from cell phones belonging to Brown and others in which he set up drug transactions

and attempted to replenish his supply. [5]  In addition, during the execution of a search warrant at Brown's residence at 1716 Latrobe Street on April 26, 2013, law enforcement officers recovered distribution quantities of heroin and cocaine, drug packaging material, and gang paperwork setting forth the rules and constitutions of BGF.

As discussed above, Brown also committed the May 2, 2013 murder of Moses Malone. The evidence will show that Brown killed Malone after learning that Malone was a "snitch," in order to prevent him from testifying against Brown's half-brother, Handy.

### iii.  *David Hunter (a/k/a "Lil Dave," a/k/a "Dave")*

Hunter was an original member of YGF.  Like Johnson, he was involved in discussions with senior BGF members regarding the mid-2007 merger between YGF and BGF.  The evidence will show that Hunter was one of several YGF members who sold drugs for Johnson between 2005 and 2007.  Further, in October 2007, Hunter and Faison were arrested in the 2220 block of Barclay Street with a distribution quantity of cocaine.

Hunter also committed at least two murders in furtherance of the Greenmount Regime. First, on July 20, 2005, he shot and killed Dante Jordan in the 200 block of East 22nd Street using a .32 caliber revolver belonging to Bonds.  The evidence will show that on the night of the murder, Jordan threw a handgun into a vehicle as he was being chased by the police.  A short time later, he returned to the area and attempted to reclaim the gun.  By that point in time, however, Hunter had removed the gun from the vehicle and hidden it in an unknown location.  Upon learning that the gun was no longer in the vehicle, Jordan demanded the return of his gun.  Hunter responded by pulling out his own gun (Bonds' revolver) and shooting Jordan to death.

---

[5] There are also several text messages dating from the spring of 2013 indicating that Brown was buying and selling firearms and ammunition.

Further, in June 2011, Hunter shot and killed Henry Mills in the 2400 block of Greenmount Avenue.  Hunter killed Mills in order to retaliate for Mills' murder of BGF Bushman Naim King, and also because Mills, who was not a member of BGF, was selling drugs in BGF territory without paying the requisite "tax."   Later on the day of the murder, a CCTV camera captured a BGF meeting led by Johnson and attended by Hunter.  During the meeting, Johnson appeared to direct another individual to hand Hunter money.  The evidence of the murder also includes testimony by multiple eyewitnesses, surveillance camera footage, and Hunter's own statement that he wanted to murder the victim.  There is also evidence that Hunter participated in an earlier, aborted plot to kill Mills in 2007.

### iv.   _Montel Harvey (a/k/a "Telly," a/k/a "Big Head")_

Harvey was among the younger, post-YGF cohort of the Greenmount Regime.  During the execution of the search warrant at Wesley Brown's residence on April 26, 2013, officers seized a note, signed by "Telly" (Harvey's nickname), in which he apologized for breaking BGF's rules and concluded by saying, "Long Live the Guerillas!"

The evidence will show that Harvey began selling drugs for Johnson as early as 2009.  Beginning in mid-2012, Harvey was arrested at least four times for drug-related offenses.  On one of those occasions, police officers told Harvey that they had seen him selling drugs on a CitiWatch camera.  Harvey responded, "You should put me on America's dumbest drug dealers."

In addition to distributing drugs, Harvey was responsible for the non-fatal shooting of Lamarr Tucker outside the Mirage nightclub on June 8, 2013.  On that night, Harvey, Johnson, Brown, and Brown's half-brother Wesley _Jerel_ Brown (then a scholarship football player at the University of Maryland) gathered at Club Mirage to celebrate Brown's birthday.  As they were leaving the club for the evening, Brown got into a fight with another club-goer named Lamarr

Tucker.  As the fight was in progress, Harvey and Wesley Jerel Brown (the football player) drove up in a white Lexus sedan, and Harvey shot Tucker in the chest.  Brown (the defendant) subsequently told multiple individuals that Harvey had shot Tucker outside the club.

There is also evidence, including co-conspirator statements and jail calls, establishing that during the summer of 2013, Harvey participated in an attempted shooting of Jones in retaliation for Jones' murder of Trevon White, a/k/a "Country," a fellow member of the Greenmount Regime.  On June 4, 2013, Harvey participated in a recorded jail call with Handy, during which he informed Handy that other members of the gang had just killed Willie "Ben" Miller in retaliation for Miller's suspected involvement in White's death.  Harvey told Handy that Miller "had to go" because he "had something to do with" White's murder.

### v.   *Kenneth Jones (a/k/a "Slay," a/k/a "K-Slay")*

Jones, like Hunter, was an original YGF member who committed multiple murders in furtherance of the Greenmount Regime.  His body is covered in BGF tattoos.  As we have discussed, the evidence will show that on January 9, 2007, Jones murdered Gregory Rochester, on orders from Johnson, in a YGF stash house at 221 E. 25th St.  On May 7, 2013, he also murdered Trevon White, a/k/a "Country," in the 200 block of East 22nd Street, using the same 9 mm handgun that was used to shoot Thabiti Wheeler, a neighborhood "hack" driver, in the 300 block of East 22nd Street two months earlier.  W-1 will testify that Jones claimed responsibility for murdering White.  Another witness, W-2, will testify that during and in furtherance of the conspiracy, Joseph Bonds confirmed that Jones had, in fact killed White.  And yet another witness, W-3, will testify that in the days following White's death, Jones accused W-3 of snitching and talking to the police about the murder.

Jones' murder of White set off a chain reaction of retaliatory violence amongst members

of the Greenmount Regime. Following the murder, now-deceased BGF member Sean Gregg, a/k/a "Hood," shot and killed Miller because Gregg believed that Miller had provided Jones with the handgun he had used to shoot White. Several weeks later, Gregg, Harvey, and a third BGF member attempted to shoot Jones (as retaliation for the murder of White) near the intersection of 22nd Street and Guilford Avenue. A witness, W-4, will testify that following the attempted shooting, Jones mistakenly believed that a fourth BGF member, Lamontae Smith, a/k/a "Chop," had participated in the attempt on his life.

Jones retaliated against Smith by shooting him in the 300 block of East 24th Street on October 5, 2013. Smith has testified in open court that Jones was the person who shot him. Following the shooting, Jones participated in a series of recorded jail calls in which he instructed an individual named Lavon Cypress, a/k/a "Swan," to dispose of the .45 caliber handgun he had used to shoot Smith. On December 12, 2013, with Cypress's assistance, BPD officers recovered the firearm from a residence located in east Baltimore.

### vi. _Kenneth Faison (a/k/a "Roscoe")_

Faison is Gerald Johnson's younger brother. Like Johnson, he was an original member of YGF, with significant involvement in drug dealing, robberies, and other violent crimes. He has the numbers "276"—the alphanumeric characters for BGF—tattooed on his hand. During the execution of the search warrant at 1716 Latrobe Street on April 26, 2013, BPD recovered a letter written by Faison to McCants while McCants was in jail, that begins with the salutation, "Eusi Gyeedi Jamaa," Swahili for "Black Guerilla Family."

The evidence will show that Faison participated in approximately nine armed robberies between 2006 and 2012. These include three armed robberies in a single night, all committed on the same block of Barclay Street in 2010. In January 2015, Faison pled guilty to first-degree

assault charges in connection with two of the robberies.  There will also be evidence that in the fall of 2012, Faison and a co-conspirator directed a BGF member from East Baltimore to rob a neighborhood drug dealer at gunpoint.  After the drug dealer attempted to retaliate, Faison and Johnson participated in an unsuccessful attempt on the drug dealer's life.

With respect to Faison's drug activity, the evidence will show that he packaged and sold narcotics for Johnson on an everyday basis between 2005 and early 2007.  Towards the end of 2007, Faison, Hunter, and a third individual were arrested in possession of a distribution quantity of cocaine.  On October 31 2012, Faison distributed cocaine in the 300 block of East Lanvale Street.  Two months later, he and a co-conspirator were found in possession of marijuana and a loaded .45 caliber handgun.

vii. *Joseph Bonds (a/k/a "Joe," a/k/a "Yo Gotti")*

Bonds was an original member of YGF.  Multiple witnesses will testify that he was a member of the Greenmount Regime.  In 2011, investigators recovered a photograph of Bonds and Hunter posing together, each crossing his arms to make an "X," a BGF symbol, while wearing t-shirts bearing the name and likeness of George Lester Jackson, a co-founder of BGF.

The evidence will show that Bonds packaged and sold drugs for Johnson on a nearly everyday basis, and that he regularly participated in gang meetings at the 25th Street stash house during the early days of YGF.  In the spring of 2008, Bonds and fellow BGF member Jesse Tate were arrested in the gang's territory with distribution quantities of cocaine.  In the fall of 2013, Bonds was arrested with a loaded .357 revolver following a traffic stop by a BPD detective.  He pled guilty to possessing the revolver, and admitted to being a member of BGF, in October 2015.

As we have discussed, in July 2005, Hunter shot and killed Dante Jordan using a .32 caliber revolver belonging to Bonds.  Following the murder, Hunter attempted to return the revolver to

Bonds, but Bonds refused, saying Hunter would need to keep it on him because he had just killed someone.  A few days later, Bonds agreed to take the revolver back from Hunter.  He later used the revolver during multiple armed robberies in late 2006 and early 2007.

> viii.   _Norman Handy (a/k/a "Lil Norm," a/k/a "Norm)_

Handy was a younger, post-YGF member of the Greenmount Regime.  As discussed above, he is Wesley Brown's half-brother.  Multiple witnesses will testify that Handy was a member of the gang.  Handy has multiple BGF tattoos, including one bearing the numbers 2-7-6.

As noted previously, Handy and a second individual robbed Moses Malone at gunpoint near the intersection of Greenmount Avenue and 25th Street on March 23, 2013.  During the robbery, Handy shot Malone in the foot with a .380 caliber handgun.  In the weeks following the robbery, Malone gave a recorded statement and completed a photo array in which he identified Handy as the person who robbed and shot him.  Malone also made similar statements to at least three civilian witnesses.  The government will present evidence of these statements at trial pursuant to Fed. R. Evid. 804(b)(6).

The evidence will show that Handy participated in other armed robberies in furtherance of the Greenmount Regime.  In January 2010, for example, he and Faison participated in an armed home invasion robbery in the 2100 block of Barclay Street.  During the robbery, Faison brandished a firearm and threatened to kill the victim while Handy attempted to steal the victim's X-Box.  Similarly, in October 2013, Handy and a now-deceased accomplice robbed two victims in the 300 block of East Lafayette Avenue.  Handy pled guilty to that robbery in October 2015.

There will also be evidence that Handy, along with Harvey and other gang members, routinely sold narcotics, including cocaine and marijuana, for Johnson.  In August 2010, Handy admitted that he sold drugs to support himself during a voluntary interview with detectives.

ix. _Marquise McCants (a/k/a "Digga")_

McCants was a younger, post-YGF member of the Greenmount Regime with close ties to Brown, Handy, and now-deceased BGF member Sean Gregg.  Multiple witnesses will testify that he was a member of the gang.  McCants has multiple BGF tattoos, including two bearing the numbers 2-7-6; one depicting a Gorilla; and another bearing the name and likeness of George Lester Jackson.

As discussed in more detail in Section III.X, in November 2016, federal investigators attempted unsuccessfully to arrest McCants following the superseding indictment in this case.  In February 2017, while still a fugitive, McCants shot Gregory Bess seven times in the legs and back using a .40 caliber handgun in the 400 block of East North Avenue.  Following the shooting, investigators arrested McCants at a home in northeast Baltimore, from which they later recovered the handgun he had used to shoot Bess.

There will also be evidence that McCants committed multiple armed robberies.  For example, on May 17, 2008, McCants and two accomplices robbed Michael Perlman at gunpoint in the 2900 block of Hargrove Alley.  Approximately two years later, McCants and an accomplice committed an armed home invasion robbery in Elkton, Maryland.  McCants pled guilty in that case to one count of first degree assault.

Like the other defendants, McCants distributed narcotics in furtherance of BGF, as evidenced by wiretap recordings and drug paraphernalia seized following his arrest in February 2017.  Further, in July 2014, McCants and another individual possessed with intent to distribute 120 grams of marijuana inside the Western Correctional Facility in Cumberland, Maryland.  Similarly, in May 2016, McCants exchanged a series of text messages with Gregg, his fellow BGF member, in which he agreed to provide Gregg with a quantity of "Blueberry Kush" marijuana.  In

his initial message to Gregg, McCants noted that he had paid $300 for the marijuana.  He then made clear that he was providing the marijuana to Gregg on consignment and that he expected to be paid back.  "[J]ust give me my 300 back," McCants wrote.  He then warned Gregg, "don't fuck up ya money."

### III.    ARGUMENT

#### a.  Motions for Severance by Kenneth Faison (ECF 179), Kenneth Jones (ECF 192), Marquise McCants (ECF 201), and Gerald Johnson (ECF 217)

Defendants Faison, Jones, McCants, and Johnson have moved to sever their trials.  All four argue that a joint trial would be prejudicial because of the length of the alleged conspiracy and different degrees of culpability among defendants.  Faison claims he should be severed because he is not alleged to have participated in any overt acts in furtherance of the racketeering conspiracy after he was locked up in 2012.  McCants argues that the government improperly joined a count charging him with an attempted murder that post-dates the racketeering conspiracy, and that joinder may deprive him of the exculpatory testimony of a co-defendant.  McCants and Jones also allege potential *Bruton* problems.  For the reasons stated below, these motions should be denied.

When defendants are properly joined under Federal Rule of Criminal Procedure 8(b), as in this case, severance under Federal Rule of Criminal Procedure 14 is justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States,* 506 U.S. 534, 539 (1993).  The party moving for severance must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal."  *United States v. Reavis,* 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted), *cert. denied,* 515 U.S. 1151 (1995).  Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to

the district court's sound discretion.  *Zafiro*, 506 U.S. at 538.

It is well-settled that there is a preference in the federal system for joint trials of defendants who are indicted together.  *Id.* at 537.  Indeed, the Fourth Circuit has held that "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy."  *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir.) (internal quotations omitted), *cert. denied*, 506 U.S. 926 (1992).  Specifically, courts have recognized that severance creates an unnecessary burden and inefficiency for the court, the government, and the witnesses, by requiring the presentation of the same case on multiple occasions.  As a result, claims of potential prejudice generally are addressed through limiting instructions rather than severance. *See Zafiro*, 506 U.S. at 539; *United States v. Hayden,* 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

### i.   *The Defendants in this Case Were Properly Joined.*

As an initial matter, it is important to note that the defendants in this case were properly joined pursuant to Federal Rule of Criminal Procedure 8(b). Specifically, the defendants are all charged in the same racketeering conspiracy and drug trafficking conspiracy and therefore plainly "are alleged to have participated in . . . the same series of acts or transactions constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Indeed, a case involving a single conspiracy is precisely the type of case in which co-conspirators should be tried together, since much of the evidence presented by the government in its case-in-chief will pertain to all defendants.  *See, e.g., Zafiro,* 506 U.S. at 537–38; *United States v. Akinkoye,* 185 F.3d 192, 197 (4th Cir. 1999), *cert. denied,* 528 U.S. 1177 (2000) ("Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly.").  Accordingly, the presumption in this case is that all of the defendants should be tried together.

ii.   *A Joint Trial Will Not Prevent any Defendant from Receiving a Fair Trial.*

A district court should grant a severance under Rule 14 only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539.   There is no such risk in this case.   None of the defendants allege irreconcilable defenses such that one defendant's claim of innocence depends upon a co-defendant's guilt.   *See id.* at 538.   The defendants are roughly evenly matched in terms of their culpability; all are all are alleged to have committed both drug trafficking offenses and violent crimes.   Although the defendants played slightly different roles in the charged conspiracy, any risk of prejudice from perceived differences in their levels of relative culpability can be resolved by "less drastic measures [than severance], such as limiting instructions." *Zafiro,* 506 U.S. at 539; *see also United States v. Brugman*, 655 F.2d 540, 543 (4th Cir. 1981) ("The language of Rule 8(b) assumes certain evidence may be admitted against one defendant not necessarily applicable to another."); *United States v. Baker,* 10 F.3d 1374, 1388 (9th Cir. 1993) (finding no prejudice despite differences in culpability), *cert. denied,* 513 U.S. 934 (1994).

Although Faison complains that the indictment does not allege his involvement in any overt acts in furtherance of the racketeering conspiracy after he was incarcerated in 2012, he does not argue that he *withdrew* from the conspiracy in 2012.   Nor can he: at trial, the government will present evidence in the form of jail calls, jail mail, social media posts, text messages, and cooperator testimony, showing that Faison's membership in the racketeering conspiracy continued up until the date of the indictment.   In essence, Faison's complaint amounts to an argument that he will be prejudiced because there is more evidence against his co-defendants than against him.   But there is no right to severance merely "because the evidence against one defendant is not as strong

as that against the other." *Akinkoye,* 185 F.3d at 197 (citing *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir.), *cert. denied*, 505 U.S 1228 (1992)).  A cautionary instruction to the jury that certain evidence can be considered only as to certain defendants is the appropriate way in which this Court should address these types of issues.  *Zafiro,* 506 U.S. at 538–39.

### iii.   *An Insufficient Showing Has Been Made Regarding the Need for a Codefendant's Testimony at Trial.*

McCants contends that severance is necessary because it is possible that a co-defendant would be willing to provide exculpatory information if subpoenaed to testify at his severed trial, but would be unwilling to do so at a joint trial.  Under the governing law, this argument, too, must fail.

The Fourth Circuit has definitively held that a defendant's attempt to have his trial severed from that of a codefendant "is far less likely to succeed when the request is based on the asserted need for a co-defendant's testimony."  *United States v. Reavis,* 48 F.3d 763, 767–68 (4th Cir. 1995), *cert. denied,* 515 U.S. 1151 (1995).  Specifically, when a motion to sever is based on the alleged need for a codefendant's testimony, a defendant must show: (1) a bona fide need for the testimony of his codefendant; (2) the likelihood that the codefendant would testify at a second trial and waive his Fifth Amendment privilege; (3) the substance of the codefendant's intended testimony; and (4) the exculpatory nature and effect of such testimony.  *Id.* (citations omitted).  The second element of this test is not met when an offer to testify is conditioned on the codefendant's case being tried first.  *United States v. Parodi,* 703 F.2d 768, 779 (4th Cir. 1983).

In this case, McCants has not even attempted to meet his burden of showing that he needs a co-defendant's testimony, that any co-defendant would in fact provide exculpatory testimony at trial, or that the co-defendant would not invoke his Fifth Amendment privilege not to testify.  Accordingly, this Court should reject that argument as a reason for any severance in this case.

iv. _Any Bruton Problem Can Be Addressed in Ways Less Drastic than Severance._

The defendants also contend that severance would be required if the government were to violate the Confrontation Clause of the Sixth Amendment, as construed in _Bruton v. United States,_ 391 U.S. 123 (1968), by introducing the testimonial confession of a non-testifying defendant that directly implicates another defendant in wrongdoing. _See_ ECF 201, at 10–11. The defendants have not identified any such confessions, and the government is not aware of any. To the extent the government seeks to admit any such confessions, it will do so by calling the confessor to the witness stand.

In any event, the proper remedy for a potential _Bruton_ violation is not to sever the trials of the defendants, but instead to edit or redact the testimonial statement in order to eliminate the Confrontation Clause problem. As the Supreme Court held in _Richardson v. Marsh,_ 481 U.S. 200, 211 (1987), the Confrontation Clause is not violated when a non-testifying codefendant's confession is redacted to eliminate any reference to the other codefendant's existence. Moreover, the Supreme Court has specifically held that there is no Sixth Amendment violation unless the confession sought to be introduced contains "facially incriminating statements," rather than merely statements which become incriminating when linked to other evidence. _Richardson,_ 481 U.S. at 208–09; _see also United States v. Akinkoye,_ 185 F.3d 192, 197–98 (4th Cir. 1999), _cert. denied_ 120 S.Ct. 1209 (2000) (finding that when a non-testifying codefendant's statement is redacted and read into evidence such that the statements do not refer to the existence of the defendant, severance is not required).

v. _There Exists No Basis on Which to Sever any Count Charging McCants with Attempted Murder._

Additionally, McCants alleges that a _count_ charging him with the attempted murder of

Gregory Bess on February 4, 2017 (while McCants was a fugitive in this case) should be severed for trial.  As a threshold matter, this challenge is not ripe for adjudication because the government has not yet charged the attempted murder.  In fairness, though, the government anticipates that the grand jury will return a Second Superseding Indictment in the near future that extends the dates of the racketeering and drug trafficking conspiracies to encompass new criminal activity, including the attempted murder.  Because the issue will be ripe for adjudication by the time of the motions hearing, we address it now.

The federal rules permits the joinder of separate offenses where "the offenses charged . . . [1] are of the same or similar character or [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  Rule 8(a) "premit[s] very broad joinder" because of the efficiency in trying the defendant on related counts in the same trial.  *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003).  Joinder of various offenses for trial is proper, even when those offenses do not literally constitute a single scheme or plan, so long as they are similar in character and "logically related to one another."  *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005).  For example, the Fourth Circuit has approved of the joinder of a drug conspiracy count and a felon-in-possession-of-a-firearm count, even where the firearm possession was not literally part of the same scheme or plan as the drug conspiracy.  *See United States v. McLaurin*, 764 F.3d 372, 385–86 (4th Cir. 2014); *United States v. Rhodes,* 32 F.3d 867, 870–72 (4th Cir. 1994), *cert. denied*, 513 U.S. 1164 (1995).

Here, the government's position is that the attempted murder was committed during and in furtherance of the racketeering conspiracy and the drug trafficking conspiracy charged in Counts One and Two and, therefore, is properly joined as "part of a common scheme or plan."  Fed. R. Crim. P. 8(a).  The attempted murder was committed at the intersection of Greenmount Avenue

and North Avenue—the heart of the BGF Greenmount Regime's territory—following discussions between McCants and another a ranking member of BGF.  Further, the attempted murder is certainly "of the same or similar character" as, and "logically related to," the other violent crimes, firearms offenses, and drug offenses charged in the indictment.  *Id.*; *Cardwell*, 433 F.3d at 387.  And McCants has not provided any reason why its joinder would prejudice him.  *See United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995) (severance of properly joined counts requires showing of "clear prejudice").  Thus, the need for judicial economy dictates that the attempted murder be tried with the other counts, and, at most, a cautionary instruction be given so that the jury is made aware of what evidence it may consider as to each count.

### b.  Motions to Suppress Evidence and Statements

### i.  Motion to Suppress Fruits of Search Warrant Executed at 2204 Guilford Avenue on May 31, 2006, by Kenneth Jones (ECF 190)

Jones moves to suppress the fruits of a search warrant executed at his residence at 2204 Guilford Avenue, Baltimore, Maryland, on May 31, 2006.[6]  The warrant was part of an unrelated investigation into the robbery of a street vendor.  The only evidence recovered from the residence was the property that had been taken from the victim.  The government does not intend to present evidence of this robbery or the fruits of the May 31, 2006 search warrant as part of its case.  Accordingly, this motion should be denied as moot.

### ii.  Motion to Suppress Fruits of Warrantless Arrest and Search of Kenneth Jones on April 11, 2011, by Kenneth Jones (ECF 194)

#### 1.  *Relevant Facts*

On April 11, 2011, Detective Austin Sailor[7] was working in plainclothes attire and

---

[6] Jones' motion papers mistakenly state that the warrant was executed on June 1, 2006.

[7] At the time, Detective Sailor was a member of BPD's Violent Crime Impact Division (VCID).

operating an unmarked vehicle traveling westbound in the 900 block of E. North Avenue.  While stopped at a red light at the intersection of E. North Avenue and Homewood Avenue, he observed several black males and a black female involved in a raucous physical altercation in front of 906 E. North Avenue.  After passing through the intersection, he heard several gunshots ring out from the location where he had observed the altercation.

