# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. JKB-16-0363** |
| | ) | |
| **GERALD JOHNSON,** | ) | |
| a/k/a Geezy, | ) | |
| | ) | |
| **WESLEY BROWN,** | ) | |
| a/k/a Shike White, | ) | |
| | ) | |
| **KENNETH JONES,** | ) | |
| a/k/a "Slay," | ) | |
| | ) | |
| **MARQUISE MCCANTS,** | ) | |
| a/k/a "Digga," and | ) | |
| | ) | |
| **JOSEPH BONDS,** | ) | |
| a/k/a "Yo Gotti," | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

...o0o...

**GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT STATEMENTS OF MOSES MALONE PURSUANT TO FORFEITURE BY WRONGDOING DOCTRINE AND FEDERAL RULE OF EVIDENCE 804(b)(6)**

The United States of America, by and through its counsel, Acting United States Attorney Stephen M. Schenning and Assistant United States Attorneys Christina A. Hoffman and Peter J. Martinez, hereby files this motion *in limine* to admit the statements of deceased witness Moses Malone pursuant to the forfeiture-by-wrongdoing doctrine and Federal Rule of Evidence 804(b)(6).

The defendants are five members of the Black Guerilla Family ("BGF") regime that operated in the Greenmount Avenue corridor of Baltimore City (hereinafter, the "BGF Greenmount Regime" or "the gang"). On May 2, 2013, Wesley Brown murdered Moses Malone at the direction of the BGF Greenmount Regime's leader, Gerald Johnson, in order to prevent Malone from testifying against fellow gang member Norman Handy. Handy had been charged with attempted murder based on information Malone had provided to law enforcement officers regarding a previous incident in which Handy had robbed and shot him. Because the defendants engaged or acquiesced in wrongdoing that was intended to, and did, procure Malone's unavailability as a witness, they have forfeited their right to confront him at trial. *See* Fed. R. Evid. 804(b)(6); *Giles v. California*, 554 U.S. 353 (2008).

The government respectfully submits that the evidence currently in the record more than satisfies the government's burden of proof by a preponderance of the evidence under Rule 804(b)(6). In the alternative, the government respectfully requests that Malone's statements be admitted conditionally at trial, subject to a determination that the elements of Rule 804(b)(6) have been met.

I. **RELEVANT FACTUAL BACKGROUND**

On March 23, 2013, Moses Malone was the victim of a robbery and shooting committed by Norman Handy and another individual in the 2400 block of Greenmount Avenue. During the robbery, Handy and his accomplice took a cell phone and cash from Malone's pockets. They then attempted to steal his sneakers, but Malone broke free and began to walk across the street. As Malone was crossing the street, Handy pointed a revolver in his direction and fired a shot into the ground. The bullet hit the ground, ricocheted, and grazed the toes of Malone's left foot. Malone was treated for his injuries at Union Memorial Hospital. In the aftermath of the incident, Malone

told three civilian witnesses (W-1, W-2, and W-3) that Handy was the individual who had robbed and shot him.

Initially, Malone was reluctant to cooperate with the police, but on April 19, 2013, he participated in a recorded interview with Detectives Dawnyelle Taylor and Glen Jackson at the Baltimore Police Department's Eastern District Headquarters. *See* Exhibit 1 (M. Malone, Recorded Interview, Apr. 19, 2013). During the interview, Malone completed a photo array in which he identified Handy as the person who robbed and shot him on March 23. *See* Exhibit 2 (M. Malone, Photo Array #1, Apr. 19, 2013). He then completed a second array, in which he identified Gerald Johnson and wrote in the "comments" section of the array: "**He got ranked so I'm guessn he sent them at me. Pluz last nite somebody told me to watch out cuz I had some stacks on me head. And said be died by summertime. BGF**." *See* Exhibit 3 (M. Malone, Photo Array #2, Apr. 19, 2013).

