1    IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF MARYLAND
2

3    UNITED STATES OF AMERICA,          )
                                        )
4         Plaintiff,                    )
     vs.                                )
5                                       ) CRIMINAL NO.: JKB-16-0363
     GERALD JOHNSON, et al.,            )
6                                       )
          Defendant.                    )
7                                       )
     _____)
8

9              Transcript of Motions Hearing
        Before the Honorable James K. Bredar
10           Tuesday, October 10th, 2017
               Baltimore, Maryland
11

12   For the Plaintiff:

13       Peter J. Martinez, AUSA

14       Christina A. Hoffman, AUSA

15   For Defendant Gerald Johnson:

16       Paul F. Enzinna, Esquire

17       Jeffrey B. O'Toole, Esquire

18   For the Defendant Wesley Jamal Brown:

19       Harry J. Trainor, Jr., Esquire

20       Christopher M. Davis, Esquire

21   For the Defendant Montell Harvey:

22       William L. Welch, III, Esquire

23
                Christine T. Asif, RPR, FCRR
24             Federal Official Court Reporter
               101 W. Lombard Street, 4th Floor
25                Baltimore, Maryland 21201

```
1                        APPEARANCES (Cont'd)

2

3    For Defendant Kenneth Jones:

4         Alan R.L. Bussard, Esquire

5    For Defendant Marquise McCants:

6         John R. Francomano, III, Esquire

7    For the Defendant Joseph Bonds:

8         Gerald C. Ruter, Esquire

9

10

11

12

13

14

15

16

17

18

19

20

21

22
     _____
23
                    Christine T. Asif, RPR, FCRR
24                  Federal Official Court Reporter
                    101 W. Lombard Street, 4th Floor
25                    Baltimore, Maryland 21201
```

```
1                    P R O C E E D I N G S
2          THE COURT:  Good morning.  Be seated, please.
3   Mr. Martinez, you may call the case.
4          MR. MARTINEZ:  Good morning, Your Honor.  I call
5   criminal case number JKB-16-363, this is United States versus
6   Gerald Thomas Johnson, Wesley Brown, Montell Harvey, Kenneth
7   Jones, Joseph Lawrence Bonds, Marquise McCants.  This matter
8   has been set in for a motions hearing.  Peter Martinez for the
9   government.  With me at counsel table are AUSA Christina
10  Hoffman and Special Agent Lisa Christy with the ATF.
11         THE COURT:  Thank you.  Appearances.  Mr. Enzinna.
12         MR. ENZINNA:  Your Honor, Paul Enzinna for Gerald
13  Johnson, accompanied by Jeffrey O'Toole.
14         THE COURT:  Hold on just a second.  Good morning to
15  you.  And good morning, Mr. O'Toole.  Good morning,
16  Mr. Johnson.
17         Mr. Davis.
18         MR. DAVIS:  Good morning, Your Honor, Christopher
19  Davis on behalf of Wesley Brown, who's seated to my right.
20         MR. TRAINOR:  And Harry Trainor, also on behalf of
21  Wesley Brown.
22         THE COURT:  Okay.  Good morning to you, Mr. Davis.
23  Good morning, Mr. Trainor.  And good morning, Mr. Brown.
24         Mr. Welch.
25         MR. WELCH:  Good morning, Your Honor.  I am William
```

```
1    Welch, that's spelled W-e-l-c-h.  I represent Mr. Harvey.
2    He's seated to my right.
3              THE COURT:  Thank you.  Good morning to you.  And
4    good morning, Mr. Harvey.
5              Mr. Bussard.
6              MR. BUSSARD:  Good morning, Your Honor.  Alan
7    Bussard representing Kenneth Jones, who is to my right at the
8    trial table.
9              THE COURT:  Thank you.  And good morning to you.
10   And good morning to you, Mr. Jones.
11             Mr. Francomano.
12             MR. FRANCOMANO:  Good morning, Your Honor.  John
13   Francomano for Mr. Marquise.
14             THE COURT:  And good morning to you, Mr. Francomano.
15   And good morning to you, is it Mr. McCants, Marquise McCants?
16             And then Mr. Ruter.
17             MR. RUTER:  Your Honor, good morning.  Gerald Ruter
18   on behalf of Mr. Bonds.  Mr. Bonds is seated to my right.
19             THE COURT:  Thank you.  And Mr. Ruter, are you
20   sufficiently well accommodated back there?
21             MR. RUTER:  Absolutely.
22             THE COURT:  Okay.  Thank you.  And good morning to
23   you, Mr. Bonds.
24             All right.  The matter comes on for the hearing on
25   pending pretrial motions in anticipation of our jury trial,
```

1    which is scheduled to begin on November the 13th, just a

2    little bit over a month from now.  Just prior to the weekend,

3    the government, in correspondence, proposed a particular

4    sequence by which they suggested that the motions be taken up.

5    The Court reviewed that and responded with a letter drafted on

6    Friday, but because of an oversight on our end was not

7    docketed until this morning.  I accept the proposed sequence

8    of motions, but our method will be that we hear the motion and

9    then we'll hear argument on that motion and decide that motion

10   and then move on to the next motion, or logical batch of

11   motions that relate to each other.  So that's going to be the

12   sequence.

13           In light of that, the first matter before the Court

14   is the motion made, I guess by Mr. Bussard, which is the

15   motion to suppress the fruits of a warrantless arrest and

16   search of Kenneth Jones on April 11th of 2011.  Is that where

17   you're expecting us to kick off here, Mr. Martinez?

18           MR. MARTINEZ:  It is, Your Honor.  And that's what

19   we indicated in our letter to the Court.  I would add though,

20   that I spoke to Mr. Bussard before the proceeding began this

21   morning and he made me aware that there are five witnesses

22   under defense subpoena in connection with another one of his

23   motions, that's ECF 193, the motion to suppress in-court and

24   out-of-court identification by government witnesses.  And so

25   with apologies, Your Honor, for the last minute curve ball, I

```
 1    think what Mr. Bussard and the government are inclined to
 2    propose to the Court is that in conjunction with the Court's
 3    consideration of Mr. Jones's motions this morning, if we could
 4    address that one initially because it's our position that one
 5    can be decided on the papers and there's no need for witness
 6    testimony.  Then the five witnesses, the law enforcement
 7    witnesses who Mr. Bussard has placed under defense subpoena,
 8    can be released from those subpoenas so they don't have to sit
 9    around for two days.
10            THE COURT:  So this is not 194, which you're
11    agreeing does need to be heard  and with respect to which
12    witness testimony needs to be taken --
13            MR. MARTINEZ:  Correct.
14            THE COURT:  -- but another paper.  Mr. Jaco, you can
15    approach.
16            I remember this motion.  Mr. Bussard, this is about
17    photo arrays?
18            MR. BUSSARD:  That's correct, Your Honor.  Your
19    Honor, I -- and the Court was gracious enough to issue Rule 17
20    subpoenas for some detectives.
21            THE COURT:  Yes.
22            MR. BUSSARD:  I have not seen any of those
23    detectives here today, and because it was a holiday weekend, I
24    didn't get a chance to communicate with the Marshal to see if
25    they had, in fact, been served, so I would like at least to
```

1    have time to see if those law enforcement officers have shown

2    up.

3             THE COURT:  Mr. Martinez?

4             MR. MARTINEZ:  Your Honor, that's news to me.

5    Mr. Bussard asked before the hearing that we tee up this issue

6    so that we could address it first.  And as I said, it's our

7    position that testimony isn't necessary here.  The Court can

8    decide the pending motion based on the legal arguments that

9    were presented in the papers.

10            THE COURT:  Well, Mr. Bussard, I'll give you 30

11    seconds to peek in the hallway to see if anybody is out there.

12    Please go ahead.

13            MR. BUSSARD:  Thank you.

14            (Pause in the proceedings.)

15            THE COURT:  Mr. Bussard.

16            MR. BUSSARD:  Your Honor, there is no one else in

17    the hallway.

18            THE COURT:  All right.  So certainly the Court's

19    ordinary procedure would be to grant enough time to allow the

20    subpoenas to be served and for the witnesses to be notified

21    and for the defendant to bring them here -- to get them to

22    court via this method.  And that's the ordinary sequence of

23    things.  But this is an argument about photo arrays; right?

24            MR. BUSSARD:  Yes, Your Honor, and two photo

25    books.

```
 1              THE COURT:  Okay.  So why wouldn't the questions

 2     just turn on the arrays themselves and what the photos look

 3     like?  And to the extent that there are questions about how

 4     the arrays were displayed, perhaps that could be the subject

 5     of a stipulation.  I don't suspect from reading the papers

 6     that there are big disagreements about how the process was

 7     conducted, more about the images that were used and

 8     specifically whether or not your client had the right to have

 9     other photographs in the array of persons who frequented the

10     Greenmount neighborhood.

11              MR. BUSSARD:  That's accurate, Your Honor.  There

12     was arrays challenged regarding Alexis Roberts, Christopher

13     Meadows, James Cornish, Lamontae Smith, and Angelique Petty.

14     The government has informed me that they will not be

15     proceeding with the Angelique Petty array.  So that is no

16     longer the subject of a motion.  Of the others, the only one

17     that I had an interest in and I believe a challenge, is the

18     Alexis Roberts.  And the reason, if I may make a proffer, Your

19     Honor, is Ms. Roberts came into homicide headquarters on

20     October 16th, 2013 --

21              THE COURT:  While we're having this colloquy, can we

22     get that particular array, is it a single array or is it a

23     photo book?

24              MR. BUSSARD:  It's an array and there's also a photo

25     book that was provided by the government, undated, so I don't
```

1    know if it happened that day or some other day with

2    Ms. Roberts.

3                THE COURT:  Can we at least get the array up on the

4    evidence presenter?

5                MR. BUSSARD:  The challenge itself, Your Honor, is

6    not necessarily the array itself, the challenge itself is that

7    subsequent to October 16th, 2013, Ms. Roberts has testified

8    three separate times under oath in Mr. Johnson's state

9    proceeding, in Mr. Brown's state proceeding, and Mr. Jones's

10   state proceeding, and testified that she has no recollection,

11   one, of the night of the shooting; two, of being -- any

12   recollection of the photo array itself.  Although, she

13   acknowledged that her signature was on the papers.  And that

14   she was severely under the influence of drugs.  In fact, she

15   testified she was under the influence of drugs most of the

16   time in 2013, to the extent that she has no recollection of

17   almost anything.  That is our issue.  That was not brought

18   out, necessarily, at Mr. Jones's trial.

19               THE COURT:  How does that -- what's your point?

20   Your point is that the Court, on a pretrial basis, should

21   invalidate any statement or testimony that she might wish to

22   make before a jury because on other occasions she has

23   recanted, disclaimed, whatever.

24               MR. BUSSARD:  It goes to credibility as much as

25   anything else.  And the fact --

1          THE COURT:  But that's not a constitutional attack

2     on the process that the government used, is it?  It's just

3     that you are entitled to the totality of the evidence and

4     circumstances surrounding the claimed identification that the

5     witness made.  And it sounds like you've got it, that you've

6     either through your own investigation or the government having

7     just provided it to you and turned it over as *Brady* or *Giglio*

8     or whatever, you know that she apparently, at least your

9     argument is, that she didn't come through with identifications

10    on other occasions, or denied having ever participated.

11         MR. BUSSARD:  Denied having the ability to even

12    recall what she identified.

13         THE COURT:  Okay.

14         MR. BUSSARD:  It doesn't -- I don't have any -- I

15    will proffer to the Court, I don't have any evidence of any

16    improprieties on the part of the detectives in the

17    presentation.  In fact -- well, this one wasn't, there was

18    some double blinds used, which really ensures that the

19    procedure is accurate.  In this case it is just that

20    Ms. Roberts was under the influence, or appears to be, even on

21    the videos, appears to be under the influence of drugs.  And

22    the detectives never even inquired on the interviews of

23    whether or not she was going through withdrawal at the time,

24    yet she had admitted later on during these -- the trials that

25    I've referenced, that in fact she was under the influence of

1      drugs.  So from that point of view --

2              THE COURT:  There's two different questions, okay.

3      The first is whether or not the government has committed some

4      sort of impropriety, or their agents have, such that the

5      remedy of suppression should be invoked and the evidence

6      should be excluded on that basis.  That's question number one.

7      Question number two is, is any of this evidence relevant or

8      reliable?  That's a different question.  You know, was she so

9      inebriated that she's not credible, et cetera?

10             But we don't suppress evidence because of

11     reliability questions.  We sometimes exclude it, perhaps, if

12     the government's unable to lay a sufficient foundation that

13     evinces some credibility or relevance of the evidence.  But

14     I'm not going to do that in a pretrial hearing.  If that

15     problem erupts and they're trying to get this in trial, sure,

16     we'll take it up.  Today's focus is on the question of whether

17     or not the government engaged in some sort of impropriety,

18     whether the agents did something that violated your client's

19     constitutional rights and how they manipulated or managed this

20     photo array experience.  So what's that?

21             MR. BUSSARD:  The only issues I have are what's in

22     the pleading.  One is that, Mr. Jones, who is in the upper

23     left-hand corner of that array, is the only person from

24     Greenmount.  He's the only person that goes by the street name

25     or the nickname of Slay.

1          THE COURT:  But there's no street names on this

2    array, agree?

3          MR. BUSSARD:  No, there was just -- he is the only

4    person from the Greenmount Regime.

5          THE COURT:  Okay.

6          MR. BUSSARD:  Or the Greenmount Area of Baltimore

7    County -- Baltimore City, so it's a geographical argument.

8          THE COURT:  So as I understand the argument,

9    Mr. Bussard, you're contending that there was something

10   inherently prejudicial or wrong, improperly suggestive about

11   displaying a photo array to a witness, in this case, who

12   presumably was familiar with the neighborhood.  And in the

13   array there was only a picture of one person who was also from

14   the neighborhood, and that is your client.  And that the other

15   five images that were used, young, bearded, African American

16   men, that they didn't come from that neighborhood.  And you

17   seem to be implying that the problem or the issue is that,

18   well, there's just a greater chance that she would have

19   recognized the person, your client, just by virtue of the fact

20   that they both frequented the neighborhood, is that the point?

21         MR. BUSSARD:  Yes, Your Honor.

22         THE COURT:  Okay.  My ruling is that that's an

23   insufficient basis for suppressing a photo array.  That a

24   defendant does not have a right to have an array, that it not

25   only is not too suggestive in terms of the actual features of

1      the faces of the people displayed, but that the defendant has

2      a right that goes beyond that, which is to have a photo array

3      used that only displays images of, in this case, young,

4      African American, bearded men, who happen to also be from the

5      neighborhood.  He's not entitled to that.  That's a step too

6      far.  And I understand the argument, and the motion to

7      suppress on that basis is denied.

8                 What else is pending of your motion?

9                 MR. BUSSARD:  That's the only motion.  There was two

10     photo books and we're submitting on those.  I -- I don't have

11     any argument as to impropriety.

12                THE COURT:  Well, do I need to look at the photo

13     books and consider the question of whether or not they're

14     impermissibly suggestive?

15                MR. BUSSARD:  I'd be happy to show them to you, Your

16     Honor.  They were also included, I believe, in the

17     government's exhibits, but I'd be happy to show them to you.

18                THE COURT:  How many images are displayed in these

19     photo books?

20                MR. BUSSARD:  Approximately 50 or 60.

21                THE COURT:  How many photo books are there?

22                MR. BUSSARD:  Well, three, one by Ms. Roberts,

23     undated.

24                THE COURT:  Is your suggestion, again, that they are

25     deficient because they do not include images of others from

1    the Greenmount neighborhood?  Or is it some other ground, are

2    there people, you know, who do not resemble the description

3    that was given of your client at all, wrong race, wrong

4    gender, wrong age, wrong facial hair, that sort of thing?

5              MR. BUSSARD:  The photo shows or photo books

6    themselves are nothing but photographs turned over one at a

7    time.  The government is right in their proffer and we are

8    proffering too, that on its face it doesn't appear to be

9    anything prejudicial to Mr. Jones as far as fail -- the photo

10   books themselves for the three that I'm mentioning.  I'd be

11   happy to show them to you.

12             THE COURT:  Well, if there's nothing prejudicial to

13   your client, then are you withdrawing the motion asking that

14   any identifications that are rooted in the -- those photo

15   books or related to them, are you withdrawing that or do you

16   still contend --

17             MR. BUSSARD:  I want the Court's ruling, Your

18   Honor.

19             THE COURT:  Okay.  But I'm ruling in the

20   circumstance where you're telling me that the government is

21   correct in their position that there's nothing prejudicial;

22   true?

23             MR. BUSSARD:  Yes, on its face.

24             THE COURT:  Denied.  Motion's denied.  Is there any

25   other element of those motions that are, what, paper No. 193?

1          MR. BUSSARD:  No, Your Honor, it's just that they

2     were separate identifications by the persons that I

3     outlined.

4          THE COURT:  Got it.

5          MR. BUSSARD:  With the same argument as to each

6     one.

7          THE COURT:  Okay.  But without any suggestion of

8     prejudice to your client being presented to the Court, I would

9     have no basis for a ruling that they are impermissibly

10    suggestive or otherwise constitutionally defective, such that

11    the remedy, the extraordinary remedy, of suppression is in

12    order.  So in light of that, the motion's denied.  Now, for

13    housekeeping purposes, are we just talking at this point about

14    paper No. 193?

15         MR. BUSSARD:  Yes, Your Honor.  The only argument I

16    would -- just to let you know, I know the Court's made a

17    ruling on it, is that in at least one of them there was a

18    presentation of Mr. Jones having a facial tattoo.  I think

19    that was in the pleadings as well.  That would be the only

20    issue of suggestibility.

21         THE COURT:  So you are contending that there was an

22    element of impermissible suggestivity with respect to one of

23    the approximately 50 photo, photo books.  And the suggestivity

24    that you note is that your client was depicted with a facial

25    tattoo and no one else in the lengthy array had a facial

1    tattoo, is that your position?

2            MR. BUSSARD:  Not the photo book, but the array for

3    Mr. Lamontae Smith.

4            THE COURT:  Okay.  Let's put that array up.

5            MR. BUSSARD:  And this one is not what is commonly

6    known as a six pack, Your Honor, so I have to show each one of

7    these.  This is photograph one.

8            THE COURT:  Tell me when your client is depicted.

9            MR. BUSSARD:  Photograph 2, photograph 3 is

10   Mr. Jones with the facial tattoo under his left eye.

11   Photograph 4, photograph 5, and photograph 6.

12           THE COURT:  No image.  Thank you.  Is that the

13   extent of the array?

14           MR. BUSSARD:  Yes, Your Honor.  It was presented in

15   a little bit different fashion than the other one, but those

16   are the six photographs that have been produced.

17           THE COURT:  Thank you, Mr. Bussard.  I appreciate

18   you showing me that array.  I find that the facial tattoo that

19   you refer to, which is in the vicinity of your client's left

20   eye, is not a significant feature in the depiction of the six

21   images, that there were minor differences, certainly, among

22   each of the six pictures.  They each display a different

23   person, but there's nothing about that particular tattoo,

24   especially in the way that these photos were displayed, that

25   particularly jumps out or serves to sort of greatly

1    distinguish that image from the other five.  I find that they

2    were not -- that the array was not impermissibly suggestive.

3    Now, is there any other element of your motion that remains

4    pending?

5              MR. BUSSARD:  No, Your Honor.

6              THE COURT:  Okay.  And is that all incorporated

7    within paper 193, Mr. Bussard?

8              MR. BUSSARD:  Yes, Your Honor.

9              THE COURT:  Does the government agree?

10             MS. HOFFMAN:  Yes, Your Honor, if we could just

11   confirm for the record that the motion to suppress

12   identifications has been denied with respect to the arrays

13   completed by Christopher Meadows, Alexis Roberts, and Lamontae

14   Smith, then I think we have disposed of everything.

15             THE COURT:  Mr. Bussard, that's now your position as

16   well as to the state of the record?

17             MR. BUSSARD:  Yes, there's one other person, James

18   Cornish.

19             THE COURT:  And that also is disposed of by virtue

20   of the Court's ruling.  You agree, Mr. Bussard?

21             MR. BUSSARD:  Yes, Your Honor.

22             THE COURT:  Yes.  All denied as to all of those

23   individuals.

24             Okay.  Mr. Martinez, you're the grand choreographer

25   here in terms of what comes next.

 1              MR. MARTINEZ:  Yes, Your Honor.  As we indicated in

 2      our letter, we're now prepared to present witness testimony

 3      relating to paper 194.  That is also a motion by Mr. Jones and

 4      that is a motion to suppress the fruits of a warrantless

 5      arrest and search on April 11, 2011.  We would be presenting

 6      testimony from one witness, former Baltimore Police Detective

 7      Austin Sailor, he's currently a special agent with the ATF.

 8              THE COURT:  Where is Agent Sailor physically?

 9              MR. MARTINEZ:  Outside.

10              THE COURT:  Have him stay there for just one moment.

11      Mr. Bussard, please give me the briefest synopsis of your

12      position on this motion.

13              MR. BUSSARD:  Your Honor, the testimony will be that

14      Detective Sailor, I believe he was the detective at the time,

15      was traveling westbound on East North Avenue around the

16      Greenmount cemetery.  We have some maps to show the Court.

17              THE COURT:  Is this the U-turn?

18              MR. BUSSARD:  Yes, he made the U-turn and he saw a

19      person running away.

20              THE COURT:  Yes.

21              MR. BUSSARD:  That person is not -- he does not

22      recall --

23              THE COURT:  Got it.  I remember which motion, I just

24      needed -- I need a little bit of prompting with 50 pending

25      motions.  I need little cues to help my memory, but I remember

1    which one this was.  Okay.  Let's bring him.

2              Please come forward, Agent, all the way to the front

3    of the Court, face our clerk.  Right there.

4              THE CLERK:  Good morning.  Please raise your right

5    hand.

6                    SPECIAL AGENT AUSTIN SAILOR,

7    called as a witness, being first duly sworn, was examined and

8    testified as follows:

9              THE WITNESS:  I do.

10             THE CLERK:  Thank you.  You can have a seat.  Please

11   state and spell your first and last name for the record.

12             THE WITNESS:  Austin Sailor, A-u-s-t-i-n,

13   S-a-i-l-o-r.

14             THE CLERK:  Thank you.

15             THE COURT:  Your witness.

16                    DIRECT EXAMINATION

17   BY MS. HOFFMAN:

18   Q    Good morning, Agent Sailor.

19   A    Good morning.

20   Q    Where are you currently employed?

21   A    I'm currently employed by the Bureau of Alcohol, Tobacco,

22   Firearms and Explosives.

23   Q    What's your position with ATF?

24   A    I'm a special agent.

25   Q    How long have you worked for ATF?

Direct Examination - Sailor   (By Ms. Hoffman)

1   A    Since 29th of April, 2013.

2   Q    And prior to that did you work for the Baltimore City

3   Police Department?

4   A    I did.

5   Q    How long did you work for BPD?

6   A    Let's see, it was over -- I believe it was around six and

7   a half years.  I was hired December 30th of 2005 and I left in

8   July of 2012.

9   Q    And can you walk us through the various positions you

10  held with BPD?

11  A    Yes.  I started out in Northwest District Patrol.  And

12  then I went to Specialized Units, Violent Crime Impact

13  Division.  In the Eastern, it was given different names,

14  Violent Crime Impact Section.  And then I was -- went to the

15  Violent Repeat Offender Unit and the Major Case Squad.

16  Q    And as of 2011, where were you working?

17  A    It was at that time the Violent Crime Impact Section.

18  Q    What were your responsibilities in the Violent Crime

19  Impact Section?

20  A    We were to go and basically make cases against violent

21  repeat offenders, targeting gun crimes, narcotics infractions,

22  things like that.

23  Q    I'd like to draw your attention to April 11th of 2011.  A

24  little after 7:00 p.m., were you working and on duty?

25  A    I was.  I was at the very tail end of my shift.

1    Q    And where were you at that point in time?

2    A    I was traveling westbound on East North Avenue.

3    Q    And did something happen that caught your attention?

4    A    It did.  I was slowing down, I stopped at a stoplight on

5    East North Avenue, just east of Homewood Avenue, and still had

6    my -- all my windows rolled down, which I did whenever the

7    weather was appropriate.  And at that time when I was stopped

8    at the stoplight, I heard a fight break out.  It was a violent

9    altercation.  I heard the blows being struck, sounded like

10   (indicating), like fists smacking on flesh.  At that time I

11   looked over to my right, I was in the number two lane going

12   westbound, and I saw a six-person brawl going on in front of

13   906 East North Avenue.

14   Q    Agent Sailor, I'd like to show you what's been marked as

15   Government's Exhibit No. 1.  It should appear on your screen

16   right there.

17   A    Yes.

18   Q    Do you recognize this exhibit?

19   A    Yes, I do.

20   Q    And what is it?

21   A    That's a picture of the location.  The road on the

22   bottom, the south side is marked as -- correctly marked as

23   East North Avenue.

24         THE COURT:  Why don't you circle that with your

25   finger, that will show up.

Direct Examination – Sailor  (By Ms. Hoffman)

1            THE WITNESS:  Where I was located, Your Honor?

2            THE COURT:  No, just where it said North Avenue.

3            THE WITNESS:  I'll do it over here so it's not --

4            THE COURT:  It's not showing up?

5            THE WITNESS:  Yeah, it's not showing up, Your

6    Honor.

7            THE COURT:  See if the clerk can help you.

8            THE WITNESS:  Am I doing something wrong?

9            THE COURT:  All right.  There's something wrong with

10   the screen.  Please call IT, Ms. Herndon.  Go ahead.

11   Q    (BY MS. HOFFMAN)  I was going to ask you, Agent Sailor,

12   to point out where you were at this point in time, but we'll

13   wait to get that working.

14           THE COURT:  That could be a long wait.  You better

15   come up with an alternative.

16   Q    (BY MS. HOFFMAN)  Where was the brawl taking place?

17   A    It was right directly in front of 906 East North Avenue,

18   like directly around the steps in front of the dwelling.

19   Q    And what did you do when you saw the brawl?

20   A    I reached for my radio and I broadcasted that there was a

21   fight going on, something to that effect.  I was trying to

22   keep it in view and then the light turned green.  There were

23   vehicles in front of me and behind me, so I was kind of forced

24   to go.  I didn't want to get out of my vehicle because at this

25   time I was by myself and I didn't want to get into the middle

1    of a six-person brawl by myself.

2              So at that time the -- I continued westbound and I'm

3    looking for a place to do a U-turn so I can keep everything in

4    sight, and right when I'm about to -- right at the time I'm

5    about to make a U-turn, I hear gunshots ring out.

6    Q    What direction were the gunshots coming from?

7    A    They were at this point right behind me, right where I

8    saw the brawl take place.

9    Q    Were you able to turn your vehicle around?

10   A    Yes.  Right in the -- immediately west of Homewood Avenue

11   in -- I was still right there, there's almost a loop, a

12   circle, did a U-turn and then I saw an individual running

13   westbound wearing blue jeans, a white T-shirt, and a pink hat,

14   running westbound on the sidewalk of East North Avenue on,

15   let's say the north sidewalk.  He then -- I observed him, he

16   was holding his dip area with his left hand and he --

17   Q    What's the dip area, Agent Sailor?

18   A    It's the waistband area of the pants.

19   Q    And what did that indicate to you?

20   A    We're trained as -- from our beginning training as a

21   Baltimore City Police, that that's demonstrating an armed

22   person.

23   Q    Was this individual running from the direction of the

24   gunshots?

25   A    Yes, ma'am, he was.

1  Q    And what did you do when you saw him turn onto Homewood

2  Avenue?

3  A    I then turned north onto Homewood Avenue, followed him,

4  catching up to him, and I kept him in sight the whole time.

5  Q    And were you able to stop him?

6  A    Yes, I was.  I pulled up next to him.  I was

7  approximately six feet away.  Let's see if we can do it now.

8  Should I give it a try?

9           THE COURT:  Yes, please.

10 A    So I went here, the light was right there.  And then I

11 did -- felt almost like doing a circle, and then continued up

12 northbound on Homewood Avenue.  And I stopped him

13 approximately right there.

14           THE COURT:  Make an X.

15           THE WITNESS:  Approximately right there, Your

16 Honor.

17 Q    (BY MS. HOFFMAN)  And how did you stop him?

18 A    I was still -- had my badge around my neck.  I pulled up,

19 I was approximately six feet to the right of him.  Just got

20 out of my vehicle, my door was between me and him.  I

21 announced myself as police, something to the effect of "stop,

22 police, put your hands up."  And because I believed he was

23 armed, I immediately drew my service weapon and pointed it at

24 him.

25 Q    Were you later able to identify this individual?

1    A    Yes, it was Mr. Kenneth Jones.

2    Q    And is he sitting here in the courtroom today?

3    A    He's the gentleman wearing blue over there.

4         MS. HOFFMAN:  Thank you.  I'll note for the record

5    that the witness has identified Kenneth Jones.

6         THE COURT:  Yes, there are several people in what I

7    would call jail clothes, Agent, could you describe this

8    further for me.

9         THE WITNESS:  He's wearing a blue shirt with a white

10   undershirt.  Can I have that individual stand up, so --

11        THE COURT:  Yes, please, Mr. Bussard, would you ask

12   the gentleman to your right to please stand.

13        THE WITNESS:  So short cut hair, beard, mustache.

14        THE COURT:  That's who you mean?

15        THE WITNESS:  Yes, sir.  Yes, Your Honor.

16        THE COURT:  The record will reflect that this

17   witness identified the defendant, Mr. Jones.

18   Q    (BY MS. HOFFMAN)  Agent Sailor, when you identified

19   yourself as police and drew your service weapon, did the

20   defendant make any statements?

21   A    Yes.  He immediately said, "Don't shoot me, I have a

22   gun."

23   Q    What did you do at that point?

24   A    He put his hands up, and I said get down, and I proned

25   him out, no force was needed or used.  He was immediately

1    compliant.  And I, you know, broadcasted out that I had, you

2    know, a person at gunpoint, you know, where I was.  And I

3    could, you know, I was already hearing sirens coming to my

4    direction.  So I just held him that way until I had backup

5    arrive.

6    Q    And were there backup units that arrived?

7    A    Yes, there were.

8    Q    Was Mr. Jones placed in handcuffs?

9    A    Yes, he was.  I gave my handcuffs to the marked unit,

10   patrol unit that arrived, and they placed my handcuffs on

11   Mr. Jones.

12   Q    And what did you do then?

13   A    More backup arrived and at that time I used -- I patted

14   him down, I asked where's the gun, and he moved his left leg,

15   indicating to me that it was in his left leg, so I patted down

16   his left leg and I found a bulge, like in the calf of his

17   pants, which I recognized to be a handgun.

18   Q    Were you able to remove that object?

19   A    Yes.  I -- because it was wedged so tightly in the pants,

20   I didn't believe that I could safely remove it, so I used a

21   pocket knife to cut the calf of the pants and removed it that

22   way.

23   Q    Were you worried that the gun might accidentally go off

24   if --

25   A    Yes.  I didn't know anything about the type, the

Direct Examination - Sailor  (By Ms. Hoffman)

1    condition of the firearm, and I didn't want to -- I was just

2    trying to as safely as possible remove this firearm.

3    Q    I'm going to show you what's been marked as Government's

4    Exhibit 2A.

5    A    Yes, that was a photograph taken of Mr. Jones as he was

6    proned out and how I cut his pants leg in order to remove the

7    firearm.

8    Q    Thank you.  And I'm going to show you now what's been

9    marked as Government's Exhibit 2B.

10   A    Yes, and that's another angle showing how the firearm was

11   located in the pants leg.

12   Q    And can you see the firearm there?

13   A    Yes, you can see the handle, the butt of the revolver.

14   Q    Was the firearm recovered?

15          THE COURT:  Put a circle around it.

16   A    (Complying.)  Yes, it was recovered by Detective Hayes,

17   who was wearing gloves in order to, you know, protect any

18   fingerprint or DNA evidence.

19   Q    (BY MS. HOFFMAN)  And what kind of firearm was it?

20   A    It was a Taurus, a black Taurus revolver, I believe it

21   was a .357.

22   Q    Was it loaded?

23   A    Yes, it had one live round and four spent shell

24   casings.

25   Q    Was a sample collected to test for gunshot residue?

1    A    Yes, a crime tech, Baltimore City crime technician, came

2    and responded to that location and collected samples on

3    scene.

4    Q    Were Miranda warnings delivered to Mr. Jones?

5    A    Yes, they were.

6    Q    And did Mr. Jones make any statements?

7    A    He -- I remember him saying that he understood his

8    Miranda warnings.  And then later on while I was basically

9    handling the firearm, running it, he made a statement a few

10   feet away from me to Lieutenant Miller.

11   Q    Was there anything that provoked the statement?

12   A    Lieutenant Miller came to the scene after everything,

13   Mr. Jones was still there in handcuffs, and Lieutenant Miller

14   said --

15              MR. BUSSARD:  Objection, Your Honor.

16              THE COURT:  Basis?

17              MR. BUSSARD:  As to what Detective Miller said.

18              THE COURT:  Yes, but it's a motions hearing.

19              MS. HOFFMAN:  It's not being offered for the truth

20   of the matter.

21              THE COURT:  Well, first -- yes, that's a separate

22   question, but the Federal Rules of Evidence govern in a

23   motions hearing, Mr. Bussard?

24              MR. BUSSARD:  Yes, Your Honor.

25              THE COURT:  They do or they don't?

1          MR. BUSSARD:  They do.

2          THE COURT:  Do you have authority for that?

3          MR. BUSSARD:  No, they don't, I mean.  Hearsay is

4    admissible.

5          THE COURT:  Thank you.  So first of all, whether

6    it's being offered for the truth of the matter asserted or

7    not, it's admissible regardless in this motions hearing and

8    issues that you might have in that regard go to weight, and

9    they may well go to weight.  Overruled.  You may answer.

10   A    Thank you.  Lieutenant Miller arrived on scene and said,

11   "Is this the suspect in the shooting?" and --

12   Q    (BY MS. HOFFMAN)  Who was he directing that question

13   to?

14   A    It wasn't me, it was one of the other detectives.  I

15   don't know because I was focused on the firearm at that time.

16   And in response to that, Mr. Jones said something to the

17   effect of "he had a gun and shot at me first."

18   Q    Did you remain on the scene much longer after that?

19   A    Not that much longer, no.  I -- let's see, Detective

20   Kinley responded and he took possession of the firearm, the

21   evidence.  And I then went back to the Eastern District and

22   began writing my record about the handgun violation.

23   Q    Your shift was over at that point?

24   A    Correct.

25   Q    Did you ever respond to the scene of the actual

1    shooting?

2    A    No, I did not.

3            MS. HOFFMAN:  I don't have any further questions

4    for the witness.

5            THE COURT:  Cross-examination.

6                        CROSS-EXAMINATION

7    BY MR. BUSSARD:

8    Q    Good morning, Agent Sailor.

9    A    Good morning.

10   Q    We met out in the hallway briefly.

11   A    Yes.

12   Q    I want to ask you to describe in a little bit more detail

13   the general area that we've been talking about.

14   A    Sure.

15   Q    You're westbound on East North Avenue; is that correct?

16   A    Yes, sir.

17   Q    And North Avenue is essentially a four-lane road, two

18   lanes going east, two lanes going west; is that correct?

19   A    Yes, sir.

20   Q    And there is a parking lane on the right side, to your

21   right as you're traveling westbound; is that correct?

22   A    Yes, sir.

23   Q    And these are essentially residential-type neighborhoods,

24   they're row houses?

25   A    Yes, sir.  It's row houses on the north side of that part

1    of North Avenue and the cemetery is on the south side.

2    Q    And that cemetery runs the entire length of, at least the

3    area we're talking about, all the way down to Greenmount

4    Avenue?

5    A    Yes, sir.

6    Q    And now, you said that you were stopped for the red light

7    at 906 East North Avenue; is that correct?

8    A    Correct.

9    Q    And there is a cross street near 906 Oak Hill; is that

10   correct?

11   A    I would have to review the picture.

12   Q    Showing you --

13   A    I know there was a cross street, but I don't recall what

14   the name is.  It's been a few years since I've been back in

15   Baltimore.

16   Q    Excuse me.  Showing you what's been marked as Kenneth

17   Jones Exhibit No. 1.

18            MR. BUSSARD:  Your Honor, a copy was provided to

19   you.

20            THE COURT:  It's fine, just put it up.

21   Q    (BY MR. BUSSARD)  And I hope I can make this a little

22   bigger.  It's not as good looking as the government's.

23            THE COURT:  Go down, get the cemetery in there.

24   Q    (BY MR. BUSSARD)  Do you see the balloon there?

25   A    Yes.

1    Q    Where my pen is?

2    A    I like the other picture better, but I can see this

3    one.

4              THE COURT:  Can you pull it down so North Avenue is

5    at the bottom of the screen so we can see the cross street

6    names.

7              MR. BUSSARD:  It may not show up -- I know one of

8    the other pages --

9    Q    (BY MR. BUSSARD)  I'm showing you Defense Exhibit 1 and

10   it is A through L and we will have Oak Hill in there.  So this

11   is 906; is that correct?

12             THE COURT:  Well, it's hard -- I don't think that's

13   a fair question without us being able to see the cross

14   streets.  Maybe we have an agreement as to which streets are

15   which.

16   Q    (BY MR. BUSSARD)  Would you agree this is North Avenue?

17   A    Yes.

18   Q    And you would agree that this is Greenmount Avenue?

19   A    Yes.

20   Q    Running north-south.  I'm going to show you some other

21   pictures, I think this will become clear.  Or I can show you

22   Government's Exhibit --

23   A    I would prefer the government exhibit.

24   Q    Government's Exhibit 1.  And the red balloon that I'm

25   pointing to, is that 906?

Cross-examination - Sailor   (By Mr. Bussard)

1   A    Approximately, yes.

2   Q    So the first cross street, if someone was traveling

3   westbound from 906, they would come to Oak Hill; is that

4   correct?

5   A    Correct.

6   Q    And Oak Hill intersects -- a T-intersection with East

7   North Avenue; is that correct?

8   A    Yes.

9   Q    And there's no traffic control device at Oak Hill; is

10   that correct?

11   A    Not that I remember.

12   Q    Now, down here, the next intersection is Homewood Avenue;

13   is that correct?

14   A    Yes.

15   Q    And that is the traffic control device that you are

16   speaking about?

17   A    Right.  And I found it strange that night that there was

18   still a pretty good amount of traffic on the road and that

19   vehicles were backed that far up, that I was stopped all the

20   way back, you know.  I don't know if there was something going

21   on westbound -- you know, to the west of the location or what.

22   Q    So where my pen is, is the traffic control device?

23   A    Yes.

24   Q    And you were saying you were approximately a block and a

25   half?

Cross-examination – Sailor  (By Mr. Bussard)

1    A    Like a block, which I found unusual.

2    Q    The block between Homewood and Oak Hill?

3    A    Yes.

4    Q    And then a partial block to 906?

5    A    Correct.

6    Q    So you would agree you were located about here?

7    A    Approximately.

8    Q    Would you circle that just for --

9    A    (Complying.)

10   Q    And when you say lane 2, is that what --

11   A    Lane number one is closest to the median divider, the

12   center of the road.  So I was number two, closer to the

13   sidewalk.

14   Q    And again, Oak Hill is that first intersection?

15   A    Correct.

16   Q    Running north; is that correct?

17   A    Correct.

18   Q    Showing you what's been marked as -- this is part of

19   Defense Exhibit 1.  Is this an accurate depiction of the row

20   houses in the 900 block of East North Avenue?

21   A    I -- it's not the clearest picture, but -- it looks like

22   it roughly could be.  But if those are the same types of

23   structures and stairwells and stairs in front.

24   Q    Showing you Defense Exhibit 1C.  I was hoping to make

25   that big.  And is that the view of looking westbound on East

1    North Avenue?

2    A    Is that the cross street there?

3    Q    If this is Oak Hill --

4    A    That's Oak Hill, then --

5    Q    This is 906.  And this is --

6         THE COURT:  Well, perhaps there's just an agreement

7    between government counsel and defense counsel that is what

8    that depicts, because I don't know how you can ask the witness

9    to -- one thing about Baltimore is that a lot of areas look

10   the same, so --

11   Q    (MR. BUSSARD)  Would you agree this looks like the

12   cemetery, Greenmount Cemetery, on the left?

13   A    Yes.

14   Q    Showing you -- again, a little bit further down, does

15   this resemble the area -- is this a depiction of the

16   intersection of Homewood and North Avenue showing the traffic

17   device over here?

18   A    It's hard to see on the picture, but roughly -- you know,

19   roughly it looks like it, but it's not the greatest picture.

20        THE COURT:  Are you asking him to assume that it is?

21        MR. BUSSARD:  Asking general --

22        THE COURT:  I'm asking you, are you asking the

23   witness to assume that that's a depiction of North Avenue and

24   Homewood?

25        MR. BUSSARD:  Yes, Your Honor.

1          THE COURT:  Okay.  Make that assumption.

2          THE WITNESS:  Okay.

3    Q    (BY MR. BUSSARD)  Showing you what's been marked as

4    Defense Exhibit 1E, is this a view looking north on Homewood

5    Avenue, to the best of your recollection?

6    A    To the best of my recollection, it is.

7    Q    And that's the street that you eventually stopped

8    Mr. Jones; is that correct?

9    A    Yes, sir.

10   Q    Aerial view, this is 1F and this is a black and white of,

11   essentially the same as Government's Exhibit 1.  I won't spend

12   a lot of time.

13          This is a little bit more of a close up –– back

14   up –– if we assume this is 906 right here –– I'm sorry, over

15   here.

16   A    Okay.

17   Q    And if this is facing north, this would be Oak Hill; is

18   that correct?

19   A    If that's how you describe it, then that's correct.

20          THE COURT:  So if that white colored roof row house

21   is 906, then the cross street you're seeing would be Oak Hill,

22   that's what you're telling us?

23          THE WITNESS:  Yes.

24   Q    (BY MR. BUSSARD)  Here's a view looking east on North

25   Avenue.

Cross-examination - Sailor  (By Mr. Bussard)

1    A    Okay.

2    Q    And do you know -- it's not very clear, do you know what

3    this building is here, Agent Sailor, is that the Poet's

4    Athletic Club?

5    A    I believe it says Poet's Athletic Club.

6    Q    And that is in the same block as the 906?

7    A    It appears to be.

8    Q    And the street sign then indicates Oak Hill Avenue; is

9    that correct?

10   A    It does.

11   Q    And that's the first intersection traveling west from

12   906?

13   A    I believe so.

14   Q    Showing you Defense Exhibit 1I, it's more of the same

15   there, the same location looking from Oak Hill.  Is that your

16   recollection of that area?

17   A    That is my recollection.

18   Q    This is 1J.  I'm not sure why it's --

19             THE COURT:  So we're a bit pressed for time,

20   Mr. Bussard, where are we headed?

21             MR. BUSSARD:  I just wanted to make sure we're

22   talking about Oak Hill Avenue there.

23   Q    (BY MR. BUSSARD)  Is that Oak Hill, Agent Sailor?

24   A    It appears to be via Google maps.

25   Q    1K, looking at Oak Hill Avenue?

1   A    That's how it shows on Google maps.

2   Q    Then the last, you indicated you made the stop on

3   Homewood Avenue at approximately 20th Street; is that

4   correct?

5   A    Homewood is just around that -- passed that alley before

6   the next road.

7   Q    Passed this intersection, so down here where my pen is

8   showing is Greenmount Cemetery and North Avenue?

9   A    Okay.

10  Q    Looking south.

11  A    Okay, I see where we are now.

12  Q    Is this the general area then of 20th and Homewood?

13  A    It appears to be.

14  Q    Now, you indicated you were on routine patrol, there was

15  no reason for you to be over at the East North Avenue location

16  otherwise?

17  A    Right.

18  Q    You were not on any specific call?

19  A    No.

20  Q    Correct?  And you indicated the traffic control device

21  was red at Homewood and that was a little bit unusual;

22  correct?

23  A    No, it's not unusual, what was unusual is, I thought that

24  it was unusual that there were so many cars, that it was

25  backed up for over a block, you know, at that time of night,

Cross-examination – Sailor    (By Mr. Bussard)

1    that normally at that time of night there's less traffic.  I

2    just didn't think it was -- I thought it was abnormal I would

3    be backed up so far due to just a red light.

4    Q    Oh, I'm sorry.  And you indicated that you were

5    stationary and had the windows down?

6    A    Yes.

7    Q    And your attention was drawn to your right by a sound; is

8    that correct?

9    A    Yes.

10   Q    So as you're coming to a stationary stop, there's nothing

11   that you recall as drawing your attention to your right before

12   then; is that correct?

13   A    Correct.  The first -- what drew my attention was that

14   smacking (indicating) sound.

15   Q    And did you also hear some hollering going on?

16   A    Yes, there was hollering and screaming and yelling.

17   Q    I don't think this was brought out by the government, you

18   were in a plain unit?

19   A    Right, I was in plain clothes at the time.

20   Q    And the unit itself, the vehicle was not a marked --

21   A    Correct, and it didn't have lights or sirens or anything

22   like that.

23   Q    And as the light turned red -- green, you started to

24   move?

25   A    Right, because I was trying to go with the free flow of

Cross-examination – Sailor   (By Mr. Bussard)

1    traffic while simultaneously broadcast things on the radio and

2    trying to find a place to immediately pull a U-turn safely.

3    Q    Is it fair to say, thinking back to the -- well, I'll

4    stay in the sequence.  You testified that you were looking for

5    a place to make a U-turn; correct?

6    A    Right, that I was trying to do my best to do whatever I

7    needed to do to keep the incident in sight so I could direct

8    other units to that location.

9    Q    And the U-turn was already passed the intersection of

10   Homewood and 20 -- Homewood and North where the traffic

11   control device was?

12   A    Immediately west of Homewood.

13   Q    Now, as you were traveling from the area of 906 East

14   North Avenue down to the intersection of Homewood and North,

15   you did not observe anyone running along the sidewalk until

16   you made the U-turn; is that correct?

17   A    Correct.

18   Q    And to the best of your recollection, when you looked to

19   your right in response to sound of the altercation, you have

20   no recollection of someone wearing a pink neon hat?

21   A    I don't recall that, mainly because it was such a chaotic

22   scene with basically bodies flying and it was hard to, you

23   know, my attention at that point was divided between all six

24   parties, and also traffic, you know, in front of me and behind

25   me.  So no, I don't recall seeing someone of that description,

Cross-examination – Sailor  (By Mr. Bussard)

1    of that instant --

2    Q    And you have no recollection of seeing Mr. Jones at the

3    altercation?

4    A    I do not.

5    Q    Now, when you said you started to move, you had -- you

6    heard gunfire; correct, what you thought was gunfire?

7    A    Yes.

8    Q    And you said it was rapid fire gunfire?

9    A    Yes.

10   Q    And I believe at a prior proceeding, last year, you

11   indicated that it sounded like automatic gunfire to you?

12   A    Well, I used that term, but by automatic fire, I mean a

13   high rate of rounds being discharged very quickly.  And from

14   my knowledge of firearms, that can be done any number of ways,

15   whether it's an automatic weapon or just, you know, from

16   someone pulling the trigger very quickly.  So I did not mean

17   to say that, you know, that it was at that particular time I

18   knew what type of weapon was used.  It was just that I was

19   trying to demonstrate how quickly the gunfire happened.

20   Q    So is the answer yes, that it sounded like automatic

21   fire?

22   A    It sounded like very fast fire.

23   Q    Now, the weapon that was ultimately recovered from

24   Mr. Jones was not an automatic weapon?

25   A    No, it was a revolver.

Cross-examination – Sailor  (By Mr. Bussard)

1    Q    And it was a five-shot revolver?

2    A    To my recollection it was.

3    Q    It was a .357?

4    A    Yes.

5    Q    And after the U-turn, it's your testimony that Mr. Jones,

6    or the man in the pink hat, was running towards you?

7    A    Yes.

8    Q    Correct?  And you said you were in an unmarked unit;

9    correct?

10   A    Yes.

11   Q    And the person running towards you made a right turn onto

12   Homewood Avenue; correct?

13   A    Correct, running northbound.

14   Q    And he was running up Homewood Avenue?

15   A    Correct.

16   Q    Now, you indicated in response to the government's

17   questions that the individual appeared to be holding his waist

18   area; is that correct?

19   A    That is correct.

20   Q    I think you used the term "dip"?

21   A    Yes.

22   Q    And you indicated through your training, knowledge, and

23   experience as a Baltimore City police officer, you believed

24   that that person was armed at that point?

25   A    Yes.

Cross-examination - Sailor   (By Mr. Bussard)

1   Q    As a Baltimore City police officer, especially in 2011,

2   you've had occasion to arrest people for drug offenses and

3   what have you?

4   A    Drug offenses, numerous -- numerous drug offenses,

5   firearm offenses.

6   Q    And so guns are not the only thing that are carried in

7   someone's dip, so to speak, there are drugs that are also

8   carried there on occasion.  So if someone is holding that

9   area, they're trying to hold it in place; is that right?

10   A    I would say that's right, but that's somewhat misleading,

11   because like I said, from the very early parts of training,

12   because of the weight of firearms, we're trained to look for

13   people holding their dip area because firearms -- I've seen

14   them literally fly out of people's pants, go down people's

15   pants.  Because of the weight of the firearm, people a lot of

16   times when they are -- their firearm's in the dip area, they

17   hold that area with their hand.

18   Q    So you see the man in the pink hat holding his waist

19   area; correct?

20   A    Yes.

21   Q    You didn't see any movement of trying to force that gun

22   down his left leg?

23   A    No.

24   Q    And you indicated that upon encountering Mr. Jones the

25   .357 was encountered -- was wedged, I think was your word,

Cross-examination – Sailor  (By Mr. Bussard)

1    wedged tightly in his left shin area; is that correct?

2    A    Correct.  And what I took to happen as --

3    Q    I'm just asking a yes or no question.

4    A    Repeat the question, please, sir.

5         THE COURT:  You may explain.

6         THE WITNESS:  What I took to happen as -- was that

7    when he removed his left hand from his dip area and put his

8    hands up, the firearm then slid down his left waistband area,

9    down his pants leg.  And that's where it was recovered.

10        THE COURT:  Were the trousers loose enough that that

11   could have happened?

12        THE WITNESS:  They were just -- I believe so, and

13   there was just -- going from the wide waist area to the

14   thinner calf part of the pants, that the size, the bulk of the

15   firearm, then stuck in the calf area.

16        MR. BUSSARD:  Court's indulgence one moment.

17   Q    (BY MR. BUSSARD)  Now, you had occasion after this arrest

18   to write a couple reports; is that correct?

19   A    Yes, sir, I did.

20   Q    And one of those reports was a statement of charges for

21   the possession of the handgun?

22   A    Yes, sir, I did.

23   Q    And you also wrote an incident report, Baltimore City

24   Police incident record on the defendant?

25   A    Yes, I did.

1   Q    Do you recall -- I'd be happy to show it to you.

2   A    That would be helpful.

3   Q    -- whether he made any statement in those reports that

4   you noticed that the gun slipped -- the word "slipped," down

5   his left shin?

6   A    No, I didn't.

7   Q    You did not make that statement?

8   A    No.

9   Q    And, in fact, the only statement you made is when you

10  encountered Mr. Jones is that he -- that you found the gun

11  lodged, I think was the word?

12  A    Correct, and the reason I did that is because I can't see

13  through his jeans, you know, I believe I had reasonable

14  suspicion that, you know, he was holding a firearm in place,

15  but you know, I can't see through blue jeans.

16  Q    So you're making an assumption that, based on your

17  training, that that's what you thought he was carrying?

18  A    Correct, because of my training, knowledge, and

19  experience.

20  Q    When he was running -- backing up just for a moment, and

21  you first see Mr. Jones running and he's running westbound on

22  East North Avenue on the sidewalk, did he attempt to be

23  putting a weapon away in his waist --

24  A    I didn't see any weapon at that point.  He was just

25  holding his dip area with his left hand.

1   Q    And he is running not knowing that you are a police

2   officer?

3   A    I believe that is the case.

4   Q    And when you encountered Mr. Jones at around the

5   intersection of 20th and Homewood Avenue, you said you were

6   about six feet away from him; is that correct?

7   A    Yes.

8   Q    And you were still in the unmarked unit obviously?

9   A    Correct.

10  Q    And when you say you had your badge displayed, is that

11  simply about a two-inch square --

12  A    I had my physical badge on a necklace around my neck.

13  Q    So there's nothing on the car itself, the automobile,

14  that says Baltimore City Police or Baltimore Police

15  Department?

16  A    Correct, at that time --

17  Q    And there's nothing -- you're not wearing a coat that has

18  "Police" in big letters across --

19  A    No, I just had my badge displayed.

20  Q    So you have this small badge and you get out of the car

21  and you have your gun drawn?

22  A    Yes.

23  Q    And when you say get down, and probably some other things

24  as well, Mr. Jones --

25       MR. MARTINEZ:  Objection.

1    Q    (BY MR. BUSSARD)  -- immediately stopped; is that

2    correct?

3         THE COURT:  Overruled.

4    A    I pulled up next to him, I said police, you know, show me

5    your hands.  And then, you know, when he showed me his hands,

6    he said don't shoot, something of the effect, don't shoot, I

7    have a gun, then I immediately ordered him to prone himself

8    out, lie down on the ground.

9    Q    (By MR. BUSSARD)  So time-wise, you pull up beside him

10   and you immediately bark some orders to him and he stops

11   running?

12   A    Exactly.  He appeared to be shocked, his eyes were wide.

13   It seemed like I genuinely surprised him when I pulled up next

14   to him and did that.

15   Q    And your weapon was clearly displayed?

16   A    Oh, yes, it was pointed at him, I believed he was

17   armed.

18   Q    Now, the jeans that Mr. Jones was wearing, were they the

19   jeans that were in style back then, baggy jeans that were worn

20   low on the hips?

21   A    Uh --

22   Q    Do you have a recollection of that?

23   A    From my recollection, but I do not ever claim to be the

24   most stylish person, and they just appeared like regular blue

25   jeans to me.  I'm not the person you want to ask about stylish

1    clothing, sir.

2    Q    But you are familiar with persons in Baltimore City --

3    A    Yes, they appeared to be common blue jeans.

4    Q    And obviously tight around the shin area because you --

5    the weapon didn't fall out, did it?

6    A    I mean, they were just normal blue jeans, but the gun was

7    of such a size that it just -- when it fell it must have

8    gotten stuck in there.

9    Q    But did you even try to pull it out?

10   A    I could tell just from my search that it was so snug in

11   there that I did not want to mess with -- I did not want to

12   alter the position of the firearm in any way.  I didn't know

13   if the hammer was cocked back, I didn't know what type of

14   firearm I'm dealing with.  I'm trying to be as safe as

15   possible.  I did not want to cause an accidental discharge and

16   shoot anybody.

17   Q    And as we sit here today and you think back on to that

18   moment, you have no knowledge at all and you're not telling

19   this court, you didn't know whether that gun had been lodged

20   in his left shin area all along as he was running, you

21   don't --

22   A    No, I don't know that.

23            MR. BUSSARD:  I don't have any further questions.

24            THE COURT:  Thank you.  Agent Sailor, you can step

25   out of the courtroom.  Are there any other witnesses for the

1    government?

2              MS. HOFFMAN:  No, Your Honor, not on this motion.

3              THE COURT:  Mr. Bussard, do you have any witnesses?

4              MR. BUSSARD:  No, Your Honor.

5              THE COURT:  I'll hear you on the motion,

6    Mr. Bussard.  Argument.

7              MR. BUSSARD:  Your Honor, thinking about the law

8    and -- would you prefer I argue from --

9              THE COURT:  Your preference.

10             MR. BUSSARD:  I can stay here.  A warrantless arrest

11   and warrantless encounters by police and citizens, Your Honor,

12   the lead case is, at least in this, is *Illinois v. Wardlow*,

13   which is different and distinguishable from this case because

14   when the police in that case appear, they are in a marked unit

15   and it's clear that they're in a marked unit and the young man

16   seeing that marked unit runs away and responds to seeing this

17   police, and so the distinguishing factor is they eventually

18   encounter him and seize him and they find whatever it is

19   there.

20             In this case there is -- all they have is a person

21   not known to Detective Sailor to have been involved in the

22   altercation, not obviously carrying a weapon, wearing a very

23   bright pink hat, he has no recollection of even being involved

24   in the altercation at 906, running down the street.  And the

25   difference is when he encounters from six feet away with his

1    gun drawn, Mr. Jones does not try to run any further.  He

2    stops, complies, gets on the ground, and then there is a

3    search, which results in -- it's more than just a pat down,

4    it's a search and he has to cut out the gun, which the word

5    that's always been used is "wedged" or "lodged" in his left

6    shin area of his jeans.

7            There is no indication at all other than the

8    detective may believe so, that this gun may have slipped down

9    when he was running, when Mr. Jones was running and carrying

10   his left hand around the waist area, that he's holding that

11   gun.  There is no evidence that that gun was there, so it is

12   merely supposition as to whether or not this person that Agent

13   Sailor or Detective Sailor saw at the moment was in fact armed

14   at the moment.  Thus, whether he has a reasonable articulable

15   suspicion, his reasonable articulable suspicion is based on

16   merely his training, knowledge, and experience of working in

17   Baltimore City and the people, especially black males, running

18   along the street holding their waist area must be armed.

19           The cases are really divided up into several -- if

20   it's a high crime area, that's important.  There was no

21   testimony this was a high crime area.  If there's an informant

22   tip of a person running down the street, that may be

23   important.  But there's no informant tip here.  If there's

24   observations -- the lateness of the hour, this was not late.

25   This was still daytime, it was 7:00 o'clock April 11th, 2011.

1   Observation by the officer that a crime may be afoot, maybe

2   yes to a fight.  He heard gunfire, he has no evidence that

3   Mr. Jones was part of that fight.  The next factor is whether

4   there's evasive conduct.  There was no evasive conduct.

5   Mr. Jones complied immediately.  If there's any furtive

6   movements, there was no furtive movements because Mr. Jones

7   was immediately on the ground.  And finally, was there a bulge

8   in the clothing?  There was no bulge in the clothing until

9   after the stop, and it's our position there was no proper

10  stop.

11          THE COURT:  Thank you, Mr. Bussard.  The salient of

12  facts are these:  The detective testified that he was on duty

13  on routine patrol.  He all the windows down in his car, he was

14  stopped in traffic.  He heard an altercation break out.  He

15  glanced and saw the scope and size of the altercation.  He

16  estimates that there were some six people involved.  He heard

17  sounds consistent with fists striking flesh, suggesting that

18  it was a serious event that was taking place beside him.  He

19  started to make decisions about how he was going to properly

20  respond to this, taking into account that he was alone and

21  that it would be a better tactic to wait until he had

22  assistance.

23          He continued to move down North Avenue as these

24  events were developing, when he heard gunshots fired.  A very

25  significant fact in the story that is told here.  After having

1    heard the gunshots fired, and while still maneuvering his

2    vehicle, he saw an individual, later turned out to be the

3    defendant, who was running from the direction from which he

4    had heard the gunshots and from where he had been when he

5    witnessed the altercation with the sounds of fists striking

6    flesh.

7         He then, in reaction to all of that, looked at the

8    individual who was running more closely and noticed that he

9    was carrying his hand in his left dip area, a common method of

10   carrying a firearm on the streets of Baltimore.  The detective

11   looped his vehicle around and then came up on the right side

12   of the defendant as the defendant, now on foot, traveled

13   northbound on Homewood.  And the detective at that point, with

14   reasonable and articulable suspicion that criminal activity

15   was a foot, confronted the defendant and challenged him.  At

16   which point the defendant immediately raised his hands, asked

17   that the detective not shoot him, and immediately then said,

18   "I have a gun."

19        At that point, the defendant -- the officer, if not

20   before, clearly had probable cause to effect an arrest of the

21   defendant and to search the defendant incident to that arrest.

22   And in the course of that search incident, to arrest, which

23   also could have been part and parcel of a *Terry* pat down, but

24   frankly, the situation had ripened into more than that.  In

25   the course of all of that, the detective located the firearm

that has been described.

The encounter between the detective and the defendant was entirely lawful. The interdiction of the defendant on the street was completely compliant with the constitution and relevant law. The subsequent search of the defendant was also lawful. There is a fact out there that is a part of this story, Mr. Bussard, you'll need to help me in this regard. First of all, let me say that any motion to suppress evidence in this case based on the lawfulness of the arrest is denied. But there was also the statement made after the lieutenant made his comment, did you want to argue to the Court now about whether or not that statement should be admissible?

MR. BUSSARD: Not at this moment, Your Honor.

THE COURT: Do you think the motion is ripe for ruling at this time?

MR. BUSSARD: I guess it is, there is no other evidence that's going to come in.

THE COURT: All right. So now's the time then, if there's anything else you want to argue on that, otherwise I'm going to rule on the admissibility of that statement.

MR. BUSSARD: The detective stated that Miranda was given. And then there was a statement after that Miranda warning was given about the -- about the weapon.

THE COURT: Correct.

1        MR. BUSSARD:  And the shooting.  I don't have an

2   argument on that.

3        THE COURT:  Thank you, Mr. Bussard.  I find that the

4   statement is admissible on two bases.  Number one, I find the

5   detective's statement that Miranda warnings had been given to

6   have been credible.  There was not a lot of discussion about

7   whether or not they were knowledgeably and clearly waived.  So

8   perhaps that is left hanging a bit, but all of it is rendered

9   moot by the following finding by the Court, and that is that

10  while I do find that the lieutenant, upon arrival at the

11  scene, did make a general inquiry of his officers who were

12  present as to whether or not this -- is this the individual

13  who's the suspect in the shooting, and that certainly was a

14  question, and it was directed at the group.

15        But importantly, it was not, and I so find, directed

16  at the defendant.  And therefore, while the defendant was

17  clearly in custody, custodial interrogation of the defendant

18  did not occur because that inquiry was not put to the

19  defendant.  It was a reasonable question that was put to the

20  group of officers.  I don't find that it was a so-called

21  Christian burial speech or other statement made by an officer

22  not in the form of a question, but nonetheless designed to

23  elicit an incriminating response from the person in custody.

24  I do not make that finding here.

25        It was a logical question to pose.  And the

1    defendant then spontaneously offered the statement about the

2    fact that the other guy shot first.  The statement, therefore,

3    is not rendered inadmissible by virtue of anything that

4    happened there on the street, to the extent that there is a

5    motion to suppress it on that basis, it is denied.

6              All right.  Where are we, Mr. Martinez?

7              MR. MARTINEZ:  Your Honor, the next motion to

8    address is paper No. 227.  That is Wesley Brown's motion to

9    suppress the fruits of a search warrant on 1716 Latrobe Street

10   on April 26th, 2013.  The challenge to the search warrant can

11   be decided based on the paper, but there's also the motion to

12   suppress a statement that Mr. Brown made while the warrant was

13   being executed.  And to resolve that motion we have two

14   witnesses to call.  Task Force Officer Jonathan Hayden from

15   the ATF and former Baltimore Police Detective Michael Glenn.

16             THE COURT:  All right.  These are all in paper 227?

17             MR. MARTINEZ:  Yes, Your Honor.

18             THE COURT:  Mr. Davis, Mr. Trainor, who's got this?

19             MR. DAVIS:  I've got it, Your Honor, Mr. Davis.

20             THE COURT:  All right.  So Mr. Davis, clearly the

21   government would like to get the evidence on first.  And I'm

22   somewhat sympathetic to that.  I don't want to disturb

23   officers' schedules anymore than necessary, but what's the

24   logical sequence in which these two issues should be decided,

25   to the motion attacking the warrant and then the subsequent

1    evidence?

2         MR. DAVIS:  I don't think there's any significance

3    as to which goes first.  I think we can take it in any

4    order.

5         THE COURT:  Okay.  So you want to just get the

6    witness on or --

7         MR. MARTINEZ:  Your Honor, I don't think it will

8    take long to get the search warrant out of the way.

9         THE COURT:  Let's deal with the search warrant.  One

10   minute.  Mr. Jaco.

11              This is the Latrobe Street; right?  1716 Latrobe?

12         MR. DAVIS:  That is correct.

13         THE COURT:  And the alleged buys at the house, in

14   front of the house.

15         MR. DAVIS:  In front of the house, I think, and in

16   the alley.

17         THE COURT:  And the fence post and that stuff.

18         MR. DAVIS:  Yes.

19         THE COURT:  I've got it.  I remember it.  Okay.

20   Let's hear first from Mr. Davis just a brief synopsis of what

21   your complaint is with respect to the execution -- or the

22   obtaining and execution of the search warrant and then we'll

23   go from there.

24         MR. DAVIS:  It primarily deals with the reliability

25   of the informants.  No controlled buys were utilized in order

1    to gain entry to this home.  The informants appear to be

2    registered informants with the city of Baltimore.  I don't

3    know if that gets them any greater degree of credibility than

4    anyone else, any other informants, but I think what's lacking

5    is, is there's no basis for the knowledge that the informants

6    are imparting to the officers.  And I think that's where the

7    problem lies.  There's no testimony that there -- there's no

8    references in the affidavit that they entered the home on

9    different occasions and observed this or observed that.  They

10   could have just as likely gotten the information from somebody

11   standing on the street corner and passed it to the Baltimore

12   Police Department.  I guess again --

13        THE COURT:  So you and I are not under -- you know,

14   we're not under *Aquilar-Spinelli*, I think is what it was when

15   you and I were in law school, all of that has been rolled back

16   and those kinds of precise specific requirements on informants

17   now sort of give way to a more of a totality of the

18   circumstances analysis.

19        MR. DAVIS:  They do, but I still think that you

20   can't justify the search based on what you come up with.  And

21   I think there's -- in the paperwork itself there's a failure

22   to state a basis of knowledge for the two confidential

23   informants and I note the lack of controlled buys.  And I note

24   the lack of stopping anyone leaving the house or leaving the

25   alley or whatever.  I note that there's no reference that we

1    saw these drugs here or we saw this -- this money here or

2    these drugs here or a gun here.  There's just nothing like

3    that.  It's just generalized statements, which after the fact

4    appear to be corroborated.  But before the fact, I don't think

5    they laid out their basis and I don't think it was

6    sufficient.

7              THE COURT:  Thanks, Mr. Davis.

8              All right.  So, Mr. Martinez, what about it, how was

9    this affidavit sufficient to demonstrate probable cause?

10             MR. MARTINEZ:  Your Honor, our position is there was

11   ample probable cause in this affidavit, and we have two

12   confidential informants who corroborated one another.  But

13   frankly, even taking their information out of the affidavit,

14   you still have the two affiants themselves, observed Mr. Brown

15   engaging in suspected drug transactions on five different

16   occasions.  On one of those occasions they saw him leave his

17   residence, take a drug -- suspected drug stash out of a fence

18   post, and on yet another they saw him leave his residence and

19   do hand-to-hand drug transactions.

20             So simply on the basis of those two observations you

21   have probable cause to believe Mr. Brown's engaged in drug

22   activity and you also have a nexus between his drug activity

23   and the residence.  So we could put the issue surrounding the

24   confidential informants to the side and just decide that

25   there's probable cause based on the affiant's observations.

1    But surely the affiant's observations also corroborated the

2    confidential informants.  And so when you put the whole

3    picture together, our position is this affidavit was showed

4    ample probable cause.

5         THE COURT:  I'm ready to rule.  I think it's a close

6    question on whether the affiant's observations by themselves

7    gave rise to probable cause to justify this search.  The

8    reason I brought up *Aquilar-Spinelli,* though, is because I

9    think the informants in this case kind of put some frosting on

10   the cake and add to the weight and substance that's in this

11   particular affidavit.  Mr. Davis is completely correct in

12   terms of the fact that there wasn't a detailed description of

13   why these informants are known to be particularly reliable and

14   trustworthy from prior experience and so forth.

15         But my view is that the case was -- the affidavit

16   was either all the way there or almost all the way there in

17   terms of probable cause just based on what the affiants

18   themselves had observed with respect to the activities that

19   were going on around the front of that house and over to the

20   side in the alley.  At some point a court is entitled to

21   accredit the testimony and experience of experienced officers,

22   experienced affiants, in terms of the sort of conduct that

23   they're observing.  And that's what I mean when I say that

24   that took at least most of the way to probable cause, then you

25   add to that, you've got informants saying, yeah, we're buying

1    drugs out of there, or certainly from in front of there.  I

2    find that there was probable cause.

3            The last piece of it is, yes, but does that get him

4    in the house?  Not just that there's probable cause to believe

5    that there's drug trafficking going on in the front stoop or

6    the alley beside that house or near the fence post, yes, it

7    does get him into the house because the individuals associated

8    with the house for whom there's probable cause to believe they

9    were involved in drug dealing were seen so clearly associated

10   with that house, traveling in and out of it, with the scale of

11   the activity that the affiants themselves observed, assisted

12   by the statements made by the informants, there's probable

13   cause to prove that there would be evidence of drug

14   trafficking found inside that house.  That motion to suppress

15   is denied.

16           Now, there's another piece of this, and it has to do

17   with what happened inside the house; right?

18           MR. MARTINEZ:  Correct, Your Honor.  As I understand

19   it, Mr. Brown is moving to suppress a statement that he made

20   while the search warrant was being executed to the effect that

21   he was located in the second floor rear bedroom when entry was

22   made to the house.

23           THE COURT:  Is that basically it, Mr. Davis?

24           MR. DAVIS:  That's correct.

25           THE COURT:  That's the attack.  Okay.  So who's your

1    witness?

2              MR. MARTINEZ:  Task Force Officer Jonathan Hayden of

3    the ATF.

4              THE COURT:  Okay.  Let's bring him in.  Sir, if you

5    would stop in front of the jury box and face our clerk.  Right

6    there.

7              THE CLERK:  Good afternoon.  Please raise your right

8    hand.

9                        TFO JONATHAN HAYDEN,

10   called as a witness, being first duly sworn, was examined and

11   testified as follows:

12             THE WITNESS:  I do.

13             THE CLERK:  Thank you.  You can have a seat.  Please

14   state and spell your first and last name for the record.

15             THE WITNESS:  Jonathan Hayden, J-o-n-a-t-h-a-n

16   H-a-y-d-e-n.

17             THE CLERK:  Thank you.

18             THE COURT:  Good afternoon.  Your witness,

19   Mr. Martinez.

20                        DIRECT EXAMINATION

21   BY MR. MARTINEZ:

22   Q    Task Force Officer Hayden, good morning.

23   A    Good morning.

24   Q    Can you tell us with which law enforcement you're

25   employed?

1    A     Employed by Baltimore City Police Department, currently

2    assigned to the Bureau of Alcohol, Tobacco, Firearms and

3    Explosives.

4    Q     And what's your rank or title?

5    A     I'm a detective with the city and a task force officer

6    with the ATF.

7    Q     How long have you been with BPD?

8    A     Little over 20 years.

9    Q     How about ATF?

10   A     Little over nine years.

11   Q     Over the last six years or so have you participated in an

12   investigation of criminal activity by the Black Guerilla

13   Family's Greenmount Avenue Regime?

14   A     Yes, I have.

15   Q     And I want to direct your attention to the early morning

16   hours of April 26, 2013.  Were you working and on duty at the

17   time?

18   A     Yes, I was.

19   Q     Did there come a time that morning when you participated

20   in executing a search warrant at 1716 Latrobe Street in

21   Baltimore City?

22   A     Yes.

23   Q     Who were the affiants on that search warrant?

24   A     It was myself and Detective Golimowski.

25   Q     And who lived at 1716 Latrobe Street?

1    A    At the time it was Wesley Brown and Lacritia Keene.

2    Q    Can you recall at approximately what time the search

3    warrant was executed?

4    A    About 4:15 in the morning.

5    Q    Can you recall who made initial entry into the home?

6    A    SWAT platoon made entry.

7    Q    Did you eventually enter the house as well?

8    A    Yes, I did.

9    Q    And after you entered the home, can you recall where the

10   occupants were at the time?

11   A    Yes.  SWAT had cleared the house and everyone had brought

12   all the individuals to the first room -- first floor room in

13   the house.

14   Q    Can you recall the identities of the persons in that

15   first floor front room when you entered?

16   A    Yes.  It was Wesley Brown, Tavon Thompson, Lacritia

17   Keene, Brittany Carter, and their young daughter.

18   Q    And do you see Mr. Wesley Brown in the courtroom today?

19   A    Yes.  He's sitting to the far left of counsel with his

20   hand on his chin right now.

21         THE COURT:  The record will so reflect.

22   Q    (BY MR. MARTINEZ)  Detective Hayden, can you recall

23   whether any of the people you just identified were in

24   handcuffs as you entered the first floor front room?

25   A    I believe Mr. Brown was, Mr. Thompson was, and I believe

1    Ms. Keene was at the time.

2    Q    And after you entered the room, Detective, what, if

3    anything, did you do to advise the occupants of their Miranda

4    rights?

5    A    I actually had Miranda forms, to which I read the Miranda

6    rights to everybody sitting in the room at one time.  And then

7    I asked each one individually if they understood their

8    rights.

9    Q    So did you ask Mr. Brown individually whether he

10   understood his rights?

11   A    Yes, I did.

12   Q    How did he respond?

13   A    First he answered nonverbally and I asked him -- I needed

14   a yes or no answer and he said yes.

15   Q    Did you also ask the occupants of the room to sign

16   written Miranda waivers?

17   A    Yes.

18   Q    Did they agree the sign the waivers?

19   A    No.  Mr. Thompson, Mr. Brown, and Ms. Carter did not sign

20   them, but Ms. Keene did sign hers.

21   Q    All right.  We'll start by showing you what we've marked

22   here as Government's 3A, recognize this?

23   A    Yes.

24   Q    What are we looking at here?

25   A    It's the advice of rights and waiver, the statements of

Direct Examination – Hayden  (By Mr. Martinez)

1    rights that I read and this was the paper I offered to

2    Mr. Brown to sign.

3    Q    How about Government's 3B?

4    A    Again, this is another advice of rights and waiver with

5    the statement of rights I read and this was Ms. Keene's, to

6    which she did sign and witnessed by Detective Glenn.

7    Q    And 3C?

8    A    Again, another advice of rights and waiver.  This one was

9    for Ms. Carter, who also refused to sign and stated she just

10   didn't feel like writing.

11   Q    Finally, 3D?

12   A    That one is another advice of rights.  This is one was

13   for Tavon Thompson, who also refused to sign.

14   Q    Was any other law enforcement officer present when you

15   read the occupants of the room their Miranda rights and

16   presented them with the written forms we just showed you?

17   A    Yes.  Detective Michael Glenn was in the front room with

18   me.

19   Q    After you read the Miranda warnings and presented those

20   forms you just looked at, did you ask any questions of the

21   occupants of the room?

22   A    Once they all advised they understood their rights, I

23   asked them where in the house they were located, to which time

24   they gave me their responses.

25   Q    Was that the only question you asked?

1    A    Yes.

2    Q    And so did Mr. Brown answer your question as to where he

3    was located in the room?

4    A    Yes.  He had stated he was in the second floor rear

5    bedroom.

6    Q    Did you, in fact, already know at the time you asked the

7    question where Mr. Brown had been located?

8    A    Yes.  Upon actually entering the house, the platoon

9    leader of the SWAT team had advised me where everybody in the

10   house was located, so I was just verifying his information.

11   Q    Now, after you had asked that question and obtained a

12   response from Mr. Brown, was the house then searched?

13   A    Yes.

14   Q    Can you summarize briefly, what, if anything, was

15   recovered?

16   A    In the second floor rear bedroom where Mr. Brown was

17   found, 16 blue top vials were located in a men's New Balance

18   shoe, two clear gel caps of heroin were located in another New

19   Balance shoe.  There were 50 gel caps of heroin located in a

20   shoebox.  There was $256 located in a purple doll purse.

21   Mr. Brown's ID and a letter addressed to Mr. Brown under the

22   name of Shike White was located.  There was various packaging

23   material, several blue top -- empty blue top vials, the book

24   *Soledad Soldier*, along with other BGF paperwork were located

25   in the bedroom closet.  There were some empty plastic baggies

1    also located in the bedroom.  Throughout the house there was

2    more packaging located in the kitchen and some various

3    paperwork on the ledge going down to the basement.

4    Q    After the search was completed and those items were

5    recovered, was Mr. Brown placed under arrest?

6    A    Yes, he was.

7              MR. MARTINEZ:  Those are the only questions I have,

8    Your Honor.

9              THE COURT:  Cross.

10             MR. DAVIS:  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12   BY MR. DAVIS:

13   Q    Detective Hayden, you entered the home at 4:15 in the

14   morning?

15   A    SWAT made entry, yes.

16   Q    And do you have that advisement of rights the Miranda

17   form, do you have that in front of you?

18             THE COURT:  Put that back on the screen.

19             MR. MARTINEZ:  Counsel, which one?

20             MR. DAVIS:  3A.

21             THE COURT:  For this individual?

22             MR. DAVIS:  Yes, for Mr. Brown.

23             THE COURT:  Thank you.

24             MR. DAVIS:  If you could slide that down a little

25   bit, Mr. Martinez, so we can see the upper left-hand --

1   Q    (BY MR. DAVIS)  What time did you read the Miranda

2   warnings?

3   A    4:27.

4   Q    And you entered at 4:15, so it was about 7 minutes later;

5   correct?

6   A    Well, approximately 4:15, so --

7           THE COURT:  That would be 12 minutes, Mr. Davis.

8           THE WITNESS:  That would be 12 minutes.

9   Approximately.

10          THE COURT:  I assume that's an arithmetic deficiency

11  on your part from your educational background.

12          MR. DAVIS:  One of many errors that are going to

13  follow today.

14  Q    (BY MR. DAVIS)  Now, you indicated that the SWAT team

15  entered the home with your unit; correct?

16  A    SWAT team entered on their own.

17  Q    All right.  And the warrant you obtained was a no-knock

18  warrant?

19  A    Correct.

20  Q    Again, it was at 4:15 a.m.; correct?

21  A    Approximately, yes.

22  Q    Did you utilize the provision in the warrant and not

23  knock to enter the home?

24  A    Correct, the SWAT team did use that provision.

25  Q    Would it be fair to say that you knocked the door down to

1    enter the home?

2    A    SWAT, yes, used force to enter.

3    Q    Was SWAT armed?

4    A    Yes.

5    Q    Weapons drawn?

6    A    Probably, yes.

7    Q    Just thinking back, what type of weapons were they

8    carrying when they entered that home?

9    A    I've never been on SWAT, so probably handguns and maybe a

10    few short guns.

11    Q    And your unit was armed also; correct?

12    A    Well, we were actually standing back towards the -- we

13    actually stayed back about a block, a half a block from when

14    SWAT is making the entry, so as not to come in any crossfire

15    or mess up any operational situations they have.

16    Q    Now, you told us when you encountered Mr. Brown he was in

17    the front room; correct?

18    A    Correct.

19    Q    Was he in cuffs at that time?

20    A    Yes.

21    Q    Based on your conversations with other officers that

22    entered the home, he had been located in another room --

23    A    Correct.

24    Q    -- upon entry.  So and he was in cuffs when you saw him;

25    correct?

Cross-examination – Hayden   (By Mr. Davis)

1   A     Correct.

2   Q     So apparently he had been moved from one room to another

3   by armed officers at 4:15 a.m. in cuffs and placed in another

4   room; correct?

5   A     Correct.

6   Q     Is it fair to say he was not free to leave?

7   A     Correct.

8   Q     Now, you also indicated that you read everyone their

9   Miranda rights; correct?

10  A     Yes.

11  Q     And did you do that as a group?

12  A     I read them individual -- I read it as a group to

13  everyone and then I asked each individual if they understood

14  their rights.

15  Q     And then you got a response from them; correct?

16  A     Correct, one at a time.

17  Q     One at a time.  So you walked up and looked at each

18  person, read them their rights, asked them if they understood,

19  they said yes, and what did they say about talking to you?

20  A     No, I asked them if they understood their rights, they

21  said yes, and that was it.  They made no response to not

22  talking to me or talking to me.

23  Q     That's when you brought out the Miranda waivers;

24  correct?

25  A     Correct.

1    Q    That's when you presented individual Miranda waivers to

2    the individuals in the home; correct?

3    A    Correct.

4    Q    At that point that's when Mr. Brown refused to waive his

5    rights; correct?

6    A    No, he just refused to sign the paper.  I said this is

7    not a waiver of rights, it's just a would-you-like-to-sign

8    this waiver of rights acknowledging that you understand --

9    basically that said I understand, but I'm not signing

10   anything.

11   Q    So it's your -- you're telling us that he didn't -- that

12   he wasn't asserting his rights, he was just asserting -- he

13   was just saying he didn't want to sign any papers?

14   A    From my understanding, even Ms. Carter said she just

15   didn't feel like writing.

16   Q    I want to narrow you down to Mr. Brown.

17   A    Okay.

18   Q    You presented him with this form, which read, you have

19   the right to remain silent, anything you say can be used

20   against you, so forth and so forth, and he told you, I don't

21   want to sign this; correct?

22   A    He said he understood his rights and he did not want to

23   sign.

24   Q    The next thing you did was is you asked him where he was

25   in the house; correct?

Cross-examination - Hayden  (By Mr. Davis)

1   A    I asked everybody, yes.

2   Q    But you --

3   A    Yes, I asked Mr. Brown where he was.

4          MR. DAVIS:  I have no further questions.

5          THE COURT:  Any redirect?

6          MR. MARTINEZ:  No.

7          THE COURT:  Okay.  We will take a brief recess.  The

8    defendants are remanded to the custody of the Marshal and we

9    will reconvene in 15 minutes.  Recess.

10          (A recess was taken.)

11          THE COURT:  More proof on this particular motion,

12   Mr. Martinez?

13          MR. MARTINEZ:  Yes, Your Honor, just briefly from

14   former Baltimore Police Detective Michael Glenn.

15          THE COURT:  Flynn?

16          MR. MARTINEZ:  Glenn.

17          THE COURT:  Oh, yes, Detective Glenn.  Bring him in.

18   Sir, please come forward up here to the jury box, stop there,

19   turn and face our clerk and raise your right hand.

20          THE CLERK:  Good afternoon.

21               DETECTIVE MICHAEL D. GLENN,

22   called as a witness, being first duly sworn, was examined and

23   testified as follows:

24          THE WITNESS:  I do, ma'am.

25          THE CLERK:  Thank you.  You may have a seat.

1          THE WITNESS:  Thank you, ma'am.

2          THE CLERK:  Please state and spell your first and

3     last name for the record.

4          THE WITNESS:  Sure.  My name is Michael D. Glenn,

5     first name spelled M-i-c-h-a-e-l; last name is spelled

6     G-l-e-n-n, just like the astronaut.

7          THE COURT:  Thank you.  Your witness,

8     Mr. Martinez.

9                    DIRECT EXAMINATION

10    BY MR. MARTINEZ:

11    Q    Mr. Glenn, good morning.

12    A    Good morning, sir.

13    Q    Tell us where you work, sir.

14    A    I'm currently employed with the Office of the Attorney

15    General as an investigator.

16    Q    What kind of investigations do you do there?

17    A    Elder abuse and Medicaid fraud, sir.

18    Q    Were you previously employed by the Baltimore Police

19    Department?

20    A    I was, sir.

21    Q    Were you also previously deputized as a task force

22    officer with the ATF?

23    A    I was, sir.

24    Q    Can you tell us how long you were with the BPD?

25    A    About 27 years, sir.

Direct Examination - Glenn   (By Mr. Martinez)

1   Q     How about the ATF, how long with them?

2   A     Deputized in 2003, retired in 2016, sir.

3   Q     Okay.  I want to direct your attention to the early

4   morning hours of April 26, 2013.  Were you working and on duty

5   at that time?

6   A     Yes, sir.

7   Q     And did there come a time that morning where you

8   participated in the execution of a state search warrant at

9   1716 Latrobe Street in Baltimore City?

10  A     Yes, sir.

11  Q     Can you recall approximately what time the search warrant

12  was executed?

13  A     Approximately 4:15 a.m., sir.

14  Q     Can you recall who made initial entry into the home?

15  A     Baltimore City SWAT made initial entry into the home,

16  sir.

17  Q     Did you eventually enter the home?

18  A     Yes, sir.  I was one of the last ones to enter the

19  house.

20  Q     When you entered the house, could you determine where the

21  occupants were?

22  A     When I entered into the house, everybody was downstairs

23  in that front room right next to the front door, sir.

24  Q     Can you recall who specifically was in that room?

25  A     Wesley Brown, Ms. Latrice Keene (sic), Brittany Carter,

1    and Tavon Thompson, sir.

2    Q    And do you see Mr. Brown in the courtroom today?

3    A    Yes, sir.  He's seated over there next to the gentleman

4    with the curly hair.

5              MR. DAVIS:  No objection.

6              THE COURT:  To either the depiction --

7              THE WITNESS:  Sorry, sir.

8              THE COURT:  The record will so reflect that the

9    witness has identified the defendant Wesley Brown.  You may

10    continue.

11    Q    (BY MR. MARTINEZ)  Detective Glenn, after you entered

12    that first floor front room, can you recall whether anyone

13    advised the occupants of the room of their Miranda rights?

14    A    Yes, sir.  Detective John Hayden advised the occupants

15    that were down there of their Miranda rights.

16    Q    And can you recall what, if anything, Detective Hayden

17    did to make sure the occupants of the room understood their

18    rights?

19    A    Detective Hayden had an ATF form with the advisement of

20    rights on there and he read the advisement of rights out to

21    everyone in the room.  And at that point, once he read out all

22    the advisement of rights, he made sure everyone in the room

23    acknowledged that they understood the advisement of rights.

24    Q    So did Detective Hayden ask Wesley Brown whether he

25    understood his rights?

1    A    Yes, he did, sir.

2    Q    Can you recall how Wesley Brown responded?

3    A    At first he didn't respond, sir.  John said you've got to

4    say yes or no that you understand your rights.  He at one

5    point said yes.

6    Q    All right.  Can you recall whether Detective Hayden also

7    asked the occupants of the home to sign written Miranda

8    waivers?

9    A    Yes, sir.

10   Q    And I'll just run through these quickly with you.  I'll

11   show you what's come in as Government's 3A.  What's this?

12   A    Yes, sir.

13   Q    Do you recognize this?

14   A    Yes, sir.  This is the advice of rights and waiver form

15   that Detective Hayden had with him as he was going through the

16   rights with the individuals inside the 1716.  And on it is the

17   signature where it's -- signature says refused, the printed

18   name is Wesley Brown.  The witness signature is mine,

19   Detective Michael D. Glenn, and printed name is Michael

20   Glenn.

21   Q    Okay.  So it was your understanding that after

22   acknowledging that he understood his rights Mr. Brown was

23   presented with this written form and refused to sign it; is

24   that right?

25   A    That's correct.

1    Q    3B, is this a similar form for Lacritia Keene?

2    A    Yes, sir.  The difference with Ms. Keene is that she

3    actually signed.  She agreed to sign the waiver form.  Again,

4    my name is here, Detective Michael Glenn, witness printed

5    Michael D. Glenn.

6    Q    3C?

7    A    Yes, sir, refused.  John -- Detective Hayden printed

8    Brittany Carter and wrote down "I just didn't feel like

9    writing."  Again, my signature is there along with my printed

10   name, sir.

11   Q    And finally, 3D?

12   A    Again, sir, it's the same form that John Hayden used.

13   Mr. Thompson refused.  His name is printed, Tavon Thompson.

14   I'm witnessing it, Michael D. Glenn, printed name Michael

15   Glenn, sir.

16   Q    All right.  Now, after Detective Hayden advised the

17   occupants of the room of their Miranda rights and presented

18   those forms, can you recall whether he asked any questions?

19   A    Yes, sir, he did.

20   Q    Can you recall how many questions he asked?

21   A    Basically one question, sir.

22   Q    What question did he ask?

23   A    Where were you at inside the dwelling.

24   Q    And did each of the occupants in the room respond to that

25   question?

1    A     Yes, sir, they did.

2    Q     Did Mr. Brown respond to that question?

3    A     He did, sir.

4    Q     And what, if anything, did he say?

5    A     He basically said he was upstairs in the rear bedroom.

6          MR. MARTINEZ:  Those are all the questions I have,

7    Your Honor.

8          THE COURT:  Mr. Davis.

9          MR. DAVIS:  I have no questions.

10         THE COURT:  Okay.  The witness may step down and be

11   excused.  Anymore proof?

12         MR. MARTINEZ:  No, Your Honor.

13         THE COURT:  Mr. Davis, argument -- you're excused.

14         THE WITNESS:  Thank you, Your Honor.

15         MR. DAVIS:  Well, Your Honor, the gist of the

16   argument is that this was a coercively elicited statement.

17   The manner of entry; SWAT team, guns, he's handcuffed he's

18   moved around against his will, he was put into a room, he's

19   advised of his rights, he's presented with a form to

20   acknowledge that he understands his rights and waives them,

21   and he refuses to answer that.  And the next thing that

22   happens is, is the detective asks him a question about where

23   he was and presumably because they had recovered a substantial

24   amount of drugs in the room that they claim that he was in.

25   And we think that under the circumstances the question was

1    certainly -- shouldn't have been asked.  He had already --

2    THE COURT:  What's your best argument for the

3    notion, which I think is implicit in what you're saying, but

4    I'm not sure, that he invoked his rights?

5    MR. DAVIS:  I think when he refuses to sign the form

6    and he doesn't answer when initially prompted, when the

7    detective initially asked him a question, he didn't even

8    answer.  When they asked him if he understood his rights, he

9    had no interest in talking to them and that upon --

10    THE COURT:  Is an officer not permitted under our

11    very much evolved Miranda law to prod a person along to a

12    response, not to a substantive question, but just to a

13    response to the question of, do you understand your rights,

14    and you get a flat no response, flat affect picture, is an

15    officer then stepping over the line when they say, hey, come

16    on, you've got to answer yes or no, you understand what's

17    going on here?  That's giving the person the option of

18    answering no, I don't understand; or no, I don't; or I won't

19    sign; or no, I don't waive, I don't do anything.

20    MR. DAVIS:  I think you have to take a look at the

21    totality of the circumstances.  We can't take anything in

22    isolation.  Your example was in isolation.  When the officer

23    asked him if he understood his rights, he doesn't say

24    anything.  That's just one part of the equation.  When we look

25    at everything, when we look at the SWAT team entry and no one

1    described what they looked like, but everyone can probably

2    conjure up an image of the SWAT team entering Mr. Brown's

3    house at 4:15 a.m.  It was probably pretty intense, probably

4    the best characterization.

5         And then you look at the fact that the doors are

6    knocked down when they go into the house, and you look at the

7    fact that he's roused out of bed, handcuffed, dragged into

8    a -- taken into another room, everybody's herded into a room,

9    and then they ask him if he understands his rights.  He's not

10   talking to them.  All right.  Well, they push it again.  He

11   says yes, I understand.  All right.  They've got him to say he

12   understands his rights.  Next step, let's have him waive those

13   rights in writing.  He understands his rights, he gets the

14   waiver with those rights, and he refuses to sign it.

15        There's no indication that he doesn't feel like

16   writing.  If anything, clearly the circumstances are is he

17   does not want to talk to them.  And the next thing that

18   happens is the officer pushes on.  And he asks him where were

19   you, and the obvious reason for asking where the individuals

20   were is because there are items secreted in different rooms,

21   in particular, in the room he was in.  And I just think under

22   the totality of the circumstances the statement was coerced.

23   I don't see how it can be characterized in a different way

24   under these circumstances.

25        THE COURT:  Thank you, Mr. Davis.  The Court's

1    finding is that the officer's efforts to Mirandize the

2    defendant and secure an indication that he understood the

3    warnings and then to find out whether or not he waived them

4    and wished to speak was greeted with what the officers

5    appropriately interpreted as ambivalence.  There were no flat

6    denials or refusals, there was just a nonresponse.  And the

7    question is, well, what are the officers to do in the face of

8    that?

9            My finding is that the next step that they took was

10    a reasonable one, which was to prod the defendant further:

11    Well, hey, man, what is it, yes or no, you understand or you

12    don't understand?  And he responded to that affirmatively that

13    he did.  Then there's the question of whether he's going to

14    understand and then sign the waiver form, and he indicated

15    that he didn't want to sign it.  Does that mean that he is

16    not, that he's expressly not waiving his rights?  Nothing of

17    that nature actually occurred, it's just more this very

18    ambivalent picture that has presented itself.  The law is that

19    the defendant has to affirmatively invoke in order for that to

20    be effective.

21            So there is no Miranda violation here.  I want to be

22    careful to distinguish this circumstance from one that came

23    before the Court relatively recently in the extensive ECI

24    prison litigation I'm doing where I did find a Miranda

25    violation and suppressed evidence.  And in that circumstance

1     the officer could not remember whether or not the defendant

2     had waived her rights and had indicated that she understood

3     and was willing to speak.  And there has to be some

4     affirmative indication.

5             In this case we have a slightly different situation,

6     which is that there's been this whole advisement given of the

7     defendant.  He hasn't indicated that he does not want to

8     speak, he hasn't declined to waive, he hasn't said no, he

9     hasn't invoked, as we say in this sort of parlance of this

10    business, and then a question gets asked, which he supplies an

11    answer to, which maybe apparently is an inculpatory answer,

12    but we'll have to see at trial what the significance of this

13    is.  But the totality of those circumstances persuade the

14    Court that informally, fully understanding what his rights

15    were and what he was entitled to do or not do in the

16    circumstances, he chose to go ahead and answer the question.

17    And effectively he waived when he did that.

18            Actually, here, Mr. Davis, though, going down a

19    slightly different road, so let's dispose of the Miranda issue

20    quickly by saying to the extent the motion is based on that,

21    it's denied, and turn to where I hear Mr. Davis going more

22    broadly, which is just a general complaint that what went on

23    here is just inherently coercive and that it effectively

24    violates the defendant's 5th Amendment rights big picture,

25    that there was an involuntariness to everything that occurred.

1          And I've thought about that.  And certainly the way

2     that the SWAT teams in Baltimore enter houses, I don't know if

3     they used any flash bangs on this one, but they batter doors

4     down.  It's certainly not a sort of a calm, neutral method of

5     entering the residence.  It's very dramatic.  It's designed to

6     be, to protect the officers' safety through stunning the

7     occupants inside, quickly gaining the upper hand so that law

8     enforcement is not endangered as they're executing a warrant,

9     which is their job to do, number one; and number two, they're

10    entitled to be safe.

11         So no criticism whatsoever to how the warrant was

12    executed, just an appreciation, though, for the true facts and

13    circumstances that attend to these very dramatic entries.

14    It's given the Court some pause.  I think that Mr. Davis's

15    broad argument about the sort of shock that is delivered in

16    one of these scenarios is real and something to be reckoned

17    with.

18         I note that the time of entry is about 4:15, that it

19    was 12 minutes later that the waiver forms were being

20    presented to the various individuals, including Defendant

21    Brown.  That is not a tremendous time, but it is in my

22    judgement enough time for the sort of shock reaction that I've

23    been referring to, to have sufficiently dissipated so that a

24    person would be expected to be able to have recovered their

25    senses and their judgment and their ability to look out for

1     themselves in terms of their rights.

2         I also give significance to the fact that the

3     evidence is that all of the individuals in the house had been

4     gathered in one room.  Yes, they were in handcuffs, but the

5     mood and circumstances had changed dramatically.  This is not

6     a situation where we've got evidence indicating that a

7     defendant has been laid out on the floor, has an officer's

8     knee in his back, a gun to his head, any of those kinds of

9     extreme circumstances.  But instead, he's in handcuffs and

10    sitting quietly in the front room of the house when this

11    interchange occurs.

12        The picture that's painted by the evidence that I've

13    heard is a situation where the original shock and the sort of

14    circumstances that would overwhelm the will of any person had

15    largely dissipated and the overall climate in the room had

16    transitioned back to a noncoercive context or environment, at

17    least within the context of what the constitution is concerned

18    with.  Accordingly, the motion to suppress the statement is

19    denied.

20        All right.  Where are we?

21        MR. MARTINEZ:  The next motion to address, Your

22    Honor, is also by Mr. Brown and that is the motion to the

23    suppress the fruits of the May 2013 tracking warrant and

24    subsequent search of his cell phone.

25        THE COURT:  Let me back up to a moment ago.  I think

1    for purposes of the record, and to have some sympathy for the

2    law clerks at the Court of Appeals, what motion was that ruled

3    on by number, Mr. Davis?

4            MR. MARTINEZ:  The one we just ruled on, I believe,

5    was 227.

6            MR. DAVIS:  Yes.

7            THE COURT:  227, it had two components and I've now

8    ruled on both of those components.

9            MR. DAVIS:  That's correct, Your Honor.

10            THE COURT:  Thanks for that clarification, counsel.

11    Now, back to where you started.  What were you telling me,

12    Mr. Martinez?

13            MR. MARTINEZ:  I was telling you we're on paper 221.

14    That is the motion to suppress the fruits of the May 2013

15    tracking warrant with respect to Mr. Brown's cell phone.

16            THE COURT:  Right.  Just bear with me a second.

17            MR. DAVIS:  Certainly, and Your Honor, may I correct

18    something in that motion?  Under the ill- -- on page 2, the

19    illegal search and seizure of the cell phones, it should be

20    cell phone singular.

21            THE COURT:  Yes.

22            MR. DAVIS:  And we should scratch out that Brown had

23    a flip cell phone.  That doesn't apply.  It's just one cell

24    phone.

25            THE COURT:  All right.  I've got to get back up to

1    speed on this for just a second here.

2           This is where we start into Stingray; right,

3    Mr. Martinez?

4           MR. MARTINEZ:  That's correct.

5           MR. DAVIS:  This particular motion, Your Honor.

6           THE COURT:  Yes.

7           MR. DAVIS:  Overlaps with Mr. --

8           THE COURT:  With 212 and 243, I'm sorry, go ahead.

9           MR. DAVIS:  221 should be argued along with 247,

10   which is the cell site simulator motion that we adopted, that

11   Mr. McCants's attorney filed.  Again, looking at that, there's

12   an error in the facts here too on 243.  It's one cell phone,

13   there was no search of 1716 Latrobe in relation to this, nor

14   was there cell phone recovered from Latrobe.  It's only one

15   cell phone that was recovered when he was stopped.  What

16   happened was, is they obtained a --

17          THE COURT:  There was one phone taken from him.

18          MR. DAVIS:  His person.  It's a white iPhone.

19          THE COURT:  Uh-huh.

20          MR. DAVIS:  And the reason this overlaps with

21   Mr. McCant's cell site simulator motion is, after we filed

22   this we were informed that a cell site simulator was utilized

23   to --

24          THE COURT:  I'm wondering if we can't break this

25   down into manageable chunks here.  First of all, do we have

1    any big factual disputes about what happened in relation to

2    this motion?

3              MR. DAVIS:  Probably not, this is really legal, I

4    believe.

5              THE COURT:  Don't you think, Mr. Martinez?

6              MR. MARTINEZ:  I think that's fair to say, Your

7    Honor.

8              THE COURT:  You have witnesses ready to go on it?

9              MR. MARTINEZ:  We do indeed.

10             THE COURT:  So make a proffer and let's see if

11   Mr. Davis and Mr. Francomano -- is anybody else implicated in

12   this?  Let's see if Mr. Davis and Mr. Francomano are able to

13   agree to your proffer as to the facts before --

14             MR. FRANCOMANO:  Your Honor, I believe we're in a

15   different situation.  Ours is a warrantless search.

16             MR. DAVIS:  That's correct.

17             MR. FRANCOMANO:  So we're going to have to have

18   testimony, Your Honor.

19             MR. DAVIS:  The United States is arguing that the

20   use of the cell site -- well, there was a warrant obtained to

21   gather GPS data from cell site -- from telecommunications --

22             THE COURT:  Was there a warrant or was there --

23             MR. DAVIS:  An order.

24             THE COURT:  An order, which the government wants to

25   have treated as a warrant, because they contend that it was

1    supported by probable cause.  And so we don't really have to

2    face the question of whether a warrant was required here or

3    not, because functionally that's exactly what happened.  There

4    was an affidavit presented under oath to a judge, who then

5    authorized the action that was taken, however you characterize

6    it.

7            MR. DAVIS:  That is the United States' argument.

8    But we have -- we are factually different than Mr. McCants's

9    motion.  But we still believe that the use of the cell site

10   simulator was not authorized.  There's also another device

11   utilized in addition to the cell site simulator.  There was a

12   radio frequency detector.  I know it sounds like Inspector

13   Gadget, it really became Inspector Gadget as it went along.

14   What happened was, is the officers obtained the order to get

15   the cell -- to get the telecommunication providers to assist

16   them.

17           THE COURT:  Yes, they start pinging the phone.

18           MR. DAVIS:  Pinging the phones and so forth.  They

19   threw a sentence in there saying that they could put -- or

20   utilize other devices to locate the phone.

21           THE COURT:  I didn't miss that.

22           MR. DAVIS:  But we don't -- and then after they got

23   that, they pinged -- actually, we might need testimony on

24   this, because we may need to know how many times they pinged

25   from the cell -- from the telecommunication providers, how

1    many times they pinged from their little device that they were

2    carrying around.  It might be helpful to hear that, because it

3    may impact on that limited issue alone, unless Mr. Martinez

4    can proffer on that.

5              MR. MARTINEZ:  Well, let me back even further up

6    first, Your Honor.  As a threshold issue, I agree with

7    Mr. Francomano that Mr. Brown and Mr. McCants, with respect to

8    cell site simulators issues, are on --

9              THE COURT:  On different grounds.

10             MR. MARTINEZ:  Vastly different situations.  Due to

11   the fact that Mr. McCants, in his case, the cell site

12   simulator was used without a warrant based on the exigent

13   circumstances.

14             THE COURT:  Right.

15             MR. MARTINEZ:  So we're going to need to take

16   testimony as to that motion.  I also believe as to Mr. Brown,

17   I think it still would be helpful to take testimony if for no

18   other reason as to establish that the application submitted to

19   Judge Glynn was sworn to and signed.  The exhibit that is

20   attached to our motion paper in candor with the Court is an

21   unsigned copy, so we need to put the detective on to at least

22   have him testify, yes, I went to the judge's chambers, I

23   signed this, and this is what I did to find the signed copy.

24             THE COURT:  Unless Mr. Davis wants to stipulate to

25   that, which he's not required to.

1          MR. DAVIS:  I have no problem stipulating to that.

2    I'm more interested in the pings.

3          THE COURT:  I think he is.  All right.  So we now

4    have a stipulated fact in the record of this case that the

5    warrant was in fact presented to Judge Glynn in the ordinary

6    course of business over there, that is to say that a properly

7    submitted affidavit was presented.  And by proper, I mean that

8    it was signed and sworn to by the affiant in Judge Glynn's

9    presence.  Does the government agree to that, is that your

10   stipulation?

11         MR. DAVIS:  It is, Your Honor.

12         THE COURT:  So Mr. Davis, you agree to it, and I

13   want to know that the government agrees to it.

14         MR. MARTINEZ:  We do.

15         MR. DAVIS:  If those are the facts, we agree.

16         THE COURT:  So that's stipulated.  Now, where is

17   that going to take us, Mr. Martinez, what do we need next?

18         MR. MARTINEZ:  So then we get to Mr. Davis's -- the

19   issue he just raised about how often the phone was pinged and

20   how often BPD was in contact with the cell phone service

21   provider, et cetera.  We turned over as part of discovery, we

22   went to --

23         THE COURT:  Well, Judge Glynn authorized pinging of

24   the phone.

25         MR. MARTINEZ:  Correct.

1          THE COURT:  In the order, explicitly, maybe not by

2     using the word "ping," but there's language in there I recall

3     reading that indicated that you can try to detect the phone.

4          MR. MARTINEZ:  Correct.  And I'm just trying to get

5     to our explanation as to why.  I don't think it's of any legal

6     significance how often Baltimore Police Department was pinging

7     the phone or in contact --

8          THE COURT:  Actually, having the service provider

9     ping the phone and tell them the results they got.

10         MR. MARTINEZ:  Correct, and I think I can proffer to

11    the Court that the witness would testify --

12         THE COURT:  Hold on.  Mr. Davis, this is Inspector

13    Gadget stuff.  You don't think that it was the phone company

14    that was pinging the phone?

15         MR. DAVIS:  No, what they did is they used the phone

16    company to narrow the phone down to the 2200 block of Barclay.

17    And then they started using their own device to narrow it down

18    so that they could get within six feet of the person.  And

19    then they stopped a group of males on the street.  And they

20    whipped out another device, a radio frequency detector, where

21    they located -- which I believe the testimony will be, leaves

22    a digital fingerprint, the cell phone.  And I believe they

23    will testify that that led to a phone that was not in public

24    view and secreted in Mr. Brown's pocket.

25         THE COURT:  This is not Mr. Francomano's motion, so

1    what I'm interested in hearing from you, Mr. Davis, is where

2    there had been an order worded as it was by Judge Glynn,

3    what's wrong with what they did?

4         MR. DAVIS:  I don't think the order authorized --

5    that's a good question.  The problem I see here is, is they go

6    to the judge, they get an order, that order authorizes them to

7    go to telecommunications providers and have them assist them

8    in gathering data on this particular phone.  That's fine.

9         THE COURT:  But there's another little clause in

10   there.

11        MR. DAVIS:  There's a clause, and it's very similar

12   to the statement about probable cause.  It's just dropped in

13   there.  It's obvious that someone decided, hey, we better

14   start including this in there.

15        THE COURT:  That's what happens when clever lawyers

16   like you file motions and there's motions hearings and judges

17   rule on them.  Law enforcement is listening and they actually

18   change their tactics and reactions to that.  That's why I'm

19   saying, I didn't miss the language in there, I didn't see that

20   before, it's like, huh.

21        MR. DAVIS:  First, let's look at the last --

22        THE COURT:  Read that into the record.

23        MR. DAVIS:  Government's Exhibit 13.  I look at the

24   last paragraph on page 7:  "Ordered that," then it lists all

25   the telecommunications providers, "provide the agency with all

1    call data and cell site data simultaneous with all

2    communications."  That's authorizing them to get the

3    telecommunications providers to give them that information.

4    That's not authorizing them to run out and use gadgets that

5    are unregulated that we have no idea how reliable they are,

6    whether they're maintained properly, whether any records are

7    kept, which is why I wanted to know how many times they were

8    pinging, because there's no records of any of this.  It's all

9    left to the unfettered discretion of law enforcement.

10          THE COURT:  So you're walking down a public street,

11   Mr. Davis, okay, and of course this would never happen with

12   you in a million years, but you have a little baggy of

13   cannabis in your pocket, okay.  And here comes the other way,

14   not Inspector Gadget but Inspector K-9 with his dog.  And the

15   dog comes walking along and Mr. Davis is walking the other way

16   and all the sudden the dog sits down or whatever, they --

17   they're not like Rin Tin Tin, they don't attack people, they

18   just sit.  And immediately they have detected, with a device,

19   in the form of a dog, that you in this public place have got

20   something that they're interested in.  They would be entitled

21   to take some steps in relation to that, wouldn't they?

22          MR. DAVIS:  Well, I live in the district, so no,

23   they wouldn't, we can possess 2 ounces of marijuana legally.

24          THE COURT:  It's still illegal in the district, just

25   under Title 21 of the United States Code.

1          MR. DAVIS:  Well, there's a dispute on that between

2     federal pretrial and superior court pretrial, but by and

3     large, you walk down any street and you get the message.

4          THE COURT:  The dog would be very busy.

5          MR. DAVIS:  Yes.  I liken it more to the thermal

6     imaging case, that's what I liken it more to.  If you put a

7     dog on someone --

8          THE COURT:  Thermal imaging, though, that's in

9     private premises.

10         MR. DAVIS:  The Fourth Amendment protects persons

11     and their places.  I mean, this is his --

12         THE COURT:  What about pot in your pocket that a dog

13     can smell?

14         MR. DAVIS:  When they put dogs on people, they

15     generally have a reason to do it.  There's generally

16     something, it's kind of similar to a *Terry* stop, there's some

17     indication that crime's afoot.  That's not what's going on

18     here.  What's going on here is, is they looked inside his

19     pockets.  If they didn't have that device, this is akin to

20     walking up and emptying his pockets out and saying, a-ha, a

21     cell phone is in there.

22         THE COURT:  No, because when you put something in

23     your pocket, like a pocket knife or something else, it's --

24     all it has is sort of a visual signature to it, and you've

25     successfully hidden that by taking an action to keep it

1    private; you put it in the pocket, you can't see it.  But

2    marijuana emits an odor, and even though it's in your pocket,

3    the odor's not in your pocket.  The odor has left your pocket

4    and it's gone out into the air within, you know, the range

5    that the dog can detect it.  You put an electronic device in

6    your pocket, if you don't turn it off, it keeps sending a

7    little indicator out into the public place that it's there,

8    and somebody walks by without reaching into your pocket and

9    detects it with a little Inspector Gadget thing.

10          MR. DAVIS:  How do we get around the mass -- first

11   of all, they wouldn't be approaching him if they hadn't used

12   their Stingray gadget, which was not authorized by the order

13   that was issued by the county judge.  That use of that device

14   was not --

15          THE COURT:  Not that particular device, but a lot of

16   other equipment also wasn't authorized in terms of the "use

17   the cell towers, use this, use that."  I don't think what the

18   device is, is what helps us decide the issue.  The question

19   is, what sort of intrusion occurred?

20          MR. DAVIS:  I think we have to look at what has been

21   approved because there has to be some order to this.  We can't

22   just do these things without structure.  There has to be a

23   record of what's used.  There has to be an approval for

24   someone to use it.  They had approval from the

25   telecommunications company to track him down, but they didn't

1    stop there.  They didn't stop there.  Then they went to their

2    own devices independent of the order.

3            I mean, how can you say their use of the Stingray

4    was legal and their subsequent use of the radio frequency

5    detector, if you take the order completely out of the picture,

6    you can't say -- there's something wrong with that.  They

7    shouldn't be able to do that.  You shouldn't be able to track

8    people around.  That's not something I expect carrying my cell

9    phone, that law enforcement is going to track me down using a

10   Stingray, and walk up to me as I'm walking down the hall and

11   stop me and take my phone from me because they detected the

12   digital fingerprint of the radio frequency waves coming out of

13   my cell phone.

14           THE COURT:  But you can make a decision whether or

15   not you want to walk down the street with very smelly

16   marijuana in your pocket or not.  And you can make a decision

17   about whether you want to turn on your device or turn it off

18   as you walk down the street.  All you've got to do is turn it

19   off and none of this would work.

20           MR. DAVIS:  How do we get around the fact -- again,

21   with the dogs, that's a fair example, but I think it's

22   comparing the dogs to this digital technology.  We're one step

23   away from identifying people before they commit crimes and

24   locking them up when we go this far.  There has to be a point

25   where you add structure to what's going on, and structure is

1    approval, which is lacking here, for what they utilized.

2            They used what they were approved for and they took

3    it another -- a few steps later.  We don't know how often they

4    were pinging with the Stingray.  We don't know if they started

5    before they went to the phone company.  We don't know how many

6    other people they stopped that may not have been in possession

7    of that.  We just don't know what's going on because there's

8    no records of this.  There's no need for records because

9    they're just doing what they want, they don't need approval.

10           THE COURT:  Well, they've got a broad approval from

11   the Court to go and find out what telephone numbers are being

12   dialed from this phone and what numbers are calling into this

13   phone.

14           MR. DAVIS:  That's all documented by the

15   telecommun- --

16           THE COURT:  They have that authority.  It's not

17   authority to get the content, but it is authority to detect

18   and know they have the right, the legal right --

19           MR. DAVIS:  I agree.

20           THE COURT:  -- to get those phone numbers and find

21   out who that person is communicating with.

22           MR. DAVIS:  I agree with that.

23           THE COURT:  Your point is, it's not that aspect of

24   it, it's that they turned a trap and trace into a locational

25   beeper.

1          MR. DAVIS:  They took it beyond the technology that

2    exists within the telecommunication providers and they

3    introduced their own unmonitored technical devices, which do

4    not record anything, there's no record of anything they do.

5    There's no buffer zone to say, hey, we can't do that for you,

6    this isn't right.

7          THE COURT:  So District of Columbia lawyers all know

8    about *United States versus Jones*.

9          MR. DAVIS:  Yes, I represented Mr. Maynard.

10          THE COURT:  Okay.

11          MR. DAVIS:  I got his plea before he got

12    convicted.

13          THE COURT:  Even more, you, Mr. Davis, in

14    particular.  Justice Scalia, the late Justice Scalia, told us

15    that really where we're supposed to be going with this whole

16    analysis is back to *Olmstead*, which I was taught back in the

17    Dark Ages was bad law that didn't apply to anything, and that

18    was in 1979.  But that's where we are, we're back to basic

19    principles about trespass, which is why I'm sort of now more

20    focused on the question of, well, did they go into his

21    pockets?  You can't slap a beeper on the bumper of somebody's

22    private car on a church parking lot; right?

23          MR. DAVIS:  That's true.

24          THE COURT:  Okay.  Without a warrant.

25          MR. DAVIS:  Without approval.

1          THE COURT:  Okay.  But why can't you do that?  Not

2     because it has a search quality to it, but because you have a

3     right of privacy in your personal effects that when the

4     government does that's a trespass.  So now I'm looking for

5     trespasses a la *Olmstead*.  And where's the trespass here?  The

6     problem is that the phone is sending the signal out into

7     public space.  They didn't go into his pockets, they didn't

8     sneak under his car, they didn't attach something to his

9     bumper.  They walked up to him on a sidewalk with NSA

10    gadgetry, I don't know what it is, but they can tell what he's

11    got because of a signal he's emitting.

12         MR. DAVIS:  Correct, but they didn't even get that

13    close until they used their other device, which had not been

14    authorized by any judicial official.

15         THE COURT:  You want the Court to find that he's got

16    a constitutional right to be sort of hidden in plain sight,

17    that he's got a right to be in what we would otherwise

18    completely recognize as a public space and not be detected

19    there by the means of government tools and apparatus.  What

20    about somebody walking around in Baltimore and they get this

21    airplane up there flying around and it's got this super duper

22    lens and it can look down and say, oh, there's Mr. Davis

23    walking down North Avenue?  You want a distinction drawn --

24         MR. DAVIS:  But I'm on North Avenue in public.

25         THE COURT:  Yes, and your client was on a public

1    street too, with this device, but nobody knew it until some

2    special technology like an airplane with a really big lens or

3    this radio frequency detecting device was used to find him

4    within the 600,000 people of Baltimore.  That's what you want.

5    You want the Court to draw a line and say sort of like where

6    Chief Justice Roberts started to go with the cell phone

7    opinion several years ago, that, you know, we've got to

8    re-evaluate this whole discussion in light of what the

9    technology is capable of.

10             MR. DAVIS:  Well, why do we need legal approval to

11    have the telecommunications providers provide this

12    information, which is all orderly, structured, and recorded,

13    and yet law enforcement doesn't need it at all?  Why would we

14    need to have any approval to get it from the

15    telecommunications providers if law enforcement can just do it

16    any way they want, however they want, with no record?

17             THE COURT:  I can't answer that.  All I can do is go

18    to the law.  What do I do with the circuit, my circuit, having

19    said en banc what it has said about historical cell site

20    information in terms of your location?

21             MR. DAVIS:  I think that's still being kicked

22    around, I believe.

23             THE COURT:  Kicked around, if that's how you

24    describe what goes on at the Supreme Court, that's fine with

25    me.

1          MR. DAVIS:  That's kind of an offhand way of saying

2     that.

3          THE COURT:  But that doesn't change the law in this

4     circuit.

5          MR. DAVIS:  No, but we have to make our arguments.

6          THE COURT:  You can preserve the argument, you've

7     already done that.  You filed the motion and you're going to

8     get a ruling here, but you've got to persuade me you've got

9     authority.

10          MR. DAVIS:  Well, there has to be legal authority

11     to -- first of all, he has a right to be secure in his person.

12     I mean, that's basic.  I understand that people -- that

13     technology is evolving, but there comes a point where you have

14     to -- when you walk outside you don't believe that everybody

15     sees what you have.  It's not a -- you have a reasonable

16     expectation of privacy.

17          THE COURT:  What about CCTV?  We've already got that

18     in this city, the blue light cameras, they're watching you all

19     the time.  You're on camera right now.

20          MR. DAVIS:  Yeah, but I'm not -- I know that,

21     everybody --

22          THE COURT:  When you walk down North Avenue, you

23     better know it too because that camera is on.

24          MR. DAVIS:  I've seen a lot of things on those

25     cameras lately, people should have known --

102

1          THE COURT:  Clearly, you've seen better than I have,

2    that's part of the problem, but the law is pretty clear.

3          MR. DAVIS:  Just I have problems with it because I

4    think it's unfettered, it's unrecorded, there's no structure

5    to it, there's no approval, and it's literally put in the

6    hands of law enforcement.  And it's -- you know, there has to

7    be checks and balances here.  I don't think we would have a

8    requirement that the telecommunications providers have to

9    adhere to the law and go through a structured process and keep

10   track of everything so that it can be reviewed later on, I

11   don't think we'd have that requirement unless the same

12   requirement should apply to a group of individuals such as law

13   enforcement.  I mean, it -- law enforcement is going to them

14   to obtain it from them.  Why can they just go out and do it on

15   their own?  I think the logical extension of all this is

16   nobody goes to their phone companies anymore, they just whip

17   out their devices and do whatever they want.  There's no

18   record to review, there's no anything

19         THE COURT:  Articulate for me the Fourth Amendment

20   right that a person has to have their location in a public

21   place not be detected by the use of a device that is merely

22   measuring what is going on in public space or a public place.

23   No hands have gone into any pockets, nobody has taken a

24   telescope and peeked through a window, nobody has taken a

25   spike mike and jammed it into the wall so they can listen to

1    what's going on in the next room.  I think -- was that *United*

2    *States versus Katz*?  I mean, all of this privacy stuff that

3    we're talking about.

4         MR. DAVIS:  But why do you have to go to the Court

5    to get the telecommunications providers to do it if law

6    enforcement can just do it with whatever they want?

7         THE COURT:  Well, the practical answer is because

8    right now the telecommunications providers are not going to

9    supply that information without a court order.  Their civil

10   lawyers have told them that, so they won't do it, so they have

11   to do that.

12        MR. DAVIS:  Checks and balances.

13        THE COURT:  The problem that really I think is

14   presented squarely by this case is really not even about

15   telephone numbers.  It's certainly not about content of

16   communications.  It's this locational issue.  It's about

17   whether or not you have a privacy right in where you are in a

18   public place at a given moment.  That's the problem.

19        MR. DAVIS:  That is part of the problem.  But the

20   other part of the problem is, how do they find you in that

21   public space, how do they find you?  And what happens if their

22   devices aren't that accurate?  And what happens if they stop a

23   group of men and search everybody, and whoops, this machine

24   must not be working right, whatever they're using, none of

25   this is monitored, just push it away.  There's no record of

1    this, the guys complain there's no record of it.

2         THE COURT:  Broader policy issue and people file

3    lawsuits over things like that.  What matters in a criminal

4    case is whether or not some individual with standing had his

5    constitutional rights violated.

6         MR. DAVIS:  Well, I'm losing, but I think --

7         THE COURT:  You're doing pretty well, because I

8    think it is a profound question.  But I don't find a lot of

9    guidance from the appellate courts about this issue of privacy

10   in public.  And I'm prepared to find that when you're walking

11   down North Avenue and you're out of your house, you're not in

12   your car anymore, you're walking in public, you still have a

13   zone of privacy.  It's a very tight one, it's very confined.

14   It's your pockets, what's inside your jacket, that sort of

15   thing.  But the problem is that if you're carrying a little

16   bag of pot, or a little device that's emitting signals,

17   they're going outside of your pockets.  They're going out into

18   a place where that officer is absolutely entitled to be, and

19   to stand, and to have his dog there sniffing, and to have his

20   little Get Smart thing turned on to see if there's radiation

21   coming out.

22        MR. DAVIS:  But is that reasonable?  I mean, do most

23   people reasonably believe that they're going to be emitting a

24   digital footprint and they're going to be located at will by

25   law enforcement at their own discretion?  I don't think so.

1      It's a reasonable expectation of privacy that there will be,

2      if you are located in that manner, that it goes through a

3      structured and organized process, that there's records created

4      of it and that someone has reviewed it determined it was

5      appropriate and it was not done here.

6              THE COURT:  Whether all that procedure -- that's all

7      secondary.  That's all required if we answer the first

8      question in the affirmative.  The only important question

9      here, which is whether or not you have a reasonable

10     expectation of privacy, such that little signals that your

11     devices that you've turned on are emitting, get detected.

12     Just like you -- do you have a reasonable expectation of

13     privacy in not having a dog walk down the sidewalk beside you

14     and sniff the fact that you had marijuana in the little baggy

15     in your pocket?

16             MR. DAVIS:  In this particular situation we have a

17     group of men that are stopped.  How do we justify stopping the

18     whole group?  And secondly, Mr. Brown is taken away

19     afterwards.  If you look at the application that was

20     submitted, they didn't even use that device to stop him, they

21     used it to get to the 2200 block of Barclay, then they used

22     the other two devices to single him out.  But how do you

23     justify stopping all the other men?  Don't they have a

24     reasonable expectation of privacy not to be stopped by law

25     enforcement?

1          THE COURT:  I don't know.  They're not in here.

2     They don't have standing.

3          MR. DAVIS:  Actually one of them is.

4          THE COURT:  Well, you're not his lawyer.

5          MR. DAVIS:  No, but it's just -- I --

6          THE COURT:  That -- listen, the Courts are in a

7     complicated spot here, but I've got to apply basic Fourth

8     Amendment principles here, like standing.  Let me hear from

9     the government.

10         MR. DAVIS:  Certainly.

11         MR. MARTINEZ:  Your Honor, just a few factual issues

12    to clear up.  First, Mr. Davis suggested that the cell site

13    simulator, and the device used here was a Hailstorm, which is

14    just a different brand name of the Stingray, he suggested that

15    the Hailstorm is a different device than the radio frequency

16    detector.  In fact, the radio frequency detector is simply an

17    accessory to the cell site simulator.  The simulator gives you

18    radio signal strength information.  It gives you a reading

19    that tells you how strong the signal of a particular device is

20    based on where you're standing.

21         THE COURT:  Do you accept that as a stipulated fact,

22    Mr. Davis?

23         MR. DAVIS:  I do.  I just read the reports and it

24    indicated that a radio frequency indicator was used.

25         THE COURT:  But this is fine with you and we don't

1 need evidence on this question?

2    MR. DAVIS:  No.

3    THE COURT:  You agree to that.  Go ahead.

4    MR. MARTINEZ:  The second factual issue I wanted to

5 raise, and I appreciate where the Court is with respect to the

6 threshold question:  Was there a search?  But just to clear up

7 the factual record with respect to the order that Judge Glynn

8 issued and what he authorized, Mr. Davis pointed to language

9 that was clearly geared towards communications carriers as if

10 to suggest to the Court that was the sum total of what was

11 authorized here.

12    In fact, as we noted in our paper, and Your Honor I

13 think was alluding to language, and I think you were alluding

14 to the language I'm about to read, which is that Judge Glynn

15 ordered that the agencies were authorized to employ

16 surreptitious or duplication of facilities and then later,

17 "and shall initiate a signal to determine the location of the

18 subject's mobile device."  That, we submit is an accurate

19 description of what cell site simulator does.  That is in no

20 uncertain terms authorizing the Baltimore Police Department to

21 use a cell site simulator.

22    I'm sure you could say, yes, it doesn't say "cell

23 site simulator," but then on the other hand, Your Honor,

24 neither -- when we apply for a federal wiretap, I don't think

25 our affidavits and applications say "wiretap."  They say we

1   are asking to intercept wire and electronic communications and

2   that's what the Court authorizes.  So the fact that there's no

3   reference expressly to a cell site simulator is really of no

4   moment here.  I just wanted to clarify the record in terms of

5   what was approved.  Mr. Davis is saying there was no judicial

6   approval of this device, and in fact there was.

7           THE COURT:  I just need to hear argument on one last

8   thing from Mr. Davis, then I'll be ready to rule.  And that

9   is, what about the submission to Judge Glynn and whether or

10  not it amounted to probable cause to believe that this process

11  would uncover relevant evidence?

12          MR. DAVIS:  Well, it didn't establish probable cause

13  to arrest this man, because he was released that day.  And

14  actually, the United States is not using any statements he

15  made after his arrest.

16          THE COURT:  No, but to find the --

17          MR. DAVIS:  He wasn't arrested, he --

18          THE COURT:  It was to find a phone; right?

19          MR. DAVIS:  Yes.

20          THE COURT:  Okay.  Was there probable cause to

21  believe that the finding of that phone would lead to

22  admissible evidence, which is the bedrock question for, you

23  know, a search, a probable cause determination for a search?

24          MR. DAVIS:  I would say it fell short.

25          THE COURT:  That's what I want to hear about.

1          MR. DAVIS:  Well, I would just say it fell short of

2    establishing that.

3          THE COURT:  And you stand on whatever record is

4    there, but you want to preserve --

5          MR. DAVIS:  The phone was used sometime beforehand.

6    You can't arrest a phone for a murder.

7          THE COURT:  No.

8          MR. DAVIS:  You can arrest someone that's in

9    possession of the phone in question.

10         THE COURT:  But if you're going to go search a thing

11   or search a place for a thing, you have to show by probable

12   cause a connection between that place or that thing, and you

13   know, the legitimate quest for evidence that's going to assist

14   you in solving crime.

15         MR. DAVIS:  Well, they found the thing.  I don't

16   think there's any question about that.  Whether or not it was

17   justified, I think it's a very close question and I would

18   submit it falls short.

19         THE COURT:  All right.

20         MR. DAVIS:  I do have one other thing to point out.

21   The United States just made representation that there was

22   language in the order.  That language in the order says the

23   agencies can use those duplication of facilities to accomplish

24   the installation and use of a pen register or trap and trace

25   cellular tracking device to implement the -- to implement the

1    installation of that --

2         THE COURT:  Or the use.

3         MR. DAVIS:  -- and shall initiate a signal.  This is

4    why -- I don't even know what that language means.  I think

5    this is very sloppily -- whoever put this sentence together

6    and slapped it into the order, and it must have come when

7    people started complaining about Stingrays, they didn't think

8    this thing through because it doesn't make sense.

9         THE COURT:  Yes, but I -- the question that I have

10   is whether or not Judge Glynn by signing off on that, was

11   authorizing the use of this -- these extra devices and

12   technologies to assist them in locating the phone so that they

13   can start to detect the numbers that it's receiving and

14   sending.

15        MR. DAVIS:  I'd say not.  I'd say not.  He's

16   authorizing them to utilize -- using the telecommunications

17   providers.  This sentence was thrown in there to try to cover

18   Stingrays, but it doesn't.  How can he authorize that?  He has

19   no information on what's going to be used, he has no

20   information about the technical requirements or -- he has no

21   idea what they're going to use.  He has no idea if it's going

22   to be recorded, he has no idea how long they're going to be

23   doing it, he has no idea who's going to be doing it.  This

24   order does not authorize them to use a Stingray.

25        And someone pointed out to me, and I don't know if I

1   argued this, but even though they find that the pocket is

2   emitting a digital fingerprint, doesn't that just give them

3   the right to obtain a warrant to search the person as opposed

4   to just grab the person and search them?  I mean, it's --

5   everything kind of builds on everything here.

6          I don't think this judge authorized them to use an

7   unmonitored unrecorded gadget to track this phone down.  I

8   think this judge authorized them to use telecommunications

9   providers despite the fact someone drafted this sentence and

10  put it in there trying to cover something else.  And if you

11  look at it, if you take everything and put it all in context,

12  the last paragraph tells what the judge really thought he was

13  authorizing and that was to have the telecommunications

14  service providers provide law enforcement with the information

15  they're seeking.  And that information that they give them is

16  recorded and kept track of, and there are time limits kept on

17  it.  And it talks about who can do it, and there's a buffer

18  zone between law enforcement and the gathering of this

19  information.

20          THE COURT:  What about the -- well, let me let

21  Mr. Martinez finish with this question first, of whether

22  there's probable cause demonstrated in the affidavit and

23  enough of a basis provided to justify what the officers

24  ultimately did once they got the order.

25          MR. MARTINEZ:  Sure.  With respect to the probable

1    cause, Detective Cirillo's application, which is Exhibit 13 to

2    the government's motions response, laid out a lot of

3    information and I would break it down into six separate

4    components that all taken together support a finding of

5    probable cause.  One, he explains Moses Malone is murdered in

6    the 600 block of Cokebury Avenue on May 2nd of 2013.  Second,

7    he explains that at the time it was law enforcement's belief,

8    which turned out to be accurate that Malone was murdered

9    because he had been a witness to a nonfatal shooting or a

10   victim of a nonfatal shooting.

11        Third, it pointed out that the homicide detective

12   investigating Malone's murder had identified a BGF member

13   named Trevon White as a co-conspirator, who was involved in

14   the murder.  Fourth, it pointed out that the detective had a

15   confidential informant, who reported having witnessed a

16   conversation in which White called the shooter and set up the

17   murder.  It also pointed out that Detective Hunter had

18   obtained toll records for that informant, which showed

19   outgoing calls to the 7094 telephone that was found on

20   Mr. Brown.

21        So based on all that information, Detective Hunter

22   believed that the person utilizing the (443) 310-7094

23   telephone was most likely the person who had murdered Malone.

24   That's why he asserted that there was probable cause to track

25   the phone in the application that Detective Cirillo submitted

1      to Judge Glynn So we submit when you take that all together,

2      Your Honor, that's probable cause to show, A, that that 7094

3      telephone number was used in connection with and will contain

4      evidence of Malone's murder; and B, the person who used the

5      phone was, in fact, the murderer, which is what we've alleged

6      in this case.  So that covers probable cause.

7             THE COURT:  Okay.  Was the probable cause directed

8      at going and finding the phone and getting the phone?

9             MR. MARTINEZ:  Indeed, that's the whole purpose of

10     the application.  And the authorization that Detective Cirillo

11     requested, it does track -- and Judge Glynn issued exactly the

12     order that Detective Cirillo proposed, but this gets us back

13     to the question of what did BPD ask for, what did the order

14     cover?  I don't want to belabor the point, Your Honor, but the

15     language we just went over dealing with site surreptitious or

16     duplication of facilities, and that is describing what a cell

17     site simulator does, it mimics a cell tower, and it then takes

18     the unique identifiers of a cell phone and takes the signals

19     that are in the area and pulls that identifier out of the air.

20             And so initiating a signal to determine the location

21     of a target cell phone, that's again a description of what the

22     cell site simulator does.  So it was clear they're showing

23     probable cause to believe that the phone was used in

24     connection with the murder.  They're asking the judge, hey,

25     Judge, we want to use a bunch of different methods of

1    tracking, including pinging, which they reference as the

2    mobile locator too, but also including this cell tracking

3    device, which entails surreptitious or duplication of

4    facilities.

5             There's no hiding of the ball here.  They're telling

6    the judge the different techniques they want to use and the

7    judge is finding that yes, there's probable cause, and yes,

8    I'm ordering that you're authorized to use all these

9    techniques.  And so under these circumstances they certainly

10   acted reasonably, if indeed the Court concludes that using the

11   cell site simulator was a search.

12            THE COURT:  Thanks.  I'm ready to rule.

13            MR. DAVIS:  Your Honor, may I -- the dog question,

14   something occurred to me.

15            THE COURT:  The dog question.

16            MR. DAVIS:  If a dog alerts to a person, you can

17   stop the person and do a *Terry* stop, but they still need to

18   get a warrant to search the person.

19            THE COURT:  Yes, but how many times have you seen

20   where a *Terry* -- they do the *Terry* stop and they find the

21   contraband, the gun, or in this case, a phone that they're

22   looking for, and they leave it in the hands of the *Terry*

23   *stopped* person?  Once they've found it, they've got a

24   connection to him.

25            MR. DAVIS:  They didn't find it until they took it

1    out of his pocket.  They used that device --

2         THE COURT:  You can take stuff out of people's

3    pockets as part of the *Terry* stop.

4         MR. DAVIS:  That isn't the justification for this.

5    The justification is, is that they're arguing that they had

6    approval from a judicial officer to utilize a private

7    device.

8         THE COURT:  Well, I recognize that, and I really

9    will say that I think a lot of what's going on here is actual

10   shadowboxing for the main event, and you are not in the main

11   event, Mr. Francomano is.  You -- your situation is different.

12   There was an order in this particular case.  Got anything --

13   something else?  Otherwise, I'm ready to rule.

14        MR. DAVIS:  No, that's it.

15        THE COURT:  So largely for the reasons that the

16   government has articulated, both in their papers and in their

17   oral argument today, I find no problem with what happened to

18   Mr. Brown in terms of how the presence of that phone was

19   detected on him and how it was taken from him.  Hard questions

20   of the sort that Mr. Davis and I were debating a few moments

21   ago aren't actually really answered by this ruling because I'm

22   relying more on the fact that the order was entered.

23        And I find that the affidavit, having looked at it

24   previously, before we even got into court here today, does

25   disclose or amount to probable cause to believe that there is

1    a connection between the item being pursued and searched for,

2    and the information relating to it, and criminal activity, and

3    that while the affidavit and especially the order could be

4    more artfully drafted, for sure, and I don't even quarrel,

5    Mr. Davis, with your suggestion that somebody took an old form

6    and then took something that they heard about or got worried

7    about from some other court proceeding and somehow slapped it

8    in there, that that may well be what happened.  But still, the

9    sum total of the words and sentences that are in Judge Glynn's

10   order, in my judgment, authorized what happened here.  So that

11   argument, that request for suppression is denied.  And I think

12   that takes care of the Wesley Brown portion of this category

13   of dispute.

14           Do you agree, Mr. Davis?

15           MR. DAVIS:  It does.  And again, as I stated

16   earlier, the statement that he is alleged to have made after

17   he was taken to the police station --

18           THE COURT:  Is the fruit of it.

19           MR. DAVIS:  They just -- they're not using anything

20   he said afterwards.  He was released from the station after

21   they took the phone.

22           THE COURT:  Is that right, you're not going to use

23   that statement?

24           MR. MARTINEZ:  We have suggested in our paper that

25   we have no intention of offering any of that statement as part

1    of our case in chief.

2           THE COURT:  To the extent that Mr. Davis's motion is

3    also directed at that statement, that portion of it's denied

4    as moot.

5           All right.  Now, we go over to the main event.  And

6    with respect to Mr. McCants, there wasn't any order.  Now,

7    this dispute comes to us in two distinct parts, as far as the

8    Court is concerned:  Exigent circumstances and then after the

9    exigent circumstances had resolved.  You claim that they still

10   fear that they had an armed and dangerous person on the

11   streets and so on and so forth.  But it wasn't the same

12   exigency that existed at the start; right?

13          MR. MARTINEZ:  I would say the exigency did not

14   resolve itself, Your Honor, until Mr. McCants walked out of

15   5617 Pioneer Drive and surrendered to authorities.

16          THE COURT:  I understand your position.  Let me

17   start with Mr. Francomano.

18          MR. FRANCOMANO:  Yes, Your Honor.

19          THE COURT:  And you don't dispute the state of the

20   law with respect to the exigent circumstances exception to the

21   warrant requirement.

22          MR. FRANCOMANO:  No, Your Honor.  We agree that

23   there are a number of exceptions to the warrant requirement,

24   but we don't believe that there was an exigent circumstances

25   in this case.  That would be -- would allow -- to not have the

1    warrant.  So that's our argument, Your Honor --

2         THE COURT:  All right.

3         MR. FRANCOMANO:  -- that there was no exigency.

4         THE COURT:  All right.  So what do we need in terms

5    of facts?  Do we have an agreement on facts and just a dispute

6    as to whether it was exigent, or when it became nonexigent, as

7    the Court has described it, or do we have a dispute on facts?

8    Counsel, what do you think?

9         MR. MARTINEZ:  I think that's largely up to

10   Mr. Francomano.  I can tell the Court what we're prepared to

11   offer today in terms of proof.

12        THE COURT:  Why don't you make a proffer as to what

13   that would look like and then Mr. Francomano will react to

14   that by saying we agree, that's what the evidence would be, or

15   no, I'm not agreeing to that.

16        MR. FRANCOMANO:  Yes, Your Honor.

17        THE COURT:  You're perfectly within your rights to

18   go either way on it, Mr. Francomano.

19        MR. FRANCOMANO:  Thank you.

20        THE COURT:  Yes.

21        MR. MARTINEZ:  So the initial witness we'd call to

22   lay the factual context for this motion would be Sergeant

23   Landsman of Baltimore Police Department.  He's the one who

24   initiated the exigent request.  He would testify that he's

25   been involved in prior BGF-related investigations and through

1    that became familiar with Mr. McCants and his speaking voice.

2    He knew about some of the historical crimes Mr. McCants was

3    suspected of committing and that he was aware that Mr. McCants

4    had been indicted by a grand jury in November of last year but

5    had fled --

6                 THE COURT:  Was a fugitive.

7                 MR. MARTINEZ:  Correct.  So Sergeant Landsman was

8    aware of all of those things as of early this year, late

9    January of 2017.  And at the time he was a deputized task

10   force officer with the FBI Safe Streets Group, and they were

11   on a wiretap of a BGF target named Deandre Dorsey.  And lo and

12   behold, on January 26th of 2017, the FBI intercepts telephone

13   calls between Dorsey and Mr. McCants.

14                THE COURT:  Stop right there.  That's basically the

15   introduction to the critical moments, true?  You're about to

16   go into the critical portion of it.  First of all,

17   Mr. Francomano, any difference with the way the government has

18   described up to this point?

19                MR. FRANCOMANO:  The only exception is that there's

20   never been any evidence that Mr. Dorsey is BGF.  Other than

21   that, we have nothing.

22                MR. MARTINEZ:  Sergeant Landsman would be prepared

23   to testify that they have identified him as BGF, that he had

24   connections to the Greenmount Avenue corridor.  He had been

25   shot there in December of 2016.  And he could expand on his

1    findings and the findings of the Safe Streets Group as to why

2    Mr. Dorsey was BGF.

3            THE COURT:  So my question is not do you dispute

4    that, that's not my question, that's not where -- you can't

5    put that question to a defense lawyer.  My question is, do you

6    agree to that?

7            MR. FRANCOMANO:  I agree with what he's saying.

8    Whether or not Dorsey is BGF, at this point, has no bearing on

9    the exigency.

10           MR. MARTINEZ:  It has a bearing on his severance

11   motion, which is why he doesn't want to concede it.

12           MR. FRANCOMANO:  That's exactly right, Your Honor,

13   I'm not conceding in any way.

14           MR. MARTINEZ:  So to the extent that matters, we're

15   happy to call Sergeant Landsman and have him explain why the

16   FBI has identified Dorsey as BGF.

17           THE COURT:  And then where will you go from that in

18   your proffer?  After you've got -- if you were to get that

19   successfully established, where would you go?

20           MR. MARTINEZ:  So then we would have -- we played

21   five wiretap calls for the sergeant and they were intercepted

22   by the FBI wiretap between January 26th of 2017 and February

23   4th.  We've summarized the contents of those calls in some

24   detail.

25           THE COURT:  In the papers.

1          MR. MARTINEZ:  In the papers, and I don't know

2     whether Mr. Francomano is prepared --

3          THE COURT:  Yes, are we in a dispute about that, do

4     we need to take that testimony from the officer?

5          MR. FRANCOMANO:  Your Honor, I think we have to.

6     It's so subjective.

7          THE COURT:  No problem at all.  You don't have to

8     shake your head or anything else.  All I want to know is if

9     you say yes, we're doing it.

10         MR. FRANCOMANO:  We have to, Your Honor.

11         THE COURT:  All right.  So I think you've told as

12    much of the tale as you can tell by virtue of a proffer and

13    now we've got to go over to the live evidence.

14         MR. MARTINEZ:  Fair enough, Your Honor.

15         THE COURT:  Call him.

16         MR. MARTINEZ:  Okay.  Can I have the Court's

17    indulgence to set this up so I can play --

18         THE COURT:  Let's see.

19         (Pause in the proceedings.)

20         THE COURT:  Back on the record.  All right.  We're

21    going to take the lunch break.  We'll be in recess until 2:45

22    and pick up at that point.  My expectation is that we'll then

23    go from 2:45 until 4:30, when I'm advised that the individual

24    who was in court previously wishes to return, for us to

25    continue on with what had been initiated this morning but

1    required a short pause.  So we'll continue on with that at

2    4:30.  That's my expectation at this point, just so counsel

3    can have some sense of what's coming.  Mr. Davis.

4              MR. DAVIS:  Your Honor, I just -- I don't want to

5    hold everyone here, but I just noticed there's one final issue

6    on document 221 that was the actual search of the white cell

7    phone that was what we were talking about, the gadget stuff.

8              THE COURT:  Yes.

9              MR. DAVIS:  They searched it three years later.

10   They got a federal warrant.  We would just ask Your Honor to

11   take a look at the warrant and rule on whether the probable

12   cause exists for that warrant to have issued.  We'd submit

13   that their hanging onto the phone for three years until

14   technology got to a point, actually until they paid the

15   Israelis $3 million to get the technology to open up the Apple

16   iPhones, we'd submit that that delay was unreasonable and,

17   therefore, they shouldn't have gotten into the phone.

18             THE COURT:  Well, where was the phone in the

19   meantime?

20             MR. MARTINEZ:  The phone was in the Evidence Control

21   Unit, at ECU.  And in her affidavit, Special Agent Christy, I

22   think there's a statement to the effect of, "I know that the

23   phone has been stored in such a way, so that its contents have

24   been maintained and are the same as they were when they were

25   seized in May of 2013."

1          THE COURT:  Well, I think the question is whether or

2     not there was a continuing investigation in between the time

3     that the phone was seized and when the warrant was executed to

4     actually uncover its contents, because it's the holding onto

5     the phone for three years that I think is really the

6     question.

7          MR. MARTINEZ:  And there was a continuing

8     investigation and, in fact, as we pointed out in our paper,

9     the key distinction between Special Agent Christy's affidavit

10    to search that phone last summer and the application that

11    Detective Cirillo submitted to track it in 2013 was that in

12    the interim two additional key pieces of evidence had been

13    uncovered because of that continuing investigation, and those

14    were, one, the statement of a witness that -- this is the same

15    witness who says he saw Trevon White make a phone call.  In

16    fact, he would say Trevon White used his phone to call the

17    7094 number to set up the murder of Malone.  That same witness

18    in 2016 said the day after the murder Mr. Brown claimed

19    responsibility for shooting Malone.  So that's a new

20    development.

21         THE COURT:  Was the ATF actively involved in a BGF

22    investigation relating in some way to individuals charged in

23    this case in 2013?

24         MR. MARTINEZ:  Yes.

25         THE COURT:  And would Agent Christy say so under

1    oath?

2              MR. MARTINEZ:  She would.

3              THE COURT:  All right.  Agent Christy, stand up,

4    raise your right hand.  Swear her.

5                   SPECIAL AGENT LISA CHRISTY,

6    called as a witness, being first duly sworn, was examined and

7    testified as follows:

8              THE WITNESS:  I do.

9              THE CLERK:  Thank you.  Please state your full name

10   for the record.

11             THE WITNESS:  Lisa Christy, L-i-s-a,

12   C-h-r-i-s-t-y.

13                        EXAMINATION

14   BY THE COURT:

15   Q    And Ms. Christy, have you been continuously involved in

16   an investigation of individuals who are charged in this case

17   for some period of time?

18   A    Yes, Your Honor.

19   Q    Does it extend back to 2013?

20   A    Further, yes.

21   Q    And you personally, not to mention your agency, has been

22   involved in the continuing investigation during that time

23   period?

24   A    Yes, Your Honor.

25   Q    Thank you.

 1              THE COURT:  Mr. Francomano, any questions of Agent

 2    Christy?

 3              MR. FRANCOMANO:  I don't have any questions, Your

 4    Honor.  I believe that Mr. --

 5              THE COURT:  Excuse me, Mr. Davis.  I'm sorry.  Any

 6    questions?

 7              MR. DAVIS:  No, I have no questions of the agent.

 8              THE COURT:  Thank you, ma'am.  You may be seated.

 9              Okay.  I'm ready to rule on it.  They had the

10    evidence the whole time.  They're involved in a longitudinal

11    and continuing investigation from 2013 to 2016.  The point

12    that's critical in my mind is, did they arrive at a point

13    where they should have been returning evidence back to those

14    from whom it had been seized?  My finding is that based on the

15    totality of information that's been presented in this case so

16    far, plus Agent Christy's testimony just this moment, is no,

17    that's not unreasonable that they held onto that phone that

18    long and the fact they still had it and then discovered that

19    they had the technology to get into it is permissible.  So

20    that motion -- that element of -- was it 221?

21              MR. DAVIS:  I'm sorry, Your Honor?

22              THE COURT:  That element of 221.

23              MR. DAVIS:  That is an element of 221.

24              THE COURT:  That element of 221 is also denied.

25              Now we'll take the lunch break.  Still 2:45.  The

1    defendants are remanded.  Counsel are excused until 2:45.

2    We'll pick up then.

3              (A recess was taken.)

4              THE COURT:  Good afternoon.  Be seated, please.

5              Okay.  Ready to take evidence, Mr. Martinez, on this

6    question?

7              MR. MARTINEZ:  Yes, ready to begin with the

8    testimony of Sergeant Landsman, BPD.

9              THE CLERK:  Good afternoon, sir, please raise your

10   right hand.

11                   SERGEANT JOSEPH LANDSMAN,

12   called as a witness, being first duly sworn, was examined and

13   testified as follows:

14             THE WITNESS:  Yes, I do.

15             THE CLERK:  You can have a seat.  Please state and

16   spell your first and last name for the record.

17             THE WITNESS:  Joseph Landsman, J-o-s-e-p-h,

18   L-a-n-d-s-m-a-n.

19             THE CLERK:  Thank you.

20             MR. MARTINEZ:  May I begin, Your Honor?

21             THE COURT:  Your witness.

22                   DIRECT EXAMINATION

23   BY MR. MARTINEZ:

24   Q    Sir, good afternoon.

25   A    Good afternoon.

Direct Examination – Landsman  (By Mr. Martinez)

1    Q    Could you tell us where you work.

2    A    Baltimore Police Department.

3    Q    Do you also work for any federal law enforcement

4    agencies?

5    A    Yes, sir.

6    Q    What agency is that?

7    A    Federal Bureau of Investigations task force, FBI Safe

8    Streets Task Force.

9    Q    And what's your rank with the BPD?

10   A    Police sergeant.

11   Q    And how about with the FBI?

12   A    Task force supervisor.

13   Q    How long have you been with BPD?

14   A    Since July of 2000.

15   Q    How about the FBI?

16   A    Since October of 2015.

17   Q    Over the last six years, Sergeant, have you participated

18   in an ongoing investigation of criminal activity by the Black

19   Guerilla Family's Greenmount Avenue Regime?

20   A    Yes, sir.

21   Q    As part of that investigation, have you become familiar

22   with an individual named Marquise McCants?

23   A    Yes, I have.

24   Q    Do you see Mr. McCants in court today?

25   A    To the far left, the second row facing the courtroom,

1    Marquise McCants.

2           THE COURT:  The record will reflect that the witness

3    has identified the defendant Marquise McCants.

4    Q    (BY MR. MARTINEZ)  Sergeant, over the course of your

5    participation in investigating the BGF Greenmount Regime, have

6    you been able to determine whether Mr. McCants goes by any

7    nicknames or street names?

8    A    Yes, I have.

9    Q    What nickname is that?

10   A    Digga.

11   Q    Could you spell that, please.

12   A    D-i-g-g-e-r or D-i-g-g-a.

13   Q    During the course of your investigation of the BGF

14   Greenmount Regime, have you had an opportunity to listen to

15   recorded jail calls in which Mr. McCants participated?

16   A    Yes.

17   Q    So are you familiar with his speaking voice?

18   A    Yes, I am.

19   Q    Sergeant, do you know when Mr. McCants was first charged

20   by the grand jury in connection with this case?

21   A    November 2016.

22   Q    Do you know whether an arrest warrant was issued for

23   Mr. McCants at that time?

24   A    Yes, it was.

25   Q    Do you know whether back in November law enforcement was

1    able to take Mr. McCants into custody on that arrest

2    warrant?

3    A    They were not.

4    Q    So did there come a point in time where Mr. McCants was

5    designated a fugitive?

6    A    Yes, sir.

7    Q    I want to direct your attention to late January of this

8    year, 2017.  Was Mr. McCants still a fugitive at that time?

9    A    Yes, he was.

10   Q    And as of January 2017, were you also participating in an

11   investigation of a suspected BGF member named Deandre

12   Dorsey?

13   A    Yes, I was.

14   Q    Can you explain for the Court why it was that law

15   enforcement suspected Mr. Dorsey to be a member of BGF?

16   A    Deandre Dorsey had been identified by individuals as

17   being a member of BGF in the area of Anne Arundel County, as

18   well as in the area of Greenmount Avenue.

19   Q    And you say individuals who identified Mr. Dorsey as

20   being a member of BGF, are these witnesses who came forward to

21   law enforcement?

22   A    Yes.

23   Q    Can you give us a sense of how many witnesses?

24   A    Four, at this time.

25   Q    Had you also intercepted wiretap conversations in which

Direct Examination - Landsman   (By Mr. Martinez)

1    Mr. Dorsey participated?

2    A    Yes, I did.

3    Q    Were any of those conversations with other BGF members?

4    A    Yes, they were.

5    Q    What kinds of issues were discussed during those calls?

6    A    There were issues discussed about taxing, paying a $100

7    for selling heroin in a certain area, bushmen had wanted that

8    payment from Deandre Dorsey based on his heroin sales, and the

9    discussion that Dorsey was having with another BGF member

10   about how that same protocol was not going to fall into place

11   on the street.  It may be in place in jail, but not the way

12   he's operating.  And Dorsey continued to show his leadership

13   role within the BGF gang that he was working with.

14   Q    You mentioned the term "bushmen."  Does that have any

15   particular significance with respect to BGF?

16   A    It does.

17   Q    What is it?

18   A    The bushman is overseeing -- if it's inside the jail, is

19   going to oversee a regime that has certain rank structures and

20   operates within that jail and they'll follow that protocol.

21   Q    What, if any, ties did Mr. Dorsey have to the Greenmount

22   Avenue corridor?

23   A    Deandre Dorsey had family along Greenmount Avenue, he

24   supplied drugs in that area, and he was shot along Greenmount

25   Avenue on December 10th, 2016.

Direct Examination - Landsman   (By Mr. Martinez)

1   Q     And can you recall the cross street of the location where

2   he was shot in December 2016?

3   A     The area of 24th and Greenmount, Loch Raven and

4   Greenmount.

5   Q     All right.  Sergeant, last December, December 2016, did

6   there come a point time when the FBI saw judicial

7   authorization to wiretap a telephone belonging to

8   Mr. Dorsey?

9   A     Yes.

10  Q     In fact, was it multiple telephones?

11  A     Yes.

12  Q     And did one of them have a cell number of

13  (443) 454-9405?

14  A     Yes.

15  Q     Prior to coming to court today, did you have an

16  opportunity to review a disk that contains recordings of some

17  of those calls?

18  A     Yes, sir.

19  Q     I'll show you Government's Exhibit 7.  Is this the disk

20  you reviewed?

21  A     Yes, it is.

22  Q     And does that contain certain recorded telephone calls

23  from the 9405 telephone, the line of Mr. Dorsey?

24  A     Yes, sir.

25  Q     Sergeant, with the Court's permission, I'm going to play

Direct Examination – Landsman  (By Mr. Martinez)

1    you some of those calls.  But first I want to ask you -- I

2    want to direct your attention to January 26th of 2017 at

3    approximately 12:48 p.m.  Did your ongoing wiretap capture a

4    call between Mr. Dorsey and an individual using a cell phone

5    with the number (410) 694-1321?

6    A    Yes.

7    Q    Was law enforcement able to identify the user of that

8    1321 telephone?

9    A    Yes.

10   Q    Who was it?

11   A    Marquise McCants.

12   Q    All right.  I want to play you an excerpt of that call.

13   Ms. Hoffman will start at the beginning.

14            (Audio played.)

15            THE COURT:  Stop the tape.  Mr. Martinez, do you

16   have a transcript of the tape?

17            MR. MARTINEZ:  We don't have a transcript prepared,

18   Your Honor.  But when we get to the relevant portions of the

19   call, we're going to -- about to get to a point where the

20   speaker identifies himself and I'll ask the sergeant.  But we

21   have --

22            MR. FRANCOMANO:  Your Honor, I do have a transcript

23   if you need it.  It was provided to me by the government.

24            MR. MARTINEZ:  Those are line sheets that I wouldn't

25   characterize as a proper transcript.  We have no objection to

1    Mr. Francomano providing it to the Court.  We also have

2    between pages --

3              THE COURT:  Well, are you offering this tape

4    recording that we're listening to here in court for its

5    content?  Because if you are, I haven't understood more than

6    two or three words.

7              MR. MARTINEZ:  We're offering it for -- in terms

8    of -- for its contents, but also in terms of what Sergeant

9    Landsman understood Mr. McCants and Mr. Dorsey to be

10   discussing, what actions he took in response to it.  And I can

11   say that we summarized the calls between page 98 and page 101.

12   There is a transcription of the most pertinent part of the

13   last call we'll play on page 100 to 101.  And then each

14   successive paragraph between 98 and 101 in our motions

15   response contains summaries with excerpts of the key terms

16   that are used in these conversations.

17             So to the extent that the Court wants something to

18   follow along with, that's helpful, and if Mr. Francomano wants

19   to provide the line sheets, those are fine too.

20             THE COURT:  Well, Mr. Francomano, is that what

21   you're suggesting, that we could look at line sheets and

22   follow along on the call?

23             MR. FRANCOMANO:  Your Honor, I believe that the only

24   issue is between 98 and 101, which I think that's what the --

25   two words we're looking at; is that correct?  If we could just

1    get to that because that's my one argument.

2         MR. MARTINEZ:  Well, we're playing the calls between

3    98 and 101 now.  It's just five calls.

4         THE COURT:  All right.  Well, pulled up on my screen

5    right now is an indication that we're going to listen to 11

6    minutes and 43 seconds of sound.  Are we going to listen to 11

7    minutes and 43 seconds?  We've already listened to 2 minutes

8    and one second.

9         MR. MARTINEZ:  No, Your Honor.  We're going to

10   listen to five more seconds of this one, two additional short

11   excerpts of this call, and then the remaining calls will be

12   pretty short.

13        THE COURT:  Okay.  And there is no transcription of

14   even the last five seconds of this call, but there is a

15   transcription of other small elements that you're going to

16   present?

17        MR. MARTINEZ:  There are line sheets.

18        THE COURT:  Line sheets.  No transcripts?

19        MR. MARTINEZ:  Correct.

20        THE COURT:  All right.  Mr. Francomano, is it

21   acceptable to you that the Court have line sheets before it

22   while the tapes are played?

23        MR. FRANCOMANO:  Yes, Your Honor.

24        THE COURT:  All right.  Let's hand them up.

25             I take it the government doesn't have the line

1    sheets in the courtroom?

2            MR. MARTINEZ:  We don't, Your Honor.

3            MR. FRANCOMANO:  If I could approach, Your Honor?

4            THE COURT:  Yes.  Show the line sheets to

5    Mr. Martinez first so he sees what the Court's being handed.

6            And do these line sheets start at the beginning of

7    the recording that's being played here in court or do they

8    relate only to certain parts of it?

9            MR. MARTINEZ:  The top document that Your Honor is

10   looking at is a line sheet that pertains to the recording we

11   are currently playing and begins at the beginning of the

12   call.

13           THE COURT:  Okay.  So if I go to the back of this,

14   because you said we only have about five seconds left, is that

15   it?

16           MR. MARTINEZ:  Well, we have five seconds left of

17   this excerpt.

18           THE COURT:  Okay.  But that might not be at the back

19   of this line sheet?

20           MR. MARTINEZ:  Correct.

21           THE COURT:  Any suggestion as to where we are in

22   terms of this line sheet?  Mr. Francomano, maybe you were

23   following along.

24           MR. FRANCOMANO:  Your Honor, we are on -- last I --

25   at page 1, 2, 3 -- bottom of page 3.

1          THE COURT:  Bottom of page 3:  "You should have

2     robbed the whole dice game, man"?

3          MR. FRANCOMANO:  Just before that, Your Honor.  I'm

4     sorry.  One, two, three -- it's before we get to that.

5          THE COURT:  But on that page, the fourth page:  "By

6     the McDonald's"?

7          MR. FRANCOMANO:  The bottom of the third page, Your

8     Honor.

9          THE COURT:  Bottom of the third page.  (Reading)  "I

10    told you, bro.  I told you that," unidentified -- "I been told

11    you that.  I probably ain't paid no mind, bro, because like,

12    we rode past it yesterday.  And I'm like, yo, where the

13    f-word, which a call it's still living in there.  Hell, nah,

14    he moved out.  I'm like" -- is that where we are?

15         MR. FRANCOMANO:  I believe so, Your Honor.

16         THE COURT:  Okay.  Let's -- why don't we back it up.

17    Are we able to back it up ten seconds or so?

18         MR. MARTINEZ:  Yes.

19         THE COURT:  Start it.  Thank you.

20         (Audio played.)

21    Q    (BY MR. MARTINEZ)  Sergeant, can you tell us whose voices

22    we were listening to just now?

23    A    Deandre Dorsey and Marquise McCants.

24    Q    And at the end of the excerpt we just listened to when

25    one of the parties said, "Digga, say what it is," who was

1    speaking then?

2    A    Deandre Dorsey.

3    Q    And was it your understanding that when Dorsey was

4    referring to Digga he was talking about the person he was

5    speaking to on the other line?

6    A    Yes.

7    Q    And based on your prior investigations, did you know

8    anyone who went by the nickname Digga?

9    A    Yes, I did.

10   Q    And did you recognize Digga's voice in listening to this

11   call?

12   A    Yes, I did.

13   Q    Whose voice did you recognize it to be?

14   A    Marquise McCants, the unique voice that would kind of

15   squeal as he was trailing off, what he was saying, and the

16   voice that called and asked where Deandre Dorsey had been

17   at.

18   Q    All right.

19        MR. MARTINEZ:  Ms. Hoffman, if you could play

20   roughly the next three minutes.

21             (Audio played.)

22             THE COURT:  Stop for a second.

23             (Pause in the proceedings.)

24             THE COURT:  You may continue.  Are we starting from

25   exactly where we stopped or have we skipped forward in the

1    conversation?

2            MR. MARTINEZ:  We're starting from exactly where we

3    stopped.

4            THE COURT:  Got it.  Go ahead.

5            (Audio played.)

6    Q    (BY MR. MARTINEZ)  Sergeant, did you hear the discussion

7    during that excerpt about a "big boy joint"?  I believe that

8    was about 3:45 through.

9    A    Yes, sir.

10   Q    Did you hear the discussion about "jimrods"?

11   A    Yes, I did.

12   Q    Did you hear the reference to a "blicky"?

13   A    Yes.

14   Q    How about the term "nickel"?

15   A    Yes.

16   Q    And finally, how about the term "21"?

17   A    Yes, I heard all that.

18   Q    At the time you were monitoring this wiretap, Sergeant,

19   what did you understand those terms to mean?

20   A    All those combined indicated a gun, specifically a .45

21   caliber handgun.

22   Q    Why is it that you believe it was a .45?

23   A    When it gives the model number 21 after describing it as

24   using the term, "showing it was a gun, then the big one," and

25   then "21," which is the model for a Glock 21, which is a .45

1   caliber handgun.

2   Q    All right.  I want to play you another excerpt of this

3   call, and we're going to begin -- this will be a ten-second

4   excerpt between 8:45 and 8:55.

5              (Audio played.)

6   Q    (BY MR. MARTINEZ)  Sergeant, did you hear the discussion

7   there about "glizzy" and a "shootout"?

8   A    Yes, sir.

9   Q    At the time you were monitoring this wiretap for the FBI,

10  what did you understand those terms to mean?

11  A    That he had a gun and had shot it out with someone, got

12  into a shooting with someone.

13  Q    So you understood glizzy to be a reference to a firearm;

14  is that correct?

15  A    Yes.

16  Q    I'm going to play you one final excerpt from this call.

17  It's going to be 16 seconds between 10:45 and 11:01.

18             THE COURT:  So picking up where we left off or

19  somewhere else on the call?

20             MR. MARTINEZ:  Somewhere else, Your Honor.  This is

21  towards the end when there's discussion about going to the

22  pound.

23             THE COURT:  You may proceed.

24             (Audio played.)

25  Q    (BY MR. MARTINEZ)  Sergeant, did your hear -- first of

1  all, whose voices were we listening to?

2  A    Dorsey McCants.

3  Q    Did you hear Mr. Dorsey tell McCants to "call the pound,

4  n-word," and to get all that stuff out of the car?

5  A    Yes, sir.

6  Q    At the time you were monitoring this call, what did you

7  understand that to mean?

8  A    The pound is a street term for the impound lot, city yard

9  off of Pulaski Highway, where Deandre Dorsey's Honda Accord

10 was towed to.  And it was towed following when Deandre Dorsey

11 was shot, and it was towed following being in police custody

12 and held at the crime lab bay.  Search warrant was executed on

13 the vehicle.

14 Q    What was found in that vehicle?

15 A    Inside the vehicle was a 9mm handgun and drugs.

16 Q    And was any ballistics testing done of that 9mm?

17 A    Yes, it was.

18 Q    What did the testing show?

19 A    Testing was a match to the spent casings that were

20 recovered from the crime scene of a murder that occurred on

21 December 10th, 2016 in the 1100 block of Curtain Avenue in

22 East Baltimore.  And the spent casings on that scene from the

23 ballistic testing showed that it was fired from that 9mm

24 recovered from Deandre Dorsey's Honda Accord.  So timeline was

25 that a homicide on Curtain occurred December 10th.  Deandre

1    Dorsey was shot December 13th.  Following Deandre Dorsey being

2    shot, his vehicle was taken into police custody and a search

3    warrant was done and that gun was recovered.

4    Q    So when you intercepted this call on January 26th of 2017

5    and Mr. Dorsey told Mr. McCants to call the pound and get his

6    stuff out of the car, did you think he was talking about the

7    gun and the drugs that BPD had already found?

8    A    Yes, because it was in a hidden area in the car and he

9    didn't know the police had recovered it.

10   Q    All right.  I want to skip forward a couple days and

11   direct your attention to February 1st of 2017 at approximately

12   11:28 p.m.

13        Did your wiretap capture another conversation between

14   Mr. Dorsey and Mr. McCants at that time?

15   A    Yes.

16   Q    I'm going to play you an excerpt of that call.

17        MR. MARTINEZ:  And Your Honor, we're now on a new

18   document.  This will be the following document.  And we're

19   going to start about 54 seconds in because the first several

20   seconds are very difficult to hear.

21        (Audio played.)

22   Q    (BY MR. MARTINEZ)  We're going to skip forward now to

23   2:10 because this next section is very difficult to hear as

24   well.

25        (Audio played.)

1   Q    (BY MR. MARTINEZ)  Sergeant, can you tell us whose voices

2   we were just listening to?

3   A    Deandre Dorsey, Marquise McCants.

4   Q    And during the three and a half minutes or so that you

5   heard, could you summarize what you understood Mr. McCants and

6   Mr. Dorsey to be talking about?

7   A    McCants -- Marquise McCants was talking about -- just

8   telling Dorsey how he had came -- went to the area of

9   Greenmount Avenue, 26th Street, 27th Street, and had seen the

10  person that they wanted to shoot.  And then he would

11  describe -- Marquise McCants was describing how he was

12  possibly armed and McCants had his hood up and then McCants

13  approached another individual and had a discussion about

14  luring an individual around the corner with him.

15      McCants also discussed about trying to call TB for a

16  getaway car or also having someone there as backup because he

17  knew the person was armed.

18  Q    Let me stop you for a moment.  How did you know that

19  McCants was at Greenmount and 26th?

20  A    He says -- refers to Greenmount as "the Mount," then he

21  talks about 26th Street and 27th Street.

22  Q    And then how -- you mentioned that the individual -- you

23  understood based on this call that the individual McCants was

24  looking for was armed.  Did you hear the word "clutching"?

25  A    Yes, I did.

1    Q    Did you hear the word "strapped"?

2    A    Yes.

3    Q    In the context of this conversation, what did you

4    understand those terms to mean?

5    A    That individual was armed.

6    Q    And did you hear the discussion about TB being a

7    getaway?

8    A    Yes.

9    Q    And what was your understanding of that?

10   A    That once he did the shooting wanted TB there to jump in

11   the car and drive away.

12   Q    Okay.  I'm going to play you roughly the last minute or

13   so of this call.

14            (Audio played.)

15   Q    (BY MR. MARTINEZ)  Sergeant, during that excerpt we just

16   listened to, at the time you were monitoring the call at FBI,

17   what did you understand Mr. McCants and Mr. Dorsey to be

18   talking about?

19   A    They continued a conversation about individuals that they

20   were going to target for violence.

21   Q    And were you able to identify references to particular

22   individuals in that excerpt we just listened to?

23   A    Yes.

24   Q    Could you explain?

25   A    Fat kid with the box on, Spaz, and Michael Jordan.

Direct Examination – Landsman  (By Mr. Martinez)

1    Q    And did you have any information available to you as of

2    February 1st when this call was taking place as to who Michael

3    Jordan meant?

4    A    Yes.

5    Q    Could you explain?

6    A    Jordan Richards.

7    Q    And what was Jordan Richards's significance to this

8    investigation?

9    A    An individual that Marquise McCants had been disputing

10   with.

11   Q    And had he also in fact shot Deandre Dorsey?

12   A    Yes.

13   Q    And towards the end of the call, what was the

14   understanding of "we need to workout this weekend"?

15   A    We need to shoot those three people.  They were going to

16   target them and meet -- and do violence against those

17   people.

18   Q    All right.  I want to skip forward three more days and

19   direct your attention to February 4th of 2017.  At 2:03 that

20   afternoon, did the wiretap of Mr. Dorsey's phone capture

21   another conversation between Mr. Dorsey and Mr. McCants?

22   A    Yes, sir.

23   Q    I'm going to play you just 45 seconds of that call

24   beginning at 1 minute.  It starts out as a call with Dorsey

25   and someone else and then becomes a three-way call.  We're

Direct Examination – Landsman   (By Mr. Martinez)

1    going to pick up there.

2            (Audio played.)

3    Q    (BY MR. MARTINEZ)   Sergeant, whose voices are we

4    listening to?

5    A    Marquise McCants, Deandre Dorsey.

6    Q    And during that short excerpt we just listened to, what

7    did you understanding them to be talking about at the time?

8    A    McCants was hurrying Dorsey, he wanted to workout.

9    Q    And again, what did you understand "workout" to mean?

10   A    That they wanted to shoot one of these persons that they

11   had discussed prior.

12   Q    How about the statement that he, McCants, was waiting for

13   TB to get there with a dirt bike, what was your understanding

14   of that?

15   A    TB was going to bring a gun.

16   Q    Now, approximately two hours after this call, is there

17   another call intercepted between Mr. Dorsey and Mr. McCants?

18   A    Yes, sir.

19   Q    I'll play this one in its entirety.

20           (Audio played.)

21   Q    (BY MR. MARTINEZ)   Sergeant, whose voices were we

22   listening to?

23   A    Marquise McCants and Deandre Dorsey.

24   Q    And at the time, what was your understanding of that

25   discussion we just heard?

 1   A    McCants was communicating with Dorsey about McCants was

 2   going to go out and see if the person they wanted to shoot was

 3   out there, and he was going out -- McCants was indicating that

 4   he was in the area of 28th and Greenmount and that he was

 5   going to hang out and check if the person was outside.

 6   Q    And when Mr. Dorsey said, "It ain't about me, it's about

 7   whenever we can get to him," what was your understanding of

 8   that?

 9   A    That he was talking about that he could do it without him

10   being there.

11   Q    All right.  Did your wiretap -- and this will be the last

12   we play.  Did your wiretap intercept another call between

13   Mr. Dorsey and Mr. McCants approximately two minutes later?

14   A    Yes, sir.

15   Q    I'm going to play you the first 2 minutes and 7 seconds

16   of this call.

17        (Audio played.)

18   Q    (BY MR. MARTINEZ)  All right.  Sergeant, one more time,

19   whose voices were we listening to?

20   A    Deandre Dorsey, Marquise McCants.

21   Q    And can you summarize what you understood was being

22   discussed during the excerpt we just listened to?

23   A    McCants went over how he went out and checked and the

24   person that they were targeting was not outside.  And then

25   they went into further discussion, McCants and Dorsey, about

1    how they could use Tamika to lure this intended target in to

2    accomplish what they needed to do.

3    Q    I want to ask you about a few specific lines we heard.

4    Do you remember hearing Mr. McCants say, "I'm glad you didn't

5    come because we would have been out that bitch for nothing, we

6    would've been out for shit after nothing."  And after that,

7    Dorsey said, "Shit, we'd have to do something."

8         What was your understanding of that?

9    A    That they would have went looking for one of the other

10   two intended persons that they were going to shoot.

11   Q    How about with respect to Tamika, did you hear the

12   statement, "She clip her first wings, yo, get the first one,

13   yo"?

14   A    That's talking about when they were going to use Tamika

15   to lure the person in, have them come around the corner, so

16   they can accomplish that.  And that would be her first time,

17   and then --

18   Q    Her first time what?

19   A    Participating in a shooting or an act of violence.

20   Q    Sergeant, in your experience, when you're monitoring a

21   wiretap and you suspect that the participants in --

22   intercepted conversations might be planning an act of

23   violence, what, if any, obligation do you have to stop it?

24   A    Respond to that first obligation and prevent the

25   violence.

1   Q    So in this case, after you listened to the calls that

2   we've just played, did you believe that there was an imminent

3   plot to commit violence?

4   A    Yes, sir.

5   Q    And what, at the time, did you believe the plot to be?

6   A    An individual along the area of Greenmount was going to

7   be shot by Marquise McCants and Deandre Dorsey.

8   Q    And in fact, during the second call we played, weren't

9   there discussions between Mr. Dorsey and Mr. McCants about

10  other targets as well?

11  A    Yes.

12  Q    All right.  So after hearing the calls we just played,

13  and we're now talking about the afternoon of February 4th,

14  2017, what, if any, steps did you take to stop the suspected

15  violent plot from materializing?

16  A    By the time of those calls, the first steps we had had

17  high visibility marked police cars and Foxtrot circling that

18  area, covering the Greenmount Avenue corridor.  They went from

19  Greenmount and 33rd all the way down to the Greenmount-Preston

20  area.  We had notified both districts, the Eastern District

21  Patrol and the Northern District Patrol, and they provide the

22  special attention to that area and kept the marked units

23  positioned along that corridor, which on calls you can see how

24  McCants went outside and the person wasn't out there because

25  mainly everybody at that Greenmount Avenue area had scattered,

1    had dispersed, once the patrol responded, got out on foot,

2    Foxtrot was overhead.

3         So it was at that same time when that call went.  So that

4    was the initial plan, having that high visibility in that

5    corridor.  The next steps were everybody involved in this was

6    called in, additional support for surveillance, and our

7    intention was for Deandre Dorsey to lead us to Marquise

8    McCants.

9    Q    So you conducted surveillance of Mr. Dorsey?

10   A    Yes, sir.

11   Q    And you were conducting surveillance because you were

12   anticipating that he would meet with Mr. McCants, is that what

13   you're saying?

14   A    Yes, sir.

15   Q    So was that surveillance conducted?

16   A    Yes, it was.

17   Q    And were the surveillance teams able to observe a meeting

18   between Mr. Dorsey and Mr. McCants?

19   A    No.

20   Q    Were you still concerned at that point that the suspected

21   plot to commit violence might actually materialize?

22   A    Yes, sir.

23   Q    So at that point what did you do?

24   A    That point I communicated with the Advanced Technical

25   Team.  I had spoke to Detective Tony Clark and it was

Direct Examination – Landsman  (By Mr. Martinez)

1    discussed preparing the request for an exigent order to track

2    the cell phone number (410) 694-1321.

3    Q    What is an exigent order?

4    A    An exigent order is something the Advanced Technical Team

5    wants us -- and once it's prepared, it's put into that

6    document and the team will forward it over to the cell phone

7    company so we can begin receiving the GPS location data for

8    that cell phone.

9    Q    At the time, Sergeant, did you also consider getting a

10   warrant to track the phone?

11   A    Yes, sir.

12   Q    And did you take the initial steps to prepare a search

13   warrant affidavit?

14   A    Yes, sir.

15   Q    But did you ultimately submit that affidavit?

16   A    No.

17   Q    Why not?

18   A    The Advanced Technical Team, based on information we had,

19   as their protocol they had to send this information to the

20   cell phone company, and that was the steps that we took.

21   Q    Right.  But I'm now talking about the search warrant

22   affidavit.  Had you gone the search warrant route, how long --

23   were you told how long --

24   A    This was a Saturday and most likely we would not have had

25   a response back till the following Monday.

Direct Examination – Landsman  (By Mr. Martinez)

```
1   Q    So that if you got the search warrant, the phone company

2   couldn't have given you location data until Monday.  Is that

3   what you're saying?

4   A    Correct.

5   Q    Is that what you were told by someone from the Advanced

6   Technical Team?

7   A    Yes, sir.

8   Q    So you decided to go the exigent route instead?

9   A    Yes, sir.

10  Q    All right.  I'm going to show you -- we'll mark for

11  identification only at this point --

12           THE COURT:  You were told that the police department

13  doesn't have the capacity to communicate with somebody at the

14  relevant cell phone company on a Saturday such that relatively

15  quickly they can get up in real time and do real-time

16  locational monitoring on a phone?

17           THE WITNESS:  The information I had was that the

18  cell phone company would not respond back to the order unless

19  it was exigent.  And based on the circumstances that I

20  described to the Advanced Technical Team, that was their

21  protocol.  This was exigent.  You have information that

22  someone's going to be shot.  We're not going to wait around --

23           THE COURT:  The problem isn't with the phone

24  company, the problem is with the Court, that you can't get a

25  warrant out of the Court?
```

1          THE WITNESS:  No, I think -- no, sir.  I believe the

2    problem is more with --

3          THE COURT:  You get a warrant from the Court maybe

4    on Saturday because there's certainly a duty judge, but the

5    problem is that warrant would go over to the cell phone

6    company and wouldn't be a so-called exigent order, it would

7    just be a court order.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And that's what you were led to believe,

10   is that because it had that status, having been signed by a

11   judge and being a court order, that it wouldn't get as fast

12   attention or response as would a nonjudicial exigent

13   circumstances order that was requested solely by a police

14   department.

15         THE WITNESS:  Yes, sir.

16         MR. MARTINEZ:  Thank you, Your Honor.

17   Q    (BY MR. MARTINEZ)  Sergeant, I'm showing you -- we're

18   marking only for identification at this point as Government's

19   Exhibit 8.  Do you recognize this?

20   A    Yes, sir.

21   Q    Is this a request by Detective Clark to T-Mobile?

22   A    Yes, it is.

23   Q    Do you see the date there?

24   A    Yes.

25   Q    Next to the field target number, (410) 694-1321, is that

1    the cell phone number that you had intercepted communicating

2    with Deandre Dorsey in conversations we just listened to?

3    A    Yes, sir.

4    Q    I want to flip to the second page here.  I want to direct

5    your attention to the underlined language right there.  What

6    are we looking at now, Sergeant?

7    A    The synopsis that I prepared and had forwarded to

8    Detective Tony Clark.

9    Q    So you put together that language and sent it to

10   Detective Clark; correct?

11   A    Yes, sir.

12   Q    And what was the purpose of doing that?

13   A    For Detective Clark to then communicate with the cell

14   phone company about the urgency of the -- receiving this data

15   and forwarding the exigent request to track that cell phone.

16   Q    So this is a description by you of what you believed were

17   the exigent circumstances at the time?

18   A    Yes, sir.

19   Q    Could you read that paragraph for the Court, please?

20   A    "During the course of an investigation involving members

21   of the Black Guerilla Family gang, detectives learned about a

22   threat.  The threat was that the members of the gang are

23   planning to shoot an individual that frequents the area of

24   Greenmount Avenue.  The members of this gang are planning to

25   do the shooting -- are planning to do the shooting, were

 1    involved in a shooting in December" -- and there's typo, it

 2    should be 2016.  "The individual planning to execute the

 3    shooting is in possession of the cell phone that has the

 4    number (410) 694-1321."

 5    Q    Sergeant, the reference there to the December of 2017,

 6    which you said should have been '16 shooting, was that a

 7    reference to the Deandre Dorsey shooting you were telling us

 8    about earlier in your testimony on Greenmount Avenue?

 9    A    Yes, sir.

10    Q    Did you learn whether Detective Clark sent this request

11    to T-Mobile?

12    A    Yes, I did.

13    Q    And did you and your BPD colleagues eventually begin

14    receiving location alerts, that is, ping data, from

15    Mr. McCants's phone?

16    A    Yes, sir.

17    Q    I'm going to show you Government's Exhibit 9A.  Do you

18    recognize this?

19    A    Yes, I do.

20    Q    What is it?

21    A    It is the location data record that was sent on February

22    4th, 2017 as we were receiving the initial messages from the

23    phone company.

24    Q    So this is the first alert you received for the phone?

25    A    Yes, sir.  10:50 p.m.

Direct Examination - Landsman   (By Mr. Martinez)

1    Q     10:50 p.m. here?

2    A     Yes, sir.

3    Q     How about -- you see this uncertainty here, 40 meters?

4    A     Yes, sir.

5    Q     What is that telling you?

6    A     It's the range that this -- the location data coming in,

7    how close it is to that area.

8    Q     So it's plus or minus 40 meters; correct?

9    A     Yes, sir.

10   Q     Are these the latitudinal and longitudinal coordinates of

11   the phone?

12   A     Yes.

13   Q     And here, is this a link that you were able to click on

14   and see a map that showed the location of the phone?

15   A     Yes, sir.

16   Q     All right.  So flipping to page 2 here, is this the map

17   that appeared when you clicked on the link?

18   A     Yes, sir.

19   Q     And where does that map show the location of the 1321

20   phone as of February 4th, 2017 at 10:50 p.m.?

21   A     Greenmount and North Avenue in the 400 block of East

22   North Avenue.

23   Q     Sergeant, at approximately the same time as you received

24   this location alert, were you notified by other law

25   enforcement officers that a shooting had just taken place?

1    A    Yes, sir.

2    Q    Do you remember learning the location of that shooting?

3    A    Yes.

4    Q    Where was it?

5    A    Right where this GPS location data was, in the 400 block

6    of East North Avenue.

7    Q    When, in relation, to this initial ping hit did you get

8    the notification of the shooting?

9    A    The same time.

10   Q    Were you notified of the victim, of the shooting's

11   name?

12   A    Yes.

13   Q    What was it?

14   A    Gregory Bess.

15   Q    Were you notified how many times Mr. Bess had been

16   shot?

17   A    Yes.

18   Q    How many times?

19   A    More than once.

20   Q    Were you notified later as to what kind of shell casings

21   were recovered from the scene?

22   A    Yes.

23   Q    What kind?

24   A    .40 caliber.

25   Q    So after you learned of the shooting, Sergeant, did you

1    believe you were still facing exigent circumstances?

2    A    Yes, sir.

3    Q    Why?

4    A    The discussions that myself and other members of FBI had

5    heard during the discussions was there was more than one

6    intended victim and that as of this shooting that the person

7    was still armed and was not located on the scene.

8    Q    And what was Mr. McCants's status with respect to the

9    outstanding arrest warrant at the time?

10   A    Still a fugitive on the run.

11   Q    After the shooting, did you continue receiving ping

12   alerts from T-Mobile for Mr. McCants's phone?

13   A    Yes, sir.

14   Q    I want to show you now what's been marked as Government's

15   9B.  Do you recognize this?

16   A    Yes, I do.

17   Q    And is this an 11:05 p.m. alert from Mr. McCants's

18   phone?

19   A    Yes, sir.

20   Q    And in fact, were you receiving alerts from the phone

21   company every 15 minutes?

22   A    Yes.

23   Q    Okay.  So the same deal here; right, latitudinal

24   coordinates?

25   A    Yes, sir.

1    Q    Longitude, and then what's the uncertainty?

2    A    13 meters.

3    Q    And is this the link you can click to see the map where

4    the phone is?

5    A    Yes.

6    Q    All right.  So flipping over to page 2, is this the map

7    that appeared when you clicked on the link?

8    A    Yes, it is.

9    Q    So according to this map, what was the location of the

10    1321 telephone as of 11:05 p.m., approximately 15 minutes

11    after the shooting on February 4th of 2017?

12    A    It was in the 5600 block of Pioneer Drive.

13    Q    And what's this cross street right here?

14    A    Roselawn Avenue.

15    Q    Let me show you one more location alert.

16                THE COURT:  Let me see all counsel at the bench.

17                (Bench conference off the record.)

18                THE COURT:  This is really just a logistical

19    problem.  We're running behind on this hearing because of

20    other things that have interfered.  And I want to be able to

21    keep going, but I'm scheduled to take Mr. Faison's guilty plea

22    at 4:30.

23                I don't want to stop this proceeding in order to

24    accomplish that, Mr. Martinez, so I've arranged for Judge

25    Blake to take Mr. Faison's guilty plea, allowing us to keep

1    pushing ahead here.  The question is, can the government

2    staff, somehow, a supervisor who can cover for you for that

3    guilty plea hearing so that you and counsel can stay right

4    here and keep going?

5              MR. MARTINEZ:  Yeah.

6              THE COURT:  You want to step out in the hallway and

7    make arrangements?

8              MR. MARTINEZ:  Yeah, if Your Honor will permit us

9    just a couple minutes.

10             THE COURT:  Yes.  I'm going to stay on the bench and

11   we'll take a stretch break while you're out in the hallway.

12             MR. MARTINEZ:  All right.  Thank you.

13             (Pause in the proceedings.)

14             THE COURT:  We're going to take a brief recess.  I

15   want the defendants to remain in court.

16             (A recess was taken.)

17             THE COURT:  You may continue.

18   Q    (BY MR. MARTINEZ)  Sergeant, as we broke just now, I'm

19   showing you Government's Exhibit 9C.  Do you recognize that?

20   A    Yes, I do.

21   Q    And what is it?

22   A    It's another location data report for the cell phone

23   (410) 694-1321 from February 4th and it's indicating a

24   51-meter hit.

25   Q    51 meters.  What time was the alert sent?

1    A    At 11:20 p.m.

2    Q    So this is the next alert after the 11:05 alert I just

3    showed you; correct?

4    A    Yes.

5    Q    And again, it has a link you would click to see the map

6    showing the location of the 1321 telephone?

7    A    Correct.

8         THE COURT:  Wait a minute, wait a minute, wait a

9    minute.  What's the time sequence?

10        THE WITNESS:  It's 11:20 p.m., but when the data

11   comes in, it indicates Pacific Standard Time, so there's -- it

12   will give ours up top when it says from/sent Saturday,

13   February 4th, 2017, 11:20 p.m.  And then on the actual report

14   coming from wherever it is, they're given a Pacific Standard

15   Time, three-hour difference.

16        THE COURT:  So your testimony is this is all the

17   same day?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  And it is the progression through that

20   same evening?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  Okay.  Despite those -- you've explained

23   the time discrepancy.

24        THE WITNESS:  Yes, sir.

25        THE COURT:  All right.

1  Q    (BY MR. MARTINEZ)  And just to further clarify, Sergeant,

2  the initial alert we showed you was 10:50 p.m.; correct?

3  A    Yes, sir.

4  Q    And that was the hit from North and Brentwood; right?

5  A    Yes, sir.

6  Q    And then we showed you 11:05, 15 minutes later?

7  A    Yes, sir.

8  Q    And that's Pioneer and Roselawn?

9  A    Yes, sir.

10  Q    And I'm currently showing you item 3, ping hit 3, and

11  this is 15 minutes later, 11:20, that is 30 minutes after the

12  shooting at North and Brentwood?

13  A    Yes, sir.

14         THE COURT:  At where?

15         THE WITNESS:  Greenmount Avenue and –– Greenmount

16  and North Avenue.  400 block East North Avenue.  He said North

17  and Brentwood, it's between Brentwood and Greenmount Avenue,

18  that 400 block of East North Avenue.

19         THE COURT:  Let's correlate it to particular pings.

20  The first ping came to the location that you just provided?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  The second ping came from Pioneer?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Further northeast?

25         THE WITNESS:  Yes, sir.

1          THE COURT:  The third ping came from?

2          THE WITNESS:  Northeast Pioneer.  Again, Pioneer

3   Drive, 5600 block.

4          THE COURT:  Same location as the second ping?

5          THE WITNESS:  Yes, sir.

6   Q    (BY MR. MARTINEZ)  Is that fact shown by the map that you

7   got by clicking on the link we were just looking at,

8   Sergeant?

9   A    Yes, sir.  That's the 5600 block of Pioneer Drive, same

10  location as the second ping.

11  Q    And did you continue receiving ping hits every 15 minutes

12  for Mr. McCants's phone for the next two hours or so?

13  A    Yes, sir.

14  Q    Did the location of the phone change or did it stay there

15  on the 5600 block of Pioneer Drive for the rest of the

16  night?

17  A    It stayed there.

18  Q    After receiving the ping alerts I just showed you, did

19  law enforcement make any additional efforts to further

20  pinpoint the location of the 1321 telephone?

21  A    Yes, sir.

22  Q    Could you describe those efforts for us, please?

23  A    The Advanced Technical Team investigator Tony Clark used

24  his cell site simulator to give the exact location of the cell

25  phone.

1  Q    And so --

2            THE COURT:  We have to take a recess.  The

3  defendant's are remanded.  We'll resume hopefully within the

4  next 15 minutes.

5            (A recess was taken.)

6            THE COURT:  You may continue, Mr. Martinez.

7  Q    (BY MR. MARTINEZ)  Sergeant, when we left off, I believe

8  I was asking you about the additional steps that were taken to

9  pinpoint the location of Mr. McCants's phone after the receipt

10  of the three ping alerts we just went through.

11            Do you remember those questions?

12  A    Yes, sir.

13  Q    And you were explaining that you had been in contact with

14  Detective Clark; is that right?

15  A    Yes, sir.

16  Q    And could you pick up the story there and tell us what

17  Detective Clark told you he had done?

18  A    Detective Clark used the cell site simulator to find the

19  exact location of that cell phone with the number

20  (410) 694-1321.

21  Q    And using the cell site simulator, where did Detective

22  Clark determine the 1321 telephone to be?

23  A    Inside of 5617 Pioneer Drive.

24  Q    And once you learned that information from Detective

25  Clark, specifically the fact that the 1321 telephone was

1    inside 5617 Pioneer Drive, what did you do next?

2    A    Met with the other investigators from U.S. Marshals,

3    Maryland State Police, and FBI, and then responded to the

4    address of 5617 Pioneer Drive.  Investigators surrounded the

5    address, I walked to the front entrance and knocked on the

6    front door.

7    Q    All right.  I want to show you Government's Exhibit 11A.

8    What are we looking at here, Sergeant?

9    A    Address of 5617 Pioneer Drive.

10   Q    And so is that the door you approached and knocked on as

11   you were just describing?

12   A    Yes, sir.

13   Q    What happened after you knocked on the front door?

14   A    Marquise McCants ran from the second floor and then into

15   the basement, and investigators and myself went down to that

16   basement window and could see McCants grab a black bag from

17   the closet.  McCants then ran into the basement bathroom, then

18   came back out, and McCants was removing items from the black

19   bag, then discarded the black bag back onto the ground and ran

20   back upstairs.

21       Investigators in the rear location began to give

22   information that McCants was coming out the rear second floor

23   window.  And then after that, all investigators were in a

24   position, a safe position, and had the house surrounded.  And

25   if McCants was seen, they gave his position.

Direct Examination – Landsman   (By Mr. Martinez)

1   Q    Were you given any information as to whether Mr. McCants

2   went back inside the house after he came out of the second

3   floor rear window?

4   A    Yes.

5   Q    Yes, he did go back --

6   A    He did go back inside.

7   Q    All right.  So after he went back into the house, did law

8   enforcement eventually contact him by calling his cell

9   phone?

10  A    Yes, sir.

11  Q    Can you recall who made the contact with McCants on the

12  cell phone?

13  A    Sergeant Siddique from Maryland State Police.

14  Q    And Sergeant Siddique with the fugitive apprehension

15  team?

16  A    Yes, sir.

17  Q    And after speaking with Sergeant Siddique, did McCants

18  eventually agree to come out of the house?

19  A    Yes, he did.

20  Q    Once Mr. McCants came back outside the house and was

21  taken into custody, did you know at the time, Sergeant,

22  whether there was anyone else inside the house?

23  A    No, I did not.

24  Q    Were you concerned that there might be additional people

25  in the house?

1    A    Yes, sir.

2    Q    Why?

3    A    Based on the calls that we had listened to, we believed

4    that McCants -- that other persons were involved and that

5    there could be someone else inside that was armed.

6    Q    And so what did you do to determine whether anyone else

7    was in the house who may have been armed and posed a threat to

8    either law enforcement or the public?

9    A    Entered the home as a team and did a protective sweep for

10   any persons who may have been armed inside the home.

11   Q    Who else was with you as you did your protective sweep?

12   A    Members of the Marshals, FBI, and the Maryland State

13   Police.

14   Q    And during the course of that protective sweep, did you

15   discover anyone else inside the house?

16   A    No, sir.

17   Q    While conducting the protective sweep, did you observe

18   any items of evidence in plain view?

19   A    Yes.

20   Q    What did you see?

21   A    There was .40 caliber ammunition in that basement toilet

22   that McCants -- in that area where McCants ran into with the

23   black bag.  The black bag was open.  There was drug items,

24   paraphernalia, such as a sifter and gelatin capsules.

25   Q    After conducting the protective sweep, Sergeant, did you

1    obtain a state search warrant for 5617 Pioneer Drive?

2    A    Yes, sir.

3    Q    Did you execute the warrant later that night -- or I

4    should say early on the morning of February 5th?

5    A    Yes.

6    Q    What, if anything, did you see when executing that

7    warrant?

8    A    .40 caliber ammunition, the cell phone that had the

9    number (410) 694-1321, the drug paraphernalia, photographs,

10   and paperwork.

11   Q    Did you find a firearm while searching the residence on

12   February 5th of 2017?

13   A    No.

14   Q    Following the search of the residence, that initial

15   search on February 5th of 2017, did you later become aware of

16   evidence suggesting that there was in fact a firearm in the

17   house?

18   A    Yes.

19   Q    What evidence was that?

20   A    Marquise McCants talking about where he hid the gun

21   inside the home and trying to direct someone to get the gun.

22   Q    And so you're describing conversations involving

23   Mr. McCants.  What kind of conversations were these, Sergeant?

24   A    Jail call conversations.

25   Q    Okay.  How many jail calls are we talking about?

Direct Examination – Landsman  (By Mr. Martinez)

1    A    Three or four.

2    Q    Okay.  And in those calls, you're saying he was

3    describing to associates where he had hidden the piece of

4    evidence?

5    A    Yes, sir.

6    Q    And based on those conversations, I take it, law

7    enforcement suspected he was talking about a firearm?

8    A    Yes.

9    Q    And so based on those calls, did there come a time where

10   you sought a second state search warrant for 5617 Pioneer

11   Drive?

12   A    Yes.

13   Q    When did you get that warrant?

14   A    On February 7th.

15   Q    Is -- are you sure about that, Sergeant?

16   A    February -- February 8th.

17   Q    Thank you.  And did you execute the warrant the following

18   day?

19   A    Yes.

20   Q    And when you executed that warrant on February 9th, 2017,

21   what did you find while searching 5617 Pioneer Drive on that

22   occasion?

23   A    In the area where Marquise McCants had described on that

24   second floor beneath the sink, reached a left, there was a

25   hole that led to the wall and then beneath the floor.  And in

Direct Examination – Landsman  (By Mr. Martinez)

1    that hole was the .40 caliber handgun that was dismantled.

2    Q    You mean taken apart?

3    A    Yes, it was in pieces.

4    Q    Okay.  So you seized a .40 caliber firearm from behind a

5    wall near the sink in the upstairs bathroom.  Did I understand

6    you correctly?

7    A    Yes.

8    Q    And after you recovered that .40 caliber firearm on

9    February 9th, did you submit it for ballistics testing?

10   A    Yes.

11   Q    What, if anything, did the ballistics testing show?

12   A    The ballistics testing showed that that .40 caliber

13   handgun was the gun that was used to fire the casings on the

14   crime scene of Greenmount --

15            THE COURT:  Why is that relevant?  Not relevant to

16   this motion, is it?

17            MR. MARTINEZ:  It's relevant to the -- it ties the

18   gun back to the shooting the sergeant testified about.

19            THE COURT:  Yeah, but this is a motions hearing and

20   the fact that it turned out to be right doesn't tell us

21   anything about the legitimacy of the process by which it was

22   found.

23            MR. MARTINEZ:  Fair enough, Your Honor.  But it -- I

24   think goes to the credibility of law enforcement's suspicion

25   that there was evidence in the home that could have been

1    destroyed at the time they were using the cell site simulator

2    to locate Mr. McCants in the house.

3            THE COURT:  Well, it's not going to -- at this point

4    anyway, but I make the point just to keep our attention

5    focused on what matters here.

6            Go ahead -- the point is we don't decide suppression

7    questions around the issue of the probativity of the evidence

8    that was ultimately uncovered.  That's the small point I'm

9    trying to make here.

10           MR. MARTINEZ:  I understand that, Your Honor.

11   Q    (BY MR. MARTINEZ)  All right.  Sergeant, I want to go

12   back to the evening of February 5th while you were executing

13   the first search warrant after McCants had come out of the

14   house.

15           MR. MARTINEZ:  And Your Honor, just for the record,

16   this pertains to a separate motion that will be taken up

17   later.  But while we have the sergeant on the stand, just like

18   three questions.

19           THE COURT:  Yes.  Whose motion is this?

20           MR. MARTINEZ:  It's Mr. Francomano's.  It's to

21   suppress the search of the Honda that was parked outside.

22           THE COURT:  Okay.  So --

23   Q    (BY MR. MARTINEZ)  Sergeant, on February 5th, 2017, did

24   there come a time where you requested a K-9 scan of a silver

25   Honda parked next to 5617 Pioneer Drive in the driveway?

1   A    Yes.

2   Q    Was the K-9 scan conducted on that car as you requested?

3   A    Yes, it was.

4   Q    If I can get the document camera back up on the screen

5   here.  Is this the vehicle here in the driveway?

6   A    Yes, sir.

7   Q    What was the result of the K-9 scan, were you informed of

8   that?

9   A    Positive alert for drugs.

10  Q    And so based on that positive alert, did law enforcement

11  then search the car?

12  A    Yes.

13          MR. MARTINEZ:  Court's indulgence.

14          THE COURT:  Yes.

15          MR. MARTINEZ:  No further questions.

16          THE COURT:  Thank you, Mr. Martinez.

17          Mr. Francomano.

18          MR. FRANCOMANO:  Thank you, Your Honor.  If I can

19  actually go to the podium --

20          THE COURT:  Wherever you're more comfortable.

21          MR. FRANCOMANO:  Thank you.

22                      CROSS-EXAMINATION

23  BY MR. FRANCOMANO:

24  Q    Good afternoon, Sergeant, how are you today?

25  A    Great.  How are you?

Cross-examination – Landsman   (By Mr. Francomano)

1    Q    Good.  Before you requested the tracking on the phone,

2    the only information you had was from these phone calls; is

3    that correct?

4    A    No.

5    Q    What other information did you have before you requested

6    the exigent work order?

7    A    We had had the bar shooting of Deandre Dorsey, the

8    ballistic information for that gun that was recovered, and

9    other violent acts that had occurred.

10   Q    Okay.  But those are acts that occurred prior; correct?

11   A    Correct.

12   Q    Okay.  So there was nothing that Mr. McCants was involved

13   in prior; correct?

14   A    There was.

15   Q    One of the shootings that you just talked about?

16   A    Yes.  There was more than -- the investigation took place

17   over a period of six years, once I had coordinated the

18   investigation with the Anne Arundel County FBI team, and we

19   believed that Marquise McCants was this person using that

20   phone --

21   Q    You believed?

22   A    Yes.

23   Q    Okay.  But nothing recent within the same day; correct?

24   Within December; is that correct?

25   A    When the calls on February 4th -- if you're saying just

1    that, yes, the calls are what we're --

2    Q    I'm sorry.  Maybe I'm not being clear.  The incidents

3    that you were talking about prior to just the phone calls that

4    you spoke -- there were other things besides just the phone

5    calls that you just spoke about?

6    A    Yes.  Once we believe it is Marquise McCants, then

7    everything comes into play, all that evidence that we've come

8    across, the violent acts Marquise McCants has been involved

9    in, all the murders.

10   Q    When did you find out it was Marquise McCants?

11          THE COURT:  When did you find out or when did they

12   come to suspect it?  They didn't come find it out until they

13   ID'd him positively after his arrest.

14   Q    (BY MR. FRANCOMANO)  When did you suspect it was Marquise

15   McCants on the phone?

16   A    On February 4th, 2016, had a conference call with the

17   investigators, and we went over that the phone number of

18   (410) 694-1321 in communication with Deandre Dorsey, played

19   those calls, and discussed how the voice sounded like Marquise

20   McCants, then the involvement with that BGF gang along

21   Greenmount Avenue, and along with calls where the

22   (410) 694-1321 was referred to as Digga, the street name that

23   Marquise McCants has within that Black Guerilla Family gang.

24   So it was the geography, tone of his voice, and the

25   nickname.

Cross-examination – Landsman  (By Mr. Francomano)

1    Q    So was that on the first call on February 4th?

2    A    February 4th.

3    Q    February 4th, 2017?

4    A    Well, the information about Digga was prominent in the

5    call on February 1st.  The discussion with all the

6    investigators involved to identify who that person -- who we

7    believed that person to be using that phone was February 4th,

8    early in the morning hours.

9    Q    Early in the morning hours?

10   A    Yes.

11   Q    Prior to that first call at 2:00 p.m. on February 4th;

12   correct?

13   A    Correct.

14   Q    So once you found out or believed it was Mr. McCants, did

15   you try and locate him?

16   A    Yes.

17   Q    What did you do to try and locate him?

18   A    So myself and Detective Neptune were positioned at one

19   end of the block where McCants had used an address in the 400

20   block of East 28th Street.  Other investigators were

21   positioned along Greenmount Avenue.  Then there was a team of

22   FBI and Marshals that were positioned in different areas where

23   we suspected that Deandre Dorsey may be and could lead us to

24   Marquise McCants.

25        So we had a team of over 20 people with our surveillance

1    operation as well as that information was put out to uniform

2    patrol in the area.

3    Q    I want to direct your attention to the call on January

4    26, 2017, that 11-minute call.

5    A    Yes, sir.

6    Q    Do you remember that call -- I'm sure you probably went

7    over these things a hundred times, the phone calls, the

8    transcripts or all the line sheets; is that correct?

9    A    Yes, sir.

10   Q    So you're very familiar with it.  If you need to, I can

11   have his honor give you the line sheets.

12   A    I have Pioneer Drive as the photo that's showing right

13   now, Your Honor.

14        MR. FRANCOMANO:  If I could have my line sheets

15   back.

16        THE COURT:  I will pass the line sheets back to

17   Mr. Francomano.  First of all, make sure there's only line

18   sheets in there.  Make sure we didn't sweep any other

19   documents in there.

20        MR. FRANCOMANO:  Thank you, Your Honor.

21   Q    (BY MR. FRANCOMANO)  The 26th of January, they're talking

22   about a dice game; right?

23   A    Yes, sir.

24   Q    And when they're talking about the dice game, they're

25   talking about rolling dice and shooting dice; correct?

1    A    Possibly.  But in this situation they were talking about

2    robbing the dice game and then went into the discussion of

3    shooting.

4    Q    And when they talked about robbing the dice game, they

5    were laughing and it was obviously a joke; correct?

6    A    No, it was not a joke.

7    Q    And then you said you interpreted the word "glizzy" to be

8    a gun?

9    A    Yes, sir.

10   Q    So glizzy couldn't be anything else?

11   A    Not in the context that they were using it.

12   Q    Well, in the context they were using it as a dice game,

13   couldn't it have been dice, money, a lucky rabbit's foot?

14   A    Well, rob the dice game with the gun, which is later

15   described as "the big one," the "21," which is the Glock 21

16   model of a .45 caliber handgun.

17   Q    Are you familiar with a dice game called 21?

18   A    No.

19   Q    And then in the transcript it also said a shootout with

20   Burns?

21   A    Yes, sir.

22   Q    Once again, dice, shootout.  You see where I'm going with

23   this?

24   A    No, I don't.  I believe it was a shootout with someone,

25   of a person.

1    Q    You believe --

2    A    Yes, that's what I believe.

3    Q    I'm showing you what's marked for identification, line

4    sheets.  And this is --

5         THE COURT:  Are we going to mark and admit these

6    line sheets, Mr. Francomano?

7         MR. FRANCOMANO:  Yes, Your Honor.  This is going to

8    be McCants Defense Exhibit No. 1.

9         THE COURT:  McCants No. 1.

10        MR. FRANCOMANO:  Going to make this actually 1A.

11        THE COURT:  1A.

12   Q    (BY MR. FRANCOMANO)  All right.  These line sheets, can

13   you see this, Sergeant?

14   A    Yes, sir.

15   Q    All right.  It says, "DI," then it says "DD."  What does

16   UI mean?

17   A    Unintelligible, according to the person who's typing the

18   line sheet.

19   Q    Okay.  And then it says, "UI with f-word Burns and them."

20   So that means unintelligible again?

21   A    Unintelligible to whoever typed the line sheet, but

22   sometimes if I listen to the call, I may hear something that

23   that person who's monitoring may not.

24   Q    So you hear something different; correct?

25   A    I may be able to hear it better than that person.

Cross-examination – Landsman  (By Mr. Francomano)

1    Q     There's a call on February 1st, 2017.  Do you remember

2    that call?

3    A     Yes.

4    Q     And that's a call where you testified that you saw him

5    clutching -- or that allegedly Mr. McCants saw someone

6    clutching?

7    A     Yes.

8    Q     And you interpreted that to mean that he saw somebody

9    with a gun?

10   A     Yes.

11   Q     And your actual testimony was McCants went to Greenmount,

12   saw a person, wanted to shoot that person, and that person was

13   potentially armed.  McCants called about TB and having someone

14   as backup.  Other person around was TB.  Is that your

15   testimony?

16   A     Yes.

17   Q     This is going to be 1B.  Defense McCants --

18         THE COURT:  Let me see counsel at the bench.

19         (Bench conference on the record.)

20         THE COURT:  So we're at the bench.  Mr. Francomano,

21   I guess I'm having trouble understanding ultimately where all

22   of this goes.  Even if you start scoring points here, which

23   I'm not saying you are doing or you aren't doing, but

24   Mr. McCants has a warrant out for his arrest through this

25   entire period of time.

1          MR. FRANCOMANO:  Right.

2          THE COURT:  Okay.  So they are operating on hunches,

3    they have incomplete information, they get lucky with some

4    suspicions and so forth.  And they ultimately, if they

5    encounter him pretty much by any means, they're entitled to

6    take him into custody; right?

7          MR. FRANCOMANO:  I would agree with that, if they

8    encounter him, not if they are without a warrant.

9          THE COURT:  So what's the remedy, he gets released?

10          MR. FRANCOMANO:  Well, the remedy in this case?

11          THE COURT:  Yes, the remedy in this case.  I mean,

12    ultimately, they're trying to find a fugitive, and they found

13    the fugitive.  Okay.  And let's suppose that their methods

14    were unconstitutional.

15          MR. FRANCOMANO:  Yes, which I'm going to argue.

16          THE COURT:  I detect that.  Five minutes before 5:00

17    and I figured that out.  Okay.  So we -- suppose that they

18    are.

19          MR. FRANCOMANO:  Well --

20          THE COURT:  Once they lay eyes on him through a

21    window at Pioneer Drive, they have the lawful right to enter

22    that house on the strength of the arrest warrant and apprehend

23    him, don't they?

24          MR. FRANCOMANO:  No, I would disagree with that.

25          THE COURT:  Okay.  So if they had suddenly had a

1    moment of constitutional clarity, as they stood on the porch

2    and gazed through the basement window, and then all of a

3    sudden, I'm Sergeant Landsman, I'm remembering this Fourth

4    Amendment course that I took at a recent seminar.  I need at

5    this moment to just call everybody off, through a central

6    processing unit wipe on my brain as to everything I've just

7    seen and noticed, and we all go home and start over tomorrow.

8    Eight hours, ten-hour head start, maybe 12, I mean, what would

9    the law require?

10           MR. FRANCOMANO:  Your Honor, the question is whether

11   or not there were exigent circumstances for them to get in the

12   house.  If he was on the street and they found him on the

13   street and there was an arrest warrant for him, absolutely,

14   they could pick him up.  The question is, can they go into a

15   house with just an arrest warrant --

16           THE COURT:  But it's not -- they can always go into

17   a house with just an arrest warrant if they have probable

18   cause to believe that the guy that's the subject of the

19   warrant is in there before they go in the house.

20           MR. FRANCOMANO:  Right.  But they haven't -- at that

21   point they don't know who -- Mr. McCants is in there until, as

22   Your Honor said, he was arrested.

23           THE COURT:  Well, they peeked through the window and

24   saw.

25           MR. FRANCOMANO:  How did he know it was Mr. McCants?

1          THE COURT:  He said he did.

2          MR. FRANCOMANO:  Your Honor, I think that what you

3     said is more correct, that they didn't know who it was until

4     he was arrested.

5          THE COURT:  Until they took his fingerprints they

6     didn't know for 100 percent.  That's for sure.

7          MR. FRANCOMANO:  I agree with that.  But what we're

8     saying is that even if there -- there still has to be a reason

9     to get in the house, and there still has to be a reason to

10    track him.  You can't all of a sudden say, well, these random

11    phone calls, which I'm trying to show, nobody can understand

12    them, number one.  Number two, how does that show that there

13    are exigent circumstances for them to try and find

14    Mr. McCants?  If he had a warrant out for him, they should

15    have applied for a warrant, and I think that that would have

16    been fine.

17         THE COURT:  Well, what about the notion -- well, we

18    are not at the end yet.  I'll let you continue.  But I

19    understand exactly the road you're going down.

20         MR. FRANCOMANO:  You're just trying to speed me

21    up.

22         THE COURT:  Not necessarily.  My question is though,

23    whether or not there isn't a bypass around -- you can go

24    through Wilmington, Delaware two ways; right?  You can go

25    through on that really slow road that's always backed up, or

1    you can also go around the other way.  Both get you to the

2    same place.  I just want to make sure that the other road

3    isn't open.  You're suggesting that there's enough question

4    about it that we ought to drive through town.

5               MR. FRANCOMANO:  I understand what Your Honor's

6    saying.

7               THE COURT:  Whatever.  I mean, I'm not cutting you

8    off.  I just want to make sure that we're not missing

9    something.

10              MR. FRANCOMANO:  We will get there.

11              THE COURT:  Thanks.

12              (The following proceedings were had in open court.)

13              THE COURT:  Mr. Francomano, you may continue.

14              MR. FRANCOMANO:  Thank you, Your Honor.

15   Q    (BY MR. FRANCOMANO)  Detective, there was a call on

16   2/4/17, that was the one where they said "dirt bike"?

17   A    Yes, sir.

18   Q    You interpreted that a dirt bike has to be a gun?

19   A    Yes, sir.

20   Q    It can't be a dirt bike?

21   A    Not in this context.

22   Q    Okay.  You're aware that there were issues with dirt

23   bikes in Baltimore City; correct?

24   A    Correct.

25   Q    Okay.  A call on February 4th at 4:09 p.m., that call you

1    stated that if you're going to get him -- you say that that

2    call was in reference to Mr. McCants and Mr. Dorsey going to

3    get someone; correct?

4    A    I don't have the call up here that you're referring to.

5    Q    This will be -- this is the call on which -- 4:09, this

6    will be 1C.

7              THE COURT:  Are we going to play a call or what?

8              MR. FRANCOMANO:  Your Honor, if I could play the

9    call.  It's just a call that is less than a minute.

10              THE COURT:  Yes.  Do you need the government's

11    assistance to play it?

12              MR. FRANCOMANO:  No, Your Honor, I've got it over

13    here.

14              THE COURT:  Okay.

15              MR. FRANCOMANO:  Can you hear that?

16              THE COURT:  Loud and clear.

17              (Audio played.)

18    Q    (BY MR. FRANCOMANO)  Detective, that call is from --

19    actually, 4:12.  Do you remember that call?

20    A    Yes.

21    Q    The first sentence out of his mouth is -- actually, the

22    first sentence is "Hello."  The next one is -- it says, "Lucky

23    day because he damn sure ain't out here"; correct?

24    A    Right.

25    Q    And then there are two calls after that; correct?

1    A    Yes.

2    Q    Let me play those for you.

3          (Audio played.)

4    Q    (BY MR. FRANCOMANO)  And Detective, that call was at

5    4:33 p.m. on the same day; correct?

6    A    Yes.

7    Q    And in that call, they weren't talking about guns, were

8    they?

9    A    It's drug talk.

10   Q    So nothing about guns?

11   A    No, but --

12   Q    No imminent threat to anyone?

13   A    No, but it put us in a position where we believed that a

14   meet was going to occur.

15   Q    A meet for drugs?

16   A    Yes, but we believed that Deandre Dorsey was going to

17   lead us to who we believed to be Marquise McCants.

18   Q    For drugs?

19   A    Well, it would have been to disrupt the violent acts that

20   were going to occur, but yeah, in between that they do sell

21   drugs, so that would have occurred.  But our function would

22   have been to disrupt someone from getting killed, so -- and we

23   would have seized the drugs.

24   Q    So the next call is at 5:01 on the same day.

25         (Audio played.)

Cross-examination - Landsman  (By Mr. Francomano)

1    Q    (BY MR. FRANCOMANO)  That call is at 5:01.  Are they

2    talking about any imminent threats to anyone in that one?

3    A    Just drug talk.

4    Q    Nothing that was a gun; right?

5    A    Correct.

6    Q    What time did you, I guess, request the exigent

7    circumstances order?

8    A    Well, I began talking to the Advanced Technical Team

9    after 9:00 o'clock.

10   Q    9:00 p.m.?

11   A    Yes, sir.

12   Q    And in that order -- actually, two orders.  There's an

13   exigent work order form, and that would be 1D, Defense

14   McCants.  Do you see that, Detective -- or excuse me,

15   Sergeant?

16   A    Yes, sir.

17   Q    What is that?

18   A    The cover sheet for the request with the synopsis in

19   there.  And that is the request that I send to the Advanced

20   Technical Team with my synopsis.  So when I forwarded the

21   information, this is the document that I prepare that

22   information on.  And you see below at the bottom where it says

23   signed, that's my name and my Baltimore police sequence number

24   G692 and then the number.  Once that document is forwarded to

25   Tony Clark, then Tony Clark prepares the order, which he

1   forwards to the cell phone company.

2   Q    And that's the one you sent over at 9:00 o'clock;

3   correct?

4   A    Yes.

5   Q    And in that document you stated that there was an

6   imminent threat; correct?

7   A    Yes.

8   Q    Even after you heard that no one was on the street and

9   the two were talking about a drug deal?

10  A    The threat was still there, that the drug transactions

11  were going to occur.  They were selling drugs as part of their

12  organization, but the threat was still there.  We did not

13  disrupt the threat that was going to occur on that weekend.

14  Q    Detective, you spoke about that you heard and you

15  received information that Mr. Bess was shot.  What time was

16  that?

17  A    10:50 p.m.

18  Q    When did you receive the information?

19  A    It was about 10:50 p.m.

20  Q    Who did you receive it from?

21  A    From the Advanced Technical Team's Lieutenant Fries, was

22  the first person that notified me at the same time that I

23  received the GPS location data.

24  Q    Now, so you heard that at 10:50 p.m.; correct?

25  A    Correct.

Cross-examination - Landsman  (By Mr. Francomano)

1    Q    And you explained to the judge that you did not request a

2    warrant because that would take too long; is that correct?

3    A    No.  It was -- the complete issue was that it would take

4    too long.  It was a couple different issues being combined.

5    One being the cell phone company responding to the

6    order once -- once it is signed -- if we did get that signed,

7    that would have been an issue in itself, preparing it, going

8    to the judge.

9        And then I think the next issue was the cell phone

10   company responding to the order in the time that we needed it,

11   which may not have been until that Monday.

12   Q    Okay.  So it was, I guess, a two-step problem, the judge

13   not responding in time and then the cell phone company not

14   responding in time?

15   A    And then the information of the threat where someone was

16   going to get killed, which was time sensitive.

17   Q    And then you did get a search warrant on 2/5 that you

18   testified to; correct?

19   A    Correct.

20   Q    And in that search warrant you filled out an affidavit;

21   correct?

22   A    Correct.

23   Q    And in that affidavit, I'm sure you put in there that

24   somebody was shot on that night; correct?

25   A    Yes, sir.

1    Q    Then there was --

2              MR. FRANCOMANO:  Court's indulgence.

3              THE COURT:  Yes.

4    Q    (BY MR. FRANCOMANO)  And there was a search warrant on

5    February 8th; correct?

6    A    Correct.

7    Q    And that search warrant -- I'm sure you put in there that

8    there was an individual that was shot?

9    A    Yes.

10   Q    Are you guessing?

11   A    No, I'm sure we put that in there.

12   Q    I'm showing you what the probable cause section is in

13   that search warrant, so I'll mark the entire search warrant as

14   Defense McCants Exhibit No. 1E.

15        Can you read that, Sergeant?

16   A    Yes, sir.

17   Q    Do you see in that section anywhere where it says an

18   individual that was shot?

19   A    It does not.

20   Q    Showing you page 2 of the probable cause.  Please review

21   that.

22   A    Okay.  I reviewed it.

23   Q    And where does it say that someone was shot?

24   A    It does not.

25   Q    Detective, in the search warrant for February 5th, you

Cross-examination – Landsman  (By Mr. Francomano)

1    identified a criminal informant -- a reliable criminal

2    informant; is that correct?

3    A    Yes.

4    Q    I'm not asking you who that criminal informant is, but is

5    it a human being?

6    A    Can I see the probable cause?

7    Q    Absolutely.

8           THE COURT:  Point to the reference, please.

9    Q    (BY MR. FRANCOMANO)  The first paragraph.  And this will

10   be Defense 1F.

11   A    On February 4th, 2017, members of the Baltimore Police

12   Department and FBI Task Force received information from a

13   confidential and reliable source that an individual known as

14   Digga has gone to shoot someone in the area of Greenmount

15   Avenue.  The confidential source indicated that Digga was

16   going to shoot somebody today.

17   Q    Is that a human being?

18   A    The source at the time would be the wiretap.

19   Q    So not a human being?

20   A    Correct.

21   Q    Detective, on June 19th, 2017, the Maryland Court of

22   Special Appeals found that you provided inaccurate

23   information; is that correct?

24   A    I would say that's not correct, based on the modification

25   to that ruling.

1  Q    The Court of Appeals found that you provided inaccurate

2  testimony; is that incorrect?

3  A    That is incorrect, based on the modification that that

4  Court of Appeals ruled on.

5  Q    Explain that to me.

6  A    The Court of Appeals had limited information on my

7  response to that question.  Once I provided the totality of

8  the circumstances, the ruling that my answer was inaccurate

9  was modified to my answer to that question was actually

10  correct for what I was responding to.  And there is a

11  modification that has been completed since that initial

12  ruling.

13          THE COURT:  What is this all about?

14          MR. FRANCOMANO:  I'm sorry?

15          THE COURT:  What is this all about?

16          MR. FRANCOMANO:  There was a finding on July 19th,

17  2017 by the Court of Special Appeals that was turned over by

18  the government providing that Sergeant Landsman provided

19  inaccurate testimony in the state murder trial of David

20  Hunter, one of the co-defendants in this case.

21          THE COURT:  Is there a modification that you're

22  aware of?

23          MR. FRANCOMANO:  Not that I'm aware, Your Honor.

24  Not that I've been provided either.

25          THE COURT:  Mr. Martinez?

1          MR. MARTINEZ:  Mr. Francomano is referring to the

2     modified ruling, Your Honor.  And we will stipulate that there

3     is a Court of Special Appeals opinion saying that he provided

4     inaccurate testimony.

5          THE COURT:  Not clarified subsequently in the

6     modification to indicate that it was not inaccurate?

7          MR. MARTINEZ:  The initial opinion, Your Honor,

8     which I believe was issued in May, took the unnecessary step

9     of having language in it purporting to characterize Sergeant

10    Landsman's mental state.  And as I understand it, the

11    attorneys in the office of the Attorney General moved for

12    reconsideration of that, submitted an affidavit from Officer

13    Landsman, submitted transcripts of the testimony, and gave the

14    Court of Special Appeals some information about the context.

15         So the modification was simply to say that the

16    testimony was inaccurate as a factual matter without making

17    any pronouncements as to whether it was misleading,

18    deliberately inaccurate, et cetera.

19         What we're left with is a finding by the Court of

20    Special Appeals that there was testimony that was factually

21    incorrect.

22         THE COURT:  Okay.  You accept that interpretation,

23    Mr. Francomano?

24         MR. FRANCOMANO:  Yes, Your Honor.  I believe that's

25    the same question I asked him.

1              THE COURT:  Okay.

2              MR. FRANCOMANO:  I have nothing further for this

3     witness.

4              THE COURT:  Do you have any other witnesses,

5     Mr. Francomano?  Do you have any other evidence you intend to

6     present?

7              MR. FRANCOMANO:  Your Honor, I do.  Depending on

8     whether or not there's going to be an issue of standing, I do

9     have another witness.

10             THE COURT:  I don't think there is going to be an

11    issue on standing.  Mr. Martinez, do you have other evidence?

12    I understand that you have not conducted redirect examination,

13    but do you have other evidence on this motion?

14             MR. MARTINEZ:  We have Detective Clark available to

15    the extent that there are factual disputes pertaining to what

16    he did.  I think there's been a record made that he used the

17    cell site simulator to find the phone at 5617.  That was going

18    to be the principle basis for his testimony.  He was going to

19    testify as to a statement he heard outside the house.  I don't

20    know whether --

21             THE COURT:  Statement made where?

22             MR. MARTINEZ:  Detective Clark was one of the

23    officers that was stationed outside the house.  He stuck

24    around after using the cell site simulator.

25             THE COURT:  Yes.

1          MR. MARTINEZ:  So he heard Mr. McCants shouting from

2     inside the house, "I've got a gun, I've got an f-ing gun."  I

3     don't expect that Mr. Francomano is prepared to concede to

4     that.

5          MR. FRANCOMANO:  No, Your Honor.

6          THE COURT:  Let's stop and hear Mr. Francomano's

7     argument with respect to matters leading up to the house and

8     the contact made with Mr. McCants at the house.

9     Mr. Francomano.

10          Mr. -- you may step down step and step outside.

11     Don't go anywhere.

12          MR. FRANCOMANO:  Your Honor, as I stated at the

13     bench, this case is about whether or not the exclusionary --

14     whether there is an exclusionary rule as to the warrant, and

15     the only exclusion that I believe --

16          MR. MARTINEZ:  Your Honor, I don't know what

17     warrant --

18          THE COURT:  Not --

19          MR. FRANCOMANO:  Not warrant.

20          THE COURT:  The warrantless pursuit of Mr. McCants,

21     utilization of special technology that assisted the government

22     in determining his location.

23          MR. FRANCOMANO:  Exactly, Your Honor.

24          THE COURT:  Several instances on the evening in

25     question.

1          MR. FRANCOMANO:  And from the case law, I don't

2     think there's an issue that this is a search.  I think the

3     only issue here is whether or not the search in itself is an

4     exception to the warrant under exigent circumstances.

5          THE COURT:  I think there's a huge question as to

6     whether or not these sorts of intrusions are searches.  I

7     think it's a burning question.  I'm not persuaded yet that it

8     needs to be resolved as part of the determination of the

9     motion that you've presented to the Court.  But let's assume

10    it was a search and that legally it should be evaluated as a

11    search.

12         MR. FRANCOMANO:  And that's what we would say, Your

13    Honor.  We would say that there were not exigent circumstances

14    in this case.  And it doesn't meet the criteria.  This case is

15    different than other cases where there is exigent

16    circumstances in that this case is a preventative action.

17    This is not a case where something has happened, a crime has

18    been committed, and they're going to try to find someone.

19    It's not a reactive case, such as the other cases; rendering

20    aid to someone, preventing the destruction of evidence, risk

21    of flight, safety to police officers.

22         THE COURT:  Well, in the second part of the story,

23    wasn't law enforcement taking actions in the wake of a

24    shooting?

25         MR. FRANCOMANO:  In the wake of a shooting that they

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    have no idea who committed the shooting.  But Your Honor,

2    that's not really the issue here.  The issue is whether or not

3    when they applied for the warrant itself -- excuse me, not the

4    warrant, when they applied for the exigent circumstances

5    order, was there an immediate eminent threat.  And the answer

6    is, no.  At that -- there was nothing at that point, Your

7    Honor, and that's why we're saying that since there was no

8    exigency at that time, there was no reason for them to use the

9    cell site simulator to try and locate Mr. McCants.  They went

10   above and beyond what they're required to do and what they're

11   allowed to do.

12            THE COURT:  Okay.  I understand the argument.

13            MR. FRANCOMANO:  Like I said, this is a case where

14   they believe something is going to happen.  Number one, we

15   don't think there's enough evidence to even show that there

16   was any type of exigent circumstances.  It's clear from the

17   calls that if there was anything going on, it dissipated by

18   the second call.  And the next two calls had nothing to do

19   with any type of emergency or imminent danger.

20            The officer -- excuse me, Sergeant Landsman

21   testified that there were no other calls -- or those two other

22   calls were dealing with drugs, not dealing with any type of

23   guns or any type of issues where someone could be harmed.  And

24   that's our position, that right there, there's no exigency

25   whatsoever.  The cases that were cited by the government all

talk about cases in which the exigency was reactive.  And
*Warden Maryland Penitentiary versus Hayden*, that was hot
pursuit of an armed felon; *Kentucky v. King*, destruction of
evidence; *U.S. v. Caraballo*, that was another one, risk of
flight; *U.S. v. Ellis*, that was one where the risk of flight
in possession of firearms.

The only case that the government does talk about
where as a preventative issue for exigency circumstances is a
case called *U.S. v. Engel*.  *U.S. v. Engel* is a 4th Circuit
case in which officers responded to a domestic violence
assault.  When they got there, the wife had told them that the
defendant was still in the home threatening to shoot law
enforcement.  The officers arrested the defendant when he came
out of the house.

The wife said there's a grenade in the house.  The
officers go into the house, they go to a locked cabinet, they
opened up the cabinet.  He was -- the defendant was the only
person who had a key to the cabinet and that court found that
them going in, and the Court stated that, "while we recognize
that preventive action may well be justified in the face of an
exigency, we conclude the factual circumstances of this case
simply do not rise to that level."  And that's what we're
saying here, Your Honor.

There's a whole bunch of phone calls that show there
is no exigency, that the cell site simulator was not in a

1  situation where it should be used because there was no

2  exigency at that time.  It is not an exception, and as we all

3  know, that the warrant has to be probable cause for the cell

4  site simulator.

5          MR. MARTINEZ:  Objection again to any -- these

6  continued references to a warrant.  Your Honor, there is no

7  warrant for the cell site simulator.

8          MR. FRANCOMANO:  I apologize.

9          THE COURT:  I'm following his argument.  You may

10 continue.

11         MR. FRANCOMANO:  And then the case that is most like

12 ours is *Moore v. City of Gaithersburg*.  That's another 4th

13 Circuit case.  In that case, at 1:00 p.m. a health care

14 operator on a suicide line got a call from a defendant who

15 said he was suicidal, had weapons in his apartment, and he

16 could understand shooting people at his work, and he might as

17 well die at work.  At that time, the officers were called and

18 they said the defendant's threats should be taken seriously.

19 They called his work, they said yes, this definitely could

20 happen.  The officers heard that the girlfriend had just

21 broken up with him.

22         The officers arrived and saw that the defendant was

23 loading a suitcase into his car and a gym bag into his van.

24 The defendant was arrested at that time.  The officers begin a

25 search of the bag, found a handgun.  They took his keys and

went and searched his apartment.  They found 41 guns.

Now, this case set out three factors in a situation where there's a preventative issue just like our case.  And the three factors were, one, the likelihood or probability that a crime will come to pass.  In the *Moore* case, the defendant himself said he was suicidal in the apartment and could understand shooting people at his work.  They spoke with his work, they said yes, this is definitely something that could happen, discovered his girlfriend had broken up with him.  It was an imminent situation.  In our case, there's been no showing of any imminency whatsoever.

How quickly the threatened crime might take place?  Imminent.  In our case, the individual -- they said in a call the individual was not on the street.  And the call 2/4 -- on February 4, 2017 at 2:12 or 4:12 p.m., and then two other phone calls talking about drugs.  And finally, the third category, the gravity of the potential crime.  Obviously, in the *Moore* case the gravity is mass murder.

In our case, according to the phone calls, there is no idea what crime is going to be committed.  It could have been the last two phone calls maybe drugs.  We don't know.  *Moore* court found when the crime is extreme and the need to prevent is great, as with potential mass murder, the constitutional questions take on a special urgency and a certain novelty.

1          In the present case, as I said, the government is

2     relying on five phone calls.  And in those five phone calls,

3     as we've gone through ad nauseam, the phone calls do not show

4     there's any imminent threat.  Do not show that -- if they show

5     that there was a threat on the call, the 4:09 call, they show

6     that threat was dissipated in the 4:12 call and in the 4:33

7     call and the call at 5:00 o'clock.  There was no imminent

8     threat.

9          This is clearly a situation in which the officers

10    are making a number of subjective assumptions about what they

11    believe is going on, what's going to happen.  They have to be

12    objective reasonable assumptions.  In these phone calls

13    there's no way to pinpoint the fact that a murder was going to

14    take place.  Here they're guessing, taking coded words to make

15    them mean what they want them to mean.  Your Honor, sometimes

16    a dirt bike is just a dirt bike.

17         What *Moore* -- what the case of *Moore* was telling us,

18    and the last remark I think is kind of telling, it says --

19    when *Moore* said, "I might as well die at work," the Court

20    found that this was ambiguous.  But the other facts such as

21    him saying he was suicidal, that he had weapons at his

22    apartment and things like that, they found that those things

23    would all confirm it.  Every single one of these phone calls

24    is ambiguous.  And if not, like I said, the one -- the 4:12

25    phone call shows that there was no longer any type of threat

1    whatsoever.  That's our argument as to the exigency, Your

2    Honor.

3              THE COURT:  Thank you, Mr. Francomano.

4              MR. FRANCOMANO:  Thank you, Your Honor.

5              THE COURT:  I have carefully considered the evidence

6    that's been presented.  I've considered Mr. Francomano's

7    argument.  Here's how I see it:  I do believe there was an

8    exigency.  I believe that it evolved from a reasonable and

9    objective interpretation of the totality of the phone calls,

10   considered together on the day in question and the

11   consultation that occurred among all of the investigators

12   earlier -- early in the morning on the 4th; and that the total

13   picture that emerged and developed over the course of the day,

14   particularly late in the day, was one of exigent

15   circumstances; and that a malignant situation was apparent to

16   reasonable and objective law enforcement officers; and that in

17   light of that they were authorized to dispense with the

18   requirement, if there was one, to get a warrant in those

19   circumstances, before deploying that special Stingray cell

20   site simulator technology and begin their pursuit of

21   Mr. McCants.

22              As the situation developed, after the shooting

23   occurred, the Court -- I'm prepared to conclude that they

24   actually found themselves to be in the exigent circumstance of

25   the hot pursuit of an armed felon and that they proceeded

1    accordingly.  My problem with the government's side of this

2    though, begins not too long after that.  And the explanation

3    given from the stand about why they were not pursuing a

4    warrant with a court simultaneous with their pursuit and their

5    pursuing the exigent circumstances authority to get the

6    information is not persuasive to me at all.  And they should

7    have been simultaneously making their best efforts to get a

8    warrant.

9         And the fact that they did not do that or were

10   failed in doing that is not going to carry the exigent

11   circumstances argument forward indefinitely.  However, I do

12   conclude that law enforcement got to the Pioneer Drive address

13   and got onto the likely presence of the defendant and the

14   phone at that address, while they were still within the scope

15   of the exigency and what it justified without a warrant.

16        Now, to the extent that they continued to use the

17   cell site simulator while they were at Pioneer Drive to

18   confirm the presence of the telephone there and then, perhaps

19   the defendant there as well, the lawfulness of that need not

20   be addressed by the Court for the reason that I find that they

21   initially got to Pioneer Drive within a period of time that is

22   covered by the exigency of the circumstances that had

23   developed through the evening while they were listening to the

24   calls and then the shooting and so forth.

25        Certainly the 11:20 p.m. locating of the phone at

1    the Pioneer Drive location falls within the scope and the

2    reach of the exigency.  The exigency gives law enforcement

3    access to the information that the phone was at Pioneer Drive.

4    And I find that once they were there, they were -- it was

5    likely, to the point of certainty, that they were going to

6    remain there, even if they -- cell site simulator broke at

7    that point and would no longer function.  They were going to

8    continue to pursue that information until they ascertained who

9    was inside of that house.  And therefore, any additional use

10   of the cell site simulator at that location as more time

11   elapsed, and as I find they were then falling at some point

12   out of the period of exigency, really just doesn't matter

13   here.

14         Mr. Martinez, the testimony about not pursuing a

15   search warrant in the circumstances that the officers found

16   themselves in is crazy.  And --

17         MR. MARTINEZ:  Your Honor, if I may.

18         THE COURT:  -- a mistake.

19         MR. MARTINEZ:  I can proffer to the Court, and

20   Sergeant Landsman had been permitted to testify on redirect,

21   we could have clarified that a bit.  I can tell the Court I

22   was up with these guys that night and I was working on a

23   tracker affidavit.  To the extent there was a delay here, it

24   was because of me and because I was hesitating.  I didn't want

25   to get evidence suppressed, and so I was telling these guys

1    don't go ahead with the exigent.  So the time that passed

2    between 4:00 and 5:00 o'clock when these guys called me and

3    said, hey, we think this is about to happen, that's me telling

4    them --

5          THE COURT:  You can't put yourself into the

6    equation, Mr. Martinez, and I'm not going to consider any of

7    that.  You're a prosecutor in the case.  You're not a witness.

8    My point is, I heard what I heard from the witness stand from

9    the witness about what his thinking was and his reasoning was.

10   You might have heard it too, and said no, he doesn't know

11   everything that was going on.  All I'm commenting on is the

12   explanation that was given here, and that explanation is

13   inadequate.

14         It's -- as it turns out, it's not going to hurt the

15   government in this case.  But it certainly could have, and it

16   could in the future.  The notion that it takes the telephone

17   company much longer to react to the issuance of a court order

18   and a court warrant than it does to a direct request claiming

19   exigent circumstances from the police is highly problematic.

20         It may not be the total picture.  I accept that,

21   Mr. Martinez.  There may be more to it, but you heard the

22   testimony that I heard.  And that's at least what the

23   sergeant's understanding was of why there was not much utility

24   in his mind in pursuing a warrant that night.  I know that

25   judges are on duty 24/7 in the city to accept warrant

1    applications.  And it's up to law enforcement and the

2    government to ensure that private companies that provide these

3    kinds of services are in a position to react to the issuance

4    of such warrants.

5            And there's no reason to believe that they aren't

6    and can't, given the fact that they evidently will react

7    instantaneously to a request that comes directly from law

8    enforcement.  The -- what I'm reacting badly to is the

9    suggestion that a court order won't get as prompt attention as

10   will a request from law enforcement where exigent

11   circumstances are claimed.  If there's more to the story than

12   that, then maybe you have nothing to worry about.  I'm ruling

13   in a case, and I'm ruling based on the information that's in

14   front of me.  I have found that the exigency that I found to

15   exist in this case was of sufficient duration and still in

16   effect, such that law enforcement getting to Pioneer Drive

17   fits within the scope of that exigency.

18           Now, once law enforcement is at Pioneer Drive,

19   they're going to stay there until they get this situation

20   sorted out.  And that includes a knock on the front door,

21   peering through the basement window to see someone who

22   resembles the defendant scurrying around.  The defendant then

23   coming to a window and potentially considering exiting the

24   building through that window, then having second thoughts.

25   And that's as far as we have gone with the story.

1        But those are my rulings to this point.  There -- I

2   will also rule that there -- it's without dispute that there

3   was a valid arrest warrant for this defendant at the time that

4   law enforcement was at the house.  I find that they had, from

5   the information that they had acquired, probable cause to

6   believe that this defendant was then inside of that house.

7   And given that, they technically didn't need a search warrant

8   to go in there.  They had a valid search warrant for someone

9   who they had probable cause to believe was inside a private

10  space, a home.  And they were entitled to go in there and go

11  after him.

12       So those are the rulings to this point in the

13  sequence.  Now, I understand there's a statement issue about

14  something that was allegedly made.  There's a factual dispute

15  about that.  It's 22 minutes before 6:00 o'clock in the

16  evening.  We're not in the position to take anymore evidence

17  this evening.

18       MR. MARTINEZ:  Your Honor, and I think based on the

19  Court's ruling so far, I don't think further testimony about

20  that statement is necessary to resolve this motion.

21       THE COURT:  Well, I think there's a -- well, I guess

22  there's a dispute as to whether the statement was made, but

23  that's a trial issue; right, Mr. Francomano?

24       MR. FRANCOMANO:  Your Honor, I would agree with

25  that.

1          THE COURT:  So any motion to suppress the statement

2     is denied now, because it would have been fruit of some prior

3     illegality under the -- under Mr. Francomano's theory that the

4     primary illegality is not found to have been an illegality.

5     So now you're down to a factual dispute about whether it even

6     happened.

7          MR. FRANCOMANO:  That's correct.  It's not a

8     constitutional issue, it's just --

9          THE COURT:  I understand.  So the motion to suppress

10    the statement, whatever number that is --

11          MR. FRANCOMANO:  There was no motion to suppress the

12    statement.  I was just talking about the statement in that

13    motion.

14          THE COURT:  Okay.  So we're done for today with this

15    exception.

16          Mr. Martinez, where are we in terms of the totality

17    of the motions, what have we got left to deal with tomorrow?

18          MR. MARTINEZ:  So, Your Honor, there are two --

19    three more motions that require the taking of testimony and

20    they will all be fairly brief.  Mr. McCants has filed a motion

21    to suppress the search of the vehicle outside of 5617.

22          THE COURT:  The Accord.

23          MR. MARTINEZ:  The K-9 officer is prepared to

24    testify that he ran the scan and it was positive.  It will

25    take a few minutes.

1          THE COURT:  Okay.

2          MR. MARTINEZ:  Mr. Harvey has filed a series of

3    motions challenging arrests and seizures of drug evidence from

4    him.  I think there are three separate arrests at issue.

5          THE COURT:  So we have officers or agents in

6    relation to those?

7          MR. MARTINEZ:  Correct, Your Honor.  I think there

8    are three law enforcement witnesses and they'll all be brief.

9    And finally, Mr. Bonds has challenged the seizure of a firearm

10   from his vehicle after a traffic stop in October 2013, and the

11   officer who conducted that stop is prepared to testify.  So in

12   total, I believe we're looking at five very brief witnesses.

13   I totally expect we ought to be able to cover them in two

14   hours or less.  And then every remaining motion after that, we

15   submit, can be decided on the papers based on the order.

16         THE COURT:  Legal argument only with the severance

17   motions, counsel, what's on your minds, is there anything

18   that's been skipped in this brief summary of what's left for

19   tomorrow?

20         MR. FRANCOMANO:  Your Honor, there was a motion that

21   I filed, a supplemental to the warrantless search of the house

22   of 5617 Pioneer Drive.

23         THE COURT:  The second search?

24         MR. FRANCOMANO:  Correct.

25         THE COURT:  The gun search, the search that

1     allegedly discovered the gun.

2              MR. FRANCOMANO:  No, actually, Your Honor, there was

3     a protective sweep.

4              THE COURT:  Yes, there's a protective sweep.

5              MR. FRANCOMANO:  Correct, after Mr. McCants was

6     arrested.

7              THE COURT:  Right.

8              MR. FRANCOMANO:  And that issue --

9              THE COURT:  They said they found something in plain

10    view.

11             MR. FRANCOMANO:  Correct.

12             THE COURT:  They say they then went and got a

13    warrant.

14             MR. FRANCOMANO:  Correct.

15             THE COURT:  They went back in and seized what they

16    found in plain view; drugs, paraphernalia, .40 caliber shells,

17    no gun.

18             MR. FRANCOMANO:  Correct.

19             THE COURT:  That's the end of that search.  Then

20    they claimed that they intercepted a communication of some

21    sort and that prompted them to submit another affidavit to

22    another judge to get a warrant to go back on -- well, they got

23    the warrant on the 8th and went back on the 9th.

24             MR. FRANCOMANO:  Went back on the 8th.

25             THE COURT:  Thought they actually executed on the

1    9th, but whatever.  Then they claim they found the gun in the

2    wall by accessing it through the little porthole in the sink

3    area.

4                MR. FRANCOMANO:  Correct.

5                THE COURT:  So what remains to be resolved is the --

6    the whole story of the protective sweep leading to a search

7    warrant, leading to another warrant, and whether or not there

8    was some illegality in there.

9                MR. FRANCOMANO:  Exactly, Your Honor.

10               THE COURT:  Okay.  So whose testimony is necessary

11   for that?

12               MR. FRANCOMANO:  I guess Detective Landsman, whoever

13   went in the house for the protective sweep.

14               MR. MARTINEZ:  The sergeant has testified as to why

15   he went in, what he was expecting, what the purpose of the

16   sweep was, and what he saw when he was in there.

17               THE COURT:  Yes, I did hear that testimony.  It

18   sounds like the government doesn't want to offer anything else

19   on it.  Do you want to offer anything on it?

20               MR. FRANCOMANO:  As to his testimony?

21               THE COURT:  Yes, do you want any more evidence in

22   before you argue on it?

23               MR. FRANCOMANO:  No, Your Honor.

24               THE COURT:  We're not going to argue it tonight, but

25   it could be the first order of business tomorrow morning.

1           MR. FRANCOMANO:  No, I don't need any more evidence

2     as to that.

3           THE COURT:  All right.  Tomorrow morning first thing

4     we will take up the question of the lawfulness of the

5     protective sweep after McCants had already been removed from

6     the house; why the officers go back in, what was their

7     justification for doing so, was that lawful?  That then

8     equipped them with certain information that they otherwise

9     wouldn't have had.  They put that into a search warrant

10    affidavit, got a search to go in, and actually seized what

11    they had previously seen.  And then how that relates to the

12    subsequent search, you can develop that as well in your

13    argument, but that's what we'll take up first thing in the

14    morning.

15          MR. FRANCOMANO:  Thank you, Your Honor.

16          THE COURT:  All right.  Thank you, Mr. Francomano.

17    Is that it, did we -- so with all that in mind, Mr. Martinez,

18    your projection for tomorrow, three to four hours of court

19    time?

20          MR. MARTINEZ:  That depends somewhat on how long

21    Your Honor wants to spend on legal argument.  But I think

22    that's fair.  If we make it through the witnesses efficiently,

23    I do think it's possible we can be done in four hours.

24          MS. HOFFMAN:  There are also motions to suppress

25    social media evidence and there are a couple other search

1    warrants that have been challenged.

2           THE COURT:  All right.  We'll still assume that

3    we've got all day tomorrow.  The Marshals should make that

4    assumption also.  Anything else we need to address this

5    evening on the government's side?

6           MR. MARTINEZ:  Not from our point of view.

7           THE COURT:  From defense counsel?

8           MR. DAVIS:  Nothing, Your Honor.

9           THE COURT:  The defendant's are remanded to the

10   custody of the Marshal.  Counsel are excused.  Court's in

11   recess.  Thank you.

```
1                          INDEX

2   Witness Name                                    Page

3   Special Agent Austin Sailor
```
```
4       Direct Examination By Ms. Hoffman......................... 19

5       Cross-examination By Mr. Bussard......................... 30

6   TFO Jonathan Hayden

7       Direct Examination By Mr. Martinez ...................... 61

8       Cross-examination By Mr. Davis ........................... 67

9   Detective Michael D. Glenn

10      Direct Examination By Mr. Martinez ...................... 73

11  Special Agent Lisa Christy

12      Examination By The Court ................................. 124

13  Joseph Landsman

14      Direct Examination By Mr. Martinez ...................... 126

15      Cross-examination By Mr. Francomano ..................... 171
```
```
16

17

18

19

20

21

22

23

24

25
```

< Dates >.
2/4/17 182:16.
April 11, 2011
  18:5.
April 26, 2013
  62:16, 74:4.
April 26th, 2013
  55:10.
April, 2013 20:1.
December 2016
  131:2.
December" 154:1.
December, december
  2016 131:5.
February 1st 141:11,
  144:2, 174:5.
February 1st, 2017
  178:1.
February 4, 2017
  198:15.
February 4th 120:22,
  144:19, 158:11,
  159:23, 172:25,
  174:1, 174:2,
  174:7, 174:11,
  182:25.
February 4th, 2016
  173:16.
February 4th, 2017
  148:13, 154:21,
  155:20, 174:3,
  189:11.
February 4th, 2017,
  11:20 160:13.
February 5th 167:4,
  167:12, 167:15,
  170:12, 188:25.
February 5th, 2017
  170:23.
February 7th
  168:14.
February 8th 168:16,
  188:5.
February 9th
  169:9.
February 9th, 2017
  168:20.
January 2017
  129:10.
January 26, 2017

175:3.
January 26th 119:12,
  120:22, 132:2,
  141:4.
July 19th, 2017
  190:16.
June 19th, 2017
  189:21.
May 2013 84:23,
  85:14.
May 2nd 112:6.
November 2016
  128:21.
October 16th, 2013
  8:20, 9:7.
October 2013
  207:10.
"21 138:25,
  176:15.
"21" 138:16.
$100 130:6.
$256 66:20.
$3 122:15.
'16 154:6.
.357 27:21, 42:3,
  43:25.
.40 156:24, 166:21,
  167:8, 169:1,
  169:4, 169:8,
  169:12, 208:16.
.45 138:20, 138:22,
  138:25, 176:16.
.
.
< 1 >.
1 32:9, 135:25,
  144:24, 177:8,
  177:9.
1. 21:15, 31:17,
  32:24, 34:19,
  36:11.
100 133:13, 181:6.
101 1:48, 2:47,
  133:14, 133:24,
  134:3.
101. 133:11,
  133:13.
10:45 139:17.
10:50 154:25, 155:1,
  155:20, 161:2,

186:17, 186:19,
  186:24.
10th 1:19, 130:25,
  140:21, 140:25.
11 134:5, 134:6.
11-minute 175:4.
1100 140:21.
11:01. 139:17.
11:05 157:17,
  158:10, 160:2,
  161:6.
11:20 160:1, 160:10,
  161:11, 201:25.
11:28 141:12.
11A 164:7.
11th 5:16, 20:23,
  50:25.
12 68:7, 68:8,
  83:19, 180:8.
124 212:23.
126 212:27.
12:48 132:3.
13 112:1, 158:2.
13. 92:23.
1321 132:8, 155:19,
  158:10, 160:6,
  162:20, 163:22,
  163:25.
13th 5:1, 141:1.
15 72:9, 157:21,
  158:10, 161:6,
  161:11, 162:11,
  163:4.
16 66:17, 139:17.
17 6:19.
171 212:29.
1716 55:9, 56:11,
  62:20, 62:25,
  74:9, 86:13.
1716. 76:16.
19 212:7.
193 5:23, 14:25,
  15:14, 17:7.
194 6:10.
194. 18:3.
1979. 98:18.
1:00 197:13.
1A 177:10, 177:11.
1B 178:17.
1C 34:24, 183:6.

1D 185:13.
1E 36:4, 188:14.
1F 36:10, 189:10.
1I 37:14.
1J 37:18.
1K 37:25.
.
.
< 2 >.
2 16:9, 34:10,
   85:18, 93:23,
   134:7, 135:25,
   146:15, 155:16,
   158:6, 188:20.
2/4 198:14.
2/5 187:17.
20 40:10, 62:8,
   174:25.
2000 127:14.
2003 74:2.
2005 20:7.
2011 20:16, 43:1.
2011. 5:16, 20:23,
   50:25.
2012 20:8.
2013 9:16, 123:11,
   123:23, 124:19,
   125:11.
2013. 112:6,
   122:25.
2015 127:16.
2016 74:2, 123:18,
   130:25, 140:21.
2016. 119:25,
   125:11, 154:2.
2017 1:19, 119:12,
   120:22, 132:2,
   141:4, 141:11,
   154:5, 158:11,
   167:12, 167:15.
2017. 119:9, 129:8,
   144:19.
20th 38:3, 38:12,
   46:5.
21 93:25, 138:23,
   138:25, 176:15,
   176:17.
212 86:8.
21201 1:49, 2:48.
22 205:15.

2200 91:16,
   105:21.
221 86:9, 122:6,
   125:20, 125:22,
   125:23, 125:24.
221. 85:13.
227 55:16, 85:5,
   85:7.
227. 55:8.
24/7 203:25.
243 86:8.
243. 86:12.
247 86:9.
24th 131:3.
26th 142:9, 142:19,
   142:21, 175:21.
27 73:25.
27th 142:9,
   142:21.
28th 146:4,
   174:20.
29th 20:1.
2:00 174:11.
2:03 144:19.
2:10 141:23.
2:12 198:15.
2:45 121:21,
   121:23.
2:45. 125:25,
   126:1.
2A 27:4.
2B 27:9.
.
.
< 3 >.
3 16:9, 135:25,
   161:10.
30 7:10, 161:11,
   212:9.
30th 20:7.
310-7094 112:22.
33rd 148:19.
3: 136:1.
3:45 138:8.
3A 64:22, 67:20,
   76:11.
3B 65:3, 77:1.
3C 65:7, 77:6.
3D 65:11, 77:11.
.

.
< 4 >.
4 16:11.
40 155:3, 155:8.
400 155:21, 156:5,
   161:16, 161:18,
   174:19.
41 198:1.
410 132:5, 150:2,
   152:25, 154:4,
   159:23, 163:20,
   167:9, 173:18,
   173:22.
43 134:6, 134:7.
443 112:22,
   131:13.
45 144:23.
454-9405 131:13.
4:00 203:2.
4:09 182:25, 183:5,
   199:5.
4:12 198:15, 199:6,
   199:24.
4:12. 183:19.
4:15 63:4, 67:13,
   68:4, 68:6, 68:20,
   70:3, 74:13, 80:3,
   83:18.
4:27 68:3.
4:30 121:23.
4:30. 122:2,
   158:22.
4:33 184:5, 199:6.
4th 1:48, 2:47,
   196:9, 197:12,
   200:12.
.
.
< 5 >.
5 16:11.
50 13:20, 15:23,
   18:24, 66:19.
51 159:25.
51-meter 159:24.
54 141:19.
5600 158:12, 162:3,
   162:9, 162:15.
5617 117:15, 163:23,
   164:1, 164:4,
   164:9, 167:1,

168:10, 168:21,
170:25, 206:21,
207:22.
5617. 192:17.
5:00 179:16, 199:7,
203:2.
5:01 184:24.
5:01. 185:1.
5th 82:24.
.
.
< 6 >.
6 16:11.
60 13:20.
600 112:6.
600,000 100:4.
61 212:13.
67 212:16.
694-1321 132:5,
150:2, 152:25,
159:23, 163:20,
167:9, 173:18,
173:22.
694-1321. 154:4.
6:00 205:15.
.
.
< 7 >.
7 68:4, 146:15.
7. 131:19.
7094 112:19, 113:2,
123:17.
73 212:19.
7: 92:24.
7:00 20:24, 50:25.
.
.
< 8 >.
8. 152:19.
8:45 139:4.
8:55. 139:4.
8th 208:23,
208:24.
.
.
< 9 >.
900 34:20.
906 21:13, 22:17,
31:7, 31:9, 32:11,
32:25, 33:3, 34:4,

36:14, 36:21,
37:6, 37:12,
40:13, 49:24.
906. 35:5.
9405 131:23.
98 133:11, 133:14,
133:24, 134:3.
9:00 185:9, 185:10,
186:2.
9A 154:17.
9B 157:15.
9C 159:19.
9mm 140:15, 140:16,
140:23.
9th 208:23, 209:1.
.
.
< A >.
a-ha 94:20.
A-u-s-t-i-n 19:12.
A. 1:27.
a.m. 68:20, 70:3,
74:13, 80:3.
ability 10:11,
83:25.
able 23:9, 24:5,
24:25, 26:18,
32:13, 83:24,
87:12, 96:7,
128:6, 129:1,
132:7, 136:17,
143:21, 149:17,
155:13, 158:20,
177:25, 207:13.
abnormal 39:2.
above 195:10.
Absolutely 4:21,
104:18, 180:13,
189:7.
abuse 73:17.
accept 5:7, 106:21,
191:22, 203:20,
203:25.
acceptable 134:21.
access 202:3.
accessing 209:2.
accessory 106:17.
accidental 48:15.
accidentally
26:23.

accommodated 4:20.
accompanied 3:13.
accomplish 109:23,
147:2, 147:16,
158:24.
Accord 140:9,
140:24, 206:22.
according 158:9,
177:17, 198:19.
Accordingly 84:18,
201:1.
account 51:20.
accredit 59:21.
accurate 8:11,
10:19, 34:19,
103:22, 107:18,
112:8.
acknowledge 78:20.
acknowledged 9:13,
75:23.
acknowledging 71:8,
76:22.
acquired 205:5.
across 46:18,
173:8.
act 147:19,
147:22.
acted 114:10.
action 88:5, 94:25,
194:16, 196:20.
actions 133:10,
194:23.
actively 123:21.
activities 59:18.
activity 52:14,
58:22, 60:11,
62:12, 116:2,
127:18.
acts 172:9, 172:10,
173:8, 184:19.
actual 12:25, 29:25,
115:9, 122:6,
160:13, 178:11.
Actually 64:5, 66:8,
69:12, 69:13,
77:3, 81:17,
82:18, 88:23,
91:8, 92:17,
106:3, 108:14,
115:21, 122:14,

123:4, 149:21,
171:19, 177:10,
183:19, 183:21,
185:12, 190:9,
200:24, 208:2,
208:25, 210:10.
ad 199:3.
add 5:19, 59:10,
59:25, 96:25.
addition 88:11.
additional 123:12,
134:10, 149:6,
162:19, 163:8,
165:24, 202:9.
Address 6:4, 7:6,
55:8, 84:21,
164:4, 164:5,
164:9, 174:19,
201:12, 201:14,
211:4.
addressed 66:21,
201:20.
adhere 102:9.
admissibility
53:21.
admissible 29:4,
29:7, 53:13, 54:4,
108:22.
admit 177:5.
admitted 10:24.
adopted 86:10.
Advanced 149:24,
150:4, 150:18,
151:5, 151:20,
162:23, 185:8,
185:19, 186:21.
advice 64:25, 65:4,
65:8, 65:12,
76:14.
advise 64:3.
advised 65:22, 66:9,
75:13, 75:14,
77:16, 78:19,
121:23.
advisement 67:16,
75:19, 75:20,
75:22, 75:23,
82:6.
Aerial 36:10.
affect 79:14.

affiant 58:25, 59:1,
59:6, 90:8.
affiants 58:14,
59:17, 59:22,
60:11, 62:23.
affidavit 57:8,
58:9, 58:11,
58:13, 59:3,
59:11, 59:15,
88:4, 90:7,
111:22, 115:23,
116:3, 122:21,
123:9, 150:13,
150:15, 150:22,
187:20, 187:23,
191:12, 202:23,
208:21, 210:10.
affidavits 107:25.
affirmative 82:4,
105:8.
affirmatively 81:12,
81:19.
afoot 51:1, 94:17.
African 12:15,
13:4.
afternoon 61:7,
61:18, 72:20,
126:4, 126:9,
126:24, 126:25,
144:20, 148:13,
171:24.
afterwards 105:19,
116:20.
age 14:4.
agencies 107:15,
109:23, 127:4.
agency 92:25,
124:21, 127:6.
Agent 3:10, 18:7,
18:8, 19:2, 19:6,
19:18, 19:24,
21:14, 22:11,
23:17, 25:7,
25:18, 30:8, 37:3,
37:23, 48:24,
50:12, 122:21,
123:9, 123:25,
124:3, 124:5,
125:1, 125:7,
125:16, 212:5,

212:21.
agents 11:4, 11:18,
207:5.
Ages 98:17.
ago 84:25, 100:7,
115:21.
agree 12:2, 17:9,
17:20, 32:16,
32:18, 34:6,
35:11, 64:18,
87:13, 89:6, 90:9,
90:12, 90:15,
97:19, 97:22,
107:3, 116:14,
117:22, 118:14,
120:6, 120:7,
165:18, 179:7,
181:7, 205:24.
agreed 77:3.
agreeing 6:11,
118:15.
agreement 32:14,
35:6, 118:5.
agrees 90:13.
ahead 7:12, 22:10,
82:16, 86:8,
107:3, 138:4,
159:1, 170:6,
203:1.
aid 194:20.
ain't 136:11, 146:6,
183:23.
air 95:4, 113:19.
airplane 99:21,
100:2.
akin 94:19.
al 1:10.
Alan 2:6, 4:6.
Alcohol 19:21,
62:2.
alert 154:24,
155:24, 157:17,
158:15, 159:25,
160:2, 161:2,
171:9, 171:10.
alerts 114:16,
154:14, 157:12,
157:20, 162:18,
163:10.
Alexis 8:12, 8:18,

17:13.
alleged 56:13,
   113:5, 116:16.
allegedly 178:5,
   205:14, 208:1.
alley 38:5, 56:16,
   57:25, 59:20,
   60:6.
allow 7:19,
   117:25.
allowed 195:11.
allowing 158:25.
alluding 107:13.
almost 9:17, 23:11,
   24:11, 59:16.
alone 51:20, 89:3.
already 26:3, 40:9,
   66:6, 79:1, 101:7,
   101:17, 134:7,
   141:7, 210:5.
alter 48:12.
altercation 21:9,
   40:19, 41:3,
   49:22, 49:24,
   51:14, 51:15,
   52:5.
alternative 22:15.
Although 9:12.
ambiguous 199:20,
   199:24.
ambivalence 81:5.
ambivalent 81:18.
Amendment 82:24,
   94:10, 102:19,
   106:8, 180:4.
AMERICA 1:5.
American 12:15,
   13:4.
ammunition 166:21,
   167:8.
among 16:21,
   200:11.
amount 33:18, 78:24,
   115:25.
amounted 108:10.
ample 58:11, 59:4.
analysis 57:18,
   98:16.
Angelique 8:13,
   8:15.

angle 27:10.
Anne 129:17,
   172:18.
announced 24:21.
answer 29:9, 41:20,
   64:14, 66:2,
   78:21, 79:6, 79:8,
   79:16, 82:11,
   82:16, 100:17,
   103:7, 105:7,
   190:8, 190:9,
   195:5.
answered 64:13,
   115:21.
answering 79:18.
anticipating
   149:12.
anticipation 4:25.
anybody 7:11, 48:16,
   87:11.
anyway 170:4.
apart 169:2.
apartment 197:15,
   198:1, 198:6,
   199:22.
apologies 5:25.
apologize 197:8.
apparatus 99:19.
apparent 200:15.
apparently 10:8,
   70:2, 82:11.
Appeals 85:2,
   189:22, 190:1,
   190:4, 190:6,
   190:17, 191:3,
   191:14, 191:20.
appear 14:8, 21:15,
   49:14, 57:1,
   58:4.
Appearances 2:1,
   3:11.
appeared 42:17,
   47:12, 47:24,
   48:3, 155:17,
   158:7.
appears 10:20,
   10:21, 37:7,
   37:24, 38:13.
appellate 104:9.
Apple 122:15.

application 89:18,
   105:19, 112:1,
   112:25, 113:10,
   123:10.
applications 107:25,
   204:1.
applied 181:15,
   195:3, 195:4.
apply 85:23, 98:17,
   102:12, 106:7,
   107:24.
appreciate 16:17,
   107:5.
appreciation
   83:12.
apprehend 179:22.
apprehension
   165:14.
approach 6:15,
   135:3.
approached 142:13,
   164:10.
approaching 95:11.
appropriate 21:7,
   105:5.
appropriately
   81:5.
approval 95:23,
   95:24, 97:1, 97:9,
   97:10, 98:25,
   100:10, 100:14,
   102:5, 108:6,
   115:6.
approved 95:21,
   97:2, 108:5.
Approximately 13:20,
   15:23, 24:7,
   24:13, 24:15,
   24:19, 33:1,
   33:24, 34:7, 38:3,
   63:2, 68:6, 68:9,
   68:21, 74:11,
   74:13, 132:3,
   141:11, 145:16,
   146:13, 155:23,
   158:10.
April 5:16, 20:23,
   50:25.
Aquilar-spinelli
   57:14, 59:8.

areas 35:9,
   174:22.
argue 49:8, 53:11,
   53:20, 179:15,
   209:22, 209:24.
argued 86:9,
   111:1.
arguing 87:19,
   115:5.
Argument 5:9, 7:23,
   10:9, 12:7, 12:8,
   13:6, 13:11, 15:5,
   15:15, 49:6, 54:2,
   78:13, 78:16,
   79:2, 83:15, 88:7,
   101:6, 108:7,
   115:17, 116:11,
   118:1, 134:1,
   193:7, 195:12,
   197:9, 200:1,
   200:7, 201:11,
   207:16, 210:13,
   210:21.
arguments 7:8,
   101:5.
arithmetic 68:10.
armed 23:21, 24:23,
   42:24, 47:17,
   50:13, 50:18,
   69:3, 69:11, 70:3,
   117:10, 142:12,
   142:17, 142:24,
   143:5, 157:7,
   166:5, 166:7,
   166:10, 178:13,
   196:3, 200:25.
around 6:9, 18:15,
   20:6, 22:18, 23:9,
   24:18, 27:15,
   38:5, 46:4, 46:12,
   48:4, 50:10,
   52:11, 59:19,
   78:18, 89:2,
   95:10, 96:8,
   96:20, 99:20,
   99:21, 100:22,
   100:23, 142:14,
   147:15, 151:22,
   170:7, 178:14,
   181:23, 182:1,

192:24, 204:22.
arranged 158:24.
arrangements
   159:7.
array 8:9, 8:15,
   8:22, 8:24, 9:3,
   9:6, 9:12, 11:20,
   11:23, 12:2,
   12:11, 12:13,
   12:23, 12:24,
   13:2, 15:25, 16:2,
   16:4, 16:13,
   16:18, 17:2.
arrays 6:17, 7:23,
   8:2, 8:4, 8:12,
   17:12.
arrest 5:15, 18:5,
   43:2, 44:17,
   49:10, 52:20,
   52:21, 52:22,
   53:10, 67:5,
   108:13, 108:15,
   109:6, 109:8,
   128:22, 129:1,
   157:9, 173:13,
   178:24, 179:22,
   180:13, 180:15,
   180:17, 205:3.
arrested 108:17,
   180:22, 181:4,
   196:13, 197:24,
   208:6.
arrests 207:3,
   207:4.
arrival 54:10.
arrive 26:5,
   125:12.
arrived 26:6, 26:10,
   26:13, 29:10,
   197:22.
artfully 116:4.
articulable 50:14,
   50:15, 52:14.
Articulate 102:19.
articulated
   115:16.
Arundel 129:17,
   172:18.
ascertained 202:8.
Asif 1:46, 2:45.

asks 78:22, 80:18.
aspect 97:23.
assault 196:11.
asserted 29:6,
   112:24.
asserting 71:12.
assigned 62:2.
assist 88:15, 92:7,
   109:13, 110:12.
assistance 51:22,
   183:11.
assisted 60:11,
   193:21.
associated 60:7,
   60:9.
associates 168:3.
assume 35:20, 35:23,
   36:14, 68:10,
   194:9, 211:2.
assumption 36:1,
   45:16, 211:4.
assumptions 199:10,
   199:12.
astronaut 73:6.
ATF 3:10, 18:7,
   19:23, 19:25,
   55:15, 61:3, 62:6,
   62:9, 73:22, 74:1,
   75:19, 123:21.
Athletic 37:4,
   37:5.
attach 99:8.
attached 89:20.
attack 10:1, 60:25,
   93:17.
attacking 55:25.
attempt 45:22.
attend 83:13.
attention 20:23,
   21:3, 39:7, 39:11,
   39:13, 40:23,
   62:15, 74:3,
   129:7, 132:2,
   141:11, 144:19,
   148:22, 152:12,
   153:5, 170:4,
   175:3, 204:9.
Attorney 73:14,
   86:11, 191:11.
attorneys 191:11.

Audio 132:14,
    136:20, 137:21,
    138:5, 139:5,
    139:24, 141:21,
    141:25, 143:14,
    145:2, 145:20,
    146:17, 183:17,
    184:3, 184:25.
AUSA 1:25, 1:27,
    3:9.
Austin 18:7, 19:6,
    19:12, 212:5.
authorities
    117:15.
authority 29:2,
    97:16, 97:17,
    101:9, 101:10,
    201:5.
authorization
    113:10, 131:7.
authorize 110:18,
    110:24.
authorized 88:5,
    88:10, 90:23,
    92:4, 95:12,
    95:16, 99:14,
    107:8, 107:11,
    107:15, 111:6,
    111:8, 114:8,
    116:10, 200:17.
authorizes 92:6,
    108:2.
authorizing 93:2,
    93:4, 107:20,
    110:11, 110:16,
    111:13.
automatic 41:11,
    41:12, 41:15,
    41:20, 41:24.
automobile 46:13.
available 144:1,
    192:14.
aware 5:21, 119:3,
    119:8, 167:15,
    182:22, 190:22,
    190:23.
away 18:19, 24:7,
    28:10, 45:23,
    46:6, 49:16,
    49:25, 96:23,

    103:25, 105:18,
    143:11.
.
.
.
< B >.
B. 1:33.
backed 33:19, 38:25,
    39:3, 181:25.
background 68:11.
backing 45:20.
backup 26:4, 26:6,
    26:13, 142:16,
    178:14.
bad 98:17.
badge 24:18, 46:10,
    46:12, 46:19,
    46:20.
badly 204:8.
bag 104:16, 164:16,
    164:19, 166:23,
    197:23, 197:25.
baggies 66:25.
baggy 47:19, 93:12,
    105:14.
Balance 66:17,
    66:19.
balances 102:7,
    103:12.
ball 5:25, 114:5.
ballistic 140:23,
    172:8.
ballistics 140:16,
    169:9, 169:11,
    169:12.
balloon 31:24,
    32:24.
Baltimore 1:20,
    1:49, 2:48, 12:6,
    12:7, 18:6, 20:2,
    23:21, 28:1,
    31:15, 35:9,
    42:23, 43:1,
    44:23, 46:14,
    48:2, 50:17,
    52:10, 55:15,
    57:2, 57:11, 62:1,
    62:21, 72:14,
    73:18, 74:9,
    74:15, 83:2, 91:6,
    99:20, 100:4,

    107:20, 118:23,
    127:2, 140:22,
    182:23, 185:23,
    189:11.
banc 100:19.
bangs 83:3.
bar 172:7.
Barclay 91:16,
    105:21.
bark 47:10.
Based 7:8, 45:16,
    50:15, 53:9,
    55:11, 57:20,
    58:25, 59:17,
    69:21, 82:20,
    89:12, 106:20,
    112:21, 125:14,
    130:8, 137:7,
    142:23, 150:18,
    151:19, 166:3,
    168:6, 168:9,
    171:10, 189:24,
    190:3, 204:13,
    205:18, 207:15.
basement 67:3,
    164:15, 164:16,
    164:17, 166:21,
    180:2, 204:21.
bases 54:4.
basic 98:18, 101:12,
    106:7.
Basically 20:20,
    28:8, 40:22,
    60:23, 71:9,
    77:21, 78:5,
    119:14.
Basis 9:20, 11:6,
    12:23, 13:7, 15:9,
    28:16, 55:5, 57:5,
    57:22, 58:5,
    58:20, 111:23,
    192:18.
batch 5:10.
bathroom 164:17,
    169:5.
batter 83:3.
bay 140:12.
bear 85:16.
beard 25:13.
bearded 12:15,

13:4.
bearing 120:8,
  120:10.
became 88:13, 118:6,
  119:1.
become 32:21,
  127:21, 167:15.
becomes 144:25.
bed 80:7.
bedrock 108:22.
bedroom 60:21, 66:5,
  66:16, 66:25,
  67:1, 78:5.
beeper 97:25,
  98:21.
beforehand 109:5.
began 5:20, 29:22,
  164:21, 185:8.
begin 5:1, 126:7,
  126:20, 139:3,
  150:7, 154:13,
  197:24, 200:20.
beginning 23:20,
  132:13, 135:6,
  135:11, 144:24.
begins 135:11,
  201:2.
behalf 3:19, 3:20,
  4:18.
behind 22:23, 23:7,
  40:24, 158:19,
  169:4.
behold 119:12.
belabor 113:14.
belief 112:7.
believed 24:22,
  42:23, 47:16,
  112:22, 153:16,
  166:3, 172:19,
  172:21, 174:7,
  174:14, 184:13,
  184:16, 184:17.
belonging 131:7.
below 185:22.
Bench 158:16,
  158:17, 159:10,
  178:18, 178:19,
  178:20, 193:13.
beneath 168:24,
  168:25.

beside 47:9, 51:18,
  60:6, 105:13.
besides 173:4.
Bess 156:14, 156:15,
  186:15.
best 36:5, 36:6,
  40:6, 40:18, 79:2,
  80:4, 201:7.
better 22:14, 32:2,
  51:21, 92:13,
  101:23, 102:1,
  177:25.
beyond 13:2, 98:1,
  195:10.
BGF 66:24, 112:12,
  119:11, 119:20,
  119:23, 120:2,
  120:8, 120:16,
  123:21, 128:5,
  128:13, 129:11,
  129:15, 129:17,
  129:20, 130:3,
  130:9, 130:13,
  130:15, 173:20.
Bgf-related
  118:25.
big 8:6, 34:25,
  46:18, 82:24,
  87:1, 100:2,
  138:7, 138:24,
  176:15.
bigger 31:22.
bike 145:13, 182:16,
  182:18, 182:20,
  199:16.
bikes 182:23.
bit 5:2, 16:15,
  18:24, 30:12,
  35:14, 36:13,
  37:19, 38:21,
  54:8, 67:25,
  202:21.
bitch 147:5.
Black 27:20, 36:10,
  50:17, 62:12,
  127:18, 153:21,
  164:16, 164:18,
  164:19, 166:23,
  173:23.
Blake 158:25.

blicky 138:12.
blinds 10:18.
block 33:24, 34:1,
  34:2, 34:4, 34:20,
  37:6, 38:25,
  69:13, 91:16,
  105:21, 112:6,
  140:21, 155:21,
  156:5, 158:12,
  161:16, 161:18,
  162:3, 162:9,
  162:15, 174:19,
  174:20.
blows 21:9.
blue 23:13, 25:3,
  25:9, 45:15,
  47:24, 48:3, 48:6,
  66:17, 66:23,
  101:18.
bodies 40:22.
Bonds 2:12, 3:7,
  4:18, 4:23,
  207:9.
book 8:23, 8:25,
  16:2, 66:23.
books 7:25, 13:10,
  13:13, 13:19,
  13:21, 14:5,
  14:10, 14:15,
  15:23.
Bottom 21:22, 32:5,
  135:25, 136:1,
  136:7, 136:9,
  185:22.
box 61:5, 72:18,
  143:25.
boy 138:7.
BPD 20:5, 20:10,
  62:7, 73:24,
  90:20, 113:13,
  126:8, 127:9,
  127:13, 141:7,
  154:13.
Brady 10:7.
brain 180:6.
brand 106:14.
brawl 21:12, 22:16,
  22:19, 23:1,
  23:8.
break 21:8, 51:14,

86:24, 112:3,
121:21, 125:25,
159:11.
Bredar 1:18.
Brentwood 161:4,
161:12, 161:17.
brief 56:20, 72:7,
159:14, 206:20,
207:8, 207:12,
207:18.
briefest 18:11.
briefly 30:10,
66:14, 72:13.
bright 49:23.
Bring 7:21, 19:1,
61:4, 72:17,
145:15.
Brittany 63:17,
74:25, 77:8.
bro 136:10,
136:11.
broad 83:15,
97:10.
broadcast 40:1.
broadcasted 22:20,
26:1.
Broader 104:2.
broadly 82:22.
broke 159:18,
202:6.
broken 197:21,
198:9.
brought 9:17, 39:17,
59:8, 63:11,
70:23.
Brown 1:35, 3:6,
3:19, 3:21, 3:23,
9:9, 55:8, 55:12,
58:14, 58:21,
60:19, 63:1,
63:16, 63:18,
63:25, 64:9,
64:19, 65:2, 66:2,
66:7, 66:12,
66:16, 66:21,
67:5, 67:22,
69:16, 71:4,
71:16, 72:3,
74:25, 75:2, 75:9,
75:24, 76:2,

76:18, 76:22,
78:2, 80:2, 83:21,
84:22, 85:15,
85:22, 89:7,
89:16, 91:24,
105:18, 112:20,
115:18, 116:12,
123:18.
buffer 98:5,
111:17.
building 37:3,
204:24.
builds 111:5.
bulge 26:16, 51:7,
51:8.
bulk 44:14.
bumper 98:21,
99:9.
bunch 113:25,
196:24.
Bureau 19:21, 62:2,
127:7.
burial 54:21.
burning 194:7.
Burns 176:20,
177:19.
bushman 130:18.
bushmen 130:7.
bushmen. 130:14.
business 82:10,
90:6, 209:25.
busy 94:4.
butt 27:13.
buying 59:25.
buys 56:13, 56:25,
57:23.
bypass 181:23.
.
.
< C >.
C-h-r-i-s-t-y
124:12.
C. 2:14.
cabinet 196:16,
196:17, 196:18.
cake 59:10.
calf 26:16, 26:21,
44:14, 44:15.
caliber 138:21,
139:1, 156:24,

166:21, 167:8,
169:1, 169:4,
169:8, 169:12,
176:16, 208:16.
called 19:7, 61:10,
72:22, 112:16,
124:6, 126:12,
137:16, 149:6,
176:17, 178:13,
196:9, 197:17,
197:19, 203:2.
calling 97:12,
165:8.
calls 112:19,
119:13, 120:21,
120:23, 128:15,
130:5, 131:17,
131:22, 132:1,
133:11, 134:2,
134:3, 134:11,
148:1, 148:12,
148:16, 148:23,
166:3, 167:25,
168:2, 168:9,
172:2, 172:25,
173:1, 173:3,
173:5, 173:19,
173:21, 175:7,
181:11, 183:25,
195:17, 195:18,
195:21, 195:22,
196:24, 198:16,
198:19, 198:21,
199:2, 199:3,
199:12, 199:23,
200:9, 201:24.
calm 83:4.
camera 101:19,
101:23, 171:4.
cameras 101:18,
101:25.
candor 89:20.
cannabis 93:13.
capable 100:9.
capacity 151:13.
caps 66:18, 66:19.
capsules 166:24.
capture 132:3,
141:13, 144:20.
car 46:13, 46:20,

51:13, 98:22,
99:8, 104:12,
140:4, 141:6,
141:8, 142:16,
143:11, 171:2,
171:11, 197:23.
Caraballo 196:4.
care 116:12,
197:13.
careful 81:22.
carefully 200:5.
carried 43:6,
43:8.
carriers 107:9.
carry 201:10.
carrying 45:17,
49:22, 50:9, 52:9,
52:10, 69:8, 89:2,
96:8, 104:15.
cars 38:24,
148:17.
Carter 63:17, 64:19,
65:9, 71:14,
74:25, 77:8.
cases 20:20, 50:19,
194:15, 194:19,
195:25, 196:1.
casings 27:24,
140:19, 140:22,
156:20, 169:13.
catching 24:4.
category 116:12,
198:17.
caught 21:3.
cause 48:15, 52:20,
58:9, 58:11,
58:21, 58:25,
59:4, 59:7, 59:17,
59:24, 60:2, 60:4,
60:8, 60:13, 88:1,
92:12, 108:10,
108:12, 108:20,
108:23, 109:12,
111:22, 112:1,
112:5, 112:24,
113:2, 113:6,
113:7, 113:23,
114:7, 115:25,
122:12, 180:18,
188:12, 188:20,

189:6, 197:3,
205:5, 205:9.
CCTV 101:17.
cellular 109:25.
Cemetery 18:16,
31:1, 31:2, 31:23,
35:12, 38:8.
center 34:12.
central 180:5.
certain 130:7,
130:19, 131:22,
135:8, 198:25,
210:8.
Certainly 7:18,
16:21, 54:13,
60:1, 79:1, 83:1,
83:4, 85:17,
103:15, 106:10,
114:9, 152:4,
201:25, 203:15.
certainty 202:5.
cetera 11:9, 90:21,
191:18.
challenge 8:17, 9:5,
9:6, 55:10.
challenged 8:12,
52:15, 207:9,
211:1.
challenging 207:3.
chambers 89:22.
chance 6:24,
12:18.
change 92:18, 101:3,
162:14.
changed 84:5.
chaotic 40:21.
characterization
80:4.
characterize 88:5,
132:25, 191:9.
characterized
80:23.
charged 123:22,
124:16, 128:19.
charges 44:20.
check 146:5.
checked 146:23.
Checks 102:7,
103:12.
Chief 100:6,

117:1.
chin 63:20.
choreographer
17:24.
chose 82:16.
Christian 54:21.
Christina 1:27,
3:9.
Christine 1:46,
2:45.
Christopher 1:39,
3:18, 8:12,
17:13.
Christy 3:10,
122:21, 123:9,
123:25, 124:3,
124:5, 124:11,
124:15, 125:2,
125:16, 212:21.
chunks 86:25.
church 98:22.
circle 21:24, 23:12,
24:11, 27:15,
34:8.
circling 148:17.
Circuit 100:18,
101:4, 196:9,
197:13.
circumstance 14:20,
81:22, 81:25,
200:24.
circumstances 10:4,
57:18, 78:25,
79:21, 80:16,
80:22, 80:24,
82:13, 82:16,
83:13, 84:5, 84:9,
84:14, 89:13,
114:9, 117:8,
117:9, 117:20,
117:24, 151:19,
152:13, 153:17,
157:1, 180:11,
181:13, 185:7,
190:8, 194:4,
194:13, 194:16,
195:4, 195:16,
196:8, 196:21,
200:15, 200:19,
201:5, 201:11,

201:22, 202:15,
203:19, 204:11.
Cirillo 112:1,
112:25, 113:10,
113:12, 123:11.
cited 195:25.
citizens 49:11.
City 12:7, 20:2,
23:21, 28:1,
42:23, 43:1,
44:23, 46:14,
48:2, 50:17, 57:2,
62:1, 62:5, 62:21,
74:9, 74:15,
101:18, 140:8,
182:23, 197:12,
203:25.
civil 103:9.
claim 47:23, 78:24,
117:9, 209:1.
claimed 10:4,
123:18, 204:11,
208:20.
claiming 203:18.
clarification
85:10.
clarified 191:5,
202:21.
clarify 108:4,
161:1.
clarity 180:1.
Clark 149:25,
152:21, 153:8,
153:10, 153:13,
154:10, 162:23,
163:14, 163:17,
163:18, 163:22,
163:25, 185:25,
192:14, 192:22.
clause 92:9,
92:11.
clear 32:21, 37:2,
49:15, 66:18,
102:2, 106:12,
107:6, 113:22,
173:2, 183:16,
195:16.
cleared 63:11.
clearest 34:21.
Clearly 47:15,

52:20, 54:7,
54:17, 55:20,
60:9, 80:16,
102:1, 107:9,
199:9.
CLERK 19:3, 19:4,
19:10, 19:14,
22:7, 61:5, 61:7,
61:13, 61:17,
72:19, 72:20,
72:25, 73:2,
124:9, 126:9,
126:15, 126:19.
clerks 85:2.
clever 92:15.
click 155:13, 158:3,
160:5.
clicked 155:17,
158:7.
clicking 162:7.
client 8:8, 11:18,
12:14, 12:19,
14:3, 14:13, 15:8,
15:24, 16:8,
16:19, 99:25.
climate 84:15.
clip 147:12.
close 36:13, 59:5,
99:13, 109:17,
155:7.
closely 52:8.
closer 34:12.
closest 34:11.
closet 66:25,
164:17.
clothes 25:7,
39:19.
clothing 48:1,
51:8.
Club 37:4, 37:5.
clutching 142:24,
178:5, 178:6.
co-conspirator
112:13.
co-defendants
190:20.
coat 46:17.
cocked 48:13.
Code 93:25.
coded 199:14.

coerced 80:22.
coercive 82:23.
coercively 78:16.
Cokebury 112:6.
colleagues 154:13.
collected 27:25,
28:2.
colloquy 8:21.
colored 36:20.
Columbia 98:7.
combined 138:20,
187:4.
comes 4:24, 17:25,
93:13, 93:15,
101:13, 117:7,
160:11, 173:7,
204:7.
comfortable
171:20.
coming 23:6, 26:3,
39:10, 96:12,
104:21, 122:3,
131:15, 155:6,
160:14, 164:22,
204:23.
comment 53:11.
commenting 203:11.
commit 96:23, 148:3,
149:21.
committed 11:3,
194:18, 195:1,
198:20.
committing 119:3.
common 48:3, 52:9.
commonly 16:5.
communicate 6:24,
151:13, 153:13.
communicated
149:24.
communicating 97:21,
146:1, 153:1.
communication
173:18, 208:20.
communications
103:16, 107:9,
108:1.
communications.
93:2.
companies 102:16,
204:2.

company 91:13,
91:16, 95:25,
97:5, 150:7,
150:20, 151:1,
151:14, 151:18,
151:24, 152:6,
153:14, 154:23,
157:21, 186:1,
187:5, 187:10,
187:13, 203:17.
comparing 96:22.
complain 104:1.
complaining 110:7.
complaint 56:21,
82:22.
complete 187:3.
completed 17:13,
67:4, 190:11.
completely 53:4,
59:11, 96:5,
99:18.
compliant 26:1,
53:4.
complicated 106:7.
complied 51:5.
complies 50:2.
Complying. 27:16,
34:9.
components 85:7,
85:8, 112:4.
concede 120:11,
193:3.
conceding 120:13.
concerned 84:17,
117:8, 149:20,
165:24.
conclude 196:21,
200:23, 201:12.
concludes 114:10.
condition 27:1.
conduct 51:4,
59:22.
conducted 8:7,
149:9, 149:15,
171:2, 192:12,
207:11.
conducting 149:11,
166:17, 166:25.
conference 158:17,
173:16, 178:19.

confidential 57:22,
58:12, 58:24,
59:2, 112:15,
189:13, 189:15.
confined 104:13.
confirm 17:11,
199:23, 201:18.
confronted 52:15.
conjunction 6:2.
conjure 80:2.
connection 5:22,
109:12, 113:3,
113:24, 114:24,
116:1, 128:20.
connections
119:24.
consider 13:13,
150:9, 203:6.
consideration 6:3.
considered 200:5,
200:6, 200:10.
considering
204:23.
consistent 51:17.
constitution 53:5,
84:17.
constitutional 10:1,
11:19, 99:16,
104:5, 180:1,
198:24, 206:8.
constitutionally
15:10.
consultation
200:11.
Cont'd 2:1.
contact 90:20, 91:7,
163:13, 165:8,
165:11, 193:8.
contain 113:3,
131:22.
contains 131:16,
133:15.
contend 14:16,
87:25.
contending 12:9,
15:21.
content 97:17,
103:15, 133:5.
contents 120:23,
122:23, 123:4,

133:8.
context 84:16,
84:17, 111:11,
118:22, 143:3,
176:11, 176:12,
182:21, 191:14.
continue 75:10,
121:25, 122:1,
137:24, 157:11,
159:17, 162:11,
163:6, 181:18,
182:13, 197:10,
202:8.
continued 23:2,
24:11, 51:23,
130:12, 143:19,
197:6, 201:16.
continuing 123:2,
123:7, 123:13,
124:22, 125:11.
continuously
124:15.
contraband 114:21.
Control 33:9, 33:15,
33:22, 38:20,
40:11, 122:20.
controlled 56:25,
57:23.
conversation 112:16,
138:1, 141:13,
143:3, 143:19,
144:21.
conversations 69:21,
129:25, 130:3,
133:16, 147:22,
153:2, 167:22,
167:23, 167:24,
168:6.
convicted 98:12.
coordinated
172:17.
coordinates 155:10,
157:24.
copy 31:18, 89:21,
89:23.
corner 11:23, 57:11,
142:14, 147:15.
Cornish 8:13,
17:18.
correctly 21:22,

169:6.
correlate 161:19.
correspondence
    5:3.
corridor 119:24,
    130:22, 148:18,
    148:23, 149:5.
corroborated 58:4,
    58:12, 59:1.
Counsel 3:9, 35:7,
    63:19, 67:19,
    85:10, 118:8,
    122:2, 126:1,
    158:16, 159:3,
    178:18, 207:17,
    211:7, 211:10.
County 12:7, 95:13,
    129:17, 172:18.
couple 44:18,
    141:10, 159:9,
    187:4, 210:25.
course 52:22, 52:25,
    90:6, 93:11,
    128:4, 128:13,
    153:20, 166:14,
    180:4, 200:13.
court. 182:12.
courtroom 25:2,
    48:25, 63:18,
    75:2, 127:25,
    135:1.
Courts 104:9,
    106:6.
cover 110:17,
    111:10, 113:14,
    159:2, 185:18,
    207:13.
covered 201:22.
covering 148:18.
covers 113:6.
crazy 202:16.
created 105:3.
credibility 9:24,
    11:13, 57:3,
    169:24.
credible 11:9,
    54:6.
Crime 20:12, 20:14,
    20:17, 20:18,
    28:1, 50:20,

50:21, 51:1,
    94:17, 109:14,
    140:12, 140:20,
    169:14, 194:17,
    198:5, 198:12,
    198:17, 198:20,
    198:22.
crimes 20:21, 96:23,
    119:2.
CRIMINAL 1:9, 3:5,
    52:14, 62:12,
    104:3, 116:2,
    127:18, 189:1,
    189:4.
criteria 194:14.
critical 119:15,
    119:16, 125:12.
criticism 83:11.
Cross 31:9, 31:13,
    32:5, 32:13, 33:2,
    35:2, 36:21, 67:9,
    131:1, 158:13.
Cross-examination
    30:5, 30:6, 67:11,
    171:22, 212:9,
    212:15, 212:29.
crossfire 69:14.
cues 18:25.
cuffs 69:19, 69:24,
    70:3.
curly 75:4.
currently 18:7,
    19:20, 19:21,
    62:1, 73:14,
    135:11, 161:10.
Curtain 140:21,
    140:25.
curve 5:25.
custodial 54:17.
custody 54:17,
    54:23, 72:8,
    129:1, 140:11,
    141:2, 165:21,
    179:6, 211:10.
cut 25:13, 26:21,
    27:6, 50:4.
cutting 182:7.
.
.
.
< D >.

D-i-g-g-a 128:12.
D-i-g-g-e-r
    128:12.
D. 72:21, 73:4,
    76:19, 77:5,
    77:14, 212:17.
damn 183:23.
danger 195:19.
dangerous 117:10.
Dark 98:17.
data 87:21, 92:8,
    93:1, 150:7,
    151:2, 153:14,
    154:14, 154:21,
    155:6, 156:5,
    159:22, 160:10,
    186:23.
date 152:23.
daughter 63:17.
David 190:19.
day 9:1, 108:13,
    123:18, 160:17,
    168:18, 172:23,
    183:23, 184:5,
    184:24, 200:10,
    200:13, 200:14,
    211:3.
days 6:9, 141:10,
    144:18.
daytime 50:25.
DD. 177:15.
deal 56:9, 157:23,
    186:9, 206:17.
dealing 48:14, 60:9,
    113:15, 195:22.
deals 56:24.
Deandre 119:11,
    129:11, 129:16,
    130:8, 130:23,
    136:23, 137:2,
    137:16, 140:9,
    140:10, 140:24,
    140:25, 141:1,
    142:3, 144:11,
    145:5, 145:23,
    146:20, 148:7,
    149:7, 153:2,
    154:7, 172:7,
    173:18, 174:23,
    184:16.

debating 115:20.
December 20:7,
    119:25, 130:25,
    140:21, 140:25,
    141:1, 154:5,
    172:24.
decide 5:9, 7:8,
    58:24, 95:18,
    170:6.
decided 6:5, 55:11,
    55:24, 92:13,
    151:8, 207:15.
decision 96:14,
    96:16.
decisions 51:19.
declined 82:8.
defective 15:10.
defendants 72:8,
    126:1, 159:15.
Defense 5:22, 6:7,
    32:9, 34:19,
    34:24, 35:7, 36:4,
    37:14, 120:5,
    177:8, 178:17,
    185:13, 188:14,
    189:10, 211:7.
deficiency 68:10.
deficient 13:25.
definitely 197:19,
    198:8.
degree 57:3.
Delaware 181:24.
delay 122:16,
    202:23.
deliberately
    191:18.
delivered 28:4,
    83:15.
demonstrate 41:19,
    58:9.
demonstrated
    111:22.
demonstrating
    23:21.
denials 81:6.
Denied 10:10, 10:11,
    13:7, 14:24,
    15:12, 17:12,
    17:22, 53:10,
    55:5, 60:15,

82:21, 84:19,
    116:11, 117:3,
    125:24, 206:2.
Department 20:3,
    46:15, 57:12,
    62:1, 73:19, 91:6,
    107:20, 118:23,
    127:2, 151:12,
    152:14, 189:12.
Depending 192:7.
depends 210:20.
depicted 15:24,
    16:8.
depiction 16:20,
    34:19, 35:15,
    35:23, 75:6.
depicts 35:8.
deploying 200:19.
Deputized 73:21,
    74:2, 119:9.
describe 25:7,
    30:12, 36:19,
    100:24, 142:11,
    162:22.
described 53:1,
    80:1, 118:7,
    119:18, 151:20,
    168:23, 176:15.
describing 113:16,
    138:23, 142:11,
    164:11, 167:22,
    168:3.
description 14:2,
    40:25, 59:12,
    107:19, 113:21,
    153:16.
designated 129:5.
designed 54:22,
    83:5.
Despite 111:9,
    160:22.
destroyed 170:1.
destruction 194:20,
    196:3.
detail 30:12,
    120:24.
detailed 59:12.
detect 91:3, 95:5,
    97:17, 110:13,
    179:16.

detected 93:18,
    96:11, 99:18,
    102:21, 105:11,
    115:19.
detecting 100:3.
detectives 6:20,
    6:23, 10:16,
    10:22, 29:14,
    153:21.
detector 88:12,
    91:20, 96:5,
    106:16.
detects 95:9.
determination
    108:23, 194:8.
determine 74:20,
    107:17, 113:20,
    128:6, 163:22,
    166:6.
determined 105:4.
determining
    193:22.
develop 210:12.
developed 200:13,
    200:22, 201:23.
developing 51:24.
development
    123:20.
device 33:9, 33:15,
    33:22, 35:17,
    38:20, 40:11,
    88:10, 89:1,
    91:17, 91:20,
    93:18, 94:19,
    95:5, 95:13,
    95:15, 95:18,
    96:17, 99:13,
    100:1, 100:3,
    102:21, 104:16,
    105:20, 106:13,
    106:15, 106:19,
    108:6, 109:25,
    114:3, 115:1,
    115:7.
device. 107:18.
devices 88:20, 96:2,
    98:3, 102:17,
    103:22, 105:11,
    105:22, 110:11.
DI 177:15.

dialed 97:12.
dice 136:2, 175:22,
  175:24, 175:25,
  176:2, 176:4,
  176:12, 176:13,
  176:14, 176:17,
  176:22.
die 197:17,
  199:19.
difference 49:25,
  77:2, 119:17,
  160:15.
differences 16:21.
different 11:2,
  11:8, 16:15,
  16:22, 20:13,
  49:13, 57:9,
  58:15, 80:20,
  80:23, 82:5,
  82:19, 87:15,
  88:8, 89:9, 89:10,
  106:14, 106:15,
  113:25, 114:6,
  115:11, 174:22,
  177:24, 187:4,
  194:15.
difficult 141:20,
  141:23.
Digga 128:10,
  136:25, 137:4,
  137:8, 137:10,
  173:22, 174:4,
  189:14, 189:15.
digital 91:22,
  96:12, 96:22,
  104:24, 111:2.
dip 23:16, 23:17,
  42:20, 43:7,
  43:13, 43:16,
  44:7, 45:25,
  52:9.
Direct 19:16, 40:7,
  61:20, 62:15,
  73:9, 74:3,
  126:22, 129:7,
  132:2, 141:11,
  144:19, 153:4,
  167:21, 175:3,
  203:18, 212:7,
  212:13, 212:19,

212:27.
directed 54:14,
  54:15, 113:7,
  117:3.
directing 29:12.
direction 23:6,
  23:23, 26:4,
  52:3.
directly 22:17,
  22:18, 204:7.
dirt 145:13, 182:16,
  182:18, 182:20,
  182:22, 199:16.
disagree 179:24.
disagreements 8:6.
discarded 164:19.
discharge 48:15.
discharged 41:13.
disclaimed 9:23.
disclose 115:25.
discover 166:15.
discovered 125:18,
  198:9, 208:1.
discovery 90:21.
discrepancy
  160:23.
discretion 93:9,
  104:25.
discussed 130:5,
  130:6, 142:15,
  145:11, 146:22,
  150:1, 173:19.
discussing 133:10.
discussion 54:6,
  100:8, 130:9,
  138:6, 138:10,
  139:6, 139:21,
  142:13, 143:6,
  145:25, 146:25,
  174:5, 176:2.
discussions 148:9,
  157:4, 157:5.
disk 131:16,
  131:19.
dismantled 169:1.
dispense 200:17.
dispersed 149:1.
display 16:22.
displayed 8:4, 13:1,
  13:18, 16:24,

46:10, 46:19,
  47:15.
displaying 12:11.
displays 13:3.
dispose 82:19.
disposed 17:14,
  17:19.
dispute 94:1,
  116:13, 117:7,
  117:19, 118:5,
  118:7, 120:3,
  121:3, 205:2,
  205:14, 205:22,
  206:5.
disputes 87:1,
  192:15.
disputing 144:9.
disrupt 184:19,
  184:22, 186:13.
dissipated 83:23,
  84:15, 195:17,
  199:6.
distinct 117:7.
distinction 99:23,
  123:9.
distinguish 17:1,
  81:22.
distinguishable
  49:13.
distinguishing
  49:17.
District 1:1, 1:2,
  20:11, 29:21,
  93:22, 93:24,
  98:7, 148:20,
  148:21.
districts 148:20.
disturb 55:22.
divided 40:23,
  50:19.
divider 34:11.
Division 20:13.
DNA 27:18.
docketed 5:7.
document 122:6,
  135:9, 141:18,
  150:6, 171:4,
  185:21, 185:24,
  186:5.
documented 97:14.

documents 175:19.
dog 93:14, 93:15,
 93:16, 93:19,
 94:4, 94:7, 94:12,
 95:5, 104:19,
 105:13, 114:13,
 114:15, 114:16.
dogs 94:14, 96:21,
 96:22.
doing 22:8, 24:11,
 81:24, 97:9,
 104:7, 110:23,
 121:9, 153:12,
 178:23, 201:10,
 210:7.
doll 66:20.
domestic 196:10.
done 41:14, 101:7,
 105:5, 140:16,
 141:3, 163:17,
 206:14, 210:23.
door 24:20, 68:25,
 74:23, 164:6,
 164:10, 164:13,
 204:20.
doors 80:5, 83:3.
double 10:18.
downstairs 74:22.
drafted 5:5, 111:9,
 116:4.
dragged 80:7.
dramatic 83:5,
 83:13.
dramatically 84:5.
draw 20:23, 100:5.
drawing 39:11.
drawn 39:7, 46:21,
 50:1, 69:5,
 99:23.
drew 24:23, 25:19,
 39:13.
Drive 117:15,
 143:11, 158:12,
 162:3, 162:9,
 162:15, 163:23,
 164:1, 164:4,
 164:9, 167:1,
 168:11, 168:21,
 170:25, 175:12,
 179:21, 182:4,

201:12, 201:17,
 201:21, 202:1,
 202:3, 204:16,
 204:18, 207:22.
driveway 170:25,
 171:5.
dropped 92:12.
Drug 43:2, 43:4,
 58:15, 58:17,
 58:19, 58:21,
 58:22, 60:5, 60:9,
 60:13, 166:23,
 167:9, 184:9,
 185:3, 186:9,
 186:10, 207:3.
drugs 9:14, 9:15,
 10:21, 11:1, 43:7,
 58:1, 58:2, 60:1,
 78:24, 130:24,
 140:15, 141:7,
 171:9, 184:15,
 184:18, 184:21,
 184:23, 186:11,
 195:22, 198:16,
 198:21, 208:16.
Due 39:3, 89:10.
duly 19:7, 61:10,
 72:22, 124:6,
 126:12.
duper 99:21.
duplication 107:16,
 109:23, 113:16,
 114:3.
duration 204:15.
During 10:24,
 124:22, 128:13,
 130:5, 138:7,
 142:4, 143:15,
 145:6, 146:22,
 148:8, 153:20,
 157:5, 166:14.
duty 20:24, 51:12,
 62:16, 74:4,
 152:4, 203:25.
dwelling 22:18,
 77:23.
.
.
< E >.
earlier 116:16,

154:8, 200:12.
Early 43:11, 62:15,
 74:3, 119:8,
 167:4, 174:8,
 174:9, 200:12.
East 18:15, 21:2,
 21:5, 21:13,
 21:23, 22:17,
 23:14, 30:15,
 30:18, 31:7, 33:6,
 34:20, 34:25,
 36:24, 38:15,
 40:13, 45:22,
 140:22, 155:21,
 156:6, 161:16,
 161:18, 174:20.
Eastern 20:13,
 29:21, 148:20.
ECF 5:23.
ECI 81:23.
ECU 122:21.
educational 68:11.
effect 22:21, 24:21,
 29:17, 47:6,
 52:20, 60:20,
 122:22, 204:16.
effective 81:20.
effectively 82:17,
 82:23.
effects 99:3.
efficiently
 210:22.
efforts 81:1,
 162:19, 162:22,
 201:7.
Eight 180:8.
either 10:6, 59:16,
 75:6, 118:18,
 166:8, 190:24.
elapsed 202:11.
Elder 73:17.
electronic 95:5,
 108:1.
element 14:25,
 15:22, 17:3,
 125:20, 125:22,
 125:23, 125:24.
elements 134:15.
elicit 54:23.
elicited 78:16.

Ellis 196:5.
emerged 200:13.
emergency 195:19.
eminent 195:5.
emits 95:2.
emitting 99:11,
    104:16, 104:23,
    105:11, 111:2.
employ 107:15.
Employed 19:20,
    19:21, 61:25,
    62:1, 73:14,
    73:18.
empty 66:23,
    66:25.
emptying 94:20.
en 100:19.
encounter 49:18,
    53:2, 179:5,
    179:8.
encountered 43:25,
    45:10, 46:4,
    69:16.
encountering
    43:24.
encounters 49:11,
    49:25.
end 5:6, 20:25,
    136:24, 139:21,
    144:13, 174:19,
    181:18, 208:19.
endangered 83:8.
enforcement 6:6,
    7:1, 61:24, 65:14,
    83:8, 92:17, 93:9,
    96:9, 100:13,
    100:15, 102:6,
    102:13, 103:6,
    104:25, 105:25,
    111:14, 111:18,
    112:7, 127:3,
    128:25, 129:15,
    129:21, 132:7,
    155:25, 162:19,
    165:8, 166:8,
    168:7, 169:24,
    171:10, 194:23,
    196:13, 200:16,
    201:12, 202:2,
    204:1, 204:8,

204:10, 204:16,
    204:18, 205:4,
    207:8.
engaged 11:17,
    58:21.
engaging 58:15.
Engel 196:9.
enough 6:19, 7:19,
    44:10, 83:22,
    111:23, 121:14,
    169:23, 182:3,
    195:15.
ensure 204:2.
ensures 10:18.
entails 114:3.
enter 63:7, 68:23,
    69:1, 69:2, 74:17,
    74:18, 83:2,
    179:21.
Entered 57:8, 63:9,
    63:15, 63:24,
    64:2, 67:13, 68:4,
    68:15, 68:16,
    69:8, 69:22,
    74:20, 74:22,
    75:11, 115:22,
    166:9.
entering 66:8, 80:2,
    83:5.
entire 31:2, 178:25,
    188:13.
entirely 53:3.
entirety 145:19.
entitled 10:3, 13:5,
    59:20, 82:15,
    83:10, 93:20,
    104:18, 179:5,
    205:10.
entrance 164:5.
entries 83:13.
entry 57:1, 60:21,
    63:5, 63:6, 67:15,
    69:14, 69:24,
    74:14, 74:15,
    78:17, 79:25,
    83:18.
environment 84:16.
Enzinna 1:31, 3:11,
    3:12.
equation 79:24,

203:6.
equipment 95:16.
equipped 210:8.
error 86:12.
errors 68:12.
erupts 11:15.
especially 16:24,
    43:1, 50:17,
    116:3.
Esquire 1:31, 1:33,
    1:37, 1:39, 1:43,
    2:6, 2:10, 2:14.
essentially 30:17,
    30:23, 36:11.
establish 89:18,
    108:12.
established
    120:19.
establishing
    109:2.
estimates 51:16.
et 1:10, 11:9,
    90:21, 191:18.
evaluated 194:10.
evasive 51:4.
evening 160:20,
    170:12, 193:24,
    201:23, 205:16,
    205:17, 211:5.
event 51:18, 115:10,
    115:11, 117:5.
events 51:24.
eventually 36:7,
    49:17, 63:7,
    74:17, 154:13,
    165:8, 165:18.
everybody 64:6,
    66:9, 72:1, 74:22,
    80:8, 101:14,
    101:21, 103:23,
    148:25, 149:5,
    180:5.
everyone 63:11,
    70:8, 70:13,
    75:21, 75:22,
    80:1, 122:5.
everything 17:14,
    23:3, 28:12,
    79:25, 82:25,
    102:10, 111:5,

111:11, 173:7,
180:6, 203:11.
evidently 204:6.
evinces 11:13.
evolved 79:11,
200:8.
evolving 101:13.
exact 162:24,
163:19.
Exactly 47:12, 88:3,
113:11, 120:12,
137:25, 138:2,
181:19, 193:23,
209:9.
Examination 19:16,
61:20, 73:9,
124:13, 126:22,
192:12, 212:7,
212:13, 212:19,
212:23, 212:27.
examined 19:7,
61:10, 72:22,
124:6, 126:12.
example 79:22,
96:21.
exception 117:20,
119:19, 194:4,
197:2, 206:15.
exceptions 117:23.
excerpt 132:12,
135:17, 136:24,
138:7, 139:2,
139:4, 139:16,
141:16, 143:15,
143:22, 145:6,
146:22.
excerpts 133:15,
134:11.
exclude 11:11.
excluded 11:6.
exclusion 193:15.
exclusionary 193:13,
193:14.
Excuse 31:16, 125:5,
185:14, 195:3,
195:20.
excused 78:11,
78:13, 126:1,
211:10.
execute 154:2,

167:3, 168:17.
executed 55:13,
60:20, 63:3,
74:12, 83:12,
123:3, 140:12,
168:20, 208:25.
executing 62:20,
83:8, 167:6,
170:12.
execution 56:21,
56:22, 74:8.
Exhibit 21:15,
21:18, 27:4, 27:9,
31:17, 32:9,
32:22, 32:23,
32:24, 34:19,
34:24, 36:4,
36:11, 37:14,
89:19, 92:23,
112:1, 131:19,
152:19, 154:17,
159:19, 164:7,
177:8, 188:14.
exhibits 13:17.
exigency 117:12,
117:13, 118:3,
120:9, 195:8,
195:24, 196:1,
196:8, 196:21,
196:25, 197:2,
200:1, 200:8,
201:15, 201:22,
202:2, 202:12,
204:14, 204:17.
Exigent 89:12,
117:8, 117:9,
117:20, 117:24,
118:6, 118:24,
150:1, 150:3,
150:4, 151:8,
151:19, 151:21,
152:6, 152:12,
153:15, 153:17,
157:1, 172:6,
180:11, 181:13,
185:6, 185:13,
194:4, 194:13,
194:15, 195:4,
195:16, 200:14,
200:24, 201:5,

201:10, 203:1,
203:19, 204:10.
exist 204:15.
existed 117:12.
exists 98:2,
122:12.
exiting 204:23.
expand 119:25.
expect 96:8, 193:3,
207:13.
expectation 101:16,
105:1, 105:10,
105:12, 105:24,
121:22, 122:2.
expected 83:24.
expecting 5:17,
209:15.
experience 11:20,
42:23, 45:19,
50:16, 59:14,
59:21, 147:20.
experienced 59:21,
59:22.
Explain 44:5,
120:15, 129:14,
143:24, 144:5,
190:5.
explained 160:22,
187:1.
explaining 163:13.
explains 112:5,
112:7.
explanation 91:5,
201:2, 203:12.
explicitly 91:1.
Explosives 19:22,
62:3.
expressly 81:16,
108:3.
extend 124:19.
extension 102:15.
extensive 81:23.
extent 8:3, 9:16,
16:13, 55:4,
82:20, 117:2,
120:14, 133:17,
192:15, 201:16,
202:23.
extra 110:11.
extraordinary

15:11.
extreme 84:9,
  198:22.
eye 16:10, 16:20.
eyes 47:12,
  179:20.
.
.
< F >.
f-ing 193:2.
f-word 136:13,
  177:19.
F. 1:31.
face 14:8, 14:23,
  19:3, 61:5, 72:19,
  81:7, 88:2,
  196:20.
faces 13:1.
facial 14:4, 15:18,
  15:24, 15:25,
  16:10, 16:18.
facilities 107:16,
  109:23, 113:16,
  114:4.
facing 36:17,
  127:25, 157:1.
fact 6:25, 9:14,
  9:25, 10:17,
  10:25, 12:19,
  45:9, 50:13,
  51:25, 53:6, 55:2,
  58:3, 58:4, 59:12,
  66:6, 80:5, 80:7,
  84:2, 89:11, 90:4,
  90:5, 96:20,
  105:14, 106:16,
  106:21, 107:12,
  108:2, 108:6,
  111:9, 113:5,
  115:22, 123:8,
  123:16, 125:18,
  131:10, 144:11,
  148:8, 157:20,
  162:6, 163:25,
  167:16, 169:20,
  199:13, 201:9,
  204:6.
factor 49:17,
  51:3.
factors 198:2,

198:4.
facts 51:12, 83:12,
  86:12, 87:13,
  90:15, 118:5,
  118:7, 199:20.
factual 87:1,
  106:11, 107:4,
  107:7, 118:22,
  191:16, 192:15,
  196:21, 205:14,
  206:5.
factually 88:8,
  191:20.
fail 14:9.
failed 201:10.
failure 57:21.
Fair 32:13, 40:3,
  68:25, 70:6, 87:6,
  96:21, 121:14,
  169:23, 210:22.
fairly 206:20.
Faison 158:21,
  158:25.
fall 48:5, 130:10.
falling 202:11.
falls 109:18,
  202:1.
familiar 12:12,
  48:2, 119:1,
  127:21, 128:17,
  175:10, 176:17.
Family 62:13,
  127:19, 130:23,
  153:21, 173:23.
far 13:6, 14:9,
  33:19, 39:3,
  63:19, 96:24,
  117:7, 125:16,
  127:25, 204:25,
  205:19.
fashion 16:15.
fast 41:22,
  152:11.
Fat 143:25.
FBI 119:10, 119:12,
  120:16, 120:22,
  127:7, 127:11,
  127:15, 131:6,
  139:9, 143:16,
  157:4, 164:3,

166:12, 172:18,
  174:22, 189:12.
FCRR 1:46, 2:45.
fear 117:10.
feature 16:20.
features 12:25.
February 168:16.
Federal 1:47, 2:46,
  28:22, 94:2,
  107:24, 122:10,
  127:3, 127:7.
feel 65:10, 71:15,
  77:8, 80:15.
feet 24:7, 24:19,
  28:10, 46:6,
  49:25, 91:18.
fell 48:7, 108:24,
  109:1.
felon 196:3,
  200:25.
felt 24:11.
fence 56:17, 58:17,
  60:6.
few 28:9, 31:14,
  69:10, 97:3,
  106:11, 115:20,
  147:3, 206:25.
field 152:25.
fight 21:8, 22:21,
  51:2, 51:3.
figured 179:17.
file 92:16, 104:2.
filed 86:11, 86:21,
  101:7, 206:20,
  207:2, 207:21.
filled 187:20.
final 122:5,
  139:16.
Finally 51:7, 65:11,
  77:11, 138:16,
  198:16, 207:9.
find 16:18, 17:1,
  40:2, 49:18, 54:3,
  54:4, 54:10,
  54:15, 54:20,
  60:2, 81:3, 81:24,
  89:23, 97:11,
  97:20, 99:15,
  100:3, 103:20,
  103:21, 104:8,

104:10, 108:16,
108:18, 111:1,
114:20, 114:25,
115:17, 115:23,
163:18, 167:11,
168:21, 173:10,
173:11, 173:12,
179:12, 181:13,
192:17, 194:18,
201:20, 202:4,
202:11, 205:4.
finding 54:9, 54:24,
81:1, 81:9,
108:21, 112:4,
113:8, 114:7,
125:14, 190:16,
191:19.
findings 120:1.
fine 31:20, 92:8,
100:24, 106:25,
133:19, 181:16.
finger 21:25.
fingerprint 27:18,
91:22, 96:12,
111:2.
fingerprints
181:5.
finish 111:21.
fire 41:8, 41:12,
41:21, 41:22,
169:13.
firearm 27:1, 27:2,
27:7, 27:10,
27:12, 27:14,
27:19, 28:9,
29:15, 29:20,
43:5, 43:15,
43:16, 44:8,
44:15, 45:14,
48:12, 48:14,
52:10, 52:25,
139:13, 167:11,
167:16, 168:7,
169:4, 169:8,
207:9.
Firearms 19:22,
41:14, 43:12,
43:13, 62:2,
196:6.
fired 51:24, 52:1,

140:23.
first. 29:17.
fists 21:10, 51:17,
52:5.
fits 204:17.
Five 5:21, 6:6,
12:15, 58:15,
120:21, 134:3,
134:10, 134:14,
135:14, 135:16,
179:16, 199:2,
207:12.
five-shot 42:1.
five. 17:1.
flash 83:3.
flat 79:14, 81:5.
fled 119:5.
flesh 21:10, 51:17,
52:6.
flight 194:21,
196:5.
flip 85:23, 153:4.
flipping 155:16,
158:6.
Floor 1:48, 2:47,
60:21, 63:12,
63:15, 63:24,
66:4, 66:16,
75:12, 84:7,
164:14, 164:22,
165:3, 168:24,
168:25.
flow 39:25.
fly 43:14.
flying 40:22,
99:21.
Flynn 72:15.
focus 11:16.
focused 29:15,
98:20, 170:5.
follow 68:13,
130:20, 133:18,
133:22.
followed 24:3.
Following 54:9,
135:23, 140:10,
140:11, 141:1,
141:18, 150:25,
167:14, 168:17,
182:12, 197:9.

follows 19:8, 61:11,
72:23, 124:7,
126:13.
foot 52:12, 52:15,
149:1, 176:13.
footprint 104:24.
Force 25:25, 43:21,
55:14, 61:2,
61:22, 62:5, 69:2,
73:21, 119:10,
127:7, 127:8,
127:12, 189:12.
forced 22:23.
form 54:22, 67:17,
71:18, 75:19,
76:14, 76:23,
77:1, 77:3, 77:12,
78:19, 79:5,
81:14, 93:19,
116:5, 185:13.
former 18:6, 55:15,
72:14.
forms 64:5, 65:16,
65:20, 77:18,
83:19.
forth 59:14, 71:20,
88:18, 117:11,
179:4, 201:24.
forward 19:2, 72:18,
129:20, 137:25,
141:10, 141:22,
144:18, 150:6,
201:11.
forwarded 153:7,
185:20, 185:24.
forwarding 153:15.
forwards 186:1.
found 26:16, 33:17,
34:1, 45:10,
60:14, 66:17,
109:15, 112:19,
114:23, 140:14,
141:7, 169:22,
174:14, 179:12,
180:12, 189:22,
190:1, 196:18,
197:25, 198:1,
198:22, 199:20,
199:22, 200:24,
202:15, 204:14,

206:4, 208:9,
208:16, 209:1.
foundation 11:12.
Four 27:23, 129:24,
168:1, 210:18,
210:23.
four-lane 30:17.
Fourth 94:10,
102:19, 106:7,
112:14, 136:5,
180:3.
Foxtrot 148:17,
149:2.
frankly 52:24,
58:13.
fraud 73:17.
free 39:25, 70:6.
frequency 88:12,
91:20, 96:4,
96:12, 100:3,
106:15, 106:16,
106:24.
frequented 8:9,
12:20.
frequents 153:23.
Friday 5:6.
Fries 186:21.
from/sent 160:12.
front 19:2, 21:12,
22:17, 22:18,
22:23, 34:23,
40:24, 56:14,
56:15, 59:19,
60:1, 60:5, 61:5,
63:15, 63:24,
65:17, 67:17,
69:17, 74:23,
75:12, 84:10,
164:5, 164:6,
164:13, 204:14,
204:20.
frosting 59:9.
fruit 116:18,
206:2.
fruits 5:15, 18:4,
55:9, 84:23,
85:14.
fugitive 119:6,
129:5, 129:8,
157:10, 165:14,

179:12, 179:13.
full 124:9.
fully 82:14.
function 184:21,
202:7.
functionally 88:3.
furtive 51:5,
51:6.
future 203:16.
.
.
.
< G >.
G-l-e-n-n 73:6.
G692 185:24.
Gadget 88:13, 91:13,
93:14, 95:9,
95:12, 111:7,
122:7.
gadgetry 99:10.
gadgets 93:4.
gain 57:1.
gaining 83:7.
Gaithersburg
197:12.
game 136:2, 175:22,
175:24, 176:2,
176:4, 176:12,
176:14, 176:17.
gang 130:13, 153:21,
153:22, 153:24,
173:20, 173:23.
gather 87:21.
gathered 84:4.
gathering 92:8,
111:18.
gave 26:9, 59:7,
65:24, 164:25,
191:13.
gazed 180:2.
geared 107:9.
gel 66:18, 66:19.
gelatin 166:24.
gender 14:4.
General 30:13,
35:21, 38:12,
54:11, 73:15,
82:22, 191:11.
generalized 58:3.
generally 94:15.
gentleman 25:3,

25:12, 75:3.
genuinely 47:13.
geographical 12:7.
geography 173:24.
Gerald 1:10, 1:29,
2:14, 3:6, 3:12,
4:17.
getaway 142:16,
143:7.
gets 50:2, 57:3,
80:13, 82:10,
113:12, 179:9.
getting 113:8,
150:9, 184:22,
204:16.
Giglio 10:7.
girlfriend 197:20,
198:9.
gist 78:15.
give 7:10, 18:11,
24:8, 57:17, 84:2,
93:3, 111:2,
111:15, 129:23,
160:12, 162:24,
164:21, 175:11.
given 14:3, 20:13,
53:23, 53:24,
54:5, 82:6, 83:14,
103:18, 151:2,
160:14, 165:1,
201:3, 203:12,
204:6, 205:7.
gives 106:17,
106:18, 138:23,
202:2.
giving 79:17.
glad 147:4.
glanced 51:15.
Glenn 55:15, 65:6,
65:17, 72:14,
72:16, 72:17,
72:21, 73:4,
73:11, 75:11,
76:19, 76:20,
77:4, 77:5, 77:14,
77:15, 212:17.
glizzy 139:7,
139:13, 176:7,
176:10.
Glock 138:25,

176:15.
gloves 27:17.
Glynn 89:19, 90:5,
  90:8, 90:23, 92:2,
  107:7, 107:14,
  108:9, 110:10,
  113:1, 113:11,
  116:9.
Golimowski 62:24.
Google 37:24,
  38:1.
gotten 48:8, 57:10,
  122:17.
govern 28:22.
GPS 87:21, 150:7,
  156:5, 186:23.
grab 111:4,
  164:16.
gracious 6:19.
grand 17:24, 119:4,
  128:20.
grant 7:19.
gravity 198:17,
  198:18.
Great 171:25,
  198:23.
greater 12:18,
  57:3.
greatest 35:19.
greatly 16:25.
green 22:22,
  39:23.
Greenmount 8:10,
  11:24, 12:4, 12:6,
  14:1, 18:16, 31:3,
  32:18, 35:12,
  38:8, 62:13,
  119:24, 127:19,
  128:5, 128:14,
  129:18, 130:21,
  130:23, 130:24,
  131:3, 131:4,
  142:9, 142:19,
  142:20, 146:4,
  148:6, 148:18,
  148:19, 148:25,
  153:24, 154:8,
  155:21, 161:15,
  161:17, 169:14,
  173:21, 174:21,

  178:11, 189:14.
Greenmount-preston
  148:19.
greeted 81:4.
Gregory 156:14.
grenade 196:15.
ground 14:1, 47:8,
  50:2, 51:7,
  164:19.
grounds 89:9.
Group 54:14, 54:20,
  70:11, 70:12,
  91:19, 102:12,
  103:23, 105:17,
  105:18, 119:10,
  120:1.
Guerilla 62:12,
  127:19, 153:21,
  173:23.
guess 5:14, 53:17,
  57:12, 178:21,
  185:6, 187:12,
  205:21, 209:12.
guessing 188:10,
  199:14.
guidance 104:9.
guilty 158:21,
  158:25, 159:3.
gun 20:21, 26:14,
  26:23, 29:17,
  43:21, 45:4,
  45:10, 46:21,
  47:7, 48:6, 48:19,
  50:1, 50:4, 50:8,
  50:11, 58:2, 84:8,
  114:21, 138:20,
  138:24, 139:11,
  141:3, 141:7,
  145:15, 167:20,
  167:21, 169:13,
  169:18, 172:8,
  176:8, 176:14,
  178:9, 182:18,
  185:4, 193:2,
  207:25, 208:1,
  208:17, 209:1.
gun. 25:22, 52:18,
  193:2.
gunfire 41:6, 41:8,
  41:11, 41:19,

  51:2.
gunpoint 26:2.
guns 43:6, 69:10,
  78:17, 184:7,
  184:10, 195:23,
  198:1.
gunshot 27:25.
gunshots 23:5, 23:6,
  23:24, 51:24,
  52:1, 52:4.
guy 55:2, 180:18.
guys 104:1, 202:22,
  202:25, 203:2.
gym 197:23.
.
.
< H >.
H-a-y-d-e-n 61:16.
Hailstorm 106:13,
  106:15.
hair 14:4, 25:13,
  75:4.
half 20:7, 33:25,
  69:13, 142:4.
hall 96:10.
hallway 7:11, 7:17,
  30:10, 159:6,
  159:11.
hammer 48:13.
hand 19:5, 23:16,
  43:17, 44:7,
  45:25, 50:10,
  52:9, 61:8, 63:20,
  72:19, 83:7,
  107:23, 124:4,
  126:10, 134:24.
hand-to-hand
  58:19.
handcuffed 78:17,
  80:7.
handcuffs 26:8,
  26:9, 26:10,
  28:13, 63:24,
  84:4, 84:9.
handed 135:5.
handgun 26:17,
  29:22, 44:21,
  138:21, 139:1,
  140:15, 169:1,
  169:13, 176:16,

197:25.
handguns 69:9.
handle 27:13.
handling 28:9.
hands 24:22, 25:24,
   44:8, 47:5, 52:16,
   102:6, 102:23,
   114:22.
hang 146:5.
hanging 54:8,
   122:13.
happen 13:4, 21:3,
   44:2, 44:6, 93:11,
   195:14, 197:20,
   198:9, 199:11,
   203:3.
happened 9:1, 41:19,
   44:11, 55:4,
   60:17, 86:16,
   87:1, 88:3, 88:14,
   115:17, 116:8,
   116:10, 164:13,
   194:17, 206:6.
happens 78:22,
   80:18, 92:15,
   103:21, 103:22.
happy 13:15, 13:17,
   14:11, 45:1,
   120:15.
Hard 32:12, 35:18,
   40:22, 115:19.
harmed 195:23.
Harry 1:37, 3:20.
Harvey 1:41, 3:6,
   4:1, 4:4, 207:2.
hat 23:13, 40:20,
   42:6, 43:18,
   49:23.
Hayden 55:14, 61:2,
   61:9, 61:15,
   61:22, 63:22,
   67:13, 75:14,
   75:16, 75:19,
   75:24, 76:6,
   76:15, 77:7,
   77:12, 77:16,
   196:2, 212:11.
Hayes 27:16.
head 84:8, 121:8,
   180:8.

headed 37:20.
headquarters 8:19.
health 197:13.
hear 5:8, 5:9, 23:5,
   39:15, 49:5,
   56:20, 82:21,
   89:2, 106:8,
   108:7, 108:25,
   138:6, 138:10,
   138:12, 139:6,
   139:25, 140:3,
   141:20, 141:23,
   142:24, 143:1,
   143:6, 147:11,
   177:22, 177:24,
   177:25, 183:15,
   193:6, 209:17.
heard 6:11, 21:8,
   21:9, 41:6, 51:2,
   51:14, 51:16,
   51:24, 52:1, 52:4,
   84:13, 116:6,
   138:17, 142:5,
   145:25, 147:3,
   157:5, 186:8,
   186:14, 186:24,
   192:19, 193:1,
   197:20, 203:8,
   203:10, 203:21,
   203:22.
Hearing 1:17, 3:8,
   4:24, 7:5, 11:14,
   26:3, 28:18,
   28:23, 29:7, 92:1,
   147:4, 148:12,
   158:19, 159:3,
   169:19.
hearings 92:16.
Hearsay 29:3.
held 20:10, 26:4,
   125:17, 140:12.
Hell 136:13.
Hello. 183:22.
help 18:25, 22:7,
   53:7.
helpful 45:2, 89:2,
   89:17, 133:18.
helps 95:18.
herded 80:8.
Herndon 22:10.

heroin 66:18, 66:19,
   130:7, 130:8.
hesitating 202:24.
hid 167:20.
hidden 94:25, 99:16,
   141:8, 168:3.
hiding 114:5.
high 41:13, 50:20,
   50:21, 148:17,
   149:4.
highly 203:19.
Highway 140:9.
Hill 31:9, 32:10,
   33:3, 33:6, 33:9,
   34:2, 34:14, 35:3,
   35:4, 36:17,
   36:21, 37:8,
   37:15, 37:22,
   37:23, 37:25.
hips 47:20.
hired 20:7.
historical 100:19,
   119:2.
hit 156:7, 159:24,
   161:4, 161:10.
hits 162:11.
Hoffman 1:27, 3:10,
   17:10, 19:17,
   22:11, 22:16,
   24:17, 25:4,
   25:18, 27:19,
   28:19, 29:12,
   30:3, 49:2,
   132:13, 137:19,
   210:24, 212:7.
Hold 3:14, 43:9,
   43:17, 91:12,
   122:5.
holding 23:16,
   42:17, 43:8,
   43:13, 43:18,
   45:14, 45:25,
   50:10, 50:18,
   123:4.
hole 168:25,
   169:1.
holiday 6:23.
hollering 39:15,
   39:16.
home 57:1, 57:8,

63:5, 63:9, 67:13,
68:15, 68:23,
69:1, 69:8, 69:22,
71:2, 74:14,
74:15, 74:17,
76:7, 166:9,
166:10, 167:21,
169:25, 180:7,
196:12, 205:10.
Homewood 21:5,
23:10, 24:1, 24:3,
24:12, 33:12,
34:2, 35:16,
35:24, 36:4, 38:3,
38:5, 38:12,
38:21, 40:10,
40:12, 40:14,
42:12, 42:14,
46:5, 52:13.
homicide 8:19,
112:11, 140:25.
Honda 140:9, 140:24,
170:21, 170:25.
Honorable 1:18.
hood 142:12.
hope 31:21.
hopefully 163:3.
hoping 34:24.
hot 196:2, 200:25.
hour 50:24.
hours 62:16, 74:4,
145:16, 162:12,
174:8, 174:9,
180:8, 207:14,
210:18, 210:23.
housekeeping
15:13.
houses 30:24, 30:25,
34:20, 83:2.
huge 194:5.
human 189:5, 189:17,
189:19.
hunches 179:2.
hundred 175:7.
Hunter 112:17,
112:21, 190:20.
hurrying 145:8.
hurt 203:14.
.
.

< I >.
ID 66:21.
Id'd 173:13.
idea 93:5, 110:21,
110:22, 110:23,
195:1, 198:20.
identification 5:24,
10:4, 151:11,
152:18, 177:3.
identifications
10:9, 14:14, 15:2,
17:12.
identified 10:12,
25:5, 25:17,
25:18, 63:23,
75:9, 112:12,
119:23, 120:16,
128:3, 129:16,
129:19, 189:1.
identifier 113:19.
identifiers
113:18.
identifies 132:20.
identify 24:25,
132:7, 143:21,
174:6.
identifying 96:23.
identities 63:14.
III 1:43, 2:10.
ill- 85:18.
illegal 85:19,
93:24.
illegality 206:3,
206:4, 209:8.
Illinois 49:12.
image 16:12, 17:1,
80:2.
images 8:7, 12:15,
13:3, 13:18,
13:25, 16:21.
imaging 94:6,
94:8.
immediate 195:5.
Immediately 23:10,
24:23, 25:21,
25:25, 40:2,
40:12, 47:1, 47:7,
47:10, 51:5, 51:7,
52:16, 52:17,
93:18.

imminency 198:11.
Imminent 148:2,
184:12, 185:2,
186:6, 195:19,
198:10, 198:13,
199:4, 199:7.
Impact 20:12, 20:14,
20:17, 20:19,
89:3.
imparting 57:6.
impermissible
15:22.
impermissibly 13:14,
15:9, 17:2.
implement 109:25.
implicated 87:11.
implicit 79:3.
implying 12:17.
important 50:20,
50:23, 105:8.
importantly 54:15.
impound 140:8.
improperly 12:10.
improprieties
10:16.
impropriety 11:4,
11:17, 13:11.
in-court 5:23.
in. 61:4, 72:17,
78:24, 80:21,
93:20.
inaccurate 189:22,
190:1, 190:8,
190:19, 191:4,
191:6, 191:16,
191:18.
inadequate 203:13.
inadmissible 55:3.
incident 40:7,
44:23, 44:24,
52:21, 52:22.
incidents 173:2.
inclined 6:1.
include 13:25.
included 13:16.
includes 204:20.
including 83:20,
92:14, 114:1,
114:2.
incomplete 179:3.

incorporated 17:6.
incorrect 190:2,
  190:3, 191:21.
incriminating
  54:23.
inculpatory 82:11.
indefinitely
  201:11.
independent 96:2.
INDEX 212:1.
indicate 23:19,
  191:6.
indicated 5:19,
  18:1, 38:2, 38:14,
  38:20, 39:4,
  41:11, 42:16,
  42:22, 43:24,
  68:14, 70:8,
  81:14, 82:2, 82:7,
  91:3, 106:24,
  138:20, 189:15.
indicates 37:8,
  160:11.
indicating 21:10,
  26:15, 39:14,
  84:6, 146:3,
  159:23.
indication 50:7,
  80:15, 81:2, 82:4,
  94:17, 134:5.
indicator 95:7,
  106:24.
indicted 119:4.
individual 23:12,
  23:23, 24:25,
  25:10, 42:17,
  52:2, 52:8, 54:12,
  67:21, 70:12,
  70:13, 71:1,
  104:4, 121:23,
  127:22, 132:4,
  142:13, 142:14,
  142:22, 142:23,
  143:5, 144:9,
  148:6, 153:23,
  154:2, 188:8,
  188:18, 189:13,
  198:13, 198:14.
individually 64:7,
  64:9.

individuals 17:23,
  60:7, 63:12, 71:2,
  76:16, 80:19,
  83:20, 84:3,
  102:12, 123:22,
  124:16, 129:16,
  129:19, 143:19,
  143:22.
indulgence 44:16,
  121:17, 171:13,
  188:2.
inebriated 11:9.
influence 9:14,
  9:15, 10:20,
  10:21, 10:25.
informally 82:14.
informant 50:21,
  50:23, 112:15,
  112:18, 189:1,
  189:2, 189:4.
informants 56:25,
  57:1, 57:2, 57:4,
  57:5, 57:16,
  57:23, 58:12,
  58:24, 59:2, 59:9,
  59:13, 59:25,
  60:12.
information 57:10,
  58:13, 66:10,
  93:3, 100:12,
  100:20, 103:9,
  106:18, 110:19,
  110:20, 111:14,
  111:15, 111:19,
  112:3, 112:21,
  116:2, 125:15,
  144:1, 150:18,
  150:19, 151:17,
  151:21, 163:24,
  164:22, 165:1,
  172:2, 172:5,
  172:8, 174:4,
  175:1, 179:3,
  185:21, 185:22,
  186:15, 186:18,
  187:15, 189:12,
  189:23, 190:6,
  191:14, 201:6,
  202:3, 202:8,
  204:13, 205:5,

210:8.
informed 8:14,
  86:22, 171:7.
infractions 20:21.
inherently 12:10,
  82:23.
initial 63:5, 74:14,
  74:15, 118:21,
  149:4, 150:12,
  154:22, 156:7,
  161:2, 167:14,
  190:11, 191:7.
initially 6:4, 79:6,
  79:7, 201:21.
initiate 107:17,
  110:3.
initiated 118:24,
  121:25.
initiating 113:20.
inquired 10:22.
inquiry 54:11,
  54:18.
Inside 60:14, 60:17,
  76:16, 77:23,
  83:7, 94:18,
  104:14, 130:18,
  140:15, 163:23,
  164:1, 165:2,
  165:6, 165:22,
  166:5, 166:10,
  166:15, 167:21,
  193:2, 202:9,
  205:6, 205:9.
Inspector 88:12,
  88:13, 91:12,
  93:14, 95:9.
installation 109:24,
  110:1.
instances 193:24.
instant 41:1.
instantaneously
  204:7.
instead 84:9,
  151:8.
insufficient
  12:23.
intend 192:5.
intended 147:1,
  147:10, 157:6.
intense 80:3.

intention 116:25,
    149:7.
intercept 108:1,
    146:12.
intercepted 120:21,
    129:25, 141:4,
    145:17, 147:22,
    153:1, 208:20.
intercepts 119:12.
interchange 84:11.
interdiction 53:3.
interest 8:17,
    79:9.
interested 90:2,
    92:1, 93:20.
interfered 158:20.
interim 123:12.
interpretation
    191:22, 200:9.
interpreted 81:5,
    176:7, 178:8,
    182:18.
interrogation
    54:17.
intersection 33:12,
    34:14, 35:16,
    37:11, 38:7, 40:9,
    40:14, 46:5.
intersects 33:6.
interviews 10:22.
introduced 98:3.
introduction
    119:15.
intrusion 95:19.
intrusions 194:6.
invalidate 9:21.
investigating
    112:12, 128:5.
investigation 10:6,
    62:12, 123:2,
    123:8, 123:13,
    123:22, 124:16,
    124:22, 125:11,
    127:18, 127:21,
    128:13, 129:11,
    144:8, 153:20,
    172:16, 172:18.
Investigations
    73:16, 118:25,
    127:7, 137:7.

investigator 73:15,
    162:23.
Investigators 164:2,
    164:4, 164:15,
    164:21, 164:23,
    173:17, 174:6,
    174:20, 200:11.
invoke 81:19.
invoked 11:5, 79:4,
    82:9.
involuntariness
    82:25.
involved 49:21,
    49:23, 51:16,
    60:9, 112:13,
    118:25, 123:21,
    124:15, 124:22,
    125:10, 149:5,
    154:1, 166:4,
    172:12, 173:8,
    174:6.
involvement
    173:20.
involving 153:20,
    167:22.
iphone 86:18.
iphones 122:16.
isolation 79:22.
Israelis 122:15.
issuance 203:17,
    204:3.
issue 6:19, 7:5,
    9:17, 12:17,
    15:20, 58:23,
    82:19, 89:3, 89:6,
    90:19, 95:18,
    103:16, 104:2,
    104:9, 107:4,
    122:5, 133:24,
    170:7, 187:3,
    187:7, 187:9,
    192:8, 192:11,
    194:2, 194:3,
    195:2, 196:8,
    198:3, 205:13,
    205:23, 206:8,
    207:4, 208:8.
issued 95:13, 107:8,
    113:11, 122:12,
    128:22, 191:8.

issues 11:21, 29:8,
    55:24, 89:8,
    106:11, 130:5,
    130:6, 182:22,
    187:4, 195:23.
item 116:1,
    161:10.
items 67:4, 80:20,
    164:18, 166:18,
    166:23.
itself 9:5, 9:6,
    9:12, 39:20,
    46:13, 57:21,
    81:18, 117:14,
    187:7, 194:3,
    195:3.
.
.
< J >.
J-o-n-a-t-h-a-n
    61:15.
J-o-s-e-p-h
    126:17.
J. 1:25, 1:37.
jacket 104:14.
Jaco 6:14, 56:10.
Jail 25:7, 128:15,
    130:11, 130:18,
    130:20, 167:24,
    167:25.
Jamal 1:35.
James 1:18, 8:13,
    17:17.
jammed 102:25.
January 119:9,
    129:7, 175:21.
jeans 23:13, 45:13,
    45:15, 47:18,
    47:19, 47:25,
    48:3, 48:6,
    50:6.
Jeffrey 1:33,
    3:13.
jimrods 138:10.
JKB-16-0363 1:9.
JKB-16-363 3:5.
job 83:9.
John 2:10, 4:12,
    75:14, 76:3, 77:7,
    77:12.

Johnson 1:10, 1:29,
  3:6, 3:13, 3:16,
  9:8.
joint 138:7.
joke 176:5, 176:6.
Jonathan 55:14,
  61:2, 61:9, 61:15,
  212:11.
Jones 2:4, 3:7, 4:7,
  4:10, 5:16, 6:3,
  9:9, 9:18, 11:22,
  14:9, 15:18,
  16:10, 18:3, 25:1,
  25:5, 25:17, 26:8,
  26:11, 27:5, 28:4,
  28:6, 28:13,
  29:16, 31:17,
  36:8, 41:2, 41:24,
  42:5, 43:24,
  45:10, 45:21,
  46:4, 46:24,
  47:18, 50:1, 50:9,
  51:3, 51:5, 51:6,
  98:8.
Jordan 143:25,
  144:3, 144:6,
  144:7.
Joseph 2:12, 3:7,
  126:11, 126:17,
  212:25.
Jr 1:37.
Judge 88:4, 89:19,
  89:22, 90:5, 90:8,
  90:23, 92:2, 92:6,
  95:13, 107:7,
  107:14, 108:9,
  110:10, 111:6,
  111:8, 111:12,
  113:1, 113:11,
  113:24, 113:25,
  114:6, 114:7,
  116:9, 152:4,
  152:11, 158:24,
  187:1, 187:8,
  187:12, 208:22.
judgement 83:22.
judges 92:16,
  203:25.
judgment 83:25,
  116:10.

judicial 99:14,
  108:5, 115:6,
  131:6.
July 20:8, 127:14.
jump 143:10.
jumps 16:25.
jury 4:25, 9:22,
  61:5, 72:18,
  119:4, 128:20.
Justice 98:14,
  100:6.
justification 115:4,
  115:5, 210:7.
justified 109:17,
  196:20, 201:15.
justify 57:20, 59:7,
  105:17, 105:23,
  111:23.
.
.
< K >.
K-9 93:14, 170:24,
  171:2, 171:7,
  206:23.
K. 1:18.
Katz 103:2.
Keene 63:1, 63:17,
  64:1, 64:20, 65:5,
  74:25, 77:1,
  77:2.
keep 22:22, 23:3,
  40:7, 94:25,
  102:9, 158:21,
  158:25, 159:4,
  170:4.
keeps 95:6.
Kenneth 2:4, 3:6,
  4:7, 5:16, 25:1,
  25:5, 31:16.
Kentucky 196:3.
kept 24:4, 93:7,
  111:16, 148:22.
key 123:9, 123:12,
  133:15, 196:18.
keys 197:25.
kick 5:17.
Kicked 100:21,
  100:23.
kid 143:25.
killed 184:22,

187:16.
kind 22:23, 27:19,
  59:9, 73:16,
  94:16, 101:1,
  111:5, 137:14,
  156:20, 156:23,
  167:23, 199:18.
kinds 57:16, 84:8,
  130:5, 204:3.
King 196:3.
Kinley 29:20.
kitchen 67:2.
knee 84:8.
knife 26:21,
  94:23.
knock 68:23,
  204:20.
knocked 68:25, 80:6,
  164:5, 164:10,
  164:13.
knowing 46:1.
knowledge 41:14,
  42:22, 45:18,
  48:18, 50:16,
  57:5, 57:22.
knowledgeably
  54:7.
known 16:6, 49:21,
  59:13, 101:25,
  189:13.
.
.
< L >.
L-a-n-d-s-m-a-n
  126:18.
L-i-s-a 124:11.
L. 1:43.
la 99:5.
lab 140:12.
lack 57:23, 57:24.
lacking 57:4,
  97:1.
Lacritia 63:1,
  63:16, 77:1.
laid 58:5, 84:7,
  112:2.
Lamontae 8:13, 16:3,
  17:13.
Landsman 118:23,
  119:7, 119:22,

120:15, 126:8,
126:11, 126:17,
133:9, 180:3,
190:18, 191:10,
191:13, 195:20,
202:20, 209:12,
212:25.
Lane 21:11, 30:20,
34:10, 34:11.
lanes 30:18.
language 91:2,
92:19, 107:8,
107:13, 107:14,
109:22, 110:4,
113:15, 153:5,
153:9, 191:9.
large 94:3.
largely 84:15,
115:15, 118:9.
last 5:25, 19:11,
38:2, 41:10, 60:3,
61:14, 62:11,
73:3, 73:5, 74:18,
92:21, 92:24,
108:7, 111:12,
119:4, 123:10,
126:16, 127:17,
131:5, 133:13,
134:14, 135:24,
143:12, 146:11,
198:21, 199:18.
late 50:24, 98:14,
119:8, 129:7,
200:14.
lately 101:25.
lateness 50:24.
later 10:24, 24:25,
28:8, 52:2, 68:4,
83:19, 97:3,
102:10, 107:16,
122:9, 146:13,
156:20, 161:6,
161:11, 167:3,
167:15, 170:17,
176:14.
latitudinal 155:10,
157:23.
Latrice 74:25.
Latrobe 55:9, 56:11,
62:20, 62:25,

74:9, 86:13,
86:14.
laughing 176:5.
lawful 53:3, 53:6,
179:21, 210:7.
lawfulness 53:9,
201:19, 210:4.
Lawrence 3:7.
lawsuits 104:3.
lawyer 106:4,
120:5.
lawyers 92:15, 98:7,
103:10.
lay 11:12, 118:22,
179:20.
lead 49:12, 108:21,
149:7, 174:23,
184:17.
leader 66:9.
leadership 130:12.
leading 193:7,
209:6, 209:7.
learn 154:10.
learned 153:21,
156:25, 163:24.
learning 156:2.
least 6:25, 9:3,
10:8, 15:17, 31:2,
49:12, 59:24,
84:17, 89:21,
203:22.
leave 58:16, 58:18,
70:6, 114:22.
leaves 91:21.
leaving 57:24.
led 91:23, 152:9,
168:25.
ledge 67:3.
left 16:10, 16:19,
20:7, 23:16,
26:14, 26:15,
26:16, 35:12,
43:22, 44:1, 44:7,
44:8, 45:5, 45:25,
48:20, 50:5,
50:10, 52:9, 54:8,
63:19, 93:9, 95:3,
127:25, 135:14,
135:16, 139:18,
163:7, 168:24,

191:19, 206:17,
207:18.
left-hand 11:23,
67:25.
leg 26:14, 26:15,
26:16, 27:6,
27:11, 43:22,
44:9.
Legal 7:8, 87:3,
91:5, 96:4, 97:18,
100:10, 101:10,
207:16, 210:21.
legally 93:23,
194:10.
legitimacy 169:21.
legitimate 109:13.
length 31:2.
lengthy 15:25.
lens 99:22, 100:2.
less 39:1, 183:9,
207:14.
letter 5:5, 5:19,
18:2, 66:21.
letters 46:18.
level. 196:22.
lie 47:8.
lies 57:7.
Lieutenant 28:10,
28:12, 28:13,
29:10, 53:11,
54:10, 186:21.
light 5:13, 15:12,
22:22, 24:10,
31:6, 39:3, 39:23,
100:8, 101:18,
200:17.
lights 39:21.
likelihood 198:4.
likely 57:10,
112:23, 150:24,
201:13, 202:5.
liken 94:5, 94:6.
limited 89:3,
190:6.
limits 111:16.
Line 79:15, 100:5,
131:23, 132:24,
133:19, 133:21,
134:17, 134:18,
134:21, 134:25,

135:4, 135:6,
135:10, 135:19,
135:22, 137:5,
175:8, 175:11,
175:14, 175:16,
175:17, 177:3,
177:6, 177:12,
177:18, 177:21,
197:14.
lines 147:3.
link 155:13, 155:17,
158:3, 158:7,
160:5, 162:7.
Lisa 3:10, 124:5,
124:11, 212:21.
listen 102:25,
106:6, 128:14,
134:5, 134:6,
134:10, 177:22.
listened 134:7,
136:24, 143:16,
143:22, 145:6,
146:22, 148:1,
153:2, 166:3.
listening 92:17,
133:4, 136:22,
137:10, 140:1,
142:2, 145:4,
145:22, 146:19,
201:23.
lists 92:24.
literally 43:14,
102:5.
litigation 81:24.
Little 5:2, 16:15,
18:24, 18:25,
20:24, 30:12,
31:21, 35:14,
36:13, 38:21,
62:8, 62:10,
67:24, 89:1, 92:9,
93:12, 95:7, 95:9,
104:15, 104:16,
104:20, 105:10,
105:14, 209:2.
live 27:23, 93:22,
121:13.
lived 62:25.
living 136:13.
lo 119:11.

loaded 27:22.
loading 197:23.
locate 88:20, 170:2,
174:15, 174:17,
195:9.
located 22:1, 27:11,
34:6, 52:25,
60:21, 65:23,
66:3, 66:7, 66:10,
66:17, 66:18,
66:19, 66:20,
66:22, 66:24,
67:1, 67:2, 69:22,
91:21, 104:24,
105:2, 157:7.
locating 110:12,
201:25.
location 21:21,
28:2, 33:21,
37:15, 38:15,
40:8, 100:20,
102:20, 107:17,
113:20, 131:1,
150:7, 151:2,
154:14, 154:21,
155:6, 155:14,
155:19, 155:24,
156:2, 156:5,
158:9, 158:15,
159:22, 160:6,
161:20, 162:4,
162:10, 162:14,
162:20, 162:24,
163:9, 163:19,
164:21, 186:23,
193:22, 202:1,
202:10.
locational 97:24,
103:16, 151:16.
locator 114:2.
Loch 131:3.
locked 196:16.
locking 96:24.
lodged 45:11, 48:19,
50:5.
logical 5:10, 54:25,
55:24, 102:15.
logistical 158:18.
Lombard 1:48,
2:47.

long 19:25, 20:5,
22:14, 56:8, 62:7,
73:24, 74:1,
110:22, 125:18,
127:13, 150:22,
150:23, 187:2,
187:4, 201:2,
210:20.
longer 8:16, 29:18,
29:19, 199:25,
202:7, 203:17.
Longitude 158:1.
longitudinal 125:10,
155:10.
look 8:2, 13:12,
35:9, 43:12,
79:20, 79:24,
79:25, 80:5, 80:6,
83:25, 92:21,
92:23, 95:20,
99:22, 105:19,
111:11, 118:13,
122:11, 133:21.
looked 21:11, 40:18,
52:7, 65:20,
70:17, 80:1,
94:18, 115:23.
Looking 23:3, 31:22,
34:25, 36:4,
36:24, 37:15,
37:25, 38:10,
40:4, 64:24,
86:11, 99:4,
114:22, 133:25,
135:10, 142:24,
147:9, 153:6,
162:7, 164:8,
207:12.
looks 34:21, 35:11,
35:19.
loop 23:11.
looped 52:11.
loose 44:10.
losing 104:6.
lot 35:9, 36:12,
43:15, 54:6,
95:15, 98:22,
101:24, 104:8,
112:2, 115:9,
140:8.

Loud 183:16.
low 47:20.
Lucky 176:13, 179:3,
  183:22.
lunch 121:21,
  125:25.
lure 147:1,
  147:15.
luring 142:14.
.
.
< M >.
M-i-c-h-a-e-l
  73:5.
M. 1:39.
ma'am 23:25, 72:24,
  73:1, 125:8.
machine 103:23.
main 115:10,
  117:5.
mainly 40:21,
  148:25.
maintained 93:6,
  122:24.
Major 20:15.
males 50:17,
  91:19.
malignant 200:15.
Malone 112:5, 112:8,
  112:12, 112:23,
  113:4, 123:17,
  123:19.
man 42:6, 43:18,
  49:15, 81:11,
  108:13, 136:2.
manageable 86:25.
managed 11:19.
maneuvering 52:1.
manipulated 11:19.
manner 78:17,
  105:2.
map 155:14, 155:16,
  155:19, 158:3,
  158:6, 158:9,
  160:5, 162:6.
maps 18:16, 37:24,
  38:1.
marijuana 93:23,
  95:2, 96:16,
  105:14.

mark 151:10, 177:5,
  188:13.
marked 21:14, 21:22,
  26:9, 27:3, 27:9,
  31:16, 34:18,
  36:3, 39:20,
  49:14, 49:15,
  49:16, 64:21,
  148:17, 148:22,
  157:14, 177:3.
marking 152:18.
Marquise 2:8, 3:7,
  4:13, 4:15,
  127:22, 128:1,
  128:3, 132:11,
  136:23, 137:14,
  142:3, 142:7,
  142:11, 144:9,
  145:5, 145:23,
  146:20, 148:7,
  149:7, 164:14,
  167:20, 168:23,
  172:19, 173:6,
  173:8, 173:10,
  173:14, 173:19,
  173:23, 174:24,
  184:17.
Marshal 6:24, 72:8,
  211:10.
Marshals 164:2,
  166:12, 174:22,
  211:3.
Maryland 1:2, 1:20,
  1:49, 2:48, 164:3,
  165:13, 166:12,
  189:21, 196:2.
mass 95:10, 198:18,
  198:23.
match 140:19.
material 66:23.
materialize
  149:21.
materializing
  148:15.
matter 3:7, 4:24,
  5:13, 28:20, 29:6,
  191:16, 202:12.
matters 104:3,
  120:14, 170:5,
  193:7.

Maynard 98:9.
Mccant 86:21.
Mcdonald 136:6.
Meadows 8:13,
  17:13.
mean 25:14, 29:3,
  41:12, 41:16,
  48:6, 59:23,
  81:15, 90:7,
  94:11, 96:3,
  101:12, 102:13,
  103:2, 104:22,
  111:4, 138:19,
  139:10, 140:7,
  143:4, 145:9,
  169:2, 177:16,
  178:8, 179:11,
  180:8, 182:7,
  199:15.
means 99:19, 110:4,
  177:20, 179:5.
meant 144:3.
meantime 122:19.
measuring 102:22.
media 210:25.
median 34:11.
Medicaid 73:17.
meet 144:16, 149:12,
  184:14, 184:15,
  194:14.
meeting 149:17.
member 112:12,
  129:11, 129:15,
  129:17, 129:20,
  130:9.
Members 130:3,
  153:20, 153:22,
  153:24, 157:4,
  166:12, 189:11.
memory 18:25.
men 12:16, 13:4,
  66:17, 103:23,
  105:17, 105:23.
mental 191:10.
mention 124:21.
mentioned 130:14,
  142:22.
mentioning 14:10.
merely 50:12, 50:16,
  102:21.

mess 48:11, 69:15.
message 94:3.
messages 154:22.
Met 30:10, 164:2.
meters 155:3, 155:8,
  158:2, 159:25.
method 5:8, 7:22,
  52:9, 83:4.
methods 113:25,
  179:13.
Michael 55:15,
  65:17, 72:14,
  72:21, 73:4,
  76:19, 77:4, 77:5,
  77:14, 143:25,
  144:2, 212:17.
middle 22:25.
mike 102:25.
Miller 28:10, 28:12,
  28:13, 28:17,
  29:10.
million 93:12,
  122:15.
mimics 113:17.
mind 125:12, 136:11,
  203:24, 210:17.
minds 207:17.
mine 76:18.
minor 16:21.
minus 155:8.
minute 5:25, 56:10,
  143:12, 144:24,
  160:8, 160:9,
  183:9.
minutes 68:4, 68:7,
  68:8, 72:9, 83:19,
  134:6, 134:7,
  137:20, 142:4,
  146:13, 146:15,
  157:21, 158:10,
  159:9, 161:6,
  161:11, 162:11,
  163:4, 179:16,
  205:15, 206:25.
Miranda 28:4, 28:8,
  53:22, 53:23,
  54:5, 64:3, 64:5,
  64:16, 65:15,
  65:19, 67:16,
  68:1, 70:9, 70:23,

  71:1, 75:13,
  75:15, 76:7,
  77:17, 79:11,
  81:21, 81:24,
  82:19.
Mirandize 81:1.
misleading 43:10,
  191:17.
missing 182:8.
mistake 202:18.
mobile 107:18,
  114:2.
model 138:23,
  138:25, 176:16.
modification 189:24,
  190:3, 190:11,
  190:21, 191:6,
  191:15.
modified 190:9,
  191:2.
moment 18:10, 44:16,
  45:20, 48:18,
  50:13, 50:14,
  53:14, 84:25,
  103:18, 108:4,
  125:16, 142:18,
  180:1, 180:5.
moments 115:20,
  119:15.
Monday 150:25,
  151:2, 187:11.
money 58:1,
  176:13.
monitored 103:25.
monitoring 138:18,
  139:9, 140:6,
  143:16, 147:20,
  151:16, 177:23.
Montell 1:41, 3:6.
month 5:2.
mood 84:5.
Moore 197:12, 198:5,
  198:18, 198:22,
  199:17, 199:19.
moot 54:9, 117:4.
morning 3:2, 3:4,
  3:14, 3:15, 3:18,
  3:22, 3:23, 3:25,
  4:3, 4:4, 4:6,
  4:9, 4:10, 4:12,

  4:14, 4:15, 4:17,
  4:22, 5:7, 5:21,
  6:3, 19:4, 19:18,
  19:19, 30:8, 30:9,
  61:22, 61:23,
  62:15, 62:19,
  63:4, 67:14,
  73:11, 73:12,
  74:4, 74:7,
  121:25, 167:4,
  174:8, 174:9,
  200:12, 209:25,
  210:3, 210:14.
Moses 112:5.
Motions 1:17, 3:8,
  4:25, 5:4, 5:8,
  5:11, 5:23, 6:3,
  14:25, 18:25,
  28:18, 28:23,
  29:7, 92:16,
  112:2, 133:14,
  169:19, 206:17,
  206:19, 207:3,
  207:17, 210:24.
Mount 142:20.
mouth 183:21.
move 5:10, 39:24,
  41:5, 51:23.
moved 26:14, 70:2,
  78:18, 136:14,
  191:11.
movement 43:21.
movements 51:6.
moving 60:19.
multiple 131:10.
murder 109:6,
  112:12, 112:14,
  112:17, 113:4,
  113:24, 123:17,
  123:18, 140:20,
  190:19, 198:18,
  198:23, 199:13.
murdered 112:5,
  112:8, 112:23.
murderer 113:5.
murders 173:9.
mustache 25:13.
myself 22:25, 23:1,
  24:21, 62:24,
  157:4, 164:15,

174:18.
.
.
< N >.
n-word 140:4.
nah 136:13.
Name 11:24, 19:11,
   31:14, 61:14,
   66:22, 73:3, 73:4,
   73:5, 76:18,
   76:19, 77:4,
   77:10, 77:13,
   77:14, 106:14,
   124:9, 126:16,
   156:11, 173:22,
   185:23, 212:3.
named 112:13,
   119:11, 127:22,
   129:11.
names 12:1, 20:13,
   32:6, 128:7.
narcotics 20:21.
narrow 71:16, 91:16,
   91:17.
nature 81:17.
nauseam 199:3.
near 31:9, 60:6,
   169:5.
necessarily 9:6,
   9:18, 181:22.
necessary 7:7,
   55:23, 205:20,
   209:10.
neck 24:18, 46:12.
necklace 46:12.
need 6:5, 6:11,
   13:12, 18:24,
   18:25, 53:7,
   88:23, 88:24,
   89:15, 89:21,
   90:17, 97:8, 97:9,
   100:10, 100:13,
   100:14, 107:1,
   108:7, 114:17,
   118:4, 121:4,
   132:23, 144:14,
   144:15, 175:10,
   180:4, 183:10,
   198:22, 201:19,
   205:7, 210:1,

211:4.
needed 18:24, 25:25,
   40:7, 64:13,
   147:2, 187:10.
needs 6:12, 194:8.
neighborhood 8:10,
   12:12, 12:14,
   12:16, 12:20,
   13:5, 14:1.
neighborhoods
   30:23.
neither 107:24.
neon 40:20.
Neptune 174:18.
neutral 83:4.
New 66:17, 66:18,
   123:19, 141:17.
news 7:4.
Next 5:10, 17:25,
   24:6, 33:12, 38:6,
   47:4, 47:13, 51:3,
   55:7, 71:24,
   74:23, 75:3,
   78:21, 80:12,
   80:17, 81:9,
   84:21, 90:17,
   103:1, 137:20,
   141:23, 149:5,
   152:25, 160:2,
   162:12, 163:4,
   164:1, 170:25,
   183:22, 184:24,
   187:9, 195:18.
nexus 58:22.
nickel 138:14.
nickname 11:25,
   128:9, 137:8,
   173:25.
nicknames 128:7.
night 9:11, 33:17,
   38:25, 39:1,
   162:16, 167:3,
   187:24, 202:22,
   203:24.
nine 62:10.
no-knock 68:17.
No. 1:9, 14:25,
   15:14, 21:15,
   29:19, 31:17,
   55:8, 64:19, 72:6,

177:8, 177:9,
   187:3, 188:14,
   195:6.
nobody 100:1,
   102:16, 102:23,
   102:24, 181:11.
noncoercive 84:16.
none 96:19,
   103:24.
nonetheless 54:22.
nonexigent 118:6.
nonfatal 112:9,
   112:10.
nonjudicial
   152:12.
nonresponse 81:6.
nonverbally 64:13.
nor 86:13.
normal 48:6.
normally 39:1.
North 18:15, 21:2,
   21:5, 21:13,
   21:23, 22:2,
   22:17, 23:14,
   23:15, 24:3,
   30:15, 30:17,
   30:25, 31:1, 31:7,
   32:4, 32:16, 33:7,
   34:16, 34:20,
   35:1, 35:16,
   35:23, 36:4,
   36:17, 36:24,
   38:8, 38:15,
   40:10, 40:14,
   45:22, 51:23,
   99:23, 99:24,
   101:22, 104:11,
   155:21, 155:22,
   156:6, 161:4,
   161:12, 161:16,
   161:18.
north-south 32:20.
northbound 24:12,
   42:13, 52:13.
Northeast 161:24,
   162:2.
Northern 1:2,
   148:21.
Northwest 20:11.
note 15:24, 25:4,

57:23, 57:25,
83:18.
noted 107:12.
Nothing 14:6, 14:12,
14:21, 16:23,
39:10, 46:13,
46:17, 58:2,
81:16, 119:21,
147:5, 172:12,
172:23, 184:10,
185:4, 192:2,
195:6, 195:18,
204:12, 211:8.
nothing. 147:6.
noticed 45:4, 52:8,
122:5, 180:7.
notification
156:8.
notified 7:20,
148:20, 155:24,
156:10, 156:15,
156:20, 186:22.
notion 79:3, 181:17,
203:16.
novelty 198:25.
November 5:1, 119:4,
128:25.
NSA 99:9.
Number 3:5, 11:6,
11:7, 21:11,
34:11, 34:12,
41:14, 54:4, 83:9,
85:3, 113:3,
117:23, 123:17,
131:12, 132:5,
138:23, 150:2,
152:25, 153:1,
154:4, 163:19,
167:9, 173:17,
181:12, 185:23,
185:24, 195:14,
199:10, 206:10.
numbers 97:11,
97:12, 97:20,
103:15, 110:13.
numerous 43:4.
.
.
< O >.
o'clock 50:25,

185:9, 186:2,
199:7, 203:2,
205:15.
O'toole 1:33, 3:13,
3:15.
Oak 31:9, 32:10,
33:3, 33:6, 33:9,
34:2, 34:14, 35:3,
35:4, 36:17,
36:21, 37:8,
37:15, 37:22,
37:23, 37:25.
oath 9:8, 88:4,
124:1.
object 26:18.
Objection 28:15,
46:25, 75:5,
132:25, 197:5.
objective 199:12,
200:9, 200:16.
obligation 147:23,
147:24.
Observation 51:1.
observations 50:24,
58:20, 58:25,
59:1, 59:6.
observe 40:15,
149:17, 166:17.
observed 23:15,
57:9, 58:14,
59:18, 60:11.
observing 59:23.
obtain 102:14,
111:3, 167:1.
obtained 66:11,
68:17, 86:16,
87:20, 88:14,
112:18.
obtaining 56:22.
obvious 80:19,
92:13.
Obviously 46:8,
48:4, 49:22,
176:5, 198:17.
occasion 43:2, 43:8,
44:17, 168:22.
occasions 9:22,
10:10, 57:9,
58:16.
occupants 63:10,

64:3, 64:15,
65:15, 65:21,
74:21, 75:13,
75:14, 75:17,
76:7, 77:17,
77:24, 83:7.
occur 54:18, 184:14,
184:20, 186:11,
186:13.
occurred 81:17,
82:25, 95:19,
114:14, 140:20,
140:25, 172:9,
172:10, 184:21,
200:11, 200:23.
occurs 84:11.
October 1:19,
127:16.
odor 95:2, 95:3.
Offender 20:15.
offenders 20:21.
offenses 43:2, 43:4,
43:5.
offer 118:11,
209:18, 209:19.
offered 28:19, 29:6,
55:1, 65:1.
offering 116:25,
133:3, 133:7.
offhand 101:1.
Office 73:14,
191:11.
Officer 42:23, 43:1,
46:2, 51:1, 52:19,
54:21, 55:14,
61:2, 61:22, 62:5,
65:14, 73:22,
79:10, 79:15,
79:22, 80:18,
81:1, 82:1, 84:7,
104:18, 115:6,
119:10, 121:4,
191:12, 195:20,
206:23, 207:11.
officers 7:1, 54:11,
54:20, 55:23,
57:6, 59:21,
69:21, 70:3, 81:4,
81:7, 83:6, 88:14,
111:23, 155:25,

192:23, 194:21,
196:10, 196:13,
196:16, 197:17,
197:20, 197:22,
197:24, 199:9,
200:16, 202:15,
207:5, 210:6.
Official 1:47, 2:46,
99:14.
often 90:19, 90:20,
91:6, 97:3.
old 116:5.
Olmstead 98:16,
99:5.
Once 65:22, 75:21,
111:24, 114:23,
143:10, 149:1,
150:5, 156:19,
163:24, 165:20,
172:17, 173:6,
174:14, 176:22,
179:20, 185:24,
187:6, 190:7,
202:4, 204:18.
one. 11:6, 181:12.
ones 74:18.
ongoing 127:18,
132:3.
open 122:15, 166:23,
182:3, 182:12.
opened 196:17.
operates 130:20.
operating 130:12,
179:2.
operation 175:1.
operational 69:15.
operator 197:14.
opinion 100:7,
191:3, 191:7.
opportunity 128:14,
131:16.
opposed 111:3.
option 79:17.
oral 115:17.
Ordered 47:7, 92:24,
107:15.
ordering 114:8.
orderly 100:12.
orders 47:10,
185:12.

ordinary 7:19, 7:22,
90:5.
organization
186:12.
organized 105:3.
original 84:13.
others 8:16,
13:25.
Otherwise 15:10,
38:16, 53:20,
99:17, 115:13,
210:8.
ought 182:4,
207:13.
ounces 93:23.
out-of-court 5:24.
outgoing 112:19.
outlined 15:3.
Outside 18:9,
101:14, 104:17,
146:5, 146:24,
148:24, 165:20,
170:21, 192:19,
192:23, 193:10,
206:21.
outstanding 157:9.
overall 84:15.
overhead 149:2.
Overlaps 86:7,
86:20.
Overruled 29:9,
47:3.
oversee 130:19.
overseeing 130:18.
oversight 5:6.
overwhelm 84:14.
own 10:6, 68:16,
91:17, 96:2, 98:3,
102:15, 104:25.
.
.
< P >.
p.m. 20:24, 132:3,
141:12, 154:25,
155:1, 155:20,
157:17, 158:10,
160:1, 160:10,
160:13, 161:2,
174:11, 182:25,
184:5, 185:10,

186:17, 186:19,
186:24, 197:13,
198:15, 201:25.
Pacific 160:11,
160:14.
pack 16:6.
packaging 66:22,
67:2.
Page 85:18, 92:24,
133:11, 133:13,
135:25, 136:1,
136:5, 136:7,
136:9, 153:4,
155:16, 158:6,
188:20, 212:3.
pages 32:8, 133:2.
paid 122:14,
136:11.
painted 84:12.
pants 23:18, 26:17,
26:19, 26:21,
27:6, 27:11,
43:14, 43:15,
44:9, 44:14.
paper 6:14, 14:25,
15:14, 17:7, 18:3,
55:8, 55:11,
55:16, 65:1, 71:6,
85:13, 89:20,
107:12, 116:24,
123:8.
papers 6:5, 7:9,
8:5, 9:13, 71:13,
115:16, 120:25,
121:1, 207:15.
paperwork 57:21,
66:24, 67:3,
167:10.
paragraph 92:24,
111:12, 133:14,
153:19, 189:9.
paraphernalia
166:24, 167:9,
208:16.
parcel 52:23.
parked 170:21,
170:25.
parking 30:20,
98:22.
parlance 82:9.

part 10:16, 30:25,
  34:18, 44:14,
  51:3, 52:23, 53:7,
  68:11, 79:24,
  90:21, 102:2,
  103:19, 103:20,
  115:3, 116:25,
  127:21, 133:12,
  186:11, 194:8,
  194:22.
partial 34:4.
participants
  147:21.
participated 10:10,
  62:11, 62:19,
  74:8, 127:17,
  128:15, 130:1.
Participating
  129:10, 147:19.
participation
  128:5.
particular 5:3,
  8:22, 16:23,
  41:17, 59:11,
  72:11, 80:21,
  86:5, 92:8, 95:15,
  98:14, 105:16,
  106:19, 115:12,
  130:15, 143:21,
  161:19.
particularly 16:25,
  59:13, 200:14.
parties 40:24,
  136:25.
parts 43:11, 117:7,
  135:8.
pass 175:16,
  198:5.
Passed 38:5, 38:7,
  40:9, 57:11,
  203:1.
past 136:12.
pat 50:3, 52:23.
Patrol 20:11, 26:10,
  38:14, 51:13,
  148:21, 149:1,
  175:2.
patted 26:13,
  26:15.
Paul 1:31, 3:12.

Pause 7:14, 83:14,
  121:19, 122:1,
  137:23, 159:13.
paying 130:6.
payment 130:8.
peek 7:11.
peeked 102:24,
  180:23.
peering 204:21.
pen 32:1, 33:22,
  38:7, 109:24.
pending 4:25, 7:8,
  13:8, 17:4,
  18:24.
Penitentiary
  196:2.
people 13:1, 14:2,
  25:6, 43:2, 43:13,
  43:14, 43:15,
  50:17, 51:16,
  63:23, 93:17,
  94:14, 96:8,
  96:23, 97:6,
  100:4, 101:12,
  101:25, 104:2,
  104:23, 110:7,
  115:2, 144:15,
  144:17, 165:24,
  174:25, 197:16,
  198:7.
percent 181:6.
perfectly 118:17.
perhaps 8:4, 11:11,
  35:6, 54:8,
  201:18.
period 124:17,
  124:23, 172:17,
  178:25, 201:21,
  202:12.
permissible
  125:19.
permission 131:25.
permit 159:8.
permitted 79:10,
  202:20.
personal 99:3.
personally 124:21.
persons 8:9, 15:2,
  48:2, 63:14,
  94:10, 145:10,

147:10, 166:4,
  166:10.
persuade 82:13,
  101:8.
persuaded 194:7.
persuasive 201:6.
pertaining 192:15.
pertains 135:10,
  170:16.
pertinent 133:12.
Peter 1:25, 3:8.
Petty 8:13, 8:15.
phones 85:19,
  88:18.
photo 6:17, 7:23,
  7:24, 8:23, 8:24,
  9:12, 11:20,
  12:11, 12:23,
  13:2, 13:10,
  13:12, 13:19,
  13:21, 14:5, 14:9,
  14:14, 15:23,
  16:2, 175:12.
Photograph 16:7,
  16:9, 16:11,
  27:5.
photographs 8:9,
  14:6, 16:16,
  167:9.
photos 8:2, 16:24.
physical 46:12.
physically 18:8.
pick 121:22, 126:2,
  145:1, 163:16,
  180:14.
picking 139:18.
picture 12:13,
  21:21, 31:11,
  32:2, 34:21,
  35:18, 35:19,
  59:3, 79:14,
  81:18, 82:24,
  84:12, 96:5,
  200:13, 203:20.
pictures 16:22,
  32:21.
piece 60:3, 60:16,
  168:3.
pieces 123:12,
  169:3.

ping 91:2, 91:9,
154:14, 156:7,
157:11, 161:10,
161:20, 161:22,
162:1, 162:4,
162:10, 162:11,
162:18, 163:10.
pinged 88:23, 88:24,
89:1, 90:19.
Pinging 88:17,
88:18, 90:23,
91:6, 91:14, 93:8,
97:4, 114:1.
pings 90:2,
161:19.
pink 23:13, 40:20,
42:6, 43:18,
49:23.
pinpoint 162:20,
163:9, 199:13.
Pioneer 117:15,
158:12, 161:8,
161:22, 162:2,
162:9, 162:15,
163:23, 164:1,
164:4, 164:9,
167:1, 168:10,
168:21, 170:25,
175:12, 179:21,
201:12, 201:17,
201:21, 202:1,
202:3, 204:16,
204:18, 207:22.
place 22:16, 23:3,
23:8, 40:2, 40:5,
43:9, 45:14,
51:18, 93:19,
95:7, 102:21,
102:22, 103:18,
104:18, 109:11,
109:12, 130:10,
130:11, 144:2,
155:25, 172:16,
182:2, 198:12,
199:14.
placed 6:7, 26:8,
26:10, 67:5,
70:3.
places 94:11.
plain 39:18, 39:19,

99:16, 166:18,
208:9, 208:16.
Plaintiff 1:7,
1:23.
plan 149:4.
planning 147:22,
153:23, 153:24,
153:25, 154:2.
plastic 66:25.
platoon 63:6,
66:8.
play 121:17, 131:25,
132:12, 133:13,
137:19, 139:2,
139:16, 141:16,
143:12, 144:23,
145:19, 146:12,
146:15, 173:7,
183:7, 183:8,
183:11, 184:2.
played 120:20,
134:22, 135:7,
148:2, 148:8,
148:12, 173:18.
played. 132:14,
136:20, 137:21,
138:5, 139:5,
139:24, 141:21,
141:25, 143:14,
145:2, 145:20,
146:17, 183:17,
184:3, 184:25.
playing 134:2,
135:11.
plea 98:11, 158:21,
158:25, 159:3.
pleading 11:22.
pleadings 15:19.
Please 3:2, 7:12,
18:11, 19:2, 19:4,
19:10, 22:10,
24:9, 25:11,
25:12, 44:4, 61:7,
61:13, 72:18,
73:2, 124:9,
126:4, 126:9,
126:15, 128:11,
153:19, 162:22,
188:20, 189:8.
plot 148:3, 148:5,

148:15, 149:21.
plus 125:16,
155:8.
pocket 26:21, 91:24,
93:13, 94:12,
94:23, 95:1, 95:2,
95:3, 95:6, 95:8,
96:16, 105:15,
111:1, 115:1.
pockets 94:19,
94:20, 98:21,
99:7, 102:23,
104:14, 104:17,
115:3.
podium 171:19.
Poet 37:3, 37:5.
point. 45:24,
121:22, 205:1.
pointed 24:23,
47:16, 107:8,
110:25, 112:11,
112:14, 112:17,
123:8.
pointing 32:25.
points 178:22.
Police 18:6, 20:3,
23:21, 24:21,
24:22, 25:19,
42:23, 43:1,
44:24, 46:1,
46:14, 46:18,
47:4, 49:11,
49:14, 49:17,
55:15, 57:12,
62:1, 72:14,
73:18, 91:6,
107:20, 116:17,
118:23, 127:2,
127:10, 140:11,
141:2, 141:9,
148:17, 151:12,
152:13, 164:3,
165:13, 166:13,
185:23, 189:11,
194:21, 203:19.
policy 104:2.
porch 180:1.
porthole 209:2.
portion 116:12,
117:3, 119:16.

portions 132:18.
pose 54:25.
posed 166:7.
position 6:4, 7:7,
  14:21, 16:1,
  17:15, 18:12,
  19:23, 48:12,
  51:9, 58:10, 59:3,
  117:16, 164:24,
  164:25, 184:13,
  195:24, 204:3,
  205:16.
positioned 148:23,
  174:18, 174:21,
  174:22.
positions 20:9.
Positive 171:9,
  171:10, 206:24.
positively 173:13.
possess 93:23.
possession 29:20,
  44:21, 97:6,
  109:9, 154:3,
  196:6.
possible 27:2,
  48:15, 210:23.
Possibly 142:12,
  176:1.
post 56:17, 58:18,
  60:6.
pot 94:12, 104:16.
potential 198:17,
  198:23.
potentially 178:13,
  204:23.
pound 139:22, 140:3,
  140:8, 141:5.
practical 103:7.
precise 57:16.
prefer 32:23,
  49:8.
preference 49:9.
prejudice 15:8.
prejudicial 12:10,
  14:9, 14:12,
  14:21.
premises 94:9.
prepare 150:12,
  185:21.
prepared 18:2,

104:10, 118:10,
  119:22, 121:2,
  132:17, 150:5,
  153:7, 193:3,
  200:23, 206:23,
  207:11.
prepares 185:25.
preparing 150:1,
  187:7.
presence 90:9,
  115:18, 201:13,
  201:18.
present 18:2, 54:12,
  65:14, 134:16,
  192:6, 199:1.
presentation 10:17,
  15:18.
presented 7:9, 15:8,
  16:14, 65:16,
  65:19, 71:1,
  71:18, 76:23,
  77:17, 78:19,
  81:18, 83:20,
  88:4, 90:5, 90:7,
  103:14, 125:15,
  194:9, 200:6.
presenter 9:4.
presenting 18:5.
preserve 101:6,
  109:4.
pressed 37:19.
presumably 12:12,
  78:23.
pretrial 4:25, 9:20,
  11:14, 94:2.
pretty 33:18, 80:3,
  102:2, 104:7,
  134:12, 179:5.
prevent 147:24,
  198:23.
preventative 194:16,
  196:8, 198:3.
preventing 194:20.
preventive 196:20.
previously 73:18,
  73:21, 115:24,
  121:24, 210:11.
primarily 56:24.
primary 206:4.
principle 192:18.

principles 98:19,
  106:8.
printed 76:17,
  76:19, 77:4, 77:7,
  77:9, 77:13,
  77:14.
Prior 5:2, 20:2,
  41:10, 59:14,
  118:25, 131:15,
  137:7, 145:11,
  172:10, 172:13,
  173:3, 174:11,
  206:2.
prison 81:24.
privacy 99:3,
  101:16, 103:2,
  103:17, 104:9,
  104:13, 105:1,
  105:10, 105:13,
  105:24.
private 94:9, 95:1,
  98:22, 115:6,
  204:2, 205:9.
probability 198:4.
probable 52:20,
  58:9, 58:11,
  58:21, 58:25,
  59:4, 59:7, 59:17,
  59:24, 60:2, 60:4,
  60:8, 60:12, 88:1,
  92:12, 108:10,
  108:12, 108:20,
  108:23, 109:11,
  111:22, 111:25,
  112:5, 112:24,
  113:2, 113:6,
  113:7, 113:23,
  114:7, 115:25,
  122:11, 180:17,
  188:12, 188:20,
  189:6, 197:3,
  205:5, 205:9.
Probably 46:23,
  69:6, 69:9, 80:1,
  80:3, 87:3,
  136:11, 175:6.
probativity 170:7.
problem 11:15,
  12:17, 57:7, 90:1,
  92:5, 99:6, 102:2,

103:13, 103:18,
103:19, 103:20,
104:15, 115:17,
121:7, 151:23,
151:24, 152:2,
152:5, 158:19,
187:12, 201:1.
problematic
203:19.
problems 102:3.
procedure 7:19,
10:19, 105:6.
proceed 139:23.
proceeded 200:25.
proceeding 5:20,
8:15, 9:9, 9:10,
41:10, 116:7,
158:23.
proceedings
182:12.
proceedings. 7:14,
121:19, 137:23,
159:13.
process 8:6, 10:2,
102:9, 105:3,
108:10, 169:21.
processing 180:6.
prod 79:11, 81:10.
produced 16:16.
proffer 8:18, 10:15,
14:7, 87:10,
87:13, 89:4,
91:10, 118:12,
120:18, 121:12,
202:19.
proffering 14:8.
profound 104:8.
progression
160:19.
projection 210:18.
prominent 174:4.
prompt 204:9.
prompted 79:6,
208:21.
prompting 18:24.
prone 47:7.
proned 25:24,
27:6.
pronouncements
191:17.

proof 72:11, 78:11,
118:11.
proper 51:9, 90:7,
132:25.
properly 51:19,
90:6, 93:6.
propose 6:2.
proposed 5:3, 5:7,
113:12.
prosecutor 203:7.
protect 27:17,
83:6.
protective 166:9,
166:11, 166:14,
166:17, 166:25,
208:3, 208:4,
209:6, 209:13,
210:5.
protects 94:10.
protocol 130:10,
130:20, 150:19,
151:21.
prove 60:13.
provide 92:25,
100:11, 111:14,
133:19, 148:21,
204:2.
provided 8:25, 10:7,
31:18, 111:23,
132:23, 161:20,
189:22, 190:1,
190:7, 190:18,
190:24, 191:3.
provider 90:21,
91:8.
providers 88:15,
88:25, 92:7,
92:25, 93:3, 98:2,
100:11, 100:15,
102:8, 103:5,
103:8, 110:17,
111:9, 111:14.
providing 133:1,
190:18.
provision 68:22,
68:24.
provoked 28:11.
public 91:23, 93:10,
93:19, 95:7, 99:7,
99:18, 99:24,

99:25, 102:20,
102:22, 103:18,
103:21, 104:10,
104:12, 166:8.
Pulaski 140:9.
pull 32:4, 40:2,
47:9, 48:9.
pulled 24:6, 24:18,
47:4, 47:13,
134:4.
pulling 41:16.
pulls 113:19.
purple 66:20.
purporting 191:9.
purpose 113:9,
153:12, 209:15.
purposes 15:13,
85:1.
purse 66:20.
pursue 202:8.
pursued 116:1.
pursuing 201:3,
201:5, 202:14,
203:24.
pursuit 193:20,
196:3, 200:20,
200:25, 201:4.
push 80:10,
103:25.
pushes 80:18.
pushing 159:1.
Put 16:4, 24:22,
25:24, 27:15,
31:20, 44:7,
54:18, 54:19,
58:23, 59:2, 59:9,
67:18, 78:18,
88:19, 89:21,
94:6, 94:14,
94:22, 95:1, 95:5,
102:5, 110:5,
111:10, 111:11,
120:5, 150:5,
153:9, 175:1,
184:13, 187:23,
188:7, 188:11,
203:5, 210:9.
putting 45:23.
.
.

< Q >.
quality 99:2.
quarrel 116:4.
quest 109:13.
questions 8:1, 8:3,
  11:2, 11:11, 30:3,
  42:17, 48:23,
  65:20, 67:7, 72:4,
  77:18, 77:20,
  78:6, 78:9,
  115:19, 125:1,
  125:3, 125:6,
  125:7, 163:11,
  170:7, 170:18,
  171:15, 198:24.
quickly 41:13,
  41:16, 41:19,
  76:10, 82:20,
  83:7, 151:15,
  198:12.
quietly 84:10.
.
.
< R >.
R. 2:10.
rabbit 176:13.
race 14:3.
radiation 104:20.
radio 22:20, 40:1,
  88:12, 91:20,
  96:4, 96:12,
  100:3, 106:15,
  106:16, 106:18,
  106:24.
raise 19:4, 61:7,
  72:19, 107:5,
  124:4, 126:9.
raised 52:16,
  90:19.
ran 164:14, 164:17,
  164:19, 166:22,
  206:24.
random 181:10.
range 95:4, 155:6.
rank 62:4, 127:9,
  130:19.
rapid 41:8.
rate 41:13.
Raven 131:3.
re-evaluate 100:8.

reach 202:2.
reached 22:20,
  168:24.
reaching 95:8.
react 118:13,
  203:17, 204:3,
  204:6.
reacting 204:8.
reaction 52:7,
  83:22.
reactions 92:18.
reactive 194:19,
  196:1.
Read 64:5, 65:1,
  65:5, 65:15,
  65:19, 68:1, 70:8,
  70:12, 70:18,
  71:18, 75:20,
  75:21, 92:22,
  106:23, 107:14,
  153:19, 188:15.
Reading 8:5, 91:3,
  106:18, 136:9.
Ready 59:5, 87:8,
  108:8, 114:12,
  115:13, 125:9,
  126:5, 126:7.
real 83:16,
  151:15.
real-time 151:15.
really 10:18, 50:19,
  87:3, 88:1, 88:13,
  98:15, 100:2,
  103:13, 103:14,
  108:3, 111:12,
  115:8, 115:21,
  123:5, 158:18,
  181:25, 195:2,
  202:12.
rear 60:21, 66:4,
  66:16, 78:5,
  164:21, 164:22,
  165:3.
reason 8:18, 38:15,
  45:12, 59:8,
  80:19, 86:20,
  89:18, 94:15,
  181:8, 181:9,
  195:8, 201:20,
  204:5.

reasonable 45:13,
  50:14, 50:15,
  52:14, 54:19,
  81:10, 101:15,
  104:22, 105:1,
  105:9, 105:12,
  105:24, 199:12,
  200:8, 200:16.
reasonably 104:23,
  114:10.
reasoning 203:9.
reasons 115:15.
recall 10:12, 18:22,
  31:13, 39:11,
  40:21, 40:25,
  45:1, 63:2, 63:5,
  63:9, 63:14,
  63:22, 74:11,
  74:14, 74:24,
  75:12, 75:16,
  76:2, 76:6, 77:18,
  77:20, 91:2,
  131:1, 165:11.
recanted 9:23.
receipt 163:9.
receive 186:18,
  186:20.
received 154:24,
  155:23, 186:15,
  186:23, 189:12.
receiving 110:13,
  150:7, 153:14,
  154:14, 154:22,
  157:11, 157:20,
  162:11, 162:18.
recent 172:23,
  180:4.
recently 81:23.
Recess 72:7, 72:9,
  72:10, 121:21,
  126:3, 159:14,
  159:16, 163:2,
  163:5, 211:11.
reckoned 83:16.
recognize 21:18,
  64:22, 76:13,
  99:18, 115:8,
  137:10, 137:13,
  152:19, 154:18,
  157:15, 159:19,

196:19.
recognized 12:19,
  26:17.
recollection 9:10,
  9:12, 9:16, 36:5,
  36:6, 37:16,
  37:17, 40:18,
  40:20, 41:2, 42:2,
  47:22, 47:23,
  49:23.
reconsideration
  191:12.
reconvene 72:9.
record 17:11, 17:16,
  19:11, 25:4,
  25:16, 29:22,
  44:24, 61:14,
  63:21, 73:3, 75:8,
  85:1, 90:4, 92:22,
  95:23, 98:4,
  100:16, 102:18,
  103:25, 104:1,
  107:7, 108:4,
  109:3, 121:20,
  124:10, 126:16,
  128:2, 154:21,
  170:15, 192:16.
record. 158:17,
  178:19.
recorded 100:12,
  110:22, 111:16,
  128:15, 131:22.
recording 133:4,
  135:7, 135:10.
recordings 131:16.
records 93:6, 93:8,
  97:8, 105:3,
  112:18.
recovered 27:14,
  27:16, 41:23,
  44:9, 66:15, 67:5,
  78:23, 83:24,
  86:14, 86:15,
  140:20, 140:24,
  141:3, 141:9,
  156:21, 169:8,
  172:8.
red 31:6, 32:24,
  38:21, 39:3,
  39:23.

redirect 72:5,
  192:12, 202:20.
refer 16:19.
reference 57:25,
  108:3, 114:1,
  138:12, 139:13,
  154:5, 154:7,
  183:2, 189:8.
referenced 10:25.
references 57:8,
  143:21, 197:6.
referred 173:22.
referring 83:23,
  137:4, 183:4,
  191:1.
refers 142:20.
reflect 25:16,
  63:21, 75:8,
  128:2.
refusals 81:6.
refused 65:9, 65:13,
  71:4, 71:6, 76:17,
  76:23, 77:7,
  77:13.
refuses 78:21, 79:5,
  80:14.
regard 29:8, 53:8.
regarding 8:12.
regardless 29:7.
Regime 12:4, 62:13,
  127:19, 128:5,
  128:14, 130:19.
register 109:24.
registered 57:2.
regular 47:24.
relate 5:11,
  135:8.
related 14:15.
relates 210:11.
relating 18:3,
  116:2, 123:22.
relation 86:13,
  87:1, 93:21,
  156:7, 207:6.
relatively 81:23,
  151:14.
released 6:8,
  108:13, 116:20,
  179:9.
relevance 11:13.

relevant 11:7, 53:5,
  108:11, 132:18,
  151:14, 169:15,
  169:17.
reliability 11:11,
  56:24.
reliable 11:8,
  59:13, 93:5,
  189:1, 189:13.
relying 115:22,
  199:2.
remain 29:18, 71:19,
  159:15, 202:6.
remaining 134:11,
  207:14.
remains 17:3,
  209:5.
remanded 72:8,
  126:1, 163:3,
  211:9.
remark 199:18.
remedy 11:5, 15:11,
  179:9, 179:10,
  179:11.
remember 6:16,
  18:23, 18:25,
  28:7, 33:11,
  56:19, 82:1,
  147:4, 156:2,
  163:11, 175:6,
  178:1, 183:19.
remembering 180:3.
remove 26:18, 26:20,
  27:2, 27:6.
removed 26:21, 44:7,
  210:5.
removing 164:18.
rendered 54:8,
  55:3.
rendering 194:19.
Repeat 20:15, 20:21,
  44:4.
report 44:23,
  159:22, 160:13.
reported 112:15.
Reporter 1:47,
  2:46.
reports 44:18,
  44:20, 45:3,
  106:23.

represent 4:1.
representation
  109:21.
represented 98:9.
representing 4:7.
request 116:11,
  118:24, 150:1,
  152:21, 153:15,
  154:10, 185:6,
  185:18, 185:19,
  187:1, 203:18,
  204:7, 204:10.
requested 113:11,
  152:13, 170:24,
  171:2, 172:1,
  172:5.
require 180:9,
  206:19.
required 88:2,
  89:25, 105:7,
  122:1, 195:10.
requirement 102:8,
  102:11, 102:12,
  117:21, 117:23,
  200:18.
requirements 57:16,
  110:20.
resemble 14:2,
  35:15.
resembles 204:22.
residence 58:17,
  58:18, 58:23,
  83:5, 167:11,
  167:14.
residential-type
  30:23.
residue 27:25.
resolve 55:13,
  117:14, 205:20.
resolved 117:9,
  194:8, 209:5.
respect 6:11, 15:22,
  17:12, 56:21,
  59:18, 85:15,
  89:7, 107:5,
  107:7, 111:25,
  117:6, 117:20,
  130:15, 147:11,
  157:8, 193:7.
Respond 29:25,

51:20, 64:12,
  76:3, 77:24, 78:2,
  147:24, 151:18.
responded 5:5, 28:2,
  29:20, 76:2,
  81:12, 149:1,
  164:3, 196:10.
responding 187:5,
  187:10, 187:13,
  187:14, 190:10.
responds 49:16.
response 29:16,
  40:19, 42:16,
  54:23, 66:12,
  70:15, 70:21,
  79:12, 79:13,
  79:14, 112:2,
  133:10, 133:15,
  150:25, 152:12,
  190:7.
responses 65:24.
responsibilities
  20:18.
responsibility
  123:19.
rest 162:15.
result 171:7.
results 50:3,
  91:9.
resume 163:3.
retired 74:2.
return 121:24.
returning 125:13.
review 31:11,
  102:18, 131:16,
  188:20.
reviewed 5:5,
  102:10, 105:4,
  131:20, 188:22.
revolver 27:13,
  27:20, 41:25,
  42:1.
Richards 144:6,
  144:7.
Rin 93:17.
ring 23:5.
ripe 53:15.
ripened 52:24.
rise 59:7, 196:22.
risk 194:20, 196:4,

196:5.
road 21:21, 30:17,
  33:18, 34:12,
  38:6, 82:19,
  181:19, 181:25,
  182:2.
rob 176:14.
robbed 136:2.
robbing 176:2,
  176:4.
Roberts 8:12, 8:18,
  8:19, 9:2, 9:7,
  10:20, 13:22,
  17:13, 100:6.
rode 136:12.
role 130:13.
rolled 21:6,
  57:15.
rolling 175:25.
roof 36:20.
room 63:12, 63:15,
  63:24, 64:2, 64:6,
  64:15, 65:15,
  65:17, 65:21,
  66:3, 69:17,
  69:22, 70:2, 70:4,
  74:23, 74:24,
  75:12, 75:13,
  75:17, 75:21,
  75:22, 77:17,
  77:24, 78:18,
  78:24, 80:8,
  80:21, 84:4,
  84:10, 84:15,
  103:1.
rooms 80:20.
rooted 14:14.
Roselawn 158:14,
  161:8.
roughly 34:22,
  35:18, 35:19,
  137:20, 143:12.
round 27:23.
rounds 41:13.
roused 80:7.
route 150:22,
  151:8.
routine 38:14,
  51:13.
row 30:24, 30:25,

34:19, 36:20,
127:25.
RPR 1:46, 2:45.
Rule 6:19, 53:21,
59:5, 92:17,
108:8, 114:12,
115:13, 122:11,
125:9, 193:14,
205:2.
ruled 85:2, 85:4,
85:8, 190:4.
Rules 28:22.
ruling 12:22, 14:17,
14:19, 15:9,
15:17, 17:20,
53:16, 101:8,
115:21, 189:25,
190:8, 190:12,
191:2, 204:12,
204:13, 205:19.
rulings 205:1,
205:12.
run 50:1, 76:10,
93:4, 157:10.
Running 18:19,
23:12, 23:14,
23:23, 28:9,
32:20, 34:16,
40:15, 42:6,
42:11, 42:13,
42:14, 45:20,
45:21, 46:1,
47:11, 48:20,
49:24, 50:9,
50:17, 50:22,
52:3, 52:8,
158:19.
runs 31:2, 49:16.
RUTER 2:14, 4:16,
4:17, 4:19,
4:21.
.
.
< S >.
S-a-i-l-o-r 19:13.
Safe 48:14, 83:10,
119:10, 120:1,
127:7, 164:24.
safely 26:20, 27:2,
40:2.

safety 83:6,
194:21.
Sailor 18:7, 18:8,
18:14, 19:6,
19:12, 19:18,
21:14, 22:11,
23:17, 25:18,
30:8, 37:3, 37:23,
48:24, 49:21,
50:13, 212:5.
sales 130:8.
salient 51:11.
sample 27:25.
samples 28:2.
Saturday 150:24,
151:14, 152:4,
160:12.
saw 18:18, 21:12,
22:19, 23:8,
23:12, 24:1,
50:13, 51:15,
52:2, 58:1, 58:16,
58:18, 69:24,
123:15, 131:6,
178:4, 178:5,
178:8, 178:12,
180:24, 197:22,
209:16.
saying 28:7, 33:24,
59:25, 71:13,
79:3, 82:20,
88:19, 92:19,
94:20, 101:1,
108:5, 118:14,
120:7, 137:15,
149:13, 151:3,
168:2, 172:25,
178:23, 181:8,
182:6, 191:3,
195:7, 196:23,
199:21.
says 37:5, 46:14,
76:17, 80:11,
109:22, 123:15,
142:20, 160:12,
177:15, 177:19,
183:22, 185:22,
188:17, 199:18.
scale 60:10.
Scalia 98:14.

scan 170:24, 171:2,
171:7, 206:24.
scattered 148:25.
scenarios 83:16.
scene 28:3, 28:12,
29:10, 29:18,
29:25, 40:22,
54:11, 140:20,
140:22, 156:21,
157:7, 169:14.
scheduled 5:1,
158:21.
schedules 55:23.
school 57:15.
scope 51:15, 201:14,
202:1, 204:17.
scoring 178:22.
scratch 85:22.
screaming 39:16.
screen 21:15, 22:10,
32:5, 67:18,
134:4, 171:4.
scurrying 204:22.
searched 66:12,
116:1, 122:9,
198:1.
searches 194:6.
searching 167:11,
168:21.
seat 19:10, 61:13,
72:25, 126:15.
seated 3:2, 3:19,
4:2, 4:18, 75:3,
125:8, 126:4.
Second 3:14, 60:21,
66:4, 66:16,
85:16, 86:1,
107:4, 112:6,
127:25, 134:8,
137:22, 148:8,
153:4, 161:22,
162:4, 162:10,
164:14, 164:22,
165:2, 168:10,
168:24, 194:22,
195:18, 204:24,
207:23.
secondary 105:7.
secondly 105:18.
seconds 7:11, 134:6,

134:7, 134:10,
134:14, 135:14,
135:16, 136:17,
139:17, 141:19,
141:20, 144:23,
146:15.
secreted 80:20,
91:24.
Section 20:14,
20:17, 20:19,
141:23, 188:12,
188:17.
secure 81:2,
101:11.
seeing 36:21, 40:25,
41:2, 49:16.
seeking 111:15.
seem 12:17.
seemed 47:13.
seen 6:22, 43:13,
60:9, 101:24,
102:1, 114:19,
142:9, 164:25,
180:7, 210:11.
sees 101:15,
135:5.
seize 49:18.
seized 122:25,
123:3, 125:14,
169:4, 184:23,
208:15, 210:10.
seizure 85:19,
207:9.
seizures 207:3.
sell 184:20.
selling 130:7,
186:11.
seminar 180:4.
send 150:19,
185:19.
sending 95:6, 99:6,
110:14.
sense 110:8, 122:3,
129:23.
senses 83:25.
sensitive 187:16.
sent 153:9, 154:10,
154:21, 159:25,
186:2.
sentence 88:19,

110:5, 110:17,
111:9, 183:21,
183:22.
sentences 116:9.
separate 9:8, 15:2,
28:21, 112:3,
170:16, 207:4.
sequence 5:4, 5:7,
5:12, 7:22, 40:4,
55:24, 160:9,
185:23, 205:13.
series 207:2.
serious 51:18.
seriously 197:18.
served 6:25, 7:20.
serves 16:25.
service 24:23,
25:19, 90:20,
91:8, 111:14.
services 204:3.
set 3:8, 112:16,
121:17, 123:17,
198:2.
Several 25:6, 50:19,
66:23, 100:7,
141:19, 193:24.
severance 120:10,
207:16.
severely 9:14.
shadowboxing
115:10.
shake 121:8.
shall 107:17,
110:3.
sheet 135:10,
135:19, 135:22,
177:18, 177:21,
185:18.
sheets 132:24,
133:19, 133:21,
134:17, 134:18,
134:21, 135:1,
135:4, 135:6,
175:8, 175:11,
175:14, 175:16,
175:18, 177:4,
177:6, 177:12.
shell 27:23,
156:20.
shells 208:16.

shift 20:25,
29:23.
Shike 66:22.
shin 44:1, 45:5,
48:4, 48:20,
50:6.
shirt 25:9.
Shit 147:6, 147:7.
shock 83:15, 83:22,
84:13.
shocked 47:12.
shoe 66:18, 66:19.
shoebox 66:20.
shoot 25:21, 47:6,
48:16, 52:17,
142:10, 144:15,
145:10, 146:2,
147:10, 153:23,
178:12, 189:14,
189:16, 196:12.
shooter 112:16.
shooting 9:11,
29:11, 30:1, 54:1,
54:13, 112:9,
112:10, 123:19,
139:12, 143:10,
147:19, 153:25,
154:1, 154:3,
154:6, 154:7,
155:25, 156:2,
156:8, 156:10,
156:25, 157:6,
157:11, 158:11,
161:12, 169:18,
172:7, 175:25,
176:3, 194:24,
194:25, 195:1,
197:16, 198:7,
200:22, 201:24.
shootings 172:15.
shootout 139:7,
176:19, 176:22,
176:24.
short 25:13, 69:10,
108:24, 109:1,
109:18, 122:1,
134:10, 134:12,
145:6.
shot 29:17, 55:2,
119:25, 130:24,

131:2, 139:11,
140:11, 141:1,
141:2, 144:11,
148:7, 151:22,
156:16, 186:15,
187:24, 188:8,
188:18, 188:23.
shouldn't 79:1,
96:7, 122:17.
shouting 193:1.
Show 13:15, 13:17,
14:11, 16:6,
18:16, 21:14,
21:25, 27:3, 27:8,
32:7, 32:20,
32:21, 45:1, 47:4,
76:11, 109:11,
113:2, 130:12,
131:19, 135:4,
140:18, 151:10,
154:17, 155:19,
157:14, 158:15,
164:7, 169:11,
181:11, 181:12,
195:15, 196:24,
199:3, 199:4,
199:5.
showed 47:5, 59:3,
65:16, 112:18,
140:23, 155:14,
160:3, 161:2,
161:6, 162:18,
169:12.
Showing 16:18, 22:4,
22:5, 27:10,
31:12, 31:16,
32:9, 34:18,
34:24, 35:14,
35:16, 36:3,
37:14, 38:8,
64:21, 113:22,
138:24, 152:17,
159:19, 160:6,
161:10, 175:12,
177:3, 188:12,
188:20, 198:11.
shown 7:1, 162:6.
shows 14:5, 38:1,
199:25.
sic 74:25.

Siddique 165:13,
165:14, 165:17.
side 21:22, 30:20,
30:25, 31:1,
52:11, 58:24,
59:20, 201:1,
211:5.
sidewalk 23:14,
23:15, 34:13,
40:15, 45:22,
99:9, 105:13.
sifter 166:24.
sight 23:4, 24:4,
40:7, 99:16.
sign 37:8, 64:15,
64:18, 64:19,
64:20, 65:2, 65:6,
65:9, 65:13, 71:6,
71:13, 71:21,
71:23, 76:7,
76:23, 77:3, 79:5,
79:19, 80:14,
81:14, 81:15.
signal 99:6, 99:11,
106:18, 106:19,
107:17, 110:3,
113:20.
signals 104:16,
105:10, 113:18.
signature 9:13,
76:17, 76:18,
77:9, 94:24.
signed 77:3, 89:19,
89:23, 90:8,
152:10, 185:23,
187:6.
significance 56:2,
82:12, 84:2, 91:6,
130:15, 144:7.
significant 16:20,
51:25.
signing 71:9,
110:10.
silent 71:19.
silver 170:24.
similar 77:1, 92:11,
94:16.
simply 46:11, 58:20,
106:16, 191:15,
196:22.

simulator 86:10,
86:21, 86:22,
88:10, 88:11,
89:12, 106:13,
106:17, 107:19,
107:21, 107:23,
108:3, 113:17,
113:22, 114:11,
162:24, 163:18,
163:21, 170:1,
192:17, 192:24,
195:9, 196:25,
197:4, 197:7,
200:20, 201:17,
202:6, 202:10.
simulators 89:8.
simultaneous 93:1,
201:4.
simultaneously 40:1,
201:7.
single 8:22, 105:22,
199:23.
singular 85:20.
sink 168:24, 169:5,
209:2.
sirens 26:3,
39:21.
sit 6:8, 48:17,
93:18.
site 86:10, 86:21,
86:22, 87:20,
87:21, 88:9,
88:11, 89:8,
89:11, 93:1,
100:19, 106:12,
106:17, 107:19,
107:21, 107:23,
108:3, 113:15,
113:17, 113:22,
114:11, 162:24,
163:18, 163:21,
170:1, 192:17,
192:24, 195:9,
196:25, 197:4,
197:7, 200:20,
201:17, 202:6,
202:10.
sits 93:16.
sitting 25:2, 63:19,
64:6, 84:10.

situation 52:24,
  82:5, 84:6, 84:13,
  87:15, 105:16,
  115:11, 176:1,
  197:1, 198:2,
  198:10, 199:9,
  200:15, 200:22,
  204:19.
situations 69:15,
  89:10.
six 16:6, 16:16,
  16:20, 16:22,
  20:6, 24:7, 24:19,
  40:23, 46:6,
  49:25, 51:16,
  62:11, 91:18,
  112:3, 127:17,
  172:17.
six-person 21:12,
  23:1.
size 44:14, 48:7,
  51:15.
skip 141:10, 141:22,
  144:18.
skipped 137:25,
  207:18.
slap 98:21.
slapped 110:6,
  116:7.
Slay 11:25.
slid 44:8.
slide 67:24.
slightly 82:5,
  82:19.
slipped 45:4,
  50:8.
sloppily 110:5.
slow 181:25.
slowing 21:4.
smacking 21:10,
  39:14.
small 46:20, 134:15,
  170:8.
Smart 104:20.
smell 94:13.
smelly 96:15.
Smith 8:13, 16:3,
  17:14.
sneak 99:8.
sniff 105:14.

sniffing 104:19.
snug 48:10.
so-called 54:20,
  152:6.
social 210:25.
Soldier 66:24.
Soledad 66:24.
solely 152:13.
solving 109:14.
somebody 57:10,
  95:8, 98:21,
  99:20, 116:5,
  151:13, 178:8,
  187:24, 189:16.
somehow 116:7,
  159:2.
someone 33:2, 40:20,
  40:25, 41:16,
  43:7, 43:8, 92:13,
  94:7, 95:24,
  105:4, 109:8,
  110:25, 111:9,
  139:11, 139:12,
  142:16, 144:25,
  151:5, 151:22,
  166:5, 167:21,
  176:24, 178:5,
  178:13, 183:3,
  184:22, 187:15,
  188:23, 189:14,
  194:18, 194:20,
  195:23, 204:21,
  205:8.
something. 147:7.
sometime 109:5.
sometimes 11:11,
  177:22, 199:15.
somewhat 43:10,
  55:22, 210:20.
Somewhere 139:19,
  139:20.
Sorry 36:14, 39:4,
  75:7, 86:8, 125:5,
  125:21, 136:4,
  173:2, 190:14.
sort 11:4, 11:17,
  14:4, 16:25,
  57:17, 59:22,
  82:9, 83:4, 83:15,
  83:22, 84:13,

94:24, 95:19,
  98:19, 99:16,
  100:5, 104:14,
  115:20, 208:21.
sorted 204:20.
sorts 194:6.
sought 168:10.
sound 39:7, 39:14,
  40:19, 134:6.
sounded 21:9, 41:11,
  41:20, 41:22,
  173:19.
sounds 10:5, 51:17,
  52:5, 88:12,
  209:18.
source 189:13,
  189:15, 189:18.
south 21:22, 31:1,
  38:10.
space 99:7, 99:18,
  102:22, 103:21,
  205:10.
Spaz 143:25.
speaker 132:20.
speaking 33:16,
  119:1, 128:17,
  137:1, 137:5,
  165:17.
Special 3:10, 18:7,
  19:6, 19:24,
  100:2, 122:21,
  123:9, 124:5,
  148:22, 189:22,
  190:17, 191:3,
  191:14, 191:20,
  193:21, 198:24,
  200:19, 212:5,
  212:21.
Specialized 20:12.
specific 38:18,
  57:16, 147:3.
specifically 8:8,
  74:24, 138:20,
  163:25.
speech 54:21.
speed 86:1,
  181:20.
spell 19:11, 61:14,
  73:2, 126:16,
  128:11.

spelled 4:1, 73:5.
spend 36:11,
  210:21.
spent 27:23, 140:19,
  140:22.
spike 102:25.
spoke 5:20, 149:25,
  173:4, 173:5,
  186:14, 198:7.
spontaneously
  55:1.
spot 106:7.
Squad 20:15.
square 46:11.
squarely 103:14.
squeal 137:15.
staff 159:2.
stairs 34:23.
stairwells 34:23.
stand 25:10, 25:12,
  104:19, 109:3,
  124:3, 170:17,
  201:3, 203:8.
Standard 160:11,
  160:14.
standing 57:11,
  69:12, 104:4,
  106:2, 106:8,
  106:20, 192:8,
  192:11.
Start 64:21, 86:2,
  88:17, 92:14,
  110:13, 117:12,
  117:17, 132:13,
  135:6, 136:19,
  141:19, 178:22,
  180:7, 180:8.
started 20:11,
  39:23, 41:5,
  51:19, 85:11,
  91:17, 97:4,
  100:6, 110:7.
starting 137:24,
  138:2.
starts 144:24.
stash 58:17.
State 9:8, 9:9,
  9:10, 17:16,
  19:11, 57:22,
  61:14, 73:2, 74:8,

117:19, 124:9,
  126:15, 164:3,
  165:13, 166:12,
  167:1, 168:10,
  190:19, 191:10.
stated 53:22, 65:9,
  66:4, 116:15,
  183:1, 186:5,
  193:12, 196:19.
Statement 9:21,
  28:9, 28:11,
  44:20, 45:3, 45:7,
  45:9, 53:10,
  53:12, 53:21,
  53:23, 54:4, 54:5,
  54:21, 55:1, 55:2,
  55:12, 60:19,
  65:5, 78:16,
  80:22, 84:18,
  92:12, 116:16,
  116:23, 116:25,
  117:3, 122:22,
  123:14, 145:12,
  147:12, 192:19,
  192:21, 205:13,
  205:20, 205:22,
  206:1, 206:10,
  206:12.
statements 25:20,
  28:6, 58:3, 60:12,
  64:25, 108:14.
States 1:1, 1:5,
  3:5, 87:19, 88:7,
  93:25, 98:8,
  103:2, 108:14,
  109:21.
station 116:17,
  116:20.
stationary 39:5,
  39:10.
stationed 192:23.
status 152:10,
  157:8.
stay 18:10, 40:4,
  49:10, 159:3,
  159:10, 162:14,
  204:19.
stayed 69:13,
  162:17.
step 13:5, 48:24,

78:10, 80:12,
  81:9, 96:22,
  159:6, 191:8,
  193:10.
stepping 79:15.
steps 22:18, 93:21,
  97:3, 148:14,
  148:16, 149:5,
  150:12, 150:20,
  163:8.
Stingray 86:2,
  95:12, 96:3,
  96:10, 97:4,
  106:14, 110:24,
  200:19.
Stingrays 110:7,
  110:18.
stipulate 89:24,
  191:2.
stipulated 90:4,
  90:16, 106:21.
stipulating 90:1.
stipulation 8:5,
  90:10.
stood 180:1.
stoop 60:5.
Stop 24:5, 24:17,
  24:21, 38:2,
  39:10, 51:9,
  51:10, 61:5,
  72:18, 94:16,
  96:1, 96:11,
  103:22, 105:20,
  114:17, 114:20,
  115:3, 119:14,
  132:15, 137:22,
  142:18, 147:23,
  148:14, 158:23,
  193:6, 207:10,
  207:11.
stoplight 21:4,
  21:8.
stopped 21:4, 21:7,
  24:12, 31:6,
  33:19, 36:7, 47:1,
  51:14, 86:15,
  91:19, 97:6,
  105:17, 105:24,
  114:23, 137:25,
  138:3.

stopping 57:24,
  105:17, 105:23.
stops 47:10, 50:2.
stored 122:23.
story 51:25, 53:7,
  163:16, 194:22,
  204:11, 204:25,
  209:6.
strange 33:17.
strapped 143:1.
Street 1:48, 2:47,
  11:24, 12:1, 31:9,
  31:13, 32:5, 33:2,
  35:2, 36:7, 36:21,
  37:8, 38:3, 49:24,
  50:18, 50:22,
  53:4, 55:4, 55:9,
  56:11, 57:11,
  62:20, 62:25,
  74:9, 91:19,
  93:10, 94:3,
  96:15, 96:18,
  100:1, 128:7,
  130:11, 131:1,
  140:8, 142:9,
  142:21, 158:13,
  173:22, 174:20,
  180:12, 180:13,
  186:8, 198:14.
Streets 32:14,
  52:10, 117:11,
  119:10, 120:1,
  127:8.
strength 106:18,
  179:22.
stretch 159:11.
striking 51:17,
  52:5.
strong 106:19.
struck 21:9.
structure 95:22,
  96:25, 102:4.
structured 100:12,
  102:9, 105:3.
structures 34:23,
  130:19.
stuck 44:15, 48:8,
  192:23.
stuff 56:17, 91:13,
  103:2, 115:2,

122:7, 140:4,
  141:6.
stunning 83:6.
style 47:19.
stylish 47:24,
  47:25.
subject 8:4, 8:16,
  107:18, 180:18.
subjective 121:6,
  199:10.
submission 108:9.
submit 107:18,
  109:18, 113:1,
  122:12, 122:16,
  150:15, 169:9,
  207:15, 208:21.
submitted 89:18,
  90:7, 105:20,
  112:25, 123:11,
  191:12, 191:13.
submitting 13:10.
subpoena 5:22,
  6:7.
subpoenas 6:8, 6:20,
  7:20.
subsequent 9:7,
  53:5, 55:25,
  84:24, 96:4,
  210:12.
subsequently
  191:5.
substance 59:10.
substantial 78:23.
substantive 79:12.
successfully 94:25,
  120:19.
successive 133:14.
sudden 93:16, 180:3,
  181:10.
suddenly 179:25.
sufficient 11:12,
  58:6, 58:9,
  204:15.
sufficiently 4:20,
  83:23.
suggest 107:10.
suggested 5:4,
  106:12, 106:14,
  116:24.
suggestibility

15:20.
suggesting 51:17,
  133:21, 167:16,
  182:3.
suggestion 13:24,
  15:7, 116:5,
  135:21, 204:9.
suggestive 12:10,
  12:25, 13:14,
  15:10, 17:2.
suggestivity 15:22,
  15:23.
suicidal 197:15,
  198:6, 199:21.
suicide 197:14.
suitcase 197:23.
sum 107:10, 116:9.
summaries 133:15.
summarize 66:14,
  142:5, 146:21.
summarized 120:23,
  133:11.
summary 207:18.
summer 123:10.
super 99:21.
superior 94:2.
supervisor 127:12,
  159:2.
supplemental
  207:21.
supplied 130:24.
supplies 82:10.
supply 103:9.
support 112:4,
  149:6.
supported 88:1.
suppose 179:13,
  179:17.
supposed 98:15.
supposition 50:12.
suppress 5:15, 5:23,
  11:10, 13:7,
  17:11, 18:4, 53:9,
  55:5, 55:9, 55:12,
  60:14, 60:19,
  84:18, 84:23,
  85:14, 170:21,
  206:1, 206:9,
  206:11, 206:21,
  210:24.

suppressed 81:25,
   202:25.
suppressing 12:23.
suppression 11:5,
   15:11, 116:11,
   170:6.
Supreme 100:24.
surely 59:1.
surprised 47:13.
surrendered
   117:15.
surreptitious
   107:16, 113:15,
   114:3.
surrounded 164:4,
   164:24.
surrounding 10:4,
   58:23.
surveillance 149:6,
   149:9, 149:11,
   149:15, 149:17,
   174:25.
suspect 8:5, 29:11,
   54:13, 147:21,
   173:12, 173:14.
suspected 58:15,
   58:17, 119:3,
   129:11, 129:15,
   148:14, 149:20,
   168:7, 174:23.
suspicion 45:14,
   50:15, 52:14,
   169:24.
suspicions 179:4.
SWAT 63:6, 63:11,
   66:9, 67:1,
   68:14, 68:16,
   68:24, 69:2, 69:3,
   69:9, 69:14,
   74:15, 78:17,
   79:25, 80:2,
   83:2.
Swear 124:4.
sweep 166:9, 166:11,
   166:14, 166:17,
   166:25, 175:18,
   208:3, 208:4,
   209:6, 209:13,
   209:16, 210:5.
sworn 19:7, 61:10,

72:22, 89:19,
   90:8, 124:6,
   126:12.
sympathetic 55:22.
sympathy 85:1.
synopsis 18:11,
   56:20, 153:7,
   185:18, 185:20.
.
.
< T >.
T-intersection
   33:6.
T-mobile 152:21,
   154:11, 157:12.
T-shirt 23:13.
T. 1:46, 2:45.
table 3:9, 4:8.
tactic 51:21.
tactics 92:18.
tail 20:25.
taken. 72:10, 126:3,
   159:16, 163:5.
tale 121:12.
talked 172:15,
   176:4.
talks 111:17,
   142:21.
Tamika 147:1,
   147:11, 147:14.
tape 132:15, 132:16,
   133:3.
tapes 134:22.
target 113:21,
   119:11, 143:20,
   144:16, 147:1,
   152:25.
targeting 20:21,
   146:24.
targets 148:10.
Task 55:14, 61:2,
   61:22, 62:5,
   73:21, 119:9,
   127:7, 127:8,
   127:12, 189:12.
tattoo 15:18, 15:25,
   16:1, 16:10,
   16:18, 16:23.
taught 98:16.
Taurus 27:20.

Tavon 63:16, 65:13,
   75:1, 77:13.
taxing 130:6.
TB 142:15, 143:6,
   143:10, 145:13,
   145:15, 178:13,
   178:14.
Team 66:9, 68:14,
   68:16, 68:24,
   78:17, 79:25,
   80:2, 149:25,
   150:4, 150:6,
   150:18, 151:6,
   151:20, 162:23,
   165:15, 166:9,
   172:18, 174:21,
   174:25, 185:8,
   185:20, 186:21.
teams 83:2,
   149:17.
tech 28:1.
Technical 98:3,
   110:20, 149:24,
   150:4, 150:18,
   151:6, 151:20,
   162:23, 185:8,
   185:20, 186:21.
technically 205:7.
technician 28:1.
techniques 114:6,
   114:9.
technologies
   110:12.
technology 96:22,
   98:1, 100:2,
   100:9, 101:13,
   122:14, 122:15,
   125:19, 193:21,
   200:20.
tee 7:5.
telecommun- 97:15.
telecommunication
   88:15, 88:25,
   98:2.
telecommunications
   87:21, 92:7,
   92:25, 93:3,
   95:25, 100:11,
   100:15, 102:8,
   103:5, 103:8,

110:16, 111:8,
111:13.
telephone 97:11,
103:15, 112:19,
112:23, 113:3,
119:12, 131:7,
131:22, 131:23,
132:8, 158:10,
160:6, 162:20,
163:22, 163:25,
201:18, 203:16.
telephones 131:10.
telescope 102:24.
tells 106:19,
111:12.
ten 136:17.
ten-hour 180:8.
ten-second 139:3.
term 41:12, 42:20,
130:14, 138:14,
138:16, 138:24,
140:8.
terms 12:25, 17:25,
59:12, 59:17,
59:22, 84:1,
95:16, 100:20,
107:20, 108:4,
115:18, 118:4,
118:11, 133:7,
133:8, 133:15,
135:22, 138:19,
139:10, 143:4,
206:16.
Terry 52:23, 94:16,
114:17, 114:20,
114:22, 115:3.
test 27:25.
testified 9:7, 9:10,
9:15, 19:8, 40:4,
51:12, 61:11,
72:23, 124:7,
126:13, 169:18,
178:4, 187:18,
195:21, 209:14.
testify 89:22,
91:11, 91:23,
118:24, 119:23,
192:19, 202:20,
206:24, 207:11.
testimony 6:6, 6:12,

7:7, 9:21, 18:2,
18:6, 18:13, 42:5,
50:21, 57:7,
59:21, 87:18,
88:23, 89:16,
89:17, 91:21,
121:4, 125:16,
126:8, 154:8,
160:16, 178:11,
178:15, 190:2,
190:19, 191:4,
191:13, 191:16,
191:20, 192:18,
202:14, 203:22,
205:19, 206:19,
209:10, 209:17,
209:20.
Testing 140:16,
140:18, 140:19,
140:23, 169:9,
169:11, 169:12.
TFO 61:9, 212:11.
Thanks 58:7, 85:10,
114:12, 182:11.
that. 95:17.
them. 177:19.
themselves 8:2,
14:6, 14:10,
58:14, 59:6,
59:18, 60:11,
84:1, 200:24,
202:16.
theory 206:3.
Thermal 94:5,
94:8.
they'll 130:20,
207:8.
They've 80:11,
97:10, 114:23.
thinking 40:3, 49:7,
69:7, 203:9.
thinner 44:14.
Third 112:11, 136:7,
136:9, 162:1,
198:16.
Thomas 3:6.
Thompson 63:16,
63:25, 64:19,
65:13, 75:1,
77:13.

though 5:19, 59:8,
82:18, 83:12,
94:8, 95:2, 111:1,
181:22, 201:2.
thoughts 204:24.
threat 153:22,
166:7, 184:12,
186:6, 186:10,
186:12, 186:13,
187:15, 195:5,
199:4, 199:5,
199:6, 199:8,
199:25.
threatened 198:12.
threatening
196:12.
threats 185:2,
197:18.
Three 9:8, 13:22,
14:10, 122:9,
122:13, 123:5,
133:6, 136:4,
137:20, 142:4,
144:15, 144:18,
163:10, 168:1,
170:18, 198:2,
198:4, 206:19,
207:4, 207:8,
210:18.
three-hour 160:15.
three-way 144:25.
threshold 89:6,
107:6.
threw 88:19.
Throughout 67:1.
thrown 110:17.
ties 130:21,
169:17.
tight 48:4,
104:13.
tightly 26:19,
44:1.
till 150:25.
time-wise 47:9.
timeline 140:24.
Tin 93:17.
tip 50:22, 50:23.
Title 62:4, 93:25.
Tobacco 19:21,
62:2.

Today 6:23, 11:16,
  25:2, 48:17,
  63:18, 68:13,
  75:2, 115:17,
  115:24, 118:11,
  127:24, 131:15,
  171:24, 189:16,
  206:14.
together 59:3,
  110:5, 112:4,
  113:1, 153:9,
  200:10.
toilet 166:21.
toll 112:18.
Tomorrow 180:7,
  206:17, 207:19,
  209:25, 210:3,
  210:18, 211:3.
tone 173:24.
tonight 209:24.
Tony 149:25, 153:8,
  162:23, 185:25.
took 29:20, 44:2,
  44:6, 59:24, 81:9,
  97:2, 98:1,
  114:25, 116:5,
  116:6, 116:21,
  133:10, 150:20,
  172:16, 180:4,
  181:5, 191:8,
  197:25.
tools 99:19.
top 66:17, 66:23,
  135:9, 160:12.
total 107:10, 116:9,
  200:12, 203:20,
  207:12.
totality 10:3,
  57:17, 79:21,
  80:22, 82:13,
  125:15, 190:7,
  200:9, 206:16.
totally 207:13.
towards 42:6, 42:11,
  69:12, 107:9,
  139:21, 144:13.
towed 140:10,
  140:11.
tower 113:17.
towers 95:17.

town 182:4.
trace 97:24,
  109:24.
track 95:25, 96:7,
  96:9, 102:10,
  111:7, 111:16,
  112:24, 113:11,
  123:11, 150:1,
  150:10, 153:15,
  181:10.
tracker 202:23.
tracking 84:23,
  85:15, 109:25,
  114:1, 114:2,
  172:1.
traffic 33:9, 33:15,
  33:18, 33:22,
  35:16, 38:20,
  39:1, 40:1, 40:10,
  40:24, 51:14,
  207:10.
trafficking 60:5,
  60:14.
trailing 137:15.
trained 23:20,
  43:12.
training 23:20,
  42:22, 43:11,
  45:17, 45:18,
  50:16.
Trainor 1:37, 3:20,
  3:23, 55:18.
transactions 58:15,
  58:19, 186:10.
Transcript 1:17,
  132:16, 132:17,
  132:22, 132:25,
  176:19.
transcription
  133:12, 134:13,
  134:15.
transcripts 134:18,
  175:8, 191:13.
transitioned
  84:16.
trap 97:24,
  109:24.
traveled 52:12.
traveling 18:15,
  21:2, 30:21, 33:2,

37:11, 40:13,
  60:10.
treated 87:25.
tremendous 83:21.
trespass 98:19,
  99:4, 99:5.
trespasses 99:5.
Trevon 112:13,
  123:15, 123:16.
trial 4:8, 4:25,
  9:18, 11:15,
  82:12, 190:19,
  205:23.
trials 10:24.
trigger 41:16.
trouble 178:21.
trousers 44:10.
true 14:22, 83:12,
  98:23, 119:15.
trustworthy 59:14.
truth 28:19, 29:6.
try 24:8, 48:9,
  50:1, 91:3,
  110:17, 174:15,
  174:17, 181:13,
  194:18, 195:9.
trying 11:15, 22:21,
  27:2, 39:25, 40:2,
  40:6, 41:19, 43:9,
  43:21, 48:14,
  91:4, 111:10,
  142:15, 167:21,
  170:9, 179:12,
  181:11, 181:20.
Tuesday 1:19.
turn 8:2, 23:9,
  24:1, 42:11,
  72:19, 82:21,
  95:6, 96:17,
  96:18.
turned 10:7, 14:6,
  22:22, 24:3,
  39:23, 52:2,
  90:21, 97:24,
  104:20, 105:11,
  112:8, 169:20,
  190:17.
turns 203:14.
two 6:9, 7:24, 9:11,
  11:2, 11:7, 13:9,

21:11, 30:17,
30:18, 34:12,
54:4, 55:13,
55:24, 57:22,
58:11, 58:14,
58:20, 66:18,
83:9, 85:7,
105:22, 117:7,
123:12, 133:6,
133:25, 134:10,
136:4, 145:16,
146:13, 147:10,
162:12, 181:12,
181:24, 183:25,
185:12, 186:9,
195:18, 195:21,
198:15, 198:21,
206:18, 207:13.
two-inch 46:11.
two-step 187:12.
type 26:25, 41:18,
48:13, 69:7,
195:16, 195:19,
195:22, 195:23,
199:25.
typed 177:21.
types 34:22.
typing 177:17.
typo 154:1.
.
.
< U >.
U-turn 18:17, 18:18,
23:3, 23:5, 23:12,
40:2, 40:5, 40:9,
40:16, 42:5.
UI 177:16, 177:19.
ultimately 41:23,
111:24, 150:15,
170:8, 178:21,
179:4, 179:12.
unable 11:12.
uncertain 107:20.
uncertainty 155:3,
158:1.
unconstitutional
179:14.
uncover 108:11,
123:4.
uncovered 123:13,

170:8.
undated 8:25,
13:23.
underlined 153:5.
undershirt 25:10.
understand 12:8,
13:6, 60:18, 71:8,
71:9, 76:4, 79:13,
79:16, 79:18,
80:11, 81:11,
81:12, 81:14,
101:12, 117:16,
138:19, 139:10,
140:7, 143:4,
143:17, 145:9,
169:5, 170:10,
181:11, 181:19,
182:5, 191:10,
192:12, 195:12,
197:16, 198:7,
205:13, 206:9.
understanding 71:14,
76:21, 82:14,
137:3, 143:9,
144:14, 145:7,
145:13, 145:24,
146:7, 147:8,
178:21, 203:23.
understands 78:20,
80:9, 80:12,
80:13.
understood 28:7,
64:7, 64:10,
65:22, 70:13,
70:18, 70:20,
71:22, 75:17,
75:23, 75:25,
76:22, 79:8,
79:23, 81:2, 82:2,
133:5, 133:9,
139:13, 142:5,
142:23, 146:21.
unfettered 93:9,
102:4.
unidentified
136:10.
uniform 175:1.
Unintelligible
177:17, 177:20,
177:21.

unique 113:18,
137:14.
Unit 20:15, 26:9,
26:10, 39:18,
39:20, 42:8, 46:8,
49:14, 49:15,
49:16, 68:15,
69:11, 122:21,
180:6.
United 1:1, 1:5,
3:5, 87:19, 88:7,
93:25, 98:8,
103:1, 108:14,
109:21.
Units 20:12, 26:6,
40:8, 148:22.
Unless 89:3, 89:24,
102:11, 151:18.
unmarked 42:8,
46:8.
unmonitored 98:3,
111:7.
unnecessary 191:8.
unreasonable 122:16,
125:17.
unrecorded 102:4,
111:7.
unregulated 93:5.
unsigned 89:21.
Until 5:7, 26:4,
40:15, 51:8,
51:21, 99:13,
100:1, 114:25,
117:14, 121:21,
121:23, 122:13,
122:14, 126:1,
151:2, 173:12,
180:21, 181:3,
181:5, 187:11,
202:8, 204:19.
unusual 34:1, 38:21,
38:23, 38:24.
up. 24:22.
upper 11:22, 67:25,
83:7.
upstairs 78:5,
164:20, 169:5.
urgency 153:14,
198:24.
user 132:7.

using 91:2, 91:17,
   96:9, 103:24,
   108:14, 110:16,
   114:10, 116:19,
   132:4, 138:24,
   163:21, 170:1,
   172:19, 174:7,
   176:11, 176:12,
   192:24.
utility 203:23.
utilization
   193:21.
utilize 68:22,
   88:20, 110:16,
   115:6.
utilized 56:25,
   86:22, 88:11,
   97:1.
utilizing 112:22.
.
.
< V >.
v. 49:12, 196:3,
   196:4, 196:5,
   196:9, 197:12.
valid 205:3,
   205:8.
van 197:23.
various 20:9, 66:22,
   67:2, 83:20.
Vastly 89:10.
vehicle 22:24, 23:9,
   24:20, 39:20,
   52:2, 52:11,
   140:13, 140:14,
   140:15, 141:2,
   171:5, 206:21,
   207:10.
vehicles 22:23,
   33:19.
verifying 66:10.
versus 3:5, 98:8,
   103:2, 196:2.
via 7:22, 37:24.
vials 66:17,
   66:23.
vicinity 16:19.
victim 112:10,
   156:10, 157:6.
videos 10:21.

view 11:1, 22:22,
   34:25, 36:4,
   36:10, 36:24,
   59:15, 91:24,
   166:18, 208:10,
   208:16, 211:6.
violated 11:18,
   104:5.
violates 82:24.
violation 29:22,
   81:21, 81:25.
violence 143:20,
   144:16, 147:19,
   147:23, 147:25,
   148:3, 149:21,
   196:10.
Violent 20:12,
   20:14, 20:15,
   20:17, 20:18,
   20:20, 21:8,
   148:15, 172:9,
   173:8, 184:19.
virtue 12:19, 17:19,
   55:3, 121:12.
visibility 148:17,
   149:4.
visual 94:24.
voice 119:1, 128:17,
   137:10, 137:13,
   137:14, 137:16,
   173:19, 173:24.
voices 136:21,
   140:1, 142:1,
   145:3, 145:21,
   146:19.
vs 1:8.
.
.
< W >.
W-e-l-c-h 4:1.
W. 1:48, 2:47.
waist 42:17, 43:18,
   44:13, 45:23,
   50:10, 50:18.
waistband 23:18,
   44:8.
Wait 22:13, 22:14,
   51:21, 151:22,
   160:8.
waiting 145:12.

waive 71:4, 79:19,
   80:12, 82:8.
waived 54:7, 81:3,
   82:2, 82:17.
waiver 64:25, 65:4,
   65:8, 71:7, 71:8,
   76:14, 77:3,
   80:14, 81:14,
   83:19.
waivers 64:16,
   64:18, 70:23,
   71:1, 76:8.
waives 78:20.
waiving 81:16.
wake 194:23,
   194:25.
walk 20:9, 94:3,
   96:10, 96:15,
   96:18, 101:14,
   101:22, 105:13.
walked 70:17, 99:9,
   117:14, 164:5.
walking 93:10,
   93:15, 94:20,
   96:10, 99:20,
   99:23, 104:10,
   104:12.
walks 95:8.
wall 102:25, 168:25,
   169:5, 209:2.
wanted 37:21, 93:7,
   107:4, 108:4,
   130:7, 142:10,
   143:10, 145:8,
   145:10, 146:2,
   178:12.
wants 87:24, 89:24,
   133:17, 133:18,
   150:5, 210:21.
Warden 196:2.
Wardlow 49:12.
warning 53:24.
warnings 28:4, 28:8,
   54:5, 65:19, 68:2,
   81:3.
warrantless 5:15,
   18:4, 49:10,
   49:11, 87:15,
   193:20, 207:21.
warrants 204:4,

211:1.
watching 101:18.
waves 96:12.
ways 41:14,
    181:24.
weapon 24:23, 25:19,
    41:15, 41:18,
    41:23, 41:24,
    45:23, 45:24,
    47:15, 48:5,
    49:22, 53:24.
Weapons 69:5, 69:7,
    197:15, 199:21.
wearing 23:13, 25:3,
    25:9, 27:17,
    40:20, 46:17,
    47:18, 49:22.
weather 21:7.
wedged 26:19, 43:25,
    44:1, 50:5.
weekend 5:2, 6:23,
    144:14, 186:13.
weight 29:8, 29:9,
    43:12, 43:15,
    59:10.
Welch 1:43, 3:24,
    3:25, 4:1.
Wesley 1:35, 3:6,
    3:19, 3:21, 55:8,
    63:1, 63:16,
    63:18, 74:25,
    75:9, 75:24, 76:2,
    76:18, 116:12.
west 23:10, 30:18,
    33:21, 37:11,
    40:12.
westbound 18:15,
    21:2, 21:12, 23:2,
    23:13, 23:14,
    30:15, 30:21,
    33:3, 33:21,
    34:25, 45:21.
Whatever 9:23, 10:8,
    40:6, 49:18,
    57:25, 93:16,
    102:17, 103:6,
    103:24, 109:3,
    182:7, 206:10,
    209:1.
whatsoever 83:11,

195:25, 198:11,
    200:1.
whenever 21:6,
    146:7.
Wherever 160:14,
    171:20.
whip 102:16.
whipped 91:20.
White 23:13, 25:9,
    36:10, 36:20,
    66:22, 86:18,
    112:13, 112:16,
    122:6, 123:15,
    123:16.
whoever 110:5,
    177:21, 209:12.
whole 24:4, 59:2,
    82:6, 98:15,
    100:8, 105:18,
    113:9, 125:10,
    136:2, 196:24,
    209:6.
whom 60:8, 125:14.
whoops 103:23.
wide 44:13, 47:12.
wife 196:11,
    196:15.
will 5:8, 8:14,
    10:15, 18:13,
    21:25, 25:16,
    32:10, 32:21,
    56:7, 63:21, 72:7,
    72:9, 75:8, 78:18,
    84:14, 91:21,
    91:23, 104:24,
    105:1, 113:3,
    115:9, 118:13,
    120:17, 128:2,
    132:13, 134:11,
    139:3, 141:18,
    146:11, 150:6,
    159:8, 160:12,
    170:16, 175:16,
    182:10, 183:5,
    183:6, 189:9,
    191:2, 198:5,
    204:6, 204:10,
    205:2, 206:20,
    206:24, 210:4.
William 1:43,

3:25.
willing 82:3.
Wilmington 181:24.
window 102:24,
    164:16, 164:23,
    165:3, 179:21,
    180:2, 180:23,
    204:21, 204:23,
    204:24.
windows 21:6, 39:5,
    51:13.
wings 147:12.
wipe 180:6.
wire 108:1.
wiretap 107:24,
    119:11, 120:21,
    120:22, 129:25,
    131:7, 132:3,
    138:18, 139:9,
    141:13, 144:20,
    146:11, 146:12,
    147:21, 189:18.
wiretap. 107:25.
wish 9:21.
wished 81:4.
wishes 121:24.
withdrawal 10:23.
withdrawing 14:13,
    14:15.
Within 17:7, 84:17,
    91:18, 95:4, 98:2,
    100:4, 118:17,
    130:13, 130:20,
    163:3, 172:23,
    172:24, 173:23,
    201:14, 201:21,
    202:1, 204:17.
Without 15:7, 32:13,
    89:12, 95:8,
    95:22, 98:24,
    98:25, 103:9,
    146:9, 179:8,
    191:16, 201:15,
    205:2.
witnessed 52:5,
    65:6, 112:15.
witnesses 5:21,
    5:24, 6:6, 6:7,
    7:20, 48:25, 49:3,
    55:14, 87:8,

```
129:20, 129:23,
  192:4, 207:8,
  207:12, 210:22.
witnessing 77:14.
wondering 86:24.
word 43:25, 45:4,
  45:11, 50:4, 91:2,
  142:24, 143:1,
  176:7.
worded 92:2.
words 116:9, 133:6,
  133:25, 199:14.
work 20:2, 20:5,
  73:13, 96:19,
  127:1, 127:3,
  172:6, 185:13,
  197:16, 197:17,
  197:19, 198:7,
  198:8, 199:19.
worked 19:25.
working 20:16,
  20:24, 22:13,
  50:16, 62:16,
  74:4, 103:24,
  130:13, 202:22.
workout 144:14,
  145:8, 145:9.
worn 47:19.
worried 26:23,
  116:6.
worry 204:12.
would've 147:6.
would-you-like-to-si
  gn 71:7.
write 44:18.
writing 29:22,
  65:10, 71:15,
  80:13, 80:16.
writing. 77:9.
written 64:16,
  65:16, 76:7,
  76:23.
wrote 44:23, 77:8.
.
.
< X >.
X. 24:14.
.
.
< Y >.
```

```
yard 140:8.
year 41:10, 119:4,
  119:8, 129:8.
years 20:7, 31:14,
  62:8, 62:10,
  62:11, 73:25,
  93:12, 100:7,
  122:9, 122:13,
  123:5, 127:17,
  172:17.
yelling 39:16.
yesterday 136:12.
yo 136:12, 147:12,
  147:13.
young 12:15, 13:3,
  49:15, 63:17.
yourself 25:19,
  203:5.
.
.
< Z >.
zone 98:5, 104:13,
  111:18.
```