1    IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF MARYLAND

2

3    UNITED STATES OF AMERICA,              )
                                            )
4            Plaintiff,                     )
         vs.                                )
5                                           ) CRIMINAL NO.: JKB-16-0363
     GERALD JOHNSON, et al.,                )
6                                           )
             Defendant.                     )
7                                           )
     _____)

8

9                Transcript of Motions Hearing
             Before the Honorable James K. Bredar
10              Wednesday, October 11th, 2017
                     Baltimore, Maryland

11

12   For the Plaintiff:

13       Peter J. Martinez, AUSA

14       Christina A. Hoffman, AUSA

15   For Defendant Gerald Johnson:

16       Paul F. Enzinna, Esquire

17       Jeffrey B. O'Toole, Esquire

18   For the Defendant Wesley Jamal Brown:

19       Harry J. Trainor, Jr., Esquire

20       Christopher M. Davis, Esquire

21   For the Defendant Montel Harvey:

22       William L. Welch, III, Esquire

23   _____

                 Christine T. Asif, RPR, FCRR
24              Federal Official Court Reporter
                101 W. Lombard Street, 4th Floor
25                 Baltimore, Maryland 21201

1                          APPEARANCES (Cont'd)

2

3    For Defendant Kenneth Jones:

4         Alan R.L. Bussard, Esquire

5    For Defendant Marquise McCants:

6         John R. Francomano, III, Esquire

7    For the Defendant Joseph Bonds:

8         Gerald C. Ruter, Esquire

9

10

11

12

13

14

15

16

17

18

19

20

21

22
_____
23
                    Christine T. Asif, RPR, FCRR
24                 Federal Official Court Reporter
                   101 W. Lombard Street, 4th Floor
25                    Baltimore, Maryland 21201

P R O C E E D I N G S

1

2          THE COURT:  Good morning.  Be seated, please.

3          Mr. Martinez, you may call the case.

4          MR. MARTINEZ:  Good morning, Your Honor.  I call

5    criminal case number JKB-16-0363, United States versus Gerald

6    Thomas Johnson, Wesley Jamal Brown, Montell Harvey, Kenneth

7    Jones, Marquise McCants, and Joseph Bonds.

8              Peter Martinez for the government, with me at

9    counsel table are Christina Hoffman, AUSA, and Special Agent

10   Lisa Christy of ATF.  We're here for day two of our pretrial

11   motions hearing.

12         THE COURT:  Thank you.  Good morning, counsel.

13   Mr. Enzinna.

14         MR. ENZINNA:  Good morning, Your Honor.  Paul

15   Enzinna and Jeffrey O'Toole for Gerald Johnson.

16         THE COURT:  Mr. Davis.

17         MR. DAVIS:  Christopher Davis and Harry Trainor on

18   behalf of Wesley Brown.

19         THE COURT:  Mr. Welch.

20         MR. WELCH:  Good morning, Your Honor.  I am William

21   Welch on behalf of Mr. Harvey.  I need to tell the Court

22   something when you're ready.

23         THE COURT:  Thank you.  Mr. Bussard.

24         MR. BUSSARD:  Good morning, Your Honor.  Alan

25   Bussard representing Kenneth Jones, who is to my right at the

1    trial table.

2                THE COURT:  Mr. Francomano.

3                MR. FRANCOMANO:  John Francomano representing

4    Mr. McCants.  Good morning, Your Honor.

5                THE COURT:  Good morning.  Mr. Ruter.

6                MR. RUTER:  Good morning.  Gerald Ruter on behalf of

7    Mr. Bonds.  He's seated to my right.

8                THE COURT:  Thank you.  Mr. Martinez, Mr. Welch, you

9    may approach.

10               (Bench conference on the record.)

11               MR. WELCH:  Good morning.  We have reached an

12   agreement in the principle to a plea again this morning.  My

13   understanding is that the government is going to re-extend the

14   plea offer that it had made previously.  Mr. Harvey would like

15   to accept that.  The government needs to make a couple of

16   revisions to the document.  There was an element to the

17   offense, I believe, that was left out.  Also, Ms. Hoffman

18   informed me the government will not be moving for the third

19   level, but once those revisions are done, I just need to go

20   over it with Mr. Harvey.  I think that the government can

21   probably do those revisions and I can meet with Mr. Harvey

22   during the lunch recess.  So I would ask to, if possible, kick

23   our motions to the very end of the pecking order and then

24   hopefully we could accomplish this all this afternoon if you

25   can accommodate us.

1          THE COURT:  All right.  So are Mr. Welch's motions

2     unique and exclusive to his client?

3          MS. HOFFMAN:  They are.

4          THE COURT:  So this is a process that can be

5     accommodated.

6          MS. HOFFMAN:  Yes, we can.  We do have three

7     witnesses here.  We'll have to hold them.

8          THE COURT:  Okay.  So we will be on an extended

9     lunch break today between 12:00 noon and 2:00 p.m., it will be

10    two hours.  So that should be ample time to get all the

11    documents together to get the final questions resolved and for

12    counsel to be in a position at 2:00 o'clock to advise me that

13    there was a signed plea.  And then if I hear that, then at

14    some point during the afternoon, probably after we have heard

15    all of the other motions, we just haven't heard yours, we will

16    adjourn the motions hearing and flip over to a Rule 11

17    proceeding for your client alone.  And that's how we could

18    conclude the day, that's how I see it.

19          MR. WELCH:  Fair enough, Your Honor.  That's fine.

20          THE COURT:  Thank you.

21          (The following proceedings were had in open court.)

22          THE COURT:  Okay.  Mr. Martinez, I think we were

23    dealing with Pioneer and the house search.

24          MR. MARTINEZ:  Correct, Your Honor.  It was my

25    understanding that we left off with Mr. Francomano's challenge

1    to the protective sweep and the subsequent obtaining of a

2    search warrant for the residence and the execution of that

3    search warrant.

4            THE COURT:  All right.  So the first issue I want to

5    hear about, Mr. Francomano, is standing.  And do you want to

6    present evidence in regard to -- I take it that the government

7    challenges standing.

8            MR. MARTINEZ:  We do, indeed, Your Honor.  As we

9    explained in our motions papers, I think the best showing

10   Mr. McCants can make here is that he may have been an

11   overnight guest at the home.  Even if he shows that, I don't

12   think it gets him all the way there.  The principle recognized

13   in *Minnesota versus Olson* is based on a long-standing social

14   custom of people having overnight guests in their house.  The

15   6th Circuit has found in the *Stuckey* case that that principle

16   is no longer recognized when you're dealing with a fugitive

17   from an arrest warrant.  So even if Mr. McCants can show

18   somehow that he was an overnight guest at 5617 Pioneer Drive,

19   it's our position that he still had no reasonable expectation

20   of privacy in that house.  But as of now there's no evidence

21   in the record.  We're not even in a place where he has shown

22   that he was an overnight guest, so we think there is a --

23           THE COURT:  What's the government's proffer on whose

24   house it was?

25           MR. MARTINEZ:  Your Honor, we don't know.  As best

1    we can tell, it was a flop house or stash house where

2    narcotics were packaged.

3          THE COURT:  Well, who -- what's the physical

4    condition of the premises?  I mean, is it a vacant or is it a

5    place where people, you know, somebody apparently lives?  Are

6    there utilities connected?

7          MR. MARTINEZ:  There were utilities connected, and

8    clearly the lights were on on the night the arrest was made.

9    There was mail in the house.  I think there was a piece of

10   mail, as Mr. Francomano has said in his motions papers, there

11   was a piece of mail with Mr. McCants's name on it.  So we

12   don't dispute that the house may have been inhabited to some

13   extent.  But by the same token, some of the wiretap intercepts

14   that Sergeant Landsman and his team were getting at the time,

15   and I think Your Honor heard a call yesterday where

16   Mr. McCants told Mr. Dorsey something to the effect of, "I'm

17   at SQ" and Dorsey says, "What?" and he says, "28th."

18          Our intelligence at the time and the FBI's suspicion

19   at the time was that Mr. McCants was staying at a residence in

20   the 400 block of East 28th Street.  And that's why Sergeant

21   Landsman explained that the FBI had camped out there, because

22   they were thinking he was staying at that residence and that's

23   where he was going to be based on the wiretap calls, all of

24   which suggests, I think, it's further evidence that 5617

25   Pioneer Drive wasn't a house he had any real connection to.

1    So we would submit that he still has a burden to carry to show

2    that he had an expectation of privacy.

3            THE COURT:  Mr. Francomano, that's just a proffer,

4    do you have a proffer?

5            MR. FRANCOMANO:  I do, Your Honor.

6            THE COURT:  What is it?

7            MR. FRANCOMANO:  Mr. McCants was not only an

8    overnight guest, he'd stay there at least 15 or 16 different

9    times.  The owner of the home, Mr. Edges, had given him a key,

10   said he could come and stay anytime he'd like.  He had invited

11   guests come with him to stay there.  His belongings were in

12   the home, he had a number of toothbrushes, hair products,

13   personal belongings up in the bedroom.  Your Honor --

14           THE COURT:  So how are you going to prove all this?

15           MR. FRANCOMANO:  Mr. McCants is going to testify as

16   to standing.

17           THE COURT:  Okay.  Well, I think that's where we go

18   first.

19           MR. FRANCOMANO:  Thank you, Your Honor.

20           THE COURT:  I need to be persuaded on that issue.

21   If you've got no standing, the rest of it's not relevant.  I

22   take it that he takes the stand to protect his interest with

23   respect to the standing issue and for no other reason.  And

24   his taking the stand should not be interpreted as any broader

25   waiver of his Fifth Amendment right against self-incrimination

1    than what is necessary to address the standing issue, and that

2    you claim that right of his to testify in a limited way to

3    vindicate his right.

4              MR. FRANCOMANO:  And that is correct, Your Honor.

5              THE COURT:  Okay.  Government agrees that the

6    defendant in taking the stand to testify does not thereby

7    generally waive his Fifth Amendment rights with respect to the

8    broader issues in this case, that he's entitled to take the

9    stand and put on proof that goes strictly to standing without

10   subjecting himself to cross-examination on wider topics, nor

11   to a finding of the Court that he has, generally speaking,

12   waived the Fifth?

13             MR. MARTINEZ:  Understood, Your Honor.

14             THE COURT:  And that's the law, you agree that's the

15   law; right, Mr. Martinez?

16             MR. MARTINEZ:  Yes, Your Honor.

17             THE COURT:  Mr. Francomano.

18             MR. FRANCOMANO:  Thank you.  Defense calls Marquise

19   McCants.

20             THE COURT:  Mr. McCants, please come forward to be

21   sworn.  Come all the way into the witness box, remain on your

22   feet, face the clerk.  Right there, sir.  Raise your right

23   hand.

24                       MARQUISE MCCANTS,

25   called as a witness, being first duly sworn, was examined and

1    testified as follows:

2             THE WITNESS:  Yes.

3             THE CLERK:  Thank you.  You can have a seat.  Please

4    state and spell your first and last name for the record.

5             THE WITNESS:  Marquise McCants, M-a-r-q-u-i-s-e;

6    McCants, M-c-C-a-n-t-s.

7             THE COURT:  If you would, Mr. McCants, slide forward

8    a little bit so that the microphone is closer to your face.

9    Thank you, sir.

10            Mr. Francomano, your witness.

11            MR. FRANCOMANO:  Thank you, Your Honor.

12                        DIRECT EXAMINATION

13   BY MR. FRANCOMANO:

14   Q    Mr. McCants, you were arrested on February 5th, 2017 at

15   5617 Pioneer Drive; is that correct?

16   A    Yes.

17   Q    Are you familiar with that address?

18   A    Yes.

19   Q    Why are you familiar with that address?

20   A    Because that's the address that I was residing at, at the

21   time.

22   Q    And who owns that -- who was renting that address at the

23   time?

24   A    Jonathan Edges.

25   Q    How do you know him?

Direct Examination - McCants   (By Mr. Francomano)

1    A    My mother used to date him about ten years ago.

2    Q    How did you get in and out of the home?

3    A    He gave -- I had a key.

4    Q    And how many times did you stay at that home?

5    A    No less than 15 times.

6    Q    Were you given permission by Mr. Edges to stay there?

7    A    Yes.

8    Q    Did you have other people stay there as well?

9    A    Yes.

10   Q    Were they allowed to stay there per your permission and

11   Mr. Edges's permission?

12   A    Yes, I had a room in the house.

13   Q    How many nights were you staying there prior to your

14   arrest?

15   A    Every day of the week probably, besides the weekend.

16   Q    Did you have any property there?

17   A    Yes, I had property there.

18   Q    Like personal belongings?

19   A    Yes.

20   Q    What kind of personal belongings?

21   A    Shoes, no less than 20 pair of shoes, all my underwear.

22   Clothes was there in the first room upstairs to your left,

23   where I slept at.  I had a TV there, a mattress.  I had a

24   toothbrush, toothpaste, soap in the bathroom, also trimmers.

25   I had food in the refrigerator downstairs.  I also had clothes

1    in the basement next to the washer and dryer.  Phones there,

2    mail.

3              THE COURT:  I'm sorry, sir.

4              THE WITNESS:  Mail.

5              THE COURT:  Mail.

6              THE WITNESS:  Yes.

7    Q    (BY MR. FRANCOMANO)  Mail with your name on it?

8    A    Yes, mail with my name on it.

9    Q    And when you would leave, would you take everything with

10    you?

11    A    No.

12    Q    You would leave all that stuff there?

13    A    Yeah, no point, because I was coming back later on that

14    night.

15              MR. FRANCOMANO:  No further questions, Your Honor.

16              THE COURT:  Cross-examination.

17                        CROSS-EXAMINATION

18    BY MR. MARTINEZ:

19    Q    Mr. McCants, Jonathan Edges goes by the nickname Toby; is

20    that right?

21    A    Yes.

22    Q    And Toby is involved in distributing narcotics, isn't

23    he?

24              MR. FRANCOMANO:  Objection.

25              THE COURT:  How's it relevant?

 1          MR. MARTINEZ:  I thought you said overruled, Your

 2   Honor.

 3          THE COURT:  I'm sorry?

 4          MR. MARTINEZ:  I'm sorry, I thought you said

 5   overruled.

 6          THE COURT:  No, I said how is it relevant?  I

 7   haven't ruled yet.

 8          MR. MARTINEZ:  Well, because to the extent that

 9   Mr. Edges may have been distributing or packaging narcotics

10   out of that house, it goes to the privacy interests.  I think

11   *Minnesota versus Carter* says that if a house is used for drug

12   distribution it affects the occupants expectation of

13   privacy.

14          THE COURT:  Okay.  That's a good argument, but

15   nevertheless sustained.  Next question.

16   Q   (BY MR. MARTINEZ)  Mr. McCants, did you hear the

17   testimony about the firearms that were recovered from the

18   silver Honda that was parked out in the driveway outside the

19   residence at 5617 Pioneer Drive, did you hear the testimony --

20          MR. FRANCOMANO:  Objection.

21          THE COURT:  What's the relevancy of that?

22          MR. MARTINEZ:  One of the firearms recovered from

23   that vehicle came back to a murder in the 1400 block of

24   Popland that was committed by Mr. Edges.

25          THE COURT:  Yes, so how does that help us on

1    deciding whether or not there's standing?

2            MR. MARTINEZ:  Mr. Edges is a --

3            THE COURT:  Is it your theory that to the extent

4    that his connection to the premises was mostly about unlawful

5    conduct that somehow that dilutes his standing?

6            MR. MARTINEZ:  Yes.  Mr. Edges was a drug-dealing,

7    violent BGF member who was providing safe harbor for another

8    gang member while he was fleeing an arrest warrant.

9            THE COURT:  All right.  So for purposes of this

10   standing question, I will make that assumption, that based on

11   the totality of the information that's been presented to the

12   Court so far, that's a reasonable finding and assumption for

13   the Court to make.  And it's really unnecessary to develop any

14   further evidence in that regard.  So the objection is

15   sustained.  But that's not to undercut the government's

16   theory.  Next question.

17   Q    (BY MR. MARTINEZ)  Mr. McCants, you were aware as of late

18   January, early February, that there was a federal arrest

19   warrant for you, were you not?

20   A    No, I wasn't.

21   Q    Are you telling this court you didn't know you had been

22   indicted in a racketeering case and that there was an arrest

23   warrant for you?

24   A    No, I don't watch the news.

25   Q    So then you didn't tell Mr. Edges there was an arrest

Cross-examination - McCants  (By Mr. Martinez)

1    warrant for you either?

2    A    No.

3    Q    He didn't know you were a fugitive?

4    A    Because I didn't know.

5          MR. MARTINEZ:  No further questions, Your Honor.

6          THE COURT:  Okay.  Redirect.

7          MR. FRANCOMANO:  No, Your Honor.

8          THE COURT:  You may step down.

9          Any evidence on standing, Mr. Martinez?

10         MR. MARTINEZ:  No, Your Honor.

11         THE COURT:  I take it you don't have anything else,

12   Mr. Francomano.

13         MR. FRANCOMANO:  No, Your Honor.

14         THE COURT:  Any evidence on standing, Mr. Martinez?

15         MR. MARTINEZ:  Your Honor, we would still submit he

16   hasn't carried his burden.  Even if he stayed in that house 15

17   or 16 times, the fact of the matter is he's a fugitive.  And

18   there's no precedent, in fact, every legal -- the only legal

19   authority we've been able to find says that if you're an

20   overnight guest for purposes of ducking an arrest warrant, you

21   have no reasonable expectation of privacy.  And so we would

22   submit there's still a standing problem that can't be overcome

23   here.

24         THE COURT:  Suppose you are a fugitive, but staying

25   at what anyone would recognize is your own home because you

1    own it or you have a lease there or whatever else, do you

2    continue to have standing --

3        MR. MARTINEZ:  You have standing in that residence

4    if it's your residence, if you're the leaseholder.  But I

5    don't think any proof has been advanced here in that regard.

6        THE COURT:  Okay.  But stay with me on the

7    hypotheticals.  At some point a person -- a person's

8    connection to premises ripens to the point where they are

9    residing there and you've just conceded that if someone is

10   residing in that premises, even if they're a fugitive, dealing

11   drugs out of the place, discussing murders that they

12   committed, storing firearms that they used to kill people

13   with, they still have standing there; right, if they also

14   reside there?

15       MR. MARTINEZ:  I think, Your Honor, residing is a

16   murkier term than the primary inhabitant of a personal

17   residence or a leaseholder.  And residing could encompass an

18   overnight guest.  And what the law --

19       THE COURT:  What about somebody is a fugitive and

20   they go down to the local Holiday Inn and they rent a room for

21   the night, do they have standing in that hotel room if they

22   are staying there and there's a search of those premises and

23   they want to challenge some aspects of that search?

24       MR. MARTINEZ:  I think it depends on the facts, Your

25   Honor.  I think if there's evidence that that person is

1    fleeing from an arrest warrant and they're on the run and

2    they're staying at hotels to cover their tracks, I think in

3    that situation, I don't think the law is prepared to call any

4    subjective expectation of privacy they may have in that hotel

5    room reasonable.

6         THE COURT:  Thank you, Mr. Martinez.  I find the

7    defendant has standing based on testimony that I heard.  I

8    found it credible in this respect.  The defendant indicated

9    that he had spent many nights there, maybe as many as 15.

10   More importantly were the ties that he had to property that

11   was there; that he had a mattress there, that he had a TV

12   there, that he had clothing in the basement near the washing

13   machine, that he had his toothbrush and toothpaste there.  And

14   to me, those are all indicia of a degree of a residential

15   connection to property.

16         Certainly, a residence that is being used by a

17   person who is a fugitive solely as a hideout or a place to

18   evade detection, or a residence that is being used solely as a

19   stash house or place to have meetings to plan illegal

20   activities like murders and robberies and so forth, is not --

21   those connections to a property are not going to give rise to

22   standing in this sense.  But where there are these other

23   indicia that I have referred to, it's completely conceivable

24   to the Court that the property is playing several different

25   roles in this person's life and that's how this appears to me

1   based on the proof that was presented.

2              All right.  So the defendant has standing.  So now

3   let's move on.  I think we heard yesterday what

4   Mr. Francomano's overall contention is, that the -- the Court

5   has already ruled that the confrontation by the police at the

6   Pioneer -- is Pioneer Road -- Pioneer?

7              MR. MARTINEZ:  Pioneer Drive, Your Honor.

8              THE COURT:  Pioneer Drive residence, was legitimate,

9   that they got there without poisonous fruit and that the

10  arrest itself was lawful.  The arrest occurred outside the

11  structure; correct, Mr. Martinez?

12             MR. MARTINEZ:  Yes, Your Honor.

13             THE COURT:  Okay.  And then immediately subsequent

14  to that arrest, I think what the government has informed the

15  Court is that police, without a search warrant, then entered

16  the premises to conduct a protective sweep.

17             MR. MARTINEZ:  That's correct, Your Honor.  That's

18  what Sergeant Landsman testified to yesterday.

19             THE COURT:  Okay.  And Mr. Francomano, your

20  contention is that the protective sweep was not justified by

21  the circumstances as a consequence.  The entry at that point

22  was an illegal warrantless entry of the premises.  And that to

23  the extent that evidence was detected in plain view during

24  that protective sweep and then disclosed in a subsequent

25  affidavit in support of an application for a search warrant,

1    it's all tainted and the chain is sort of cut at that point,

2    and the Court should suppress all of the evidence that was

3    discovered on those premises from the protective sweep

4    forward.  Is that the basic thrust of it?

5              MR. FRANCOMANO:  Exactly, Your Honor.

6              THE COURT:  All right.  So Mr. Francomano has raised

7    that issue, I think it's back to the government now to put on

8    their proof to the extent that they contest Mr. Francomano's

9    allegation.  I take it that's where you want to go,

10   Mr. Martinez?

11             MR. MARTINEZ:  Your Honor, I think we've already put

12   on our proof as far as Sergeant Landsman got on the stand and

13   explained that at the time Mr. McCants was taken into custody,

14   law enforcement was reasonably concerned that there might be

15   other people inside the residence, and that those people might

16   be armed, and that that's why they did the protective sweep.

17             THE COURT:  Tell me a little bit more about the

18   reasonableness of the fear that there might be other armed

19   people in the residence.

20             MR. MARTINEZ:  Sure, Your Honor.  Throughout the day

21   on February 4th, the FBI had been intercepting telephone

22   conversations between Mr. McCants and co-conspirators in which

23   they were planning acts of violence.  Within an hour or hour

24   and a half before arresting Mr. McCants, they had tracked his

25   phone and placed it at the scene of a nonfatal shooting near

1    the intersection of Greenmount and North.  And his phone was

2    tracked immediately from the scene of that shooting to the

3    5617 Pioneer Drive residence.

4            They were intercepting wiretap calls at the time

5    between Mr. McCants and other individuals.  And they knew that

6    he was a member of a violent criminal enterprise.  He was

7    fleeing from an arrest warrant.  All of those factors taken

8    together, I think, made it entirely reasonable for Sergeant

9    Landsman and his colleagues to -- and I haven't even mentioned

10   the events that occurred while they were standing -- while law

11   enforcement had surrounded the home.  They were dealing with a

12   stand-off situation here.  Mr. McCants initially wouldn't come

13   out.  He then came out the second floor window, tried to

14   escape, ran back inside, had -- I can proffer to the Court

15   that had Detective Clark testified yesterday --

16           MR. FRANCOMANO:  I'm going to object to that because

17   he didn't testify yesterday.

18           THE COURT:  Yes, so let's not go there.  I have a

19   more specific question for you, Mr. Martinez.  Let's take the

20   arrest warrant affidavit -- the search warrant affidavit.

21           MR. MARTINEZ:  Yes.

22           THE COURT:  Okay.  Let's excise from it --

23           MR. MARTINEZ:  Yup.

24           THE COURT:  -- any reference to things that were

25   seen during the protective sweep.

1          MR. MARTINEZ:  Uh-huh.

2          THE COURT:  And what have we got left?

3          MR. MARTINEZ:  Well, then we still have the

4    information that Mr. McCants has an outstanding federal

5    indictment for racketeering, has been identified as a member

6    of BGF.  And then the information that Mr. McCants was located

7    at the scene of a shooting and was tracked leaving the scene

8    of the shooting to 5617 Pioneer Drive, that he was found

9    there.  He tried to escape out the back window, that upon

10   confronting the officers, McCants went back into the home and

11   was heard running to the basement of the house.  Investigators

12   surrounded the home and eventually took Mr. McCants into

13   custody.  That's consistent with what Sergeant Landsman

14   testified yesterday.

15         THE COURT:  That's fine.  So Mr. Francomano, would

16   the affidavit, in support of the application for the first

17   search warrant, nonetheless have demonstrated probable cause

18   to justify a search of that house, even if there had been no

19   reference to anything observed in plain view during the

20   protective sweep?

21         MR. FRANCOMANO:  No, Your Honor.  We still believe

22   that it would still not have enough probable cause.  Number

23   one, the tracking of a cell phone was not a tracking of

24   Mr. McCants.  So there was a tracking of a cell phone in an

25   area where a shooting took place.  Mr. McCants was arrested at

1    the home.  We do agree with that.  But all the other indicia

2    does not build up enough to find probable cause.  The

3    ammunition that was found in plain view, the suspected

4    paraphernalia, the manufacturing and packaging paraphernalia,

5    if all of those were taken out of the search warrant, Your

6    Honor, you're left with speculation about a cell phone that

7    was being tracked and an arrest of Mr. McCants, and that he

8    also did have a warrant out for him at the time.

9            THE COURT:  Thank you, Mr. Francomano.  Appreciate

10   it.  I'm ready to rule.  First of all, I do find that there

11   was justification for the protective sweep, that the totality

12   of the information that the officers had at the moment that

13   they arrested Mr. McCants outside the house justified a quick

14   look through the house to make sure that there wasn't someone

15   else who had potentially been associated with the activities

16   that the police believe Mr. McCants had been involved in

17   earlier that evening inside that residence and able to pose

18   some sort of threat to law enforcement.

19            I think what's important here is broader context,

20   the length of time that the investigation had been underway,

21   the general knowledge that the investigators had with respect

22   to the violent nature of this organization and its different

23   members.  All that coupled with the information that they had

24   gleaned from listening in on conversations over the course of

25   that particular evening, and the officers, I find, were

1    justified in taking a quick look through the house for the

2    reason solely to protect their own safety in the context of

3    who they were dealing with.

4          Nonetheless, even if the protective sweep itself was

5    not justified by the circumstances, because the defendant was

6    arrested outside, because there was at best ambiguous

7    indications of whether there might be anyone else present or

8    specifically dangerous, the -- I find the authorities

9    inevitably would have sought a search warrant for that home,

10   given that they had found Mr. McCants there and given what he

11   was not just suspected of, but what they had probable cause to

12   believe he had been involved in, there would have been

13   probable cause to believe that there was evidence inside of

14   that residence that tied this defendant to the illegal

15   activities that occurred that evening and perhaps broader

16   illegal activities.

17         And so we get into a zone of inevitable discovery.

18   That doctrine comes into play here as justification for

19   ultimately admitting the evidence.  But I've also gone down

20   this third route, which is to say, suppose we took the

21   affidavit that was submitted to the state judge and excised

22   out all the information that was acquired by the officers

23   during the protective sweep, what are we left with?  And I

24   conclude that that affidavit still would have provided

25   probable cause for the search of that house in the

circumstances that were disclosed in that affidavit.

So the search that ultimately really matters here is the search that was conducted pursuant to the warrant. That's when the various items that admittedly were seen during the protective sweep were actually seized and taken by the government and became the means by which the government has to introduce during this trial. I find that that search was lawful.

Now we are left with another search that occurred -- was it on the 8th or the 9th? I thought it was obtained on the 8th and done on the 9th.

MR. MARTINEZ: Your Honor's correct.

THE COURT: So we're left with that search. And Mr. Francomano, have you moved to suppress, specifically, the fruits of that search, and is there something else to be discussed in light of the rulings that the Court has just made with respect to the protective sweep and the initial warranted search?

MR. FRANCOMANO: Yes, Your Honor. I have moved to suppress the 2/8 search warrant as well.

THE COURT: Yes.

MR. FRANCOMANO: The reason for that, Your Honor, is once again, there's not enough probable cause. What we're stating in there is that six of the eight facts using the affidavit are from the 2 -- the February 5th search warrant.

1    Those were just basically cut and pasted into the 2/8 search

2    warrant.  And then they added two phone calls that they

3    believed were talking about items in Pioneer Drive.

4            So essentially what they're doing is just adding

5    on -- or just using prior probable cause for a warrant in

6    February 8th of 2017 to go back and search again by adding

7    these two phone calls.  If you take out the prior probable

8    cause from 2/5, you are left with two phone calls that are

9    vague, do not talk about exactly specifically what items

10   they're talking about, does not specifically say where the

11   residence is.  At that point, Your Honor, we believe that

12   there isn't sufficient probable cause.

13           THE COURT:  How long after a temporary resident of

14   premises is no longer residing there do they lose standing to

15   contest a search of those same premises?

16           MR. FRANCOMANO:  Well, Your Honor, I think if they

17   voluntarily left, I believe that if they took all of their

18   things and left the home, I think they would lose standing at

19   that point.  All his things were still in the home, his

20   toothbrush, his shoes.  He did not voluntarily leave,

21   obviously he was taken by the police.  So I don't think --

22           THE COURT:  Somebody got arrested out of a hotel

23   room, would they still have standing to contest searches of

24   that room three days later?

25           MR. FRANCOMANO:  If his stuff is in still in the

1    room, I would agree, he would, Your Honor.  If they cleaned

2    out the room and his things were not in the room, then I'd say

3    he would not have standing.  In this situation, all his stuff

4    was still in the home.

5            THE COURT:  Okay.  Well, I'm ready to rule.  I think

6    standing is an even closer question on this one, but we're

7    going to leap over standing and just go to the substance of

8    it.  Did you want to present any evidence in support of your

9    position?

10           MR. FRANCOMANO:  No, Your Honor, thank you.

11           THE COURT:  The Court concludes that the search on

12   the 9th, subsequent to the additional warrant issued on the

13   8th, was itself lawful.  The law enforcement had a legitimate

14   continuing interest in those premises.  I find that the

15   additional information that they supplied to the Court in

16   support of the application for the second warrant was new and

17   that it was relevant and that it did supply a justification

18   for going back into the house.  There's the circumstance that

19   ammunition or shells were found, but no weapon, in the initial

20   search.  That's another significant fact.  That motion to

21   suppress is denied.

22           All right.  Where are we, Mr. Martinez?

23           MR. MARTINEZ:  Your Honor, now I think we're at the

24   motion to challenge the search of the silver Honda Accord

25   parked outside 56 --

```
1              THE COURT:  Sorry.
2              MR. FRANCOMANO:  I'm sorry, I couldn't hear
3    Mr. Martinez.
4              MR. MARTINEZ:  I couldn't hear myself either.
5              THE COURT:  So Mr. Francomano, you want a moment to
6    talk with your client?
7              MR. FRANCOMANO:  If I could, Your Honor.
8              THE COURT:  Yes.
9              (Pause in the proceedings.)
10             THE COURT:  Okay.  Mr. Francomano, are we ready to
11   continue our hearing?
12             MR. FRANCOMANO:  We are, Your Honor.
13             THE COURT:  Okay.  Where are we, Mr. Martinez?
14             MR. MARTINEZ:  Your Honor, we're about to take up
15   the challenge to the search of the silver Honda Accord that
16   was parked outside the residence.
17             THE COURT:  Right.
18             MR. MARTINEZ:  And we have Trooper Boyce who did the
19   K-9 scan here.  But again, I think there's also a standing
20   issue to be addressed first.  There's no evidence in the
21   record that Mr. McCants had a possessory interest in that
22   vehicle.
23             THE COURT:  Let me hear Mr. Francomano on standing
24   on the car.  First of all, let's start with, who's the car
25   registered to?
```

1              MR. FRANCOMANO:  I don't know, Your Honor, but

2    that's not our issue.  The issue was that the car was in the

3    curtilage of the property.

4              THE COURT:  Okay.

5              MR. FRANCOMANO:  And once Trooper Boyce testifies

6    and I show him the pictures, you can see the car is well

7    within the curtilage.  So if he has standing for the property,

8    then he has standing for the vehicle that is on the

9    property.

10             THE COURT:  What case says that?

11             MR. FRANCOMANO:  *U.S. v. Dunn*, 480 U.S. 294

12   (1987).

13             THE COURT:  Have you got that, Mr. Jaco?

14             THE CLERK:  Yes.

15             MR. FRANCOMANO:  They set out four factors in that

16   case.

17             THE COURT:  Okay.  Tell me about it.

18             MR. FRANCOMANO:  Number one, the proximity of the

19   area claimed to be curtilage to the home, in this case, the

20   property is one foot from the home, or the car --

21             THE COURT:  But we're not really talking about a

22   homeowner.  I think hotel cases would be more relevant.

23             MR. FRANCOMANO:  Well, this case, Your Honor, the

24   hedge encloses the entire -- well, not the entire property,

25   but the driveway itself.  If I could show Your Honor a

1    picture.

2              THE COURT:  I can imagine it.

3              MR. FRANCOMANO:  Okay.  It encloses the driveway in

4    which the car was in.  The car was not on public property, was

5    not on the street, it was inside the curtilage of the home.

6              THE COURT:  You're talking curtilage in a case where

7    there's questions about whether there's really standing that

8    goes beyond one room of the house.

9              MR. FRANCOMANO:  I believe Your Honor found that

10   there was standing.

11             THE COURT:  I did, but we're right on the edge.

12             MR. FRANCOMANO:  Well, Your Honor, if there is

13   standing, then if the vehicle is within the curtilage, which

14   we can show that it is, or at least attempt to show that it

15   is, then he would have standing to object to the search of the

16   vehicle.

17             THE COURT:  We're going to operate on the assumption

18   that there is standing, recognize --

19             MR. MARTINEZ:  We can do that, Your Honor, as a

20   constitutional matter.

21             THE COURT:  Well, if you're going to push me, I find

22   that there is standing.  There you go.

23             MR. MARTINEZ:  Fair enough.

24             THE COURT:  You pushed, you got an answer.  Let's

25   hear the testimony.

1           MR. MARTINEZ:  Okay.  We call Trooper Ryan Boyce of

2   the Maryland State Police.

3           THE COURT:  Good morning, sir.  Come all the way up,

4   stand in front of our jury box right there.  Come on up, stop

5   there and face our clerk.

6           THE CLERK:  Good morning.  Please raise your right

7   hand.

8                       TROOPER RYAN BOYCE,

9   called as a witness, being first duly sworn, was examined and

10  testified as follows:

11          THE WITNESS:  I do.

12          THE CLERK:  Thank you.  You can have a seat.  Please

13  state and spell your first and last name for the record.

14          THE WITNESS:  It's Ryan, R-y-a-n; last name Boyce,

15  B-o-y-c-e.  Trooper First Class.

16          THE CLERK:  Thank you.

17          THE COURT:  Good morning.  Mr. Martinez, your

18  witness.

19                      DIRECT EXAMINATION

20  BY MR. MARTINEZ:

21  Q    Trooper, good morning.

22  A    Good morning.

23  Q    Could you tell the Court what law enforcement agency you

24  work for.

25  A    Maryland State Police.

Direct Examination - Boyce  (By Mr. Martinez)

1    Q    How long have you been with the MSP?

2    A    Coming on seven years.

3    Q    What's your rank?

4    A    Trooper First Class.

5    Q    Are you also a K-9 handler?

6    A    That's correct.

7    Q    Could you describe your duties as a K-9 handler?

8    A    I'm a dual purpose K-9 handler, so I do narcotics and

9    also patrol functions.

10   Q    Okay.  Let's start with the narcotics function you

11   described.  What is the narcotics component of your K-9

12   handling duties?

13   A    Well, the dog's trained on five different odors of

14   narcotics.

15              THE COURT:  You've got to talk a little bit

16   slower.

17   A    Sorry.  The dog's trained in five different odors of

18   narcotics.  He's obviously my partner, do various scans and

19   searches with him for narcotics.

20   Q    (BY MR. MARTINEZ)  Okay.  What is your dog's name?

21   A    Max.

22   Q    How long have you worked with Max?

23   A    Coming on three years.

24   Q    Is Max certified in CDS detection?

25   A    He is.

Direct Examination - Boyce  (By Mr. Martinez)

1  Q    He's trained to give an alert when he detects drugs; is

2  that right?

3  A    That's correct.

4  Q    What kind of alert does he give?

5  A    A passive sit response.

6         THE COURT:  A passive sit response?

7         THE WITNESS:  Yes, sir.

8  Q    (BY MR. MARTINEZ)  Does that mean he sits down when he

9  smells narcotics?

10  A    That's correct.

11  Q    Were Max's CDS detection certifications valid as of

12  February 5th, 2007?

13  A    That's correct.

14  Q    Now, you also mentioned that there's a -- I meant 2017,

15  Trooper, just for the record.

16  A    Okay.

17  Q    2007 was before you were with MSP; right?

18  A    Yes.

19         THE COURT:  That would be a very old dog.

20  A    I still have some from then.

21  Q    (BY MR. MARTINEZ)  Trooper, you also mentioned that you

22  and your partner Max have a patrol function?

23  A    That's correct.

24  Q    Can you describe that?

25  A    So patrol function would be indicating and locating the

Direct Examination - Boyce  (By Mr. Martinez)

1    whereabouts of a criminal suspect as well as apprehending a

2    suspect.  Everything is in accordance per our patrol policy

3    with the 1989 Supreme Court ruling *Graham v. Connor*, so

4    apprehending a suspect.

5    Q    Is Max also certified to perform a patrol function?

6    A    That's correct.

7    Q    All right.  I want to direct your attention to the early

8    morning hours of February 5th, 2017, were you working and on

9    duty at the time?

10   A    That's correct, I was.

11   Q    Did there come a time where you were directed to respond

12   to a residence at 5617 Pioneer Drive in Baltimore City?

13   A    That's correct, I was.

14   Q    Why were you asked to go to that location?

15   A    I was assisting the U.S. Marshals task force with a

16   warrant service, a federal warrant service.

17   Q    And who was the subject of the warrant you were asked to

18   help serve?

19   A    Mr. Marquise McCants.

20   Q    So as between your patrol function and your CDS detection

21   function, which of the functions were you planning to serve

22   when you went off to 5617 Pioneer Drive?

23   A    My primary function that night was patrol, just in case

24   Mr. McCants fled the residence.

25   Q    All right.  Now, approximately what time did you arrive

Direct Examination - Boyce  (By Mr. Martinez)

1    at 5617 Pioneer Drive?

2    A    I believe it was approximately 12:40 a.m.

3    Q    And when you and Max arrived, did you set up at a

4    particular location on the scene?

5    A    We did, side perimeter of the house.

6    Q    All right.  Show you Government's Exhibit 11A, do you

7    recognize this?

8    A    That's correct.

9    Q    So where, in relation to the residence, were you?

10   A    So I would have been behind the -- the silver Honda

11   there, I would have been to the rear of that facing the back

12   of the residence with the dog.

13              THE COURT:  Can you mark on the screen.

14              THE WITNESS:  I can just point, sir?

15              THE COURT:  Just touch it.

16   A    Back around here, behind the car.

17   Q    (BY MR. MARTINEZ)  Trooper, what, if anything, do you

18   recall observing from that location?

19   A    As my partner and I made our approach, Mr. McCants fled

20   the residence by jumping on a second floor roof.  At that

21   point I proceeded to give loud verbal commands with my

22   partner, "state police K-9, get on the ground."  At that point

23   he jumped back through a window to go back in the residence

24   instead of surrendering.

25   Q    After Mr. McCants went back in the residence, did there

Direct Examination - Boyce   (By Mr. Martinez)

1    come a time when you put Max away or inside a vehicle?

2    A    At that point I did.

3    Q    Why did you do that?

4    A    Since I was extensively briefed on Mr. McCants prior to

5    going down for the warrant service, I knew it could be

6    possible that he could be armed and dangerous.  At that point

7    we treat it like a barricade.  So SWAT team was called from

8    Baltimore City, put Max back in the car, just because in case

9    it did turn into a shootout, which I was afraid it could, he

10   was secure.

11   Q    Did Mr. McCants eventually come out of the house?

12   A    Eventually.

13   Q    And was he taken into custody?

14   A    He was.

15   Q    After he was taken into custody, were you asked to

16   conduct a K-9 scan?

17   A    That's correct.

18   Q    What were you asked to scan?

19   A    The silver Honda right next to the house.

20   Q    Can you recall whether the car had any license plates?

21   A    It did not.

22   Q    So did Max scan that silver Honda there?

23   A    He did.

24   Q    What was the result?

25   A    He indicated a positive alert to the odor of a trained

1      narcotic on the vehicle.

2              THE COURT:  He gave a positive alert, I'm sorry?

3              THE WITNESS:  The positive alert to an odor, the

4      presence of the odor of a trained narcotic.

5              THE COURT:  Of a what narcotic?

6              THE WITNESS:  Trained.

7              THE COURT:  A trained narcotic.

8              THE WITNESS:  Trained narcotic.

9              THE COURT:  Oh, a narcotic on which the dog had been

10     trained?

11             THE WITNESS:  Trained, yes.  Correct.

12             THE COURT:  A lot of buzz words here, but I get

13     it.

14     Q    (BY MR. MARTINEZ)  Did Max alert on a particular part of

15     the vehicle?

16     A    Driver's side door handle.

17     Q    What did that suggest to you?

18     A    That the odor of narcotics was present on that vehicle.

19     Q    What did you do when the scan was over?

20     A    Secured Max in the vehicle and secured him for the

21     night.

22             MR. MARTINEZ:  Those are all the questions I have,

23     Your Honor.

24             THE COURT:  Cross-examination, Mr. Francomano.

25             MR. FRANCOMANO:  Yes, Your Honor.

1                          CROSS-EXAMINATION

2    BY MR. FRANCOMANO:

3    Q    Trooper, did you find drugs in the car?

4    A    I secured after the dog alerted on the vehicle.

5    Q    Do you know if any drugs were found in the car?

6    A    I'm not aware.

7    Q    What time did you perform the K-9 scan of the vehicle?

8    A    It would have been after Mr. McCants was taken into

9    custody.  I don't know the exact time.

10   Q    Would it be in your report?

11   A    Approximate, I believe it would be, yes.

12   Q    1:30, does that sound about right?

13   A    Sounds correct.

14   Q    This is before the search warrant of the home; correct?

15   A    No.  I arrived on scene approximately 12:40 hours, so

16   that would have been after 1:30.

17   Q    Not the arrest warrant, sir, I'm talking about the search

18   warrant.

19   A    I don't know anything about the search warrant because

20   after the dog alerted I left.

21   Q    Okay.  So you went to the vehicle at 1:30 -- or you

22   searched -- had the vehicle searched at 1:30; correct?

23   A    If that's what my report says, then yes.

24   Q    I'm going to show you what I'm going to mark as

25   defense -- for identification Defense Exhibit No. 2A.

1          THE COURT:  Turn it.  Thank you.

2     Q    (BY MR. FRANCOMANO)  Can you identify that, Trooper,

3     where that picture is?

4     A    It's a little bit blurry, but it looks similar to the

5     residence where we served the search warrant for Mr. McCants

6     at 5617 Pioneer Drive.

7     Q    To the right of that is where the car was in that

8     driveway, where that red car is now?

9     A    That's correct.

10    Q    Can you kind of circle the area where the car was?

11    A    Yes, sir.

12    Q    I'm going to show you Defense McCants Exhibit 2B.  This

13    is the same --

14         THE COURT:  Touch the lower left and that thing will

15    disappear.

16    Q    (BY MR. FRANCOMANO)  Can you identify that, Trooper?  I

17    know it's a little blurry.

18    A    It's blurry, but it still looks like the residence we

19    came up, but there's a tree, obviously, in the center of the

20    picture.

21    Q    To the left is the driveway of 5617; correct?

22    A    Appears to be.

23    Q    There are hedges running along the right side of that?

24    A    Appears to be, yes.

25    Q    Then there's a hedge at the end of it blocking out the

1    alley; correct?

2    A    It appears to be.

3    Q    And the driveway is feet from the house; correct?

4    A    Yeah.

5    Q    And the silver vehicle was located in that driveway and

6    not on the street; correct?

7    A    It was in the driveway, the silver Honda was in the

8    driveway.

9    Q    Now, these pictures that I've shown you, they accurately

10   depict the way that the house looked?

11   A    They're extremely blurry.  I can't see numbers exactly,

12   but to give a general description of the house and the

13   driveway, then yes.

14   Q    So they accurately reflect the way the house looked that

15   day?

16   A    Correct.

17   Q    But for the blurriness?

18   A    Correct.

19           MR. FRANCOMANO:  No further questions.

20           THE COURT:  Redirect.

21           MR. MARTINEZ:  No, thank you, Your Honor.

22           THE COURT:  Thank you, Trooper.  You may step

23   down.

24           THE WITNESS:  Thank you.

25           THE COURT:  I'll hear you, Mr. Francomano.  Is there

1    any other evidence?

2            MR. FRANCOMANO:  No, Your Honor.

3            THE COURT:  None from the government.

4            MR. MARTINEZ:  The dog alerted there was probable

5    cause --

6            THE COURT:  No.  No, evidence.

7            MR. MARTINEZ:  No other evidence.

8            THE COURT:  Just a reflex in you, Mr. Martinez,

9    can't stop yourself.  Mr. Francomano.

10           MR. FRANCOMANO:  Your Honor, as I said, this issue

11   is whether or not the vehicle's in the curtilage, number one.

12   And then there's a second issue whether or not -- if it is in

13   the curtilage, whether or not the dog sniff was allowable

14   because it was inside the premises of the -- of the area of

15   the home.

16           So number one, is the vehicle in the curtilage?  I

17   think it obviously shows it the way the pictures -- the

18   pictures show that there's a hedge blocking off any type of

19   view into the driveway area, into the home itself.  It blocks

20   off from the alley.  I believe the driveway and the vehicle

21   are within the curtilage of the house.  And I could go through

22   the four factors in *Dunn* if Your Honor would like me to.

23           THE COURT:  No.  What about the fact that -- I mean,

24   could they have taken the dog in the house as part of the

25   protective sweep?

1          MR. FRANCOMANO:  As part of the protective sweep?

2          THE COURT:  Yes.

3          MR. FRANCOMANO:  Well, Your Honor, I believe they

4    could, but they're not taking the dog -- there is no exigency

5    in the vehicle.  No one has ever testified that there was a

6    bomb in the vehicle that was going to explode or there was

7    anybody in the vehicle or going into the vehicle.  The

8    protective sweep -- if the dog would have walked around the

9    car for the protective sweep and alerted, I would agree with

10   Your Honor.  In this situation, it was not where the trooper

11   was standing and the dog just alerted.  He was actually

12   ordered to perform the scan around the vehicle.

13         THE COURT:  But the trooper, with the dog, was

14   already, not to use old terminology from old cases, but was

15   legitimately on the premises.

16         MR. FRANCOMANO:  I agree with that, Your Honor.  But

17   our difference is --

18         THE COURT:  So where is the greater intrusion?

19         MR. FRANCOMANO:  The intrusion becomes when he

20   says --

21         THE COURT:  The dog's got to breathe.

22         MR. FRANCOMANO:  I agree, Judge.

23         THE COURT:  So the dog is inevitably smelling the

24   air on those premises.

25         MR. FRANCOMANO:  And Your Honor, like I said, I

1    agree with you a hundred percent.  As your example yesterday,

2    if you're walking down the street and the dog smells marijuana

3    in your pocket, that's it.  In this situation, if the dog

4    would have smelled drugs in the car, then I agree with Your

5    Honor.  But it's not that type of situation.  The situation

6    was, Detective Landsman said, "Trooper Boyce, I want you to

7    perform a scan on that vehicle."  And in *Florida v. Jardines*,

8    569 U.S. 1 (2013), in that case -- I'm sure Your Honor's

9    familiar with that case, where the officers took a dog up to

10   the porch and smelled marijuana, and they said you just can't

11   have --

12        THE COURT:  Yes, but those officers weren't

13   otherwise legitimately on the premises.

14        MR. FRANCOMANO:  Like I said, I agree with Your

15   Honor with that point, but in this case, Detective -- or

16   Trooper Boyer (sic) was told to perform the scan.  That's the

17   difference.  I think right there it turns on whether or not if

18   it just happened to alert to the drugs, or whether or not

19   they're told to look for the drugs.

20        THE COURT:  Thank you, Mr. Francomano.

21        MR. FRANCOMANO:  Thank you, Your Honor.

22        THE COURT:  So I find that the dog sniff was legit.

23   First of all, once again, there's the overall context of what

24   the officers are investigating in this situation.  They have

25   reason to believe that the defendant may be involved in a

1    broad scope of criminal activity, some of which involves

2    illegal drugs.  The officers were legitimately there on the

3    premises, within the curtilage attempting to serve a warrant

4    for the arrest of a fugitive.  And as part of that, there was

5    a dog and K-9 handler present to assist in that apprehension.

6         As it turns out, the dog had multiple skills,

7    including the ability to sniff for narcotics, controlled

8    substances.  I can't find that there's any greater intrusion

9    or violation of a privacy right with the dog that's already

10   legitimately there, being walked around the car that's in the

11   driveway, which is what happened, and then the dog alerted.

12        It's not the *Florida* situation where there's really

13   no justification for the narcotics officers to bring a dog up

14   to the porch of a house, private property, private curtilage.

15   They were already legitimately there.  So I don't find any

16   Fourth Amendment violation with respect to how this was done.

17   So that motion to suppress is denied.

18        All right.  Now what?

19        MS. HOFFMAN:  Your Honor, I believe we're going to

20   hold Montel Harvey's motions in abeyance for the time being,

21   so our next motion as to which we have a witness to call is

22   Mr. Joseph Bond's motion to suppress a firearm that was

23   recovered from his vehicle on October 23rd of 2013.  And the

24   government will be calling Detective Jamal Neptune.

25        THE COURT:  Okay.  Mr. Ruter, if you would, just

1    give me a brief thumbnail again, so we can all be reminded as

2    to what your motion is.

3            MR. RUTER:  Your Honor, this is a motion to suppress

4    a -- the seizure of a handgun in a car driven by Mr. Bonds on

5    October 2013.  He was driving a vehicle in Baltimore City.

6    Officer Neptune indicated that he had failed to stop at a stop

7    line, and as a result, he instituted a stop.  After stopping

8    him, he discovered that Mr. Bonds was driving on a suspended

9    license.  There came a time when he placed him under arrest

10   and then did an inventory search at which time he found this

11   handgun.  We questioned the validity of the stop and the

12   actual extent of the search itself.

13           THE COURT:  Got it.  Okay.  Let's hear the witness.

14   Please come forward, sir, stop halfway to the witness stand,

15   face our clerk.

16           THE CLERK:  Good morning.  Raise your right hand.

17                DETECTIVE JAMAL NEPTUNE,

18   called as a witness, being first duly sworn, was examined and

19   testified as follows:

20           THE WITNESS:  Yes, I do.

21           THE CLERK:   Thank you.  You can have a seat in the

22   witness box.

23           THE WITNESS:  Thank you.

24           THE CLERK:  Please state and -- do me a favor, speak

25   right into the microphone and keep your voice up.  Please

1   state and spell your first and last name for the record.

2              THE WITNESS:  Jamal Neptune.  First name Jamal,

3   J-a-m-a-l; last name Neptune, N-e-p-t-u-n-e.

4              THE CLERK:  Thank you.

5              THE COURT:  Your witness.

6                        DIRECT EXAMINATION

7   BY MS. HOFFMAN:

8   Q     Good morning, Detective Neptune.

9   A     Good morning, ma'am.

10  Q     Where are you employed?

11  A     Prince George's County Police Department.

12  Q     How long have you worked there?

13  A     Four years this December.

14  Q     And what's your rank and position there?

15  A     I'm a detective.

16  Q     Prior to working for the Prince George's County Police

17  Department, did you work for the Baltimore Police

18  Department?

19  A     Yes, ma'am.

20  Q     How long did you work there?

21  A     From 2012, April to 2013, November.

22  Q     Can you walk us through the positions you held with

23  BPD?

24  A     I was first in the academy, then I was assigned to

25  patrol, and then in and out of Flex Units, both the Western

1    District and Southern District.

2    Q    I want to direct your attention to October 23rd of 2013

3    at approximately 4:30 in the afternoon.  Were you on patrol in

4    the Southern District at that time?

5    A    Yes, ma'am.

6    Q    And is that a high crime area?

7    A    Yes, ma'am.  There's -- there are numerous calls for

8    drugs and violent crimes.

9              THE COURT:  The entire Southern District --

10   Q    (BY MS. HOFFMAN)  I should ask you where specifically in

11   the Southern District were you?

12   A    The area that I patrolled specifically was Cherry Hill.

13   Q    And is that particular area a high crime area?

14   A    Yes, ma'am.

15             THE COURT:  All of Cherry Hill is a high crime area?

16             THE WITNESS:  Yes, sir.

17   Q    (BY MS. HOFFMAN)  Did there come a time when you

18   witnessed a traffic violation?

19   A    Yes, ma'am.

20   Q    And what did you see?

21   A    In the 3300 block of Cherryland Road, I observed a green

22   Honda Accord right by the intersection of Seagull Avenue fail

23   to come to a stop before the stop line.

24   Q    And what did you do?

25   A    So while I was coming down the 3300 block of Cherryland

1    Road, I observed the vehicle coming down Seagull and it drove

2    through the stop sign and came to a stop inside of the

3    intersection at Cherryland.  And I activated my emergency

4    light and sirens, conducted a traffic stop.

5    Q    What happened once you pulled the car over?

6    A    Once the vehicle came to a stop, I approached the vehicle

7    on the driver's side.  And I contacted the driver, asked for

8    the license and registration, to which I then identified the

9    driver as Mr. Bonds.

10   Q    And was that based on the license that he provided you?

11   A    Yes, ma'am.

12   Q    Did you run a license check?

13   A    Yes, ma'am.  I used my -- at the time it was called a

14   Pocket Cop, had an application on the phone that was issued

15   through the Baltimore Police Department that had NCIC access

16   where I was able to run the license for license status.

17   Q    And what did you find?

18   A    So on the Pocket Cop it stated that the -- that Mr. Bonds

19   was driving on a suspended license, and I confirmed it with

20   dispatch through KGA.

21   Q    Detective Neptune, were you familiar with Joseph Bonds

22   before that day?

23   A    No, ma'am.

24   Q    What did you do after you determined that he was driving

25   on a suspended license?

Direct Examination - Neptune  (By Ms. Hoffman)

1   A    Once I determined he was driving on a suspended license,

2   Mr. Bonds was removed from the vehicle and placed into custody

3   without incident.

4   Q    And did you leave the vehicle sitting in the middle of

5   the road?

6   A    No, ma'am.  The vehicle was towed by -- to the city

7   yard.

8   Q    And why did you have the vehicle towed?

9   A    Per departmental policy, we have to impound vehicles

10  pursuant to an arrest of the driver, if the owner and/or no

11  other occupants are inside the vehicle.

12  Q    And was anyone inside the vehicle other than Mr. Bonds?

13  A    No, ma'am.

14  Q    Did you search the vehicle before it was towed?

15  A    I conducted an inventory search.

16  Q    Why did you do that?

17  A    Again, departmental policy.  We have to conduct inventory

18  searches to protect both ourselves and the individual that

19  we're towing the vehicle from.

20  Q    What, if anything, did you recover from the vehicle?

21  A    During the inventory search, I recovered a revolver under

22  the rear seat of the vehicle.  Because it's -- it was like the

23  rear bench, it was loose and lifted and I was able to --

24  Q    You mean the bench was loose?

25  A    Yes, ma'am.

Direct Examination - Neptune  (By Ms. Hoffman)

1    Q    And the firearm was underneath the bench?

2    A    Yes, ma'am.  It was -- it was underneath the passenger

3    side of the vehicle.

4    Q    And what kind of firearm was it?

5    A    It was a .357 magnum revolver, ma'am.

6    Q    Was it loaded?

7    A    Yes, ma'am, six rounds.

8    Q    Was it within reach of the driver's seat?

9    A    Yes, ma'am.  When you turn back, you could clearly reach

10   it because it's a small Honda Accord.

11   Q    Did you complete a tow vehicle report?

12   A    Yes, ma'am.

13   Q    I'm going to show you Government's Exhibit 22.  Is it

14   showing up on the screen in front of you?

15   A    Yes, ma'am.

16   Q    Do you recognize this document?

17   A    Yes.  This is the towed vehicle report, ma'am.

18   Q    And this is the tow vehicle report specifically that you

19   completed for Mr. Bonds's vehicle?

20   A    Yes, ma'am.

21   Q    Did you deliver Miranda warnings to Mr. Bonds?

22   A    Yes, ma'am, while Mr. Bonds was seated near the vehicle,

23   as a result of the arrest.

24   Q    And did he indicate that he understood his rights?

25   A    Initially he nodded his head as an affirmation.  And I

1    had him clarify audibly and he said yes.

2    Q    And by the way, did you read the rights from memory or

3    did you read them from --

4    A    No, at that time I had a sheet on me.  Unfortunately, I

5    don't have it on me right now.

6    Q    Did Mr. Bonds make any statements after you had read him

7    his Miranda rights?

8    A    He said he understood his rights and then I asked him why

9    he had the gun under the seat, because if I wanted to be able

10   to access my gun, I know that I'd want it to be clearly within

11   reach for me, to which he stated that he had it under the seat

12   to keep it away from his children.

13   Q    And Detective Neptune, did you include that statement in

14   your incident report?

15   A    No, I didn't, ma'am.

16   Q    And why not?

17   A    So a lot of things were going on, unfortunately, my mind

18   may have forgotten.  And also, it was one of my first arrests,

19   as I was a patrol officer pretty young into my career, and

20   unfortunately, I just forgot.

21   Q    Did you write Mr. Bonds up for the traffic violation?

22   A    Yes, ma'am.

23   Q    And specifically, what traffic violations did you cite

24   him for?

25   A    I cited him for failure to stop before a stop line.  And

1    obviously for the driving on a suspended license, ma'am.

2              MS. HOFFMAN:  Thank you.  No further questions for

3    the witness.

4              THE COURT:  Thank you.  Mr. Ruter.

5                          CROSS-EXAMINATION

6    BY MR. RUTER:

7    Q    Detective, good morning.

8    A    Good morning, sir.

9    Q    If we could go through -- you actually prepared a police

10   report in this case, did you not?

11   A    Yes, sir.

12             MR. RUTER:  I'd like marked as Bonds Exhibit No. 1,

13   Your Honor, for identification but later for admission, a one,

14   two, 11-page document prepared and given to counsel in

15   discovery.

16             THE COURT:  It's all the police report or --

17             MR. RUTER:  It is, Your Honor, it is, along with the

18   statement of probable cause and the like.

19             THE COURT:  There's no objection, that's received.

20             MS. HOFFMAN:  No objection.

21   Q    (BY MR. RUTER)  Directing your attention to the statement

22   of probable cause -- rather, the police report, Detective,

23   that you prepared this yourself; correct?

24   A    Yes, sir.

25   Q    And can you see that well enough on the screen, sir?

Cross-examination – Neptune  (By Mr. Ruter)

1  A    Yes, sir.

2  Q    Now, I know that you start out by indicating that you're

3  on patrol, and you also note that there have been numerous

4  calls, reference to acts of violence and illegal narcotics.

5  You wrote that in your report soon after this event occurred;

6  correct?

7  A    Yes, sir.

8  Q    And would you agree with me that in terms of the actual

9  stop itself, that's not relevant at all, is it?

10  A    It was just in reference to the area I was patrolling,

11  sir.

12  Q    You didn't stop this man because he was driving in a high

13  crime area, did you?

14  A    No, sir.

15  Q    Nonetheless, it was on your mind, wasn't it?

16  A    During the stop, no, sir.

17  Q    Pardon?

18  A    Not in reference to the stop, no, just the traffic

19  violation was.

20  Q    When did it become a part of your thought process, since

21  you put it in the report following the actual stop and seizure

22  of the gun?

23  A    It was just to give a description of the area I was in,

24  sir.

25  Q    I see.  So your testimony is that was not a part of your

 1    thought process, however, when you actually pulled him over;

 2    correct?

 3    A    No, sir.

 4    Q    Okay.  You write also that, "I observed the driver of the

 5    vehicle fail to stop before the stop line"; correct?

 6    A    Yes, sir.

 7    Q    And is there a stop line there, by the way?

 8    A    I don't know what the street looks like right now, sir.

 9    Q    I'll show it to you.

10    A    Sure.

11    Q    What is a stop line?

12    A    It would be the line by where the stop sign is, sir.

13    Q    Okay.  And what's the purpose of a stop line?

14    A    To indicate the area where the stop sign is.

15    Q    Now, there's -- under the transportation article, a

16    person can be stopped for going through a stop sign;

17    correct?

18    A    Yes, sir.

19    Q    I guess they also can be stopped for going through a stop

20    line?

21    A    Yes, sir.

22    Q    Okay.  Why did you choose to write in your report that he

23    failed to stop at a stop line?

24    A    Same -- falls under the same violation, sir.

25    Q    Yeah, that's because in your judgment he didn't stop at a

1    stop line; correct?

2    A    Yes, sir.

3    Q    I want to show you Government Exhibit 21 and ask you if

4    you can identify that.

5    A    This is the area where the traffic stop --

6    Q    Yeah.  And you can see where the stop sign is?

7    A    Yes, sir.

8    Q    Right here; correct?

9    A    Yes, sir.

10    Q    And you can see the roadway, can you not?

11    A    Correct.

12    Q    It's apparently in great disrepair, wouldn't you agree?

13    A    Sure.

14    Q    Yes.  And there's no stop line there, is it?

15    A    Not that I can see from this photograph, sir, no.

16    Q    Would you think that other photographs might show that

17    there is a stop line there?

18    A    I wouldn't know, sir.

19    Q    Okay.  If I told you I visited there yesterday morning

20    and took a whole bunch of photographs, I didn't see a stop

21    line, would that surprise you?

22    A    No, sir.

23    Q    Okay.  It could be consistent with this picture, there is

24    no stop line; right?

25    A    I wasn't with you, sir, if you say so --

1    Q    Pardon?

2    A    I wasn't with you when you took the photos.

3    Q    Say it again?

4    A    If you say there weren't, then there weren't, sir.

5    Q    Why did you write there was?

6    A    It's synonymous in the same charge, whether you stop from

7    the stop line or if don't stop for the stop sign.  So I

8    just -- on the day, I can't speak for where my mind was at

9    that very second for that, but it's the same charge.

10    Q    Well, it's not the same charge because if you look at the

11    transportation article, there's different subsections,

12    Detective.  You're aware of that.  There's subsection A,

13    there's a subsection B, and there's a subsection C, and you

14    will check whichever one is applicable to the particular stop

15    in question; isn't that right?

16    A    Yes, sir.

17    Q    Okay.  You chose subsection A, which references a stop

18    line.  And in fact, further on in this Bonds Exhibit No. 1 we

19    actually see a copy of your citation.  And this is your

20    handwriting, isn't it?

21    A    Yes, sir.

22    Q    And you said that the driver did fail to stop at the stop

23    line, l-i-n-e, subsection A, got the right section.  But the

24    fact is, he did not fail to stop at a stop line, did he?

25    A    He did, sir.

Cross-examination – Neptune  (By Mr. Ruter)

1    Q    He did what?

2    A    There was no line, but it's the same charge.

3    Q    Therefore, Detective, he did not fail to stop at a stop

4    line, did he?

5    A    Specifically, no, sir.

6    Q    Okay.  Now, when you look back at this photograph that

7    the government provided us, do I understand that your

8    vehicle -- that you're -- see my pen there, Detective?

9    A    Yes, sir.

10    Q    Was your vehicle pointed the way in which my pen is

11    presently moving?

12    A    I can't recall at this time, sir.

13    Q    You cannot recall.  So you can't recall today whether

14    your car was coming this way or whether your car was coming

15    that way, is that your testimony?

16    A    Yes, sir.

17    Q    That you can't remember?

18    A    I can't recall which way my vehicle was going, sir.

19    Q    You can't recall -- and you can't recall because what you

20    said in direct examination, quote, "a lot of things were going

21    on"?

22    A    That's not the reason, sir.

23    Q    I'm sorry?

24    A    That's not the reason why I can't remember, sir.

25    Q    Why can't you remember?

Cross-examination – Neptune   (By Mr. Ruter)

1    A    I just don't recall at this time.

2    Q    Can you see -- to make sure the Court understands, if I

3    am correct, Mr. Bonds is traveling from the direction that my

4    pen is presently moving; is that correct?

5    A    Yes, sir.

6    Q    And which way did he turn, did he turn this way, which

7    would be a left-hand turn; or did he turn this way, which

8    would be a right-hand turn?

9    A    Again, I don't recall at this time, sir.

10   Q    You do not recall at this time.  Well, let me ask you

11   this:  Would you agree with me that if a person's attempting

12   to make a right-hand turn, they're going to have a real tough

13   time trying to see around that corner with these trees

14   obviously blocking someone's view to make a right-hand turn,

15   wouldn't that be correct?

16   A    Theoretically.

17   Q    Theoretically.  Isn't it also true that the

18   transportation article calls for and allows a person to creep

19   out as far as they can into an intersection before they make a

20   turn if they can't see unimpeded; is that right?

21   A    I don't know that, sir.

22   Q    Check subsection C of the same article.

23              THE COURT:  Well, if we're going to check it, let's

24   check it.

25              MR. RUTER:  Well, in a second, Your Honor.

1          THE COURT:  You gave him an instruction that he

2     can't carry out if you don't have it in front of him.  That's

3     the problem with building expectations, I'm curious.

4     Q    (BY MR. RUTER)  You can see, can you not though,

5     Detective, that there's a lot of trees here obstructing one's

6     view if they're attempting to make a right-hand turn, isn't

7     that accurate?

8     A    Yes, sir.

9     Q    And again, you're not able to tell us whether or not you

10    were headed in this direction I'm now pointing from, the

11    bottom up, or whether you're moving from the top down, you

12    can't recall that; is that right?

13    A    No, I cannot, sir.

14    Q    So when you saw him, was your vehicle in motion?

15    A    Yes, sir.

16    Q    And when you saw him, as you're trying to reach back in

17    the recesses of your mind, can you see his vehicle on your

18    left side or on your right side, as you're attempting to

19    recreate what you saw when this event occurred?

20    A    Again, I can't recall, sir.

21    Q    Would you also agree with me that if you were traveling

22    in this direction, I'm now pointing from the top of the page

23    down, you would -- you might have a very difficult time seeing

24    with precision what it was this car was doing given the fact

25    that there are several trees there that would obstruct your

1   view?

2   A    Sir, could you repeat the question.

3   Q    Be happy to.  Would you agree with me that if you were

4   moving in this direction, going from the top of the page down,

5   that you'd have a difficult time seeing with precision what

6   the vehicle did because there would be trees obstructing your

7   view?

8   A    I comfortably can't say what I would be feeling or seeing

9   if I wasn't in that position, sir.

10  Q    Okay.  Transportation Article 21-707(a) states, and I

11  quote, Detective:  "Unless otherwise directed by a police

12  officer or traffic control device, the driver of a vehicle

13  approaching a stop sign at an intersection shall stop at the

14  near side of the intersection at a clearly marked stop line."

15      That's a quote from the section.  Are you with me so

16  far?

17  A    Yes, sir.

18  Q    Okay.  And we agree that you charged him under that

19  subsection, 21-707(a), are we not -- we're in agreement

20  there?

21  A    Yes, sir.

22  Q    Okay.  Subsection B says -- this is the important part of

23  subsection B:  "If there is no clearly marked stop line, then

24  a driver is to stop before entering any crosswalk," end quote.

25      Did you see any crosswalk here, is there a crosswalk

1    here?

2    A    No, sir.

3    Q    Okay.  Subsection C says:  "If there is no crosswalk, a

4    driver is to stop at the nearest point before entering the

5    intersection that gives the driver a view of traffic

6    approaching on the intersecting roadway," end quote.

7         Would you agree with me, Detective, that if Mr. Bonds is

8    traveling in this direction, and he was, wasn't he?

9    A    Yes, sir.

10   Q    You remember that much; correct?

11   A    Yes, sir.

12   Q    All right.  And if he were turning right -- and you have

13   no recollection where he was turning; is that right?

14   A    Correct, sir.

15   Q    Then he may very well have to come out into this

16   intersection a little bit to see if there's any oncoming

17   traffic, true?

18   A    Perhaps.

19   Q    Pardon?

20   A    I said perhaps.

21   Q    So given all that, what did you see, what exactly did you

22   see?

23   A    I saw the vehicle fail to come to a stop at the stop sign

24   and come into the intersection on the roadway.

25   Q    I thought on direct examination I heard you say that he

Cross-examination – Neptune   (By Mr. Ruter)

1    came out in the intersection and then he stopped.

2    A    Correct.

3    Q    Pardon?

4    A    Which he came past the stop sign and then came into the

5    intersection.

6    Q    Yes.  But I think you testified on direct that when he

7    got through -- when he failed to stop at the stop sign, he

8    stopped in the intersection and then he went on.

9    A    He rolled through the stop sign.  He never came to a

10   complete stop.

11   Q    I may have to ask the court reporter to review what you

12   said on direct because my recollection was that you said that

13   he went through the intersection and stopped and then he made

14   his turn.  In other words, your complaint was he didn't stop

15   in front of the stop sign, he stopped a little bit after the

16   stop sign and then proceeded on to make his right- or

17   left-hand turn, of which you can't recall today?

18   A     I don't recall making that exact statement, sir.

19            THE COURT:  Well, did he ever stop?

20            THE WITNESS:  Excuse me, sir?

21            THE COURT:  Did he ever stop?

22            THE WITNESS:  He came past -- what I can remember

23   today, sir, he came past the stop sign, came into the

24   intersection.  That's what I observed, and he never came to a

25   complete stop.

1    Q    (BY MR. RUTER)    That is not what I believe you said on

2    direct, but we may have to get that back.    That's not what I

3    recall hearing you say, Detective, on direct examination.

4    A    Okay.

5    Q    And so what you're not sure of, you're not sure of

6    whether or not -- and by the way, was your vehicle moving?

7    A    Yes, sir.

8    Q    Okay.    You can't recall which direction you were moving

9    in, but you do recall that -- now you're telling us you do

10    recall that you didn't see the vehicle stop at all?

11    A    Correct.

12    Q    But yet you were able to discern that he failed to stop

13    at a stop line when there is no stop line?

14    A    Correct.

15    Q    Now, when -- if you were coming in this direction, I'm

16    now pointing -- I'm looking at Defense -- rather, Government

17    Exhibit 21, if you're traveling in this direction from

18    Cherryland Road, and Mr. Bonds made a right-hand turn, you

19    would have had to have done a U-turn, wouldn't you, to have

20    stopped him?

21    A    In that situation, perhaps.

22    Q    Yeah.

23    A    Perhaps in that situation.

24    Q    And do you recall whether you did that or not?

25    A    No, I do not.

Cross-examination – Neptune    (By Mr. Ruter)

1    Q    So you stop him and you ask for his driver's license and

2    his registration?

3    A    Yes, sir.

4    Q    And he provides them to you?

5    A    Yes, sir.

6    Q    You discovered that his driver's license was suspended?

7    A    Yes, sir.

8    Q    And when you discovered that, did you come back to his

9    vehicle and advise him that he was suspended, did you say

10   "you're suspended"?

11   A    At some point during the course of the stop, yes.  I

12   don't know exactly when that happened, but yes, at some

13   point.

14   Q    Well, you told us that you -- there came a time when you

15   arrested him?

16   A    Correct.

17   Q    And do you recall how long after it was that you noted

18   that he was suspended that the arrest took place?

19   A    No, I don't recall how much time.

20   Q    Do you always arrest any driver who you -- that you

21   discovered is driving on a suspended license?

22   A    I have so many stops, I can't recall -- not every time.

23   Q    You're not required to arrest somebody --

24   A    No, we have discretion, sir.

25   Q    Now, there's -- it's an incarcerable offense; right?

1    A    Yes.

2    Q    But you're not required to actually formally arrest

3    somebody; isn't that right?

4    A    Yes.

5    Q    In this case you were not going -- initially going to

6    arrest Mr. Bonds, were you?

7    A    I don't know that, sir.

8    Q    Well, don't you recall his calling his family, you

9    allowed him to make a phone call to his father?

10   A    No, I don't recall that, sir.

11   Q    You don't recall his father coming down to the scene of

12   the stop and speaking with you personally about taking away

13   the vehicle?

14   A    No, I don't recall that, sir.

15   Q    You don't recall that at all?

16   A    No.

17   Q    But you do recall that he told you why he had a gun in

18   his car?

19   A    That's something that sticks out in your mind pretty

20   well, sir.

21   Q    It sticks out in your mind so much, Detective, that there

22   is no possible way you'd forget to put it in a statement of

23   probable cause, would you?

24   A    No, I forgot, sir.

25   Q    You forgot.  But you said that's something that would

1    stick in your mind, it stuck in your mind today, didn't it?

2    A    Yes, sir.

3    Q    It didn't stick in your mind when you wrote your police

4    report, did it?

5    A    No, sir.

6    Q    It didn't stick in your mind when you wrote a statement

7    of probable cause, did it?

8    A    No, sir.

9    Q    When did you tell the government that that all

10    happened?

11    A    During the interview, sir.

12    Q    Pardon?

13    A    During my conference with them, sir.

14    Q    When was that?

15    A    Last week, sir.

16    Q    Last week.  So to your knowledge, the first time the

17    United States Government learned about this statement made by

18    Mr. Bonds was when you told them last week?

19    A    I believe so, sir, yes.

20    Q    Would you be surprised that the first time that I heard

21    it was in this courtroom?

22    A    No, sir.

23    Q    Okay.  And yet that's something that stuck out in your

24    mind?

25    A    Yes, sir.

Cross-examination – Neptune   (By Mr. Ruter)

1   Q    You do not recall at all, other people coming to the

2   scene of the stop, ready to take the vehicle away?

3   A    No, sir.

4   Q    You don't recall that?

5   A    No, sir.

6   Q    You do not recall this man making a phone call?

7   A    No, sir.

8   Q    So Detective, you -- we need to go back to your statement

9   of probable cause.  The statement of probable cause is

10  identical to the police report, isn't it?

11  A    Yes, sir.

12  Q    The statement of probable cause, by the way, you actually

13  swear that under the punishment of perjury, don't you?

14  A    Yes, sir.

15  Q    And we all can agree that -- let me ask another question,

16  do you think it's significant or important, as you testified,

17  when Mr. Bonds told you or admitted that he knew the gun was

18  there?

19  A    Yes, sir.

20  Q    Did you think that was significant or important on the

21  day that he told that to you?

22  A    I can't speak to my thoughts on that day, but I forgot to

23  put it in unfortunately.

24  Q    But Detective, I'm asking you about your thoughts that

25  day.

1    A    Sir, could you repeat --

2    Q    Not your thoughts today, your thoughts on October 23rd,

3    2013, is what I'm asking about.

4    A    Could you repeat what you're asking me, sir.

5    Q    Sure.  On October 23rd, 2013, did you not think it was

6    legally and factually significant that Mr. Bonds allegedly

7    told you that he knew that gun was in that vehicle?

8    A    On that day, on October 23rd, 2013, did I think it was

9    important to put it in there, sir?

10   Q    Yes, sir.

11   A    Again, I can't answer to my thought process at that

12   time.

13   Q    Detective, you ended up charging the man with possession

14   of a handgun?

15   A    Yes, sir.

16   Q    How could you not believe it was the centerpiece of what

17   should have been in your statement of probable cause?

18   A    I don't know, sir.

19   Q    Could it be because he didn't say it?

20   A    No, sir.

21   Q    I see.  Now, when we go to the third paragraph of this

22   statement of probable cause, you indicate that while

23   inventorying the vehicle for valuables, so now what you're

24   telling the world is that whatever search you were doing, you

25   were doing an inventory search; correct?

1    A    Yes, sir.

2    Q    You were doing an inventory search because the only

3    probable cause you had to believe that any offense was

4    committed, in your mind, was number one, some kind of a

5    traffic violation for going through a stop line, which is what

6    you wrote; correct?

7    A    It was a traffic stop, yes, sir.

8    Q    And number two, was driving on a suspended license?

9    A    He was arrested for that, yes, sir.

10   Q    Therefore, you would not have probable cause to go

11   searching the entirety of the vehicle, tearing up things and

12   trying to find actual evidence of crime; correct?

13   A    It was an inventory search to protect both myself and

14   Mr. Bonds.

15   Q    Yes, which is what you put in the statement of probable

16   cause.  And then you say that, "I recovered a .357 magnum

17   silver Ruger revolver fully loaded," and so on, "located under

18   the rear bench on the passenger side of the vehicle."

19        So Detective, what I've been doing is going on the

20   internet looking for a 1998 Honda the last few weeks, and I

21   couldn't find any that had any space underneath the bench

22   seat, as you described it in the statement of probable cause.

23   And that's because this car doesn't have a rear bench seat

24   that you can stick anything under; isn't that right?

25   A    That's incorrect, sir.  If you lift the pad where a

1   passenger would be seated, it's actually removable.  And that

2   seat was loose before I even touched it.

3   Q    So how loose was it?

4   A    It was loose enough that the -- it was accessible.

5   Q    Yeah, because you forced it up?

6   A    No, sir.

7   Q    You picked it up?

8   A    No, sir.  Like I just said, it was already loose before I

9   even touched it.

10  Q    Could you peek inside it and see a gun?

11  A    I don't believe so.

12  Q    No.  But when you read what you wrote, Detective, don't

13  you agree with me that it sounds as if you saw this particular

14  weapon in what we would call in "plain view," wouldn't you

15  agree with that?

16  A    No, sir.  I didn't say "plain view" in my probable cause,

17  sir.

18  Q    Yes.  We know that.  You also didn't tell us that he

19  admitted that he knew the gun was there; right?

20  A    Correct.

21  Q    And you also didn't tell us that he said that he had it

22  there and didn't want his children to get it, is that what you

23  testified to?

24  A    Yes, sir.

25  Q    So we know all that, but when it says located under the

Cross-examination – Neptune   (By Mr. Ruter)

1    rear bench, it wasn't located under the rear bench, was it?

2    A    Yes, it was, sir.

3    Q    It was located under the back seat, which you had to lift

4    up; isn't that right, Detective?

5    A    Correct.

6    Q    Okay.  So Detective, you understand clearly the

7    significance and the importance of writing reports accurately;

8    right?

9    A    Yes, sir.

10   Q    If I understand it, when you went to work for the Prince

11   George's County Police Department, you were accused by the

12   department of making a couple false statements.

13   A    No, sir, misrepresentation of facts.

14   Q    I'm sorry?

15   A    Misrepresentation of facts, sir.

16   Q    So a misrepresentation of fact, is that different from

17   making a false statement?

18   A    Yes, sir.

19   Q    Tell us how that is.

20   A    I can't really speak to what the department decides the

21   difference is.  A false statement is an egregious lie.

22   Misrepresentation of facts is the department's interpretation.

23   Q    I'm referring to an internal affairs investigation where

24   you were the respondent; right?

25   A    Yes, sir.

Cross-examination – Neptune   (By Mr. Ruter)

1    Q    And it dealt with a stop that occurred in December of

2    2014; correct?

3    A    Yes, sir.

4    Q    And you had advised not one, not two, but I think three

5    different police officers as to your version of events that

6    occurred on that evening; correct?

7    A    Correct.

8    Q    And after -- and then thereafter, you gave two separate

9    statements on -- not under oath, but under the LEOBR, you were

10   interviewed under the Law Enforcement Officers Bill of Rights,

11   and you gave a recorded statement; correct?

12   A    Correct.

13   Q    And it was all reduced to a transcript; correct?

14   A    Yes, sir.

15   Q    And you gave your version of what happened in terms of

16   your pursuit of a vehicle on a certain night, which resulted,

17   evidently, in a very nasty car accident between that vehicle

18   and another vehicle that were hit head on?

19   A    Correct.

20   Q    You had told your superiors and investigators that you

21   were not in pursuit of one of those vehicles?

22   A    Is that a question, sir?

23   Q    It is a question, you told them --

24   A    Yes.

25   Q    And there were witnesses and cameras, five cameras, that

1    controverted your statement; is that right?

2    A    That's not correct, sir.

3    Q    What is correct?

4    A    On the day in question, a vehicle fled from me, and

5    evidence showed that at the time of the crash, the suspect

6    vehicle was traveling 97 miles per hour.  I was driving 45

7    miles per hour, I was a half mile back, and my lights and

8    sirens were off.

9    Q    There were findings made in that case; correct?

10   A    Correct.

11   Q    And they were actually sustained by full board review,

12   and you were found to have been in violation of two things I

13   want to talk about briefly here.  It's charge number two.

14        MR. RUTER:  And Your Honor, I would move to

15   introduce this as Bond's No. 2.

16        MS. HOFFMAN:  Objection, Your Honor.  May we

17   approach?

18        THE COURT:  Yes.

19        (Bench conference on the record.)

20        MS. HOFFMAN:  So --

21        THE COURT:  You've got to speak up so the reporter

22   can hear you on that mike.

23        MS. HOFFMAN:  We submitted a letter to Your Honor on

24   Friday and it's our position that there's really no -- the

25   defendant Mr. Bonds stipulated through his counsel under oath

1    during a state guilty plea that he was pulled over for a

2    traffic violation.  So probing Detective Neptune on his

3    character for truthfulness on a completely separate unrelated

4    incident is a little far afield here, I think.  Using

5    extrinsic evidence to cross-examine him, I think it's even

6    farther afield.  We'd like to preclude admission of the

7    underlying file.  He maintains that he didn't misrepresent any

8    facts.  There's a 200-page IAD file.  We don't want this to

9    become a trial within a trial.  We think that --

10           THE COURT:  Well, what did the police department

11   conclude?

12           MS. HOFFMAN:  It was a sustained finding of

13   misrepresentation of fact.  He maintains that he didn't

14   misrepresent facts.  However, he, of course, acknowledges that

15   the finding was sustained.  He brought it to our attention.

16   He sent us the entire file.

17           MR. MARTINEZ:  I think we might propose, Your Honor,

18   Mr. Ruter is free to question and extract the confession which

19   I think he's prepared to give, that there were sustained

20   findings.  I think what we propose is for the Court to leave

21   it at that and that the extrinsic evidence has some

22   applicability here.

23           THE COURT:  Are we talking about in this hearing or

24   are we talking about at trial?

25           MR. MARTINEZ:  Well, at this hearing.  I certainly

1      recognize rules of evidence don't strictly apply, but I still

2      think the policy under 608(b) and using extrinsic evidence

3      should still be of some weight.  And all I'm saying is that if

4      the detective acknowledges there were sustained findings, I

5      think it's appropriate to leave it at that and not admit --

6            THE COURT:  I think there's some value though in

7      seeing how he deals with the issue when he's being

8      cross-examined and whether or not he's forthright about it, or

9      whether he is not.  And I take some value from what Mr. Ruter

10     has been doing in terms of not just the substance of what the

11     trial board found, but whether the witness readily

12     acknowledges that circumstance, and if he doesn't, why doesn't

13     he, you know, perhaps he's got his theory on it and so forth.

14     So I don't know that I actually need the document itself.

15           MR. RUTER:  I'd be happy to read what the finding

16     is, Judge.

17           THE COURT:  I think that that's fair and

18     appropriate.  But that's really where the focus on this should

19     be.  Doesn't sound like there's any dispute between the

20     parties as to what the finding was.

21           MR. RUTER:  I agree.

22           THE COURT:  Let's just see how he -- you're entitled

23     to test before me, the fact finder, you know, how this guy

24     manages information like this.  And whether he, you know,

25     allowing me to form an impression about whether he is

1    essentially truthful or essentially not truthful.

2              MR. MARTINEZ:  Agreed.

3              MS. HOFFMAN:  I think that's fair, Your Honor.

4    Thank you.

5              (The following proceedings were had in open court.)

6              THE COURT:  You may continue, Mr. Ruter.

7    Q    (BY MR. RUTER)  Detective, you had said a moment ago in

8    your attempt to explain what had happened in December of 2014

9    that this one vehicle was traveling at approximately 90 miles

10   an hour, and you were traveling at approximately 50 miles.

11   Did I hear you say that?

12   A    I said 45 miles per hour myself, sir, and the suspect was

13   going 97 miles per hour at the time of the accident.

14   Q    Okay.  And you agree with me, do you not, however, that

15   there were five cameras located on different commercial

16   buildings that showed that you were only three seconds behind

17   that vehicle that's going over 50 miles an hour faster than

18   you during this pursuit, you recall all that, do you not?

19   A    No, sir, at the time --

20   Q    You don't recall -- you don't recall, Detective,

21   testimony about five different cameras that had time sequences

22   on them that saw the Lexus vehicle speeding down Beech Road in

23   Prince George's County, and you in pursuit with a marked

24   vehicle, three seconds behind it on one of those clips, four

25   seconds behind it in another clip, on different buildings, you

1    don't recall that, sir?

2    A    Sir, the cameras were placed at different spots on the

3    roadway.

4    Q    Yes.

5    A    Initially off the turn, when the vehicle began to

6    increase speed, that was my closest time I was at the vehicle.

7    And I believe the first camera showed me at three seconds.

8    But at that time we were both going approximately the same

9    speed coming off of a turn, so we were both going well under

10   his 97 miles per hour.

11   Q    So your testimony now is, he was picking up speed later

12   on, that's when he got to 90 miles an hour, before he hit

13   another car head on; right?

14   A    Yes, sir, that's when he was fleeing and I was just on

15   the same road going the same direction.

16   Q    Those issues were thoroughly vetted before a disciplinary

17   board in Prince George's County; correct?

18   A    Yes, sir.

19   Q    And if I understand it, you were -- findings were

20   sustained as follows:  That the respondent, police officer

21   Jamal Neptune, did, on or about June the 4th, 2015 -- this is

22   six months after the event; right?

23   A    Yes, sir.

24   Q    Okay.  At 6707 Groveton Drive, Clinton, Maryland, that's

25   where you were interviewed by other police personnel;

Cross-examination – Neptune   (By Mr. Ruter)

1    correct?

2    A    That's the internal affairs division, sir.

3    Q    Yes, intentionally misrepresent facts to Corporal Kyle

4    Butterharm (phonetic) concerning his actions in a vehicle

5    pursuit that occurred on or about December 29th, 2014, in

6    violation of Prince George's County Code Section 18-160, which

7    says, "No member of the police department under any

8    circumstances shall make any false official statement or

9    intentional misrepresentation of fact."  That was the finding;

10   correct, Detective?

11   A    Yes, sir.

12   Q    Do you take issue with that?

13   A    No, sir.

14   Q    Okay.  You didn't appeal the decision, did you?

15   A    I did, sir.  I took it to trial board, and I'm working on

16   going through an appeal now, sir.

17   Q    Pardon?

18   A    I'm exploring the options to go through an appeal right

19   now, sir.

20   Q    Okay.  This finding occurred in February of 2017, but

21   you're still exploring your options?

22   A    Yes, sir.  If you recall the date, the incident occurred

23   December 2013, and I wasn't even -- didn't get a conclusion

24   until 2016, so unfortunately these processes move kind of

25   slowly.

1    Q    I see.  And then charge No. 3 was sustained, which says

2    that the respondent, police officer Jamal Neptune, on or about

3    December 29th, 2014, in the area of the 5000 block of Beech

4    Road, Temple Hills, Maryland intentionally misrepresented

5    facts to Corporal Davon Thompson concerning his actions in a

6    vehicle pursuit that he was involved on that day, in violation

7    of Prince George's County Code Section 18-160:  "No member of

8    the police department under any circumstances shall make any

9    false official statement or intentional misrepresentation of

10   facts."  That was sustained, was it not?

11   A    Yes, sir.

12   Q    And you gave your version of events, did you not,

13   Detective, because you did not want your authorities believing

14   you were making a hot pursuit outside of your jurisdiction;

15   isn't that right?

16   A    I was inside of my jurisdiction, sir, and I just gave my

17   recollection of what occurred.

18   Q    And then charge No. 1, which was sustained is, "Officers

19   may only engage in vehicle pursuits in the county and

20   neighboring jurisdictions outside of the county if there's

21   reason to believe that the following suspect is committing,

22   has committed, or attempted to commit any of the following:

23   homicide, contact shooting, armed robbery, armed carjacking."

24        You were found not to have been engaged in any of those;

25   isn't that right?

1    A    Correct, sir.

2              MR. RUTER:  No further questions.  Thank you.

3              THE COURT:  Redirect.  One second.

4              Ms. Hoffman.

5                    REDIRECT EXAMINATION

6    BY MS. HOFFMAN:

7    Q    Detective Neptune, I'd like to show you again

8    Government's Exhibit 21.  Do you know when this photograph was

9    taken?

10   A    No, ma'am.

11   Q    If I told you it was a Google maps image from 2011, would

12   you have any reason to disagree?

13   A    Actually, I can see on the top left it says 2011.  Yes,

14   ma'am, I see.

15   Q    Is it possible the intersection looked different two

16   years later in 2013 when the stop of Joseph Bonds occurred?

17   A    Yes, ma'am.

18   Q    Do you know for sure whether or not there was a stop line

19   at that intersection on October 23rd of 2013?

20   A    Based on this photograph, no, ma'am.

21   Q    Do you know for sure whether those trees were there in

22   2013?

23   A    Again, based on this photograph, no, ma'am.

24   Q    You testified on direct examination and on

25   cross-examination that Mr. Bonds's vehicle rolled into the

Redirect Examinaton – Neptune  (By Ms. Hoffman)

1    intersection without stopping; is that correct?

2    A    Yes, ma'am.

3    Q    Can you point in this photograph to approximately where

4    the car was when it slowed down?

5    A    Just point right here, ma'am?

6    Q    Yeah, you can use your finger to touch on the screen

7    here.

8    A    As I could see -- I could see it past the sidewalk

9    there.

10    Q    Did it ever come to a complete stop?

11    A    No, it continued to roll through, ma'am.

12    Q    Was what you saw consistent with someone --

13         THE COURT:  Okay.  Counsel can approach.

14         (Bench conference between Court and court reporter.)

15         THE COURT:  We're back on the record.  The reporter

16    will turn to her notes recording the direct testimony of the

17    witness, page 43, line 9, and will read back from line 9 to

18    line 23.

19         Madame Reporter, you may begin.  Line 8 actually.

20         (Page 46, line 20 through page 47, line 9, of the

21    final, certified, transcript, was read by the court reporter.)

22         THE COURT:  Thank you, Madame Reporter.

23         The witness will be brought back into the courtroom.

24         Ms. Hoffman, you may continue your redirect

25    examination.

1          Detective Neptune has rejoined us, you remain under

2    oath.

3          Ms. Hoffman, you may continue.

4    Q    (BY MS. HOFFMAN)  Detective Neptune, I believe on direct

5    examination you testified that you saw -- you observed the car

6    fail to stop at the stop sign, roll into the intersection

7    before coming to a stop; is that right?

8    A    Correct.

9    Q    Do you recall whether the vehicle came to a complete

10   stop, what exactly did you see?

11   A    On the day of the traffic infraction, I recall the

12   vehicle not stopping at the stop sign and coming through the

13   intersection where I could see it.  It didn't come to a

14   complete stop where the vehicle was rocking backwards.  It was

15   already in the intersection, and it continued to roll through.

16   It did slow down when it came to the intersection, but it

17   continued to roll through without coming to an absolute

18   complete stop.

19   Q    And was it at that point you turned on your emergency

20   lights?

21   A    Correct.

22   Q    Was what you saw consistent with someone trying to look

23   around the corner to see whether there was any oncoming

24   traffic or someone who just blew through a stop sign?

25          MR. RUTER:  Objection.

Redirect Examinaton – Neptune  (By Ms. Hoffman)

1          THE COURT:  Sustained.  You may rephrase your

2     question so it's not leading.

3     Q    (BY MS. HOFFMAN)  Was what you saw consistent with

4     someone trying to look around the corner to see whether there

5     was oncoming traffic?

6          MR. RUTER:  Objection, Your Honor.

7          THE COURT:  I'll allow that.

8          MR. RUTER:  He can't know.

9          THE COURT:  He can have an opinion on that.

10    Overruled.

11    A    The vehicle went through the stop sign and into the

12    intersection.  It committed the traffic infraction, so I

13    pulled it over as a result.

14    Q    (BY MS. HOFFMAN)  Could you tell at the time whether the

15    driver was attempting to see around the corner?

16    A    Not at that time, I couldn't tell that specific --

17         MR. RUTER:  Objection.

18         THE COURT:  Well, the question was, could he tell.

19         MR. RUTER:  I'm sorry, Judge?

20         THE COURT:  The question was, could he tell.  Could

21    he tell?

22         MR. RUTER:  Withdrawn.

23    A    Ma'am, I could not tell if somebody was just trying to

24    simply look around the corner at that time.

25    Q    (BY MS. HOFFMAN)  Did you believe you had probable cause

1    to pull him over for running a stop sign?

2    A    Yes, ma'am, he had gone through the stop sign.

3            THE COURT:  Did he believe -- I mean, it's

4    overruled.

5    Q    (BY MS. HOFFMAN)  Is it a violation of the Maryland

6    traffic code to run a stop sign if there is not a clearly

7    marked stop line in the road?

8    A    Yes, ma'am.

9    Q    Is it possible that you cited him for failure to stop at

10   a stop line when you meant failure to stop at a stop sign?

11           MR. RUTER:  Objection.

12           THE COURT:  Yes.  Sustained.

13   Q    (BY MS. HOFFMAN)  What citation did you typically use

14   when someone failed to stop at a stop sign?

15           MR. RUTER:  Objection.  Relevancy.

16           THE COURT:  Overruled.

17   A    At that time I was using the stop line, ma'am.

18   Q    (BY MS. HOFFMAN)  And is that part of the same section of

19   the Maryland traffic code as failure to stop at a stop sign?

20   A    Yes, ma'am.

21   Q    Is the punishment for both infractions the same?

22   A    Yes, ma'am.

23   Q    And both are offenses for which someone can be pulled

24   over?

25   A    Yes, ma'am.

Redirect Examinaton – Neptune  (By Ms. Hoffman)

1    Q    I'd like to show you Government's Exhibit 22.  And this

2    is the towed vehicle report that you completed on October 23rd

3    of 2013; correct?

4    A    Yes, ma'am.

5    Q    And can you see where it says who the registered owner of

6    the vehicle is?

7    A    Yes, ma'am.

8    Q    Who is it?

9    A    A Ms. Tameeka Gilliam.

10   Q    And was she present at the scene when you made this

11   stop?

12   A    No, ma'am.

13   Q    I'd like to show you Government's Exhibit 23.  Can you

14   read what it says at the top of this document?

15   A    Baltimore Police Department General Order, then it says

16   I-2, procedures governing the use of pushing/towing

17   vehicles.

18   Q    And is this the policy that was in place at the time that

19   you made this traffic stop, to the best of your knowledge?

20   A    Yes, ma'am.

21   Q    I'd like to flip a page here.  I'm showing you page --

22   it's I-24 of this document, can you read the highlighted text

23   there?

24   A    Note:  In all other cases, not including DWI, the vehicle

25   driven by the arrested driver may only be released by the

Redirect Examinaton - Neptune  (By Ms. Hoffman)

1    arresting officer to the owner/co-owner of the vehicle or a

2    licensed driver, with the consent of owner/co-owner.

3    Q    Were you permitted under this policy to release a vehicle

4    whose operator had been arrested to a licensed driver without

5    the consent of the owner or co-owner?

6    A    No, ma'am.

7    Q    And was the owner or co-owner there at the scene?

8    A    No, ma'am.

9         THE COURT:  And did the defendant consent to the car

10   being given to somebody else?

11        THE WITNESS:  That question never arose, sir.

12   Q    (BY MS. HOFFMAN)  Well, it says here that the vehicle

13   driven by the arrested driver may only be released by the

14   arresting officer to the owner or co-owner of the vehicle or a

15   licensed driver with the consent of the owner or co-owner; is

16   that right?

17   A    Yes, ma'am.

18   Q    Was Joseph Bonds the owner or co-owner of the vehicle?

19   A    No, ma'am.

20   Q    Did you believe you were complying with this policy when

21   you had it towed to city yard?

22   A    Yes, ma'am.

23        THE COURT:  Well, was there anybody else there

24   willing to take the car?

25        THE WITNESS:  Mr. Bonds was the only occupant of the

1    vehicle, sir.

2            THE COURT:  And nobody else arrived or showed up and

3    said I'll take the car?

4            THE WITNESS:  No, sir.

5            THE COURT:  It was just the two of you, that was the

6    total interaction?

7            THE WITNESS:  Myself, Mr. Bonds, and then assisting

8    officers, those are the only people I remember on scene.

9            THE COURT:  But there weren't any friends,

10   relatives, anybody else who came to the scene, and Mr. Bonds

11   said, look, let them take the car?

12           THE WITNESS:  No, sir.  There was no one else that I

13   can recall now.

14   Q    (BY MS. HOFFMAN)  Even if there had been other licensed

15   drivers who came to the scene, would you have been authorized,

16   under Baltimore Police Department's policy at the time to

17   release the vehicle to them without the consent of the actual

18   owner of the vehicle?

19   A    No, ma'am.  If I did that, I would be in violation of my

20   general orders.

21   Q    Now, you mentioned on direct examination --

22           THE COURT:  So I'm driving in Baltimore, it's my

23   wife's car, only she's on the registration.  You pull me over

24   and find that I'm suspended, so I'm being arrested.  My son

25   comes around the corner and says, that's fine, I'll take the

1    car.  You wouldn't let him take the car?

2              THE WITNESS:  So if your wife is the sole registered

3    owner of the vehicle and she was in the vehicle with you and

4    you were arrested --

5              THE COURT:  No, no, she's not anywhere.

6              THE WITNESS:  Oh, she's not on scene.

7              THE COURT:  -- at all, her only involvement is she's

8    on the registration.

9              THE WITNESS:  Unfortunately, due to the general

10   order, she's the only one that could give me consent.

11             THE COURT:  Next question.

12   Q    (BY MS. HOFFMAN)  Detective Neptune, you mentioned on

13   direct examination that the rear bench of the Honda was

14   loose?

15   A    Yes, ma'am.

16   Q    And what did you mean when you said rear bench?

17   A    The rear passenger seat.

18   Q    And is the seat sometimes referred to as a bench?

19   A    Yes, ma'am.

20   Q    Did you believe it was possible that valuables could be

21   stashed under that bench?

22   A    Yes, ma'am.

23             MR. RUTER:  Objection, Your Honor.

24             THE COURT:  Overruled.

25   Q    (BY MS. HOFFMAN)  And why was that?

1    A    Due to my experience, valuables can and often do fall

2    behind the seat and underneath the seat.

3    Q    And were you required by the Baltimore Police Department

4    policy at the time to search the car thoroughly for

5    valuables?

6    A    Yes, ma'am.

7    Q    Were you complying with that policy when you searched

8    under the rear bench of the vehicle?

9    A    Yes, ma'am.

10   Q    Mr. Ruter asked you about a Prince George's County Police

11   Department IAD proceeding on cross-examination.  How long have

12   you been a police officer, Detective Neptune?

13   A    I became a police officer in April of 2012, and I'm

14   currently one today, so five and a half years.

15   Q    Have you ever had a sustained IAD violation other than

16   the one Mr. Ruter asked you about?

17   A    No, ma'am.

18   Q    Have you, in fact, received commendations for your work

19   as a police officer from the Prince George's County Police

20   Department?

21   A    Yes, ma'am.

22   Q    Can you give us some examples?

23   A    I've been awarded officer of the month on three different

24   occasions.  And I was also -- I was awarded a commendation and

25   also the District Commander's Award.

1   Q    And what is that award given for?

2   A    The District Commander's Award is given by the district

3   commander in reference to some extraordinary act by an

4   officer.

5   Q    Did you feel you were treated fairly in the Prince

6   George's County's IAD proceeding that Mr. Ruter asked you

7   about?

8            MR. RUTER:  Objection.

9            THE COURT:  Well, as though we don't know the answer

10  to that question.  Overruled.  You can answer.

11  A    No, ma'am, I did not feel I was treated fairly.

12  Q    And why was that?

13  A    Due to the facts that were brought in reference to my

14  defense, I believe that they were overlooked.

15           MS. HOFFMAN:  All right.  I have no further

16  questions for the witness.

17           THE COURT:  Thank you.  You may step down,

18  Detective.

19           Any other witnesses on this issue, Ms. Hoffman?

20           MS. HOFFMAN:  No, Your Honor.

21           THE COURT:  All right.  Mr. Ruter, do you have

22  witnesses?

23           MR. RUTER:  I do not.  Thank you.

24           THE COURT:  Okay.  So I'll hear argument, but let's

25  just cut to the chase.  We've got two problems here, one for

 1   each side.  Mr. Ruter, if there is a violation that justifies

 2   police action, and if the Court concludes that the violation

 3   did occur, but also concludes that the violation might,

 4   technically speaking, be different from the one for which the

 5   defendant was cited, does that change anything?

 6             MR. RUTER:  No, I think the case law --

 7             THE COURT:  The question is whether or not an

 8   officer could lawfully stop somebody.  And if there was a

 9   reason why the officer lawfully could stop the person, it's

10   just that it's different from the reason that the officer

11   cited or believed.

12             MR. RUTER:  Only defense attorneys, Your Honor, get

13   punished for not having the right reason in their arguments,

14   police officers do not.  The fact -- the case law is very

15   clear that if they're right on one thing, but they wrote down

16   something else, that does not change the fact that the -- if

17   the something else gives them a reason to arrest someone, they

18   can still do that.

19             THE COURT:  Precisely.  Mr. Ruter, one of the things

20   I appreciate about you is candor, which I always get from you.

21   And now we'll turn to the government, since candor is the

22   topic of the moment.  Ms. Hoffman.

23             MS. HOFFMAN:  Well, I think first --

24             THE COURT:  What am I supposed to do about an

25   officer who first gets himself apparently in quite a jam with

1    his agency in very -- in a very serious case, such that

2    they're conducting an investigation that goes so far as to

3    collecting building surveillance camera tape.  And then at the

4    conclusion of which, at least at this point, is that the

5    officer was -- that he intentionally -- intentionally --

6    misrepresented facts?  That's problem number one.  And then

7    problem number two, in testimony in front of me, on a fact of

8    some importance, not a dispositive fact by itself, but a fact

9    of some importance, not an immaterial fact, directly

10   contradicts himself, directly.  What credibility am I to

11   afford him?

12        MS. HOFFMAN:  Well, I think we have to back up a

13   minute and look first to the fact that the defendant Joseph

14   Bonds pleaded guilty to this offense in state court.  More

15   importantly than that, he did stipulate through counsel that

16   he was pulled over for a traffic violation.  So I think we

17   have to start there.  That's some evidence on the scale

18   leaving us to believe that Detective Neptune did lawfully stop

19   Joseph Bonds for a traffic violation.

20        Now, turning to this case, I think -- I don't

21   entirely agree that he did contradict himself.  I do see that

22   on direct examination -- I think what he meant to say is that

23   the car rolled out into the intersection, it started to stop,

24   possibly because he saw a police officer there, and then

25   continued turning on.

1            THE COURT:  I didn't hear "started to stop."  I

2    heard "stopped."  Did you hear something different from that

3    when Ms. Asif read back the record?

4            MS. HOFFMAN:  No, I think that's correct, Your

5    Honor.  That is what he said.  I believe that the question

6    here is whether or not Detective Neptune had probable cause to

7    stop for a traffic violation, so whether or not he was

8    ultimately correct that a traffic violation occurred doesn't

9    matter.  He believed that he had probable cause to stop the

10   car for a traffic violation because he saw Joseph Bonds blow

11   through a stop sign.  That was clearly a violation of the

12   Maryland traffic code.

13           THE COURT:  The whole process that we conduct in

14   criminal cases is dependant upon the integrity of police

15   officers and their being scrupulously honest, honest with

16   exactitude.  And when a shadow is cast on that question, we've

17   got a big problem.  I wasn't out at that intersection in

18   Cherry Hill, nor was anybody else in this courtroom except the

19   defendant and the officer.  I better be able to rely on the

20   credibility of the officer.  If I can't, well, if I can't rely

21   on his credibility with respect to details like whether or not

22   the vehicle stopped or didn't stop, why should I still rely on

23   the overall premise, which was that there was a traffic

24   violation at all?  Why should I?

25           MS. HOFFMAN:  In part because the defendant himself

1    admitted that under a -- through counsel in a state guilty

2    plea proceeding.

3              THE COURT:  Mr. Ruter, what do you say about that?

4              MR. RUTER:  You may not want to hear everything I've

5    told the government about that, Judge, but then again,

6    maybe --

7              THE COURT:  Well, just use language that's

8    appropriate for court.

9    MR. RUTER:  Your Honor, without in any -- I'm as serious about

10   this as I can possibly be.  As I told Mr. Martinez and Ms.

11   Hoffman, I said, you know, it is a -- it's a legal fiction,

12   Judge Bredar, and we all know it in this courtroom, that when

13   people go into a court being charged with some offense,

14   especially in the Baltimore City Circuit Court, if they get to

15   go home that day, they would admit they shot Jimmy Hoffa.  And

16   that is a fact.  Now I recognize Rule 801(d)(A)(1) (sic), I

17   believe that's the rule, is valid and this court uses it all

18   the time.  I'm well aware of that, but to use that as a

19   linchpin is being quite disingenuous.  This guy got a

20   two-year, I think, suspended jail sentence.  And that's why

21   people plead guilty in the Baltimore City Circuit Court, not

22   because of the statement of facts, Judge.  I doubt this guy

23   even heard them

24              THE COURT:  What kind of a court am I running if, A,

25   I can't believe the police officers, on one hand, we already

1  discussed that with the government; now from the defense side

2  I can't give significance to information and evidence that the

3  rules of evidence say by rule that I am to accredit?

4          MR. RUTER:  I'm going to solve that problem, Your

5  Honor --

6          THE COURT:  I hope you can, because this is a real

7  problem.

8          MR. RUTER:  Because the statement of facts -- the

9  statement of facts he pled guilty to say he was stopped for a

10 traffic violation.  Yes, he was stopped.  He didn't admit that

11 he committed a traffic violation.

12         THE COURT:  Then what crime did he admit to?

13         MR. RUTER:  To having a handgun.

14         THE COURT:  Whatever happened to the driving under

15 suspension charge?

16         MR. RUTER:  Judge, I don't know if that even

17 proceeded.  I don't recall.  I don't think that he was -- he

18 pled guilty to that.

19         THE COURT:  And the sign, stop line, stop whatever

20 it is, what happened to that?

21         MR. RUTER:  I saw no -- in the discovery I saw no

22 disposition on those two charges.  But I'm not being -- I'm

23 not playing footloose and fancy free with the statement of

24 facts.  You have the statement of facts.  The government

25 outlined them in their answer.  And all that he admitted to

1    was that he was stopped for a traffic violation.  He did not

2    admit that he committed the traffic violation.  He was stopped

3    for a traffic violation, but he didn't say that he, in fact,

4    was guilty of it.  He pled guilty to the gun charge.  So

5    that's the answer to the dilemma you have about who do I

6    believe and who I don't believe.

7              THE COURT:  Recess until 2:00 o'clock.

8              (A recess was taken.)

9              THE COURT:  Good afternoon.  Be seated, please.  The

10   government wants to put something on the record.

11             MS. HOFFMAN:  Thank you, Your Honor.  Your Honor, we

12   have talked it over with supervisors and in light of the

13   Court's concerns about some of the inconsistencies that came

14   out during the witness's testimony, we've told Mr. Ruter we're

15   willing to stipulate that we're not going to introduce the gun

16   recovered from Mr. Bonds on October 23rd, 2013, in evidence at

17   trial.  We don't believe we need the gun.  We are planning to

18   go forward with introducing Mr. Bonds's guilty plea to

19   possessing the firearm in question.  But we think the

20   stipulation moots Mr. Bonds's motion to suppress the

21   evidence.

22             THE COURT:  Do you agree, Mr. Ruter, it moots it?

23             MR. RUTER:  Your Honor, I don't think so.  And

24   ordinarily, Your Honor, it would.  But I'm not involved in

25   this case except for this motions hearing, as the Court's well

1    aware.  And I had questioned whether or not should the Court

2    rule that this stop and this seizure were unconstitutional,

3    that it may in some way affect the ability of the government

4    to introduce the guilty plea on the very same charges that

5    occurred in state court.

6            Now, I know you already ruled, Judge Bredar, but you

7    ruled -- I think the reasoning given by Mr. Faison, whose

8    motion was the one, the motion in limine actually outlined in

9    the argument, it was adopted by Mr. Solomon, had to do with

10   had he known by pleading guilty to a gun in state court, it

11   very much could in effect be an equivalent to a guilty plea in

12   a federal gang-related type case, you found that was not

13   persuasive and you ruled against them.

14           I don't know what the status of the law is, Judge

15   Bredar, on whether or not if you were to rule in favor of

16   Mr. Bonds in this motion, if that could have some adverse

17   effect on the government's ability to introduce at trial the

18   very act which you have found to be constitutionally

19   impermissible, so --

20           THE COURT:  If I were to so find.

21           MR. RUTER:  Of course, Judge, I'm being very

22   presumptuous.

23           THE COURT:  Somebody would have to file a motion

24   seeking to exclude admission of the conviction you're

25   referring to.

1           MR. RUTER:  Judge, I think in effect, the motion in

2    limine --

3           THE COURT:  That I ruled on.

4           MR. RUTER:  That you ruled on, that I read, may --

5           THE COURT:  These circumstances weren't before the

6    Court in relation to that motion.

7           MR. RUTER:  That's correct.

8           THE COURT:  And so that ruling stands.  I have no

9    basis for going back and reopening that record.  No one's

10   asked me to do that.

11          MR. RUTER:  I'm not going to ask you, because I'm

12   not going to be here.  Mr. Solomon might.  And you may or may

13   not allow him to do so.

14          THE COURT:  So the point is this, right now we're

15   dealing with a specific gun.

16          MR. RUTER:  Yes.

17          THE COURT:  And the government has disclaimed any

18   intention to introduce that into evidence.  The motion that's

19   before me is to suppress the gun.

20          MR. RUTER:  Yes.

21          THE COURT:  Well, that's no longer ripe.  There's

22   nothing -- there's no case or controversy with respect to that

23   issue.  Why wouldn't it be an advisory opinion that I would be

24   entering?

25          MR. RUTER:  Well, I attempted to answer that when

1    you asked the question is it moot.  And my response is, I

2    don't think it's moot because of their intention of

3    introducing the underlying conviction of the very gun that

4    you're about to rule on.

5            THE COURT:  I find --

6            MR. RUTER:  But I could be wrong, Judge Bredar.

7            THE COURT:  Listen, you're doing a great job and

8    fighting for your client and illuminating relevant issues.

9    I'm with you a hundred percent.  I'm just not going to rule in

10    your favor.  I find that with respect to the gun, which is

11    what the motion is directed at, it is appropriately now found

12    to be moot and it is denied as moot.

13            Does that preclude other theories or litigation with

14    respect to other aspects of the government's proof?  I mean,

15    we are passed the motions deadline, but the ruling goes as far

16    as it goes, which is to say that there's nothing for me

17    specifically to decide anymore in reference to that motion,

18    because the government's not going to introduce the evidence

19    that the motion, on its face, is directed at.  So the motion

20    is denied as moot.  We'll see where we go.  All right.

21            Listen to Mr. O'Toole.  He's got a lot of

22    experience, he'll give you good advice.

23            Mr. Martinez, what's next?

24            MR. MARTINEZ:  Your Honor, I think in light of the

25    fact Mr. Harvey's motions are being held in abeyance, we've

1   now completed the motions that require the taking of witness

2   testimony.  And so we can now turn to motions that require

3   legal argument only.  And I would propose that we just address

4   these in the order they're addressed in our motions response

5   starting with the motion to sever.  And this is filed by

6   Kenneth Faison, Kenneth Jones, Marquise McCants, and Gerald

7   Johnson.

8          THE COURT:  Let me see Mr. Ruter and government

9   counsel at the bench on a housekeeping matter.

10         (Bench conference on the record.)

11         THE COURT:  Refresh my recollection as to why you

12   are saying what you're saying about, "I'm not going to be a

13   part of this."

14         MR. RUTER:  I'm just here, Judge, for the motions

15   hearing.

16         THE COURT:  Because of Mr. Solomon's still

17   developing re-entry into the case, is that what you're talking

18   about?

19         MR. RUTER:  No, I was advised by, I think your

20   chambers and by Maureen Essex, that I was to handle this

21   motions hearing.  And so I just then reviewed the documents,

22   did my own little surveillance --

23         MS. HOFFMAN:  You're a pretty good pinch hitter.

24         MR. RUTER:  -- and did my argument and so I'm out.

25   That's why I made the comment.  I don't know what's going to

1    happen as far as --

2              THE COURT:  What's government's counsel's

3    understanding of the status of Mr. Solomon vis-a-vis trial?

4              MS. HOFFMAN:  Our understanding is that he will be

5    representing Mr. Bonds at trial.  We certainly have no

6    objection in light of what happened today to him filing such a

7    motion to preclude this guilty plea.  We would like a chance

8    to respond to it, but we have no objection to the filing of

9    such a motion.

10             THE COURT:  Right.  And --

11             MR. MARTINEZ:  Do I understand the Court to be more

12   concerned about Mr. Bond's Sixth Amendment rights to have

13   continuing counsel --

14             THE COURT:  That's really what I'm focused on at the

15   moment, is the overall relationship between the client,

16   yourself, and Mr. Solomon and where all that stands.  It seems

17   like it's an appropriate moment to sort of make a record on

18   that, as you understand it.  And let's get Mr. Bonds on an

19   earpiece, please.  The clerk will ensure that only Mr. Bonds

20   has his earpiece in and everybody else is -- collect the

21   earpieces from everyone else.  Thank you.  Help her, Mr. Jaco.

22             (Pause in the proceedings.)

23             THE COURT:  Back on the record.  Mr. Bonds, if you

24   can hear me, raise your hand.

25             DEFENDANT BONDS:  (Indicating).

```
 1              THE COURT:  Let the record reflect that Mr. Bonds is
 2     able to hear us, he's raised his hand.  Go ahead, Mr. Ruter.
 3              MR. RUTER:  Your Honor, you wanted me to address the
 4     issue or --
 5              THE COURT:  Explain the situation.
 6              MR. RUTER:  Your Honor, sometime ago I received a
 7     call from the Criminal Justice Act supervising attorney,
 8     Maureen Essex, concerning whether or not I would have the
 9     ability to represent Mr. Bonds at a motions hearing scheduled
10     for yesterday and today, because Mr. Bonds's attorney David
11     Solomon could not make it.  I don't --
12              THE COURT:  How did -- I think there's an even
13     further background to the story, which is that I believe
14     Mr. Solomon was originally on the case?
15              MR. RUTER:  He was.
16              THE COURT:  Then he became ill.
17              MR. RUTER:  Yes.
18              THE COURT:  Then he --
19              MS. HOFFMAN:  Mr. Van Hoven.
20              THE COURT:  -- left the case, Mr. Van Hoven came in
21     the case, then some difficulties arose in the relationship
22     between Mr. Van Hoven --
23              MS. HOFFMAN:  There was an unforeseen conflict.
24              THE COURT:  It was a conflict that progressed.  By
25     the time that conflict arose, fortunately, Mr. Solomon's
```

1    health had unexpectedly taken a turn for the good, and

2    Mr. Solomon somewhat unexpectedly found himself in a physical

3    condition where he was able to return to practice.

4              MR. RUTER:  Yes, that's true.

5              THE COURT:  But he had some travel plan or some

6    other conflict that was going to interfere with his ability to

7    participate in this hearing.  So the consequence of that was

8    that court staff were directed to locate other counsel who

9    would be able to assist Mr. Bonds and all of this, although

10   the defendant doesn't have the right to choose his lawyer in

11   an appointed counsel context.  In this particular instance, my

12   understanding is that Mr. Bonds didn't have any objections to

13   the situation and that you came into the relationship,

14   Mr. Ruter, and have been representing him on these motions,

15   but with the understanding between yourself, Mr. Solomon, and

16   Mr. Bonds, that Mr. Solomon would be coming back into the case

17   as trial counsel.

18             MR. RUTER:  Yes, and when I met Mr. Bonds, Your

19   Honor, I thought it was appropriate that I should -- he should

20   see me face to face before I -- he sees me in court.  When I

21   met him last week, I had reviewed briefly what you just

22   outlined, and he seemed to have understood all of that.  So

23   I'm confident that Mr. Solomon had explained all that to him,

24   given my discussions with him at the lock up at Chesapeake

25   last week.

1              THE COURT:  So is that all correct, Mr. Bonds?

2              DEFENDANT BONDS:  (Indicating.)

3              THE COURT:  Is that a positive signal you're sending

4     me?

5              DEFENDANT BONDS:  (Indicating.)

6              THE COURT:  Yes, nodding his head vigorously and

7     raised his hand to indicate that's what happened in his view.

8     Is that all correct, Mr. Bonds?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  And he said "yes, sir" here in open

11    court.

12             MR. RUTER:  And then, Your Honor, Mr. Bonds should

13    know, unless the Court grants otherwise, that at the

14    conclusion of this motions hearing, I most likely would not

15    see him again or need to meet with him.  But the Court has my

16    assurance that I'll make certain Mr. Solomon is brought up to

17    speed on exactly where we are, is my understanding.

18             THE COURT:  Well, you're both appointed to represent

19    him at this time.  You're handling the motions hearing.

20             MR. RUTER:  Yes, sir.

21             THE COURT:  Mr. Bonds effectively has two lawyers,

22    Mr. Ruter and Mr. Solomon, simultaneously, and this is how the

23    responsibilities have been divided up between the two of

24    you.

25             MR. RUTER:  Yes.

```
 1              THE COURT:  Okay.  I just want the record to reflect
 2    that.  I want it to be crystal clear to Mr. Bonds here in open
 3    court exactly what the arrangement is and I think it is clear.
 4              Is it clear to you, Mr. Bonds?
 5              THE DEFENDANT:  Yes, sir.
 6              THE COURT:  He's responded "yes, sir."  Thank you.
 7              (The following proceedings were had in open court.)
 8              THE COURT:  Now, Mr. Martinez.
 9              MR. MARTINEZ:  Yes, Your Honor.  I was saying that
10    the government proposes that we take up the various pending
11    motions for severance.  These would be a motion by Kenneth
12    Faison, that's ECF 179; a motion by Kenneth Jones is ECF 192;
13    Marquise McCants had a severance motion pending, it's ECF 201;
14    and finally, Gerald Johnson, ECF 217.
15              THE COURT:  179, 192, 201, 217.
16              MR. MARTINEZ:  Correct, Your Honor.
17              THE COURT:  Okay.  And on the defense side, who
18    wishes to argue?  The party moving for the severance has to
19    establish actual prejudice.  Who's up on the defense side and
20    wants to take the lead on this?  Mr. O'Toole.
21              MR. O'TOOLE:  Your Honor, I'm not sure, we haven't
22    discussed this as any one defendant taking the lead on it.
23    The government's response itemizes or lists each defendant
24    separately except for Mr. Johnson, who they don't really
25    mention except in the first sentence.  So I think I prefer to
```

1    address this very brief motion on behalf of Mr. Johnson.

2           THE COURT:  Alone.

3           MR. O'TOOLE:  And not on behalf of everybody else.

4           THE COURT:  That's fine.  Would you like to go

5    first?

6           MR. O'TOOLE:  Sure.

7           THE COURT:  You may.

8           MR. O'TOOLE:  Your Honor, I have to say, this is

9    probably not a slam dunk severance motion.  It might not

10   even --

11          THE COURT:  Those are few and far between.

12          MR. O'TOOLE:  It might not be an easy lay up.  But I

13   think the prejudice is real.  I can't say that joinder is

14   improper.  It would be difficult to make that argument in

15   light of the indictment, but I think the prejudice is real in

16   this case.  In this case Mr. Johnson went to trial on very

17   similar, if not identical charges, in the state court, and was

18   found not guilty, including charges that involved gang-related

19   charges.

20          His defense, our defense, is going to be that the

21   gang-related charges in the others are not guilty as to

22   Mr. Johnson.  What they've done now by joining the entire

23   neighborhood originally, and now down to five, is that we have

24   over 100 overt acts over a decade period of time.  And they

25   will be alleging that each member is a member of this Black

1    Guerilla Family.  And I think that by bringing in the entire

2    neighborhood over so many counts and so many years, it's going

3    to be -- you're going to hear some of the same things over and

4    over and over, and by the time it's done, the jury's just

5    going to be numb.

6         And I think that while the prejudice is difficult to

7    point to exactly, I think it's impossible to think there's not

8    prejudice, and it's an improper prejudice.  This is not just a

9    matter, we think, of saying that we'd be better off trying

10   this case by ourselves.  I think in this case the prejudice of

11   trying Mr. Johnson with everybody else, especially in this

12   lead seat that we have right here, is absolutely prejudicial,

13   and we think, improper.

14        THE COURT:  You look for problems like those that

15   arise under *Bruton*.

16        MR. O'TOOLE:  I don't see that happening.

17        THE COURT:  We look for grossly disparate proof.

18   Even that in this circuit generally has not been enough to get

19   a severance.  And there's no real suggestion of that here.

20   The difference in your -- that you're pointing out is, there's

21   this odd circumstance of -- there's going to be evidence in

22   this case of some people having gone to trial and been

23   convicted of offenses, I take it.

24        MR. O'TOOLE:  Right.  And the jury's going to hear

25   that and the jury's not going to hear that he went to trial

1    and was acquitted.

2           THE COURT:  It's going to be at variance with the

3    experience that your client had.

4           MR. O'TOOLE:  Correct.

5           THE COURT:  And were that to be the sole evidence

6    that was going to be presented as against any particular

7    defendant, I think that would be problematic.  But the

8    pretrial papers in this case suggest that those convictions or

9    trials without convictions are but a bit of the story that the

10   government intends to present during the many weeks of this

11   trial, and that there is an additional substantial volume of

12   evidence that is not flowing directly from what happened in

13   these other trial proceedings.  Meaning that the uniqueness

14   issue or standing out from the pack, however you want to

15   describe the circumstance that appellate courts have sometimes

16   been somewhat troubled by, I mean, it's not so present here.

17          MR. O'TOOLE:  Well, you know, I think that the

18   remedy that is routinely suggested is that someone like you,

19   who's a persuasive and authoritative figure and quite

20   articulate, will tell the jury to consider the evidence only

21   as to this defendant, that defendant, and that defendant.  And

22   we've all seen that happen.  And we've all said that that

23   doesn't work.  And I don't think it's going to work in this

24   case.  I think it's going to be difficult with the BGF label

25   that the government's going to try to put on this, that the

1    state court was unable to prove, the state prosecution was

2    unable to prove that he was a member of this gang.

3              THE COURT:  Well, they might not be able to prove it

4    here too.

5              MR. O'TOOLE:  Might not, I mean, in that case he was

6    by himself.

7              THE COURT:  But rolling into this, there's

8    substantial cause to believe that the government will support

9    their allegations with substantial proof.  Will it be

10   persuasive?  I have no way of knowing.  That's not my job.

11   But I do play sort of a gatekeeper role here in terms of what

12   kind of proceeding are we going to allow to be conducted here.

13   The early indications are that there's very, very substantial

14   evidence indicating that everyone who's left in this trial was

15   a member of this organization.  Lots of indicia.

16             MR. O'TOOLE:  But the Court said -- just said that

17   there's lots and lots and lots of evidence.  There's only a

18   handful, even less than handful, of overt acts that are

19   attributed to Mr. Johnson.  So out of the 100 overt acts, only

20   a handful are his.  And so the evidence is maybe huge against

21   the whole neighborhood or the extended neighborhood, and by

22   its force -- by its force and with the videos that the

23   government's going to try to get in, I think that the

24   prejudice is extreme.

25             THE COURT:  That's the problem presented in

1    hub-and-spoke type conspiracies frequently.

2           MR. O'TOOLE:  Right.  I understand.

3           THE COURT:  That's not to suggest where your client

4    falls, whether he's a spoke or hub, but even people who are

5    out the spokes, there's so much law that addresses this.  I

6    understand your concerns.  Who else wants to argue in terms of

7    severance?  Mr. Bussard.

8           MR. BUSSARD:  Good afternoon, Your Honor.  I'm in a

9    similar situation.  What happened in state court, Your Honor,

10    prosecutor in state court made a decision to actually try

11    Mr. Johnson, Mr. Brown, and Mr. Jones separately.  So they

12    didn't have to even confront this problem to begin with.  The

13    issues that Mr. O'Toole just raised.  I don't have a joinder

14    argument.  They were indicted together, they stay together.  I

15    don't have a *Bruton* issue that I'm aware of at this point.

16           So again, it comes down to this -- do we put all

17    these persons together?  And as the Court maybe heard a little

18    bit yesterday, things like the photo books where there's going

19    to be two witnesses, James Cornish and Christopher Meadows, go

20    through this photo book and they say who's BGF and who's not,

21    then they tell a little story about them.

22           But when they write down BGF on the back of those

23    photographs, that's a -- that's a serious prejudice to

24    every -- it's an indictment, essentially.  It may not be a

25    legal indictment, but it's an indictment that carries a lot of

1    weight against all of our clients who are going to trial at

2    this time, that because they're BGF and they might be in a

3    gang, does that make it a racketeering?  This could be a

4    separate issue when we go to trial.

5         THE COURT:  Remind me of how this one is charged.

6    In this one BGF or YGF or the Greenmount Regime or whatever,

7    is charged as the enterprise, isn't it?

8         MR. BUSSARD:  It is.  BGF and Greenmount Regime.

9    It's a limiting indictment as well.  And then there's Count 2,

10   which is the drug conspiracy and it goes along with this.  So

11   I just echo -- I hate to do this, but echo Mr. O'Toole.

12        THE COURT:  I hear you and there's no denying that

13   RICO is a huge club in the hand of the government, has been

14   ever since it was enacted.  But it has generally withstood

15   exactly this kind of challenge, which comes in different

16   clothing in different cases, but it's basically the same beef

17   that I've heard many times.  And each time you go into the

18   case law that has evaluated RICO for the 30 some years that

19   it's been on the book, and the appellate courts have at least

20   held that this is exactly what Congress's intention was, is

21   that your association, your participation, your membership in

22   that enterprise, provided the other elements were also proven,

23   are appropriately considered indicia of criminal culpability.

24   It's not your membership alone, but that's clearly a material

25   part.  So prejudicial?  Yes, as is lots of information and

1    evidence that's presented in a criminal case.

2         Who else wants to argue on severance?  Join --

3         MR. BUSSARD:  Your Honor, can I ask the Court too,

4    I'm going to be asking the Court later on, Mr. O'Toole brought

5    it up, about the Court's ruling on the prior convictions and

6    what have you.

7         THE COURT:  Yes.

8         MR. BUSSARD:  At some point I would like

9    clarification of who that covers and which convictions because

10   Mr. Jones's prior conviction is not listed in the

11   government's -- potentially convictions that they would

12   believe were covered by the government's response and the

13   government's ruling.

14        THE COURT:  Mr. Martinez.

15        MR. MARTINEZ:  Yeah, I can clarify that now quickly.

16   We filed our response to the pending motion by Mr. Faison,

17   which was joined by Mr. Bonds.

18        THE COURT:  The pending motion?

19        MR. MARTINEZ:  Sorry, the decided motion.

20        THE COURT:  Right.

21        MR. MARTINEZ:  We filed a response to that motion on

22   September 1st, which was before the Second Superseding

23   Indictment was returned.  And when the Second Superseding

24   Indictment was returned, it included the April 11th, 2011,

25   handgun possession offense to which Mr. Jones pleaded guilty

1     in state court.  And in the table that we include in our

2     response of prior guilty pleas that we believed would come

3     into evidence at trial, we didn't include the April 11th --

4                THE COURT:  You did or did not?

5                MR. MARTINEZ:  We did not because it was not yet a

6     part of the case.  There was a footnote to the effect of, we

7     reserve the right to amend this as charges evolve, because we

8     had a sense at that point that a Second Superseding was

9     coming.  So I can now say for the record that, A, Mr. Jones

10    did plead guilty to possessing that gun in state court.  And

11    we believe that the reasoning in the Court's opinion on the

12    motion by Mr. Faison and Mr. Bonds covers that guilty plea, as

13    it does all the others in our charge.  So it is our intent to

14    prove that one in the same manner as the others.

15               THE COURT:  So Mr. Bussard, technically it wasn't

16    ripe.

17               MR. BUSSARD:  Correct.

18               THE COURT:  Now it is.  So I will give you a week

19    from today to file a motion seeking to preclude that with

20    respect to your client alone for the reason that it wasn't

21    technically addressed when the Faison motion was originally

22    litigated.  We'll -- let's see, what's a week from today?

23               MR. MARTINEZ:  The 18th, Your Honor.

24               THE COURT:  The 18th, right.  And we'll give the

25    government a week to respond.  That's the 25th.  We'll give

1    the defendant two days to reply.  That's the 27th.  Okay.

2             MR. BUSSARD:  Thank you, Your Honor.

3             THE COURT:  That will be reflected in the order

4    that -- the omnibus order that comes out of this hearing

5    today.

6             MR. BUSSARD:  Thank you.  That will suffice.

7             THE COURT:  Anybody else in that situation, that

8    wasn't -- their convictions weren't part of the package when

9    the Faison motion was decided?  I didn't think so.  Okay.

10            Back to severance, Mr. Francomano.

11            MR. FRANCOMANO:  Your Honor, I filed a reply on

12   September 29th, 2017, to the severance motions.  Did Your

13   Honor receive that?

14            THE COURT:  I'm sorry?

15            MR. FRANCOMANO:  Did Your Honor receive --

16            THE COURT:  I don't have the docket open in front of

17   me at the moment.  If you've got a docket indication, then

18   it's in.

19            MR. FRANCOMANO:  It was --

20            THE COURT:  Paper number?

21            MR. FRANCOMANO:  I apologize, it was the 26th of

22   September.  I do not have the docket number in front of me.

23   Does the government have it?

24            MS. HOFFMAN:  We have it, Your Honor.  I believe

25   it's Docket No. 271.

1          THE COURT:  All right.  So it's of record.

2 Mr. Francomano.

3          MR. FRANCOMANO:  In that severance motion, our

4 argument is a bit different.  We're asking that the count that

5 was added, the count of felon in possession of a handgun, that

6 that count be severed from the other counts, which were the

7 racketeering and the drug conspiracy, is what we're asking for

8 in that count.

9          THE COURT:  Okay.  Why don't you go ahead and argue

10 that now.

11          MR. FRANCOMANO:  Thank you, Your Honor.

12          THE COURT:  We'll let the government respond.

13          MR. FRANCOMANO:  Your Honor, in that count the

14 government's contending that it's all part of a common scheme

15 or plan.  I know Your Honor heard from Sergeant Landsman

16 yesterday that Mr. Dorsey, who was in the phone calls speaking

17 with Mr. McCants, Sergeant Landsman identified Mr. Dorsey as a

18 BGF member.  He identified him -- as there were four other

19 people that would come that would say he was BGF.  He said

20 that he lived in the area.  I think all that information

21 should be taken as information, not as evidence for showing

22 that Mr. Dorsey is BGF, because we've never received anything

23 in discovery showing that Mr. Dorsey is part of BGF.

24          Your Honor, as to how he was prejudiced --

25          THE COURT:  Well, the government has told you that

1    they expect to prove at trial that he is.

2            MR. FRANCOMANO:  Yes, Your Honor.

3            THE COURT:  Do you have all the *Jencks?*

4            MR. FRANCOMANO:  No, Your Honor.  Right.  Well, I

5    understand that.  And I just want to bring that to your

6    attention, Your Honor.  But there also is the issue of

7    prejudice.  And the issue of prejudice is, in this case when

8    they added the felon in possession, at this point Mr. McCants

9    either has to have them prove that he's a felon or has to

10   admit that he's a felon in this case.  Obviously there's a

11   preference for joinder, but our position is that --

12           THE COURT:  You're talking about joinder of charges

13   just against your client, it's joinder of charges against

14   Mr. McCants.

15           MR. FRANCOMANO:  Just the felon in possession

16   charge.

17           THE COURT:  That's an old issue.

18           MR. FRANCOMANO:  Yes, Your Honor.

19           THE COURT:  Got a lot of law on this one too, almost

20   as much as there is on RICO.

21           MR. FRANCOMANO:  Right.  And, Your Honor, the Courts

22   are obviously split on whether or not a charge such as this

23   should be joined or not joined.  And obviously we're in the

24   situation where it should not be joined.  There are a number

25   of cases, such as *U.S. v. Johnson*, where courts have held that

1    joinder, an ex-felon --

2          THE COURT:  What have you got from this circuit that

3    addresses that issue?

4          MR. FRANCOMANO:  Your Honor, I have a U.S. Supreme

5    Court case in which *Greer versus Miller*, and that's 483 U.S.

6    756, and in that one it said the Court said that presumption

7    that a jury will adhere to a limiting instruction evaporates

8    where there is an overwhelming probability that the jury will

9    be unable to follow the Court's instructions and the evidence

10   is devastating to the defense.

11         THE COURT:  Generalized statement, yes.  But not

12   applied specifically to the relatively common problem of a

13   charge of felon in possession of firearm proceeding to trial,

14   with some other substantive count, say, armed bank robbery.

15         MR. FRANCOMANO:  Correct, Your Honor.  But like I

16   said, if this count were to go to -- if the felon in

17   possession count were to go with the other two counts, what it

18   shows is, number one, Mr. McCants is a felon; number two, just

19   because he's a felon he must be guilty of being part of the

20   BGF racketeering; and then he also must be guilty of

21   conspiring to distribute narcotics.  So I think that that

22   obviously shows there is definitely some type of prejudice

23   against Mr. McCants because that will have to be either

24   admitted or shown that he is a felon.

25         THE COURT:  Well, let me ask the government how they

1    are intending to prove up the defendant McCants's prohibited

2    status.

3            MS. HOFFMAN:  Well, Your Honor, I think there's

4    already going to be evidence that comes in that Mr. McCants is

5    a felon, because certain of his state guilty pleas are going

6    to come in as evidence against him as well.  I think his

7    prohibited status is going to be such a small blip in the

8    universe of evidence against him that it's not really going to

9    be prejudicial.  The Second Superseding Indictment that was

10   returned on September 20th alleges that the attempted murder

11   of Gregory Bess on February 4th of 2017, and Mr. McCants's

12   illegal possession of a firearm in connection with that

13   offense, were committed in furtherance of the charged

14   racketeering conspiracy.

15            And I don't think the Court's inquiry needs to go

16   any further than that.  A crime that's committed in

17   furtherance of a conspiracy is by its nature connected with or

18   part of a common scheme or plan under Rule 8(a).  And I'm not

19   aware of any case where a court has held that a conspiracy and

20   a crime committed in furtherance of that conspiracy are

21   improperly joined under Rule 8(a).

22            THE COURT:  Mr. Francomano, I'll give you the last

23   word if you want it, or you can submit.

24            MR. FRANCOMANO:  We'll submit, Your Honor.

25            THE COURT:  Okay.  Well, I've heard you,

1    Mr. Francomano, and you've made your record very well, as you

2    always do.  But the motion is denied.  And it's not just for

3    the reasons outlined by the government, which I think are also

4    quite powerful, but it is the overall circumstance of a

5    defendant facing this sort of charge in connection with other

6    activity that's not unrelated.  It's just that the other

7    charges wouldn't bring with them the chance that the felon

8    evidence would be introduced.

9           Well, this charge carries that with it as an

10   essential element.  What I was going to start to push the

11   lawyers toward is the solution that we often do work out in

12   these kinds of cases when the evidence is other than it's

13   apparently going to be in this one, and that is, can we reach

14   some kind of stipulation about how we are going to prove up

15   the prohibited status such that there's no question that the

16   government has had their opportunity to prove that element and

17   that element is of record, but that we don't go any further

18   than we need to in terms of extending prejudice that comes

19   from the nature of that offense.

20          That said, Mr. Francomano, maybe we can have that

21   discussion here, but a lot of what Ms. Hoffman said a minute

22   ago, it just sort of undercuts all of that.  I mean, the

23   jury's going to be hearing about your client's prior

24   convictions in another context and for -- and under other

25   justification.  Isn't that just going to kind of completely

1    overtake this issue?

2            MR. FRANCOMANO:  Your Honor, his prior convictions,

3    which are only two of them, and --

4            THE COURT:  But are they both otherwise coming in,

5    in this trial?

6            MR. FRANCOMANO:  At this point, yes, Your Honor.

7            THE COURT:  Yes.  Feel free to talk with the

8    government if you think there's some way that the sting can be

9    lessened, and you can persuade them that there's something

10   prejudicial about it in the specific context of the felon in

11   possession charge.  Sure, I'm open to a stipulation in that

12   regard and even open to prodding the government a little bit

13   if you can persuade me that it actually means something in

14   this case.  Right now, based on what Ms. Hoffman just reminded

15   me of, I don't even see how it matters that much.

16           MR. FRANCOMANO:  I'll speak with them, Your Honor.

17           THE COURT:  Thanks.

18           MR. FRANCOMANO:  Thank you.

19           THE COURT:  So the motion for severance by Defendant

20   Mr. McCants, within his own case, separate the felon in

21   possession charge from others that he's facing, is denied for

22   the reasons set out here.

23           Are there any other severance motions pending?

24           MS. HOFFMAN:  The motion for severance by Kenneth

25   Faison is moot now that he has pleaded guilty, I didn't catch

1    whether Your Honor said that already.

2         THE COURT:  Well, it is, as are all motions by

3    anyone who pleads guilty.  That's denied as moot.  But we have

4    to be careful to make sure there isn't somebody left in the

5    case who joined that motion.  So even if you did previously

6    join the Faison motion for a severance, I'm telling you now

7    you have to speak up now and reassert that motion on your own

8    or it's denied.  Is anybody standing here on their joinder of

9    the -- they're joining in the Faison motion for severance?

10        MR. BUSSARD:  Well, Your Honor, since I never had

11   the opportunity in the first place, I will be, but I can join

12   as --

13        THE COURT:  You're not going to be able to join it

14   because it's not going to exist in about a minute.

15        MR. BUSSARD:  I will join the argument.

16        THE COURT:  Well, I think in your case if you -- you

17   believe you've got a severance motion that arises by virtue of

18   the Second Superseding Indictment, or is this a severance

19   motion that you contend that you made previously and were

20   entitled to make previously, you just did it by joining

21   Mr. Faison's motion?

22        MR. BUSSARD:  No, I -- never mind, Your Honor.

23   Excuse me, I was thinking of the other Faison motion that we

24   were talking about previously.

25        THE COURT:  Oh, no, we've already addressed that.

1          MR. BUSSARD:  I apologize.

2          THE COURT:  All right.  Anything else on severance?

3     Is there any severance motion that the Court has not

4     addressed, Ms. Hoffman and Mr. Martinez?

5          MS. HOFFMAN:  I don't believe so.

6          THE COURT:  Mr. Jaco, can you approach?

7          (Pause in the proceedings.)

8          THE COURT:  Back on the record.  And for the record,

9     severance motions addressed in paper 179, 192, 201, 217, all

10    those motions are denied.  179 is denied as moot, the others

11    were ruled on the substance.

12         Okay.  What's next?

13         MS. HOFFMAN:  Your Honor, if we're going in order, I

14    think the next motion is the motion to suppress the fruits of

15    the search warrant executed at 2204 Guilford Avenue on May

16    31st of 2006.  This is Docket No. 190.  And I believe in our

17    response we've laid out that we think this motion is moot

18    because we don't intend to introduce any evidence recovered

19    during the search warrant.

20         THE COURT:  190, that's Jones, that's the search at

21    2204 Guilford, the house search.  It was an offense that was

22    under investigation that's unrelated to this indictment.  The

23    government's position is they don't intend to introduce any

24    evidence that was the product of that search, is that it

25    Ms. Hoffman?

```
 1              MS. HOFFMAN:  That's correct, Your Honor.

 2              THE COURT:  Why shouldn't I deny this as moot in

 3      light of the government's position, Mr. Bussard?

 4              MR. BUSSARD:  I have no argument on it.

 5              THE COURT:  Denied as moot for the reason that the

 6      government has advised the Court, it has no intention of

 7      introducing any evidence that was the product of that

 8      search.

 9              MR. BUSSARD:  Thank you, Your Honor.

10              THE COURT:  Yes, thank you.  Next, ma'am?

11              MS. HOFFMAN:  The next motion in line is docket

12      No. 195, which is also a motion by Mr. Jones to suppress a

13      series of recorded and nonrecorded calls in November and

14      December of 2013.  I have spoken to Mr. Bussard about this

15      motion, and I believe he intends to withdraw it now that we

16      have cleared up a factual misunderstanding.

17              THE COURT:  What's the status of 195, Mr. Bussard?

18              MR. BUSSARD:  Court's indulgence for a brief moment.

19      There was a factual inaccuracy, Your Honor, and the defense

20      will be withdrawing that motion.

21              THE COURT:  195 is withdrawn and denied as moot.

22              Mr. Martinez?

23              MR. MARTINEZ:  Next is motion 187 -- or 216, rather.

24      I'm sorry.

25              THE COURT:  216.
```

```
 1           MR. MARTINEZ:  And this is Mr. Johnson's motion to
 2   suppress the fruits of a 2013 state wiretap.
 3           THE COURT:  Did you say 216?
 4           MR. MARTINEZ:  Yes.
 5           THE COURT:  Okay.  Mr. Enzinna.
 6           MR. ENZINNA:  Thank you, Your Honor.  Your Honor,
 7   the 4th Circuit said in the Leavis case that electronic
 8   surveillance is an extraordinarily intrusive investigative
 9   means and should only be used when it's necessary, and that
10   requires that the government make a full and complete showing
11   of the necessity for electronic surveillance in their
12   application form.  The government here --
13           THE COURT:  And the Maryland State statute and
14   procedure is virtually and material -- it's identical to the
15   federal procedure.
16           MR. ENZINNA:  Correct.  Everyone agrees that the
17   government can't simply make a boilerplate statement about
18   necessity.  Obviously, wiretap would be a great way to
19   investigate anything.  The problem here is that the government
20   did in fact lay out what it had done to date, but then in
21   their necessity section, if you read the necessity section, it
22   is effectively boilerplate.  Rather than giving specific
23   factual reasons to the Court as to why electronic surveillance
24   was necessary in this particular case, they simply made
25   statements like, "Our confidential informants can't work their
```

way all the way up to the top of the chain," which is going to
be true in any one of these cases and so on.

It goes on like this throughout this necessity
presentation.  I think the only place where there's any
specific information given in the necessity section of the
affidavit is with regard to undercover officers.  It's on page
53 of the affidavit, where they say that for -- that, you
know, it's -- we can't prove our case through undercover
officers doing controlled buys.  And they say that we've tried
to do this, but it hasn't worked.

And they list here -- they say for example, on April
3rd, 2013, an undercover officer attempted to make a buy, and
though the purpose was successful, the individuals weren't
members of the target organization.  On April 10th, we tried
again, but people said it was too hot and nobody was doing
it -- was selling that day.

So what the government has said here is, it's
necessary because undercover officers can't make these buys.
But what they've shown by their factual statement is that they
tried twice in the period of one week to make undercover buys.
And on one occasion they made a buy but from the wrong person.
On another occasion, they went and it turned out to be a day
that the people selling drugs, and presumably the targets of
their investigation, were simply not selling.

Now, that is hardly exhaustion of the effort to use

1    undercover officers to make these kind of controlled buys.  So

2    it's not simply enough for the government to say, here's what

3    we did, Your Honor, and here's why it's necessary and it's

4    necessary for all the reasons -- it's necessary or at least

5    efficient for us to use wiretapping in any case.  They have to

6    make specific ties between the facts of their own

7    investigation and the necessity.  We couldn't do it here

8    because X.  And what they've said is, we can't do it here,

9    look, we tried, we tried twice in one week to do this.

10           And if you look at what they -- what the government

11   did in fact accomplish, like for example, they say, our

12   confidential sources met with limited success.  Let's look at

13   what they learned through their confidential sources.  Henry

14   Walker, guy named Stimey, has a leadership role.  Gerald

15   Johnson is the commander of BGF Greenmount Avenue.  He

16   approves all the sanctions, he focuses on the north end, he

17   gives daily instructions, he conducts meetings.  Warren

18   Comodore transcribes these meetings.  He's been arrested,

19   Warren Comodore.  Is he cooperating?  Has he been approached

20   to cooperate?  Michael Robinson is a high ranking leader.

21   William McLaren supervises dealers, dealers report to him for

22   supplies.  Martin Jenkins prepares and packages drugs.  Rick

23   Savoy supplies Jenkins.  Shawn Gregg is a street-level dealer.

24   Handy is a member.  He's been arrested too.

25           THE COURT:  What's a court to do, Mr. Enzinna, when

1    the affidavit that's presented to the judge who's asked to

2    sign the wiretap order clearly shows that the government has

3    already got enough proof to charge targets with multiple

4    serious offenses, such as drug trafficking, even murders and

5    homicides and this sort of thing, but the government explains

6    to the Court that while that quantity of proof has been

7    acquired, the government has greater aspirations, and that

8    while they concede that they have been successful with less

9    extraordinary measures of gathering the evidence probably

10   necessary to gain convictions on drug crimes and even maybe

11   discrete murders, it isn't at the point where it has explored

12   or uncovered what it believes are probably the full contours

13   of a criminal organization.

14          MR. ENZINNA:  Well, Your Honor, I am not arguing

15   that the government has to stop because they've got enough.

16   But if the government does have loftier ambitions here, they

17   want to get people higher up the chain, they want to get a

18   bigger net --

19          THE COURT:  Sometimes they just want more proof on

20   people they've already got and can convict.

21          MR. ENZINNA:  Well, I think those are really two

22   different questions because the requirement under the wiretap

23   statute is necessity.  Now, if the government has enough

24   proof, is it necessary?

25          THE COURT:  Well, that's the question.

1          MR. ENZINNA:  But I don't think that's what's going

2     on here.  Because here, what the government is saying is, we

3     want to get to the higher up people.  We can't do that.  Now,

4     what I'm saying is, they have not shown the authorizing court

5     that they made a sufficient effort to do that through these

6     other methods.  What they've done is simply said, here's what

7     we did do, we made a couple of undercover buys and then we

8     quit.

9          And there was one where they had confidential

10    sources call -- one called Mr. Johnson and one calls McLaren.

11    And with regard to Mr. Johnson, they say in the affidavit that

12    Mr. Johnson told the confidential source that he couldn't do

13    the deal because he didn't have the drugs.  And in the McLaren

14    case -- McLaren, they say in the affidavit, agreed to deliver

15    drugs, but they, the government, decided not to go ahead with

16    it.

17         Now, how can that possibly show exhaustion of those

18    investigative means when they've got -- they say that we

19    contacted one of the targets and said do a deal with us and he

20    said I would, but I don't have the stuff.  Then they called

21    the next guy and he said sure, meet me on the corner.  They

22    said we're not going to go.  That's not exhausting normal

23    investigative means.  You know, I could go on --

24         THE COURT:  Well, I think that you could go on, but

25    I'm not sure that that ultimately answers the question when

1    you are talking about the investigation of an operation at an

2    organization that is as far flung as the government told --

3    the judge was considering the application, that they believed

4    the organization to be.  I'm not sure that it's enough for you

5    to show in one, two, three, even four instances that, well,

6    they didn't run that lead all the way out.  They didn't pursue

7    that avenue to the full extent that they could have.  One of

8    the things that you immediately run into is that the

9    government often will advise that, yeah, that avenue could be

10   pursued more, we could chase that further down, but to do that

11   actually risks our capacity to simultaneously go down another

12   avenue, which is also important to us.

13          MR. ENZINNA:  But let's be very careful about what

14   they really do say in this affidavit.  Take for example the

15   undercover officers making controlled buys.  They say that

16   doesn't work, we've had -- let me find what they actually do

17   say exactly about that in the necessity section.

18           "In your affiant's experience, high-ranking criminal

19   gang members refuse to deal with potential customers."  Then

20   they go on to say, here's what we did.  What they did is, they

21   tried two buys in the course of one week.  Now, I understand

22   what you're saying, and what they're saying is that this is a

23   far-flung enterprise and we need to be able to investigate it.

24   But to say we know it's a far-flung enterprise out there, so

25   we have to exhaust our ability to use other investigative

means, one of our investigative means is undercover buys, so
we're going to exhaust that.  Okay, you guys go check that
box, make two attempts in a week, and then say, okay, we're
done.

          Then we go in with the boilerplate to say that --
you know, Your Honor, it's hard to do that.  I mean, that's
not sufficient under *Leavis*.  You have to show specifically.
Now, if it's a far-flung enterprise, try the two buys here for
this week, try some buys someplace else on a different week.
I mean, you can't simply -- it's not just a question of
checking the box, and that's what happened here.  They checked
the boxes.

          THE COURT:  What if the authorities are working in a
jurisdiction where they have the experience of routinely
introducing evidence of buys having been made by informants
and undercover officers and so forth, who come into court and
testify about what they saw and what they heard, but the
experience is that convictions are not returned in those
circumstances, and so there's essentially a judgment being
made by the community that that evidence, evidence of the type
you're describing, isn't of a sufficient quality to warrant
the return of a guilty verdict?  We live in modern times when
for better, for worse, in some forms it seems that the
standard for, you know, proof beyond a reasonable doubt is,
did I hear it, did I see it on video?  If I didn't --

1                MR. ENZINNA:  The CSI effect.

2                THE COURT:  Some might call it the CSI effect, some

3      might call -- well, I'm not going to editorialize.

4                MR. ENZINNA:  But, Your Honor, that's another

5      problem with this.

6                THE COURT:  This is the reality of -- you know, this

7      is something, Mr. Enzinna, I'm indulging this discussion

8      because it's a matter of great concern.  When I was a young

9      prosecutor, the frequency with which the U.S. Attorney's

10     Office in which I worked got a wiretap order was -- well, it

11     was not great.  And you had to be a very senior prosecutor

12     before you were entitled to request or supervise such an

13     investigative technique.  It's amazing how things have changed

14     in 30 years and how ubiquitous this very intrusive method

15     is.

16                MR. ENZINNA:  And part --

17                THE COURT:  But there seems to have been an

18     evolution in our assessment of just exactly how problematic it

19     is to empower the government to listen in on people like

20     this.

21                MR. ENZINNA:  I think that's exactly right.  And

22     part of the problem is necessity showings like that made here.

23     Now, you talked about cases where a controlled buy is not

24     sufficient evidence to get a guilty verdict.  Now, you can

25     take any one of these investigative means, especially in cases

1    such as this where you're alleging a very broad conspiracy and

2    say, Judge, you know, undercover buys aren't going to prove

3    our whole case, physical surveillance isn't going to prove our

4    whole case, confidential informants aren't going to prove our

5    whole case.  Well, that's probably true.  But the question is

6    not:  Is any one of those investigative methods sufficient in

7    and of itself?  The question is:  Have you exhausted your

8    ability to use these alternative, less intrusive means of

9    investigation to get evidence?  And if you haven't done that

10   yet, you need to go back and do it.

11            THE COURT:  But that's ultimately a judgment for a

12   judge to make in reading the affidavit and considering the

13   application.  And while they of course are to focus primarily

14   on what's within the four corners of that affidavit, they also

15   inevitably consider just the broader context that they're

16   aware of and exercise their good judgment in applying that and

17   we are -- we have moved into a different era in terms of

18   the -- I guess the crude way of wording this is to say that it

19   seems to be that T3 orders are more necessary than they once

20   were.

21            MR. ENZINNA:  Well, let me --

22            THE COURT:  If crime is to be interdicted on this

23   scale.

24            MR. ENZINNA:  Let me read what the 4th Circuit said

25   in the *Oriakhi*.  The government must base its need on real

1    facts and must specifically describe how in the case at hand

2    it has encountered difficulties.  It is not sufficient to come

3    in and say, Judge, we got another gang case.  You know what

4    it's like, we can't do it.  And it's also not sufficient to

5    say, Judge, we get it, we got to check the undercover buy

6    source -- undercover buy box, so we're going to send somebody

7    out on a Tuesday and somebody else out on a Wednesday and get

8    that done and then come in here and say you understand, it's

9    hard in these cases.

10            I mean, that's not what the law requires.  The law

11    requires a very specific factual presentation, that you have

12    tried other investigative means, and that you have exhausted

13    them.  And, Your Honor, I would submit that that clearly isn't

14    shown here.  I mean, you look at what they have been able to

15    get through these other investigative means so far with

16    relatively minimal efforts, but they talk about monitored

17    calls where they intercepted jail calls of people talking

18    about the Mirage nightclub shooting, and I need you out there

19    and I need you to grab the bank.

20            Now, all those conversations occurred within the

21    space of a week.  And then they came and they said, Judge, you

22    understand, you know these guys -- and they do cite one call

23    where one of the people on the call says you've got to be

24    careful talking on these phones because they're recorded.

25            THE COURT:  Well, let's first be careful about what

we're talking about here and whether we're talking about jail
calls or whether we're attacking monitored calls pursuant to
T3 orders, persons who were -- or state wiretap orders of
persons who were not in the custody.

MR. ENZINNA:  I think I'm talking about jail calls
here, because I believe if I read the affidavit correctly,
they're talking about -- let me see if I can find it.  Oh,
you're correct, Your Honor.  They're not jail calls, they are
wiretap calls.

THE COURT:  I wouldn't have had this whole long
discussion with you if we were only on jail calls, because I
think jail calls are easy.

MR. ENZINNA:  Okay.  But the point I think that's
even more to my point, which is on the jail calls they said,
at least they talked about how they've got to be careful
because these calls are being recorded.  But if these guys are
being recorded on wiretaps, and if in a space of week they
record these conversations with that much evidence, shouldn't
we be asking that they maybe monitor those conversations a
little bit longer before we say, fine, just go ahead and
monitor everybody?

THE COURT:  Let's finish up just by clarifying what
your position is on jail calls.  What's your client's
expectation of privacy in a jail call where he's been told
that his calls are subject to being recorded?

1          MR. ENZINNA:  Very minimal.

2          THE COURT:  Yes.

3          MR. ENZINNA:  If existent at all.

4          THE COURT:  Right.  Okay.  Mr. Martinez, who's going

5    to argue for the government on this side?

6          MR. MARTINEZ:  I will, Your Honor.

7          THE COURT:  Let me first clarify that on the jail

8    calls I don't see any issue.  I don't see where -- do you want

9    to address the jail calls before I rule?

10         MR. MARTINEZ:  I think, Your Honor, as a factual

11   matter, the jail call issue is more pertinent to Mr. Jones.

12   Mr. Jones was only intercepted on the state wire while having

13   conversations from the recorded jail phone.

14         THE COURT:  All right.  So maybe --

15         MR. MARTINEZ:  I think Mr. Enzinna's addressing of

16   jail calls was in the context of that portion of the state's

17   wiretap affidavit that talked about exhausting that tool for

18   gathering intelligence.

19         THE COURT:  Before I turn to Mr. Martinez,

20   Mr. Bussard, do you want to be heard on jail calls, do you

21   want to amplify anything that Mr. Enzinna has offered?

22         MR. BUSSARD:  The only thing I would add, Your

23   Honor, just factually speaking is, it was line H, which was a

24   line for Michael Robinson.  He was having conversations with

25   Mr. Jones.  Mr. Jones was calling from a jail.

1          THE COURT:  Yes.

2          MR. BUSSARD:  Limited almost nonexistent expectation

3    of privacy.  He may have had standings statutorily but for the

4    jail calls because he was picked up on the line, but the

5    complicated factor is the jail calls there.  So consequently,

6    Your Honor, they were all jail calls, as far as I'm aware, in

7    a rather limited time space of October, November of 2013, if

8    I'm not mistaken.

9          THE COURT:  All right.  Let's just clear the air.

10   Does anyone want to argue to me that their client had a

11   protected constitutional expectation of privacy in their jail

12   calls that were monitored in this case?  Because I'm about to

13   rule on jail calls, and I want to make sure everybody

14   understands where we're headed before I enter that ruling,

15   that that's the topic.  Anybody want to be heard on jail

16   calls?

17         MR. BUSSARD:  I don't have any case law to support,

18   Your Honor.

19         THE COURT:  So without the government being asked to

20   argue jail calls, it -- to the extent that any of these

21   motions are attacking the monitoring of jail calls, I don't

22   find that there were rights or expectations of privacy on

23   those calls that the government improperly intruded upon by

24   monitoring jail calls, given the context.  So that aspect of

25   the motions is denied.

1          Now, Mr. Martinez, I would like your reply, your

2     response to Mr. Enzinna on T3 or state equivalent monitored

3     calls, not jail calls.

4          MR. MARTINEZ:  Sure.

5          THE COURT:  And specifically failure to exhaust

6     demonstration of necessity.  Why did you need such an

7     intrusive measure instead of search warrants, controlled buys,

8     trash runs?

9          MR. MARTINEZ:  Sure.  And I want to do three things,

10    Your Honor.  I want to focus on standard here, I want to talk

11    about some of the other information in the wiretap affidavit

12    that Mr. Enzinna didn't mention, and I want to address the

13    specific factor issue with respect to undercovers.  So first,

14    with respect to the standard, Mr. Enzinna is certainly correct

15    that there is a necessity component of -- Maryland's component

16    is identical to the federal one.

17         He declined to discuss case law which holds that a

18    proper showing of exhaustion can be more easily made in

19    complex cases where the investigative goal is to identify the

20    higher ups, in particular -- in a particular organization, and

21    that was in fact the goal here.  Not long ago, I think it was

22    2010 or 2011, in a somewhat similar RICO case in this

23    district, Judge Quarles explained that although the government

24    cannot show exhaustion through a mere boilerplate recitation

25    of the difficulties of gathering useful evidence, the burden

1    on the government is not great and courts should be weary of

2    reading the exhaustion requirement in an overly restrictive

3    manner unless they unduly hamper the investigative law

4    enforcement agencies.

5         So I just wanted to add that in terms of the

6    principles the Court should be considering as we walk through

7    the facts of the state wiretap affidavit.

8         Mr. Enzinna did something clever, which is the same

9    thing he did in his motion to suppress the wiretap, which is

10    that he focused the Court only on the few pages in the

11    affidavit that appear under the heading "Necessity." I don't

12    think there's any reason for the Court not to consider the

13    entire rest of the affidavit in terms of evaluating what state

14    investigators showed the authorizing judge in terms of what

15    they had done and whether it was successful. So I'm going to

16    walk through each of those things and I'm going to refer the

17    Court to information that appeared throughout the initial

18    affidavit.

19         I want to start with confidential sources. First,

20    as Mr. Enzinna acknowledged, there was a great deal that state

21    investigators had done with confidential sources. And they

22    went through in the affidavit, in a section titled

23    "Confidential Sources," the information provided with respect

24    to the roles and responsibilities of 12 different BGF members.

25    They went through efforts to make controlled telephone calls.

Mr. Enzinna mentioned those.  And they explained that one of

the reasons they didn't further pursue that was because they

wanted to maintain the confidentiality of their source.  They

didn't want to out that person because they feared for his

safety.  Also, they wanted to maintain the integrity of their

investigation.

Those are all legitimate reasons not to continue

forward with the tactic.  The broader point here, Your Honor,

is that outside the four corners of the necessity section,

elsewhere in the affidavit, there was a wealth of information

pertaining to what state investigators had done with respect

to confidential sources.  So when they got to the necessity

section and they said, Judge, our efforts so far with

confidential sources haven't gotten us where we want to go,

that was not merely boilerplate.  There was a lot of fact

case-specific information in there giving the judge a sense of

what they had done and where they still needed to go.

And, in fact, Mr. Johnson says in his motion, "If

investigators had showed that over a period of months they

used multiple confidential informants who had failed to obtain

information regarding the upper levels of the regime despite

targeted efforts to do so, that might have been enough to

demonstrate that tool as unlikely to succeed."  We would

submit that if you look at the whole affidavit, that's exactly

what it shows.

1           So moving to undercovers.  Mr. Enzinna mentioned
2   that they did only two buys in a week and that they decided
3   further additional buys wouldn't be useful.  One of the
4   reasons why, and they explained this in the affidavit in the
5   necessity section, they said, we've looked at the criminal
6   histories of our targets, and we think that from a safety
7   perspective, we're a little concerned about sending additional
8   undercovers in there.  And I think if the Court looked at the
9   criminal histories of the target subjects, and we're not just
10  talking about the people in this case, it was a much broader
11  investigation at that point.  That's a very reasonable
12  fact-specific determination, that's case-specific information.
13  There's nothing boilerplate about that.  So again --
14          THE COURT:  And it's in the affidavit.
15          MR. MARTINEZ:  Correct.  Mr. Enzinna didn't mention
16  search warrants, but in their motion they say state
17  investigators provided the judge with no information about
18  search warrants.  There's a whole section in the affidavit
19  titled search warrants.  And they go through all of the
20  different occasions where they executed search warrants.  In
21  fact, they go through 30 of them over approximately four
22  months.  And I'm not sure what else they could have done, and
23  that's seven and a half search warrants a month for over four
24  months.  And they say, Judge, this is what we've gotten, this
25  is the kind of thing we're looking for, we haven't gotten it

yet.  I'm not sure what more they could have done to satisfy the judge that search warrants had been exhausted.

Then with respect to jail calls, Mr. Johnson says they didn't give the Court any information about jail calls. There are four -- five full pages in the affidavit that go through jail calls, including some by Mr. Brown to a woman named Bria Wright, and Mr. Enzinna mentioned.  In one of the calls he says, "Man, don't talk about that shit on the phone, that shit's being recorded."  And the point they made based on that was, look, we can listen to jail calls, but these defendants are careful about what they do and don't discuss on the phones, so it's going to be of limited utility to us. They point to a real example in which that happened in this case.  That's case-specific information.  There's nothing boilerplate about it.

Mr. Johnson also challenges the showings with respect to surveillance, CCTV cameras, witness interviews, and grand jury subpoenas.  The only argument there is the difficulties the government identified.  That comes up in every big gang investigation, every big narcotics conspiracy. That may be true, Your Honor, it's hard to conduct physical surveillance.  Practiced criminals do counter surveillance. Our position with respect to that is, the fact that a problem is common or the investigators bump into a problem that happens frequently is hardly reason to discount the fact that

1    it crops up in a particular case.

2         And so these officers shouldn't be dinged for the

3    fact that they went to the judge and said, hey, surveillance

4    isn't helping us.  So we think when you put the whole thing

5    together, you read the affidavit as a whole, you don't

6    narrowly focus on the seven necessity page, there's an

7    abundant showing of necessity.  They went far beyond the

8    burden that Judge Quarles explained in the *Willock* case that

9    the government has to satisfy.  And when you add to the fact

10   that the goal of this was to identify the upper levels of a

11   complex far-flung organization, I don't think there's any

12   problem with the exhaustion shown here, Your Honor.

13        THE COURT:  Thank you, Mr. Martinez.  I'm ready to

14   rule.  I already addressed the jail calls.  That aspect of the

15   motion is denied.  The affidavit seeking the warrant, the

16   order details long investigation that had yielded substantial

17   evidence on the broader contours of the target organization.

18   But I'm persuaded that the judge was adequately told and it

19   was adequately explained that the investigation had stalled

20   out regarding the higher level leaders, the highest level

21   leaders; and that they had still not acquired key information

22   on who top level suppliers were of narcotics, the location of

23   stash houses, and this sort of information; and that they had

24   employed a number of means and methods to try to acquire that,

25   but had reasonably stopped based on what they had run into and

1    were reasonably seeking to resort to this far more intrusive

2    investigative technique.

3            I also conclude that the affidavit did a good job of

4    revealing the violent nature of the target organization and

5    that based on that a more extensive efforts at undercover

6    operations and controlled buys and that sort of thing really

7    weren't feasible or plausible in the context of the group that

8    they were investigating.  Physical surveillance was difficult

9    because of the urban environment.  You know, that's a little

10   bit boilerplate and I'm not sure that that is so different in

11   this situation than from any other.

12           But making a practical, common sense evaluation of

13   the circumstances that were truly present here, the nature and

14   complexity of the organization that the authorities disclosed

15   to the judge that they were asking to enter the order, and

16   taking into account this Court's responsibility to pay

17   deference to the issuing judge's determination on all of these

18   complex factual questions, causes me to ultimately conclude

19   that the affidavit was sufficient, that it did set forth

20   case-specific challenges and difficulties that were sufficient

21   to warrant the issuance of wiretaps, wiretap orders.  In my

22   mind, with that conclusion, I have effectively now decided the

23   motion that is Paper No. 216.  I deny it based on these

24   conclusions.

25           Let's see, 187 was mainly directed at the jail

calls.

MR. BUSSARD:  Yes, Your Honor, based on my review and the government's position taken in their response that it was limited to the jail calls between Mr. Jones and Mr. Robinson.

THE COURT:  Yes.  So that motion has been denied and I've already discussed why.  Have we finished 187 and 216, as far as the government's concerned?

MR. MARTINEZ:  Yes, Your Honor.  And we're prepared to turn to 214.  That's Mr. Johnson's motion to suppress the fruits of search warrants at 1520 Madison Avenue, as well as the 2010 Hyundai vehicle on November 27th of 2013.

THE COURT:  Is this -- whose argument is this?  Mr. Enzinna, is this just an attack on the affidavit?  I'm trying to remember which one this is.

MR. ENZINNA:  No, this is an attack on the affidavit's failure to draw a nexus between the alleged criminal activity and the residence searched.  I will say, Your Honor, as an initial matter, one of the -- we do attack the search on the Hyundai in here as well.  And the government raised the argument that we lack standing, and I'm prepared to concede that and drop that piece of the motion.

THE COURT:  Okay.  So that -- that portion of 214 is denied because the defendant lacks standing with respect to the 2010 Hyundai automobile as part of the November 27, 2013

1    search, leaving us just with the house.  One question that

2    always jumps to my mind in these kinds of cases is, in terms

3    of suppression, why isn't the issue resolved just by applying

4    *Sheppard* and *Leon*?  And if they were applied -- if I were to

5    somehow come to the conclusion that you were right on the

6    substance, wouldn't *Sheppard* and *Leon* still be in play, and

7    how would I nonetheless suppress evidence on your theory?

8              MR. ENZINNA:  Well, *Leon* does not apply where the

9    affidavit is insufficient to allow a reasonable person to

10   rely --

11             THE COURT:  Yes, the officer himself has to

12   understand that even though he persuaded a judge to sign it,

13   he in his own mind reasonably should have known this is

14   inadequate.

15             MR. ENZINNA:  Right.

16             THE COURT:  That's a pretty high test.

17             MR. ENZINNA:  It is a high test.

18             THE COURT:  An officer who's not required to have a

19   law degree or similar training and expertise knows that it's

20   inadequate, but a properly trained, licensed, and appointed

21   judge didn't get it.

22             MR. ENZINNA:  Well, Your Honor, let me address first

23   of all exactly what it is that the government is arguing.

24   What the government is arguing here is really pretty

25   astonishing, to my mind.  The government argues that under 4th

Circuit law, I want to quote their motion:  "Warrants to
search suspect's residences and even temporary abodes, 4th
Circuit has consistently upheld warrants to search suspect's
residences on the basis of evidence of the suspect's
involvement in drug trafficking combined with the reasonable
suspicion that drug traffickers store drug-related evidence in
their homes."

THE COURT:  Yes, the way I've characterized it in
the past in opinions I've issued is I said that if the proof
in an affidavit rises to the level where a reasonable judge
could conclude this is a livelihood, this is what they're
doing, this is how they spend their time, maybe even support
themselves through this method and so forth, then there is
probable cause to believe that there's going to be evidence of
that activity found where they reside.  I mean, you know, I'm
a lawyer and a judge.  I mostly work at the courthouse.  But
it's such a large aspect of my life that there's every reason
to believe that if you went into my home, where I reside, that
you'd find evidence that I'm a lawyer.

MR. ENZINNA:  So where that proposition takes us is,
for example, say you're a lawyer, suppose you are under
investigation for fraud, and the government had evidence that
you were involved in a fraud.  Can they search your law office
simply based on that evidence?

THE COURT:  Well, apart from special issues

1      associated with searching a law office and attorney-client

2      privilege and so forth, it would be a function of how

3      extensive was the person's involvement in the activity.  Is

4      there proof to the judge that, hey, there's a one-off drug

5      deal involving this guy, or is it more extensive than that?

6              MR. ENZINNA:  Well, let's look at the evidence that

7      the affidavit gave the judge about the alleged criminal

8      activity.  And what that evidence consists of is, one, an

9      intercepted phone call in which Mr. Johnson was alleged to

10     have said something about nickels, which is a drug term.  Two,

11     there was a conversation intercepted by Ms. Massey where she

12     said to someone that "you almost got shot last night for

13     following us home."  That's it.  That's the evidence they're

14     putting in of criminal activity.  That certainly does not rise

15     to the level of so extensive an activity that it's a

16     livelihood and it's, therefore, likely to be in their home as

17     well.

18              First of all, the evidence of -- the conversation in

19     which Ms. Massey said something about "you almost got shot

20     last night," the government said, well, this is evidence that

21     Mr. Johnson, who's a felon, wrongly possessed a firearm.  What

22     you have is a statement by his girlfriend the next day, after

23     something supposedly happened, that "you almost got shot."

24     No -- not even any statement that "we had a gun."  Moreover,

25     that conversation took place a month before the search.  But

1    putting that aside, the evidence of drug activity, you said a

2    one-off drug dealer.  As far as I can tell, that's the

3    evidence here.

4            THE COURT:  Well, what about, wasn't there a

5    reference in that affidavit to recordings of calls related to

6    other drug trafficking activity?

7            MR. ENZINNA:  I don't know that there was.  And

8    I'm -- I think that what the affidavit said was that there

9    is -- that drug traffickers, it's my -- in my training and

10   experience, I know that drug traffickers generally keep

11   evidence of drug trafficking in their residences.  There are a

12   number of problems with that.  First of all, Officer Hayden

13   did not explain to the judge what exactly his training and

14   experience was.  Now if he just started the day before,

15   obviously, that's different from having him start ten years

16   ago investigating drug cases.

17           But putting that aside, the evidence that

18   Mr. Johnson or Ms. Massey was an individual involved in drug

19   trafficking, they cite the call, the nickels call, but beyond

20   that, I'm not sure there is anything.  They do say -- they do

21   allege them to be members of the BGF Greenmount Regime, but

22   that again is an assertion.  It's not facts from which the

23   magistrate can draw.

24           THE COURT:  Well, he's swearing that he knows that

25   to be true, based on the investigation that he's conducting.

1          MR. ENZINNA:  Well, Your Honor, the probable cause

2     determination has to be based on facts provided by the officer

3     involved in the competitive enterprise of investigative crime,

4     given the neutral unattached magistrate who can then evaluate

5     those facts.  It's not up to the officer to evaluate those

6     facts.  For example, if that were the standard, an officer

7     could come in and say, Your Honor, I've investigated it and

8     John Smith is a drug trafficker.

9          THE COURT:  Of course.  And what you're basically

10    saying is that affidavits can't be so conclusory that they

11    really deprive the ultimate decision maker of the opportunity

12    to evaluate the relevant data and decide for himself or

13    herself what's really going on here.  My point, though, is

14    that in other aspects of this affidavit they were very

15    detailed.  They talked about particular telephone calls.  I

16    think it was calls, maybe call.  They talk about a particular

17    transaction.  And then in general, on top of that, provide

18    this contextual information.  They're certainly not seeking a

19    warrant solely based on an assertion of BGF membership.

20         MR. ENZINNA:  Well, but what they are seeking here,

21    and this is important, in the *Lalor* case, which we cited in

22    our brief, I think it was Judge Motz who wrote, "In

23    determining whether a search warrant is supported by probable

24    cause, the crucial element is not whether the target of the

25    search is suspected of a crime, but whether it is reasonable

1    to believe that the items to be seized would be found in the

2    place to be searched."  The nexus requirement.

3              THE COURT:  Right.

4              MR. ENZINNA:  And the government is arguing there is

5    no nexus requirement.  If there is a nexus automatically where

6    it's reasonable to suspect that this person who's involved in

7    criminal activity --

8              THE COURT:  It's not automatic, it's --

9              MR. ENZINNA:  That's the government's argument.

10             THE COURT:  It's inferred from certain facts:  A,

11   it's where the person resides; and B, they're involved in this

12   activity to this extent.

13             MR. ENZINNA:  Well, that's not what the government

14   says.  The government says that if we have a person who's

15   involved in criminal activity, a drug trafficker specifically,

16   we can reasonably assume or believe that they have evidence of

17   it in their house and we can search their house.

18             THE COURT:  All right.  Let me hear from the

19   government.  And Ms. Hoffman.

20             MS. HOFFMAN:  Thank you.  I think Mr. Enzinna does a

21   good job of trying to distinguish *Williams, Grossman*, and

22   *Servance* on their facts, but in reality they do stand for a

23   broader proposition of law, and that is, I quote, "The nexus

24   between the place to be searched and the items to be seized

25   may be established by the nature of the item and the normal

inferences of where one would likely keep such evidence."

So as Your Honor pointed out, it's not automatic. There need to be facts from which the judge can infer that it is reasonable for the person -- the subject of the warrant to store evidence of criminal activity in their residence.  The case law is very clear that you don't need evidence directly tying a subject's drug trafficking activity to his residence if the affiant explains or the judge implicitly finds that drug traffickers normally keep drugs in their residences. That's a rule of decision that is binding in this circuit.

And here the affidavit describes two different wiretap calls in which Mr. Johnson discussed illegal drug trafficking.  I think Mr. Enzinna makes a similar mistake here as he did with the motion to suppress the state wiretap.  He focuses exclusively on one section of the affidavit but misses some of the information supporting probable cause in later sections of the affidavit.

So for example, later on in the affidavit, in paragraphs 46 and 47 of the affidavit, the affiants explain that on that date Mr. Johnson was intercepted in a wiretap call with a known BGF leader, Henry Walker, a/k/a Stimey, during which the two agreed to meet so Walker could give Mr. Johnson an unknown object.  Shortly thereafter, Detectives Hood and Smith observed Kelly Massey, the co-resident of the residence, and Johnson in the vehicle, the Hyundai Sonata,

1    traveling southbound in the 1700 block of Latrobe Street

2    directly behind another vehicle driven by Walker.  They were

3    able to follow the vehicles to the Madison Avenue premises,

4    the subject residence, where they observed Johnson exit the

5    passenger seat of that vehicle and enter the rear door of the

6    residence.

7          So again, we have a surveillance of a suspected drug

8    transaction, following which Mr. Johnson goes directly to that

9    residence.  So even if it's true that you need evidence

10   directly tying the drug trafficking activity to the residence,

11   we do have that here.

12         I did also want to correct one factual statement by

13   Mr. Enzinna.  Detective Hayden, who was one of the affiants,

14   did describe at length his training and experience in this

15   affidavit.  It's a different affidavit.  It's the affidavit

16   supporting the social media warrants in which there was not

17   information supplied about his training and experience.  But

18   in this one, both Jonathan Hayden and two other detectives who

19   were co-affiants, did describe their training and experience

20   at length and explained that based on their extensive

21   experience it is very common for drug traffickers to keep

22   drugs and drug paraphernalia in their residences.

23         THE COURT:  Tell me again about the tie to the

24   particular house.  What's the government's theory on the fact

25   that it's not just that he's a drug dealer and this is where

1    he lives, but an actual action or act in relation to that

2    house?

3          MS. HOFFMAN:  So they intercepted on October 9th of

4    2013 a wiretap call between Mr. Johnson and a known BGF

5    leader, Henry Walker, in which they discussed exchanging an

6    unknown object, which the detectives believed to be illegal

7    contraband, and they do spell that out in the affidavit.  They

8    explain that they conducted surveillance and saw Mr. Johnson,

9    immediately after the suspected transaction, enter the subject

10   premises.

11         THE COURT:  Okay.  Thank you.  I'll give you the

12   last word, Mr. Enzinna, or you can submit.

13         MR. ENZINNA:  Thank you, Your Honor.  I just want to

14   address case law, briefly.  The government -- I'm sorry,

15   Ms. Hoffman talked about case law, and it's good law in this

16   circuit, but let's be careful exactly what that case law says.

17   First of all, the *Williams* case, the Court did not find there

18   was probable cause.  The Court said we don't have to resolve

19   that under *Leon*, so they never address the issue of probable

20   cause.

21         Second, in *Grossman* and in *Servance*, both of those

22   cases, and I think we detailed this in our reply brief, there

23   is direct evidence tying the drug activity to the houses.  For

24   example, in one case the defendant is in the house for three

25   and a half hours, leaves the house, goes immediately to meet

someone and conduct what appears to be a drug transaction.
And the other one, the suspect is driving to the house, takes
evasive action to try and lose this surveillance, the tail
that's coming behind him, and gets to the house, looks around,
goes in the house, takes a key, opens the door, goes in, stays
in there for a little while, then comes out, goes to get in a
different car.  When the police officer approached him, he
said, I was never in that house, said that's not my car, said,
I didn't have a key, and lied about what was in the house.

So by taking that evasive action and then disavowing
any connection to the house, he provided some suggestion that
there was evidence of his illegal activity in the house.  Now,
I'm -- I apologize, I'm trying to find in the affidavit
exactly where this -- the surveillance that Ms. Hoffman talked
about.  Can you tell me the paragraph?

MS. HOFFMAN:  It's paragraphs 46 and 47.

MR. ENZINNA:  Is that your Exhibit 18?

MS. HOFFMAN:  It is in Exhibit 18.

MR. ENZINNA:  46, you said?  I'm sorry.

MS. HOFFMAN:  Paragraphs 46 and 47, might start with
paragraph 45.

MR. ENZINNA:  Okay.  Thank you.  Yeah, here's what
happens:  Johnson and Walker arranged meet so that Walker can
give something to Johnson.  They arranged to meet at a house,
then they saw a Chevy Impala in the neighborhood where the

house was.  And they saw Walker get out of the car, go to a
house, and take an unknown object from somebody, get back in
the Impala, and drive away.  Then he advised Johnson he was on
Latrobe Street, and they saw the red Impala being followed by
the gray Hyundai, and then Johnson got out of the vehicle and
entered through the rear door.

I've -- let's assume for argument's sake that
whatever Mr. Walker was going to get was evidence of drug
activity or was involved in drug trafficking.  Where is the
connection to that evidence in the house, Mr. Johnson's house?
What the detectives say is, we saw Mr. Walker do this thing
with this thing, we didn't know what it is, and get in his
car, then we saw Mr. Johnson driving behind him.  Where's the
connection?  There's no argument that we saw Mr. Johnson give
something to -- Mr. Walker give something to Mr. Johnson.
There's no argument that we saw Mr. Johnson get in
Mr. Walker's car or vice versa.  I mean --

THE COURT:  Thank you, Mr. Enzinna.  I understand
the argument.  The simplest way to resolve this problem is to
simply look at what *Sheppard* and *Leon* tell us in such
circumstances.  The picture, if it is muddled on the question
of whether there really was probable cause or not, it was not
so muddled that an officer submitting an affidavit containing
this information to a judge would understand for certain,
would understand by whatever standard is applicable or

1    appropriate in the circumstance that this is not probable

2    cause, see if this judge will sign it, but I know it's not.

3            No, this is not close to that at all.  A reasonable

4    officer would reasonably submit this affidavit and hope and

5    expect to receive a warrant and not be engaged in anything in

6    conflict with his or her training, anything that was dishonest

7    or deceptive.  The standard -- so in light of that, the motion

8    is denied just by application of *Sheppard* and *Leon*, and I so

9    hold.

10           But beyond that, you know, there's another principle

11   that comes into play, and that is, the standard isn't really

12   whether I, sitting here on this bench, with everything that's

13   been presented to me, would conclude that I would issue that

14   warrant.  Some deference is owed to the issuing judge's

15   determination and their weighing of the information that's

16   been presented to them, and they have the discretion to make

17   their judgment about that.  And it's only when that judgment

18   starts to really become questionable in the application of

19   basic probable cause principles that a judge sitting where I

20   am now should say, no, I don't think there was probable cause

21   and that judge shouldn't have issued that warrant and as a

22   consequence there really wasn't probable cause for it.

23           That still doesn't get us by the *Sheppard* and *Leon*

24   problem.  But I judge this situation to be one that is

25   certainly within the range where a judge could reasonably come

1    to the conclusion that there was probable cause to issue an

2    order to search that house, based on the totality of the

3    information that was presented in that affidavit.

4    Accordingly, the motion's denied, on the separate ground that

5    there was probable cause -- or the judge's assessment that

6    there was probable cause, so it was reasonable and

7    appropriate.

8              All right.  Now where are we?

9              MS. HOFFMAN:  Your Honor, the next motion is Docket

10   No. 215, which is also a motion by Mr. Gerald Johnson.

11             THE COURT:  Right.

12             MS. HOFFMAN:  To suppress the fruits of a

13   warrantless search of his person on June 30th of 2016.  The

14   government last week filed a motion to dismiss Count 7 of the

15   Second Superseding -- I'm sorry, Count 6 of the Second

16   Superseding Indictment charging Mr. Johnson with possession

17   with intent to distribute crack cocaine related to that

18   search.  And we are prepared to stipulate that we will not

19   present any evidence of the recovery of that crack cocaine at

20   trial.  So we believe that that moots this motion.

21             THE COURT:  Agreed, Mr. Enzinna?

22             MR. ENZINNA:  Yes, Your Honor.

23             THE COURT:  Okay.  Denied as moot.  Government's not

24   going to offer the evidence.

25             MS. HOFFMAN:  The next motion, Your Honor, is Docket

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    No. 180, I believe, which is Kenneth Faison's motion to

2    suppress the fruits of a search warrant executed on a cell

3    phone seized from him on November 15th of 2016, and I think we

4    can also deny that motion as moot now that Mr. Faison has pled

5    guilty.

6              THE COURT:  Anyone object to my denying that as

7    moot?  180 is denied as moot.

8              MS. HOFFMAN:  The next motion, Your Honor, is Docket

9    Nos. 213, 191, and 211.  This is the motion to suppress social

10   media evidence pursuant to search warrants by Gerald Johnson,

11   that's Docket 213; Kenneth Jones, that's Docket 191; and

12   Marquise McCants and that's Docket 211.

13             THE COURT:  So I've got 191, 211, 236, and 213 in

14   that group.  Do I have that right?

15             MR. DAVIS:  236 would be my motion to adopt, Your

16   Honor.

17             MS. HOFFMAN:  I'm sorry, Your Honor, then yes, 236

18   as well.

19             THE COURT:  236 would be your motion to adopt?

20             MR. DAVIS:  Adopt and conform.

21             THE COURT:  So 191, 211, 236, which is adopting 211

22   and 213.  That's what I've got in that group.  Have I got them

23   all?

24             MS. HOFFMAN:  I believe that's correct, Your

25   Honor.

1          THE COURT:  Okay.  That's Mr. Enzinna and

2     Mr. O'Toole, that's Mr. Bussard, that's Mr. Francomano, and

3     Mr. Davis.  Is there a consolidated position on behalf of the

4     defendants that one lawyer is prepared to argue on behalf of

5     most if not all of you?

6          MR. BUSSARD:  Your Honor, Mr. Jones's motion, ECF

7     Paper No. 191 is different, and if I may be heard, I think we

8     can resolve that --

9          THE COURT:  Okay.  Where are you on 191?

10         MR. BUSSARD:  Your Honor, the facts on 191 are

11    simply, while Mr. Jones is incarcerated there are other

12    persons with social media accounts, Instagram, what have you,

13    and they -- our motion is simply that there are posts on those

14    social media accounts talking -- maybe talking about

15    Mr. Jones.  They're not -- there's no communication with

16    Mr. Jones because he's incarcerated and doesn't have access to

17    the internet.  However -- so he may not have standing that's

18    one problem.  Two, it's more in the form of a motion in limine

19    and I think I could --

20         THE COURT:  Yes, that's how I'm hearing it,

21    Mr. Bussard.  This sounds like a trial issue, and you know,

22    relevance.  How are you going to connect these communications

23    to him and demonstrate that they're his communications, et

24    cetera?  Those are trial problems.

25         MR. BUSSARD:  Correct.  I missed that, Your Honor,

1    but I think it is going to be a motion in limine at some point

2    either orally or on a renewed --

3              THE COURT:  Or it's just a trial objection when they

4    start to introduce the evidence.  I mean, I don't want to put

5    the government to their proof at this particular moment, but

6    is your theory on this with respect to Mr. Jones that these

7    are just admissions of his or co-conspirator statements or

8    what is it?

9              MS. HOFFMAN:  Your Honor, I believe they're -- there

10   will be co-conspirator statements that we seek to admit that

11   were made in furtherance of the conspiracy.  I'm not aware of

12   any actual communications in which Mr. Jones was directly

13   involved, although our position is that he was a member of the

14   conspiracy throughout that period of time, and so statements

15   made by his co-conspirators in furtherance of the

16   conspiracy --

17             THE COURT:  So might well be a statement on an

18   account ostensibly owned by him that you can't prove that he

19   made, in fact he was in jail, but you contend that you can

20   prove that a co-conspirator made it, so it's coming in as his

21   statement anyway.

22             MS. HOFFMAN:  Exactly.

23             THE COURT:  Well, that's just standard stuff for

24   trial.  We'll see if they can actually pull that off or not.

25             MR. BUSSARD:  Very well.

```
 1              THE COURT:  But I'm not going to decide that weeks
 2    before trial.  Okay.  So 191 is denied without prejudice,
 3    denied without prejudice as premature.
 4              MR. BUSSARD:  Thank you, Your Honor.
 5              THE COURT:  Mr. Jaco, with me?
 6              THE CLERK:  Yes.
 7              THE COURT:  Okay.  So who's left, Mr. Enzinna?
 8              MR. ENZINNA:  Thank you, Your Honor.  Our motion to
 9    suppress the social media evidence is based on two pieces to
10    it.  One is the magistrate judge's authority issue to a
11    warrant.
12              THE COURT:  Right.
13              MR. ENZINNA:  The other is the probable cause piece
14    of it.
15              THE COURT:  What about this whole notion that it's
16    actually Stored Communications Act?
17              MR. ENZINNA:  Well, it is.  But the Stored
18    Communications Act says that the warrant should be issued
19    under the procedures of Rule 41.  And the government reads
20    that as --
21              THE COURT:  Whoa, whoa.  What, including the fact
22    that magistrate judges don't have nationwide authority on SCA
23    papers?
24              MR. ENZINNA:  Well, that's what Rule 41 says.
25              THE COURT:  What's the case law say on that?
```

 1          MR. ENZINNA:  Well, I have to admit, the case law on

 2   this is not very favorable to me.

 3          THE COURT:  I think that's a settled question.

 4          MR. ENZINNA:  It's not in the 4th Circuit a settled

 5   question.  So I'm prepared to submit.

 6          THE COURT:  Okay.  You've got your issue on that,

 7   but --

 8          MR. ENZINNA:  Understood.

 9          THE COURT:  -- the Court is going to rule against

10   you, unless you have some other argument you want to make in

11   that regard.

12          MR. ENZINNA:  No.  I'd like to address the probable

13   cause piece.

14          THE COURT:  So I am ruling at this point that the

15   judge's authority on the Stored Communications Act is

16   national.  Despite that reference to Rule 41, I find that's

17   not what it means and that Congress's intent is more

18   specifically expressed in the actual language of the statute

19   and that -- who was it, Judge Copperthite?

20          MS. HOFFMAN:  It was Judge Copperthite.

21          THE COURT:  Judge Copperthite acted within his

22   authority.

23          MR. ENZINNA:  Thank you, Your Honor.

24          THE COURT:  So now, did he have probable cause, was

25   probable cause presented to him?

1          MR. ENZINNA:  I'm sorry?

2          THE COURT:  Was there probable cause?

3          MR. ENZINNA:  Yes.  The probable cause showing here

4    was based on a couple things.  One was Officer Hayden saying

5    that based on my training and expertise I know that people

6    involved in drug trafficking often use their social media

7    accounts to further that activity.  Problems we talked about

8    earlier is that Officer Hayden did not explain what his

9    training and experience is.

10          Second, he said people who are involved with drug

11   trafficking.  He did not provide the magistrate with the

12   facts --

13          THE COURT:  Magistrate judge.

14          MR. ENZINNA:  Magistrate judge, I apologize.

15          THE COURT:  In this courtroom, the word "magistrate"

16   is an adjective, not a noun.

17          MR. ENZINNA:  Yes, sir.  Officer Hayden did not

18   provide the magistrate judge with facts from which he could

19   determine that Gerald Johnson, whose social media account it

20   is, was in fact the individual involved in drug trafficking

21   activity in his affidavit.

22          Third, he argues -- Officer Hayden sends the

23   magistrate judge -- look at his social media, there's all this

24   evidence of criminal activity.  They're -- he's wearing

25   jewelry and holding money and talking about drugs and talking

1    about shooting people and stuff, as though these are

2    documentaries that Mr. Johnson has created as a narrative of

3    his life, as opposed to what they are, which is -- now

4    Mr. Johnson is --

5            THE COURT:  An entertainer.

6            MR. ENZINNA:  He is involved in that activity.

7    Rapping is a legitimate form of art and people do it.  And

8    part of the conventions and the tropes of that involve this

9    type of activity because that's where the -- this form has

10   evolved.  And you know, it's like we said in the motion, it's

11   almost like arguing that we have probable cause to believe

12   that Johnny Cash killed a man in Reno.  You know, at some

13   point art is art and life is life.

14           THE COURT:  Yes, I agree.

15           MR. ENZINNA:  I'll rest on that.

16           THE COURT:  Okay.  I'll hear from the government.

17           MS. HOFFMAN:  Thank you, Your Honor.

18           THE COURT:  He didn't tell what his qualifications

19   were.

20           MS. HOFFMAN:  That's true, he didn't.

21           THE COURT:  Yes, well, that's a little bit

22   problematic; isn't it?

23           MS. HOFFMAN:  I think you can excise his statement

24   that drug traffickers and gang members commonly use social

25   media to intimidate witnesses and communicate with drug

1    customers.  You can excise that completely from the affidavit

2    and there would still be more than ample showing of nexus

3    here.

4         THE COURT:  It may also not require much expertise

5    to reach that conclusion.

6         MS. HOFFMAN:  That's correct, Your Honor.

7         THE COURT:  Someone who is a police officer on his

8    first day as a sworn officer's probably been to the police

9    academy and received some basic training in how criminal

10   activity is --

11        MS. HOFFMAN:  I think that's right.  This affidavit

12   in particular contains pages and pages of very concrete

13   examples of Mr. Johnson's use of his social media accounts,

14   his Facebook and Instagram accounts, to demonstrate his

15   involvement in drug trafficking and violent crimes, his

16   membership in BGF, his attempts to tamper with witnesses

17   against him and in the state trial, among other racketeering

18   activities.  And there's actually a video in which he

19   advertises drugs for sale.  He says, "Big dimes of that shit

20   right here, big loud packs" and holds it up.

21        There's a direct message from his -- one of his

22   Instagram accounts that was recovered from a cell phone that

23   was recovered from Mr. Johnson on June 30th of 2016 in which

24   he asks an associate if he has any 45 shells, which we believe

25   is a reference to .45 caliber ammunition.  I could go on and

1    on.  I think there's, like I said, more than ample probable

2    cause evidence, nexus evidence --

3              THE COURT:  I'm ready to rule.  Mr. Enzinna, I

4    always had one question about this Johnny Cash song:  How do

5    you end up in Folsom Prison if he shot a man in Reno?

6              MR. ENZINNA:  That's an excellent question.

7              THE COURT:  I'm sure there's something on the

8    internet about that.

9              MR. ENZINNA:  I'm sure there's a scholarly article

10   on that somewhere.

11             THE COURT:  That always bothered me from a

12   jurisdictional standpoint.  The -- the circumstances in this

13   affidavit, I find, the evidence in the information that's

14   supplied is more than sufficient to demonstrate probable

15   cause.  The -- we have made humorous reference to the Johnny

16   Reno -- the Johnny Cash song and "I shot a man in Reno,"

17   that's made by someone who is, based on ample other outside

18   evidence available to everyone, who is clearly an entertainer.

19   And yes, we use contextual clues all the time to sort out

20   whether or not somebody is saying something for real or for

21   pretend.

22             And that sort of assessment has to occur all the

23   time with respect to information.  And when we're listening to

24   Johnny Cash sing that song, we have all the contextual clues

25   in the world to indicate this is entertainment.  And at least

1    to my knowledge, Johnny Cash never shot a man in Reno.  The

2    contextual clues that are otherwise provided in this social

3    media account and the information that is supplied on it, plus

4    the other information that appears in the affidavit, suggests

5    just the opposite with respect to this defendant.  And Judge

6    Copperthite was entitled, based on the information submitted

7    to him, to conclude that there's probable cause.  So that

8    motion's denied.

9            All right.  What else have we got?

10            MR. MARTINEZ:  Next up, Your Honor, is ECF 205.

11    This is Mr. McCants's motion to suppress the federal wiretap

12    through which the calls Your Honor listened to yesterday were

13    intercepted.

14            THE COURT:  Mr. Francomano.

15            MR. FRANCOMANO:  Your Honor, basically our argument

16    would be almost the same as Mr. Enzinna's.  The only thing I

17    did want to add is just in this case it's the issue with the

18    search warrant.  The government said they executed one search

19    warrant.  It's our position that that's not enough, that they

20    could have tracked Mr. Dorsey, they could have found out where

21    he lived, they could have done a number of other investigative

22    techniques to find him.  Thank you, Your Honor.

23            THE COURT:  Thank you, Mr. Francomano.  And I adopt

24    the explanation for my ruling on the earlier motion, the

25    number of which I forget at the moment, but the one directed

1    at the state wiretap, and the same explanation for why this

2    affidavit on the federal wiretap was sufficient.  I

3    incorporate that earlier ruling because the analysis is

4    exactly the same.  Motion denied.

5           MR. MARTINEZ:  Next, Your Honor, is ECF 203, that's

6    another motion by Mr. McCants.  That's a motion to suppress

7    statements.  The motion doesn't identify any statements in

8    particular.  I understand it was filed by Mr. Francomano in an

9    abundance of caution, although --

10          MR. FRANCOMANO:  I spoke with Mr. Martinez and I

11   spoke with my client, we're going to withdraw that motion,

12   Your Honor.

13          THE COURT:  203 is withdrawn and denied as moot.

14          MS. HOFFMAN:  I believe the next motion is Docket

15   No. 199, which is Mr. McCants's motion to dismiss Count 1.

16   It's two different grounds.  One ground is that the indictment

17   fails to allege the elements of the offense, and the other is

18   that it charges multiple conspiracies.

19          THE COURT:  Mr. Francomano.

20          MR. FRANCOMANO:  Your Honor, we would submit on two,

21   the second one.

22          THE COURT:  Yes.

23          MR. FRANCOMANO:  The first one we'd just like to

24   argue that the indictment here under *U.S. v. Morrow*, 39 F.3d

25   1228, the 1st Circuit:  "An indictment may charge that a

single conspiracy had multiple criminal objectives, but to

support the charge of multiple criminal conspiracy, at a

minimum, a conspirator must have knowledge of foregoing the

conspiracy's multiplicity of objectives."

       We're saying here, in a 120-count -- or 120 overt

acts, where Mr. McCants has five, I don't believe that in this

situation that that single count is -- they've gone through

the entire counts, is what we're trying to say, Your Honor,

and submit.

       THE COURT:  I understand.  Government want to make a

record?

       MS. HOFFMAN:  Well, it sounds to me like more of a

motion to sever than a motion to dismiss, based on multiple

conspiracies.  I think it's clear that the indictment alleges

that Mr. McCants joined a single overall agreement involving

the same actors, the same goals, and methods.  And the case

law makes clear that members of the conspiracy may have

different roles, there may be different evidence against each

of them.  Each member may not need to know the full scope of

the conspiracy or all its members.  That does not mean that

there are multiple conspiracies so long as there's one overall

agreement.

       THE COURT:  And I am prepared to rule that based on

how it is framed in the indictment, it does allege one

conspiracy; many, many elements and many, many overt acts to

1    it.  But there are agreements that are themselves complex,

2    broad, far flung, but nonetheless, conceptually are best

3    understood to be all part of the same overall global agreement

4    and this is in that category, at least as charged.  We'll see

5    what the proof is at trial.  The motion's denied.  And there

6    were -- the -- both motions are denied.  What were those

7    numbers again?

8              MS. HOFFMAN:  It's Docket No. 199.

9              THE COURT:  Both elements of it within 199?

10             MR. FRANCOMANO:  Yes, Your Honor, just 199.

11             THE COURT:  Two theories, one motion.

12             MR. FRANCOMANO:  Correct, Your Honor.

13             THE COURT:  Okay.  Denied on all theories.

14             MS. HOFFMAN:  I believe the next motion is Docket

15   Nos. 188 and 206.  These are the motions by Kenneth Jones and

16   Marquise McCants for the disclosure of evidence pursuant to

17   Federal Rule of Evidence --

18             THE COURT:  Did you say 188 and 206?

19             MS. HOFFMAN:  206, that's correct.

20             THE COURT:  Oh, yes.

21             MS. HOFFMAN:  And this is a motion for disclosure of

22   evidence pursuant to Rule 404(b).  I think the government

23   addressed this motion in our response.  We don't intend to

24   present any Rule 404(b) evidence in our case in chief.  All

25   the evidence we plan to present is intrinsic to the charged

1    conspiracy and it's all been turned over in discovery, so

2    there shouldn't be any surprises.

3              THE COURT:  So --

4              MR. MARTINEZ:  Your Honor, if I could add a caveat

5    to that.

6              THE COURT:  Yes.

7              MR. MARTINEZ:  With respect to 404(b), we do reserve

8    the right to introduce any post-offense evidence that may be

9    generated through jail calls, or what have you, in CDF, to the

10   extent that that would be post dating the end date of the

11   conspiracy we charged in the Superseding Indictment.

12   Technically, that would be 404(b), and so if new evidence

13   emerges that we become aware of between now and the trial --

14             THE COURT:  Well, it can be intrinsic if it is

15   reflective of what was going on within the charged period.

16             MR. MARTINEZ:  Correct, Your Honor.

17             THE COURT:  It's not intrinsic if it describes

18   conduct or relates to conduct that didn't occur within the

19   charged period.  That's how that line gets drawn.

20             MR. MARTINEZ:  Correct.

21             THE COURT:  So what are you saying, there may be

22   evidence of conduct that occurred outside the --

23             MR. MARTINEZ:  No, I'm just laying down the

24   marker.

25             THE COURT:  -- time boundary of the charge?

1    MR. MARTINEZ:  All I want to do, Your Honor, is

2   preserve our ability -- if there are probative jail calls that

3   happen between now and trial, or during the trial, and there's

4   an argument that, hey, these are 404(b) and the government

5   said it wasn't going to introduce 404(b), I just want to

6   preserve our ability to do that.

7    THE COURT:  Well, fine, but you better disclose

8   them.

9    MR. MARTINEZ:  Oh, yeah.

10    THE COURT:  And that's what the Court will

11   ultimately make the determination on is whether or not the

12   defendants had notice.  Whether it was technically described

13   as 404(b) when it's in this kind of a murky circumstance is

14   less important to the Court, and what's more important is, did

15   you know it was coming.

16    MR. MARTINEZ:  Understood, Your Honor.

17    THE COURT:  All right.  Mr. Bussard.

18    MR. BUSSARD:  Your Honor, based on the Court's last

19   statement, that's essentially what my argument is going to be.

20   As long as we have notice, we don't have an argument.  The

21   government knows its obligation.  We hope it does.

22    THE COURT:  Yes.  Okay.  So --

23    MR. BUSSARD:  I'm not withdrawing the motion.

24    THE COURT:  Yes, well, I'm -- they're denied without

25   prejudice, is what it is.  I don't have any reason to believe

172

1  that there has been a failure to make necessary disclosure at

2  this point, on the record that's in front of me.  For that

3  reason, it's denied.  It's denied without prejudice because

4  it's not over yet.

5           MR. BUSSARD:  That's fine.

6           THE COURT:  What else?

7           MS. HOFFMAN:  The next motions are Docket No. 18 and

8  Docket No. 206.  These are motions by Kenneth Jones and

9  Marquise McCants for the disclosure of evidence pursuant the

10 Federal Rules of Evidence 609.  And again, I think this motion

11 has been addressed by our response, which lays out the prior

12 convictions we think should be admitted if the defendants

13 choose to testify.

14          THE COURT:  Okay.  So denied as moot without

15 prejudice.  Mr. Bussard.

16          MR. BUSSARD:  That's acceptable, Your Honor.

17          THE COURT:  And Mr. Francomano, are you on this?

18          MR. FRANCOMANO:  Yes, Your Honor.

19          THE COURT:  And you understand the Court's ruling

20 and no objection to it?

21          MR. FRANCOMANO:  No objection, Your Honor.

22          THE COURT:  All right.  You may renew it later if

23 you've got some new problem, but as far as I can tell, the

24 disclosure's been made.  Anybody else on that motion?

25          MR. BUSSARD:  No, Your Honor.

1          THE COURT:  Okay.  All right.

2          MS. HOFFMAN:  And, Your Honor, I just noticed that,

3    I'm not sure we resolved Docket No. 211, which was Marquise

4    McCants's motion to suppress social media evidence based on a

5    lack of probable cause --

6          THE COURT:  Wasn't that -- that wasn't the same

7    affidavit?

8          MS. HOFFMAN:  It's the same affidavit, but slightly

9    different factual circumstances.

10          THE COURT:  Did I effectively resolve that

11    Mr. Francomano?

12          MR. FRANCOMANO:  You did, Your Honor, if I could

13    just make a quick record.

14          THE COURT:  Yes, go ahead.

15          MR. FRANCOMANO:  Thank you.  Your Honor, in our

16    specific case, the affidavit states that the Facebook account

17    associated with the user profile, Digga.McCants, was believed

18    to be used by Marquise McCants.  That assertion provides no

19    information which Judge Coulson could assess its validity or

20    even that Mr. McCants had set up the account or was the one

21    using the account.  If it is accepted as accurate and he

22    wasn't the one using the account, the affidavit still doesn't

23    describe any information contained in the account, provides no

24    information at all which can be determined whether the account

25    might contain evidence of criminal activity.  And

1    Mr. McCants's account, I don't believe there's any pictures

2    showing any type of criminal activity whatsoever.  I don't

3    believe there are any conversations involving any criminal

4    activity.

5            THE COURT:  All right.  Ms. Hoffman.

6            MS. HOFFMAN:  I think the evidence is fairly clear

7    that it was Mr. McCants's account.  The profile picture

8    associated with the account is a photograph of Mr. McCants,

9    and as described in the affidavit, Digga is a known alias for

10   Mr. McCants.

11           THE COURT:  Do you dispute the photo depicts your

12   client?

13           MR. FRANCOMANO:  No, Your Honor, I do not dispute

14   that.

15           THE COURT:  Okay.  Continue.

16           MS. HOFFMAN:  Furthermore, the user name is

17   Digga.McCants, which is a combination of Mr. McCants's street

18   name and his actual last name.  As far as the probable cause

19   evidence, the affidavit provided that, first of all,

20   Mr. McCants's Facebook friends included fellow members of the

21   BGF Greenmount Regime and co-defendants Wesley Brown and

22   Norman Handy; that on August 26th of 2010, the day after

23   Mr. McCants was arrested for committing an armed home invasion

24   in Elkton, Maryland, Mr. Brown posted a message to his

25   Facebook account saying, quote, "Free my Nigga Digga," which

175

1    was a reference to Mr. McCants; and third, on March 27th of

2    2010, Mr. McCants posted a photograph to the Facebook account

3    that depicted him crossing his arms in front of his body,

4    making an X, which investigators knew to be a BGF sign.  I

5    think that last point is probably the most important.  There's

6    clear evidence on the account of him demonstrating that he's

7    member of BGF.

8              THE COURT:  Was that explicitly said in the

9    affidavit?

10             MS. HOFFMAN:  It was.

11             THE COURT:  Okay.  Motion's denied for the reasons

12   set out in the government's explanation.  What else?

13             MS. HOFFMAN:  The very last motions are the motions

14   to adopt motions of other defendants, which I think were filed

15   by most of the defendants, and the motions for leave to file

16   additional motions.

17             THE COURT:  All right.  So here's how we're going to

18   deal with the motion to adopt other persons' motions:  To the

19   extent that those -- that you have been heard on your position

20   that you adopt someone else's motion and you have reaffirmed

21   that here, that is acknowledged in the record.  But to the

22   extent that there are stray -- the stray joining of motions of

23   others that have not yet been addressed by the Court that are

24   hanging there in the record, you're required to tell me now

25   that you have a motion of someone else's that you joined and

1    that you have not yet been heard on.  Speak now or forever

2    hold your peace.  I'm going to rule against you and deny your

3    capacity to pursue that theory, claim, or motion unless you

4    tell me right now and bring it to my attention.

5            Starting with Mr. Johnson, Mr. Enzinna, do you have

6    any?

7            MR. ENZINNA:  No, Your Honor.

8            THE COURT:  Mr. Davis, do you have any?

9            MR. DAVIS:  No, Your Honor.

10            THE COURT:  Mr. Welch, do you have any?

11            MR. WELCH:  I would, Your Honor, but I believe it

12    depends.

13            THE COURT:  Okay.  Your motions in general haven't

14    been addressed yet.

15            MR. WELCH:  Correct.

16            THE COURT:  Mr. Bussard, do you have any?

17            MR. BUSSARD:  The only motion I would adopt is

18    Mr. Enzinna on behalf of Mr. Johnson, the social media

19    motion.

20            THE COURT:  I understand that's adopted and denied

21    for the reasons as I explained to Mr. Enzinna, but you have

22    your record.

23            MR. BUSSARD:  Thank you.

24            THE COURT:  Mr. Francomano.

25            MR. FRANCOMANO:  No, Your Honor.

1          THE COURT:  Mr. Ruter.

2          MR. RUTER:  No, sir.

3          THE COURT:  Very good, that record is cleared up.

4    Now what?

5          MS. HOFFMAN:  There were motions for leave to file

6    additional motions made by Kenneth Jones, that's Docket 186;

7    and Marquise McCants, that's Docket No. 208.

8          THE COURT:  All right.  So the motions deadline has

9    come and gone.  We've had the motions hearing.  Mr. Bussard

10   has made a specific request in a specific context and has been

11   granted relief and has a motions -- has a motion briefing

12   schedule set on a specific discrete issue.  Any others?

13         MR. BUSSARD:  No, Your Honor, not that I'm aware of

14   at this point.  That was the one of concern.

15         THE COURT:  Got it.  Mr. Francomano?

16         MR. FRANCOMANO:  No, Your Honor.

17         THE COURT:  So withdrawn?

18         MR. FRANCOMANO:  It is withdrawn, Your Honor.

19         THE COURT:  Withdrawn and denied as moot.  And as to

20   Mr. Bussard, on behalf of Mr. Jones, withdrawn and denied as

21   moot, except with respect to the one issue that was previously

22   carved out.

23         MR. BUSSARD:  Thank you, Your Honor.

24         THE COURT:  Agreed, Mr. Bussard.

25         MR. BUSSARD:  Yes, Your Honor.

1          THE COURT:  All right.  Mr. Martinez.

2          MR. MARTINEZ:  From our point of view, Your Honor,

3    that's the end of the road.  I just wanted to put on the

4    record that the government appreciates the efforts of the

5    court security staff and the Marshals for accommodating all

6    the moving pieces where concerned.

7          THE COURT:  Yes, okay.  I'll go down the line.

8    Mr. Enzinna, Mr. O'Toole, anything else in this motions

9    hearing?

10          MR. ENZINNA:  Nothing further, Your Honor.

11          THE COURT:  Mr. Davis, Mr. Trainor.

12          MR. DAVIS:  Nothing, Your Honor.

13          THE COURT:  Mr. Welch, we'll get to you in just a

14    moment.  Mr. Bussard.

15          MR. BUSSARD:  Yes, Your Honor.  Your Honor, I filed

16    ECF Paper No. 189, consolidated motion to suppress statements.

17    It was timely filed and it was not addressed in the

18    government's response.  And we ask the Court to rule.

19          THE COURT:  Okay.

20          MR. BUSSARD:  I've heard no opposition to our

21    motion.

22          THE COURT:  So tell me what it's about.

23          MR. BUSSARD:  Your Honor, there are essentially five

24    statements and the only information I have are going through

25    the voluminous discovery.  There is a statement made on May

```
1    10, 2006.  I can -- the progress note simply says, "On May

2    10th, 2006, Detective Sergeant Leonard Willis and Detective

3    Michael C. Johnson located Mr. Kenneth Jones, a member of the

4    YGF or Young Guerilla Family."  Spelling of Guerilla was

5    wrong.

6            He was sitting on the steps of 2204 Guilford Avenue.

7    These detectives transported Mr. Jones to the homicide unit

8    where he was interviewed and then transported to his residence

9    of 2204 Guilford Avenue.  That is the sum and substance of

10    what I know, and I don't have a recording.  We were not

11    provided any other details of whether or not he made a

12    statement and the extent of it or whether the government

13    intends to use that statement.

14            THE COURT:  All right.  So your suggestion is that

15    maybe there was custodial interrogation or some kind of

16    involuntary statement made?

17            MR. BUSSARD:  Yes.

18            THE COURT:  All right.  Government?

19            MR. MARTINEZ:  We don't have any further information

20    beyond what's in that 11-year-old case file.  And I can affirm

21    that we have no intention of using any statement by Mr. Jones

22    on May 10th of 2006, so that aspect of the motion, from our

23    point of view, can be denied as moot.

24            THE COURT:  Mr. Bussard, any objection to it being

25    denied as moot upon the government's statement that they will
```

1    not use such statement in the trial in their case in chief?

2              MR. BUSSARD:  No objection, Your Honor.

3              THE COURT:  Okay.

4              MR. BUSSARD:  The next statement, Your Honor, is

5    outlined in the motion, was on January 11th, 2007.  Mr. Jones

6    was allegedly arrested and transported to Eastern District

7    where it says he was interviewed.  There is allegedly an

8    interview and tape recording.  I do not have that recording or

9    video.

10             THE COURT:  Mr. Martinez?

11             MR. MARTINEZ:  Again, here, Your Honor, there's

12   no -- we have no intention of using that statement.  It's my

13   understanding that he just didn't cooperate, didn't say

14   anything.

15             THE COURT:  In light of the government's statement

16   that they will not attempt to introduce such evidence in their

17   case in chief, is that motion appropriately denied as moot,

18   Mr. Bussard?

19             MR. BUSSARD:  The next --

20             THE COURT:  Is it --

21             MR. BUSSARD:  Oh, that's acceptable.

22             THE COURT:  Denied as moot.

23             MR. BUSSARD:  The next statement was March 8, 2007,

24   and all I have is some documents that appears to indicate that

25   Mr. Jones was taken to homicide and asked a few questions

1    regarding a shooting of Vick Roy Fenner, F-e-n-n-e-r, which

2    took place on February 22nd, 2007, just one handwritten

3    statement that Mr. Jones says he doesn't -- he heard somebody

4    had been shot and that's -- that was the extent of the

5    statement.

6             MR. MARTINEZ:  Your Honor, that's part -- that's not

7    part of this case.  We don't need it.  We're not going to use

8    it.

9             THE COURT:  Okay.  The government has stated that

10   they will not use such evidence during their case in chief.

11   Mr. Bussard, it seems appropriate to deny the motion as moot,

12   do you agree?

13            MR. BUSSARD:  Yes, Your Honor.

14            THE COURT:  Denied as moot.  Next.

15            MR. BUSSARD:  The last one is May -- well, the

16   fourth one is May 22nd, 2013.  Again, there's just discovery

17   within the -- the discovery indicating that Mr. Jones was

18   taken over to homicide and interviewed, and I believe

19   there's -- the statement page is actually --

20            THE COURT:  Blank.

21            MR. BUSSARD:  It just indicates that he was there

22   and interviewed by a Detective T. Jackson.

23            THE COURT:  Mr. Martinez?

24            MR. MARTINEZ:  Our response is the same, Your Honor.

25   I don't think anything materialized from that interview.  I

182

1    think he just declined to answer questions and we have no

2    intention of using anything coming from that statement as part

3    of in our case in chief.

4              THE COURT:  In light of the government's statement

5    that they're not going to use anything flowing from that in

6    their case in chief, Mr. Bussard, do you have any objection

7    to my denying your motion as moot?

8              MR. BUSSARD:  No, Your Honor.

9              THE COURT:  Denied as moot.

10             MR. BUSSARD:  The final one is October 28, 2013.

11   Mr. -- and there was a recording of this interview made.

12   Mr. Jones was taken over to police headquarters.  Again, there

13   was an interview.  To the best of my knowledge, there was a

14   long interview with no admissions to any involvement in any

15   action.

16             THE COURT:  Mr. Martinez.

17             MR. MARTINEZ:  I think Mr. Bussard has appropriately

18   characterized the interview.  I also don't think there would

19   be any factual dispute that he was Mirandized on camera at the

20   beginning of the interview, such that it would be voluntary.

21   In light of the fact that it wasn't helpful, we have no

22   intention of using it as part of our case in chief.  So I

23   think the Court can deny the motion as moot, but we do reserve

24   the right to use it if he testifies and says something that's

25   inconsistent.

1          THE COURT:  That always reopens the question and

2     that's always understood with respect to motions to suppress

3     statements.  That's why we always confine it to the fact that

4     the government has stated that they have no intention to use

5     the evidence in their case in chief.  In light of that, do you

6     agree that it's appropriate to deny your request as moot?

7          MR. BUSSARD:  Based on the government's assertion to

8     the Court that they do not intend to use the statement in

9     their case in chief, that's acceptable,  Your Honor.

10          THE COURT:  Denied as moot.

11          MR. BUSSARD:  That's the five statements that were

12     raised in the consolidated motion.

13          THE COURT:  Anything else from you, Mr. Bussard?

14          MR. BUSSARD:  Nothing further.  Thank you, Your

15     Honor.

16          THE COURT:  Thank you.  Mr. Francomano.

17          MR. FRANCOMANO:  No, Your Honor.

18          THE COURT:  Thank you.  Mr. Ruter.

19          MR. RUTER:  No, thank you, Your Honor.

20          THE COURT:  Very well then.  We are ready to adjourn

21     this motions hearing.  One moment, please.

22          (Pause in the proceedings.)

23          THE COURT:  Back on the record.  The Court has been

24     maintaining its own elaborate chart of these 50-plus motions.

25     We show two not yet ruled upon.  222 was a corrected motion to

1  suppress statements. I think it relates to statements of

2  Mr. Brown that the government has indicated they're not going

3  to use.

4          MR. DAVIS: That's correct, Your Honor.

5          THE COURT: So that one should be denied as moot as

6  well for the reason that the government has indicated that

7  they do not intend to use those statements in their case in

8  chief. Is that your request, Mr. Martinez?

9          MR. MARTINEZ: It is, Your Honor.

10          THE COURT: And no objection, Mr. Davis, to denying

11  that motion as moot; correct?

12          MR. DAVIS: Correct.

13          THE COURT: And what about 239, that's one of yours

14  Mr. Francomano, motion to late file and suppress warrantless

15  search of Shawn Gregg's cell phone, what happened to that?

16          MR. FRANCOMANO: We'll submit, Your Honor.

17          THE COURT: Okay. Government want to be heard on

18  it?

19          MR. MARTINEZ: Yes, Your Honor. I think we filed a

20  paragraph or two on this. The simple fact of the matter is

21  the phone belonged solely and simply to Shawn Gregg. There's

22  no --

23          THE COURT: Standing.

24          MR. MARTINEZ: -- standing.

25          THE COURT: The Court finds there's no standing in

1    this particular defendant.  Accordingly, the motion is denied.

2    That's everything on the Court's list.

3         The defendant's are remanded to the custody of the

4    Marshal.  We're adjourned as to the motions hearing, but we

5    will reconvene at 4:30 in United States versus Harvey.  And

6    the defendant's required to be present, although he can be

7    taken out for a comfort break.  Counsel are excused.  Thank

8    you.

9         (The proceedings were concluded.)

10

11        I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
      record of proceedings in the above-entitled matter.

12

                    _____/s/_____
13                       Christine T. Asif
                     Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX
 2   Witness Name                                          Page
 3   Marquise McCants
 4       Direct Examination By Mr. Francomano..................... 10
 5       Cross-examination By Mr. Martinez....................... 12
 6   Trooper Ryan Boyce
 7       Direct Examination By Mr. Martinez ..................... 30
 8       Cross-examination By Mr. Francomano ..................... 37
 9   Detective Jamal Neptune
10       Direct Examination By Ms. Hoffman....................... 45
11       Redirect Examination By Ms. Hoffman ..................... 79
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1    < Dates >.              111:22.                  18th 112:23,
     2012, April 45:21.      September 29th, 2017      112:24.
2    2013, November           113:12.                 190 121:20.
      45:21.                  .357 49:5, 68:16.        190. 121:16.
3    April 3rd, 2013         .45 164:25.              191 157:9, 157:11,
      124:11.                .                         157:13, 157:21,
4    August 26th             .                         158:7, 158:9,
      174:22.                < 1 >.                     158:10, 160:2.
5    December 2013           1 42:8, 51:12,           192 104:12, 104:15,
      77:23.                   55:18, 78:18.            121:9.
6    December 29th, 2014     1. 167:15.               195 122:12, 122:17,
      77:5, 78:3.            10 186:7.                  122:21.
7    February 22nd, 2007     100 105:24,              1987 28:12.
      181:2.                   108:19.                1989 33:3.
8    February 4th 19:21,     101 1:48, 2:47.          199 167:15, 169:8,
      117:11.                10th 124:14, 179:2,       169:9, 169:10.
9    February 5th             179:22.                 1998 68:20.
      24:25.                 11 5:16.                  1:30 37:12, 37:16,
10   February 5th, 2007      11-page 51:14.            37:21, 37:22.
      32:12.                 11-year-old              1st 167:25.
11   February 5th, 2017       179:20.                 .
      10:14, 33:8.           11A 34:6.                .
12   February 8th 25:6.      11th 1:19, 111:24,       < 2 >.
     March 27th 175:1.         112:3, 180:5.          2 24:25, 110:9.
13   March 8, 2007           12 137:24, 186:9.        2. 72:15.
      180:23.                120 168:5.               2/5 25:8.
14   May 10, 2006            120-count 168:5.         2/8 24:20, 25:1.
      178:25.                1228 167:25.             20 11:21, 80:20.
15   May 22nd, 2013          12:00 5:9.               200-page 73:8.
      181:16.                12:40 34:2, 37:15.       2006 179:2,
16   May 31st 121:15.        1400 13:23.               179:22.
     November 15th           15 8:8, 11:5,            2006. 121:16.
17    157:3.                   15:16.                  2007 32:17.
     November 27, 2013       15. 17:9.                2007. 180:5.
18    143:25.                1520 143:11.             201 104:13, 104:15,
     November 27th           16 8:8, 15:17.            121:9.
19    143:12.                1700 151:1.              2010 136:22, 143:12,
     October 2013 44:5.      179 104:12, 104:15,       143:25, 174:22,
20   October 23rd 43:23,       121:9, 121:10.          175:2.
      46:2, 79:19,           18 153:17, 153:18,       2011 79:11, 111:24,
21    84:2.                    172:7.                   136:22.
     October 23rd, 2013      18-160 77:6.             2011. 79:13.
22    67:2, 67:5, 67:8,      18-160: 78:7.            2012 45:21, 88:13.
      95:16.                 180 157:1, 157:7.        2013 42:8, 45:21,
23   October 28, 2013        186 177:6.                46:2, 79:16,
      182:10.                187 122:23, 142:25,       79:19, 79:22,
24   October 9th 152:3.        143:7.                   84:3, 123:2,
     October, november      188 169:15,                135:7, 143:12,
25    135:7.                   169:18.                  152:4.
     September 1st          189 178:16.              2013. 43:23,
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

122:14.
2014 71:2, 75:8.
2015 76:21.
2016 77:24, 157:3,
   164:23.
2016. 156:13.
2017 1:19, 25:6,
   32:14, 77:20,
   117:11.
203 167:5, 167:13.
205. 166:10.
206 169:18,
   169:19.
206. 169:15,
   172:8.
208 177:7.
20th 117:10.
21 54:3, 62:17.
21-707(a 59:10,
   59:19.
21. 79:8.
211 157:12, 157:13,
   157:21, 173:3.
211. 157:9.
21201 1:49, 2:48.
213 157:9, 157:11,
   157:13.
213. 157:22.
214 143:23.
214. 143:10.
215 156:10.
216 122:23, 122:25,
   123:3, 143:7.
216. 142:23.
217 104:14, 104:15,
   121:9.
22. 49:13, 84:1.
2204 121:15, 121:21,
   179:6, 179:9.
222 183:25.
23. 80:18, 84:13.
236 157:13, 157:15,
   157:17, 157:19,
   157:21.
239 184:13.
25th 112:25.
26th 113:21.
271 113:25.
27th 113:1.
28th 7:20.

28th. 7:17.
294 28:11.
2:00 5:9, 5:12,
   95:7.
2A 37:25.
2B 38:12.
.
.
< 3 >.
3 78:1.
30 110:18, 130:14,
   139:21, 186:13.
30th 156:13,
   164:23.
3300 46:21, 46:25.
37 186:15.
39 167:24.
.
.
< 4 >.
400 7:20.
404(b 169:22,
   169:24, 170:7,
   170:12, 171:4,
   171:5, 171:13.
41 160:24, 161:16.
41. 160:19.
43 80:17.
45 72:6, 75:12,
   153:21, 164:24,
   186:19.
46 80:20, 150:19,
   153:16, 153:19,
   153:20.
47 80:20, 150:19,
   153:16, 153:20.
480 28:11.
483 116:5.
4:30 46:3, 185:5.
4th 1:48, 2:47,
   76:21, 123:7,
   131:24, 144:25,
   145:2, 161:4.
.
.
< 5 >.
50 75:10, 75:17.
50-plus 183:24.
5000 78:3.
53 124:7.

56 26:25.
5617 6:18, 7:24,
   10:15, 13:19,
   20:3, 21:8, 33:12,
   33:22, 34:1, 38:6,
   38:21.
569 42:8.
.
.
< 6 >.
6 156:15.
608(b 74:2.
609. 172:10.
6707 76:24.
6th 6:15.
.
.
< 7 >.
7 156:14.
756 116:6.
79 186:21.
.
.
< 8 >.
8 80:19.
8(a 117:18,
   117:21.
801(d)(a)(1 93:16.
8th 24:10, 24:11,
   26:13.
.
.
< 9 >.
9 80:17, 80:20.
90 75:9, 76:12.
97 72:6, 75:13,
   76:10.
9th 24:10, 24:11,
   26:12.
_____/s/_____
   _____ 185:15.
.
.
< A >.
A. 1:27.
a.m. 34:2.
a/k/a 150:21.
abeyance 43:20,
   98:25.
ability 43:7, 96:3,

96:17, 101:9,
102:6, 128:25,
131:8, 171:2,
171:6.
able 15:19, 22:17,
47:16, 48:23,
50:9, 58:9, 62:12,
92:19, 101:2,
102:3, 102:9,
108:3, 120:13,
128:23, 132:14,
151:3.
abodes 145:2.
above-entitled
185:13.
absolute 81:17.
absolutely 106:12.
abundance 167:9.
abundant 141:7.
academy 45:24,
164:9.
accept 4:15.
acceptable 172:16,
180:21, 183:9.
accepted 173:21.
access 47:15, 50:10,
158:16.
accessible 69:4.
accident 71:17,
75:13.
accommodate 4:25.
accommodated 5:5.
accommodating
178:5.
accomplish 4:24,
125:11.
Accord 26:24, 27:15,
46:22, 49:10.
accordance 33:2.
Accordingly 156:4,
185:1.
account 142:16,
159:18, 162:19,
166:3, 173:16,
173:20, 173:21,
173:22, 173:23,
173:24, 174:1,
174:7, 174:8,
174:25, 175:2,
175:6.

accounts 158:12,
158:14, 162:7,
164:13, 164:14,
164:22.
accredit 94:3.
accurate 58:7,
173:21.
accurately 39:9,
39:14, 70:7.
accused 70:11.
acknowledged 137:20,
175:21.
acknowledges 73:14,
74:4, 74:12.
acquire 141:24.
acquired 23:22,
126:7, 141:21.
acquitted 107:1.
Act 89:3, 96:18,
101:7, 152:1,
160:16, 160:18,
161:15.
acted 161:21.
action 90:2, 152:1,
153:3, 153:10,
182:15.
actions 77:4,
78:5.
activated 47:3.
activities 17:20,
22:15, 23:15,
23:16, 164:18.
activity 43:1,
118:6, 143:18,
145:15, 146:3,
146:8, 146:14,
146:15, 147:1,
147:6, 149:7,
149:12, 149:15,
150:5, 150:7,
151:10, 152:23,
153:12, 154:9,
162:7, 162:21,
162:24, 163:6,
163:9, 164:10,
173:25, 174:2,
174:4.
actors 168:16.
acts 19:23, 52:4,
105:24, 108:18,

108:19, 168:6,
168:25.
actual 44:12, 52:8,
52:21, 68:12,
86:17, 104:19,
152:1, 159:12,
161:18, 174:18.
Actually 24:5,
41:11, 51:9, 53:1,
55:19, 64:2,
66:12, 69:1,
72:11, 74:14,
79:13, 80:19,
96:8, 109:10,
119:13, 128:11,
128:16, 159:24,
160:16, 164:18,
181:19.
add 134:22, 137:5,
141:9, 166:17,
170:4.
added 25:2, 114:5,
115:8.
adding 25:4, 25:6.
additional 26:12,
26:15, 107:11,
139:3, 139:7,
175:16, 177:6.
address 9:1, 10:17,
10:19, 10:20,
10:22, 99:3,
101:3, 105:1,
134:9, 136:12,
144:22, 152:14,
152:19, 161:12.
addressed 27:20,
99:4, 112:21,
120:25, 121:4,
121:9, 141:14,
169:23, 172:11,
175:23, 176:14,
178:17.
addresses 109:5,
116:3.
addressing 134:15.
adequately 141:18,
141:19.
adhere 116:7.
adjective 162:16.
adjourn 5:16,

183:20.
adjourned 185:4.
admission 51:13,
  73:6, 96:24.
admissions 159:7,
  182:14.
admit 74:5, 93:15,
  94:10, 94:12,
  95:2, 115:10,
  159:10, 161:1.
admitted 66:17,
  69:19, 93:1,
  94:25, 116:24,
  172:12.
admittedly 24:4.
admitting 23:19.
Adopt 157:15,
  157:19, 157:20,
  166:23, 175:14,
  175:18, 175:20,
  176:17.
adopted 96:9,
  176:20.
adopting 157:21.
advanced 16:5.
adverse 96:16.
advertises 164:19.
advice 98:22.
advise 5:12, 63:9,
  128:9.
advised 71:4, 99:19,
  122:6, 154:3.
advisory 97:23.
affairs 70:23,
  77:2.
affect 96:3.
affects 13:12.
affiant 128:18,
  150:8.
affiants 150:19,
  151:13.
affidavits 148:10.
affirm 179:20.
affirmation 49:25.
afford 91:11.
afield 73:4, 73:6.
afraid 35:9.
afternoon 4:24,
  5:14, 46:3, 95:9,
  109:8.

agencies 137:4.
agency 30:23,
  91:1.
Agent 3:9.
ago 11:1, 75:7,
  101:6, 118:22,
  136:21, 147:16.
agree 9:14, 22:1,
  26:1, 41:9, 41:16,
  41:22, 42:1, 42:4,
  42:14, 52:8,
  54:12, 57:11,
  58:21, 59:3,
  59:18, 60:7,
  66:15, 69:13,
  69:15, 74:21,
  75:14, 91:21,
  95:22, 163:14,
  181:12, 183:6.
Agreed 75:2, 127:14,
  150:22, 156:21,
  177:24.
agreement 4:12,
  59:19, 168:15,
  168:22, 169:3.
agreements 169:1.
agrees 9:5,
  123:16.
ahead 101:2, 114:9,
  127:15, 133:20,
  173:14.
air 41:24, 135:9.
al 1:10.
Alan 2:6, 3:24.
alert 32:1, 32:4,
  35:25, 36:2, 36:3,
  36:14, 42:18.
alerted 37:4, 37:20,
  40:4, 41:9, 41:11,
  43:11.
alias 174:9.
allegation 19:9.
allegations 108:9.
allege 147:21,
  167:17, 168:24.
alleged 143:17,
  146:7, 146:9.
allegedly 67:6,
  180:6, 180:7.
alleges 117:10,

168:14.
alleging 105:25,
  131:1.
alley 39:1, 40:20.
allow 82:7, 97:13,
  108:12, 144:9.
allowable 40:13.
allowed 11:10,
  64:9.
allowing 74:25.
allows 57:18.
almost 115:19,
  135:2, 146:12,
  146:19, 146:23,
  163:11, 166:16.
Alone 5:17, 105:2,
  110:24, 112:20.
already 18:5, 19:11,
  41:14, 43:9,
  43:15, 69:8,
  81:15, 93:25,
  96:6, 117:4,
  120:1, 120:25,
  126:3, 126:20,
  141:14, 143:7.
alternative 131:8.
although 102:9,
  136:23, 159:13,
  167:9, 185:6.
amazing 130:13.
ambiguous 23:6.
ambitions 126:16.
amend 112:7.
Amendment 8:25, 9:7,
  43:16, 100:12.
AMERICA 1:5.
ammunition 22:3,
  26:19, 164:25.
among 164:17.
ample 5:10, 164:2,
  165:1, 165:17.
amplify 134:21.
analysis 167:3.
and/or 48:10.
answer 29:24, 67:11,
  89:9, 89:10,
  94:25, 95:5,
  97:25, 182:1.
answers 127:25.
Anybody 41:7, 85:23,

```
 1      86:10, 92:18,            approaching 59:13,      arises 120:17.
        113:7, 120:8,            60:6.                   armed 19:16, 19:18,
 2      135:15, 172:24.          appropriate 74:5,       35:6, 78:23,
        anytime 8:10.            74:18, 93:8,            116:14, 174:23.
 3      anyway 159:21.           100:17, 102:19,         arms 175:3.
        apart 145:25.            155:1, 156:7,           arose 85:11, 101:21,
 4      apologize 113:21,        181:11, 183:6.          101:25.
        121:1, 153:13,           appropriately 98:11,    around 34:16, 41:8,
 5      162:14.                  110:23, 180:17,         41:12, 43:10,
        apparently 7:5,          182:17.                 57:13, 81:23,
 6      54:12, 90:25,            approves 125:16.        82:4, 82:15,
        118:13.                  Approximate 37:11.      82:24, 86:25,
 7      appeal 77:14, 77:16,     approximately 33:25,    153:4.
        77:18.                   34:2, 37:15, 46:3,      arranged 153:23,
 8      appear 137:11.           75:9, 75:10, 76:8,      153:24.
        APPEARANCES 2:1.         80:3, 139:21.           arrangement 104:3.
 9      appeared 137:17.         April 88:13, 111:24,    arrest 6:17, 7:8,
        Appears 17:25,           112:3, 124:14.          11:14, 14:8,
10      38:22, 38:24,            area 21:25, 28:19,      14:18, 14:22,
        39:2, 153:1,             38:10, 40:14,           14:25, 15:20,
11      166:4, 180:24.           40:19, 46:6,            17:1, 18:10,
        appellate 107:15,        46:12, 46:13,           18:14, 20:7,
12      110:19.                  46:15, 52:10,           20:20, 22:7,
        applicability            52:13, 52:23,           37:17, 43:4, 44:9,
13      73:22.                   53:14, 54:5, 78:3,      48:10, 49:23,
        applicable 55:14,        114:20.                 63:18, 63:20,
14      154:25.                  argue 104:18, 109:6,    63:23, 64:2, 64:6,
        application 18:25,       111:2, 114:9,           90:17.
15      21:16, 26:16,            134:5, 135:10,          arrested 10:14,
        47:14, 123:12,           135:20, 158:4,          21:25, 22:13,
16      128:3, 131:13,           167:24.                 23:6, 25:22,
        155:8, 155:18.           argues 144:25,          63:15, 68:9,
17      applied 116:12,          162:22.                 84:25, 85:4,
        144:4.                   arguing 126:14,         85:13, 86:24,
18      apply 74:1, 144:8.       144:23, 144:24,         87:4, 125:18,
        applying 131:16,         149:4, 163:11.          125:24, 174:23,
19      144:3.                   argument 13:14,         180:6.
        appointed 102:11,        89:24, 96:9, 99:3,      arresting 19:24,
20      103:18, 144:20.          99:24, 105:14,          85:1, 85:14.
        Appreciate 22:9,         109:14, 114:4,          arrests 50:18.
21      90:20.                   120:15, 122:4,          arrive 33:25.
        appreciates 178:4.       140:18, 143:13,         arrived 34:3, 37:15,
22      apprehending 33:1,       143:21, 149:9,          86:2.
        33:4.                    154:7, 154:14,          art 163:7, 163:13.
23      apprehension 43:5.       154:16, 154:19,         Article 53:15,
        approach 4:9, 34:19,     161:10, 166:15,         55:11, 57:18,
24      72:17, 80:13,            171:4, 171:19,          57:22, 59:10,
        121:6.                   171:20.                 165:9.
25      approached 47:6,         arguments 90:13.        articulate 107:20.
        125:19, 153:7.           arise 106:15.           aside 147:1,
```

147:17.
Asif 1:46, 2:45,
  92:3, 185:11,
  185:16.
asks 164:24.
aspect 135:24,
  141:14, 145:17,
  179:22.
aspects 16:23,
  98:14, 148:14.
aspirations 126:7.
assertion 147:22,
  148:19, 173:18,
  183:7.
assess 173:19.
assessment 130:18,
  156:5, 165:22.
assigned 45:24.
assist 43:5,
  102:9.
assisting 33:15,
  86:7.
associate 164:24.
associated 22:15,
  146:1, 173:17,
  174:8.
association
  110:21.
assume 149:16,
  154:7.
assumption 14:10,
  14:12, 29:17.
assurance 103:16.
astonishing
  144:25.
ATF 3:10.
attack 143:14,
  143:16, 143:19.
attacking 133:2,
  135:21.
attempt 29:14, 75:8,
  180:16.
attempted 78:22,
  97:25, 117:10,
  124:12.
attempting 43:3,
  57:11, 58:6,
  58:18, 82:15.
attempts 129:3,
  164:16.

attention 33:7,
  46:2, 51:21,
  73:15, 115:6,
  176:4.
Attorney 101:7,
  101:10, 130:9.
attorney-client
  146:1.
attorneys 90:12.
attributed 108:19.
audibly 50:1.
AUSA 1:25, 1:27,
  3:9.
authoritative
  107:19.
authorities 23:8,
  78:13, 129:13,
  142:14.
authority 15:19,
  160:10, 160:22,
  161:15, 161:22.
authorized 86:15.
authorizing 127:4,
  137:14.
automatic 149:8,
  150:2.
automatically
  149:5.
automobile 143:25.
available 165:18.
Avenue 46:22,
  121:15, 125:15,
  128:7, 128:9,
  128:12, 143:11,
  151:3, 179:6,
  179:9.
Award 88:25, 89:1,
  89:2.
awarded 88:23,
  88:24.
aware 14:17, 37:6,
  55:12, 93:18,
  96:1, 109:15,
  117:19, 131:16,
  135:6, 159:11,
  170:13, 177:13.
away 35:1, 50:12,
  64:12, 66:2,
  154:3.
.

.
< B >.
B-o-y-c-e 30:15.
B. 1:33.
background 101:13.
backwards 81:14.
Baltimore 1:20,
  1:49, 2:48, 33:12,
  35:8, 44:5, 45:17,
  47:15, 84:15,
  86:16, 86:22,
  88:3, 93:14,
  93:21.
bank 116:14,
  132:19.
barricade 35:7.
base 131:25.
Based 6:13, 7:23,
  14:10, 17:7, 18:1,
  47:10, 79:20,
  79:23, 119:14,
  140:9, 141:25,
  142:5, 142:23,
  143:2, 145:24,
  147:25, 148:2,
  148:19, 151:20,
  156:2, 160:9,
  162:4, 162:5,
  165:17, 166:6,
  168:13, 168:23,
  171:18, 173:4,
  183:7.
basement 12:1,
  17:12, 21:11.
basic 19:4, 155:19,
  164:9.
basically 25:1,
  110:16, 148:9,
  166:15.
basis 97:9, 145:4.
bathroom 11:24.
became 24:6, 88:13,
  101:16.
become 52:20, 73:9,
  155:18, 170:13.
becomes 41:19.
bedroom 8:13.
Beech 75:22, 78:3.
beef 110:16.
began 76:5.

| | | |
|---|---|---|
| 1 | begin 80:19, 109:12. | 152:4, 164:16, 174:21, 175:4, 175:7. | Boyce 27:18, 28:5, 30:1, 30:8, 30:14, 42:6, 186:11. |
| 2 | beginning 182:20. behalf 3:18, 3:21, 4:6, 105:1, 105:3, 158:3, 158:4, 176:18, 177:20. | Big 92:17, 140:20, 164:19, 164:20. bigger 126:18. Bill 71:10. | Boyer 42:16. BPD 45:23. break 5:9, 185:7. breathe 41:21. Bredar 1:18, 93:12, 96:6, 96:15, 98:6. |

behind 34:10, 34:16, 75:16, 75:24, 75:25, 88:2, 151:2, 153:4, 154:13.
believed 25:3, 90:11, 92:9, 112:2, 128:3, 152:6, 173:17.
believes 126:12.
believing 78:13.
belonged 184:21.
belongings 8:11, 8:13, 11:18, 11:20.
Bench 4:10, 48:23, 48:24, 49:1, 68:18, 68:21, 68:23, 70:1, 72:19, 80:14, 87:13, 87:16, 87:18, 87:21, 88:8, 99:9, 99:10, 155:12.
besides 11:15.
Bess 117:11.
best 6:9, 6:25, 23:6, 84:19, 169:2, 182:13.
better 92:19, 106:9, 129:23, 171:7.
beyond 29:8, 129:24, 141:7, 147:19, 155:10, 179:20.
BGF 14:7, 21:6, 107:24, 109:20, 109:22, 110:2, 110:6, 110:8, 114:18, 114:19, 114:22, 114:23, 116:20, 125:15, 137:24, 147:21, 148:19, 150:21,

binding 150:10.
bit 10:8, 19:17, 31:15, 38:4, 60:16, 61:15, 107:9, 109:18, 114:4, 119:12, 133:20, 142:10, 163:21.
Black 105:25.
Blank 181:20.
blew 81:24.
blip 117:7.
block 7:20, 13:23, 46:21, 46:25, 78:3, 151:1.
blocking 38:25, 40:18, 57:14.
blocks 40:19.
blow 92:10.
blurriness 39:17.
blurry 38:4, 38:17, 38:18, 39:11.
board 72:11, 74:11, 76:17, 77:15.
body 175:3.
boilerplate 123:17, 123:22, 129:5, 136:24, 138:15, 139:13, 140:15, 142:10.
bomb 41:6.
Bond 43:22, 72:15, 100:12.
book 109:20, 110:19.
books 109:18.
bothered 165:11.
bottom 58:11.
boundary 170:25.
box 9:21, 30:4, 44:22, 129:3, 129:11, 132:6.
boxes 129:12.

Bria 140:7.
brief 44:1, 105:1, 122:18, 148:22, 152:22.
briefed 35:4.
briefing 177:11.
briefly 72:13, 102:21, 152:14.
bring 43:13, 115:5, 118:7, 176:4.
bringing 106:1.
broad 43:1, 131:1, 169:2.
broader 8:24, 9:8, 22:19, 23:15, 131:15, 138:8, 139:10, 141:17, 149:23.
brought 73:15, 80:23, 89:13, 103:16, 111:4.
Brown 1:35, 3:6, 3:18, 109:11, 140:6, 174:21, 174:24, 184:2.
Bruton 106:15, 109:15.
build 22:2.
building 58:3, 91:3.
buildings 75:16, 75:25.
bump 140:24.
bunch 54:20.
burden 8:1, 15:16, 136:25, 141:8.
Butterharm 77:4.
buy 124:12, 124:21, 130:23, 132:5, 132:6.

```
 1   buys 124:9, 124:18,     Carter 13:11.           140:16, 142:20.
       124:20, 125:1,        carved 177:22.        chambers 99:20.
 2     127:7, 128:15,        case-specific         chance 100:7,
       128:21, 129:1,          138:16, 139:12,       118:7.
 3     129:8, 129:9,           140:14, 142:20.     change 90:5,
       129:15, 131:2,        cases 28:22, 41:14,     90:16.
 4     136:7, 139:2,           84:24, 92:14,       changed 130:13.
       139:3, 142:6.           110:16, 115:25,     character 73:3.
 5   buzz 36:12.               118:12, 124:2,      characterized 145:8,
     .                         130:23, 130:25,       182:18.
 6                             132:9, 136:19,      charge 55:6, 55:9,
     < C >.                    144:2, 147:16,        55:10, 56:2,
 7   C. 2:14, 179:3.           152:22.               72:13, 78:1,
     caliber 164:25.         Cash 163:12, 165:4,     78:18, 94:15,
 8   call 3:3, 3:4, 7:15,      165:16, 165:24,       95:4, 112:13,
       17:3, 30:1, 43:21,      166:1.                115:16, 115:22,
 9     64:9, 66:6, 69:14,    cast 92:16.             116:13, 118:5,
       101:7, 127:10,        catch 119:25.           118:9, 119:11,
10     130:2, 130:3,         category 169:4.         119:21, 126:3,
       132:22, 132:23,       causes 142:18.          167:25, 168:2,
11     133:24, 134:11,       caution 167:9.          170:25.
       146:9, 147:19,        caveat 170:4.         charged 59:18,
12     148:16, 150:21,       CCTV 140:17.            93:13, 110:5,
       152:4.                CDF 170:9.              110:7, 117:13,
13   called 9:25, 30:9,      CDS 31:24, 32:11,       169:4, 169:25,
       35:7, 44:18,            33:20.                170:11, 170:15,
14     47:13, 127:10,        cell 21:23, 21:24,      170:19.
       127:20.                 22:6, 157:2,        charges 94:22, 96:4,
15   calling 43:24, 64:8,      164:22, 184:15.       105:17, 105:18,
       134:25.               center 38:19.           105:19, 105:21,
16   camera 76:7, 91:3,      centerpiece 67:16.      112:7, 115:12,
       182:19.               certain 71:16,          115:13, 118:7,
17   cameras 71:25,            103:16, 117:5,        167:18.
       75:15, 75:21,           149:10, 154:24.     charging 67:13,
18     76:2, 140:17.         Certainly 17:16,        156:16.
     camped 7:21.              73:25, 100:5,       chart 183:24.
19   candor 90:20,             136:14, 146:14,     chase 89:25,
       90:21.                  148:18, 155:25.       128:10.
20   capacity 128:11,        certifications       Check 47:12, 55:14,
       176:3.                  32:11.                57:22, 57:23,
21   career 50:19.           certified 31:24,        57:24, 129:2,
     careful 120:4,            33:5, 80:21.          132:5.
22     128:13, 132:24,       certify 185:11.       checked 129:11.
       132:25, 133:15,       cetera 158:24.        checking 129:11.
23     140:11, 152:16.       chain 19:1, 124:1,    Cherry 46:12, 46:15,
     carjacking. 78:23.        126:17.               92:18.
24   carried 15:16.          challenge 5:25,       Cherryland 46:21,
     carries 109:25,           16:23, 26:24,         46:25, 47:3,
25     118:9.                  27:15, 110:15.        62:18.
     carry 8:1, 58:2.        challenges 6:7,       Chesapeake 102:24.
```

Chevy 153:25.
chief 169:24, 180:1,
  180:17, 181:10,
  182:3, 182:6,
  182:22, 183:5,
  183:9, 184:8.
children 50:12,
  69:22.
choose 53:22,
  102:10, 172:13.
chose 55:17.
Christina 1:27,
  3:9.
Christine 1:46,
  2:45, 185:11,
  185:16.
Christopher 1:39,
  3:17, 109:19.
Christy 3:10.
circle 38:10.
Circuit 6:15, 93:14,
  93:21, 106:18,
  116:2, 123:7,
  131:24, 145:1,
  145:3, 150:10,
  152:16, 161:4,
  167:25.
circumstance 26:18,
  74:12, 106:21,
  107:15, 118:4,
  155:1, 171:13.
circumstances 18:21,
  23:5, 24:1, 77:8,
  78:8, 97:5,
  129:19, 142:13,
  154:21, 165:12,
  173:9.
citation 55:19,
  83:13.
cite 50:23, 132:22,
  147:19.
cited 50:25, 83:9,
  90:5, 90:11,
  148:21.
City 33:12, 35:8,
  44:5, 48:6, 85:21,
  93:14, 93:21.
claim 9:2, 176:3.
claimed 28:19.
clarification

111:9.
clarify 50:1,
  111:15, 134:7.
clarifying 133:22.
Clark 20:15.
Class 30:15, 31:4.
cleaned 26:1.
clear 90:15, 104:2,
  104:3, 104:4,
  135:9, 150:6,
  168:14, 168:17,
  174:6, 175:6.
cleared 122:16,
  177:3.
clearly 7:8, 49:9,
  50:10, 59:14,
  59:23, 70:6, 83:6,
  92:11, 110:24,
  126:2, 132:13,
  165:18.
CLERK 9:22, 10:3,
  28:14, 30:5, 30:6,
  30:12, 30:16,
  44:15, 44:16,
  44:21, 44:24,
  45:4, 100:19,
  160:6.
clever 137:8.
client 5:2, 5:17,
  27:6, 98:8,
  100:15, 107:3,
  109:3, 112:20,
  115:13, 118:23,
  133:23, 135:10,
  167:11, 174:12.
clients 110:1.
Clinton 76:24.
clip 75:25.
clips 75:24.
close 155:3.
closer 10:8, 26:6.
closest 76:6.
Clothes 11:22,
  11:25.
clothing 17:12,
  110:16.
club 110:13.
clues 165:19,
  165:24, 166:2.
co-affiants

151:19.
co-conspirator
  159:7, 159:10,
  159:20.
co-conspirators
  19:22, 159:15.
co-defendants
  174:21.
co-owner 85:5, 85:7,
  85:14, 85:15,
  85:18.
co-resident
  150:24.
cocaine 156:17,
  156:19.
Code 77:6, 78:7,
  83:6, 83:19,
  92:12.
colleagues 20:9.
collect 100:20.
collecting 91:3.
combination
  174:17.
combined 145:5.
comes 23:18, 86:25,
  109:16, 110:15,
  113:4, 117:4,
  118:18, 140:19,
  153:6, 155:11.
comfort 185:7.
comfortably 59:8.
Coming 12:13, 31:2,
  31:23, 46:25,
  47:1, 56:14,
  62:15, 64:11,
  66:1, 76:9, 81:7,
  81:12, 81:17,
  102:16, 112:9,
  119:4, 153:4,
  159:20, 171:15,
  182:2.
Commander 88:25,
  89:2, 89:3,
  125:15.
commands 34:21.
commendation
  88:24.
commendations
  88:18.
comment 99:25.

commercial 75:15.
commit 78:22.
committed 13:24,
    16:12, 68:4,
    78:22, 82:12,
    94:11, 95:2,
    117:13, 117:16,
    117:20.
committing 78:21,
    174:23.
common 114:14,
    116:12, 117:18,
    140:24, 142:12,
    151:21.
commonly 163:24.
communicate
    163:25.
communication
    158:15.
Communications
    158:22, 158:23,
    159:12, 160:16,
    160:18, 161:15.
community 129:20.
Comodore 125:18,
    125:19.
competitive 148:3.
complaint 61:14.
complete 49:11,
    61:10, 61:25,
    80:10, 81:9,
    81:14, 81:18,
    123:10.
completed 49:19,
    84:2, 99:1.
completely 17:23,
    73:3, 118:25,
    164:1.
complex 136:19,
    141:11, 142:18,
    169:1.
complexity 142:14.
complicated 135:5.
complying 85:20,
    88:7.
component 31:11,
    136:15.
concede 126:8,
    143:22.
conceded 16:9.

conceivable 17:23.
conceptually
    169:2.
concern 130:8,
    177:14.
concerned 19:14,
    100:12, 139:7,
    143:8, 178:6.
concerning 77:4,
    78:5, 101:8.
concerns 95:13,
    109:6.
conclude 5:18,
    23:24, 73:11,
    142:3, 142:18,
    145:11, 155:13,
    166:7.
concluded. 185:9.
concludes 26:11,
    90:2, 90:3.
conclusion 77:23,
    91:4, 103:14,
    142:22, 144:5,
    156:1, 164:5.
conclusions
    142:24.
conclusory 148:10.
concrete 164:12.
condition 7:4,
    102:3.
conduct 14:5, 18:16,
    35:16, 48:17,
    92:13, 140:21,
    153:1, 170:18,
    170:22.
conducted 24:3,
    47:4, 48:15,
    108:12, 152:8.
conducting 91:2,
    147:25.
conducts 125:17.
conference 4:10,
    65:13, 72:19,
    80:14, 99:10.
confession 73:18.
confident 102:23.
Confidential 123:25,
    125:12, 125:13,
    127:9, 127:12,
    131:4, 137:19,

137:21, 137:23,
    138:12, 138:14,
    138:20.
confidentiality
    138:3.
confine 183:3.
confirmed 47:19.
conflict 101:23,
    101:24, 101:25,
    102:6, 155:6.
conform 157:20.
confront 109:12.
confrontation
    18:5.
confronting 21:10.
Congress 110:20,
    161:17.
connect 158:22.
connected 7:6, 7:7,
    117:17.
connection 7:25,
    14:4, 16:8, 17:15,
    117:12, 118:5,
    153:11, 154:10,
    154:14.
connections 17:21.
Connor 33:3.
consent 85:2, 85:5,
    85:9, 85:15,
    86:17, 87:10.
consequence 18:21,
    102:7, 155:22.
consequently
    135:5.
consider 107:20,
    131:15, 137:12.
considered 110:23.
considering 128:3,
    131:12, 137:6.
consistent 21:13,
    54:23, 80:12,
    81:22, 82:3.
consistently
    145:3.
consists 146:8.
consolidated 158:3,
    178:16, 183:12.
conspiracies 109:1,
    167:18, 168:14,
    168:21.

conspiracy 110:10,
  114:7, 117:14,
  117:17, 117:19,
  117:20, 131:1,
  140:20, 159:11,
  159:14, 159:16,
  168:1, 168:2,
  168:4, 168:17,
  168:20, 168:25,
  170:1, 170:11.
conspirator 168:3.
conspiring 116:21.
constitutional
  29:20, 135:11.
constitutionally
  96:18.
Cont'd 2:1.
contact 78:23.
contacted 47:7,
  127:19.
contain 173:25.
contained 173:23.
containing 154:23.
contains 164:12.
contend 120:19,
  159:19.
contending 114:14.
contention 18:4,
  18:20.
contest 19:8, 25:15,
  25:23.
context 22:19, 23:2,
  42:23, 102:11,
  118:24, 119:10,
  131:15, 134:16,
  135:24, 142:7,
  177:10.
contextual 148:18,
  165:19, 165:24,
  166:2.
Continue 16:2,
  27:11, 75:6,
  80:24, 81:3,
  138:7, 174:15.
continued 80:11,
  81:15, 81:17,
  91:25.
continuing 26:14,
  100:13.
contours 126:12,

141:17.
contraband 152:7.
contradict 91:21.
contradicts 91:10.
control 59:12.
controlled 43:7,
  124:9, 125:1,
  128:15, 130:23,
  136:7, 137:25,
  142:6.
controversy 97:22.
controverted 72:1.
conventions 163:8.
conversation 146:11,
  146:18, 146:25.
conversations 19:22,
  22:24, 132:20,
  133:18, 133:19,
  134:13, 134:24,
  174:3.
convict 126:20.
convicted 106:23.
conviction 96:24,
  98:3, 111:10.
convictions 107:8,
  107:9, 111:5,
  111:9, 111:11,
  113:8, 118:24,
  119:2, 126:10,
  129:18, 172:12.
cooperate 125:20,
  180:13.
cooperating
  125:19.
Cop 47:14, 47:18.
Copperthite 161:19,
  161:20, 161:21,
  166:6.
copy 55:19.
corner 57:13, 81:23,
  82:4, 82:15,
  82:24, 86:25,
  127:21.
corners 131:14,
  138:9.
Cornish 109:19.
Corporal 77:3,
  78:5.
corrected 183:25.
correctly 133:6.

Coulson 173:19.
Counsel 3:9, 3:12,
  5:12, 51:14,
  72:25, 80:13,
  91:15, 93:1, 99:9,
  100:2, 100:13,
  102:8, 102:11,
  102:17, 185:7.
Count 110:9, 114:4,
  114:5, 114:6,
  114:8, 114:13,
  116:14, 116:16,
  116:17, 156:14,
  156:15, 167:15,
  168:7.
counter 140:22.
counts 106:2, 114:6,
  116:17, 168:8.
County 45:11, 45:16,
  70:11, 75:23,
  76:17, 77:6, 78:7,
  78:19, 78:20,
  88:10, 88:19,
  89:6.
couple 4:15, 70:12,
  127:7, 162:4.
coupled 22:23.
course 22:24, 63:11,
  73:14, 96:21,
  128:21, 131:13,
  148:9.
court. 5:21, 75:5,
  104:7.
courthouse 145:16.
courtroom 65:21,
  80:23, 92:18,
  93:12, 162:15.
Courts 107:15,
  110:19, 115:21,
  115:25, 137:1.
cover 17:2.
covered 111:12.
covers 111:9,
  112:12.
crack 156:17,
  156:19.
crash 72:5.
created 163:2.
credibility 91:10,
  92:20, 92:21.

credible 17:8.
creep 57:18.
crime 46:6, 46:13,
    46:15, 52:13,
    68:12, 94:12,
    117:16, 117:20,
    131:22, 148:3,
    148:25.
crimes 46:8, 126:10,
    164:15.
Criminal 1:9, 3:5,
    20:6, 33:1, 43:1,
    92:14, 101:7,
    110:23, 111:1,
    126:13, 128:18,
    139:5, 139:9,
    143:18, 146:7,
    146:14, 149:7,
    149:15, 150:5,
    162:24, 164:9,
    168:1, 168:2,
    173:25, 174:2,
    174:3.
criminals 140:22.
crops 141:1.
Cross-examination
    9:10, 12:16,
    12:17, 36:24,
    37:1, 51:5, 79:25,
    88:11, 186:9,
    186:15.
cross-examine
    73:5.
cross-examined
    74:8.
crossing 175:3.
crosswalk 59:24,
    59:25, 60:3.
crucial 148:24.
crude 131:18.
crystal 104:2.
CSI 130:1, 130:2.
culpability
    110:23.
curious 58:3.
currently 88:14.
curtilage 28:3,
    28:7, 28:19, 29:5,
    29:6, 29:13,
    40:11, 40:13,

40:16, 40:21,
    43:3, 43:14.
custodial 179:15.
custody 19:13,
    21:13, 35:13,
    35:15, 37:9, 48:2,
    133:4, 185:3.
custom 6:14.
customers 164:1.
customers. 128:19.
cut 19:1, 25:1,
    89:25.
.
.
< D >.
daily 125:17.
dangerous 23:8,
    35:6.
data 148:12.
date 11:1, 77:22,
    123:20, 150:20,
    170:10.
dating 170:10.
David 101:10.
DAVIS 1:39, 3:16,
    3:17, 157:15,
    157:20, 158:3,
    176:8, 176:9,
    178:11, 178:12,
    184:4, 184:10,
    184:12.
Davon 78:5.
day 3:10, 5:18,
    11:15, 19:20,
    39:15, 47:22,
    55:8, 66:21,
    66:22, 66:25,
    67:8, 72:4, 78:6,
    81:11, 93:15,
    124:16, 124:22,
    146:22, 147:14,
    164:8, 174:22.
days 25:24, 113:1.
deadline 98:15,
    177:8.
deal 127:13, 127:19,
    128:19, 137:20,
    146:5, 175:18.
dealer 125:23,
    147:2, 151:25.

dealers 125:21.
dealing 5:23, 6:16,
    16:10, 20:11,
    23:3, 97:15.
deals 74:7.
dealt 71:1.
decade 105:24.
December 45:13,
    71:1, 75:8,
    122:14.
deceptive 155:7.
decide 98:17,
    148:12, 160:1.
decided 111:19,
    113:9, 127:15,
    139:2, 142:22.
decides 70:20.
deciding 14:1.
decision 77:14,
    109:10, 148:11,
    150:10.
declined 136:17,
    182:1.
defendants 140:11,
    158:4, 171:12,
    172:12, 175:14,
    175:15.
Defense 9:18, 37:25,
    38:12, 62:16,
    89:14, 90:12,
    94:1, 104:17,
    104:19, 105:20,
    116:10, 122:19.
deference 142:17,
    155:14.
definitely 116:22.
degree 17:14,
    144:19.
deliver 49:21,
    127:14.
demonstrate 138:23,
    158:23, 164:14,
    165:14.
demonstrated
    21:17.
demonstrating
    175:6.
demonstration
    136:6.
deny 122:2, 142:23,

```
 1    157:4, 176:2,
      181:11, 182:23,
 2    183:6.
      denying 110:12,
 3    157:6, 182:7,
      184:10.
 4    Department 45:11,
      45:17, 45:18,
 5    47:15, 70:11,
      70:12, 70:20,
 6    70:22, 73:10,
      77:7, 78:8, 84:15,
 7    86:16, 88:3,
      88:11, 88:20.
 8    departmental 48:9,
      48:17.
 9    dependant 92:14.
      depends 16:24,
10    176:12.
      depict 39:10.
11    depicted 175:3.
      depicts 174:11.
12    deprive 148:11.
      describe 31:7,
13    32:24, 107:15,
      132:1, 151:14,
14    151:19, 173:23.
      described 31:11,
15    68:22, 171:12,
      174:9.
16    describes 150:11,
      170:17.
17    describing 129:21.
      description 39:12,
18    52:23.
      Despite 138:21,
19    161:16.
      detailed 148:15,
20    152:22.
      details 92:21,
21    141:16, 179:11.
      detected 18:23.
22    detection 17:18,
      31:24, 32:11,
23    33:20.
      Detectives 150:23,
24    151:18, 152:6,
      154:11, 179:7.
25    detects 32:1.
      determination
```

```
139:12, 142:17,
148:2, 155:15,
171:11.
determine 162:19.
determined 47:24,
48:1, 173:24.
determining
148:23.
devastating
116:10.
develop 14:13.
developing 99:17.
device 59:12.
difference 41:17,
42:17, 70:21,
106:20.
difficult 58:23,
59:5, 105:14,
106:6, 107:24,
142:8.
difficulties 101:21,
132:2, 136:25,
140:19, 142:20.
Digga 174:9,
174:25.
Digga.mccants
173:17, 174:17.
dilemma 95:5.
dilutes 14:5.
dimes 164:19.
dinged 141:2.
Direct 10:12, 30:19,
33:7, 45:6, 46:2,
56:20, 60:25,
61:6, 61:12, 62:2,
62:3, 79:24,
80:16, 81:4,
86:21, 87:13,
91:22, 152:23,
164:21, 186:7,
186:13, 186:19.
directed 33:11,
59:11, 98:11,
98:19, 102:8,
142:25, 166:25.
Directing 51:21.
direction 57:3,
58:10, 58:22,
59:4, 60:8, 62:8,
62:15, 62:17,
```

```
76:15.
directly 91:9,
91:10, 107:12,
150:6, 151:2,
151:8, 151:10,
159:12.
disagree 79:12.
disappear 38:15.
disavowing 153:10.
discern 62:12.
disciplinary
76:16.
disclaimed 97:17.
disclose 171:7.
disclosed 18:24,
24:1, 142:14.
disclosure 169:16,
169:21, 172:1,
172:9, 172:24.
discount 140:25.
discovered 19:3,
44:8, 63:6, 63:8,
63:21.
discovery 23:17,
51:15, 94:21,
114:23, 170:1,
178:25, 181:16,
181:17.
discrete 126:11,
177:12.
discretion 63:24,
155:16.
discuss 136:17,
140:11.
discussed 24:16,
94:1, 104:22,
143:7, 150:12,
152:5.
discussing 16:11.
discussion 118:21,
130:7, 133:11.
discussions
102:24.
dishonest 155:6.
disingenuous
93:19.
dismiss 156:14,
167:15, 168:13.
disparate 106:17.
dispatch 47:20.
```

disposition 94:22.
dispositive 91:8.
dispute 7:12, 74:19,
    174:11, 174:13,
    182:19.
disrepair 54:12.
distinguish
    149:21.
distribute 116:21,
    156:17.
distributing 12:22,
    13:9.
distribution
    13:12.
District 1:1, 1:2,
    46:1, 46:4, 46:9,
    46:11, 88:25,
    89:2, 136:23,
    180:6.
divided 103:23.
division 77:2.
Docket 113:16,
    113:17, 113:22,
    113:25, 121:16,
    122:11, 156:9,
    156:25, 157:8,
    157:11, 157:12,
    167:14, 169:8,
    169:14, 172:7,
    172:8, 173:3,
    177:6, 177:7.
doctrine 23:18.
document 4:16,
    49:16, 51:14,
    74:14, 84:14,
    84:22.
documentaries
    163:2.
documents 5:11,
    99:21, 180:24.
dog 31:13, 31:17,
    31:20, 32:19,
    34:12, 36:9, 37:4,
    37:20, 40:4,
    40:13, 40:24,
    41:4, 41:8, 41:11,
    41:13, 41:21,
    41:23, 42:2, 42:3,
    42:9, 42:22, 43:5,
    43:6, 43:9, 43:11,

43:13.
doing 25:4, 58:24,
    67:24, 67:25,
    68:2, 68:19,
    74:10, 98:7,
    124:9, 124:15,
    145:12.
done 4:19, 24:11,
    43:16, 62:19,
    105:22, 106:4,
    123:20, 127:6,
    129:4, 131:9,
    132:8, 137:15,
    137:21, 138:11,
    138:17, 139:22,
    140:1, 166:21.
door 36:16, 151:5,
    153:5, 154:6.
Dorsey 7:16, 7:17,
    114:16, 114:17,
    114:22, 114:23,
    166:20.
doubt 93:22,
    129:24.
down 15:8, 16:20,
    23:19, 32:8, 35:5,
    39:23, 42:2,
    46:25, 47:1,
    58:11, 58:23,
    59:4, 64:11,
    75:22, 80:4,
    81:16, 89:17,
    90:15, 105:23,
    109:16, 109:22,
    128:10, 128:11,
    170:23, 178:7.
downstairs 11:25.
draw 143:17,
    147:23.
drawn 170:19.
Drive 6:18, 7:25,
    10:15, 13:19,
    18:7, 18:8, 20:3,
    21:8, 25:3, 33:12,
    33:22, 34:1, 38:6,
    76:24, 154:3.
driven 44:4, 84:25,
    85:13, 151:2.
Driver 36:16, 47:7,
    47:9, 48:10, 49:8,

53:4, 55:22,
    59:12, 59:24,
    60:4, 60:5, 63:1,
    63:6, 63:20,
    82:15, 84:25,
    85:2, 85:4, 85:13,
    85:15.
drivers 86:15.
driveway 13:18,
    28:25, 29:3, 38:8,
    38:21, 39:3, 39:5,
    39:7, 39:8, 39:13,
    40:19, 40:20,
    43:11.
driving 44:5, 44:8,
    47:19, 47:24,
    48:1, 51:1, 52:12,
    63:21, 68:8, 72:6,
    86:22, 94:14,
    153:2, 154:13.
drop 143:22.
drove 47:1.
drug-dealing 14:6.
drug-related
    145:6.
drugs 16:11, 32:1,
    37:3, 37:5, 42:4,
    42:18, 42:19,
    43:2, 46:8,
    124:23, 125:22,
    127:13, 127:15,
    150:9, 151:22,
    162:25, 164:19.
dryer 12:1.
dual 31:8.
ducking 15:20.
Due 87:9, 88:1,
    89:13.
duly 9:25, 30:9,
    44:18.
dunk 105:9.
Dunn 28:11, 40:22.
During 4:22, 5:14,
    18:23, 20:25,
    21:19, 23:23,
    24:4, 24:7, 48:21,
    52:16, 63:11,
    65:11, 65:13,
    73:1, 75:18,
    95:14, 107:10,

121:19, 150:22,
171:3, 181:10.
duties 31:7,
31:12.
duty 33:9.
DWI 84:24.
.
.
< E >.
earlier 22:17,
162:8, 166:24,
167:3.
early 14:18, 33:7,
108:13.
earpiece 100:19,
100:20.
earpieces 100:21.
easily 136:18.
East 7:20.
Eastern 180:6.
easy 105:12,
133:12.
ECF 104:12, 104:13,
104:14, 158:6,
166:10, 167:5,
178:16.
echo 110:11.
edge 29:11.
Edges 8:9, 10:24,
11:6, 11:11,
12:19, 13:9,
13:24, 14:2, 14:6,
14:25.
editorialize
130:3.
effect 7:16, 96:11,
96:17, 97:1,
112:6, 130:1,
130:2.
effectively 103:21,
123:22, 142:22,
173:10.
efficient 125:5.
effort 124:25,
127:5.
efforts 132:16,
137:25, 138:13,
138:22, 142:5,
178:4.
egregious 70:21.

eight 24:24.
either 15:1, 27:4,
115:9, 116:23,
159:2.
elaborate 183:24.
electronic 123:7,
123:11, 123:23.
element 4:16,
118:10, 118:16,
118:17, 148:24.
elements 110:22,
167:17, 168:25,
169:9.
Elkton 174:24.
elsewhere 138:10.
emergency 47:3,
81:19.
emerges 170:13.
employed 45:10,
141:24.
empower 130:19.
enacted 110:14.
encloses 28:24,
29:3.
encompass 16:17.
encountered 132:2.
end 4:23, 38:25,
59:24, 60:6,
125:16, 165:5,
170:10, 178:3.
ended 67:13.
Enforcement 19:14,
20:11, 22:18,
26:13, 30:23,
71:10, 137:4.
engage 78:19.
engaged 78:24,
155:5.
enough 5:19, 21:22,
22:2, 24:23,
29:23, 51:25,
69:4, 106:18,
125:2, 126:3,
126:15, 126:23,
128:4, 138:22,
166:19.
ensure 100:19.
enter 135:14,
142:15, 151:5,
152:9.

entered 18:15,
154:6.
entering 59:24,
60:4, 97:24.
enterprise 20:6,
110:7, 110:22,
128:23, 128:24,
129:8, 148:3.
entertainer 163:5,
165:18.
entertainment
165:25.
entire 28:24, 46:9,
73:16, 105:22,
106:1, 137:13,
168:8.
entirely 20:8,
91:21.
entirety 68:11.
entitled 9:8, 74:22,
120:20, 130:12,
166:6.
entry 18:21,
18:22.
environment 142:9.
equivalent 96:11,
136:2.
era 131:17.
escape 20:14,
21:9.
especially 93:14,
106:11, 130:25.
Esquire 1:31, 1:33,
1:37, 1:39, 1:43,
2:6, 2:10, 2:14.
essential 118:10.
essentially 25:4,
75:1, 109:24,
129:19, 171:19,
178:23.
Essex 99:20,
101:8.
establish 104:19.
established
149:25.
et 1:10, 158:23.
evade 17:18.
evaluate 148:4,
148:5, 148:12.
evaluated 110:18.

evaluating 137:13.
evaluation 142:12.
evaporates 116:7.
evasive 153:3,
    153:10.
evening 22:17,
    22:25, 23:15,
    71:6.
event 52:5, 58:19,
    76:22.
events 20:10, 71:5,
    78:12.
Eventually 21:12,
    35:11, 35:12.
everybody 100:20,
    105:3, 106:11,
    133:21, 135:13.
Everyone 100:21,
    108:14, 123:16,
    165:18.
Everything 12:9,
    33:2, 93:4,
    155:12, 185:2.
evidence. 150:1.
evidently 71:17.
evolution 130:18.
evolve 112:7.
evolved 163:10.
ex-felon 116:1.
exact 37:9, 61:18.
exactitude 92:16.
Exactly 19:5, 25:9,
    39:11, 60:21,
    63:12, 81:10,
    103:17, 104:3,
    106:7, 110:15,
    110:20, 128:17,
    130:18, 130:21,
    138:24, 144:23,
    147:13, 152:16,
    153:14, 159:22,
    167:4.
Examination 10:12,
    30:19, 45:6,
    56:20, 60:25,
    62:3, 79:5, 79:24,
    80:25, 81:5,
    86:21, 87:13,
    91:22, 186:7,
    186:13, 186:19,

186:21.
examined 9:25, 30:9,
    44:18.
example 42:1,
    124:11, 125:11,
    128:14, 140:13,
    145:21, 148:6,
    150:18, 152:24.
examples 88:22,
    164:13.
excellent 165:6.
except 92:18, 95:25,
    104:24, 104:25,
    177:21.
exchanging 152:5.
excise 20:22,
    163:23, 164:1.
excised 23:21.
exclude 96:24.
exclusive 5:2.
exclusively
    150:15.
Excuse 61:20,
    120:23.
excused 185:7.
executed 121:15,
    139:20, 157:2,
    166:18.
execution 6:2.
exercise 131:16.
exhaust 128:25,
    129:2, 136:5.
exhausted 131:7,
    132:12, 140:2.
exhausting 127:22,
    134:17.
exhaustion 124:25,
    127:17, 136:18,
    136:24, 137:2,
    141:12.
Exhibit 34:6, 37:25,
    38:12, 49:13,
    51:12, 54:3,
    55:18, 62:17,
    79:8, 84:1, 84:13,
    153:17, 153:18.
exigency 41:4.
exist 120:14.
existent 134:3.
exit 151:4.

expect 115:1,
    155:5.
expectation 6:19,
    8:2, 13:12, 15:21,
    17:4, 133:24,
    135:2, 135:11.
expectations 58:3,
    135:22.
experience 88:1,
    98:22, 107:3,
    128:18, 129:14,
    129:18, 147:10,
    147:14, 151:14,
    151:17, 151:19,
    151:21, 162:9.
expertise 144:19,
    162:5, 164:4.
Explain 75:8, 101:5,
    147:13, 150:19,
    152:8, 162:8.
explained 6:9, 7:21,
    19:13, 102:23,
    136:23, 138:1,
    139:4, 141:8,
    141:19, 151:20,
    176:21.
explains 126:5,
    150:8.
explanation 166:24,
    167:1, 175:12.
explicitly 175:8.
explode 41:6.
explored 126:11.
exploring 77:18,
    77:21.
expressed 161:18.
extended 5:8,
    108:21.
extending 118:18.
extensive 142:5,
    146:3, 146:5,
    146:15, 151:20.
extensively 35:4.
extent 7:13, 13:8,
    14:3, 18:23, 19:8,
    44:12, 128:7,
    135:20, 149:12,
    170:10, 175:19,
    175:22, 179:12,
    181:4.

```
 1   extract 73:18.
     extraordinarily
 2     123:8.
     extraordinary 89:3,
 3     126:9.
     extreme 108:24.
 4   extremely 39:11.
     extrinsic 73:5,
 5     73:21, 74:2.
     .
 6   .
     < F >.
 7   F-e-n-n-e-r 181:1.
     F. 1:31.
 8   F.3d 167:24.
     face 9:22, 10:8,
 9     30:5, 44:15,
       98:19, 102:20.
10   Facebook 164:14,
       173:16, 174:20,
11     174:25, 175:2.
     facing 34:11, 118:5,
12     119:21.
     fact-specific
13     139:12.
     fact. 77:9.
14   factor 135:5,
       136:13.
15   factors 20:7, 28:15,
       40:22.
16   facts 16:24, 24:24,
       70:13, 70:15,
17     70:22, 73:8,
       73:14, 77:3, 78:5,
18     89:13, 91:6,
       93:22, 94:8, 94:9,
19     94:24, 125:6,
       132:1, 137:7,
20     147:22, 148:2,
       148:5, 148:6,
21     149:10, 149:22,
       150:3, 158:10,
22     162:12, 162:18.
     facts. 78:10.
23   factual 122:16,
       122:19, 123:23,
24     124:19, 132:11,
       134:10, 142:18,
25     151:12, 173:9,
       182:19.
```

```
factually 67:6,
  134:23.
fail 46:22, 53:5,
  55:22, 55:24,
  56:3, 60:23,
  81:6.
failed 44:6, 53:23,
  61:7, 62:12,
  83:14, 138:20.
fails 167:17.
failure 50:25, 83:9,
  83:10, 83:19,
  136:5, 143:17,
  172:1.
Fair 5:19, 29:23,
  74:17, 75:3.
fairly 89:5, 89:11,
  174:6.
Faison 96:7, 99:6,
  104:12, 111:16,
  112:12, 112:21,
  113:9, 119:25,
  120:6, 120:9,
  120:21, 120:23,
  157:1, 157:4.
fall 88:1.
falls 53:24,
  109:4.
false 70:12, 70:17,
  70:21, 77:8,
  78:9.
familiar 10:17,
  10:19, 42:9,
  47:21.
Family 64:8,
  106:1.
Family. 179:4.
fancy 94:23.
far 14:12, 19:12,
  57:19, 59:16,
  73:4, 91:2, 98:15,
  100:1, 105:11,
  128:2, 132:15,
  135:6, 138:13,
  141:7, 142:1,
  143:8, 147:2,
  169:2, 172:23,
  174:18.
far-flung 128:23,
  128:24, 129:8,
```

```
  141:11.
farther 73:6.
faster 75:17.
father 64:9,
  64:11.
favor 44:24, 96:15,
  98:10.
favorable 161:2.
FBI 7:18, 7:21,
  19:21.
FCRR 1:46, 2:45,
  185:11.
fear 19:18.
feared 138:4.
feasible 142:7.
February 14:18,
  77:20.
Federal 1:47, 2:46,
  14:18, 21:4,
  33:16, 96:12,
  123:15, 136:16,
  166:11, 167:2,
  169:17, 172:10.
Feel 89:5, 89:11,
  119:7.
feeling 59:8.
feet 9:22, 39:3.
fellow 174:20.
felon 114:5, 115:8,
  115:9, 115:10,
  115:15, 116:13,
  116:16, 116:18,
  116:19, 116:24,
  117:5, 118:7,
  119:10, 119:20,
  146:21.
Fenner 181:1.
few 68:20, 105:11,
  137:10, 180:25.
fiction 93:11.
Fifth 8:25, 9:7,
  9:12.
fighting 98:8.
figure 107:19.
file 73:7, 73:8,
  73:16, 96:23,
  112:19, 175:15,
  177:5, 179:20,
  184:14.
filed 99:5, 111:16,
```

111:21, 113:11, 156:14, 167:8, 175:14, 178:15, 178:17, 184:19.

filing 100:6, 100:8.

final 5:11, 80:21, 182:10.

finally 104:14.

find 15:19, 17:6, 22:2, 22:10, 22:25, 23:8, 24:7, 26:14, 29:21, 37:3, 42:22, 43:8, 43:15, 47:17, 68:12, 68:21, 86:24, 96:20, 98:5, 98:10, 128:16, 133:7, 135:22, 145:19, 152:17, 153:13, 161:16, 165:13, 166:22.

finder 74:23.

finding 9:11, 14:12, 73:12, 73:15, 74:15, 74:20, 77:9, 77:20.

findings 72:9, 73:20, 74:4, 76:19.

finds 150:8, 184:25.

fine 5:19, 21:15, 86:25, 105:4, 133:20, 171:7, 172:5.

finger 80:6.

finish 133:22.

finished 143:7.

firearm 43:22, 49:1, 49:4, 95:19, 116:13, 117:12, 146:21.

firearms 13:17, 13:22, 16:12.

five 31:13, 31:17, 71:25, 75:15, 75:21, 88:14, 105:23, 140:5,

168:6, 178:23, 183:11.

fled 33:24, 34:19, 72:4.

fleeing 14:8, 17:1, 20:7, 76:14.

Flex 45:25.

flip 5:16, 84:21.

Floor 1:48, 2:47, 20:13, 34:20.

flop 7:1.

Florida 42:7, 43:12.

flowing 107:12, 182:5.

flung 128:2, 169:2.

focus 74:18, 131:13, 136:10, 141:6.

focused 100:14, 137:10.

focuses 125:16, 150:15.

follow 116:9, 151:3.

followed 154:4.

following 5:21, 52:21, 75:5, 78:21, 78:22, 104:7, 146:13, 151:8.

follows 10:1, 30:10, 44:19, 76:20.

Folsom 165:5.

food 11:25.

foot 28:20.

footloose 94:23.

footnote 112:6.

force 33:15, 108:22.

forced 69:5.

foregoing 168:3, 185:12.

forever 176:1.

forget 64:22, 166:25.

forgot 50:20, 64:24, 64:25, 66:22.

forgotten 50:18.

form 74:25, 123:12,

158:18, 163:7, 163:9.

formally 64:2.

forms 129:23.

forth 17:20, 74:13, 129:16, 142:19, 145:13, 146:2.

forthright 74:8.

fortunately 101:25.

forward 9:20, 10:7, 19:4, 44:14, 95:18, 138:8.

found 6:15, 17:8, 21:8, 22:3, 23:10, 26:19, 29:9, 37:5, 44:10, 72:12, 74:11, 78:24, 96:12, 96:18, 98:11, 102:2, 105:18, 145:15, 149:1, 166:20.

Four 28:15, 40:22, 45:13, 75:24, 114:18, 128:5, 131:14, 138:9, 139:21, 139:23, 140:5.

Fourth 43:16, 181:16.

framed 168:24.

fraud 145:22, 145:23.

Free 73:18, 94:23, 119:7, 174:25.

frequency 130:9.

frequently 109:1, 140:25.

Friday 72:24.

friends 86:9, 174:20.

front 30:4, 49:14, 58:2, 61:15, 91:7, 113:16, 113:22, 172:2, 175:3.

fruit 18:9.

fruits 24:15, 121:14, 123:2, 143:11, 156:12, 157:2.

fugitive 6:16, 15:3,
    15:17, 15:24,
    16:10, 16:19,
    17:17, 43:4.
full 72:11, 123:10,
    126:12, 128:7,
    140:5, 168:19.
fully 68:17.
function 31:10,
    32:22, 32:25,
    33:5, 33:20,
    33:21, 33:23,
    146:2.
functions 31:9,
    33:21.
furtherance 117:13,
    117:17, 117:20,
    159:11, 159:15.
.
.
< G >.
gain 126:10.
gang 14:8, 108:2,
    110:3, 128:19,
    132:3, 140:20,
    163:24.
gang-related 96:12,
    105:18, 105:21.
gatekeeper 108:11.
gathering 126:9,
    134:18, 136:25.
gave 11:3, 36:2,
    58:1, 71:8, 71:11,
    71:15, 78:12,
    78:16, 146:7.
General 22:21,
    39:12, 84:15,
    86:20, 87:9,
    148:17, 176:13.
Generalized
    116:11.
generally 9:7, 9:11,
    106:18, 110:14,
    147:10.
generated 170:9.
George 45:11, 45:16,
    70:11, 75:23,
    76:17, 77:6, 78:7,
    88:10, 88:19,
    89:6.

Gerald 1:10, 1:29,
    2:14, 3:5, 3:15,
    4:6, 99:6, 104:14,
    125:14, 156:10,
    157:10, 162:19.
gets 6:12, 90:25,
    153:4, 170:19.
getting 7:14.
Gilliam 84:9.
girlfriend 146:22.
give 17:21, 32:1,
    32:4, 34:21,
    39:12, 44:1,
    52:23, 73:19,
    87:10, 88:22,
    94:2, 98:22,
    112:18, 112:24,
    112:25, 117:22,
    140:4, 150:22,
    152:11, 153:24,
    154:14, 154:15.
given 8:9, 11:6,
    23:10, 51:14,
    58:24, 60:21,
    85:10, 89:1, 89:2,
    96:7, 102:24,
    124:5, 135:24,
    148:4.
gives 60:5, 90:17,
    125:17.
giving 123:22,
    138:16.
gleaned 22:24.
global 169:3.
goal 136:19, 136:21,
    141:10.
goals 168:16.
Google 79:11.
gotten 138:14,
    139:24, 139:25.
governing 84:16.
grab 132:19.
Graham 33:3.
grand 140:18.
granted 177:11.
grants 103:13.
gray 154:5.
great 54:12, 98:7,
    123:18, 130:8,
    130:11, 137:1,

137:20.
greater 41:18, 43:8,
    126:7.
green 46:21.
Greenmount 20:1,
    110:6, 110:8,
    125:15, 147:21,
    174:21.
Greer 116:5.
Gregg 125:23,
    184:15, 184:21.
Gregory 117:11.
grossly 106:17.
Grossman 149:21,
    152:21.
ground 156:4,
    167:16.
ground. 34:22.
grounds 167:16.
group 142:7, 157:14,
    157:22.
Groveton 76:24.
Guerilla 106:1,
    179:4.
guess 53:19,
    131:18.
guest 6:11, 6:18,
    6:22, 8:8, 15:20,
    16:18.
guests 6:14, 8:11.
Guilford 121:15,
    121:21, 179:6,
    179:9.
guilty 73:1, 91:14,
    93:1, 93:21, 94:9,
    94:18, 95:4,
    95:18, 96:4,
    96:10, 96:11,
    100:7, 105:18,
    105:21, 111:25,
    112:2, 112:10,
    112:12, 116:19,
    116:20, 117:5,
    119:25, 120:3,
    129:22, 130:24,
    157:5.
gun 50:9, 50:10,
    52:22, 64:17,
    66:17, 67:7,
    69:10, 69:19,

```
 1   95:4, 95:15,              129:11, 140:13,           158:7, 175:19,
     95:17, 96:10,             146:23, 184:15.           176:1, 178:20,
 2   97:15, 97:19,          happening 106:16.            181:3, 184:17.
     98:3, 98:10,           happens 140:25,           Hearing 1:17, 3:11,
 3   112:10.                   153:23.                   5:16, 27:11, 62:3,
  gun. 146:24.              happy 59:3, 74:15.           73:23, 73:25,
 4   guy 74:23, 93:19,      harbor 14:7.                 95:25, 99:15,
     93:22, 125:14,         hard 129:6, 132:9,           99:21, 101:9,
 5   127:21, 146:5.            140:21.                    102:7, 103:14,
  guys 129:2, 132:22,       hardly 124:25,               103:19, 113:4,
 6   133:16.                   140:25.                    118:23, 158:20,
  .                         Harry 1:37, 3:17.            177:9, 178:9,
 7   .                      Harvey 1:41, 3:6,            183:21, 185:4.
  < H >.                       3:21, 4:14, 4:20,      hedge 28:24, 38:25,
 8   hair 8:12.                4:21, 43:20,               40:18.
  half 19:24, 72:7,            98:25, 185:5.          hedges 38:23.
 9   88:14, 139:23,         hate 110:11.              held 45:22, 98:25,
     152:25.                Hayden 147:12,               110:20, 115:25,
10   halfway 44:14.            151:13, 151:18,           117:19.
  hamper 137:3.                162:4, 162:8,         Help 13:25, 33:18,
11   hand 9:23, 30:7,          162:17, 162:22.           100:21.
     44:16, 93:25,          he'll 98:22.             helpful 182:21.
12   100:24, 101:2,         head 49:25, 71:18,       helping 141:4.
     103:7, 110:13,            76:13, 103:6.         Henry 125:13,
13   132:1.                 headed 58:10,               150:21, 152:5.
  handful 108:18,              135:14.               hereby 185:11.
14   108:20.                heading 137:11.          herself 148:13.
  handgun 44:4, 44:11,      headquarters            hideout 17:17.
15   67:14, 94:13,             182:12.               high 46:6, 46:13,
     111:25, 114:5.         health 102:1.               46:15, 52:12,
16   handle 36:16,          hear 5:13, 6:5,              125:20, 144:16,
     99:20.                    13:16, 13:19,             144:17.
17   handler 31:5, 31:7,       27:2, 27:4, 27:23,    high-ranking
     31:8, 43:5.               29:25, 39:25,             128:18.
18   handling 31:12,           44:13, 72:22,         higher 126:17,
     103:19.                   75:11, 89:24,             127:3, 136:20,
19   handwriting 55:20.        92:1, 92:2, 93:4,         141:20.
  handwritten 181:2.           100:24, 101:2,        highest 141:20.
20   Handy 125:24,             106:3, 106:24,        highlighted 84:22.
     174:22.                   106:25, 110:12,       Hill 46:12, 46:15,
21   hanging 175:24.           129:25, 149:18,           92:18.
  happen 100:1,                163:16.              Hills 78:4.
22   107:22, 171:3.         heard 5:14, 5:15,        histories 139:6,
  happened 42:18,              7:15, 17:7, 18:3,         139:9.
23   43:11, 47:5,              21:11, 60:25,         hit 71:18, 76:12.
     63:12, 65:10,             65:20, 92:2,          hitter 99:23.
24   71:15, 75:8,              93:23, 109:17,        Hoffa 93:15.
     94:14, 94:20,             110:17, 114:15,       hold 5:7, 43:20,
25   100:6, 103:7,             117:25, 129:17,           155:9, 176:2.
     107:12, 109:9,            134:20, 135:15,       holding 162:25.
```

holds 136:17,
  164:20.
Holiday 16:20.
home 6:11, 8:9,
  8:12, 11:2, 11:4,
  15:25, 20:11,
  21:10, 21:12,
  22:1, 23:9, 25:18,
  25:19, 26:4,
  28:19, 28:20,
  29:5, 37:14,
  40:15, 40:19,
  93:15, 145:18,
  146:16, 174:23.
home. 146:13.
homeowner 28:22.
homes. 145:7.
homicide 78:23,
  179:7, 180:25,
  181:18.
homicides 126:5.
Honda 13:18, 26:24,
  27:15, 34:10,
  35:19, 35:22,
  39:7, 46:22,
  49:10, 68:20,
  87:13.
honest 92:15.
Honorable 1:18.
Hood 150:24.
hope 94:6, 155:4,
  171:21.
hopefully 4:24.
hot 78:14, 124:15.
hotel 16:21, 17:4,
  25:22, 28:22.
hotels 17:2.
hour 19:23, 72:6,
  72:7, 75:10,
  75:12, 75:13,
  75:17, 76:10,
  76:12.
hours 5:10, 33:8,
  37:15, 152:25.
housekeeping 99:9.
houses 141:23,
  152:23.
Hoven 101:19,
  101:20, 101:22.
hub 109:4.

hub-and-spoke
  109:1.
huge 108:20,
  110:13.
humorous 165:15.
hundred 42:1,
  98:9.
hypotheticals
  16:7.
Hyundai 143:12,
  143:20, 143:25,
  150:25, 154:5.
.
.
< I >.
I-2 84:16.
I-24 84:22.
IAD 73:8, 88:11,
  88:15, 89:6.
identical 66:10,
  105:17, 123:14,
  136:16.
identification
  37:25, 51:13.
identified 21:5,
  47:8, 114:17,
  114:18, 140:19.
identify 38:2,
  38:16, 54:4,
  136:19, 141:10,
  167:7.
III 1:43, 2:10.
ill 101:16.
illegal 17:19,
  18:22, 23:14,
  23:16, 43:2, 52:4,
  117:12, 150:12,
  152:6, 153:12.
illuminating 98:8.
image 79:11.
imagine 29:2.
immaterial 91:9.
immediately 18:13,
  20:2, 128:8,
  152:9, 152:25.
Impala 153:25,
  154:3, 154:4.
impermissible
  96:19.
implicitly 150:8.

importance 70:7,
  91:8, 91:9.
important 22:19,
  59:22, 66:16,
  66:20, 67:9,
  128:12, 148:21,
  171:14, 175:5.
importantly 17:10,
  91:15.
impossible 106:7.
impound 48:9.
impression 74:25.
improper 105:14,
  106:8, 106:13.
improperly 117:21,
  135:23.
in. 29:4.
inaccuracy 122:19.
inadequate 144:14,
  144:20.
incarcerable
  63:25.
incarcerated 158:11,
  158:16.
incident 48:3,
  50:14, 73:4,
  77:22.
include 50:13,
  112:1, 112:3.
included 111:24,
  174:20.
including 43:7,
  84:24, 105:18,
  140:6, 160:21.
inconsistencies
  95:13.
inconsistent
  182:25.
incorporate 167:3.
incorrect 68:25.
increase 76:6.
INDEX 186:1.
indicate 49:24,
  53:14, 67:22,
  103:7, 165:25,
  180:24.
indicated 17:8,
  35:25, 44:6,
  184:2, 184:6.
indicates 181:21.

Indicating 32:25,
    52:2, 100:25,
    108:14, 181:17.
Indicating. 103:2,
    103:5.
indication 113:17.
indications 23:7,
    108:13.
indicia 17:14,
    17:23, 22:1,
    108:15, 110:23.
indicted 14:22,
    109:14.
Indictment 21:5,
    105:15, 109:24,
    109:25, 110:9,
    111:23, 111:24,
    117:9, 120:18,
    121:22, 156:16,
    167:16, 167:24,
    167:25, 168:14,
    168:24, 170:11.
individual 48:18,
    147:18, 162:20.
individuals 20:5,
    124:13.
indulgence 122:18.
indulging 130:7.
inevitable 23:17.
inevitably 23:9,
    41:23, 131:15.
infer 150:3.
inferences 150:1.
inferred 149:10.
informants 123:25,
    129:15, 131:4,
    138:20.
informed 4:18,
    18:14.
infraction 81:11,
    82:12.
infractions 83:21.
inhabitant 16:16.
inhabited 7:12.
initial 24:17,
    26:19, 137:17,
    143:19.
Initially 20:12,
    49:25, 64:5,
    76:5.

Inn 16:20.
inquiry 117:15.
inside 19:15, 20:14,
    22:17, 23:13,
    29:5, 35:1, 40:14,
    47:2, 48:11,
    48:12, 69:10,
    78:16.
Instagram 158:12,
    164:14, 164:22.
instance 102:11.
instances 128:5.
instead 34:24,
    136:7.
instituted 44:7.
instruction 58:1,
    116:7.
instructions 116:9,
    125:17.
insufficient
    144:9.
integrity 92:14,
    138:5.
intelligence 7:18,
    134:18.
intend 121:18,
    121:23, 169:23,
    183:8, 184:7.
intending 117:1.
intends 107:10,
    122:15, 179:13.
intent 112:13,
    156:17, 161:17.
intention 97:18,
    98:2, 110:20,
    122:6, 179:21,
    180:12, 182:2,
    182:22, 183:4.
intentional 77:9,
    78:9.
intentionally 77:3,
    78:4, 91:5.
interaction 86:6.
intercepted 132:17,
    134:12, 146:9,
    146:11, 150:20,
    152:3, 166:13.
intercepting 19:21,
    20:4.
intercepts 7:13.

interdicted
    131:22.
interest 8:22,
    26:14, 27:21.
interests 13:10.
interfere 102:6.
internal 70:23,
    77:2.
internet 68:20,
    158:17, 165:8.
interpretation
    70:22.
interpreted 8:24.
interrogation
    179:15.
intersecting 60:6.
intersection 20:1,
    46:22, 47:3,
    57:19, 59:13,
    59:14, 60:5,
    60:16, 60:24,
    61:1, 61:5, 61:8,
    61:13, 61:24,
    79:15, 79:19,
    80:1, 81:6, 81:13,
    81:15, 81:16,
    82:12, 91:23,
    92:17.
interview 65:11,
    180:8, 181:25,
    182:11, 182:13,
    182:14, 182:18,
    182:20.
interviewed 71:10,
    76:25, 179:8,
    180:7, 181:18,
    181:22.
interviews 140:17.
intimidate 163:25.
intrinsic 169:25,
    170:14, 170:17.
introduce 24:7,
    72:15, 95:15,
    96:4, 96:17,
    97:18, 98:18,
    121:18, 121:23,
    159:4, 170:8,
    171:5, 180:16.
introduced 118:8.
introducing 95:18,

1   98:3, 122:7,
    129:15.
2   intruded 135:23.
    intrusion 41:18,
3     41:19, 43:8.
    intrusive 123:8,
4     130:14, 131:8,
      136:7, 142:1.
5   invasion 174:23.
    inventory 44:10,
6     48:15, 48:17,
      48:21, 67:25,
7     68:2, 68:13.
    inventorying
8     67:23.
    investigate 123:19,
9     128:23.
    investigated
10    148:7.
    investigating 42:24,
11    142:8, 147:16.
    investigation 22:20,
12    70:23, 91:2,
      121:22, 124:24,
13    125:7, 128:1,
      131:9, 138:6,
14    139:11, 140:20,
      141:16, 141:19,
15    145:22, 147:25.
    investigative 123:8,
16    127:18, 127:23,
      128:25, 129:1,
17    130:13, 130:25,
      131:6, 132:12,
18    132:15, 136:19,
      137:3, 142:2,
19    148:3, 166:21.
    Investigators 21:11,
20    22:21, 71:20,
      137:14, 137:21,
21    138:11, 138:19,
      139:17, 140:24,
22    175:4.
    invited 8:10.
23  involuntary
      179:16.
24  involve 163:8.
    involved 12:22,
25    22:16, 23:12,
      42:25, 78:6,

95:24, 105:18,
  145:23, 147:18,
  148:3, 149:6,
  149:11, 149:15,
  154:9, 159:13,
  162:6, 162:10,
  162:20, 163:6.
involvement 87:7,
  145:5, 146:3,
  164:15, 182:14.
involves 43:1.
involving 146:5,
  168:15, 174:3.
issuance 142:21.
issued 26:12, 47:14,
  145:9, 155:21,
  160:18.
issues 9:8, 76:16,
  98:8, 109:13,
  145:25.
issuing 142:17,
  155:14.
item 149:25.
itemizes 104:23.
items 24:4, 25:3,
  25:9, 149:1,
  149:24.
itself 18:10, 23:4,
  26:13, 28:25,
  40:19, 44:12,
  52:9, 74:14, 91:8,
  131:7.
.
.
< J >.
J-a-m-a-l 45:3.
J. 1:25, 1:37.
Jackson 181:22.
Jaco 28:13, 100:21,
  121:6, 160:5.
jam 90:25.
Jamal 1:35, 3:6,
  43:24, 44:17,
  45:2, 76:21, 78:2,
  186:17.
James 1:18,
  109:19.
January 14:18,
  180:5.
Jardines 42:7.

Jeffrey 1:33,
  3:15.
Jencks 115:3.
Jenkins 125:22,
  125:23.
jewelry 162:25.
Jimmy 93:15.
JKB-16-0363 1:9,
  3:5.
job 98:7, 108:10,
  142:3, 149:21.
John 2:10, 4:3,
  148:8.
Johnny 163:12,
  165:4, 165:15,
  165:16, 165:24,
  166:1.
Join 111:2, 120:6,
  120:11, 120:13,
  120:15.
joinder 105:13,
  109:13, 115:11,
  115:12, 115:13,
  116:1, 120:8.
joined 111:17,
  115:23, 115:24,
  117:21, 120:5,
  168:15, 175:25.
joining 105:22,
  120:9, 120:20,
  175:22.
Jonathan 10:24,
  12:19, 151:18.
Joseph 2:12, 3:7,
  43:22, 47:21,
  79:16, 85:18,
  91:13, 91:19,
  92:10.
Jr 1:37.
judges 160:22.
judgment 53:25,
  129:19, 131:11,
  131:16, 155:17.
jumped 34:23.
jumping 34:20.
jumps 144:2.
June 76:21, 156:13,
  164:23.
jurisdiction 78:14,
  78:16, 129:14.

```
 1   jurisdictional
       165:12.
 2   jurisdictions
       78:20.
 3   jury 30:4, 106:4,
       106:24, 106:25,
 4     107:20, 116:7,
       116:8, 118:23,
 5     140:18.
     Justice 101:7.
 6   justification 22:11,
       23:18, 26:17,
 7     43:13, 118:25.
     justified 18:20,
 8     22:13, 23:1,
       23:5.
 9   justifies 90:1.
     justify 21:18.
10   .
     .
11   < K >.
     K-9 27:19, 31:5,
12     31:7, 31:8, 31:11,
       34:22, 35:16,
13     37:7, 43:5.
     K. 1:18.
14   keep 44:25, 50:12,
       147:10, 150:1,
15     150:9, 151:21.
     Kelly 150:24.
16   Kenneth 2:4, 3:6,
       3:25, 99:6,
17     104:11, 104:12,
       119:24, 157:1,
18     157:11, 169:15,
       172:8, 177:6,
19     179:3.
     key 8:9, 11:3,
20     141:21, 153:5,
       153:9.
21   KGA 47:20.
     kick 4:22.
22   kill 16:12.
     killed 163:12.
23   kind 11:20, 32:4,
       38:10, 49:4, 68:4,
24     77:24, 93:24,
       108:12, 110:15,
25     118:14, 118:25,
       125:1, 139:25,
```

```
     171:13, 179:15.
     kinds 118:12,
       144:2.
     knowing 108:10.
     knowledge 22:21,
       65:16, 84:19,
       166:1, 168:3,
       182:13.
     known 96:10, 144:13,
       150:21, 152:4,
       174:9.
     knows 144:19,
       147:24, 171:21.
     Kyle 77:3.
     .
     .
     < L >.
     l-i-n-e 55:23.
     L. 1:43.
     label 107:24.
     lack 143:21,
       173:5.
     lacks 143:24.
     laid 121:17.
     Lalor 148:21.
     Landsman 7:14, 7:21,
       18:18, 19:12,
       20:9, 21:13, 42:6,
       114:15, 114:17.
     language 93:7,
       161:18.
     large 145:17.
     Last 10:4, 30:13,
       30:14, 45:1, 45:3,
       65:15, 65:16,
       65:18, 68:20,
       102:21, 102:25,
       117:22, 146:12,
       146:20, 152:12,
       156:14, 171:18,
       174:18, 175:5,
       175:13, 181:15.
     late 14:17,
       184:14.
     later 12:13, 25:24,
       51:13, 76:11,
       79:16, 111:4,
       150:16, 150:18,
       172:22.
     Latrobe 151:1,
```

```
     154:4.
     lawful 18:10, 24:8,
       26:13.
     lawfully 90:8, 90:9,
       91:18.
     lawyer 102:10,
       145:16, 145:19,
       145:21, 158:4.
     lawyers 103:21,
       118:11.
     lay 105:12,
       123:20.
     laying 170:23.
     lays 172:11.
     lead 104:20, 104:22,
       106:12, 128:6.
     leader 125:20,
       150:21, 152:5.
     leaders 141:20,
       141:21.
     leadership 125:14.
     leading 82:2.
     leap 26:7.
     learned 65:17,
       125:13.
     lease 16:1.
     leaseholder 16:4,
       16:17.
     least 8:8, 29:14,
       91:4, 110:19,
       125:4, 133:15,
       165:25, 169:4.
     leave 12:9, 12:12,
       25:20, 48:4,
       73:20, 74:5,
       175:15, 177:5.
     leaves 152:25.
     leaving 21:7, 91:18,
       144:1.
     Leavis 123:7,
       129:7.
     left 4:17, 5:25,
       11:22, 21:2, 22:6,
       23:23, 24:9,
       24:13, 25:8,
       25:17, 25:18,
       37:20, 38:14,
       38:21, 58:18,
       79:13, 101:20,
       108:14, 120:4,
```

160:7.
left-hand 57:7,
  61:17.
legal 15:18, 93:11,
  99:3, 109:25.
legally 67:6.
legit 42:22.
legitimate 18:8,
  26:13, 138:7,
  163:7.
legitimately 41:15,
  42:13, 43:2,
  43:10, 43:15.
length 22:20,
  151:14, 151:20.
LEOBR 71:9.
Leon 144:4, 144:6,
  144:8, 152:19,
  154:20, 155:8,
  155:23.
Leonard 179:2.
less 11:5, 11:21,
  108:18, 126:8,
  131:8, 171:14.
lessened 119:9.
letter 72:23.
level 4:19, 141:20,
  141:22, 145:10,
  146:15.
levels 138:21,
  141:10.
Lexus 75:22.
license 35:20, 44:9,
  47:8, 47:10,
  47:12, 47:16,
  47:19, 47:25,
  48:1, 51:1, 63:1,
  63:6, 63:21,
  68:8.
licensed 85:2, 85:4,
  85:15, 86:14,
  144:20.
lie 70:21.
lied 153:9.
life 17:25, 145:17,
  163:3, 163:13.
lift 68:25, 70:3.
lifted 48:23.
light 24:16, 47:4,
  95:12, 98:24,

100:6, 105:15,
  122:3, 155:7,
  180:15, 182:4,
  182:21, 183:5.
lights 7:8, 72:7,
  81:20.
likely 103:14,
  146:16, 150:1.
limine 96:8, 97:2,
  158:18, 159:1.
Limited 9:2, 125:12,
  135:2, 135:7,
  140:12, 143:4.
limiting 110:9,
  116:7.
linchpin 93:19.
line. 59:14.
Lisa 3:10.
list 124:11,
  185:2.
listed 111:10.
Listen 98:7, 98:21,
  130:19, 140:10.
listened 166:12.
listening 22:24,
  165:23.
lists 104:23.
litigated 112:22.
litigation 98:13.
little 10:8, 19:17,
  31:15, 38:4,
  38:17, 60:16,
  61:15, 73:4,
  99:22, 109:17,
  109:21, 119:12,
  133:20, 139:7,
  142:9, 153:6,
  163:21.
live 129:22.
lived 114:20,
  166:21.
livelihood 145:11,
  146:16.
lives 7:5, 152:1.
loaded 49:6,
  68:17.
local 16:20.
locate 102:8.
located 21:6, 39:5,
  68:17, 69:25,

70:1, 70:3, 75:15,
  179:3.
locating 32:25.
location 33:14,
  34:4, 34:18,
  141:22.
lock 102:24.
loftier 126:16.
Lombard 1:48,
  2:47.
long 25:13, 31:1,
  31:22, 45:12,
  45:20, 63:17,
  88:11, 133:10,
  136:21, 141:16,
  168:21, 171:20,
  182:14.
long-standing
  6:13.
longer 6:16, 25:14,
  97:21, 133:20.
look 22:14, 23:1,
  42:19, 55:10,
  56:6, 81:22, 82:4,
  82:24, 86:11,
  91:13, 106:14,
  106:17, 125:9,
  125:10, 125:12,
  132:14, 138:24,
  140:10, 146:6,
  154:20, 162:23.
looked 39:10, 39:14,
  79:15, 139:5,
  139:8.
looking 62:16,
  68:20, 139:25.
looks 38:4, 38:18,
  53:8, 153:4.
loose 48:23, 48:24,
  69:2, 69:3, 69:4,
  69:8, 87:14.
lose 25:14, 25:18,
  153:3.
lot 36:12, 50:17,
  56:20, 58:5,
  98:21, 109:25,
  115:19, 118:21,
  138:15.
Lots 108:15, 108:17,
  110:25.

| | | | |
|---|---|---|
| 1 | loud 34:21,<br>   164:20. | marked 51:12, 59:14,<br>   59:23, 75:23,<br>   83:7. | 83:3, 87:16,<br>   98:14, 107:16,<br>   108:5, 118:22, |
| 2 | lower 38:14.<br>lunch 4:22, 5:9. | marker 170:24. | 129:6, 129:10,<br>132:10, 132:14, |
| 3 | .<br>. | Marquise 2:8, 3:7,<br>   9:18, 9:24, 10:5,<br>   33:19, 99:6, | 145:15, 154:17,<br>159:4, 168:20. |
| 4 | < M >.<br>M-a-r-q-u-i-s-e | 104:13, 157:12,<br>169:16, 172:9, | Meaning 107:13.<br>means 24:6, 119:13, |
| 5 |    10:5.<br>M-c-c-a-n-t-s | 173:3, 173:18,<br>177:7, 186:5. | 123:9, 127:18,<br>127:23, 129:1, |
| 6 |    10:6.<br>M. 1:39. | Marshal 185:4.<br>Marshals 33:15, | 130:25, 131:8,<br>132:12, 132:15, |
| 7 | machine 17:13.<br>Madame 80:19, | 178:5.<br>Martin 125:22. | 141:24, 161:17.<br>meant 32:14, 83:10, |
| 8 |    80:22.<br>Madison 143:11, | Maryland 1:2, 1:20,<br>   1:49, 2:48, 30:2, | 91:22.<br>measure 136:7. |
| 9 |    151:3.<br>Magistrate 147:23, | 30:25, 76:24,<br>78:4, 83:5, 83:19, | measures 126:9.<br>media 151:16, |
| 10 | 148:4, 160:10,<br>160:22, 162:11, | 92:12, 123:13,<br>136:15, 174:24. | 157:10, 158:12,<br>158:14, 160:9, |
| 11 | 162:13, 162:14,<br>162:15, 162:18, | Massey 146:11,<br>146:19, 147:18, | 162:6, 162:19,<br>162:23, 163:25, |
| 12 | 162:23.<br>magnum 49:5, | 150:24.<br>material 110:24, | 164:13, 166:3,<br>173:4, 176:18. |
| 13 | 68:16.<br>Mail 7:9, 7:10, | 123:14.<br>materialized | meet 4:21, 103:15,<br>127:21, 150:22, |
| 14 | 7:11, 12:2, 12:4,<br>12:5, 12:7, | 181:25.<br>matter 15:17, 29:20, | 152:25, 153:23,<br>153:24. |
| 15 | 12:8.<br>mainly 142:25. | 92:9, 99:9, 106:9,<br>130:8, 134:11, | meetings 17:19,<br>125:17, 125:18. |
| 16 | maintain 138:3,<br>138:5. | 143:19, 184:20,<br>185:13. | member 14:7, 14:8,<br>20:6, 21:5, 77:7, |
| 17 | maintaining<br>183:24. | matters 24:2,<br>119:15. | 78:7, 105:25,<br>108:2, 108:15, |
| 18 | maintains 73:7,<br>73:13. | mattress 11:23,<br>17:11. | 114:18, 125:24,<br>159:13, 168:19, |
| 19 | maker 148:11.<br>Man 52:12, 66:6, | Maureen 99:20,<br>101:8. | 175:7, 179:3.<br>members 22:23, |
| 20 | 67:13, 140:8,<br>163:12, 165:5, | Max 31:21, 31:22,<br>31:24, 32:11, | 124:14, 128:19,<br>137:24, 147:21, |
| 21 | 165:16, 166:1.<br>manages 74:24. | 32:22, 33:5, 34:3,<br>35:1, 35:8, 35:22, | 163:24, 168:17,<br>168:20, 174:20. |
| 22 | manner 112:14,<br>137:3. | 36:14, 36:20.<br>Mclaren 125:21, | membership 110:21,<br>110:24, 148:19, |
| 23 | manufacturing<br>22:4. | 127:10, 127:13,<br>127:14. | 164:16.<br>memory 50:2. |
| 24 | maps 79:11.<br>marijuana 42:2, | Meadows 109:19.<br>mean 7:4, 32:8, | mention 104:25,<br>136:12, 139:15. |
| 25 | 42:10.<br>mark 34:13, 37:24. | 40:23, 48:24, | mentioned 20:9, |

32:14, 32:21,
86:21, 87:12,
138:1, 139:1,
140:7.
mere 136:24.
merely 138:15.
message 164:21,
174:24.
met 102:18, 102:21,
125:12.
method 130:14,
145:13.
methods 127:6,
131:6, 141:24,
168:16.
Michael 125:20,
134:24, 179:3.
microphone 10:8,
44:25.
middle 48:4.
mike 72:22.
mile 72:7.
miles 72:6, 72:7,
75:9, 75:10,
75:12, 75:13,
75:17, 76:10,
76:12.
Miller 116:5.
mind 50:17, 52:15,
55:8, 58:17,
64:19, 64:21,
65:1, 65:3, 65:6,
65:24, 68:4,
120:22, 142:22,
144:2, 144:13,
144:25.
minimal 132:16,
134:1.
minimum 168:3.
Minnesota 6:13,
13:11.
minute 91:13,
118:21, 120:14.
Mirage 132:18.
Miranda 49:21,
50:7.
Mirandized 182:19.
misrepresent 73:7,
73:14, 77:3.
Misrepresentation

70:13, 70:15,
70:16, 70:22,
73:13, 77:9,
78:9.
misrepresented 78:4,
91:6.
missed 158:25.
misses 150:15.
mistake 150:13.
mistaken 135:8.
misunderstanding
122:16.
modern 129:22.
moment 22:12, 27:5,
75:7, 90:22,
100:15, 100:17,
113:17, 122:18,
159:5, 166:25,
178:14, 183:21.
money 162:25.
monitor 133:19,
133:21.
monitored 132:16,
133:2, 135:12,
136:2.
monitoring 135:21,
135:24.
Montel 1:41,
43:20.
Montell 3:6.
month 88:23, 139:23,
146:25.
months 76:22,
138:19, 139:22,
139:24.
moots 95:20, 95:22,
156:20.
morning 3:2, 3:4,
3:12, 3:14, 3:20,
3:24, 4:4, 4:5,
4:6, 4:11, 4:12,
30:3, 30:6, 30:17,
30:21, 30:22,
33:8, 44:16, 45:8,
45:9, 51:7, 51:8,
54:19.
Morrow 167:24.
mostly 14:4,
145:16.
mother 11:1.

Motz 148:22.
move 18:3, 72:14,
77:24.
moved 24:14, 24:19,
131:17.
moving 4:18, 56:11,
57:4, 58:11, 59:4,
62:6, 62:8,
104:18, 139:1,
178:6.
MSP 31:1, 32:17.
muddled 154:21,
154:23.
multiple 43:6,
126:3, 138:20,
167:18, 168:1,
168:2, 168:13,
168:21.
multiplicity
168:4.
murder 13:23,
117:10.
murders 16:11,
17:20, 126:4,
126:11.
murkier 16:16.
murky 171:13.
Myself 27:4, 68:13,
75:12, 86:7.
.
.
< N >.
N-e-p-t-u-n-e
45:3.
Name 7:11, 10:4,
12:7, 12:8, 30:13,
30:14, 31:20,
45:1, 45:2, 45:3,
174:16, 174:18,
186:3.
named 125:14,
140:7.
narcotic 36:1, 36:4,
36:5, 36:7, 36:8,
36:9.
narcotics 7:2,
12:22, 13:9, 31:8,
31:10, 31:11,
31:14, 31:18,
31:19, 32:9,

36:18, 43:7,
43:13, 52:4,
116:21, 140:20,
141:22.
narrative 163:2.
narrowly 141:6.
nasty 71:17.
national 161:16.
nationwide 160:22.
nature 22:22,
    117:17, 118:19,
    142:4, 142:13,
    149:25.
NCIC 47:15.
near 17:12, 19:25,
    49:22, 59:14.
nearest 60:4.
necessary 9:1,
    123:9, 123:24,
    124:18, 125:3,
    125:4, 126:10,
    126:24, 131:19,
    172:1.
necessity 123:11,
    123:18, 123:21,
    124:3, 124:5,
    125:7, 126:23,
    128:17, 130:22,
    136:6, 136:15,
    138:9, 138:12,
    139:5, 141:6,
    141:7.
Necessity. 137:11.
need 3:21, 4:19,
    8:20, 66:8, 74:14,
    95:17, 103:15,
    118:18, 128:23,
    131:10, 131:25,
    132:18, 132:19,
    136:6, 150:3,
    150:6, 151:9,
    168:19, 181:7.
needed 138:17.
needs 4:15,
    117:15.
neighborhood 105:23,
    106:2, 108:21,
    153:25.
neighboring 78:20.
Neptune 43:24, 44:6,

44:17, 45:2, 45:3,
    45:8, 47:21,
    50:13, 73:2,
    76:21, 78:2, 79:7,
    81:1, 81:4, 87:12,
    88:12, 91:18,
    92:6, 186:17.
net 126:18.
neutral 148:4.
nevertheless
    13:15.
new 26:16, 170:12,
    172:23.
news 14:24.
Next 12:1, 13:15,
    14:16, 35:19,
    43:21, 87:11,
    98:23, 121:12,
    121:14, 122:10,
    122:11, 122:23,
    127:21, 146:22,
    156:9, 156:25,
    157:8, 166:10,
    167:5, 167:14,
    169:14, 172:7,
    180:4, 180:19,
    180:23, 181:14.
nexus 143:17, 149:2,
    149:5, 149:23,
    164:2, 165:2.
nickels 146:10,
    147:19.
nickname 12:19.
Nigga 174:25.
night 7:8, 12:14,
    16:21, 33:23,
    36:21, 71:16,
    146:12, 146:20.
nightclub 132:18.
nights 11:13,
    17:9.
No. 1:9, 37:15,
    37:25, 40:6,
    40:23, 51:12,
    55:18, 69:12,
    72:15, 78:1,
    78:18, 113:25,
    121:16, 122:12,
    142:23, 156:10,
    157:1, 158:7,

161:12, 167:15,
    169:8, 172:7,
    172:8, 173:3,
    177:7, 178:16.
nobody 86:2,
    124:15.
nodded 49:25.
nodding 103:6.
None 40:3.
Nonetheless 21:17,
    23:4, 52:15,
    144:7, 169:2.
nonexistent 135:2.
nonfatal 19:25.
nonrecorded
    122:13.
noon 5:9.
nor 9:10, 92:18.
normal 127:22,
    149:25.
normally 150:9.
Norman 174:22.
North 20:1,
    125:16.
NORTHERN 1:2.
Nos. 157:9,
    169:15.
Note 52:3, 84:24,
    179:1.
noted 63:17.
notes 80:16.
Nothing 97:22,
    98:16, 139:13,
    140:14, 178:10,
    178:12, 183:14.
notice 171:12,
    171:20.
noticed 173:2.
notion 160:15.
noun 162:16.
November 122:13.
numb 106:5.
Number 3:5, 8:12,
    21:22, 28:18,
    40:11, 40:16,
    68:4, 68:8, 72:13,
    91:6, 91:7,
    113:20, 113:22,
    115:24, 116:18,
    141:24, 147:12,

```
 1      166:21, 166:25.        obtain 138:20.          71:10, 78:18,
       numbers 39:11,          obtained 24:10.         86:8, 90:14,
 2       169:7.                obtaining 6:1.          92:15, 93:25,
       numerous 46:7,          Obviously 25:21,       124:6, 124:9,
 3       52:3.                   31:18, 38:19,         124:18, 125:1,
       .                         40:17, 51:1,         128:15, 129:16,
 4     .                         57:14, 115:10,        141:2.
       < O >.                    115:22, 115:23,      Official 1:47, 2:46,
 5     o'clock 5:12,             116:22, 123:18,        77:8, 78:9,
         95:7.                   147:15.               185:17.
 6     O'toole 1:33, 3:15,     occasion 124:21,       often 88:1, 118:11,
         98:21, 104:20,          124:22.               128:9, 162:6.
 7       104:21, 105:3,        occasions 88:24,       old 32:19, 41:14,
         105:6, 105:8,           139:20.               115:17.
 8       105:12, 106:16,       occupant 85:25.        Olson 6:13.
         106:24, 107:4,        occupants 13:12,       omnibus 113:4.
 9       107:17, 108:5,          48:11.               Once 4:19, 24:23,
         108:16, 109:2,        occur 90:3, 165:22,      28:5, 42:23, 47:5,
10       109:13, 110:11,         170:18.               47:6, 48:1,
         111:4, 158:2,         occurred 18:10,         131:19.
11       178:8.                  20:10, 23:15,        oncoming 60:16,
       oath 71:9, 72:25,         24:9, 52:5, 58:19,     81:23, 82:5.
12       81:2.                   71:1, 71:6, 77:5,    one-off 146:4,
       object 20:16, 29:15,      77:20, 77:22,         147:2.
13       150:23, 152:6,          78:17, 79:16,        one. 40:11, 91:6,
         154:2, 157:6.           92:8, 96:5,           136:16.
14     Objection 12:24,          132:20, 170:22.      open 5:21, 75:5,
         13:20, 14:14,         October 1:19.           103:10, 104:2,
15       51:19, 51:20,         odd 106:21.             104:7, 113:16,
         72:16, 81:25,         odor 35:25, 36:3,       119:11, 119:12.
16       82:6, 82:17,            36:4, 36:18.         opens 153:5.
         83:11, 83:15,         odors 31:13,           operate 29:17.
17       87:23, 89:8,            31:17.               operation 128:1.
         100:6, 100:8,         offense 4:17, 63:25,   operations 142:6.
18       159:3, 172:20,          68:3, 91:14,         operator 85:4.
         172:21, 179:24,         93:13, 111:25,       opinion 82:9, 97:23,
19       180:2, 182:6,           117:13, 118:19,        112:11.
         184:10.                 121:21, 167:17.      opinions 145:9.
20     objections 102:12.      offenses 83:23,       opportunity 118:16,
       objectives 168:1.         106:23, 126:4.        120:11, 148:11.
21     objectives. 168:4.      offer 4:14,           opposed 163:3.
       obligation 171:21.        156:24.             opposite 166:5.
22     observed 21:19,         offered 134:21.       opposition 178:20.
         46:21, 47:1, 53:4,    Office 130:10,         options 77:18,
23       61:24, 81:5,            145:23, 146:1.        77:21.
         150:24, 151:4.        Officers 21:10,       orally 159:2.
24     observing 34:18.          22:12, 22:25,       Order 4:23, 84:15,
       obstruct 58:25.           23:22, 42:9,         87:10, 99:4,
25     obstructing 58:5,         42:12, 42:24,        113:3, 113:4,
         59:6.                   43:2, 43:13, 71:5,   121:13, 126:2,
```

130:10, 141:16,
142:15, 156:2.
ordered 41:12.
orders 86:20,
131:19, 133:3,
142:21.
ordinarily 95:24.
organization 22:22,
108:15, 124:14,
126:13, 128:2,
128:4, 136:20,
141:11, 141:17,
142:4, 142:14.
Oriakhi 131:25.
originally 101:14,
105:23, 112:21.
ostensibly 159:18.
others 105:21,
112:13, 112:14,
119:21, 121:10,
175:23, 177:12.
otherwise 42:13,
59:11, 103:13,
119:4, 166:2.
ourselves 48:18,
106:10.
outlined 94:25,
96:8, 102:22,
118:3, 180:5.
outside 13:18,
18:10, 22:13,
23:6, 26:25,
27:16, 78:14,
78:20, 138:9,
165:17, 170:22.
outstanding 21:4.
overall 18:4, 42:23,
92:23, 100:15,
118:4, 168:15,
168:21, 169:3.
overcome 15:22.
overlooked 89:14.
overly 137:2.
overnight 6:11,
6:14, 6:18, 6:22,
8:8, 15:20,
16:18.
Overruled 13:1,
13:5, 82:10, 83:4,
83:16, 87:24,

89:10.
overt 105:24,
108:18, 108:19,
168:5, 168:25.
overtake 119:1.
overwhelming
116:8.
owed 155:14.
own 15:25, 16:1,
23:2, 99:22,
119:20, 120:7,
125:6, 144:13,
183:24.
owned 159:18.
owner 8:9, 48:10,
84:5, 85:5, 85:7,
85:14, 85:15,
85:18, 86:18,
87:3.
owner/co-owner 85:1,
85:2.
owns 10:22.
.
.
< P >.
p.m. 5:9.
pack 107:14.
package 113:8.
packaged 7:2.
packages 125:22.
packaging 13:9,
22:4.
packs 164:20.
pad 68:25.
Page 58:22, 59:4,
80:17, 80:20,
84:21, 124:6,
141:6, 181:19,
186:3.
pages 137:10, 140:5,
164:12.
pair 11:21.
Paper 113:20, 121:9,
142:23, 158:7,
178:16.
papers 6:9, 7:10,
107:8, 160:23.
paragraph 67:21,
153:15, 153:21,
184:20.

Paragraphs 150:19,
153:16, 153:20.
paraphernalia 22:4,
151:22.
Pardon 52:17, 55:1,
60:19, 61:3,
65:12, 77:17.
parked 13:18, 26:25,
27:16.
part 36:14, 40:24,
41:1, 43:4, 52:20,
52:25, 59:22,
83:18, 92:25,
99:13, 110:25,
112:6, 113:8,
114:14, 114:23,
116:19, 117:18,
130:16, 130:22,
143:25, 163:8,
169:3, 181:6,
181:7, 182:2,
182:22.
participate 102:7.
participation
110:21.
particular 22:25,
34:4, 36:14,
46:13, 55:14,
69:13, 102:11,
107:6, 123:24,
136:20, 141:1,
148:15, 148:16,
151:24, 159:5,
164:12, 167:8,
185:1.
parties 74:20.
partner 31:18,
32:22, 34:19,
34:22.
party 104:18.
passed 98:15.
passenger 49:2,
68:18, 69:1,
87:17, 151:5.
passive 32:5,
32:6.
past 61:4, 61:22,
61:23, 80:8,
145:9.
pasted 25:1.

patrol 31:9, 32:22,
  32:25, 33:2, 33:5,
  33:20, 33:23,
  45:25, 46:3,
  50:19, 52:3.
patrolled 46:12.
patrolling 52:10.
Paul 1:31, 3:14.
Pause 27:9, 100:22,
  121:7, 183:22.
pay 142:16.
peace 176:2.
pecking 4:23.
peek 69:10.
pen 56:8, 56:10,
  57:4.
pending 104:10,
  104:13, 111:16,
  111:18, 119:23.
people 6:14, 7:5,
  11:8, 16:12,
  19:15, 19:19,
  66:1, 86:8, 93:13,
  93:21, 106:22,
  109:4, 114:19,
  124:15, 124:23,
  126:17, 126:20,
  127:3, 130:19,
  132:17, 132:23,
  139:10, 162:5,
  162:10, 163:1,
  163:7.
Per 11:10, 33:2,
  48:9, 72:6, 72:7,
  75:12, 75:13,
  76:10.
percent 42:1,
  98:9.
perform 33:5, 37:7,
  41:12, 42:7,
  42:16.
Perhaps 23:15,
  60:18, 60:20,
  62:21, 62:23,
  74:13.
perimeter 34:5.
period 105:24,
  124:20, 138:19,
  159:14, 170:15,
  170:19.

perjury 66:13.
permission 11:6,
  11:10, 11:11.
permitted 85:3.
person 16:7, 16:25,
  17:17, 17:25,
  53:16, 57:11,
  57:18, 90:9,
  124:21, 138:4,
  144:9, 146:3,
  149:6, 149:11,
  149:14, 150:4,
  156:13.
personal 8:13,
  11:18, 11:20,
  16:16.
personally 64:12.
personnel 76:25.
persons 109:17,
  133:3, 133:4,
  158:12, 175:18.
perspective 139:7.
persuade 119:9,
  119:13.
persuaded 8:20,
  141:18, 144:12.
persuasive 96:13,
  107:19, 108:10.
pertaining 138:11.
pertinent 134:11.
Peter 1:25, 3:8.
phone 19:25, 20:1,
  21:23, 21:24,
  22:6, 25:2, 25:7,
  25:8, 47:14, 64:9,
  66:6, 114:16,
  134:13, 140:8,
  146:9, 157:3,
  164:22, 184:15,
  184:21.
Phones 12:1, 132:24,
  140:12.
phonetic 77:4.
photo 109:18,
  109:20, 174:11.
photograph 54:15,
  56:6, 79:8, 79:20,
  79:23, 80:3,
  174:8, 175:2.
photographs 54:16,

54:20, 109:23.
photos 55:2.
Physical 7:3, 102:2,
  131:3, 140:21,
  142:8.
picked 69:7,
  135:4.
picking 76:11.
picture 29:1, 38:3,
  38:20, 54:23,
  154:21, 174:7.
pictures 28:6, 39:9,
  40:17, 40:18,
  174:1.
piece 7:9, 7:11,
  143:22, 160:13,
  161:13.
pieces 160:9,
  178:6.
pinch 99:23.
Pioneer 5:23, 6:18,
  7:25, 10:15,
  13:19, 18:6, 18:7,
  18:8, 20:3, 21:8,
  25:3, 33:12,
  33:22, 34:1,
  38:6.
place 6:21, 7:5,
  16:11, 17:17,
  17:19, 21:25,
  63:18, 84:18,
  120:11, 124:4,
  146:25, 149:2,
  149:24, 181:2.
placed 19:25, 44:9,
  48:2, 76:2.
plain 18:23, 21:19,
  22:3, 69:14,
  69:16.
Plaintiff 1:7,
  1:23.
plan 17:19, 102:5,
  114:15, 117:18,
  169:25.
planning 19:23,
  33:21, 95:17.
plates 35:20.
plausible 142:7.
play 23:18, 108:11,
  144:6, 155:11.

playing 17:24,
    94:23.
plea 4:12, 4:14,
    5:13, 73:1, 93:2,
    95:18, 96:4,
    96:11, 100:7,
    112:12.
plead 93:21,
    112:10.
pleaded 91:14,
    111:15, 119:25.
pleading 96:10.
pleads 120:3.
pleas 112:2,
    117:5.
Please 3:2, 9:20,
    10:3, 30:6, 30:12,
    44:14, 44:24,
    44:25, 95:9,
    100:19, 183:21.
pled 94:9, 94:18,
    95:4, 157:4.
plus 166:3.
Pocket 42:3, 47:14,
    47:18.
point. 25:19,
    109:15, 139:11,
    177:14.
pointed 56:10,
    150:2.
pointing 58:10,
    58:22, 62:16,
    106:20.
poisonous 18:9.
policy 33:2, 48:9,
    48:17, 74:2,
    84:18, 85:3,
    85:20, 86:16,
    88:4, 88:7.
Popland 13:24.
porch 42:10,
    43:14.
portion 134:16,
    143:23.
pose 22:17.
position 5:12, 6:19,
    26:9, 45:14, 59:9,
    72:24, 115:11,
    121:23, 122:3,
    133:23, 140:23,

143:3, 158:3,
    159:13, 166:19,
    175:19.
positions 45:22.
positive 35:25,
    36:2, 36:3,
    103:3.
possessed 146:21.
possessing 95:19,
    112:10.
possession 67:13,
    111:25, 114:5,
    115:8, 115:15,
    116:13, 116:17,
    117:12, 119:11,
    119:21, 156:16.
possessory 27:21.
possible 4:22, 35:6,
    64:22, 79:15,
    83:9, 87:20.
possibly 91:24,
    93:10, 127:17.
post 170:10.
post-offense
    170:8.
posted 174:24,
    175:2.
posts 158:13.
potential 128:19.
potentially 22:15,
    111:11.
powerful 118:4.
practical 142:12.
practice 102:3.
Practiced 140:22.
precedent 15:18.
Precisely 90:19.
precision 58:24,
    59:5.
preclude 73:6,
    98:13, 100:7,
    112:19.
prefer 104:25.
preference 115:11.
prejudice 104:19,
    105:13, 105:15,
    106:6, 106:8,
    106:10, 108:24,
    109:23, 115:7,
    116:22, 118:18,

160:2, 160:3,
    171:25, 172:3,
    172:15.
prejudiced 114:24.
prejudicial 106:12,
    110:25, 117:9,
    119:10.
premature 160:3.
premise 92:23.
premises 7:4, 14:4,
    16:8, 16:10,
    16:22, 18:16,
    18:22, 19:3,
    25:14, 25:15,
    26:14, 40:14,
    41:15, 41:24,
    42:13, 43:3,
    151:3, 152:10.
prepared 17:3, 51:9,
    51:14, 51:23,
    73:19, 143:9,
    143:21, 156:18,
    158:4, 161:5,
    168:23.
prepares 125:22.
presence 36:4.
present 6:6, 23:7,
    26:8, 36:18, 43:5,
    84:10, 107:10,
    107:16, 142:13,
    156:19, 169:24,
    169:25, 185:6.
presentation 124:4,
    132:11.
presented 14:11,
    18:1, 107:6,
    108:25, 111:1,
    126:1, 155:13,
    155:16, 156:3,
    161:25.
presently 56:11,
    57:4.
preserve 171:2,
    171:6.
presumably 124:23.
presumption 116:6.
presumptuous
    96:22.
pretend 165:21.
pretrial 3:10,

```
 1        107:8.
      pretty 50:19, 64:19,
 2        99:23, 144:16,
          144:24.
 3    previously 4:14,
          120:5, 120:19,
 4        120:20, 120:24,
          177:21.
 5    primarily 131:13.
      primary 16:16,
 6        33:23.
      Prince 45:11, 45:16,
 7        70:10, 75:23,
          76:17, 77:6, 78:7,
 8        88:10, 88:19,
          89:5.
 9    principle 4:12,
          6:12, 6:15,
10        155:10.
      principles 137:6,
11        155:19.
      Prior 11:13, 25:5,
12        25:7, 35:4, 45:16,
          111:5, 111:10,
13        112:2, 118:23,
          119:2, 172:11.
14    Prison 165:5.
      privacy 6:20, 8:2,
15        13:10, 13:13,
          15:21, 17:4, 43:9,
16        133:24, 135:3,
          135:11, 135:22.
17    private 43:14.
      privilege 146:2.
18    probability 116:8.
      probably 4:21, 5:14,
19        11:15, 105:9,
          126:9, 126:12,
20        131:5, 164:8,
          175:5.
21    probative 171:2.
      probing 73:2.
22    problem 15:22, 58:3,
          91:6, 91:7, 92:17,
23        94:4, 94:7,
          108:25, 109:12,
24        116:12, 123:19,
          130:5, 130:22,
25        140:23, 140:24,
          141:12, 154:19,
```

```
      155:24, 158:18,
      172:23.
problematic 107:7,
      130:18, 163:22.
Problems 89:25,
      106:14, 147:12,
      158:24, 162:7.
procedure 123:14,
      123:15.
procedures 84:16,
      160:19.
proceeded 34:21,
      61:16, 94:17.
proceeding 5:17,
      88:11, 89:6, 93:2,
      108:12, 116:13.
proceedings 5:21,
      75:5, 104:7,
      107:13, 185:9,
      185:13.
proceedings. 27:9,
      100:22, 121:7,
      183:22.
process 5:4, 52:20,
      53:1, 67:11,
      92:13.
processes 77:24.
prodding 119:12.
product 121:24,
      122:7.
products 8:12.
proffer 6:23, 8:3,
      8:4, 20:14.
profile 173:17,
      174:7.
progress 179:1.
progressed 101:24.
prohibited 117:1,
      117:7, 118:15.
proof 9:9, 16:5,
      18:1, 19:8, 19:12,
      98:14, 106:17,
      108:9, 126:3,
      126:6, 126:19,
      126:24, 129:24,
      145:9, 146:4,
      159:5, 169:5.
proper 136:18.
properly 144:20.
property 11:16,
```

```
      11:17, 17:10,
      17:15, 17:21,
      17:24, 28:3, 28:7,
      28:9, 28:20,
      28:24, 29:4,
      43:14.
propose 73:17,
      73:20, 99:3.
proposes 104:10.
proposition 145:20,
      149:23.
prosecution 108:1.
prosecutor 109:10,
      130:9, 130:11.
protect 8:22, 23:2,
      48:18, 68:13.
protected 135:11.
protective 6:1,
      18:16, 18:20,
      18:24, 19:3,
      19:16, 20:25,
      21:20, 22:11,
      23:4, 23:23, 24:5,
      24:17, 40:25,
      41:1, 41:8,
      41:9.
prove 8:14, 108:1,
      108:2, 108:3,
      112:14, 115:1,
      115:9, 117:1,
      118:14, 118:16,
      124:8, 131:2,
      131:3, 131:4,
      159:18, 159:20.
proven 110:22.
provide 148:17,
      162:11, 162:18.
provided 23:24,
      47:10, 56:7,
      110:22, 137:23,
      139:17, 148:2,
      153:11, 166:2,
      174:19, 179:11.
provides 63:4,
      173:18, 173:23.
providing 14:7.
proximity 28:18.
public 29:4.
pull 83:1, 86:23,
      159:24.
```

| | | |
|---|---|---|
| 1 | pulled 47:5, 53:1, | questions 5:11, | 133:6, 141:5. |

pulled 47:5, 53:1,
  73:1, 82:13,
  83:23, 91:16.
punished 90:13.
punishment 66:13,
  83:21.
purpose 31:8, 53:13,
  124:13.
purposes 14:9,
  15:20.
pursuant 24:3,
  48:10, 133:2,
  157:10, 169:16,
  169:22, 172:9.
pursue 128:6, 138:2,
  176:3.
pursued 128:10.
pursuit 71:16,
  71:21, 75:18,
  75:23, 77:5, 78:6,
  78:14.
pursuits 78:19.
push 29:21,
  118:10.
pushed 29:24.
pushing/towing
  84:16.
put 9:9, 19:7,
  19:11, 35:1, 35:8,
  52:21, 64:22,
  66:23, 67:9,
  68:15, 95:10,
  107:25, 109:16,
  141:4, 159:4,
  178:3.
putting 146:14,
  147:1, 147:17.
.
.
< Q >.
qualifications
  163:18.
quality 129:21.
quantity 126:6.
Quarles 136:23,
  141:8.
questionable
  155:18.
questioned 44:11,
  96:1.

questions 5:11,
  12:15, 15:5, 29:7,
  36:22, 39:19,
  51:2, 79:2, 89:16,
  126:22, 142:18,
  180:25, 182:1.
quick 22:13, 23:1,
  173:13.
quickly 111:15.
quit 127:8.
quite 90:25, 93:19,
  107:19, 118:4.
quote 56:20, 59:11,
  59:15, 59:24,
  60:6, 145:1,
  149:23, 174:25.
.
.
< R >.
R-y-a-n 30:14.
R. 2:10.
racketeering 14:22,
  21:5, 110:3,
  114:7, 116:20,
  117:14, 164:17.
Raise 9:22, 30:6,
  44:16, 100:24.
raised 19:6, 101:2,
  103:7, 109:13,
  143:21, 183:12.
ran 20:14.
range 155:25.
rank 31:3, 45:14.
ranking 125:20.
Rapping 163:7.
Rather 51:22, 62:16,
  122:23, 123:22,
  135:7.
re-entry 99:17.
re-extend 4:13.
reach 49:8, 49:9,
  50:11, 58:16,
  118:13, 164:5.
reached 4:11.
read 50:2, 50:3,
  50:6, 69:12,
  74:15, 80:17,
  80:21, 84:14,
  84:22, 92:3, 97:4,
  123:21, 131:24,

133:6, 141:5.
readily 74:11.
reading 131:12,
  137:2.
reads 160:19.
ready 3:22, 22:10,
  26:5, 27:10, 66:2,
  141:13, 165:3,
  183:20.
reaffirmed 175:20.
real 7:25, 57:12,
  94:6, 105:13,
  105:15, 106:19,
  131:25, 140:13,
  165:20.
reality 130:6,
  149:22.
really 14:13, 24:2,
  28:21, 29:7,
  43:12, 70:20,
  72:24, 74:18,
  100:14, 104:24,
  117:8, 126:21,
  128:14, 142:6,
  144:24, 148:11,
  148:13, 154:22,
  155:11, 155:18,
  155:22.
rear 34:11, 48:22,
  48:23, 68:18,
  68:23, 70:1,
  87:13, 87:16,
  87:17, 88:8,
  151:5, 154:6.
reason 8:23, 23:2,
  24:22, 42:25,
  56:22, 56:24,
  78:21, 79:12,
  90:9, 90:10,
  90:13, 90:17,
  112:20, 122:5,
  137:12, 140:25,
  145:17, 171:25,
  172:3, 184:6.
reasonable 6:19,
  14:12, 15:21,
  17:5, 20:8,
  129:24, 139:11,
  144:9, 145:5,
  145:10, 148:25,

| | | |
|---|---|---|
| 1 | 149:6, 150:4, 155:3, 156:6. | record. 4:10, 72:19, 99:10. | regarding 138:21, 141:20, 181:1. |
| 2 | reasonableness 19:18. | recorded 71:11, 122:13, 132:24, | Regime 110:6, 110:8, 138:21, 147:21, |
| 3 | reasonably 19:14, 141:25, 142:1, | 133:16, 133:17, 133:25, 134:13. | 174:21. registered 27:25, |
| 4 | 144:13, 149:16, 155:4, 155:25. | recorded. 140:9. recording 80:16, | 84:5, 87:2. registration 47:8, |
| 5 | reasoning 96:7, 112:11. | 179:10, 180:8, 182:11. | 63:2, 86:23, 87:8. |
| 6 | reasons 118:3, 119:22, 123:23, | recordings 147:5. recover 48:20. | rejoined 81:1. related 147:5, |
| 7 | 125:4, 138:2, 138:7, 139:4, | recovered 13:17, 13:22, 43:23, | 156:17. relates 170:18, |
| 8 | 175:11, 176:21. reassert 120:7. | 48:21, 68:16, 95:16, 121:18, | 184:1. relation 34:9, 97:6, |
| 9 | receive 113:13, 113:15, 155:5. | 164:22, 164:23. recovery 156:19. | 152:1. relationship 100:15, |
| 10 | received 51:19, 88:18, 101:6, | recreate 58:19. red 38:8, 154:4. | 101:21, 102:13. relatively 116:12, |
| 11 | 114:22, 164:9. Recess 4:22, 95:7, | Redirect 15:6, 39:20, 79:3, 79:5, | 132:16. relatives 86:10. |
| 12 | 95:8. recesses 58:17. | 80:24, 186:21. reduced 71:13. | release 85:3, 86:17. |
| 13 | recitation 136:24. recognize 15:25, | refer 137:16. reference 20:24, | released 84:25, 85:13. |
| 14 | 29:18, 34:7, 49:16, 74:1, | 21:19, 52:4, 52:10, 52:18, | relevance 158:22. Relevancy 13:21, |
| 15 | 93:16. recognized 6:12, | 89:3, 89:13, 98:17, 147:5, | 83:15. relevant 8:21, |
| 16 | 6:16. recollection 60:13, | 161:16, 164:25, 165:15, 175:1. | 12:25, 13:6, 26:17, 28:22, |
| 17 | 61:12, 78:17, 99:11. | references 55:17. referred 17:23, | 52:9, 98:8, 148:12. |
| 18 | reconvene 185:5. record 6:21, 10:4, | 87:18. referring 70:23, | relief 177:11. rely 92:19, 92:20, |
| 19 | 27:21, 30:13, 32:15, 45:1, | 96:25. reflect 39:14, | 92:22, 144:10. remain 9:21, 81:1. |
| 20 | 80:15, 92:3, 95:10, 97:9, | 101:1, 104:1. reflected 113:3. | remanded 185:3. remedy 107:18. |
| 21 | 100:17, 100:23, 101:1, 104:1, | reflective 170:15. reflex 40:8. | remember 56:17, 56:24, 56:25, |
| 22 | 112:9, 114:1, 118:1, 118:17, | Refresh 99:11. refrigerator | 60:10, 61:22, 86:8, 143:15. |
| 23 | 121:8, 133:18, 168:11, 172:2, | 11:25. refuse 128:19. | Remind 110:5. reminded 44:1, |
| 24 | 173:13, 175:21, 175:24, 176:22, | regard 6:6, 14:14, 16:5, 119:12, | 119:14. removable 69:1. |
| 25 | 177:3, 178:4, 183:23, 185:13. | 124:6, 127:11, 161:11. | removed 48:2. renew 172:22. |

| | |
|---|---|
| 1 | renewed 159:2. |

renewed 159:2.
Reno 163:12, 165:5,
  165:16, 166:1.
rent 16:20.
renting 10:22.
reopening 97:9.
reopens 183:1.
repeat 59:2, 67:1,
  67:4.
rephrase 82:1.
reply 113:1, 113:11,
  136:1, 152:22.
report 37:10, 37:23,
  49:11, 49:17,
  49:18, 50:14,
  51:10, 51:16,
  51:22, 52:5,
  52:21, 53:22,
  65:4, 66:10, 84:2,
  125:21.
Reporter 1:47, 2:46,
  61:11, 72:21,
  80:15, 80:19,
  80:22, 185:17.
reporter. 80:14,
  80:21.
reports 70:7.
represent 101:9,
  103:18.
representing 3:25,
  4:3, 100:5,
  102:14.
request 130:12,
  177:10, 183:6,
  184:8.
require 99:1, 99:2,
  164:4.
required 63:23,
  64:2, 88:3,
  144:18, 175:24,
  185:6.
requirement 126:22,
  137:2, 149:2,
  149:5.
requires 123:10,
  132:10, 132:11.
reserve 112:7,
  170:7, 182:23.
reside 16:14,
  145:15, 145:18.

residences 145:2,
  145:4, 147:11,
  150:9, 151:22.
resident 25:13.
residential 17:14.
resides 149:11.
residing 10:20,
  16:9, 16:10,
  16:15, 16:17,
  25:14.
resolve 152:18,
  154:19, 158:8,
  173:10.
resolved 5:11,
  144:3, 173:3.
resort 142:1.
respect 8:23, 9:7,
  17:8, 22:21,
  24:17, 43:16,
  92:21, 97:22,
  98:10, 98:14,
  112:20, 136:13,
  136:14, 137:23,
  138:11, 140:3,
  140:17, 140:23,
  143:24, 159:6,
  165:23, 166:5,
  170:7, 177:21,
  183:2.
respond 33:11,
  100:8, 112:25,
  114:12.
responded 104:6.
respondent 70:24,
  76:20, 78:2.
response 32:5, 32:6,
  98:1, 99:4,
  104:23, 111:12,
  111:16, 111:21,
  112:2, 121:17,
  136:2, 143:3,
  169:23, 172:11,
  178:18, 181:24.
responsibilities
  103:23, 137:24.
responsibility
  142:16.
rest 8:21, 137:13,
  163:15.
restrictive 137:2.

result 35:24, 44:7,
  49:23, 82:13.
resulted 71:16.
return 102:3,
  129:22.
returned 111:23,
  111:24, 117:10,
  129:18.
revealing 142:4.
review 61:11, 72:11,
  143:2.
reviewed 99:21,
  102:21.
revisions 4:16,
  4:19, 4:21.
revolver 48:21,
  49:5, 68:17.
Rick 125:22.
RICO 110:13, 110:18,
  115:20, 136:22.
right- 61:16.
right-hand 57:8,
  57:12, 57:14,
  58:6, 62:18.
Rights 9:7, 49:24,
  50:2, 50:7, 50:8,
  71:10, 100:12,
  135:22.
ripe 97:21,
  112:16.
ripens 16:8.
rise 17:21,
  146:14.
rises 145:10.
risks 128:11.
Road 18:6, 46:21,
  47:1, 48:5, 62:18,
  75:22, 76:15,
  78:4, 83:7,
  178:3.
roadway 54:10, 60:6,
  60:24, 76:3.
robberies 17:20.
robbery 78:23,
  116:14.
Robinson 125:20,
  134:24, 143:5.
rocking 81:14.
role 108:11,
  125:14.

roles 17:25, 137:24,
    168:18.
roll 80:11, 81:6,
    81:15, 81:17.
rolled 61:9, 79:25,
    91:23.
rolling 108:7.
roof 34:20.
room 11:12, 11:22,
    16:20, 16:21,
    17:5, 25:23,
    25:24, 26:1, 26:2,
    29:8.
rounds 49:7.
route 23:20.
routinely 107:18,
    129:14.
Roy 181:1.
RPR 1:46, 2:45,
    185:11.
Ruger 68:17.
Rule 5:16, 22:10,
    26:5, 93:16,
    93:17, 94:3, 96:2,
    96:15, 98:4, 98:9,
    117:18, 117:21,
    134:9, 135:13,
    141:14, 150:10,
    160:19, 160:24,
    161:9, 161:16,
    165:3, 168:23,
    169:17, 169:22,
    169:24, 176:2,
    178:18.
ruled 13:7, 18:5,
    96:6, 96:7, 96:13,
    97:3, 97:4,
    121:11, 183:25.
Rules 74:1, 94:3,
    172:10.
ruling 33:3, 97:8,
    98:15, 111:5,
    111:13, 135:14,
    161:14, 166:24,
    167:3, 172:19.
rulings 24:16.
run 17:1, 47:12,
    47:16, 83:6,
    128:6, 128:8,
    141:25.

running 21:11,
    38:23, 83:1,
    93:24.
runs 136:8.
Ryan 30:1, 30:8,
    30:14, 186:11.
.
.
< S >.
safe 14:7.
safety 23:2, 138:5,
    139:6.
sake 154:7.
sale 164:19.
sanctions 125:16.
satisfy 140:1,
    141:9.
Savoy 125:23.
saw 58:14, 58:16,
    58:19, 60:23,
    69:13, 75:22,
    80:12, 81:5,
    81:22, 82:3,
    91:24, 92:10,
    94:21, 129:17,
    152:8, 153:25,
    154:1, 154:4,
    154:11, 154:13,
    154:14, 154:16.
saying 74:3, 99:12,
    104:9, 106:9,
    127:2, 127:4,
    128:22, 148:10,
    162:4, 165:20,
    168:5, 170:21,
    174:25.
says 7:17, 13:11,
    15:19, 28:10,
    37:23, 41:20,
    59:22, 60:3,
    69:25, 77:7, 78:1,
    79:13, 84:5,
    84:14, 84:15,
    85:12, 86:25,
    132:23, 138:18,
    140:3, 140:8,
    149:14, 152:16,
    160:18, 160:24,
    164:19, 179:1,
    180:7, 181:3,

    182:24.
SCA 160:22.
scale 91:17,
    131:23.
scan 27:19, 35:16,
    35:18, 35:22,
    36:19, 37:7,
    41:12, 42:7,
    42:16.
scans 31:18.
scene 19:25, 20:2,
    21:7, 34:4, 37:15,
    64:11, 66:2,
    84:10, 85:7, 86:8,
    86:10, 86:15,
    87:6.
schedule 177:12.
scheduled 101:9.
scheme 114:14,
    117:18.
scholarly 165:9.
scope 43:1,
    168:19.
screen 34:13, 49:14,
    51:25, 80:6.
scrupulously
    92:15.
Seagull 46:22,
    47:1.
searched 37:22,
    88:7, 143:18,
    149:24.
searched. 149:2.
searches 25:23,
    31:19, 48:18.
searching 68:11,
    146:1.
seat 10:3, 30:12,
    44:21, 48:22,
    49:8, 50:9, 50:11,
    68:22, 68:23,
    69:2, 70:3, 87:17,
    87:18, 88:2,
    106:12, 151:5.
seated 3:2, 4:7,
    49:22, 69:1,
    95:9.
Second 20:13, 26:16,
    34:20, 40:12,
    55:9, 57:25, 79:3,

111:22, 111:23,
  112:8, 117:9,
  120:18, 152:21,
  156:15, 162:10,
  167:21.
seconds 75:16,
  75:24, 75:25,
  76:7.
Section 55:23,
  59:15, 77:6, 78:7,
  83:18, 123:21,
  124:5, 128:17,
  137:22, 138:9,
  138:13, 139:5,
  139:18, 150:15.
sections 150:17.
secure 35:10.
Secured 36:20,
  37:4.
security 178:5.
seeing 58:23, 59:5,
  59:8, 74:7.
seek 159:10.
seeking 96:24,
  112:19, 141:15,
  142:1, 148:18,
  148:20.
seemed 102:22.
seems 100:16,
  129:23, 130:17,
  131:19, 181:11.
seen 20:25, 24:4,
  107:22.
sees 102:20.
seized 24:5, 149:1,
  149:24, 157:3.
seizure 44:4, 52:21,
  96:2.
self-incrimination
  8:25.
selling 124:16,
  124:23, 124:24.
send 132:6.
sending 103:3,
  139:7.
sends 162:22.
senior 130:11.
sense 17:22, 112:8,
  138:16, 142:12.
sent 73:16.

sentence 93:20,
  104:25.
separate 71:8, 73:3,
  110:4, 119:20,
  156:4.
separately 104:24,
  109:11.
September 113:22,
  117:10.
sequences 75:21.
Sergeant 7:14, 7:20,
  18:18, 19:12,
  20:8, 21:13,
  114:15, 114:17,
  179:2.
series 122:13.
serious 91:1, 93:9,
  109:23, 126:4.
Servance 149:22,
  152:21.
serve 33:18, 33:21,
  43:3.
served 38:5.
service 33:16,
  35:5.
set 28:15, 34:3,
  119:22, 142:19,
  173:20, 175:12,
  177:12.
settled 161:3,
  161:4.
seven 31:2, 139:23,
  141:6.
sever 99:5,
  168:13.
several 17:24,
  58:25.
severance 104:11,
  104:13, 104:18,
  105:9, 106:19,
  109:7, 111:2,
  113:10, 113:12,
  114:3, 119:19,
  119:23, 119:24,
  120:6, 120:9,
  120:17, 120:18,
  121:2, 121:3,
  121:9.
severed 114:6.
shadow 92:16.

shall 59:13, 77:8,
  78:8.
Shawn 125:23,
  184:15, 184:21.
sheet 50:4.
shells 26:19,
  164:24.
Sheppard 144:4,
  144:6, 154:20,
  155:8, 155:23.
shit 140:8, 140:9,
  164:19.
Shoes 11:21,
  25:20.
shooting 19:25,
  20:2, 21:7, 21:8,
  21:25, 78:23,
  132:18, 163:1,
  181:1.
shootout 35:9.
Shortly 150:23.
shot 93:15, 146:12,
  146:19, 165:5,
  165:16, 166:1,
  181:4.
shot. 146:23.
shouldn't 122:2,
  133:18, 141:2,
  155:21, 170:2.
Show 6:17, 8:1,
  28:6, 28:25,
  29:14, 34:6,
  37:24, 38:12,
  40:18, 49:13,
  53:9, 54:3, 54:16,
  79:7, 84:1, 84:13,
  127:17, 128:5,
  129:7, 136:24,
  183:25.
showed 72:5, 75:16,
  76:7, 86:2,
  137:14, 138:19.
showing 6:9, 49:14,
  84:21, 114:21,
  114:23, 123:10,
  136:18, 141:7,
  162:3, 164:2,
  174:2.
showings 130:22,
  140:16.

shown 6:21, 39:9,
  116:24, 124:19,
  127:4, 132:14,
  141:12.
shows 6:11, 40:17,
  116:18, 116:22,
  126:2, 138:25.
sic 42:16, 93:16.
side 34:5, 36:16,
  38:23, 47:7, 49:3,
  58:18, 59:14,
  68:18, 90:1, 94:1,
  104:17, 104:19,
  134:5.
sidewalk 80:8.
sign 47:2, 53:12,
  53:14, 53:16,
  54:6, 55:7, 59:13,
  60:23, 61:4, 61:7,
  61:9, 61:15,
  61:16, 61:23,
  81:6, 81:12,
  81:24, 82:11,
  83:1, 83:2, 83:6,
  83:10, 83:14,
  83:19, 92:11,
  94:19, 126:2,
  144:12, 155:2,
  175:4.
signal 103:3.
signed 5:13.
significance 70:7,
  94:2.
significant 26:20,
  66:16, 66:20,
  67:6.
silver 13:18, 26:24,
  27:15, 34:10,
  35:19, 35:22,
  39:5, 39:7,
  68:17.
similar 38:4,
  105:17, 109:9,
  136:22, 144:19,
  150:13.
simple 184:20.
simplest 154:19.
simply 82:24,
  123:17, 123:24,
  124:24, 125:2,

127:6, 129:10,
  145:24, 154:20,
  158:11, 158:13,
  179:1, 184:21.
simultaneously
  103:22, 128:11.
sing 165:24.
single 168:1, 168:7,
  168:15.
sir. 104:6.
sirens 47:4, 72:8.
sit 32:5, 32:6.
sits 32:8.
sitting 48:4,
  155:12, 155:19,
  179:6.
situation 17:3,
  20:12, 26:3,
  41:10, 42:3, 42:5,
  42:24, 43:12,
  62:21, 62:23,
  101:5, 102:13,
  109:9, 113:7,
  115:24, 142:11,
  155:24, 168:7.
six 24:24, 49:7,
  76:22.
Sixth 100:12.
skills 43:6.
slam 105:9.
slept 11:23.
slide 10:7.
slightly 173:8.
slow 81:16.
slowed 80:4.
slower 31:16.
slowly 77:25.
small 49:10,
  117:7.
smelled 42:4,
  42:10.
smelling 41:23.
smells 32:9, 42:2.
Smith 148:8,
  150:24.
sniff 40:13, 42:22,
  43:7.
soap 11:24.
social 6:13, 151:16,
  157:9, 158:12,

158:14, 160:9,
  162:6, 162:19,
  162:23, 163:24,
  164:13, 166:2,
  173:4, 176:18.
sole 87:2, 107:5.
solely 17:17, 17:18,
  23:2, 148:19,
  184:21.
Solomon 96:9, 97:12,
  99:16, 100:3,
  100:16, 101:11,
  101:14, 101:25,
  102:2, 102:15,
  102:16, 102:23,
  103:16, 103:22.
solution 118:11.
solve 94:4.
Somebody 7:5, 16:19,
  25:22, 63:23,
  64:3, 82:23,
  85:10, 90:8,
  96:23, 120:4,
  132:6, 132:7,
  154:2, 165:20,
  181:3.
somehow 6:18, 14:5,
  144:5.
Someone 16:9, 22:14,
  57:14, 80:12,
  81:22, 81:24,
  82:4, 83:14,
  83:23, 90:17,
  107:18, 146:12,
  153:1, 164:7,
  165:17, 175:20,
  175:25.
someplace 129:9.
sometime 101:6.
Sometimes 87:18,
  107:15, 126:19.
somewhat 102:2,
  107:16, 136:22.
somewhere 165:10.
son 86:24.
Sonata 150:25.
song 165:4, 165:16,
  165:24.
soon 52:5.
Sorry 12:3, 13:3,

```
1    13:4, 27:1, 27:2,        136:5, 149:15,         statements 50:6,
     31:17, 36:2,             161:18.                  70:12, 71:9,
2    56:23, 70:14,         speculation 22:6.           123:25, 159:7,
     82:19, 111:19,        speed 76:6, 76:9,           159:10, 159:14,
3    113:14, 122:24,          76:11, 103:17.           167:7, 178:16,
     152:14, 153:19,       speeding 75:22.             178:24, 183:3,
4    156:15, 157:17,       spell 10:4, 30:13,          183:11, 184:1,
     162:1.                   45:1, 152:7.             184:7.
5    sort 19:1, 22:18,     Spelling 179:4.          States 1:1, 1:5,
     100:17, 108:11,       spend 145:12.               3:5, 59:10, 65:17,
6    118:5, 118:22,        spent 17:9.                 173:16, 185:5.
     126:5, 141:23,        split 115:22.            stating 24:24.
7    142:6, 165:19,        spoke 109:4, 167:10,     status 47:16, 96:14,
     165:22.                  167:11.                  100:3, 117:2,
8    sought 23:9.          spoken 122:14.             117:7, 118:15,
     sound 37:12,          spokes 109:5.              122:17.
9    74:19.                spots 76:2.             statute 123:13,
     Sounds 37:13, 69:13,  SQ 7:17.                   126:23, 161:18.
10   158:21, 168:12.       staff 102:8,            statutorily 135:3.
     source 127:12,           178:5.               stay 8:8, 8:10,
11   132:6, 138:3.         stalled 141:19.            8:11, 11:4, 11:6,
     Sources 125:12,       stand 8:22, 8:24,          11:8, 11:10, 16:6,
12   125:13, 127:10,          9:6, 9:9, 19:12,        109:14.
     137:19, 137:21,          30:4, 44:14,         stayed 15:16.
13   137:23, 138:12,          149:22.              staying 7:19, 7:22,
     138:14.               stand-off 20:12.           11:13, 15:24,
14   southbound 151:1.     standard 129:24,           16:22, 17:2.
     Southern 46:1, 46:4,     136:10, 136:14,      stays 153:5.
15   46:9, 46:11.             148:6, 154:25,       stenographic
     space 68:21, 132:21,     155:7, 155:11,          185:12.
16   133:17, 135:7.           159:23.              step 15:8, 39:22,
     speaking 9:11,        standings 135:3.           89:17.
17   64:12, 90:4,          standpoint 165:12.     steps 179:6.
     114:16, 134:23.       stands 97:8,            stick 65:1, 65:3,
18   Special 3:9,             100:16.                 65:6, 68:24.
     145:25.               start 27:24, 31:10,     sticks 64:19,
19   specific 20:19,          52:2, 91:17,            64:21.
     82:16, 97:15,            118:10, 137:19,      Stimey 125:14,
20   119:10, 123:22,          147:15, 153:20,         150:21.
     124:5, 125:6,            159:4.               sting 119:8.
21   132:11, 136:13,       started 91:23, 92:1,    stipulate 91:15,
     173:16, 177:10,          147:14.                 95:15, 156:18.
22   177:12.               Starting 99:5,          stipulated 72:25.
     Specifically 23:8,       176:5.               stipulation 95:20,
23   24:14, 25:9,          starts 155:18.             118:14, 119:11.
     25:10, 46:10,         stash 7:1, 17:19,       stop. 92:1.
24   46:12, 49:18,            141:23.              stopped 53:16,
     50:23, 56:5,          stashed 87:21.             53:19, 61:1, 61:8,
25   98:17, 116:12,        stated 47:18, 50:11,       61:13, 61:15,
     129:7, 132:1,            181:9, 183:4.           62:20, 92:22,
```

| | | |
|---|---|---|
| 1 | 94:9, 94:10, 95:1, 95:2, 141:25. | 59:23, 60:3. | supply 26:17. |
| 2 | stopped. 92:2. | subsections 55:11. | support 18:25, |
| 3 | stopping 44:7, 80:1, 81:12. | subsequent 6:1, 18:13, 18:24, 26:12. | 21:16, 26:8, 26:16, 108:8, 135:17, 145:12, |
| 4 | stops 63:22. | substance 26:7, | 168:2. |
| | store 145:6, 150:5. | 74:10, 121:11, 144:6, 179:9. | supported 148:23. |
| 5 | Stored 160:16, 160:17, 161:15. | substances 43:8. | supporting 150:16, 151:16. |
| 6 | storing 16:12. | substantial 107:11, 108:8, 108:9, | Suppose 15:24, 23:20, 145:21. |
| 7 | story 101:13, 107:9, 109:21. | 108:13, 141:16. | supposed 90:24. |
| | stray 175:22. | substantive 116:14. | supposedly 146:23. |
| 8 | Street 1:48, 2:47, 7:20, 29:5, 39:6, | succeed. 138:23. | suppress 19:2, 24:14, 24:20, |
| 9 | 42:2, 53:8, 151:1, 154:4, 174:17. | success 125:12. successful 124:13, 126:8, 137:15. | 26:21, 43:17, 43:22, 44:3, 95:20, 97:19, |
| 10 | street-level 125:23. | suffice 113:6. sufficient 25:12, | 121:14, 122:12, 123:2, 137:9, |
| 11 | strictly 9:9, 74:1. | 127:5, 129:7, 129:21, 130:24, | 143:10, 144:7, 150:14, 156:12, |
| 12 | structure 18:11. | 131:6, 132:2, 132:4, 142:19, | 157:2, 157:9, 160:9, 166:11, |
| 13 | stuck 65:1, 65:23. Stuckey 6:15. | 142:20, 165:14, 167:2. | 167:6, 173:4, 178:16, 183:2, |
| 14 | stuff 12:12, 25:25, 26:3, 127:20, | suggest 36:17, 107:8, 109:3. | 184:1, 184:14. suppression 144:3. |
| 15 | 159:23, 163:1. subject 33:17, | suggested 107:18. suggestion 106:19, | Supreme 33:3, 116:4. |
| 16 | 133:25, 150:4, 150:7, 151:4, | 153:11, 179:14. suggests 7:24, | surprise 54:21. surprised 65:20. |
| 17 | 152:9. subjecting 9:10. | 166:4. sum 179:9. | surprises 170:2. surrendering |
| 18 | subjective 17:4. subjects 139:9. | superiors 71:20. Superseding 111:22, | 34:24. surrounded 20:11, |
| 19 | submit 8:1, 15:15, 15:22, 117:23, | 111:23, 112:8, 117:9, 120:18, | 21:12. surveillance 91:3, |
| 20 | 117:24, 132:13, 138:24, 152:12, | 156:15, 156:16, 170:11. | 99:22, 123:8, 123:11, 123:23, |
| 21 | 155:4, 161:5, 167:20, 168:9, | supervise 130:12. supervises 125:21. | 131:3, 140:17, 140:22, 141:3, |
| 22 | 184:16. submitted 23:21, | supervising 101:7. supervisors 95:12. | 142:8, 151:7, 152:8, 153:3, |
| 23 | 72:23, 166:6. submitting 154:23. | supplied 26:15, 151:17, 165:14, | 153:14. suspect 33:1, 33:2, |
| 24 | subpoenas 140:18. Subsection 55:12, | 166:3. suppliers 141:22. | 33:4, 72:5, 75:12, 78:21, 145:2, |
| 25 | 55:13, 55:17, 55:23, 57:22, 59:19, 59:22, | supplies 125:22, 125:23. | 145:3, 145:4, 149:6, 153:2. |

suspected 22:3,
    23:11, 148:25,
    151:7, 152:9.
suspended 44:8,
    47:19, 47:25,
    48:1, 51:1, 63:6,
    63:9, 63:10,
    63:18, 63:21,
    68:8, 86:24,
    93:20.
suspension 94:15.
suspicion 7:18,
    145:6.
Sustained 13:15,
    14:15, 72:11,
    73:12, 73:15,
    73:19, 74:4,
    76:20, 78:1,
    78:10, 78:18,
    82:1, 83:12,
    88:15.
SWAT 35:7.
swear 66:13.
swearing 147:24.
sweep 6:1, 18:16,
    18:20, 18:24,
    19:3, 19:16,
    20:25, 21:20,
    22:11, 23:4,
    23:23, 24:5,
    24:17, 40:25,
    41:1, 41:8,
    41:9.
sworn 9:21, 9:25,
    30:9, 44:18,
    164:8.
synonymous 55:6.
.
.
< T >.
T. 1:46, 2:45,
    181:22, 185:16.
T3 131:19, 133:3,
    136:2.
table 3:9, 4:1,
    112:1.
tactic 138:8.
tail 153:3.
tainted 19:1.
taken. 95:8.

talked 95:12,
    130:23, 133:15,
    134:17, 148:15,
    152:15, 153:14,
    162:7.
Tameeka 84:9.
tamper 164:16.
tape 91:3, 180:8.
target 124:14,
    139:9, 141:17,
    142:4, 148:24.
targeted 138:22.
targets 124:23,
    126:3, 127:19,
    139:6.
task 33:15.
team 7:14, 35:7.
tearing 68:11.
Technically 90:4,
    112:15, 112:21,
    170:12, 171:12.
technique 130:13,
    142:2.
techniques 166:22.
telephone 19:21,
    137:25, 148:15.
Temple 78:4.
temporary 25:13,
    145:2.
ten 11:1, 147:15.
term 16:16,
    146:10.
terminology 41:14.
terms 52:8, 71:15,
    74:10, 108:11,
    109:6, 118:18,
    131:17, 137:5,
    137:13, 137:14,
    144:2.
test 74:23, 144:16,
    144:17.
testified 10:1,
    18:18, 20:15,
    21:14, 30:10,
    41:5, 44:19, 61:6,
    66:16, 69:23,
    79:24, 81:5.
testifies 28:5,
    182:24.
testify 8:15, 9:2,

9:6, 20:17,
    129:17, 172:13.
testimony 13:17,
    13:19, 17:7,
    29:25, 52:25,
    56:15, 75:21,
    76:11, 80:16,
    91:7, 95:14,
    99:2.
text 84:22.
Thanks 119:17.
themselves 145:13,
    169:1.
Theoretically 57:16,
    57:17.
theories 98:13,
    169:11, 169:13.
theory 14:3, 14:16,
    74:13, 144:7,
    151:24, 159:6,
    176:3.
thereafter 71:8,
    150:23.
thereby 9:6.
they've 105:22,
    124:19, 125:8,
    126:15, 126:20,
    127:6, 127:18,
    133:15, 168:7.
thinking 7:22,
    120:23.
Third 4:18, 23:20,
    67:21, 162:22,
    175:1.
this. 99:13.
Thomas 3:6.
Thompson 78:5.
thoroughly 76:16,
    88:4.
though 58:4, 74:6,
    89:9, 124:13,
    144:12, 148:13,
    163:1.
thoughts 66:22,
    66:24, 67:2.
threat 22:18.
three 5:6, 25:24,
    31:23, 71:4,
    75:16, 75:24,
    76:7, 88:23,

```
1    128:5, 136:9,         tough 57:12.           transported 179:7,
     152:24.               tow 49:11, 49:18.        179:8, 180:6.
2  Throughout 19:20,       toward 118:11.         trash 136:8.
     124:3, 137:17,        towed 48:6, 48:8,      travel 102:5.
3    159:14.                 48:14, 49:17,        traveling 57:3,
   thrust 19:4.              84:2, 85:21.           58:21, 60:8,
4  thumbnail 44:1.         towing 48:19.            62:17, 72:6, 75:9,
   tie 151:23.             tracked 19:24, 20:2,     75:10, 151:1.
5  tied 23:14.               21:7, 22:7,          treat 35:7.
   ties 17:10, 125:6.        166:20.              treated 89:5,
6  timely 178:17.          tracking 21:23,          89:11.
   titled 137:22,            21:24.               tree 38:19.
7    139:19.               tracks 17:2.           trees 57:13, 58:5,
   Toby 12:19, 12:22.      trafficker 148:8,        58:25, 59:6,
8  today 5:9, 56:13,         149:15.                79:21.
     61:17, 61:23,         traffickers 145:6,     trials 107:9.
9    65:1, 67:2, 88:14,      147:9, 147:10,       tried 20:13, 21:9,
     100:6, 101:10,          150:9, 151:21,         124:9, 124:14,
10   112:19, 112:22,         163:24.                124:20, 125:9,
     113:5.                trafficking 126:4,       128:21, 132:12.
11 together 5:11, 20:8,      145:5, 147:6,        trimmers 11:24.
     109:14, 109:17,         147:11, 147:19,      Trooper 27:18, 28:5,
12   141:5.                  150:7, 150:13,         30:1, 30:8, 30:15,
   token 7:13.               151:10, 154:9,         30:21, 31:4,
13 took 21:12, 21:25,        162:6, 162:11,         32:15, 32:21,
     23:20, 25:17,           162:20, 164:15.        34:17, 37:3, 38:2,
14   42:9, 54:20, 55:2,    Trained 31:13,           38:16, 39:22,
     63:18, 77:15,           31:17, 32:1,           41:10, 41:13,
15   146:25, 181:2.          35:25, 36:4, 36:6,     42:6, 42:16,
   tool 134:17,              36:7, 36:8, 36:10,     186:11.
16   138:23.                 36:11, 144:20.       tropes 163:8.
   toothbrush 11:24,       training 144:19,      troubled 107:16.
17   17:13, 25:20.           147:9, 147:13,      true 57:17, 60:17,
   toothbrushes 8:12.        151:14, 151:17,        102:4, 124:2,
18 toothpaste 11:24,         151:19, 155:6,         131:5, 140:21,
     17:13.                  162:5, 162:9,          147:25, 151:9,
19 top 58:11, 58:22,         164:9.                 163:20.
     59:4, 79:13,          Trainor 1:37, 3:17,   truly 142:13.
20   84:14, 124:1,           178:11.             truthful 75:1.
     141:22, 148:17.       transaction 148:17,  truthfulness 73:3.
21 topic 90:22,              151:8, 152:9,       try 107:25, 108:23,
     135:15.                 153:1.                 109:10, 129:8,
22 topics 9:10.            transcribes             129:9, 141:24,
   total 86:6.               125:18.                153:3.
23 totality 14:11,         Transcript 1:17,      trying 57:13, 58:16,
     22:11, 156:2.           71:13, 80:21,          68:12, 81:22,
24 Touch 34:15, 38:14,       185:12.                82:4, 82:23,
     80:6.                 Transportation          106:9, 106:11,
25 touched 69:2,             53:15, 55:11,          143:15, 149:21,
     69:9.                   57:18, 59:10.          153:13, 168:8.
```

```
 1   Tuesday 132:7.              129:16, 131:2,           3:5, 65:17,
     Turn 35:9, 38:1,           132:5, 132:6,            185:5.
 2     49:9, 57:6, 57:7,        142:5.                  Units 45:25.
       57:8, 57:12,           undercovers 136:13,       universe 117:8.
 3     57:14, 57:20,            139:1, 139:8.           unknown 150:23,
       58:6, 61:14,           undercut 14:15.            152:6, 154:2.
 4     61:17, 62:18,          undercuts 118:22.         unlawful 14:4.
       76:5, 76:9, 80:16,     underlying 73:7,          Unless 59:11,
 5     90:21, 99:2,             98:3.                     103:13, 137:3,
       102:1, 134:19,         underneath 49:1,           161:10, 176:3.
 6     143:10.                  49:2, 68:21,            unlikely 138:23.
     turned 81:19,              88:2.                   unnecessary 14:13.
 7     124:22, 170:1.         understand 56:7,          unrelated 73:3,
     turning 60:12,             70:6, 70:10,              118:6, 121:22.
 8     60:13, 91:20,            76:19, 100:11,          until 77:24, 95:7.
       91:25.                   100:18, 109:2,          upheld 145:3.
 9   turns 42:17, 43:6.         109:6, 115:5,           upper 138:21,
     TV 11:23, 17:11.           128:21, 132:8,            141:10.
10   twice 124:20,              132:22, 144:12,         ups 136:20.
       125:9.                   154:18, 154:24,         upstairs 11:22.
11   two-year 93:20.            154:25, 167:8,          urban 142:9.
     two. 72:13.                168:10, 172:19,         useful 136:25,
12   tying 150:7, 151:10,       176:20.                   139:3.
       152:23.               understanding 4:13,       user 173:17,
13   type 40:18, 42:5,          5:25, 100:3,              174:16.
       96:12, 109:1,            100:4, 102:12,          uses 93:17.
14     116:22, 129:20,          102:15, 103:17,         Using 24:24, 25:5,
       163:9, 174:2.            180:13.                   73:4, 74:2, 83:17,
15   typically 83:13.        understands 57:2,            173:21, 173:22,
     .                          135:14.                   179:21, 180:12,
16   .                       Understood 9:13,             182:2, 182:22.
     < U >.                     49:24, 50:8,            utilities 7:6,
17   U-turn 62:19.              102:22, 161:8,            7:7.
     ubiquitous 130:14.         169:3, 171:16,          utility 140:12.
18   ultimate 148:11.           183:2.                  .
     ultimately 23:19,       underway 22:20.            .
19     24:2, 92:8,           underwear 11:21.           < V >.
       127:25, 131:11,       unduly 137:3.              v. 28:11, 33:3,
20     142:18, 171:11.       unexpectedly 102:1,          42:7, 115:25,
     unable 108:1, 108:2,       102:2.                    167:24.
21     116:9.                unforeseen 101:23.         vacant 7:4.
     unattached 148:4.       Unfortunately 50:4,       vague 25:9.
22   unconstitutional           50:17, 50:20,          valid 32:11,
       96:2.                    66:23, 77:24,             93:17.
23   uncovered 126:12.          87:9.                   validity 44:11,
     undercover 124:6,       unimpeded 57:20.             173:19.
24     124:8, 124:12,        unique 5:2.               valuables 67:23,
       124:18, 124:20,       uniqueness 107:13.          87:20, 88:1,
25     125:1, 127:7,         unit 179:7.                 88:5.
       128:15, 129:1,        United 1:1, 1:5,          value 74:6, 74:9.
```

Van 101:19, 101:20,
    101:22.
variance 107:2.
various 24:4, 31:18,
    104:10.
vehicle. 42:7,
    68:18.
vehicles 48:9,
    71:21, 84:17,
    151:3.
verbal 34:21.
verdict 129:22,
    130:24.
versa 154:17.
version 71:5, 71:15,
    78:12.
versus 3:5, 6:13,
    13:11, 116:5,
    185:5.
vetted 76:16.
vice 154:17.
Vick 181:1.
video 129:25,
    164:18, 180:9.
videos 108:22.
view 18:23, 21:19,
    22:3, 40:19,
    57:14, 58:6, 59:1,
    59:7, 60:5, 69:14,
    69:16, 103:7,
    178:2, 179:23.
vigorously 103:6.
vindicate 9:3.
violation 43:9,
    43:16, 46:18,
    50:21, 52:19,
    53:24, 68:5,
    72:12, 73:2, 77:6,
    78:6, 83:5, 86:19,
    88:15, 90:1, 90:2,
    90:3, 91:16,
    91:19, 92:7, 92:8,
    92:10, 92:11,
    92:24, 94:10,
    94:11, 95:1, 95:2,
    95:3.
violations 50:23.
violence 19:23,
    52:4.
violent 14:7, 20:6,

22:22, 46:8,
    142:4, 164:15.
virtually 123:14.
virtue 120:17.
vis-a-vis 100:3.
visited 54:19.
voice 44:25.
volume 107:11.
voluminous 178:25.
voluntarily 25:17,
    25:20.
voluntary 182:20.
vs 1:8.
.
.
< W >.
W. 1:48, 2:47.
waive 9:7.
waived 9:12.
waiver 8:25.
walk 45:22, 137:6,
    137:16.
walked 41:8,
    43:10.
Walker 125:14,
    150:21, 150:22,
    151:2, 152:5,
    153:23, 154:1,
    154:8, 154:11,
    154:15, 154:17.
walking 42:2.
wanted 50:9, 101:3,
    137:5, 138:3,
    138:5, 178:3.
wants 95:10, 104:20,
    109:6, 111:2.
warnings 49:21.
warranted 24:17.
warrantless 18:22,
    156:13, 184:14.
Warrants 136:7,
    139:16, 139:18,
    139:19, 139:20,
    139:23, 140:2,
    143:11, 145:1,
    145:3, 151:16,
    157:10.
Warren 125:17,
    125:19.
washer 12:1.

washing 17:12.
watch 14:24.
wealth 138:10.
weapon 26:19,
    69:14.
wearing 162:24.
weary 137:1.
Wednesday 1:19,
    132:7.
week 11:15, 65:15,
    65:16, 65:18,
    102:21, 102:25,
    112:18, 112:22,
    112:25, 124:20,
    125:9, 128:21,
    129:3, 129:9,
    132:21, 133:17,
    139:2, 156:14.
weekend 11:15.
weeks 68:20, 107:10,
    160:1.
weighing 155:15.
weight 74:3,
    110:1.
Welch 1:43, 3:19,
    3:20, 3:21, 4:8,
    4:11, 5:1, 5:19,
    176:10, 176:11,
    176:15, 178:13.
Wesley 1:35, 3:6,
    3:18, 174:21.
Western 45:25.
Whatever 16:1,
    67:24, 94:14,
    94:19, 110:6,
    154:8, 154:25.
whatsoever 174:2.
whereabouts 33:1.
whichever 55:14.
Whoa 160:21.
whole 54:20, 92:13,
    108:21, 131:3,
    131:4, 131:5,
    133:10, 138:24,
    139:18, 141:4,
    141:5, 160:15.
wider 9:10.
wife 86:23, 87:2.
William 1:43, 3:20,
    125:21.

Williams 149:21,
  152:17.
willing 85:24,
  95:15.
Willis 179:2.
Willock 141:8.
window 20:13, 21:9,
  34:23.
wire 134:12.
wiretap 7:13, 7:23,
  20:4, 123:2,
  123:18, 126:2,
  126:22, 130:10,
  133:3, 133:9,
  134:17, 136:11,
  137:7, 137:9,
  142:21, 150:12,
  150:14, 150:20,
  152:4, 166:11,
  167:1, 167:2.
wiretapping 125:5.
wiretaps 133:17,
  142:21.
wishes 104:18.
withdraw 122:15,
  167:11.
withdrawing 122:20,
  171:23.
Withdrawn 82:22,
  122:21, 167:13,
  177:17, 177:18,
  177:19, 177:20.
Within 19:23, 28:7,
  29:13, 40:21,
  43:3, 49:8, 50:10,
  73:9, 119:20,
  131:14, 132:20,
  155:25, 161:21,
  169:9, 170:15,
  170:18, 181:17.
without 9:9, 18:9,
  18:15, 48:3, 80:1,
  81:17, 85:4,
  86:17, 93:9,
  107:9, 135:19,
  160:2, 160:3,
  171:24, 172:3,
  172:14.
withstood 110:14.
witnessed 46:18.

witnesses 5:7,
  71:25, 89:19,
  89:22, 109:19,
  163:25, 164:16.
woman 140:6.
word 117:23, 152:12,
  162:15.
wording 131:18.
words 36:12,
  61:14.
work 30:24, 45:17,
  45:20, 70:10,
  88:18, 107:23,
  118:11, 123:25,
  128:16, 145:16.
worked 31:22, 45:12,
  124:10, 130:10.
working 33:8, 45:16,
  77:15, 129:13.
world 67:24,
  165:25.
worse 129:23.
Wright 140:7.
write 50:21, 53:4,
  53:22, 55:5,
  109:22.
writing 70:7.
wrongly 146:21.
wrote 52:5, 65:3,
  65:6, 68:6, 69:12,
  90:15, 148:22.
.
.
< X >.
X. 125:8.
.
.
< Y >.
yard 48:7, 85:21.
years 11:1, 31:2,
  31:23, 45:13,
  79:16, 88:14,
  106:2, 110:18,
  130:14, 147:15.
yesterday 7:15,
  18:3, 18:18,
  20:15, 20:17,
  21:14, 42:1,
  54:19, 101:10,
  109:18, 114:16,

  166:12.
YGF 110:6, 179:4.
yielded 141:16.
Young 50:19, 130:8,
  179:4.
yourself 40:9,
  51:23, 100:16,
  102:15.
Yup 20:23.
.
.
< Z >.
zone 23:17.