```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF MARYLAND
 2

 3   UNITED STATES OF AMERICA,        )
                                      )
 4             Plaintiff,             )
          vs.                         )
 5                                    )  CRIMINAL NO.: JKB-16-0363
     GERALD JOHNSON, et al.,          )  Jury Trial:  Volume 7
 6                                    )
               Defendant.             )
 7                                    )
     _____)

 8

 9                   Transcript of Proceedings
               Before the Honorable James K. Bredar
10                  Monday, December 4th, 2017
                       Baltimore, Maryland
11

12   For the Plaintiff:

13        Peter J. Martinez, AUSA

14        Christina A. Hoffman, AUSA

15   For Defendant Gerald Johnson:

16        Paul F. Enzinna, Esquire

17        Jeffrey B. O'Toole, Esquire

18   For Defendant Kenneth Jones:

19        Alan R.L. Bussard, Esquire

20   For Defendant Marquise McCants:

21        John R. Francomano, III, Esquire

22
     _____
23                  Christine T. Asif, RPR, FCRR
                    Federal Official Court Reporter
24                  101 W. Lombard Street, 4th Floor
                       Baltimore, Maryland 21201
25
```

1                        P R O C E E D I N G S

2              THE COURT:  On the record in JKB-16-0363, United

3    States versus Johnson, et al.  We're ready to begin our trial

4    day.

5              Mr. Martinez, trial was scheduled to begin this

6    morning at 9:45.  I understand there was a telephone

7    conference between you and my chambers in reference to a

8    sentencing that was set in for 9:30.  Subsequent to that

9    telephone conference, the sentencing had to be vacated because

10   the Marshals were unable to get the defendant here for

11   sentencing.  My understanding of the conference was that you

12   asked if the sentencing was going forward, my chambers

13   confirmed that it was.  And the best understanding from in

14   chambers that I've received is that you were told that -- you

15   asked if court would then begin around 10:00 and that's what

16   was confirmed.  Perhaps my chambers assistant should not have

17   given you that advice, but regardless, it was 10:00, not

18   10:20.

19             MR. MARTINEZ:  I apologize, Your Honor.  When I did

20   speak to chambers, I believe the conversation was, how long do

21   you expect the sentencing to last, and I think she said 45

22   minutes.  And I said, if we get there around 10:00, we should

23   be okay.  And when we came, we didn't see anything going on,

24   so we thought we still had some time.  We were just upstairs

25   because we thought the sentencing was going to go until 10:15.

1    I apologize.

2              THE COURT:  I'll address it on my end.  But all of

3    us have to be attendant to the interests of jurors who've now

4    been sitting in there for probably 40 minutes.  What's first

5    up this morning?

6              MR. MARTINEZ:  Your Honor, we have some witnesses

7    lined up today.  The first witness is Detective Sendy

8    Ferdinand of the Baltimore City Police Department.  And I

9    don't know whether the Court wants to revisit the legal issue

10   that it raised at the end of the day Thursday.  We're prepared

11   to do that whenever the Court is.

12             THE COURT:  Not now given how much delay we've got.

13   Why don't you raise that at the end of the day.  So ready?

14             MR. MARTINEZ:  We are, Your Honor.

15             THE COURT:  Let's bring them.  And let's get the

16   witness in here.

17             (Jury entered the courtroom.)

18             THE COURT:  What's her name again?

19             MR. MARTINEZ:  It's a he.  It's Sendy Ferdinand.

20             THE COURT:  How do you spell the first name?

21             MR. MARTINEZ:  S-e-n-d-y.

22             THE COURT:  Spell the last name.

23             MR. MARTINEZ:  F-e-r-d-i-n-a-n-d.

24             THE COURT:  Good morning, ladies and gentlemen.

25   We're now ready to continue with the government's case in

1    chief.

2              The government may call their next witness.

3              MR. MARTINEZ:  Your Honor, the government calls

4    Detective Sendy Ferdinand of the Baltimore City Police

5    Department.

6              THE COURT:  Thank you.  Detective Ferdinand, please

7    stand.

8              THE CLERK:  Sir, if you would please raise your

9    right hand to be placed under oath.

10                    DETECTIVE SENDY FERDINAND,

11   called as a witness, being first duly sworn, was examined and

12   testified as follows:

13             THE WITNESS:  I do.

14             THE CLERK:  Thank you, sir.  You may have a seat in

15   the witness box.  And if you would please adjust the

16   microphone, and if you would, speak directly into it.  State

17   your first and last name and spell your first and last name.

18             THE WITNESS:  Sendy Ferdinand,

19   S-e-n-d-y, F-e-r-d-i-n-a-n-d.

20             THE CLERK:  Thank you, sir.

21             THE COURT:  Mr. Martinez.

22                    DIRECT EXAMINATION

23   BY MR. MARTINEZ:

24   Q    Detective, good morning.

25   A    Good morning.

1    Q    Could you tell the ladies and gentlemen of the jury where

2    you work, please?

3    A    Baltimore City Police Department.

4    Q    And what's your rank and assignment?

5    A    I'm assigned to the Investigative Intelligence Section,

6    which is IIS.  It's undercover.

7    Q    How long have you been with BPD?

8    A    16 years.

9    Q    Could you walk the jury through the various positions

10   you've held at BPD?

11   A    Yes, sir.  I spent a year at the Northeast District,

12   about a year, year and a half as patrol.  From there I went to

13   Flex, which is -- we specialize in high-crime areas.  From

14   then I went to SET, which that was through the whole city of

15   Baltimore City.  From SET I went to -- MET -- well, it was MET

16   first and then SET.  And then from there I went to

17   Public Housing where I started my undercover career.  From

18   Public Housing I went down to downtown where I've been ever

19   since.

20   Q    Tell us about your work as an undercover officer, do you

21   make undercover purchases of narcotics?

22   A    Yes, sir.

23   Q    Have you made them in different neighborhoods in

24   Baltimore City?

25   A    Yes, sir.

Direct Examination – Ferdinand (By Mr. Martinez)

1   Q    Have you made them in the Greenmount neighborhood of

2   Baltimore City?

3   A    Yes, sir.

4   Q    Detective, could you tell us what your rank and

5   assignment was as of September 2007?

6   A    I was a detective assigned to Organized Crime Division.

7   Q    And were you also working in an undercover capacity at

8   this time?

9   A    Yes, sir.

10   Q    I want to direct your attention to the afternoon of

11   September 28th, 2007.  Were you working and on duty that

12   afternoon?

13   A    Yes, sir.

14   Q    Were you working in an undercover capacity?

15   A    Yes, sir.

16   Q    Directing your attention to approximately 1:50 on

17   September 28th, 2007, did there come a time where you went to

18   the 2400 block of Brentwood Avenue?

19   A    Yes, sir.

20   Q    Why did you go to the 2400 block of Brentwood Avenue?

21   A    To purchase narcotics.

22   Q    How did you get there?

23   A    Drove.  I drove my department vehicle, which is the

24   unmarked police car.

25   Q    I want to show you Government's Exhibit GM 31.  What are

1    we looking at there, Detective?

2    A    The 2400 block of Brentwood.

3    Q    And tell us what happened when you arrived in your

4    unmarked vehicle on this block on the afternoon of

5    September 28th, 2007.

6    A    Yes.  I drove up on Brentwood.  As I was driving, I saw

7    the defendant that was standing in front of a house on

8    Brentwood.

9    Q    And let me stop you for a minute.  You said you saw the

10   defendant, could you point out which of the defendants you

11   saw?

12   A    That would be the man right here with the blue sweater,

13   glasses, and cornrow, fish hair.

14   Q    So you said you saw him in the 2400 block of

15   Brentwood Avenue?

16            THE COURT:  We need some clarification on the record

17   as to who is being identified.  Is there any objection?

18            MR. ENZINNA:  No, Your Honor.

19            THE COURT:  Let the record reflect that the witness

20   has identified Mr. Johnson.  Continue.

21   A    I made contact with Mr. Johnson.  As I was driving, I

22   look up -- I look at him, we make eye contact.  I kept

23   driving, turn into the alley.  As I was turning into the

24   alley, I heard Mr. Johnson yelling out "yo."  I stopped my

25   car, I went back to Mr. Johnson, and he asked me what I was

1    looking for, and I told him I was looking for ready.

2    Q    (BY MR. MARTINEZ)  Let me stop you for a moment.  Do you

3    recall how Mr. Johnson was dressed on this particular

4    afternoon?

5    A    Yes, sir.

6    Q    Could you tell us what he was wearing?

7    A    He had a white T-shirt, blue jeans; he had a bandana on

8    his head with cornrows going back.

9    Q    Do you recall what color the bandana was?

10   A    Black, I believe.

11   Q    Before I stopped you a moment ago, you said that

12   Mr. Johnson asked you what you were looking for and you said

13   "ready"; right?

14   A    Yes, sir.

15   Q    Could you tell the ladies and gentlemen of the jury what

16   you meant by ready?

17   A    Ready is a street term for crack cocaine.

18   Q    And when you told Mr. Johnson that you were looking for

19   ready, what, if anything, did he say to you?

20   A    He asked me how many and I told him I was looking for

21   two.  He then told me to go into the alley, so I drove into

22   the alley and I stood --

23   Q    Detective, let me stop you again.  I just want to make

24   sure, when you said you were looking for two, what were you

25   conveying to Mr. Johnson?

1    A    I was looking for two units of crack cocaine, which are

2    dimes.

3    Q    And when you say dimes, what is a dime?

4    A    $10 units.

5    Q    So is a dime the same as a dime bag?

6    A    Yes.

7    Q    All right.  And I stopped you as you were explaining what

8    happened after you said that you wanted two.

9    A    Yes.  I went into the alley stood in the alley.  By the

10    few -- I'm going to say few seconds, Mr. Johnson came and he

11    stood in the mouth of the alley.  He told me to get out of the

12    car and I got out of the car and I approached him.  He gave me

13    two clear Ziplocs, which contained white substance suspected

14    to be cocaine, and then in return I gave him $20 and then I

15    got back into my vehicle.

16    Q    All right.  Detective, I want to show you what's been

17    marked as Government's Exhibit GM 32.  Can you tell us what

18    we're looking at there?

19    A    That's the alley that I went into and I parked my car.

20    Ran into the alley from right here and then when he came, he

21    stood in the mouth of the alley.  He told me to get out of the

22    alley -- to get out the car, I got out of the car, and he

23    stood right here and we made the transaction.

24    Q    All right.  I want to show you what's been marked as

25    Government's Exhibit 1 -- I'll ask you to open the bag and

1   take out what's inside.

2           MR. ENZINNA:  What exhibit number?

3           MR. MARTINEZ:  1.

4   A    Okay.

5   Q    (BY MR. MARTINEZ)  Do you recognize the contents of that

6   bag in Government's Exhibit No. 1?

7   A    Yes, sir.

8   Q    What's in the bag?

9   A    The bag contain the two Ziploc of cocaine that I

10  purchased from Mr. Johnson and also a picture of the

11  submission.

12  Q    Okay.  And in addition to that picture, I want to show

13  you a different picture that's been marked as

14  Government's Exhibit PHE 1.  Is that a picture of the same

15  exhibit that you're holding in your hand?

16  A    Yes, sir.

17  Q    So after the transaction you just described with

18  Mr. Johnson in the alley in the 2400 block of Brentwood, what

19  happened when the deal was over?

20  A    After the transaction I contact my cover team.  I have

21  a -- which include my sergeant and several other detectives.

22  I called them on the phone and I told them that I had made a

23  purchase, it was a positive buy.  And I told them exactly

24  where the purchase was made.  And then I give them

25  Mr. Johnson's description and direction of travel, where he

1    was at the time.  Then I after that, a few minutes later the

2    arrest team came to the location, to the block on Brentwood

3    where they located Mr. Johnson.  After that my sergeant called

4    me so I can come and make a positive ID.  I drove back in the

5    area, not on the block, but I was as close as where I can see

6    exactly who they had.  And I positively identified Mr. Johnson

7    as the person that sold me the crack cocaine.

8    Q    When you drove back to the scene and made the positive ID

9    of Mr. Johnson, had he been placed under arrest at that

10   time?

11   A    He was -- I believe he was detained.

12   Q    Okay.  Did you later learn that he had been arrested?

13   A    I'm sorry?

14   Q    Did you later learn that he had been arrested?

15   A    Yes.

16   Q    The drugs that you bought from Mr. Johnson that you have

17   there as Government's Exhibit 1, what did you do with them

18   when the transaction was over?

19   A    After the transaction was over it stayed with me and then

20   I went downtown to the office.  I waited for my cover team to

21   come.  After they did Mr. Johnson's paperwork, sent him down

22   to Central Booking, then we met up to headquarters where I

23   gave the drug to Detective Green and Detective Green submitted

24   the drugs to ECU.

25   Q    And did you also submit the drugs to be analyzed by a

1   chemist with the Baltimore Police Department?

2   A     Yes, sir.

3           MR. MARTINEZ:  Your Honor, at this time I'd like to

4   read a paragraph, paragraph 1 from Stipulation 4 between the

5   parties.

6           THE COURT:  Without objection.  You may read it.

7           MR. MARTINEZ:  Stipulation 1 reads as follows:

8   Government's Exhibit 1 is two Ziploc baggies containing rock

9   substance obtained in connection with Gerald Johnson's arrest

10  on September 28th, 2007.  It is agreed and stipulated by the

11  parties that Ayesha Larkins of the Baltimore City Police

12  Department Laboratory Section analyzed Government's

13  Exhibit No. 1 and determined that it contains cocaine base a

14  Schedule II controlled substance.  Ms. Larkins's drug analysis

15  report regarding Government's Exhibit No. 1 is admitted as

16  Government's Exhibit No. DL 1 without the necessity of her

17  testimony.

18          THE COURT:  Ladies and gentlemen, you'll recall that

19  matters that are the subject of a stipulation are to be taken

20  as true or proven by you.  Nothing for you to decide there.

21  That's just a fact.

22  Q     (BY MR. MARTINEZ)  Detective Ferdinand, now I'd like to

23  show you what we just referenced in the stipulation, what's

24  now been admitted into evidence as Government's Exhibit DL 1.

25  Do you recognize this exhibit, Detective?

1    A    Yes, sir.

2    Q    And is this a copy of Ms. Larkins's lab report with

3    respect to the drugs that you purchased from Mr. Johnson on

4    September 28th, 2007?

5    A    Yes, sir.

6    Q    And above the pen here, does the report indicate the

7    identity of the substance that Ms. Larkins examined that you

8    purchased from Mr. Johnson?

9    A    Yes, sir.

10   Q    And what substance is that?

11   A    It's cocaine base, Schedule II.

12   Q    Detective, I want to ask you, were you wearing a camera

13   of any kind during the transaction that you just described

14   with Mr. Johnson?

15   A    Yes, sir.

16   Q    Did you submit -- well, did the camera generate a

17   recording of the purchase?

18   A    Yes, sir.

19   Q    Did you submit the recording of the purchase to

20   Evidence Control after the purchase was completed?

21   A    Yes, sir.

22   Q    Can you tell us whether you charged Mr. Johnson with a

23   crime based on the undercover purchase we just went through?

24   A    Yes, sir, I did.

25   Q    Was he convicted of a crime?

Direct Examination – Ferdinand (By Mr. Martinez)

1    A    Yes, sir.

2    Q    I want to show you now what's been marked as

3    Government's Exhibit SC 1.  Do you recognize this document,

4    Detective?

5    A    Yes, sir.

6    Q    Is this a certified court record of the case that you

7    initiated against Mr. Johnson after the undercover purchase?

8    A    Yes, sir.

9    Q    So can you read the name here?

10    A    Johnson, Gerald.

11    Q    And then the offense charged, here above the pen?

12    A    It's CDS, manufacture, distribute.

13    Q    And then I'd like to --

14            THE COURT:  What does CDS stand for?

15            THE WITNESS:  I'm sorry?

16            THE COURT:  What does CDS stand for?

17            THE WITNESS:  Oh, controlled dangerous substance.

18    Q    (BY MR. MARTINEZ)  Is cocaine base a controlled dangerous

19    substance?

20    A    Yes, sir.

21    Q    And then under verdict here and G, does this reflect how

22    the case was disposed?

23    A    Yes, sir.

24    Q    What does verdict G mean?

25    A    Guilty.

Cross-examination – Ferdinand (By Mr. Francomano)

1    Q    Detective, based on this disposition, did there come a

2    time when ECU discarded the video footage that you just

3    described that you submitted in connection with the undercover

4    purchase?

5    A    Yes, sir.

6              MR. MARTINEZ:  Court's indulgence.  No further

7    questions, Your Honor.

8              THE COURT:  Mr. Enzinna, cross-examination.

9              MR. ENZINNA:  No questions, Your Honor.

10             THE COURT:  Thank you.  Mr. Bussard.

11             MR. BUSSARD:  No questions.  Thank you.

12             THE COURT:  Mr. Francomano.

13             MR. FRANCOMANO:  Yes.

14                        CROSS-EXAMINATION

15   BY MR. FRANCOMANO:

16   Q    Detective, my client, Mr. McCants, wasn't there that

17   day?

18   A    No, sir.

19             MR. FRANCOMANO:  Thank you.

20             THE COURT:  Redirect, Mr. Martinez.

21             MR. MARTINEZ:  No, Your Honor.

22             THE COURT:  May the witness be excused, defense

23   counsel?

24             MR. ENZINNA:  Yes, Your Honor.

25             THE COURT:  Sir, you are excused, you may depart.

1    Next witness.

2           MS. HOFFMAN:  The government will call

3    Special Agent Austin Sailor.

4           THE COURT:  Austin Sailor.  Please come all the way

5    up to our witness box, sir, stand there by the corner and face

6    our clerk.

7           THE CLERK:  Sir, if you would please raise your

8    right hand to be placed under oath.

9                  SPECIAL AGENT AUSTIN SAILOR

10   called as a witness, being first duly sworn, was examined and

11   testified as follows:

12          THE WITNESS:  I do.

13          THE CLERK:  Thank you, sir.  You may enter the

14   witness box.

15          MR. MARTINEZ:  Your Honor, before the questioning of

16   the witness begins, can I ask if Special Agent Christy can

17   approach and clear the drug exhibit from the witness stand?

18          THE COURT:  Yes.  You may be seated.

19          THE CLERK:  Sir, if you would please speak directly

20   into the microphone.  State your first and last name and spell

21   your first and last name.

22          THE WITNESS:  My name is Austin Sailor, A-u-s-t-i-n;

23   last name is Sailor, S-a-i-l-o-r.

24          THE CLERK:  Thank you.

25          THE COURT:  Your witness, ma'am.

1                         DIRECT EXAMINATION

2    BY MS. HOFFMAN:

3    Q    Good morning, Agent Sailor.  Where are you currently

4    employed?

5    A    I'm currently as a special agent at Bureau of Alcohol,

6    Tobacco, Firearms and Explosives in San Diego, California.

7    Q    Is that commonly known as ATF?

8    A    It is.

9    Q    How long have you worked for ATF?

10   A    Since April 29th of 2013.

11   Q    Prior to that, did you work for the Baltimore City Police

12   Department?

13   A    I did.  I was hired December of 2005 and I left in July

14   of 2012.  And then immediately lateraled over to

15   Baltimore County Police Department where I worked until I was

16   hired by the ATF.

17   Q    And Agent Sailor, would you mind pulling the microphone a

18   little closer to you as you speak.

19             THE COURT:  Move yourself up, is the only option.

20   A    Yes, I'll try to move myself also.

21   Q    (BY MS. HOFFMAN)  Can you walk us through the positions

22   that you held with BPD?

23   A    Yes.  I initially was hired, went through the academy,

24   and then started out as patrol in the Northwest District in

25   the Park Heights area.  And then moved over to

Direct Examination - Sailor (By Ms. Hoffman)

1    Violent Crime Impact Division, which was later renamed the

2    Violent Crime Impact Squad.  From there I went to the

3    Violent Repeat Offender Unit and the Major Case Squad.

4    Q    As of 2008, were you working in the

5    Violent Crime Impact Division?

6    A    I was.

7    Q    What were your responsibilities as part of the

8    Violent Crime Impact Division?

9    A    We were doing target enforcement against street level

10   narcotics, violent offenders, and violent crime.

11   Q    Were you assigned to a particular section of the city?

12   A    Eastern District.

13   Q    I want to draw your attention to June 6th of 2008 around

14   7:55 p.m.

15   A    Okay.

16   Q    Were you working and on duty at that time?

17   A    Yes, I was.

18   Q    Did there come a time when you witnessed suspected drug

19   activity?

20   A    Yes.

21   Q    Where were you at the time?

22   A    I was in the 2200 block of Guilford Avenue.  And I was

23   with my partner, Detective Jermaine Cook.  We were in plain

24   clothes capacity in an unmarked vehicle in the 2200 block of

25   Guilford.

1    Q    And what did you observe on the evening in question?

2    A    So I observed in the cut on the west side of 2000 block

3    of Guilford two African American males standing in the cut.

4    One of the gentleman, who I -- was later identified as

5    Mr. Joseph Bonds, was looking around like this, looking like

6    he was looking for someone.  And he reached into his pocket,

7    produced just a -- small objects that I believed to be

8    narcotics and street-level packaging.  He then handed them to

9    the other gentleman, who took them, looked around, and then

10   walked to the north -- the wall on the north side of the cut

11   about ten feet away and placed the small objects in a hole in

12   the wall.

13   Q    I'm going to show you Government's Exhibit No. GM, as in

14   Google maps, 19.  What are we looking at here?

15   A    That's the 2200 block of Guilford Avenue.

16   Q    And I'm going to show you now Government's Exhibit GM, as

17   in Google maps, 18.

18   A    All right.  And that is the cut area that I was

19   describing in that same block.

20   Q    And is that where you saw the two individuals you just

21   described?

22   A    Yes.

23   Q    Going to show you Government's Exhibit No. PHI, as in

24   photos of individuals, 6.  Who are we looking at here?

25   A    That's Mr. Joseph Bonds.

Direct Examination – Sailor (By Ms. Hoffman)

1   Q     And is this the individual who you observed take

2   suspected CDS out of his pocket?

3   A     Yes.

4   Q     And I'm going to show you Government's Exhibit

5   No. PHI 77.  Who are we looking at here?

6   A     That's Mr. Jesse Tate.

7   Q     And is Mr. Jesse Tate the individual you saw place those

8   objects into the hole in the cut?

9   A     Yes.

10  Q     Where were you relative to them when you observed this

11  activity?

12  A     We were in the middle of the block about 40 feet away.

13  Q     And I'll put Government's Exhibit GM 18 back up.  And

14  after you observed Mr. Bonds hand these objects to Mr. Tate,

15  who then placed them in the hole in the wall, what did you do

16  at that point?

17  A     Myself and Mr. -- excuse me, Detective Cook, exited our

18  vehicle, just approached Mr. Bonds and Tate and announced

19  ourselves as police.  We had our badges in plain sight and had

20  the two gentleman sit down right there against the wall.

21  Detective Cook watched them, I went immediately to the hole in

22  the wall and recovered five orange top glass vials, which

23  contained a rock-like substance, which I suspected to be

24  cocaine.

25  Q     Between the time when you first observed Mr. Tate place

1    those objects in the hole in the wall and the time when you

2    searched it, did you take your eyes off the location?

3    A    No.

4    Q    Were Mr. Bonds and Mr. Tate placed under arrest?

5    A    Yes, they were.

6    Q    Did you conduct a search of Mr. Bonds's person at the

7    time of his arrest?

8    A    I did.  And I recovered $390 from his right pants

9    pocket.

10   Q    What did you do with the recovered evidence in the

11   case?

12   A    It was all submitted to the Baltimore City

13   Evidence Control Unit.

14            MS. HOFFMAN:  At this time I'd like to read part of

15   Stipulation No. 4 into the record, specifically paragraph 2.

16            THE COURT:  You may.

17            MS. HOFFMAN:  Government's Exhibit No. DL 2 is a

18   laboratory report prepared by Marta Iwashko of the BPD

19   Laboratory Section analyzing five orange top vials containing

20   white rock substance obtained in connection with

21   Joseph Bonds's arrest on June 6th, 2008.  It is agreed and

22   stipulated by the parties that Ms. Iwashko analyzed drug

23   evidence and determined that it contained cocaine, a Schedule

24   II controlled substance.  Government's Exhibit No. DL 2 is

25   admitted into evidence without the necessity of testimony by

1   Ms. Iwashko.

2   Q   (BY MS. HOFFMAN)   And Agent Sailor, I'd like to now show

3   you Government's Exhibit No. DL 2.   Agent Sailor, is this the

4   drug lab report corresponding to the evidence you recovered on

5   that day?

6   A   Yes.   It's on the top left corner, it says

7   Laboratory Section Drug Analysis Report.   The same date,

8   6/6/08; from the same time; 2200 block of Guilford Avenue –– I

9   have number one, orange top vials with white rock substance,

10   five of them; and laboratory results/schedule are

11   cocaine/Schedule II.

12   Q   Thank you.   Now, I'd like to shift gears and draw your

13   attention to the evening of April 11th, 2011 around 7:00 p.m.

14   Were you still working in the Violent Crime Impact Division or

15   Section at that point?

16   A   Yes.   I think it was called Section at that point.

17   Q   And were you still in the Eastern District?

18   A   Yes, I was.

19   Q   Were you working and on duty that evening?

20   A   I was coming to the very end of my shift.

21   Q   And where were you headed at around 7:00 p.m.?

22   A   I was headed to get a –– get some dinner at the end of my

23   shift and I was heading westbound in the 900 block of

24   East North Avenue.

25   Q   Did there come a time when you came into contact with a

Direct Examination – Sailor (By Ms. Hoffman)

1    person you've come to know as Kenneth Jones?

2    A    Yes.

3    Q    Is he sitting in the courtroom today?

4    A    Yes.  He is the gentleman in the pink shirt seated to my

5    left.

6             MR. BUSSARD:  No objection.

7             THE COURT:  Record will reflect that the witness has

8    identified Defendant Jones.  You may continue.

9    Q    (BY MS. HOFFMAN)  Can you tell the ladies and gentlemen

10    of the jury how you came into contact with Mr. Jones that

11    evening?

12    A    Okay.  So I was stopped at the stoplight, which is at

13    Homewood Avenue.  And it was kind of a -- strangely busy

14    traffic for what I thought that time of day.  It was backed

15    up, so I was actually stuck in traffic right in front of

16    906 East North Avenue.  It was a warm evening, so whenever it

17    was a warm evening, I would have my windows down.  So I was

18    sitting there and I hear a bunch of yelling and screaming,

19    look over, and I observed a six-person fight.  It was like

20    three on three.  I believe it was three males versus -- the

21    other party was two males and one female.  I knew it was

22    serious because I could actually hear the fists smacking on

23    meat.  It was a (indicating), that type of noise.  And I

24    thought to myself, this is not rough-housing, this is a

25    serious fight.  So still had my radio.

1   Q    Just want to stop you for a second there, Agent Sailor,

2   to show you Government's Exhibit GM, as in Google maps, 20.

3   It's a little grainy, but can you tell us what we're looking

4   at here?

5   A    Yes.  This is a picture of -- Google maps picture of the

6   streets where the incident occurred.  So this is, as you can

7   see, with the annotation, 906 East North Avenue.  I was -- may

8   I make a mark on the screen, Your Honor?

9        THE COURT:  Yes.

10  A    So I was right approximately there, just sitting in

11  traffic due to the red light with my windows down.  So

12  Homewood Avenue where the light is, is right about --

13  actually, yeah, right around there, roughly.  So you can see

14  that there was a good amount of traffic for it to be that far

15  backed up due to a red light.

16  Q    (BY MS. HOFFMAN)  Thank you.  And can you tell the ladies

17  and gentlemen of the jury what you did when you observed this

18  brawl taking place at 906 East North Avenue?

19  A    So I grabbed my radio, it was still next to me.  I called

20  it in saying that there's a violent fight going on, gave the

21  hundred block, and I did my best to keep it in view.  And I

22  didn't get out of my vehicle because I was alone.  But I was

23  doing my best to call in backup, describing the fight.  The

24  red light turned green, and because I was stuck in traffic, I

25  proceeded westbound trying to keep the fight in view.  Still

Direct Examination - Sailor (By Ms. Hoffman)

 1   had my radio in hand.  And as I was keying up again, I heard

 2   shots ring out.

 3   Q    Did you see who actually fired the shots?

 4   A    No, I did not.

 5   Q    And when you heard the gunshots, did you turn around?

 6   A    Yes.  I called it in and then turned around.  So because

 7   I was progressing westbound, I made it through the light at

 8   Homewood and immediately turned around.  I'll do my best to

 9   draw it.  And in the beginning of the 700 block of

10   East North Avenue, I did almost a loop and then progressed

11   north.  Now, while I was right around -- I'm sorry -- here,

12   and facing eastbound, I observed a -- the individual who was

13   later identified as Mr. Jones running westbound on the

14   sidewalk.  And he was -- and then turned northbound on

15   Homewood Avenue.

16   Q    Was Mr. Jones running from the direction of where you

17   observed the brawl?

18   A    Yes, he was.

19        MR. BUSSARD:  Objection.

20        THE COURT:  Basis.

21        MR. BUSSARD:  Leading.

22        THE COURT:  Overruled.

23   A    Yes, he was.  He was wearing blue jeans, a white T-shirt,

24   and kind of a pastel pink colored hat.

25   Q    (BY MS. HOFFMAN)  Did you observe Mr. Jones doing

Direct Examination – Sailor (By Ms. Hoffman)

1    anything while he ran?

2    A    Yes.  He was holding -- he was running at what I believed

3    to be full speed.  It looked like he was sprinting and he was

4    holding his waistband, dip area, with his left hand, which I

5    observed people in the past, you know, holding firearms in

6    that very same position.

7    Q    (BY MS. HOFFMAN)  And you used the term "dip area," and

8    could just explain to the members of the jury what the dip

9    area is?

10   A    The waistband crotch area.  I'll stand up and just

11   demonstrate.  So it was just holding -- he was running,

12   holding this area with his left hand (indicating).

13   Q    What happened once you turned onto Homewood Avenue?

14   A    Mr. Jones went to the west side of the street, he was

15   still running in the street but on the west side of the

16   street.  I was progressing north but on the east side of the

17   street.  So I pulled up next to him, right around -- I'll do

18   my best to -- there, to that area.  He was, like I said, still

19   on the east side of the street.  I was beside him -- pardon

20   me, he was on the west side of the street, I was on the east

21   side of the street beside him.  So he was basically running

22   beside my driver's side window.  So I immediately stopped the

23   car, I still had my badge on, I identified myself as police.

24   And I -- because I thought he was armed because of how he was

25   holding his hand, I immediately drew my service weapon and

Direct Examination - Sailor (By Ms. Hoffman)

1    pointed it at him.

2    Q    Did Mr. Jones say anything at that point?

3    A    He raised his hands and immediately said "don't shoot me,

4    I have a gun."

5    Q    At that -- sorry, Agent Sailor.  At that point did you

6    give Mr. Jones an order?

7    A    Yes.  I directed Mr. Jones to keep his hands up and to

8    lie down on the street and he complied.  There was no use of

9    force needed whatsoever.

10   Q    What did you do then?

11   A    I called in for backup, I gave my position, and I could

12   already hear the sirens that other -- that sounded like there

13   was a lot of units coming to that area.

14   Q    And did back-up units arrive on the scene?

15   A    Yes, they did.

16   Q    Once back-up units arrived was Mr. Jones placed in

17   handcuffs?

18   A    Yes, he was placed in handcuffs.  And --

19   Q    What did you do then?

20   A    Asked him where the firearm was.  And he kind of kicked

21   his left leg, and so I, you know, felt on his pants leg.  It

22   was his lower calf area.  And I could feel what felt like a

23   handgun wedged into the lower calf area of his pants.

24   Q    And at that point did you retrieve the firearm?

25   A    Yes.  At that time we didn't know what type of firearm it

Direct Examination – Sailor (By Ms. Hoffman)

1    was.  We didn't know, you know, what we were working with,

2    whether it was safe.  So in order to be safe, the pants leg

3    was cut.  We didn't want to try to remove it and have an

4    accidental discharge.  So the pants leg was cut and the

5    firearm was safely removed.

6    Q    Going to show you Government's Exhibit PHCS, as in photos

7    of crime scenes, 3-2.  Well -- sorry, I'll start with 3-3.

8            THE COURT:  Let's clear the screen.

9    Q    (BY MS. HOFFMAN)  What are we looking at here?

10   A    That was Mr. Jones handcuffed laying on the ground.

11   Can't really see it very well in the picture, but the firearm

12   is still -- the pants leg is cut open and the firearm is still

13   there right next to his leg, inside of his pants leg.

14   Q    And let me show you Government's Exhibit No. PHCS 3-2.

15   A    Right.  And that was Mr. Jones again with the pants leg

16   cut open.  You can see the revolver, you know, as it was when

17   we cut open the pants leg.

18   Q    Was the firearm recovered?

19   A    Yes, it was.

20   Q    And going to approach and show you

21   Government's Exhibit 8.

22           MS. HOFFMAN:  And Your Honor, may I ask to have this

23   exhibit made safe?

24           THE COURT:  Yes.  Will the Marshal examine the

25   exhibit and make sure that it is safe.  Marshal, is the

1    exhibit safe?

2              THE MARSHAL:  It has been made safe.

3              THE COURT:  You may proceed, ma'am.

4    Q    (BY MS. HOFFMAN)  And Agent Sailor, feel free to open up

5    the bag there, and if you could identify this exhibit for us.

6    A    This was the firearm that was recovered from Mr. Jones on

7    the night of the incident that we're discussing.

8    Q    And what kind of firearm was it?

9    A    It's a .357 magnum Taurus revolver.

10   Q    At the time you recovered it, was it loaded?

11   A    Yes.  It had four spent shell casings and one live

12   round.

13   Q    And what are spent shell casings?

14   A    They're bullets that have been fired, they're the casings

15   left over from firing bullets.

16   Q    Were Miranda warnings delivered to Mr. Jones?

17   A    Yes, they were.

18   Q    And did you hear Mr. Jones make any statements after

19   Miranda warnings were delivered?

20   A    Lieutenant Miller, who was our boss at the time, came up

21   and while I was working with this firearm and I was focused on

22   the firearm, but Lieutenant Miller came up and he asked --

23   there were about six or seven of us, he said, is this the

24   suspect for the shooting.  And Mr. Jones replied to him, "he

25   shot at me first."

Direct Examination – Sailor (By Ms. Hoffman)

1    Q    Is that an exact quote or is that --

2    A    That's roughly from my recollection, but that's roughly

3    what he said.

4    Q    Did you remain on the scene after that?

5    A    I did for a while, you know, made sure that the evidence

6    was handled properly, that the firearm was run to check for

7    stolen.  You know, oversaw that Mr. Jones got into police

8    transport.  And then at that time I was, you know, instructed

9    just to go back to the Eastern District and begin writing my

10   report.

11   Q    Did you ever respond to the scene of the actual

12   shooting?

13   A    No, I did not.

14         MS. HOFFMAN:  Court's indulgence.

15         THE COURT:  Yes.

16   Q    (BY MS. HOFFMAN)  Going to show you Government's

17   Exhibit No. PHE, as in photos of evidence, 8.  Can you tell us

18   what we're looking at here?

19   A    This is the same revolver, Taurus revolver, that was

20   recovered from Mr. Jones during this incident.  It has the

21   property division evidence property tag.

22   Q    Thank you.

23         MS. HOFFMAN:  I have no further questions, but I

24   will approach and retrieve the exhibit from you.

25         THE COURT:  Mr. Enzinna.

Cross-examination – Sailor (By Mr. Bussard)

1          MR. ENZINNA:  No questions, Your Honor.

2          THE COURT:  Mr. Bussard.

3          MR. BUSSARD:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. BUSSARD:

6    Q    Good morning, Special Agent Sailor.

7    A    Good morning.

8    Q    I'm going to show you some exhibits and then we'll talk a

9    little bit.  Showing you what's been marked as -- I think it's

10   Defendant's Exhibit 2, and ask you if based on your testimony,

11   are you familiar with the 900 block of East -- well, before I

12   show it, East North Avenue?

13   A    Yes.

14   Q    Okay.  And we're looking at Jones Defendant 2, is that an

15   accurate representation of the 900 block of

16   East North Avenue?

17   A    It appears to be.  It's at a pretty, you know, good

18   distance, so it would be better if I saw the actual numbers on

19   the buildings, but roughly.

20   Q    Not really trying to trick you, just --

21   A    Okay.

22   Q    Has it changed at all since 2011 in any way?

23   A    I'm not sure, sir.  You know, I'm in San Diego now, so

24   it's been a number of years since I've been through there.

25   Q    Showing you what's been marked as Defense Exhibit 3.  And

Cross-examination - Sailor (By Mr. Bussard)

1    we'll -- you said you would like to see the numbers on them,

2    can you read the numbers on the house?

3    A    Could you blow it up a little bit, bring it in a little

4    bit.

5    Q    You're asking me to do something with this machine --

6    does that help?

7    A    I believe it says --

8    Q    Let me see if I can get any closer.

9    A    I believe it could say 906, is that what we're going for?

10   If that's truly 906, I'll agree that it's 906, but it

11   appears --

12          THE COURT:  Can't answer the question that way.  Are

13   you able to say what those numbers are?

14   A    Not really.

15          THE COURT:  Sort of speaks for itself, whatever it

16   is, it is.

17   Q    (BY MR. BUSSARD)  Thank you.  Now, you --

18   Special Agent Sailor, you indicated that on April 11th, 2011,

19   you were traveling westbound on East North Avenue; is that

20   correct?

21   A    Yes, sir.

22   Q    Okay.  And East North Avenue is two lanes going east and

23   two lanes going west?

24   A    Yes.

25   Q    Cars parked along the side of the street?

Cross-examination – Sailor (By Mr. Bussard)

1    A    Correct.

2    Q    Showing you what's been marked as Defense Exhibit

3    No. 4 -- Kenneth Jones Exhibit No. 4.  And ask you, is that an

4    accurate representation looking westbound on

5    East North Avenue?

6    A    It appears to be.

7    Q    Now, along the side -- on the left side over here, what

8    is --

9    A    That's the cemetery.

10   Q    Okay.  And that runs along the south side of

11   East North Avenue?

12   A    Yes, sir.

13   Q    Correct.  And then there's row houses, for the most

14   part?

15   A    Correct.

16   Q    On the --

17   A    North side.

18   Q    -- north side of East North Avenue; is that correct?

19   A    Yes.

20   Q    And showing you what's been marked as Defense

21   Exhibit 5 -- Kenneth Jones Exhibit 5, this is a little bit

22   different view than the government showed you.  This is

23   906 East North Avenue?

24   A    Appears to be.

25   Q    And the first cross street if you were traveling

1    westbound, that would be this direction; is that correct?

2    A    Yes, sir.

3    Q    And that's the direction you were traveling that day?

4    A    Correct.

5    Q    The first street you come to is Oakville Avenue?

6    A    Oakhill Avenue.

7    Q    Oakhill, excuse me.  And then there's another block of

8    row houses?

9    A    Yes, sir.

10   Q    And then the -- can you see it on your screen, is this

11   Homewood Avenue?

12   A    Yes, it is.

13   Q    And this is the intersection where you indicated there is

14   a traffic control device?

15   A    Yes.

16   Q    A stoplight?

17   A    Yes.

18   Q    And then you're indicating that this -- that you made the

19   stop of Mr. Jones around Homewood and 20th Street?

20   A    No, it was a little bit farther south.  It was right

21   around --

22   Q    You can take your finger if you want.

23   A    I'll do my best.  It was right around here.

24   Q    So about a block and a half north of East North Avenue,

25   give or take?

1   A    Um --

2   Q    There's a cross street in there?

3   A    Yeah, I mean --

4   Q    Well, I'm going to show you --

5   A    It seemed like a short block.  I wouldn't necessarily say

6   a block and a half, it was right where I just drew.

7   Q    Showing you Defense Exhibit 6.  Can you see that,

8   Special Agent?

9   A    Yes.  That's the traffic control device, the stoplight at

10  Homewood Avenue.

11  Q    So the car I have my pen on is traveling westbound on

12  East North Avenue?

13  A    It appears to be.

14  Q    And this is Homewood Avenue then going north?

15  A    Yes, it is.

16  Q    Correct, and these are the traffic control devices?

17  A    Yes.

18  Q    One last picture.  You said there was a stop around --

19  northbound on Homewood Avenue?

20  A    Yes.

21  Q    And showing you what's been marked as Defense Exhibit 7.

22  Is this --

23           THE COURT:  Jones No. 7.

24  Q    (BY MR. BUSSARD)  Jones No. 7, an accurate representation

25  looking northbound?

1    A    It's looking northbound.  It appears to be a little bit

2    far north of where the stop happened.

3    Q    Is there anything unique about if -- if the picture was

4    pulled back, looking at the bottom of the picture,

5    Homewood Avenue looks about the same though; is that

6    correct?

7    A    Yeah.  I mean, just while, you know, I was pursuing

8    Mr. Jones, to the left you see the grassy corner of the lot

9    below the one way arrow.  I remember while he was running --

10    that's an empty lot, if you see, like, a Google maps picture.

11    And I was worried that while he was running maybe he would cut

12    through that lot and I was trying to figure out how I was

13    going to navigate my vehicle to pursue him through the lot,

14    whether I should go up through the grass.  I was worried if

15    I'd pop a tire or am I going to make this turn here and go

16    like that, you know, and I was trying to figure out in the

17    middle of the pursuit, what's the best way to keep this guy in

18    my view so I don't lose him.

19    Q    Showing you -- going back to Defense Exhibit 5.

20    A    Right.

21    Q    The empty lot, I think you indicated that the stop was

22    around this area.

23    A    No.  The stop was -- see, there's an alley here and

24    there's an alley here, the stop happened right around here.

25    You can see the difference between Homewood and Oakhill.

Cross-examination – Sailor (By Mr. Bussard)

1   Look.  Homewood has this empty lot, which I was just talking

2   about.  Oakhill does not have an empty lot.  There's houses

3   still there.  The empty lot on Homewood is from houses being

4   torn down.  This right here is the empty lot that I'm

5   discussing when I was saying I was concerned about the

6   direction of travel where I thought Mr. Jones may run.

7   Q    So the stop was before the empty lot?

8   A    Correct.  It was just right around -- just before this

9   second alley right there.

10  Q    Let's go back for a few moments.  You had left the

11  Eastern District -- nothing specific, you didn't have a

12  specific reason for going on East North Avenue and

13  westbound --

14  A    It was just one of my main, you know, ways of traveling

15  to work, from work, during work.  It's a main thoroughfare.  I

16  typically drove -- you know, I lived in the city at the time.

17  And I drove to the Eastern District to get to work on

18  North Avenue and I drove home using that same route going back

19  home on North Avenue.  And it was just, like I said, a main

20  thoroughfare that I was on all the time during my work hours

21  as well.

22  Q    So you're in the 900 block of East North Avenue;

23  correct?

24  A    Correct.

25  Q    And the traffic light, which is about a block and a half

1  in front of you, stops traffic, traffic backs up to the 900

2  block?

3  A    On that night it did.

4  Q    Which is unusual but it did?

5  A    I mean, I thought, you know, that it was strange that it

6  was backed up that far.

7  Q    And you weren't paying attention to anything in

8  particular until you heard sounds; is that correct?

9  A    Right.  I mean, I was just kind of paying attention to

10  traffic.  I was kind of like winding down near the end of my

11  shift, you know, and just at the stoplight.

12  Q    So if you're stopped in the 900 block, and I'm showing

13  you Jones Exhibit 2, your car is out in this travel lane?

14  A    Right.  I was in the travel lane -- we would call it the

15  No. 2 lane, it would be the northbound lane furthest away from

16  the double yellow lines.  The travel lane closer to the

17  sidewalk.

18  Q    And your attention is drawn to the smacking sound that

19  you've already talked --

20  A    Right, the yelling and the sounds of a violent

21  altercation.

22  Q    And you made a call at that time; is that right?

23  A    Correct.

24  Q    And am I correct, you have no recollection of seeing

25  somebody in a pink hat over there at the --

Cross-examination - Sailor (By Mr. Bussard)

1   A    It was such a violent altercation that, you know, I don't

2   recall, you know, the descriptions of any of the individuals

3   involved, only that it was a six-person fight, three on three,

4   and one of them appeared to be a female.

5   Q    So you heard hollering and yelling; correct?

6   A    Yes.

7   Q    And you heard punching?

8   A    Correct.

9   Q    Right.  And you're in a plain unit?

10  A    Right, plain clothes unit.

11  Q    So if anybody was looking around, they wouldn't know that

12  you were a police --

13  A    No.  I would have blended in with all the other, you

14  know, people in traffic that day.

15  Q    Did you have -- was the unit still equipped with lights

16  that you --

17  A    No.

18  Q    -- could have turned on?

19  A    No.  I had no lights, no sirens.  So you know, we rented

20  our vehicles, it was a rental vehicle.

21  Q    And did -- well, the light turns green?

22  A    Correct.

23  Q    And so you are proceeding into the left; is that

24  correct?

25  A    Correct.

Cross-examination – Sailor (By Mr. Bussard)

1    Q    And showing you Defense Exhibit --

2    Jones Defense Exhibit No. 4, so if this is the 900 block, you

3    proceed down past Oakhill; is that correct?

4    A    Correct.

5    Q    And around -- as you enter that second block, you hear

6    what you believe to be gunfire; correct?

7    A    That sounds about right, yeah, beginning of the second

8    block.

9    Q    And --

10   A    The next block.

11   Q    Is it fair to say you didn't see anybody actually --

12   A    No, I did not see the shooting, I only heard it.

13   Q    And when you turned your head -- going back to when you

14   were still at a stationary position, stopped position, when

15   you turned your head and looked towards the yelling and

16   screaming, you didn't see anybody pointing guns at that point?

17   A    No.

18   Q    Is that correct?

19   A    No.

20   Q    So you get down there and you hear a rapid fire

21   gunshot?

22   A    I heard rapid firing.  You know, just as if there were a

23   lot of round -- there was a -- rounds being fired quickly.

24   Q    Like a semi-automatic handgun?

25   A    It -- I wouldn't call it a semi-automatic handgun.  I

1    mean, any number of firearms -- you know, it's just as fast as

2    the trigger is pulled, can be pulled, is how the rounds went,

3    you know.  And that can happen with a revolver as well.  It's

4    just how quick you pull the trigger.

5    Q    The gun that you did ultimately retrieve though was not a

6    semi-automatic; is that correct?

7    A    It was a revolver.

8    Q    Revolver.  Now, you didn't see Kenneth Jones actually

9    throw any punches over at that fight?

10   A    No, I did not.

11   Q    And you didn't see him kick anybody?

12   A    No, I did not.

13   Q    And you didn't see him point a gun at anybody?

14   A    No, I did not.

15   Q    And did you ever hear anybody yell, call the police, or

16   anything like that while you were sitting in that stationary

17   position in front of 906?

18   A    No.

19   Q    So you go down the street.  Looking again at

20   Mr. Jones's Exhibit No. 5, you're -- this is the intersection;

21   is that correct?

22   A    Correct.

23   Q    I can get you a better picture.

24   A    Yeah, that's a -- focus on that one is little --

25   Q    Showing you Mr. Jones's Exhibit -- Defense Exhibit No. 5,

1    this is the traffic control device; is that correct?

2    A    Correct.

3    Q    So by your description earlier, you made a U-turn about

4    where my pen is?

5    A    Correct.

6    Q    And as you came -- you were back facing eastbound?

7    A    Yes.

8    Q    This direction, you saw Mr. Jones running this way?

9    A    Correct.  I saw him running westbound on the sidewalk of

10   the 800 block of East North Avenue.

11   Q    And that's the first sighting you had of Mr. Jones;

12   correct?

13   A    That I recall, yes.

14   Q    And then he turns northbound on Homewood?

15   A    Yes.

16   Q    Correct.  And as you see him running, he's holding his

17   left waistband area?

18   A    Correct.

19   Q    Correct.  You describe it as the dip, you didn't describe

20   that as a dip in your offense report --

21   A    It's just dip is kind of a common law enforcement, not

22   even just Baltimore City, but law enforcement terminology for

23   that area.

24   Q    When you eventually pulled up beside him, I think you

25   said he was on your side of your vehicle?

1   A    Yes.  He was on the west side and I was on the east side.

2   So you know, I was looking out, you know, to the left out of

3   my driver's side window and he was approximately six feet

4   away.

5   Q    Happened very quickly, you get out of the car, radio in

6   one hand?

7   A    Correct.

8   Q    I think you testified and you had your service weapon in

9   the other hand --

10  A    Correct.

11  Q    -- is that correct?

12  A    Yes.

13  Q    And you immediately asked Mr. Jones or ordered Mr. Jones

14  to stop?

15  A    Yes.

16  Q    He did stop?

17  A    He did.

18  Q    You then ordered him to get on the ground and he did get

19  on the ground?

20  A    Right.  He complied.

21  Q    And then did you have to ask him, were you armed or did

22  he volunteer that?

23  A    He just -- like I said, you know, when I initially

24  addressed him, identifying myself as police, you know, I had

25  my service weapon out and pointed at him and he brought his

Cross-examination – Sailor (By Mr. Bussard)

1    hands up and said, you know, "don't shoot me, I have a gun,"

2    something to that effect, and immediately complied and when I

3    instructed him to get on the ground.

4    Q    And you didn't -- the last motion you saw with his left

5    hand was up around his left waste area; is that correct?

6    A    Right.  His front like belt, waist area, as I

7    demonstrated to the jury before.

8    Q    You didn't see him as he was running down there trying to

9    fiddle with the bottom, the shin area of his pants?

10   A    No.  What I took as -- what happened was, when he brought

11   his hands up, the firearm slid down his waistband area and

12   lodged into his left calf.

13   Q    But as you said that, that -- you don't know for a

14   fact --

15   A    Right.  I don't have x-ray vision, I can't see through

16   blue jeans.

17   Q    And as a result of arresting -- you did arrest

18   Mr. Jones?

19   A    Yes.

20   Q    As a result of arresting Mr. Jones, you prepared a

21   statement of charges?

22   A    I did.

23   Q    He was charged with various possession charges relating

24   to the firearm; is that correct?

25   A    Correct.

Cross-examination – Sailor (By Mr. Bussard)

1    Q    And you also prepared an offense report, an incident

2    report, I guess it's called?

3    A    Yes, I did.

4    Q    And when Mr. Jones was running northbound on

5    Homewood Avenue, you saw the pink hat; is that correct?

6    A    Correct.

7    Q    And that's the first time you had seen the pink hat, I

8    guess, was when you saw him running on North Avenue before he

9    turned?

10   A    Correct.

11   Q    And he has his left hand on his waist?

12   A    On his -- yeah, belt line, dip area.

13   Q    And when you stop him though, the firearm is tightly

14   wedged in the bottom of his jeans?

15   A    Right.

16   Q    Down in the shin area?

17   A    In the shin area.

18   Q    And did you try to push it out of the bottom area?

19   A    No, just -- I didn't try to push it out.  Just out of

20   concerns for safety, I knew -- I felt it, it was wedged down

21   there, you know, obviously the thigh area of blue jeans are

22   wider than the calf area of blue jeans, just how they're

23   constructed.  But I didn't know the make, model, anything

24   about this firearm, I was concerned if I forced it in any

25   direction that it could have an accidental discharge.  And I

1    thought that the safest way to do it would be to cut it out of

2    the calf of the jeans.

3    Q    I guess my question is, it didn't just keep on slipping

4    as you said, slipping out, it wasn't -- you couldn't see any

5    part of that gun sticking out of the lower part of his

6    pants?

7    A    I couldn't see any part of the firearm until the calf of

8    the blue jeans were sliced open.

9    Q    It was in there pretty snug; is that right?

10   A    Right.  When it fell down the -- it appeared -- I'm

11   guessing it fell down the thigh area, and because the thigh is

12   bigger and got smaller into the calf area, that's where it got

13   wedged into.

14   Q    So when it's wedged in there, Mr. Jones didn't have very

15   good access to it either?

16   A    No.

17   Q    So it was "snug," is the right word?

18   A    Yes.

19   Q    Now, you've testified that after you arrested Mr. Jones

20   and were you the one that was -- or read him the Miranda

21   rights?

22   A    No, it was one of the other detectives.

23   Q    But you heard that?

24   A    I heard it, yes.

25   Q    And you've testified that Mr. Jones allegedly made a

Cross-examination – Sailor (By Mr. Bussard)

1    statement after his arrest?

2    A    Yes.

3    Q    And thinking back to your incident report and statement

4    of charges, this is a yes or no question, did you note those

5    statements in his -- in the reports that you wrote?

6    A    No, I did not.  But I want to specify that.  I gave

7    you -- I said no.  But at that time I was focused on the

8    firearm, rendering it safe, running it, and I was not a part

9    of that conversation.  Therefore, I put in what I was

10    responsible for at that time, which was the firearm.

11    Q    So in an offense report and statement of charges, you

12    write down what you saw with your own eyes; correct?

13    A    Correct.

14    Q    You write down what you did as a police officer; is that

15    correct?

16    A    Correct.

17    Q    And you write down what you heard, which is Mr. Jones

18    saying "don't shoot, I have a gun"; correct, you did say

19    that?

20    A    Yes.

21    Q    Now, this other statement, however, that "he shot at me

22    first," does not appear in any of your reports, does it?

23    A    Not in my personal reports.  There were other reports

24    written by other detectives that I do believe have that

25    statement.

1          MR. BUSSARD:  Objection, Your Honor.

2          THE COURT:  Sustained.  Just answer the question

3    that's put to you.  Go ahead, Mr. Bussard.

4    Q    (BY MR. BUSSARD)  You did not write a report noting any

5    of those statements; is that correct?

6    A    I did not.  I focused on my portion of the

7    investigation.

8    Q    And are you aware that Mr. Jones was eventually convicted

9    of possession of a firearm from April 11th, 2011?

10   A    That's my understanding, yes.

11         MR. BUSSARD:  I have no other questions,

12   Your Honor.

13         THE COURT:  Mr. Francomano.

14         MR. FRANCOMANO:  No questions, Your Honor.

15         THE COURT:  Redirect.

16                   REDIRECT EXAMINATION

17   BY MS. HOFFMAN:

18   Q    Just briefly, Agent Sailor.  You were asked whether you

19   later learned that Mr. Jones was convicted of handgun

20   possession and I want to show you what's been marked as

21   Government's Exhibit No. SC 11.  Can you tell what we're

22   looking at here?

23   A    It says 4/11/17; criminal court of Baltimore; there's the

24   case number; defendant Kenneth Jones.

25   Q    I'm going to turn to the next page.

1   A   All right.  Same thing, then it says, handgun on person;

2   verdict G for guilty.

3   Q   Can you read the defendant's name at the top?

4   A   Yes, Kenneth Jones.

5   Q   And if you could read the date for us too.

6   A   4/11/17, the same as the incident, and then date down at

7   the bottom is March 13th, 2012, it appears.

8   Q   Thank you.  No further questions.

9          MR. BUSSARD:  No further questions.

10          THE COURT:  May the witness be excused?

11          MR. FRANCOMANO:  Yes, Your Honor.

12          THE COURT:  You may be excused, sir.  You may

13   depart.  Next witness.

14          MR. MARTINEZ:  Your Honor, may we approach?

15          MR. BUSSARD:  Your Honor, may I also retrieve an

16   exhibit?

17          THE COURT:  Yes.

18          (Bench conference on the record.)

19          MR. MARTINEZ:  Agent Christy, is in contact with our

20   next two witnesses, neither of them came to the courthouse at

21   this moment.  I understand that Sergeant Landsman is on his

22   way and within a few minutes, I hope.  And then Corporal Finch

23   from the Elkton Police Department was supposed to be here this

24   morning, which I haven't seen him yet.  So we're -- do what we

25   can to make sure that they're here as soon as possible.  In

```
 1    light of that --
 2              THE COURT:  You're going to be saved by the break.
 3    In general, you've got to have them here.  We can take a
 4    break.
 5              MR. MARTINEZ:  I understand.
 6              (The following proceedings were had in open court.)
 7              THE COURT:  Ladies and gentlemen, we'll take the
 8    morning recess.  During the recess do not discuss the case
 9    with anyone.  Do not discuss it even among yourselves.  Do not
10    allow yourselves to be exposed to any news articles or reports
11    that touch upon the case or the issues it presents or any
12    articles or reports that relate to any of the participants in
13    the case.  Avoid all contact with any of the participants in
14    the trial.  Do not make any independent investigation of the
15    law or facts of the case.  Do not look up anything related to
16    the case on the internet.  Do not consult an encyclopedia or a
17    dictionary.  15 minutes.  We'll reconvene at 11:50.  Please
18    take the jury out.
19              (Jury left the courtroom.)
20              THE COURT:  What will be the subject of the
21    testimony of the next couple witnesses?
22              MR. MARTINEZ:  Sergeant Landsman's going to testify
23    about the 2011 homicide of Henry Dominic Mills, his
24    investigation of that crime.  Corporal Finch from the
25    Elkton Police Department will testify --
```

1          THE COURT:  From which police department?

2          MR. MARTINEZ:  The Elkton, Maryland.

3          THE COURT:  The Elkton Police of the Harford County

4     stuff, Cecil County.

5          MR. MARTINEZ:  Correct.

6          THE COURT:  Got it.  15 minutes.

7          (A recess was taken.)

8          THE COURT:  Ready for the jury?

9          MR. MARTINEZ:  We are.  I don't know what the

10    Court's preference is, either after they come out or before,

11    Sergeant Landsman is going to be testifying about a homicide.

12    We do have a couple of crime scene and autopsy photos that we

13    want to introduce through him.  I thought maybe the most

14    efficient way to address them would be to do it either now or

15    at the bench.

16         THE COURT:  Yes, outside their hearing.  Let's do it

17    now.  Let me see it.  Be seated, please.  Have I heard about

18    this murder before?

19         MR. MARTINEZ:  It's the 2011 murder of victim H.M.

20    that was committed by Mr. Hunter.  Your Honor did hear about

21    it at a re-arraignment, but I don't think we've featured it

22    otherwise.

23         THE COURT:  Okay.  It wasn't in one of the motions

24    hearing.

25         MR. MARTINEZ:  No.

1              THE COURT:  Okay.

2              MR. MARTINEZ:  Can I approach?

3              THE COURT:  Yes.  Counsel have seen these, know what

4    we're referring to, or you need to be up here?

5              MR. O'TOOLE:  I think those were sent to us over the

6    weekend.

7              MR. MARTINEZ:  Yes.

8              MR. O'TOOLE:  There's only one, Your Honor, that I

9    had a question about.

10             THE COURT:  Okay.  So and are these the trial

11   exhibit numbers AP-1, AP-2, and PHCS 9-1, PHCS 9-2, PHCS 9-3.

12   Okay.  So these are autopsy shots?

13             MR. MARTINEZ:  Yes, Your Honor.

14             MR. O'TOOLE:  The picture to your left, Your Honor,

15   my argument would be that that picture is just simply

16   unnecessary.  It's a picture of a dead man's face, apparently.

17   The picture next to your right is the picture apparently with

18   the bullet wound where he was shot, which I think is relevant

19   and we're not objecting to -- I'm not objecting to that

20   portion.  This one, I think is just gratuitously a picture of

21   a dead man, his face.  I don't think it's probative of

22   anything except that he's dead and we certainly know that.

23   Those we do not object to.  But the one with the bullet wound

24   in the back of his head appears to be one that could be

25   important to see.

```
 1              THE COURT:  All right.  Counsel, any other defense
 2    counsel have any other objections to any of the pictures?
 3              MR. O'TOOLE:  The one I identified, Your Honor, for
 4    the record, is AP 3-1.
 5              MR. BUSSARD:  Your Honor, on behalf of Mr. Jones,
 6    we're objecting for the same reason.
 7              THE COURT:  Only to AP 3-1 and you do not object to
 8    the other four exhibits that are in question here?
 9              MR. BUSSARD:  That's correct.
10              THE COURT:  Mr. Francomano.
11              MR. FRANCOMANO:  Same, on behalf of Mr. McCants.
12              THE COURT:  So in looking at AP 3-1, there is
13    nothing about this image that is gruesome.  It doesn't reflect
14    anything that is horribly bloody or reflective of great
15    trauma.  In fact, it's not even crystal clear that the
16    individual depicted is deceased, although once that
17    information is supplied, one can certainly see how he may well
18    be.  But given that the allegation is homicide and that that
19    is at the core of what this part of the case is about, the
20    depiction of someone who is deceased is not inconsistent with
21    that.  So the motion to exclude Exhibit AP 3-1 on 403 grounds,
22    which I understand is the basis --
23              MR. O'TOOLE:  Yes.
24              THE COURT:  -- is denied.  Okay.  And please give
25    me -- Mr. Martinez, you'll be conducting this examination?
```

1          MR. MARTINEZ:  I will.

2          THE COURT:  You'll give me some kind of indication

3     that we're going there, because I want to warn the jurors.

4          MR. MARTINEZ:  Sure.  And Your Honor, while we're

5     waiting for the jury, just for the record, I heard a question

6     raised by defense counsel as to whether Sargeant Landsman will

7     be back later in the case.  For the Court's benefit, we are

8     going to recall him to testify about later events.

9          THE COURT:  Okay.  And Sergeant Landsman is purely a

10    fact witness in this trial?

11         MR. MARTINEZ:  Correct.

12         THE COURT:  Okay.  Now are we ready for the jury?

13         MR. MARTINEZ:  We are.

14         THE COURT:  And is Landsman next?

15         MR. MARTINEZ:  Yes.

16         THE COURT:  Okay.  Let's get him in here and get the

17    jury in.

18              (Jury entered the courtroom.)

19         THE COURT:  Government may call their next

20    witness.

21         MR. MARTINEZ:  Your Honor, the government's next

22    witness is Sergeant Joseph Landsman of the Baltimore Police

23    Department.

24         THE COURT:  Sergeant Landsman, please face our

25    clerk.

 1          THE CLERK:  Sir, if you would -- thank you.
 2                 SERGEANT JOSEPH LANDSMAN
 3    called as a witness, being first duly sworn, was examined and
 4    testified as follows:
 5          THE WITNESS:  Yes, ma'am.
 6          THE CLERK:  You may enter the witness box and watch
 7    your step.  And Sergeant, if you would please speak directly
 8    into the microphone, state your first and last name and spell
 9    your first and last name.
10          THE WITNESS:  Joseph Landsman, J-o-s-e-p-h,
11    Landsman, L-a-n-d-s-m-a-n.
12          THE CLERK:  Thank you.
13          THE COURT:  Mr. Martinez.
14                 DIRECT EXAMINATION
15    BY MR. MARTINEZ:
16    Q    Sergeant, good afternoon.
17    A    Good afternoon.
18    Q    Can you please tell us where you work?
19    A    Baltimore Police Department, Federal Bureau of
20    Investigations, FBI, Safe Streets Task Force.
21    Q    So you're employed by both the BPD and the FBI; is that
22    right?
23    A    Yes, sir.
24    Q    With the BPD what is your rank and assignment?
25    A    Police sergeant in the Operation Intelligence Division.

Direct Examination - Landsman (By Mr. Martinez)

1    Q    How about the FBI, what is your title there?

2    A    Police sergeant in the Task Force.

3    Q    So do I understand correctly that you're deputized to the

4    FBI as a Task Force officer; is that right?

5    A    Yes, sir.

6    Q    All right.  Could you tell us how long you've been with

7    the Baltimore Police Department?

8    A    Since July of 2000.

9    Q    How about the FBI, how long have you been with them?

10   A    Since October of 2015.

11   Q    Could you please walk us through the positions you've

12   held over the course of your career with the BPD?

13   A    During my career with the police department, I worked in

14   the Eastern District Patrol.  From -- in 2004, I went from the

15   Eastern District Patrol to the Citywide Operations Unit, which

16   worked in public housing properties around the city.  In

17   November 2007, I was assigned to the Homicide Unit until

18   December of 2011 when I was promoted to police sergeant.  And

19   when I was promoted to sergeant, I went back to

20   Western District Patrol Unit.  And I worked in patrol as a

21   supervisor until 2012, when I was assigned to the

22   Pennsylvania Avenue initiative, which worked along the

23   Central District -- Central and Western Districts,

24   Pennsylvania Avenue corridor.  In 2013, I was assigned as a

25   supervisor in the District Detective Unit.  I worked out of

1    Eastern District and I supervised nonfatal shooting

2    investigations, robberies, and burglaries.  In 2014, June of

3    2014, I was assigned to a Cease Fire Initiative.  And in

4    October of 2015, I was assigned to the FBI Safe Streets Task

5    Force.

6    Q    All right.  Thank you.  So you indicated that you were a

7    homicide detective between 2007 and December of 2011; is that

8    correct?

9    A    That's correct.

10   Q    So were you working in that capacity in June of 2011?

11   A    Yes, I was.

12   Q    I want to direct your attention to the afternoon of

13   June 14th, 2011.  Did there come a time that afternoon when

14   you responded to the scene of a homicide?

15   A    Yes.

16   Q    Where was the scene of the homicide?

17   A    The 2400 block of Greenmount Avenue, which is in the

18   Eastern District, east side of Baltimore City.

19   Q    I want to show you what's already been admitted as

20   Government's Exhibit GM 10.  And I want to ask if you can use

21   your finger on the touch screen and show the jury where the

22   scene of the homicide was.

23   A    (Indicating.)

24   Q    All right.

25   A    So 2400 block of Greenmount Avenue and it would have been

Direct Examination – Landsman (By Mr. Martinez)

1    on the even side of the street but between 25th Street and

2    24th Street and Greenmount Avenue.

3    Q    And is the even side of the street actually on the west

4    side of Greenmount, Sergeant?

5    A    This –– yes, the west side.

6    Q    Sergeant, during your years as a BPD officer, have you

7    become familiar with the 2400 block of Greenmount Avenue?

8    A    Yes, I have.

9    Q    Is it a busy street?

10   A    It is.

11   Q    Could you tell us what time you arrived on the scene of

12   this homicide?

13   A    About 1:20 p.m.

14   Q    Were other officers present when you got there?

15   A    Yes, they were.

16   Q    How about the victim, was he present when you got

17   there?

18   A    Yes, he was.

19   Q    And where was the victim when you got there?

20   A    Was in the Baltimore Police Department medic, the

21   transport ambulance.

22   Q    Were you able ––

23   A    The Baltimore City medic, not the police medic.  But he

24   was in the ambulance getting ready to go to the hospital.

25   Q    Were you able to identify the victim, Sergeant?

Direct Examination – Landsman (By Mr. Martinez)

1    A    Yes.

2    Q    Who was it?

3    A    Henry Dominic Mills.

4    Q    Did Mr. Mills go by any nicknames?

5    A    Nique.

6    Q    I want to show you Government's Exhibit PHI 59.  Who's

7    that?

8    A    Henry Mills.

9    Q    Sergeant, while you were on the scene of the homicide,

10   did you recover any ballistic evidence?

11   A    Yes, I did.

12   Q    What did you recover?

13   A    Two spent .40 caliber casings and fragments.

14   Q    Were photographs taken at the scene of the homicide?

15   A    Yes, they were.

16   Q    I'm going to show you Government's Exhibit PHCS 9-1.  And

17   I'll ask you what we're looking at here, let's start with the

18   top.

19   A    Top photograph is the sidewalk, blood and markings for

20   evidence that was going to be recovered.  And that's the --

21   Q    And I'll zoom in on the bottom photo, clear for the jury.

22   What are we looking at here, Sergeant?

23   A    It's a photograph facing north on the 2400 block of

24   Greenmount Avenue towards the west side of the street and the

25   crime scene where Henry Mills was lying.

Direct Examination - Landsman (By Mr. Martinez)

1    Q    I'm going to show you Government's Exhibit PHCS 2.  This

2    top photo here, what's depicted in this photo, Sergeant?

3    A    In this photograph it's facing south towards the west

4    side of the 2400 block of Greenmount Avenue.  And the crime

5    scene, same photograph different angle.

6    Q    And Sergeant, as we look south, could you tell us

7    whether -- is there a liquor store on this particular block of

8    Greenmount Avenue?

9    A    Yes.  On the left side of the street, the

10   Greenmount Liquors.

11   Q    Okay.  And a little further south is there also a park on

12   this particular portion of Greenmount Avenue?

13   A    Yes, there is.

14   Q    Could you circle the park?

15   A    (Indicating.)

16   Q    What is the park called?

17   A    Mund Park.

18   Q    Now I'm going to move to the bottom photo, PHCS 9-2.

19   What are we looking at there, Sergeant?

20   A    It's the evidence marker for one of the fired .40 caliber

21   casings that was recovered from the sidewalk of the 2400 block

22   of Greenmount Avenue.

23   Q    Finally, for the crime scene photos, I'm going to show

24   you PHCS 9-3.  Zoom in.  What's depicted here, Sergeant?

25   A    It's another fired .40 caliber casing that's in the

Direct Examination - Landsman (By Mr. Martinez)

1    street in the 2400 block of Greenmount Avenue.

2    Q    Sergeant, you said a moment ago that the victim,

3    Mr. Mills, was in the medic unit when you arrived at the

4    scene, did you later learn more about his condition?

5    A    Yes.

6    Q    What did you learn?

7    A    The doctor pronounced Henry Dominic Mills dead at

8    Johns Hopkins Hospital.

9    Q    And was evidence recovered from Mr. Mills at the

10   hospital?

11   A    Yes, there was.

12   Q    What was that?

13   A    Clothing, three gelatin capsules of suspected heroin, and

14   money.

15   Q    Did you later attend Mr. Mills's autopsy, Sergeant?

16   A    Yes, I did.

17   Q    Did you learn the cause of Mr. Mills's death?

18   A    Yes.

19   Q    What was it?

20   A    Homicide by gunshot wound.

21        MR. MARTINEZ:  And Your Honor, with the Court's

22   permission I'd like to read a paragraph, paragraph 3 of

23   Stipulation 3 into evidence at this time.

24        THE COURT:  Without objection.

25        MR. O'TOOLE:  No objection.

1           MR. FRANCOMANO:  No objection.

2           MR. MARTINEZ:  Paragraph 3 of Stipulation 3 reads as

3    follows:  Government's Exhibit AR 3 is an autopsy report

4    prepared by Dr. James Locke of Maryland's OCME, the Office of

5    the Chief Medical Examiner, in connection with the death of

6    Henry Mills on June 14th, 2011.  It is agreed and stipulated

7    by the parties that Locke determined that Mills's manner of

8    death was homicide and cause of death was a gunshot to the

9    head.  Government's Exhibit AR 3 is admitted into evidence

10   without the necessity of testimony by Dr. Locke.

11          THE COURT:  Thank you.  That's a matter of

12   stipulation, ladies and gentlemen.  Take it as true.

13   Q    (BY MR. MARTINEZ)  Sergeant, I want to just show you for

14   the record now Government's Exhibit AR 3.  Do you recognize

15   this?

16   A    Yes.

17   Q    Is this a copy of Dr. Locke's autopsy report for

18   Mr. Mills?

19   A    Yes, it is.

20   Q    Sergeant, I want to show you now Government's Exhibit

21   AP --

22          THE COURT:  Ladies and gentlemen --

23          MR. MARTINEZ:  Sorry, Your Honor.

24          THE COURT:  -- I always try to give you a little

25   advanced notice when you're going to see graphic photos so you

1    can brace yourself, and you will now see two graphic

2    photographs.  Go ahead.

3    Q    (BY MR. MARTINEZ)   Sergeant, I'm putting

4    Government's Exhibit AP 3 back on the screen and I'll ask you

5    if you recognize this picture here.

6    A    Yes, I do.

7    Q    What are we looking at?

8    A    It's Henry Dominic Mills as he is photographed at the

9    medical examiner's office.

10   Q    I'll show you now Government's Exhibit AP 3-2 and I'll

11   ask you what this picture shows.

12   A    It's a photograph of the gunshot wound to Henry Mills,

13   the back of his head.

14   Q    Sergeant, I want to talk to you now about your

15   investigation of this homicide.  As part of your

16   investigation, did you gather surveillance footage from

17   cameras in the area of the homicide?

18   A    Yes, I did.

19   Q    Can you tell the jury whether there's a closed circuit

20   television camera near the intersection of Greenmount Avenue

21   and 25th Street?

22   A    There is.

23   Q    Did you obtain footage from that camera as part of your

24   investigation?

25   A    Yes.

Direct Examination – Landsman (By Mr. Martinez)

1    Q    Now, I want to put a photo back on the screen here, it's

2    PHCS 2.  I want to focus your attention on the liquor store

3    that you pointed out earlier, that's the building with the red

4    awning; is that correct?

5    A    Yes.

6    Q    Did you obtain footage from a surveillance camera at

7    Greenmount Liquors as part of your investigation?

8    A    Yes, I did.

9    Q    And then you also indicated when we were looking at this

10   photo that just past the liquor store a little further south

11   on Greenmount is Mund Park; is that right?

12   A    Correct.

13   Q    Can you tell the ladies and gentlemen of the jury whether

14   there's a CCTV camera in the area of Mund Park?

15   A    There is.

16   Q    Did you obtain footage from that camera as well as parts

17   of your investigation?

18   A    Yes.

19   Q    Okay.  Let's start by talking about the CCTV footage from

20   the intersection of Greenmount and 25th.  Did that camera

21   capture any footage that was relevant to your investigation?

22   A    Yes, it did.

23   Q    And were you able to generate still images or screenshots

24   from portions of that relevant footage?

25   A    Yes.

1    Q    I want to show you some of the still images now, start

2    with Government's Exhibit PHCS 13-1.  Can you tell us who

3    we're looking at here, Sergeant?

4    A    Yes.  On the -- in the darker clothing is the victim,

5    Henry Mills.  And they are walking in the 400 block of

6    East 25th Street towards Greenmount Avenue.

7    Q    And how about the gentleman in the white, were you able

8    to identify that person?

9    A    Yes.  Jerome Page.

10   Q    I'll show you now Government's Exhibit PHCS 13-2.  Is

11   this another still image that was captured by the same

12   camera?

13   A    Yes, it is.

14   Q    And is it correct that the camera rotates or pans so that

15   it takes shots from different angles of the intersection?

16   A    Yes.

17   Q    So tell us in what direction the camera is facing, what

18   street are we looking at here?

19   A    The camera in this photograph is facing south into the

20   2400 block of Greenmount Avenue.

21   Q    And who are we looking at that's spotlighted in the

22   middle there?

23   A    The shooter, identified as David Hunter.

24   Q    And can you tell us when in relation to the murder the

25   footage that generated that still shot was taken?

1    A    Minutes before the murder.

2    Q    I want to move on now to the footage from the liquor

3    store surveillance camera.  First I'm going to approach and

4    show you the Government's Exhibit CD 2.  Sergeant, do you

5    recognize that disk?

6    A    Yes.

7    Q    Does that contain footage from the Greenmount Liquors

8    surveillance camera?

9    A    Yes.

10   Q    Prior to coming into court today, did you review the

11   footage on that disk?

12   A    Yes, I did.

13   Q    I'd like to play that video for you now.  Just give me a

14   moment, we need to switch the input on our screen.

15        The screen appears to be blank.  Ms. Hoffman, if you

16   could rewind to the very beginning and pause immediately.

17        All right.  Sergeant, could you tell us who in the top

18   middle portion of the screen -- I'll ask you, if you can, to

19   circle that individual with your finger on the touch screen.

20   That doesn't work?

21   A    No, it's not working.

22            THE COURT:  Maybe it doesn't work when you're in

23   this function.  I'm not sure what the answer to that is.  I

24   thought it did.

25            THE CLERK:  It should work, Your Honor.  I think

1    unfortunately it froze again.

2            THE COURT:  Let's see if we're totally frozen or if

3    you're going to be able to operate without the marking

4    function.

5            THE CLERK:  Sir, do you mind making a mark on the

6    screen?

7            THE WITNESS:  Yeah, it looks like --

8            THE COURT:  Just mark the screen, draw a circle in

9    the middle of it.

10            THE WITNESS:  There's several marks.

11            THE COURT:  I think it's suspicious.  It's making up

12    its own mind about which marks its accepting.

13            THE CLERK:  Your Honor, it's not even responding to

14    my command to clear.

15            THE COURT:  Completely frozen.

16            THE CLERK:  It's frozen, Judge.

17            THE COURT:  Counsel, you can approach.

18            (Bench conference on the record.)

19            THE COURT:  Call IT.  All right.  How dependant upon

20    the images are you for the next portion of this testimony, is

21    it something you can --

22            MR. MARTINEZ:  This next portion I do think it will

23    be helpful to the jury for the sergeant to be able to point

24    out who he's looking at.  And they're going to see clips in a

25    few minutes that are especially pertinent and some of the

 1    footage because it's zoomed in, we're going to show some gif

 2    files, so those are a little grainy.

 3            THE COURT:  So the images are your evidence, is what

 4    you're trying to say?

 5            MR. MARTINEZ:  Part of it, yes.

 6            THE COURT:  We've had nothing but trouble with this

 7    system for two years in this courtroom.  We redid it

 8    completely, we fixed -- went through a trial month ago, it

 9    worked pretty well.  It seems to be on the switch between the

10    two functions that it gets discombobulated.  What's their --

11    do they -- they have a short-term solution?

12            THE CLERK:  Reboot.

13            THE COURT:  Rebooting.  Go ahead, start now, start

14    to reboot.

15            THE CLERK:  The husher will turn off if I reboot.  I

16    just want to let you know.

17            THE COURT:  That's fine.  You can resume your

18    positions.

19            (The following proceedings were had in open court.)

20            THE COURT:  Ladies and gentlemen, to move ahead here

21    we really need the technology working in the courtroom.  So we

22    are going to sit tight for a moment and see if a reboot will

23    fix our problems.  That has on occasion been a successful

24    strategy.  So we'll just wait.

25            (Pause in the proceedings.)

1          THE COURT:  We're back on the record.

2     Mr. Martinez.

3     Q    (BY MR. MARTINEZ)  Sergeant, before the break, I was

4     asking you about the individual who's depicted in the -- on

5     the top of the screen, in the center of the screen, and I was

6     asking you to circle that individual with your touch screen.

7     A    Yes, sir.  (Indicating.)

8     Q    Were you able to identify that person?

9     A    Yes, I was.

10    Q    Who is that?

11    A    Henry Mills.

12    Q    How about the woman in -- or the person in red across the

13    street, were you able the identify that person?

14    A    Yes, I was.

15    Q    Who is that?

16    A    Sharon Hawkins.

17    Q    Now, if you would, with your finger show us where on this

18    screen the actual homicide occurred.

19    A    Well, the homicide occurs in that top area where I made

20    the marking on the left side of the 2400 block of

21    Greenmount Avenue.

22    Q    Let me clear this now.

23         And if you could resume the tape.

24             (Video played.)

25    Q    (BY MR. MARTINEZ)  All right.  Sergeant, I'll ask you to

1   circle -- do you see the two people at the top, they're kind

2   of small?

3   A    Yes.

4   Q    Can you circle them?

5   A    (Indicating.)

6   Q    Who are those people, were you able to identify them?

7   A    On the right side in the darker clothing is Henry Mills,

8   on the left side in the white T-shirt and gray sweatpants is

9   Jerome Page.

10  Q    And so these are the same two individuals that we looked

11  at in the still image that were on 25th Street from the other

12  camera at the intersection of Greenmount and 25th; is that

13  correct?

14  A    That's correct.

15  Q    Let's resume the tape.

16        (Video played.)

17  Q    (BY MR. MARTINEZ)  Sergeant, it looks like the top of the

18  footage is cut off on the screen.

19  A    When you clear the stuff at the bottom, then it shows up.

20  Now it's full screen.

21  Q    All right.  Are you able to show us, on this screen can

22  you circle the area where you believe the homicide occurred?

23  A    (Indicating.)  In that area, on the sidewalk.

24  Q    And the excerpt we just watched, are you able to tell us

25  what was happening with respect to those two people who were

1    walking north on Greenmount?

2    A    As Henry Mills and Jerome Page were walking north, you'll

3    see the other individual who's pictured from the CCTV camera

4    at that other angle, walking south on the west side of 2400

5    block of Greenmount Avenue.  That individual passes

6    Henry Mills and Jerome Page, then turns back and fires the

7    gunshot and Henry Mills collapses there in the 2400 block of

8    Greenmount Avenue.

9    Q    All right.  Sergeant, I want to play the remainder of

10   this tape in a moment.  Before I do I want to ask you, in

11   addition to the footage we're watching here, which is the raw

12   footage, did you also participate in generating smaller

13   excerpts or clips which were converted into gif files?

14   A    Yes, I did.

15   Q    We'll watch those as well.  But first, let's go ahead and

16   resume this tape.

17              (Video played.)

18   Q    (BY MR. MARTINEZ)  Can you tell us what you saw?

19   A    Henry Mills and Jerome Page passed that individual and

20   that individual turned back and fires a gunshot.

21   Q    Can you circle the area where that's occurring?

22   A    (Indicating.)

23   Q    All right.  Go ahead and continue the tape.

24              (Video played.)

25   Q    (BY MR. MARTINEZ)  I'll direct you to the top right-hand

1    corner of the screen, Sergeant, do you see the individual

2    who's crossed in front of a truck?

3    A    Yes, I do.

4    Q    Can you circle him, please?

5    A    (Indicating.)

6    Q    Were you able to identify that person?

7    A    Yes.

8    Q    Who is it?

9    A    David Hunter.

10   Q    All right.  Go ahead and run the rest of the tape.

11        (Video played.)

12   Q    (BY MR. MARTINEZ)  Sergeant, now I want to approach and

13   show you Government's Exhibit CD 13.  Do you recognize this

14   disk?

15   A    Yes.

16   Q    Does this disk contain the graphical interchange

17   formatting or gif files that were generated in excerpts from

18   the footage that we just watched?

19   A    Yes, it does.

20   Q    I'll go through some of these with you.  These we'll just

21   play on a continuous loop.

22        All right.  Sergeant, as this plays, the gentleman

23   walking backwards across the street, that's the person you

24   identified as Mr. Mills; right?

25   A    Right.

1    Q    And the woman in red, that's Sharon Hawkins?

2    A    Yes.

3    Q    Let's go to the next one.

4              MR. O'TOOLE:  Ask to approach, Your Honor.

5              THE COURT:  Stop the tape.  You may approach.  Clear

6    the image.  Thank you.

7              (Bench conference was had on the record.)

8              MR. O'TOOLE:  Your Honor, as we look at the titles

9    of the gif pieces, we're going to see two of them refer to my

10   client as doing something.  I think it says dancing, Geezy

11   dancing or something else.  These are perceptions by somebody

12   who decided to title certain gif portions as certain things.

13   So my objection is that, is there a way for the government to

14   put these on, if they're going to put them on, without having

15   the title, which tells the jury what somebody who titles these

16   videos thought they saw.  It's not this witness.

17             THE COURT:  Right.  It's a 21st century problem we

18   have with the presentation of electronic evidence.  I don't --

19   I wasn't going to say anything unless defense counsel said

20   something.  But it's perfectly possible that just through the

21   labels that are thrown up on the screen that we've got

22   prejudicial information that's being pushed at the jury that

23   really isn't in the form of evidence and has to be filtered

24   out.  Now, if it's information that's inconsequential, like

25   computer language or codes or that sort of thing, the fact

 1   that it's up there, even though it's not in evidence, really

 2   is of no great significance.

 3        But when -- through the labeling and titling of

 4   exhibits we start to have characterizations of what it is that

 5   that bit of electronic media actually shows, we're starting to

 6   interfere with the process.  And now we've got an objection

 7   along those lines.  I didn't happen to notice that particular

 8   reference.  What I saw that was troubling me was a description

 9   of the overall piece of video as murder flight.  Now, I

10   suppose if Mr. Hunter himself were on trial here there may

11   have been an immediate objection from his lawyer, but this is

12   obviously relevant evidence because it relates to the overall

13   activities of the group.  So any concern that Mr. Hunter might

14   have had at that reference would, it seems to me, be shared by

15   defense counsel.

16        MR. O'TOOLE:  Yes, sir.

17        THE COURT:  On the other hand, no one objected with

18   respect to that, so the Court didn't intercede at that point.

19   Now we have a reference to something that to me seems a little

20   more innocuous, a label that says "dancing."  I don't know how

21   prejudicial that is on its face, maybe in context it would be

22   because of the subject matter that's being portrayed and maybe

23   dancing would be thought to be inappropriate.  Regardless, it

24   is a label.  Is there some way for the government to display

25   their admissible relevant electronic media without placing the

Direct Examination - Landsman (By Mr. Martinez)

1   labels in front of the jury?  That's the question.

2          MR. MARTINEZ:  There is, and I think all that is

3   required in order to do that is for us to be able to bring

4   back the window with the labels and perhaps Ms. Hoffman can do

5   it so that her --

6          MS. HOFFMAN:  Disconnect.

7          MR. MARTINEZ:  Yes.  Unplug her laptop so it's not

8   displaying on the screen and we'll just relabel the titles of

9   the gif files so that the jury doesn't see the titles.  We're

10  happy -- if the Court thinks appropriate to instruct the jury

11  to disregard anything they may have seen in the titles of the

12  files, we think that's appropriate as well.

13         MR. O'TOOLE:  We'd join that.

14         THE COURT:  Okay.  But are you able to do this in

15  real-time, just rolling forward here?

16         MS. HOFFMAN:  Yeah, I just need to disconnect from

17  the thing and then relabel them.

18         THE COURT:  So how long is that going to take you to

19  do?

20         MS. HOFFMAN:  Maybe two minutes.

21         THE COURT:  Why don't you get back and work on that.

22  And meanwhile, I will craft the instruction.  And I'm going to

23  explain exactly what the nature of the problem is to give them

24  an explanation of why we are doing what we are.  Any objection

25  to that?

1              MR. O'TOOLE:  No objection.

2              MR. BUSSARD:  No, Your Honor.

3              MR. FRANCOMANO:  No, Your Honor.

4              THE COURT:  Okay.

5              (The following proceedings were had in open court.)

6              THE COURT:  Ladies and gentlemen, we have a very

7    sort of 21st century type issue.  This is not a huge deal at

8    this point, but it's something that needs to be addressed.  In

9    the old days, which qualifies as 25 years ago when I became a

10   trial lawyer, there weren't any TV screens in courtrooms.  We

11   didn't even imagine such things.  Instead we worked with paper

12   exhibits and passed out photographs and the witnesses marked

13   on the photograph and then the photograph got published to the

14   jury and was passed to the jury box.  And there were some real

15   advantages to that old system.  For instance, you didn't end

16   up wasting 15 minutes every trial day because the technology

17   breaks and we can't figure out how to turn it back on and

18   there was some other things.

19             There's some real advantages to the modern approach,

20   which is that we don't have to pass papers among the jurors,

21   we can move more quickly when the technology is working.  In

22   general, this is I guess, progress.  One of the things that

23   comes with this progress is the fact that lots of things show

24   up on the screen in front of jurors beyond just the exhibit or

25   the photograph or the image that the judge has ruled is

1    appropriate for the jurors to see.  For instance, right now if

2    you look at your screens, you'll see a bunch of basically

3    indices of things that could be shown to you if somebody were

4    to click on them.  In general, we allow that to occur even

5    though that information isn't really in evidence because it's

6    not relevant to anything and it's not prejudicial one way or

7    the other.

8          But little bit more of a problem area when we see

9    the -- a lawyer's sort of menu of items that they could click

10    on and play for you, and then that lawyer has put labels on

11    them.  Like there was a label left in front of you a little

12    while ago related to that little image that said "murder

13    flight" or "flight from a murder," and that was the title that

14    a lawyer put on that particular video segment.  So the concern

15    that I have with counsel is putting those sorts of titles in

16    front of you.  Whether that's "flight from a murder" is for

17    you to decide, not for somebody to put a title on and tell you

18    that that's what that is.  You might say, well, that's sort of

19    a subtle point.  Well, it is a subtle point.  But labels

20    matter when they start to have information contained in them.

21          So I'm giving you this long explanation in part

22    because the government needs some time and they're taking

23    advantage of this time while I'm speaking to you to eliminate

24    their labels.  So that instead, we're going to have images

25    come up that don't have little descriptions on them.  And you

1    decide yourself what it is, as opposed to somebody else

2    putting a title on it.  All right.  Was that a long enough

3    speech to give you the opportunity to do what you need to do?

4            MS. HOFFMAN:  Yes.

5            THE COURT:  She told me two and a half minutes, so I

6    tried to speak for exactly two and a half minutes.  Are we

7    back on the record, ready to go back on the record?

8            MR. MARTINEZ:  We are, Your Honor.

9            THE COURT:  Okay.  Mr. Martinez.

10   Q    (BY MR. MARTINEZ)  Sergeant, we have now put back on the

11   video screen here the same loop that we were looking at just a

12   moment ago.  And I want to ask you, on your screen, if you

13   would draw a wide circle so that you don't make any markings

14   on the area where the activity is actually occurring.  Would

15   you isolate for the jury the area where you believe the

16   homicide is occurring?

17   A    Yes, sir.  (Indicating.)

18   Q    Could you tell us what we're looking at in that area?

19   A    It's the loop of -- as Henry Mills and Jerome Page are

20   walking north on that west side of 2400 block of

21   Greenmount Avenue, they pass the other individual, who was

22   seen from the CCTV camera angle walking south on that west

23   side of 2400 Greenmount Avenue.  When that individual passes

24   Henry Mills and Jerome Page, he then turns back and that's

25   when the gunshot is fired into Henry Mills.

1    Q    All right.  Sergeant, I want to move to the next gif

2    file.  All right.  Sergeant, this one is grainy, obviously

3    because of the zoom, but as this plays on a loop, could you

4    explain what we're looking at here and identify the area where

5    the relevant footage is taking place?

6    A    So it's the same video with -- it's blown up at the top

7    left-hand portion of the video, still at 2400 block of

8    Greenmount Avenue.  And it's a better video of as Henry Mills

9    and Jerome Page walk past and then that other individual

10   passes and turns back and you can see at the last second when

11   Henry Mills's body collapses.

12   Q    Okay.  Let's move to the next one.  All right.  Sergeant,

13   as this plays on a loop, can you tell us what you see

14   occurring?  At the top of the screen you have that truck

15   that's stopped and the gentleman runs out in front of it.

16   What's happening in this portion of the tape?

17   A    The shooting has occurred and that individual is running

18   from the shooting, crossing the 2400 block of

19   Greenmount Avenue from the west side of the street to the east

20   side of the street and continuing south in the 2400 block of

21   Greenmount Avenue.

22   Q    Okay.  We have one more gif from this tape to play for

23   you.  What did we just see there, Sergeant?

24   A    That individual continuing to run south onto the east

25   side of the 2400 block of Greenmount Avenue, grabbing the left

Direct Examination - Landsman (By Mr. Martinez)

1    side of his clothing.

2    Q    Okay.  If we can take the gif file down.

3         And I want to show you -- did you also participate in

4    generating still photograph images from the footage we just

5    looked at?

6    A    Yes.

7    Q    I'll show you what's been marked as Government's

8    Exhibit --

9              MR. MARTINEZ:  I'm sorry, Your Honor, I'm still just

10   getting a blank screen at the lectern.  Thank you.

11   Q    (BY MR. MARTINEZ)  I want to show you what we've marked

12   as Government Exhibit PHCS 15.  Do you recognize this photo,

13   Sergeant?

14   A    Yes.

15   Q    And is this the still image you generated from the

16   footage we just watched?

17   A    Yes.

18   Q    Tell us what we're looking at here.

19   A    It's blown up portion of that video from the liquor store

20   and it's a still image of the individual that committed the

21   shooting grabbing the left side of their clothing.

22   Q    And tell us again who you identified this individual to

23   be.

24   A    David Hunter.

25   Q    And tell me about the shoes he's wearing.

1    A    The shoes are black Adidas shell top with three white

2    stripes.

3    Q    Thank you.  Oh, and while we have the photo on the

4    screen, can you just generally describe the clothing

5    Mr. Hunter is wearing, for the jury?

6    A    White T-shirt, black pants, and the black Adidas shell

7    tops with the three white stripes.

8    Q    I'm going to switch back to the video function.

9         MR. MARTINEZ:  And Ms. Powell, I apologize, I can't

10   get the options to come up on my screen.

11        THE CLERK:  You're fine.  It takes about a minute to

12   just switch over.

13        MR. MARTINEZ:  And Your Honor, may we --

14   Q    (BY MR. MARTINEZ)  All right.  Sergeant, you mentioned

15   earlier that there was a CCTV camera in the area of Mund Park;

16   is that right?

17   A    Right.

18   Q    You mentioned that you obtained footage that was

19   collected by that camera as part of your investigation?

20   A    That's correct.

21   Q    Is that what we're starting to look at here?

22   A    Yes.

23   Q    Could you tell us when -- was this footage taken on the

24   day of the homicide?

25   A    It was.

Direct Examination – Landsman (By Mr. Martinez)

1    Q    When, in relation to the homicide, was the footage

2    taken?

3    A    About three hours after the crime scene was cleared, so

4    about the 7:00 o'clock p.m.

5    Q    Let's do this in relation to the murder.  You said the

6    murder was about 1:00 p.m.; is that right?

7    A    Yes.

8    Q    So this is about 7:00 p.m., which is six hours later; is

9    that correct?

10   A    Correct.

11   Q    All right.  Before we play the footage, did you also --

12   could you tell the jury, did you also participate in gif

13   excerpts like the ones we just watched for the liquor store

14   for this video?

15   A    Yes.

16            MR. O'TOOLE:  Objection, Your Honor.

17            THE COURT:  You wish to approach?

18            MR. O'TOOLE:  If you like.

19            THE COURT:  Please.

20            (Bench conference on the record.)

21            MR. O'TOOLE:  Your Honor, it appears that I object

22   on relevance grounds, out of the box.  First of all, it

23   appears that this video is taken six hours after the crime

24   happened, when the crime scene is cleared.  I'd ask for a

25   proffer as to how, in what the government sees these videos

1    can be relevant to this crime scene.

2              THE COURT:  Well, I think it's a foundational

3    objection, at least that's -- I don't know what this is about.

4    It seems to be more foundation before we start to play this

5    video.  We've got the image up in front of the jury.

6              MR. MARTINEZ:  Okay.  We can certainly do --

7              THE COURT:  Sustained.

8              (The following proceedings were had in open court.)

9    Q    (BY MR. MARTINEZ)  Sergeant, before we play the video,

10   just a few preliminary questions.  Did your investigation of

11   the homicide begin immediately on the afternoon of the

12   murder?

13   A    Yes.

14   Q    And were you notified that afternoon by a CCTV operator

15   that potentially relevant footage had been captured in the

16   area of Mund Park?

17   A    Yes.

18   Q    Did you make a determination that footage was relevant to

19   your investigation?

20             MR. O'TOOLE:  Objection to leading, Your Honor.

21   Q    (BY MR. MARTINEZ)  Can you tell the jury whether or

22   not --

23             THE COURT:  Sustained.  Rephrase the question.

24   Q    (BY MR. MARTINEZ)  Can you tell the jury whether or not

25   that footage ultimately proved relevant to your

1    investigation?

2    A    Yes, it did prove relevant to the investigation.

3    Q    Why?

4    A    The individual positioned in that park was wearing the

5    same white T-shirt, black pants, and those Adidas shell top

6    shoes with the three white stripes.

7    Q    Was there anything else about the footage that you deemed

8    relevant?

9    A    The individual in the center identified as

10   Gerald Johnson, seated to the right of counsel in the blue

11   sweater, was positioned in the center of that meeting having a

12   discussion and is apparently reenacting a shooting.

13           MR. O'TOOLE:  Your Honor, may we approach the bench,

14   please?

15           THE COURT:  Yes.

16           (Bench conference on the record.)

17           THE COURT:  I think I'll just sustain the objection,

18   strike the last reference to re-enacting anything, and move

19   onto the next question.

20           MR. O'TOOLE:  Cutting out the middleman here.  Thank

21   you.

22           (The following proceedings were had in open court.)

23           THE COURT:  Strike any reference to a reenactment,

24   ladies and gentlemen, next question.

25   Q    (BY MR. MARTINEZ)  And Sergeant, just to recap, do I

1    understand you to be saying that you believed the footage was

2    relevant because it captured a meeting --

3            MR. O'TOOLE:  Your Honor, objection.  If we can

4    approach the bench?

5            THE COURT:  Sustained.  Leading.  Next question.

6            MR. MARTINEZ:  Let's just go ahead and play the

7    video.

8            MR. O'TOOLE:  Objection.

9            THE COURT:  Sustained.  Lack of foundation.

10   Q    (BY MR. MARTINEZ)  All right.  Sergeant, let's continue

11   explaining why you believed that the footage from the CCTV

12   camera was relevant.

13   A    Those individuals were gathered in that park --

14           MR. O'TOOLE:  Objection.

15           THE COURT:  Overruled.

16   Q    (BY MR. MARTINEZ)  Sergeant, did the footage capture --

17           THE COURT:  Let him answer.  "Those individuals were

18   gathered in the park."

19   A    In the 2400 block of Greenmount Avenue.  That homicide of

20   Henry Mills occurred that day and that individual wearing the

21   same clothing of the person who was the shooter was captured

22   in that meeting, that white T-shirt and black pants and the

23   black Adidas with white stripes, also the same build as the

24   person captured in the liquor store video.

25   Q    And Sergeant, you described this as a meeting.  What kind

1    of meeting, when you reviewed the footage, did you believe it

2    to be?

3                MR. O'TOOLE:  Objection.

4                THE COURT:  Overruled.  You may answer.

5    A    During the course of the investigation, I believed it to

6    be a gang meeting, BGF gang meeting.

7                MR. O'TOOLE:  Objection.

8                THE COURT:  All right.  Sustained.  Lack of

9    foundation.  The Court's view is there is sufficient

10   foundation to play the video at this point, if that's where

11   counsel wants to next go.

12               MR. MARTINEZ:  Well, I do want to go there,

13   Your Honor, but I have two more questions for

14   Sergeant Landsman.

15   Q    (BY MR. MARTINEZ)  At the time of Mr. Mills's murder,

16   Sergeant, were you also participating in a broader

17   investigation of gang activity in the Greenmount corridor?

18   A    Yes.

19   Q    And what gang was the focus of that investigation?

20   A    The Black Guerilla Family.

21   Q    And I'm sorry, I said two questions, this is going to be

22   a third:  Through that investigation, did you become familiar

23   with various targets that law enforcement believed were

24   Black Guerilla Family members in the Greenmount

25   neighborhood?

1    A    Yes, I did.

2    Q    So based on that background, your involvement in that

3    investigation, what type of meeting did you believe had been

4    captured by the CCTV footage from Mund Park?

5              MR. O'TOOLE:  Objection.  Characterization.

6              THE COURT:  Overruled.  You may answer.

7    A    BGF gang meeting.

8    Q    (BY MR. MARTINEZ)  Now I'd like play the tape.

9              (Video played.)

10   Q    (BY MR. MARTINEZ)  Sergeant, could you tell us who we're

11   looking at there?

12   A    David Hunter.

13             (Video played.)

14   Q    (BY MR. MARTINEZ)  So Sergeant, the gentleman you

15   identified as Mr. Hunter is on the left there in the black

16   jeans; is that right?

17   A    Yes.

18   Q    Now, the clothing that he's wearing here, you touched on

19   this earlier, but is that -- was that significant to your

20   investigation?

21   A    Yes, it was.

22   Q    Why?

23   A    That's the same clothing that the shooter was wearing

24   earlier in the day, that was seen running past that liquor

25   store video following the shooting of Henry Mills in the 2400

1    block of Greenmount Avenue.

2               (Video played.)

3    Q    (BY MR. MARTINEZ)   All right.   Sergeant, the person in

4    the bluish green shirt in the middle there, were you able to

5    identify that person?

6    A    Yes.

7    Q    Who is that?

8    A    Gerald Johnson, seated in the courtroom to the right of

9    defense counsel in the blue sweater.

10   Q    Okay.   I want to play maybe 30 seconds more of this tape.

11              (Video played.)

12   Q    (BY MR. MARTINEZ)   Sergeant, you mentioned earlier that

13   you created gif excerpts from this footage; is that right?

14   A    Yes.

15   Q    And there's one particular gif excerpt that I'd like to

16   show you.

17              (Video played.)

18   Q    (BY MR. MARTINEZ)   Sergeant, is the loop we're watching

19   now, was that of evidentiary significance to your

20   investigation?

21   A    Yes, it was.

22   Q    Why?

23   A    It looks like Gerald Johnson --

24              MR. O'TOOLE:   Objection.

25              THE COURT:   Counsel, you can approach.

1              (Bench conference on the record.)

2              THE COURT:  Can we stop the gif, please?

3              (Bench conference on the record.)

4              THE COURT:  So why should the witness be able to

5      characterize what he thinks he's seeing, why isn't that

6      argumentative?  And counsel can certainly talk about it, but

7      the evidence is what it is.

8              MR. MARTINEZ:  Your Honor raises a fair point.  I

9      wanted to have him explain why he believed it was important as

10     he was doing the investigation, but I understand the Court's

11     concern.

12             THE COURT:  Let's leave it where it is.

13     Sustained.

14             MR. MARTINEZ:  While we're here, I defer to the

15     Court on this, but this may be a good time to break for

16     lunch.

17             THE COURT:  How much longer is he going -- has he

18     got a ways to go?

19             MR. MARTINEZ:  20 minutes.

20             THE COURT:  Okay.  Yeah, this will work.

21             (The following proceedings were had in open court.)

22             THE COURT:  Ladies and gentlemen, we are going to

23     stop and take our lunch break.  During the lunch break do not

24     discuss the case with anyone.  Do not discuss it even among

25     yourselves.  Do not allow yourselves to be exposed to any news

1  articles or reports that touch upon the case or the issues it

2  presents or any articles or reports that relate to any of the

3  participants in the case.  Avoid all contact with any of the

4  participants in the trial.  Do not make any independent

5  investigation of the law or the facts of the case.  Do not

6  look up anything related to the case or its participants on

7  the internet.  Do not consult an encyclopedia or dictionary.

8  We'll be out for 1 hour and 10 minutes, resuming at 2:15.

9  Please take the jury out.

10           (Jury left the courtroom.)

11           THE COURT:  Sergeant Landsman, you're excused until

12  2:15, you must return then.  You may step down.  Counsel,

13  let's plan to come back at 2:00 o'clock to address the

14  juvenile issue.  2:00 o'clock.

15           (A recess was taken.)

16           THE COURT:  Be seated, please.  Let's take up the

17  juvenile matter.  If there was no evidence presented during

18  the course of this trial that Mr. McCants had any involvement

19  in unlawful activity under the umbrella of the alleged

20  conspiracy after his 18th birthday, it would strike me that

21  under *Spoone*, the Court may well be confronted with a personal

22  jurisdiction issue in relation to Mr. McCants's presence in

23  this case.  But the evidence that I'm aware of, both some of

24  which has been presented, other was foreshadowed by opening

25  statement, other was presented during the course of the

1    motions hearing, would suggest that the government likely will

2    be in the position to demonstrate that Mr. McCants was

3    involved in conspiratorial activity, as set out in the

4    indictment after he turned 18.

5            Mr. Francomano, I'm not asking you whether you agree

6    with that factual matter, what I'm asking you is whether you

7    agree with the legal proposition that if the Court were to

8    find that there was such evidence that the Court would have

9    jurisdiction over your client and the allegations against him

10   in this case.

11           MR. FRANCOMANO:  I would agree with that,

12   Your Honor.

13           THE COURT:  So I so find.  That resolves the first

14   question and subject to some Rule 29 argument that

15   Mr. Francomano makes that, hey, they never presented any

16   evidence that he was involved in the conspiracy after his 18th

17   birthday, otherwise, I'm clear in my own mind on what the law

18   requires.

19           All right.  Then in that circumstance, then we're

20   left with a question of, well, what do we make of the evidence

21   relating to the stabbing that allegedly occurred -- I forgot

22   now, was that on Guilford?  My north/south streets --

23           MR. FRANCOMANO:  24th Street.

24           MR. MARTINEZ:  Greenmount.

25           MR. FRANCOMANO:  Greenmount, yeah.

1          THE COURT:  All right.  Wherever it allegedly

2    occurred, we know the incident we're talking about, when

3    clearly Mr. McCants had not achieved the age of 18.  What are

4    we to make of that evidence, is it even admissible?  My ruling

5    is that the mere fact of his having been a juvenile at that

6    time is not a basis for excluding that evidence from

7    consideration by this jury, just wholesale across the board,

8    it should not have come in and it needs to be stricken.  I

9    don't think that's the answer.

10         The case law would suggest that at a minimum it

11   could come in as evidence that would reflect on such things as

12   knowledge, intent, plan, opportunity, absence of a mistake or

13   accident, the sorts of things that we see as exceptions listed

14   under Rule 404(b).  It would be probative of those kinds of

15   questions about Mr. McCants's sort of knowledge and intentions

16   after he had achieved the age of 18.  So it strikes me that

17   it's admissible on that basis at least.

18         The last part of it that I think is more of an open

19   question is whether or not that evidence comes in against

20   Mr. McCants as evidence of substantive guilt on the conspiracy

21   charge.  Mr. Martinez.

22         MR. MARTINEZ:  Your Honor, we think it should --

23         THE COURT:  Well, you've cited me one case that is

24   unpublished.  And there's a lot of other cases that would sort

25   of suggest maybe not.  But go ahead.

1            MR. MARTINEZ:  Well, with respect to that case, the

2      Sparks case, I think is useful for the analysis that it

3      engages in of the 4th Circuit's *Spoone* decision.  I think

4      *Spoone* over the years has been projected as being something

5      it's not, if you actually look at the opinion.  What happened

6      in that case, the defendant participated in a conspiracy both

7      before and after his 18th birthday.  If I recall correctly, he

8      had not yet attained the age of 21 at the time of the

9      prosecution, and the simple issue that the *Spoone* court

10     decided is whether in a -- whether conspiracy is a continuing

11     offense such that one who participates in the conspiracy

12     before and after their 18th birthday, thereby is not protected

13     from having the jury consider evidence of things that may have

14     happened before they turned 18.

15            And the portion of the *Spoone* opinion that I think

16     later courts have glommed onto and cited as standing for a

17     proposition, I think goes beyond what the opinion actually

18     says, is they say:  "We see no basis in the record to conclude

19     that *Spoone* was convicted solely on the basis of things that

20     happened before his 18th birthday.  And in fact, we take great

21     comfort from the fact that the trial court repeatedly

22     instructed the jury that they were not to consider such

23     things."

24            So from that simple statement, later courts,

25     including the *Claiborne* court in the Eastern District of

1    Virginia, the *Thomas* court in the D.C. Circuit, and I think

2    there may be a few other opinions.  They've taken that simple

3    language from *Spoone* and turned it into a requirement that

4    such a limiting instruction be given and a rule that

5    premajority conduct is only admissible for the purpose of

6    showing knowledge and intent in the types of 404(b) things the

7    Court was just talking about.

8            I don't think anything in the language of *Spoone*

9    stands for that.  I think there are other later case law

10   including the *De La Torre* opinion from the 10th Circuit that

11   we cited, which gave essentially the explanation and reading

12   of *Spoone* I just gave to the Court.  I think that's the

13   sounder reading and if you look at Judge --

14           THE COURT:  Let's leap past that because I think I

15   generally agree with that proposition, but that doesn't

16   necessarily resolve this in your favor.  I don't think I'm

17   required by *Spoone* to give the limiting instruction, but I

18   have a more fundamental question, and that is, isn't there

19   something wrong with trying to hold someone accountable in

20   adult court for misconduct that they committed when they were

21   a child?

22           I mean, I could turn this thing on its head.  Let's

23   suppose you've got a case where the conspiracy charge is --

24   begins on the defendant's 13th birthday and it ends on the day

25   after his 18th birthday.  On the day after his 18th birthday,

1    he drove Mr. Big to a meeting where they were going to talk

2    about everything that was going on and he knew exactly what

3    was up with the conspiracy and he nonetheless got in the car

4    and drove the boss to that meeting.  So just no question at

5    all that he engaged in an overt act himself in furtherance of

6    the conspiracy during the life of the conspiracy.

7             But when he was 14, 15, and 16, he committed murders

8    on his own, also in furtherance of the whole thing.  So we're

9    going to say that based on the one day driving of the boss to

10   a meeting, he can be held substantively accountable in adult

11   court in relation to those three homicides committed when he

12   was a juvenile, simply because it can be proven that it was

13   all part of the same conspiratorial scheme.  To me that's

14   holding a child responsible as an adult without a lawful basis

15   for doing so.

16             MR. MARTINEZ:  Well, with respect to the lawful

17   basis, Your Honor, I mean, I think there's case law from a

18   bunch of different circuits that suggest exactly that type of

19   scenario is appropriate.  The 4th Circuit has not gone so far

20   as to hold that definitively.  But in the *Foster* opinion from

21   the Lexington Terrace case that we referenced in our letter,

22   Judge Blake did find that one of the members of the

23   Lexington Terrace Boys gang who had participated in two

24   murders while he was 17, could be -- well, the government

25   could introduce evidence of those murders as part of its case

1    in chief without regard to Rule 404(b) in that case.

2            And so she, I think, may have parted company with

3    the Court's perspective in terms of deciding, well, simply

4    because these murders happened when the defendant, whose name

5    was Taylor, was a juvenile, that doesn't mean that they can't

6    come in against him at trial.  So we do think that there's

7    case law that stands for the proposition of pre-18 conduct

8    should come in as evidence of guilt.

9            I would also point out here, even though I believe

10   the charges were nolle prossed, Mr. McCants was charged as an

11   adult in the Circuit Court for Baltimore City with assault.

12           THE COURT:  Yeah, that's of no moment because

13   there's also a procedure whereby you can attempt to hold him

14   accountable for his juvenile conduct in federal court too, but

15   you've got to jump through a bunch of hoops.

16           MR. MARTINEZ:  That was going to be my next point,

17   Your Honor.  In the hypothetical the Court just posited, a

18   defendant who participates in a conspiracy almost exclusively

19   before 18, then turns 18 and does something on day one, and

20   thereby renders it a continuing offense, that's a far cry --

21   that hypothetical is a far cry from what we have here.

22           THE COURT:  Sure it is, but it's still a good test

23   of the principle because the principle needs to hold up in

24   that circumstance just as well as it does on your more

25   attractive fact pattern for it to be legally sound.

1          MR. MARTINEZ:  I agree with that generally,

2   Your Honor, except I think from a legal point of view, we're

3   on different footing when we're dealing with a defendant who's

4   21 or older after the case is indicted, because between 18 and

5   21, at least at the time of the indictment, a defendant is --

6   does have the protection of the Federal Juvenile Delinquency

7   Act under *Spoone*.  I think what the 4th Circuit said in Sparks

8   is that if the defendant's 21 years or older when the case is

9   indicted, then he's no longer a juvenile within the meaning of

10  the act.  And those authorities, *Spoone* and the Federal

11  Juvenile Delinquency Act --

12          THE COURT:  It's all true.  I look more at *Spoone*

13  about jurisdiction, and I'm totally satisfied the government,

14  provided they prove up the facts they say they're going to

15  prove up, absolutely has jurisdiction over -- that this Court

16  has jurisdiction over Mr. McCants.  And I think that's sort of

17  the end of that issue.  But it's in holding -- in holding that

18  jurisdiction over him, what do I lawfully hold him accountable

19  for?

20          It just seems odd to me that conduct that -- I mean,

21  you would agree that if you came in here and charged Mr.

22  McCants with a single act of murder from when he was 15 or 16

23  years old, that if you hadn't invoked the special procedures

24  that are set out in 5035 or whatever it is, of the Juvenile --

25  what is it, the Federal Juvenile Delinquency Act, I forget

1    what it's called.  If you hadn't done that, then you couldn't

2    hold him accountable.  You would say yes, because there wasn't

3    jurisdiction.

4              MR. MARTINEZ:  Yes.

5              THE COURT:  But my question goes beyond that, is

6    that even when we're in the circumstance where we've got

7    jurisdiction, is he still accountable as an adult for illegal

8    conduct that he committed as a child?

9              MR. MARTINEZ:  Under conspiracy principles, I think

10   he is, under the reasoning that conspiracy is a continuing

11   offense.  And there's case law in the 4th Circuit in the

12   sentencing context --

13             THE COURT:  But we don't hold even adults

14   accountable for misconduct that occurred under the umbrella of

15   a conspiracy that wasn't known to them and wasn't foreseeable

16   to them.

17             MR. MARTINEZ:  Correct.

18             THE COURT:  So why isn't standard law about the lack

19   of capacity of juveniles the answer to this?  In other words,

20   we don't treat his thinking about this and his intentions,

21   whatever they were when he was 15 or 16, as intent or

22   foreseeing in the way that we do with an adult.

23             MR. MARTINEZ:  I think the answer to the Court's

24   question, or at least the best and most satisfying answer I

25   can give at this point, is that the Court to have gone so far

as to hold premajority conduct as substantive evidence of

guilt, rely on the concept of ratification.  And they say that

if you ratify your participation in the conspiracy by

continuing to participate after you were 18, then that brings

in everything that happened before.  There are lots of

authorities, including *De La Torre*, that go in that

direction.

THE COURT:  It just seems like -- I mean, there's a

lot of fiction involved in conspiracy law.  We would all agree

to that, especially in racketeering conspiracy law, but these

are subtle questions and I'm not trying to undo all of that.

But wow, it really gets to an extreme point when we start

trying to say that you can effectively reach back from your

state of majority, and by continuing to be involved in a

particular group, make yourself legally culpable for choices

and decisions and actions that you took when you were 15 or 16

years old.

I mean, the whole premise of not extending

adult-type response -- responsibility or culpability to that

sort of misconduct is that they are children.  They have

unformed brains, they are not fully responsible for their

conduct.  And yet, through this principle, we're trying to say

that, well, because you were doing similar things when you

were 22, 23, 24, you didn't stop doing it, somehow that

renders what you did when you were 15 and 16 to be decisions

1    made with capacity.  But --

2         MR. MARTINEZ:  Your Honor, I do think that is what

3    this concept of ratification does.  I think that's how it

4    operates, in principle.  I think when we're talking about

5    overt acts in racketeering conspiracy, it's important to note

6    that we're not always necessarily -- in this particular case

7    we're talking about an assault and a stabbing.  But we're not

8    always talking about acts that happen to be in themselves

9    criminal.  One can do all kinds of overt acts in furtherance

10   of a conspiracy that aren't criminal.

11        And to posit another hypothetical, if we're talking

12   about somebody who when they're 17 made a phone call, posted

13   something on social media while they were a juvenile, under

14   the Court's analysis of diminished capacity, is the Court

15   saying that we couldn't then, through the concept of

16   ratification, reach back and bring that into the post-18

17   conduct if they continue to participate?

18        THE COURT:  It's a fair point.  I think the other

19   point that you could make in rebuttal to my argument is that

20   this is different from if there was a freestanding count that

21   you had -- that the grand jury had returned.

22        MR. MARTINEZ:  That's correct.

23        THE COURT:  Which was somehow, you know, there was

24   jurisdiction.  I don't know quite what it would be, but also,

25   when he was 15 on such and such a date, he stabbed a guy.

1                MR. MARTINEZ:  Right.

2                THE COURT:  And we haven't gone -- and you haven't

3      got any of the Juvenile Delinquency Act prerequisites

4      satisfied.

5                MR. MARTINEZ:  Your Honor, while we're discussing

6      this, one thing I do want to say that I think we agree is

7      appropriate, after having thought about this, what emerges

8      from this whole analysis is that the idea of ratification is

9      important.  And we are perfectly comfortable going forward

10     with the limiting instruction -- or a jury instruction rather,

11     at the end of the case, that instructs the jury that in order

12     to find Mr. McCants guilty of the conspiracy count, they have

13     to find that he did something to ratify his participation in

14     the conspiracy after age 18.  I think that would be an

15     appropriate instruction in a case like this where you have

16     conduct --

17               THE COURT:  Yes, but what is -- I'm with you on

18     that, but what would that mean?  Does he have to simply --

19     there has to be proof that he was involved in the conspiracy

20     after age 18, or does there have to be proof beyond that,

21     which was not only was he involved after 18, but he somehow,

22     through his actions, his words, conduct, whatever,

23     acknowledges involvement before he was 18 and said, "As an

24     adult, I adopt that, I ratify that."

25               MR. MARTINEZ:  Well, I'm not sure there's a

1    difference in practice between the two things the Court just

2    hypothesized, because the evidence of ratification is going to

3    be something he said or did.  I do agree with the Court that

4    in the ordinary course you're -- once you're in a conspiracy,

5    you're presumed to be in until you affirmatively withdraw.  I

6    think in the context of a conspiracy that straddles the age of

7    18, that principle does not apply and there does need to be

8    some showing of ratification after 18.

9            THE COURT:  Was he in the conspiracy the day before

10   his 18th birthday?

11           MR. MARTINEZ:  Mr. McCants?

12           THE COURT:  Yeah.

13           MR. MARTINEZ:  Indeed.

14           THE COURT:  That's sort of the question, isn't it?

15   Because functionally, I understand your position completely.

16   I'm asking you legally.  Let's suppose that he'd engaged in

17   all the activity that you're describing prior to his 18th

18   birthday.  And it just so happens that he didn't turn 18 until

19   November 1st of this year and you returned the second

20   Superseding Indictment in October of 20 -- or September,

21   whatever it is, of 2017.  Would he be liable?  I mean, you

22   couldn't charge him, he's a juvenile.

23           MR. MARTINEZ:  That would be correct, then we'd have

24   a jurisdictional issue.

25           THE COURT:  Everything he did, but you're saying

1    that's just back to the jurisdictional question.

2              MR. MARTINEZ:  Well, even putting aside the

3    jurisdictional issue, we wouldn't have been able to charge

4    him, as a practical matter, nor would we have as a matter of

5    prudence.

6              THE COURT:  All right.  We're not going to resolve

7    it this afternoon, but that's the last thing that I am hung up

8    on.  I have no question that the evidence is admissible.  It's

9    to what extent and in support of what theories, and we'll

10   continue to review this.  We'll have to get it resolved by the

11   time, obviously, of our instructions conference after the

12   holidays.

13             Mr. Francomano, do you want to be heard further

14   before we let it rest for today?

15             MR. FRANCOMANO:  Your Honor, just briefly.  You did

16   touch on what our argument is under 18, U.S.C., 5032.  And in

17   the Juvenile Deliquency -- the Federal Juvenile Deliquency

18   Act, there are a number of hoops that the government does have

19   to jump through before they can bring a case into adult court.

20   I could go through the entire list, but I don't want to waste

21   anybody's time.  But that's our argument, Your Honor.  Prior

22   to his 18th birthday, all of those issues would have had to

23   have gone through that, I guess, transformation to bring it up

24   into adult court.  Thank you, Your Honor.

25             THE COURT:  The case law doesn't seem to support

1    that, with many judges having the opportunity to sort of look

2    at this issue and it's not where they go.  They get very

3    fixated on the question of jurisdiction.  And pretty much

4    every court that's looked at it has satisfied itself that if

5    the conspiracy spans the two phases of a defendant's life,

6    juvenile and adult, and it's the same conspiracy, that that's

7    enough to bring into the courtroom the evidence of the crimes

8    and overt acts and actions in furtherance of the conspiracy

9    committed by that defendant when that defendant was a

10   juvenile.

11          Whether or not there has to be a limiting

12   instruction saying, well, you're only to consider this on

13   these 404(b) exception type bases or whether it comes in

14   straight up, is our hanging question that we still have to

15   resolve.  And I don't find the case law completely satisfying

16   in that regard.

17          All right.  Mr. O'Toole.

18          MR. O'TOOLE:  It occurs to us that because our

19   client is also being held responsible for conduct, apparently,

20   that was committed by either this defendant or another one of

21   the co-conspirators, Mr. Handy, who was also about the same

22   age as Mr. McCants.  So there's conduct being conducted by

23   juveniles that our client, as an adult, is going to be held

24   responsible for.  I think we have to join the objection and

25   see how it plays out with -- down the road.

1          THE COURT:  Well, you can note it for the record and

2     you as well, Mr. Bussard.

3          MR. BUSSARD:  And I have one additional --

4          THE COURT:  Yes.

5          MR. BUSSARD:  Your Honor, Mr. Jones's birthday is

6     XX/XX/1987.  Therefore, in the indictment there are two overt

7     acts that are listed that would have -- it just says sometime

8     in 2005, so anything that predates May 6th, 1985 -- or '05,

9     would have been before his 18th birthday, so for that reason,

10    we join.

11         THE COURT:  All right.  Well, but it's also

12    incumbent upon you to reiterate that issue with respect to any

13    proof that specifically comes in of misconduct occurring prior

14    to May -- what is it?

15         MR. BUSSARD:  May 6th, 2005.

16         THE COURT:  May 6th of 2005.  You better object when

17    that particular evidence is presented or I will conclude that

18    you waived it.  I'm not going to give you an overarching

19    objection to any such evidence.  I don't know if there is any,

20    and you need to bring it to the Court's attention if and when

21    it's offered.

22         MR. BUSSARD:  I have not heard it as of yet.

23         THE COURT:  All right.  Are we ready for the jury?

24         MR. MARTINEZ:  Yes, Your Honor.

25         THE COURT:  Bring them.

1          (Jury entered the courtroom.)

2          THE COURT:  Good afternoon, ladies and gentlemen.

3    We are now ready to resume.  Having addressed and resolved

4    some questions outside of your hearing, we are ready to go

5    once again.  Sergeant Landsman, you remain under oath, you may

6    be seated.  Mr. Martinez, you may continue with your

7    examination.

8          MR. MARTINEZ:  Thank you.

9    Q    (BY MR. MARTINEZ)  Sergeant, before the break we were

10   watching the CCTV footage from the area of Mund Park.  Do you

11   remember that?

12   A    Yes.

13   Q    I may have asked you this earlier, but did you also

14   participate -- in addition to the gif image that we just saw,

15   did you participate in generating still photos or screenshots

16   from the Mund Park CCTV footage?

17   A    Yes, I did.

18   Q    All right.  I want to show you a couple of exhibits.

19   This is Government's Exhibit PHCS 14-3, Sergeant, if you could

20   tell us what we're looking at here.

21   A    It's a still photograph from that CCTV camera footage

22   from Mund Park on June 14th, 2011.  The still photo is

23   highlighting David Hunter standing in the park.

24   Q    And could you tell us what kind of shoes he's wearing?

25   A    Black Adidas shell tops with the three white stripes.

Direct Examination - Landsman (By Mr. Martinez)

1    Q    Sergeant, now I'm going to show you

2    Government's Exhibit PHCS 14-2.  Could you tell me what this

3    picture shows?

4    A    It's another still photograph of that CCTV video from

5    Mund Park on that date of June 14th, 2011, which is

6    highlighting David hunter.

7    Q    And the gentleman in the blue shirt there, did you

8    indicate to us before the break who you believed that to be?

9    A    Gerald Johnson, seated in the courtroom in the blue

10   sweater.

11   Q    I just want to show you Government's Exhibit PHI 45.

12   Who's that, Sergeant?

13   A    It's David Hunter.

14   Q    Sergeant, I want to fast-forward about ten days and

15   direct your attention to June 24th of 2011.  Did there come a

16   time where David Hunter was brought to your office at homicide

17   for an interview?

18   A    Yes.

19   Q    Was Mr. Hunter photographed when he was brought to

20   homicide?

21   A    Yes, he was.

22   Q    I'm going to show you a couple exhibits, I'll start with

23   Government's Exhibit PHCS 10-2.  I'll start with the photo on

24   the top.  I know his head is cut off, but what are we looking

25   at here?

1    A    The photograph taken in the homicide office of

2    David Hunter on that date wearing the black Adidas tennis

3    shoes with the three white stripes.

4    Q    Okay.  The bottom photo here, is this the same person,

5    only we can see his face?

6    A    Yes, it is.

7    Q    Show you Government's Exhibit PHCS 10-1, what are we

8    looking at in these photographs?

9    A    A photograph of the shoes on David Hunter's feet, the

10   black Adidas with the three white stripes, then it's a

11   photograph of the shoes being removed.

12   Q    Sergeant, while Mr. Hunter was in the homicide office,

13   did you obtain a search and seizure warrant for his shoes?

14   A    Yes, I did.

15   Q    Why did you do that?

16   A    Recover the shoes that were captured in that video that

17   the shooter that killed Henry Mills was wearing on that date

18   of June 14th, 2011.

19   Q    Sergeant, I want to approach and show you

20   Government's Exhibit 52.  Open the bag and I'll ask you

21   whether you recognize those items.

22   A    Yes, I do.

23   Q    What do you have there?

24   A    The two black Adidas tennis shoes with the three white

25   stripes seized from David Hunter.

Direct Examination - Landsman (By Mr. Martinez)

1    Q    Sergeant, when Mr. Hunter was photographed at the

2    homicide office, were photographs taken of his tattoos?

3    A    Yes, there were.

4    Q    I'm going to show you Government's Exhibit PHT 1-1 and

5    I'll focus you on this image here of the right hand.  Tell us

6    what we see on his palm -- or sorry, on the outside of his

7    hand there.

8    A    David Hunter's right hand, it's the letters B, G, F.

9    Q    Let me show you what's marked as

10   Government's Exhibit PHT 1-4.  I'll start with the top photo,

11   what does it say above Mr. Hunter's left -- left chest

12   there?

13   A    RIP Lil' Don 276.

14   Q    Sergeant, before the break do you remember telling us

15   that in addition to the Henry Mills homicide investigation,

16   you've also been involved in a broader investigation -- with a

17   broader investigation of BGF activity in the Greenmount Avenue

18   area?

19   A    Yes.

20   Q    And through that investigation, you've become familiar

21   with various targets or suspected BGF members in the

22   neighborhood?

23   A    Yes.

24   Q    Was there a target of your investigation who went by the

25   nickname of Lil' Don?

1    A    Yes, there was.

2    Q    What was that target's real name?

3    A    Donatello Fenner.

4    Q    Is Mr. Fenner still with us?

5    A    No, he's dead.

6    Q    Do you know when he died?

7    A    2010 he was shot and killed.

8    Q    Do you know how he died -- I'm sorry, you just answered

9    that.

10         Give me a moment, Sergeant, I'm just trying to get back

11   to the document camera.  I want to show you the bottom half of

12   Government's PHT 1-4 and I'll ask you to tell us what you see

13   there.

14   A    Photograph of the back of David Hunter with the numbers

15   276 in flames tattooed on it.

16   Q    Now I'd like to show you Government's Exhibit PHT 1-5,

17   this is the top half of it.  What are we looking at in this

18   photograph, Sergeant?

19   A    It's a photograph of David Hunter's left hand with the

20   tattoos 24th and Barclay and 22nd Street.

21   Q    Let me see if I can zoom in on the 4 here.  Can you tell

22   us where you see the Barclay?

23   A    The Barclay is tattooed inside the 4.

24   Q    Thank you.  Sergeant, I want to move forward about

25   another month and direct your attention to July 23rd of 2011.

1  On that date did law enforcement arrest a suspect in

2  connection with the murder of Henry Mills?

3  A    Yes.

4  Q    Who was that?

5  A    David Hunter was arrested.

6  Q    Did you take a statement from Mr. Hunter on the date of

7  his arrest?

8  A    Yes.

9  Q    Did he tell you where he was at the time of the murder?

10 A    Yes, he did.

11 Q    Where did he say?

12 A    He was at 2824 North Calvert Street at his mother's

13 house.

14 Q    Did you ask him whether he was with Geezy on the night of

15 the murder at the park?

16 A    He said he was not.

17 Q    Sergeant, did you also execute search warrants as part of

18 your investigation?

19 A    Yes, I did.

20 Q    I want to direct your attention to August 8th of 2011.

21 On that date, did law enforcement execute a search warrant at

22 a residence located at 300 East 22nd Street?

23 A    Yes.

24 Q    Who lived at that address?

25 A    Dawnyell Gary.

1    Q    Who was she?

2    A    It was a girl that David Hunter had a child with.

3    Q    Did you seize any evidence from Ms. Gary's residence?

4    A    Yes.

5    Q    I want to show you a copy of Government's Exhibit GP 10.

6    Do you recognize this document, Sergeant?

7    A    Yes, I do.

8    Q    What is it?

9    A    It's a portion of the BGF 30 rules, 33s.

10    Q    And was this one of the items that you seized from

11    Ms. Gary's residence?

12    A    Yes, it is.

13    Q    Zooming in a little bit here, do you see any references

14    to Jamaa in this shot?

15    A    Yes.

16    Q    Can you point a couple of them out for us?

17    A    It's not working.

18    Q    That's all right, you can just read the ones you see.

19    A    We do not bring harm to those who depend on Jamaa.  We do

20    not bring harm to those members of Jamaa without -- I can't

21    read that.  We never steal from Jamaa.  We never lie to Jamaa.

22    The truth is revealed in discipline.

23    Q    You can stop there.  During your time investigating the

24    Black Guerilla Family, Sergeant, have you become familiar with

25    the phrase Jamaa?

Direct Examination - Landsman (By Mr. Martinez)

1    A    Yes.

2    Q    Do you know what language it is?

3    A    Swahili.

4    Q    Do you know what it means in Swahili?

5    A    Family.

6    Q    I'm going to show you Government's Exhibit GP 11.  I'll

7    ask you what we're looking at here.

8              THE COURT:  One second, Mr. Martinez.

9              (Pause in the proceedings.)

10             THE COURT:  Ladies and gentlemen, we do have now one

11   of our IT engineers present in the courtroom.  And she is

12   going to be moving around the courtroom a little bit testing

13   out our technology and when we get a problem like this, where

14   it suddenly won't highlight again, you may see her walking up

15   to the witness stand or back to the podium or wherever, just

16   pretend she's not here.

17             MR. MARTINEZ:  May I continue?

18             THE COURT:  You may proceed.

19   Q    (BY MR. MARTINEZ)  Sergeant, could you tell us what

20   Government's Exhibit GP 11 is?

21   A    The rules of Jamaa.

22   Q    I want to focus you here on the section that says Jamaa

23   visions.  Do you see above my pen here where it says Eusi

24   Gayedi Jamaa?

25   A    Yes.

Direct Examination - Landsman (By Mr. Martinez)

1    Q    Do you know what language that is?

2    A    Swahili.

3    Q    Do you know what it means in Swahili?

4    A    Black Guerilla Family.

5    Q    I'm going to show you Government's Exhibit GP 12.  Do you

6    recognize this item?

7    A    Yes, I do.

8    Q    What is it?

9    A    It's several -- a photograph and pieces of paperwork that

10   were seized from the search warrant at 300 East 22nd Street.

11   Q    And just for the record, the exhibit we just looked at,

12   GP 11, was that also seized at 300 East 22nd Street?

13   A    Yes.

14   Q    I'm going to take these piece by piece here.  I want to

15   focus you on this particular section of the exhibit, Sergeant.

16   What are we looking at here?

17   A    Piece of paper that had different phone numbers and

18   street names next to the numbers.

19   Q    On the basis of your participation in the broader

20   investigation of BGF activity in Greenmount, are you familiar

21   with any of these street names?

22   A    Yes.

23   Q    Are you familiar with the street name Geezy?

24   A    Yes, I am.

25   Q    Does that name correspond to a target of your

1    BGF Greenmount investigation?

2    A    Yes, it does.

3    Q    Which target?

4    A    Gerald Johnson.

5    Q    The same Gerald Johnson you pointed out earlier?

6    A    Yes.

7    Q    How about the street name K Slay, does that correspond to

8    a target of your broader investigation?

9    A    Yes, it does.

10   Q    Who?

11   A    Kenneth Jones, seated in the courtroom with the pink

12   collared neck shirt.

13   Q    How about on the right, the street name Roscoe, does that

14   correspond to a target of your investigation?

15   A    Yes, it does.

16   Q    Who is that?

17   A    Kenneth Faison.

18   Q    I'll show you Government's Exhibit PHI 27.  Can you tell

19   us who that person is?

20   A    Kenneth Faison.

21   Q    And do you know what, if any, relationship there is

22   between Mr. Faison and Mr. Jones?

23   A    It's Gerald Johnson's brother.

24   Q    Now, back to the exhibit here, I want to focus you on the

25   loose-leaf note at the top, or a copy of it.  Did your broader

 1    investigation of BGF activity in Greenmount focus on a target

 2    named Taz at any point?

 3    A    Yes, it did.

 4    Q    Can you tell us whom you believe Taz to be?

 5    A    Artez Harris.

 6    Q    And GP 12, just could you remind us where that was

 7    recovered?

 8    A    In 300 East 22nd Street, in the third floor front room.

 9    Q    That was the residence belonging to Dawnyell Gary;

10    correct?

11    A    Yes.

12    Q    Sergeant, I now want to direct your attention to

13    September 27th of 2011.  Did law enforcement execute another

14    search warrant on that date?

15    A    Yes.

16    Q    Do you know which address?

17    A    318 East 22nd Street.

18    Q    And could you tell us who lived there?

19    A    Artesia Simmons.

20    Q    Who was she?

21    A    Artesia Simmons was a girl that David -- that was

22    visiting David Hunter while he was in jail and receiving mail

23    from David Hunter.

24    Q    Did you seize any evidence from that address?

25    A    Yes, I did.

1    Q    Let me show you a few more exhibits.  This is

2    Government's SM 1, do you recognize this photograph,

3    Sergeant?

4    A    Yes, I do.

5    Q    All right.  I'm going to zoom in as much as I can here.

6    Now, if your technology is working, can you use the touch

7    screen and identify anybody you might recognize in this

8    picture?

9    A    Yes, I can.

10   Q    Can you, though?  Sergeant, we can --

11          THE COURT:  All right.  We're going to have to limp

12   along until the next break.  Let's do the best we can without

13   the ability to actually use the pointer.

14   Q    (BY MR. MARTINEZ)  All right.  Sergeant, I will use my

15   pen.  Who's this gentleman here?

16   A    Joseph Bonds.

17   Q    And was he a target of your investigation of the

18   BGF Greenmount Regime?

19   A    Yes, he was.

20   Q    How about this gentleman here?

21   A    Yes.

22   Q    Who was it?

23   A    Wesley Brown.

24   Q    Was he also a target of your broader investigation?

25   A    Yes, he was.

Direct Examination - Landsman (By Mr. Martinez)

1   Q   How about this gentleman here in the --

2   A   Gerald Johnson.

3   Q   And you've identified him previously as being seated

4   right over here; correct?

5   A   Yes.

6   Q   How about that guy here?

7   A   David Hunter.

8   Q   And lastly, this gentleman right there?

9   A   Ronnie Hall.

10  Q   I'm going to show you Government's Exhibit SM 2.  Do you

11  recognize this photograph?

12  A   Yes, I do.

13  Q   What are we looking at now?

14  A   It's a photograph of David Hunter and Joseph Bonds making

15  an X sign.

16  Q   What, if anything, can you tell us about their

17  T-shirts?

18  A   The T-shirts say George Lester Jackson.

19  Q   Sergeant, based on your investigation of the BGF, are you

20  familiar with George Lester Jackson?

21  A   Yes.

22  Q   Do you know who he was?

23  A   The founder of the Black Guerilla Family.

24  Q   Sergeant, in addition to executing search warrants, did

25  you also interview witnesses in connection with your

1    investigation?

2    A    Yes.

3    Q    Did you interview eyewitnesses?

4    A    Yes, I did.

5    Q    Did you interview one or more than one?

6    A    More than one.

7    Q    I want to now direct your attention to October 20th of

8    2011.  On that date did you take a statement from

9    Mr. Johnson?

10    A    Yes, I did.

11    Q    During the interview did you ask Mr. Johnson about where

12    he was when Henry Mills was murdered?

13    A    Yes, I did.

14    Q    What did he say?

15    A    He indicated that he was with Lakeya Brady at the time of

16    the murder and came up later.

17    Q    Did you ask Mr. Johnson whether he was at the park with

18    David Hunter later that night?

19    A    Yes, I did.

20    Q    What did he say?

21    A    He indicated that he came up to the park with Dave.

22    Q    Did Mr. Johnson say how long he had known Dave?

23    A    For years.

24    Q    Did you ask Mr. Johnson whether he knew the victim,

25    Henry Mills?

1    A    Yes.

2    Q    What did he say?

3    A    He indicated that he did know him.

4    Q    Did he say how he knew him?

5    A    He knew him as a Muslim and he had -- he indicated he was

6    a cold dude.

7    Q    Did you ask Mr. Johnson any questions about the 2007

8    murder of Naim King?

9    A    Yes.

10   Q    What did he say?

11   A    He indicated he heard Naim King was killed when he was in

12   jail and that he heard Nique had killed him.

13   Q    Did you ask Mr. Johnson whether he was a member of YGF?

14   A    Yes.

15   Q    And first let me ask whether you know what YGF is.

16   A    Yes, I do.

17   Q    What is it?

18   A    The Young Guerilla Family.

19   Q    Now, in response to your question to Mr. Johnson as to

20   whether he was a member of YGF, what did he tell you?

21   A    That he was.

22   Q    Did you ask Mr. Johnson if he was a member of BGF?

23   A    Yes.

24   Q    Did he admit or deny being a member of BGF?

25   A    He denied being a member of BGF.

1    Q    Sergeant, as part of your broader investigation into the

2    BGF Greenmount Regime, did you review an Instagram photo that

3    was posted on the account with the user name dattniccageeznutz

4    in April 2016?

5    A    Yes.

6    Q    I want to approach and show you -- actually, it's already

7    in evidence, Government's CD 3.  I'd like to play you a clip,

8    very short clip of CD 3.  Now, I just want to make sure we get

9    to the right.  Sorry, we need to fix the sound.

10                 (Video played.)

11    Q    (BY MR. MARTINEZ)  All right.  Towards the end of that

12    video did you hear Mr. Johnson say "free Roscoe"?

13    A    Yes, I did.

14    Q    You mentioned earlier one of the targets of your broader

15    BGF investigation was someone named Roscoe; right?

16    A    Yes.

17    Q    You said you believed that person to be Kenneth Faison?

18    A    Correct.

19    Q    At the very end did you hear Mr. Johnson say "free Dave,

20    N-word, my shooter"?

21    A    Yes.

22    Q    Did any of the targets of your investigation of the

23    BGF Greenmount Regime go by the nickname Dave?

24    A    David Hunter did.

25    Q    Were there any other targets of your investigation who

1    went by the name Dave?

2    A    No.

3    Q    So far as you're aware; is that right?

4    A    Correct.

5            MR. MARTINEZ:  Those are all the questions we have

6    for Sergeant Landsman.

7            THE COURT:  Thank you.  Cross-examination,

8    Mr. O'Toole.

9            MR. O'TOOLE:  Thank you.

10                        CROSS-EXAMINATION

11   BY MR. O'TOOLE:

12   Q    Sergeant, good afternoon, sir.

13   A    Good afternoon.

14   Q    We went through parts of a video that were filmed on the

15   day that Mr. Mills was killed; correct?

16   A    Correct.

17   Q    That video was filmed -- the part that you showed us was

18   filmed some several hours -- six hours after the killing;

19   right?

20   A    Yes.

21   Q    And the park had been cleaned up and cleared -- the park

22   and the murder was cleared up and roped off by yellow tape;

23   right?

24   A    Correct.

25   Q    So the video was not filmed right at the scene;

1    correct?

2    A    That's correct.

3    Q    And it was nearby, you said?

4    A    Yes.

5    Q    How far, half a block, a block?

6    A    Well, it's actually at the start of the 2400 block of

7    Greenmount Avenue.

8    Q    So that's how much?

9    A    The same block, but about -- the murder's in the area of

10   2458 Greenmount Avenue, so half a block away or more.

11   Q    All right.  Half a block or more.  But the part of the

12   crime scene itself was not available to anybody because it was

13   still being cordoned off -- it was fenced off or taped off?

14   A    From 1:00 o'clock to about 4:00 o'clock, yes.

15   Q    And then after that it was opened up?

16   A    Yes, sir.

17   Q    All right.  So at the time the video was filmed, that

18   part of the neighborhood was open to anybody who wanted to

19   walk through it?

20   A    Correct.

21   Q    Including the people you saw in the video that we saw

22   earlier this morning?

23   A    Yes, sir.

24   Q    All right.  The part that you showed us started at what,

25   about 6:00-something, 7:00-something, what time is it?

1    A    It was after 7:00 p.m.

2    Q    And that wasn't a private setting, was it?  That was in a

3    public part of the neighborhood; correct?

4    A    Yes, sir.

5    Q    Anybody could have come and gone, walked in, walked out

6    during that time period; right?

7    A    Yes.

8    Q    It wasn't -- there wasn't any kind of a fencing or a --

9    or barricade that allowed these people that you showed us in

10   the video to have a private meeting?

11   A    Yes --

12   Q    It wasn't a private meeting in a sense that it was in a

13   closed area, was it?

14   A    No, it was not.

15   Q    Now, you didn't have any sound to that video.  Did your

16   camera capability come with audio?

17   A    No, it did not.

18   Q    So it was turned -- it wasn't turned down, it just didn't

19   exist; is that right?

20   A    That's correct.

21        MR. O'TOOLE:  Your Honor, I'm going to ask the

22   government if they would play for us the beginning of that --

23   I'm going to ask for some help here.

24        MR. MARTINEZ:  Asking the wrong person.

25   Q    (BY MR. O'TOOLE)  Sergeant, we're going to ask my

1    assistant here to play this video from the first part of

2    the -- when the camera is in your vantage point -- started

3    videoing.

4        When you showed us the video -- let me ask you this while

5    Mr. Martinez is trying to help me:  When you showed us that

6    video today, was that the first part of any video that you had

7    that day from that camera?

8    A    No.

9    Q    No.  So we're going to play this and this is where we saw

10   it played from the beginning this morning; right?

11   A    Yes, sir.

12   Q    And as it's playing --

13       How do we get this going, Mr. Martinez -- oh, here we go.

14       As we're going, if you don't mind, I'm not going to stop

15   it.  I'm going to ask you questions.  I think you can answer

16   the questions while we're playing it, if that's okay with you.

17   A    Yes, sir.

18   Q    I asked you before if people could come and go in the --

19   what you called a meeting or a gathering.  Can you see from

20   the way people are standing that there's active possible

21   access from people who were coming and going?

22   A    Yes.

23   Q    I see somebody leaving right now.

24   A    Yes.

25   Q    Do you know if that person was in the gathering or he is

1    just walking by?

2    A    At that time he was just -- he was leaving.

3    Q    All right.  Now, there's a road to the left or a path to

4    the left.  What is that, is that a sidewalk or a road?

5    A    It looks like part -- the sidewalk is outside of that

6    black steel fence, but then it -- they're inside the park and

7    it's summertime, so the grass is worn down, so it's a dirt

8    area around that park bench.

9    Q    So we see some trees on the left and see some shadows,

10   are those shadows public area?

11   A    Yes.

12   Q    Now here comes a person in a pink shirt.  That person

13   didn't seem to have interest and just walked by; is that

14   right?

15   A    Correct.

16   Q    Now we see vehicles in the front, between the people that

17   we're looking at and where the camera is.  Are those vehicles

18   on the road there, the street?

19   A    They're on Greenmount Avenue.

20   Q    All right.  And you called that a busy street before?

21   A    Yes, it is.

22   Q    All right.  And that's four lanes, two lanes in each

23   direction?

24   A    Yes.

25   Q    All right.  And I think later we see some buses; is that

Cross-examination - Landsman (By Mr. O'Toole)

1    right?

2    A    Yes.

3    Q    Now here there's a person walking around the outside.  Is

4    he stopping -- he seems to have come by and he's shaking

5    somebody's hand.

6    A    Yes, he is.

7    Q    Is that Mr. Hunter, he shook his hand?

8    A    Yes.

9    Q    And that person is now leaving; is that right?

10   A    No.

11   Q    He's staying in the area?

12   A    He is.

13   Q    I don't have the screen here, so I'm looking over

14   Mr. Martinez's shoulder.  As you see people in the background,

15   like that person who just walked by in the striped shirt, he

16   did not join the meeting; is that right, or the gathering?

17   A    It looks like he's remaining there to the right side.

18   Q    All right.  Now I see somebody on a bicycle.  Is that a

19   juvenile on a bicycle, can you tell?

20   A    Once I get a better view, maybe.

21   Q    So the person on the bicycle just rode right up to the

22   middle of this gathering that you just told us about.  Now

23   there's two bicycles.  Now the cameras seem to follow them for

24   a second and then left, so somebody is handling this camera;

25   is that right?

Cross-examination – Landsman (By Mr. O'Toole)

1    A    Correct.

2    Q    So they can pan it in, they can pan it out, and they can

3    follow the people in terms of watching; right?

4    A    Yes, sir.

5    Q    Now, you can't tell from what you're watching what

6    anybody's saying, can you?  You can't make out any words from

7    where you're sitting, can you?

8    A    No.

9    Q    Do you see anybody -- let me ask you, do you see anybody

10   with black bandanas on them?

11   A    Not at this time.

12   Q    You told Mr. Martinez that somebody was making the

13   crossed arms or crossing the sign as some sort of message.  Do

14   you see anybody in this video, as you watch it, and if you do,

15   let me know who are crossing their arms in front of somebody

16   else.  If you see that, please tell me.

17   A    I don't see it at this time.

18   Q    Well, if you do -- if you do, let me know.

19   A    Yes, sir.

20   Q    You don't know everybody who's in this video, do you?

21   A    No, I don't.

22   Q    You told Mr. Martinez the people whose names you knew,

23   you were able to identify from watching; right?

24   A    Yes, sir.

25   Q    So the other people who you did not mention, you don't

1    know who they are?

2    A    Right, correct.

3    Q    There's somebody walking by, did he join?  No, he didn't.

4    Now, there's somebody in the back, several people, were they

5    in this meeting, gathering, or are they just walking by, can

6    you tell?

7    A    The two that just walked away from it and then there's a

8    female who was not in it.  And then the other guy just walking

9    the sidewalk, he was not in it.

10   Q    Can you tell us why the person who's operating the

11   camera -- here comes a person on a scooter, do you know who

12   this person is?  Does he appear to be saying hello to

13   people?

14   A    He does.

15   Q    He does.  Person operating the camera seems to be panning

16   it in and panning it out, what is the purpose of that?

17   A    I think that -- just trying to focus the camera and see

18   if anything else is occurring or the camera may go back to a

19   tour after a certain amount of seconds, so I don't know why.

20   Q    A woman just walked by in a tank type shirt, she didn't

21   appear to be joining the group, did she?

22   A    No.

23   Q    Some people are standing up and some people are sitting

24   down; right?

25   A    Yes, sir.

Cross-examination - Landsman (By Mr. O'Toole)

1    Q    And the person on the scooter just started his scooter

2    and now he's leaving; right?

3    A    Yes.

4    Q    Here comes some more people.  You said before this is

5    really not a private area.  Now these people seem to be

6    joining the others we talked about.  Now there's more people;

7    is that correct?

8    A    Yes.  The one in white, black, and red stripes is

9    Ronnie Hall.

10   Q    Okay.  With the short-sleeved shirt?

11   A    Yes.

12   Q    How about the fellow in the black and white and red

13   shirt?

14   A    Ronnie Hall.

15   Q    Oh, in that shirt.  Who's the person in the short-sleeved

16   shirt right there on the left?

17   A    David Hunter with the black pants and the white short

18   sleeve.

19   Q    No, that's the one you're talking about.  The one behind

20   him in the --

21   A    In the tank top?

22   Q    Right.

23   A    I don't know.

24   Q    Does this appear to you there's a conversation going on

25   to the left some place and Mr. Johnson is sort of standing off

1    to the right, where we're looking at it right now?

2    A    It looks like they're --

3    Q    In different conversations; right?

4    A    I wouldn't say that.  It kind of looks like they're in

5    the same -- they're kind of circled around facing that inner

6    circle.  And it looks like David Hunter is talking now and

7    they're focused on him, the way he's moving his hands.

8    Q    This is the full six hours after the alleged -- the crime

9    that took place earlier in the day; right?

10   A    Yes, sir.

11   Q    Got some children running up to the -- getting a ball, is

12   that what it looked like?  Just going to look at this until

13   the end.  I'm not sure how long it goes, but we're going to

14   watch just a few minutes more until the end of it.  Now it

15   looks like there's, how many people left; one, two, three,

16   maybe seven, is that about your count?

17   A    Seven, eight, nine, ten.

18   Q    Now what do you think is happening?

19   A    The police were responding to the block.

20   Q    I'm sorry?

21   A    The police responded to the block based on the CCTV

22   camera operator.

23   Q    So the police asked them to walk away?

24   A    No, just the -- they pulled up in the block and the crowd

25   broke up and started to walk away.  The last one who remains

1    is David Hunter.

2    Q    I'm sorry, you said a bunch of police pulled up in the

3    block?

4    A    Yes.

5    Q    Okay.  Shut that off.  Is that -- that's the end of your

6    filming -- so during the course of that film, we didn't ever

7    see anybody with any crossed arms or black bandanas or those

8    two things you talked about before, have they -- or did we?

9    A    No, sir.

10            MR. O'TOOLE:  Your Honor, I have no more

11   questions.

12            THE COURT:  Thank you.  Mr. Bussard.

13            MR. BUSSARD:  Thank you, Your Honor.  May we

14   approach briefly before I start?

15            THE COURT:  Yes.

16            (Bench conference on the record.)

17            MR. BUSSARD:  Your Honor, I just wanted

18   clarification.  Detective -- or Sergeant Landsman received

19   other information about possible other suspects other than

20   Mr. Hunter.  It came from James Cornish and that was the

21   subject of the appeal where the Court of Special Appeals in

22   Maryland, there was a question about whether he had lied under

23   oath.  I don't care about that.  I just care about whether

24   they received other information about other possible suspects.

25   That's all I wanted to --

1              THE COURT:  Okay.  So you're giving us advanced

2     notice that you're not attempting to go into the area that we

3     already discussed during the pretrial motions about the

4     admissibility of anything that the Court of Special Appeals

5     might or might not have concluded about Sergeant Landsman's

6     testimony.  Instead, you simply want to explore with him

7     whether or not the investigation uncovered evidence of

8     involvement in the homicide by persons other than

9     David Hunter.

10             MR. BUSSARD:  That's correct.

11             THE COURT:  Okay.  And your basis for pursuing that

12    line of questioning is the fact that during the state

13    proceedings in relation to the same matter, it was what,

14    elicited that they had run down some other such leads or been

15    aware of them --

16             MR. BUSSARD:  That's all it really is, is that when

17    they get into an investigation, there is information coming in

18    from different sources until they eventually focus on one

19    particular person or none at all.  I'm not getting --

20             THE COURT:  Standard cross-examination to me.  Any

21    questions from the government?

22             MR. MARTINEZ:  No.  I mean, there's no issue with

23    him eliciting that, you know, there were -- there was

24    information that may have identified other suspects.  Where it

25    gets complicated, Your Honor, is eliciting the substance of

1    that information and trying to get other people's accounts in

2    through the sergeant on cross-examination.  I'm not sure --

3              THE COURT:  That's hearsay.  That would be hearsay.

4    The fact that there was potentially other leads or whatever,

5    but getting into what their exact statements were, you

6    couldn't do that.  But given the notion that there was other

7    information out there that figured into the investigation,

8    sounds to me like very standard material.

9              MR. BUSSARD:  And the source of that, that

10   alternative information.

11             THE COURT:  Source of it as well.

12             MR. BUSSARD:  Yes, but I'm not going to get into the

13   substance --

14             THE COURT:  Who said what.  Right.  I understand.

15   You may proceed.

16             (The following proceedings were had in open court.)

17                        CROSS-EXAMINATION

18   BY MR. BUSSARD:

19   Q    Good afternoon, Sergeant Landsman.

20   A    Good afternoon.

21   Q    You indicated in response to government's questions that

22   you received a call and responded to the 2400 block, I think

23   of Greenmount Avenue, for this crime scene?

24   A    Yes, sir.

25   Q    And when you arrived there, patrol was already on the

1    scene?

2    A    They were.

3    Q    And was the crime scene techs already on the scene as

4    well?

5    A    They were not.

6    Q    Was the yellow tape already up?

7    A    Yes, it was.

8    Q    Okay.  And the purpose of the yellow tape is really to

9    make sure people don't go walking through a potential crime

10   scene; is that correct?

11   A    Yes, sir.

12   Q    Was the street blocked off as well by -- so that there

13   wouldn't be any traffic on Greenmount Avenue during this crime

14   scene investigation?

15   A    There were certain areas that were blocked off.

16   Q    And I'm showing you Government's Exhibit PHCS 9-2, which

17   you looked at before.  Are you able to see that, Sergeant?

18   A    Yes.

19   Q    And is this the crime scene at Greenmount Avenue?

20   A    Yes, sir.

21   Q    And these little yellow markers, do you see those?

22   A    Yes, sir.

23   Q    And then the larger marker down at the lower picture, do

24   you see that?

25   A    Yes.

1    Q    Okay.  And do you place those markers or does somebody

2    else place those markers?

3    A    Crime lab technician places the markers.

4    Q    So when you arrive and the crime scene tech arrives, you

5    do a walk around through the crime scene?

6    A    Yes, and direct a crime lab tech on what to recover.

7    Q    Okay.  And you're not sure at that point whether what you

8    pick up has any relevance at all to the case; is that

9    correct?

10   A    Well --

11   Q    You hope it does, I guess.

12   A    Yeah, and you're basing -- you're investigating the crime

13   scene and looking -- so it's a shooting, so you're looking at

14   items that would be related to the shooting and in that

15   proximity of where the murder occurred, so --

16   Q    Would you also pick up if there happened to be a bottle

17   or something else that might yield fingerprints or DNA, would

18   you pick up something like that at this crime scene?

19   A    Well, it depends on the crime scene, but at this crime

20   scene I did pick up certain evidence, a bottle and -- the

21   water bottle and the --

22   Q    Okay.  And they're processed by the crime scene tech

23   then?

24   A    Yes, sir.

25   Q    And also, in the top photograph over here near the tree,

1    I see some yellow tape, is that the kind of yellow tape that

2    would be used?

3    A    Yes, sir.

4    Q    To block off a crime scene?

5    A    Yes.

6    Q    And is that standard procedure to put that type of tape

7    up?

8    A    Yes, it is.

9    Q    Now, I just want to ask you a question.  You just looked

10   at a video a few moments ago that was shown.  Was Mr. Jones in

11   that video?

12   A    He was not.

13   Q    And it came to your attention around Halloween of 2007

14   that a person by the name of Naim King had been murdered?

15   A    Yes, sir.

16   Q    Okay.  And through the course of your investigation into

17   this incident that you've been talking about, the murder of

18   Henry Mills, that occurred in June 14th, 2011; is that

19   correct?

20   A    Yes, sir.

21   Q    And did you come to understand that this may have been a

22   retaliatory action for the murder of Naim King?

23   A    Yes, I did.

24   Q    Now, based on your investigation, also, you had occasion

25   in June to arrest Mr. Hunter; is that correct?  Did I get the

1    date correct?

2    A    Yeah, there was two dates, you're right.  He came into

3    police custody for the search warrant in June and he was

4    arrested the following month.

5    Q    So in July?

6    A    Yes, sir.

7    Q    So eventually Mr. Hunter was arrested for the murder of

8    Mr. Mills that we saw earlier today?

9    A    Yes, sir.

10   Q    And through -- your investigation doesn't always stop

11   with the arrest of somebody; is that correct, is that a fair

12   assessment?

13   A    Correct.

14   Q    Did there come a time where you received information that

15   someone else may have been involved in this murder?

16   A    Yes.

17   Q    And was that information that two other people may have

18   been responsible for that murder?

19             MR. MARTINEZ:  Objection.

20             THE COURT:  Overruled.

21             MR. MARTINEZ:  May we approach?

22             THE COURT:  Yes.

23             (Bench conference on the record.)

24             THE COURT:  Isn't this what we were talking about?

25             MR. MARTINEZ:  I think it is and I think that the

1    substance of the information is where the line is crossed.

2    He's not in a position to know the answer to the question

3    Mr. Bussard just asked, but for the conversations he's had

4    with other people about the substance of the information

5    others came forward with.  So I objected because I think this

6    is the moment where he crossed the line.

7              THE COURT:  Overruled.  Doesn't mean we're not close

8    to it.

9              (The following proceedings were had in open court.)

10             THE COURT:  Overruled.  You may continue.

11   Q    (BY MR. BUSSARD)  Sergeant Landsman, you did receive

12   information that two other people were involved in this

13   murder; is that correct?

14   A    Yes.

15   Q    And the substance of that was received from an

16   individual?

17   A    I was forwarded the information from other investigators

18   that they had interviewed a person that had information that

19   someone else was involved in this murder.

20   Q    Do you know who that information came from?

21             MR. MARTINEZ:  Objection.

22             THE COURT:  Overruled.  Do you know who the

23   information came from?

24   A    Yes, sir.

25             MR. BUSSARD:  I have no other questions, Your Honor.

1    I will ask --

2    Q    (BY MR. BUSSARD)  Sergeant Landsman, who was that

3    person?

4    A    James Cornish.

5    Q    And do you know James Cornish to be -- to go by a street

6    name?

7    A    Nod.

8    Q    Nod?

9    A    N-o-d.

10   Q    Were any other arrests made in this case?

11   A    Yes, there were.

12   Q    As a result -- in the Henry Mills murder?

13   A    As a part of the broader investigation, but specific to

14   just for the murder of Henry Mills, there was the one person

15   identified by three witnesses and that was David Hunter.

16   Q    So Mr. Cornish provided information different than what

17   you had received before?

18   A    Mr. Cornish had received information and he -- that he

19   provided about someone else may -- being involved and that

20   information did not develop as that person had any specific

21   involvement.  But developments did come out that David Hunter

22   was trying to get someone else to take the charge for the

23   murder of Henry Mills through communication in jail.

24             MR. BUSSARD:  I have no other questions.  Thank you.

25             THE COURT:  Mr. Francomano.

Redirect Examination – Landsman (By Mr. Martinez)

1          MR. FRANCOMANO:  No questions, Your Honor.

2          THE COURT:  Redirect.

3                    REDIRECT EXAMINATION

4    BY MR. MARTINEZ:

5    Q    Sergeant, I want to show you -- if we could go back to

6    the park video, I just want to show you 20 seconds of it.  But

7    before we do, we got into all the information that Mr. Cornish

8    provided.  At the end of the day, did you find that

9    information to be credible?

10   A    The way that Mr. Cornish received the information, I

11   believed the information that he was providing was credible.

12   Q    Was Mr. Cornish an eyewitness in the Mills case?

13   A    He was not.

14   Q    And the information he was providing, was it in the

15   nature of something he had personal knowledge about?

16          MR. BUSSARD:  Objection.

17          THE COURT:  Hold on, I heard an objection.

18          MR. O'TOOLE:  Leading, but it could lead somewhere

19   else.

20          THE COURT:  Overruled.  You may continue.

21   Q    (BY MR. MARTINEZ)  The information Mr. Cornish was

22   providing, was it in the nature of personal knowledge or was

23   it more in the nature of a rumor he had heard on the street?

24   A    It was a rumor he had heard.

25   Q    And did you investigate that rumor?

Redirect Examination – Landsman (By Mr. Martinez)

1    A    Yes, sir.

2    Q    Did it pan out?

3    A    No.

4    Q    Okay.  Now I want to go back to the park video, if we

5    could.  Let me play about 25 seconds, Sergeant.

6              (Video played.)

7    Q    (BY MR. MARTINEZ)  Sergeant, during cross-examination

8    Mr. O'Toole asked you with respect to a later clip, whether

9    there was one conversation or multiple conversations happening

10   at that particular point in time later on in the tape.  Do you

11   remember that?

12   A    Yes, sir.

13   Q    As if to say there are multiple things that could be the

14   center of attention at that point in time, is that fair to

15   say?

16   A    Correct.

17   Q    What's the center of attention at this point in time?

18   A    Gerald Johnson.

19            MR. MARTINEZ:  Court's indulgence.  Those are all

20   the questions we have, Your Honor.

21            THE COURT:  Thank you.  May the witness be excused

22   on the defense side?

23            MR. FRANCOMANO:  Yes, Your Honor.

24            MR. O'TOOLE:  Yes.

25            THE COURT:  Thank you.  Sergeant Landsman, you are

 1    excused.  You may depart.

 2                THE WITNESS:  Thank you.

 3                THE COURT:  Ladies and gentlemen, we'll take the

 4    afternoon recess.  During the recess do not discuss the case

 5    with anyone.  Do not discuss it among yourselves.  You must

 6    wait until after you've heard all the evidence, the closing

 7    arguments, and my instructions as to the law.  Do not allow

 8    yourselves to be exposed to any news articles or reports that

 9    touch upon this case or the issues it presents or any articles

10    or reports that relate to any of the participants in the case.

11    Avoid all contact with any of the participants in the trial.

12    Do not make any independent investigation of the law or the

13    facts of the case.  Do not look up anything related to the

14    case or its participants on the internet.  Do not consult an

15    encyclopedia or a dictionary.  15 minutes.  Please take the

16    jury out.

17                (Jury left the courtroom.)

18                THE COURT:  Who's next?

19                MR. MARTINEZ:  Next is Corporal Finch from the

20    Elkton Police Department.  He's not going to be a long witness

21    and he's the last of the four we have scheduled for today.  I

22    can tell the Court we're ahead of schedule and our next three

23    witnesses are all incarcerated prisoners who are being

24    transported tomorrow.

25                THE COURT:  So you're going to want to leave early

Redirect Examination - Landsman (By Mr. Martinez)

1    today.  Okay.  Bear in mind that tomorrow, I think we already

2    mentioned this, but presumably we'll go until 1:00, 1:15,

3    1:20, or whenever, but when we do take that lunch break, I

4    will be detained in other court-related business from

5    beginning at 2:00 p.m. I think until 3:00 p.m.  So program

6    that into the scheduling.  Otherwise, a regular court day.  15

7    minutes.

8              (A recess was taken.)

9              THE COURT:  Are we ready for the jury?

10             MR. MARTINEZ:  Yes.

11             THE COURT:  You can bring in the witness?

12             (Jury entered the courtroom.)

13             THE COURT:  Be seated, please.  Mr. Martinez, you

14   may call your next witness.

15             MR. MARTINEZ:  Your Honor, the government's next

16   witness is Corporal Todd Finch of the

17   Elkton Police Department.

18             THE COURT:  Thank you.  Madame Clerk.

19             THE CLERK:  Corporal, raise your right hand to be

20   placed under oath.

21                      CORPORAL TODD FINCH

22   called as a witness, being first duly sworn, was examined and

23   testified as follows:

24             THE WITNESS:  I do.

25             THE CLERK:  Thank you, sir.  You may have a seat.

Direct Examination – Finch (By Mr. Martinez)

 1    If you would please speak directly into the microphone.  State

 2    your first and last name and spell your first and last name.

 3              THE WITNESS:  My name's Corporal Todd Finch of the

 4    Elkton Police Department --

 5              THE COURT:  Hold on, we're having problems.  Fixed

 6    that one pretty quickly.  Say that again, sir.

 7              THE WITNESS:  Yes, sir.  Corporal Todd Finch from

 8    the Elkton Police Department.  First name is spelled T-o-d-d;

 9    last name, F-i-n-c-h.

10              THE COURT:  Your witness.

11                         DIRECT EXAMINATION

12    BY MR. MARTINEZ:

13    Q    Corporal, good afternoon.

14    A    Good afternoon.

15    Q    I'm going to ask you to make sure you keep the microphone

16    close to you and speak up so the ladies and gentlemen of the

17    jury can hear you.  Can you please tell us which law

18    enforcement agency you work for?

19    A    I'm employed with the Elkton Police Department,

20    Elkton, Maryland.

21    Q    How long have you been with the Elkton PD?

22    A    Ten years now.

23    Q    And could you walk us through the various positions

24    you've held up until you became a corporal?

25    A    Yes.  From being on patrol in June 2008, I've been a

1    field training officer for at least seven years and a

2    supervisor holding the rank of corporal for three.

3    Q    So Corporal, what was your assignment as of

4    August 2010?

5    A    I was patrol officer in August of 2010.

6    Q    And I want to direct your attention specifically to the

7    early morning hours of August 26th, 2010.  Were you working

8    and on duty at the time?

9    A    Yes, sir.

10   Q    Did there come a time early that morning when you were

11   asked to report to the scene of a home invasion robbery --

12              MR. FRANCOMANO:  Objection.

13              THE COURT:  You may approach.

14              (Bench conference on the record.)

15              THE COURT:  The characterization?

16              MR. FRANCOMANO:  Exactly, Your Honor.  Foundation --

17   there's nothing about it --

18              THE COURT:  An incident.  Sustained.

19              (The following proceedings were had in open court.)

20              THE COURT:  Sustained.  Rephrase the question.

21   Q    (BY MR. MARTINEZ)  Corporal, did there come a time early

22   on the morning of August 6th, 2010, when you were asked to

23   respond to an incident?

24   A    Yes, sir.

25   Q    What type of incident were you asked to respond to?

Direct Examination – Finch (By Mr. Martinez)

1          MR. FRANCOMANO:  Objection.

2          THE COURT:  Overruled, you may answer.

3     A    On that date at that time, I responded to a home invasion

4     in progress.

5     Q    Can you recall the scene of --

6          THE COURT:  Subject to being connected up.  Go

7     ahead.

8     Q    (BY MR. MARTINEZ)  Can you recall the scene where you

9     went to respond to that call?

10    A    How, recall the scene how?  I'm sorry.

11    Q    I'm sorry, it was a bad question.  Where did you go -- to

12    what scene did you go after you got the call?

13    A    I responded to 126 Pheasant Drive, Elkton, Maryland.

14    Q    I want to show you Government's Exhibit GM 33.  Do you

15    recognize this location, Corporal?

16    A    Yes, sir.  That's 126 Pheasant Drive in Elkton,

17    Maryland.

18    Q    Was anybody else with you when you responded to the

19    residence?

20    A    There was another officer with an allied agency, yes,

21    sir.

22    Q    What agency was that?

23    A    Cecil County Sheriff's Department.

24    Q    When you got to the residence, Corporal, where did you

25    go?

Direct Examination - Finch (By Mr. Martinez)

1    A    I went to the front door of the residence.

2    Q    How about your -- first of all, your colleague what, was

3    his name?

4    A    Deputy Muller.

5    Q    And were you able the see where Deputy Muller went as you

6    were going to the front of the residence?

7    A    As I was going to the front, he was going around the rear

8    of the residence.

9    Q    So when you got to the front door, Corporal, can you tell

10   us whether it was locked?

11   A    It was not locked, it was slightly ajar.  It was

12   unsecured.

13   Q    Okay.  And what did you do when you reached the threshold

14   of the front door?

15   A    I looked in, I noticed there was no lights on, I couldn't

16   see anything.  With the type of call we received, I decided to

17   just go ahead and make sure the area was safe and I opened the

18   door slightly and I still couldn't see anything, nor could I

19   hear anything at that time.

20   Q    All right.  Did you eventually go inside?

21   A    I did.

22   Q    What happened when you went inside?

23   A    As I entered the residence, I stated that I was there,

24   yelling "Elkton Police."  And as soon as that happened, things

25   became pretty chaotic.

1  Q    What do you mean by that, what happened after you yelled

2  out "police"?

3  A    After I yelled out my presence being there, I heard

4  several loud noises, loud crashing coming from the second

5  floor, people started yelling.  And I also heard people

6  yelling "shut up" to other people.

7  Q    Were you still downstairs at that point?

8  A    I was.

9  Q    Did there come a point when anyone ran down the stairs?

10  A    Yes.  Shortly after all that -- all that happened, all

11  the noise, several people come running down the steps towards

12  me.

13  Q    Tell us what you saw as people were running down the

14  stairs.

15  A    First, a white female and a black male came rushing down

16  the steps towards me.  I quickly identified them as being the

17  residents at the address.  And you know, they're shouting to

18  me, "they're upstairs, they're upstairs, they have a gun" --

19          MR. FRANCOMANO:  Objection, Your Honor.

20          MR. MARTINEZ:  Excited utterance.

21          MR. FRANCOMANO:  Foundation, then.

22          THE COURT:  Overruled.  Counsel may approach.

23          (Bench conference on the record.)

24          THE COURT:  Proffer.  What's coming?

25          MR. MARTINEZ:  Well, proffer what's coming?  I

1    thought you said Crawford and my mind was racing for a

2    second.

3              THE COURT:  Proffer.

4              MR. MARTINEZ:  He's going to testify that then two

5    gentleman came running down the stairs, the couple who lived

6    there shouted "that's them, that's them" as they ran

7    downstairs, and then he and his partner chased the two people

8    who were upstairs in the house.  And his partner followed one

9    suspect, he followed another, and eventually they find

10   Mr. McCants hiding in some bushes a few blocks or so from the

11   residence.  He arrests him, interviews him, and Mr. McCants

12   says "I was the only person involved" and he asks Mr. McCants

13   where he knows -- whether he had any connection to anybody in

14   the residence.  And McCants says, "Yes, I knew one of the

15   girls who lived there, I met her in Baltimore, we went to the

16   movies."  He's going to say they never arrested the second

17   suspect.

18             THE COURT:  Okay.  So I'll hear you, Mr. Francomano,

19   but back in the dark ages we used to call this res gestae

20   evidence.  That's a criticized term now, but it introduces the

21   loose concept of what we're talking about here, an excited

22   utterance, statements made in the heat of the moment of what's

23   transpiring.  Impression of a then occurring event, a number

24   of exceptions come in the Court's mind --

25             MR. FRANCOMANO:  At this time I withdraw,

1    Your Honor.

2              MR. O'TOOLE:  Res gestae is no longer good?

3              THE COURT:  That's a lot of trouble, you go there.

4              (The following proceedings were had in open court.)

5              THE COURT:  You may inquire, Mr. Martinez.

6    Q    (BY MR. MARTINEZ)  Corporal, I think the last question

7    was -- well, you were describing the first two people you saw

8    come running down the steps and you said you identified them

9    as residents of the home.

10   A    Yes, sir.

11   Q    I believe before the objection you were explaining to the

12   ladies and gentlemen of the jury what those two people said as

13   they were coming down the stairs, do you remember that?

14   A    Yes.

15   Q    I just want to give you an opportunity to complete your

16   answer to that question.

17   A    Certainly.  As they were, you know, shouting at me what

18   was going on, they had told me that they were trying to get

19   out of the window.  So I looked up towards the window of the

20   residence and I didn't see anything.  I didn't see anybody

21   trying to get out.  And at about the same time as I was kind

22   of focused towards the front of the house, I saw one of the

23   people running down the steps.  They continued down the steps

24   out towards where I was and in front of the residence.

25   Q    Okay.  And were you able to identify who those two people

1    were?

2    A    Not immediately, no, sir.

3    Q    As they were coming down the steps, did the couple who

4    came down initially, did they blurt anything out as the other

5    two followed?

6    A    As they came down the steps and were --

7              THE COURT:  Which they?

8              THE WITNESS:  I'm sorry?

9              THE COURT:  Which they?

10             THE WITNESS:  As the next two individuals came down

11   the steps, not the residents who initially came down, as the

12   next two individuals came down the steps, they were crossing

13   the threshold coming outside.  That's when the residents, the

14   first two people that came down the steps, identified them as

15   being the subjects, the suspects.

16   Q    (BY MR. MARTINEZ)  Okay.  I'm going to show you

17   Government's Exhibit GM 34.  Sorry about the glare.  All

18   right.  Corporal, can you tell us what we're looking at

19   here?

20   A    Yes, sir.  That is an overview or aerial view of

21   Pheasant Drive, Mallard Court, Huntsman and Quail Court.

22   Q    And I'd like you to start by indicating for us with your

23   finger on the touch screen, if you would, where

24   126 Pheasant Drive is.

25   A    126 Pheasant Drive should be located -- I'm sorry.

Direct Examination – Finch (By Mr. Martinez)

1     (Indicating.)

2          THE COURT:  You can clear the screen by hitting the

3     lower left -- or lower right, I guess.

4          THE WITNESS:  Lower right?

5          THE COURT:  Try the lower left.  There you go.

6          THE WITNESS:  It's going to be right there.

7     Q    (BY MR. MARTINEZ)  All right.  So let's pick up the story

8     when the second two individuals who came down the stairs

9     exited the house.  Were you able to see where they went after

10    they left the house?

11    A    Yes.  The two individuals split up immediately after

12    exiting the front of the residence and went in two separate

13    directions.

14    Q    And can you show us on Exhibit GM 34 here where the two

15    individuals went?

16    A    That's correct, after entering the front of the

17    residence, one individual went this way and the other went

18    that way.

19    Q    And were those two individuals pursued?

20    A    Yes, they were.

21    Q    Did you pursue one of them?

22    A    I did.

23    Q    Which way did you go?

24    A    I came down here, following the suspect I was behind.

25    And the other deputy came down here, following the second

1    suspect.

2    Q    As you were chasing the suspect down -- if this is

3    Quail Court here, were you able to get a better look -- or

4    were you able to get a look at what he was wearing, do you

5    remember anything distinctive about his clothing?

6    A    I believe the only thing I could recall at that time was

7    a dark top, dark shirt with pants on.

8    Q    And how about the suspect who went the other way before

9    you chased after the guy down Quail Court, did you get a look

10   at the other guy as he was heading towards Mallard Court?

11   A    That's right.  The other suspect who fled in the other

12   direction, the one thing that stood out to me pretty

13   distinctively, he was wearing large yellow latex gloves.

14   Q    All right.  So Corporal, can you tell us what happened --

15   do I understand you correctly that you chased your suspect all

16   the way down Quail Court?

17   A    Yes, sir.

18   Q    Did you chase him to the end of the cul-de-sac?

19   A    That's correct.

20   Q    What happened when you reached the end of the

21   cul-de-sac?

22   A    As I reached the end of the cul-de-sac, the two suspects

23   kind of end up meeting right here in this open field between

24   Gooseneck Court, which is this street here, and Quail.

25   There's this large field here where they kind of all met up

Direct Examination - Finch (By Mr. Martinez)

1    and I met up with the other deputy as well as, as we're

2    chasing after the two individuals.

3    Q    What happened after that?

4    A    After that the suspects fled into the brush right in this

5    area here.  And myself and the other officers were able to

6    establish a perimeter of the area.

7    Q    Did there come a time you called for a K-9 unit?

8    A    I did, sir.

9    Q    Why did you do that?

10   A    In case we had to continue tracking the suspects through

11   the woods.

12   Q    Tell us what, if anything, happened while you were

13   waiting for the K-9 unit to arrive.

14   A    As I was waiting for a K-9 unit to arrive to the area,

15   there was some rustling going on in the brush line right in

16   front of myself and the other deputy that was with me.  And we

17   were able to see one subject inside the brush.  We gave

18   commands and he came crawling out of the brush to us.

19   Q    And were you able to tell whether he was the person you

20   were chasing down Quail Court?

21   A    Yes, sir, he was the person I chased down.

22   Q    And what happened when the person came out of the brush,

23   did you take him into custody?

24   A    Yes, he was taken into custody.

25   Q    Placed in handcuffs?

Direct Examination - Finch (By Mr. Martinez)

1    A    Yes, sir.

2    Q    Do you see the person you took into custody and placed

3    into handcuffs in the courtroom today?

4    A    Yes, I do.

5    Q    Could you point him out and identify an article of

6    clothing?

7    A    That would be the subject next to defense counsel all the

8    way in the back of the room, wearing all black and glasses.

9    Q    Were you able to identify that suspect?

10   A    Yes.

11   Q    What was his name?

12   A    Marquise McCants.

13   Q    What about the second suspect, Corporal, the guy who you

14   said was wearing the latex gloves, was law enforcement able to

15   apprehend that individual?

16   A    No.  That individual did eventually get away.  We weren't

17   able to locate him by search of the area or with a K-9.

18   Q    So after you looked unsuccessfully for the second

19   suspect, did there come a time where you went back to

20   126 Pheasant Drive?

21   A    Yes.

22   Q    And when you went back to the residence, were you able to

23   determine whether anything had been taken from the occupants

24   of the home?

25   A    Yes.  We learned that there was a wallet that was stolen,

 1    as well as some cash, U.S. currency.

 2    Q    Did you search the residence for evidence?

 3    A    Yes, I did.

 4    Q    Can you tell us what, if anything, you found in the

 5    house?

 6    A    A small .38 caliber revolver was located in the bedroom,

 7    second floor bedroom.

 8    Q    And when you recovered that gun, did you run the serial

 9    number through an ATF database?

10    A    Yes, sir, I did.

11    Q    What did that database reveal?

12    A    It later revealed the handgun was stolen through Georgia,

13    I believe it was.

14    Q    Can you tell us what ultimately happened to that

15    firearm?

16    A    The firearm was returned back to its owner, I believe a

17    few years after the incident had taken place.

18    Q    In addition to the firearm, Corporal, did you recover any

19    significant items from the home?

20    A    There was a set of latex gloves recovered from the

21    residence as well, matching the gloves that the suspect -- the

22    other suspect was wearing that got away.

23    Q    So after you searched the home, Corporal, later that

24    evening, did you go back to the Elkton Police Department and

25    take a statement from Mr. McCants?

Direct Examination - Finch (By Mr. Martinez)

1    A    I did.

2    Q    Did you read Mr. McCants his Miranda rights prior to

3    taking the statement?

4    A    I did, yes, sir.

5    Q    What, if anything, did Mr. McCants tell you about whether

6    he had been involved in the robbery that you responded to?

7    A    Mr. McCants didn't advise a whole lot.  But he did state

8    to me that there was no one else involved and that he was the

9    only one that was there.

10   Q    Did you ask Mr. McCants whether he had any connection to

11   the people who lived at 126 Pheasant Drive?

12   A    Yes, I did.

13   Q    What did he tell you in response?

14   A    He told me that he was, I believe, in a relationship or

15   he was seeing -- I believe were his words, he was seeing one

16   of the girls who lived at the residence.

17   Q    Did he tell you where he met that --

18   A    He told me he met the -- one of the females from the

19   residence in Baltimore.

20   Q    Did you ask Mr. McCants how he had gotten to

21   Pheasant Drive in Elkton, Maryland on the night of his

22   arrest?

23   A    I did ask him, I don't remember his response.

24   Q    Would anything refresh your recollection?

25   A    If I had my report documenting his statement to me.

1        MR. MARTINEZ:  Court's indulgence.

2        THE COURT:  Yes.

3   Q   (BY MR. MARTINEZ)  Read it to yourself and once you've

4   had a chance, look up, and we'll know you're done.

5   A    If I remember, I believe your question was how he had

6   gotten --

7        THE COURT:  First of all, have you had the

8   opportunity to refresh your memory?

9        THE WITNESS:  Yes, sir.

10        THE COURT:  Hand the report back to Mr. Martinez.

11        MR. MARTINEZ:  Thank you, Corporal.

12   Q   (BY MR. MARTINEZ)  So having reviewed your report, is

13   your recollection refreshed?

14   A    Yes, sir.

15   Q    All right.  Now, I'll ask you the same question, and

16   again, did you ask Mr. McCants how he had gotten to

17   Pheasant Drive in Elkton, Maryland on the night of his

18   arrest?

19   A    Yes.

20   Q    What did he tell you?

21   A    He told me that they were watching a movie at their

22   residence.  I didn't recall seeing anything, him telling me

23   how he got there.

24        MR. MARTINEZ:  Court's indulgence.  No further

25   questions, Your Honor.

1          THE COURT:  Thank you.  Mr. Enzinna, Mr. Bussard.

2          MR. BUSSARD:  No questions.

3          THE COURT:  Mr. Francomano.

4          MR. FRANCOMANO:  Yes, Your Honor.

5                        CROSS-EXAMINATION

6     BY MR. FRANCOMANO:

7     Q    Corporal Finch, you approached the house with

8     Deputy Muller; correct?

9     A    Yes, sir.

10    Q    And you went in the house and you said "come out,"

11    something like that, to that effect; correct?

12    A    Yes, sir.

13    Q    And then you saw a white female and an African American

14    male come down the stairs?

15    A    Yes, sir.

16    Q    Correct?  And then you saw two African American males

17    come after them; correct?

18    A    Yes.

19    Q    And you testified today that you immediately knew that

20    the white woman and the African American man were victims; is

21    that correct?

22    A    Not immediately, like as soon as they came down the

23    steps.  But once they started talking to me, I recognized who

24    they were from prior dealings with those subjects.  But yes, I

25    did recognize them to be the residents of the house.

Cross-examination - Finch (By Mr. Francomano)

1    Q    So your testimony is that you -- is different than what
2    you just said.  You're saying that you didn't immediately
3    recognize them as victims, later you did; is that more
4    correct?
5    A    It depends on the time frame that you're talking about.
6    Immediately, I guess in my mind, would mean that as I saw them
7    coming down the steps, I immediately recognized them.  It
8    wasn't until they were outside standing with me that I
9    recognized who they were.
10   Q    So when they were standing outside with you?
11   A    Yes, sir.
12   Q    Okay.  So when they first came down you had no idea?
13   A    Not as they were coming down the steps, no, I did not.
14   Q    And you said when these two African American males passed
15   you, you couldn't identify them; correct?
16   A    Not as they passed me, no, sir.
17   Q    You didn't see either of them carrying a gun; correct?
18   A    Did not see any of them carrying a gun, no, sir.
19   Q    The only thing you remember is that one of them did have
20   yellow gloves on?
21   A    Yes.
22   Q    And you also stated that one of them was wearing dark
23   pants and a dark shirt; correct?
24   A    Dark shirt and pants, I don't remember specifically what
25   kind of shirt or what kind of pants, just general color.

Cross-examination - Finch (By Mr. Francomano)

1  Q    I'm sorry.  Did you testify earlier that it was dark

2  pants and a dark shirt or did you just say dark shirt?

3  A    I said dark -- dark top, dark shirt and pants.

4  Q    Now, you said you chased an individual -- you chased one

5  of the individuals; correct?

6  A    Yes, sir.

7  Q    And you chased him down, was it Quail?

8  A    Yes, it was Quail Court, I believe I chased him down.

9  Q    Okay.  But at some point you lost sight of him?

10  A    When they entered the wood line, yes, I lost sight of

11  him.

12  Q    And that's when you set up a perimeter?

13  A    Yes.

14  Q    What do you mean by setting up a perimeter?

15  A    To be as specific as I can, when we kind of establish a

16  perimeter, we try to surround the area as best as possible.

17  Mind you, just beyond the wood line there's a small river that

18  flows through kind of cutting us off from the other side of

19  what would be Oldfield Point Road, which is kind of on the

20  back end of Gooseneck Court.  So by setting up a perimeter,

21  myself and Deputy Muller would have stayed at the wood line

22  where they entered to keep sight of that.  And there was other

23  officers who were down the road on the other side of the river

24  on Oldfield Point, where, if somebody would have swam through

25  the river, that would be the closest point they would have,

1    you know, come into contact with.  And then we also had

2    another officer on Gooseneck Court as well.

3    Q    All right.  So it's taking some time to set all this

4    up?

5    A    Well, by the time we had gotten to the wood line, other

6    officers were kind of already arriving on scene.  So it was

7    almost as we were chasing them into the wood line that there

8    was officers arriving on scene.  So it was probably within a

9    few seconds of us chasing them into the wood line we were able

10   to establish that.

11   Q    All right.  Now, I'm confused.  You set up a perimeter,

12   why would you set up a perimeter if a few seconds later you

13   found him?

14   A    As we were -- as we had set up the perimeter, we called

15   for a K-9 officer, and as we were waiting for that K-9 officer

16   to respond, that's when we heard and saw the rustling in the

17   wood line and called the person out to us.

18   Q    Okay.  And when the person came out, you said, you know,

19   come out, and the person came out was cooperative; correct?

20   A    Yes, sir.

21   Q    And when that person came out, they didn't have any

22   gloves with them; correct?

23   A    No.

24   Q    They didn't have any guns with them; correct?

25   A    No, sir.

Cross-examination - Finch (By Mr. Francomano)

1   Q    You said after Mr. McCants -- he came out of the bushes,

2   you took him back to the station; correct?

3   A    Yeah.  We did take him back to the station eventually,

4   yes, sir.

5   Q    Okay.  In your report -- well, strike that.

6        You said today that you saw the person who was running,

7   was the same person that you found under the bushes; is that

8   correct?

9   A    I don't believe I stated that in my report.

10  Q    But you stated that today; right?

11  A    Yes, sir.

12  Q    But it's not in your report, is it?

13  A    No.

14  Q    In your report you wrote this:  "Immediately after the

15  incident happened"; correct?

16  A    Which part of my report?

17            MR. MARTINEZ:  Objection.

18  Q    (BY MR. FRANCOMANO)  The re --

19            MR. MARTINEZ:  Objection to the contents of the

20  report coming into evidence.

21            THE COURT:  Is that what you're attempting --

22            MR. FRANCOMANO:  Not at all, Your Honor.

23            THE COURT:  Okay.  Well, that was what was implied

24  by your question.

25            MR. FRANCOMANO:  I'll rephrase, Your Honor.

1          THE COURT:  Thank you.

2     Q    (BY MR. FRANCOMANO)  The report that you wrote, would it

3     help to refresh your recollection if I showed you that

4     report?

5     A    Yes, sir.

6     Q    Showing you the statement of probable cause.

7     A    Okay.

8     Q    Just take a look at it.

9     A    Okay.

10    Q    The question is, do you remember right when you wrote

11    that report?  Don't read anything about it, just when you

12    wrote it.

13    A    Don't read anything about it?

14    Q    Just let me know when you wrote that report.

15         MR. MARTINEZ:  Your Honor, can I just object to the

16    whole process that's unfolding here?

17         THE COURT:  If you want to refresh his recollection

18    with a document, you're entitled to do that.  You've placed

19    that document in front of him.

20         MR. FRANCOMANO:  Yes, I have.

21         THE COURT:  Officer, you can look at the report,

22    once you've had the opportunity to review the report and

23    you're finished, look up.

24         THE WITNESS:  Okay.  Okay.

25         THE COURT:  Hand the report back.

1    Q    (BY MR. FRANCOMANO)  Does the report refresh your

2    recollection?

3    A    Yes, I believe so.

4         THE COURT:  So now you can restate the question,

5    Mr. Francomano.

6    Q    (BY MR. FRANCOMANO)  When did you write this report?

7         MR. MARTINEZ:  Your Honor, I don't believe that was

8    the question pending at the time he asked to have his

9    recollection -- Mr. Francomano --

10        THE COURT:  Technically it wasn't.  But did reading

11   that report refresh your recollection about when you wrote the

12   report?

13        THE WITNESS:  I can't say exactly when I started

14   typing.

15        THE COURT:  I'm not asking you that question.  I'm

16   asking whether or not the report refreshed your memory.

17        THE WITNESS:  Yes.

18        THE COURT:  Now, when did you write the report?

19        THE WITNESS:  The report would have been written

20   probably about an hour or so after the incident.  That's when

21   I would have written a report.

22        THE COURT:  Next question.

23   Q    (BY MR. FRANCOMANO)  So the report that you wrote an hour

24   afterwards didn't have in there that the same person you saw

25   was the same person you saw in the bushes; is that correct?

1      THE COURT:  The same person you saw was the same
2  person you saw in the bushes.
3      MR. FRANCOMANO:  I'll rephrase, Your Honor.
4  Q    (BY MR. FRANCOMANO)  The same person you saw running down
5  Quail was the same person you saw in the bushes; correct?
6  A    No, I did not write that in the report.  You're right,
7  sir.
8  Q    You spoke about a handgun that you found in
9  126 Pheasant Drive; correct?
10 A    Yes, sir.
11 Q    What kind of gun was that?
12 A    Smith and Wesson .38 caliber revolver.
13 Q    Did you find any fingerprints on that gun?
14 A    Did I?  No, I didn't find any fingerprints on that gun.
15 Q    Were any fingerprints -- was it tested for
16 fingerprints?
17 A    I don't believe it was.  I believe it was tested for
18 other evidence.
19 Q    Were the shell casings tested that were found -- were
20 there any shell casings in the gun?
21 A    Yes, I believe there were four rounds in the gun.
22 Q    Were those rounds tested for fingerprints?
23 A    I don't know if the rounds were tested for
24 fingerprints.
25 Q    Was there any DNA test on the gun?

Cross-examination - Finch (By Mr. Francomano)

1    A    Yes.

2    Q    There was DNA test done on the gun?

3    A    For the firearm, I believe so, yes, sir.

4    Q    You believe so or there was?

5    A    Pretty sure that firearm was tested for DNA evidence.

6    Q    And that DNA evidence came back to anyone?

7    A    If I remember correctly, from the supplemental report

8    information, the majority of the DNA evidence found from the

9    firearm came back to a female and minority evidence came back

10    to a male.  But they did not come back to anybody in

11    particular.

12    Q    So you no longer have that gun; correct?

13    A    I no longer have the firearm, no, sir.

14    Q    So there's no way to test it for fingerprints now or to

15    test it for anything, for DNA, anything like that; correct?

16    A    I don't believe so.

17    Q    Well, you haven't gotten the gun back and you can't get

18    it back; correct?

19    A    I have no idea if we can get the gun back or not.  It was

20    returned to the owner, I want to say maybe two or three years

21    ago.

22    Q    You stated that you spoke to Mr. McCants and he gave you

23    a statement; is that right?

24    A    Yes.

25    Q    Okay.  He said he was there visiting his girlfriend?

1    A    Yes, sir.

2    Q    All right.  And you stated that he said no one else was

3    involved?

4    A    Yes.

5    Q    But he wasn't -- he didn't say that he was involved in

6    any type of crime or any type of incident.  He said he was

7    there watching a movie with his girlfriend; correct?

8    A    I believe when I asked him how he met his girlfriend he

9    said that he was watching a movie with his girlfriend.  I

10   don't recall questioning him what he was doing at the house

11   that night.

12   Q    So I guess my question is, he never said to you he was

13   committing a crime at the house that night; correct?

14   A    He never said he was committing a crime at the house that

15   night.

16            MR. FRANCOMANO:  I have no further questions.

17            THE COURT:  Redirect.

18                       REDIRECT EXAMINATION

19   BY MR. MARTINEZ:

20   Q    Corporal, when you took Mr. McCants -- yeah, when you

21   took Mr. McCants back to the police department and you asked

22   him questions --

23   A    Yes, sir.

24   Q    -- were you asking him questions about the robbery?

25   A    I was.

1   Q    And were you asking him questions about the robbery when

2   he said that no one else was involved?

3   A    Yes, sir.

4              MR. MARTINEZ:  No further questions.

5              THE COURT:  May the witness be excused?

6              MR. FRANCOMANO:  Yes, Your Honor.

7              MR. BUSSARD:  Yes.

8              THE COURT:  You're excused.  You may depart.

9               Mr. Martinez, any other evidence for the day?

10             MR. MARTINEZ:  No, Your Honor, we got through our

11  witnesses today ahead of schedule.

12             THE COURT:  Thank you.  Ladies and gentlemen, we

13  will now recess for the day.  During the overnight recess do

14  not discuss the case with anyone.  Do not discuss it with your

15  fellow jurors.  Do not discuss it with your friends or your

16  family members.  Remember what I told you last week, if people

17  are quizzing you about your jury service, all you're allowed

18  to tell them is that you're serving on a jury in federal court

19  in a criminal case, that the trial's expected to last until

20  about the third week of January, that you've been instructed

21  by the judge that you're not allowed to speak to them about

22  the case while the trial is underway.

23             Do not allow yourselves to be exposed to any news

24  articles or reports that touch upon the case or the issues it

25  presents or the participants in the trial.  Avoid all contact

1    of any kind with any of the participants in the trial.  Do not

2    make any independent investigation of the law or the facts

3    relevant to the case.  Do not conduct internet searches with

4    respect to the issues presented or the persons participating

5    in the trial.  Do not consult external sources such as

6    encyclopedias or dictionaries in reference to the issues and

7    terms that have been presented to you here.

8            Ladies and gentlemen, we'll plan to start at 9:30

9    tomorrow morning.  So please be here in anticipation of that

10   start time.  I may have mentioned the fact that we will take a

11   longer lunch tomorrow because of a matter in which I must

12   participate.  We'll probably break for lunch like we normally

13   do, sometime in the 1:00 to 1:30 time frame, but we will

14   definitely be on recess then until 3:00 o'clock because of

15   this other matter that I have to take up during that period of

16   time.  The jury's excused overnight.  Please take the jury

17   out.

18           (Jury left the courtroom.)

19           THE COURT:  Be seated, please.  Elkton is

20   August 26th, 2008?

21           MR. MARTINEZ:  Yes, and Mr. McCants turned 18 on

22   June 30th of --

23           MR. FRANCOMANO:  2010, your Honor.

24           THE COURT:  2010, that's it, that's it.  And he had

25   turned 18 earlier that summer, is that it?

1           MR. MARTINEZ:  Correct.

2           MR. FRANCOMANO:  Correct, Your Honor.

3           THE COURT:  No disagreement about that.  Thank you.

4   Anything else to take up outside the hearing of the jury,

5   Mr. Martinez?

6           MR. MARTINEZ:  The only matter I wanted to mention,

7   Your Honor, is now it's been two weeks since we first raised

8   the issue of the expert disclosures that we got from defense

9   counsel in the case.

10           THE COURT:  Yes.

11           MR. MARTINEZ:  And I'm aware of what the Court's

12   view of the effect of the tardy disclosures was at the time.

13   It's two weeks later, we're in the second substantive week of

14   the trial, we have heard --

15           THE COURT:  Are we going to call expert witnesses on

16   the defense side?

17           MR. FRANCOMANO:  We're not, Your Honor.

18           THE COURT:  Mr. Enzinna.

19           MR. ENZINNA:  Yes, Your Honor, we do plan to call an

20   expert.

21           THE COURT:  Mr. Bussard.

22           MR. BUSSARD:  No, Your Honor.

23           THE COURT:  Okay.  So Mr. Enzinna, Mr. O'Toole,

24   you're going to call an expert witness.  Has your expert

25   prepared a report?

1          MR. ENZINNA:  He has not yet.  He was only

2    authorized, I think last week.  I spoke with him -- well, I

3    e-mailed him last night and we're going to speak one night

4    this week and I hope to have his report by next week.

5          THE COURT:  You hope to have his report by next

6    week.  Okay.  There's your update.

7          MR. MARTINEZ:  Well, I think we'll just note a

8    continuing objection to the way this is playing out and to

9    being forced to prepare to digest what an expert has to say

10   and to cross-examine someone in the middle of our case in

11   chief.  I think Rule 16 says what it says about early

12   disclosures for a reason.

13         THE COURT:  I understand your position.  And

14   Mr. Enzinna, as soon as that report has been prepared, I'll

15   expect you to produce it and advise the Court that you have

16   done so.

17         MR. ENZINNA:  Yes, sir.

18         THE COURT:  Anything else, Mr. Martinez?

19         MR. MARTINEZ:  No, Your Honor.

20         THE COURT:  Anything else on the defense side before

21   we recess for the evening?

22         MR. FRANCOMANO:  No, Your Honor.

23         THE COURT:  Okay.  9:30 tomorrow morning.  We're in

24   recess.  Defendants are remanded.

25              (The proceedings were concluded.)

```
 1              I, Christine Asif, RPR, FCRR, do hereby certify that
       the foregoing is a correct transcript from the stenographic
 2     record of proceedings in the above-entitled matter.

 3              _____/s/_____
                    Christine T. Asif
 4                  Official Court Reporter

 5


 6                          INDEX

 7     Witness Name                                          Page

 8     Detective Sendy Ferdinand

 9         Direct Examination By Mr. Martinez ..................... 4

10         Cross-examination By Mr. Francomano .................... 15

11     Special Agent Austin Sailor

12         Direct Examination By Ms. Hoffman...................... 17

13         Cross-examination By Mr. Bussard...................... 31

14         Redirect Examination By Ms. Hoffman ..................... 48

15     Sergeant Joseph Landsman

16         Direct Examination By Mr. Martinez ..................... 55

17         Cross-examination By Mr. O'Toole...................... 122

18         Cross-examination By Mr. Bussard...................... 134

19         Redirect Examination By Mr. Martinez .................... 141

20     Corporal Todd Finch

21         Direct Examination By Mr. Martinez ..................... 145

22         Cross-examination By Mr. Francomano .................... 160

23         Redirect Examination By Mr. Martinez ................... 169

24


25
```

< Dates >
2014, June 57:2.
4/11/17 48:23,
    49:6.
6/6/08 22:8.
April 2016 121:4.
April 29th 17:10.
August 2010 146:4.
August 26th, 2008
    171:20.
August 26th, 2010
    146:7.
August 6th, 2010
    146:22.
August 8th 111:20.
December 4th, 2017
    1:19.
July 23rd 110:25.
June 14th, 2011
    57:13, 62:6,
    106:22, 107:5,
    108:18, 137:18.
June 2008 145:25.
June 24th 107:15.
June 6th 18:13.
June 6th, 2008
    21:21.
May 6th 105:16.
May 6th, 1985
    105:8.
May 6th, 2005
    105:15.
November 1st
    102:19.
November 2007
    56:17.
September 2007
    6:5.
September 27th
    116:13.
September 28th, 2007
    6:11, 6:17, 7:5,
    12:10, 13:4.
$10 9:4.
$20 9:14.
$390 21:8.
'05 105:8.
.357 29:9.
.38 157:6, 167:12.
.40 59:13, 60:20,

    60:25.
.
.
.
< 0 >.
00-something
    123:25.
.
.
< 1 >.
1 9:25, 10:6, 11:17,
    12:4, 12:7, 12:8,
    12:13, 12:15,
    12:16, 90:8,
    117:2.
1-1 109:4.
1-4 110:12.
1-4. 109:10.
1-5 110:16.
1. 10:3, 10:14,
    12:24, 14:3.
10 90:8.
10-1 108:7.
10-2. 107:23.
10. 57:20, 112:5.
101 1:48.
10:00 2:15, 2:17,
    2:22.
10:15. 2:25.
10:20 2:18.
10th 94:10.
11 113:20, 114:12.
11. 48:21, 113:6.
11:50. 50:17.
11th 22:13, 32:18,
    48:9.
12 116:6.
12. 114:5.
122 174:32.
126 147:13, 147:16,
    152:24, 152:25,
    156:20, 158:11,
    167:9.
13-1. 65:2.
13-2. 65:10.
13. 72:13.
134 174:34.
13th 49:7, 94:24.
14 95:7.
14-2. 107:2.
14-3 106:19.

141 174:36.
145 174:40.
15 50:17, 51:6,
    76:16, 95:7,
    97:22, 98:21,
    99:16, 99:25,
    100:25, 143:15,
    144:6, 174:18.
15. 80:12.
16 5:8, 95:7, 97:22,
    98:21, 99:16,
    99:25, 173:11.
160 174:42.
169 174:44.
17 95:24, 100:12,
    174:22.
18 20:13, 96:19,
    97:4, 99:4,
    101:20, 101:21,
    101:23, 102:7,
    102:8, 102:18,
    103:16, 171:21,
    171:25.
18. 19:17, 91:4,
    92:3, 92:16,
    93:14, 101:14.
18th 90:20, 91:16,
    93:7, 93:12,
    93:20, 94:25,
    102:10, 102:17,
    103:22, 105:9.
19. 19:14.
1:00 82:6, 123:14,
    144:2, 171:13.
1:15 144:2.
1:20 58:13, 144:3.
1:30 171:13.
1:50 6:16.
.
.
< 2 >.
2 21:15, 21:17,
    21:24, 31:10,
    31:14, 38:13,
    38:15.
2. 22:3, 60:1, 64:2,
    66:4, 118:10.
20 89:19, 102:20,
    141:6.
20. 24:2.

2000 19:2, 56:8.
2004 56:14.
2005 17:13, 105:8.
2005. 105:16.
2007 57:7, 120:7,
    137:13.
2008 18:4, 18:13.
2010 110:7, 146:5,
    171:23, 171:24.
2011 22:13, 31:22,
    32:18, 48:9,
    50:23, 51:19,
    56:18, 57:7,
    57:10.
2011. 107:15,
    110:25, 111:20,
    116:13, 119:8.
2012 49:7, 56:21.
2012. 17:14.
2013 17:10, 56:24.
2014 57:2, 57:3.
2015 56:10, 57:4.
2017. 102:21.
20th 34:19, 119:7.
21 93:8, 97:4, 97:5,
    97:8.
21201 1:49.
21st 73:17, 76:7.
22 99:24.
2200 18:22, 18:24,
    19:15, 22:8.
22nd 110:20, 111:22,
    114:10, 114:12,
    116:8, 116:17.
23 99:24.
24 99:24.
2400 6:18, 6:20,
    7:2, 7:14, 10:18,
    57:17, 57:25,
    58:7, 59:23, 60:4,
    60:21, 61:1,
    65:20, 69:20,
    71:4, 71:7, 78:20,
    78:23, 79:7,
    79:18, 79:20,
    79:25, 85:19,
    87:25, 123:6,
    134:22.
2458 123:10.
24th 58:2, 91:23,

    110:20.
25 76:9, 142:5.
25th 58:1, 63:21,
    64:20, 65:6,
    70:11, 70:12.
27. 115:18.
276 109:13,
    110:15.
2824 111:12.
29 91:14.
2:00 90:13, 90:14,
    144:5.
2:15 90:12.
2:15. 90:8.
.
.
< 3 >.
3 61:22, 61:23,
    62:2, 62:3, 62:9,
    63:4.
3-1 53:4, 53:7,
    53:12, 53:21.
3-2 63:10.
3-2. 28:7, 28:14.
3-3. 28:7.
3. 31:25, 62:14,
    121:7, 121:8.
30 88:10, 112:9.
300 111:22, 114:10,
    114:12, 116:8.
30th 171:22.
31 174:24.
31. 6:25.
318 116:17.
32. 9:17.
33. 147:14.
33s 112:9.
34 153:14.
34. 152:17.
3:00 144:5,
    171:14.
.
.
< 4 >.
4 12:4, 21:15, 33:3,
    40:2, 110:21,
    110:23, 174:16.
4. 33:3.
40 3:4, 20:12.
400 65:5.

403 53:21.
404(b 92:14, 94:6,
    96:1, 104:13.
45 2:21.
45. 107:11.
48 174:26.
4:00 123:14.
4th 1:48, 93:3,
    95:19, 97:7,
    98:11.
.
.
< 5 >.
5 33:21, 41:20,
    41:25.
5. 36:19.
5032. 103:16.
5035 97:24.
52. 108:20.
55 174:30.
59. 59:6.
.
.
< 6 >.
6. 19:24, 35:7.
6: 123:25.
.
.
< 7 >.
7 1:10, 35:23,
    35:24.
7. 35:21.
700 25:9.
77. 20:5.
7: 123:25.
7:00 22:13, 22:21,
    82:4, 82:8,
    124:1.
7:55 18:14.
.
.
< 8 >.
8. 28:21, 30:17.
800 42:10.
.
.
< 9 >.
9-1 52:11.
9-1. 59:16.
9-2 52:11, 135:16.

9-2. 60:18.
9-3. 52:11, 60:24.
900 22:23, 31:11,
    31:15, 37:22,
    38:1, 38:12,
    40:2.
906 23:16, 24:7,
    24:18, 32:9,
    32:10, 33:23,
    41:17.
9:30 171:8,
    173:23.
9:30. 2:8.
9:45. 2:6.
_____/s/_____
    _____ 174:5.
.
.
< A >.
A-u-s-t-i-n 16:22.
A. 1:27.
ability 117:13.
above 13:6, 14:11,
    109:11, 113:23.
above-entitled
    174:3.
absence 92:12.
absolutely 97:15.
academy 17:23.
accepting 67:12.
access 46:15,
    125:21.
accident 92:13.
accidental 28:4,
    45:25.
account 121:3.
accountable 94:19,
    95:10, 96:14,
    97:18, 98:2, 98:7,
    98:14.
accounts 134:1.
accurate 31:15,
    33:4, 35:24.
achieved 92:3,
    92:16.
acknowledges
    101:23.
across 69:12, 72:23,
    92:7.
Act 95:5, 97:7,

97:10, 97:11,
    97:22, 97:25,
    101:3, 103:18.
action 137:22.
actions 99:16,
    101:22, 104:8.
active 125:20.
activities 74:13.
activity 18:19,
    20:11, 78:14,
    86:17, 90:19,
    91:3, 102:17,
    109:17, 114:20,
    116:1.
acts 100:5, 100:8,
    100:9, 104:8,
    105:7.
actual 30:11, 31:18,
    69:18.
actually 23:15,
    23:22, 24:13,
    25:3, 40:11, 41:8,
    58:3, 74:5, 78:14,
    93:5, 93:17,
    117:13, 121:6,
    123:6.
addition 10:12,
    71:11, 106:14,
    109:15, 118:24,
    157:18.
additional 105:3.
address 3:2, 51:14,
    90:13, 111:24,
    116:16, 116:24,
    149:17.
addressed 43:24,
    76:8, 106:3.
Adidas 81:1, 81:6,
    84:5, 85:23,
    106:25, 108:2,
    108:10, 108:24.
adjust 4:15.
admissibility
    133:4.
admissible 74:25,
    92:4, 92:17, 94:5,
    103:8.
admit 120:24.
admitted 12:15,
    12:24, 21:25,

57:19, 62:9.
adopt 101:24.
adult 94:20, 95:10,
    95:14, 96:11,
    98:7, 98:22,
    101:24, 103:19,
    103:24, 104:6,
    104:23.
adult-type 99:19.
adults 98:13.
advanced 62:25,
    133:1.
advantage 77:23.
advantages 76:15,
    76:19.
advice 2:17.
advise 158:7,
    173:15.
aerial 152:20.
affirmatively
    102:5.
African 19:3,
    160:13, 160:16,
    160:20, 161:14.
afternoon 6:10,
    6:12, 7:4, 8:4,
    55:16, 55:17,
    57:12, 57:13,
    83:11, 83:14,
    103:7, 106:2,
    122:12, 122:13,
    134:19, 134:20,
    143:4, 145:13,
    145:14.
afterwards 166:24.
age 92:3, 92:16,
    93:8, 101:14,
    101:20, 102:6,
    104:22.
agency 145:18,
    147:20, 147:22.
Agent 16:9, 16:9,
    16:16, 17:3, 17:5,
    17:17, 22:2, 22:3,
    24:1, 27:5, 29:4,
    31:6, 32:18, 35:8,
    48:18, 49:19,
    174:20.
ages 150:19.
ago 8:11, 61:2,

68:8, 76:9, 77:12,
78:12, 137:10,
168:21.
agree 32:10, 91:5,
91:7, 91:11,
94:15, 97:1,
97:21, 99:9,
101:6, 102:3.
agreed 12:10, 21:21,
62:6.
ahead 48:3, 63:2,
68:13, 68:20,
71:15, 71:23,
72:10, 85:6,
92:25, 143:22,
147:7, 148:17,
170:11.
ajar 148:11.
al 1:10, 2:3.
Alan 1:37.
Alcohol 17:5.
allegation 53:18.
allegations 91:9.
alleged 90:19,
131:8.
allegedly 46:25,
91:21, 92:1.
alley 7:23, 7:24,
8:21, 8:22, 9:9,
9:11, 9:19, 9:20,
9:21, 9:22, 10:18,
36:23, 36:24,
37:9.
allied 147:20.
allow 50:10, 77:4,
89:25, 143:7,
170:23.
allowed 124:9,
170:17, 170:21.
almost 25:10, 96:18,
163:7.
alone 24:22.
already 27:12,
38:19, 57:19,
121:6, 133:3,
134:25, 135:3,
135:6, 144:1,
163:6.
altercation 38:21,
39:1.

alternative
134:10.
although 53:16.
ambulance 58:21,
58:24.
AMERICA 1:5.
American 19:3,
160:13, 160:16,
160:20, 161:14.
among 50:9, 76:20,
89:24, 143:5.
amount 24:14,
129:19.
Analysis 12:14,
22:7, 93:2,
100:14, 101:8.
analyzed 11:25,
12:12, 21:22.
analyzing 21:19.
angle 60:5, 71:4,
78:22.
angles 65:15.
annotation 24:7.
announced 20:18.
answer 32:12, 48:2,
66:23, 85:17,
86:4, 87:6, 92:9,
98:19, 98:23,
98:24, 125:15,
139:2, 147:2,
151:16.
answered 110:8.
anticipation
171:9.
Anybody 39:11,
40:11, 40:16,
41:11, 41:13,
41:15, 103:21,
117:7, 123:12,
123:18, 124:5,
128:6, 128:9,
128:14, 132:7,
147:18, 150:13,
151:20, 168:10.
AP 53:4, 53:7,
53:12, 53:21,
62:21, 63:4,
63:10.
AP-1 52:11.
AP-2 52:11.

apologize 2:19, 3:1,
81:9.
apparently 52:16,
52:17, 84:12,
104:19.
appeal 132:21.
Appeals 132:21,
133:4.
appear 47:22,
129:12, 129:21,
130:24.
appeared 39:4,
46:10.
Appears 31:17,
32:11, 33:6,
33:24, 35:13,
36:1, 49:7, 52:24,
66:15, 82:21,
82:23.
apply 102:7.
apprehend 156:15.
approach 16:17,
28:20, 30:24,
49:14, 52:2, 66:3,
67:17, 72:12,
73:4, 73:5, 76:19,
82:17, 84:13,
85:4, 88:25,
108:19, 121:6,
132:14, 138:21,
146:13, 149:22.
approached 9:12,
20:18, 160:7.
appropriate 75:10,
75:12, 77:1,
95:19, 101:7,
101:15.
approximately 6:16,
24:10, 43:3.
April 22:13, 32:18,
48:9.
AR 62:3, 62:9,
62:14.
areas 5:13,
135:15.
argument 52:15,
91:14, 100:19,
103:16, 103:21.
argumentative
89:6.

arguments 143:7.
armed 26:24,
  43:21.
arms 128:13, 128:15,
  132:7.
arrest 11:2, 11:9,
  12:9, 21:4, 21:7,
  21:21, 44:17,
  47:1, 111:1,
  111:7, 137:25,
  138:11, 158:22,
  159:18.
arrested 11:12,
  11:14, 46:19,
  111:5, 138:4,
  138:7, 150:16.
arresting 44:17,
  44:20.
arrests 140:10,
  150:11.
arrive 27:14, 136:4,
  155:13, 155:14.
arrived 7:3, 27:16,
  58:11, 61:3,
  134:25.
arrives 136:4.
arriving 163:6,
  163:8.
arrow 36:9.
Artesia 116:19,
  116:21.
Artez 116:5.
article 156:5.
articles 50:10,
  50:12, 90:1, 90:2,
  143:8, 143:9,
  170:24.
aside 103:2.
Asif 1:46, 174:1,
  174:6.
asks 150:12.
assault 96:11,
  100:7.
assessment 138:12.
assigned 5:5, 6:6,
  18:11, 56:17,
  56:21, 56:24,
  57:3, 57:4.
assignment 5:4, 6:5,
  55:24, 146:3.

assistant 2:16,
  125:1.
ATF 17:7, 17:9,
  17:16, 157:9.
attained 93:8.
attempt 96:13.
attempting 133:2,
  164:21.
attend 61:15.
attendant 3:3.
attention 6:10,
  6:16, 18:13,
  22:13, 38:7, 38:9,
  38:18, 57:12,
  64:2, 105:20,
  107:15, 110:25,
  111:20, 116:12,
  119:7, 137:13,
  142:14, 142:17,
  146:6.
attractive 96:25.
audio 124:16.
August 146:5.
AUSA 1:25, 1:27.
Austin 16:3, 16:4,
  16:9, 16:22,
  174:20.
authorities 97:10,
  99:6.
authorized 173:2.
autopsy 51:12,
  52:12, 61:15,
  62:3, 62:17.
available 123:12.
Avoid 50:13, 90:3,
  143:11, 170:25.
aware 48:8, 90:23,
  122:3, 133:15,
  172:11.
away 19:11, 20:12,
  38:15, 43:4,
  123:10, 129:7,
  131:23, 131:25,
  156:16, 157:22.
awning 64:4.
Ayesha 12:11.
.
.
< B >.
B. 1:33.

back-up 27:14,
  27:16.
backed 23:14, 24:15,
  38:6.
background 87:2,
  127:14.
backs 38:1.
backup 24:23,
  27:11.
backwards 72:23.
bad 147:11.
badge 26:23.
badges 20:19.
bag 9:5, 9:25, 10:6,
  10:8, 10:9, 29:5,
  108:20.
baggies 12:8.
ball 131:11.
ballistic 59:10.
Baltimore 1:20,
  1:49, 3:8, 4:4,
  5:3, 5:15, 5:24,
  6:2, 12:1, 12:11,
  17:11, 17:15,
  21:12, 42:22,
  48:23, 54:22,
  55:19, 56:7,
  57:18, 58:20,
  58:23, 96:11,
  150:15, 158:19.
bandana 8:7, 8:9.
bandanas 128:10,
  132:7.
Barclay 110:20,
  110:22, 110:23.
barricade 124:9.
base 12:13, 13:11,
  14:18.
based 13:23, 15:1,
  31:10, 87:2, 95:9,
  118:19, 131:21,
  137:24.
bases 104:13.
basically 26:21,
  77:2.
basing 136:12.
Basis 25:20, 53:22,
  92:6, 92:17,
  93:18, 93:19,
  95:14, 95:17,

114:19, 133:11.
Bear 144:1.
became 76:9, 145:24,
   148:25.
become 58:7, 86:22,
   109:20, 112:24.
bedroom 157:6,
   157:7.
begin 2:3, 2:5,
   2:15, 30:9,
   83:11.
beginning 25:9,
   40:7, 66:16,
   124:22, 125:10,
   144:5.
begins 16:16,
   94:24.
behalf 53:5,
   53:11.
behind 130:19,
   153:24.
believed 19:7, 26:2,
   85:1, 85:11, 86:5,
   86:23, 89:9,
   107:8, 121:17,
   141:11.
belonging 116:9.
below 36:9.
belt 44:6, 45:12.
Bench 49:18, 51:15,
   67:18, 73:7,
   82:20, 84:13,
   84:16, 85:4, 89:1,
   89:3, 126:8,
   132:16, 138:23,
   146:14, 149:23.
benefit 54:7.
beside 26:19, 26:21,
   26:22, 42:24.
best 2:13, 24:21,
   24:23, 25:8,
   26:18, 34:23,
   36:17, 98:24,
   117:12, 162:16.
better 31:18, 41:23,
   79:8, 105:16,
   127:20, 154:3.
beyond 76:24, 93:17,
   98:5, 101:20,
   162:17.

BGF 86:6, 87:7,
   109:17, 109:21,
   112:9, 114:20,
   115:1, 116:1,
   117:18, 118:19,
   120:22, 120:24,
   120:25, 121:2,
   121:15, 121:23.
bicycle 127:18,
   127:19, 127:21.
bicycles 127:23.
Big 95:1.
bigger 46:12.
birthday 90:20,
   91:17, 93:7,
   93:12, 93:20,
   94:24, 94:25,
   102:10, 102:18,
   103:22, 105:5,
   105:9.
bit 31:9, 32:3,
   32:4, 33:21,
   34:20, 36:1, 74:5,
   77:8, 112:13,
   113:12.
Black 8:10, 81:1,
   81:6, 84:5, 85:22,
   85:23, 86:20,
   86:24, 87:15,
   106:25, 108:2,
   108:10, 108:24,
   112:24, 114:4,
   118:23, 126:6,
   128:10, 130:8,
   130:12, 130:17,
   132:7, 149:15,
   156:8.
Blake 95:22.
blank 66:15,
   80:10.
blended 39:13.
blocked 135:12,
   135:15.
blocks 150:10.
blood 59:19.
bloody 53:14.
blow 32:3.
blown 79:6, 80:19.
blue 7:12, 8:7,
   25:23, 44:16,

45:21, 45:22,
   46:8, 84:10, 88:9,
   107:7, 107:9.
bluish 88:4.
blurt 152:4.
board 92:7.
body 79:11.
Bonds 19:5, 19:25,
   20:14, 20:18,
   21:4, 21:6, 21:21,
   117:16, 118:14.
Booking 11:22.
boss 29:20, 95:4,
   95:9.
bottle 136:16,
   136:20, 136:21.
bottom 36:4, 44:9,
   45:14, 45:18,
   49:7, 59:21,
   60:18, 70:19,
   108:4, 110:11.
bought 11:16.
box 4:15, 16:5,
   16:14, 55:6,
   76:14, 82:22.
Boys 95:23.
BPD 5:7, 5:10,
   17:22, 21:18,
   55:21, 55:24,
   56:12, 58:6.
brace 63:1.
Brady 119:15.
brains 99:21.
brawl 24:18,
   25:17.
break 50:2, 50:4,
   69:3, 89:15,
   89:23, 106:9,
   107:8, 109:14,
   117:12, 144:3,
   171:12.
breaks 76:17.
Bredar 1:18.
Brentwood 6:18,
   6:20, 7:2, 7:6,
   7:8, 7:15, 10:18,
   11:2.
briefly 48:18,
   103:15, 132:14.
Bring 3:15, 32:3,

75:3, 100:16,
103:19, 103:23,
104:7, 105:20,
105:25, 112:19,
112:20, 144:11.
brings 99:4.
broader 86:16,
109:16, 109:17,
114:19, 115:8,
115:25, 117:24,
121:1, 121:14,
140:13.
broke 131:25.
brother 115:23.
brought 43:25,
44:10, 107:16,
107:19.
Brown 117:23.
brush 155:4, 155:15,
155:17, 155:18,
155:22.
build 85:23.
building 64:3.
buildings 31:19.
bullet 52:18,
52:23.
bullets 29:14,
29:15.
bunch 23:18, 77:2,
95:18, 96:15,
132:2.
Bureau 17:5,
55:19.
burglaries 57:2.
buses 126:25.
bushes 150:10,
164:1, 164:7,
166:25, 167:2,
167:5.
business 144:4.
busy 23:13, 58:9,
126:20.
buy 10:23.
.
.
< C >.
calf 27:22, 27:23,
44:12, 45:22,
46:2, 46:7,
46:12.

caliber 59:13,
60:20, 60:25,
157:6, 167:12.
California 17:6.
Call 4:2, 16:2,
24:23, 38:14,
38:22, 40:25,
41:15, 54:19,
67:19, 100:12,
134:22, 144:14,
147:9, 147:12,
148:16, 150:19,
172:15, 172:19,
172:24.
called 4:11, 10:22,
11:3, 16:10,
22:16, 24:19,
25:6, 27:11, 45:2,
55:3, 60:16, 98:1,
125:19, 126:20,
144:22, 155:7,
163:14, 163:17.
calls 4:3.
Calvert 111:12.
cameras 63:17,
127:23.
capability 124:16.
capacity 6:7, 6:14,
18:24, 57:10,
98:19, 100:1,
100:14.
capsules 61:13.
capture 64:21,
85:16.
captured 65:11,
83:15, 85:2,
85:21, 85:24,
87:4, 108:16.
car 6:24, 7:25,
9:12, 9:19, 9:22,
26:23, 35:11,
38:13, 43:5,
95:3.
care 132:23.
career 5:17, 56:12,
56:13.
carrying 161:17,
161:18.
Cars 32:25.
cases 92:24.

cash 157:1.
casing 60:25.
casings 29:11,
29:13, 29:14,
59:13, 60:21,
167:19, 167:20.
cause 61:17, 62:8,
165:6.
CCTV 64:14, 64:19,
71:3, 78:22,
81:15, 83:14,
85:11, 87:4,
106:10, 106:16,
106:21, 107:4,
131:21.
CD 66:4, 72:13,
121:7, 121:8.
CDS 14:12, 14:14,
14:16, 20:2.
Cease 57:3.
Cecil 51:4,
147:23.
cemetery 33:9.
center 69:5, 84:9,
84:11, 142:14,
142:17.
Central 11:22,
56:23.
century 73:17,
76:7.
certain 73:12,
129:19, 135:15,
136:20.
Certainly 52:22,
53:17, 83:6, 89:6,
151:17.
certified 14:6.
certify 174:1.
chambers 2:7, 2:12,
2:14, 2:16,
2:20.
chance 159:4.
changed 31:22.
chaotic 148:25.
Characterization
87:5, 146:15.
characterizations
74:4.
characterize 89:5.
charge 92:21, 94:23,

102:22, 103:3,
140:22.
charged 13:22,
14:11, 44:23,
96:10, 97:21.
charges 44:21,
44:23, 47:4,
47:11, 96:10.
chase 154:18.
chased 150:7, 154:9,
154:15, 155:21,
162:4, 162:7,
162:8.
chasing 154:2,
155:2, 155:20,
163:7, 163:9.
check 30:6.
chemist 12:1.
chest 109:11.
Chief 4:1, 62:5,
96:1, 173:11.
child 94:21, 95:14,
98:8, 112:2.
children 99:20,
131:11.
choices 99:15.
Christina 1:27.
Christine 1:46,
174:1, 174:6.
Christy 16:16,
49:19.
circle 60:14, 66:19,
67:8, 69:6, 70:1,
70:4, 70:22,
71:21, 72:4,
78:13, 131:6.
circled 131:5.
Circuit 63:19, 93:3,
94:1, 94:10,
95:19, 96:11,
97:7, 98:11.
circuits 95:18.
circumstance 91:19,
96:24, 98:6.
cited 92:23, 93:16,
94:11.
City 3:8, 4:4, 5:3,
5:14, 5:15, 5:24,
6:2, 12:11, 17:11,
18:11, 21:12,

37:16, 42:22,
56:16, 57:18,
58:23, 96:11.
Citywide 56:15.
Claiborne 93:25.
clarification 7:16,
132:18.
cleaned 122:21.
Clear 9:13, 16:17,
28:8, 53:15,
59:21, 67:14,
69:22, 70:19,
73:5, 91:17,
153:2.
cleared 82:3, 82:24,
122:21, 122:22.
clearly 92:3.
CLERK 4:8, 4:14,
4:20, 16:6, 16:7,
16:13, 16:19,
16:24, 54:25,
55:1, 55:6, 55:12,
66:25, 67:5,
67:13, 67:16,
68:12, 68:15,
81:11, 144:18,
144:19, 144:25.
click 77:4, 77:9.
client 15:16, 73:10,
91:9, 104:19,
104:23.
clip 121:7, 121:8,
142:8.
clips 67:24,
71:13.
close 11:5, 139:7,
145:16.
closed 63:19,
124:13.
closer 17:18, 32:8,
38:16.
closest 162:25.
closing 143:6.
clothes 18:24,
39:10.
Clothing 61:13,
65:4, 70:7, 80:1,
80:21, 81:4,
85:21, 87:18,
87:23, 154:5,

156:6.
co-conspirators
104:21.
cocaine 8:17, 9:1,
9:14, 10:9, 11:7,
12:13, 13:11,
14:18, 20:24,
21:23.
cocaine/schedule
22:11.
codes 73:25.
cold 120:6.
collapses 71:7,
79:11.
collared 115:12.
colleague 148:2.
collected 81:19.
color 8:9, 161:25.
colored 25:24.
comes 76:23, 92:19,
104:13, 105:13,
126:12, 129:11,
130:4.
comfort 93:21.
comfortable 101:9.
coming 22:20, 27:13,
66:10, 125:21,
133:17, 149:4,
149:24, 149:25,
151:13, 152:3,
152:13, 161:7,
161:13, 164:20.
command 67:14.
commands 155:18.
committed 51:20,
80:20, 94:20,
95:7, 95:11, 98:8,
104:9, 104:20.
committing 169:13,
169:14.
common 42:21.
commonly 17:7.
communication
140:23.
company 96:2.
complete 151:15.
completed 13:20.
Completely 67:15,
68:8, 102:15,
104:15.

complicated
  133:25.
complied 27:8,
  43:20, 44:2.
computer 73:25.
concept 99:2, 100:3,
  100:15, 150:21.
concern 74:13,
  77:14, 89:11.
concerned 37:5,
  45:24.
concerns 45:20.
conclude 93:18,
  105:17.
concluded 133:5.
concluded. 173:25.
condition 61:4.
conduct 21:6, 94:5,
  96:7, 96:14,
  97:20, 98:8, 99:1,
  99:22, 100:17,
  101:16, 101:22,
  104:19, 104:22,
  171:3.
conducted 104:22.
conducting 53:25.
conference 2:7, 2:9,
  2:11, 49:18,
  67:18, 73:7,
  82:20, 84:16,
  89:1, 89:3,
  103:11, 132:16,
  138:23, 146:14,
  149:23.
confirmed 2:13,
  2:16.
confronted 90:21.
confused 163:11.
connected 147:6.
connection 12:9,
  15:3, 21:20, 62:5,
  111:2, 118:25,
  150:13, 158:10.
consider 93:13,
  93:22, 104:12.
consideration
  92:7.
conspiracy 90:20,
  91:16, 92:20,
  93:6, 93:10,

93:11, 94:23,
  95:3, 95:6, 96:18,
  98:9, 98:10,
  98:15, 99:3, 99:9,
  99:10, 100:5,
  100:10, 101:12,
  101:14, 101:19,
  102:4, 102:6,
  102:9, 104:5,
  104:6, 104:8.
conspiratorial 91:3,
  95:13.
constructed 45:23.
consult 50:16, 90:7,
  143:14, 171:5.
contact 7:21, 7:22,
  10:20, 22:25,
  23:10, 49:19,
  50:13, 90:3,
  143:11, 163:1,
  170:25.
contain 10:9, 66:7,
  72:16.
contained 9:13,
  20:23, 21:23,
  77:20.
containing 12:8,
  21:19.
contains 12:13.
contents 10:5,
  164:19.
context 74:21,
  98:12, 102:6.
Continue 3:25, 7:20,
  23:8, 71:23,
  85:10, 100:17,
  103:10, 106:6,
  113:17, 139:10,
  141:20, 155:10.
continued 151:23.
continuing 79:20,
  79:24, 93:10,
  96:20, 98:10,
  99:4, 99:14,
  173:8.
continuous 72:21.
Control 13:20,
  21:13, 34:14,
  35:9, 35:16,
  42:1.

controlled 12:14,
  14:17, 14:18,
  21:24.
conversation 2:20,
  47:9, 130:24,
  142:9.
conversations 131:3,
  139:3, 142:9.
converted 71:13.
conveying 8:25.
convicted 13:25,
  48:8, 48:19,
  93:19.
Cook 18:23, 20:17,
  20:21.
cooperative
  163:19.
copy 13:2, 62:17,
  112:5, 115:25.
cordoned 123:13.
core 53:19.
corner 16:5, 22:6,
  36:8, 72:1.
Cornish 132:20,
  140:4, 140:5,
  140:16, 140:18,
  141:7, 141:10,
  141:12, 141:21.
cornrow 7:13.
cornrows 8:8.
Corporal 49:22,
  50:24, 143:19,
  144:16, 144:19,
  144:21, 145:3,
  145:7, 145:13,
  145:24, 146:2,
  146:3, 146:21,
  147:15, 147:24,
  148:9, 151:6,
  152:18, 154:14,
  156:13, 157:18,
  157:23, 159:11,
  160:7, 169:20,
  174:38.
correctly 56:3,
  93:7, 154:15,
  168:7.
correspond 114:25,
  115:7, 115:14.
corresponding

22:4.
corridor 56:24,
    86:17.
Counsel 15:23, 52:3,
    53:1, 53:2, 54:6,
    67:17, 73:19,
    74:15, 77:15,
    84:10, 86:11,
    88:9, 88:25, 89:6,
    90:12, 149:22,
    156:7, 172:9.
count 100:20,
    101:12, 131:16.
County 17:15, 51:3,
    51:4, 147:23.
couple 50:21, 51:12,
    106:18, 107:22,
    112:16, 150:5,
    152:3.
course 56:12, 86:5,
    90:18, 90:25,
    102:4, 132:6,
    137:16.
court-related
    144:4.
court. 50:6, 68:19,
    76:5, 83:8, 84:22,
    89:21, 134:16,
    139:9, 146:19,
    151:4.
courthouse 49:20.
courtroom 23:3,
    68:7, 68:21, 88:8,
    104:7, 107:9,
    113:11, 113:12,
    115:11, 156:3.
courtroom. 3:17,
    50:19, 54:18,
    90:10, 106:1,
    143:17, 144:12,
    171:18.
courtrooms 76:10.
courts 93:16,
    93:24.
cover 10:20,
    11:20.
crack 8:17, 9:1,
    11:7.
craft 75:22.
crashing 149:4.

Crawford 150:1.
crawling 155:18.
created 88:13.
credible 141:9,
    141:11.
crimes 104:7.
CRIMINAL 1:9, 48:23,
    100:9, 100:10,
    170:19.
criticized 150:20.
cross 33:25, 35:2.
Cross-examination
    15:8, 15:14, 31:4,
    122:7, 122:10,
    133:20, 134:2,
    134:17, 142:7,
    160:5, 174:18,
    174:24, 174:32,
    174:34, 174:42.
cross-examine
    173:10.
crossed 72:2,
    128:13, 132:7,
    139:1, 139:6.
crossing 79:18,
    128:13, 128:15,
    152:12.
crotch 26:10.
crowd 131:24.
cry 96:20, 96:21.
crystal 53:15.
cul-de-sac 154:18,
    154:21, 154:22.
culpability 99:19.
culpable 99:15.
currency 157:1.
currently 17:3,
    17:5.
custody 138:3,
    155:23, 155:24,
    156:2.
cut 19:2, 19:3,
    19:10, 19:18,
    20:8, 28:3, 28:4,
    28:12, 28:16,
    28:17, 36:11,
    46:1, 70:18,
    107:24.
Cutting 84:20,
    162:18.

.
.
< D >.
dancing 73:10,
    73:11, 74:23.
dancing. 74:20.
dangerous 14:17,
    14:18.
Dark 150:19, 154:7,
    161:22, 161:23,
    161:24, 162:1,
    162:2, 162:3.
darker 65:4, 70:7.
database 157:9,
    157:11.
date 22:7, 49:5,
    49:6, 100:25,
    107:5, 108:2,
    108:17, 111:1,
    111:6, 111:21,
    116:14, 119:8,
    138:1, 147:3.
dates 138:2.
dattniccageeznutz
    121:3.
Dave 119:21, 119:22,
    121:19, 121:23,
    122:1.
David 65:23, 72:9,
    80:24, 87:12,
    106:23, 107:6,
    107:13, 107:16,
    108:2, 108:9,
    108:25, 109:8,
    110:14, 110:19,
    111:5, 112:2,
    116:21, 116:22,
    116:23, 118:7,
    118:14, 119:18,
    121:24, 130:17,
    131:6, 132:1,
    133:9, 140:15,
    140:21.
Dawnyell 111:25,
    116:9.
day 2:4, 3:10, 3:13,
    15:17, 22:5,
    23:14, 34:3,
    39:14, 76:16,
    81:24, 85:20,

87:24, 94:24,
94:25, 95:9,
96:19, 102:9,
122:15, 125:7,
131:9, 141:8,
144:6, 170:9,
170:13.
days 76:9, 107:14.
De 94:10, 99:6.
dead 52:16, 52:21,
52:22, 61:7,
110:5.
deal 10:19, 76:7.
dealing 97:3.
dealings 160:24.
death 61:17, 62:5,
62:8.
deceased 53:16,
53:20.
December 17:13,
56:18, 57:7.
decide 12:20, 77:17,
78:1.
decided 73:12,
93:10, 148:16.
deciding 96:3.
decision 93:3.
decisions 99:16,
99:25.
deemed 84:7.
Defendant 1:12,
1:29, 1:35, 1:39,
2:10, 7:7, 7:10,
23:8, 31:10,
31:14, 48:24,
49:3, 93:6, 94:24,
96:4, 96:18, 97:3,
97:5, 97:8, 104:5,
104:9, 104:20.
Defendants 7:10,
173:24.
Defense 15:22,
31:25, 33:2,
33:20, 35:7,
35:21, 36:19,
40:1, 40:2, 41:25,
53:1, 54:6, 73:19,
74:15, 88:9,
142:22, 156:7,
172:8, 172:16,

173:20.
defer 89:14.
definitely 171:14.
definitively
95:20.
delay 3:12.
Delinquency 97:6,
97:11, 97:25,
101:3.
Deliquency 103:17.
delivered 29:16,
29:19.
demonstrate 26:11,
91:2.
demonstrated 44:7.
denied 53:24,
120:25.
deny 120:24.
depart 15:25, 49:13,
143:1, 170:8.
Department 3:8, 4:5,
5:3, 6:23, 12:1,
12:12, 17:12,
17:15, 49:23,
50:25, 51:1,
54:23, 55:19,
56:7, 56:13,
58:20, 143:20,
144:17, 145:4,
145:8, 145:19,
147:23, 157:24,
169:21.
depend 112:19.
dependant 67:19.
depends 136:19,
161:5.
depicted 53:16,
60:2, 60:24,
69:4.
depiction 53:20.
deputized 56:3.
Deputy 148:4, 148:5,
153:25, 155:1,
155:16, 160:8,
162:21.
describe 42:19,
81:4.
described 10:17,
13:13, 15:3,
19:21, 85:25.

describing 19:19,
24:23, 102:17,
151:7.
description 10:25,
42:3, 74:8.
descriptions 39:2,
77:25.
detained 11:11,
144:4.
Detective 3:7, 4:4,
4:6, 4:10, 4:24,
6:4, 6:6, 7:1,
8:23, 9:16, 11:23,
12:22, 12:25,
13:12, 14:4, 15:1,
15:16, 18:23,
20:17, 20:21,
56:25, 57:7,
132:18, 174:14.
detectives 10:21,
46:22, 47:24.
determination
83:18.
determine 156:23.
determined 12:13,
21:23, 62:7.
develop 140:20.
developments
140:21.
device 34:14, 35:9,
42:1.
devices 35:16.
dictionaries
171:6.
dictionary 50:17,
90:7, 143:15.
died 110:6, 110:8.
Diego 17:6, 31:23.
difference 36:25,
102:1.
different 5:23,
10:13, 33:22,
60:5, 65:15,
95:18, 97:3,
100:20, 114:17,
131:3, 133:18,
140:16, 161:1.
digest 173:9.
dime 9:3, 9:5.
dimes 9:2, 9:3.

diminished 100:14.
dinner 22:22.
dip 26:4, 26:7,
  26:8, 42:19,
  42:20, 42:21,
  45:12.
Direct 4:22, 6:10,
  17:1, 55:14,
  57:12, 71:25,
  107:15, 110:25,
  111:20, 116:12,
  119:7, 136:6,
  145:11, 146:6,
  174:16, 174:22,
  174:30, 174:40.
directed 27:7.
Directing 6:16.
direction 10:25,
  25:16, 34:1, 34:3,
  37:6, 42:8, 45:25,
  65:17, 99:7,
  126:23, 154:12.
directions 153:13.
directly 4:16,
  16:19, 55:7,
  145:1.
dirt 126:7.
disagreement
  172:3.
discarded 15:2.
discharge 28:4,
  45:25.
discipline 112:22.
disclosures 172:8,
  172:12, 173:12.
discombobulated
  68:10.
Disconnect 75:6,
  75:16.
discuss 50:8, 50:9,
  89:24, 143:4,
  143:5, 170:14,
  170:15.
discussed 133:3.
discussing 29:7,
  37:5, 101:5.
discussion 84:12.
disk 66:5, 66:11,
  72:14, 72:16.
display 74:24.

displaying 75:8.
disposed 14:22.
disposition 15:1.
disregard 75:11.
distance 31:18.
distinctive 154:5.
distinctively
  154:13.
distribute 14:12.
District 1:1, 1:2,
  5:11, 17:24,
  18:12, 22:17,
  30:9, 37:11,
  37:17, 56:14,
  56:15, 56:20,
  56:23, 56:25,
  57:1, 57:18,
  93:25.
Districts 56:23.
Division 6:6, 18:1,
  18:5, 18:8, 22:14,
  30:21, 55:25.
DL 12:16, 12:24,
  21:17, 21:24,
  22:3.
DNA 136:17, 167:25,
  168:2, 168:5,
  168:6, 168:8,
  168:15.
doctor 61:7.
document 14:3,
  110:11, 112:6,
  165:18, 165:19.
documenting
  158:25.
doing 18:9, 24:23,
  25:25, 73:10,
  75:24, 89:10,
  95:15, 99:23,
  99:24, 169:10.
Dominic 50:23, 59:3,
  61:7, 63:8.
Don 109:13,
  109:25.
Donatello 110:3.
done 98:1, 159:4,
  168:2, 173:16.
door 148:1, 148:9,
  148:14, 148:18.
double 38:16.

downstairs 149:7,
  150:7.
downtown 5:18,
  11:20.
draw 18:13, 22:12,
  25:9, 67:8,
  78:13.
drawn 38:18.
dressed 8:3.
drew 26:25, 35:6.
Drive 147:13,
  147:16, 152:21,
  152:24, 152:25,
  156:20, 158:11,
  158:21, 159:17,
  167:9.
driver 26:22,
  43:3.
driving 7:6, 7:21,
  7:23, 95:9.
Drove 6:23, 7:6,
  8:21, 11:4, 11:8,
  37:16, 37:17,
  37:18, 95:1,
  95:4.
Drug 11:23, 12:14,
  16:17, 18:18,
  21:22, 22:4,
  22:7.
drugs 11:16, 11:24,
  11:25, 13:3.
dude 120:6.
due 24:11, 24:15.
duly 4:11, 16:10,
  55:3, 144:22.
During 13:13, 30:20,
  37:15, 37:20,
  50:8, 56:13, 58:6,
  86:5, 89:23,
  90:17, 90:25,
  95:6, 112:23,
  119:11, 124:6,
  132:6, 133:3,
  133:12, 135:13,
  142:7, 143:4,
  170:13, 171:15.
duty 6:11, 18:16,
  22:19, 146:8.
.
.

< E >.
e-mailed 173:3.
earlier 42:3, 64:3,
    81:15, 87:19,
    87:24, 88:12,
    106:13, 115:5,
    121:14, 123:22,
    131:9, 138:8,
    162:1, 171:25.
early 143:25, 146:7,
    146:10, 146:21,
    173:11.
eastbound 25:12,
    42:6.
Eastern 18:12,
    22:17, 30:9,
    37:11, 37:17,
    56:14, 56:15,
    57:1, 57:18,
    93:25.
ECU 11:24, 15:2.
effect 44:2, 160:11,
    172:12.
effectively 99:13.
efficient 51:14.
eight 131:17.
either 46:15, 51:10,
    51:14, 104:20,
    161:17.
electronic 73:18,
    74:5, 74:25.
elicited 133:14.
eliciting 133:23,
    133:25.
eliminate 77:23.
Elkton 49:23, 50:25,
    51:2, 51:3,
    143:20, 144:17,
    145:4, 145:8,
    145:19, 145:20,
    145:21, 147:13,
    147:16, 148:24,
    157:24, 158:21,
    159:17, 171:19.
emerges 101:7.
employed 17:4,
    55:21, 145:19.
empty 36:10, 36:21,
    37:1, 37:2, 37:3,
    37:4, 37:7.

encyclopedia 50:16,
    90:7, 143:15.
encyclopedias
    171:6.
end 3:2, 3:10, 3:13,
    22:20, 22:22,
    38:10, 76:15,
    97:17, 101:11,
    121:11, 121:19,
    131:13, 131:14,
    132:5, 141:8,
    154:18, 154:20,
    154:22, 154:23,
    162:20.
ends 94:24.
enforcement 18:9,
    42:21, 42:22,
    86:23, 111:1,
    111:21, 116:13,
    145:18, 156:14.
engaged 95:5,
    102:16.
engages 93:3.
engineers 113:11.
enough 78:2,
    104:7.
enter 16:13, 40:5,
    55:6.
entered 3:17, 54:18,
    106:1, 144:12,
    148:23, 162:10,
    162:22.
entering 153:16.
entire 103:20.
entitled 165:18.
ENZINNA 1:31, 7:18,
    10:2, 15:8, 15:9,
    15:24, 30:25,
    31:1, 160:1,
    172:18, 172:19,
    172:23, 173:1,
    173:14, 173:17.
equipped 39:15.
especially 67:25,
    99:10.
Esquire 1:31, 1:33,
    1:37, 1:41.
essentially 94:11.
establish 155:6,
    162:15, 163:10.

et 1:10, 2:3.
Eusi 113:23.
evening 19:1, 22:13,
    22:19, 23:11,
    23:16, 23:17,
    157:24, 173:21.
event 150:23.
events 54:8.
eventually 42:24,
    48:8, 133:18,
    138:7, 148:20,
    150:9, 156:16,
    164:3.
everybody 128:20.
Everything 95:2,
    99:5, 102:25.
evidentiary 88:19.
exact 30:1, 134:5.
Exactly 10:23, 11:6,
    75:23, 78:6, 95:2,
    95:18, 146:16,
    166:13.
Examination 4:22,
    17:1, 48:16,
    53:25, 55:14,
    106:7, 141:3,
    145:11, 169:18,
    174:16, 174:22,
    174:26, 174:30,
    174:36, 174:40,
    174:44.
examine 28:24.
examined 4:11, 13:7,
    16:10, 55:3,
    144:22.
Examiner 62:5,
    63:9.
except 52:22,
    97:2.
exception 104:13.
exceptions 92:13,
    150:24.
excerpt 70:24,
    88:15.
excerpts 71:13,
    72:17, 82:13,
    88:13.
Excited 149:20,
    150:21.
exclude 53:21.

excluding 92:6.
exclusively 96:18.
excuse 20:17,
  34:7.
excused 15:22,
  15:25, 49:10,
  49:12, 90:11,
  142:21, 143:1,
  170:5, 170:8,
  171:16.
execute 111:17,
  111:21, 116:13.
executing 118:24.
exhibits 31:8, 53:8,
  74:4, 76:12,
  106:18, 107:22,
  117:1.
exist 124:19.
exited 20:17,
  153:9.
exiting 153:12.
expect 2:21,
  173:15.
expected 170:19.
expert 172:8,
  172:15, 172:20,
  172:24, 173:9.
explain 26:8, 75:23,
  79:4, 89:9.
explaining 9:7,
  85:11, 151:11.
explanation 75:24,
  77:21, 94:11.
explore 133:6.
Explosives 17:6.
exposed 50:10,
  89:25, 143:8,
  170:23.
extending 99:18.
extent 103:9.
external 171:5.
extreme 99:12.
eye 7:22.
eyes 21:2, 47:12.
eyewitness 141:12.
eyewitnesses
  119:3.
.
.
< F >.

F-e-r-d-i-n-a-n-d
  3:23, 4:19.
F-i-n-c-h 145:9.
F. 1:31.
face 16:5, 52:16,
  52:21, 54:24,
  74:21, 108:5.
facing 25:12, 42:6,
  59:23, 60:3,
  65:17, 65:19,
  131:5.
fact 12:21, 44:14,
  53:15, 54:10,
  73:25, 76:23,
  92:5, 93:20,
  93:21, 96:25,
  133:12, 134:4,
  171:10.
facts 50:15, 90:5,
  97:14, 143:13,
  171:2.
factual 91:6.
fair 40:11, 89:8,
  100:18, 138:11,
  142:14.
Faison 115:17,
  115:20, 115:22,
  121:17.
familiar 31:11,
  58:7, 86:22,
  109:20, 112:24,
  114:20, 114:23,
  118:20.
Family 86:20, 86:24,
  112:24, 113:5,
  114:4, 118:23,
  120:18, 170:16.
far 24:14, 36:2,
  38:6, 95:19,
  96:20, 96:21,
  98:25, 122:3,
  123:5.
farther 34:20.
fast 41:1.
fast-forward
  107:14.
favor 94:16.
FBI 55:20, 55:21,
  56:1, 56:4, 56:9,
  57:4.

FCRR 1:46, 174:1.
featured 51:21.
Federal 1:47, 55:19,
  96:14, 97:6,
  97:10, 97:25,
  103:17, 170:18.
feel 27:22, 29:4.
feet 19:11, 20:12,
  43:3, 108:9.
fell 46:10, 46:11.
fellow 130:12,
  170:15.
felt 27:21, 27:22,
  45:20.
female 23:21, 39:4,
  129:8, 149:15,
  160:13, 168:9.
females 158:18.
fence 126:6.
fenced 123:13.
fencing 124:8.
Fenner 110:3,
  110:4.
Ferdinand 3:8, 3:19,
  4:4, 4:6, 4:10,
  4:18, 12:22,
  174:14.
few 9:10, 11:1,
  37:10, 49:22,
  67:25, 83:10,
  94:2, 117:1,
  131:14, 137:10,
  150:10, 157:17,
  163:9, 163:12.
fiction 99:9.
fiddle 44:9.
field 146:1, 154:23,
  154:25.
fight 23:19, 23:25,
  24:20, 24:23,
  24:25, 39:3,
  41:9.
figure 36:12, 36:16,
  76:17.
figured 134:7.
file 79:2, 80:2.
files 68:2, 71:13,
  72:17, 75:9,
  75:12.
film 132:6.

filmed 122:14,
    122:17, 122:18,
    122:25, 123:17.
filming 132:6.
filtered 73:23.
Finally 60:23.
Finch 49:22, 50:24,
    143:19, 144:16,
    144:21, 145:3,
    145:7, 160:7,
    174:38.
find 91:8, 91:13,
    95:22, 101:12,
    101:13, 104:15,
    141:8, 150:9,
    167:13, 167:14.
fine 68:17, 81:11.
finger 34:22, 57:21,
    66:19, 69:17,
    152:23.
fingerprints 136:17,
    167:13, 167:14,
    167:15, 167:16,
    167:22, 167:24,
    168:14.
finished 165:23.
Fire 40:20, 57:3.
firearm 27:20,
    27:24, 27:25,
    28:5, 28:11,
    28:12, 28:18,
    29:6, 29:8, 29:21,
    29:22, 30:6,
    44:11, 44:24,
    45:13, 45:24,
    46:7, 47:8, 47:10,
    48:9, 157:15,
    157:16, 157:18,
    168:3, 168:5,
    168:9, 168:13.
Firearms 17:6, 26:5,
    41:1.
fired 25:3, 29:14,
    40:23, 60:20,
    60:25, 78:25.
fires 71:6, 71:20.
firing 29:15,
    40:22.
first. 29:25.
fish 7:13.

fists 23:22.
five 20:22, 21:19,
    22:10.
fix 68:23, 121:9.
fixated 104:3.
Fixed 68:8, 145:5.
flames 110:15.
fled 154:11,
    155:4.
Flex 5:13.
flight 74:9, 77:13,
    77:16.
Floor 1:48, 116:8,
    149:5, 157:7.
flows 162:18.
focus 41:24, 64:2,
    86:19, 109:5,
    113:22, 114:15,
    115:24, 116:1,
    129:17, 133:18.
focused 29:21, 47:7,
    48:6, 131:7,
    151:22.
follow 127:23,
    128:3.
followed 150:8,
    150:9, 152:5.
following 50:6,
    68:19, 76:5, 83:8,
    84:22, 87:25,
    89:21, 134:16,
    138:4, 139:9,
    146:19, 151:4,
    153:24, 153:25.
follows 4:12, 12:7,
    16:11, 55:4, 62:3,
    144:23.
footing 97:3.
Force 27:9, 55:20,
    56:2, 56:4,
    57:5.
forced 45:24,
    173:9.
foregoing 174:2.
foreseeable 98:15.
foreseeing 98:22.
foreshadowed
    90:24.
forget 97:25.
forgot 91:21.

form 73:23.
formatting 72:17.
forward 2:12, 75:15,
    101:9, 110:24,
    139:5.
forwarded 139:17.
Foster 95:20.
found 157:4, 163:13,
    164:7, 167:8,
    167:19, 168:8.
Foundation 83:4,
    85:9, 86:9, 86:10,
    146:16, 149:21.
foundational 83:2.
founder 118:23.
four 29:11, 53:8,
    126:22, 143:21,
    167:21.
fragments 59:13.
frame 161:5,
    171:13.
free 29:4, 121:12,
    121:19.
freestanding
    100:20.
friends 170:15.
front 7:7, 23:15,
    38:1, 41:17, 44:6,
    72:2, 75:1, 76:24,
    77:11, 77:16,
    79:15, 83:5,
    116:8, 126:16,
    128:15, 148:1,
    148:6, 148:7,
    148:9, 148:14,
    151:22, 151:24,
    153:12, 153:16,
    155:16, 165:19.
froze 67:1.
frozen 67:2, 67:15,
    67:16.
full 26:3, 70:20,
    131:8.
fully 99:21.
function 66:23,
    67:4, 81:8.
functionally
    102:15.
functions 68:10.
fundamental 94:18.

furtherance 95:5,
  95:8, 100:9,
  104:8.
furthest 38:15.
.
.
< G >.
gang 86:6, 86:17,
  86:19, 87:7,
  95:23.
Gary 111:25, 112:3,
  112:11, 116:9.
gather 63:16.
gathered 85:13,
  85:18.
gathering 125:19,
  125:25, 127:16,
  127:22, 129:5.
gave 9:12, 9:14,
  11:23, 24:20,
  27:11, 47:6,
  94:11, 94:12,
  155:17, 168:22.
Gayedi 113:24.
gears 22:12.
Geezy 73:10, 111:14,
  114:23.
gelatin 61:13.
general 50:3, 76:22,
  77:4, 161:25.
generally 81:4,
  94:15, 97:1.
generate 13:16,
  64:23.
generated 65:25,
  72:17, 80:15.
generating 71:12,
  80:4, 106:15.
gentleman 19:4,
  19:9, 20:20, 23:4,
  65:7, 72:22,
  79:15, 87:14,
  107:7, 117:15,
  117:20, 118:1,
  118:8, 150:5.
gentlemen 3:24, 5:1,
  8:15, 12:18, 23:9,
  24:17, 50:7,
  62:12, 62:22,
  64:13, 68:20,

76:6, 84:24,
  89:22, 106:2,
  113:10, 143:3,
  145:16, 151:12,
  170:12, 171:8.
George 118:18,
  118:20.
Georgia 157:12.
Gerald 1:10, 1:29,
  12:9, 14:10,
  84:10, 88:8,
  88:23, 107:9,
  115:4, 115:5,
  115:23, 118:2,
  142:18.
gestae 150:19,
  151:2.
gets 68:10, 99:12,
  133:25.
getting 58:24,
  80:10, 131:11,
  133:19, 134:5.
gif 68:1, 71:13,
  72:17, 73:9,
  73:12, 75:9, 79:1,
  79:22, 80:2,
  82:12, 88:13,
  88:15, 89:2,
  106:14.
girl 112:2,
  116:21.
girlfriend 168:25,
  169:7, 169:8,
  169:9.
girls 150:15,
  158:16.
Give 10:24, 27:6,
  34:25, 53:24,
  54:2, 62:24,
  66:13, 75:23,
  78:3, 94:17,
  98:25, 105:18,
  110:10, 151:15.
given 2:17, 3:12,
  53:18, 94:4,
  134:6.
giving 77:21,
  133:1.
glare 152:17.
glass 20:22.

glasses 7:13,
  156:8.
glommed 93:16.
gloves 154:13,
  156:14, 157:20,
  157:21, 161:20,
  163:22.
GM 6:25, 9:17,
  19:13, 19:16,
  20:13, 24:2,
  57:20, 147:14,
  152:17, 153:14.
Google 19:14, 19:17,
  24:2, 24:5,
  36:10.
Gooseneck 154:24,
  162:20, 163:2.
gotten 158:20,
  159:6, 159:16,
  163:5, 168:17.
GP 112:5, 113:6,
  113:20, 114:5,
  114:12, 116:6.
grabbed 24:19.
grabbing 79:25,
  80:21.
grainy 24:3, 68:2,
  79:2.
grand 100:21.
graphic 62:25,
  63:1.
graphical 72:16.
grass 36:14,
  126:7.
grassy 36:8.
gratuitously
  52:20.
gray 70:8.
great 53:14, 74:2,
  93:20.
Green 11:23, 24:24,
  39:21, 88:4.
ground 28:10, 43:18,
  43:19, 44:3.
grounds 53:21,
  82:22.
group 74:13, 99:15,
  129:21.
gruesome 53:13.
Guerilla 86:20,

86:24, 112:24,
114:4, 118:23,
120:18.
guess 45:2, 45:8,
46:3, 76:22,
103:23, 136:11,
153:3, 161:6,
169:12.
guessing 46:11.
Guilford 18:22,
18:25, 19:3,
19:15, 22:8,
91:22.
guilt 92:20, 96:8,
99:2.
Guilty 14:25, 49:2,
101:12.
gun 41:5, 41:13,
44:1, 46:5, 47:18,
149:18, 157:8,
161:17, 161:18,
167:11, 167:13,
167:14, 167:20,
167:21, 167:25,
168:2, 168:12,
168:17, 168:19.
gun. 27:4.
gunfire 40:6.
guns 40:16,
163:24.
gunshot 40:21,
61:20, 62:8,
63:12, 71:7,
71:20, 78:25.
gunshots 25:5.
guy 36:17, 100:25,
118:6, 129:8,
154:9, 154:10,
156:13.
.
.
< H >.
hair 7:13.
Half 5:12, 34:24,
35:6, 37:25, 78:5,
78:6, 110:11,
110:17, 123:5,
123:10, 123:11.
Hall 118:9, 130:9,
130:14.

Halloween 137:13.
Hand 4:9, 10:15,
16:8, 20:14, 25:1,
26:4, 26:12,
26:25, 43:6, 43:9,
44:5, 45:11,
74:17, 109:5,
109:7, 109:8,
110:19, 127:5,
127:7, 144:19,
159:10, 165:25.
handcuffed 28:10.
handcuffs 27:17,
27:18, 155:25,
156:3.
handed 19:8.
handgun 27:23,
40:24, 40:25,
48:19, 49:1,
157:12, 167:8.
handled 30:6.
handling 127:24.
hands 27:3, 27:7,
44:1, 44:11,
131:7.
Handy 104:21.
hanging 104:14.
happen 41:3, 74:7,
100:8.
Happened 7:3, 9:8,
10:19, 26:13,
36:2, 36:24, 43:5,
44:10, 82:24,
93:5, 93:14,
93:20, 96:4, 99:5,
136:16, 148:22,
148:24, 149:1,
149:10, 154:14,
154:20, 155:3,
155:12, 155:22,
157:14, 164:15.
happening 70:25,
79:16, 131:18,
142:9.
happens 102:18.
happy 75:10.
Harford 51:3.
harm 112:19,
112:20.
Harris 116:5.

hat 25:24, 38:25,
45:5, 45:7.
Hawkins 69:16,
73:1.
head 8:8, 40:13,
40:15, 52:24,
62:9, 63:13,
94:22, 107:24.
headed 22:21,
22:22.
heading 22:23,
154:10.
headquarters
11:22.
hear 23:18, 23:22,
27:12, 29:18,
40:5, 40:20,
41:15, 51:20,
121:12, 121:19,
145:17, 148:19,
150:18.
heard 7:24, 25:1,
25:5, 38:8, 39:5,
39:7, 40:12,
40:22, 46:23,
46:24, 47:17,
51:17, 54:5,
103:13, 105:22,
120:11, 120:12,
141:17, 141:23,
141:24, 143:6,
149:3, 149:5,
163:16, 172:14.
hearing 51:16,
51:24, 91:1,
106:4, 172:4.
hearsay 134:3.
heat 150:22.
Heights 17:25.
held 5:10, 17:22,
56:12, 95:10,
104:19, 104:23,
145:24.
hello 129:12.
help 32:6, 124:23,
125:5, 165:3.
helpful 67:23.
hereby 174:1.
heroin 61:13.
hiding 150:10.

high-crime 5:13.
highlight 113:14.
highlighting 106:23,
  107:6.
hired 17:13, 17:16,
  17:23.
hitting 153:2.
Hoffman 1:27, 16:2,
  17:2, 17:21,
  21:14, 21:17,
  22:2, 23:9, 24:16,
  25:25, 26:7, 28:9,
  28:22, 29:4,
  30:14, 30:16,
  30:23, 48:17,
  66:15, 75:4, 75:6,
  75:16, 75:20,
  78:4, 174:22,
  174:26.
Hold 94:19, 95:20,
  96:13, 96:23,
  97:18, 98:2,
  98:13, 99:1,
  141:17, 145:5.
holding 10:15, 26:2,
  26:4, 26:5, 26:11,
  26:12, 26:25,
  42:16, 95:14,
  97:17, 146:2.
hole 19:11, 20:8,
  20:15, 20:21,
  21:1.
holidays 103:12.
hollering 39:5.
home 37:18, 37:19,
  146:11, 147:3,
  151:9, 156:24,
  157:19, 157:23.
Homewood 23:13,
  24:12, 25:8,
  25:15, 26:13,
  34:11, 34:19,
  35:10, 35:14,
  35:19, 36:5,
  36:25, 37:1, 37:3,
  42:14, 45:5.
Homicide 50:23,
  51:11, 53:18,
  56:17, 57:7,
  57:14, 57:16,

57:22, 58:12,
  59:9, 59:14,
  61:20, 62:8,
  63:15, 63:17,
  69:18, 69:19,
  70:22, 78:16,
  81:24, 82:1,
  83:11, 85:19,
  107:16, 107:20,
  108:1, 108:12,
  109:2, 109:15,
  133:8.
homicides 95:11.
Honorable 1:18.
hoops 96:15,
  103:18.
hope 49:22, 136:11,
  173:4, 173:5.
Hopkins 61:8.
horribly 53:14.
Hospital 58:24,
  61:8, 61:10.
hour 90:8, 166:20,
  166:23.
hours 37:20, 82:3,
  82:8, 82:23,
  122:18, 131:8,
  146:7.
house 7:7, 32:2,
  111:13, 150:8,
  151:22, 153:9,
  153:10, 157:5,
  160:7, 160:10,
  160:25, 169:10,
  169:13, 169:14.
houses 33:13, 34:8,
  37:2, 37:3.
Housing 5:17, 5:18,
  56:16.
huge 76:7.
hundred 24:21.
hung 103:7.
Huntsman 152:21.
husher 68:15.
hypothesized
  102:2.
hypothetical 96:17,
  96:21, 100:11.
.
.

< I >.
ID 11:4, 11:8.
idea 101:8, 161:12,
  168:19.
identified 7:17,
  7:20, 11:6, 19:4,
  23:8, 25:13,
  26:23, 53:3,
  65:23, 72:24,
  80:22, 84:9,
  87:15, 118:3,
  133:24, 140:15,
  149:16, 151:8,
  152:14.
identify 29:5,
  58:25, 65:8, 69:8,
  69:13, 70:6, 72:6,
  79:4, 88:5, 117:7,
  128:23, 151:25,
  156:5, 156:9,
  161:15.
identifying 43:24.
identity 13:7.
II 12:14, 13:11,
  21:24, 22:11.
III 1:41.
IIS 5:6.
illegal 98:7.
image 53:13, 65:11,
  70:11, 73:6,
  76:25, 77:12,
  80:15, 80:20,
  83:5, 106:14,
  109:5.
images 64:23, 65:1,
  67:20, 68:3,
  77:24, 80:4.
imagine 76:11.
immediate 74:11.
Immediately 17:14,
  20:21, 25:8,
  26:22, 26:25,
  27:3, 43:13, 44:2,
  66:16, 83:11,
  152:2, 153:11,
  160:19, 160:22,
  161:2, 161:6,
  161:7, 164:14.
Impact 18:1, 18:2,
  18:5, 18:8,

22:14.
implied 164:23.
important 52:25,
  89:9, 100:5,
  101:9.
Impression 150:23.
in. 60:24.
inappropriate
  74:23.
incarcerated
  143:23.
incident 24:6, 29:7,
  30:20, 45:1, 47:3,
  49:6, 92:2,
  137:17, 146:18,
  146:23, 146:25,
  157:17, 164:15,
  166:20, 169:6.
include 10:21.
Including 93:25,
  94:10, 99:6,
  123:21.
inconsequential
  73:24.
inconsistent
  53:20.
incumbent 105:12.
independent 50:14,
  90:4, 143:12,
  171:2.
INDEX 174:10.
indicate 13:6,
  107:8.
indicated 32:18,
  34:13, 36:21,
  57:6, 64:9,
  119:15, 119:21,
  120:3, 120:5,
  120:11, 134:21.
indicating 23:23,
  26:12, 34:18,
  152:22.
Indicating. 57:23,
  60:15, 69:7, 70:5,
  70:23, 71:22,
  72:5, 78:17,
  153:1.
indication 54:2.
indices 77:3.
indicted 97:4,

97:9.
Indictment 91:4,
  97:5, 102:20,
  105:6.
individual 20:1,
  20:7, 25:12,
  53:16, 66:19,
  69:4, 69:6, 71:3,
  71:5, 71:19,
  71:20, 72:1,
  78:21, 78:23,
  79:9, 79:17,
  79:24, 80:20,
  80:22, 84:4, 84:9,
  85:20, 139:16,
  153:17, 156:15,
  156:16, 162:4.
individuals 19:20,
  19:24, 39:2,
  70:10, 85:13,
  85:17, 152:10,
  152:12, 153:8,
  153:11, 153:15,
  153:19, 155:2,
  162:5.
indulgence 15:6,
  30:14, 142:19,
  159:1, 159:24.
initially 17:23,
  43:23, 152:4,
  152:11.
initiated 14:7.
Initiative 56:22,
  57:3.
inner 131:5.
innocuous 74:20.
input 66:14.
inquire 151:5.
inside 10:1, 28:13,
  110:23, 126:6,
  148:20, 148:22,
  155:17.
Instagram 121:2.
instance 76:15,
  77:1.
Instead 76:11,
  77:24, 133:6.
instruct 75:10.
instructed 30:8,
  44:3, 93:22,

170:20.
instruction 75:22,
  94:4, 94:17,
  101:10, 101:15,
  104:12.
instructions 103:11,
  143:7.
instructs 101:11.
Intelligence 5:5,
  55:25.
intent 92:12, 94:6,
  98:21.
intentions 92:15,
  98:20.
intercede 74:18.
interchange 72:16.
interest 126:13.
interests 3:3.
interfere 74:6.
internet 50:16,
  90:7, 143:14,
  171:3.
intersection 34:13,
  41:20, 63:20,
  64:20, 65:15,
  70:12.
interview 107:17,
  118:25, 119:3,
  119:5, 119:11.
interviewed
  139:18.
interviews 150:11.
introduce 51:13,
  95:25.
introduces 150:20.
invasion 146:11,
  147:3.
investigate
  141:25.
investigating
  112:23, 136:12.
Investigations
  55:20, 57:2.
Investigative 5:5.
investigators
  139:17.
invoked 97:23.
involved 39:3, 91:3,
  91:16, 99:9,
  99:14, 101:19,

101:21, 109:16,
138:15, 139:12,
139:19, 140:19,
150:12, 158:6,
158:8, 169:3,
169:5, 170:2.
involvement 87:2,
90:18, 101:23,
133:8, 140:21.
isolate 78:15.
issue 3:9, 76:7,
90:14, 90:22,
93:9, 97:17,
102:24, 103:3,
104:2, 105:12,
133:22, 172:8.
issues 50:11, 90:1,
103:22, 143:9,
170:24, 171:4,
171:6.
item 114:6.
items 77:9, 108:21,
112:10, 136:14,
157:19.
itself 32:15, 104:4,
123:12.
Iwashko 21:18,
21:22, 22:1.
.
.
< J >.
J-o-s-e-p-h 55:10.
J. 1:25.
Jackson 118:18,
118:20.
jail 116:22, 120:12,
140:23.
Jamaa 112:14,
112:19, 112:20,
112:21, 112:25,
113:21, 113:22,
113:24.
James 1:18, 62:4,
132:20, 140:4,
140:5.
January 170:20.
jeans 8:7, 25:23,
44:16, 45:14,
45:21, 45:22,
46:2, 46:8,

87:16.
Jeffrey 1:33.
Jermaine 18:23.
Jerome 65:9, 70:9,
71:2, 71:6, 71:19,
78:19, 78:24,
79:9.
Jesse 20:6, 20:7.
JKB-16-0363 1:9,
2:2.
John 1:41.
Johns 61:8.
join 75:13, 104:24,
105:10, 127:16,
129:3.
joining 129:21,
130:6.
Joseph 19:5, 19:25,
21:21, 54:22,
55:2, 55:10,
117:16, 118:14,
174:28.
Judge 67:16, 76:25,
94:13, 95:22,
170:21.
judges 104:1.
July 17:13, 56:8,
138:5.
jump 96:15,
103:19.
June 57:10, 137:25,
138:3, 171:22.
jurisdiction 90:22,
91:9, 97:13,
97:15, 97:16,
97:18, 98:3, 98:7,
100:24, 104:3.
jurisdictional
102:24, 103:1,
103:3.
jurors 3:3, 54:3,
76:20, 76:24,
77:1, 170:15.
Juvenile 90:14,
90:17, 92:5,
95:12, 96:5,
96:14, 97:6, 97:9,
97:11, 97:24,
97:25, 100:13,
101:3, 102:22,

103:17, 104:6,
104:10, 127:19.
juveniles 98:19,
104:23.
.
.
< K >.
K-9 155:7, 155:13,
155:14, 156:17,
163:15.
K. 1:18.
keep 24:21, 24:25,
27:7, 36:17, 46:3,
145:15, 162:22.
Kenneth 1:35, 23:1,
33:3, 33:21, 41:8,
48:24, 49:4,
115:11, 115:17,
115:20, 121:17.
kept 7:22.
keying 25:1.
kick 41:11.
kicked 27:20.
killed 108:17,
110:7, 120:11,
120:12, 122:15.
killing 122:18.
kind 13:13, 23:13,
25:24, 27:20,
29:8, 38:9, 38:10,
42:21, 54:2, 70:1,
85:25, 106:24,
124:8, 131:4,
131:5, 137:1,
151:21, 154:23,
154:25, 161:25,
162:15, 162:18,
162:19, 163:6,
167:11, 171:1.
kinds 92:14,
100:9.
King 120:8, 120:11,
137:14, 137:22.
knowledge 92:12,
92:15, 94:6,
141:15, 141:22.
known 17:7, 98:15,
119:22.
knows 150:13.
.

.
< L >.
L-a-n-d-s-m-a-n
  55:11.
La 94:10, 99:6.
lab 13:2, 22:4,
  136:3, 136:6.
label 74:20, 74:24,
  77:11.
labeling 74:3.
labels 73:21, 75:1,
  75:4, 77:10,
  77:19, 77:24.
Laboratory 12:12,
  21:18, 21:19,
  22:7, 22:10.
Lack 85:9, 86:8,
  98:18.
Ladies 3:24, 5:1,
  8:15, 12:18, 23:9,
  24:16, 50:7,
  62:12, 62:22,
  64:13, 68:20,
  76:6, 84:24,
  89:22, 106:2,
  113:10, 143:3,
  145:16, 151:12,
  170:12, 171:8.
Lakeya 119:15.
Landsman 49:21,
  50:22, 51:11,
  54:6, 54:9, 54:14,
  54:22, 54:24,
  55:2, 55:10,
  55:11, 86:14,
  90:11, 106:5,
  122:6, 132:18,
  133:5, 134:19,
  139:11, 140:2,
  142:25, 174:28.
lane 38:13, 38:14,
  38:15, 38:16.
lanes 32:22, 32:23,
  126:22.
language 73:25,
  94:3, 94:8, 113:2,
  114:1.
laptop 75:7.
large 154:13,
  154:25.

larger 135:23.
Larkins 12:11,
  12:14, 13:2,
  13:7.
last 2:21, 3:22,
  4:17, 16:20,
  16:21, 16:23,
  35:18, 44:4, 55:8,
  55:9, 79:10,
  84:18, 92:18,
  103:7, 131:25,
  143:21, 145:2,
  145:9, 151:6,
  170:16, 170:19,
  173:2, 173:3.
lastly 118:8.
later 11:1, 11:12,
  11:14, 18:1, 19:4,
  25:13, 48:19,
  54:7, 54:8, 61:4,
  61:15, 82:8,
  93:16, 93:24,
  94:9, 119:16,
  119:18, 126:25,
  142:8, 142:10,
  157:12, 157:23,
  161:3, 163:12,
  172:13.
lateraled 17:14.
latex 154:13,
  156:14, 157:20.
law 42:21, 42:22,
  50:15, 86:23,
  90:5, 91:17,
  92:10, 94:9,
  95:17, 96:7,
  98:11, 98:18,
  99:9, 99:10,
  103:25, 104:15,
  111:1, 111:21,
  116:13, 143:7,
  143:12, 145:17,
  156:14, 171:2.
lawful 95:14,
  95:16.
lawfully 97:18.
lawyer 74:11, 76:10,
  77:9, 77:10,
  77:14.
laying 28:10.

lead 141:18.
Leading 25:21,
  83:20, 85:5,
  141:18.
leads 133:14,
  134:4.
leap 94:14.
learn 11:12, 11:14,
  61:4, 61:6,
  61:17.
learned 48:19,
  156:25.
least 83:3, 92:17,
  97:5, 98:24,
  146:1.
leave 89:12,
  143:25.
leaving 125:23,
  126:2, 127:9,
  130:2.
lectern 80:10.
left-hand 79:7.
leg 27:21, 28:2,
  28:4, 28:12,
  28:13, 28:15,
  28:17.
legal 3:9, 91:7,
  97:2.
legally 96:25,
  99:15, 102:16.
Lester 118:18,
  118:20.
letter 95:21.
letters 109:8.
level 18:9.
Lexington 95:21,
  95:23.
liable 102:21.
lie 27:8, 112:21.
lied 132:22.
Lieutenant 29:20,
  29:22.
life 95:6, 104:5.
light 24:11, 24:12,
  24:15, 24:24,
  25:7, 37:25,
  39:21, 50:1.
lights 39:15, 39:19,
  148:15.
likely 91:1.

Lil 109:13,
 109:25.
limiting 94:4,
 94:17, 101:10,
 104:11.
limp 117:11.
line 45:12, 133:12,
 139:1, 139:6,
 155:15, 162:10,
 162:17, 162:21,
 163:5, 163:7,
 163:9, 163:17.
lined 3:7.
lines 38:16, 74:7.
liquor 60:7, 64:2,
 64:10, 66:2,
 80:19, 82:13,
 85:24, 87:24.
Liquors 60:10, 64:7,
 66:7.
list 103:20.
listed 92:13,
 105:7.
little 17:18, 24:3,
 31:9, 32:3, 33:21,
 34:20, 36:1,
 41:24, 60:11,
 62:24, 64:10,
 68:2, 74:19, 77:8,
 77:11, 77:12,
 77:25, 112:13,
 113:12, 135:21.
live 29:11.
lived 37:16, 111:24,
 116:18, 150:5,
 150:15, 158:11,
 158:16.
loaded 29:10.
locate 156:17.
located 11:3,
 111:22, 152:25,
 157:6.
location 11:2, 21:2,
 147:15.
Locke 62:4, 62:7,
 62:10, 62:17.
locked 148:10,
 148:11.
lodged 44:12.
Lombard 1:48.

long 2:20, 5:7,
 17:9, 56:6, 56:9,
 75:18, 77:21,
 78:2, 119:22,
 131:13, 143:20,
 145:21.
longer 89:17, 97:9,
 151:2, 168:12,
 168:13, 171:11.
Look 7:22, 23:19,
 37:1, 50:15, 60:6,
 73:8, 77:2, 81:21,
 90:6, 93:5, 94:13,
 97:12, 104:1,
 131:12, 143:13,
 154:3, 154:4,
 154:9, 159:4,
 165:8, 165:21,
 165:23.
looked 19:9, 26:3,
 40:15, 70:10,
 80:5, 104:4,
 114:11, 131:12,
 135:17, 137:9,
 148:15, 151:19,
 156:18.
looks 36:5, 67:7,
 70:17, 88:23,
 126:5, 127:17,
 131:2, 131:4,
 131:6, 131:15.
loop 25:10, 72:21,
 78:11, 78:19,
 79:3, 79:13,
 88:18.
loose 150:21.
loose-leaf 115:25.
lose 36:18.
lost 162:9,
 162:10.
lot 27:13, 36:8,
 36:10, 36:12,
 36:13, 36:21,
 37:1, 37:2, 37:3,
 37:4, 37:7, 40:23,
 92:24, 99:9,
 151:3, 158:7.
lots 76:23, 99:5.
loud 149:4.
Lower 27:22, 27:23,

46:5, 135:23,
 153:3, 153:4,
 153:5.
lunch 89:16, 89:23,
 144:3, 171:11,
 171:12.
lying 59:25.
  .
  .
< M >.
ma'am 16:25, 29:3,
 55:5.
machine 32:5.
Madame 144:18.
magnum 29:9.
mail 116:22.
main 37:14, 37:15,
 37:19.
Major 18:3.
majority 99:14,
 168:8.
male 149:15, 160:14,
 168:10.
males 19:3, 23:20,
 23:21, 160:16,
 161:14.
Mallard 152:21,
 154:10.
man 7:12, 52:16,
 52:21, 160:20.
manner 62:7.
manufacture 14:12.
maps 19:14, 19:17,
 24:2, 24:5,
 36:10.
March 49:7.
mark 24:8, 67:5,
 67:8.
marked 9:17, 9:24,
 10:13, 14:2, 31:9,
 31:25, 33:2,
 33:20, 35:21,
 48:20, 76:12,
 80:7, 80:11,
 109:9.
marker 60:20,
 135:23.
markers 135:21,
 136:1, 136:2,
 136:3.

marking 67:3,
    69:20.
markings 59:19,
    78:13.
marks 67:10,
    67:12.
Marquise 1:39,
    156:12.
MARSHAL 28:24,
    28:25, 29:2.
Marshals 2:10.
Marta 21:18.
Maryland 1:2, 1:20,
    1:49, 51:2, 62:4,
    132:22, 145:20,
    147:13, 147:17,
    158:21, 159:17.
matching 157:21.
material 134:8.
matter 62:11, 74:22,
    77:20, 90:17,
    91:6, 103:4,
    133:13, 171:11,
    171:15, 172:6,
    174:3.
matters 12:19.
mean 14:24, 35:3,
    36:7, 38:5, 38:9,
    41:1, 94:22,
    95:17, 96:5,
    97:20, 99:8,
    99:18, 101:18,
    102:21, 133:22,
    139:7, 149:1,
    161:6, 162:14.
meaning 97:9.
means 113:4,
    114:3.
meant 8:16.
meanwhile 75:22.
meat 23:23.
media 74:5, 74:25,
    100:13.
medic 58:20, 58:23,
    61:3.
Medical 62:5,
    63:9.
meeting 84:11, 85:2,
    85:22, 85:25,
    86:1, 86:6, 87:3,

87:7, 95:1, 95:4,
    95:10, 124:10,
    124:12, 125:19,
    127:16, 129:5,
    154:23.
member 120:13,
    120:20, 120:22,
    120:24, 120:25.
members 26:8, 86:24,
    95:22, 109:21,
    112:20, 170:16.
memory 159:8,
    166:16.
mention 128:25,
    172:6.
mentioned 81:14,
    81:18, 88:12,
    121:14, 144:2,
    171:10.
menu 77:9.
mere 92:5.
message 128:13.
MET 5:15, 11:22,
    150:15, 154:25,
    155:1, 158:17,
    158:18, 169:8.
microphone 4:16,
    16:20, 17:17,
    55:8, 145:1,
    145:15.
middle 20:12, 36:17,
    65:22, 66:18,
    67:9, 88:4,
    127:22, 173:10.
middleman 84:20.
Miller 29:20,
    29:22.
Mind 17:17, 67:5,
    67:12, 91:17,
    125:14, 144:1,
    150:1, 150:24,
    161:6, 162:17.
minimum 92:10.
minority 168:9.
minute 7:9, 81:11.
Minutes 2:22, 3:4,
    11:1, 49:22,
    50:17, 51:6, 66:1,
    67:25, 75:20,
    76:16, 78:5, 78:6,

89:19, 90:8,
    131:14, 143:15,
    144:7.
Miranda 29:16,
    29:19, 46:20,
    158:2.
misconduct 94:20,
    98:14, 99:20,
    105:13.
mistake 92:12.
model 45:23.
modern 76:19.
moment 8:2, 8:11,
    49:21, 61:2,
    66:14, 68:22,
    71:10, 78:12,
    96:12, 110:10,
    139:6, 150:22.
moments 37:10,
    137:10.
Monday 1:19.
money 61:14.
month 68:8, 110:25,
    138:4.
morning 2:6, 3:5,
    3:24, 4:24, 4:25,
    17:3, 31:6, 31:7,
    49:24, 50:8,
    123:22, 125:10,
    146:7, 146:10,
    146:22, 171:9,
    173:23.
mother 111:12.
motion 44:4,
    53:21.
motions 51:23, 91:1,
    133:3.
mouth 9:11, 9:21.
Move 17:19, 17:20,
    60:18, 66:2,
    68:20, 76:21,
    79:1, 79:12,
    84:18, 110:24.
moved 17:25.
movie 159:21, 169:7,
    169:9.
movies. 150:16.
moving 113:12,
    131:7.
Muller 148:4, 148:5,

160:8, 162:21.
multiple 142:9,
  142:13.
Mund 60:17, 64:11,
  64:14, 81:15,
  83:16, 87:4,
  106:10, 106:16,
  106:22, 107:5.
murdered 119:12,
  137:14.
murders 95:7, 95:24,
  95:25, 96:4.
Muslim 120:5.
Myself 17:20, 20:17,
  23:24, 26:23,
  43:24, 155:5,
  155:16, 162:21.
.
.
< N >.
N-o-d 140:9.
N-word 121:20.
Naim 120:8, 120:11,
  137:14, 137:22.
Name 3:18, 3:20,
  3:22, 4:17, 14:9,
  16:20, 16:21,
  16:22, 16:23,
  49:3, 55:8, 55:9,
  96:4, 110:2,
  114:23, 114:25,
  115:7, 115:13,
  121:3, 122:1,
  137:14, 140:6,
  145:2, 145:3,
  145:8, 145:9,
  148:3, 156:11,
  174:12.
named 116:2,
  121:15.
names 114:18,
  114:21, 128:22.
narcotics 5:21,
  6:21, 18:10,
  19:8.
nature 75:23,
  141:15, 141:22,
  141:23.
navigate 36:13.
near 38:10, 63:20,

136:25.
nearby 123:3.
necessarily 35:5,
  94:16, 100:6.
necessity 12:16,
  21:25, 62:10.
neck 115:12.
need 7:16, 52:4,
  66:14, 68:21,
  75:16, 78:3,
  102:7, 105:20,
  121:9.
needed 27:9.
needs 76:8, 77:22,
  92:8, 96:23.
neighborhood 6:1,
  86:25, 109:22,
  123:18, 124:3.
neighborhoods
  5:23.
neither 49:20.
news 50:10, 89:25,
  143:8, 170:23.
nickname 109:25,
  121:23.
nicknames 59:4.
night 29:7, 38:3,
  111:14, 119:18,
  158:21, 159:17,
  169:11, 169:13,
  169:15, 173:3.
nine 131:17.
Nique 59:5,
  120:12.
No. 1:9, 10:6,
  12:13, 12:15,
  12:16, 19:13,
  19:23, 20:5,
  21:15, 21:17,
  21:24, 22:3,
  28:14, 30:17,
  33:3, 35:23,
  35:24, 36:23,
  38:15, 39:13,
  39:19, 40:2,
  41:20, 41:25,
  44:10, 47:7,
  48:21, 125:9,
  133:22, 156:16.
Nod 140:7, 140:8.

noise 23:23,
  149:11.
noises 149:4.
nolle 96:10.
none 133:19.
nonetheless 95:3.
nonfatal 57:1.
nor 103:4, 148:18.
normally 171:12.
north/south 91:22.
northbound 25:14,
  35:19, 35:25,
  36:1, 38:15,
  42:14, 45:4.
Northeast 5:11.
NORTHERN 1:2.
Northwest 17:24.
note 47:4, 100:5,
  105:1, 115:25,
  173:7.
Nothing 12:20,
  37:11, 53:13,
  68:6, 146:17.
notice 62:25, 74:7,
  133:2.
noticed 148:15.
notified 83:14.
noting 48:4.
notion 134:6.
number 10:2, 22:9,
  31:24, 41:1,
  48:24, 103:18,
  150:23, 157:9.
numbers 31:18, 32:1,
  32:2, 32:13,
  52:11, 110:14,
  114:17, 114:18.
.
.
< O >.
o'clock 82:4, 90:13,
  90:14, 123:14,
  171:14.
Oakhill 34:6, 34:7,
  36:25, 37:2,
  40:3.
Oakville 34:5.
oath 4:9, 16:8,
  106:5, 132:23,
  144:20.

object 52:23, 53:7,
   82:21, 105:16,
   165:15.
objected 74:17,
   139:5.
objecting 52:19,
   53:6.
objections 53:2.
objects 19:7, 19:11,
   20:8, 20:14,
   21:1.
observe 19:1,
   25:25.
observed 19:2, 20:1,
   20:10, 20:14,
   20:25, 23:19,
   24:17, 25:12,
   25:17, 26:5.
obtain 63:23, 64:6,
   64:16, 108:13.
obtained 12:9,
   21:20, 81:18.
obviously 45:21,
   74:12, 79:2,
   103:11.
occasion 68:23,
   137:24.
occupants 156:23.
occur 77:4.
occurred 24:6,
   69:18, 70:22,
   79:17, 85:20,
   91:21, 92:2,
   98:14, 136:15,
   137:18.
occurring 71:21,
   78:14, 78:16,
   79:14, 105:13,
   129:18, 150:23.
occurs 69:19,
   104:18.
OCME 62:4.
October 56:10, 57:4,
   102:20, 119:7.
odd 97:20.
Offender 18:3.
offenders 18:10.
offense 14:11,
   42:20, 45:1,
   47:11, 93:11,

   96:20, 98:11.
offered 105:21.
Office 11:20, 62:4,
   63:9, 107:16,
   108:1, 108:12,
   109:2.
Officer 5:20, 47:14,
   56:4, 58:6, 146:1,
   146:5, 147:20,
   163:2, 163:15,
   165:21.
officers 58:14,
   155:5, 162:23,
   163:6, 163:8.
Official 1:47,
   174:7.
old 76:9, 76:15,
   97:23, 99:17.
older 97:4, 97:8.
Oldfield 162:19,
   162:24.
Once 26:13, 27:16,
   53:16, 102:4,
   106:5, 127:20,
   159:3, 160:23,
   165:22.
one. 73:3, 79:12.
ones 82:13,
   112:18.
Open 9:25, 28:12,
   28:16, 28:17,
   29:4, 46:8, 50:6,
   68:19, 76:5, 83:8,
   84:22, 89:21,
   92:18, 108:20,
   123:18, 134:16,
   139:9, 146:19,
   151:4, 154:23.
opened 123:15,
   148:17.
opening 90:24.
operate 67:3.
operates 100:4.
operating 129:10,
   129:15.
Operation 55:25.
Operations 56:15.
operator 83:14,
   131:22.
opinion 93:5, 93:15,

   93:17, 94:10,
   95:20.
opinions 94:2.
opportunity 78:3,
   92:12, 104:1,
   151:15, 159:8,
   165:22.
opposed 78:1.
option 17:19.
options 81:10.
orange 20:22, 21:19,
   22:9.
order 27:6, 28:2,
   75:3, 101:11.
ordered 43:13,
   43:18.
ordinary 102:4.
Organized 6:6.
others 130:6,
   139:5.
Otherwise 51:22,
   91:17, 144:6.
ourselves 20:19.
outside 51:16,
   106:4, 109:6,
   126:5, 127:3,
   152:13, 161:8,
   161:10, 172:4.
overall 74:9,
   74:12.
overarching
   105:18.
overnight 170:13,
   171:16.
Overruled 25:22,
   85:15, 86:4, 87:6,
   138:20, 139:7,
   139:10, 139:22,
   141:20, 147:2,
   149:22.
oversaw 30:7.
overt 95:5, 100:5,
   100:9, 104:8,
   105:6.
overview 152:20.
own 47:12, 67:12,
   91:17, 95:8.
owner 157:16,
   168:20.
.

.
< P >.
p.m. 18:14, 22:13,
  22:21, 58:13,
  82:4, 82:6, 82:8,
  124:1, 144:5.
packaging 19:8.
Page 48:25, 65:9,
  70:9, 71:2, 71:6,
  71:19, 78:19,
  78:24, 79:9,
  174:12.
palm 109:6.
pan 128:2, 142:2.
panning 129:15,
  129:16.
pans 65:14.
pants 21:8, 27:21,
  27:23, 28:2, 28:4,
  28:12, 28:13,
  28:15, 28:17,
  44:9, 46:6, 81:6,
  84:5, 85:22,
  130:17, 154:7,
  161:23, 161:24,
  161:25, 162:2,
  162:3.
paper 76:11,
  114:17.
papers 76:20.
paperwork 11:21,
  114:9.
Paragraph 12:4,
  21:15, 61:22,
  62:2.
pardon 26:19.
Park 17:25, 60:11,
  60:14, 60:16,
  60:17, 64:11,
  64:14, 81:15,
  83:16, 84:4,
  85:13, 87:4,
  106:10, 106:16,
  106:22, 106:23,
  107:5, 111:15,
  119:17, 119:21,
  122:21, 126:6,
  126:8, 141:6,
  142:4.
park. 85:18.

parked 9:19,
  32:25.
Part 18:7, 21:14,
  33:14, 46:5, 46:7,
  47:8, 53:19,
  63:15, 63:23,
  64:7, 68:5, 77:21,
  81:19, 92:18,
  95:13, 95:25,
  111:17, 121:1,
  122:17, 123:11,
  123:18, 123:24,
  124:3, 125:1,
  125:6, 126:5,
  140:13, 164:16.
parted 96:2.
participants 50:12,
  50:13, 90:3, 90:4,
  90:6, 143:10,
  143:11, 143:14,
  170:25, 171:1.
participate 71:12,
  80:3, 82:12, 99:4,
  100:17, 106:14,
  106:15, 171:12.
participated 93:6,
  95:23.
participates 93:11,
  96:18.
participating 86:16,
  171:4.
participation 99:3,
  101:13, 114:19.
particular 8:3,
  18:11, 38:8, 60:7,
  60:12, 74:7,
  77:14, 88:15,
  99:15, 100:6,
  105:17, 114:15,
  133:19, 142:10,
  168:11.
parties 12:5, 12:11,
  21:22, 62:7.
partner 18:23,
  150:7, 150:8.
parts 64:16,
  122:14.
party 23:21.
pass 76:20, 78:21.
passed 71:19, 76:12,

  76:14, 161:14,
  161:16.
passes 71:5, 78:23,
  79:10.
past 26:5, 40:3,
  64:10, 79:9,
  87:24, 94:14.
pastel 25:24.
path 126:3.
Patrol 5:12, 17:24,
  56:14, 56:15,
  56:20, 134:25,
  145:25, 146:5.
pattern 96:25.
Paul 1:31.
Pause 66:16, 68:25,
  113:9.
paying 38:7, 38:9.
PD 145:21.
pen 13:6, 14:11,
  35:11, 42:4,
  113:23, 117:15.
pending 166:8.
Pennsylvania 56:22,
  56:24.
perceptions 73:11.
perfectly 73:20,
  101:9.
Perhaps 2:16,
  75:4.
perimeter 155:6,
  162:12, 162:14,
  162:16, 162:20,
  163:11, 163:12,
  163:14.
period 124:6,
  171:15.
permission 61:22.
personal 47:23,
  90:21, 141:15,
  141:22.
persons 133:8,
  171:4.
perspective 96:3.
pertinent 67:25.
Peter 1:25.
phases 104:5.
PHCS 28:6, 28:14,
  52:11, 59:16,
  60:1, 60:18,

60:24, 64:2, 65:2,
65:10, 80:12,
106:19, 107:2,
107:23, 108:7,
135:16.
PHE 10:14, 30:17.
Pheasant 147:13,
147:16, 152:21,
152:24, 152:25,
156:20, 158:11,
158:21, 159:17,
167:9.
PHI 19:23, 20:5,
59:6, 107:11,
115:18.
phone 10:22, 100:12,
114:17.
photo 59:21, 60:2,
60:18, 64:1,
64:10, 80:12,
81:3, 106:22,
107:23, 108:4,
109:10, 121:2.
Photograph 59:19,
59:23, 60:3, 60:5,
63:12, 65:19,
76:13, 76:25,
80:4, 106:21,
107:4, 108:1,
108:9, 108:11,
110:14, 110:18,
110:19, 114:9,
117:2, 118:11,
118:14, 136:25.
photographed 63:8,
107:19, 109:1.
photographs 59:14,
63:2, 76:12,
108:8, 109:2.
photos 19:24, 28:6,
30:17, 51:12,
60:23, 62:25,
106:15.
phrase 112:25.
PHT 109:4, 109:10,
110:12, 110:16.
pick 136:8, 136:16,
136:18, 136:20,
153:7.
picture 10:10,

10:12, 10:13,
10:14, 24:5,
28:11, 35:18,
36:3, 36:4, 36:10,
41:23, 52:14,
52:15, 52:16,
52:17, 52:20,
63:5, 63:11,
107:3, 117:8,
135:23.
pictured 71:3.
pictures 53:2.
Piece 74:9, 114:14,
114:17.
pieces 73:9,
114:9.
pink 23:4, 25:24,
38:25, 45:5, 45:7,
115:11, 126:12.
place 20:7, 20:25,
24:18, 79:5,
130:25, 131:9,
136:1, 136:2,
157:17.
Placed 4:9, 11:9,
16:8, 19:11,
20:15, 21:4,
27:16, 27:18,
144:20, 155:25,
156:2, 165:18.
places 136:3.
placing 74:25.
plain 18:23, 20:19,
39:9, 39:10.
Plaintiff 1:7,
1:23.
plan 90:13, 92:12,
171:8, 172:19.
play 66:13, 71:9,
72:21, 77:10,
79:22, 82:11,
83:4, 83:9, 85:6,
86:10, 87:8,
88:10, 121:7,
124:22, 125:1,
125:9, 142:5.
played 125:10.
played. 69:24,
70:16, 71:17,
71:24, 72:11,

87:9, 87:13, 88:2,
88:11, 88:17,
121:10, 142:6.
playing 125:12,
125:16, 173:8.
plays 72:22, 79:3,
79:13, 104:25.
Please 4:6, 4:8,
4:15, 5:2, 16:4,
16:7, 16:19,
50:17, 51:17,
53:24, 54:24,
55:7, 55:18,
56:11, 72:4,
82:19, 84:14,
89:2, 90:9, 90:16,
128:16, 143:15,
144:13, 145:1,
145:17, 171:9,
171:16, 171:19.
pocket 19:6, 20:2,
21:9.
podium 113:15.
point. 74:18, 77:19,
89:8, 100:18.
pointed 27:1, 43:25,
64:3, 115:5.
pointer 117:13.
pointing 40:16.
Police. 148:24.
pop 36:15.
portion 48:6, 52:20,
60:12, 66:18,
67:20, 67:22,
79:7, 79:16,
80:19, 93:15,
112:9.
portions 64:24,
73:12.
portrayed 74:22.
posit 100:11.
posited 96:17.
position 26:6,
27:11, 40:14,
41:17, 91:2,
102:15, 139:2,
173:13.
positioned 84:4,
84:11.
positions 5:9,

17:21, 56:11,
68:18, 145:23.
positive 10:23,
11:4, 11:8.
positively 11:6.
possession 44:23,
48:9, 48:20.
possible 49:25,
73:20, 125:20,
132:19, 132:24,
162:16.
post-18 100:16.
posted 100:12,
121:3.
potential 135:9.
potentially 83:15,
134:4.
Powell 81:9.
practical 103:4.
practice 102:1.
pre-18 96:7.
predates 105:8.
preference 51:10.
prejudicial 73:22,
74:21, 77:6.
preliminary 83:10.
premajority 94:5,
99:1.
premise 99:18.
prepare 173:9.
prepared 3:10,
21:18, 44:20,
45:1, 62:4,
172:25, 173:14.
prerequisites
101:3.
presence 90:22,
149:3.
present 58:14,
58:16, 113:11.
presentation
73:18.
presented 90:17,
90:24, 90:25,
91:15, 105:17,
171:4, 171:7.
presents 50:11,
90:2, 143:9,
170:25.
presumably 144:2.

presumed 102:5.
pretend 113:16.
pretrial 133:3.
Pretty 31:17, 46:9,
68:9, 104:3,
145:6, 148:25,
154:12, 168:5.
previously 118:3.
principle 96:23,
99:22, 100:4,
102:7.
principles 98:9.
Prior 17:11, 66:10,
102:17, 103:21,
105:13, 158:2,
160:24.
prisoners 143:23.
private 124:2,
124:10, 124:12,
130:5.
probable 165:6.
probably 3:4, 163:8,
166:20, 171:12.
probative 52:21,
92:14.
problem 73:17,
75:23, 77:8,
113:13.
problems 68:23,
145:5.
procedure 96:13,
137:6.
procedures 97:23.
proceed 29:3, 40:3,
113:18, 134:15.
proceeded 24:25.
proceeding 39:23.
Proceedings 1:17,
50:6, 68:19, 76:5,
83:8, 84:22,
89:21, 133:13,
134:16, 139:9,
146:19, 151:4,
173:25, 174:3.
proceedings. 68:25,
113:9.
process 74:6,
165:16.
processed 136:22.
produce 173:15.

produced 19:7.
Proffer 82:25,
149:24, 149:25,
150:3.
program 144:5.
progress 76:22,
76:23, 147:4.
progressed 25:10.
progressing 25:7,
26:16.
projected 93:4.
promoted 56:18,
56:19.
pronounced 61:7.
proof 101:19,
101:20, 105:13.
properly 30:6.
properties 56:16.
property 30:21.
proposition 91:7,
93:17, 94:15,
96:7.
prosecution 93:9.
prossed 96:10.
protected 93:12.
protection 97:6.
prove 84:2, 97:14,
97:15.
proved 83:25.
proven 12:20,
95:12.
provided 97:14,
140:16, 140:19,
141:8.
providing 141:11,
141:14, 141:22.
proximity 136:15.
prudence 103:5.
Public 5:17, 5:18,
56:16, 124:3,
126:10.
published 76:13.
pull 41:4.
pulled 26:17, 36:4,
41:2, 42:24,
131:24, 132:2.
pulling 17:17.
punches 41:9.
punching 39:7.
purchase 6:21,

10:23, 10:24,
13:17, 13:19,
13:20, 13:23,
14:7, 15:4.
purchased 10:10,
13:3, 13:8.
purchases 5:21.
purely 54:9.
purpose 94:5,
129:16, 135:8.
pursue 36:13,
153:21.
pursued 153:19.
pursuing 36:7,
133:11.
pursuit 36:17.
push 45:18, 45:19.
pushed 73:22.
put 20:13, 47:9,
48:3, 64:1, 73:14,
77:10, 77:14,
77:17, 78:10,
137:6.
putting 63:3, 77:15,
78:2, 103:2.
.
.
< Q >.
Quail 152:21, 154:3,
154:9, 154:16,
154:24, 155:20,
162:7, 162:8,
167:5.
qualifies 76:9.
questioning 16:15,
133:12, 169:10.
quick 41:4.
quickly 40:23, 43:5,
76:21, 145:6,
149:16.
quite 100:24.
quizzing 170:17.
quote 30:1.
.
.
< R >.
R. 1:41.
racing 150:1.
racketeering 99:10,
100:5.

radio 23:25, 24:19,
25:1, 43:5.
raise 3:13, 4:8,
16:7, 144:19.
raised 3:10, 27:3,
54:6, 172:7.
raises 89:8.
Ran 9:20, 26:1,
149:9, 150:6.
rank 5:4, 6:4,
55:24, 146:2.
rapid 40:20,
40:22.
rather 101:10.
ratification 99:2,
100:3, 100:16,
101:8, 102:2,
102:8.
ratify 99:3, 101:13,
101:24.
raw 71:11.
re 164:18.
re-arraignment
51:21.
re-enacting 84:18.
reach 99:13,
100:16.
reached 19:6,
148:13, 154:20,
154:22.
Read 12:4, 12:6,
14:9, 21:14, 32:2,
46:20, 49:3, 49:5,
61:22, 112:18,
112:21, 158:2,
159:3, 165:11,
165:13.
reading 94:11,
94:13, 166:10.
reads 12:7, 62:2.
Ready 2:3, 3:13,
3:25, 8:1, 8:13,
8:16, 8:17, 8:19,
51:8, 54:12,
58:24, 78:7,
105:23, 106:3,
106:4, 144:9.
real 76:14, 76:19,
110:2.
real-time 75:15.

really 28:11, 31:20,
32:14, 68:21,
73:23, 74:1, 77:5,
99:12, 130:5,
133:16, 135:8.
rear 148:7.
reason 37:12, 53:6,
105:9, 173:12.
reasoning 98:10.
Reboot 68:12, 68:14,
68:15, 68:22.
Rebooting 68:13.
rebuttal 100:19.
recall 8:3, 8:9,
12:18, 39:2,
42:13, 54:8, 93:7,
147:5, 147:8,
147:10, 154:6,
159:22, 169:10.
recap 84:25.
receive 139:11.
received 2:14,
132:18, 132:24,
134:22, 138:14,
139:15, 140:17,
140:18, 141:10,
148:16.
receiving 116:22.
recess 50:8, 51:7,
90:15, 143:4,
144:8, 170:13,
171:14, 173:21,
173:24.
recognize 10:5,
12:25, 14:3,
62:14, 63:5, 66:5,
72:13, 80:12,
108:21, 112:6,
114:6, 117:2,
117:7, 118:11,
147:15, 160:25,
161:3.
recognized 160:23,
161:7, 161:9.
recollection 30:2,
38:24, 158:24,
159:13, 165:3,
165:17, 166:2,
166:9, 166:11.
reconvene 50:17.

Record 2:2, 7:16,
  7:19, 14:6, 21:15,
  23:7, 53:4, 54:5,
  62:14, 69:1, 78:7,
  93:18, 105:1,
  114:11, 174:3.
record. 49:18,
  67:18, 73:7,
  82:20, 84:16,
  89:1, 89:3,
  132:16, 138:23,
  146:14, 149:23.
recording 13:17,
  13:19.
Recover 59:10,
  59:12, 108:16,
  136:6, 157:18.
recovered 20:22,
  21:8, 21:10, 22:4,
  28:18, 29:6,
  29:10, 30:20,
  59:20, 60:21,
  61:9, 116:7,
  157:8, 157:20.
red 24:11, 24:15,
  24:24, 64:3,
  69:12, 73:1,
  130:8, 130:12.
redid 68:7.
Redirect 15:20,
  48:15, 48:16,
  141:2, 141:3,
  169:17, 169:18,
  174:26, 174:36,
  174:44.
reenacting 84:12.
reenactment 84:23.
refer 73:9.
reference 2:7, 74:8,
  74:14, 74:19,
  84:18, 84:23,
  171:6.
referenced 12:23,
  95:21.
references 112:13.
referring 52:4.
reflect 7:19, 14:21,
  23:7, 53:13,
  92:11.
reflective 53:14.

refresh 158:24,
  159:8, 165:3,
  165:17, 166:1,
  166:11.
refreshed 159:13,
  166:16.
regard 96:1,
  104:16.
regarding 12:15.
Regardless 2:17,
  74:23.
Regime 117:18,
  121:2, 121:23.
regular 144:6.
reiterate 105:12.
relabel 75:8,
  75:17.
relate 50:12, 90:2,
  143:10.
related 50:15,
  77:12, 90:6,
  136:14, 143:13.
relates 74:12.
relating 44:23,
  91:21.
relation 65:24,
  82:1, 82:5, 90:22,
  95:11, 133:13.
relationship 115:21,
  158:14.
relative 20:10.
relevance 82:22,
  136:8.
relevant 52:18,
  64:21, 64:24,
  74:12, 74:25,
  77:6, 79:5, 83:1,
  83:15, 83:18,
  83:25, 84:2, 84:8,
  85:2, 85:12,
  171:3.
rely 99:2.
remain 30:4,
  106:5.
remainder 71:9.
remaining 127:17.
remains 131:25.
remanded 173:24.
Remember 36:9,
  106:11, 109:14,

142:11, 151:13,
  154:5, 158:23,
  159:5, 161:19,
  161:24, 165:10,
  168:7, 170:16.
remind 116:6.
remove 28:3.
removed 28:5,
  108:11.
renamed 18:1.
rendering 47:8.
renders 96:20,
  99:25.
rental 39:20.
rented 39:19.
Repeat 18:3.
repeatedly 93:21.
Rephrase 83:23,
  146:20, 164:25,
  167:3.
replied 29:24.
Reporter 1:47,
  174:7.
reports 47:5, 47:22,
  47:23, 50:10,
  50:12, 90:1, 90:2,
  143:8, 143:10,
  170:24.
representation
  31:15, 33:4,
  35:24.
required 75:3,
  94:17.
requirement 94:3.
requires 91:18.
Res 150:19, 151:2.
residence 111:22,
  112:3, 112:11,
  116:9, 147:19,
  147:24, 148:1,
  148:6, 148:8,
  148:23, 150:11,
  150:14, 151:20,
  151:24, 153:12,
  153:17, 156:22,
  157:2, 157:21,
  158:16, 158:19,
  159:22.
residents 149:17,
  151:9, 152:11,

152:13, 160:25.
resolve 94:16,
103:6, 104:15.
resolved 103:10,
106:3.
resolves 91:13.
respect 13:3, 70:25,
74:18, 93:1,
95:16, 105:12,
142:8, 171:4.
respond 30:11,
146:23, 146:25,
147:9, 163:16.
responded 57:14,
131:21, 134:22,
147:3, 147:13,
147:18, 158:6.
responding 67:13,
131:19.
response 99:19,
120:19, 134:21,
158:13, 158:23.
responsibilities
18:7.
responsibility
99:19.
responsible 47:10,
95:14, 99:21,
104:19, 104:24,
138:18.
rest 72:10,
103:14.
restate 166:4.
result 44:17, 44:20,
140:12.
results/schedule
22:10.
resume 68:17, 69:23,
70:15, 71:16,
106:3.
resuming 90:8.
retaliatory
137:22.
retrieve 27:24,
30:24, 41:5,
49:15.
return 9:14,
90:12.
returned 100:21,
102:19, 157:16,

168:20.
reveal 157:11.
revealed 112:22,
157:12.
review 66:10,
103:10, 121:2,
165:22.
reviewed 86:1,
159:12.
revisit 3:9.
Revolver 28:16,
29:9, 30:19, 41:3,
41:7, 41:8, 157:6,
167:12.
rewind 66:16.
right-hand 71:25.
rights 46:21,
158:2.
ring 25:2.
RIP 109:13.
river 162:17,
162:23, 162:25.
Road 104:25, 126:3,
126:4, 126:18,
162:19, 162:23.
robberies 57:2.
robbery 146:11,
158:6, 169:24,
170:1.
rock 12:8, 21:20,
22:9.
rock-like 20:23.
rode 127:21.
rolling 75:15.
Ronnie 118:9, 130:9,
130:14.
room 116:8, 156:8.
roped 122:22.
Roscoe 115:13,
121:12, 121:15.
rotates 65:14.
rough-housing
23:24.
roughly 24:13, 30:2,
31:19.
round 29:12,
40:23.
rounds 40:23, 41:2,
167:21, 167:22,
167:23.

route 37:18.
row 33:13, 34:8.
RPR 1:46, 174:1.
Rule 91:14, 92:14,
94:4, 96:1,
173:11.
ruled 76:25.
rules 112:9,
113:21.
ruling 92:4.
rumor 141:23,
141:24, 141:25.
run 30:6, 37:6,
72:10, 79:24,
133:14, 157:8.
running 25:13,
25:16, 26:2,
26:11, 26:15,
26:21, 36:9,
36:11, 42:8, 42:9,
42:16, 44:8, 45:4,
45:8, 47:8, 79:17,
87:24, 131:11,
149:11, 149:13,
150:5, 151:8,
151:23, 164:6,
167:4.
runs 33:10, 79:15.
rushing 149:15.
rustling 155:15,
163:16.
.
.
< S >.
S-a-i-l-o-r 16:23.
S-e-n-d-y 3:21,
4:19.
Safe 28:2, 28:23,
28:25, 29:1, 29:2,
47:8, 55:20, 57:4,
148:17.
safely 28:5.
safest 46:1.
safety 45:20.
Sailor 16:3, 16:4,
16:9, 16:22,
16:23, 17:3,
17:17, 22:2, 22:3,
24:1, 27:5, 29:4,
31:6, 32:18,

48:18, 174:20.
San 17:6, 31:23.
Sargeant 54:6.
satisfied 97:13,
  101:4, 104:4.
satisfying 98:24,
  104:15.
saved 50:2.
saying 24:20, 37:5,
  47:18, 85:1,
  100:15, 102:25,
  104:12, 128:6,
  129:12, 161:2.
says 22:6, 32:7,
  48:23, 49:1,
  73:10, 74:20,
  93:18, 105:7,
  113:22, 113:23,
  150:12, 150:14,
  173:11.
SC 14:3, 48:21.
scenario 95:19.
scenes 28:7.
Schedule 12:14,
  13:11, 21:23,
  143:22, 170:11.
scheduled 2:5,
  143:21.
scheduling 144:6.
scheme 95:13.
scooter 129:11,
  130:1.
screaming 23:18,
  40:16.
screens 76:10,
  77:2.
screenshots 64:23,
  106:15.
search 21:6, 108:13,
  111:17, 111:21,
  114:10, 116:14,
  118:24, 138:3,
  156:17, 157:2.
searched 21:2,
  157:23.
searches 171:3.
seat 4:14, 144:25.
seated 16:18, 23:4,
  51:17, 84:10,
  88:8, 90:16,

106:6, 107:9,
  115:11, 118:3,
  144:13, 171:19.
second 24:1, 37:9,
  40:5, 40:7, 79:10,
  102:19, 113:8,
  127:24, 149:4,
  150:2, 150:16,
  153:8, 153:25,
  156:13, 156:18,
  157:7, 172:13.
seconds 9:10, 88:10,
  129:19, 141:6,
  142:5, 163:9,
  163:12.
Section 5:5, 12:12,
  18:11, 21:19,
  22:7, 22:15,
  22:16, 113:22,
  114:15.
seeing 38:24, 89:5,
  158:15, 159:22.
seem 103:25, 126:13,
  127:23, 130:5.
seemed 35:5.
seems 68:9, 74:14,
  74:19, 83:4,
  97:20, 99:8,
  127:4, 129:15.
seen 45:7, 49:24,
  52:3, 75:11,
  78:22, 87:24.
sees 82:25.
segment 77:14.
seize 112:3,
  116:24.
seized 108:25,
  112:10, 114:10,
  114:12.
seizure 108:13.
semi-automatic
  40:24, 40:25,
  41:6.
Sendy 3:7, 3:19,
  4:4, 4:10, 4:18,
  174:14.
sense 124:12.
sent 11:21, 52:5.
sentencing 2:8, 2:9,
  2:11, 2:12, 2:21,

2:25, 98:12.
separate 153:12.
September 102:20.
serial 157:8.
serious 23:22,
  23:25.
service 26:25, 43:8,
  43:25, 170:17.
serving 170:18.
SET 2:8, 5:14, 5:15,
  5:16, 91:3, 97:24,
  157:20, 162:12,
  163:3, 163:11,
  163:12, 163:14.
setting 124:2,
  162:14, 162:20.
Seven 29:23, 131:16,
  131:17, 146:1.
several 10:21,
  67:10, 114:9,
  122:18, 129:4,
  149:4, 149:11.
shadows 126:9,
  126:10.
shaking 127:4.
shared 74:14.
Sharon 69:16,
  73:1.
shell 29:11, 29:13,
  81:1, 81:6, 84:5,
  106:25, 167:19,
  167:20.
Sheriff 147:23.
shift 22:12, 22:20,
  22:23, 38:11.
shin 44:9, 45:16,
  45:17.
shirt 23:4, 88:4,
  107:7, 115:12,
  126:12, 127:15,
  129:20, 130:10,
  130:13, 130:15,
  130:16, 154:7,
  161:23, 161:24,
  161:25, 162:2,
  162:3.
shoes 80:25, 81:1,
  84:6, 106:24,
  108:3, 108:9,
  108:11, 108:13,

108:16, 108:24.
shook 127:7.
shoot 27:3, 44:1,
   47:18.
shooter 65:23,
   85:21, 87:23,
   108:17, 121:20.
shooting 29:24,
   30:12, 40:12,
   57:1, 79:17,
   79:18, 80:21,
   84:12, 87:25,
   136:13, 136:14.
short 35:5, 121:8,
   130:17.
short-sleeved
   130:10, 130:15.
short-term 68:11.
Shortly 149:10.
shot 29:25, 47:21,
   52:18, 65:25,
   110:7, 112:14.
shots 25:2, 25:3,
   52:12, 65:15.
shoulder 127:14.
shouted 150:6.
shouting 149:17,
   151:17.
showed 33:22,
   122:17, 123:24,
   124:9, 125:4,
   125:5, 165:3.
Showing 31:9, 31:25,
   33:2, 33:20, 35:7,
   35:21, 36:19,
   38:12, 40:1,
   41:25, 94:6,
   102:8, 135:16,
   165:6.
shown 77:3,
   137:10.
shows 63:11, 70:19,
   74:5, 107:3.
Shut 132:5, 149:6.
sidewalk 25:14,
   38:17, 42:9,
   59:19, 60:21,
   70:23, 126:4,
   126:5, 129:9.
sight 20:19, 162:9,

162:10, 162:22.
sighting 42:11.
sign 118:15,
   128:13.
significance 74:2,
   88:19.
significant 87:19,
   157:19.
similar 99:23.
Simmons 116:19,
   116:21.
simple 93:9, 93:24,
   94:2.
simply 52:15, 95:12,
   96:3, 101:18,
   133:6.
single 97:22.
sirens 27:12,
   39:19.
sit 20:20, 68:22.
sitting 3:4, 23:3,
   23:18, 24:10,
   41:16, 128:7,
   129:23.
six 29:23, 43:3,
   82:8, 82:23,
   122:18, 131:8.
six-person 23:19,
   39:3.
Slay 115:7.
sleeve 130:18.
sliced 46:8.
slid 44:11.
slightly 148:11,
   148:18.
slipping 46:3,
   46:4.
SM 117:2, 118:10.
smacking 23:22,
   38:18.
small 19:7, 19:11,
   70:2, 157:6,
   162:17.
smaller 46:12,
   71:12.
Smith 167:12.
snug 46:9, 46:17.
social 100:13.
sold 11:7.
solely 93:19.

solution 68:11.
somebody 38:25,
   73:11, 73:15,
   77:3, 77:17, 78:1,
   100:12, 125:23,
   127:5, 127:18,
   127:24, 128:12,
   128:15, 129:3,
   129:4, 136:1,
   138:11, 162:24.
somehow 99:24,
   100:23, 101:21.
someone 19:6, 53:20,
   94:19, 121:15,
   138:15, 139:19,
   140:19, 140:22,
   173:10.
sometime 105:7,
   171:13.
somewhere 141:18.
soon 49:25, 148:24,
   160:22, 173:14.
Sorry 11:13, 14:15,
   25:11, 27:5, 28:7,
   62:23, 80:9,
   86:21, 109:6,
   110:8, 121:9,
   131:20, 132:2,
   147:10, 147:11,
   152:8, 152:17,
   152:25, 162:1.
Sort 32:15, 73:25,
   76:7, 77:9, 77:18,
   92:15, 92:24,
   97:16, 99:20,
   102:14, 104:1,
   128:13, 130:25.
sorts 77:15,
   92:13.
sound 38:18, 96:25,
   121:9, 124:15.
sounded 27:12.
sounder 94:13.
sounds 38:8, 38:20,
   40:7, 134:8.
Source 134:9,
   134:11.
sources 133:18,
   171:5.
south 33:10, 34:20,

60:3, 60:6, 60:11,
64:10, 65:19,
71:4, 78:22,
79:20, 79:24.
spans 104:5.
Sparks 93:2, 97:7.
speaking 77:23.
speaks 32:15.
Special 16:3, 16:9,
16:16, 17:5, 31:6,
32:18, 35:8,
97:23, 132:21,
133:4, 174:20.
specialize 5:13.
specific 37:11,
37:12, 140:13,
140:20, 162:15.
specifically 21:15,
105:13, 146:6,
161:24.
specify 47:6.
speech 78:3.
speed 26:3.
Spell 3:20, 3:22,
4:17, 16:20, 55:8,
145:2.
spelled 145:8.
spent 5:11, 29:11,
29:13, 59:13.
split 153:11.
spoke 167:8, 168:22,
173:2.
Spoone 90:21, 93:3,
93:4, 93:9, 93:15,
93:19, 94:3, 94:8,
94:12, 94:17,
97:7, 97:10,
97:12.
spotlighted 65:21.
sprinting 26:3.
Squad 18:2, 18:3.
stabbed 100:25.
stabbing 91:21,
100:7.
stairs 149:9,
149:14, 150:5,
151:13, 153:8,
160:14.
stand 4:7, 14:14,
14:16, 16:5,

16:17, 26:10,
113:15.
Standard 98:18,
133:20, 134:8,
137:6.
standing 7:7, 19:3,
93:16, 106:23,
125:20, 129:23,
130:25, 161:8,
161:10.
stands 94:9, 96:7.
start 28:7, 59:17,
64:19, 65:1,
68:13, 74:4,
77:20, 83:4,
99:12, 107:22,
107:23, 109:10,
123:6, 132:14,
152:22, 171:8,
171:10.
started 5:17, 17:24,
123:24, 125:2,
130:1, 131:25,
149:5, 160:23,
166:13.
starting 74:5,
81:21.
State 4:16, 16:20,
55:8, 99:14,
133:12, 145:1,
158:7.
stated 148:23,
161:22, 164:9,
164:10, 168:22,
169:2.
statement 44:21,
47:1, 47:3, 47:11,
47:21, 47:25,
90:25, 93:24,
111:6, 119:8,
157:25, 158:3,
158:25, 165:6,
168:23.
statements 29:18,
47:5, 48:5, 134:5,
150:22.
States 1:1, 1:5,
2:3.
station 164:2,
164:3.

stationary 40:14,
41:16.
stayed 11:19,
162:21.
staying 127:11.
steal 112:21.
steel 126:6.
stenographic
174:2.
step 55:7, 90:12.
steps 149:11,
149:16, 151:8,
151:23, 152:3,
152:6, 152:11,
152:12, 152:14,
160:23, 161:7,
161:13.
sticking 46:5.
stipulated 12:10,
21:22, 62:6.
Stipulation 12:4,
12:7, 12:19,
12:23, 21:15,
61:23, 62:2,
62:12.
stolen 30:7, 156:25,
157:12.
stood 8:22, 9:9,
9:11, 9:21, 9:23,
154:12.
Stop 7:9, 8:2, 8:23,
24:1, 34:19,
35:18, 36:2,
36:21, 36:23,
36:24, 37:7,
43:14, 43:16,
45:13, 73:5, 89:2,
89:23, 99:24,
112:23, 125:14,
138:10.
stoplight 23:12,
34:16, 35:9,
38:11.
stopped 7:24, 8:11,
9:7, 23:12, 26:22,
38:12, 40:14,
79:15.
stopping 127:4.
stops 38:1.
store 60:7, 64:2,

64:10, 66:3,
80:19, 82:13,
85:24, 87:25.
story 153:7.
straddles 102:6.
straight 104:14.
strange 38:5.
strangely 23:13.
strategy 68:24.
street-level 19:8.
Streets 24:6, 55:20,
57:4, 91:22.
stricken 92:8.
Strike 84:18, 84:23,
90:20, 164:5.
strikes 92:16.
striped 127:15.
stripes 81:2, 81:7,
84:6, 85:23,
106:25, 108:3,
108:10, 108:25,
130:8.
stuck 23:15,
24:24.
stuff 51:4, 70:19.
Subject 12:19,
50:20, 74:22,
91:14, 132:21,
147:6, 155:17,
156:7.
subjects 152:15,
160:24.
submission 10:11.
submit 11:25, 13:16,
13:19.
submitted 11:23,
15:3, 21:12.
Subsequent 2:8.
substance 9:13,
12:9, 12:14, 13:7,
13:10, 14:17,
14:19, 20:23,
21:20, 21:24,
22:9, 133:25,
134:13, 139:1,
139:4, 139:15.
substantive 92:20,
99:1, 172:13.
substantively
95:10.

subtle 77:19,
99:11.
successful 68:23.
suddenly 113:14.
sufficient 86:9.
suggest 91:1, 92:10,
92:25, 95:18.
summer 171:25.
summertime 126:7.
Superseding
102:20.
supervised 57:1.
supervisor 56:21,
56:25, 146:2.
supplemental
168:7.
supplied 53:17.
support 103:9,
103:25.
suppose 74:10,
94:23, 102:16.
supposed 49:23.
surround 162:16.
surveillance 63:16,
64:6, 66:3,
66:8.
suspect 29:24,
111:1, 150:9,
150:17, 153:24,
154:1, 154:2,
154:8, 154:11,
154:15, 156:9,
156:13, 156:19,
157:21, 157:22.
suspected 9:13,
18:18, 20:2,
20:23, 61:13,
109:21.
suspects 132:19,
132:24, 133:24,
152:15, 154:22,
155:4, 155:10.
suspicious 67:11.
sustain 84:17.
Sustained 48:2,
83:7, 83:23, 85:5,
85:9, 86:8, 89:13,
146:18, 146:20.
Swahili 113:3,
113:4, 114:2,

114:3.
swam 162:24.
sweater 7:12, 84:11,
88:9, 107:10.
sweatpants 70:8.
switch 66:14, 68:9,
81:8, 81:12.
sworn 4:11, 16:10,
55:3, 144:22.
system 68:7,
76:15.
.
.
.
< T >.
T-o-d-d 145:8.
T-shirt 8:7, 25:23,
70:8, 81:6, 84:5,
85:22.
T-shirts 118:17,
118:18.
T. 1:46, 174:6.
tag 30:21.
taken. 51:7, 90:15,
144:8.
talked 38:19, 130:6,
132:8.
tank 129:20,
130:21.
tape 69:23, 70:15,
71:10, 71:16,
71:23, 72:10,
73:5, 79:16,
79:22, 87:8,
88:10, 122:22,
135:6, 135:8,
137:1, 137:6,
142:10.
taped 123:13.
tardy 172:12.
target 18:9, 109:24,
110:2, 114:25,
115:3, 115:8,
115:14, 116:1,
117:17, 117:24.
targets 86:23,
109:21, 121:14,
121:22, 121:25.
Task 55:20, 56:2,
56:4, 57:4.
Tate 20:6, 20:7,

20:14, 20:18,
20:25, 21:4.
tattooed 110:15,
110:23.
tattoos 109:2,
110:20.
Taurus 29:9,
30:19.
Taylor 96:5.
Taz 116:2, 116:4.
team 10:20, 11:2,
11:20.
tech 136:4, 136:6,
136:22.
Technically
166:10.
technician 136:3.
technology 68:21,
76:16, 76:21,
113:13, 117:6.
techs 135:3.
telephone 2:6,
2:9.
television 63:20.
tells 73:15.
Ten 19:11, 107:14,
131:17, 145:22.
tennis 108:2,
108:24.
term 8:17, 26:7,
150:20.
terminology 42:22.
terms 96:3, 128:3,
171:7.
Terrace 95:21,
95:23.
test 96:22, 167:25,
168:2, 168:14,
168:15.
tested 167:15,
167:17, 167:19,
167:22, 167:23,
168:5.
testified 4:12,
16:11, 43:8,
46:19, 46:25,
55:4, 144:23,
160:19.
testify 50:22,
50:25, 54:8,

150:4, 162:1.
testifying 51:11.
testimony 12:17,
21:25, 31:10,
50:21, 62:10,
67:20, 133:6,
161:1.
testing 113:12.
that. 101:24.
themselves 100:8.
theories 103:9.
thereby 93:12,
96:20.
They've 94:2.
thigh 45:21,
46:11.
things. 93:23.
thinking 47:3,
98:20.
thinks 75:10,
89:5.
third 86:22, 116:8,
170:20.
Thomas 94:1.
thoroughfare 37:15,
37:20.
though 36:5, 41:5,
45:13, 74:1, 77:5,
96:9, 117:10.
three 23:20, 39:3,
61:13, 81:1, 81:7,
82:3, 84:6, 95:11,
106:25, 108:3,
108:10, 108:24,
131:15, 140:15,
143:22, 146:2,
168:20.
three. 23:20.
threshold 148:13,
152:13.
throw 41:9.
thrown 73:21.
Thursday 3:10.
tight 68:22.
tightly 45:13.
tire 36:15.
title 56:1, 73:12,
73:15, 77:13,
77:17, 78:2.
titles 73:8, 73:15,

75:8, 75:9, 75:11,
77:15.
titling 74:3.
Tobacco 17:6.
today 3:7, 23:3,
66:10, 103:14,
125:6, 138:8,
143:21, 144:1,
156:3, 160:19,
164:6, 164:10,
170:11.
Todd 144:16, 144:21,
145:3, 145:7,
174:38.
tomorrow 143:24,
144:1, 171:9,
171:11, 173:23.
took 19:9, 44:10,
99:16, 131:9,
156:2, 164:2,
169:20, 169:21.
Top 20:22, 21:19,
22:6, 22:9, 49:3,
59:18, 59:19,
60:2, 66:17, 69:5,
69:19, 70:1,
70:17, 71:25,
79:6, 79:14, 81:1,
84:5, 107:24,
109:10, 110:17,
115:25, 130:21,
136:25, 154:7,
162:3.
tops 81:7, 106:25.
torn 37:4.
Torre 94:10, 99:6.
totally 67:2,
97:13.
touch 50:11, 57:21,
66:19, 69:6, 90:1,
103:16, 117:6,
143:9, 152:23,
170:24.
touched 87:18.
tour 129:19.
Towards 40:15,
59:24, 60:3, 65:6,
121:11, 149:11,
149:16, 151:19,
151:22, 151:24,

154:10.
tracking 155:10.
traffic 23:14,
   23:15, 24:11,
   24:14, 24:24,
   34:14, 35:9,
   35:16, 37:25,
   38:1, 38:10,
   39:14, 42:1,
   135:13.
training 146:1.
transaction 9:23,
   10:17, 10:20,
   11:18, 11:19,
   13:13.
Transcript 1:17,
   174:2.
transformation
   103:23.
transpiring
   150:23.
transport 30:8,
   58:21.
transported
   143:24.
trauma 53:15.
travel 10:25, 37:6,
   38:13, 38:14,
   38:16.
traveling 32:19,
   33:25, 34:3,
   35:11, 37:14.
treat 98:20.
tree 136:25.
trees 126:9.
Trial 1:10, 2:3,
   2:5, 50:14, 52:10,
   54:10, 68:8,
   74:10, 76:10,
   76:16, 90:4,
   90:18, 93:21,
   96:6, 143:11,
   170:19, 170:22,
   170:25, 171:1,
   171:5, 172:14.
trick 31:20.
tried 78:6.
trigger 41:2,
   41:4.
trouble 68:6,

151:3.
troubling 74:8.
truck 72:2, 79:14.
true 12:20, 62:12,
   97:12.
truly 32:10.
truth 112:22.
Try 17:20, 28:3,
   45:18, 45:19,
   62:24, 153:5,
   162:16.
trying 24:25, 31:20,
   36:12, 36:16,
   44:8, 68:4, 94:19,
   99:11, 99:13,
   99:22, 110:10,
   125:5, 129:17,
   134:1, 140:22,
   151:18, 151:21.
turn 7:23, 25:5,
   36:15, 48:25,
   68:15, 76:17,
   94:22, 102:18.
turned 24:24, 25:6,
   25:8, 25:14,
   26:13, 39:18,
   40:13, 40:15,
   45:9, 71:20, 91:4,
   93:14, 94:3,
   124:18, 171:21,
   171:25.
turning 7:23.
turns 39:21, 42:14,
   71:6, 78:24,
   79:10, 96:19.
TV 76:10.
two. 8:21, 9:8.
type 23:23, 27:25,
   76:7, 87:3, 95:18,
   104:13, 129:20,
   137:6, 146:25,
   148:16, 169:6.
types 94:6.
typically 37:16.
typing 166:14.
.
.
< U >.
U-turn 42:3.
ultimately 41:5,

83:25, 157:14.
umbrella 90:19,
   98:14.
unable 2:10.
uncovered 133:7.
undercover 5:6,
   5:17, 5:20, 5:21,
   6:7, 6:14, 13:23,
   14:7, 15:3.
understand 2:6,
   49:21, 50:5,
   53:22, 56:3, 85:1,
   89:10, 102:15,
   134:14, 137:21,
   154:15, 173:13.
understanding 2:11,
   2:13, 48:10.
underway 170:22.
undo 99:11.
unfolding 165:16.
unformed 99:21.
unfortunately
   67:1.
unique 36:3.
Unit 18:3, 21:13,
   39:9, 39:10,
   39:15, 56:15,
   56:17, 56:20,
   56:25, 61:3,
   155:7, 155:13,
   155:14.
United 1:1, 1:5,
   2:2.
units 9:1, 9:4,
   27:13, 27:14,
   27:16.
unlawful 90:19.
unless 73:19.
unmarked 6:24, 7:4,
   18:24.
unnecessary 52:16.
Unplug 75:7.
unpublished 92:24.
unsecured 148:12.
unsuccessfully
   156:18.
until 2:25, 17:15,
   38:8, 46:7, 56:17,
   56:21, 90:11,
   102:5, 102:18,

117:12, 131:12,
131:14, 133:18,
143:6, 144:2,
144:5, 145:24,
161:8, 170:19,
171:14.
unusual 38:4.
update 173:6.
upstairs 2:24,
    149:18, 150:8.
useful 93:2.
user 121:3.
using 37:18.
utterance 149:20,
    150:22.
.
.
< V >.
vacated 2:9.
vantage 125:2.
various 5:9, 44:23,
    86:23, 109:21,
    145:23.
vehicle 6:23, 7:4,
    9:15, 18:24,
    20:18, 24:22,
    36:13, 39:20,
    42:25.
vehicles 39:20,
    126:16, 126:17.
verdict 14:21,
    14:24, 49:2.
versus 2:3, 23:20.
vials 20:22, 21:19,
    22:9.
victim 51:19, 58:16,
    58:19, 58:25,
    61:2, 65:4,
    119:24.
victims 160:20,
    161:3.
videoing 125:3.
videos 73:16,
    82:25.
view 24:21, 24:25,
    33:22, 36:18,
    86:9, 97:2,
    127:20, 152:20,
    172:12.
Violent 18:1, 18:2,

18:3, 18:5, 18:8,
    18:10, 22:14,
    24:20, 38:20,
    39:1.
Virginia 94:1.
vision 44:15.
visions 113:23.
visiting 116:22,
    168:25.
Volume 1:10.
volunteer 43:22.
vs 1:8.
.
.
< W >.
W. 1:48.
waist 44:6, 45:11.
waistband 26:4,
    26:10, 42:17,
    44:11.
wait 68:24, 143:6.
waited 11:20.
waiting 54:5,
    155:13, 155:14,
    163:15.
waived 105:18.
walk 5:9, 17:21,
    56:11, 79:9,
    123:19, 131:23,
    131:25, 136:5,
    145:23.
walked 19:10, 124:5,
    126:13, 127:15,
    129:7, 129:20.
walking 65:5, 71:1,
    71:2, 71:4, 72:23,
    78:20, 78:22,
    113:14, 126:1,
    127:3, 129:3,
    129:5, 129:8,
    135:9.
wall 19:10, 19:12,
    20:15, 20:20,
    20:22, 21:1.
wallet 156:25.
wanted 9:8, 89:9,
    123:18, 132:17,
    132:25, 172:6.
wants 3:9, 86:11.
warm 23:16, 23:17.

warn 54:3.
warnings 29:16,
    29:19.
warrant 108:13,
    111:21, 114:10,
    116:14, 138:3.
warrants 111:17,
    118:24.
waste 44:5,
    103:20.
wasting 76:16.
watch 55:6, 71:15,
    128:14, 131:14.
watched 20:21,
    70:24, 72:18,
    80:16, 82:13.
watching 71:11,
    88:18, 106:10,
    128:3, 128:5,
    128:23, 159:21,
    169:7, 169:9.
water 136:21.
ways 37:14, 89:18.
weapon 26:25, 43:8,
    43:25.
wearing 8:6, 13:12,
    25:23, 80:25,
    81:5, 84:4, 85:20,
    87:18, 87:23,
    106:24, 108:2,
    108:17, 154:4,
    154:13, 156:8,
    156:14, 157:22,
    161:22.
wedged 27:23, 45:14,
    45:20, 46:13,
    46:14.
week 170:16, 170:20,
    172:13, 173:2,
    173:4, 173:6.
weekend 52:6.
weeks 172:7,
    172:13.
Wesley 117:23.
Wesson 167:12.
west 19:2, 26:14,
    26:15, 26:20,
    32:23, 43:1, 58:3,
    58:5, 59:24, 60:3,
    71:4, 78:20,

78:22, 79:19.
westbound 22:23,
 24:25, 25:7,
 25:13, 32:19,
 33:4, 34:1, 35:11,
 37:13, 42:9.
Western 56:20,
 56:23.
whatever 32:15,
 97:24, 98:21,
 101:22, 102:21,
 134:4.
whatsoever 27:9.
whenever 3:11,
 23:16, 144:3.
whereby 96:13.
Wherever 92:1,
 113:15.
White 8:7, 9:13,
 21:20, 22:9,
 25:23, 65:7, 70:8,
 81:1, 81:6, 81:7,
 84:5, 84:6, 85:22,
 85:23, 106:25,
 108:3, 108:10,
 108:24, 130:8,
 130:12, 130:17,
 149:15, 160:13,
 160:20.
who've 3:3.
whole 5:14, 95:8,
 99:18, 101:8,
 158:7, 165:16.
wholesale 92:7.
whom 116:4.
wide 78:13.
wider 45:22.
Will 16:2, 23:7,
 28:24, 30:24,
 50:20, 50:25,
 54:1, 54:6, 63:1,
 67:22, 68:15,
 68:22, 75:22,
 89:20, 91:1,
 105:17, 117:14,
 140:1, 144:4,
 170:13, 171:10,
 171:13.
winding 38:10.
window 26:22, 43:3,

75:4, 151:19.
windows 23:17,
 24:11.
wish 82:17.
withdraw 102:5,
 150:25.
within 49:22, 97:9,
 163:8.
Without 12:6, 12:16,
 21:25, 61:24,
 62:10, 67:3,
 73:14, 74:25,
 95:14, 96:1,
 112:20, 117:12.
witnessed 18:18.
witnesses 3:6,
 49:20, 50:21,
 76:12, 118:25,
 140:15, 143:23,
 170:11, 172:15.
woman 69:12, 73:1,
 129:20, 160:20.
wood 162:10, 162:17,
 162:21, 163:5,
 163:7, 163:9,
 163:17.
woods 155:11.
word 46:17.
words 98:19, 101:22,
 128:6, 158:15.
work 5:2, 5:20,
 17:11, 37:15,
 37:17, 37:20,
 55:18, 66:20,
 66:22, 66:25,
 75:21, 89:20,
 145:18.
worked 17:9, 17:15,
 56:13, 56:16,
 56:20, 56:22,
 56:25, 68:9,
 76:11.
working 6:7, 6:11,
 6:14, 18:4, 18:16,
 22:14, 22:19,
 28:1, 29:21,
 57:10, 66:21,
 68:21, 76:21,
 112:17, 117:6,
 146:7.

worn 126:7.
worried 36:11,
 36:14.
wound 52:18, 52:23,
 61:20, 63:12.
wow 99:12.
write 47:12, 47:14,
 47:17, 48:4,
 166:6, 166:18,
 167:6.
writing 30:9.
written 47:24,
 166:19, 166:21.
wrote 47:5, 164:14,
 165:2, 165:10,
 165:12, 165:14,
 166:11, 166:23.
.
.
< X >.
x-ray 44:15.
XX/XX/1987 105:6.
.
.
< Y >.
year 5:11, 5:12,
 102:19.
years 5:8, 31:24,
 58:6, 68:7, 76:9,
 93:4, 97:8, 97:23,
 99:17, 119:23,
 145:22, 146:1,
 157:17, 168:20.
yell 41:15.
yelled 149:1,
 149:3.
yelling 7:24, 23:18,
 38:20, 39:5,
 40:15, 148:24,
 149:5, 149:6.
yellow 38:16,
 122:22, 135:6,
 135:8, 135:21,
 137:1, 154:13,
 161:20.
YGF 120:13, 120:15,
 120:20.
yield 136:17.
yo. 7:24.
Young 120:18.

yourself 17:19,
  63:1, 78:1, 99:15,
  159:3.
yourselves 50:9,
  50:10, 89:25,
  143:5, 143:8,
  170:23.
.
.
< Z >.
Ziploc 10:9, 12:8.
Ziplocs 9:13.
Zoom 59:21, 60:24,
  79:3, 110:21,
  117:5.
zoomed 68:1.
Zooming 112:13.