Detective Sailor used his police radio to advise other units that a discharging had just occurred in the vicinity of E. North Avenue and Homewood Avenue.  He quickly made a U-turn in the 700 block of E. North Avenue.  As he was traveling back toward the 900 block of E. North Avenue, he observed a black male, later identified as the defendant, Kenneth Jones, running from the direction of the gunshots.  Jones ran westbound in the 900 block of E. North Avenue and then turned north on Homewood Avenue.  Detective Sailor observed that Jones was holding his waist area with his left hand, behavior that he knew to be characteristic of an armed person.  He pulled his vehicle alongside Jones in the 1900 block of Homewood Avenue, exited, and drew his service weapon.  Seeing the officer, Jones yelled, "Don't shoot!  I have a gun!"  Detective Sailor ordered Jones to put his hands on his head and lay on the ground.  Jones immediately complied.  Detective Sailor then used his police radio to advise other units that he was with a suspect armed with a gun. He asked Jones where the gun was, and Jones replied "my leg" and moved his left leg, indicating that the gun was concealed there.

At that point, backup units arrived, and another police officer secured Jones using Detective Sailor's handcuffs.  While patting Jones down, Detective Sailor felt a bulge consistent with a gun in the shin area of his left pants leg.  Because of the size of the gun and the tightness of Jones'

---

(continued from previous page) He is now a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF").

jeans in the area where the gun had lodged, Detective Sailor did not believe he could remove it without risking accidental discharge.  He therefore used a knife to carefully cut open Jones' left pant leg.  Detective Sailor took photographs showing the position of the weapon, and Detective Hayes used latex gloves to remove the gun.  The gun was a black Taurus .357 magnum caliber revolver containing four spent casings and one live round.  While Detectives Sailor and Hayes were removing the gun, Lieutenant Miller arrived on the scene and asked the officers whether this was the shooting suspect who was in custody.  Hearing him, Jones blurted out, "He shot at me first."  Jones was placed under arrest and advised of his *Miranda* rights, and he indicated that he understood them.

2.  *Detective Sailor Had Reasonable Suspicion to Conduct an Investigatory Stop of Kenneth Jones and Search Him for Weapons.*

A police officer may conduct a brief investigatory stop, known as a *Terry* stop, "when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  Once such a stop is conducted, if the officer reasonably believes that the suspect may be armed and dangerous, the officer may conduct a brief pat-down for weapons, known as a *Terry* frisk.  *See Terry*, 392 U.S. at 23.  The level of suspicion required for a *Terry* stop-and-frisk is "less demanding than that for probable cause" and "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  In evaluating the validity of a *Terry* stop, courts consider "the totality of the circumstances."  *Sokolow*, 490 U.S. at 8.  Factors which alone may be "susceptible of innocent explanation" can "form a particularized and objective basis for a stop when taken together."  *United States v. Arvizu*, 534 U.S. 266, 277–78 (2002).  While an officer's "hunch" will not justify a stop, *Terry*, 392 U.S. at 27, courts should "give due weight to common sense judgments reached by officers in light of their experience and training."  *United States v.*

*Perkins*, 363 F.3d 317, 321 (4th Cir. 2004).

Officers conducting a *Terry* stop are authorized to "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). Even a "complete restriction of liberty is valid," so long as it lasts "no longer than necessary to verify or dispel the officer's suspicion." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). Thus, "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest." *Id.* at 1109–10; *see also United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) ("These officers reasonably suspected that Elston was armed and dangerous, and thus did not exceed the limits of a *Terry* stop by drawing their weapons and placing Elston in handcuffs.").

Here, Detective Sailor had a particularized and objectively reasonable basis to believe that Jones was involved in criminal activity and had a weapon on his person. Specifically, Detective Sailor (1) saw Jones running from the scene of a shooting just moments after gunshots rang out, and (2) observed Jones holding his waist area, which his training and experience told him was a sign that Jones was attempting to secure a gun. The Fourth Circuit has routinely affirmed the use of a *Terry* stop and frisk in similar circumstances. *See, e.g.*, *United States v. Black*, 525 F.3d 359, 265 (4th Cir. 2008) (officer had reasonable suspicion to justify *Terry* stop and frisk of a suspect based on location in high-crime area and bulge in suspect's pocket); *United States v. Pittman*, 102 Fed. Appx. 315, 320 (4th Cir. 2004) (*Terry* stop and frisk justified based on nervous behavior and furtive movements of suspect and location in high-crime area where shots had recently been fired).

Jones erroneously classifies his initial detention by Detective Sailor as a full arrest rather than a *Terry* stop. Having reasonable suspicion to believe Jones was armed and dangerous,

Detective Sailor did not exceed the limits of a *Terry* stop by drawing his weapon to protect himself and prevent Jones from fleeing with the weapon. *See Hensley*, 469 U.S. at 235; *Elston*, 479 F.3d at 320. Jones does not allege that his detention lasted longer than was necessary to verify the detective's suspicion that he had a gun. Indeed, upon seeing Detective Sailor emerge from his vehicle with his service weapon drawn, Jones immediately advised Detective Sailor that he was armed. At that point, Detective Sailor unquestionably had reasonable suspicion—and indeed, probable cause—to search Jones' person for the gun he confessed to having. The motion to suppress the gun recovered from Jones' person should be denied.

### 3.   *Kenneth Jones' Statements Were Voluntary and Admissible.*

In order to protect the right granted by the Fifth Amendment that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, U.S. Const. amend. V, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), adopted prophylactic procedural rules that must be followed in custodial interrogations. *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001). In general, any statements elicited from a suspect without first advising the suspect of his rights to remain silent and to counsel are inadmissible in the prosecution's case-in-chief. *Id.* An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). On the other hand, "volunteered statements"—that is, statements "given freely and voluntarily without any compelling influences"—"are not barred by the Fifth Amendment and their admissibility is not affected by" the Supreme Court's holding in *Miranda*. *Miranda*, 384 U.S. at 478.

30

Statements made after a *Miranda* waiver must also be voluntary.   An incriminating statement is deemed involuntary only if the suspect's "will has been overborne" or "his capacity for self-determination critically impaired" by police conduct.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).  "Coercive police activity is a necessary predicate to the finding that a confession is not voluntary."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002).   Examples of coercive police activity include prolonged detention and interrogation without sleep or rest, administration of "truth serums," physical abuse, and threats of physical abuse.  *See Cristobal*, 293 F.3d at 140.

In this case, the admissibility of Jones' statements is not a close question.  Jones' first statement—"Don't shoot! I have a gun!"—was made before he was in police custody, and was not in response to police interrogation.  Rather, it was an unprompted exclamation that is admissible even in the absence of *Miranda* warnings.  *See Innis*, 446 U.S. at 301–02; *Miranda*, 384 U.S. at 478.  Jones' second statement—"He shot at me first"—although made while Jones was in police custody, was also a "volunteered statement" unprompted by police interrogation.  *See Miranda*, 384 U.S. at 478; *Innis*, 446 U.S. at 301.  Lieutenant Miller's question to the other officers on the scene was not the type of statement that police should know is "reasonably likely to elicit an incriminating response from the suspect."  *Innis*, 446 U.S. at 301 (conversation between two officers in the defendant's presence was not interrogation for *Miranda* purposes); *cf. United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992) (agent's declaratory statement that a gun was found in the defendant's house was not *Miranda* interrogation).   There is no allegation that Jones' statement was the product of compelling influences, psychological ploys, or even direct questioning.  Accordingly, the motion to suppress Jones' statements should be denied.

iii. **Motion to Suppress Out-of-Court and In-Court Identifications by Government Witnesses, by Kenneth Jones (ECF 193)**

Jones moves to suppress several out-of-court identifications of him by government witnesses on the ground that they were the product of "impermissibly suggestive" photo arrays. Specifically, Jones raises three challenges to the photo arrays: first, Jones was the only person pictured from the Greenmount area of Baltimore; second, Jones was the only person pictured with facial and neck tattoos; and third, each photo identification was preceded by an unrecorded interview with the witness. Jones also moves to preclude the witnesses at issue from identifying him in court at trial, arguing that the suggestive photo arrays fatally tainted any subsequent identifications.

This motion should be denied. The alleged improprieties are either unsupported by the record, or they cannot be characterized as suggestive. Even if the photo arrays fell short of the ideal, the surrounding circumstances indicate that the witnesses' identifications were reliable and were not corrupted by anything the police said or did. We begin with a summary of the legal landscape before turning to Jones' specific challenges.

In general, "[t]he Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). The Supreme Court has, however, recognized a limited due process check on the admission of eyewitness identifications in cases where the police use an identification procedure that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Courts follow a two-step analysis for determining whether identification testimony is inadmissible, *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996), and the defendant bears

the burden of proof at both stages, *United States v. Johnson*, 114 F.3d 435, 441 (4th Cir. 1997). First, the defendant must establish that the identification procedure was impermissibly suggestive. *Manson v. Brathwaite*, 432 U.S. 98, 110 (1977); *Neil v. Biggers*, 409 U.S. 188, 198–99 (1972). Second, the defendant must establish that the suggestive identification procedure rendered the identification unreliable. *Brathwaite*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199.

In evaluating the reliability of the identification, courts are to consider the "totality of the circumstances," including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200. "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances," the identification evidence should be admitted. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012); *see also Brathwaite*, 432 U.S. at 106 (holding that the central question is "whether under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive").

Exclusion of identification evidence is a "drastic sanction" that is "limited to identification testimony which is manifestly suspect." *Harker v. Maryland*, 800 F.2d 437, 443 (4th Cir. 1986). In the only case in which the Supreme Court has held that an identification procedure violated due process,[8] police first arranged a three-man lineup in which the defendant was considerably taller

---

[8] In other cases, the Supreme Court has indicated that lineup procedures were suggestive without reaching the question whether they violated due process. *See Gilbert v. California*, 388 U.S. 263, 269–71 (1967) (discussing lineup that "was conducted in an auditorium in which some 100 witnesses to several alleged state and federal robberies charged to [the defendant] made wholesale identifications of [the defendant] as the robber in each other's presence"); *United States v. Wade*, 388 U.S. 218, 233–34 (1967) (discussing lineup in which it was apparent to the witness that the defendant was the only participant in the custody of the case agent).

than the other two men and was the only person wearing clothing similar to the suspect. *Foster v. California*, 394 U.S. 440, 442–43 (1969). When that did not result in a positive identification, the police allowed a one-on-one confrontation between the witness and the defendant, and then followed it with another lineup in which the defendant was the only person who had participated in the first lineup. *Id.* The Supreme Court held that "[t]he suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify [the defendant]," reasoning that, "[i]n effect, the police repeatedly said to the witness, 'This is the man.'" *Id.*; *see also United States v. Wade*, 388 U.S. 218, 232–33 (1967) (providing, as examples of suggestive identification procedures, those in which "the other participants in a lineup were grossly dissimilar in appearance to the suspect," where "only the suspect was required to wear distinctive clothing which the culprit allegedly wore," or where "the suspect is pointed out before or during a lineup").

Conversely, courts have frequently held that witness identifications were reliable and admissible notwithstanding identification procedures that were unduly suggestive. In *Biggers*, for instance, police called a rape victim to the police station seven months after the incident for a "showup" in which they walked the defendant past the victim and directed him to say the words used by the perpetrator during the crime. 409 U.S. at 194–95. The Court held that notwithstanding the improper showup, the victim's identification was reliable and admissible because she saw her assailant for a considerable period of time under adequate light, provided police with a detailed description of her attacker long before the showup, and had "no doubt" that the defendant was the person she had seen. *Id.* at 200–01. Similarly, in *Brathwaite*, an undercover officer identified a drug dealer from whom he had purchased drugs after viewing a single photograph shown to him by a fellow officer. 432 U.S. at 100–01. Despite the suggestiveness of the procedure, the Court held, the officer's identification was reliable because he viewed the defendant in good light for

several minutes, provided a thorough description of the suspect, and was certain of his identification, which was made only two days later. *Id.* at 114–15; *see also Simmons v. United States*, 390 U.S. 377, 384 (1968) (notwithstanding less-than-ideal identification procedure in which the defendant appeared several times in a series of six photographs, bank tellers' identifications were reliable where they had ample opportunity to view the robber in good lighting, viewed the photographs only a day later, and did not display any doubt in their choice); *United States v. Saunders*, 501 F.3d 384, 390–93 (4th Cir. 2007) (despite unduly suggestive photo array in which defendant's photo "stood out sharply from the others" in lighting and background color and police indicated the array contained the perpetrator, cashier's identification was reliable where he had a good opportunity to view the robber, provided a "generally accurate" description, and confidently identified the defendant two days after the robbery).[9]

---

[9] Although most of the Fourth Circuit cases addressing due process challenges to photo arrays are unpublished, the vast majority have held that the witness identifications were reliable and admissible notwithstanding any suggestiveness in the array. *See e.g.*, *United States v. Jasper*, 8 Fed. Appx. 168, 170 (4th Cir. 2001) (witness' identification was reliable despite less-than-ideal identification procedure in which defendant was the only person pictured with distinctive acne scarring); *United States v. Mabine*, 629 Fed. Appx. 470, 472 (4th Cir. 2015) (witness' identification was reliable where witness had ample opportunity to view the suspect and gave "fairly accurate description" of the defendant prior to viewing the photo array); *United States v. Mack*, 442 Fed. Appx. 881, 882–83 (4th Cir. 2011) (witness' identification was reliable where "eyewitness had a good opportunity to view the shooter at close range and selected [the defendant's] picture from the photo array with confidence less than seven hours after the shooting"); *United States v. Frink*, 328 Fed. Appx. 183, 192 (4th Cir. 2009) (witness' identification was reliable where witness "was able to see [defendant] clearly," witness was "very certain of the identification," and "only two weeks passed between" crime and identification).

 Other challenges have failed at step one of the due process analysis. For instance, the Fourth Circuit has held that identification procedures were *not* unduly suggestive (1) where the witness was shown more photographs of the defendant than any other individual, *United States v. Cunningham*, 423 F.2d 1269, 1271–73 (4th Cir. 1970), (2) where there were "variations in the exposure of the photograph and the color of the [defendant's] shirt," *United States v. Allen*, 576 Fed. Appx. 281, 281–82 (4th Cir. 2014), (3) where the array included only three photographs, *United States v. Hatten*, 69 Fed. Appx. 606, 607 (4th Cir. 2003), and (4) where defendant's photo "had a darker background than the others in the array and was the only photo in which the subject was smiling with a slight head tilt," *United States v. Taylor*, 19 Fed. Appx. 62, 64–65 (4th Cir.

### 1. *The Photo Arrays Were Not Impermissibly Suggestive.*

As a threshold matter, Jones cannot show that the photo arrays were impermissibly suggestive. Jones' first claim—that he was the only person pictured in each array who was from the Greenmount area of Baltimore—is of questionable validity. On their face, the four photo arrays at issue provide no indication as to where the subjects are from.[10] The only identifying information connected to each photo is a seven-digit Maryland state identification or "SID" number. Even if it were true—and somehow evident from the photo arrays—that Jones was the only subject from the Greenmount area, there is no reason to believe that a witness would be more likely to pick him out simply because he lived in the neighborhood where the crime allegedly occurred, particularly given that the other subjects in the photo arrays were also arrested for crimes committed in Baltimore. The Second Circuit rejected a similar challenge in *United States v. Concepcion*, holding that "[a]n array is not unduly suggestive merely because legends on the pictures reveal that the defendant was arrested in one borough [of New York City] and the other persons were arrested in another." 983 F.2d 369, 378–79 (2d Cir. 1992); *see also United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984) (holding that a bank teller was not more likely to pick the defendant out of photo array simply because the caption indicated he was arrested in Manhattan, where the crime occurred, and the others were arrested in adjacent boroughs). Here, as in *Concepcion* and *Archibald*, all the subjects in the photo arrays were arrested in the same city, and

---

(continued from previous page) 2001).

[10] Jones purports to challenge a fifth photo array that the government has not yet produced in discovery because it is protected by the Jencks Act. *See* ECF 193, at 2 & n.2. The admissibility of the witness's identification is not ripe for adjudication on the current record given that neither the witness's identity nor the photo identification procedure is in evidence. The government respectfully submits that this challenge should be litigated once the photo array is produced with the other Jencks material, two weeks before trial.

due process did not require the police to limit their selection to a smaller geographic area.[11]

Jones' second claim—that he was the only person pictured with facial and neck tattoos—is not supported by the record.  In the photo array shown to Christopher Meadows on June 11, 2007, Jones himself does not have any facial or neck tattoos, at least none that are clearly visible. *See* Ex. 1 (C. Meadows Photo Array).  In the photo array shown to Angelique Petty on April 12, 2011, at least three of the subjects besides Jones have visible facial tattoos.  *See* Ex. 2 (A. Petty Photo Array).  In the photo array shown to Alexis Roberts on October 16, 2013, Jones' tattoos are barely visible, and two other subjects appear to have face and/or neck tattoos.  *See* Ex. 3 (A. Roberts Photo Array).  Finally, in the photo array shown to Lamontae Smith, a/k/a "Chop," on October 25, 2013, Jones is one of two subjects with neck tattoos visible in profile.  *See* Ex. 4 (L. Smith Photo Array).

In any event, there is no evidence that any witness described the perpetrator as having face or neck tattoos prior to viewing the photo array, and therefore no reason to believe that the presence of face or neck tattoos was a decisive factor in the witnesses' identifications.  *See Rea v. Arizona*, 944 F.2d 909 (9th Cir. 1991) (holding that pretrial photo array was not unduly suggestively merely because the defendant was the only person in the photo array with a neck tattoo, given that "[t]he witness had identified [the defendant] and had informed the police of her selection before recalling that the robber may have had a tattoo on his neck"); *Campbell v. Lazaroff*, 2016 WL 6876299, Slip Copy at *2 (N.D. Ohio July 19, 2016) (where the defendant "offered no evidence indicating that either [witness] ever informed the police that the suspect had tattoo markings on his neck prior to

---

[11] Indeed, the more tightly the geographic area is circumscribed, the less effectively the police will be able to group the suspect with other subjects who are similar in physical appearance—a more important due process concern.

viewing the photo array, the photo array cannot reasonably be deemed unduly suggestive for including only one individual with visible tattoos").  A dissimilarity between the suspect and the other subjects in a photo array cannot be considered suggestive unless the witness is aware that the distinctive trait has some significance in the context of the crime.  *Cf. Wade*, 388 U.S. at 232 (finding fault with an identification procedure "where the perpetrator of the crime was known to be a youth, [and] a suspect under twenty was placed in a lineup with five other persons, all of whom were forty or over").  Here, the subjects in each photo array were remarkably similar to Jones in terms of complexion, hair style, age, and build, and Jones' complaint about the variation in tattoos is mere nitpicking.  As the Second Circuit pointed out in *United States v. Bubar*, "[t]he due process clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility."  567 F.2d 192, 199 (2d Cir.), *cert. denied*, 434 U.S. 872 (1977); *see also United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir. 1998) ("A lineup of clones is not required.").

Finally, Jones' third claim—that each photo array was preceded by an unrecorded interview with the witness at issue—is a nonstarter.  Jones stops short of claiming that the police engaged in any improper conduct while off-camera, and there is no evidence to support such a claim.[12]  To the contrary, three of the witnesses at issue—Christopher Meadows, Alexis Roberts, and Lamontae Smith—had already identified Jones by name ("Kenny" or "Slay") on their own initiative before being shown the photo arrays.  *See* Ex. 5 (Tr. of C. Meadows Interview, June 11,

---

[12] Jones insinuates that there was some irregularity, but in fact it is customary for police converse with a witness before pressing the "record" button, if only to advise the witness of the purpose of the interview, determine whether the witness has relevant information, and obtain the witness' consent to be recorded.

2007), at 2 (Mr. Meadows: "Kenny had told me that him and Foo had killed Craig Mack in Jeezy house."); Ex. 6 (Tr. of A. Roberts Interview, Oct. 16, 2013), at 3 (Det. Gaskins: "Okay, um, do you know—who did you see shoot Chop?"  Ms. Roberts: "Slay."); Ex. 7 (Tr. of Lamontae Smith Interview, Oct. 25, 2013), at 3 (Det. Landsman: "Did you know [the shooter]?" Mr. Smith: "Yeah." Det. Landsman: "Who was it?"  Mr. Smith: "Slay.").  In addition, two of the witnesses— Christopher Meadows and Angelique Petty—confirmed during their recorded interviews that they picked Jones out of the array without any help from the police.  *See* Ex. 5, at 6 (Det. Lloyd: "Were you told as to who to pick?"  Mr. Meadows: "No, sir."); Ex. 8 (Tr. of A. Petty Interview), Apr. 12, 2011, at 14–16 (Q: "We did not help you to pick him out?" Ms. Petty: "No."  Q: "You picked him out because he is the person who shot Perry?"  Ms. Petty: "All by myself, yes.").[13]  There is no evidence that the police attempted to influence any of the witnesses to finger a particular suspect, and Jones has not come close to carrying his burden of proof in showing that the photo arrays were impermissibly suggestive.

## 2.  *In Any Event, the Witness Identifications Were Reliable.*

Even if the photo arrays were suggestive in certain respects, the witnesses' identifications were unquestionably reliable when considering the totality of the circumstances.  All four witnesses had ample opportunity to view the perpetrator at the time of the crime (or, in Meadows' case, the confession to the crime), and all four confidently identified Jones as the triggerman.  *See* Ex. 5, at 2–4 (recounting in detail a face-to-face conversation with Jones in which Jones confessed

---

[13] As Jones points out, Petty later recanted her testimony at his trial in May 2016, claiming, in direct contradiction to her recorded statement in 2013, that she did not see who shot Perry Johnson, that she had been told by the police that she "had to pick somebody" from the photo array, and that she chose Jones' photo at random.  *Maryland v. Kenneth Jones*, Trial Tr., May 24, 2016, at 54. Although her recantation is certainly evidence the jury is entitled to consider, and it lessens the probative value of her identification, it cannot be said to have retroactively rendered the photo array impermissibly suggestive.

to the Gregory Rochester murder); Ex. 6, at 11–14 (explaining that, although it was dark, street lights and a full moon illuminated the scene, and she recognized "Slay" as the person who was shooting at "Chop"); Ex. 7, at 3–5 (indicating that he was familiar with "Slay" from the neighborhood and was able to recognize his attacker); Ex. 8, at 3, 15 (explaining that the shooter "got real close to us," and stating she was "positive" the person in the photo array was him).   In each case, not much time passed between the crime and the identification.   *See* Ex. 5 (roughly five months); Ex. 6 (eleven days); Ex. 7 (twenty days); Ex. 8 (one day).

Most importantly, three of the four witnesses—Meadows, Roberts, and Smith—were familiar with Jones from previous encounters and were able to identify him by name *prior* to viewing the photo arrays.  *See* Ex. 5, at 4 (explaining that he had known "Kenny" for "about three years now" and that, as fellow members of YGF/BGF, they "consider each other as family"); Ex. 6, at 6, 11 (explaining that she had known "Slay" for "like seven years"); Ex. 7, at 4–5 (explaining that he knew "Slay" and was "close" with fellow BGF member Travon White, a/k/a "Country," whom Slay was rumored to have killed).   The fourth witness, Petty, had not encountered Jones before, but she was able to provide a detailed and accurate description of him prior to picking him out of the array.   Ex. 8, at 5–6 (describing a chubby, black male, about 5 foot 7 inches tall and 180–190 pounds, with a light mustache and chin hair, medium to dark brown skin, approximately 25 to 26 years of age, wearing a white t-shirt and blue jeans).

The Fourth Circuit has consistently held that witness identifications are reliable despite suggestive photo arrays in cases where the witness is familiar with the suspect based on prior encounters.  *See, e.g.*, *United States v. Van Harris*, 515 Fed. Appx. 204, 206–07 (4th Cir. 2013) (unpub.) (witness' identification was reliable where the witness "was familiar with the Defendant from prior incidents" and "was able to describe the Defendant's physical characteristics and

provided the Defendant's first name and address"); *United States v. Garcia*, 598 Fed. Appx. 861, 862 (4th Cir. 2015) (unpub.) (witness' identification was reliable where witness "had multiple opportunities to familiarize himself with [the defendant's] appearance" and was certain of his identification); *United States v. Simmons*, 380 Fed. Appx. 323, 329 (4th Cir. 2010) (unpub.) (witness' identification was reliable where the witness "was personally familiar with [the defendant]," was able to identify him by name as the perpetrator, and was certain of his identification); *United States v. Hawkins*, 116 F.3d 473 (4th Cir. 1997) (unpub.) (per curiam) (witnesses' identifications were reliable where they were familiar with the defendant from prior encounters).