On April 20, 2013, based on the information Malone provided during the interview with police, Detective Jackson obtained an arrest warrant for Handy charging him with attempted murder, armed robbery, and other offenses. *See* Exhibit 4 (N. Handy Arrest Warrant & Statement of Charges, Apr. 20, 2013). Later that day, a patrol officer saw Handy exit a residence at 2466 Greenmount Avenue and placed him under arrest. Following Handy's arrest, a team of officers led by Detective Jackson executed a search warrant at 2466 Greenmount Avenue in an attempt to locate the revolver that Handy had used to shoot Malone. During the search of the residence, Detective Jackson left a copy of the search warrant affidavit—which, inexplicably, had not been sealed or redacted—on a kitchen table inside the home. The affidavit contained multiple paragraphs summarizing the information that Malone had provided to the police regarding

3

Handy's involvement in the March 23 robbery and shooting.  *See* Exhibit 5 (Search Warrant Aff., 2466 Greenmount Ave., Apr. 20, 2013).

W-1 and W-2 will testify that after the search warrant was executed, the affidavit was read by several BGF members and then conveyed to Gerald Johnson, who authorized Malone's murder in his capacity as leader of the BGF Greenmount Regime.

On April 23, 2013, BPD officers placed Malone in their witness relocation program.  They noted in their case file that following Handy's arrest, Malone had "been receiving threats from the BGF organization stating that they are going to kill him for getting their member arrested."  *See* Exhibit 6 (D. Ciotti, Witness Relocation Rpt., Apr. 23, 2013).  In light of these threats, the officers transported Malone to a safe house outside of Baltimore City.  Malone stayed at the safe house for several days, but on April 30, 2013, he was evicted by BPD for violating program rules.  *See* Exhibit 7 (E. Navarro, Rpt. on Violation of Program Rules, Apr. 30, 2013).

Within twenty-four hours, Malone had returned to the Greenmount Avenue corridor to stay with a female friend at 650 Cokesbury Avenue.  W-1 will testify that at some point on May 1, Wesley Brown retrieved a "snub-nosed" .22 caliber firearm from the residence at 2466 Greenmount Avenue.  Later that night, BGF member Trevon White, a/k/a "Country," learned of Malone's whereabouts and alerted fellow members of the gang.  Shortly before 12:30 a.m. on May 2, White ran into 2466 Greenmount Avenue and borrowed W-1's cell phone to make a call.  During the call, which W-1 overheard, White said something to the effect of, "**the one who got your brother … Cokesbury**."  W-1, who was working for BPD as a confidential informant at the time, immediately called Detective Dawnyelle Taylor to inform her that BGF members were on their way to kill Malone.  Within minutes, Malone was shot multiple times in the head with a .22 caliber

4

handgun in the 600 block of Cokesbury Avenue. *See* Exhibit 8 (M. Malone Autopsy Rpt.); Exhibit 9 (Firearms Examination Unit, Cartridge/Cartridge Case Rpt., M. Malone Murder).

Toll records and additional testimony establish that the number dialed by White—(443) 310-7094—comes back to an iPhone belonging to Wesley Brown, who is Handy's half-brother. *See* Exhibit 10 (Excerpt from Sprint Records for W-1's phone, (443) 814-4080) (showing two outbound calls to (443) 310-7094 at 12:26 a.m. and 12:27 a.m. on May 2, 2013). Law enforcement officers recovered the iPhone from Brown's person on May 14, 2013. Toll records also establish that, immediately after White's calls to Brown, W-1 made several outbound calls to (443) 681-0803—a phone number belonging to Detective Dawnyelle Taylor. *See id.* Detective Taylor will testify that she was at home when she saw that she had missed multiple calls from W-1. When she connected with W-1, he told her that Gerald Johnson and his fellow gang members were on their way to kill Malone. Detective Taylor immediately called BPD's Eastern District to have officers sent to the location, but as she did that, she heard a report come out over her police radio of a shooting on Cokesbury Avenue. When she talked to detectives at the Eastern District, she found out that it was Malone who had been shot and that he was dead.