Here, as in these cases, Meadows, Roberts, and Smith were familiar with the perpetrator and recognized him at the time of the crime, making it highly improbable that they would be led astray by a subsequent photo array, no matter how suggestive.  In a sense, these witnesses had already "matched" the perpetrator to a mental image formed from prior encounters, and the photo arrays were only confirmatory in nature.  Although Petty was not familiar with Jones, her identification bore all the hallmarks of reliability, as she had ample opportunity to view Jones at the time of the shooting, provided an accurate description of his appearance prior to viewing the array, and identified him with certainty just one day after the crime.  *See Biggers*, 409 U.S. at 199–200.  In these circumstances, the identifications were highly reliable, and the evidence should be admitted for the jury to determine its worth in light of any allegedly suggestive police techniques. *See Perry*, 565 U.S. at 239 ("when an 'identification is reliable despite an unnecessarily suggestive [police] identification procedure,' automatic exclusion 'is a Draconian sanction,' one 'that may frustrate rather than promote justice'") (quoting *Brathwaite*, 432 U.S. at 113).

iv. **Motion to Suppress a Series of Recorded and Non-Recorded Calls in November and December 2013, by Kenneth Jones (ECF 195)**

Kenneth Jones moves to suppress a series of recorded jail calls in November and December 2013 in which he instructed an associate named Lavon Cypress to dispose of a firearm that Jones had used to shoot Lamontae Smith, a/k/a "Chop," on October 5, 2013. Jones also moves to suppress what he refers to as an "un-recorded[] call on December 12, 2013 in which Lavon Cypress, at the direction of law enforcement placed a call to Mr. Jones while her [sic] was incarcerated." ECF 195, at 2. Jones argues that a call could not have been made *to* him while he was incarcerated, and that law enforcement officers must have fabricated the story.

Jones misunderstands the evidence. Cypress did, in fact, place an unrecorded call at the direction of law enforcement on December 12, 2013. But the call was not to the defendant. It was, instead, to *Charmaine* Jones—to whom Cypress (falsely) claimed he had transferred the firearm. Law enforcement officers will testify that during the call, Cypress asked for the firearm, and Charmaine Jones replied (sounding confused), "What are you talking about? You have it!" Cypress then admitted that he had lied about giving the firearm to Charmaine Jones, that he was still holding the firearm for the defendant, and that he had hidden it in a family member's house at 4447 Pall Mall Avenue, Baltimore, Maryland. (Cypress's admissions were also memorialized in a recorded interview, which was produced in discovery.) Thereafter, law enforcement officers recovered the firearm, and ballistic analysis confirmed that it was the same firearm the defendant had used to shoot Lamontae Smith on October 5, 2013.

Jones has not put forward any reason for suppressing the recorded or unrecorded calls aside from the mistaken belief that law enforcement officers fabricated evidence. As explained above, no evidence was fabricated, and there is no reason why the government should be prevented from introducing the defendant's recorded jail calls, or presenting testimony of law enforcement officers

42

regarding the unrecorded call between Cypress and Charmaine Jones. This motion should be denied.

> v. **Motion to Suppress Fruits of Search Warrant on 1716 Latrobe Street on April 26, 2013, by Wesley Brown (ECF 227)**

Brown moves to suppress evidence, including drugs, drug paraphernalia, and BGF gang paperwork, recovered from his residence at 1716 Latrobe Street during the execution of a state search warrant on April 26, 2013. ECF 227. He also moves to suppress his post-*Miranda* statement that he was in the rear bedroom on the second floor when police officers entered his home. In support of his motion, Brown argues that the search warrant for his residence was lacking in probable cause. He further contends that he did not receive *Miranda* warnings prior to confirming his location, and that his statement to police officers regarding his location was involuntary.[14]

We begin with Brown's challenge to the search warrant. The Supreme Court has described probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The Court's assessment as to whether probable cause existed should be based on the totality of the circumstances, rather than on the technical or rigid demands of a formulaic legal test. *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990). Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated. *Gates*, 462 U.S. at 241.

Here, the search warrant for Brown's residence was amply supported by probable cause.

---

[14] Brown also moves to suppress evidence recovered from a Samsung cellular telephone that officers found in his bedroom. This telephone has not been examined or downloaded. Thus, Brown's allegation that "[t]he [Samsung] phone was searched absent a warrant," ECF 227 at 2, is incorrect.

It was based in part on information provided by two reliable confidential sources, both of whom told law enforcement that an individual named "Chite," or "Shike," was distributing cocaine and heroin from his residence at 1716 Latrobe Street.  *See* Ex. 9 (Search Warrant Materials, 1716 Latrobe St.), at 9–10.  One of the sources positively identified "Shike" as "Shike White" (an alias we now know Wesley Brown has used in the past).  *Id*. at 9.  The affiants stated that they had encountered "Shike White" on seven or eight occasions during the preceding two months.  *Id*. at 10.  On five of those occasions, "White" told the affiants that his name was Wesley Brown.  *Id*.[15]

The affiants further stated that they had conducted surveillance of Brown's residence on several occasions between April 5 and April 23, 2013.  *Id*.  On three of those occasions, the affiants watched as Brown engaged in hand-to-hand transactions with suspected customers, during which Brown exchanged objects "consistent [with] the size and shape of narcotics" for U.S. currency.  *Id*.  On another occasion, the affiants watched as Brown left his residence and recovered "suspected narcotics" from a fence post next to his home.  *Id*.  On yet another occasion, the affiants watched as Brown left his residence and conducted a hand-to-hand transaction near the intersection of Barclay Street and Pitman Place.  *Id*.

Measured under any standard, this evidence was more than sufficient to establish probable cause.  Indeed, the information provided by the confidential sources, who corroborated one another, was likely enough on its own.  That information was further corroborated by the affiants' own observations, which included multiple instances in which they personally saw Brown engage in suspected drug transactions.  Courts have found that probable cause existed on much weaker evidence than this.  *See United States v. Williams*, 974 F.2d 480, 481–82 (4th Cir. 1992) (upholding

---

[15] The affiants believed at the time that "White" was using the alias "Wesley Brown."  They later determined, however, that the reverse was actually true, *i.e.*, that Brown was using the alias "Shike White."

search warrant for motel room of known drug dealer where motel receipt was sole connection to defendant); *United States v. Monteith*, 662 F.3d 660, 664–65 (4th Cir. 2011) (upholding search warrant for defendants' home on basis of tip from ATF agent and evidence of drug dealing found in defendant's trash).   Thus, Brown's motion to suppress the items recovered from his residence should be denied.[16]

We now turn to Brown's statement.  The record reflects that prior to making his statement, Brown *did*, in fact, receive *Miranda* warnings from BPD Detective Jonathan Hayden.  *See* Ex. 10 (Incident Rpt., Det. J. Hayden), at 2.  Detective Hayden will testify that after he and his colleagues entered Brown's residence and performed a protective sweep, they gathered the occupants of the residence, including Brown, his girlfriend, his mother, and BGF member Tavon Thompson, in the front room on the first floor.  *Id*.  Detective Hayden recalls that Brown was in handcuffs at the time.   At approximately 4:27 a.m., Detective Hayden read *Miranda* warnings to everyone assembled in the room, including Brown.   *Id*. After being advised of their rights, all four individuals, including Brown, verbally confirmed that they understood.   *Id*.  Detective Hayden then requested that all four individuals sign written *Miranda* waivers.  Only Brown's mother, however, was willing to sign the form.  Brown, Carter, and Thompson refused.  Detective Hayden then asked all four individuals where they were located when police officers entered the home.  *Id*. Brown and Carter both responded that they were in the rear bedroom on the second floor.  *Id*.

The Fourth Circuit has held that in order "[t]o effectuate a waiver of one's *Miranda* rights,

---

[16] Assuming, *arguendo*, that the search warrant affidavit for Brown's residence was *not* supported by probable cause, it still contained "sufficient indicia of probable cause so as not to render reliance on it totally unreasonable."  *United States v. Clutchette*, 24 F.3d 577, 582 (4th Cir. 1994) (applying good faith exception and reversing decision to suppress evidence); *United States v. Leon*, 486 U.S. 897, 922 n.3 (1984) (good faith exception applies unless "a reasonably well-trained officer … [should] have known that the search was illegal despite the magistrate's authorization").

a suspect need not utter any particular words." *United States v. Umana*, 750 F.3d 310, 344 (4th Cir. 2014) (quoting *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000)).  Rather, "[a] suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and subsequently is willing to answer questions."  *Id*. at 344 (citing *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996)).  That is exactly what happened here.  Detective Hayden gave verbal *Miranda* warnings to Brown, who.  indicated that he understood his rights before answering Detective Hayden's question as to where he was located when police officers entered his home.  Nothing more is required to establish a valid waiver.

 Further, with regard to Brown's argument that his statement was somehow involuntary, Brown points to no facts suggesting that his "will [was] overborne or [that] his capacity for self-determination [was] critically impaired."  *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc) (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)).  As discussed above, Brown made his statement inside his residence; in the presence of his mother, daughter, and girlfriend; and after receiving verbal *Miranda* warnings from Detective Hayden, which he indicated he understood.  Under these circumstances, Brown's response to a single question by Detective Hayden was in no way attributable to coercive police activity.  His statement is therefore admissible. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary' within the meaning of the Due Process Clause."); *United States v. Wharton*, 2014 WL 3943358 at * 22 (D. Md. Aug. 12, 2014) (Hollander, J.) ("Cases in which courts have found that a defendant's will was overborne are few and far between and universally involve circumstances that scream out for judicial intervention.").

vi. **Motion to Suppress Fruits of May 2013 Tracking Warrant and Subsequent Search of Cell Phone, by Wesley Brown (ECF 221)**

Brown challenges the tracking, seizure, and subsequent search of his cell phone—a white iPhone, assigned call number 443-310-7094—by BPD officers in May 2013.  ECF 221.  Brown contends that BPD did not have probable cause to track his iPhone, or to detain him and seize the iPhone after locating it in his possession.  *Id.* at 1–2.  Brown further contends that federal authorities lacked probable cause to search his iPhone pursuant to a warrant in 2016.  *Id.* at 2.

## 1. *Pertinent Facts*

As the Court is aware, on May 2, 2013, Moses Malone was shot to death in the 600 block of Cokesbury Avenue.  Prior to his death, Malone, a self-identified member of the Bloods gang, had been the victim of a robbery and shooting committed by Brown's half-brother (and fellow BGF member) Norman Handy.  In late April 2013, BGF members discovered that Malone had identified Handy as the person who robbed and shot him.  At the trial of this matter, the government will present evidence, including evidence recovered from Brown's iPhone, establishing that Brown murdered Malone in order to prevent him from testifying in a pending state case against Handy.

In the days following Malone's murder, state investigators interviewed a witness, W-1, who provided information regarding events that he observed on the night of Malone's death.  W-1 recalled that shortly before Malone was killed, BGF member Trevon White (a/k/a "Country") entered his residence and asked to use his cell phone.  W-1 stated that he gave his cell phone to White, and that White placed a call in his presence, during the course of which White said something to the effect of, "the one who got your brother … Cokesbury."  Within minutes, W-1 heard gunshots coming from the area of Cokesbury Avenue.

On May 6, 2013, in an effort to identify who White called on the night of Malone's death, BPD Homicide Detective Raymond Hunter obtained toll records for W-1's cell phone.  The

records showed two outgoing calls, placed minutes before Malone was killed, to a phone assigned call number 443-310-7094.  Based on that information, as well as the information provided by W-1, Detective Hunter determined that the user of the 7094 telephone was likely the person who murdered Malone.

Meanwhile, on the night of May 7, 2013, Trevon White—the BGF member who called the 7094 number on the night of Malone's death—was himself shot to death in the 200 block of E. 22nd St.  At the time, Detective Hunter believed that White may have been murdered as retaliation for his involvement in Malone's death.  Thus, after learning that White had been killed, and fearing that additional retaliation might be imminent, Detective Hunter initiated an exigent circumstances request to AT&T, the service provider for the 7094 telephone.  The request, which was sent on May 9, 2013 by Detective Anthony Cirillo of BPD's Advanced Technical Team, sought subscriber information, call records, and precision location information (*i.e.*, "Mobile Locator" ping alerts, sent by the service provider every 15 minutes) for the 7094 telephone.  Ex. 11 (Exigent Circumstances Request, Target No. 443-310-7094), at 1.  The request included a paragraph describing the exigency that justified seeking information prior to obtaining a court order.  *Id.*

The following day, Detective Cirillo applied for a court order authorizing "the use of a device known as a Pen Register/Trap & Trace and Cellular Tracking Device" pursuant to Md. Code Ann., Cts. & Jud. Proc. § 10-4B-03.  Ex. 12 (Pen/Trap & Trace App., Target No. 443-310-7094).  In his application, Cirillo requested that the court grant an order authorizing BPD to "use a … Cellular Tracking Device … for a period of 60 days," and to:

> ***employ surreptitious or duplication of facilities***, technical devices or equipment to accomplish the installation and use of a Pen Register/Trap & Trace and Cellular Tracking Device, unobtrusively and with a minimum of interference to the service of the subscriber(s) of the aforesaid telephone, ***and shall initiate a signal to determine the location of the subject's mobile device*** on the

> service provider's network or with such other reference points as
> may reasonably be available.

*Id*. at 4, ¶ E (emphasis added).

Detective Cirillo's application also included a statement of probable cause.  *Id*. at 2.  The statement explained that (i) Malone had been murdered; (ii) Detective Hunter believed that Malone had "most likely" been murdered because he was a witness to a non-fatal shooting; (iii) Detective Hunter had identified Trevon White as a co-conspirator who was involved in Malone's murder; (iv) Detective Hunter had obtained toll records for a "confidential informant" on May 6, 2013; (v) Detective Hunter's investigation revealed that White had used the confidential informant's telephone "to call 443-310-7094 to set up the shooting that resulted in the murder of Malone"; and (vi) Detective Hunter believed "that the person utilizing 443-310-7094 is the individual responsible for murdering Moses Malone."  *Id*.  Notably, the statement of probable cause did not refer to any information obtained from AT&T pursuant to the exigent circumstances request initiated by Detective Hunter the previous day.

Later on May 10, the Honorable John Glynn of the Circuit Court for Baltimore City issued an order granting Detective Cirillo's application.  Ex. 13 (Pen/Trap & Trace Order, Target No. 443-310-7094).  In the first paragraph of the order, Judge Glynn expressly found that Detective Cirillo's application was supported by probable cause.  *Id*. at 1.  He thus directed AT&T to provide BPD with information regarding the 7094 telephone, including but not limited to location information, for a period of 60 days.  *Id*. at 1–7 (the 60-day limitation appears at page 2).  The order also authorized BPD to "employ surreptitious or duplication of facilities" and to "initiate a signal to determine the location of the subject's mobile phone."  *Id*.  at 2.  Detective Cirillo then forwarded Judge Glynn's order (by facsimile) to AT&T.  Ex. 14 (Facsimile from A. Cirillo to AT&T, Target No. 443-310-7094).  In the cover sheet for his fax to AT&T, Detective Cirillo stated

as follows: "In reference to File# 1329396 initiated as an exigent please … CONTINUE sending the Mobile Locator Alerts." *Id.* at 1.

On the afternoon of May 14, 2013, two members of BPD's Advanced Technical Team, Sergeant Scott Danielczyk and Detective John Haley, located the 7094 telephone in the 2200 block of Barclay Street.  Ex. 15 (CID/ATT After Action Rpt., Target No. 443-310-7094).  They located the phone initially using the periodic mobile alerts (*i.e.*, "ping" data) that BPD was receiving from AT&T.  They then used a cell site simulator to determine the phone's location with greater precision.  This led to Brown, whom the officers encountered walking southbound on Barclay Street with four other individuals, including Gerald Johnson and Montel Harvey, two of Brown's codefendants in this case.  The officers approached the group, stopped them, and used a hand-held radio frequency detector to determine that Brown was in possession of the 7094 telephone.  Sergeant Danielczyk then seized the phone from Brown's front left pants pocket.   Shortly thereafter, Detective Haley dialed the 7094 number using his BPD cell phone.  As the call was being put through, Sergeant Danielcyzk noted that Haley's BPD phone number was flashing across the screen of the phone he had recovered from Brown, thus confirming that the phone was, in fact, the 7094 telephone.  *Id.* at 2.

Following the recovery of the 7094 telephone, a third officer transported Brown to BPD Homicide, where Brown was interviewed by Detective Hunter and a second Detective, Thomas Jackson.  At the beginning of the interview, which was recorded, Detective Hunter advised Brown of his *Miranda* rights.  Brown initialed and signed a printed *Miranda* waiver form.  He then answered questions by Detectives Hunter and Jackson.  Brown left the police station after the interview, which lasted approximately 26 minutes.

Between May and August 2013, Detective Hunter obtained three state search warrants for

the 7094 telephone.  Due to shortcomings in their technical know-how at the time, however, state investigators were unable to unlock the telephone in order to access and analyze its contents.

Approximately three years later, ATF Special Agent Lisa Christy applied for a new, federal warrant for the 7094 telephone.  In the affidavit supporting her application, SA Christy relied on much of the evidence discussed above, including (i) W-1's statements regarding the phone call from White to the 7094 number on the night of Malone's murder; (ii) the toll records corroborating W-1's statements; and (iii) the recovery of the 7094 telephone from Brown.  Ex. 16 (Search Warrant Materials, White-Colored iPhone), at 3-7.  She also relied on the following: (i) a statement by W-1 that Brown had claimed responsibility for murdering Malone; and (ii) a statement by a second witness, W-2, that in the days following Malone's murder, Brown had asked for W-2's assistance in disposing of a .22 caliber handgun that Brown had used to a shoot a witness who had provided information to law enforcement regarding Norman Handy.  *Id*. at 4-5.  Based on that information, United States Magistrate Judge A. David Copperthite issued a search warrant for the 7094 telephone on August 2, 2017.   ATF agents promptly executed the warrant, and this time, they were able to unlock the 7094 telephone and download and analyze its contents.

## 2. *BPD Had Probable Cause to Track Brown's Cell Phone*.

It is not necessary to decide whether the  tracking of Brown's cell phone on a public street constituted a "search" under the Fourth Amendment.[17]    Assuming, *arguendo*, that the "pinging"

---

[17] Courts have reached different conclusions as to whether such tracking is a "search," and the Supreme Court has not addressed the issue.  *Compare United States v. Skinner*, 690 F.3d 772, 777–78 (6th Cir. 2012) (holding that "pinging" does not qualify as a search, and explaining that where "authorities tracked a known number that was voluntarily used while traveling on public thoroughfares, [the defendant] did not have a reasonable expectation of privacy in the GPS data and location of his cell phone"), *and In re Application of the United States for an Order for the Disclosure of Telecommunications Records and Authorizing the Use of a Pen Register and Trap and Trace*, 405 F. Supp. 2d 435 (S.D.N.Y. 2005) (holding, pursuant to the third party doctrine, that the collection of certain real-time CLSI is not a search), *with Tracey v. State*, 152 So.3d 504,

of Brown's phone, and the use of the cell site simulator to locate his phone, were in fact searches

under the Fourth Amendment, they were amply supported by probable cause.  At the time BPD

officers located Brown's phone—May 14, 2013—they were acting pursuant to an order issued

upon a finding of probable cause by Judge Glynn.  That finding was based on Detective Cirillo's

application, which, as we have discussed, explained the circumstances of Malone's murder, as well

as the information provided by W-1 and corroborating toll records, all of which led BPD to believe

that the user of the 7094 telephone had murdered Malone after learning of his whereabouts from

Trevon White.  That information established (i) probable cause to believe that the 7094 telephone

contained evidence of, and was an instrument used in connection with, the murder of Moses

Malone; and (ii) probable cause to believe that the user of the 7094 telephone had committed that

offense.  In short, given the information set forth in Detective Cirillo's application, Judge Glynn

had "a substantial basis for determining the existence of probable cause."  *Gates*, 462 U.S. at 239;

*United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (quoting *Texas v. Brown*, 460 U.S.

730, 742 (1983)) ("To establish probable cause, the facts presented to the magistrate need only

---

506–07 (Fla. 2014) (defendant had reasonable expectation of privacy in real-time CLSI, even on
public roads), and *In re Application of the United States for an Order Authorizing Disclosure of
Location Information of a Specific Wireless Telephone*, 849 F. Supp. 2d 526 (D. Md. 2011)
(Gauvey, J.) ("[T]he subject here has a reasonable expectation of privacy both in his location as
revealed by real-time location data and in his movement where his location is subject to continuous
tracking over an extended period of time, here thirty days.").

  Similarly, with respect to the use of a cell site simulator, the Maryland Court of Appeals
recently suggested that the use of a cell site simulator may not constitute a "search" where no
physical trespass is involved; where its use is limited in duration; and where it is not used to
identify movements in a private place.  *State v. Copes*, -- A.3d – 2017 WL3205521 at * 16 (Md.
Jul. 28, 2017) (McDonald, J.); *cf. United States v. Patrick*, 842 F.3d 540, 542 (7th Cir. 2016)
(suggesting, without deciding, that the use of a cell site simulator to locate a fugitive for whom
police had a valid arrest warrant on a public street was not a search; noting that fugitive "did not
have any privacy interest in his location"); *but see United States v. Lambis*, 197 F. Supp. 3d 606,
611 (S.D.N.Y. 2016) (holding that use of a cell site simulator *was* a search).

'warrant a man of reasonable caution' to believe that evidence of a crime will be found.").[18]

Further, although Brown has not raised the issue, the government notes that in addition to establishing probable cause, Detective Cirillo's application was "sworn and subscribed to" before Judge Glynn and identified the target telephone with particularity.  Ex. 12, Ex. 13.    When these criteria are met, an "order" issued under a state pen register statute is effectively a warrant for purposes of the Fourth Amendment.  *See Wisconsin v. Tate*, 849 N.W.2d 798, 810 (2014) (order issued under Wisconsin pen register statute functioned as warrant, which allowed police to collect real-time CLSI and use cell site simulator); *Copes*, 2017 WL 3205521 at *19 ("There is a strong—perhaps even conclusive—argument that the order obtained under the [Maryland] Pen Register Statute provided constitutionally-sufficient authorization for use of the cell site simulator."); *United States v. Wilford*, 961 F. Supp. 2d 740, 772–73 (D. Md. 2013) (Hollander, J.) (Maryland pen/trap orders authorizing pinging of cell phones complied with Fourth Amendment's warrant requirement, even though styled as "orders" rather than "warrants").[19]

Ultimately, even if the Court determines that Detective Cirillo's application, and Judge Glynn's ensuing order, did *not* function as a warrant in this case, the Court should nonetheless conclude, as the Maryland Court of Appeals did in *Copes*, that BPD acted in good faith.  Here, as

---

[18]    Assuming, *arguendo*, that the application fell short of meeting this standard, it still contained "sufficient indicia of probable cause so as not to render reliance on it totally unreasonable."  *Clutchette*, 24 F.3d at 582 (applying good faith exception and reversing decision to suppress evidence); *Leon*, 486 U.S at 922 n.3 (good faith exception applies unless "a reasonably well-trained officer … [should] have known that the search was illegal despite the magistrate's authorization").

[19] *Cf. Tracey*, 152 So. 3d 504 (order under Florida pen register statute did not authorize collection of real-time CLSI where applicant *failed* to show probable cause and did *not* seek permission to collect real-time CLSI); *State v. Andrews*, 227 Md. App. 350, 360 (Md. Ct. Spec. App. 2016) (pen/trap order authorizing real-time tracking "failed to meet the requirements of a warrant"), *superseded by Copes*, 2017 WL 3205521 at *19–22.

in *Copes*, BPD officers will testify that "applications for similar orders had been approved 'many, many times." *Copes*, 2017 WL 3205521 at *21. Here, as in *Copes*, the officers "believed that the order allowed them to use a cell site simulator." *Id*. And here, as in *Copes*, "a fair reading" of Judge Glynn's order—specifically, the portion of the order that authorized the employment of "surreptitious or duplication of facilities" and "initiat[ing] a signal to determine the location of the subject's mobile phone"—would "encompass a cell site simulator." *Id*. at *23.