In the days following the murder, W-1 overheard a conversation in which Brown took responsibility for killing Malone. W-1's testimony is consistent with the testimony of a second witness, James Cornish, a/k/a "Nod," who has already testified during a state court proceeding. Cornish will testify that in the days following Malone's murder, Brown asked for Cornish's assistance in disposing of a .22 caliber handgun. According to Cornish, Brown explained that the handgun was "dirty" because he had used it to shoot a witness who was testifying against his brother, *i.e.*, Handy. Brown further told Cornish that the shooting had occurred on Cokesbury Avenue, and that he had given the witness "**all headshots**." Following this conversation, Cornish

5

attempted to obtain the .22 caliber handgun from Brown, with the intent of turning it over to law enforcement.  (Cornish was also working for BPD as a confidential informant at the time.)  By the time Cornish got back in touch with Brown, however, he had disposed of the handgun through a mutual friend named Delando Belton, a/k/a "Eggy."

Initially, investigators were unable to unlock Brown's iPhone due to limitations in their technical know-how at the time.  In 2017, however, ATF analysts successfully unlocked the phone and conducted a forensic examination of its contents.  Text messages from Brown's iPhone corroborate both W-1's and Cornish's testimony about the gun used to kill Malone.  Specifically, on May 12, 2013, Brown exchanged the following text messages with a contact saved as "Eggy" in his contacts list:

| | | |
|---|---|---|
| **Eggy**: | | Yo he wanna know what he buying and how much |
| **BROWN**: | | 22 cobra 250 |
| **BROWN**: | | It hold 10 |
| **Eggy**: | | Ard [alright] |
| **Eggy:** | | Cool |

*See* Exhibit 11 (Excerpt from Forensic Examination Rpt., W. Brown iPhone).  Notably, a Cobra .22 caliber pistol is a short-barreled or "snub-nosed" firearm, just as W-1 described.  *See* Exhibit 12 (Sample Image of Cobra .22 Caliber Pistol).

Investigators have also obtained historical cell site location information for Brown's cell phone from the service provider, AT&T.  The data show that during the time period of Malone's murder (between 12:00 and 1:00 a.m. on May 2, 2013), Brown's cell phone moved from the area of Latrobe Homes, where Brown was known to live, to the area of the 600 block of Cokesbury

Avenue, where it was at the time Malone was shot to death, and then back to the area of Latrobe Homes.  *See* Exhibit 13 (FBI Cellular Analysis Rpt.).

On May 14, 2013, at approximately 9:08 a.m., Handy made a recorded jail call during which he and fellow BGF member Anthony Evans, a/k/a "Archie,"[1] discussed their belief that Handy's pending attempted murder charges would be dismissed in light of Malone's death. Specifically, Handy and Evans had the following conversation:

> **EVANS**: When you go back to court?
>
> **HANDY**: I go to court the 21st.  I ain't even—this is still my preliminary [hearing]. You heard me?
>
> **EVANS**: Hell no! This still your preliminary?
>
> **HANDY**: Hell, yeah.
>
> **EVANS**: Man, you know they [*i.e.*, state prosecutors] probably [unintelligible] and postpone that.
>
> **HANDY**: Uh-huh.  That's all they do, yo.
>
> **EVANS**: Yeah, that's crazy.  'Cause if you would have had a lawyer at your preliminary, they would have had to do something, you heard me?
>
> **HANDY**: Yeah.
>
> **EVANS**: Yeah. Yo [*i.e.*, Malone] gone anyways, so there ain't no case, for real.  You want to get technical—there ain't no case.
>
> **HANDY**: Yeah.
>
> **EVANS**: So, you probably—you probably know that process.  You probably just gotta sit for a little second, though.  You'll be home—you'll be right home, though.

---

[1] Evans pleaded guilty to criminal gang activity in state court on October 27, 2014 and admitted to being a member of BGF.  *See* Baltimore City Circuit Court Case No. 113310019.  In addition, a publicly available photograph from Norman Handy's Facebook account shows Evans and Handy standing together and crossing their arms to make an "X" sign, a well-known symbol of BGF.  *See* Exhibit 14 (N. Handy Facebook Photo).