Under these circumstances, the government submits that "none of the reasons identified by the Supreme Court … for discounting law enforcement reliance on an apparently valid warrant apply[.]" *Id*. at *22. Brown has not alleged, nor can he, that Judge Glynn "abandon[ed] a detached and neutral role," or that Detective Cirillo knowingly provided false information. *Leon*, 468 U.S. at 923. Nor is there reason to believe, as we have discussed, that Judge Glynn's order was so lacking in probable cause as to "render official belief in its existence entirely unreasonable," or that it was "facially deficient" with respect to the particularity requirement. *Id*.; *see also Copes*, 2017 WL 3205521 at *22. For these reasons, the Court should determine that the good faith exception applies, and that BPD officers were engaged in "objectively reasonable law enforcement activity" when they used a cell site simulator (and also when they obtained real-time "ping" data for Brown's phone from the service provider) pursuant to an order based on the Maryland pen register statute. *Copes*, 2017 WL 3205521 at *21.

### 3. *BPD Lawfully Stopped Brown and Seized His Phone.*

As we have discussed, by the time Sergeant Danielczyk and Detective Haley approached Brown, Johnson, and three other individuals in the 2200 block of Barclay Street, they had probable cause to believe that the user of the 7094 telephone had murdered a witness and that the phone contained evidence of the crime. They also had used a cell site simulator to determine that

someone in the group was carrying the 7094 telephone. Under these circumstances, the officers had reasonable suspicion, and likely even probable cause, to stop the group on a public street and further deploy the cell site simulator to determine which individual had the telephone. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity *or to maintain the status quo momentarily while obtaining more information*, may be most reasonable in light of the facts known to the officer at the time."). Once the officers determined that Brown had the telephone, they had probable cause to seize the telephone (and even to place Brown under arrest). Based on these facts, the Court should determine that Sergeant Danielczyk and Detective Haley acted reasonably, and did not violate the Fourth Amendment, when they seized the 7094 telephone from Brown. *See Riley v. California*, 134 S. Ct. 2473, 2486 (2014) (law enforcement can seize cell phone to prevent destruction of evidence while seeking a warrant); *United States v. Harris*, 2017 WL 1828945 at *1 (4th Cir. May 5, 2017 (same).

### 4. *The Federal Search Warrant for Brown's Telephone Was Supported by Probable Cause.*

In seeking a federal warrant for the 7094 telephone, SA Christy relied on much of the same information that Detective Cirillo had included in his application to track the telephone in May 2013. That information, which is recited in detail above, established a clear nexus between the 7094 telephone and the murder of Moses Malone. *See* III.b.vi.1, *supra* (citing Ex. 12, at 3–7). In addition, SA Christy's affidavit relied upon statements by W-1 and W-2 indicating that Brown had claimed responsibility for murdering Malone. Ex. 16, at 4–5. That information strengthened an already-ample body of evidence, raising more than a fair probability that Brown had used the 7094 telephone in connection with the murder of Malone. Accordingly, because SA Christy's affidavit was supported by probable cause, the Court should reject Brown's challenge to the search of his

cell phone by federal investigators.[20]

### vii.  Motion to Suppress Wesley Brown's Statement to Law Enforcement Officers on May 14, 2013, by Wesley Brown (ECF 200)

Brown moves to suppress his statements to Detectives Hunter and Jackson during the above-referenced interview on May 14, 2013. The government does not intend, however, to use those statements at trial. The Court should therefore deny Brown's motion as moot.

### viii.  Motions to Suppress Fruits of 2013 State Wiretap, by Gerald Johnson (ECF 216) and Kenneth Jones (ECF 187)

Between August and November 2013, BPD, with assistance from ATF, obtained state wiretap authorization for a series of telephones belonging to multiple targets, including Kelli Massey, the then-girlfriend of Gerald Johnson; and Michael Robinson, a now-deceased member of the BGF Greenmount Regime. The wiretap on Massey's telephone intercepted multiple calls to and from Johnson, who regularly used the telephone to communicate with his confederates. The wiretap of Robinson's telephone intercepted multiple calls between Robinson and Kenneth Jones, who was detained on state charges and speaking with Robinson on a recorded jail telephone at the time.

Johnson and Jones challenge the state wiretaps in separate filings. Johnson argues that the state's initial wiretap affidavit, which was incorporated into its subsequent application for a wiretap on Massey's telephone, failed to establish that normal investigative procedures had been exhausted and therefore that a wiretap was necessary. ECF 216-1 at 1. Jones, by contrast, does not specifically identify which of the state wiretaps he seeks to challenge. ECF 187. Nor does he provide any facts or case-specific arguments to support his assertion that the state wiretaps were

---

[20] Brown also challenges the alleged search of a "flip phone" recovered by BPD officers on May 14, 2013. The government does not intend, however, to use evidence recovered from the "flip phone" at trial. The Court should therefore deny Brown's motion as moot.

illegal.  *Id*.  We address the defendants' arguments below, starting with Johnson's.

> 1. *Johnson Ignores a Wealth of Information in the State's Initial Affidavit, Which Clearly Established that a Wiretap was Necessary Because Normal Investigative Procedures had Been Exhausted.*

"When a state court authorizes a wiretap, state wiretap law should govern the admissibility of evidence in federal court."  *United States v. Bullock*, 2000 WL 84449 at *9 (4th Cir. Jan. 27, 2000) (citing *United States v. Glasco*, 917 F.2d 797, 799 (4th Cir. 1990)); *see also United States v. Willock*, 682 F. Supp. 2d 512, 521 (D. Md. 2010).  Because Maryland law is identical to federal law with respect to exhaustion and probable cause, however, "whether [the Court] analyzes this case under state or federal law is of little consequence."  *Bullock*, 2000 WL 84449 at *4.  Section 10-408 of the Courts and Judicial Procedure Article of the Maryland Code authorizes a wiretap where the applicant shows (i) probable cause to believe that an individual is committing, has committed, or is about to commit an enumerated offense; (ii) probable cause to believe that particular communications concerning the offense will be intercepted; (iii) that normal investigative procedures have been tried and have failed or appear unlikely to succeed or are too dangerous; and (iv) probable cause to believe that the facilities from which the communications are to be intercepted are being used in connection with the offense.  Md. Code Ann., Cts. & Jud. Proc. § 10-408.

Like its federal counterpart, Maryland Section 10-408(c)'s exhaustion requirement was enacted "to make doubly sure that the statutory authority [to wiretap] is used with restraint and only where the circumstances warrant … surreptitious interception."  *Salzman v. State*, 49 Md. App. 25, 32 (Md. Ct. Spec. App. 1981) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)); *see also Willock*, 682 F. Supp. 2d at 523.  "The exhaustion requirement's basic purpose is to assure that wiretapping is not … routinely employed as the initial step in [a] criminal

investigation." *Salzman*, 49 Md. App. at 32.  Thus, an affidavit in support of a wiretap application "must demonstrate … that normal investigative procedures have been tried and failed, or [that] they are unlikely to be successful, or that their use is too perilous to investigators." *Id*.

Importantly, however, law enforcement officers "need not exhaust every conceivable investigative possibility before seeking a wiretap order." *Id*.  Rather, "the exhaustion requirement is to be tested in a practical and common-sense fashion." *Id*.  Although the government cannot show exhaustion through "a mere boilerplate recitation of the difficulties of gathering useful evidence," *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995), the burden on the government is "not great," and "courts should be wary of reading the exhaustion requirement in an overly restrictive manner, lest they unduly hamper the investigative powers of law enforcement agents." *Willock*, 682 F. Supp. 2d at 523 (citing *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994)).

Courts have also found that a proper showing of exhaustion can be more easily made in complex cases, such as this one, in which the goal of wiretapping certain telephones is to identify individuals who are "higher up" in a criminal organization, and who otherwise could not be identified.  *See United States v. Clerkey*, 556 F. 2d 709, 714 (4th Cir. 1977); *United States v. Vargas*, 116 F.3d 195, 197 (7th Cir. 1997); *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1998) (government's affidavit provided sufficient evidence to allow the reviewing court to determine that a confidential informant would not be able to proffer information regarding the upper levels of the target conspiracy).

As we have discussed, Johnson argues that the state's initial wiretap affidavit failed to establish that electronic surveillance was necessary.  ECF 216-1 at 6.  In support of this argument, he focuses exclusively on the nine-page "necessity" section of the state's initial affidavit.  *Id*. at 6–

9.  He critiques this section by briefly addressing some, but not all, of its sub-parts, such as those addressing confidential sources, undercover officers, search warrants, physical surveillance, witness interviews, grand jury subpoenas, CCTV cameras, and the monitoring of suspects' jail calls.  *Id*.  With respect to certain sub-parts, Johnson argues that the state failed to cite sufficient facts in support of its assertion that a particular investigative technique had been exhausted.  *Id*. With respect to others, he contends that the difficulties identified by state investigators commonly arise during investigations of criminal gangs, and that they therefore should not carry weight in the exhaustion analysis.  *Id*. at 8.

The first of Johnson's criticisms—that the state failed to provide sufficient facts to establish the success or failure of a particular investigative technique—is based on an incomplete reading of the state's initial affidavit.  By focusing exclusively on the nine-page section addressing necessity, Johnson conveniently ignores other sections of the affidavit, including sections specifically addressing the use of confidential sources, search warrants, physical surveillance, and the monitoring of suspects' jail calls.  He also ignores facts that undercut his arguments in the necessity section itself.  Those facts demonstrated, in significant detail, why "normal" investigative techniques would not be effective in this case.

For example, with respect to confidential sources, Johnson complains that the state's initial affidavit "gave the authorizing court *no facts* from which that court could determine the scope or sufficiency of investigators' efforts" to use that particular technique.  *Id*. at 7 (emphasis added). But this ignores an earlier section of the affidavit, which appears under the heading "confidential sources."  *See* Ex. 17 (2013 Wiretap Aff., Target Nos. 443-540-9844 & 410-608-5053), at 26–30. In that section, the affiants explained in detail what they had learned from three different sources over a period of roughly 10 months.  *Id*.  They explained, for example, that confidential sources

had provided information about the roles and responsibilities of 12 different members of the BGF Greenmount Regime, including Johnson, Henry Walker, Kenneth Jones, Michael Robinson, William McLaren, Martin Jenkins, Shawn Gregg, Warren Commodore, Norman Handy, Tangier Hitchens, Paul Wilson, and Tavon Thompson. *Id.* Further, in subsequent sections of the affidavit (*e.g.*, the sections addressing communications occurring over the target telephones), the affiants provided detailed summaries of controlled calls by one confidential source, CS-1, to Johnson and McLaren in July of 2013. *Id.* at 45–46.

On page six of his motion, Johnson concedes that "a showing that investigators had, over a period of months, used multiple confidential informants who had failed to obtain [information regarding the upper levels of the BGF Greenmount Regime] despite targeted efforts to do so might be sufficient to demonstrate that this investigatory method was 'unlikely to succeed.'"  ECF 216-1, at 6.  But the "confidential sources" section of the affidavit discussed above—which Johnson ignores—demonstrated precisely that.  It thus provided ample context for the affiants' explanation, on pages 52 and 53 of the affidavit, why the use of confidential sources had been thoroughly exhausted as an investigative tool.  Ex. 17, at 52–53.

Similarly, with respect to undercover officers, Johnson complains that the initial affidavit "failed to provide *any* information from which the authorizing court could determine the scope of this effort[.]"  ECF 216-1, at 7 (emphasis added).  This is incorrect.  In the section addressing undercover officers, the affiants emphasized three important facts.  First, they explained that high-ranking targets typically "refuse[d] to deal with a potential customer without an introduction from a trusted customer," and that none of the state's confidential sources was "in a position in relation to the other TARGET SUBJECTS that would allow for the introduction of an undercover officer/agent."  Ex. 17, at 53.  Second, the affiants explained that they had attempted to use

undercover officers to purchase narcotics from the target subjects on two different occasions, but that neither attempt was successful. *Id.*[21]   Finally, the affiants stated that they had reviewed the criminal histories of the target subjects and their associates, which they had previously referenced in multiple other sections of the affidavit. *Id.* at 54; *see also id.* at 20–26 ("Background of Target Subjects), 32–37 ("Homicides and Shootings").   Based on that review, the affiants determined that given "the amount of violence connected with this group," it was "too dangerous to utilize an undercover investigator to the level necessary to meet the goals of the investigation." *Id.* at 54. These explanations were neither boilerplate nor conclusory.   Rather, they relied on case-specific information that supported the affiants' argument that further use of undercover officers would be unproductive *and* unsafe.   More is not required under the law.

With respect to search warrants, Johnson relies again on the same discredited claim.   He argues that the state's initial affidavit "provided the authorizing court with *no* information from which the judge the scope of investigators' efforts[.]" ECF 216-1, at 8 (emphasis added).   On page 49, however, under the heading "Search Warrants," the affiants explained that they had executed approximately 30 search warrants, over a period of roughly four months, leading to "approximately 40 arrests[,] including arrests of some TARGET SUBJECTS." Ex. 17, at 49.   Surely, the execution of more than seven search warrants a month, for a four-month period, provided the authorizing courts with sufficient information to evaluate the affiants' claim that the execution of search warrants "had done little to … help identify where stash houses are located, the vehicles used in furtherance of CDS trafficking, and the locations of weapons." *Id.* at 54.   Indeed, it is difficult to imagine what more the affiants could have done to establish that the execution of search warrants

---

[21] On the first occasion, the undercover officer purchased narcotics from two individuals, but neither was a member of the BGF Greenmount Regime.   On the second occasion, the undercover officer went to two different locations but failed to purchase any narcotics at all. *Id.*  at 53–54.

would not meet their investigative goals.

Johnson repeats the same mantra with respect to jail calls.  He argues that the state's initial affidavit "did not provide the authorizing court with *any* facts from which the court could judge the likely success of this investigative method."  ECF 216-1, at 8 (emphasis added).  Here again, Johnson hides (or misses) the ball.  Earlier in the affidavit, for five full pages, the affiants summarized a series of jail calls by Wesley Brown, including some to Bria Wright, the user of the targeted A-line.  Ex. 17, at 38–42.  The affiants noted that in one particular jail call, Brown told his brother, "Man … don't even talk about that shit on the phone … that shit is being recorded."  *Id*. at 38.  The affiants then stated as follows:

> Based on their training, experience, and knowledge, your Affiants understand this call to signify that TARGET SUBJECT Wesley BROWN is cognizant and mindful of the fact that his communications over the jail telephones provided to inmates are recorded and monitored.  Your affiants understand that Wesley BROWN and the other TARGET SUBJECTS, armed with this knowledge, will not have overtly explicit conversations about prior or ongoing illegal activities on the recorded line[.]

*Id*. at 41.  This is yet another example in which the affiants provided case-specific information to support their assertion that a particular investigative technique—here, jail calls—"is not practicable or reasonably appears unlikely to succeed."  *Id*. at 59.  Here as well, the affiants showed exhaustion under the law.

Finally, Johnson spends all of two sentences explaining why the affidavit did not show exhaustion with respect to physical surveillance, CCTV cameras, witness interviews, and grand jury subpoenas.  ECF 216-1, at 8.  In addressing these techniques, Johnson claims that the challenges identified by the affiants, *e.g.*, targets engaging in counter-surveillance or knowing the location of CCTV cameras, are "assuredly" present "in *any* investigation of activity like that at issue here."  ECF 216-1, at 8 (emphasis original).  While that may well be true—indeed, most

practiced criminals engage in counter-surveillance—Johnson does not explain why the emergence of a common investigative challenge should not be considered in the exhaustion analysis.  His suggestion to the contrary should be rejected.

In sum, when the state's initial affidavit is considered as a whole, and when the section regarding necessity is read in conjunction with the earlier sections regarding confidential sources, search warrants, and other techniques, it is clear that the affiants explained in detail, using case-specific information, why those techniques would not succeed.  That is all exhaustion requires. Johnson's motion to suppress the 2013 wiretap should therefore be denied.

2.  *Jones Cannot Challenge the Wiretap Because He Did Not Have a Reasonable Expectation of Privacy in His Jail Calls, Which Inevitably Would Have Been Discovered*.

Over four months of wiretaps on eight separate lines, state investigators intercepted only a handful of telephone calls in which Jones participated, all of which were captured on the H-line, which belonged to now-deceased BGF member Michael Robinson.  Notably, during all of his conversations with Robinson, Jones was using a recorded jail phone in the Baltimore City Detention Center, where he was detained pending trial in connection with an attempted murder. When detainees use the jail phone at BCDC, they are advised, before each and every phone call that they make, that their conversations are being recorded.  Under these circumstances, Jones did not have a reasonable expectation of privacy in his jail calls, including his jail calls with Robinson. *See*, *e.g.*, *Lanza v. New York*, 370 U.S. 139, 143 (1962) (in jail setting, "official surveillance has traditionally been the order of the day"); *United States v. Apodaca*, -- F. Supp. 3d – 2017 WL 1435715 at *5 (D.C. Cir. Apr. 21, 2017) (defendants lacked reasonable expectation of privacy in jail calls when put on notice that calls were recorded and monitored); *United States v. Monghur*, 588 F.3d 975, 978–99 (9th Cir. 2009) ("[The defendant] concedes, as he must, that he had no

expectation of privacy in jail telephone conversations that he knew were being monitored by law enforcement."); *United States v. Novak*, 531 F.3d 99, 102 (1st Cir. 2008) (O'Connor, J., sitting by designation) ("Inmates and detainees who have been given notice of monitoring of jail calls have been deemed to have consented to monitoring.").

Based on these authorities, Jones lacks standing to challenge the state wiretap in this case because he cannot show any legitimate expectation of privacy in his recorded jail calls.  *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ("[The] capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in the invaded place.").  And even if he *did* have standing to challenge the wiretap, Jones' jail calls with Robinson inevitably would have been discovered (indeed, they have been discovered) using the Maryland Department of Public Safety and Correctional Services' database of recorded calls by inmates and pretrial detainees.  *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered without the unconstitutional source.").  Jones' motion to suppress the state wiretap should therefore be denied.

ix.  **Motion to Suppress Fruits of Search Warrants Executed on 1520 Madison Avenue and a 2010 Hyundai on November 7, 2013, by Gerald Johnson (ECF 214)**

Johnson moves to suppress drug evidence seized pursuant to a search warrant executed at his residence on the ground that the warrant failed to establish the requisite nexus between his alleged criminal activity and the residence.  He also moves to suppress documents seized from a vehicle belonging to his ex-girlfriend, Kelli Massey, arguing that the statement of probable cause was vague and conclusory.  This motion should be denied.

64

## 1. *Relevant Facts*

On November 6, 2013, BPD Detectives Jon Hayden, Brad Hood, and Frank Golimowski applied for a warrant to search sixteen residences and vehicles, including a residence shared by Johnson and Massey at 1520 Madison Avenue, Apartment 1B, Baltimore, Maryland (the "Madison Avenue Premises"), and Massey's 2010 Hyundai Sonata.  The search warrants were issued by Judge Robert Cooper of the District Court of Maryland for Baltimore City, and they were executed in the early morning hours of November 7, 2013.  Massey was located in the residence at the time of the search, but Johnson was not.  From the bedroom of the dwelling, law enforcement officers recovered numerous baggies containing heroin, cocaine, and marijuana, as well as drug packaging materials such as vials and ziplock baggies.  From the Hyundai Sonata, they recovered Massey's MVA registration, Johnson's Maryland DOC inmate identification card, and a photograph of Johnson.

The affidavit supporting the search warrants described a roughly nine-month investigation led by the ATF and BPD that involved wiretaps on seven phone lines, physical surveillance, arrests and drug seizures, and interviews with numerous witnesses and confidential sources.  *See* Ex. 18 (Search Warrant Materials, 1520 Madison Ave.), at ¶¶ 19–20, *et passim*.  At a high level, the affidavit explained that the investigation had revealed Johnson to be a member of the BGF regime operating in the Greenmount Avenue corridor of Baltimore City who was involved in the distribution of heroin, cocaine, marijuana, and prescription medications, and who had participated in the planning and execution of acts of violence such as murder, robbery, and extortion in an attempt to maintain the dominance of the gang.  *Id.* at ¶ 19.  It also provided the following specific evidence that Johnson was involved in drug trafficking and was unlawful in possession of a firearm:

- on September 2, 2013, Johnson was intercepted in a wiretap call in which an unknown person asked for "nickels"—which the affiants knew to be street terminology for $5 bags of cocaine or marijuana—and Johnson replied that he would "get some," *see id.* at ¶ 21;

- on October 10, 2013, Johnson was intercepted in a wiretap call with BGF member Anthony Hunter in which Johnson asked where he could get "millies"—which the affiants knew to be street terminology for Percocet pills, *see id.* at ¶ 42;

- on October 5, 2013, Massey was intercepted in a wiretap call in which she admonished a female for following Johnson and Massey home the previous night, telling her they thought she was police and that she "almost got shot last night . . . You think we playing—we dead-ass serious," *see id.* at ¶ 22; and

- Johnson was prohibited from possessing a firearm because of a previous felony conviction, *id.*

The affidavit further stated that the Madison Avenue Premises was known to be the "joint," "primary residence" of Johnson and Massey, for two reasons: (1) Detectives Hayden and Hood had observed Johnson and Massey entering and exiting the location on "several occasions," and (2) wiretap calls indicated that Johnson and Massey shared a phone and were often together in the early morning hours. *Id.* at ¶ 21. Finally, the affiants explained that they knew, based on their training and experience in drug trafficking investigations, that "evidence of involvement in the drug trade"—including "CDS, CDS paraphernalia and packaging, diluents [sic] or 'cutting agents,' CDS proceeds, firearms and ammunition"—"is likely to be found where dealers reside." *Id.* at Exhibit 1; *see also id.* at ¶ 10 ("gang members commonly possess . . . in their vehicles, at their residence, and/or inside their 'stash locations' firearms . . . used to protect and secure the traffickers' property"); *id.* at ¶ 14 ("houses and/or apartments within neighborhoods are often utilized as stash houses" for "the storage of drugs and currency").

With respect to the 2010 Hyundai Sonata, the affidavit set forth that Massey and Johnson "ha[d] been observed utilizing a 2010 Hyundai MD Registration 7AF2070 VIN #KMHDU4AD0AU192590 throughout this investigation to transport narcotics to the Greenmount

Avenue corridor.  *Id.* at ¶ 22.  In a later section dealing with a different target residence, the affidavit described one such incident on October 9, 2013.  Specifically, on that date, Johnson was intercepted in a wiretap call with BGF leader Henry Walker, a/k/a "Stimey," during which the two agreed to meet so that Walker could give Johnson an unknown object.  *Id.* at ¶ 46.  Shortly thereafter, Detectives Hood and Smith observed Massey and Johnson in the Hyundai Sonata traveling southbound in the 1700 block of Latrobe Street directly behind another vehicle driven by Walker.  *Id.* at ¶ 47.  Detectives Hood and Smith were able to follow the vehicles to the Madison Avenue Premises, where they observed Johnson exit the passenger seat of the Hyundai Sonata and enter the rear door of the residence.  *Id.*  The detectives continued to follow Walker's vehicle, but stopped when he began using counter-surveillance tactics.  Based on their training and experience in narcotics trafficking investigations, the affiants believed Johnson and Walker had met to exchange illegal contraband.  *Id.*

### 2. *As a Threshold Matter, Johnson Lacks Standing to Challenge the Search of Massey's Vehicle*

Fourth Amendment rights "may not be vicariously asserted."  *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).  "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."  *Id.* at 134.  The defendant bears the burden of showing that he had a legitimate expectation of privacy in the area searched, by establishing that he had either an ownership or possessory interest in the property.  *United States v. Castellanos*, 716 F.3d 828, 833–34 & n.4 (4th Cir. 2013).

In *Castellanos*, the Fourth Circuit held that a defendant could not challenge the search of vehicle conducted while it was being transported on a commercial carrier, even though he showed up to claim the vehicle with the title in hand, because he was not the registered owner and could

not establish "any legitimate possessory interest in it" at the time of the search.  716 F.3d at 834; *see also United States v. Arce*, 633 F.2d 689, 694 (5th Cir. 1980), *cert. denied*, 451 U.S. 972 (1981) (defendant "had no standing to contest the search [of another person's car] since he had no legitimate expectation of privacy in a car registered to someone else when he was not even a passenger in it when arrested").