7

Exhibit 15 (Recording of N. Handy Jail Call, May 14, 2013, 9:08 a.m.), at 4:40.

Norman Handy and Marquise McCants are currently in federal custody at the Chesapeake Detention Facility ("CDF") awaiting trial in the instant case. On September 25, 2017, Handy and McCants talked about their case in a common area of the jail that contained an audio-video recording device. They discussed the fact that Wesley Brown had been acquitted of the Malone murder in state court, the differences between the evidence in the state and federal case, and their concern that the government's cooperating witnesses might include Delando Belton, a/k/a "Eggy," or the individual to whom Belton sold the gun that Brown used to kill Malone. The following is an excerpt of their conversation:

> **HANDY**: He [*i.e.*, Brown] beat the body [*i.e.*, the state murder charge].
>
> **MCCANTS**: Oh, how'd he beat it?
>
> **HANDY**: Nod [*i.e.*, Cornish]—Nod—that was all the evidence they had, was Nod saying, 'He told me he did it.'
>
> **MCCANTS**: Then how the fuck they [*i.e.*, federal prosecutors] got the text messages—talkin' about they got the text messages—
>
> **HANDY**: They got a text message from Country [*i.e.*, White] sayin, 'Yo—Yo that Norm locked up for [*i.e.*, Malone] around here.' Two—two hours later, he was dead.
>
> **MCCANTS**: But they sayin' they got Wes on the phone trying to get rid of the gun he shot such-and-such in the head with. What's that about?
>
> **HANDY**: That's the same [unintelligible]—that's the same one! You talkin' about—you talkin' about Eggy? Eggy probably telling on him [*i.e.*, cooperating with law enforcement against Brown], yo! That's what he [*i.e.*, Brown] said he keep worrying about. Eggy probably telling on a nigga. [unintelligible] Eggy got rid of the joint [*i.e.*, the gun], for real.

8

    **MCCANTS**: Yeah. Eggy got rid of it, sold it to Deandre—Dre. But, I don't think Eggy telling. I mean, I ain't put that past him, but [unintelligible].

    **HANDY**: How the fuck they [*i.e.*, federal prosecutors] know who—who Yo [*i.e.*, Belton] sold the gun to? They say they got the nigga that bought the gun—the nigga—whoever Yo sold the gun to—

    **MCCANTS**: They said that?!—

    **HANDY**: —telling on Wes. Yeah!

    **MCCANTS**: Who said that?

    **HANDY**: Wes said the nigga that Eggy gave the joint to telling on him.

*See* Exhibit 16 (N. Handy & M. McCants Recording, CDF, Sept. 25, 2017), at 32:20.

In addition to the evidence discussed above, numerous witnesses will testify that one of the fundamental rules of BGF is a rule against cooperating with law enforcement, or "snitching." These witnesses will explain that the rule against snitching is one of the so-called "33 Constitutions" upon which BGF was founded, and violators are subject to the ultimate sanction—death. In accordance with this rule, members of the BGF Greenmount Regime commonly used violence and threats of violence to intimidate or eliminate those they suspected of cooperating with law enforcement.

The witness testimony will be corroborated by an abundance of documentary evidence recovered during the investigation of the BGF Greenmount Regime. For instance, on April 26, 2013, law enforcement officers executed a search warrant at Wesley Brown's residence at 1716 Latrobe Street and recovered a handwritten list of the "**33 Constitutions**" of BGF, including: "**We do not participate in snitching or working with the police**." *See* Exhibit 17 (BGF Paperwork, 1716 Latrobe St. Search Warrant, Apr. 26, 2013). In addition, Wesley Brown's iPhone recovered on May 14, 2013 contained a photograph—with a "last modified" date of May 5, 2013—showing

9

Brown wearing a sweatshirt with the words "**Fcuka Rat**" and a picture of Mickey Mouse caught in a mousetrap. *See* Exhibit 18 (Image from Forensic Examination Rpt., W. Brown iPhone). Gerald Johnson later posted the same photograph on his Instagram account, dattniccageeznutz, along with the comment "Free my round coasta nostra!!! Young gangsta ly champ!!! #savage!!!" *See* Exhibit 19 (G. Johnson Instagram Account, dattniccageeznutz, at 280).