Here, as in *Castellanos*, Johnson lacks standing to challenge the search of the Hyundai Sonata because he cannot establish an ownership or possessory interest in the vehicle.  The vehicle was registered to Massey, and although Johnson had been observed riding in it on past occasions, he was not present at the time of the search and has not alleged that he had Massey's permission to drive it.  Indeed, Massey told the law enforcement officers who executed the warrant that she had not seen Johnson since they broke up roughly a week earlier.  Accordingly, Johnson cannot demonstrate that he had a legitimate expectation of privacy in the vehicle, and his motion should be denied.  *See Castellanos*, 713 F.3d at 834; *Arce*, 633 F.2d at 694.

### 3.   *The Search Warrants Were Supported by Probable Cause*

A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false.").  The statement

of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant," *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002). "Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before him. *Montieth*, 662 F.3d at 664.

The Fourth Circuit has consistently upheld "warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008). In such circumstances, warrants are to be upheld "even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought" to the target address. *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005); *see also United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005) (recognizing "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence").

Here, the statement of probable cause was more than sufficient to justify the judge's decision to issue the warrants. The affidavit provided particularized information that Johnson was involved in drug trafficking (*i.e.*, the wiretap calls on September 2 and October 10, 2013, and the surveillance on October 9, 2013), and that he was unlawfully in possession of a firearm (*i.e.*, the call indicating Massey and Johnson almost shot someone who followed them home, combined

with Johnson's prohibited status).    The affidavit also concretely tied Johnson to the Madison

Avenue Premises and the Hyundai Sonata through the surveillance conducted on October 9, 2013,

and it explicitly articulated that drug traffickers commonly store drugs and firearms in their homes

and vehicles.   Under binding Fourth Circuit case law, nothing more was required.   *See Williams*,

548 F.3d at 319; *Grossman*, 400 F.3d at 217; *Servance*, 394 F.3d at 230.   Contrary to Johnson's

assertion, the affiants were *not* required to make "factual assertions directly linking the items

sought" to the target address and vehicle.   *Grossman*, 400 F.3d at 217.   To be sure, the affiants

could have elaborated more upon their assertion that Johnson was "observed" using the Hyundai

Sonata "throughout this investigation to transport narcotics."   *Id.* ¶ 23.   Nevertheless, under the

totality of the circumstances, the affidavit certainly supplied ample factual material from which

the judge could conclude that there was a fair probability that drugs and firearms were likely to be

found in the vehicle.   *See Bynum*, 293 F.3d at 197; *Montieth*, 662 F.3d at 664.

### 4.   *In Any Event, the Officers Relied on the Warrants in Good Faith*

Under the "good faith" doctrine set forth in the Supreme Court's decision in *United States*

*v. Leon*, the exclusionary rule does not apply when law enforcement officers act in "objectively

reasonable" reliance on a warrant later held invalid.   468 U.S. 897, 922 (1984).   Here, even if the

court has doubts about the quantum of probable cause, the motion to suppress should be denied

because the executing officers relied in good faith on a facially valid warrant.   *Id.*   There is no

suggestion that the issuing judge was anything but neutral and detached, *see Lo-Ji Sales, Inc. v.*

*New York*, 442 U.S. 319, 326–27 (1979), or that he was misled by information in the affidavit that

the affiants knew was false or would have known was false except for their reckless disregard of

the truth, *see Franks v. Delaware*, 438 U.S. 154 (1978).

Even if the affidavit failed to connect the dots in certain respects—for instance, by

neglecting to explain who observed Johnson and Massey using the Hyundai Sonata to transport narcotics and when—the fruits of the search warrant are still admissible under *Leon*.  *See United States v. Williams*, 548 F.3d 311 (4th Cir. 2008) (applying *Leon* even though search warrant affidavits "contain[ed] bare assertions that the targeted dwellings were [the defendants'] current residences, without explicitly describing how," because affidavits otherwise detailed a seven-month investigation involving a confidential informant, controlled purchases, intercepted phone calls, and physical surveillance); *United States v. Harris*, 215 Fed. Appx. 262, 272 (4th Cir. 2007) (unpub.) (applying *Leon*, despite officers' omission from affidavit (1) that the defendant resided in targeted premises and (2) their grounds for believing that the defendant lived there, because "[t]he apartment to be searched is prominently identified in the affidavit, and it is easy to read the affidavit and not realize that the officers failed to connect the final dots specifically linking [the defendant] to the apartment").

> x.  **Motion to Suppress Fruits of Warrantless Search of Gerald Johnson on June 30, 2016, by Gerald Johnson (ECF 215)**

Johnson moves to suppress roughly two grams of crack cocaine seized from his "dip," or waistband, area in a search incident to his arrest on June 30, 2016.  He concedes that the police had probable cause to conduct a warrantless search of his person for weapons and contraband in the first instance.  However, he argues that the crack was recovered as a result of an unlawful *successive* search after officers had already searched him once and found nothing.  He also points to recent news stories about members of the Baltimore Police Department staging the recovery of evidence, and argues that a hearing is necessary to determine whether the crack allegedly found in the second search was, in reality, planted by the police.  This motion should be denied.

1. *Relevant Facts*

In June 2016, law enforcement officers received information from two different confidential sources indicating that Johnson was unlawfully in possession of a firearm. Specifically, on June 30, 2016, Special Agent Lisa Christy participated in an interview with a confidential source who stated that he/she had recently observed Johnson and others removing multiple firearms from a gold Cadillac near the intersection of Greenmount Avenue and North Avenue. The confidential source further stated that he/she had personally observed Johnson driving the gold Cadillac.[22] Thereafter, Agent Christy learned that a registered confidential informant had recently told members of the BPD that he/she had observed Johnson carrying a firearm in his "dip" while in close proximity to a gold Cadillac.[23] ("Dip" is a street term for the inner waistband area where criminals often conceal firearms and contraband.)

Agent Christy was aware that Johnson's driver's license had been suspended. She was also aware that Johnson had been convicted of multiple felony offenses and was prohibited from possessing firearms or ammunition under federal law. She relayed this information to members of the BPD and requested that they be on the lookout for a gold Cadillac driven by Johnson in the area of Greenmount Avenue and North Avenue.

Shortly after 5:00 p.m. on June 30, 2016, Detective Kevin Fassl, Detective Timothy Romeo, and Sergeant John Burns were operating an unmarked patrol vehicle when they observed

---

[22] The confidential source agreed to provide information to law enforcement officers voluntarily, without any inducements.

[23] The confidential informant began cooperating with law enforcement in the hope of receiving a lesser sentence for then-pending charges, but continued to provide information in exchange for monetary compensation thereafter. The informant had provided reliable information in the past that had led to the seizure of firearms and narcotics.

Johnson driving a gold Cadillac with Maryland license plate number 1CH9116 in the area of Greenmount Avenue and East Lafayette Street.   Aware that Johnson's driver's license was suspended, Detective Fassl and his colleagues activated their emergency lights and stopped the gold Cadillac in the 1800 block of Barclay Street.   When Detective Fassl and his colleagues approached the vehicle, they observed Johnson in the driver's seat and three other occupants in the car.  The officers removed all four occupants from the vehicle and called for the assistance of a K-9 unit.  Approximately 10 minutes later, Detective Peter Iacovo and his K-9, Luke, arrived at the scene.  The K-9 performed a scan of the Cadillac and gave a positive alert signaling the presence of narcotics.[24]

On the basis of the positive K-9 scan, Detectives Fassl and Romeo conducted a search of the gold Cadillac.   From the center console area of the vehicle, Detective Fassl recovered two black digital scales with suspected drug residue and a cellular phone.  From a compartment in the driver's side door, Detective Fassl recovered four ziplock bags with suspected drug residue, two clear sandwich bags with suspected drug residue, and additional packaging material.  From the trunk of the vehicle, Detective Romeo recovered one black latex glove containing seven rounds of .45 caliber ammunition.

Following the search of the vehicle, Sergeant Burns placed Johnson under arrest and advised him of his *Miranda* rights.  During a search of Johnson's outer garments, Detective Romeo recovered packaging material and two cellular phones from the rear left pocket of Johnson's shorts.

---

[24] At approximately the same time, Detective Fassl requested information from his dispatcher regarding the tag number (1CH9116) on the Cadillac.   The dispatcher informed Detective Fassl that the license plates bearing this tag number had been reported stolen by Baltimore County authorities on June 12, 2016.

In addition, Sergeant Burns recovered $500 of suspected counterfeit currency from Johnson's wallet.

Based on the items recovered from Johnson's vehicle and pockets and the information relayed by the confidential sources, Detective Fassl suspected that Johnson may be concealing weapons or contraband in his dip area. By that time, the police transport wagon had arrived on the scene. Using the rear door of the transport wagon to shield himself and Johnson from public view, Detective Fassl conducted a search of Johnson's inner waistband area and recovered a gray sock containing four clear ziplock bags of crack weighing approximately half a gram each.

### 2. *The Search of Johnson's Dip Area Was Supported by Probable Cause and was Reasonable under the Circumstances*

Johnson concedes that "[t]he Fourth Amendment permitted the officers who arrested [him] to search him, without a warrant, to the extent necessary to ensure that he had no access to a weapon, and that he could not compromise any evidence." ECF 215-1, at 4 (citing *Chimel v. California*, 395 U.S. 752, 762–63 (1969). And Johnson does not contend that the officers lacked probable cause to search his inner waistband area where the drugs were recovered. Indeed, as Johnson acknowledges, "[t]hose officers had been told that an informant claimed that Mr. Johnson had been observed carrying a firearm in his waistband." *Id.* Moreover, the officers had just recovered .45 caliber ammunition from the trunk of Johnson's vehicle. They had also seized evidence of drug trafficking—digital scales, packaging material, and three cell phones—from the driver's seat area of the vehicle and from Johnson's pockets. They unquestionably had probable cause to believe Johnson may be concealing weapons or contraband in his dip area.

Johnson's sole complaint is that the search of his dip area constituted an unlawful *second* search of his person that was not "necessary or justified" by an exception to the warrant requirement. *Id.* at 5. Johnson misunderstands the facts and the law. The initial search of

Johnson's person was conducted alongside a busy street in Baltimore City, in full view of the other occupants of the Cadillac and the public at large. Sensitive to the lack of privacy, the officers restricted the search to his outer garments and pockets. After the police transport wagon arrived, Detective Fassl conducted a separate search of Johnson's inner waistband area—which had not been searched before—using the rear door to shield them from public view.

A review of the case law explains why this was the right thing to do. In *Bell v. Wolfish*, the Supreme Court explained that in evaluating the reasonableness of sexually intrusive searches (*i.e.*, strip searches and body cavity searches), courts must analyze "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. 520, 559 (1979). Subsequently, the Fourth Circuit held that the search of a defendant's "'dip,' or waistband, area" is "properly characterized as a strip search" because it involves "the exposure of a person's naked body for the purpose of a visual or physical examination." *United States v. Edwards*, 666 F.3d 877, 882 (4th Cir. 2011) (quoting *Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001)). Accordingly, in the Fourth Circuit, a police search of an arrestee's dip area is subject to the *Bell v. Wolfish* test for reasonableness.[25]

The last factor in the *Bell v. Wolfish* inquiry—the location of the search—"is especially relevant in determining whether [it was] reasonable under the circumstances." *Polk v. Montgomery Co., Md.*, 782 F.2d 1196, 1201–02 (4th Cir. 1986). Thus, several cases have held that a strip search conducted in public view violated the Fourth Amendment. *See, e.g.*, *United*

---

[25] *Edwards* considered a police search of an arrestee's dip area that involved "an officer's use of a knife to cut a sandwich baggie containing suspected narcotics off the defendant's penis." *Id.* at 879. Applying the *Bell v. Wolfish* test, the court concluded that the search violated the Fourth Amendment because (1) it occurred "in the middle of a public, residential street"; (2) the scope of the intrusion—which involved inspecting the defendant's genitals—"was extensive"; and (3) the search was carried out in a manner that "posed a significant and an unnecessary risk of injury to [the defendant]." *Id.* at 883–85.

*States v. Ford*, 232 F. Supp. 2d 625, 629–31 (E.D.Va. 2002) (body cavity search that exposed defendant's buttocks on the side of a public highway in broad daylight violated the Fourth Amendment, as it "could have waited until [the defendant] was taken to an appropriate location for such searches"); *Bushee v. Angelone*, 7 Fed. Appx. 182, 183–84 (4th Cir. 2001) (unpub.) (per curiam) (reversing dismissal of civil rights lawsuit where complainant made out a claim that body cavity search "may have occurred in an unnecessarily open area"); *see generally Edwards*, 666 F.3d at 883 ("We have repeatedly emphasized the necessity of conducting a strip search in private."). Conversely, in *United States v. Dorlouis*, the Fourth Circuit held that a strip search was *not* unreasonable because it "did not occur on the street subject to public viewing but took place in the privacy of the police van." 107 F.3d 248, 256 (4th Cir. 1997).

Here, the separate search of Johnson's dip area in an area shielded from public view was eminently reasonable and, indeed, expressly sanctioned by the case law. *See Dorlouis*, 107 F.3d at 256. Searching Johnson's inner waistband area on a busy street would have landed the officers in hot water under *Bell v. Wolfish* and its progeny. The two-step nature of the search does nothing to undercut its reasonableness. In fact, the natural consequence of the *Bell v. Wolfish* line of cases is that officers who have reason to suspect that an arrestee is hiding weapons or contraband in his undergarments or body cavities will proceed in two stages: an initial pat down for officer safety, followed by a strip search in a more private setting. This is what happened in *Dorlouis* itself. *See* 107 F.3d at 251, 256 (describing initial search of vehicle and its four occupants, followed by strip search of one of the occupants in the jump seat of the police van).

The Fourth Circuit's decision in *United States v. Madriz*, 532 Fed. Appx. 353 (4th Cir. 2013), though unpublished, is instructive. There, the BPD officer in question conducted a second search of the defendant's groin area after an initial pat down "yielded negative results." *Id.* at 353.

During the second search, which occurred "along the busy Baltimore-Washington Parkway," the officer unbuckled the defendant's pants, conducted a brief visual inspection, and then used his hand to remove a package of cocaine from inside the defendant's underwear.   *Id.* at 355.   The court found that the search of the defendant's groin area complied with the Fourth Amendment *despite* the public setting because "both the scope and manner of the search were reasonable."   *Id.* Here, too, the scope and manner of the strip search were reasonable, but it had the *added* benefit of being conducted in a private setting.   Indeed, all the *Bell v. Wolfish* factors point toward reasonableness, and the motion to suppress should be denied.

### 3.   *There is No Basis to Believe Evidence Was Planted, and No Need for an Evidentiary Hearing*

Johnson claims that he is entitled to an evidentiary hearing to explore the possibility that BPD officers planted evidence.   He points to two alleged red flags: (1) Detective Fassl's "claim[] to have found evidence that the officers who conducted the initial search somehow, inexplicably missed," and (2) "a pattern of Baltimore police officers planting drug evidence."   As discussed above, the first alleged red flag is untethered to the facts of the case.   The initial search of Johnson's person, which was conducted in public view on a city street, explored only his outer pockets, not his waistband area.   Once the police transport wagon arrived, Detective Fassl conducted a separate search of Johnson's waistband area—which had not been searched before—using the rear door of the wagon to shield them from public view.   Far from doing anything untoward, Detective Fassl made a reasonable attempt to afford Johnson privacy and stay within the strictures of the Fourth Amendment.

The second alleged red flag is really a red herring.   Johnson does not claim that any of the officers who are alleged to have fabricated evidence were involved in his arrest.   Nor does he contend that any of the officers who participated in his arrest have a history of fabricating evidence.

He simply argues that the allegations against a handful of officers should cast a black cloud of suspicion over the entire police department.  To be sure, the members of the Baltimore Police Department are not beyond reproach, and there is a strong societal interest in bringing police misconduct to light.  But the court should not countenance reckless accusations unsupported by any evidence.  *See*, *e.g.*, *United States v. Randle*, 966, F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality.  Reliance on vague, conclusory allegations is insufficient."); *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969) (same); *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (same).

Nor should the court be fooled by Johnson's assertion that he "will testify that the 'evidence' allegedly seized from him in his 'additional search' was not on his person at the time of the arrest." ECF 215-1, at 7.  This would truly be a fabrication of evidence.  In multiple recorded jail calls following his arrest, Johnson admitted that he had drugs on his person, claiming only that they were intended for personal use rather than distribution.  *See, e.g.*, Ex. 19, Jail Call from G. Johnson to K. Brady, July 2, 2016, 11:00:06 a.m. (Johnson questions how he is being charged for distribution when there is no proof he sold to anyone, claiming he "was about to get high"); Ex. 20, Jail Call from G. Johnson to K. Brady, July 7, 2016, 6:08:33 p.m. (Johnson: "I got [charged with] distribution."  Brady: "But you get high."  Johnson: "They don't know that."); Ex. 21, Jail Call from G. Johnson to R. Reedy, July 12, 2016, 8:54:24 a.m. (Johnson: "I got distribution. Distributing.  I don't even distribute nothing for real.  They don't know I take everything I get? . . . Bitch, I take everything; I don't distribute nothing.").  Evidently, the media storm surrounding the BPD evidence-planting story prompted Johnson to change his tactic and argue that he never possessed drugs in the first place.  Johnson's request for a hearing is a boldfaced attempt to subvert

justice and slander officers who engaged in no wrongdoing, and it should be denied.

xi. **Motion to Suppress Fruits of Search Warrant Executed on Cell Phone Seized from Kenneth Faison on November 15, 2016, by Kenneth Faison (ECF 180)**

Kenneth Faison moves to suppress evidence obtained from his cell phone, which was seized incident to his arrest on November 15, 2016 and searched pursuant to a federal search warrant issued by United States Magistrate Judge Stephanie A. Gallagher.  He argues that the warrant was facially invalid because the affidavit did not allege that Faison participated in any criminal activity after 2012, and therefore the evidence supporting probable cause was stale.  He also notes the absence of any allegation that Faison used a cell phone during the period of the conspiracy.  This motion should be denied.

Assessed in a commonsense, nontechnical manner, and giving due deference to the issuing magistrate judge, the warrant easily met the probable cause standard.  Ex. 22 (Search Warrant Materials, Faison Cell Phone).  The affidavit explained as follows:

- multiple witnesses had testified in state trial court and before a federal grand jury regarding Faison's membership in the BGF Greenmount Regime, *id.* at ¶ 13;

- on November 9, 2016, the federal grand jury returned an indictment charging Faison with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, *id.*;

- the indictment alleged that from in or about 2005 until November 9, 2016, Faison was a member of the BGF Greenmount Regime and conspired with his co-defendants and others to conduct and participate in the gang's affairs through a pattern of racketeering activity consisting of multiple acts of murder, robbery, conspiracy to distribute controlled substances, distribution of controlled substances, witness tampering, and witness retaliation, *id.* at ¶ 14;

- on the basis of the indictment, United States Magistrate Judge Beth P. Gesner issued a warrant for Faison's arrest, *id.* at ¶ 13;

- on November 15, 2016, members of ATF arrested Faison and seized a cell phone from his person;

- at the time of his arrest, Faison was at the intersection of 21st Street and Barclay Avenue with Will Harris and Shareef Dupree, both known members of the BGF Greenmount Regime, *id.* at ¶¶ 19–20;

- based on the agents' extensive training and experience, drug traffickers and members of street gangs commonly use cell phones to conduct drug transactions, plan criminal activity, store phone numbers of their co-conspirators (along with their street names and other identifying information), and take and store photographs that constitute evidence of drug trafficking (*i.e.*, photographs of drugs or firearms), or evidence of racketeering conspiracy (*i.e.*, photographs with other members of the BGF Greenmount Regime, or photographs of themselves displaying gang signs or gang tattoos), *id.* at ¶ 21, *see also id.* at ¶¶ 7–8.

These facts established probable cause to believe that evidence of racketeering conspiracy and drug trafficking conspiracy would be found in Faison's cell phone. The magistrate judge was entitled to rely on the grand jury's return of an indictment, which necessarily entailed a determination that there was probable cause supporting the charges against Faison. *Cf. Giordenello v. United States*, 357 U.S. 480, 487 (1958) ("[A] warrant of arrest can be based upon an indictment because the grand jury's determination that probable cause existed for the indictment also establishes that element for purpose of issuing a warrant for the apprehension of the person so charged."). And the affidavit provided important additional evidence, namely, (1) sworn testimony by multiple witnesses that Faison was a member of the BGF Greenmount Regime, (2) Faison's location in the BGF Greenmount Regime's territory at the time of his arrest, (3) Faison's continued association with known members of the gang, and (4) the affiant's knowledge regarding the use of cell phones by drug traffickers and gang members. More importantly, the indictment— which, as Faison acknowledges, was incorporated by reference in the affidavit—described numerous instances in which members of the BGF Greenmount Regime used cell phones to communicate with drug customers, *see* ECF 40, at ¶¶ 45–46, 52–60, 62–63, 88–99; arrange the illegal sale of firearms and ammunition, *see id.* at ¶¶ 50–51, 57, 70, 100; and coordinate the murder of a witness, *id.* at ¶ 65.

It was not necessary for the affidavit to attest to personal observations of Faison using the specific cell phone at issue—or even cell phones generally—in furtherance of his criminal activities. As the Fourth Circuit has explained, the "nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). And it is well-established that cell phones are tools of the drug trade. *See, e.g.*, *United States v. Gibson*, 547 Fed. Appx. 174, 185 n.1 (4th Cir. 2013) (Davis, J., concurring in part and concurring in the judgment) (recognizing the frequent use of cell phones in the drug trade); *United States v. Fisher*, 2015 WL 1862329, at *2 (D. Md. Apr. 22, 2015) ("[c]ell phones . . . are acknowledged tools of drug-traffickers"); *United States v. Saunders*, 2017 WL 1234149, at *4 (N.D.W.V. Apr. 3. 2017) (noting that "circuits throughout the country have recognized that cellphones are tools of the drug trafficking trade," and collecting cases); *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992) (a cell phone is a "recognized tool of the trade in drug dealing"); *cf. United States v. Garcia-Lagunas*, 835 F.3d 479, 490 (4th Cir. 2016) (describing multiple cell phones as "tools of the drug trade"). Indeed, the affidavit here clearly articulated the ways in which drug traffickers and gang members use cell phones to further their criminal activities, and the indictment provided specific examples of such use by Faison's co-conspirators.

Faison's reliance on *United States v. McCall*, 740 F.2d 1331 (4th Cir. 1984), is misplaced. *McCall* considered whether there was probable cause to search the defendant's residence based on a witness's tip that, seven months earlier, the defendant had confessed to committing a robbery and displayed the gun he used to commit it. *Id.* at 1337. The Fourth Circuit held that the seven-month interim between the defendant's confession and the issuance of the warrant did not render the evidence stale given that the gun at issue was a stolen service weapon that could not easily be

pawned or sold.  *Id*.  The staleness doctrine is simply not at issue here.  Contrary to Faison's assertion, the affidavit clearly set forth that Faison continued his involvement in the charged racketeering conspiracy and narcotics trafficking conspiracy *up until the date of the indictment*, or November 9, 2016.  Moreover, the circumstances of Faison's arrest—in the heart of the gang's territory while he was with two other members of the gang—were a clear indication that he had not withdrawn from the racketeering conspiracy.  It is somewhat disingenuous for Faison to fault the government for not alleging that he committed any overt acts in furtherance of the racketeering conspiracy after 2012, when, as Faison acknowledges, he was incarcerated from December 19, 2012 to September 26, 2016.  The staleness argument does not have much force when the "gap" in drug dealing and gun slinging is due to a period of incarceration, not a period of good behavior suggesting a renunciation of the criminal conspiracy.