Furthermore, multiple publicly accessible YouTube videos feature Gerald Johnson talking about killing cooperators, or attempting to shame and intimidate specific witnesses against him. For instance, in one video, Johnson boasts about beating gang conspiracy and murder charges in state court and wags his finger at the camera, saying: "**Nigga Nod [*i.e.*, Cornish]—you know what you did. Weirdo Chris [*i.e.*, Meadows, another witness in Johnson's state trial]—you know what you did. Niggas on the stand**." *See* Exhibit 20 (HawkkEyeVisionz YouTube Account, "Welcome Home Gzy pt. 1"). In another video, Johnson states: "**[A]ll I got is bullets for you rat niggas.**" *See* Exhibit 21 (HawkEyeVisionz YouTube Account, "Kay Tudda Profit"). In yet another, Johnson brags: "**I get niggas shot just for running mouth**." *See* Exhibit 22 (Ty Barclay YouTube Account, "Harlem Primo"). Finally, in one video, Johnson warns, "**That's that snitch shit; type of thing that get your whole team hit [*i.e.*, killed]**." *See* Exhibit 23 (Crisso Shawty YouTube Account, "Gzy Tha Prince-JamaaVille(reloaded)"). In sum, the evidence and testimony will establish that Moses Malone's murder was in keeping with both the founding principles and the regular practice of members of the BGF Greenmount Regime to kill those whose cooperation with law enforcement threatened their criminal organization.

## II.     ARGUMENT

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. AMEND. VI. As a

general rule, the Confrontation Clause prevents out-of-court testimony from being admitted in a criminal trial unless the defendant has an opportunity to confront and cross-examine the witness against him. An important exception to this rule, however, is the doctrine of forfeiture by wrongdoing. Codified in Federal Rule of Evidence 804(b)(6), the forfeiture-by-wrongdoing doctrine allows the admission of "[a] statement offered against a party that wrongfully caused— or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6). The rule "has its foundation in the principle that no one should be permitted to take advantage of his own wrongdoing." *Giles v. California*, 554 U.S. 353, 366 (2008);[2] *see also Crawford v. Washington*, 541 U.S. 36, 68 (2004) (common law forfeiture-by-wrongdoing exception "extinguishes confrontation claims on essentially equitable grounds"); *Reynolds v. United States*, 98 U.S. 145, 158 (1878) ("[I]f a witness is absent by [the accused's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away.").

The Fourth Circuit has "endorsed a broad understanding of the forfeiture-by-wrongdoing exception." *United States v. Jackson*, 706 F.3d 264, 268 (4th Cir. 2013). Several principles emerge from the case law:

---

[2] *Giles* held that the Confrontation Clause incorporates the common law forfeiture-by-wrongdoing exception that existed at the time of the founding, which was limited to situations where "the defendant engaged in conduct *designed* to prevent the witness from testifying." *Id.* at 359–360; *see also United States v. Hanna*, No. 07-4629, 353 Fed. Appx. 806, 808 (4th Cir. Dec. 2, 2009) (unpub.) (applying *Giles* and holding that murder victim's statements were admitted erroneously where the defendant procured the witness's unavailability for the purpose of collecting life insurance proceeds, not to prevent the witness from testifying).
   Because Rule 804(b)(6) includes an intent requirement, it comports with the Confrontation Clause and *Giles*. *Id.* at 367. Accordingly, *Giles* "did not materially alter" Fourth Circuit case law on the forfeiture-by-wrongdoing exception, *United States v. Jackson*, 706 F.3d 264, 269 (4th Cir. 2013), but "merely clarified existing precedent and affirmed that the intent requirement of Rule 804(b)(6) is sufficient to prevent any violation of the Confrontation Clause." *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012).