Even if the Court determines that the affidavit failed to establish probable cause, the evidence should not be suppressed because the agents' reliance on the warrant was objectively reasonable.  *See United States v. Leon*, 468 U.S. 897, 923 (1984).  There is no suggestion that the affiant intentionally misled the magistrate judge or omitted material information; indeed, the affidavit *disclosed* that Faison had very recently been released from prison.  Ex. 22, at ¶ 20.  Moreover, the affidavit contained "sufficient indicia of probable cause so as not to render reliance on it entirely unreasonable."  *United States v. Bynum*, 293 F.3d 192, 197–99 (4th Cir. 2002).  The Fourth Circuit has applied the *Leon* good faith exception to the exclusionary rule in circumstances where the statement of probable cause was more bare bones than the one at issue here.  *See, e.g.*, *United States v. Williams*, 548 F.3d 311 (4th Cir. 2008) (bare assertion that the targeted dwelling was known to be the defendant's, without explaining how); *United States v. Harris*, 215 Fed. Appx. 262, 272 (4th Cir. 2007) (unpub.) (no indication that the defendant lived in the targeted

premises, let alone grounds for believing so).

    xii.  **Motion to Suppress Social Media Evidence Collected Pursuant to Search Warrants, by Gerald Johnson (ECF 213), Kenneth Jones (ECF 191), and Marquise McCants (ECF 211)**

On May 10 and May 17, 2017, United States Magistrate Judge A. David Copperthite authorized search warrants for information associated with twenty Facebook, Instagram, and YouTube accounts used by the defendants and their co-conspirators. *See* Ex. 23 (Search Warrant Materials, Social Media Accounts, May 10, 2017); Ex. 24 (Search Warrant Materials, Social Media Accounts, May 17, 2017). Defendants Johnson, Jones, and McCants have moved to suppress the fruits of those search warrants on two grounds: (1) the court lacked jurisdiction under Federal Rule of Criminal Procedure 41 to issue warrants for property located outside the District of Maryland, and (2) the warrants were not supported by probable cause. For the reasons discussed below, these motions should be denied.

    1.  *The Magistrate Judge Had Jurisdiction to Issue the Warrants Pursuant to the Stored Communications Act*

Johnson's jurisdictional argument demonstrates a fundamental misunderstanding of the nature of the social media warrants, which were not traditional warrants to search and seize property under Rule 41, but rather warrants requiring the disclosure of information held by third party service providers pursuant to the Stored Communications Act.

The Stored Communications Act, 18 U.S.C. §§ 2701–2712 ("SCA"), regulates how stored wire and electronic communications may be lawfully accessed or disclosed. Section 2703 of the SCA permits the government, in specified circumstances, to compel service providers to disclose records or information pertaining to their customers, as well as the contents of their customers' stored electronic communications. Relevant here, Section 2703 provides that "[a] governmental entity may require . . . a provider of electronic communication service" or "a provider of remote

computing service to disclose the contents of any wire or electronic communication" if it "obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction," 18 U.S.C. § 2703(a), (b)(1)(A).  Section 2711, in turn, defines "court of competent jurisdiction" to include "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated" or "is in . . . a district in which the provider of a wire or electronic communication service is located or in which the wire  or electronic communications, records, or other information are stored."  18 U.S.C. § 2711(3)(A)(i).

Although the SCA adopts Rule 41's probable cause standard for warrants compelling the disclosure of the contents of communications, an SCA warrant is a "distinct procedural mechanism from a traditional Rule 41 search warrant."  *In re Search of Information Associated with [redacted]@gmail.com that is Stored at Premises Controlled by Google Inc.* ("*Google*"), Case No. 16-mj-00757(BAH), 2017 WL 3445634 (D.D.C. July 31, 2017).  For instance, whereas traditional Rule 41 warrants typically must be executed by law enforcement officers (and commonly authorize law enforcement officers to enter private property without the consent of the owner or occupant), SCA warrants, in contrast, are executed simply by serving the warrant upon the designated provider, an act which is typically accomplished remotely by email or fax.  *See* 18 U.S.C. § 2703(g) (stating that the presence of an officer is not required for service or execution of a § 2703 warrant); *United States v. Bach*, 310 F.3d 1063, 1068 (8th Cir. 2002) (search of email by service provider without presence of law enforcement did not violate Fourth Amendment).  In addition, obtaining an SCA warrant obviates the need to give notice to the subscriber.  *Compare* 18 U.S.C. § 2703(b)(1)(A), *with* Fed. R. Crim. P. 41(f)(1)(C).  Most important here, although traditional Rule 41 search warrants are limited to "a search of property . . . within the district" of the authorizing

magistrate judge, Fed. R. Crim. P. 41(b), SCA warrants may be issued by any court that "has jurisdiction over the offense being investigated," 18 U.S.C. § 2711(3)(A)(i).

Johnson is correct that under Rule 41(b), with some exceptions not relevant here, a judge in one district cannot issue a search warrant for property located in another district. But the text, structure, and legislative history of the SCA make clear that the operative language in 18 U.S.C. § 2703(a) and (b)(1)(A)—"using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction"—incorporates only the procedures described in Rule 41, such as Rule 41(d)'s requirement of a sworn statement of probable cause, and not the limitations on the territorial reach of a search warrant under Rule 41(b). Thus, every court to have considered the jurisdictional issue has held that Section 2703 properly authorizes out-of-district warrants for stored communications such as email and social media content. *See, e.g.*, *United States v. Berkos*, 543 F.3d 392, 398 (7th Cir. 2008) (jurisdictional provision of "Rule 41(b) deals with substantive judicial authority—not procedure—and thus does not apply to § 2703(a)."); *United States v. Kernell*, No. 3:08-CR-142, 2010 U.S. Dist. LEXIS 32802, at *12–13 (E.D. Tenn. Apr. 2, 2010) ("If there was any doubt about the intent of the 2001 Amendment in issue . . . one need only look to its title, 'Nationwide Service of Search Warrants for Electronic Evidence.'"), *report and recommendation adopted*, No. 3:08-CR-142(TWP), 2010 WL 1491861 (E.D. Tenn. Apr. 13, 2010); *In re Search Warrant*, No. 6:05-MC-168-ORL-31JGG, 2005 WL 3844032, at *6 (M.D. Fla. Feb. 13, 2006) ("[S]ubsection (b) of Rule 41, because it is not procedural, does not impair the ability of a district court to issue out-of-district warrants under Section 2703(a)."); *Google*, 2017 WL 3445634, at *20 (same); *United States v. Scully*, 108 F. Supp. 3d 59, 75-83 (E.D.N.Y. 2015) (same); *In re Search of Yahoo, Inc.*, No. 07-3194-MB, 2007 WL 1539971 (D. Ariz. May 21, 2007) (same); *Hubbard v. MySpace, Inc.*, 788 F. Supp. 2d 319, 325 (S.D.N.Y. 2011)

(same); *United States v. Noyes*, No. 1:08-CR-55(SJM), 2010 WL 5139859, at *9 n.8 (W.D. Pa. Dec. 8, 2010) (same); *United States v. Freeman*, No. CRIM. 10-68(JRT)(RLE), 2010 WL 4386897, at *12 n.6 (D. Minn. May 13, 2010) (same), *report and recommendation adopted*, No. CRIM. 10-68(JRT)(LIB), 2010 WL 4386894 (D. Minn. Oct. 28, 2010); *In re United States*, 665 F. Supp. 2d 1210, 1219 (D. Or. 2009) (same).[26]

Here, the court had jurisdiction pursuant to the SCA to issue warrants requiring the disclosure of information stored in the Northern District of California because Facebook, Instagram, and YouTube are providers of electronic communications service and/or remote computing service,[27] and the court "has jurisdiction over the offense[s] being investigated,"

---

[26] In a recent, highly publicized decision, the Second Circuit held that an SCA warrant may not be used to require providers to disclose electronic communications stored on servers outside the United States. *In the Matter of a Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corp.* ("*Microsoft I*"), 829 F.3d 197 (2d Cir. 2016), *reh'g denied*, 855 F.3d 53 (2d Cir. 2017) ("*Microsoft II*"). Every other court to consider the issue has reached the opposite result. *See, e.g.*, *Matter of Search of Content Stored at Premises Controlled by Google Inc.*, Case No. 16-mc-80263-RS, 2017 WL 3478809 (N.D.Cal. Aug. 14, 2017); *In re Search of Information Associated with [Redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.*, Case No. 16-mj-00757 (BAH), 2017 WL 3445634 (D.D.C. July 31, 2017); *In re Search Warrant No. 16-960-M-1 to Google*, MJ No. 16-960, MJ No. 16-1061, 2017 WL 3535037 (E.D.Pa. Aug. 17, 2017). In any case, even the Second Circuit acknowledged that the SCA permits magistrate judges "to issue warrants to be executed in other 'districts'"—just "not overseas." *Microsoft I*, 829 F.3d at 213.

[27] The SCA defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). A "remote computing service" is defined as one that is responsible for "the provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2). An "electronic communications system" is defined, in turn, as "any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C. § 2510(14). Although the case law applying these definitions is somewhat muddled, it is clear that Facebook (which controls Instagram) and YouTube are either providers of electronic communication service, remote computing service, or both, depending on the particular service at issue. *See Viacom Int'l, Inc. v. YouTube Inc.*, 253 F.R.D. 256, 264 (S.D.N.Y. 2008) (characterizing YouTube as a provider of remote computing service); *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 980–90 (C.D.

namely, violations of 18 U.S.C. § 1962(d), 18 U.S.C. § 922(g), and 21 U.S.C. §§ 841 and 846 that occurred in the District of Maryland.  Johnson's reliance on *United States v. Owens*, No. 16-CR-38-JPS, 2016 WL 7053195 (E.D. Wis. Dec. 5, 2016), is misdirected, because *Owens* did not involve a warrant issued pursuant to the SCA.  The warrant at issue in *Owens* authorized the FBI to use what is known as a "Network Investigative Technique" or "NIT" to transmit instructions to out-of-state computers that were being used to access a child pornography website called "Playpen." *Id.* at *1–2.  These instructions caused the computers to transmit location information such as IP addresses back to the FBI, allowing the FBI to find and apprehend the child pornographers. *Id.*  Thus, the warrant authorized the FBI to conduct an actual, physical search of the out-of-state computers, in violation of the territorial limits on a magistrate judge's jurisdiction under Rule 41(b). *See id.* at *4 ("The NIT searches the user's computer to discover the IP address associated with that device."); *see also id.* at *6 ("At all relevant times, Mr. Owen's computer was located in Wisconsin, and therefore it was not located in the Eastern District of Virginia, as it must be for the magistrate judge to have the authority to issue the warrant under Rule 41(b)(1) or 41(b)(2).").  The warrant did *not* simply require the disclosure of information held by third party service providers, as did the SCA warrant at issue here.

Although the warrant application here did not expressly state that the SCA was the source of the court's out-of-district jurisdiction, it was clear from the citations to the SCA in the application paperwork and the nature of the request.  For instance, the affidavit noted that the

---

(continued from previous page) Cal. 2012) (holding that Facebook is a provider of both electronic communications service and remote computing service); *In re Zynga Privacy Litigation*, 750 F.3d 1098, 1104 (9th Cir. 2014) (characterizing Facebook as a provider of remote computing service); *In re Facebook Privacy Litigation*, 791 F. Supp. 2d 705, 713–14 (N.D. Cal. 2011) (characterizing Facebook as a provider of electronic communications service), *summarily aff'd*, 572 Fed. Appx. 494 (9th Cir. 2014).

government had submitted preservation requests to Facebook, Instagram, and YouTube for some of the subject accounts pursuant to the Section 2703(f) of the SCA. Ex. 23, at 39, 43, 47. In addition, the affidavit was accompanied by a request for orders prohibiting Facebook, Instagram, and YouTube from notifying the subscribers of the subject accounts about the existence of the warrants pursuant to the Section 2705(b) of the SCA. *Id.* at 4. The entire application was styled as a request for authorization to require the *disclosure* of information held by third parties, *not* a request for authorization to *search* a particular place or *seize* particular things. *See id.* at 10 (seeking "warrants requiring Facebook, . . . Instagram, . . . and Google . . . to disclose to the government records and other information in their possession"); *see also Google*, 2017 WL 3445634, at *16 (explaining that compelled disclosure under the SCA "does not amount to a 'search' or a 'seizure' in any meaningful sense, because such providers routinely control [subscriber information] without infringing on 'any expectation of privacy' or 'meaningfully interfer[ing] with the customer's possessory interests"). And although the affidavit stated that the application was being submitted "pursuant to Federal Rule of Criminal Procedure 41," Ex. 23, at 10, that was not an incorrect statement of the law, since, as discussed above, the SCA expressly provides that the government should "obtain a warrant using the *procedures* described in the Federal Rules of Criminal Procedure." 18 U.S.C. § 2703(a), (b)(1)(A) (emphasis added).

Even if the source of the court's jurisdiction was unclear from the application materials, it would not render the warrant invalid. There is no legal requirement that a warrant application expressly invoke the source of the court's jurisdiction, and many warrant applications do not do so. It is a long-established principle of jurisprudence that a court must determine for itself whether it has jurisdiction before deciding the merits of a question, regardless whether any jurisdictional issue is raised by the parties. *See, e.g.*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S.

83, 95–98 (1998) (reaffirming "two centuries of jurisprudence" holding that a court must "satisfy itself of its own jurisdiction . . . even though the parties are prepared to concede it"); *Ex parte McCardle*, 7 Wall. 506, 514 (1868) ("[T]he first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes.  This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.").  Here, Judge Copperthite was unquestionably familiar with the SCA, and he evidently satisfied himself that he had jurisdiction before deciding to issue the warrant.  There are no grounds upon which to upset that decision.

### 2. *The Warrants Were Supported by Probable Cause*

#### a. Johnson

Johnson's argument that the search warrant affidavit failed to establish a sufficient nexus between his alleged criminal activity and his social media accounts deserves little attention.  As discussed above, the Fourth Circuit has held "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."  *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005).  The affidavit need not contain "factual assertions directly linking the items sought" to the placed to be searched.  *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).

Here, the affidavit went well beyond what was necessary to establish a nexus between Johnson's alleged criminal activity and the subject accounts.  As Johnson acknowledges, the affiant, Task Force Officer Jonathan Hayden, provided a rather lengthy explanation of the ways in which drug traffickers and gang members commonly use social media platforms in furtherance of their criminal activities.  *See* Ex. 23, at ¶¶ 28–29.  But more importantly, TFO Hayden provided

dozens of *concrete examples* of Johnson's use of the subject Facebook, Instagram, and YouTube accounts to, among other things, advertise drugs for sale, *see id.* at ¶ 41 ("Big dimes of that shit right here . . . Big loud packs"); request ammunition from an associate, *id.* at ¶ 35 ("Already ne 45shells???");[28] intimidate witnesses, *id.* at ¶ 37 ("Nigga Nod—you know what you did . . . Nigga Chris . . . Niggas on the stand."), ¶ 39 ("All I got is bullets for you rat niggas."), ¶ 40 ("I get niggas shot just for running mouth . . . You niggas can't flag 'round my block."); and flaunt his association with BGF and its precursor YGF, *id.* at ¶ 37 ("Back when YGF was popping, that's the murder team."), ¶ 42 ("catch me in all black"), ¶ 44 ("Holler at them BGF niggas that run things."). Johnson suggests that these statements are simply artistic expression that should not be taken literally, ECF 213-1, at 11–12, but it is hard to take this claim seriously when he identifies the real-life witnesses who testified against him in his state trial and says, "This is my life; this is not a song." *Id.* at ¶ 37.

Johnson's complaint that TFO Hayden neglected to explain what qualified him to render an opinion about the use of social media by drug traffickers and gang members is rather feeble in light of this surfeit of "nexus" evidence. It is difficult to imagine any clearer indication that the account would contain evidence of Johnson's membership in BGF and his involvement in the racketeering activities charged in the indictment. In any event, Judge Copperthite was entitled to draw his own commonsense inferences about the likelihood that drug traffickers and gang members will store evidence of their criminal activity in their social media accounts, whether or

---

[28] Johnson misunderstands the evidence regarding the Instagram account with username "dattniccageeznutz," referred to in the warrant application as Subject Account 13. As described in the affidavit, Johnson's cell phone seized incident to his arrest on June 30, 2016 contained records that Johnson sent instant messages *from* Subject Account 13 *to* another, unknown Instagram user. *Id.* at ¶ 35. In any event, to the extent Johnson claims he is not the user of Subject Account 13, he has no standing to challenge the warrant.

not it was "explicitly articulated by the applying officer."  *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008).

Finally, Johnson has no standing to challenge the disclosure of information associated with Subject Accounts 15 through 20—the YouTube accounts—because he was not the subscriber of the accounts.  *See Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978); *United States v. Castellanos*, 716 F.3d 828, 833–34 & n.4 (4th Cir. 2013).  Johnson acknowledges that his only connection to the YouTube accounts is that they featured publicly-accessible videos in which he appeared.  ECF 213-1, at 9 & n.4.  He cannot show a legitimate expectation of privacy in the accounts any more than someone who is featured in a Time Magazine profile can assert a legitimate expectation of privacy in the magazine's contents on that basis.

### b.  Jones

Jones was not the subscriber of any of the social media accounts at issue, and he cannot show any legitimate expectation of privacy in the contents of those accounts.  Accordingly, he lacks standing to challenge the warrants.  *See Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978); *United States v. Castellanos*, 716 F.3d 828, 833–34 & n.4 (4th Cir. 2013).

### c.  McCants

McCants attempts to piggyback off Johnson's motion to suppress the social media warrants, but makes no particularized argument as to why the affidavit failed to establish probable cause with respect to his Facebook account.  *See* ECF 211.  The affidavit in support of the warrant clearly established probable cause to believe both that McCants was the user of the Facebook account and that evidence of racketeering conspiracy would be found there.  With respect to the former, the affidavit explained that the username for the account, "digga.mccants," was a combination of McCants' street name, "Digga," and his family name, McCants, and furthermore,

the profile picture associated with the account was a photograph of McCants.  Ex. 23, at ¶ 46.
With respect to the latter, in addition to the general information about the ATF's investigation and
the federal indictment, the affidavit provided that: (1) McCants' Facebook "friends" included
fellow BGF Greenmount Regime members and co-defendants Wesley Brown, *id.* at ¶ 45, and
Norman Handy, *id.* at ¶ 47; (2) on August 26, 2010, the day after McCants was arrested for
committing an armed home invasion robbery in Elkton, Maryland, Brown posted a message to his
Facebook account saying "FREE MY NIGGA DIGGA," which was a reference to McCants, *id.* at
¶ 45; and (3) on March 7, 2010, McCants posted a photograph to the Facebook account that
depicted him crossing his arms in front of his body to make an "X," which investigators knew to
be a BGF gang sign, *id.* at ¶ 46.  This was clear indication that the account would contain evidence
of McCants' membership in BGF and involvement in the charged racketeering conspiracy.

### 3.   *In Any Event, the Agents Relied on the Warrants in Good Faith*

Even if the failure to cite the SCA was somehow fatal to the court's jurisdiction—and it
was not—it would not justify suppression of the social media evidence because the agents relied
in good faith on facially valid warrants.  *See United States v. Leon*, 468 U.S. 897 (1984).  Johnson
is wrong to suggest that the *Leon* good faith exception to the exclusionary rule does not apply
because the warrants were "void *ab initio*."  ECF 213-1, at 4.  The Supreme Court has held that
*Leon* applies to an officer's objectively reasonable belief that a warrant was valid, *even if there
was never any such warrant*.  *See United States v. Herring*, 555 U.S. 135 (2009).  In *Herring*, a
police officer mistakenly believed, as a result of the "negligent bookkeeping error" by another
officer, that there was an outstanding arrest warrant for the defendant.  *Id*. at 144.  Notwithstanding
the Fourth Amendment violation, the Supreme Court held that the exclusionary rule did not apply
to the drug and gun evidence seized from the defendant's person and vehicle in the search incident

to his unconstitutional arrest.  *Id.*  The Court explained that, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Id.* at 136. A negligent bookkeeping error did not rise to this level.

If *Leon* applies to a *constitutional* violation resulting from a mistaken-but-reasonable belief in the *existence* of a warrant, it certainly applies to a violation of a *non-constitutional* jurisdictional rule resulting from a mistaken-but-reasonable belief in the *validity* of a warrant.  The Supreme Court has held that the violation of statutory requirements that go beyond the Constitution's demands does not justify the suppression of evidence unless the statute itself specifies this remedy. *See United States v. Caceres*, 440 U.S. 741, 754–57 (1979).  Here, the SCA expressly provides that suppression is not a remedy "for nonconstitutional violations of this chapter."  18 U.S.C. § 2708.  Indeed, in the very case Johnson relies upon, *Owens*, the court denied the defendant's motion to suppress under *Leon*, holding that the exclusionary rule could not be invoked based on the issuing magistrate judge's lack of jurisdiction.  *Owens*, 2016 WL 7053195 at *8; *see also United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (allowing a defendant to go free based on a violation of Rule 41(b)'s jurisdictional requirements would be "wildly out of proportion to the wrong"); *United States v. Cazares-Olivas*, 515 F.3d 726, 730 (7th Cir. 2008) (violations of Rule 41 "do not justify the exclusion of evidence that has been seized on the basis of probable cause, and with advance judicial approval").

Here, there is no suggestion that the agents deliberately misled the magistrate judge regarding his jurisdictional authority or otherwise acted in bad faith.  The failure to expressly invoke the court's jurisdiction under the SCA, if it was an error, was at most a negligent one, and it certainly did not amount to a Fourth Amendment violation.  Suppression of the evidence would

be wildly out of proportion to the wrong.  *Owens*, 2016 WL 7053195 at *8; *Berkos*, 543 F.3d at

396; *Cazares-Olivas*, 515 F.3d at 730.

xiii. **Motion to Suppress Fruits of 2016/2017 Federal Wiretap, by**
**Marquise McCants (ECF 205)**

Last November, ATF agents attempted unsuccessfully to arrest McCants following the

original RICO indictment in this case.  Between November and late January, neither ATF nor the

United States Marshals Service were able to determine McCants' whereabouts.  Beginning on

January 26, however, FBI investigators intercepted a series of telephone calls between McCants

and Deandre Dorsey, a BGF member whom the government was targeting in a separate case.  As

discussed further below, the intercepted telephone calls between McCants and Dorsey culminated

in a non-fatal shooting by McCants on February 4, 2017, after which federal and state investigators

tracked McCants to a home in northeast Baltimore and placed him under arrest.

McCants now moves to suppress the intercepted telephone calls between him and Dorsey.

ECF 205.  Of this much, the government is sure.  In all other aspects, however, McCants' motion

is far from a model of clarity.  Nowhere in 10 pages of legal boilerplate does McCants identify the

phone number targeted by the wiretap he seeks to suppress, or the date on which the wiretap was

authorized.  Further, where he does provide factual information, McCants simply gets it wrong.

On pages 2 and 3 of his motion, for example, McCants appears to suggest that the intercepted

telephone calls between him and Dorsey were captured by the wiretap that targeted Gerald Johnson

and other defendants in this case.  *Id.* at 2–3.  That is incorrect.  As we have explained, and as our

Rule 16 discovery clearly indicates, the Dorsey wiretap targeted *other* BGF members, and by the

time it was authorized, the defendants in this case (except McCants) were all in jail.

When the boilerplate passages are stripped from McCants' motion, as they should be, what

remains is a single paragraph, in which McCants appears to take issue with the FBI's statement to

the authorizing judge (here, Judge Hollander) that search warrants had been exhausted as an investigative tool. *Id*. at 8. Even here, however, McCants refers vaguely to "the affidavit," without explaining which of the multiple affidavits pertaining to the Dorsey wiretap he means to discuss. *Id*. More should be required from a defendant who seeks to suppress a wiretap in federal court.

The government assumes, although it really cannot be sure, that when McCants refers to "the affidavit," he is referring to the initial affidavit submitted by FBI Task Force Officer Daniel DeLorenzo in support of his application to intercept wire communications on two telephone lines belonging to Dorsey: 443-454-9405 (the A line), and 443-360-2276 (the B line). Ex. 25 (2016/2017 Wiretap Aff., Target Nos. 443-454-9405 and 443-360-2276). We make this assumption because (i) McCants' only substantive argument is addressed to the issue of exhaustion, and (ii) exhaustion matters most in the context of an initial wiretap application (as opposed to a re-authorization or "spin-off"). Here, Judge Hollander granted FBI's initial application on December 21, 2016. Ex. 26 (2016/2017 Wiretap Order, Target Nos. 443-454-9405 and 443-360-2276). Approximately one month later, on January 19, 2017, she authorized continued interception on both the A and B lines. Ex. 27 (2016/2017 Wiretap Order Authorizing Cont'd Interception, Target Nos. 443-454-9405 and 443-360-2276). All of the intercepted phone calls between McCants and Dorsey were captured on the A line after the reauthorization on January 19.