11

*First*, the government need not show that the intent to prevent the witness from testifying was the wrongdoer's *sole* motivation, so long as he was motivated *in part* by a desire to silence the witness. *Jackson*, 706 F.3d at 268–69; *see also United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir. 1996); *United States v. Martinez*, 476 F.3d 961, 966 (D.C. Cir. 2007); *People v. Banos*, 178 Cal. App. 4th 483 (2009), *cert. denied*, 560 U.S. 911 (2010). As the Fourth Circuit explained in *Jackson*, a different rule would produce an "intolerable incentive" for criminals to murder, injure, or intimidate witnesses just so long as they can provide an additional evil motive for their conduct, such as retaliation (which they could do in almost every case). *Id.* at 269. It would also suppress the "vigorous and candid participation of relevant witnesses" and "hinder[] factual development in criminal prosecutions." *Id.*

*Second*, "Rule 804(b)(6) applies *whenever* the defendant's wrongdoing was intended to, and did, render the declarant unavailable as a witness against the defendant, without regard to the nature of the charges at the trial in which the declarant's statements are offered." *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005); *see also id.* at 242 ("A defendant who wrongfully and intentionally renders a witness unavailable in any proceeding forfeits the right to exclude the witness's statements at that proceeding *and* any subsequent proceeding."); *United States v. Lentz*, 524 F.3d 501, 527 (4th Cir. 2008). Indeed, the Rule applies where the declarant was only a "potential witness," and "there was no ongoing proceeding in which the declarant was scheduled to testify." *United States v. Dhinsa*, 243 F.3d 635, 652 (2d Cir. 2001) (cited favorably by *Gray*). Again, this interpretation of the Rule is necessary to prevent wrongdoers from profiting from their misconduct in cases where charges have not yet been brought, or the defendant is later subject to additional charges. *See Gray*, 405 F.3d at 241.

12

*Third*, traditional principles of *Pinkerton* conspiracy liability apply in the forfeiture-by-wrongdoing context. *See United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012); *see also Gray*, 405 F.3d at 242; *Jackson*, 706 F.3d at 268. Thus, a defendant need not have participated directly in planning or procuring the declarant's unavailability through wrongdoing. *Dinkins*, 691 F.3d at 385. Rather, the forfeiture-by-wrongdoing exception applies so long as "the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." *Id.* As the Fourth Circuit explained in *Jackson*, "*Pinkerton* liability . . . [is] wholly consistent with the Supreme Court's statement that '[t]he Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts.'" *Jackson*, 706 F.3d at 268 (quoting *Reynolds*, 98 U.S. at 158); *see also United States v. Cherry*, 217 F.3d 811, 820 (10th Cir. 2000) ("Failure to consider *Pinkerton* conspiratorial responsibility affords too much weight to Confrontation Clause values in balancing those values against the importance of preventing witness tampering."); *cf. United States v. Rivera*, 412 F.3d 562, 567 (4th Cir. 2005) ("[A] defendant need only tacitly assent to wrongdoing in order to trigger [Rule 804(b)(6)'s applicability.").

*Fourth*, the government's burden of proof under Rule 804(b)(6) may be met by a preponderance of the evidence. *Dinkins*, 691 F.3d at 383; *Rivera*, 412 F.3d at 566–67; United States v. Scott, 284 F.3d 758, 762 (7th Cir. 2002); *United States v. Houlihan*, 92 F.3d 1271, 1280 (1st Cir. 1996); *see also Davis v. Washington*, 547 U.S. 813, 833 (2006) (noting that "federal courts … have generally held the Government to the preponderance-of-the-evidence standard). Furthermore, the district court "need not hold an independent evidentiary hearing if the requisite findings may be made based upon evidence presented in the course of trial." *Gray*, 405 F.3d at 241; *United States v. Johnson*, 219 F.3d 349, 356 (4th Cir. 2000).