1. *FBI's Initial Affidavit Clearly Established that the Execution of Search Warrants Would Not Further Its Investigative Goals.*

With respect to exhaustion, McCants focuses on a single section of DeLorenzo's initial affidavit, in which he explained that the execution of search warrants, in the absence of a wiretap, was unlikely to achieve the FBI's investigative goals. Ex. 25, at 52–53. In this section, DeLorenzo stated that despite physical and electronic surveillance, FBI had not been able to identify the drug

stash location used by Dorsey and his co-conspirators. *Id*. at 52. He further mentioned that the Anne Arundel County Police Department had previously executed a search warrant at a "known stash location for DORSEY," but was ultimately unsuccessful at "tying … DORSEY to the narcotics located there." *Id*. at 52–53. He then explained that even if the FBI successfully identified particular stash locations, executing search warrants at those locations was unlikely to identify other co-conspirators, including sources of supply, and would potentially alert the target subjects to the existence of the FBI's investigation. *Id*. at 53.

McCants critiques this analysis on two grounds. First, he suggests that "this type of allegation"—*i.e.*, that search warrants will not be successful—"could almost always be made in every narcotics conspiracy action." ECF 205, at 8. Second, he points out that "at no time either prior to [DeLorenzo's] application, [sic] has the government specifically sought to have a search warrant executed at the home of Deandre Dorsey." *Id*. Because the FBI did not execute a search warrant at Dorsey's home, McCants contends that DeLorenzo was merely speculating when he claimed that search warrants would not be an effective tool. *Id*.

Both of McCants' arguments should be rejected. As to the first argument, it may well be true that in many drug conspiracy cases, the execution of search warrants, in the absence of wiretaps, will not identify higher-level participants, such as suppliers. That a problem may be common, however, is hardly reason to discount its impact on a particular case. Further, and in any event, DeLorenzo's affidavit did not simply rely on a generic statement that search warrants would not be successful. To the contrary, the affidavit offered multiple specific reasons why the execution of search warrants would not be effective, including (i) Dorsey's pattern of moving from place to place, (ii) the inability of surveillance officers to identify stash locations "with certainty," and (iii) the execution of a prior search warrant that did not lead to evidence "tying" Dorsey to

recovered narcotics.  Ex. 25, at 52–53.  More is not required under the law.

Similarly, with respect to McCants' second argument, there is a simple explanation as to why the FBI did not execute a search warrant at Dorsey's home: at the time of DeLorenzo's affidavit, Dorsey was known to reside at multiple different locations, none of which were known to investigators.  *Id*. at 52.  This fact bolsters, and renders *less* speculative, DeLorenzo's assessment that search warrants would not be effective.  After all, one cannot search a location without knowing where the location is.  Under these circumstances, DeLorenzo reasonably determined, and Judge Hollander reasonably agreed, that the execution of search warrants would not meet the FBI's investigative goals.  Thus, McCants has failed to demonstrate that the wiretap of Dorsey's telephones was unnecessary or otherwise unlawful.  His motion to suppress the wiretap should therefore be denied.

### xiv. Motions to Suppress "Exigent Circumstances Search Warrant" and to Suppress Electronic Evidence Resulting from Use of Cell Site Simulator, by Marquise McCants (ECF 212 & 240)

In his initial set of motions, McCants moved to suppress the fruits of what he inaccurately characterized as an "exigent circumstances search warrant."  ECF 212.  In this motion, McCants challenged the real-time tracking of his cell phone by BPD officers on February 4 and 5, 2017.  *Id*. At the time of this filing, McCants apparently believed that officers had obtained a warrant to track his cell phone, notwithstanding the fact that it was clear from the government's discovery that no such warrant was obtained—a fact that the government has repeatedly explained during telephone conversations with counsel, and during a reverse proffer with counsel and McCants himself.

While preparing its response to McCants' initial motion, the government learned that in addition to tracking McCants' cell phone via "ping" alerts, BPD also used a cell site simulator to pinpoint the phone's location after tracking the phone to an intersection in northeast Baltimore.

The government obtained this information on August 31, 2017.  It conveyed the information to McCants' counsel the following day.  Two days later, on September 3, 2017, McCants filed a new motion to suppress, in which he challenged the warrantless tracking of his cell phone through the use of both "ping" data *and* a cell site simulator.  ECF 240.  The September 3 motion incorporated McCants' prior challenge to the government's use of "ping" data, and it corrected his misstatement that the "ping" data was collected pursuant to a warrant.  We respond to the September 3 motion below.

1.  *Facts Pertaining to the Tracking of McCants' Cell Phone, his Subsequent Arrest, and Evidence Seized by Law Enforcement*

The pertinent facts are as follows.  As we have noted, in January and February 2017, FBI investigators were lawfully intercepting wire communications on two telephones belonging to Deandre Dorsey, a target in a separate federal case.  Between January 26 and February 5, 2017, the wiretaps intercepted multiple telephone calls between Dorsey and McCants.  At the time of the intercepted phone calls, McCants was wanted on a federal arrest warrant issued in connection with this case.

The intercepted phone calls between McCants and Dorsey raised an escalating series of red flags for FBI, to the point where FBI believed, by the afternoon of February 4, 2017, that McCants and Dorsey had imminent plans to murder an unknown individual in or near the Greenmount Avenue corridor.  Because the intercepted calls are critical to the government's argument that BPD acted reasonably in tracking McCants' cell phone without a warrant, we summarize the pertinent calls below.

The first pertinent call was intercepted on January 26, 2017.  During this call, McCants told Dorsey that that he had recently been at a dice game.  Dorsey responded that McCants should have robbed the participants in the game.  Approximately six minutes later, McCants told Dorsey,

"I be having glizzy on me when I do go 'round the way … [u/i] shootout with Burns and them." Based on their training and experience, as well as the context of this discussion, investigators believed that McCants' reference to "glizzy" was a coded reference to a firearm.  Later during the same call, Dorsey told McCants to "call the pound nigga," and to "get all that stuff outta the car." At the time of this statement, investigators knew that a vehicle belonging to Dorsey had recently been impounded after Dorsey was the victim of a non-fatal shooting.  Investigators recovered a 9mm handgun from the vehicle, which they matched through ballistics testing to a December 2016 murder in the 1100 block of Curtain Avenue, as well as a July 2016 shooting in the 700 block of Mello Court.  Investigators also recovered narcotics from Dorsey's vehicle.  Thus, on the basis of this information, and based on their training and experience, investigators believed that when Dorsey told McCants to "call the pound nigga" and to "get all that stuff outta the car," he was instructing McCants to remove firearms and narcotics from his impounded vehicle.

McCants and Dorsey spoke again on February 1, 2017.  During this call, McCants told Dorsey that he had been looking for a particular individual, and that he had encountered that individual in the area of Greenmount Avenue and 26th Street.  McCants explained that the individual had been "clutching" and "staring at me" and "watching my every move."  Based on their training and experience, as well as the context of this discussion, investigators believed that when McCants told Dorsey that the individual was "clutching," he was explaining that the individual had his hand ready on a gun.  Similarly, McCants later stated that he thought the individual was "strapped," which, again, investigators took to mean that the individual was carrying a gun.  McCants then explained that he had tried to call an individual named "TB," so that "TB" could be the "getaway"—that is, a getaway driver for McCants.  Later during the same call, Dorsey told McCants, "we gotta holler at yo."  McCants responded, "some shit gotta get

done."  Dorsey then stated, "this week, we gonna have some fun."  McCants agreed.  "This weekend," he said, "we trying to work out this weekend.  We gotta be serious though, yo."

McCants and Dorsey had multiple similar conversations on February 4, 2017.  For example, in a call that began at approximately 2:03 that afternoon, McCants told Dorsey that he was waiting on him, and that he (*i.e.*, McCants) needed to "work out."  McCants then stated that "TB" was downstairs, and that "TB" was waiting for another individual to get to his location with a "dirt bike."  Based on their training and experience, as well as the context of this discussion, investigators believed that McCants' reference to a "dirt bike" was a coded reference to a firearm.

Approximately two hours later, at 4:09 p.m., McCants placed an outgoing call to Dorsey. During this call, McCants told Dorsey that he was in the area of 28th Street.  He then asked Dorsey whether he wanted to "wait 'til tomorrow."  Dorsey responded, "it ain't about me.  It's about whenever we can get to him[.]"  McCants then stated, "let me make this call and see if he out there. If he out there we going to get him[.]"

Three minutes later, at approximately 4:12 p.m. on February 4, McCants called Dorsey back and stated, "It must be his lucky day cause he damn sure ain't out there."  McCants and Dorsey then had the following exchange:

MCCANTS:    Yeah. I'm glad you didn't come cause we been out of that bitch for nothing. We been mad as shit after nothing man.

DORSEY:     Shit. We'd have to do something.  (Laughter) (U/I)

DORSEY:     We would have been out. Once we on go mode, we got to be out.

MCCANTS:    Bring Tameka with us yo. She clip her first wings yo (?) Get the first one yo.

DORSEY:     Huh?

MCCANTS:    I said, I was going to tell you, bring Tameka yo cause we was going to get busy (laughter).

DORSEY:      Yeah, yeah, yeah. I told her already. She ready.

MCCANTS:    She want to go yo for real yo.

DORSEY:      Yo, listen, I told her I said if you ready to see some real shit or you ready to
             get some real shit cause you keep complaining this shit get ugly.

MCCANTS:    (U/I) for real bro. We ready to go out there and send her yo.

DORSEY:      Matter of fact that's what we going to do. When we do something. She
             ready. If it ain't nothing. She ready to go out there like a bird, tell a nigga
             she trying to eat him up and get him around the corner (U/I)

MCCANTS:    (laughter) (U/I)

DORSEY:      Get that corner.

Based on these intercepted calls, FBI believed that McCants and Dorsey had imminent

plans to murder an unknown individual, and that they intended to use a female named "Tameka"

to lure him around the corner where they would be waiting for him.  In an effort to disrupt the plot,

FBI decided to seek real-time location data for McCants' cell phone.  Thus, on the evening of

February 4, 2017, FBI Task Officer Joseph Landsman, who is also a BPD Sergeant, submitted an

"exigent circumstances" request to T-Mobile, the service provider for McCants' phone.  The

request, which was faxed to T-Mobile by Detective Tony Clark, a member of BPD's Advanced

Technical Team, provided the following narrative regarding the exigent nature of the situation:

"Reliable intel has been developed that target that has the target number 410-694-1321 will cause

bodily harm or death to another in Baltimore City."  Ex. 28 (Exigent Circumstances Request,

Target No. 410-694-1321), at 2.  The narrative continued as follows:

> During the course of an investigation involving members of the
> Black Guerilla Family gang Detectives learned about a threat.  The
> threat was that members of the gang are planning to shoot an
> individual that frequents the area of Greenmount Avenue.  The
> members of this gang that are planning to do the shooting were
> involved in a shooting in December 2017 [sic].  The individual

> planning to execute the shooting is in possession of the cell phone
> that has the number 410-694-1321.

*Id*.

T-Mobile granted this request, and Landsman and his colleagues began receiving location alerts for McCants' cell phone at 10:50 p.m.  According to the very first alert at 10:50 p.m., McCants' cell phone was located in the 400 block of East North Avenue.  At roughly the same time, Landsman and his colleagues were notified that a shooting had taken place on that very block.  They later discovered that the victim of the shooting, Gregory Bess, had been shot seven times in the leg and back with a .40 caliber firearm.

After learning of the shooting, Landsman and his colleagues continued to monitor the location of McCants' phone.  At 11:05 p.m., the phone was located (via "ping" data) near the intersection of Pioneer Drive and Roselawn Avenue in northeast Baltimore.  Based on that information, Detective Clark and his supervisor, BPD Sergeant Joseph Burton, responded to the intersection and deployed a cell site simulator to pinpoint the exact location of McCants' phone.  Within approximately 15 minutes, Clark determined that McCants' phone was inside a residence at 5617 Pioneer Drive.[29]  He then notified Landsman of the phone's location.  Shortly thereafter, a team of officers from BPD, FBI, the Maryland State Police, and the United States Marshals Service arrived on the scene and surrounded the home.

TFO Landsman then approached the residence, knocked on the front door, and announced, "Police!"  Rather than answer the door, McCants attempted to escape by climbing from an upstairs window in the rear of the house.  He quickly retreated, however, after seeing that officers were outside, thus beginning a standoff that lasted less than an hour.  During the standoff, the officers

---

[29] McCants has conceded in a separate motion that 5617 Pioneer Drive is not his home.  ECF 202.

waiting outside could see that McCants was going back and forth from the basement to the upstairs bathroom.  They also heard him moving items in the basement.  At one point, the officers heard McCants shout something to the effect of, "I'm not coming out.  I've got a fuckin' gun.  I've got a fuckin' gun!"

Eventually, an MSP officer contacted McCants by calling his cell phone (the same phone that was intercepted over the wiretap).  After a brief negotiation, McCants agreed to exit the home and was taken into custody without incident.  Following McCants' arrest, a team of officers entered the home and conducted a protective sweep to ensure that no one else was inside.  While conducting the protective sweep, the officers saw contraband in plain view, including several rounds of ammunition, which they observed inside a toilet; as well as drug paraphernalia and packaging material, which they observed inside an open backpack in the basement.

After McCants was arrested, the FBI wiretap intercepted an additional phone call between McCants' girlfriend, who by that point had arrived at Pioneer Drive, and Dorsey.  During the call, the girlfriend told Dorsey that McCants had done the best he could to "ditch the bitch." Investigators knew, based on their training and experience, that "bitch" is a commonly-used term for a firearm.  The girlfriend continued, "the bitch sleep at PDR [*i.e.*, the residence on Pioneer Drive]."

Based on the foregoing information, Landsman obtained a state search warrant for 5617 Pioneer Drive from the Honorable Wanda Heard of the Circuit Court for Baltimore City on the morning of February 5.  During the subsequent search of the home, officers seized the ammunition (which turned out to be .40 caliber) and drug paraphernalia (including gelatin caps, a scale, and sifters) that they had previously observed while conducting the protective sweep.  The officers did not find a firearm during the search.  As they later learned, however, there was, in fact, a firearm

in the house.

In addition to searching the residence, officers also searched a silver Honda Accord that was parked in the driveway outside.  (Prior to the search, an MSP officer had conducted a canine scan of the vehicle, which gave a positive alert  for the presence of narcotics).  While searching the vehicle, the officers found a secret compartment in the center console, inside of which they discovered an XP .45 caliber handgun; as well as a Taurus 9 mm handgun, both of which were loaded at the time.  Notably, following the search of the vehicle, the FBI wiretap intercepted a telephone call between McCants' girlfriend and Dorsey, in which the girlfriend told Dorsey that police officers had taken "the black jacket … that he [*i.e.*, McCants] always keep in the car."  Based on their training and experience, as well as the context of this discussion, investigators believed that "black jacket" was a coded reference to a firearm.

Following the initial searches at Pioneer Drive, the FBI obtained jail calls made by McCants to his girlfriend on February 5, 6, and 7.  During these calls, the girlfriend used a three-way calling function to permit McCants to speak with other people, including Dorsey, Martin Wilson (a/k/a "TB"), and an individual named "Malik."   The highlights of the calls were as follows:

- In a call on February 5, McCants asked "Malik" whether someone had been "to "PDR" [*i.e.*, the residence on Pioneer Drive].  He also asked repeatedly what had happened to "the willow," which officers understood—correctly, as it turned out—to be a coded reference to a firearm.

- In a call on February 6, McCants asked Dorsey to instruct "TB" (*i.e.*, Wilson) as follows: "TB told me, yo, you always keep hair right here, yo … he'll know what I'm talking about.  Tell him look under there, and look towards the left, and go inside there … you know what I'm talking about, right?"  Based on this call, officers believed—again, correctly—that McCants was telling his associates to look for a firearm underneath (and to the left of) a piece of plumbing in one of the bathrooms at the house on Pioneer Drive.

- In a call on February 7, McCants asked "Malik" whether "TB" had gotten his message. Malik responded that "TB" had looked, but that "it" was gone. Based on this call, officers believed that "TB" had gone to the house on Pioneer Drive and attempted unsuccessfully to recover the firearm.

Based on these jail calls, officers obtained a second state search warrant for 5617 Pioneer Drive on February 8, 2017, which they executed the following day. During the search, which was videotaped by TFO Landsman, the officers discovered a hole inside a wall in the bathroom. The hole was underneath, and to the left of, the bathroom sink, just as McCants had described. Inside the hole, the officers discovered a disassembled Ruger .40 caliber handgun, bearing serial number 343854459.

Following the second search warrant, the officers submitted the .40 caliber handgun for ballistics testing. The testing showed: (i) a match between the handgun and shell casings recovered from the scene of the shooting of Gregory Bess. in the 400 block of East North Avenue on February 4; and (ii) a match between the handgun and shell casings recovered from the scene of a second shooting, this one involving two victims, in the 900 block of North Eden Street on November 1, 2016.

2. _McCants Lacks Standing to Challenge the Tracking of His Cell Phone_.

As a threshold matter, McCants must establish that he has standing to challenge the tracking of his phone. *See United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). He has not met that burden here.

As we have explained, on February 4 and 5, 2017, McCants was a fugitive who was wanted on an active arrest warrant issued in connection with this case. Further, during the period in which BPD was tracking McCants' phone, the phone was in one of two locations: (i) on a public street

105

(*e.g.*, the 400 block of East North Avenue), or (ii) inside the residence at 5617 Pioneer Drive, which McCants has conceded is not his home.  *See* ECF 202.  McCants did not have a reasonable expectation of privacy in either location.

First, as a fugitive, McCants did not have a reasonable expectation of privacy in his movements on a public street.  In a case decided last year, the Seventh Circuit held that "[a] person wanted on probable cause (and an arrest warrant) who is taken into custody in a public place, *where he had no legitimate expectation of privacy*, cannot complain about how the police learned his location," even where the police determined his location by using a cell site simulator.  *United States v. Patrick*, 842 F.3d 540, 545 (7th Cir. 2016) (Easterbrook, J.) (emphasis added).  The Court explained as follows:

> From [the defendant's] perspective, it is all the same whether a paid informant, a jilted lover, police with binoculars, a bartender, a member of a rival gang, a spy trailing his car after it left his driveway, the phone company's cell towers, or a device pretending to be a cell tower, provided location information.  *A fugitive cannot be picky about how he is run to ground*.

*Id*. (emphasis added).  As a result, the Seventh Circuit affirmed the district court's denial of the defendant's motion to suppress the firearm found on his person when he was arrested.

The same is true in this case: McCants, like the fugitive in *Patrick*, did not have a "legitimate expectation of privacy" in a "public place," such as the 400 block of East North Avenue.  *Id*.  He therefore "cannot complain" that BPD tracked his cell phone, whether via "ping" data or any other method, in such locations.  Thus, to the extent that the "pinging" of McCants' cell phone was a search, McCants lacks standing to challenge it.

McCants also lacks standing to challenge the use of a cell site simulator to locate his cell phone (and him) at 5617 Pioneer Drive.  As we have explained, McCants has conceded that 5617 Pioneer Drive is not his home.  *See* ECF 202 at 3.  Nevertheless, McCants attempts to claim

standing with respect to the residence by noting that he was arrested there, and that a document with his name on it was found in the home. *Id*. He then cites *Minnesota v. Olson* for the proposition that overnight guests have a reasonable expectation of privacy under the Fourth Amendment. *Id*. (citing 495 U.S. 91, 96–97 (1990)).

This combination of facts and legal authority is plainly insufficient to establish standing. Without more, the fact that McCants was arrested at 5617 Pioneer Drive, and/or that a document with his name on it was found in the home, does not support an inference that he was an overnight guest. And even if McCants could demonstrate that he *was* an overnight guest—a showing he has yet to make—the fact remains that he was a fugitive when he and his phone were found in the house. This renders *Olson*, which relied on the "longstanding social custom [of being an overnight guest] that serves functions recognized as valuable by society," 495 U.S. at 98, inapplicable. Instead, under these circumstances, the Court should conclude that "[s]leeping at another's [residence] in order to evade capture by the police does not comport with our everyday expectations of privacy and is not a longstanding social custom." *United States v. Stuckey*, 253 Fed. Appx. 468, 481 (6th Cir. 2007) (unpub.). Pursuant to this principle, even if McCants was an overnight guest at 5617 Pioneer Drive, he did not have a reasonable expectation of privacy in the house. Thus, his motion to suppress the tracking of his cell phone in the house should be denied for lack of standing.

### 3.   *The Warrantless Tracking of McCants' Cell Phone Was Justified by Exigent Circumstances*.

"The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967). Pursuant to this principle, Courts have dispensed with the warrant requirement where "the exigencies of the situation make the needs of law enforcement so

compelling that [a] warrantless search is objectively reasonable[.]" *Kentucky v. King*, 562 U.S. 452, 460 (2011).  Stated differently, "the rationale underpinning the exigent circumstances doctrine is that when faced with an immediate and credible threat or danger, it is inherently reasonable to permit the police to act without a warrant." *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013).

In the last thirteen months, two federal courts have applied the exigent circumstances doctrine to uphold the warrantless tracking of a suspect's cell phone.    In the first case, police officers tracked the defendant's phone via "ping" data.  In the second, they accomplished the tracking by way of a cell site simulator.  In both cases, the court concluded, as the Court should in this case, that the warrantless tracking was reasonable under the circumstances and did not run afoul of the Fourth Amendment.

The first case, *United States v. Caraballo*, 831 F.3d 95 (2d Cir. 2016), was decided last year.   The defendant in that case, a known drug dealer, was suspected of killing one of his customers in an execution-style shooting near Brattleboro, Vermont.   *Id*. at 97–99.   After discovering the victim's body, and believing that the defendant was still armed and dangerous, police offers submitted an exigent circumstances request to the defendant's cell phone provider for real-time location data.  *Id*.  at 98-100.  They then tracked the defendant's cell phone using "ping" data for approximately two hours before locating the defendant and placing him under arrest.  *Id*. at 100.

In an opinion by Judge Calabresi, the Second Circuit held that "exigent circumstances justified the officers' pinging of [the defendant's cell] phone following their discovery of [the victim's] body."  *Id*. at 104.  The Court explained that although the officers did not have probable cause to arrest the defendant for murder, they "properly considered him to be their primary

suspect." *Id*. at 104.  They also had specific reasons to think that that the defendant would commit violence against others; they did not have a reasonable opportunity to secure a warrant; the degree of their intrusion was "relatively slight";[30] and the warrantless "pinging" was strictly circumscribed to find the defendant as quickly as possible.  *Id*. at 104–05.  Given these factors, the Court determined that the officers acted reasonably, under exigent circumstances, in "pinging" the defendant's cell phone without a warrant.

If the circumstances in *Caraballo* were exigent, they were even more exigent here.  Unlike in *Caraballo*, the suspect in this case was a fugitive who was wanted on a federal arrest warrant.  Further, in *Caraballo*, the murder had already occurred when police began tracking the defendant's phone, and the court expressly found that the police officers did not have probable cause to arrest the defendant for murder.  Here the FBI and BPD clearly had probable cause, based on the intercepted phone calls between McCants and Dorsey, to believe that McCants and Dorsey were about to commit a murder that could still be prevented.  Thus, the officers  reasonably believed that waiting hours for a magistrate judge to sign a warrant, and still longer for the service provider to respond in the normal course, might cost the individual whom McCants and Dorsey were targeting his life.  After the shooting, the officers had probable cause to believe that McCants was the shooter, based on the "ping" data that placed him at the scene of the crime.  They also had probable cause to believe that McCants was armed and dangerous.  Thus, under these circumstances, the FBI and BPD had every reason to act swiftly, without a warrant, to apprehend a dangerous fugitive, and to prevent him from fleeing, destroying evidence, or committing

---

[30] Indeed, the Court expressly noted that "any expectation of privacy that [the defendant] had in his cell-phone location was dubious at best."  *Id*. at 105.  This is yet another indication that McCants does not have standing to challenge the pinging of his cell phone on a public street, as explained above.

additional acts of violence while a warrant was being obtained.

The second case, *United States v. Ellis*, was decided approximately three weeks ago.  2017 WL 3641867 (N.D. Cal. Aug. 24, 2017).  In that case, the Oakland Police Department and the FBI used multiple cell site simulators, without obtaining a warrant, to locate a defendant whom they believed had been involved in an attempted murder and a subsequent shooting.  The relevant facts were as follows:

- the defendant was identified by an eyewitness as the getaway driver in an attempted murder on January 20, 2013;

- the same eyewitness identified the license plate number of the car the defendant was driving, and that car was located in the rear lot of the apartment building where the defendant lived;

- the next day, an OPD officer investigating the getaway car was attacked, beaten and shot while the defendant stood in the driveway of the apartment building;

- guns stolen from the officer were in the defendant's room;

- in the days immediately preceding the shooting, the defendant was in possession of a large number of firearms; and

- the defendant was a known member of a gang with a violent history.