Here, there is proof by a preponderance of the evidence that Wesley Brown murdered Moses Malone at the Gerald Johnson's direction in order to prevent Malone from testifying against fellow gang member Norman Handy. Under the forfeiture-by-wrongdoing doctrine and Rule 804(b)(6), Malone's statements are admissible against the defendants because they engaged or acquiesced in wrongdoing that was intended to, and did, procure Malone's unavailability as a witness. Malone's statements are clearly admissible against Johnson and Brown because they directly participated in planning and carrying out Malone's murder. Although Johnson and Brown may have had additional motivations for killing Malone (for instance, a desire to retaliate or a general dislike for him), this would not defeat the applicability of Rule 804(b)(6), as there is a wealth of evidence that one of the substantial motivations was to eliminate the state's key witness against Handy. *See Jackson*, 706 F.3d at 268–69. Furthermore, in murdering Malone, Johnson and Brown forfeited their right to confront him in all subsequent proceedings, not merely the then-pending attempted murder case against Handy. *See Gray*, 405 F.3d at 241–242.

Malone's statements are also admissible against the other trial defendants under traditional principles of *Pinkerton* conspiracy liability. The Fourth Circuit's decision in *United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012), is instructive. In *Dinkins*, three defendants faced various charges including the murder of a government witness named John Dowery. The three defendants belonged to an organization called Special that dealt drugs and had a history of committing acts of violence in furtherance of its narcotic activities. *Id*. at 362-63. James Dinkins was one of Special's "enforcers." *Id*. at 363. Dowery was a government informant regarding the murder of another drug dealer by members of Special. *Id*. Dinkins, along with another member of Special, attempted to kill Dowery before he could testify. *Id*. at 364. Dowery survived the attack, and Dinkins was later arrested and incarcerated on another charge. *Id*. at 365. Ultimately, Melvin Gilbert, the leader

14

of Special, and Darron Goods, another member of the organization, succeeded in killing Dowery about a year after Dinkins was incarcerated. *Id*. at 363, 365.

Dinkins objected to the government's use of Dowery's unconfronted statements against him under the forfeiture-by-wrongdoing exception because he was incarcerated at the time Dowery was murdered and therefore could not have been responsible for rendering Dowery unavailable as a witness. Relying on *Pinkerton* liability principles, the trial court admitted Dowery's statements, and the Fourth Circuit affirmed. *Id*. at 362. The Fourth Circuit reasoned that the evidence was sufficient to prove Dowery was a known "snitch" and that members of Special, including Dinkins, had a pattern of targeting government informants. *Id*. Although Dinkins did not directly participate in Dowery's murder, his murder by Gilbert and Goods "was reasonably foreseeable to Dinkins" and "a natural consequence of an ongoing conspiracy." *Id*. at 386.

Here, as in *Dinkins*, all of the defendants were members of a violent gang known for targeting "snitches." Malone's murder was in keeping with the founding principles and regular practice of BGF members to carry out acts of violence against individuals they suspected of cooperating with law enforcement. And indeed, as recently as a month ago, McCants and his co-defendant, Handy, displayed intimate knowledge of the Malone murder and its details, including how Brown "beat" the murder charge in state court, what became of the murder weapon, and who may be testifying against Brown in this case (and therefore in danger of further retaliation, and potentially death). Under these circumstances, there is simply no question that Malone's murder was "in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." *Dinkins*, 691 F.3d at 385. Evidence of his statements should therefore be admissible against all of the defendants at trial.

### III. CONCLUSION

For the foregoing reasons, the Court should grant the government's motions *in limine* without a hearing. In the alternative, the government respectfully requests that Malone's statements be admitted conditionally at trial, subject to a determination that the elements of Rule 804(b)(6) have been met.

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney

By: _____
Christina A. Hoffman
Peter J. Martinez
Assistant United States Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland  21201
(410) 209-4871

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 27, 2017, I filed the foregoing motion through the electronic case filing system and thereby served all counsel of record.

 

Christina A. Hoffman
Assistant United States Attorney