*Id*. at *10.

In light of these circumstances, at approximately 2:00 a.m. on January 22, 2013—the morning after the second shooting—the OPD and FBI began deploying a cell site simulator, without obtaining a warrant.  *Id*. at *12.  At approximately 10:00 a.m., they deployed a second cell site simulator, which they used for approximately an hour before locating the defendant's phone.  *Id*.

Based on these facts, the district court determined that a "warrant was not required to locate [the defendant's] cell phone under the exigent circumstances that existed [on] the morning of January 22, 2013."  *Id*. at 13.  The Court explained that, although the defendant "was not known

to be the shooter" in either the January 20th or January 21st incidents described above, "he was believed to be a suspect in possession of firearms." *Id.* at *11. The Court agreed that given the "timeline of events" in the case, "law enforcement officers on the scene believed that any unnecessary delay in finding [the defendant] would endanger their lives or the safety of others and/or that speed was essential to prevent [the defendant's] escape." *Id.*

Here again, the exigencies presented in *Ellis* were not as significant as the exigencies presented in this case. The defendant in *Ellis* was not suspected of a shooting. In this case, by contrast, by the time BPD used a cell site simulator to locate McCants, they had probable cause to believe, based on wiretap calls and "ping" data, that McCants had just shot Gregory Bess seven times in the legs and back. Further, unlike the defendant in *Ellis*, McCants was a fugitive who was wanted on a federal arrest warrant. This provided an independent (and urgent) rationale for preventing his escape. Further still, in this case BPD used a cell site simulator for less than an hour before locating McCants, whereas in *Ellis*, OPD and FBI used two different cell site simulators over a period of roughly nine hours. In short, BPD's use of the cell site simulator to locate McCants was both more urgent and more circumscribed, and therefore more reasonable, than the use of the cell site simulator in *Ellis*. Thus, if a warrant was unnecessary in *Ellis*, it was also unnecessary here.

*     *     *     *     *     *     *

As the discussion above makes clear, McCants has no standing to challenge the tracking of his cell phone, either on public streets or in a residence that he concedes was not his own. Further, the BPD and FBI acted reasonably, under manifestly exigent circumstances, in using both "ping" data and a cell site simulator to track McCants' phone without a warrant. Put simply, there was no constitutional violation here—only brave and effective police work. McCants' motion to

suppress should therefore be denied.

### xv. Motion to Suppress Evidence Seized from 5617 Pioneer Drive, by Marquise McCants (ECF 202)

McCants moves to suppress evidence recovered from 5617 Pioneer Drive, which he concedes is not his home, during the execution of the two state search warrants referenced above. ECF 202. As we have explained, BPD and FBI executed the search warrants on February 5 and February 8, 2017.

As a threshold matter, we have already explained, McCants lacked a reasonable expectation of privacy in 5617 Pioneer Drive. *See supra* at Section III.b.xiv.2. He therefore lacks standing to challenge the searches of the home.

Even assuming that McCants has standing, the Court should reject his motion on the merits. As an initial matter, with respect to the February 5 search warrant, McCants provides the Court with exactly zero legal analysis. Indeed, in the argument section of his motion (titled "Probable Cause Analysis"), McCants does not refer *once* to the February 5 search warrant. ECF 202, at 3–8. For this reason alone, his challenge to the search warrant should be rejected, without an evidentiary hearing. *See*, *e.g.*, *United States v. Randle*, 966, F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality. Reliance on vague, conclusory allegations is insufficient."); *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969) (same); *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (same); *see also United States v. McAndrews*, 12 F.3d 273, 280 (1st Cir. 1993) ("A district court need not grant an evidentiary hearing on a motion merely because a defendant's hopes spring eternal or because a defendant wishes to mount a fishing expedition.").

Further, and in any event, the February 5 search warrant was supported by probable cause, as reflected in the affidavit submitted by Sergeant Landsman to the Honorable Wanda Heard of

the Circuit Court for Baltimore City.  Ex. 29 (Search Warrant Materials, 5617 Pioneer Drive).  In his affidavit, Landsman explained that (i) McCants was wanted on a federal arrest warrant in connection with this case; (ii) McCants' cell phone was located at the scene of a non-fatal shooting (*i.e.*, the shooting of Gregory Bess) and subsequently tracked to 5617 Pioneer Drive; (iii) McCants tried to escape from 5617 Pioneer Drive before eventually surrendering to authorities; and (iv) after McCants was arrested, officers conducted a protective sweep of the residence and discovered ammunition and drug paraphernalia in plain view.  *Id.* at 5.  This information was more than sufficient to establish probable cause.  *See, e.g.*, *United States v. Jones*, 667 F.3d 477, 480–87 (4th Cir. 2012) (declining to suppress evidence discovered in plain view during protective sweep, later referenced in search warrant affidavit, and subsequently seized during execution of search warrant).  Further, even if the information fell short of establishing probable cause, it was not so deficient that a reasonable officer would not have relied on the subsequently-issued warrant.  *Clutchette*, 24 F.3d at 582; *Leon*, 486 U.S. at 922 n.3.

McCants fares no better with respect to the February 8 warrant.  In seeking that warrant, BPD Detective Mark Neptune submitted an affidavit to the Honorable James Green of the Circuit Court for Baltimore City, which noted that (i) McCants had been arrested at 5617 Pioneer Drive on February 5, 2017; (ii) before they arrested McCants, officers had observed him "going into the upstairs bathroom area several times," and had also heard him "moving items around in the basement"; (iii) officers had seized .40 caliber ammunition and drug paraphernalia while executing the search warrant on February 5; and (iv) officers had recovered two additional handguns from a vehicle parked in the driveway.  Ex. 30, at 7–8.  Notably, Neptune's affidavit further stated that after McCants was arrested, he participated in two recorded jail calls, which were placed on February 6 and 7, 2017.  In the first recorded jail call, McCants directed an unknown individual to

go to "PDR," which Neptune understood to be a reference to 5617 Pioneer Drive, and to look for an item that McCants had left in the home. *Id.* Similarly, in the second recorded jail call, McCants asked an unknown individual whether "TB" had looked for an item in a particular place, and whether the item had been seized by law enforcement. *Id.* The unknown individual responded that "TB" had looked, but could not find the item, and that the hiding place McCants described appeared to have been left undisturbed. *Id.*

This information clearly supported an inference that McCants was attempting to obstruct justice by directing his associates to remove incriminating evidence (which had not yet been recovered by law enforcement) from 5617 Pioneer Drive. Although McCants objects that the content of the jail calls was "vague," ECF 202, at 5, it was sufficiently clear to raise a "fair probability" that when McCants told his confederate to go to "PDR," he was talking about 5617 Pioneer Drive. Likewise, when McCants asked his confederate whether "TB" had looked in a particular location for a particular item, and whether the item had been seized by law enforcement, it was reasonable for Detective Neptune (and, indeed, for Judge Green) to infer that McCants was talking about contraband or evidence of a crime. This meets the threshold of probable cause. *See United States v. Ventresca*, 380 U.S. 102, 108 (1965) ("[Affidavits for search warrants … must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.").

      xvi.  **Motion to Suppress Fruits of Warrantless Search of Honda Accord Parked at 5617 Pioneer Drive on February 5, 2017, by Marquise McCants (ECF 204)**

McCants moves to suppress the handguns recovered from the vehicle that was parked

outside 5617 Pioneer Drive on February 5, 2017.  ECF 204.  Here again, however, McCants makes no effort to demonstrate that he has standing to challenge the search.  He does not claim that he owned the car, that he drove the car with the consent of its lawful owner, or that he otherwise had a legitimate possessory interest in the car.  The Court should demand such a showing before it entertains McCants' motion, and certainly before it holds an evidentiary hearing.  *See United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir. 1990) ("A criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion.").

On the merits, McCants is correct that officers searched the silver Honda without a warrant.  Prior to the search, however, MSP Trooper First Class Ryan Boyse conducted a canine scan of the vehicle, which gave a positive alert for the presence of narcotics.  This established probable cause, *see United States v. Jeffus*, 22 F.3d 554, 556–57 (4th Cir. 1994), which, in turn, justified a warrantless search pursuant to the automobile exception to the warrant requirement.  *See*, *e.g.*, *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  McCants' challenge to the search of the Honda should therefore be rejected.

### xvii.   **Motion to Suppress Statements, by Marquise McCants (ECF 203)**

McCants has filed a boilerplate motion to suppress statements, in which he declines to identify any particular statement that he would like the Court to suppress.  ECF 203.  The government cannot respond to this motion unless and until McCants identifies a statement that he claims is inadmissible at trial.  As of this writing, the government does not believe that McCants made any statements in response to interrogation by law enforcement.  He did make other statements, however, including: (i) statements made during intercepted phone calls, (ii) statements made during jail calls, and (iii) statements made in text messages, all of which have been turned over in discovery.  If McCants wishes to suppress any or all of these statements, he needs to

identify the statement or statements with particularity, and then come forward with concrete reasons (*i.e.*, non-boilerplate arguments) as to why a particular statement is inadmissible.  Absent such a showing, McCants' motion should be denied.

### c.   Motion to Dismiss Count One, by Marquise McCants (ECF 199)

McCants moves to dismiss Count One of the Superseding Indictment, which charges him with racketeering conspiracy in violation of 18 U.S.C. § 1962(d), pursuant to Federal Rule of Criminal Procedure 12(b)(3).  He argues, first, that Count One improperly combines multiple conspiracies in a single count, because it alleges many different transactions with different methods and goals, not all of which were known to him, and because none of his co-defendants are named in the five overt acts he is alleged to have committed in furtherance of the racketeering conspiracy.   Second, he argues that Count One fails to allege all the essential elements of a racketeering conspiracy.  For the reasons discussed below, this motion should be denied.

### i.   Count One Does Not Charge Multiple Conspiracies

A case involving multiple transactions may nevertheless constitute a single conspiracy "where the conspirators are shown to share the same objectives, the same methods, the same geographic spread, and the same results."  *United States v. Smith*, 451 F.3d 209, 218 (4th Cir. 2006); *see also United States v. Stockton*, 349 F.3d 755, 762 (4th Cir. 2003).  As the Fourth Circuit has explained, the determination rests on whether there is an "overlap of key actors, methods, and goals."  *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988).  Indeed, the Fourth Circuit has held that a conspiracy can be a "loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market."  *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993).  "The question whether the evidence shows a single conspiracy or multiple conspiracies "is one of fact and is

properly the province of the jury."  *Leavis*, 853 F.2d at 218; *see also United States v. McGrath*, 613 F.2d 361, 367 (2d Cir. 1979) (question is "singularly well-suited to resolution by the jury"), *cert. denied*, 446 U.S. .

Here, Count One alleges that all of the defendants, including McCants, were members of the Black Guerilla Family gang who operated in the Greenmount Avenue corridor of Baltimore, a territory that grew to encompass a few dozen city blocks.  ECF 40 (Superseding Indictment), at ¶¶ 10–11.  Members of the BGF Greenmount Regime swore an oath of allegiance to the gang and adhered to a hierarchical structure and written rules.  *Id.* at ¶¶ 2–10.  They shared the same objectives, among them, enriching themselves by distributing controlled substances and committing robberies in the Greenmount Avenue corridor, preserving their territory, preventing detection by law enforcement, providing financial support to incarcerated members, and promoting the gang's status.  *Id.* at ¶ 13.  They accomplished these goals by, among other means, attending gang meetings, paying dues to the gang consisting of the proceeds of their criminal activity, maintaining a cache of weapons, and using violence and threats of violence to intimidate or eliminate rival drug dealers and would-be witnesses against them.  *Id.* at ¶ 15.  In short, Count One alleges a single racketeering conspiracy involving the same core participants, the same drug turf, the same methods, and the same objectives.  *See Smith*, 451 F.3d at 218; *Leavis*, 853 F.3d at 762; *Banks*, 10 F.3d and 1054.

It is irrelevant that McCants is not alleged to have participated in, or even known about, every racketeering act or overt act committed by other members of the conspiracy.  *See United States v. Johnson*, 54 F.3d 1150, 1154 (4th Cir. 1995) ("One may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."); *Banks*, 10 F.3d at 1054.  It is also insignificant

that the five overt acts McCants is alleged to have carried out in furtherance of the racketeering conspiracy did not involve the direct participation of his co-defendants. A racketeering conspiracy may—and often does—have many different criminal objectives, and members with their own specialized functions. *See United States v. Urbanik*, 801 F.2d 692, 696 (4th Cir. 1986) ("The principals may have performed their roles at different points in the distribution network, but the evidence suffices to support the inference of a single large conspiracy."); *Banks*, 10 F.3d at 1054. What matters is that the indictment alleges McCants participated in "one overall agreement" with the same "key actors, methods, and goals." *Leavis*, 853 F.3d at 218.

### ii.   Count One Alleges All the Elements of a Racketeering Conspiracy

The elements that the government must prove to establish a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) are: (1) that an enterprise existed as alleged in the indictment; (2) that the enterprise affected interstate commerce; (3) that the defendant was associated with or employed by the enterprise; and (4) that the defendant knowingly and willfully became a member of the conspiracy, *i.e.*, that he knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity. *See United States v. Cornell*, 780 F.3d 616, 621 (4th Cir. 2015); L. Sand & J. Siffert, *Modern Federal Jury Instructions*, No. 52–58.

Here, Count One charges:

Beginning in or about 2005 and continuing until on or about the date of this Superseding Indictment, in the District of Maryland, and elsewhere, the defendants, . . . each being a person employed by and associated with the organization known today as the BGF Greenmount Regime, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, together with each other and with other persons known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree to violate Section 1962(c) of Title 18, United States Code, that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, as defined in Sections 1961(1) and (5) of Title 18, United

> States Code, which pattern consisted of multiple acts involving . . . [murder, robbery, conspiracy to distribute controlled substances, distribution and possession with intent to distribute controlled substances, witness tampering, and witness retaliation].

ECF 40, at ¶ 14.  Although not required, Count One also describes the history and structure of the BGF Regime, its purposes and methods, and over one hundred overt acts committed by the defendants in furtherance of the racketeering conspiracy.  "By describing at length the alleged enterprise, the defendants' roles in that enterprise, and the alleged racketeering acts," the indictment does more than enough to inform McCants of the charge against him.  *United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 774 (E.D.Va. 2004); *see also United States v. McDonough*, 959 F.2d 1137, 1141 (1st Cir. 1992) (holding that an indictment that "track[s] the language of the RICO statute" is sufficient).  McCants makes no attempt to specify which element of racketeering conspiracy is missing—and there are none.

McCants' reliance on *United States v. Hooker*, 841 F.3d 1225 (4th Cir. 1988), is misplaced.  There, the indictment "failed to allege that the [racketeering] enterprise had any effect on interstate commerce or to state, either directly or through incorporation by reference, any facts that would show that the enterprise affected interstate commerce." *Id.* at 1227.  As a result, *Hooker* held that the racketeering charge was "defective for failure to allege an essential ingredient of the offense." *Id.* at 1228.  There is no such fatal omission here.  Count One of the Superseding Indictment explicitly charges that the BGF Greenmount Regime was "an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce."  ECF 40, at ¶ 14.  Count One also alleges facts from which a jury could find that the enterprise affected interstate commerce, for instance, that members of the BGF Greenmount Regime "sold various controlled substances, including cocaine, cocaine base, [and] heroin," *id.* at ¶ 7, that the government will show were produced outside the State of Maryland.   Nothing more was required.

### d. Motion for Disclosure of Evidence Pursuant to Federal Rule of Evidence 404(b) by Kenneth Jones (ECF 188) and Marquise McCants (ECF 206)

The government does not intend to present any Rule 404(b) evidence in this case.  It is the government's position that each of the overt acts listed in Count One of the indictment was committed in furtherance of the charged racketeering and drug trafficking conspiracies, and each piece of evidence presented in the government's case-in-chief at trial will be used to establish the defendant's participation in the charged racketeering and drug trafficking conspiracies.  However, in the event the Court should determine otherwise, the government will seek admission of the evidence pursuant to Federal Rule of Evidence 404(b).  Either way, notice has been provided pursuant to Rule 404(b) as requested by the defendants.  The government has produced voluminous discovery relating to the murders, shootings, robberies, assaults, drug trafficking offenses, and firearms offenses committed by the defendants that it intends to prove at trial, and the government does not intend to use any evidence in its case-in-chief that has not been produced in discovery.

### e. Motion for Disclosure of Evidence Pursuant to Federal Rule of Evidence 609 by Kenneth Jones (ECF 188) and Marquise McCants (ECF 206)

As discussed in the government's separate response to Kenneth Faison's motion *in limine* (ECF 237), the government intends to present evidence in its case-in-chief at trial of certain guilty pleas entered by the defendants to state offenses committed during and in furtherance of the racketeering conspiracy charged in Count One.  Federal Rule of Evidence 609—which deals only with the impeachment of witnesses—has no bearing on the admissibility of these guilty pleas to prove the elements of a charged offense.

In addition, should any of the defendants testify at trial, the government hereby provides notice that it intends to use the following convictions for impeachment purposes pursuant to Federal Rule of Evidence 609:

| Defendant | Case Number(s) | Date of Conviction | Offense(s) | Relevant Provision of Rule 609 |
|---|---|---|---|---|
| Gerald Johnson | 3B01309276, District Court for Baltimore City | 10/02/2000 | CDS Possession Not Marijuana | Rule 609(b) |
| Gerald Johnson | 3B01392982, District Court for Baltimore City | 01/04/2002 | CDS Possession Marijuana, CDS Possession Not Marijuana | Rule 609(b) |
| Gerald Johnson | 6B01430701, District Court for Baltimore City | 03/22/2002 | Deadly Weapon Conceal | Rule 609(b) |
| Gerald Johnson | 0B01476664, District Court for Baltimore City | 10/30/2003 | CDS Possession Not Marijuana | Rule 609(b) |
| Gerald Johnson | 103126009, Circuit Court for Baltimore City | 08/14/2003 | CDS PWID | Rule 609(b) |
| Gerald Johnson | 4B01860394, District Court of Maryland, Baltimore City | 02/16/2007 | Assault Second Degree (two counts), Handgun on Person | Rule 609(b) |
| Gerald Johnson | 107297026, Circuit Court for Baltimore City | 03/12/2008 | CDS Distribution | Rule 609(a)(1) |
| Wesley Brown | 113310037, Circuit Court for Baltimore City | 10/16/2015 | Criminal Gang Activity | Rule 609(a)(1) |
| Wesley Brown | 113136013, Circuit Court for Baltimore City | 10/26/2015 | CDS PWID | Rule 609(a)(1) |
| David Hunter | 806268012, Circuit Court for Baltimore City | 09/26/2006 | Firearm on Person, Firearm Possession w/ Felony Conviction | Rule 609(b) |
| David Hunter | 107296020, Circuit Court for Baltimore City | 12/16/2008 | CDS Distribution | Rule 609(a)(1) |
| Montel Harvey | 812074014, Circuit Court for Baltimore City | 04/03/2012 | Possession of Heroin, Possession of Cocaine | Rule 609(a)(1) |
| Montel Harvey | 812107015, Circuit Court for Baltimore City | 05/03/2012 | Conspiracy to Distribute CDS Narcotic | Rule 609(a)(1) |
| Montel Harvey | 812257015, Circuit Court for | 04/08/2013 | CDS Attempted Distribution | Rule 609(a)(1) |

| | Baltimore City | | | |
|---|---|---|---|---|
| Montel Harvey | 113319945, Circuit Court for Baltimore City | 09/17/2015 | Criminal Gang Activity, CDS PWID | Rule 609(a)(1) |
| Kenneth Jones | 111126014, Circuit Court for Baltimore City | 03/13/2012 | Handgun on Person: Carry/Wear | Rule 609(b) |
| Kenneth Jones | 113310058, Circuit Court for Baltimore City | 08/18/2016 | First Degree Murder, Attempted First Degree Murder, Conspiracy to Commit First Degree Murder, Criminal Gang Activity, Handgun: Use in Crime, Regulated Firearm: Illegal Possession | Rule 609(a)(1) |
| Kenneth Faison | 107296021, Circuit Court for Baltimore City | 12/16/2007 | CDS Distribution (two counts) | Rule 609(a)(1) |
| Kenneth Faison | 6B02173317, District Court for Baltimore City | 08/15/2012 | CDS Possession Not Marijuana | Rule 609(a)(1) |
| Kenneth Faison | 113008035, Circuit Court for Baltimore City | 08/03/2013 | CDS Distribution | Rule 609(a)(1) |
| Kenneth Faison | 113008036, Circuit Court for Baltimore City | 08/06/2013 | CDS Possession of Firearms | Rule 609(a)(1) |
| Kenneth Faison | 113310024, Circuit Court for Baltimore City | 01/13/2015 | Criminal Gang Activity, Assault First Degree (two counts) | Rule 609(a)(1) |
| Joseph Bonds | 200277027, 201019026, Circuit Court for Baltimore City | 03/29/2001 | Distribution of Cocaine, Conspiracy to Distribute Cocaine | Rule 609(b) |
| Joseph Bonds | 808315005, Circuti Court for Baltimore City | 11/12/2008 | Possession of Cocaine | Rule 609(a)(1) |
| Joseph Bonds | 113323002, Circuit Court for Baltimore City | 10/24/2013 | Felon in Possession of Regulated Firearm | Rule 609(a)(1) |
| Joseph Bonds | 113310044, Circuit Court for Baltimore City | 10/19/2015 | Criminal Gang Activity | Rule 609(a)(1) |
| Norman Handy | 113119004, | 07/03/2013 | CDS Possession of | Rule 609(a)(1) |

| | | | | |
|---|---|---|---|---|
| | Circuit Court for Baltimore City | | Marijuana | |
| Norman Handy | 113310036, 113346031, Circuit Court for Baltimore City | 10/02/2015 | Criminal Gang Activity, Robbery | Rule 609(a)(1) |
| Marquise McCants | 07K1001446, Circuit Court for Cecil County | 01/28/2011 | Assault First Degree | Rule 609(a)(1) |
| Marquise McCants | 115323012, Circuit Court for Baltimore City | 04/06/2016 | Possession of Marijuana, Tobacco in Place of Confinement | Rule 609(a)(1) |

**f.   Motions to Adopt Motions of Other Defendants by Joseph Bonds (ECF 183), Marquise McCants (ECF 207), Gerald Johnson (ECF 218), Norman Handy (ECF 219), Wesley Brown (ECF 220), and Kenneth Jones (ECF 185)**

Several defendants have filed motions to adopt relevant motions filed by their co-defendants.  Although the government does not object to the adoption of motions of general applicability, it is respectfully requested that the defendants be required to particularize their basis for adopting co-defendants' motions to the extent they are relying on different facts or authorities.  Otherwise, the government is left in the impossible position of having to guess about the issues to which it should respond and what evidence will need to be presented at the motions hearing.  *See United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973) (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity"); *United States v. Randle*, 966, F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality.  Reliance on vague, conclusory allegations is insufficient."); *cf. United States v. Peterson*, 524 F.2d 167, 178 (4th Cir. 1975) (defendants who failed to present specific grounds for suppressing evidence at motions hearing could not raise claims for the first time during trial).

**g. Motions for Leave to File Additional Motions by Kenneth Jones (ECF 186) and Marquise McCants (ECF 208)**

The government takes no position as to the motions by Jones and McCants for leave to file additional motions after the deadline imposed by the Court in this case.  However, to the extent the defendants are allowed to file additional motions, the government respectfully requests at least two weeks to respond.

**IV.   CONCLUSION**

For the foregoing reasons, all of the pending motions should be denied.

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney

By:   ___/s/_____
Peter J. Martinez
Christina A. Hoffman
Assistant United States Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland  21201
(410) 209-4800

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of September, 2017 , I caused a copy of the

foregoing Response to be served on defense counsel through the electronic case filing system.

                        /s/ _____

                        Peter J. Martinez
                        Assistant United States Attorney