IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,      )
                                  )
        Plaintiff,         )
     vs.                    )
                                  )  **CRIMINAL NO.:** JKB-16-0363
GERALD JOHNSON, et al.,     )  **Jury Trial:** Volume 25
                                  )
        Defendant.         )
                                  )
_____)

Transcript of Proceedings
Before the Honorable James K. Bredar
Tuesday, January 23rd, 2018
Baltimore, Maryland

For the Plaintiff:

     Peter J. Martinez, AUSA

     Christina A. Hoffman, AUSA

For Defendant Gerald Johnson:

     Paul F. Enzinna, Esquire

     Jeffrey B. O'Toole, Esquire

For Defendant Kenneth Jones:

     Alan R.L. Bussard, Esquire

For Defendant Marquise McCants:

     John R. Francomano, III, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

```
1                        P R O C E E D I N G S

2              THE COURT:  Good morning.

3              Mr. Enzinna, are we ready for the jury?

4              MR. ENZINNA:  Yes, Your Honor.

5              THE COURT:  Okay.  Let's bring them in.

6              (Jury entered the courtroom.)

7              THE COURT:  Good morning, ladies and gentlemen.

8              JURORS:  Good morning.

9              THE COURT:  We are ready to start our trial day.  We

10   now turn to Mr. Enzinna, counsel for Mr. Johnson.

11             Mr. Enzinna, do you wish to make a closing argument?

12             MR. ENZINNA:  Yes, Your Honor.  Thank you.

13             THE COURT:  You may proceed.

14             MR. ENZINNA:  Good morning, ladies and gentlemen.

15             JURORS:  Good morning.

16             MR. ENZINNA:  I'd like to start by echoing

17   Ms. Hoffman and thanking you for your service on behalf of

18   myself, my colleague Mr. O'Toole, and my client Gerald

19   Johnson.  One of the things that makes our country great is

20   the rights we enjoy and the ways we protect those rights.  And

21   one of the important ways we protect our rights and freedom is

22   through the trial by jury.  The judge yesterday called you

23   essential workers, in contrast to the government shut down,

24   and I think that's an apt word.

25             The government has charged my client Gerald Johnson
```

Defendant Johnson's Closing Argument

1    with a very, very serious crime.  There aren't anymore serious

2    crimes.  And they want to take away his freedom.  But before

3    they can do that, the constitution requires that they submit

4    the evidence to an impartial jury of citizens like yourselves,

5    Mr. Johnson's peers, who will determine whether the government

6    has met its burden to prove beyond a reasonable doubt that

7    Mr. Johnson, in fact, committed the crimes the government

8    accuses him of.

9            As I said, the right to a trial by jury is a

10   wonderful thing.  The problem is it imposes some costs.  And

11   unfortunately the cost is being borne in this case by you all.

12   And the costs are pretty significant in this case.  This was

13   an unusual case, we've been here more than two months.  In

14   fact, a little more than two months.  There have been dozens

15   of witnesses, hundreds of documents, pieces of evidence, some

16   of that evidence was disturbing, shocking, even frightening.

17   But through it all you showed up every day, you paid

18   attention, you took notes, and you did an excellent job and we

19   thank you for that.

20           Now we turn to the second piece of your job.  You're

21   going to deliberate on the case.  That's an interesting word,

22   "deliberate."  In fact, you might say it was chosen very

23   deliberately.  You make a lot of decisions in your life, you

24   don't deliberate about all of them.  To deliberate means to

25   consider something very carefully.  And we have no doubt that

1    you will.

2            This is a multi-defendant case and that makes it

3    particularly complicated because there are three defendants.

4    And you need to remember that you are not here to render a

5    verdict as to Gerald Johnson, Kenneth Jones, and Marquise

6    McCants.  You're here to render three separate verdicts; one

7    verdict as to Mr. Johnson, one verdict as to Mr. Jones, and

8    one verdict as to Mr. McCants.  You must consider them

9    separately.  You must consider the evidence against them

10   separately.

11           Now, when I stood up here in the opening, some of

12   you may remember that, two months ago, I told you that Gerald

13   Johnson would testify in this case.  He didn't have to, but he

14   did.  And he was -- he went on the stand and he told you that

15   he sold drugs.  I told you he would tell you that and he did.

16   And in a lot of ways he explained how he survives in

17   Greenmount.  He talked about selling drugs, everybody in that

18   neighborhood sells drugs, he talked about the parties he

19   organizes, and he talked about his dreams, about becoming a

20   rapper and becoming famous and making music.  In a lot of ways

21   this case is about -- the question in this case is, who is

22   Gerald Johnson?  Is he a neighborhood drug dealer?  Or is he,

23   as the government claims, some kind of gangster overlord?

24           Now, as I told you in my opening, the government

25   would put on evidence that Mr. Johnson broke laws, including

1    laws against selling drugs and laws against assault.  You

2    remember, he was convicted of an assault for shooting at those

3    two people.  But Mr. Johnson -- those aren't the crimes

4    Mr. Johnson was charged with.  He was charged with very

5    particular crimes.  So let's talk about what those crimes are.

6         Mr. Johnson is charged with five counts in this

7    case, and I've grouped them here.  You see at the top there

8    are the racketeering counts, Counts 1, 3, and 4.  Conspiracy

9    to participate in a racketeering enterprise, conspiracy to

10   commit murder in aid of racketeering, that's the Moses Malone

11   murder, and murder in aid of racketeering, that's also the

12   Moses Malone murder.  There's a separate drug charge, Count 2.

13   He's charged with conspiracy to distribute and possess with

14   intent to distribute controlled substances.  And finally,

15   there's a firearm charge.  He's charged with being a felon in

16   possession of ammunition.

17        You've heard the evidence.  You've heard the

18   evidence on the firearm charge.  I'm not going to spend a lot

19   of time talking about it today.  And I'm going to return to

20   the drug charge later on, but I want to start with the

21   racketeering charges because those are really the center of

22   this case.  The racketeering charges all have one thing in

23   common, they require proof of a relationship to an enterprise.

24        Ms. Hoffman talked a little bit about what an

25   enterprise is yesterday and we'll get to that.  But if you

1    look at them, Count 1 requires proof beyond a reasonable doubt

2    that Mr. Johnson knowingly and willfully became a member of an

3    enterprise -- I'm sorry, knowingly and willfully joined an

4    agreement to participate in the affairs of an enterprise.

5    Counts 3 and 4, the Moses Malone murder counts, require proof

6    that that murder was committed to maintain or increase his

7    position in the enterprise.  So in all of these counts the key

8    question is, was Gerald Johnson a member of the BGF Greenmount

9    Regime?

10            An enterprise is a group of people associated for a

11    common purpose with an ongoing organization, formal or

12    informal, the personnel in it function as an ongoing unit, and

13    it has an effect on interstate commerce.  Those are the

14    requirements.

15            Now, the government's version in this case is

16    that -- this is the government's version of Gerald Johnson's

17    relationship to the enterprise:  They say he was a member of

18    YGF and that as a member of YGF, the Young Guerilla Family, he

19    authorized the murder of Gregory Rochester, also known as

20    Craig Mack.  And they say he transitioned, graduated from

21    Young Guerilla Family to BGF.  That happened sometime early in

22    2007.  Or they claim it happened.  He became, quote-unquote,

23    "C of the Greenmount Regime," and as such, he presided over a

24    BGF meeting after the murder of Henry Mills in 2011, that he

25    ran BGF drug shops, and that he green-lighted the murder of

1    Moses Malone.

2         Let's look at the acts Mr. Johnson is actually

3    charged with.  Now, this chart -- the first thing you need to

4    look at on this chart is the top line where you see a purple

5    and black oval, two ovals, one says YGF, one says Black

6    Guerilla Family.  And you see that they come up against each

7    other in 2007.  That's the government's argument in this case,

8    that the Young Guerilla Family morphed into the Black Guerilla

9    Family.  But I would submit to you that the evidence shows

10   that what happened in this case was that there was a Young

11   Guerilla Family, and we'll talk about exactly what that was in

12   a minute.  But that what happened then is that the Black

13   Guerilla Family -- the evidence is that the Black Guerilla

14   Family shut it down and some of those people joined Black

15   Guerilla Family, not all of them did.  In fact, Mr. Gray

16   testified that one of them was killed.  But it was a separate

17   organization that they had to make an affirmative effort to

18   join.  And Mr. Johnson did not do that.

19        Now let's look at the events below the timeline.

20   There are different colored boxes here and the different

21   colors mean different things.  If you look at the blue boxes,

22   those are acts that Mr. Johnson is alleged to have committed

23   with other members of YGF or BGF.

24        It's alleged that from 2005 to 2007 he supplied

25   drugs to other members of the YGF and that he participated in

1    meetings at their quote-unquote "stash house."  It's alleged

2    that he authorized the murder of Craig Mack in January of '07

3    while YGF was still operating.  It's alleged that in June 2011

4    he presided over a meeting in the park after the Henry Mills

5    murder.  And it's alleged in 2013 he paid tribute to Mr. Gray

6    in the form of money and cocaine.  And in April he

7    quote-unquote "green-lighted" the Moses Malone murder.

8         Shortly, after the Moses Malone murder, it's alleged

9    that he and Mr. Jones confronted someone about snitching.  And

10   then finally, in August of that year, it's alleged that he

11   agreed to supply drugs to Wesley Brown in jail.  Those are the

12   acts he's alleged to have committed with other gang members.

13        Now, if you look at these yellow boxes, those are

14   the other acts he's alleged to have done that didn't involve

15   other gang members.  In July -- I'm sorry, in December of 2006

16   he attempted to shoot the testers, the two people who lived in

17   his house.  And like I said, he was convicted of assault for

18   that.  In September of '07, he distributed cocaine base to the

19   undercover officer.  You heard the undercover officer testify.

20   And in November 2015, he distributed cocaine again, that's

21   Mr. Stokes.  In the fall of 2015 sometime, he supposedly

22   offered to sell Mr. Stokes an assault rifle.  Finally, in June

23   of 2016, he was arrested and the police found ammunition in

24   his trunk.

25        Now, the rest of the boxes on this page, if you look

Defendant Johnson's Closing Argument

1    up at the top here in the corner, there's an orange box and a

2    gray box.  Those are Instagram posts and text messages.  I'm

3    sorry, one of those Instagram posts should say Facebook.

4    That's the social media.  We saw a lot of Mr. Johnson's social

5    media in this case and the government alleges that that's

6    evidence that he was a member of BGF, and I'll come to that

7    later on.  And then down below you see the rap videos.  Again,

8    the government argues that those rap videos were part and

9    parcel of his supposed membership in this enterprise.  And

10   we'll talk about that later.  But that's the framework I want

11   you to have in mind as I go through the rest of my closing

12   argument.

13            Now, the first question is, what is the enterprise

14   in this case?  YGF, the Young Guerilla Family was not an

15   enterprise.  You heard the evidence.  Mr. Meadows, the

16   government's witness, testified it was a bunch of kids who

17   grew up in the neighborhood.  Every witness who testified said

18   it was a bunch of kids who called themselves YGF.  They looked

19   around their neighborhood, just like any kids do, and they

20   thought, who are the cool people around here?  Some kids in

21   some neighborhoods play army or play cops or play cowboys or

22   whatever.  The cool people in Greenmount were BGF, and these

23   kids wanted to be like BGF and they called themselves YGF.

24            But they had no meetings.  Remember Mr. Meadows

25   testified about the supposed meeting, the second meeting about

Defendant Johnson's Closing Argument

1    the murder of Gregory Rochester.  What he said was, well, it

2    was different people, different individual meetings.  It

3    sounds like a bunch of people milling around in the park

4    saying, hey, did you hear this, did you hear that.  It was not

5    an organized meeting.

6           YGF had no organization or structure.  The

7    government showed you a little org chart of YGF, which the

8    government invented.  There is no organization in YGF.  It had

9    no rules, had no paperwork, no oaths, no missions, no dues,

10   and it had no effect on interstate commerce.  Was there any

11   evidence that YGF had any effect outside the Greenmount

12   neighborhood?

13          Now, BGF, the Black Guerilla Family, might have been

14   an enterprise.  But Gerald Johnson did not join the Black

15   Guerilla Family.  Now, the government has -- there are five

16   kinds of evidence in this case.  I'm going to talk about each

17   of them separately.  And the government wants you to find,

18   based on these five categories of evidence, they want you to

19   find beyond a reasonable doubt that Mr. Johnson joined the

20   Black Guerilla Family.

21          The first category is gang signs and symbols.  We

22   heard a lot about the BGF rules.  Ms. Hoffman showed you

23   yesterday that BGF rules that were recovered from certain

24   people's places where they lived.  Nothing like that was

25   recovered from Mr. Johnson.  The closest the government came

1    was a photograph that they happened to find in, I believe it

2    was Wesley Brown's house during a search that was tucked

3    inside Mr. Brown's copy of George Jackson's memories.  And the

4    government would like you to find that because Mr. Brown put

5    that photograph inside that book, Mr. Johnson is a member of

6    BGF.

7            You heard a lot of evidence that to get into BGF you

8    had to take an oath and you had to perform a mission.  There

9    was not any evidence in this case that Mr. Johnson performed a

10   mission to get into BGF or that he ever took the oath.  Nobody

11   testified that they ever heard Mr. Johnson take the oath.  I

12   think the most revealing evidence in this was Lamontae Smith.

13   Remember Lamontae Smith said he got out of prison and he came

14   to Greenmount and he didn't know anybody.  He wandered around,

15   he ran into people, and he ran into Cakes and Carrdai.  And

16   they spit the oath to him, so he thought, okay, I'm here with

17   my brothers, my comrades, I know these guys are BGF, so I'm

18   good.  They introduced him to other people, and he said, I met

19   Norman Handy, Norman Handy spit the oath to me.  He met Montel

20   Harvey, and he said, Montel Harvey spit the oath to me.  And

21   we asked him, did Gerald Johnson spit the oath to you?  And he

22   said no, he didn't.  Remember Mr. Johnson's rap video where he

23   says, "I ain't spit the oath."

24           Government also points to Mr. Johnson's tattoos.  He

25   has the tattoo of the word Jamaa on his forearm.  Jamaa, as we

1   know, is a Swahili word that means family.  The phrase -- and

2   I'm going to butcher this, the phrase Eusi Gayedi Jamaa means

3   Black Guerilla Family in Swahili.  Mr. Johnson told you what

4   the word Jamaa means.  He told it's the name of his record

5   label.  There was talk about that record label yesterday, in

6   particular, that it was not incorporated.  But remember what

7   Agent Hayden said about that.  He checked to see if this

8   record label was incorporated, but did he ask anybody, all the

9   subjects of his investigation, about the record label?  He

10  said he didn't.

11          Now, let's talk about the tattoos Mr. Johnson

12  doesn't have.  He has no 276, no George Jackson, no gorilla,

13  no cross, sword, and rifle, no dragon.  Now those are the

14  tattoos that are arguably specific to Black Guerilla Family.

15  Jamaa is a Swahili word, it means family.  These other

16  tattoos, particularly, George Jackson or 276, that's pretty

17  specific.  Mr. Johnson doesn't have those.

18          You remember Mr. Martinez when he was questioning

19  Mr. Johnson, talked to him about what he called

20  misunderstandings.  And he showed all these cases where he

21  thought that it was, isn't it funny that you have this thing

22  that is almost like BGF, but you say it's a misunderstanding?

23  But ladies and gentlemen, I ask you to look at that question

24  from the point of view of the burden of proof in this case.

25          Someone might have tattoos on their body and they

1    might have -- be covered with tattoos; 276, George Jackson,

2    gorillas, et cetera, et cetera, which makes you think, I feel

3    one way about whether that person is a member of BGF.  Or a

4    person might have no tattoos at all and you might say, well,

5    that's not really evidence that he was.  Most people are

6    somewhere in the middle there; right?  Where's Gerald Johnson

7    in the middle there?  He has a Jamaa tattoo, is that beyond a

8    reasonable doubt that he's a member of BGF?

9         There's also evidence that Mr. Johnson has a tattoo

10   on his back -- oh, let me go back I apologize.  The government

11   made much of the fact that the letter L is tattooed at the end

12   of Jamaa.  Well, it's sort of at the end of Jamaa.  It's

13   pretty obvious that it's not part of that original tattoo.

14   It's in capital letters, which would -- if you were trying to

15   make it say Jamal, it's odd that you would make it in capital

16   letters.  Mr. Johnson testified about what that tattoo means.

17   I'll leave it to you to decide.

18        There's evidence about Mr. Johnson's angel of death

19   tattoo.  The government of course put on evidence that the

20   death angel was a phrase used by BGF.  Was there evidence that

21   Gerald Johnson was ever considered a quote-unquote "death

22   angel" in BGF?  Or is this tattoo explained as Mr. Johnson

23   told you, by the fact that Ja Rule, who is a pretty famous

24   rapper, has the same tattoo on his stomach?

25        We heard a lot about the gorilla shirts.  Now, this

1    picture is -- in a way it's very emblematic of this case.

2    Gerald Johnson is a large man.  He's 6'6", I believe, 300

3    pounds plus.  He's a presence.  He's a charismatic man.  He's

4    a rapper.  He's outgoing.  He knows everybody.  And he's in a

5    neighborhood where a lot of people belong to BGF, and here he

6    is with some people who the government says are BGF.  And they

7    all have on these gorilla shirts, and the government says,

8    see, he's got a gorilla shirt on, that means he's Black

9    Guerilla Family.

10           Look carefully at this picture, what's different

11   about Gerald Johnson?  You see on the left is Stimey and on

12   the right is, I think it's Reef, I'm not sure.  But look at

13   their T-shirts, what's on the front of their T-shirts?  Both

14   of them put a picture of George Jackson on the front of their

15   shirts.  George Jackson, of course, the founder of BGF.  Mr.

16   Johnson doesn't have that.  The government also argued that

17   Mr. Johnson wore a black bandana and that that was a BGF

18   symbol.  You see here on the right a picture of Mr. Johnson

19   wearing a black bandana on the cover of this record, of his

20   records, the Jamaaville Reloaded.

21           There's also a picture the government introduced on

22   the left here, a picture of, I believe that's Bank standing

23   next to Mr. Johnson.  There's a black bandana in Mr. Bank's

24   pocket.  That black bandana is not on Gerald Johnson's head,

25   it's in Mr. Bank's pocket.

1            With respect to the cover of the recording, Mr.

2      Johnson told you how that got done, that he was not -- he did

3      not create that, he didn't put the gorilla on it.  He did put

4      the black bandana on his head, but I ask you, is that a symbol

5      of being in Black Guerilla Family?

6            Look at these photographs, here's Mr. Johnson in a

7      white bandana.  Here he is in a white bandana on the left, a

8      red bandana on the right.  Here he is, a white bandana on the

9      left, a red bandana on the right, so there is no question that

10     Mr. Johnson wore bandanas.  He told you his head was simply

11     too big to wear a hat.  But he wore all kinds of bandanas.

12     And again, this is a case where the government wants to argue

13     that the fact that Mr. Johnson did something that was also

14     done by Black Guerilla Family members makes him a member of

15     the Black Guerilla Family.  And that's not enough.  The

16     question is, did he willingly join the Black Guerilla Family?

17            The crossed arms symbol is another piece of that

18     where the government says this is a Black Guerilla Family

19     symbol.  I don't know if you've seen that anyplace else, there

20     was some evidence here about that and about what it meant.

21     Remember Mr. Johnson told you about the organization called

22     Protect the Family.  See on the left, the gentleman wearing

23     the blue hat with the sign that says PTF, Protect the Family,

24     with the crossed chains and the lock.  Mr. Johnson explained

25     to you what that meant.  You see on the left he's got the

1    T-shirt on with the same symbol in red.

2              The next category of evidence that the government

3    wants you to look at is Mr. Johnson's cell phone.  Remember

4    Mr. Johnson's cell phone was seized and extracted and a lot of

5    things were put on from his cell phone.  Let's look at those

6    things.  This is the list of contacts that the government

7    pulled out of Mr. Johnson's phone.  Now, remember there were

8    at least 3,000 contacts in that phone the government pulled

9    out.  I don't know how many this is, maybe 60, 70.  And you

10   see they moved certain ones of these up to the top.  You see

11   the top five are numerically out of order.  And those are the

12   contacts that the government thought were the closest they had

13   to evidence in Mr. Johnson's cell phone of his contact with

14   the Black Guerilla Family.

15             Now, who are these folks?  First one, Chrisha West,

16   remember who Chrisha West was?  It's Norman Handy's mother.

17   Rondo, there was evidence that Rondo was a Black Guerilla

18   Family member.  But again, I submit to you, if you live in

19   Greenmount, you know Black Guerilla Family people.  It doesn't

20   make you a member of Black Guerilla Family.  The next two

21   people, T. Broski and Tudda.  There was evidence that they

22   were subjects of Agent Hayden's investigation.  Was there

23   evidence that they were Black Guerilla Family members?

24             Also, look at the top two contacts under times

25   contacted.  How many times -- those are the two people who

 1    arguably were closest to the Black Guerilla Family, how many

 2    times did Mr. Johnson contact them?  There's a dash there.

 3    Now, Agent Hayden testified that, well, that might mean an

 4    infinite number of contacts.  Again, Ms. Hoffman told you to

 5    use your common sense, please do.

 6          Let's look at Mr. Johnson's text messages.

 7    Government showed you a lot of those as well.  And Agent

 8    Hayden testified about the keyword searches he performed.

 9    Remember he said he looked for Jamaaville and so on and so

10    forth.  But where are the text messages that refer to BGF, or

11    Jamaa or LLTG or anything like that?  They certainly had the

12    power to keyword search these texts for that.  What these

13    texts show, and you know, I won't coat it, they show

14    Mr. Johnson talking to people about the distribution of

15    narcotics, but they don't show him talking to those people

16    about distributing narcotics as a member of Black Guerilla

17    Family, and that's what he's charged with here.

18          Here's some more evidence from the cell phone.

19    Remember this picture?  The government showed you this and

20    said, look, there's Porky on the left.  And Porky was a member

21    of BPD, so this means Gerald Johnson was a member of BGF.

22    Now, that's not Porky, we know that now.  And I'm going to get

23    this wrong, I can't remember if the guy on the right is -- I

24    can't remember.  He's a famous rapper, so the government got

25    it wrong.

Defendant Johnson's Closing Argument

```
 1              And you know, that's an important point here, ladies
 2     and gentlemen, in a -- well, let me show you this too.  This
 3     next video Mr. Johnson has a pile of money in his lap,
 4     remember that, that money?  And the police officer testified
 5     about Mr. Johnson having counterfeit money.  Let's look at
 6     that money.  You see that money, you see how the 100 is
 7     backwards on it?  Is that really counterfeit money or is it
 8     play money?  Mr. Johnson said, I use this in my videos.  And
 9     when I asked Agent Hayden about that, he couldn't even tell if
10     this was real or counterfeit money.
11              Now, as I said, Mr. Martinez said to Mr. Johnson,
12     well, you're arguing there's a vast conspiracy and the police
13     are lying and they're out to get you, they're framing you.
14     Ladies and gentlemen, we're not arguing that the police are
15     lying, that they deliberately went out to frame Mr. Johnson.
16     But the police got some things wrong.  They clearly did.  And
17     you know, there's a saying, I'm sure you've heard it, to a
18     hammer the whole world looks like a nail.  And after a while,
19     once the government started to believe that Mr. Johnson was in
20     BGF, everything started to look like he was a member of BGF.
21              And some of the things weren't even looked into,
22     like for example, when I asked Detective Hayden about the
23     Facebook posts, I asked him do you recognize that, did you
24     search that, did you determine if those were the lyrics from a
25     rap song, and he said no, I didn't bother.  Even after
```

1    Dr. Nielson got up on the stand and testified about how he did

2    exactly that and how he went to a website that he identified

3    and said you can search rap lyrics there.  Did the government

4    bother to do that?

5          There's also a lot of evidence from Mr. Johnson's

6    social media page.  Well, the social media evidence is

7    interesting because there were a number of pictures of

8    Mr. Johnson with Black Guerilla Family members, or pictures of

9    people who were allegedly in the Black Guerilla Family and the

10   government showed you all those.  Remember the testimony was

11   that these were a small fraction of the photographs on

12   Mr. Johnson's cell phone.

13         Now, as I said, Mr. Johnson was in this neighborhood

14   and he was a presence in this neighborhood.  You saw the

15   videos, you saw the "Welcome Home" video.  He was somebody

16   that people wanted to be around, that people came to.  He knew

17   everybody in the neighborhood.  He knew the Black Guerilla

18   Family members, he knew the non Black Guerilla Family members.

19   Now, the pictures of him with people who were not in Black

20   Guerilla Family were not in evidence and they disappeared from

21   his website, from his Facebook page.

22         Now, there's also this text on the left where it

23   says Jama, J-a-m-a, and it says deleted by user.  So what the

24   government asks you to believe from that is that Mr. Johnson

25   posted the word "Jama," misspelling it, and then deleted it

1    because he thought that was -- that would get him in trouble,
2    would reveal he was a member of BGF.  Now, again, ladies and
3    gentlemen, use your common sense.  Does that make any sense?
4    There were plenty of things on the social media websites or on
5    Mr. Johnson's social media accounts that the government argues
6    connected him to BGF.  Why weren't all those deleted?  And why
7    would he make a post that just says "Jama," misspelling it?
8    Is it more likely that something else happened here?

9            There's a picture on the right, the not guilty
10   picture.  And remember that it talked about -- underneath that
11   it's very hard to read, but it talks about Mr. Cornish and
12   compares him to Sammy the Bull and has the rat emojis.  And
13   the government says, see, that's Mr. Johnson trying to
14   intimidate witnesses and calling him out for being a snitch.
15   You know, I don't think it's a mystery that everybody in that
16   neighborhood knew about Mr. Brown's court case and knew that
17   James Cornish testified against him and talked about the fact
18   that Mr. Cornish snitched.  Mr. Johnson talked about it.
19   Maybe Mr. Johnson was angry at Mr. Cornish.  Mr. Brown was a
20   friend of his and he didn't think Mr. Cornish should have
21   quote-unquote "snitched."  But again, is this a post by a
22   criminal overlord trying to intimidate witnesses, or is it
23   simply somebody reflecting what's happened in the
24   neighborhood?

25            Let's talk about the rap videos.  Now, I told you at

1    the beginning of the case that the government was going to

2    play these videos to you, and I also told you I don't know

3    what your taste in music is, but these videos are not for

4    everybody.  And they are a bit jarring to look at them if you

5    aren't familiar with that genre.  There's a lot of talk about

6    shooting and snitching and guns and brains and a lot of things

7    in there.

8         But Dr. Nielson came in and he explained to you

9    about the genre of hip hop and rap music, which is a worldwide

10   phenomenon.  It's the most popular type of music in the world

11   today.  And it's something that's unfamiliar to us, but he

12   explained exactly what was going on in those videos.  Like for

13   example, you remember the video of Mr. Johnson rapping,

14   holding a bottle of tequila, red glasses on, his hair tied up,

15   black leather jacket and talking about shooting people and

16   running their mouths and things like that, looking out of

17   control.  And people thought, holy cow, I mean, when you see

18   that video the first time, it's a little scary.

19        But then we showed you the video of -- remember the

20   two guys rapping, the two guys in the rap battle and how they

21   were yelling at each other and threatening each other and

22   pretending to shoot each other, that's what the genre is and

23   that's what Mr. Johnson was doing.  Remember in that rap video

24   you saw Mr. Johnson in that video, remember that?  He was

25   standing behind those rappers with a big smile on his face

1    because this is what Mr. Johnson does, he entertains, he gets

2    people together, he's a -- well -- prosecution wants you to

3    believe that these rap videos are documentaries, that they are

4    really either documentaries, a film of exactly what was

5    happening or confessions, or that they were weapons used by

6    Mr. Johnson as a criminal overlord, that he was trying to

7    intimidate witnesses.

8           Now, you saw the "Welcome Home" video where he talks

9    about Christopher Meadows, and he talks about James Cornish

10   testifying against him.  And you saw him standing there in his

11   pajamas bottoms saying, you know what you did, you know what

12   you did.  Mr. Meadows got up on the stand and he was asked,

13   how did you feel when you saw that, what was going on?  And he

14   said, well, he was calling me out for snitching.  Did he say,

15   I was intimidated, I was scared, I thought someone was going

16   to kill me, I thought somebody was going to harm me?  No

17   Mr. Johnson is standing there in his pajamas bottoms calling

18   him a weirdo.  How intimidating is that?

19          Government also argues that Mr. Johnson used these

20   videos to exert his control over the gang and to boost his

21   standing in the gang.  Again, you saw the "Welcome Home"

22   video, you heard the people who testified, they said that

23   wasn't choreographed, we were just all hanging out and some

24   guy came up with a camera and said hey, let's film it and they

25   did.  And you also heard him say in there, "I ain't spit the

1    oath."

2            You also heard him say in the 24th and Barclay

3    freestyle, remember the government talked about this video a

4    lot, where he said, "them BGF," and put his finger to his

5    nose.  And the government said, see, he's talking about BGF

6    and warning people to be quiet.  What did he say?  He said

7    "them BGF," did he say "we"?  Was he trying to excerpt his

8    control or boost his own standing in the gang?  Dr. Nielson

9    told you, he's seen plenty of videos where people do exactly

10   that.  And this is totally inconsistent.  He's talking about

11   BGF as something separate from him.  That's not boosting his

12   standing in the gang.

13           Now, I want to get to the centerpiece of the

14   government's case.  The BGF witnesses.  Ms. Hoffman talked

15   yesterday about the courage of the witnesses who came forward

16   in this case, as if these witnesses were some kind of heroes.

17   I want to talk about each of them in detail and I want you to

18   decide, was it courage that brought them in to testify, are

19   they heroes?

20           Let's start with Michael Gray.  Mr. Gray told you at

21   17 he received an eight-year sentence for robbery with a

22   deadly weapon, he was paroled, but soon returned to prison for

23   attempted murder with a 12-year sentence.  He stabbed another

24   inmate in prison.  He said he didn't care if the guy died or

25   lived.  He said he got away with it.  He was one of the

1    original members of BGF in Maryland and he was the

2    quote-unquote "Hodari," a citywide leader.  He said he

3    personally green-lighted 30 to 40 hits.  He said he ordered

4    YGF, the Young Guerilla Family, to become BGF and he ordered

5    one of the members killed when he quote-unquote "bucked."

6    Now, was there any evidence that any YGF member was ever

7    killed for quote-unquote "bucking"?

8            He also testified he had no remorse over that

9    murder, whether or not it happened, and was never charged with

10   it.  And he told -- well, the evidence is clear that he lied

11   to the prosecutors because he wanted to avoid testifying.  He

12   told them, I wasn't a BGF leader.  He said -- and then he

13   said, well, I wasn't the BGF leader over everybody, I was just

14   the leader in the city, I was just the Hodari, I wasn't the

15   whatever, which is kind of like saying, I'm not the leader --

16   I'm not a leader of the United States because I'm the vice

17   president, I'm not the president.

18           Now, that's sort of like when Ms. Hoffman talked

19   yesterday about Mr. Meadows when he testified.  Remember, he

20   went in the first time and met with the police and talked

21   about the Gregory Rochester murder.  And he said that Slay and

22   Foo committed the murder and that they were told to do it by

23   the Lanvale and Barclay group.  Six months later he went in

24   and he said, oh, actually it was Gerald Johnson who told them

25   to do it, and actually, Donatello Fenner was part of the

1    shooting too.  And Ms. Hoffman said, well, he -- at the first

2    interrogation he didn't realize that they wanted to know who

3    ordered it, they only asked him who did the shooting.  Is that

4    plausible?  Does that make sense?  Especially when they asked

5    him at the end of the interview, is there anything else you

6    can tell us about this interview?  Is it sensible for someone

7    in that position to think, well, I know who ordered it, but

8    they're obviously not asking me that?  Of course they were

9    asking him that.

10           Mr. Gray pled guilty to racketeering conspiracy in

11   2015.  He's cooperating in an effort to reduce his sentence.

12   He said he is testifying to help himself and for no other

13   reason.  I'll leave it to you to decide how much of a hero is

14   he is.

15           Brian Rainey testified.  He's currently incarcerated

16   for his second armed robbery conviction.  He too is an

17   original member of BGF in Maryland.  Talked about drugs,

18   prostitution, extortion, and hits in prison, said he assaulted

19   20 or 30 inmates and stabbed 5 or 10, never prosecuted for any

20   of them.

21           What else did he tell us?  He said BGF is

22   opportunistic, he said it's everybody for himself.  He was an

23   informant for DEA while he was a BGF member and he says he has

24   23 years remaining on a 30-year sentence for armed robbery.

25   He's 49 years old now, that means he's in prison until he's

1    72, and he's testifying here to reduce his sentence.  Again,

2    is he a hero?

3           Christopher Meadows.  Christopher Meadows is an

4    important witness in this case because Christopher Meadows

5    is -- Christopher Meadows's testimony is the only evidence

6    that Gerald Johnson had any involvement in the murder of

7    Gregory Rochester.  And as I already told you, the first time

8    he was asked by police, he didn't say that Gerald Johnson

9    ordered it, he said Lanvale and Barclay ordered it.  Only six

10   months later that he suddenly remembered that Gerald Johnson

11   ordered it.

12          Troy Kellam testified.  You remember Troy Kellam,

13   convicted of possession with intent to distribute three times.

14   Pled guilty to murdering George Nealy in 2015.  George Nealy

15   he said was like a brother to him.  His father, Nealy's

16   father, was Kellam's mentor.  Nevertheless, Kellam shot Nealy

17   four times in the head at point blank range on Father's Day.

18   And why did he do it?  He did it because he was ordered to.

19   And he said if he refused, he knew that his life would not

20   have been worth very much.

21          He lied to stay out of prison on that murder.  He

22   accused one of his fellow BGF comrades.  Now he's awaiting

23   sentencing on murder and racketeering as a career offender and

24   he testified for leniency.  Now, if Troy Kellam can lie to the

25   police and tell them that another member of his BGF group

1    killed Nealy, and if he can kill Nealy, his best friend, like

2    a brother to him, if he can in cold blood go out and shoot him

3    four times in the head because if he didn't his life wouldn't

4    be worth much, what's his life worth if he goes to prison for

5    the rest of his life?  How much easier is it to say that

6    Gerald Johnson is a member of BGF than it was to kill George

7    Nealy?

8         Joseph Davis testified.  Again, he's awaiting

9    sentence.  He spent half his life in prison.  He's

10   cooperating.

11        Michael Gwaltney testified.  Multiple drug and

12   robbery convictions.  He also is awaiting sentencing as a

13   career offender and he said he's tired of being in prison and

14   he's cooperating to get a lower sentence.

15        Lamontae Smith testified.  Remember he lied to the

16   police about who shot him and about his membership in BGF.  He

17   joined BGF when was 15 while he was in prison for assault.  He

18   admitted to using a gun in robberies.  He admitted to being

19   with Hood when he shot Ben and was never charged for that.  He

20   changed his testimony about who killed Country.  Remember he

21   told the grand jury that he was told that -- he said he told

22   the grand jury that Hood told him that Ben shouldn't have

23   killed Country, but here he said Slay killed Country, leaving

24   out the part about Ben, at least on direct.

25        Now, that brings me to an important point, ladies

1    and gentlemen.  When you're considering these witnesses, and

2    in fact any witnesses, you have to ask yourself how credible

3    are they?  How do you judge that?  There are a number of ways

4    to judge that, and you know them.  You look -- do they have a

5    motive to testify falsely?  Are they biased?  What's their

6    perception?  Were they there when this thing happened?  Or are

7    they there saying somebody told somebody who told somebody?

8    What's the level of detail?

9           I mean, can they tell you -- if they say, yeah, he

10   was a member of BGF, that's one thing.  But if they say, he's

11   a member of BGF, I saw him at a meeting on 24th Street on

12   February 2nd, that kind of detail suggests someone is telling

13   the truth.  And what was their attitude?  Did their attitude

14   change when they were testifying on direct and telling the

15   story they were prepared to tell, as opposed to when they were

16   cross-examined and were asked questions about that, did their

17   attitude change?

18          Let's go on to Harry Caesar.  Harry Caesar also is a

19   very important witness in this case.  In 2002, he pled guilty

20   to attempted murder.  After his release, he worked as an

21   informant.  But while he was working as an informant, he sold

22   drugs and kept the money, carried a firearm, didn't tell the

23   government he was doing that.  He talked about how his

24   relationship with Moses Malone, how he looked out for Moses

25   Malone, and how he was upset about the killing.  But

1    nevertheless, he was arrested for selling drugs to an

2    undercover officer the day after Moses Malone was killed,

3    hasn't been charged for that.

4           Now, as I said, Mr. Caesar is a very important

5    witness.  Ms. Hoffman testified yesterday that the Moses

6    Malone murder is the centerpiece of the government's case.

7    That makes Mr. Caesar very important because Mr. Caesar's

8    testimony that Mr. Johnson green-lighted that murder is the

9    evidence, the only evidence, that connects Gerald Johnson to

10   that murder.

11          Now, the question is, are all these guys lying?

12   Well, we know that BGF is opportunistic, we know it's every

13   man for himself.  We know its members do whatever they can to

14   advance their own interests and they do it by any means

15   necessary.

16          We know they're liars.  Gray lied to the

17   prosecutors, saying he wasn't a BGF leader.  In his original

18   interview, Meadows said Lanvale and Johnson ordered Slay and

19   Foo to kill Rochester and six months later he suddenly

20   remembered that Johnson ordered it.

21          Troy Kellam said that after he killed Nealy he lied

22   to stay out of prison.  One month before the trial Mr. Davis

23   told the prosecutors that Mustafa and Roscoe sent Gwaltney to

24   rob him, and here he said it was Mustafa, Roscoe, and Gerald

25   Johnson.  Mr. Caesar sold drugs and kept the money and carried

1    a firearm while he was an informant without telling his

2    handlers.   Lamontae Smith lied about who shot him and about

3    his own membership in BGF.

4          We also know their stories don't add up.   There are

5    different stories about the change from YGF to BGF.   Remember

6    who came to YGF and told them that they had to be -- had to

7    join BGF?  We heard Uncle Ray, we heard Sister Kim, we heard

8    Will, we heard Mr. Gray.   Mr. Gray talked about a YGF member

9    who resisted joining BGF and was killed.   How many YGF members

10   moved to BGF?   They were all over the place on that, somebody

11   said only nine were taken.

12          Did YGF continue to exist?   Mr. Rainey said it did,

13   everybody else said it didn't.   Mr. Kellam talked about the

14   BGF -- I put quotes here, Facebook, he didn't call it

15   Facebook, what he described was a membership roster that BGF,

16   this criminal enterprise, keeps a book with all of its

17   members' names and pictures in it.   Did we see that book?   How

18   likely is it that a criminal organization does that?

19          Mr. Caesar was back and forth about Country's phone.

20   Remember he said Country came in to borrow his phone because

21   he didn't have one.   Another time he said Country used his own

22   phone.   Mr. Caesar said that Gerald Johnson green-lighted the

23   Malone murder, but remember the testimony, Mr. Malone was not

24   a member of BGF, remember?   Mr. Malone was a member of the

25   Bloods and the testimony was that a green light was required

1    to kill another BGF member.  It's not required to kill

2    somebody who's outside of BGF.

3             Their stories lack detail.  Mr. Johnson said -- I'm

4    sorry, Mr. Gray said that Johnson was in charge of the BGF

5    drug shops.  What drug shops?  Where were they?  What drugs?

6    Who else was involved?  How did that -- being in charge

7    manifest itself?  Mr. Davis said Johnson was basically kind of

8    running it.  Again, where's the detail?  He said BGF members

9    told him not to sell in the building, but it was his

10   understanding that this came from Mr. Johnson.  So Mr. Johnson

11   never told him not to sell in that building.  Mr. Gwaltney

12   said that Johnson gave him drugs probably two or three times

13   in 2012.  When?  Kellam said that all his information about

14   Mr. Johnson and BGF came from David Hunter.  He said he only

15   met Mr. Johnson once.

16           Let's talk about what's missing.  Remember

17   Mr. Caesar testified that he was an informant for years,

18   including while he was in BGF.  Remember he worked for Uncle

19   Perry, who was a higher up in BGF.  And while he was working

20   for Uncle Perry, his car was bugged, his phone was tapped, and

21   he made recordings of his interactions with Uncle Perry.  He

22   saw Mr. Johnson every day he said.  Where's -- did he tape any

23   conversations with Mr. Johnson?  He said that Tech told him

24   that when Tech went into the house, Geezy green-lighted the

25   murder.  Is there a conversation that he recorded with Tech

1    about that?  What about Rainey?  Rainey was an undercover

2    agent.  Again, no evidence.

3         Now, Kellam, here's an interesting one.  Kellam says

4    that he heard David Hunter call Mr. Johnson from the jail and

5    ask him to get somebody else to take the charge for the Mills

6    murder.  Now, we heard a lot of jail calls here because every

7    single jail call is recorded.  And we know that the government

8    can find pertinent jail calls.  They found a lot of them in

9    this case.  Where's the jail call of David Hunter asking

10   Gerald Johnson to get somebody else to take the charge?

11        Now, you heard a lot of talk about what Mr. Martinez

12   called a vast conspiracy.  Does this mean the police are

13   lying, the prosecutors are lying, that people are deliberately

14   trying to frame Gerald Johnson?  No, it doesn't.  But BGF

15   members they're cunning, they're opportunistic, they're

16   desperate, they're facing a lot of time in jail.  They know,

17   they're experienced, they know that when you cooperate, the

18   more evidence you have, the better your deal.  It doesn't help

19   you much if you cooperate and say that guy you already

20   convicted is a member of BGF or that guy you've already got a

21   lot of evidence on is a member of BGF.  They want fresh blood,

22   and who better than Gerald Johnson.  He's a presence in the

23   neighborhood, everybody knows him, he's a big guy.

24        This is a page from Ms. Hoffman's closing argument.

25   It's a picture of the photo array that Moses Malone completed

1   after he was shot.  And he wrote on here, he identified Gerald

2   Johnson and he said, "He got ranked, so I'm guessing he sent

3   them at me."  So what he said was, Gerald Johnson's a big deal

4   in BGF, so he probably sent Norman Handy to rob me and shoot

5   me.  Well, what do we know about that?  We know it's not true,

6   remember?  Because Mr. Caesar testified that the reason Handy

7   robbed Malone was because he owed Tech money.  Gerald Johnson

8   had nothing to do with it.  So we know that when Mr. Malone

9   told this to the police he was wrong.

10          But nevertheless, if you're a police officer and you

11  get this, what do you do with that?  You say, well, I better

12  look into this Geezy guy.  So you bring in the BGF guys who

13  are cooperating and say, tell me about BGF, and they tell you

14  about BGF.  Who else was in it, who else was in it, what about

15  Geezy?  And suddenly the BGF people are talking about Geezy.

16          We also know that BGF is a conspiracy, and it's a

17  conspiracy that operates in the jail.  So if I'm a BGF guy and

18  I'm cooperating and I come in and they ask me about Geezy and

19  I say, yeah, Geezy's a member too, and that gets their

20  interest, I realize I've got something here.  I go back to

21  jail and I talk to my friends and I say Geezy.

22          Now, I want to talk about the murders.  Mr. Johnson

23  is alleged to have been connected to three murders in this

24  case:  The Gregory Rochester murder, Henry Mills murder, and

25  the Moses Malone murder.  He's not alleged to have

1   participated in -- these people were all shot.  He's not

2   alleged to have participated in the shootings, he's alleged to

3   have authorized the Rochester and Malone murders.  And he's

4   alleged to have directed money to Mills's killer and then to

5   have reenacted the killing.

6          Let's look at each of those.  I talked about the

7   Gregory Rochester murder, what Mr. Meadows said.  Remember in

8   June '07, he said Lanvale and Barclay told Foo and Slay to do

9   it.  When the government said, is there anything else you can

10  tell us?  He didn't tell them anything about Gerald Johnson.

11  He didn't think, well, anything else might include the person

12  who I know ordered the murder.  But suddenly six months later

13  he remembered that and he told them that.

14         Let's look at one other thing.  Remember the

15  testimony that there were two meetings about the Gregory

16  Rochester murder; right?  Mr. Meadows said that the first plan

17  was to kill him outdoors.  But then he said they had another

18  meeting.  Well, he said it was more like a bunch of individual

19  meetings, but he said there was another meeting and they

20  decided, we need to keep Geezy out of this, so we're going to

21  do it differently.  So how do we keep Geezy out of this?  We

22  kill him in Geezy's house while Geezy's there.  Does that make

23  sense?  In our stash house that we know we're not going to be

24  able to use after we kill him, does that make any sense?

25         Now, the government talked about Mr. Johnson's

1    spaghetti sauce comment and that -- you know, you can look at

2    that one way, if you didn't hear it made, and think that's

3    kind of cold.  But you saw Ms. Woodley testify about the shock

4    Gerald was in after that, somebody had been killed in his

5    house, a friend of his.

6            Henry Mills, who is also called Nique, we saw the

7    video of someone running up and shooting him.  And then we saw

8    the video of the BGF meeting in the park.  Remember that

9    video?  I won't show it to you, but you saw it.  What it

10   consisted of was a bunch of guys hanging out under a tree in a

11   public park while people came up on bikes and walked back and

12   forth and moseyed around.  This is hours after Mr. Mills was

13   killed.  The testimony was that the police were still on

14   scene.  Does this deadly, cunning, criminal organization

15   decide, time to have our meeting, let's have it out in the

16   park, let's pay off the killer and let's reenact it too?  Does

17   that make any sense?

18           And look at that video again.  The government says

19   that someone -- that Mr. Johnson directed somebody to Hunter

20   saying give him the money, and then someone handed something

21   to Mr. Hunter.  What did he hand to Mr. Hunter?  We don't

22   know, we couldn't see it.  Was it money?  Was it cigarettes?

23   Is Mr. Johnson actually reenacting the murder while the police

24   are still on the scene?

25           Now let's talk about Moses Malone.  Again, the

1  government says this is the center of their case.  And if this

2  is the center of the case, what does that say about the rest

3  of the case?  The evidence against Mr. Johnson with respect to

4  this murder, and this is Counts 3 and 4, because if he's not

5  involved in this murder, he's not guilty of Counts 3 and 4.

6  What's the evidence here?  The evidence is that Mr. Caesar

7  said that he and Tech got the search warrant and walked to

8  Geezy's house, that Tech went inside while Mr. Caesar remained

9  outside, and Tech came outside and said Geezy green-lighted

10  the murder.

11       Now, first of all, Mr. Caesar said you didn't need a

12  green light to kill somebody who was in BGF.  Malone wasn't in

13  BGF.  Second, I talked already about Mr. Caesar acting as an

14  informant and taping conversations, none of those were here.

15  Third, we saw Mr. Malone's photo array when he said he

16  thought -- he guessed Gerald was involved in this.  Again,

17  that was proven wrong.  And now, Mr. Caesar got on the stand

18  and said, Gerald Johnson green-lighted this and I know

19  because, one, Tech told me, and two, I heard Mr. Johnson in

20  the little store tell Oct, who was Mr. Malone's girlfriend,

21  that if she didn't help them find Malone, she was going to get

22  killed.

23       Now, where was Tech, where was Oct?  The government

24  brought in a lot of people to testify in this case.  Now, if

25  you have somebody who says, well, I wasn't there when it

1    happened, I wasn't in the house when Geezy green-lighted the

2    murder, but Tech told me, wouldn't it make more sense to bring

3    in Tech, who was actually there, who can tell us exactly what

4    was said and tell us exactly what happened?  Where was Tech,

5    where was Oct?

6         Mr. Caesar's testimony, I think there was some

7    suggestion that Detective Taylor corroborated Mr. Caesar's

8    testimony, but in fact she did the opposite.  She said that

9    when Caesar called her, he said Geezy and them are going to

10   get Malone now, they're going to shoot him.  The night of the

11   shooting she said he called her on the cell phone and said

12   Geezy and them are going to get Malone.  What did Caesar say?

13   Caesar said, I did not see Gerald Johnson that night, he was

14   not there.

15        So the question on the racketeering counts, Counts

16   1, 3, and 4 -- well, there's, two questions really, one, is

17   there a reasonable degree as to whether Gerald Johnson was a

18   member of the BGF Greenmount Regime?  The other question of

19   course is, did what the government says happened happen, did

20   he in fact green light the Malone murder?

21        We went through all the evidence.  No evidence that

22   Mr. Johnson took an oath, that he performed a mission.  All

23   the signs that are missing, the tattoos, the bandanas, the

24   George Jackson on the front of his shirt, his contacts, his

25   text messages, the evidence that wasn't here, and the BGF

 1    witnesses.  That's what it is.  Now, you have to take all that

 2    evidence and decide, ladies and gentlemen, beyond a reasonable

 3    doubt was Mr. Johnson in fact a member of the BGF Greenmount

 4    Regime?  And I would submit respectfully that the evidence

 5    does not support that.

 6           Let me turn finally to the drug conspiracy, Count 2.

 7    Count 2 is a -- the crime alleged in Count 2 is a conspiracy

 8    to possess or distribute drugs.  And there is evidence in this

 9    case, as I told you in the opening, and Mr. Johnson told you,

10    that Mr. Johnson sold drugs.  The question is, did he conspire

11    with somebody, did he enter into an unlawful agreement

12    knowingly and willfully?  And if he did, with whom, who did he

13    conspire with?  I already talked about BGF and all the

14    evidence that he was not a member of BGF.  Who did he conspire

15    with?

16           Mr. Stokes testified that he got drugs from Gerald

17    Johnson.  If you believe Mr. Stokes, maybe he conspired with

18    Mr. Stokes.  But then -- and there was also evidence,

19    Mr. Johnson testified himself that he acted as kind of a

20    broker, that when someone would text him and say, hey, I want

21    Percocets or whatever, he would put them in touch with

22    somebody who was selling.  Maybe he conspired with those

23    people, but ask yourselves is there evidence that those

24    transactions every happened?

25           And also, you're going to be asked in your

1    deliberations to determine that if there was a drug

2    conspiracy, how much was involved?  You need to figure out the

3    weight that was involved.  So when you go back there and think

4    about was there a conspiracy, you need to ask yourselves, what

5    was the evidence about how much of these drugs was involved in

6    this case?  There was evidence about BGF and all the drugs it

7    sold.  But if the conspiracy is not BGF, the question of how

8    much drugs there was is critical.

9            So ladies and gentlemen, as I told you, this case is

10   really about one simple question and the question is, who's

11   Gerald Johnson?  Is he a low-level neighborhood drug dealer,

12   flamboyant personality, but neighborhood drug dealer, or is he

13   a criminal overlord?  He testified, he told you about how he

14   lives his life, about how he tries to get by.  He admitted his

15   drug record.  In fact, his record, his criminal record is all

16   drug possession, drug dealing charges, except for the assault

17   charge.  Other than that, there's no shootings, no killings.

18           All we can ask at this point is that you go back and

19   deliberate.  You've listened very carefully to the evidence,

20   that's been obvious.  Now what we ask is that you go back and

21   deliberate very carefully, with an open mind, that you talk

22   about the evidence, that you think very carefully about what

23   the evidence showed, that you think about what evidence

24   applies to what person and what act.  And I think if you do

25   that, you'll deliver a verdict of not guilty.  Thank you very

1    much.

2         THE COURT:  Thank you, Mr. Enzinna.  Ladies and

3    gentlemen, we'll take a very short recess, about five minutes.

4    During this recess do not discuss the case with anyone.  Do

5    not discuss it among yourselves.  Do not allow yourselves to

6    be exposed to any news articles or reports that touch upon the

7    case or the issues it presents.  Avoid all contact with any of

8    the participants in the trial.  Do not make any independent

9    investigation of the law or the facts in the case.  Do not

10   look up anything on the internet.  Do not consult an

11   encyclopedia or dictionary.  Please take the jury out.

12        (Jury left the courtroom.)

13        THE COURT:  Five minutes.

14        (A recess was taken.)

15        THE COURT:  Mr. Bussard, are we ready for the jury?

16        MR. BUSSARD:  Yes, Your Honor.

17        MR. ENZINNA:  Your Honor, may I be excused to go to

18   Judge Blake's courtroom?

19        THE COURT:  Yes, you may.  And let's see,

20   Mr. O'Toole will be here.

21        MR. O'TOOLE:  Yes, sir.

22        THE COURT:  And then at some point Mr. O'Toole is

23   going to depart, when is that?

24        MR. O'TOOLE:  I'm not sure, that's up in the air

25   about that case.  That may have be resolved, I'm just not

Defendant Jones' Closing Argument

1    sure.

2           THE COURT:  Oh, okay.  So not today.  You'll be here

3    with us all day today.

4           MR. O'TOOLE:  I'll be here all day.

5           THE COURT:  Okay.  Mr. Enzinna, you are excused.

6           MR. ENZINNA:  Thank you.

7           THE COURT:   And Mr. Bussard, you are ready.

8    Let's bring the jury in.

9           Mr. O'Toole, I will tell the jury that Mr. Enzinna

10   has been excused, unless you want me to just not mention it.

11          MR. O'TOOLE:  No, I think it's fine, Your Honor.

12   Thank you.

13              (Jury entered the courtroom.)

14          THE COURT:  Be seated, please.  Ladies and

15   gentlemen, we're ready to resume.  You'll notice that

16   Mr. Enzinna has been excused for a few minutes to attend to

17   another matter in another courtroom.  Of course Mr. O'Toole

18   remains here on behalf of Mr. Johnson.

19          Mr. Bussard, do you wish to deliver a closing

20   argument?

21          MR. BUSSARD:  Yes, Your Honor.

22          THE COURT:  Then you may proceed.

23          MR. BUSSARD:  Thank you.

24          Good morning, ladies and gentlemen.

25          JURORS:  Good morning.

 1          MR. BUSSARD:  It's been a long nine weeks.  We've
 2     had a couple holidays in there, couple snowstorms in there.
 3     And for the most part your role has been passive, you just sit
 4     there and listen.  And you don't have a whole lot of control
 5     over what happens.  That's all about to change.  And instead
 6     of all of this being the focus of this trial, you're going to
 7     be the focus of this trial.  But for the next about an hour,
 8     if you can grant me that courtesy, because I'm speaking on
 9     behalf of Mr. Jones.

10          You all are part of a tradition extends back 600,
11     700 years starting over in Europe.  And the circuit judges
12     used to travel around the countryside, and they then gathered
13     the important citizens, the most respected citizens in the
14     community together to serve as jurors and they would hear the
15     important cases of the day.  For Mr. Jones, this is the most
16     important case of the day.

17          Who is Kenneth Jones?  Well, he's 30 years old, grew
18     up in the Greenmount area.  He lived in a family that had some
19     tough finances, as you heard.  His biological father was not
20     in the home.  He was raised by his mother and stepfather.  And
21     his stepfather was a work-a-day chef.  And unfortunately,
22     while he was the role model or the male in that house, he died
23     prematurely of a heart attack.  Mr. Jones left school soon
24     after that.  He in fact got a job and on the day he was
25     arrested for this case, actually the one in the state, he had

1    been working that day before he was arrested and he told you

2    that on the stand.

3          What's the Greenmount area like?  Well, the

4    Greenmount area is a neighborhood in Baltimore City, and

5    you've seen the maps and I'm not going to bore you with all

6    those maps.  The Greenmount area consists of people, not

7    geography.  And the people are people like these three young

8    men over here and a lot more, as you've heard.  And they all

9    grew up together, they played in the playgrounds when they

10   were real young, their mothers probably strolled them down the

11   street.  They went to school together.  They became friends.

12         And I want you to think a little bit about your

13   friends from early childhood, everybody didn't remain perfect,

14   but you still stayed friends with them if you see them.  If

15   you see them around now they may not have become, you know,

16   doctors or accountants, they may have been a little bit less

17   successful in life.  But nonetheless, they were your friends.

18   And you have friends today and you call those people your

19   friends.

20         Well, when we talk about Kenneth Jones and Joseph

21   Bonds and Gerald Johnson and Marquise McCants, Wes Brown, I

22   can go on and on with the names, these are people that grew up

23   together, and they're friends.  Does that make them part of a

24   conspiracy?  No.  And I apologize in advance for repeating

25   some of what Mr. Enzinna had said earlier.  They talked a lot.

1    You heard there was a lot of rumors in the neighborhood, you

2    heard there was a lot of things going on in the neighborhood.

3    But does that make you BGF?  These were friends, these were

4    childhood friends that grew up together.

5            In the beginning I asked you to keep in mind two

6    concepts.  One was to keep an open mind.  We're not done yet,

7    so I'm asking you to keep that open mind until you hear all

8    sides of this -- this story, this vast conspiracy that the

9    government is talking about.  Second, and I'm really going to

10   ask you to follow this, is follow the evidence in this case.

11   There's a couple ways of looking at it.  You can decide that

12   you've either found these young men guilty or you've found

13   them not guilty.  But that's the result.

14           What we're asking you to do is look at the evidence.

15   That's what Mr. Enzinna did when he went through for the last

16   hour talking about the evidence in this case.  And that's what

17   I'm going to do too.  And that's what the government is asking

18   you to do.  And that's not an easy job.  If you just want to

19   get it over with, you can think about the result and the

20   result -- just take a vote and call it a day.  But that's not

21   what the instructions that Judge Bredar's going to give you

22   say, and that's not what deliberations are all about.

23   Deliberations are going to start around lunchtime today and

24   that's when your hard work begins.  Take your time and make a

25   deliberate, that's why they call it deliberations, a

1    deliberate decision.

2            There's a few instructions that Judge Bredar is

3    going to be giving you later on.  And I always start with this

4    one because it is the foundation of our justice system, and it

5    says -- this is the words that Judge Bredar is going to read

6    to you in a little while, the presumption of innocence.  And

7    it really is a guideline about how you're supposed to look at

8    this case.  It gives you all the information you need to deal

9    with the rest of this case and this huge amount of evidence

10    that we have.

11            And there's one line in about the third, fourth

12    paragraph down that says the presumption of innocence alone is

13    sufficient to acquit a defendant.  Presumption of innocence

14    remains with the defendant until and unless you are convinced

15    by the government's evidence that the government has proven

16    the defendant's guilt beyond a reasonable doubt.

17            It's your job to take the government's evidence and

18    challenge it.  You look at it, you mull it around for a while.

19    Does it live up to the way Ms. Hoffman yesterday explained it

20    to you?  And then you're going to be drawing conclusions from

21    that.  I ask you to base your decision on the evidence, not on

22    argument, not on speculation, and not on emotion.

23            A major portion of this trial has been -- dealt with

24    videos, tattoos, cell phones, Facebook, jail calls, and a lot

25    of talk by others about people.  Would you like to be judged

1    by how other people talk about you when you're not there to

2    contradict it?  The history of this case started actually in

3    2005, 12 years ago.  Some of you are too young, but if you can

4    remember 12 years ago, Facebook was kind of an after thought,

5    people didn't even know what it was all about.  Instagram

6    hadn't even really taken effect yet, it wasn't popular.  And

7    cell phones were something that you maybe were able to call

8    your mother or call your husband or call your wife and talk to

9    them a few minutes.  Obviously they've become a lot more in

10   the last 12 years.

11           There's no videos of Kenneth Jones, you haven't seen

12   one video in this courtroom of Kenneth Jones.  You haven't

13   seen Kenneth Jones having a Facebook account.  You haven't

14   seen Kenneth Jones having an Instagram account.  You've seen

15   Kenneth Jones's picture, but they're always in somebody else's

16   Facebook account.  And you've heard testimony about how people

17   just post things, and think about -- some of you may be on

18   Facebook and Instagram.  Pictures kind of pop up there and you

19   go, my goodness, I got tagged in that and that must have been

20   five years ago, and you're sitting there with a group of

21   friends and you're going, it's nice to see them on there and

22   it brings back all these memories.

23           What the government's done with these Facebook

24   accounts is saying, because they're in these pictures and

25   they're on the Facebook account of maybe Mr. Johnson or Wesley

1    Brown or as we're going to hear, Ronnie Hall and these other

2    people, your picture would show up on that, all the sudden you

3    might be a member of a conspiracy.  That doesn't make you a

4    member of a conspiracy.  And I'm going to close my remarks in

5    a little while with some guidelines for you to keep in mind.

6         The tragedy in this case is that Moses Malone, Henry

7    Mills, Thabiti Wheeler, Trevon White, Ben Miller, and Gregory

8    Rochester and others met a tragic end.  In the case of Moses

9    Malone, I talked to you briefly in the opening and I'm going

10   to tell you again, his death may have been preventable.  There

11   was a series of unfortunate acts by law enforcement, by law

12   enforcement's agent on the scene, Harry Caesar, by missed

13   calls, by miscommunication with the witness protection, and

14   all of that combined along with somebody who had a gun, Moses

15   Malone died.

16        Don't be fooled by the gallantry with which Harry

17   Caesar has been put up on a pedestal.  Mr. Enzinna talked

18   about that a little bit earlier.  He did call Detective

19   Taylor, he did try to warn her that Moses Malone was back in

20   the neighborhood.  When he couldn't reach her, what did he do?

21   He didn't call 911.  He could have called 911 and said look,

22   I'm a government informant, can you help me out real quick,

23   can you find her and all that, she must have her phone turned

24   off.  But no, he didn't do that.  He just kept calling and she

25   was missing her calls and what have you.

 1          Harry Caesar is a thug.  The visual of what I had

 2    listening to Harry Caesar is somebody -- and I hate to be --

 3    I'm not trying to be humorous, but somebody with alligator

 4    arms that couldn't quite reach that warrant that was sitting

 5    there on the table when they came back from the police

 6    station.  Tech grabbed it, Harry Caesar was there, and you saw

 7    Harry Caesar was a pretty dominant personality.  But he didn't

 8    want do all that because he would have blown his cover.  He

 9    could have grabbed that warrant, he could have chewed it up,

10    could have done whatever as soon as he saw it.  But he didn't

11    do that.  Tech runs out of the house.  He could have done any

12    number of things, but he didn't do it.  And unfortunately a

13    tragedy occurred.  Did Harry Caesar cause that?  No, he didn't

14    cause that.  But he was on the scene and it may have been

15    preventable.

16          Kenneth Jones was not even mentioned during the two

17    weeks or more of the Moses Malone event.  He's not charged

18    with murder in this case, although you may think so based on

19    the government's presentation.  As you've heard, this is about

20    something different, it's about racketeering.  Defendants

21    aren't claiming that the young men that I mentioned earlier

22    were not murdered.  But were they murdered as part of a

23    racketeering conspiracy?  When David Hunter and Wesley Brown

24    and Ben Miller and Shawn Gregg, known as Hood, kills people,

25    is that part of BGF or is it the old fashioned state charge of

Defendant Jones' Closing Argument

1    murder?  You've heard that Kenneth Jones allegedly was a

2    member of BGF because he had some tattoos.  Not one person

3    walked into this courtroom and said that Kenneth Jones took an

4    oath, in prison or elsewhere.  I apologize.

5              As you're going to hear from the instructions read

6    by Judge Bredar in a little while, Mr. Jones is only charged

7    in Counts 1 and 2.  Count 1 is the racketeering conspiracy.

8    Count 2 is the drug conspiracy.  He's not charged with any of

9    the murder counts.  He's not charged with any of the gun

10   counts.  Every word that Judge Bredar reads is going to have

11   special meaning to you and you have to follow his

12   instructions.  And I ask you to do that.

13             The government showed you a slide similar to this

14   yesterday, and Mr. Enzinna showed you one similar to this

15   morning.  It's Count 1, the racketeering conspiracy.  And the

16   defendants have to conspire to violate the Racketeering

17   Influence and Corrupt Organizations Act.  First, there has to

18   be an agreement between two or more people to participate in

19   an enterprise that would affect interstate commerce through a

20   pattern of racketeering activity.  Second, that the defendant

21   knowingly and willfully became a member of that agreement.

22   And third, that the defendant or another member of the

23   conspiracy agreed to commit two racketeering acts.  All that

24   will be explained to you by Judge Bredar in a little while.

25             What does that mean in practical terms?  Well,

1    generally speaking there was a gang, it was called YGF and

2    you've heard ad nauseam about the YGF group in Greenmount,

3    bunch of childhood friends with no -- they got together, there

4    was no meetings, no rules, no -- no nothing, they just got

5    together.  At some point, the government spent about two weeks

6    in the beginning of this case talking about the gang called

7    BGF.  And then they talked about membership in BGF, and they

8    talked about the transition.

9         Michael Gray, Brian Rainey, Troy Kellam, and Michael

10   Gwaltney testified that there was a group, beginning of 2005,

11   12, 13 years ago, and continuing to 2017, that was in the

12   Greenmount area and they were called YGF.  And at some point

13   around mid 2007, there was this transition.  Michael Gray was

14   the acknowledged leader of this group.  He would tell you that

15   he was the leader of this group.  Michael Gray also admitted

16   that he had a lot of power.  He wanted power.  He thrived on

17   power and control.  He ordered numerous murders.  Mr. Enzinna

18   told you about that.

19        He also got money.  He set up these regimes,

20   according to him, all through the city, and who did they

21   benefit?  Well, they benefited Michael Gray.  Michael Gray was

22   given money by all these people.  Allegedly there was

23   something called dues, and they would pay these dues and the

24   dues were all trickled down.  Well, if you trickle down to the

25   last person, the leader, who's getting that money?  Well,

Defendant Jones' Closing Argument

1    Michael Gray is.  He said people gave him drugs because he was

2    the leader, they gave him all this stuff.  So Michael Gray

3    naturally says, I created the organization, I set this thing

4    up, it's working rather well.

5            The government also told you that Kenneth Jones was

6    a member of the BGF Avenue Regime.  You will recall, and I saw

7    all of you taking notes, listening to the testimony.  You also

8    notice that I did not cross-examine any of those four

9    witnesses.  And the reason is, they didn't mention Kenneth

10   Jones.  None of those four, in any respect, mentioned Kenneth

11   Jones.  They didn't talk about him doing anything in prison

12   and all those guys talked about their prison activities.

13   Kenneth Jones has been in prison, you know that.  They didn't

14   talk about anybody giving him the oath.  They didn't talk

15   about him being at meetings.

16           Those four individuals who were brought in here to

17   tell you how structured BGF was, and they gave you all the

18   terms, did not link Kenneth Jones to BGF.  I don't care how

19   many charts you make up, how many faces you put on these

20   charts, just because your face is on an exhibit, a chart

21   doesn't make you a member of BGF.

22           Christopher Meadows, we'll talk about him a lot,

23   talked about Mr. Jones being at the transition that happened

24   around mid or early 2007.  The four individuals that I have on

25   the screen in front of you couldn't testify about Kenneth

1    Jones because they didn't know Kenneth Jones.  You saw them

2    sitting up here, looking down the rows.  They were looking to

3    see if they knew anybody, and they didn't know Mr. Jones.  The

4    government asks you to find that the Greenmount Regime of BGF

5    is a racketeering enterprise.  But the criminal conduct

6    conducted by the members, and you've heard a lot about

7    criminal conduct in this case, were all part of a pattern of

8    racketeering activity.  And they produced charts to show you

9    that because their picture's on that chart they must be a

10   member of the Greenmount Avenue Regime of BGF.

11          Judge Bredar's instructions are going to control how

12   you handle all that evidence.  I will tell you, and the

13   testimony is uncontradicted in this case, that except for a

14   few days in 2007, Mr. Jones was in prison.  If the transition,

15   the meeting that Christopher Meadows was so confident about,

16   and some of those other people talked about, occurred, Kenneth

17   Jones wasn't there.  And that's why these four individuals

18   didn't mention him.  But that didn't stop Christopher Meadows

19   from saying that Kenneth Jones was there.  He didn't think

20   hard enough to realize that Kenneth Jones was in jail for all

21   of 2007 except for a very few days.

22          Count 2 is a conspiracy to distribute and possess

23   with intent to distribute controlled substances.  And the

24   requirements generally are two or more people entered into an

25   unlawful agreement to distribute and possess with the intent

1   to distribute controlled substances.  Second, that the

2   defendant knowingly and willfully became a member of that

3   conspiracy.  Now, you'll recall, and Judge Bredar's

4   instructions are going to control how you look at this

5   evidence, but I ask you to think about it.

6         Aside from Christopher Meadows, who else has even

7   mentioned Kenneth Jones as being around Jones -- drugs?  There

8   are no traffic stops, there are no sales to undercover

9   officers.  There were no search warrants executed at any of

10   Mr. Jones's houses where drugs were found.  And Mr. Jones

11   never admitted or was asked during his testimony about whether

12   he used drugs.  It simply is not reasonably foreseeable to

13   Mr. Jones that he was part of a controlled substance

14   conspiracy.  He didn't have drugs in his prison cell, he

15   didn't have drugs in his pocket when he had the gun in his

16   pants, he didn't have drugs when he was arrested.

17         We're going to talk about the government witnesses a

18   little bit.  But the government's invested about four years,

19   maybe even longer, in this prosecution.  And they presented a

20   lot of witnesses, criminals.  The nicer term is cooperating

21   witnesses, but make no mistake, they were all criminals.  And

22   they're all criminals looking for a benefit, and those

23   benefits can be any number of things.  The obvious one is they

24   hope for a lesser sentence after pleading guilty, some of them

25   do.  No doubt about that.

1          Judge Bredar's going to instruct you down the road,

2     probably this afternoon, that you have to evaluate people who

3     enter into plea agreements and agree to cooperate and testify.

4     You have to use a little bit different standard in evaluating

5     their testimony as opposed to ordinary witnesses.  Some of

6     these individuals were never charged with any criminal

7     conduct.

8          Michael Gray, make no mistake, was never charged

9     with the 40 murders that he talked about.  Joe Davis was never

10    charged with the shooting of his -- or the robberies that he

11    committed.  Troy Kellam admitted killing his best friend, as

12    Mr. Enzinna told you this morning.  Michael Gwaltney committed

13    numerous acts of violence and he wasn't charged with all of

14    those.  Make no mistake, when sentencing comes for some of

15    these individuals, the government is going to recommend a

16    lower sentence.

17         There's some individuals who never had a plea

18    agreement.  The government's going to make a deal about that,

19    that why would they come in here?  They came in here out of

20    the goodness of their hearts and as upstanding citizens of the

21    Greenmount community.  And Lamontae Smith is one of those in

22    particular.  He didn't have a plea agreement.  He admitted to

23    actively participating in the murder of Ben Miller.  He didn't

24    pull the trigger, but he was there.  He knew that Shawn Gregg,

25    Hood, was going to kill Ben Miller and he went along kind of

1    as a distraction to Miller to lure him into a place where Hood

2    could do it.  So he didn't kill anybody, but he may as well

3    have.

4            Christopher Meadows robbed numerous people in Dutch

5    Village and then he said he came back into the neighborhood,

6    different neighborhoods, and was robbing different people.  He

7    was never charged with those robberies.  Joseph Davis, I don't

8    believe was charged with shooting Mr. Johnson.

9            They also committed crimes without fear of criminal

10   prosecution.  The big example is Harry Caesar.  Harry Caesar

11   admitted to selling drugs as an informant.  He was out there

12   selling on the corner as part of his informant duties and he

13   was allowed to keep the profits of all that.  Now, you may

14   recall that Mr. Caesar stumbled a little bit when asked about

15   his finances because apparently he was -- he was keeping some

16   of those profits.  When he was asked about how he made bail,

17   he said, well, I had some money stashed away.  Now, person

18   with a felony record doesn't make $51,000 a year, which is the

19   financial consideration that he was getting for that, and

20   allowed to keep the profits from his drug business.

21           Why is the government so sure about this case?

22   They're so earnest when they get on the witness stand, all the

23   law enforcement.  It's because of what I told you in the

24   beginning, the government doesn't make mistakes.  They get a

25   theory, they insert some facts, and they run with it.  Well,

 1    I'm going to give you a few other ways of looking at it.

 2    Mr. Jones is not charged with murder, as I've already said.

 3          I'm going to show you how some of the facts in this

 4    case are seriously flawed.  Your recollection is going to

 5    govern all this.  There's almost no eyewitnesses to almost any

 6    of these events, there's only word on the street.  And as you

 7    heard from the one conversation, I think between Mr. McCants

 8    and Mr. Burris, Mr. Burris, who we never heard in this trial,

 9    Mr. Burris said there's so many -- so many stories going

10    around I don't know what to believe anymore.  That's the way

11    the Greenmount area was.  There was rumors and that was part

12    of the one-upmanship, was how many more murders -- or rumors

13    could you spread and how could you deflect attention away from

14    yourself onto other people.

15          Now, you just heard government witnesses without

16    defense cross-examination, that may sound like a very good

17    story.  The government attempted to bolster their story by

18    saying BGF's in prison, BGF's all over the city, BGF is

19    pervasive in the Greenmount area, and BGF has created a

20    neighborhood living in fear.

21          A video, I'm not going to show you the video, has

22    Mr. Johnson in a green shirt hanging around in the park and it

23    looks like a good time.  And when it's focused in just on

24    Mr. Johnson and allegedly Mr. Hunter, who received something

25    from somebody else over there, it looks like just a few -- a

Defendant Jones' Closing Argument

1    gathering of friends.  When the camera pulls back though, and

2    you were able to see the full video and I ask you to look at

3    that full video back in -- when you start deliberating, you're

4    going to see people walking by on phones, you're going to see

5    people -- mothers pushing strollers, you're going to see

6    children playing ball.  You're going to see a young man on a

7    scooter who wheels up, listens to these guys and goes, oh,

8    fools, we don't need them, and he wheels away on this little

9    two-wheel scooter.  Is that a neighborhood that is in fear?

10   Is that a neighborhood that looks like they're being

11   threatened and intimidated?  That video was put in to evoke a

12   lot of strong emotions because it followed the Henry Mills

13   horrible murder that was not committed by any of these three

14   young men.

15          More about the witnesses.  I had told you a little

16   bit about what to look for in the witnesses.  Well, think

17   about the law enforcement witnesses.  For instance, law

18   enforcement witnesses get on the stand, they were well

19   prepared, they would answer the questions directly from the

20   government, and they would turn their head.  It was very, very

21   orchestrated, very rehearsed, and they would address their

22   answers to you.  The cooperating witnesses would make good eye

23   contact with the prosecutors, they would answer the questions,

24   they knew what the questions already were going to be, and

25   they answered accordingly.  They would say yes, ma'am; no,

1    ma'am; yes, sir; and no, sir.

2          And then the four of us would stand up and start

3    asking questions and you start getting instead of yes, sir;

4    no, sir, you start getting "nah," "yeah," and then you start

5    getting hesitancy and pauses, then you start getting some

6    surliness, and then you start getting the body language that

7    becomes more defiant.  And if you remember, from this witness

8    stand, Lamontae Smith, who didn't want to be here in the first

9    place but he was, started hiding his head.  In the end of his

10   testimony, his head was over against that monitor and he was

11   trying to hold it up and he had his arm up there.  He didn't

12   want to answer any of our questions.  And again, as I said,

13   the most dramatic of all was Mr. Caesar.  Mr. Caesar just had

14   some questions about his finances that he didn't want to talk

15   about.

16          Mr. Meadows testified and he's testified a lot of

17   times and he answered all the questions put to him by the

18   government.  Mr. Meadows on cross got a little vague about

19   when these meetings were happening, where these meetings were

20   happening, and he wasn't really certain about some of his past

21   testimony or when he became a member of BGF or where he became

22   a member of BGF.  And he just shrugged it off and he actually

23   said a couple times "whatever" in response to counsel's

24   questions.  Well, "whatever" is not a fact.  Again, you can't

25   speculate.

1          The law enforcement people -- I just point out, was

2     there a dress code involved?  Because I think the four or five

3     first witnesses from law enforcement all came in looking much

4     better dressed than anybody in this courtroom.  They had their

5     bow ties on, they were trained to look at the jury.  And all

6     the sudden, when they started getting questioned, they go, "I

7     don't recall."  But they testified about thing -- events that

8     were happening 10 or 12 years ago like it happened yesterday.

9     But all the sudden, when they're cross-examined, "I don't

10    recall" or "I don't remember."  Well, that's because they

11    weren't asked that question in prep sessions.  "I don't

12    recall" and "I don't remember" doesn't fit with the facts of

13    this case.

14          When the government said, is there some document

15    that would refresh your memory, oh, yeah, it will.  And they

16    showed them the report, oh, yeah, I know.  When we ask them,

17    the defense would ask, is there a document that would refresh

18    your memory?  No.  We can't ask anything else.  If there's

19    nothing that will refresh their memory, we can't go any

20    further.

21          I'm going to talk a little bit more about the

22    government's proof.  These are witnesses who did not testify

23    in this case.  Joseph Bonds, we heard a lot about Joe, we

24    heard a lot about Gotti, but he didn't testify.  Wesley Jerel

25    Brown, I call him Terp Brown because he was a running back at

 1    the University of Maryland before he got into some trouble.

 2              Government put in testimony through Detective Hayden

 3    that seems to indicate, and we'll talk about this in a little

 4    while, that he was trying to buy a weapon from Kenneth Jones.

 5    He surely was buying weapons from other people, you can read

 6    those text messages before.  He was trying to sell drugs,

 7    probably at the University of Maryland.  He was trying to buy

 8    guns.  He had some ammunition, which is really clear from the

 9    text messages.  And when the police come in, I'm going to talk

10    about this in a few minutes, when the police come into his

11    dorm room, he has a .22 in his dorm room.  What would a

12    college student need with a gun?

13              This is James Cornish, otherwise known as Nod.  You

14    heard that "nod" is a drug term, I think Mr. Meadows maybe

15    admitted that, for somebody who takes a lot of drugs and

16    sometimes nods, passes out.  This is Lavon Cypress, this is

17    Swan.  Swan, you heard his voice on a phone call from Kenneth

18    Jones, maybe a couple phone calls from jail.  And they're

19    talking about something the government says was a gun.

20    Mr. Jones says it was a car.  Nobody knows what it was.  But

21    we didn't hear from Mr. Swan -- Mr. Cypress, only Officer

22    Badgujar talked about his conversations with this gentleman.

23    But we didn't hear from Mr. Cypress to hear his side of the

24    story.  And while I'm at it, we didn't hear from his cousin

25    where the gun was found, Courtney Carroll.

1          This is Kenneth Faison, otherwise known as Roscoe.

2     There was a lot of talk to other people about other people.

3     He hasn't talked to Kenneth Jones.  We have Ronnie Hall,

4     Cakes.  We have his Facebook, we have all kinds of text

5     messages.  We didn't hear from Mr. Hall.  Mr. Handy, which

6     I'll get to in a few moments, we didn't hear from Mr. Handy.

7     Ms. Hitchens, we didn't hear from Ms. Hitchens in this case.

8     David Hunter, we heard a lot about things that David Hunter

9     was allegedly doing, but we didn't actually hear from David

10    Hunter in this case.

11         Heard about this individual, his name is Antonio

12    Oliver, Bubba.  Bubba's not a BGF member.  He was part of a

13    rival gang, he was probably part of Lanvale and Barclay, which

14    Mr. Enzinna mentioned this morning.  A rival gang, not

15    anything from Greenmount.  You heard about this individual,

16    Tech.  Tech's the guy who allegedly grabbed the warrant, ran

17    to Mr. Johnson, and set in motion that horrible set of

18    circumstances.  We heard about Stymie.  We saw pictures of him

19    with the T-shirts and what have you.

20         We heard about this individual, Paul Wilson, Twin.

21    We also unfortunately didn't hear from these individuals.  We

22    didn't hear from Ben Miller.  We didn't hear from Donatello

23    Fenner.  We didn't hear from Shawn Gregg, Hood.  We didn't

24    hear from Moses Malone, although we did hear a little bit of

25    his discussions with law enforcement.  We didn't hear about

1   Charles Pace, otherwise known as Foo.  We didn't hear about

2   Michael Robinson, otherwise known as Mike Mike.

3          Now, I'm going to try and go through a little bit

4   of -- and these are taken out of the indictment.  And I'm

5   going to talk about the different allegations that pertain to

6   Mr. Jones in this case, and I'll try to be as brief as

7   possible, but they are important to Mr. Jones.  Overt Act 17

8   says beginning in approximately 2005 and continuing until

9   early 2007, Johnson supplied distribution quantities of

10  cocaine, cocaine base, heroin, and I'm not going to pronounce

11  that, to other YGF members, including Faison, Bonds, Jones,

12  Hunter, who in turn assisted Johnson in distributing drugs on

13  the street.

14         The only testimony about these acts is Christopher

15  Meadows.  Now, there was no house raids, there was no sales to

16  undercover officers, there were no traffic stops, and there's

17  no telephone calls talking about quantities of drugs, types of

18  drugs between Mr. Jones and anybody else during this time, or

19  any time, as a matter of fact.

20         Overt Act 18 says that approximately 2005 to early

21  2007 Johnson used a residence located at 221 East 25th Street

22  as a stash house where other YGF members, including Faison,

23  Bonds, Jones, would store and package their drugs.  The sole

24  testimony in this case, Christopher Meadows.  No one else came

25  in here and said that there was drugs at that location.

1          Overt Act 19 beginning in approximately 2005 and

2     continuing until early 2007, Johnson and other members of YGF,

3     including Faison, Bonds, Jones, and Hunter, held gang meetings

4     there.  Again, Christopher Meadows, not Michael Gray, not

5     Brian Rainey, not Troy Kellam, not Michael Gwaltney, not

6     Joseph Davis, none of them talked about that, only this

7     gentleman right here, Christopher Meadows.

8          On January 9th, 2007, there was a horrible murder at

9     221 East 25th Street.  This Overt Act 23 alleges and the

10    government -- you've heard the assertions that Mr. Jones and

11    others participated in the murder of Gregory Rochester.

12    Detective Lloyd testified that he interviewed, he investigated

13    the crime, he examined the crime scene, he reviewed CCTV and

14    other surveillance cameras in the area.  And he walked around

15    the crime scene with his tech, recovered shell casings.  And

16    he concluded there were no suspects, there were no leads.

17         Detective Lloyd is very important for another

18    reason, however, it's that on that crime scene, no drugs were

19    found, there was no drug paraphernalia found on the drug scene

20    at 221 East 25th Street.  Nobody except this gentleman says

21    that this happened, and we know it happened, but who was

22    responsible for it?

23         Now, six months later, June of 2007, Meadows gets

24    arrested for possession of a handgun and he starts talking.

25    And as Mr. Enzinna already told you, he told one story, he

1    signs a plea agreement when he comes over to the feds and

2    about six months later, again in January 2008, one year after

3    the murder of Gregory Rochester, he starts changing his story

4    a little bit and he adds other people.

5            Now, you have to think about that a little bit

6    because, what's happened in that year?  Well, we mentioned

7    Charles Pace.  Charles Pace was killed February 19th, 2007,

8    four months before Meadows talks about that murder.  Little

9    bit later, Fenner, who he had thrown in the mix, gets stopped

10   at a traffic stop by Detective Roepcke.  And what does Fenner

11   have in his car, after he runs away, kind of flees and alludes

12   away from Officer Roepcke's orders to stay there?  What does

13   he find in the car, what does Officer Roepcke find?  Two guns.

14           And those two guns that Fenner had go back to the

15   shooting of a person named Bubba, which I showed you earlier,

16   and this shooting.  Mr. Fenner had that gun, but now he's

17   dead, so we can't question Mr. Fenner about where those guns

18   came from.  And Foo's dead.  So here we are, ten years, 12

19   years later and the government points its legal finger at

20   Kenneth Jones because Kenneth Jones is the one person still

21   alive that Mr. Meadows mentioned, otherwise there's no reason

22   to even be here.

23           Now, you have to think about this a little bit and

24   I'm not trying to be funny.  But the testimony -- and

25   Mr. Enzinna touched on this briefly, there was a meeting,

1    actually two meetings, and Mr. Johnson and Mr. Jones and a

2    couple other people all decided that Gregory Rochester had to

3    go.  So what do they plan to do?  Well, since they package and

4    store all their drugs at 221 East 25th Street, let's kill him

5    there, that won't draw any attention to us.  And since

6    Mr. Johnson lives there, and you heard Mr. Johnson testify

7    that it was his residence and the detectives also testified

8    that they interviewed Mr. Johnson as being a resident.  Let's

9    kill him where Mr. Johnson lives, that won't draw any

10   attention to us.

11            And 221 East 25th Street is a boarding house,

12   there's other residents that live in there.  Let's kill him

13   right there, so there's witnesses around who we maybe don't

14   have any control over those witnesses.  The absurdity defies

15   rational thought.  What is supported by the facts is, Gregory

16   Rochester was homeless, according to Mr. Meadows.  Gregory

17   Rochester would stay in the common area where he was found

18   shot to death at 221 East 25th Street.  And Gregory Rochester

19   was killed by someone, probably a rival drug gang, who wanted

20   it to look like these guys were involved.  That might be Foo,

21   that might be Donatello Fenner, that might be Bubba, who

22   actually was taking action, and less than a month later he did

23   kill Pace.

24            MR. MARTINEZ:  Objection --

25            MR. BUSSARD:  There was testimony from --

1            THE COURT:  You may approach.

2            (Bench conference on the record.)

3            THE COURT:  Mr. Martinez.

4            MR. MARTINEZ:  Your Honor, this is the second or

5     third time there's been evidence mentioned to the jury about

6     Charles Pace.  There are a couple instances where Mr. Bussard

7     mentioned Charles Pace being murdered.  I don't believe that

8     came out and came into evidence during this trial, and I don't

9     believe that there was evidence of the incident Mr. Bussard

10    just mentioned.  We let it go the first couple of times --

11            THE COURT:  Mr. Bussard, what is the factual basis

12    in the record of this case from which you can make that

13    argument or from which you can extrapolate in order to justify

14    this argument as a reasonable inference to be drawn from proof

15    presented here?

16            MR. BUSSARD:  Christopher Meadows testified as a

17    government witness in this case.  Christopher Meadows said

18    that while he was in protective custody, I forget if he was ad

19    seg at the jail, he was housed with Antonio Oliver, known as

20    Bubba.  Bubba told him a few things, including the fact that

21    he --

22            THE COURT:  So Christopher Meadows said that Bubba

23    told him --

24            MR. BUSSARD:  That he was responsible for the -- for

25    killing Charles Pace on February 19th, 2007.

1        MR. MARTINEZ:  That came out in the grand jury, but

2    not in the -- before this trial.

3        THE COURT:  I don't have a clear enough recollection

4    to specifically resolve the issue.  Accordingly, I will advise

5    the jury that it's their recollection that will control.

6    Mr. Martinez, you remain free to argue the evidence as you

7    believe it was presented in your rebuttal.  You may step back.

8        (The following proceedings were had in open court.)

9        THE COURT:  Ladies and gentlemen, at a time like

10   this where there's a dispute between the attorneys as to what

11   or was not presented to you during the trial, what is in the

12   evidence and what is not in the evidence, it's appropriate for

13   me to remind you that ultimately after this lengthy trial, it

14   is your recollection of the evidence that controls, not the

15   attorney's recollections on either side, but your own

16   recollection of what the testimony was and what the proof was.

17   And I so instruct you.

18       Mr. Bussard, you may continue.

19       MR. BUSSARD:  Thank you.  About a year later,

20   January 2008, Mr. Meadows decides to add Donatello Fenner to

21   the mix.  And he actually completes a photo array.  And I'm

22   not sure it's showing up as well as it should, and he picks

23   out Mr. Fenner and adds that as well.  There's the photo array

24   and the bottom center picture is Mr. Meadows's identification

25   of Mr. Fenner.  Mr. Fenner had been stopped May -- March 3rd,

1    2007 by Detective Roepcke and he had a .38 caliber Taurus

2    handgun and a Sig Sauer 9mm pistol.  Ms. Bohlen came in and

3    Ms. Bohlen said to a reasonable degree of ballistic certainty,

4    based on her expertise, that those guns in the possession of

5    Mr. Fenner, were -- who -- the weapons that had fired the

6    casings that were found at the scene of the Antonio Oliver

7    shooting on January 4th and the Gregory Rochester shooting on

8    January 9th of 2007.

9         The government says that, how would Mr. Meadows know

10   about that?  Well, he didn't have to know about that except

11   that he knew about Mr. Fenner.  They were still all friends at

12   that time.  He knew Mr. Fenner had been arrested, the rumors

13   in the neighborhood were -- were strong.  And Mr. Fenner was

14   arrested with two firearms, and Mr. Meadows probably had some

15   pretty good knowledge about Mr. Fenner's involvement in all

16   this, so he had no reason not to put Mr. Fenner into the mix.

17   Again, ten years later the government points its finger at the

18   only person still alive, and that's Kenneth Jones.

19        Ms. Hoffman did not talk about that, but I want to

20   talk about this for a moment.  On April 11th, 2011, in the 900

21   block of East North Avenue, Mr. Jones unlawfully possessed a

22   Taurus .357 magnum firearm.  Yes, he did.  He -- I told you in

23   the beginning, Mr. Jones admitted it, and he was convicted of

24   that possession of a firearm.  He was not a felon, not charged

25   as a felon in possession.  He was charged with possession.  He

1    served his time, he didn't resist.  Detective Sailor, he

2    obeyed all the commands.  And if you remember, they had to cut

3    the gun out of his lower pants, down around his calf.

4           Mr. Jones pled guilty to that, served time to

5    possession of a firearm.  Six or seven years -- oh, and

6    Detective Sailor, after he had arrested Mr. Jones, writes a

7    report, an official report.  And in that report he talks about

8    yelling to Mr. Jones to stop.  And he stopped.  And he found

9    the gun.  He doesn't mention in that report, and I asked

10   Mr. -- Detective Sailor, you can recall what Detective

11   Sailor's comments were, there was no mention of any statements

12   that were made after Mr. Jones was arrested.  Detective Sailor

13   couldn't leave that alone, so six or seven years later he

14   decides to add a little bit to it, "because they shot at me

15   first."  He says Mr. Jones just blurted it out and he didn't

16   put that in the report because he didn't think it was

17   necessary or important at the time.

18          Well, there's no link, first of all, to BGF about

19   anything in that incident.  Detective Sailor's recent comments

20   that are not in his report six or seven years ago were meant

21   to be inflammatory, and I ask the Court -- or the members of

22   the jury to take it for whatever value you think is necessary.

23          It's an interesting little pattern that developed

24   and I know two is not a pattern, but Detective Sailor added

25   some things that weren't in his report and we also have an

1    Officer Badgujar who testified.  And Officer Badgujar said --

2    and you may recall, he was out there in the alleyway when he

3    was recovering this firearm from 4447 Pall Mall Road.

4    Detective Badgujar had written in his report that he had

5    recovered the gun.  You heard him, he didn't recover the gun,

6    he obtained the gun later on, but he put in the report that he

7    recovered the gun.  Actually, some other detective recovered

8    that gun and Detective Badgujar said, well, I didn't put that

9    in the report, it wasn't necessary.  He's the one that finally

10   obtained the gun and took it to be examined.

11        It's just another incident where if we just took it

12   at face value, we would think that Officer Badgujar went over

13   and picked up that gun from the trash can lid, but that isn't

14   what happened.  He was handed it by another detective who

15   actually was in the alleyway.  That's the gun Kenneth Jones

16   had in his pants that day.

17        April 3rd, 2013, the records are in evidence.

18   Detective Hayden said that he examined the records and he

19   found a series of text messages.  You will recall that Wesley

20   Jerel Brown was a student at University of Maryland, he was

21   involved in some incident at the Mirage nightclub and through

22   a series of good law enforcement, they located him at

23   University of Maryland, tag readers and what have you.  And

24   they found out he was a college student at the University of

25   Maryland and he had a Lexus, a car, and that tag showed up on

1    tag readers.  And they went down to -- they wanted to talk to

2    him.

3            Well, when Detective Bradley Hood goes to talk to

4    Mr. Brown, takes a swing at him and he runs away.  He had to

5    be subdued later on.  They get a search warrant and they

6    search his dorm room and they find the gun.  And lo and behold

7    it's not a .380, it's not a .357, it's a .22.  And as I said,

8    you will also find out that Mr. Brown was selling drugs and

9    there's virtually no evidence that Mr. Jones ever provided any

10   firearm to Mr. Brown.  And again, there's no link to BGF.

11   That's Mr. Wesley Jerel Brown.  That's the gun they found in

12   his dorm room, a .22.

13           Now, there's been a lot of talk about this, and if

14   you'll indulge me for a few moments.  On May 7th, 2013, Trevon

15   White, known as Country, was found sitting on the front steps

16   of his house -- of a house, 214 East 22nd Street, suffering

17   from gunshot wounds.  And there's no eyewitnesses, Detective

18   Jackson, who we heard from yesterday, said he was the

19   investigating detective and he had no leads.  There was a cell

20   phone found at the scene, don't know whose it is.  But it

21   yielded no results and there was no link found, as Detective

22   Jackson testified yesterday, between that phone or any phone

23   and Mr. Jones.  Your recollection will control.

24           There was a lot of rumors in the neighborhood.

25   We've heard all kinds of phone calls, we've heard phone calls

1    about people who had nothing to do with this, were in jail,

2    out of jail, or who knows what they were doing.  There was

3    rumors that Ben Miller had something to do with it, there was

4    rumors Kenneth Jones had something to do with it.  Well, Ben

5    Miller was there.  Colin Knight, who testified on behalf of

6    Mr. Jones, said he saw Mr. Miller sitting there on the steps a

7    little bit above Mr. White, on the steps and behind him.

8    Mr. White was shot from behind.

9           There was bottles found.  It wasn't just bottles

10    found on the steps there that had Mr. Jones's fingerprints,

11    there was also bottles down at the end of the block with

12    Mr. Jones's fingerprints on it.  This is Mr. Jones's

13    neighborhood.  He was walking around the street, drinking, you

14    know, sometimes bottles just fall out.  That's all the

15    evidence shows.  Mr. Jones did not deny on the witness stand

16    when asked whether he could have been there, he goes, yeah, I

17    may have touched those bottles, I may have used those bottles.

18    He didn't deny any of that.

19           Then we have Harry Caesar, and Harry Caesar -- Harry

20    Caesar is a paid informant.  He had a chance to maybe prevent

21    the murder of Moses Malone and he didn't because he didn't

22    want to blow his cover.  He's selling drugs.  He also lied a

23    little bit about his finances to law enforcement.  And then he

24    testifies that he gets arrested for drugs and he's over at

25    MRDCC, which is a Maryland corrections facility.  He hasn't

1    seen Mr. Jones in a while and they pass each other in the

2    hallway.  And in less than one minute, Mr. Jones just decides

3    he's going to confess to a murder.

4        Well, ladies and gentlemen, the world is a strange

5    place and you've heard a lot of strange stuff in this, but the

6    world doesn't work that way.  When you haven't seen anybody

7    for a long time, you don't just in 30 seconds or 20 seconds,

8    oh, by the way, I'm going to confess to a murder.

9        You heard evidence about retaliations in this case.

10   The rumors were that Ben Miller had something to do with it

11   and the facts support that Ben Miller committed that murder.

12   Ben Miller was murdered.  He was murdered by Shawn Gregg and

13   Lamontae Smith.

14       And after the Ben Miller murder, Shawn Gregg tells

15   Wesley Brown that he had shot Miller because of his

16   involvement in the White murder.  That corroborates what

17   happened there, that's the retaliation that some of these guys

18   did.  There was also -- the government presented some talk

19   that there was some rivalry in the neighborhood.  The facts

20   are that this picture, and it's government's CP 29, taken from

21   Mr. Brown's phone, Mr. White is the gentleman in the middle

22   back row with his arms around Kenneth Jones and another

23   individual, that probably -- I think that's Mr. Brown.

24   Mr. Jones testified that Mr. White was his best childhood

25   friend.  That's fact.  Why would he kill his best friend?

Defendant Jones' Closing Argument

1    This picture, which is in the government's evidence, shows

2    that Mr. White and Mr. Jones were good friends.

3            Come to the Thabiti Wheeler murder on March 2nd,

4    2013.  And you see that there was crime scene techs that

5    showed up and Detective Kazmarek walked around the crime scene

6    with the crime scene tech and they lifted some fingerprints.

7    And you will see from this report, you'll have the paper back

8    there, that the fingerprints found were Norman Handy and

9    Tangier Hitchens.  And there was a stipulation read to you,

10   members of the jury, that said that they were the only

11   fingerprints along with the victim's fingerprints and that

12   Mr. Johnson, Mr. Jones, and Mr. McCants's fingerprints were

13   not on that vehicle.

14           Detective Kazmarek, after receiving this report,

15   starts looking for these two individuals, Norman Handy and

16   Tangier Hitchens.  He's doing what any good law enforcement

17   officer would do, follow the evidence.  What he does is, he

18   puts out a wanted poster for Tangier Hitchens and he puts out

19   a wanted poster for Norman Handy.  Now, that was the work of a

20   good law enforcement guy -- detective.  And when Detective

21   Kazmarek found these individuals and he talked to them, I

22   asked him, your recollection is going to recall, that he

23   didn't find either one of them to be credible when he was

24   talking to them.

25           Again, the ballistic evidence shows that that weapon

1    was used in the Trevon White shooting.  That firearm was never

2    produced here.  Some of the questioning by the firearms people

3    about the process and quality of ECU, the Evidence Control

4    Unit, and how safe it was and it's always available, we don't

5    lose evidence, and goes on and on and on.  Well, they lost

6    that gun.  Didn't show up in this courtroom.

7           Few days after the Trevon White murder, the name is

8    not in here, but the government used the name and the witness

9    testified, Breonna Lewis, Buffy testified.  And if you read

10   this, you would think that she was being threatened and

11   harassed and whatever.  Well, what happened is, on

12   cross-examination, Ms. Lewis -- your recollection will govern,

13   what you recall from the testimony, that there was no threats,

14   she wasn't harmed, just a conversation with her, and I think

15   Mr. Johnson was there.  There was no real accusations.

16          June 29th, about a couple months after the shooting

17   of Trevon White, the government presented a jail call between

18   Mr. Handy, seems like he's everywhere, and Montel Harvey and

19   they're talking about all kinds of things.  One of them is in

20   jail, one of them isn't, and they're just rehashing old -- old

21   history.  And they're talking about, as you'll see in the next

22   couple slides, going out to shoot Kenneth Jones.  Now, there's

23   no eyewitnesses to the shooting of Kenneth Jones, there's no

24   shell casings.  Law enforcement didn't come in here and say,

25   we found some shell casings that are consistently found at a

Defendant Jones' Closing Argument

1    shooting that took place and we reviewed all these phone calls

2    and they match up with the facts as Mr. Handy and Mr. Harvey

3    are talking about.  Again, Mr. Jones is no part of this.

4            Four or five days later, Mr. Brown and Mr. Harvey

5    have a conversation about the same thing.  Again, there's no

6    law enforcement to support anything they're talking about

7    here, no shell casings found.  That's Mr. Brown, that's

8    Mr. Harvey.  And then there's talk in the summer, I don't know

9    what date it was, Mr. Harvey and a couple other people tried

10   to shoot Mr. Jones.  Again, no police report, no

11   investigation, no law enforcement officer testified that they

12   were even called in to investigate.

13           October 5th, Lamontae Smith says that he was shot

14   walking around the neighborhood having a soda with friends

15   after he had been at a gas station and he was shot by Kenneth

16   Jones.  Well, you may recall Detective Gaskins testifying that

17   part of his investigation, he started walking the crime scene,

18   was to pull some of the videotapes from the gas station and

19   from other locations.  And Mr. Smith's story didn't hold up.

20   He didn't go to the gas station, he didn't walk the path.

21   What he did do is he ran away after being shot and the

22   detective was able to follow the blood trail.  What Detective

23   Gaskins couldn't confirm is what was Mr. Smith doing before.

24           Mr. Smith was interviewed by law enforcement three

25   or four times over the next couple days and he lied and he

 1    lied and he lied.  He gave a very detailed description.  Most

 2    liars don't throw in a whole description of 5'7", tall, thin,

 3    long hair.  They don't throw in those kind of details.  He was

 4    thinking of somebody specific and it sure wasn't Kenneth

 5    Jones, who's never been 5'7", never been thin, never had long

 6    hair.  He then, when he realizes that he's possibly getting

 7    squeezed, he decides to throw Kenneth Jones into the mix

 8    because there's this little split in the neighborhood.  You

 9    have 24th and Barclay and you have 22nd and Guilford.  They

10    might be two or three blocks apart, but they're worlds apart,

11    and even Lamontae Smith, through all his stories, admitted

12    there was a lot of friction.

13          You see in Government's SM 3, Wesley Brown's

14    Facebook account.  Page 2, that's Chop on the left.  24th and

15    Barclay.  You heard Mr. Jones testify he lived at 22nd and

16    Guilford.  You can see Mr. -- Chop down in the lower left at a

17    party on Mr. Brown's Facebook account.  You can see Lamontae

18    Smith in the lower right, again partying.  Mr. Jones isn't in

19    any of those pictures.

20          This is Government's Exhibit SM 8, Gerald Johnson's

21    Facebook account.  There's Mr. Johnson and on the right is

22    Lamontae Smith.  And then at page 78 of that same exhibit,

23    this is Mr. Smith again and he calls himself "Money-making

24    Chop Lamont," also known as Lamontae Smith.

25          While we're talking about Facebook accounts, showing

1    you Government's Exhibit SM 10, this is Marquise McCants's

2    Facebook account.  If you recall, there was page after page

3    after page after page of Mr. McCants thousands of friends.

4    But not Kenneth Jones.

5            Now, regarding the retrieval of the gun, Officer

6    Badgujar testified, and I've already hit on that, he didn't

7    interview anybody.  You didn't hear from everybody.  You

8    didn't hear from Mr. Cypress, you didn't hear from Courtney

9    Carroll, who had possession of the gun.  You only heard

10   Officer Badgujar talk about it.  And again, that firearm was

11   never produced.  Never produced.  Didn't come in here again.

12   It went to ECU, but didn't come out of ECU, and it sure didn't

13   come into this courtroom.  And ECU is supposed to be the

14   protector of all evidence.

15           Another thing about the evidence:  When the

16   detectives all looked at the little envelopes, they didn't

17   even open it up at first.  The question was, do you

18   remember -- and can you identify these objects?  Oh, yeah,

19   they're the casings or they're the bullets or they're the this

20   or that from the scene.  What they were looking at is the

21   number at the top.  They didn't open the envelope.  They all

22   opened it up and gave it a little bit of cursory look over.

23   But they didn't know -- you could put a box of Cracker Jacks

24   in there and they would have looked at that number and say

25   whatever's in that envelope it's going to be good enough for

them.

Only Mr. Wagster, the firearms examiner, came in
here and said that he was confident enough in his techniques
that after he would look at something, he would put a little
identification, a laser marking on there, so he knew -- so
that he couldn't be asked, are you just looking at that number
again?  And he would say, well, I'm looking at the number, but
I'm also looking at my little laser identification that I put
on there, and he was confident certain roles matched with
certain firearms.  Ms. Bohlen said that she never did that.

The Fenner guns.  The guns that were found on
Mr. Fenner never walked into this courtroom.  They were never
brought in here.  Again, presumably they went to ECU and they
never came out again.  I've talked about the drug conspiracy
and I don't think I need to say anymore.  Examine all your
notes and examine all your recollection.  You will see that
other than Christopher Meadows, there has been no talk of
Mr. Jones and drugs aside from Christopher Meadows.

Was it reasonably foreseeable to Mr. Jones that
there was a drug conspiracy and that he was a knowing and
willful member of that drug conspiracy?  I submit to you that
he wasn't.

Judge Bredar's going to talk to you again about
presumption of innocence in a few minutes.  And it says only
by the government's presentation of competent credible proof

1    and whether they've met, in your judgment, their burden of

2    proof, can you overcome the presumption of innocence.  I'm

3    going to leave you with four legal concepts that I want you to

4    think about when you're examining the evidence.  These will be

5    in the instructions given to you in a little while by Judge

6    Bredar.

7            The first one says you may not infer that the

8    defendant is guilty of participating in criminal conduct

9    merely from the fact that he associated with other people who

10   were guilty of wrongdoing.  Does Mr. Jones associate with

11   other people who were guilty of wrongdoing?  Yes.

12           Next one, mere similarity of conduct or the fact

13   that they may have assembled together or discussed common aims

14   or interest does not necessarily establish proof of the

15   existence of a conspiracy.

16           The third, a defendant's mere presence at the scene

17   of the alleged crime does not by itself make him a member of

18   the conspiracy.

19           And finally, mere knowledge of or acquiescence

20   without participation in the unlawful plan is not sufficient

21   to make him a member of the conspiracy.  These are the words

22   that are going to be read to you by Judge Bredar and you're

23   required to follow them when you're deliberating these

24   concepts.

25           In the end, thank you for your attention.  I'm going

Defendant Jones' Closing Argument

1    to sit down, and later today I'm probably going to think of

2    five or ten more things that I should have told you about.

3    Then I'm going to wake up tomorrow morning and think of five

4    or ten more things.  But my time is done.  You have a very

5    important job to do.  This wouldn't have taken nine weeks if

6    it wasn't important.  You wouldn't have seen the skilled

7    presentation by these two prosecutors here, you wouldn't have

8    seen the defense challenging every aspect of their case if it

9    wasn't important.  And in this case I ask you to find Kenneth

10   Jones not guilty.  Thank you.

11        THE COURT:  Thank you, Mr. Bussard.  Ladies and

12   gentlemen, we'll take another brief recess.  During this

13   recess do not discuss the case with anyone.  Do not discuss

14   the case even among yourselves.  Do not allow yourselves to be

15   exposed to any news articles or reports that touch upon the

16   case or the issues it presents.  Avoid all contact with any of

17   the participants in the trial.  Do not make any independent

18   investigation of the law or the facts in the case.  Do not

19   look up anything related to the case or its participants on

20   the internet.  Do not consult an encyclopedia or dictionary.

21   Five minutes.  Take the jury out.

22        (Jury left the courtroom.)

23        THE COURT:  Five minutes, then we'll hear from

24   Mr. Francomano, then we'll take the lunch break, then we'll

25   hear the rebuttal.

Defendant McCants' Closing Argument

1           (A recess was taken.)

2           THE COURT:  Ready for the jury, Mr. Francomano?

3           MR. FRANCOMANO:  Yes, Your Honor.

4           THE COURT:  Bring them in, please.

5           MR. BUSSARD:  Your Honor --

6           THE COURT:  Hold on a second.  Bring the CSO back.

7           MR. MARTINEZ:  Don't worry about it.

8           THE COURT:  Mr. Bussard.

9           MR. BUSSARD:  Your Honor, I just wanted to put on

10   the record that what I had said turns out to be not

11   objectionable to the government, but I'm not asking for any

12   relief on that as a result of what was said.  I don't know how

13   you put the genie back in the bottle, so I'll just leave it

14   alone.  I appreciate the government's candor.

15           (Jury entered the courtroom.)

16           THE COURT:  Mr. Francomano, on behalf of

17   Mr. McCants, do you wish to make a closing argument?

18           MR. FRANCOMANO:  We do, Your Honor.

19           THE COURT:  You may proceed.

20           MR. FRANCOMANO:  Thank you.

21           Good afternoon, ladies and gentlemen of the jury.

22           JURORS:  Good afternoon.

23           MR. FRANCOMANO:  We're finally here, we're at

24   closing.  What I want to make clear though is, Mr. McCants is

25   not charged with murder.  He's not charged with attempted

1    murder.  He's not charged with robbery.  He's charged with

2    conspiracy racketeering, drug conspiracy, and a felon in

3    possession of a handgun.

4            Now, the government said yesterday that joining a

5    gang that did bad things, knowing that the gang did bad things

6    is a conspiracy.  It's not that simple, especially in

7    Mr. McCants's case.  In Mr. McCants's case, number one, you're

8    going to have to find out -- or deliberate and discuss, is he

9    BGF?  Secondly, you're going to have to deliberate and

10   discuss, was he BGF after he turned 18?

11           Now, the government alleges that this conspiracy

12   took place from 2005 to 2017.  In 2005, Mr. McCants was 12

13   years old.  After closing, Judge Bredar is going to read to

14   you a number of jury instructions.  The one on the screen is

15   one of them that discusses Mr. McCants's age.  In order to

16   prove Marquise McCants guilty of the conspiracy charged --

17   conspiracies charged, the government must establish beyond a

18   reasonable doubt that -- either that Marquise McCants became a

19   member of the conspiracy after the age of 18, or if he became

20   a member of the conspiracy prior to the age of 18, that he

21   ratified or affirmed his prior participation in that

22   conspiracy, meaning that if you believe he was a member of BGF

23   prior to turning 18 years old, he must perform some act or

24   some conduct affirming that he has ratified his position in

25   the gang after he turns 18.

1        Marquise McCants's conduct prior to age of 18 cannot

2    by itself sustain a finding of guilt as to the conspiracy

3    counts.  That means if he was in the gang prior to 18, and you

4    believe that nothing ratified or affirmed his conduct after

5    that, those acts, you cannot find him guilty of the

6    racketeering prior to 18.

7        What this means is, you're going to have to separate

8    his conduct into two separate groups, prior to 18 and post 18.

9    Now, you've heard two months about tattoos:  tattoos of 276,

10   tattoos of a gorilla, of George Jackson.  There's no question

11   Mr. McCants has tattoos of 276 on his body.  He has a tattoo

12   of a gorilla, he has a tattoo of George Jackson.  He testified

13   he got those tattoos when he was 15 years old.  This is

14   undisputed testimony.  No one has come in and testified, no,

15   that's not true, Mr. McCants got those tattoos after he was

16   18.

17       YGF is not a gang.  YGF has no structure.  YGF has

18   no -- is not an enterprise.  You've heard testimony from

19   Mr. McCants that it was a bunch of people in the neighborhood

20   that hung out and they just got the moniker YGF.  YGF was from

21   2005 to 2007.  Mr. McCants was 12 to 14 during that time

22   range.  This is -- the one that's on the screen right now is

23   the government -- excuse me, Johnson's exhibit that was used

24   during the entire trial and you'll see that when you go back.

25   This next exhibit was put up by the government yesterday in

1    which now Mr. McCants's picture is there and Mr. Cornish's has

2    been removed.

3            You've heard from over 50 witnesses in this case,

4    over 500 pieces of evidence have been entered.  Of those

5    witnesses you've heard from, ten have criminal records and

6    eight are from the BGF.  You heard from Michael Gwaltney, BGF

7    member.  He didn't say one word about Mr. McCants.  You heard

8    from Brian Rainey.  Once again, BGF member, didn't say one

9    word about Mr. McCants.  Heard from Harry Caesar, I'm sure you

10   remember Harry Caesar's testimony.  Once again, didn't say one

11   word about Marquise McCants.  Kennethfer Stokes, nothing about

12   Marquise McCants.  Joseph Davis, admitted BGF member, said

13   nothing about Marquise McCants.  In fact, I don't know if you

14   remember this, it was so long ago, but when he was asked, do

15   you know Marquise McCants, he said McCants?  He had no idea

16   who he was.  Five witnesses called from the government and all

17   these five have no idea who Mr. Marquise -- or Mr. McCants is.

18           Now, I talked to you in opening about witness

19   credibility.  And I explained that credibility is going to be

20   a big issue in this case.  And it's going to be the most

21   important part of your job.  How did the witness act on the

22   stand?  How did they testify on direct versus

23   cross-examination?  Does the witness have a reason to lie?

24   Was the witness even there when something happened?  And

25   that's important because most of the witnesses the government

1    brought to testify weren't there when these things happened.

2    Do they have a criminal record?  Nearly all the civilian

3    witnesses who testified have a criminal record.

4    Michael Gray, you heard him testify, he was the

5    first person the government called.  He testified that he was

6    the founding member of BGF in Maryland.  One of the highest

7    ranking members of the BGF, the Hodari.  He testified that

8    crossed arms aren't necessarily BGF, said it could be

9    considered a greeting in jail.  He met with the government and

10   he testified that he met with the government eight times in

11   2015 to talk about the BGF, to talk about Greenmount.  Not

12   once did he bring up Digga or the name Marquise or the name

13   McCants.

14   On May 16th he testified in federal court for an

15   entire day.  Not once did he bring up the name Digga, Marquise

16   McCants.  He met with the government five more times in 2016

17   to talk about BGF and Greenmount.  Not once did he talk about

18   Digga or Marquise McCants.  And then he testified that he was

19   shown a picture on August 19th, 2016 of Marquise McCants.  And

20   he said, I recognize his face.  That was it.  And then he

21   testified in another meeting, November 1st, 2017, and again,

22   he was shown a picture of Marquise McCants.  And again, he

23   says, I know his face.  And then at the end of the interview

24   he testified somebody said the name Digga to him and then

25   that's when he remembered he's BGF.

1          Doesn't say when he was supposedly BGF, no personal

2    knowledge Mr. McCants is BGF.  Someone told him that

3    Mr. McCants was BGF.  He can't even tell you who told him that

4    McCants was BGF.  No evidence to show that somebody else told

5    him that Marquise McCants was BGF.  He's not able to give any

6    personal information about Mr. McCants, was not able to give

7    any information about how he joined the gang.  And at trial

8    when he was asked, have you ever heard of him committing

9    crimes, and he said, the only thing I ever heard about Digga

10   was that he was a mischievous child.  He testified 13 -- he

11   testified at 13 prior meetings with the government, an entire

12   day at trial, and didn't once say his name.  He admitted to

13   prosecutors that he lied.

14         Troy Kellam.  You heard testimony from Troy Kellam,

15   he testified in a BGF trial on 6/1 -- June 1st, 2016.  In that

16   trial he didn't say a word about Marquise McCants.  Testified

17   he met with the government on June 17th, 2015, testified he

18   spoke about BGF, spoke about the Greenmount Regime.  He

19   actually named 23 members of the Greenmount Regime.  He

20   testified to all their names.  You know whose name he didn't

21   say?  Marquise McCants.  Met with the government on four --

22   April 11th, 2017 and was shown a picture of Marquise McCants,

23   and he said, I don't know him.

24         Then on November 24th, 2017, after trial had already

25   started in this case, he tells the government about this

1   magical book that has every BGF member in it from Greenmount

2   specifically.  And all the sudden he remembers, oh, yeah, I

3   saw Marquise McCants in this book.  He doesn't say what year

4   he saw the book, doesn't say when he saw the book, doesn't say

5   where he saw the book, doesn't say who has the book.  There's

6   been no evidence to show this -- this book has never appeared

7   here in this courtroom.  No other witness has testified that

8   this book exists.  The head of BGF, Michael Gray, came in here

9   and testified, he didn't even say that there's such a thing as

10  this book that has people's pictures in it.  Do you know why?

11  Because it doesn't exist.  It makes no sense.  It's not

12  logical to have a face book of people in a gang.  Mr. Kellam

13  also admitted to lying to prosecutors.

14          Lamontae Smith, Chop, testified he couldn't remember

15  any specific occasions when he saw Mr. McCants with a gun.

16  And after five questions from the government he finally says,

17  yeah, I saw him with a gun, like twice.  And he can't remember

18  where, he can't remember when he saw him with this gun, he

19  can't even remember what year it is.  We asked him, was it

20  2007?  I don't know.  Was it 2010?  I don't know.  Was it

21  2015?  I don't know.  Testified that Carrdai told him that

22  McCants shot a guy in 2006.  2006, Mr. McCants was 13 years

23  old.  No evidence whatsoever has been presented that anyone

24  was shot by Mr. McCants, when they were shot by Mr. McCants in

25  2006.

Defendant McCants' Closing Argument

1          You didn't hear any ballistics, didn't hear any

2   witnesses.  There's no pictures, no guns, no shell casings

3   have been introduced in evidence.  Nothing to show you that a

4   murder even was committed in 2006, much less that Mr. McCants

5   had anything to do with it or committed it.  Then on

6   cross-examination Mr. Smith said, well, Carrdai was high and

7   that he didn't believe him when he told him Mr. McCants

8   committed a murder.

9          The government called a witness that testified he

10  didn't even believe what he was saying, then he tells you

11  about a stabbing.  He tells you that someone named Noodles

12  told him that McCants stabbed someone in jail.  It's the only

13  time that the name Noodles came up in this trial at all.  Not

14  one other person mentioned the name Noodles in this case.  No

15  evidence that was presented by the government or any witnesses

16  that anyone was stabbed in a Baltimore City detention center,

17  much less Mr. McCants stabbed someone.  Mr. Smith testified,

18  has no idea what year this happened.  There's no evidence that

19  Mr. McCants stabbed anyone.  There's been no testimony from

20  any witnesses.  And we didn't hear anything from Noodles.

21          Mr. Smith's prior testimony, he testified about a

22  meeting with the government on April 14th, 2016.  At that

23  meeting he was asked to identify all members of the BGF in

24  Greenmount.  I asked him -- he testified, he named 19 people,

25  but didn't say a word about Marquise McCants.  He testified

1    that he met with the government on May 11th, 2016.  Once

2    again, didn't say anything about Marquise McCants.  At the

3    grand jury, the same day of that meeting, he went in and

4    admitted he testified there but didn't say anything about

5    Marquise McCants.

6         He talked about the younger group.  And you've heard

7    about the split, that there was a younger group and an older

8    group.  And he named the individuals in the younger group when

9    he testified.  He said Telly, Nate, Norman, Wes, Hood,

10   Carrdai.  I asked him, well, did you name the older group as

11   well?  He testified he named Joe, Slay, Nut, Big Mike, Mike

12   Mike.  Didn't say anything about Mr. McCants.  Then on

13   10/26/17, he testified that he was brought back to the

14   government's offices.  And now he tells them for the first

15   time to anyone ever that Mr. McCants murdered somebody and

16   stabbed somebody in jail.  And he's never mentioned this

17   before at any other interview or at any other time.  And he

18   testified to that.

19         Christopher Meadows.  Everything that Christopher

20   Meadows testified to about BGF was 2008 and prior.  He

21   testified that McCants -- Mr. McCants committed an e-pill

22   robbery when he was 12 years old.  Testified that he was

23   selling drugs, sold drugs for Geezy.  He met with the

24   government on two separate occasions to talk about BGF

25   Greenmount and didn't once mention Mr. McCants.  He admitted

1    to testifying on September 25th, 2015 and talking about BGF,

2    specifically the Greenmount BGF, and not mentioning

3    Mr. McCants.

4         He admitted to changing his testimony in a prior

5    case to the police.  He did tell the truth about one thing, he

6    said Mr. McCants didn't transfer over to BGF because he was a

7    juvenile.  All four of these witnesses have a number of things

8    in common.  One, they all testified at meetings or trials

9    involving BGF where they never mentioned Mr. McCants.  They

10   all testified that the only time that they mentioned

11   Mr. McCants was a part of BGF were crimes that he committed

12   dealing with BGF were either weeks before trial started or in

13   Mr. Smith's case when trial had already started.

14        All of them have prior convictions.  Not one of them

15   has personal knowledge that Mr. McCants was in BGF.  Not one

16   of them saw or heard that he was at a meeting.  Never saw or

17   heard of him paying dues to anyone in BGF.  No one ever heard

18   him say the oath.  Never heard anyone else tell them that he

19   said the oath to them.  They couldn't identify any of the

20   sponsors or his sponsors in the gang, whether or not he

21   sponsored someone in the gang, not one witness testified and

22   said, I personally know Mr. McCants is in the BGF because he

23   told me.  Not one person came in and said that.

24        Facebook.  The government contends that the Facebook

25   page listed as Digga McCants is Mr. McCants's Facebook.  First

1    log in date was October 17th, 2010.  We all know Mr. McCants

2    was in jail at that time.  There are a number of

3    communications that are in evidence that you've seen

4    throughout this trial.

5            "This Digga?"

6            "No, Keyshay.  But I can tell him what you want me

7    to."

8            "Tell him I need his info.  Cool.  What?  Who's

9    this?"

10           "His son's mother."

11           "It's your little sister, hi noni, Digga is locked

12   up.  This is his girlfriend.  You want me to tell him

13   anything?"

14           "My son, I need you.  Digga, I need some money.

15   Damn, you, yo, what, did I do something to you?"

16           "This is Keyshay, Mr. James, do you want his

17   number?"

18           Mr. McCants testified that he had no access to this

19   Facebook page, never put anything in the Facebook page.  It is

20   absolutely clear from these communications that this Facebook

21   page is Keyshay Oliver, the mother of his son.  There's no

22   evidence that this page belongs to Mr. McCants.  On the

23   contrary, all the evidence points to Keyshay Oliver as a

24   person who is running this page, putting pictures on the page.

25   The government cannot admit that they are wrong on this, but

1    it is painfully obvious this is Ms. Oliver's page.

2              They showed you a post from Roscoe, who is in BGF.

3    Roscoe thinks he's writing to Mr. McCants and says "GMB for

4    life" in the highlighted section.  GMB, not BGF, because he

5    knows Mr. McCants is from Barclay and he knows he's not BGF.

6              All the social media pictures are put in evidence,

7    they have one of Mr. McCants putting his arms across his

8    chest.  He testified, yes, I can remember this picture because

9    the clothes are so out of date, it's from 2008.  Of all the

10   pictures you've seen from Instagram, Facebook, from everybody

11   in this case, the government shows you one picture.

12             There are a number of pictures that were entered

13   into evidence from cell phones.  There are five pictures of

14   Mr. McCants entered from Shawn Gregg's cell phone.  Of these

15   five pictures, he's here with Shawn Gregg.  No gang signs,

16   nothing to do with BGF, no gang shirts.  Another picture,

17   standing with friends.  No gang signs, no BGF paraphernalia.

18   Picture of him and his girlfriend, obviously no gang signs

19   here.  Holding up the peace sign.  No gang signs, not

20   representing whatsoever, nothing, not wearing any clothes.

21   Another picture with him and Shawn Gregg and a friend outside

22   the basketball courts, throwing the peace sign again.

23             The government showed you this picture, timeline of

24   murders and shootings.  Now, Mr. McCants was in jail --

25   Mr. McCants was in jail or under the age of 18 for every

1    murder and shooting but for Mr. Bess, every single one of

2    these.  Mr. McCants is not a suspect in any of these murders.

3    Mr. McCants is not a suspect but for Gregory Bess in any of

4    these shootings.

5           Mr. McCants, since his 18th birthday, has spent most

6    of his time in jail.  He's spent ten months on the street

7    since his 18th birthday.  This is something he is not proud

8    of, trust me.  It's nothing to be proud of.  It is just a

9    fact.

10          Moses Malone is the centerpiece of this case.

11   That's the one thing I agree with the government about.

12   Mr. McCants has absolutely nothing to do with the murder of

13   Moses Malone.  In fact, he was in jail at the time.

14          May 9th, 2008, the government brought in -- there

15   was an assault of Jerome Brice that occurred on that day.

16   Mr. McCants was 15 years old at the time.  Ms. Scott testified

17   that she witnessed the assault.  On cross-examination she was

18   asked about her prior statements who stabbed Mr. Brice, that

19   she couldn't see because she was too far away, and she kept

20   responding, I'm not sure.  She testified that she met with the

21   government on 8/15 -- or August 15th, 2017 and when asked on

22   cross-examination about that meeting, she was asked if in that

23   meeting did she say she was uncertain if Mr. McCants stabbed

24   Mr. Brice, and her answer was, I'm not sure.

25          She also testified, at that meeting she was asked,

1    who is in BGF?  And she named Wesley, Ronnie, Joshua -- or

2    excuse me, Wesley, Ronnie, Joshua Carroll, Carrdai, Norman,

3    Montray McNair, Shareiff Dupree.  She didn't say Marquise

4    McCants.

5            Mr. McCants pled guilty to assault in the first

6    degree in Cecil County.  He explained that he pled guilty by

7    way of what's called an Alford plea.  An Alford plea is a

8    guilty plea, but the person proclaims their innocence of the

9    crime.  They admit that the prosecution has enough evidence to

10   prove that he is guilty though.  The only testimony about that

11   incident was from Corporal Finch, Cecil County police officer.

12   He testified that he responded to the home in Elkton,

13   testified that four people came running out.  Two said they

14   have a gun, followed one person to Quail Court and he lost

15   him.  Found Mr. McCants in the woods and then on

16   cross-examination, I asked him, did he admit to committing a

17   crime?  And he said no.

18           Mr. McCants testified he pled guilty to this crime

19   by way of an Alford plea, and he said it:  I'm a black man in

20   Cecil County, said he's being harassed in jail.  He said his

21   public defender told him he was looking at 25 years if he

22   didn't plead.  And that's his reason, he took the Alford plea.

23           Even if you believe that Mr. McCants committed this

24   crime, there's not one piece of evidence at all that has

25   anything to do with the BGF.  The government showed you a

1    letter written by someone else, by Roscoe.  Now, the letter

2    was found in 2013.  Obviously it was never mailed.  We have no

3    idea when it was written.  Roscoe didn't come in to testify

4    about what it is.  It has the words Eusi Gayedi Jamaa on it,

5    so automatically Mr. McCants is BGF.  Well, that's just not

6    logical.  He didn't write it.  He had nothing to do with this

7    letter.  Because it has the name Digga, all the sudden he's

8    BGF.  And that's kind of the mentality here.

9         There's a second letter that the government put on

10   two days ago or on -- maybe yesterday, and this letter was

11   allegedly from him to his girlfriend.  Mr. McCants testified

12   he didn't write it.  The government hasn't proven that he

13   wrote it.  There's no handwriting expert that came in here and

14   said, yes, this handwriting matches other exemplars we have

15   from Mr. McCants and it is in fact a letter he wrote.  No one

16   has testified to that.  No one came in and testified this is

17   similar writing, I believe it's Mr. McCants's handwriting.  No

18   one has said that at all.

19        Also, it's strange this letter is going out and it

20   has a received stamp on it and the date Mr. McCants testified,

21   11/15.  There's a lot of questions about this letter.  There's

22   no testimony that this letter was found in Mr. McCants's jail

23   cell.  There's been no testimony as to where this letter was

24   found.

25        Mr. McCants admitted that he was found guilty of

1    possession of marijuana in a Baltimore City detention center.

2    He pled guilty to that.  There's no evidence or testimony that

3    that had anything to do with BGF.  In fact, a witness, Dequan

4    Shields, came and he testified that it had nothing do with

5    BGF.  Mr. McCants testified that it had nothing to do with

6    BGF.  You haven't heard from a witness or anyone to say, oh,

7    yeah, that weed in jail on July 4th, 2014, that was BGF.

8    Nobody's testified to that.

9         Text messages from Shawn Gregg.  There were text

10    messages that Mr. McCants admits that he was talking about

11    marijuana when he was texting Shawn Gregg.  He was talking

12    about Blueberry Kush, but once again, there's no evidence that

13    Mr. McCants or Mr. Gregg completed the transaction, money was

14    given for marijuana.  There's been nothing to show that either

15    one of them received marijuana or got money for getting

16    marijuana.  And there's no evidence that this has anything to

17    do with BGF.  No one's come in and testified, well, this was a

18    drug deal and it was a BGF drug deal.

19         There's nothing in the text messages at all about

20    BGF.  There's nothing in the text messages about furthering

21    the objectives of BGF.  Nothing in the text messages about

22    paying dues.  Nothing about, hey, you missed a meeting last

23    week, you've got to show up to the next BGF meeting.  Nothing

24    about meetings.  There's no pictures, as we showed you, in

25    Mr. Gregg's phone of Mr. McCants doing anything that has

1    anything to do with BGF.  Shirts, signs, X crosses.

2    Mr. McCants testified that, yes, we were talking about

3    marijuana, but I didn't really have it.  And it really had

4    nothing to do -- or it had nothing to do with BGF.

5            There are a number of phone calls that you've

6    listened to between Mr. McCants and Mr. Brown.  Now, Wes Brown

7    is the father of his sister's children.  Mr. McCants went to

8    school with Wes Brown.  It would be more unusual for him not

9    to talk to him than to talk to him.  Mr. McCants said he

10   thought Wes Brown was BGF.  But he also testified that just

11   because somebody's BGF you don't automatically stop being

12   friends with them.

13           On the calls, they talked about gossip on the

14   street.  Mr. McCants used the word "Oatmeal" in one of the

15   calls.  He testified he admitted he knew what the oath was and

16   how BGF used it.  He also explained that the Bloods did as

17   well, but he also explained that he knew from the Bloods they

18   also had their own type of oath called Soo Woo.  And the

19   Muslims had their own type of saying called As-Salaam-Alaikum.

20           Now, when he was using the word Oatmeal, he was

21   explaining why Man Man got into a fight because another

22   individual couldn't say the oath.  Now, he never testified

23   that he knows what the oath is.  But being where he grew up

24   and being in jail, he's heard what an oath is, and he knows

25   the other gangs, the Bloods, the Muslims, Crips, just from his

1    upbringing and from where he's been.

2         Mr. McCants talked about being heavy.  And he got up

3    here and admitted, yeah, I was talking about a gun.  But he

4    also said, I didn't really have a gun on me, I just wanted --

5    I don't trust anyone, and I wanted to make sure that if

6    anybody was going to come up on me that I was tough, you know,

7    and they wouldn't try and do something like that.

8         The phone calls from Mr. Burris.  You heard phone

9    calls from Mr. Burris in which the beginning of the call -- it

10   gives an insight into how their world really works.  "Man,

11   n-word heard so many stories, man, n-word ain't know what to

12   believe."  So the way that the things happen on the street is,

13   there are so many different stories floating around about

14   every single person, that in this conversation you can see

15   nobody knows what to believe about what's being said.  They

16   said he was dead, he being Mr. McCants.  They said he was

17   dead, they said he was locked up.  Well, obviously he wasn't

18   either because he was on the phone.

19        Now, there was an exchange where they were

20   discussing Chop, where Mr. Burris is ranting about Chop and

21   he's going to put in work.  Mr. McCants says after that 14

22   line rant, "right."  He testified, I really wasn't even

23   listening to what he was saying, he was just going on and on.

24        The text messages from Mr. McCants's phone.  There

25   are 641 text messages from his phone.  They picked out two.

1    The message they had the letter J:  "Bro, J shit, she prolly

2    did send Steve to SQ."  So they're saying because the letter J

3    is in a text message of 641 different text messages,

4    Mr. McCants must be BGF.  He explained that this text had

5    nothing to do with BGF.  And there's been no evidence

6    presented by anyone that this text had something to do with

7    BGF.  The person who it was sent to, Trick Boy, he didn't come

8    testify.  So the letter J is what the government's going to

9    hang its hat on.

10         There was a second text message in which he's

11   saying, "This n-word I be getting the C from, yo, we got to

12   fix him, bro."  Now, this is a text message in which he's

13   talking with an individual, Mook, who turns out his name

14   actually is James Harris (sic).  Mr. McCants testified they're

15   talking about cash or coins.  Once again, it's uncontradicted

16   evidence.  Okay.  No one has come in and said, no, no, that C

17   means cocaine.  Okay.  Mr. Harris didn't come in and testify,

18   no, no, we were talking about cocaine.

19         Now, the government has now said, no, they were

20   planning the robbery of a cocaine dealer.  There's been no

21   evidence whatsoever of a robbery of a cocaine dealer.  There's

22   been no evidence that Mr. McCants or Mr. Hair had anything to

23   do with robbing a cocaine dealer.  This is just a theory that

24   the government just pulled from out of the air and said, this

25   is what we believe this is about, so believe this.  Well, why

1    isn't it just as believable to believe Mr. McCants, who is

2    actually the one on the phone or the one making the text

3    messages?

4            And that's the big problem in this case.  Every

5    phone call, every text message is interpreted by the

6    government to mean BGF or it's BGF related.  But there's an

7    alternate explanation for all the text messages, for all the

8    phone calls.  And Mr. McCants has given those explanations.

9    And the government has not contradicted his explanations with

10   other witnesses coming in.

11           There are phone calls between Mr. McCants and

12   Deandre Dorsey.  Now, the government wants you to believe that

13   Deandre Dorsey is BGF.  Sergeant Landsman testified that he

14   heard Dorsey using BGF terms on a wiretap.  Those calls were

15   never played.  We didn't hear those calls about him talking

16   about BGF terms.  No one came in and testified that Dorsey is

17   BGF.  Mr. McCants testified, in fact, that he was a BGF and

18   testified that he didn't think he was BGF, didn't know he

19   was -- rephrase that.  Mr. McCants testified he didn't know if

20   he was BGF.  Once again, that's uncontradicted.

21           They want you to believe that Mr. Dorsey is BGF

22   without giving you any proof.  You heard six phone calls

23   between Mr. McCants and Mr. Dorsey.  They're talking about

24   what was happening on the streets, about what was happening in

25   their lives.  They talked about a person named Pinky, who may

 1    have had a gun on him.  They were talking about clutching.

 2    Mr. McCants admitted that on the calls he was talking about a

 3    gun.  He said blickety, jimmyrod, nickel.  These are all

 4    references to guns, and he admitted that.  He explained though

 5    that he was talking about that or talking about jimmyrods and

 6    guns because he was with a group of people where he's playing

 7    dice in the county, and he wanted to make sure all those

 8    people heard that because he wanted to make sure they wouldn't

 9    rob him or try and take money from him.

10         But the government wants you to believe that every

11    single word is gun or BGF.  For example, they said, well, he

12    said black jacket, black jacket has to be a gun.  He said dirt

13    bike, dirt bike has to be a gun.  Sometimes a dirt bike is

14    just a dirt bike.

15         Testified on two -- you never heard them talk about

16    Gregory Bess on any of these calls, not a nickname of Bess,

17    nothing associated with Bess, no evidence that Bess crossed

18    BGF, no evidence that Bess was involved in BGF in any way, and

19    there's no motive why BGF would want to shoot Mr. Bess.

20         You heard four phone calls from Mr. McCants when he

21    was in jail.  He talks about PDR, which is Pioneer Drive.  He

22    explained what a willow was, and a willow was his stash can

23    where he kept marijuana, his money in it.  And he hid it and

24    he hid it in a relatively entertaining place.  He explained

25    that it was where the hair was and he explained that the hair

1  was actually a wig of the girlfriend's of Marty, who is Trick

2  Boy, and that's what he was explaining to him to get the stash

3  can out of the house.

4       Now, on February 7th, 2017, Detective Landsman

5  testified that when they're talking about Superbowl they're

6  actually talking about a shooting.  Mr. McCants testified that

7  he placed a bet with his friend Malik before he was arrested.

8  He testified he actually bet on the Patriots.  The day after

9  he was arrested the Superbowl was played.  He was talking to

10 Malik on the 7th, Superbowl was on the 6th, which makes more

11 sense in that conversation.  He didn't know what the score was

12 because he was in lock up, and he needed the money because he

13 needed the money for commissary.

14       All the phone calls and text messages from 2013 to

15 2017, there's only one time it's uttered -- only one time a

16 word is uttered that has anything to do with BGF and that is

17 Oatmeal.  And Mr. McCants explained that and the government's

18 trying to take that out of context.

19       There's been no evidence whatsoever that these calls

20 had anything to do with BGF.  Not once in any of the calls is

21 BGF being mentioned.  They're talking about gossip on the

22 street, about women they were with, people who got into

23 trouble, people who were coming home.  These are things that

24 are important in his life, in their life.  They didn't discuss

25 who owed money to BGF, they didn't discuss if dues were paid.

1    They didn't talk about who had to be disciplined by BGF.  They

2    didn't talk about the inner workings of the gang.  You didn't

3    hear them talking about someone who disrespected BGF and they

4    had to get him.  The term green light was never used.

5         Mr. Bess, as I said, has no affiliation whatsoever

6    with BGF.  There's no evidence that he was targeted by BGF.

7    CCTV cameras just before the shooting, there's no person

8    identified as Mr. McCants caught on those CCTV videos.

9    Detective Gauze testified that he received a tip about a

10    person named Bones in reference to Mr. Bess's shooting.  Never

11    heard anything about Bones.  Now, sometimes you have to judge

12    the credibility of police officers as well.  Now, it's your

13    decision whether to accept the testimony of a law enforcement

14    witness and to give that testimony whatever weight, if any,

15    you find it deserves.

16         Now, Detective -- excuse me, Sergeant Landsman

17    testified he was surveilling Mr. Dorsey from late 2006 to

18    Mr. McCants's arrest on February 5th, 2017 and didn't once see

19    them get together.  He admitted that the police were not

20    watching the house at Pioneer Drive and that anyone could have

21    come and gone from the house from February 5th to the second

22    search warrant on February 9th, 2017 without their knowledge.

23    Detective Landsman admitted that when he got into the house

24    the blinds were all drawn.  He admitted that when he went up

25    to the house the door was shut.

1        Detective Clark testified he heard someone yell out

2   the house "I got an f'ing gun."  Detective Clark admitted it's

3   not in any written reports.  Detective Clark said, no, it's

4   not in either of the search warrants, the one on February 4th,

5   another one on February 8th.  Admitted he didn't say anything

6   about that statement until he met with the government after

7   all this happened.  He admitted he didn't tell anyone and he

8   heard that coming from the house.  And on cross-examination I

9   asked him, that's pretty important, isn't it?  And he said,

10  yes, but he didn't tell anyone.

11       Not one of the other 12 officers at the scene came

12  to testify to say that they heard anyone from the house

13  yelling "I got an f'ing gun."  In fact, Detective Landsman,

14  who was there the entire time, didn't testify that he heard

15  Mr. McCants say, "I got an f'ing gun."  Trooper Boyce, who was

16  the K-9 officer, testified he didn't hear anything coming from

17  the house.

18       Now, Mr. McCants is suspected of a shooting, but

19  when he's arrested they don't test him for any gunshot residue

20  on his hands, on his clothes.  Trooper Boyce testified that

21  Sergeant Landsman ordered him to scan the car in the driveway.

22  Now, the drug dog Max, which is a drug dog, did scan the car.

23  And the drug dog alerted to drugs in the car.  There were no

24  drugs found in the car.  There were two tickets that were

25  found in that car that had nothing to do with Mr. McCants.  No

1    paperwork in the car belonging to Mr. McCants.  No clothing in

2    the car belonging to Mr. McCants.  And then Sergeant Landsman

3    said the guns in the car were Mr. McCants's.  Then he admitted

4    there were no fingerprints or DNA of Mr. McCants on guns.  He

5    said, well, based on prior calls, it showed that he had been

6    in possession of those guns.

7         You never heard those prior calls, did we?  The car

8    was not registered to Mr. McCants.  There are no records

9    connected, the car -- connecting the car to Mr. McCants.  No

10   fingerprints or DNA found in the car, outside the car, of

11   Mr. McCants.  No one ever seen him driving the car.  There's

12   no evidence whatsoever to support any statement that he had

13   anything to do with that car or the guns in the car.

14        There are a number of items found in the house.  But

15   no drugs.  There were no fingerprints or DNA of Mr. McCants's

16   found on any of the bullets in the home.  No fingerprints or

17   DNA of Mr. McCants found in the black bag he was supposedly

18   carrying around.  No fingerprints or DNA found on any of the

19   drug paraphernalia, the gel caps, the sifters, any of the drug

20   paraphernalia in the house.

21        Now, a gun was found at 5617 Pioneer Drive five days

22   after the shooting of Gregory Bess.  The gun was found in

23   pieces.  Well, Detective Landsman testified he had to cut

24   through a wall and through the floorboards to get to the gun.

25   He testified that all the pieces of the gun were recovered.

1    He specifically mentions that even the spring was recovered.

2    He stated that the gun found in the house could be fired,

3    because all the pieces were there, they just need to be put

4    back together.  He said it was sent to the unit, the firearms

5    testing unit, and it was test fired without any other pieces

6    from any other gun.

7          Then he went on to say that the gun was not tested

8    for fingerprints or DNA.  And after showing him the laboratory

9    report that it was tested for DNA, he did admit, yes, it was

10   tested for DNA.  Well, there was no DNA of Mr. McCants on the

11   gun.  The ballistics expert, James Wagster, testified that the

12   gun was missing a recoil spring, a guide, and the rear frame

13   was cracked.  The gun will not fire.  He had to get a recoil

14   spring and a guide from another Ruger so that he could fire

15   the gun.  He testified that when it did fire it would double

16   fire.

17         Mr. Wagster also testified that he did recognize

18   some of these names and he did recognize in particular that

19   the gun was sent to the fingerprint lab.  Well, there are no

20   fingerprints of Mr. McCants on that gun.  We would have heard

21   that.

22         Mr. McCants testified -- or excuse me, Sergeant

23   Landsman testified that you get GPS from cell towers and

24   accuracy is based on how many phone calls are coming into a

25   cell tower.  If it's busy, it's not accurate.  Well, and he

1    testified that T-Mobile does provide documentation as to its

2    accuracy.  Well, we know from T-Mobile that they don't.

3    Detective Clark testified GPS and cell towers are two totally

4    separate things.  Detective Clark testified Baltimore City

5    police did not verify the accuracy of the data provided by

6    T-Mobile.  T-Mobile does not verify its accuracy.

7          10:38, the text message was sent by Mr. McCants that

8    he was at his mother's house three blocks away from where

9    Mr. Bess was shot.  At 10:50, the government gets an e-mail

10   from T-Mobile showing the phone near where Mr. Bess was shot.

11   The government says, well, it's within 40 meters, so it has to

12   be within 40 meters.  Well, Mr. Pinchback from T-Mobile

13   testified about assisted GPS.  And he said, well, assisted GPS

14   is GPS and cell tower combined together that make it accurate.

15   But it wasn't used in this case.

16         He also testified that they don't verify accuracy in

17   their data.  They admitted that in a city where there are

18   large buildings the accuracy can be affected.  There were also

19   other e-mails that came in about GPS, 11:51 showed that the

20   GPS failed, 12:06 a.m. -- at 12:06 a.m. on February 25th

21   showed that it failed.  Another one at 12:21 a.m. showed GPS

22   failed.  There was an e-mail sent at 2:21 a.m., uncertainty is

23   148 meters.  And finally, there's one sent at 2:36 a.m. with

24   an uncertainty of 1,191 meters, which is three-quarters of a

25   mile.

1          There are no witnesses.  The CCTV camera shows that

2     there's a number of people in the area, but Mr. McCants wasn't

3     on any of those cameras.  Not one of those people on the

4     cameras was identified as Mr. McCants.  No witness came

5     forward to say Mr. McCants was in that area or that he shot

6     Mr. Bess, including Mr. Bess.  Detective Gauze testified that

7     Mr. Bess told him, I was walking down the street, somebody

8     asked for a cigarette, I don't know who it was that shot me.

9          Now, the government tells you that this is an

10    airtight case, as you can imagine.  There's no witnesses,

11    there's no fingerprints, no DNA of Mr. McCants in connection

12    with this shooting whatsoever.  No gunshot residue test was

13    performed, the accuracy of the GPS cannot be verified, and the

14    gun was found four days later in a home.  We have different

15    definitions of airtight.

16          Now, you've seen the recording in the Chesapeake

17    Detention Facility.  He had no idea he was being recorded.  He

18    knows that Mr. Handy is a member of BGF.  Not once did you

19    hear them talking about BGF.  They didn't discuss who owed

20    money to BGF.  They didn't talk about if dues were paid, who

21    was being disciplined because they broke the rule of BGF.

22    They didn't talk about the inner workings of the gang, didn't

23    hear them talking about someone disrespected BGF.  Talking

24    about guns and shooting someone.  Don't get me wrong, it was

25    an awful display.  Mr. McCants testified that he made it up

1    and it didn't happen.

2           Well, the government hasn't shown that it did

3    happen.  The government hasn't put on one piece of evidence

4    that Mr. McCants murdered somebody, that he was shot by

5    Mr. McCants and then shot by Rondo.  There hasn't been one

6    witness.  There hasn't been any guns that have come in.

7    There's no substantial -- or substantive evidence at all that

8    this happened.  Mr. McCants was afraid, he wanted to seem like

9    a big man, and that is why he told Handy that he had killed

10   somebody.

11          Now, he admitted that he made things up.  He

12   admitted that in the phone calls and jail calls.  He calls it

13   "stunting."  He owned it.  I call it lying.  He admitted to

14   lying on those calls.  And he testified in his -- where he's

15   from everyone does the same thing, they all exaggerate, nobody

16   tells the truth, everybody is trying to make themselves look

17   better than the next person that they're talking to, like

18   saying I have a gun when you don't have a gun, like saying I

19   have drugs and you don't have drugs, like saying I killed

20   somebody and you didn't kill someone.

21          Now, the government made a big deal that Mr. McCants

22   knew about Shawn Gregg's death the day after it happened.

23   Well, he said a friend had told him that it had happened.  In

24   his neighborhood, I'm surprised he didn't know about it the

25   same day that it happened.

1          Colin Knight came to testify for Mr. Jones, and he

2     testified that he has known Mr. McCants his entire life.  And

3     he lived in Greenmount his entire life.  He never saw

4     Mr. McCants with a gun, never saw him dealing drugs.

5     Mr. McCants testified about why people in his neighborhood do

6     not talk to the police.  He actually gave a specific instance

7     where he talked to the police and they took his money.  He

8     talked about how if you're a victim of a crime and you go talk

9     to the police, they flip the script.  And what he's saying is,

10    if you're a victim, all the sudden, in his neighborhood you

11    become the defendant.  And that's why people don't talk to the

12    police in his neighborhood.

13          Now, conspiracy with the possession with intent to

14    distribute.  None of the drugs that were placed in evidence

15    have any direct connection to Mr. McCants.  He admitted he

16    possessed marijuana at the Baltimore City Detention Center,

17    but that had nothing to do with BGF.  The only references to

18    drugs are in the phone calls and text messages.  And no

19    evidence that Mr. McCants carried out any of those actions.

20    No witnesses have testified that Mr. McCants sold them drugs.

21    No law enforcement has testified that Mr. McCants was caught

22    selling drugs in the Greenmount area.  No search warrants were

23    ever executed at any homes where he was where drugs were

24    found.  No undercover agents ever purchased drugs from

25    Mr. McCants.  You have testimony from Christopher Meadows that

1    Mr. McCants was selling drugs when he was 12 years old.  There

2    are no drug arrests for Mr. McCants when he was 12 years old.

3         Felon in possession of a firearm.  The government

4    has to prove beyond a reasonable doubt Mr. McCants knowingly

5    possessed the firearm.  The gun was found five days after.

6    There's no DNA, no fingerprints whatsoever of Mr. McCants on

7    that gun.  Like I said in opening statement two months ago,

8    not one fingerprint, not one piece of DNA was found on any

9    evidence brought in here by Mr. McCants.

10        The government brought in five witnesses to say

11   Mr. McCants is BGF.  Every single witness told them that

12   somebody else told them that.  Not one witness said

13   Mr. McCants told them he was BGF.  Not one witness saw him at

14   a meeting.  Not one witness said they heard him say the oath.

15   Not one witness said they knew who his sponsor was.  Not one

16   person got on the stand and said, I personally know

17   Mr. McCants is BGF.  Not one person said that.

18        And finally, and most importantly, the people that

19   did say he was BGF, they didn't tell you when, meaning that

20   they never said Mr. McCants is BGF in 2007, he's BGF in 2008,

21   '10, '12, '17.  The government is trying to jam a round peg

22   into a square hole.  If you know someone or you hang out with

23   somebody who's BGF, then you're a member.

24        Mr. McCants testified he knew 19 people in this cast

25   of characters.  He testified that he had heard or thought

1    seven of them were BGF.  He explained the difference between

2    knowing someone and hanging out with someone.  Knowing someone

3    is seeing them on the street and saying hi and keep moving.

4    Hanging out with someone meant you spent time with them, they

5    were your friends.  He admitted some of his friends are BGF.

6    He admitted some of his friends are Bloods.  He admitted some

7    of his friends are in the Muslim gangs.  Does that make him a

8    member of Bloods, a member of the Muslim gangs?  The only

9    evidence the government has to link Mr. McCants to the BGF are

10   his tattoos.  There has not been credible testimony that links

11   Mr. McCants to the BGF prior to him turning 18 or after he

12   turned 18.

13           Now, the government left you with some old sayings,

14   here's one:  A person is innocent until proven guilty.  And

15   the government has not proven that Mr. McCants is guilty

16   beyond a reasonable doubt of conspiracy racketeering, drug

17   conspiracy, or possession of a gun by a felon.  Thank you.

18           THE COURT:  Thank you, Mr. Francomano.  Ladies and

19   gentlemen, we'll take our lunch break.  During the lunch break

20   do not discuss the case with anyone.  Do not discuss the case

21   even among yourselves.  Do not allow yourselves to be exposed

22   to any news articles or reports that touch upon this case or

23   the issues it presents or any articles or reports that relate

24   to any of the participants in the case.  Avoid all contact

25   with any of the participants in the trial.  Do not make any

1    independent investigation of the law or the facts in this

2    case.  Do not look up anything related to the case or its

3    participants on the internet.  Do not consult an encyclopedia

4    or dictionary.

5            Ladies and gentlemen, to keep things moving we're

6    going to take a 45-minute recess for lunch today, same as

7    yesterday.  45 minutes.  Please take the jury out.

8            (Jury left the courtroom.)

9            THE COURT:  Okay.  Let's be ready to go at 20 past

10   2:00.

11           (A recess was taken.)

12           (Jury entered the courtroom.)

13           THE COURT:  Mr. Johnson, that's acceptable to you

14   that Mr. Enzinna is excused this afternoon and that you're

15   accompanied here this afternoon only by Mr. O'Toole?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  Thank you.  Off the record.

18           (Jury entered the courtroom.)

19           THE COURT:  Ladies and gentlemen, the closing

20   arguments per se have been completed, but you'll recall that I

21   told you that because the government has the burden of proof,

22   they can elect to make a rebuttal argument after the

23   defendants have argued.

24           Does the government wish to make a rebuttal

25   argument?

Government's Rebuttal Closing Argument

 1          MR. MARTINEZ:  Yes, Your Honor.  Thank you.

 2          THE COURT:  You may proceed, Mr. Martinez.

 3          MR. MARTINEZ:  Ladies and gentlemen, good

 4   afternoon.

 5          JURORS:  Good afternoon.

 6          MR. MARTINEZ:  For the past couple of hours you've

 7   heard explanations of the evidence in this case that simply

 8   aren't plausible.  You've heard attacks on the credibility of

 9   witnesses that are themselves incredible.  And you've heard

10   lots of other arguments that shouldn't distract you from the

11   overwhelming evidence in this case.

12          But here's the good news:  Each and every one of you

13   has a built-in mechanism that will allow you the keep your

14   eyes on the ball, to put the arguments you've just heard in

15   their proper place.  You use it every day at home with your

16   families, at work with your colleagues, in your social

17   interactions with your friends.  It's not a degree or a title

18   or any kind of specialized training, it's good old fashioned

19   common sense.  So let's use old fashioned common sense to

20   consider or reject many of the arguments you just heard.

21          When we're done you're going to realize Ms. Hoffman

22   was right when she told you yesterday that these defendants

23   are guilty.  They're guilty as can be on every single count in

24   this case.  So if we're thinking about common sense, if we

25   think about this case in terms of common sense, a logical

1     place to start is Count 1.

2              Let's start by clarifying and re-emphasizing exactly

3     what you're being asked to decide.  You heard a lot from

4     defense counsel about specific murders, shootings, robberies,

5     and drug dealing.  And while counsel all acknowledge that

6     Count 1 charge is a conspiracy, you may have thought listening

7     to their arguments that you're being asked to return

8     individualized verdicts as to those particular crimes.

9              That's not correct.  Except for the murder of Moses

10    Malone, which we'll get to in a moment, you're not being asked

11    to determine whether these defendants are guilty of any

12    particular murder or shooting.  You're not being asked to

13    determine whether they're guilty of any particular robbery or

14    drug dealing.  Instead, ladies and gentlemen, when you think

15    about Count 1, keep in mind that the reason you heard about

16    all those specific murders and shootings and all those

17    specific robberies and drug dealing and acts of witness

18    intimidation was to help you determine the scope of the

19    defendants' agreement to participate in the charged

20    racketeering conspiracy.

21             When you think about Count 1, remember what needs to

22    be proved and what doesn't.  Notwithstanding what we just

23    heard a moment ago, the formula is pretty simple.  To prove

24    these defendants guilty on Count 1, we need to show that the

25    gang today known as BGF Greenmount Regime, formerly known as

Government's Rebuttal Closing Argument

1    YGF, existed.  We need to show the gang did the kinds of bad

2    things, murders, robberies, shootings, drug dealing, witness

3    tampering, that we've been talking about.  We need to show

4    that these defendants agreed to join and participate in the

5    gang knowing that they or some other member would commit those

6    types of crimes.

7         So again, where Count 1 is concerned, it's the

8    defendants' agreement and the scope of the agreement that

9    matters.  Those are the goal posts, ladies and gentlemen.

10   Those are the boundary lines on the field.  Keep that in mind

11   as you consider the evidence on Count 1.

12        Now, you've heard a lot from all three counsel about

13   the credibility of witnesses.  The defendants want you to

14   believe that virtually every government witness, civilians and

15   cooperators, civilians and law enforcement, took the stand and

16   lied.  But the defendants don't get to make that call.  You

17   get to make that call.  It's your job to determine whether the

18   witnesses in this case were telling the truth.

19        As you make that determination, ladies and

20   gentlemen, ask yourself this:  Did witnesses like Christopher

21   Meadows and Harry Caesar and Lamontae Smith, did the testimony

22   make sense?  Was it consistent with the testimony of other

23   witnesses?  Was it consistent with the other evidence in this

24   case?  Common sense will tell you that the answer to those

25   questions is yes.  Common sense will tell you that Meadows and

1    Caesar and Smith and all the rest of the government witnesses

2    came in here and gave accurate testimony about the brutal

3    realities they observed.

4            Let's start with Christopher Meadows.  He told you

5    that Geezy, Slay, and Digga all were members of YGF.  And all

6    three defendants admitted that.  He told you that Geezy, Slay,

7    and Digga all sold drugs, including large quantities of crack,

8    in the Greenmount Avenue neighborhood between 2005 and 2007.

9    On the stand a couple weeks ago, Geezy admitted Meadows was

10   right, at least in 2007, he was selling crack, marijuana, and

11   ecstasy every day.  That testimony was further corroborated by

12   what you heard from Detective Ferdinand who purchased crack

13   cocaine from Geezy in the 2400 block of Brentwood Avenue in

14   2007.  Chris Meadows also told you that Geezy shot at a pair

15   of drug users outside the 25th Street stash house in 2006.

16   That was a YGF stash house, remember?  Geezy conceded when he

17   testified that Chris Meadows was right about that too.

18            What about the murder of Gregory Rochester and the

19   shooting of Antonio Oliver or Bubba?  You heard that when

20   Meadows first told the police about those crimes way back in

21   2007 he had no idea that the firearms examiner, Sandy Bohlen,

22   would determine to a reasonable degree of certainty in her

23   field of expertise that Rochester and Oliver had been shot

24   with the same gun.  There's no getting around it, ladies and

25   gentlemen, that's a powerful piece of evidence that strongly

 1    corroborates Christopher Meadows's testimony.

 2            Now, counsel, Mr. Enzinna and Mr. Bussard, this

 3    morning emphasized that Chris Meadows didn't tell Detective

 4    Lloyd that Geezy had green-lighted Gregory Rochester or that

 5    Donatello Fenner was there when Rochester was murdered until a

 6    second interview with the police in 2008.  But remember,

 7    Meadows wasn't asked who green-lighted the murder until that

 8    second interview.  When he was asked who green-lighted the

 9    murder, he told the police what he knew, just like he did with

10    you on the witness stand.  And keep in mind, ladies and

11    gentlemen, Geezy is not the person who should be throwing

12    stones at Christopher Meadows for providing inconsistent

13    statements.  On this topic, on the murder of Gregory

14    Rochester, Geezy lives in a glass house.

15            Remember that in January 2007, and this came out

16    during Geezy's cross-examination a couple weeks ago, Geezy

17    talked to the police about what he was doing on the night

18    Rochester was killed and he told them he was watching a movie.

19    Then when he testified in state court in 2015, he told a jury

20    just like you that he was asleep.  Then you heard testimony

21    from Geezy's ex-girlfriend, Tyra Woodley, who told you on the

22    night of the murder she was playing with Geezy's hair.  You

23    also heard from Christopher Meadows in this case that Geezy

24    told Meadows he was using the bathroom when the murder took

25    place.  Those are four different versions, ladies and

1    gentlemen.  That's what we call a version control problem.

2    Geezy has that problem, not Christopher Meadows.

3            Like Ms. Hoffman told you yesterday, as Detective

4    Lloyd told you on the witness stand way back in November,

5    Christopher Meadows's account of the Gregory Rochester murder

6    has been consistent from day one.  He's also been corroborated

7    by physical evidence and admissions by these defendants.

8            How about Harry Caesar?  Caesar told you in detail

9    about the green-lighting of Moses Malone and also about the

10   murder itself.  He told you about discovering the search

11   warrant affidavit that revealed Malone as a witness in his

12   house.  He told you he was there when Elliott Reed took the

13   affidavit to Geezy.  Told you he was there when Geezy

14   pressured Malone's girlfriend, a woman named Oct, to tell BGF

15   where Malone was.  He told you that he heard from Geezy's own

16   mouth, if anyone spots Moses Malone, there's a green light.

17           Ladies and Gentlemen, Harry Caesar didn't just tell

18   you those things.  He also told Detective Taylor.  And he told

19   her in 2013 in real-time as the events were taking place.

20   Detective Taylor confirmed those conversations when she

21   testified.  And we know from Caesar's -- well, and her account

22   was consistent with Harry Caesar's.  And we know from Caesar's

23   phone records, which remember, Harry Caesar has never seen,

24   conversations between Caesar and Taylor did in fact take

25   place.

1          Caesar also told you that Wesley Brown claimed

2   responsibility for murdering Moses Malone.  That testimony was

3   also corroborated.  In fact, it was corroborated by two

4   members of the Greenmount Regime.  You heard the conversation

5   between Digga and Norman Handy in the Chesapeake Detention

6   Facility in September 2017.  During that conversation when

7   they thought that no one else was listening, Digga and Handy

8   confirmed that Wes Brown had killed Malone to keep him from

9   testifying against Handy.  They confirmed that Nod or James

10  Cornish had testified in state court that Wes had done it.

11  Then they confirmed that Wes had sent the text messages in

12  which he made arrangements to get rid of the .22 caliber gun

13  that he used to murder Malone.  You know those text messages

14  exist.  You saw them yourselves in Wes Brown's phone records.

15          By the way, ladies and gentlemen, with respect to

16  Digga and the September 2017 conversation about Moses Malone,

17  don't believe for a second that he learned about that murder

18  from the government at a reverse proffer.  That never

19  happened.  You heard testimony from two law enforcement

20  officers yesterday who were there at the reverse proffer, both

21  told you that no one said a word about Moses Malone or about

22  his murder during that meeting.  Both told you that no one

23  recited the BGF oath for Mr. McCants.  Both agents told you

24  that no one threatened to put Mr. McCants away for the rest of

25  his life unless he cooperated.  Any suggestion otherwise is a

1    fiction.  And you shouldn't hesitate to reject it.

2          Back to Harry Caesar.  Caesar testified that while

3    he was locked up with Slay at MRDCC Slay admitted that he

4    murdered Trevon White or Country in May of 2013.  Harry

5    Caesar's not the only person who told you that Slay killed

6    Country.  According to Lamontae Smith or Chop, it was

7    basically common knowledge among the gang's younger members

8    that Slay was responsible for murdering their friend.  That

9    was the upshot of the jail call that you heard between Norman

10   Handy and Montel Harvey in June of 2013, which Harvey made

11   clear he didn't mess with Slay or his friends anymore because

12   of what happened with Country.

13         So given all that, don't let anyone try to persuade

14   you that Harry Caesar was making things up.  His testimony was

15   corroborated by Detective Taylor and other witnesses,

16   including members of the gang.  It was further corroborated by

17   cell phone records, cell site location data, social media

18   posts, and all the other information that Ms. Hoffman

19   mentioned yesterday.  That corroboration isn't an accident.

20   It's not a lucky coincidence.  It shows you that Harry

21   Caesar's testimony, just like Christopher Meadows's, was

22   accurate and squarely on point.

23         That brings us to Chop or Lamontae Smith.  Chop told

24   you that all three of these defendants were members of the

25   Greenmount Regime and you heard the same thing from multiple

1   other witnesses in this case.  Chop also told you that after

2   Slay killed Country in May of 2013 he and other members of the

3   gang retaliated against Slay and Ben Miller for their role in

4   Country's death.  Again, ladies and gentlemen, that testimony

5   is also corroborated.  It's corroborated by the jail call

6   between Norman Handy and Montel Harvey, in which Harvey told

7   Handy, excuse my French, that "motherfuckin' Ben got his

8   motherfuckin' issue" the previous night.  It's further

9   corroborated by a second jail call in which Harvey told Handy

10  that he had gone to look for Slay with the gun.

11          While we're talking about Chop, Slay, and Ben, we

12  need to correct the record on an important point.  During his

13  argument, Mr. Enzinna told you this morning that Chop had

14  changed his testimony as to who killed Country.  Mr. Enzinna

15  suggested that Chop had told the grand jury that Ben had

16  killed Country, but then he changed his testimony and told you

17  Slay had done this.  I think we did this before when Chop was

18  on the witness stand during cross-examination you may remember

19  we put a transcript on the screen.

20          But just to refresh your memory, Chop was asked in

21  the grand jury:  "Do you recall ever learning Ben played a

22  role providing Slay the weapon that was used to kill Country?"

23          Answer:  "Yeah."

24          Question:  "What did you hear about that?"

25          "They said Ben gave Slay the gun to kill Country and

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    then after he killed Country he," that is Slay, "gave Ben the

2    gun."

3         Ladies and gentlemen, Chop told you the same thing

4    on the witness stand in this case, so don't believe for a

5    second that he came in here and changed his testimony.

6         How about the murder of Thabiti Wheeler?  Chop

7    testified that while he was sharing a cell with Roscoe, Roscoe

8    told him Slay killed a hack driver, who you now know as

9    Wheeler.  Roscoe told Chop that Slay was in the back seat and

10   that the victim, Wheeler, was in the front.  As Ms. Hoffman

11   told you yesterday, that testimony is also corroborated.

12   Remember Detective Kazmarek, he testified that based on the

13   location of Wheeler's gunshot wounds, where the exit and entry

14   wounds were, he was able to determine that Wheeler had been

15   shot from behind.  And you heard from the firearms examiner,

16   again, Sandy Bohlen, who told you that to a reasonable degree

17   of certainty in her field of expertise, Country and Thabiti

18   Wheeler had been killed with the same gun.  That is entirely

19   consistent with Chop's testimony that Slay was responsible for

20   both murders.

21        Chop also told you, just as he told Detectives Veney

22   and Landsman in October of 2013, that Slay was the person that

23   shot him on October 5th of 2013.  Now, you heard a lot about

24   how Chop didn't tell the police that Slay had shot him for a

25   couple of weeks.  You heard that days after the shooting Chop

1    refused to say who did it, then he said the shooter was 5'7"

2    with hair, and that wasn't correct either.  Chop explained on

3    the stand why he did that.  And his explanation makes sense.

4    He wanted to get the police off his back and he knew that

5    under the rules of BGF "you ain't supposed to tell."  Those

6    were his words.  You ain't supposed to tell because if you do

7    tell you wind up dead like Moses Malone.

8           Here again, ladies and gentlemen, we're not simply

9    asking you to take Chop at his word.  There's other evidence

10   supporting his testimony that Slay is the person who shot him.

11   You heard the jail calls in which Slay told other people,

12   including the guy Lavon Cypress, Swan, to get rid of a whip or

13   a car or a watch.  You saw where those calls led.  They didn't

14   lead to the blue Honda that you heard so much about, nor did

15   they lead to a watch.  It led to a .45 caliber gun.  James

16   Wagster told you that to a reasonable degree in his field of

17   expertise that was the gun that had been used to shoot Chop.

18   How could that have happened if Chop wasn't telling the truth?

19          So we've just reviewed the testimony of three key

20   witnesses in this case.  We should emphasize again that none

21   of these witnesses were testifying pursuant to plea agreements

22   or in the hope of reducing their sentences in the future.  In

23   fact, Harry Caesar and Christopher Meadows walked in here off

24   the street.  These were not witnesses who came here to sing

25   for their supper.  These were witnesses with little to gain

1    and everything to lose.  Under the rules of BGF, ladies and

2    gentlemen, those witnesses signed their own death warrants

3    when they took the stand in this case, yet they still told

4    you, without flinching, who these defendants were and what

5    they did.

6         You've heard attacks on other government witnesses

7    too, but none of those attacks are legitimate.  You've heard,

8    for example, that Mike Gray is a liar.  Mike Gray's testimony

9    regarding the history of BGF and the merger between BGF and

10   YGF is entirely consistent with the testimony of other

11   witnesses, including Brian Rainey.  Gray and Rainey both told

12   you that around 2007 senior BGF members wanted to shut YGF

13   down because they thought YGF was out of control.  Now that

14   you've seen the evidence, now that you've heard about the

15   murders and shootings and robberies, you know that YGF was in

16   fact out of control.  You know that YGF was, as Geezy called

17   it, "the murder team."

18        The same way Gray and Rainey both told you when BGF

19   issued its ultimatum to YGF, told them to either shut down or

20   cross over and follow BGF's rules, they issued the ultimatum

21   to Geezy.  They issued the ultimatum to Geezy because he was

22   the one in charge.  That is consistent with all the other

23   evidence you've heard in this case.

24        While we're talking about Mike Gray, you may

25   remember that he also testified about the meeting at Artez

1    Harris's mom's house in late 2012 or early 2013.  This was the

2    meeting where Geezy personally volunteered to get rid of Porky

3    or Joseph Davis.  And you heard about the beef between Porky

4    and Geezy from other witnesses, including Porky himself as

5    well as Michael Gwaltney.  Ladies and gentlemen, the testimony

6    by Porky and Gwaltney was like seeing two different sides of

7    the same coin.  Porky told you about the plot to rob him and

8    kill him from one side, Gwaltney told you about it from the

9    other.  Both witnesses told you that Geezy was trying to help

10   kill -- rather -- yeah, Geezy was trying to help kill Porky on

11   the night when Geezy got shot.  It's not an accident or

12   coincidence, ladies and gentlemen, that the testimony by Porky

13   and Gwaltney was consistent.  Not an accident or coincidence

14   that the testimony of those witnesses makes sense.

15           And while we're talking about this, this is probably

16   a good time to mention that when you go back to fill out the

17   verdict forms, you'll get verdict forms for each defendant, as

18   to Count 1, the RICO conspiracy, if you find them guilty on

19   Count 1, you'll then be asked to complete a box that has

20   different types of predicate crimes that you can find were

21   foreseeable to these defendants.  Those will be the ones

22   you've heard about, murder and attempted murder and all its

23   lesser included offenses, robbery, drug-related offenses,

24   witness tampering, and witness intimidation.

25           When you're talking about murders, murders include

1    not only the ones Mr. Enzinna mentioned during his closing

2    this morning, he talked about three:  Rochester, Malone, and

3    Henry Mills.  They also include episodes like the ones we just

4    talked about with Porky.  When Geezy went to the meeting with

5    Mike Gray and Artez Harris and Stimey and Ricky Evans, three

6    other BGF bushmen, and they talked about getting rid of Porky,

7    that is a conspiracy to commit a murder that is foreseeable to

8    Geezy.  That goes to show that an act of murder was

9    foreseeable to him in furtherance of the racketeering

10   conspiracy.  Same goes with respect to the plot to lure Porky

11   out of the apartment building.  Same victim different murder

12   plot.  Those are all murders that you can find were

13   foreseeable to that defendant.

14          How about Troy Kellam?  Kellam testified that he

15   talked to David Hunter in jail about Hunter's murder of Nique

16   or Henry Mills.  Told you that Hunter confessed to the murder

17   and that Hunter was worried about a video tape in which he was

18   depicted running away.  Kellam testified that according to

19   Hunter the order to kill Nique had come through the pipeline,

20   it had come through the BGF chain of command, that Hunter was

21   trying to get Geezy or "Big Bro" to get someone else to take

22   the charge.

23          Now, Kellam told you that he had never seen the

24   video that David Hunter was worried about, but you've seen it

25   during this trial.  And just like David Hunter told Troy

1    Kellam, it did show the shooter of Henry Mills running down

2    Greenmount Avenue seconds after the murder took place.  You

3    then saw a second video captured later on the day of the

4    murder in which Hunter was wearing the same clothes he had

5    been wearing when he murdered Henry Mills.  You saw in the

6    video Geezy reenacted the shooting, remember the (indicating),

7    and that looked an awful lot like the shooting of Henry Mills.

8    Those videos prove not only that David Hunter killed Henry

9    Mills and that murder was foreseeable to Geezy, but also that

10   Troy Kellam gave accurate testimony in this case.

11           Now, you also heard a lot about the testimony of

12   these defendants.  And all three testified.  But when you

13   think about what the defendants actually said and all the

14   evidence contradicting what they said, it should be obvious

15   the defendant's testimony only made the case against them even

16   stronger.  Remember the defendants want you the believe that

17   all of the governments witnesses are lying.  On the facts of

18   this case, ladies and gentlemen, that dog simply won't hunt.

19           You've heard from over ten cooperators in this case.

20   Many of those witnesses have known these defendants for years.

21   Many of them don't know and haven't spoken with one another,

22   yet they all gave specific details about who these defendants

23   were and what they did.  Again, many of the witnesses

24   corroborated one another, were further corroborated by

25   physical evidence and these defendants' own admissions.

1             Back to the defendants' testimony.  To credit their

2    testimony, you'd have to believe a long list of self-serving

3    explanations that simply aren't consistent with old fashioned

4    common sense.  You'd have to believe that Geezy's Jamaa tattoo

5    was not a BGF tattoo, but instead was a reference to a

6    nonexistent record company called Jamaaville.  You'd have to

7    believe that the silver back gorilla shirts that Geezy,

8    Stimey, Sharieff Dupree were all wearing in the social media

9    pictures, you saw in one of them Geezy was also making the X,

10   weren't BGF, but instead depicted scenes from *Planet of the*

11   *Apes*.  So Stimey and Reef were wearing *Planet of the Apes*

12   t-shirts that just happened to have George Lester Jackson on

13   the front.

14             You'd have to believe that when Geezy said, "free

15   Roscoe, free Dave, n-word, my shooter," wasn't saying

16   "shooter," but he was instead referring to a singer named

17   Shoody on Duty.  Come on.  You'd have to believe that when

18   Geezy pantomimed the shooting in Mund Park on the day Henry

19   Mills was murdered in the presence of David Hunter that he was

20   reenacting a different shooting instead of the murder of Henry

21   Mills.

22             You'd have to believe that Slay wasn't on the steps

23   of 214 East 22nd Street on the night Country was killed, when

24   in fact he left his fingerprints on two different bottles at

25   the scene.  Now, Mr. Bussard emphasized that one of those

1    fingerprints was found in the gutter, but what he didn't tell

2    you was that one was found on the steps literally next to the

3    blood trail that was left after Country was killed.

4           In fact, when you go back to deliberate, if you look

5    at Government's PHCS 5-7, you'll see that that Seagram's

6    Escapes bottle that had Slay's fingerprint on it was found

7    next to another bottle which was laying sideways and had

8    splattered blood on the bottom of its label.

9           In order to believe these defendants, ladies and

10   gentlemen, you'd have to believe that the 276 tattoo means

11   Barclay and Guilford instead of BGF.  You'd have to believe

12   that Digga was just "blowing smoke," as he put it, when he

13   told his friends repeatedly that he was willing to sell them

14   drugs or that he was carrying a gun.

15          You'd have to believe that Digga just happened to be

16   in Cecil County shooting a game of dice when Corporal Finch

17   chased him and found him hiding in the bushes after a home

18   invasion robbery in 2010.  You'd have to believe that when

19   Digga told Norman Handy that he had shot someone 11 times and

20   taken the victim's cell phone while the victim was still

21   twitching he was just talking to sound tough in the jail.  And

22   you heard Digga himself tell his girlfriend on the jail call

23   that no one's going to buy that.  Ladies and gentlemen, you

24   shouldn't buy that.

25          Those are just examples, ladies and gentlemen, to

1     consider those examples, keep in mind that in addition to

2     saying things that simply can't be squared with common sense,

3     the defendants damaged their credibility in other ways.  You

4     heard that Geezy testified untruthfully before a state jury

5     when he said that he hadn't sold drugs following his arrest in

6     2007.  You heard that when Slay was questioned about the jail

7     call which he said that Swan was trying to sell a blue Honda,

8     not a gun.  He threw his hands up and said, "I'm not a good

9     explainer."  That, as it happens, ladies and gentlemen, was

10    the most accurate piece of testimony he gave.

11         You learned just yesterday that Digga wasn't

12    truthful when he said he didn't drive a car, that he didn't

13    call his brother Tradon, that he didn't sell drugs.  In fact,

14    you heard him say on the jail call that we played yesterday

15    that Tradon, who he called Tradon and not Dog Ass or Don, had

16    gotten smacks from his hitter.  You also learned yesterday

17    that when Digga told you that he was on his phone at

18    10:50 p.m. on February 4th, 2017, the time Gregory Bess was

19    shot, he had previously asked Ricky Evans or Dorsey whether

20    his dad would come to court to say that Digga's phone was

21    charging in his house.  Apparently between November 28th,

22    2017, the second day of the government's case in chief, and

23    the day he took the stand in this case, Mr. McCants decided to

24    ditch the Dorsey's dad phone charging story and trade in for a

25    better one saying he was on his phone.

1          You heard him on the jail calls with his girlfriend

2     saying that he had to figure out how to talk around things

3     when he got on the witness stand.  That was exactly what he

4     was doing when he went to Dorsey's cell in CDF and said, hey,

5     can pops come testify?

6          You also heard that when Digga was questioned about

7     all the different conversations which he admitted having drugs

8     or selling a gun -- selling drugs or having a gun, rather, or

9     having warrants or having a baby on the way, he told

10    Ms. Hoffman, you want the jury to believe that just because I

11    was lying then when no one was listening and nothing was at

12    stake, he was also lying to you when you were listening and

13    everything was at stake.  That, ladies and gentlemen, is up to

14    you to decide.  It's up to you to decide whether that shoe

15    fits.

16         So when you weigh the defendants' testimony against

17    the testimony of other witnesses and against all the other

18    evidence in this case, ask yourselves whether you're

19    comfortable believing anything that came out of their mouths.

20    Ask yourselves whether any of their testimony is credible.

21    Old fashioned common sense should tell you the answer to those

22    questions is no.

23         Let's talk about membership in the racketeering

24    enterprise, the BGF Greenmount Regime, formerly known as YGF.

25    It's amazing that despite all the evidence you've seen and

1    heard these defendants still deny being members of the gang.

2    Don't believe that for a second.  You've heard from a parade

3    of witnesses who put these defendants in the gang.  Meadows,

4    Caesar, Lamontae Smith all put Slay in the gang.  Gray,

5    Meadows, Kellam, and Smith all put Digga in the gang.  And

6    Gray, Rainey, Meadows, Kellam, Davis, Gwaltney, Caesar, Smith,

7    Kennethfer Stokes, and Moses Malone all put Geezy in the gang.

8    That is an awful lot of witnesses.

9         It's not just the witnesses either.  Defendants have

10   all poo-pooed the tattoos, which Ms. Hoffman summarized

11   extensively for you yesterday.  Those tattoos are real life

12   advertisements of the defendants' membership in BGF.  The

13   defendants wore those advertisements proudly, at least until

14   they took the witness stand in this case.

15        You also saw the letter from Roscoe to Digga, which

16   began with the salutation Eusi Guyedi Jamaa or Black Guerilla

17   Family.  Even Slay acknowledged when he testified that Eusi

18   Guyedi Jamaa really means BGF.  You've seen the postings on

19   social media about J and Jamaa and gorillas.  You've seen the

20   silver back gorilla shirts that we talked about.  You've seen

21   the text messages in which Digga talked about "J shit" as well

22   as the bug recording which he conceded that Chop would confirm

23   that he was in the gang.  That's exactly what Chop did.

24        While we're talking about Digga, let's set a couple

25   things straight.  You heard about witnesses like Gray, Kellam,

1   and Smith who met with investigators a few times before they

2   put Digga in the gang.  In fact, with respect to Gray and

3   Kellam, you were told they testified in a different federal

4   trial and that they didn't mention Digga during that

5   testimony.  Digga wasn't on trial in that case.  It was other

6   BGF members from other parts of the city.

7           As you heard at trial, ladies and gentlemen, when

8   investigators asked those witnesses about Digga, they told the

9   government what they knew.  You also heard that none of the

10  witnesses I just mentioned had a conversation with Digga in

11  which Digga put himself in the gang.  But guess who did hear a

12  conversation like that?  You, the jury.  We already mentioned

13  the September 25th, 2017 CDF bug recording.  It's the same

14  conversation where Digga and Norman were talking about who was

15  going to come testify and they talked about, we know Nod's

16  going to come testify, he put everybody in the gang.  And

17  Digga said Chop's going to confirm that shit, his rat ass, yo,

18  he going to confirm that shit.

19          You may remember that later -- there's a later

20  excerpt of that same recording, 41 minutes and 41 seconds to

21  47 minutes, where Digga and Norman have a long conversation

22  where Norman was talking about how Robbo was the LTC and yo

23  was the C.  They were talking about comrades surrounding an

24  n-word.  And Norman said he ain't do right for J.  At one

25  point McCants says, but he was the C, though; right?  And you

1    may remember that this morning toward the end of his closing

2    argument, Mr. Francomano told you that you didn't hear any

3    recorded conversations where Digga was talking to anybody

4    about green lights, did you?  Well, in this conversation

5    Norman says somebody was geeking and ready to put a green

6    light on somebody.  So ladies and gentlemen, what you heard

7    before lunch was just wrong.  You can say something with all

8    the conviction in the world, that doesn't make it right.

9         Speaking of recorded conversations where Digga

10   talked about BGF, another call Mr. Francomano forgot to

11   mention to you was the jail call with Shelton Burris, or at

12   least the part of it where they talked about being brought up

13   top and how BMs didn't like Shelton Burris.  Remember Burris

14   also referred to himself as the MOD.  You know from Mike Gray

15   and other BGF witnesses that that's a position in the BGF

16   bubble, minister of defense.  In that conversation, Burris

17   told him he wanted to put in work and retaliate against Chop

18   because Chop had testified against Slay.  Ladies and

19   gentlemen, Chop is the same witness who Digga called a rat in

20   another recorded conversation with Norman Handy about a year

21   later.

22         Then there's the letter from Digga to Keyshay.  Make

23   no mistake about it, ladies and gentlemen, Digga wrote that

24   letter.  You saw his name on the return address, you saw his

25   inmate ID number, you saw the side-by-side comparison of the

1    envelope in which the letter was sent with the mail that was

2    recovered from Pioneer Drive.  Remember Ms. Hoffman had them

3    both up on the screen.  You also saw that in that letter Digga

4    talked about being J and getting into an altercation with a

5    Blood.  Here again, he's putting himself in the gang.  So put

6    aside Mike Gray and Troy Kellam and Lamontae Smith, all of

7    whom we've explained are credible.  You don't need them, Digga

8    puts himself in the gang and he does it over and over.

9        By the way, another way you know Digga wrote that

10    letter is he talks about his brother, Tradon.  Of course he

11    tried to distance himself from that letter by saying that he

12    doesn't call Tradon, Tradon, he only calls him Dog Ass or Don.

13    You know from the jail call you heard yesterday that's not

14    true.

15        Talk a little bit about YGF.  You've heard arguments

16    that YGF shouldn't be considered as part of the racketeering

17    enterprise in this case.  You've heard that YGF was basically

18    a neighborhood club, no goals, no structure.  That's not

19    consistent with the evidence.  The evidence shows that YGF did

20    have goals and structure.  YGF dealt drugs, crack, heroin,

21    marijuana, ecstasy, on a daily basis.  You saw where YGF

22    members sold those drugs.  You heard about the specific

23    locations or stash houses where they stored and packaged the

24    drugs.  You heard who supplied the drugs, Geezy was the crack

25    connect and Fats was the heroin connect.  And who sold the

1    drugs on the street?  Slay, Digga, Dave, Roscoe, Joe, Foo, and

2    Don.  Sure, ladies and gentlemen, you saw evidence of a

3    organized and structured drug operation.

4           How about the murder -- well, before we go to the

5    murder of Rochester, I want to circle back to the shooting of

6    the drug users.  Remember that occurred outside a YGF stash

7    house.  And it occurred because Geezy thought those drug users

8    had stolen drugs from the gang, from his drug organization.

9           Now let's talk about the murder of Rochester.  You

10   heard that YGF had multiple meetings where members of the gang

11   planned that murder.  You heard the murder was authorized by

12   Geezy and carried out by Slay and Foo.  That in and of itself,

13   ladies and gentlemen, is evidence that YGF did have structure

14   in the chain of command.  It was an order being passed down by

15   Geezy.  The chain of command began with Geezy.  That's

16   consistent, that stayed the same, ladies and gentlemen, for

17   all intents and purposes throughout the conspiracy in this

18   case.

19           YGF also had a defined territory, 2200 to 2400

20   blocks of Guilford Avenue, Barclay Street, and Greenmount

21   Avenue.  Those city blocks remained the core of the gang's

22   territory after it merged into BGF and became the Greenmount

23   Regime the 2007.  YGF had a defined membership:  Geezy, Slay

24   Digga, Roscoe, Joe, Dave, and others.  All those members

25   remained in the gang and continued to participate in the gang

1    after it transitioned into BGF.

2          So like Ms. Hoffman told you yesterday, the evidence

3    demonstrates that throughout the charged conspiracy, YGF and

4    BGF, specifically the BGF Greenmount Regime, were the same

5    gang, operating in the same neighborhood, committing the same

6    crimes with the same core members, plus some new younger

7    members as time went by.  And throughout it all, ladies and

8    gentlemen, one guy, Geezy, was the man in charge.

9          So there should be no reasonable doubt of the charge

10   of racketeering conspiracy in this case does include YGF.  And

11   remember, there's a reason why all three defense counsel were

12   trying to carve YGF off in this case.  It's because all of

13   their clients admitted on the stand that they were members of

14   that gang.  Before we leave with YGF, I just want to correct

15   the record as to one thing that came up in the arguments you

16   heard before lunch.  Mr. Francomano told you that Mr. McCants

17   was, I believe he said 12 years old at the time of the e-pill

18   robbery that Christopher Meadows testified about.  Mr. Meadows

19   testified that the robbery happened in 2007, which means

20   Mr. McCants would have been 14 or 15.  Those facts are

21   important to get right.

22         Now let's talk about the murder of Moses Malone.  By

23   now there's no question Moses Malone was murdered, that he was

24   murdered because he was a witness against Norman Handy, and

25   that Wesley Brown pulled the trigger.  There should also be no

1    question that Geezy green-lighted that murder.  We've already

2    talked about Harry Caesar's testimony, we've talked about all

3    the different ways in which he's corroborated.  I won't repeat

4    all that here.

5         Notwithstanding all that, Geezy wants you to believe

6    he had nothing to do with the murder, that he didn't even know

7    Moses Malone, and that Harry Caesar shouldn't be trusted.

8    During his argument Mr. Enzinna attempted to discredit Harry

9    Caesar by pointing out that when he called Detective Taylor to

10   tell her that Malone was about to be killed and the murder was

11   about to get down, he said something to the effect of "Geezy

12   and them are coming to get your boy."  According to

13   Mr. Enzinna, that story doesn't make sense because Caesar

14   wasn't with Geezy on the night of the murder because Wesley

15   Brown is the person who killed Country -- or Malone rather.

16        Ladies and gentlemen, that argument misses the

17   point.  What Caesar told Detective Taylor in the heat of the

18   moment, that Geezy and them were coming to get Malone, he was

19   just reaffirming that Geezy was the one behind the plot.

20   Ladies and gentlemen, Harry Caesar knew that because Harry

21   Caesar was there when Tech brought Geezy the search warrant

22   that outed Moses Malone as a witness.  He was there when Geezy

23   pressured Oct to tell BGF where Malone was.  He was there when

24   he said if anyone spots Moses, there's a green light.

25        So given all that it makes sense that Harry Caesar

1    told Detective Taylor that Geezy and them were coming to get

2    Malone.  It makes sense because Caesar understood correctly

3    that Geezy was responsible for what was about to happen.

4         What about the fact that Caesar didn't see Geezy on

5    the night of the murder?  Caesar told you candidly that he

6    never made it to Cokesbury Avenue on the night Malone was

7    killed.  But that's where Geezy was.  Geezy admitted on

8    cross-examination that he was right there at Lock Raven and

9    Cokesbury when Moses Malone was killed.  That's why Harry

10   Caesar never saw Geezy.  He never saw Geezy because Geezy was

11   at the scene of the crime watching Wesley Brown do his dirty

12   work.

13        Mr. Enzinna also tried to claim that Geezy couldn't

14   have green-lighted Moses Malone because a green light wasn't

15   necessary for the murder of a non BGF member.  Well, first of

16   all, that's not exactly what Harry Caesar said.  While

17   cross-examining Caesar, Mr. Enzinna mentioned there's a BGF

18   rule that says members aren't supposed to take matters into

19   their own hands with respect to another brother.  He asked

20   Caesar something like, does that rule apply to non BGF

21   members?  Caesar answered well, if non BGF members, if the C

22   gives an order and he sees something in black and white, he's

23   allowed to go ahead and make whatever order it is.

24        Ladies and gentlemen, that is exactly what happened

25   when Geezy ordered the murder of Moses Malone.  In any event,

1    even if a green light wasn't required for the murder of a non

2    BGF member, that certainly doesn't mean that a ranking member

3    of the gang couldn't tell a subordinate member of the gang to

4    kill a witness.  Whether it was required or not, Geezy still

5    gave that order to Wesley Brown and that's why he's guilty on

6    Counts 3 and 4.

7            Before we leave the murder of Malone, Mr. Francomano

8    argued that McCants was locked up at the time Malone was

9    murdered and therefore had nothing to do with Moses Malone's

10   murder.  But that doesn't understand how RICO works.  Remember

11   when we talked about in the very beginning of this, we said

12   we're going to take this in terms of common sense and we're

13   going to start by telling you where the goal posts are.

14           We talked about the things you have the find to find

15   these defendants guilty of Count 1.  Did the gang exist?  Were

16   the defendants in it?  And did they join and participate

17   knowing that it did the kind of bad things that we've been

18   talking about?

19           So with respect to the murder of Moses Malone,

20   Digga's conversation with Norman Handy in the jail on

21   September 25th, 2017 where they discussed the insider details,

22   the fact that Wes had done it, what became of the murder

23   weapon, who might be telling, in connection with this case,

24   that makes -- that's an act of murder.  It's foreseeable to

25   Marquise McCants, in furtherance of this conspiracy, as a

1    member of BGF.  It's a type of crime that was foreseeable to

2    him as a result of his participation in a gang.

3           The defendants want you to believe that several of

4    the crimes you've heard about have nothing to do with the

5    charged conspiracy.  For example, you've heard arguments of

6    Digga's shooting of Gregory Bess or his drug activity in the

7    jail or his robbery in Cecil County had nothing to do with

8    BGF.

9           You've also heard argument that Geezy's drug dealing

10   over a period of years were somehow not connected to the gang.

11   Ladies and gentlemen, you should reject those arguments.  For

12   starters, the law doesn't just require that every time a gang

13   member commits a crime he has to be caught on camera pounding

14   his chest and saying this one's for BGF before you can find he

15   acted in furtherance of the gang.  Instead, ladies and

16   gentlemen, all you need to find is that the crimes the

17   defendants are committed -- the crimes they committed here are

18   consistent in terms of location, participants, or modus

19   operandi, the broader pattern of racketeering activity in

20   which the gang engaged, and that's true of all the crimes

21   you've heard about in this case.

22           With respect to Digga's shooting of Gregory Bess,

23   the evidence shows that he committed that shooting near the

24   intersection of Greenmount and Brentwood squarely within the

25   territory, right in the middle of the territory controlled by

1    the BGF Greenmount Regime.  Committed that shooting while

2    ducking an arrest warrant issued in connection with this case.

3    He then attempted to hide the gun that he used to commit the

4    shooting and later to get rid of the gun with the help of

5    associates who were helping him flee from the charges in this

6    case.

7             You heard them on the wire call after Digga came out

8    of the house on the morning of February 5th, 2017.  I know he

9    told you he only thought he had a state warrant on the

10   violation of probation.  But you heard his friends saying, oh,

11   was his phone tapped?  And Deandre Dorsey pipes up, did he

12   have a reward, did he have a reward?  Ladies and gentlemen, no

13   one has a reward on a state violation of probation.  Digga and

14   his friends all knew that at the time Gregory Bess was shot,

15   he was fleeing the charges in this case.  All of that

16   establishes, ladies and gentlemen, that the shooting of

17   Gregory Bess and all the conduct relating to that shooting was

18   committed in furtherance of the racketeering conspiracy

19   charged in Count 1.

20            Now would be a good time to correct another thing

21   that came up during Mr. Francomano's closing argument.

22   Mr. Francomano mentioned that when Digga testified he gave

23   alternate explanations, alternative facts, if you will, of

24   things that happened in this case that haven't been

25   contradicted.  One of those alternate explanations was what he

1    told you about being on his phone at the time Gregory Bess was

2    shot.  Well, you already know that's contradicted because

3    Digga was fishing around for another story when this trial

4    started when he went to Ricky Evans and asked his dad to come

5    testify that his phone was charging in his house.

6            Digga also contradicted himself on his explanation

7    of what he was talking about with Norman Handy on the CDF bug

8    when he talked about the murder where he shot the guy 11

9    times.  Contradicted himself when you heard him say in a jail

10   call that no one was going the buy his explanation.

11           Go back to the connection between the crimes you

12   heard about and the conspiracy charged in Count 1.  I want to

13   talk about the robbery in Cecil County in 2010.  Now, you

14   heard from Christopher Meadows, Lamontae Smith, Mike Gwaltney,

15   and Troy Kellam that BGF members committed robberies all the

16   time.  But importantly, you also heard that they sometimes

17   committed robberies or hit licks outside their neighborhoods

18   where they wouldn't be known or recognized by their victims.

19   That's what Christopher Meadows did in Dutch Village in West

20   Baltimore in 2006 and 2007.  That's what Mike Gwaltney did

21   when he robbed Porky in the apartment building on North Avenue

22   in 2012.  That's what Digga did when he committed the home

23   invasion robbery in Cecil County in 2010.  He went outside his

24   neighborhood and hit a lick, which is entirely consistent with

25   a pattern of racketeering activity that you've heard about in

 1    this case.

 2            While we're talking about Cecil County, let's

 3    correct another point about Corporal Finch's testimony.

 4    Mr. Francomano said that Corporal Finch said that Mr. McCants

 5    said he didn't commit a crime.  On direct examination,

 6    Corporal Finch said when he interviewed Digga he didn't say

 7    much, but what he said was no one else was involved.

 8            You also heard -- let's talk about the weed in the

 9    jail.  You heard that BGF was originally a prison gang, that

10    one of its original purposes was smuggling drugs and

11    contraband into correctional facilities.  So when Digga was

12    caught packaging weed in the jail cell at BCDC or when, for

13    that matter, Geezy gave suboxone to Mike Gwaltney at CDF or

14    when Digga was caught talking to Norman Handy on that same

15    September 25th bug recording talking about getting weed into

16    CDF, all those defendants were simply doing what incarcerated

17    BGF members have been doing since the mid 1990s at the Cut or

18    the Maryland House of Corrections.  Make no mistake about it,

19    ladies and gentlemen, drug smuggling in jails is racketeering

20    activity in furtherance of BGF.

21            That brings us to a related point.  McCants has

22    emphasized to you that he was locked up for much of the

23    charged conspiracy in this case.  That's correct.  It's not a

24    defense, especially in the context of a prison gang with BGF.

25    You've heard from multiple witnesses that members of BGF don't

1    stop being members when they get locked up.  They're still in

2    BGF.  They're still subject to BGF's rules.  They still stay

3    up to date on what's happening with fellow gang members on the

4    street.  And they still commit crimes in furtherance of the

5    gang.  During this trial, ladies and gentlemen, you've seen

6    evidence that Mr. McCants engaged in drug trafficking,

7    committed stabbings, and shared information about murders and

8    other crimes with BGF members all while he was locked up.  All

9    that conduct is part of the charged conspiracy in this case.

10        McCants has also emphasized he was a juvenile until

11   June of 2010.  That's also true.  But again, it's not a

12   defense.  There's no reasonable doubt that Marquise McCants

13   continued to participate in a charged racketeering conspiracy

14   after he turned 18.  He committed the robbery in Cecil County,

15   he was caught with weed in the jail, he committed a stabbing

16   in the jail, he confessed to murders in the jail, he engaged

17   in drug activity with Shawn Gregg and others, and he attempted

18   to murder Gregory Bess.

19        By engaging in that conduct, ladies and gentlemen,

20   Marquise McCants ratified, you heard that term from

21   Mr. Francomano, everything he did in furtherance of the

22   charged conspiracy as a juvenile.  While you can't consider

23   Mr. McCants's juvenile conduct as substantive evidence of his

24   guilt, you can consider it to help you determine when

25   Mr. McCants joined the charged conspiracy, the scope of the

1    conspiracy he agreed to join, and whether the conduct of

2    co-conspirators was foreseeable.

3           Mr. Francomano didn't tell you about that later --

4    that latter part this morning.  He only told you what you

5    couldn't do with the evidence.  But what you can do is

6    important because that means that you can consider all of

7    Digga's drug dealing in furtherance of YGF, which you heard

8    about from Christopher Meadows, when you sit down to

9    deliberate on Count 2 and you determine whether or not drug

10    dealing by other BGF members was foreseeable to Mr. McCants.

11    That is permissible use of his juvenile conduct once you find

12    that he ratified that conduct as an adult, and there's

13    abundant evidence that he did.

14           Now, let's talk about Geezy for a minute.  He argued

15    that there's no connection between his drug dealing and the

16    BGF Greenmount Regime.  Let's dispose of that argument

17    quickly.  The evidence has shown you beyond a reasonable doubt

18    that Geezy supplied both other drug dealers, including BGF

19    members, as well as customers throughout the Greenmount Avenue

20    corridor between 2005 and 2016.  You heard about Geezy's drug

21    dealing from Christopher Meadows as well as Detective

22    Ferdinand.  You heard about it from Mike Gwaltney, Mike Gray,

23    Lamontae Smith, and Porky.  You also heard about it from

24    Kennethfer Stokes.

25           You saw evidence of Geezy's drug activity on his

1    cell phone as well as on social media.  In fact, as

2    Mr. Enzinna candidly acknowledged, Geezy himself admitted much

3    of his drug dealing activity while testifying before you in

4    this case.  And it's not a defense, ladies and gentlemen, to

5    point out that some of Geezy's customers weren't members of

6    BGF.  That doesn't change the fact that when Geezy distributed

7    drugs to those individuals in the Greenmount neighborhood he

8    was using his status as a ranking BGF member, as well as his

9    control over street corners and alleyways in the neighborhood

10    to sell crack and other drugs in furtherance of the gang.

11         Let's go to another topic.  Heard a lot of arguments

12    about occasions where the police didn't find fingerprints or

13    DNA on a gun or a crime scene.  You've heard arguments about

14    evidence, including firearms, that was either destroyed or

15    returned to its original owner.  The thrust of those attacks

16    is that the investigation of these defendants by the Baltimore

17    Police Department, the ATF, and the FBI was somehow incomplete

18    or untrustworthy.  Ladies and gentlemen, those arguments are a

19    red herring.  They shouldn't distract you from the

20    overwhelming evidence in this case.  They shouldn't distract

21    you from the overwhelming evidence that multiple agencies

22    collected over the period of 12 years.

23         This isn't CSI, it's the real world.  When you're

24    talking about dozens of crimes committed over a 12-year

25    period, there are going to be cases where evidence is disposed

1    of or where a certain kind of testing just weren't done.  In

2    those situations, ladies and gentlemen, to use a golf analogy,

3    you just have to play the ball as it lies.

4            When these arguments are finished, Judge Bredar will

5    instruct you that under the law the government's not required

6    to use specific investigative techniques to prove its case and

7    that law enforcement techniques aren't your concern.  Don't

8    worry about whether particular tests were done or whether

9    particular forensic evidence was discovered at the scene of

10   particular crimes.  Instead, keep your eye on the ball, focus

11   on the evidence that was recovered.  Focus on the evidence

12   that was presented during this trial because that evidence

13   standing on its own is more than enough to convict these

14   defendants on every single count in this case.

15           Talk about rap lyrics.  Heard a lot about rap

16   lyrics.  More generally you've heard arguments that words and

17   terminology, whether used in rap videos, social media, or jail

18   calls, can often be misunderstood.  Let's start with the rap

19   lyrics.  Ladies and gentlemen, this is not a case about rap

20   lyrics.  No one's being prosecuted for being a rapper.  This

21   is a case about a gang and the crimes that it committed and

22   the rap lyrics you heard are simply an additional piece of

23   context that you can use to consider the defendant's conduct

24   and associations.

25           So when Geezy bragged in a rap video that he gets

1    n-words shot just for running their mouths, that's additional

2    context for the other significant evidence showing that Geezy

3    didn't hesitate to authorize violence against snitches like

4    Rochester or Moses Malone.  When Geezy rapped about the BGF

5    n-words that run things, when he bragged about YGF being the

6    murder team, that's additional context for the overwhelming

7    evidence that he was the member of a gang.

8          Now, it's obviously not true every lyric rap song,

9    for that matter, not every post that gets uploaded to social

10   media, be taken as a literal statement of truth.  But it's

11   just as true, ladies and gentlemen, that context matters, and

12   that sometimes depending on the facts, things people say in

13   rap videos or things they upload to Instagram or Facebook can

14   reveal important information about their conduct and

15   associations.  Of course, you don't need a lawyer or an expert

16   witness to tell you that.  It's simply common sense.

17         So while we're talking about common sense, let's

18   consider the statement you heard a lot about this morning,

19   Geezy's lyric in the "Welcome Home" video, which said, "I

20   ain't spit the oath."  Mr. Enzinna didn't give you the whole

21   lyric.  He said, "I don't know you, I ain't rocking with you,

22   so I ain't spit the oath."  Basically, I don't know you, I'm

23   not spitting the oath to you because I don't know whether or

24   not to reveal myself to you as BGF.

25         So use your common sense, ladies and gentlemen, to

1    evaluate the rap lyrics and the other evidence you've seen and

2    heard.  Consider that evidence not in the abstract and not

3    from the point of view of a lawyer or an English professor

4    like the one you heard from, rather, in the context of the

5    facts.  When you do that, you will find that the rap lyrics

6    and other social media evidence that you heard and saw will

7    confirm what you already know.  These defendants were in fact

8    members of the gang and they did in fact engage in violence

9    and drug dealing in furtherance of the Greenmount Regime.

10            Let's talk about Count 2, the drug conspiracy count.

11    You've heard evidence that each of these defendants agreed to

12    distribute drugs, including large quantities of crack and

13    heroin as well as marijuana and Oxycodone.  The evidence has

14    shown that from the beginning of the conspiracy, Geezy

15    supplied crack to members of the gang, including these

16    defendants, as well as to Norman Handy, Montel Harvey, Tangier

17    Hitchens, Mike Gray, Michael Gwaltney, and Kennethfer Stokes.

18            You've seen the evidence on his cell phone and

19    you've heard him admit that he sold crack, marijuana, and

20    Oxycodone in this case.  You also heard from Christopher

21    Meadows about a single occasion where YGF members packaged and

22    distributed a half kilogram of crack, that's 500 grams.  You

23    heard Meadows testify that members of this gang, including

24    these defendants, were selling anywhere from $7,000 worth or

25    roughly seven ounces, conservatively, to $10,000 worth or

1    roughly 10 ounces of crack cocaine every day.  Multiply that

2    by two years and you get well over the 280-gram threshold that

3    you'll see on the verdict form for Count 2.  You actually see

4    it for Count 1 as well, because for Count 1 you're going to

5    have to find whether or not to the extent drug dealing was a

6    type of racketeering activity that was foreseeable to the

7    defendants and what quantities were involved.  So you should

8    check 280 grams or more on both Counts 1 and 2.

9          But we're not done with the crack evidence because

10   we're not even counting the testimony of Lamontae Smith, the

11   evidence from Geezy's and Wes Brown's cell phones, which jacks

12   up the quantity higher.  Same is true of the heroin.  Meadows

13   testified that YGF was selling 2,500- to $5,000 worth, roughly

14   25 grams of heroin a day.  Again, multiply that two years and

15   you get well over the 100-gram threshold that you'll see on

16   verdict form Counts 1 and 2.  And that's not counting the 51

17   grams that were seized from Wesley Brown's house in June of

18   2013 or all of the text messages about heroin that you saw on

19   his phone or all the heroin-related testimony you've heard for

20   other witnesses.

21          Geezy, Slay, and Digga were all a part of that drug

22   operation.  With respect to Digga, you've heard again that he

23   was a juvenile during the YGF years and that you can't

24   consider his juvenile conduct, even if you find he ratified

25   that conduct, as substantive evidence of guilt.  But I just

1    want to emphasize again with respect to Count 2 that you can

2    consider it for purposes of determining the scope of his

3    agreement to distribute drugs and whether or not quantity is

4    distributed by his co-conspirators were foreseeable.

5         And remember, while we're talking about ratification

6    and post juvenile conduct and we're talking about Count 2,

7    there's post-18 conduct as well.  There's Digga's text

8    messages with Shawn Gregg, the conversation with Norman Handy

9    inside CDF about the weed.  And with respect to the testimony

10   about Gregg, Mr. Francomano made a dig deal this morning about

11   the fact, well, how do you know a drug deal ever took place?

12   How do you know Digga actually sold the drugs to Shawn Gregg?

13   Nobody brought the marijuana in here.  Well, that would be a

14   good defense if we charged distribution or possession.

15        The crime charged here, ladies and gentlemen, is

16   conspiracy.  An agreement is all that is required and the text

17   messages between Digga and Shawn Gregg speak for themselves.

18   That was an agreement by Digga to sell Shawn Gregg marijuana.

19   He had the price, he said he was fronting the marijuana to

20   him, it was Blueberry Kush, I think there was even discussion

21   about how and when Gregg would pay him back, and at the end,

22   Digga said "don't fuck up your money."  That's an agreement.

23   Don't believe for a second that he was stunting or not telling

24   the truth when he sent that text message to Shawn Gregg.

25        We're talking about post-18 evidence of Digga's drug

1    dealing.  In context, ladies and gentlemen, the wiretap calls

2    with Dorsey about c-line where he's talking about mixing

3    things and making it change color, those are drug-related

4    calls.  Those are cocaine-related calls.  That's the only

5    thing that makes sense.  He wasn't talking about pills.  Same

6    goes with the text messages with Mook, who Digga said on the

7    witness stand he didn't know, about C.

8         You've also seen the drug paraphernalia that was

9    recovered from Pioneer Drive when Digga was arrested in

10   February of 2017.  You've heard he was seen lugging a backpack

11   containing that paraphernalia back and forth from the bathroom

12   before he came out of the house after the long standoff when

13   he was barricaded inside.  Common sense should tell you he was

14   lugging that backpack to and from the bathroom for a reason,

15   flush drugs and drug-related evidence down the toilet.

16        Now, Mr. Francomano showed you the pictures inside

17   the house where the blinds were drawn.  He didn't show you the

18   picture that we had on the document camera when Sergeant

19   Landsman was testifying.  He did remind you that Sergeant

20   Landsman saw Digga through that basement window, which when

21   you go back and look at photos from the Pioneer Drive crime

22   scene, you'll see that there are no blinds on that window.

23   That's just more misdirection, ladies and gentlemen.

24        So with respect to Count 2, there's no reasonable

25   doubt that all three of these defendants agreed to deal drugs

1    with one another, with other defendants named in the

2    indictment, and with other individuals both known and unknown

3    to the grand jury.

4         Two more things to keep in mind when you think about

5    Count 2.  First, remember that everyday drug dealing is the

6    very core of BGF's business model.  On the streets and inside

7    the jails, controlling the drug economies is the primary way

8    in which BGF makes its money.  So it's basically impossible,

9    ladies and gentlemen, to be a BGF member without knowing that

10   you or some other member of the gang is going to distribute

11   narcotics.

12        Now, make no mistake about it, Count 2, you don't

13   have to find the defendants were members of BGF to find that

14   they were participants in the conspiracy charged in Count 2.

15   But at the same time, it's also true that being in BGF and

16   being in the Greenmount Regime is being in a drug conspiracy.

17   And that's especially true of the Greenmount Regime.

18        You heard that for roughly 12 years on a daily basis

19   members of the gang sold crack, heroin, and other drugs.  They

20   sold those drugs in a small neighborhood, which consisted of a

21   few dozen city blocks at most.  It's not unreasonable to doubt

22   that someone who was in the gang for years, as these

23   defendants were, would not have either participated in that

24   activity or known at a minimum that it was taking place.

25        Finally, at least with respect to Count 2, I want to

1    talk about foreseeability and remind you again what

2    Ms. Hoffman told you yesterday.  Under the law, these

3    defendants are liable not just for drugs they personally

4    distributed or planned to distribute, but also for any drugs

5    that another member of the conspiracy distributed or planned

6    to distribute, so long as that activity was foreseeable to

7    them.

8        Given what you've heard about the Greenmount

9    Regime's drug operation, and this includes YGF, and the way

10   that it operated in plain sight on the same city blocks in the

11   same neighborhood over a period of 12 years, there should be

12   no reasonable doubt that all of the gang's drug activity was

13   foreseeable to all three of these defendants.  There should be

14   no reasonable doubt that that agreement included a conspiracy

15   to distribute 100 grams or more of heroin and 280 grams or

16   more of crack.

17       Last thing I want the talk about before I wrap up

18   are the guns recovered from Pioneer Drive in February of 2017.

19   You heard arguments from Mr. Francomano about the fact that

20   the .40 caliber, the gun that was used to shoot Gregory Bess

21   and found in the hole behind the bathroom wall, was in a

22   disassembled state when Sergeant Landsman and his law

23   enforcement colleagues found it on February 9th.  And

24   Mr. Francomano made a big deal of the fact that Sergeant

25   Landsman said, well, everything was there.  He didn't know it

1    was missing a spring, but they actually figured it out, put

2    the spring in, and shot it.

3          The important thing to keep in mind for purposes of

4    Count 8, which charges McCants of being a felon in possession

5    of that gun, is that even though the gun was missing its

6    spring, it still clearly met the definition of a firearm under

7    federal law.  It was still clearly designed or could be

8    readily converted to expel a projectile by action of an

9    explosive.  That's what Mr. Wagster testified to on the

10   witness stand.  So pay no mind to the fact that the gun was

11   missing a spring or a rider or whatever part Mr. Francomano

12   talked about.  The bottom line is it worked to shoot Gregory

13   Bess and it worked when Mr. Wagster test fired it at the

14   range.  It was a firearm for purposes of federal law.

15         With respect to possession of that gun, the evidence

16   shows beyond a reasonable doubt that Mr. McCants possessed

17   that gun when he shot Gregory Bess.  It also shows that he

18   possessed it even after he was arrested because he was

19   continuing to excerpt dominion and control over the firearm.

20   He's the one who knew where it was.  He's the one who was on

21   the jail phone talking to Malik and TB on three-way calls

22   telling them where to go and where to look for it.  That's

23   still possession, under the law.

24         Finally, with respect to the guns, let's talk about

25   the guns in the car.  Mr. Francomano talked about Sergeant

1    Landsman testifying on cross-examination.  This was actually

2    during the big dramatic part of his closing where he was

3    saying, oh, you can scrutinize the credibility of law

4    enforcement officers too.  He tried to suggest that Sergeant

5    Landsman was somehow uncredible when he said that the jail

6    call -- one of the jail calls he listened to was a reference

7    to Mr. McCants having guns in the gray Honda.  And Sergeant

8    Landsman said, well, I heard about that on a wiretap call.

9    Mr. Francomano told you, you never heard any wiretap calls

10   talking about guns in the gray Honda.

11        You'll remember that the reason they searched the

12   gray Honda and ordered the K-9 scan of that was because on the

13   night Mr. McCants was taken into custody they intercepted a

14   telephone call in which his girlfriend Kesharna Roberson was

15   talking to Deandre Dorsey and giving him the update on what

16   had been taken out of the house.  This was the call where she

17   told him "he did the best he could, the bitch," that is the

18   firearm, "sleep at PDR."

19        Now, I know we've told you that a lot of different

20   terms that you've heard on wiretap calls and jail calls mean a

21   gun.  In the context of this case, when you use your common

22   sense, I think you'll agree.  Anyway, in that call the

23   reference to "bitch" was a firearm.  Later during the call

24   Dorsey says, "Is everything else gone?"  Or something to that

25   effect.  Roberson said, "Yeah, except that black jacket that

1    he always keep in the car." That's the wiretap call Sergeant

2    Landsman was talking about. That's why they searched the car.

3    You heard Mr. McCants on the jail call talking to Ms. Roberson

4    explaining how he was going to get on the stand and get around

5    that call. The black jacket could be anything, it could be an

6    expensive Montclair coat, I just got to figure out what I'm

7    going to say.

8           So we covered a lot of ground, ladies and gentlemen.

9    We've explained that Count 1 is all about the agreement,

10   rather than specific crimes. We've explained that our

11   witnesses are credible, corroborated and consistent with one

12   another. We've explained that all the conduct you've heard

13   about was committed in furtherance of the Greenmount Regime,

14   formerly known as YGF, and that YGF was part of the

15   racketeering enterprise in this case. We explained why Geezy

16   is responsible for the murder of Moses Malone. We've

17   explained how these defendants agreed among themselves and

18   others to distribute drugs and in quantities reflected in the

19   indictment and on the verdict form.

20          So let me leave you with this: During this trial,

21   thanks to the ability of law enforcement to keep its witnesses

22   safe, you've seen evidence of BGF's rules and structure.

23   You've seen how it operates in the jail and on the streets.

24   You've seen that it has its own illegal economy, its own

25   brutal system of justice, and you've seen that the overarching

1    goal of BGF, perhaps its most important goal, is to use

2    bullets, threats, and fear aiding its members from ever being

3    held accountable by this system of justice.

4           That's why witnesses like Moses Malone get killed.

5    It's why people like Christopher Meadows, James Cornish, and

6    Chop are intimidated and made into examples.  People like

7    Geezy, Slay, and Digga can terrorize a neighborhood without

8    ever having to face a jury like you.  Guess what, in this case

9    that didn't work out for BGF.  This trial has been held in a

10   legal system of justice.  Not in the system that handed down

11   death sentences to all of the victims you heard about.

12          We're now at the end of the road.  We're now at the

13   point where you, ladies and gentlemen, must consider the

14   evidence in light of the judge's instructions and reach a fair

15   and impartial verdict.  In this case, ladies and gentlemen,

16   that is a verdict of guilty on each and every count as to each

17   and every defendant.  Thank you for your time.

18          THE COURT:  Thank you, Mr. Martinez.  Ladies and

19   gentlemen, we'll now take a ten-minute recess.  During this

20   recess do not discuss the case with anyone.  Do not discuss

21   the case even among yourselves.  Do not allow yourselves to be

22   exposed to any news articles or reports that touch upon the

23   case or the issues it presents or any articles or reports that

24   relate to any of the participants in the case.  Avoid all

25   contact with any of the participants in the trial.  Do not

 1    make any independent investigation of the law or the facts of

 2    the case.  Do not look up anything on the internet.  Do not

 3    consult an encyclopedia or a dictionary.  Ten minutes.  Please

 4    take the jury out.

 5              (Jury left the courtroom.)

 6              THE COURT:  Ten minutes.

 7              (A recess was taken.)

 8              THE COURT:  Be seated, please.

 9              MR. O'TOOLE:  Your Honor, if you would like to

10    address the exhibits now --

11              THE COURT:  We'll do that at the end of the day

12    after we have excused the jury.

13              MR. O'TOOLE:  That's fine.  Thank you.

14              THE COURT:  Okay.  Let's bring them in.

15              (Jury entered the courtroom.)

16              THE COURT:  Be seated, please.  Ladies and

17    gentlemen, thank you for your patience and attention

18    throughout the case.  I shall now instruct you as to the law

19    applicable to the case before you.

20              Two things before we begin.  First, it is unlikely

21    that I will complete all of these instructions before it's

22    time for us to stop for the day.  So it may be that some of

23    the instructions will be delivered this evening with the

24    remainder delivered when we reconvene tomorrow morning.  We'll

25    just sort of see how much progress we make over the next hour

1    or so, see where we are.

2              The second thing I wanted to tell you is that you

3    will have a copy of these jury instructions in the jury room

4    with you during your deliberations.

5              Let me begin by explaining our respective roles,

6    which are quite different.  It's my duty as the judge to

7    instruct you as to the law that applies to the case.  It's

8    your duty to decide the facts, and in deciding these facts, to

9    comply with the rules of law and apply them as I state them to

10   you without regard to what you think the law is or should be.

11             On these legal matters, you are required to follow

12   the law exactly as I give it to you.  If any attorney has

13   stated a legal principle different from any that I state to

14   you in my instructions, it's my instructions that you must

15   follow.

16             You should not single out any instruction as alone

17   stating the law, but you should consider my instructions as a

18   whole when you retire to deliberate in the jury room.

19             None of you should be concerned about the wisdom of

20   any rule that I state.  Regardless of any opinion that you may

21   have as to what the law may be, or ought to be, it would

22   violate your sworn duty to base a verdict upon any other view

23   of the law than that which I give you.

24             Your duty is to pass upon and decide the factual

25   issues that are in the case.  You, the members of the jury,

1    are the sole and exclusive judges of the facts.  You pass upon

2    the weight of the evidence; you determine the credibility of

3    the witnesses; you resolve such conflicts as there may be in

4    the testimony; and you draw whatever reasonable inferences you

5    decide to draw from the facts as you have determined them.  If

6    any expression of mine or anything I may or may not have done

7    or said would seem to indicate any opinion relating to any

8    factual matters, I instruct you to disregard it.

9        You are to perform the duty of finding the facts

10   without bias or prejudice as to any party.  You're to perform

11   your final duty in an attitude of complete fairness and

12   impartiality.  This case is important to the government, for,

13   the enforcement of criminal laws is a matter of prime concern

14   to the community.  Equally, it is important to the defendants,

15   who are charged with serious crimes.  The fact that the

16   prosecution is brought in the name of the United States of

17   America entitles the government to no greater consideration

18   than that accorded to any other party to a case in litigation.

19   By the same token, the government is entitled to no less

20   consideration.  All parties, whether government or

21   individuals, stand as equals at the bar of justice.

22       It would be improper for you to consider, in

23   reaching your decision as to whether the government has

24   sustained its burden of proof, any personal feelings that you

25   may have about the defendants' race, religion, national or

1    ethnic origin, sex, or age.  All persons are entitled to the

2    presumption of innocence and the government has the burden of

3    proof, as I will discuss in a moment.

4         It would be equally improper for you to allow any

5    feelings you might have about the nature of the crimes charged

6    to interfere with your decision-making process.

7         Under your oaths as jurors, it would be improper for

8    you to be swayed by sympathy.  You're to be guided solely by

9    the evidence in the case, and the crucial question you must

10   ask yourselves as you sift through the evidence is:  Has the

11   government proven the -- has the government proven the guilt

12   of the defendants beyond a reasonable doubt?

13        It's for you alone to decide whether the government

14   has proven that the defendants are guilty of the crimes

15   charged solely on the basis of the evidence and subject to the

16   law as I instruct you.  If you let fear or prejudice or bias

17   or sympathy interfere with your thinking, there's a risk that

18   you will not arrive at a true and just verdict.

19        If you have a reasonable doubt as to the defendants'

20   guilt, you should not hesitate for any reason to find a

21   verdict of not guilty.  But on the other hand, if you should

22   find that the government has met its burden of proving the

23   defendants' guilt beyond a reasonable doubt, you should not

24   hesitate because of sympathy or any other reason to render a

25   verdict of guilty.

1         The statements, objections, and arguments of counsel

2    are not evidence and should not be considered by you as

3    evidence.  The evidence in this case consists of the sworn

4    testimony of the witnesses, the exhibits received in evidence,

5    and any stipulations.

6         Exhibits that were marked for identification but not

7    received may not be considered by you as evidence.  Only those

8    exhibits received may be considered as evidence.  Admitted

9    exhibits will be available for your review.

10        You are to disregard any testimony when I have

11   ordered it to be stricken.  Only the witnesses' answers are

12   evidence and you are not to consider a question as evidence.

13        A stipulation is an agreement among the parties that

14   a certain fact is true.  You should regard such agreed facts

15   as true.

16        Anything you may have seen or heard outside the

17   courtroom, including any newspaper or media publicity of any

18   kind, is not evidence and must be entirely disregarded.  You

19   must limit the information you get about the case to what came

20   to you in the courtroom through the rules of evidence.

21        At times, a lawyer on cross-examination may have

22   incorporated into a question a statement that assumed certain

23   facts to be true and asked the witness if the statement was

24   true.  If the witness denies the truth of a statement, and if

25   there is no evidence in the record proving that the assumed

1    fact is true, then you may not consider the fact to be true

2    simply because it was contained in the lawyer's question.  In

3    short, ladies and gentlemen, questions are not evidence;

4    answers are.

5           It's the duty of the attorney for each side of a

6    case to object when the other side offers testimony or other

7    evidence that the attorney believes is not properly

8    admissible.  The attorneys also have the right and duty to ask

9    me to make rulings of law and request conferences at the bench

10   out of the hearing of the jury.  All those questions of law

11   must be decided by me.  You should not show any prejudice

12   against an attorney or his client because the attorney

13   objected to the admissibility of evidence, or asked for a

14   conference out of the hearing of the jury, or asked the Court

15   for a ruling on the law.

16          The government has presented exhibits in the form of

17   charts and summaries.  I decided to admit these charts and

18   summaries in place of or in addition to the underlying

19   documents that they represent in order to save time and avoid

20   unnecessary inconvenience.  The charts and summaries are no

21   better than the testimony or the documents upon which they are

22   based and are not themselves independent evidence.  So while

23   you are entitled to consider them, you are to give no greater

24   consideration to these charts or summaries than you would give

25   to the evidence upon which they are based.

1        It's for you to decide whether the charts,

2    schedules, or summaries correctly present the information

3    contained in the testimony and in the exhibits on which they

4    were based.  You are entitled to consider the charts,

5    schedules, and summaries if you find that they are of

6    assistance to you in analyzing the evidence and understanding

7    the evidence.

8        As I've told you, a stipulation of facts is an

9    agreement among the parties that a certain fact is true.  You

10   must regard such agreed facts as true.

11       Ladies and gentlemen, although the defendants have

12   been indicted, you must remember that an indictment is only an

13   accusation to which the defendants have pleaded not guilty.

14   As a result of the defendants' pleas of not guilty, the burden

15   is on the prosecution to prove guilt beyond a reasonable

16   doubt.  This burden never shifts to the defendants for the

17   simple reason that the law never imposes upon a defendant in a

18   criminal case the burden or duty of calling any witness or

19   producing any evidence.

20       The law presumes the defendants to be innocent of

21   the charges against them.  I therefore instruct you that the

22   defendants are presumed by you to be innocent throughout your

23   deliberations until such time, if ever, you as a jury are

24   satisfied that the government has proven that defendant guilty

25   beyond a reasonable doubt.

1          The defendants begin the trial here with a clean

2     slate.  This presumption of innocence alone is sufficient to

3     acquit a defendant unless you as jurors are unanimously

4     convinced beyond a reasonable doubt of that defendants' guilt,

5     after a careful and impartial consideration of all of the

6     evidence in this case.  If the government fails to sustain its

7     burden, you must find the defendants not guilty.

8          This presumption was with the defendants when the

9     trial began and remains with them even now as I speak to you

10    and will continue with them into your deliberations unless and

11    until you are convinced that the government has proven the

12    defendants' guilt beyond a reasonable doubt.

13          The fact that one party called more witnesses and

14    introduced more evidence than the other does not mean that you

15    should necessarily find the facts in favor of the side

16    offering the most witnesses.  By the same token, you do not

17    have to accept the testimony of any witness who has not been

18    contradicted or impeached, if you find the witness not to be

19    credible.  You also have to decide which witnesses to believe

20    and which facts are true.  To do this, you must look at all

21    the evidence, drawing upon your own common sense and personal

22    experience.  After examining all the evidence, you may decide

23    that the party calling the most witnesses has not persuaded

24    you because you do not believe its witnesses, or because you

25    do believe the fewer witnesses called by the other side.

1    In a moment, I will discuss the criteria for
2    evaluating credibility; for the moment, however, you should
3    keep in mind that the burden of proof is always on the
4    government and the defendants are not required to call any
5    witnesses or offer any evidence, since they are presumed to be
6    innocent.

7    You're about to be asked to decide whether or not
8    the government has proven beyond a reasonable doubt the guilt
9    of the defendants before you.  You're not being asked whether
10   any other person has been proven guilty.

11   Some of the other co-defendants were not on trial
12   and you're not being asked to reach verdicts as to those other
13   co-defendants.  You're not to be concerned with the other
14   co-defendants, nor are you to speculate about the reasons why
15   they are not a part of this trial.  Any co-defendant's absence
16   from this trial should not affect or influence your verdict
17   with respect to these defendants now before you.

18   Your verdicts should be based solely upon the
19   evidence or lack of evidence as to each defendant before you,
20   in accordance with my instructions and without regard to
21   whether the guilt of other people has or has not been proven.

22   You may not draw any inference, favorable or
23   unfavorable, towards the government or the defendants, from
24   the fact that certain persons were not named as defendants in
25   the indictment.  The fact that these persons were not indicted

1    must play no part in your deliberations.  Therefore, you may

2    not consider it in any way in reaching your verdict as to the

3    defendants on trial.

4            Ladies and gentlemen, there are two types of

5    evidence that you may properly use in deciding whether a

6    defendant is guilty or not guilty.

7            One type of evidence is called direct evidence.

8    Direct evidence is where a witness testifies to what he or she

9    saw, heard, or observed.  In other words, when a witness

10   testifies about what is known to him or her, of his or her own

11   knowledge by virtue of his or her own senses, what he or she

12   sees, feel, touches, or hears, that's called direct evidence.

13           Circumstantial evidence is evidence that tends to

14   prove a disputed fact by proof of other facts.  Let me give

15   you a simple example of circumstantial evidence.

16           Assume that when you came into the courthouse this

17   morning the sun was shining and it was a nice day.  Assume

18   that the courtroom has no windows and you could not look

19   outside.

20           As you were sitting here, some hours later, someone

21   walked in to the courtroom with an umbrella that was dripping

22   wet.  Someone else then walked in with a raincoat that was

23   also dripping wet.

24           Now, you cannot look outside of the courtroom and

25   you cannot see whether or not it is raining.  So you have no

1   direct evidence of that fact.  But on the combination of facts

2   that I have asked you to assume, someone coming in with a wet

3   umbrella, someone else coming in with a wet raincoat, it would

4   be reasonable and logical for you to conclude that it had

5   started raining outside.

6         That's all there is to circumstantial evidence.  You

7   infer on the basis of reason, experience, and common sense

8   from an established fact, wet umbrella, wet raincoat, the

9   existence or the nonexistence of some other fact, it's raining

10  outside.

11        Circumstantial evidence is of no less value than

12  direct evidence; for, it's a general rule that the law makes

13  no distinction between direct and circumstantial evidence, but

14  simply requires that before convicting a defendant, the jury

15  must be satisfied of the defendant's guilt beyond a reasonable

16  doubt from all of the evidence in the case.

17        During the trial you've heard the attorneys use the

18  term "inference," and in their arguments they may ask you to

19  infer, on the basis of your reason, experience, and common

20  sense, from one or more established facts, the existence of

21  some other fact.  An inference is not a suspicion or a guess.

22  It's a reasoned, logical decision to conclude that a disputed

23  fact exists on the basis of another fact that you know exists.

24        There are times when different inferences may be

25  drawn from facts, whether proved by direct or circumstantial

1    evidence.  The government asks you to draw one set of

2    inferences, while the defense asks you to draw another.  It's

3    for you, and you alone, to decide what inferences you will

4    draw.  The process of drawing inferences from facts in

5    evidence is not a matter of guesswork or speculation.  An

6    inference is a deduction or a conclusion that you, the jury,

7    are permitted to draw, but are not required to draw, from the

8    facts that have been established by either direct or

9    circumstantial evidence.  In drawing inferences, you should

10   exercise your common sense.

11        So while you are considering the evidence presented

12   to you, you are permitted to draw, from the facts that you

13   find to be proven, such reasonable inferences as would be

14   justified in light of your experience.

15        Here, again, let me remind you that, whether based

16   upon direct or circumstantial evidence, or upon the logical,

17   reasonable inferences drawn from such evidence, you must be

18   satisfied of the guilt of a defendant beyond a reasonable

19   doubt before you may convict him.

20        Because, you, the jurors, are the sole judges of the

21   facts, you're also the sole judges of the credibility of the

22   witnesses, and it's up to you to decide what weight, if any,

23   should be given to a witness's testimony.  You're not required

24   to believe any witness even though his or her testimony is

25   uncontradicted.

1              In deciding whether or not to believe a witness, you

2      should carefully scrutinize all of the testimony of each

3      witness, the circumstances under which each witness has

4      testified, and any other matter in evidence that may help you

5      to decide the truth and the importance of each witness's

6      testimony.

7              You should consider a witness's demeanor and manner

8      of testifying on the stand.  Was the witness candid, frank,

9      and forthright?  Or, did the witness seem as if he or she was

10     hiding something, being evasive or suspect in some way?  How

11     did the way the witness testified on direct examination

12     compare with the way the witness testified on

13     cross-examination?  Was the witness consistent in his or her

14     testimony or did he or she contradict himself or herself?  Did

15     the witness appear to know what he or she was talking about

16     and did the witness strike you as someone who was trying to

17     report his or her knowledge accurately?

18             You should also consider whether a witness may have

19     been biased.  Does the witness have a relationship with the

20     government or a defendant that may affect how he or she

21     testified?  Does the witness have some incentive, loyalty, or

22     motive that might cause him or her to shade the truth; or does

23     the witness have some bias, prejudice, or hostility that might

24     have caused the witness, consciously or not, to give you

25     something other than a completely accurate account of the

1    facts he or she testified to?

2            Another consideration is the witness's opportunity

3    to observe the matters about which he or she testified, as

4    well as the witness's ability to express himself or herself.

5            Inconsistencies or discrepancies in the testimony of

6    a witness, or between the testimonies of different witnesses,

7    may or may not cause you to discredit such testimony.  Two or

8    more persons witnessing an incident or a transaction may see

9    or hear it differently; an innocent misrecollection, like a

10   failure of recollection, is not an uncommon experience.  In

11   weighing the effect of a discrepancy, always ask yourself

12   whether it pertains to a matter of importance or an

13   unimportant detail, and whether the discrepancy results from

14   innocent error or intentional falsehood.

15           You've heard the testimony of law enforcement

16   officials.  The fact that a witness may be employed by the

17   federal government, or a state or local government as a law

18   enforcement official, does not mean that his or her testimony

19   is necessarily deserving of more or less consideration or

20   greater or lesser weight than that of an ordinary witness.

21           Ladies and gentlemen, it's your decision, after

22   reviewing all the evidence, whether to accept the testimony of

23   a law enforcement witness and to give that testimony whatever

24   weight, if any, you find it deserves.

25           After you have considered all the factors bearing

1    upon the credibility of a witness that I have mentioned to

2    you, you may decide to accept all of the testimony of a

3    particular witness, none of the testimony of a particular

4    witness, or part of the testimony of a particular witness.  In

5    other words, ladies and gentlemen, you may give the testimony

6    of any witness such credibility and weight, if any, as you may

7    think it deserves.

8         You have heard testimony from government witnesses

9    who pled guilty to criminal charges.  You're instructed that

10   you are to draw no conclusions or inferences of any kind about

11   the guilt of the defendants on trial from the fact that any

12   prosecution witness pled guilty to criminal charges.  That

13   witness's decision to plead guilty was a personal decision

14   about his own guilt.  It may not be excused in any way as

15   evidence against or unfavorable to the defendants on trial

16   here.

17        You've heard witnesses who testified that they were

18   actually involved in planning and carrying out crimes alleged

19   in the indictment.  Some of these witnesses pled guilty and

20   entered into agreements with the government to testify.  The

21   government is permitted to enter into this kind of plea

22   agreement.  There's been a great deal said about these

23   so-called accomplices in the summations of counsel and whether

24   or not you should believe them.

25        The government argues, as it's permitted to do, that

1    it must take the witnesses as it finds them.  It argues that

2    only people who themselves take part in criminal activity have

3    the knowledge required to show criminal behavior by others.

4    For those very reasons the law allowed the use of accomplice

5    testimony.  Indeed, it is the law in federal courts that the

6    testimony of accomplices may be enough in itself for

7    conviction, if the jury finds that the testimony establishes

8    guilt beyond a reasonable doubt.

9         However, it is also the case that accomplice

10   testimony is of such a nature that it must be scrutinized with

11   great care and viewed with particular caution when you decide

12   how much of that testimony to believe.

13        I've given you some general considerations on

14   credibility and I will not repeat them all here, nor will I

15   repeat all the arguments made on both sides.  However, let me

16   say a few things that you may want to consider during your

17   deliberations on the subject of accomplices.

18        You should ask yourselves whether these so-called

19   accomplices would benefit more by lying or by telling the

20   truth.  Was their testimony made up in any way because they

21   believed or hoped that they would somehow receive favorable

22   treatment by testifying falsely?  Or did they believe that

23   their interests would be best served by testifying truthfully?

24   If you believe that the witness was motivated by hopes of

25   personal gain, was the motivation one that would cause him to

 1    lie, or was it one that would cause him to tell the truth?

 2    Did this motivation color his testimony?

 3            You should bear in mind that a witness who has

 4    entered into a plea agreement that requires the witness to

 5    testify has an interest in this case different from any

 6    ordinary witness.  A witness who realizes that he may be able

 7    to obtain his own freedom or receive a lighter sentence by

 8    giving testimony favorable to the prosecution has a motive to

 9    testify falsely.  Therefore, you must examine his testimony

10    with caution and weigh it with great care.  If, after

11    scrutinizing his testimony, you decide to accept it, you may

12    give it whatever weight, if any, you find it deserves.

13            In sum, you should look at all the evidence in

14    deciding what credence and what weight, if any, you will want

15    to give to the testimony of accomplice witnesses.

16            You've heard evidence that a witness made a

17    statement on an earlier occasion that counsel may argue is

18    inconsistent with the witness's trial testimony.  Evidence of

19    the prior inconsistent statement was placed before you for the

20    limited purpose of helping you decide whether to believe the

21    trial testimony of the witness.  If you find that the witness

22    made an earlier statement that conflicts with his or her trial

23    testimony, you may consider that fact in deciding how much of

24    his or her trial testimony, if any, to believe.

25            In making this determination, you may consider

1   whether the witness purposely made a false statement or

2   whether it was an innocent mistake; whether the inconsistency

3   concerns an important fact, or whether it had to do with a

4   small detail; whether the witness had an explanation for the

5   inconsistency; and whether that explanation appealed to your

6   common sense.

7           It is exclusively your duty, based upon all the

8   evidence and your own good judgment, to determine whether the

9   prior statement was inconsistent, and if so how much, if any,

10  weight to be given to the inconsistent statement in

11  determining whether to believe all or part of the witness's

12  testimony.

13          There's been evidence introduced at trial that the

14  government called as a witness a person who was using drugs

15  when the events he observed took place or who is now using

16  drugs.  I instruct you that there is nothing improper about

17  calling such a witness to testify about events within his

18  personal knowledge.

19          On the other hand, his testimony must be examined

20  with greater scrutiny than the testimony of any other witness.

21  The testimony of a witness who was using drugs at the time of

22  the events he is testifying about, or who is using drugs at

23  the time of his testimony may be less believable because of

24  the effect the drugs may have on his ability to perceive or

25  relate the events in question.

1    If you decide to accept his testimony, after

2    considering it in light of all of the evidence in this case,

3    then you may give it whatever weight, if any, you find it

4    deserves.

5    You've heard the testimony of witnesses who have

6    been promised that in exchange for testifying truthfully,

7    completely, and fully, the government will not use any of

8    their testimony against them in any criminal case.  These

9    promises were not a formal order of immunity by the Court, but

10   were arranged directly between the witnesses and the

11   government.

12   The government is permitted to make these kinds of

13   promises and is entitled to present as witnesses people to

14   whom these promises are given.  You are instructed that you

15   may convict a defendant on the basis of such a witness's

16   testimony alone, if you find that his testimony provides --

17   proves the defendant guilty beyond a reasonable doubt.

18   However, the testimony of a witness who has been

19   promised that his statements will not be used against him

20   should be examined by you with greater care than the testimony

21   of an ordinary witness.  You should scrutinize it closely to

22   determine whether or not it is colored in such a way as to

23   place guilt upon a defendant in order to further the witness's

24   own interests; for, such a witness, confronted with the

25   realization that his statements will not be used against him

1    in any criminal prosecution, may have a motive to falsify his

2    testimony.

3              Such testimony should be received by you with

4    suspicion and you may give it such weight, if any, as you

5    believe it deserves.

6              The government has offered evidence in the form of

7    recordings of conversations with the defendants.  These

8    recordings were made without the knowledge of the defendants,

9    but with court authorization.

10             The use of this procedure to gather evidence is

11   lawful, and the government is entitled to use the recordings

12   in this case.

13             The government has been permitted to hand out typed

14   documents, transcripts, which it prepared containing the

15   government's interpretation of what appears on the recordings

16   that have been received as evidence.  Those documents or

17   transcripts were given to you as an aid or guide to assist you

18   in listening to the calls.  However, they are not in and of

19   themselves evidence.  Therefore, when the calls were played, I

20   advised you to listen very carefully to the calls themselves.

21   You alone should make your own interpretation of what appears

22   on the calls based on what you heard.  If you think you heard

23   something differently from what appeared on the transcript,

24   then what you heard is controlling.  Let me say again, you,

25   the jury, are the sole judges of the facts.

1          Let's take a stretch break, ladies and gentlemen.

2          (Pause in the proceedings.)

3          THE COURT:  Be seated, please.

4          Ladies and gentlemen, in a criminal case, a

5    defendant cannot be required to testify, but if a defendant

6    chooses to testify, he is, of course, permitted to take the

7    witness stand on his own behalf.  In this case, all three of

8    the defendants decided to testify.  You should examine and

9    evaluate the testimony of each defendant just as you would the

10   testimony of any witness with an interest in the outcome of

11   the case.

12         Ladies and gentlemen, there's been evidence that one

13   or more of the defendants made certain statements in which the

14   government claims he admitted certain relevant facts.

15         I instruct you that you are to give the statements

16   such weight as you feel they deserve in light of all of the

17   evidence.

18         You are cautioned that the evidence of one

19   defendant's statement to the authorities after his arrest

20   about his own conduct may not be considered or discussed by

21   you in any way with respect to any defendant on trial other

22   than the defendant who made the statement.

23         You've heard testimony that some of the defendants

24   made certain statements outside the courtroom to law

25   enforcement authorities in which the defendant claimed that

1    his conduct was consistent with innocence and not with guilt.

2    The government claims that these statements in which he

3    exonerated or exculpated himself are false.

4         If you find that the defendant gave a false

5    statement in order to divert suspicion from himself, you may,

6    but are not required, to infer that the defendant believed

7    that he was guilty.  You may not, however, infer on the basis

8    of this alone, that the defendant is, in fact, guilty of the

9    crime for which he is charged.

10        Whether or not the evidence as to a defendant's

11   statements show that the defendant believed that he was

12   guilty, and the significance, if any, to be attached to any

13   such evidence, are matters for you, the jury, to decide.

14        You've heard testimony that informants were used by

15   the government to investigate the defendants.

16        There's nothing improper or illegal with the

17   government using this technique.  Indeed, certain types of

18   evidence would be extremely difficult to detect without the

19   use of informants.

20        You're instructed that there's no legal requirement

21   for the government to use any specific investigative technique

22   to prove its case.  Law enforcement techniques are not your

23   concern.

24        Moreover, the law does not require the prosecution

25   to call as witnesses all persons who have been present at any

1   time or place involved in the case, or who may appear to have

2   some knowledge of the matters at issue in this trial.  Nor

3   does the law require the prosecution to produce as exhibits

4   all papers and things mentioned in the evidence.

5          You've also heard testimony in this case regarding

6   evidence seized by the government during the execution of

7   search warrants.  You are hereby instructed that it is the

8   responsibility of the Court alone to determine the validity

9   and legality of those search warrants and other searches, and

10  the Court has determined that the searches in this case were

11  valid and legal.  It's up to you to decide what significance,

12  if any, the evidence seized may have in this case.

13         You've heard testimony from certain persons who were

14  qualified as expert witnesses.  An expert is allowed to

15  express his or her opinion on those matters about which he or

16  she has special knowledge and training.  Expert testimony is

17  presented to you on the theory that someone who is experienced

18  in the field can assist you in understanding the evidence or

19  in reaching an independent decision on the facts.

20         In weighing the expert's testimony, you may consider

21  the expert's qualifications, his or her opinions, his or her

22  reasons for testifying, as well as all the other

23  considerations that ordinarily apply when you are deciding

24  whether or not to believe a witness's testimony.  You may give

25  the expert testimony whatever weight, if any, you find it

1    deserves in light of all of the evidence in this case.  You

2    should not, however, accept this witness's testimony merely

3    because he or she is an expert; nor should you substitute it

4    for your own reason, judgment, and common sense.  The

5    determination of the facts in this case rests solely with you.

6         We shall next consider the crimes with which the

7    defendants are charged in the indictment, and I shall discuss

8    with you the rules of law that govern whether the crimes

9    charged have been proven.  Each alleged crime is charged in

10   the indictment in what is called a count.  Whenever I refer to

11   "the indictment" in these instructions, I'm referring to the

12   second Superseding Indictment, the actual charging instrument

13   in this particular case.

14        The jury must consider each count against each

15   defendant separately, and the burden is always upon the

16   government to prove each count beyond a reasonable doubt.  In

17   reaching your verdict, bear in mind that guilt is personal and

18   individual.  Your verdict of guilty or not guilty must be

19   based solely upon the evidence about each defendant.  The case

20   against each defendant, on each count, stands or falls upon

21   the proof or lack of proof against that defendant alone, and

22   your verdict as to any defendant on any count should not

23   control your decision as to any other defendant or any other

24   count.  No other considerations are proper.

25        Keep in mind, and I remind you, you will be provide

1    add copy of these instructions for your use during

2    deliberations.

3            While we're on the subject of the indictment, I

4    should draw your attention to the fact that the indictment

5    charges that specific acts occurred on or about certain dates.

6    The proof need not establish with any certainty the exact date

7    of the specific act charged.  It's sufficient if the evidence

8    in this case establishes that an offense was committed on a

9    date reasonably near the dates alleged in the indictment.  The

10   law only requires a substantial similarity between the date

11   alleged in the indictment and the date established by

12   testimony or exhibits.

13           The indictment alleges that the conspiracy began in

14   or about 2005 and continued until the date of the indictment

15   on September 20th, 2017.  You need not find that the starting

16   date of a conspiracy coincides with the starting date alleged

17   in the indictment in order to render a guilty verdict.

18   Rather, you may find that the starting date of a conspiracy

19   began any time in the window alleged in the indictment.

20           In order to sustain its burden of proof, the

21   government must prove that the defendants acted knowingly.  A

22   person acts knowingly if he intentionally and voluntarily --

23   if he acts intentionally and voluntarily, and not because of

24   ignorance, mistake, accident, or carelessness.  Whether a

25   defendant acted knowingly may be proven by a defendant's

1    conduct and by all of the facts and circumstances surrounding

2    the case.

3            You have been instructed that in order to sustain

4    its burden of proof the government must prove that the

5    defendants acted willfully.  Willfully means to act with

6    knowledge that one's conduct is unlawful and with the intent

7    to do something the law forbids, that is to say, with the bad

8    purpose to disobey or disregard the law.

9            A defendant's conduct was not willful if it was due

10   to negligence, inadvertence, or mistake.

11           The government must prove beyond a reasonable doubt

12   that the defendants acted intentionally when they committed

13   the crimes charged in the indictment.  Before you can find

14   that a defendant acted intentionally, you must be satisfied

15   beyond a reasonable doubt that he acted deliberately and

16   purposefully.  That is, a defendant's acts must have been the

17   product of that defendant's conscious objective rather than

18   the product of a mistake or an accident.

19           Intent ordinarily may not be proved directly,

20   because there's no way of fathoming or scrutinizing the

21   operations of the human mind.  But you may infer a defendant's

22   intent from the surrounding circumstances.  You may consider

23   any statement made, any act done or omitted by the defendant,

24   and all other facts and circumstances in evidence that

25   indicate his state of mind.

1    You may consider it reasonable to draw the

2  inferences and find that a person intends the natural and

3  probable consequences of acts knowingly done or knowingly

4  omitted.  As I have said, it's entirely up to you to decide

5  what facts to find from the evidence.

6    Knowledge, willfulness, and intent involve the state

7  of a person's mind.  The state of one's mind is a fact.

8  Accordingly, this is a fact you are called upon to decide.

9    Medical science has not yet devised an instrument

10  capable of recording what was in one's mind in the distant

11  past.  Rarely is direct proof available to establish the state

12  of one's mind.  However, state of mind may be inferred from

13  what one says or does:  One's words, one's actions, and one's

14  conduct, as of the time of the occurrence of certain events.

15    The intent with which an act is done is often more

16  clearly and conclusively shown by the act itself, or by a

17  series of acts, than by words or explanations of the act

18  uttered long after its occurrence.  Accordingly, intent,

19  willfulness, and knowledge are usually established by

20  surrounding facts and circumstances as of the time the acts in

21  question occurred, or the events took place, and the

22  reasonable inferences to be drawn from them.

23    Willful intent or guilty knowledge may be inferred

24  from the secretive or irregular manner in which a transaction

25  is carried out.

1          Proof of motive is not a necessary element of the

2     crimes with which the defendants are charged.

3          Proof of motive does not establish guilt, nor does a

4     lack of proof of motive establish that a defendant is

5     innocent.

6          If the guilt of a defendant is shown beyond a

7     reasonable doubt, it's immaterial what the motive for the

8     crime may be -- or whether any motive be shown, but the

9     presence or absence of motive is a circumstance you may

10    consider as bearing on the intent of a defendant.

11         The defendants named in Counts 1, 2, and 3 are

12    accused of having been members of a conspiracy to violate

13    certain federal laws.  All of the defendants are charged in

14    Counts 1 and 2.  Defendant Gerald Johnson is charged in Count

15    3.

16         I will now explain to you the law on conspiracy.  I

17    will then explain to you the law on each individual count in

18    the indictment.

19         A conspiracy is a kind of criminal partnership -- a

20    combination or agreement of two or more persons to join

21    together to accomplish an unlawful purpose.

22         The crime of conspiracy to violate a federal law is

23    an independent offense.  It is separate and distinct from the

24    actual violation of any specific federal laws, which the law

25    refers to as substantive crimes.

1    Indeed, you may find a defendant guilty of the crime

2    of conspiracy to commit an offense against the United States

3    even though the substantive crime that was the object of the

4    conspiracy was not actually committed.

5    In order to satisfy its burden of proof as to Counts

6    1, 2, and 3, the government must establish for each count,

7    each of the following two essential elements beyond a

8    reasonable doubt:  First, that two or more persons entered the

9    unlawful agreement charged in the count; second, that the

10    defendant in question knowingly and willfully joined the

11    unlawful agreement charged by that count.

12    The first element the government must prove beyond a

13    reasonable doubt to establish the offense of conspiracy is

14    that two or more persons entered the unlawful agreement

15    charged in the indictment.

16    In order for the government to satisfy this element,

17    you need not find that the alleged members of the conspiracy

18    met together and entered into any express or formal agreement.

19    Similarly, you need not find that the alleged conspirators

20    stated, in words or in writing, what the scheme was, its

21    object or purpose, or every precise detail of the scheme or

22    the means by which its object or purpose was to be

23    accomplished.  What the government must prove is that there

24    was a mutual understanding, either spoken or unspoken, between

25    two or more people to cooperate with each other to accomplish

1    an unlawful act.

2        You may, of course, find that the existence of an

3    agreement to disobey or disregard the law has been established

4    by direct proof.  However, since conspiracy is, by its very

5    nature, characterized by secrecy, you may also infer its

6    existence from the circumstances of this case and the conduct

7    of the parties involved.

8        In a very real sense, then, in the context of

9    conspiracy cases, actions often speak louder than words.  In

10   this regard, you may, in determining whether an agreement

11   existed here, consider the actions and statements of all of

12   those you find to be participants as proof that a common

13   design existed on the part of the persons charged to act

14   together to accomplish an unlawful act.

15       The second element the government must prove beyond

16   a reasonable doubt to establish the offense of conspiracy is

17   that a defendant knowingly, willfully, and voluntarily became

18   a member of the conspiracy.

19       If you are satisfied that the conspiracy charge in

20   the indictment existed, then you must next ask yourselves who

21   the members of that conspiracy were.  In deciding whether a

22   particular defendant was, in fact, a member of the conspiracy,

23   you should consider whether that defendant knowingly and

24   willfully joined the conspiracy.  Did he participate in it

25   with knowledge of its unlawful purpose and with the specific

1    intention of furthering its business or objective as an

2    associate or worker?

3            In that regard it has been said that in order for a

4    defendant to be deemed a participant in a conspiracy, he must

5    have had a stake in the venture or its outcome.  You're

6    instructed that, while proof of a financial interest in the

7    outcome of a scheme is not essential, if you find that a

8    defendant had such an interest, then that is a factor you may

9    properly consider in determining whether or not a defendant

10   was a member of the conspiracy charged in the indictment.

11           As I mentioned a moment ago, before a defendant can

12   be found to have been a conspirator, you must find that he

13   knowingly joined in the unlawful agreement or plan.  The key

14   question, therefore, is whether a defendant joined the

15   conspiracy with an awareness of at least some of the basic

16   aims and purposes of the unlawful agreement.

17           It is important for you to note that a -- it is

18   important for you to note that a defendant's participation in

19   a conspiracy must be established by independent evidence of

20   his own acts or statements as well as those of other alleged

21   co-conspirators and the reasonable inferences that may be

22   drawn from them.

23           A defendant's knowledge is a matter of inference

24   from the facts proved.  In that connection, I instruct you

25   that to become a member of the conspiracy, a defendant need

1    not have known the identities of each and every other member,

2    nor need he have been apprised of all of their activities.

3    Moreover, a defendant need not have been fully informed as to

4    all of the details or the scope of the conspiracy in order to

5    justify an inference of knowledge on his part.  Furthermore, a

6    defendant need not have joined in all of the conspiracy's

7    unlawful objectives.

8         The extent of a defendant's participation has no

9    bearing on the issue of a defendant's guilt.  A conspirator's

10   liability is not measured by the extent or duration of his

11   participation.  Indeed, each member may perform separate and

12   distinct acts and may perform them at different times.  Some

13   conspirators may play major roles, while others play minor

14   parts in the scheme.  An equal role is not what the law

15   requires.  In fact, even a single act may be sufficient to

16   draw a defendant within the ambit of the conspiracy.

17        I want to caution you, however, that a defendant's

18   mere presence at the scene of the alleged crime does not, by

19   itself, make him a member of the conspiracy.  Similarly, mere

20   association with one or more members of the conspiracy does

21   not automatically make a defendant a member.  A person may

22   know or be friendly with a criminal without being a criminal

23   himself.  Mere similarity of conduct or the fact that they may

24   have assembled together and discussed common aims and

25   interests does not necessarily establish proof of the

1    existence of a conspiracy.

2              I also want to caution you that mere knowledge or

3    acquiescence, without participation, in the unlawful plan is

4    not sufficient.  Moreover, the fact that the acts of a

5    defendant, without knowledge, merely happen to further the

6    purposes or objectives of the conspiracy, does not make that

7    defendant a member.  More is required under the law.  What is

8    necessary is that a defendant must have participated with

9    knowledge of at least some of the purposes or objectives of

10   the conspiracy and with the intention of aiding in the

11   accomplishment of those unlawful ends.

12             A mere buyer-seller relationship is insufficient to

13   support a conviction for conspiracy to distribute controlled

14   substances.  However, such evidence is at least relevant, that

15   is probative, on the issue of whether a conspiratorial

16   relationship exists.  Evidence of continuing relationships and

17   repeated transactions can support the finding that there was a

18   conspiracy, especially when coupled with a substantial

19   quantity of drugs.

20             In sum, a defendant, with the understanding of the

21   unlawful character of the conspiracy, must have intentionally

22   engaged, advised, or assisted in it for the purpose of

23   furthering the illegal undertaking.  He thereby becomes a

24   knowing and willing participant in the unlawful agreement,

25   that is to say, a conspirator.

 1              In order to prove a defendant guilty of the

 2     conspiracies charged in Counts 1, 2, and 3 of the indictment,

 3     the government must establish beyond a reasonable doubt that

 4     the defendant became a member of the conspiracy after the age

 5     of 18.  Or, if he became a member of the conspiracy prior to

 6     the age of 18, that he ratified his prior participation in the

 7     conspiracy.  A defendant's conduct prior to age of 18 cannot

 8     by itself sustain a finding of guilt as to Counts 1, 2, and 3.

 9     Only if you find that the defendant has undertaken some

10     conduct after the age of 18, which ratifies or affirms his

11     status as a member of the conspiracy, can you find him guilty

12     of Counts 1, 2, or 3.

13              If you find that the defendant has undertaken

14     conduct after the age of 18 that ratifies his prior

15     participation in the conspiracy, you may not consider that

16     prior conduct as substantive evidence of guilt.  You may,

17     however, consider the defendant's prior conduct as evidence of

18     when he joined the conspiracy, the scope of the conspiracy he

19     agreed to, and the foreseeability of the acts of

20     co-conspirators.

21              You will recall that I've admitted into evidence

22     against the defendants the acts and statements of other

23     persons because the government charges that these acts and

24     statements were committed by persons who were also

25     confederates or co-conspirators of the defendants on trial.

1    The reason for allowing this evidence to be received against a

2    defendant has to do with the nature of the crime of

3    conspiracy.  A conspiracy is often referred to as a

4    partnership in crime.  Thus, as in other types of

5    partnerships, when people enter into a conspiracy to

6    accomplish an unlawful act, each and every member becomes an

7    agent for the other conspirators in carrying out the

8    conspiracy.

9         Accordingly, the reasonably foreseeable acts,

10   declaration, statements, and omissions of any member of the

11   conspiracy done in furtherance of the common purpose of the

12   conspiracy, are deemed, under law, to be the acts of all of

13   the members, and all of the members are responsible for such

14   acts, declarations, statements, and omissions.

15        If you find, beyond a reasonable doubt, that a

16   defendant was a member of the conspiracy charged in the

17   indictment, then any reasonably foreseeable acts done or

18   statements made in furtherance of the conspiracy by persons

19   also found by you to have been members of that conspiracy, may

20   be considered against that defendant.  This is so even if such

21   acts were done and statements were made in that defendant's

22   absence and without his or her knowledge.

23        However, before you may consider the statements or

24   acts of a co-conspirator in deciding the issue of a

25   defendant's guilt, you must first determine that the acts and

1    statements were made during the existence, and in furtherance,

2    of the unlawful scheme.  If the acts were done or the

3    statements made by someone whom you do not find to have been a

4    member of the conspiracy, or if they were not done or said in

5    furtherance of the conspiracy, they may be considered by you

6    as evidence only against the member who did or said them.

7        We will next consider the specific crimes with which

8    the defendants are charged in the second Superseding

9    Indictment.  Whenever in these instructions I refer to "the

10    indictment," I am of course referring to the second

11    Superseding Indictment.

12        I turn to the specific counts.  Count 1 of the

13    indictment charges the defendants with conspiracy to violate

14    the Racketeer Influenced and Corrupt Organizations Act, the

15    RICO Act.  This means that the defendants have been charged

16    with conspiracy to conduct or participate in the affairs of an

17    enterprise through a pattern of racketeering activity.

18        The charging language of Count 1 is lengthy, and I

19    shall not read all of the formal charge to you because of its

20    length.  Instead, I shall point out that the government

21    alleges that the defendants were members of an organization

22    known today as the Black Guerilla Family's Greenmount Avenue

23    Regime, formerly known as the Young Guerilla Family or YGF.  I

24    shall now read the operative language of Count 1.

25        Beginning in or about 2005 and continuing until on

or about the date of the second Superseding Indictment, in the

District of Maryland and elsewhere, the defendants, Gerald

Thomas Johnson, a/k/a Geezy, a/k/a Geezy the Prince; Wesley

Jamal Brown, a/k/a Shike White, a/k/a Wes, a/k/a West Coast,

a/k/a Coasta; David Albert Hunter, a/k/a Lil' Dave, a/k/a

Dave; Montel Harvey, a/k/a Telly, a/k/a Telephone, a/k/a Big

Head; Kenneth Jones, a/k/a K-Slay, a/k/a Slay; Kenneth Lee

Faison, a/k/a Roscoe; Joseph Lawrence Bonds, a/k/a Joe, a/k/a

Yo Gotti; Norman Tyrone Handy, a/k/a Lil' Norm, a/k/a Norm;

and Marquise McCants, a/k/a Digga, each being a person

employed by and associated with the organization known today

as the BGF Greenmount Regime, an enterprise, which engaged in

and the activities of which affected interstate or foreign

commerce, together with each other and with other persons

known and unknown to the grand jury, did knowingly,

intentionally, and unlawfully, combine, conspire, confederate,

and agree to violate Section 1962(c) of Title 18, United

States Code, that is, to conduct and participate, directly and

indirectly, in the conduct of the enterprise's affairs through

a pattern of racketeering activity, as defined in sections

1961(1) and (5) of Title 18, United States Code, which pattern

of racketeering activity consisted of multiple:  A, acts

involving murder; B, acts involving robbery; C, offenses

involving trafficking in controlled substances, distribution

of controlled substances and conspiracy to distribute

1    controlled substances; and D, multiple acts, i, relating to

2    tampering with a witness, victim, or an informant; ii, of

3    retaliating against witnesses, victims, and informants.

4         The defendants are charged with violating Section

5    1962(d) of Title 18 of the United States Code.  That section

6    reads as follows:  It shall be unlawful for any person to

7    conspire, to violate any of the provisions of subsection A, B,

8    or C of this section.

9         Subsection (c) to which I just referred, provides as

10   follows:  It shall be unlawful for any person employed by or

11   associated with any enterprise engaged in, or the activities

12   of which affect interstate or foreign commerce, to conduct or

13   participate, directly or indirectly, in the conduct of such

14   enterprise's affairs through a pattern of racketeering

15   activity or collection of an unlawful debt.

16        The word "racketeering" has certain implications in

17   our society.  Use of that term in this statute and in this

18   courtroom should not be regarded as having anything to do with

19   your determination of whether the guilt of these defendants

20   has been proven.  The term is only a word used by Congress to

21   describe the statute.

22        In order to prove that the defendants conspired to

23   violate the Racketeer Influenced and Corrupt Organizations

24   Act, the RICO Act, the government must establish beyond a

25   reasonable doubt each of the following elements of the

1    offense:  First, that there was an agreement among two or more

2    persons to participate in an enterprise that would affect

3    interstate commerce through a pattern of racketeering

4    activity; second, that the defendant knowingly and willfully

5    became a member of that agreement; and third, that the

6    defendant or another member of the conspiracy agreed to commit

7    two racketeering acts, as I will define that term for you.

8         As to Count 1, the first element that the government

9    must establish beyond a reasonable doubt is that there was a

10   conspiracy among two or more persons to participate in an

11   enterprise that would affect interstate commerce through a

12   pattern of racketeering activity.

13        As I have already explained, a conspiracy is an

14   agreement among two or more persons to achieve an unlawful

15   object.  To show a conspiratorial agreement, the government is

16   not required to prove that two or more people entered into a

17   solemn pact, but only that two or more persons explicitly or

18   implicitly came to an understanding to achieve the specified

19   unlawful object, whether or not they were successful.

20        In this case, the unlawful act is the formation of

21   an enterprise whose activities would affect interstate

22   commerce through a pattern of racketeering activity.  Let me

23   define these terms for you.

24        An "enterprise" for the purposes of this case,

25   includes a group of people who have associated together for a

1    common purpose of engaging in a course of conduct over a

2    period of time.  This group of people, in addition to having a

3    common purpose, must have an ongoing organization, either

4    formal or informal, and it must have personnel who function as

5    a continuing unit.  This group of people does not have to be a

6    legally recognized entity, such as a partnership or

7    corporation.  This group may be organized for a legitimate and

8    lawful purpose, or it may be organized for an unlawful

9    purpose.

10              The government has charged in the indictment that

11    the organization known today as the Black Guerilla Family's

12    Greenmount Avenue Regime, formerly known as the Young Guerilla

13    Family or YGF, including its leadership, members, and

14    associates, constitutes the enterprise.  If you find that this

15    was a group of people characterized by one, a common purpose;

16    two, an ongoing formal or informal organization; and three,

17    personnel who functioned as a continuing unit, then you may

18    find that an enterprise existed.

19              If you find that this enterprise existed, you must

20    also determine whether this enterprise continued in an

21    essentially unchanged form during substantially the entire

22    period charged in the indictment.  This does not mean everyone

23    involved has to be the same, but the core of the enterprise

24    has to be the same throughout.

25              "Interstate commerce" includes the movement of

1    goods, services, money, and individuals between states or

2    between states and the District of Columbia or a U.S.

3    territory or a possession or between the United States and a

4    foreign state or nation.

5              As noted above, the government must prove that the

6    enterprise engaged in interstate commerce or that its

7    activities affected interstate commerce in any way, no matter

8    how minimal.  It does not have to prove that the racketeering

9    activity affected interstate commerce, although proof that

10   racketeering acts did affect interstate commerce is sufficient

11   to satisfy this element.  It is not necessary to prove that

12   the acts of any particular defendant affected interstate

13   commerce as long as the acts of the enterprise had such

14   effect.  Finally, the government is not required to prove that

15   any defendant knew he was affecting interstate commerce.

16             As with the enterprise element, it is not required

17   that the government prove that the enterprise actually

18   affected interstate commerce as long as it proves beyond a

19   reasonable doubt that if the object of the conspiracy had been

20   achieved, the enterprise would have affected interstate

21   commerce.

22             A "pattern of racketeering activity" requires the

23   commission of two racketeering acts within ten years of each

24   other.  The indictment alleges that the following racketeering

25   acts were or were intended to be committed as part of the

conspiracy:  A, multiple acts involving:  One, murder under state law; and two, robbery under state law; B, offenses involving:  One, conspiracy to distribute a controlled substance and distribution of controlled substances under federal law; C, multiple acts indictable under:  One, 18, United States Code, Section 1512, relating to tampering with a witness, victim, or an informant; two, 18, United States Code, Section 1513, retaliating against witnesses, victims, and informants.

To prove that the acts constituted a pattern of racketeering activity, the government must prove that the acts of racketeering are related to each other and that they pose a threat of continued criminal activity.  It is not sufficient for the government to prove only that a member of the enterprise committed two of the racketeering acts I've just described.  A series of disconnected acts does not constitute a pattern, and a series of disconnected crimes does not constitute a pattern of racketeering activity, nor do they amount to or pose a threat of continued racketeering activity.

To prove that the acts of racketeering are related, the government must prove that the acts had the same or similar purposes, results, participants, victims, or methods of commission, and that they are otherwise interrelated by distinguishing characteristics and are not isolated events.

To prove that the racketeering acts pose a threat of

1    continued racketeering activity, the government must establish

2    that the acts are part of a long-term association that exists

3    for criminal purposes.

4            The second element the government must prove beyond

5    a reasonable doubt is that the defendant knowingly and

6    willfully became a member of the conspiracy charged in the

7    indictment.  You were already instructed on membership in a

8    conspiracy.

9            Finally, as to Count 1, the third element the

10   government must prove beyond a reasonable doubt is that the

11   defendant or another member of the conspiracy agreed to commit

12   two racketeering acts.

13           The focus of this element is on the defendant's

14   agreement to participate in the objective of the enterprise to

15   engage in a pattern of racketeering activity and not on the

16   defendant's agreement to commit the individual criminal acts.

17   The government must prove that the defendant participated in

18   some manner in the overall objective of the conspiracy, and

19   that the conspiracy involved, or would have involved, the

20   commission of two racketeering acts.  The government is not

21   required to prove either that the defendant agreed to commit

22   two racketeering acts or that he actually committed two such

23   acts, although you may conclude that he agreed to participate

24   in the conduct of the enterprise from proof that he agreed to

25   commit or actually committed such acts.

1            For the purposes of this count, the indictment

2    alleges that the following racketeering acts were or were

3    intended to be committed as a part of the conspiracy:  A,

4    multiple acts involving:  One, murder under state law; and

5    two, robbery under state law.  B, offenses involving:  One,

6    conspiracy to distribute a controlled substance and

7    distribution of controlled substances under federal law.  C,

8    multiple acts indictable under:  One, 18, United States Code,

9    Section 1512, relating to tampering with a witness, victim, or

10   an informant; two, 18, United States Code, Section 1513,

11   retaliating against witnesses, victims, and informants.

12           In order for the state offenses of murder and

13   robbery to be considered as racketeering acts, the government

14   must prove to you beyond a reasonable doubt that the offenses

15   were or were intended to be committed as part of the

16   conspiracy.

17           The elements of these offenses are as follows:  A,

18   first degree murder is the intentional killing of another

19   person with willfulness, deliberation, and premeditation.  The

20   elements of this offense are:  One, that the defendant caused

21   the death of the victim; two, that the killing was willful,

22   deliberate, and premeditated; three, that the killing was not

23   justified; and four, that there were no mitigating

24   circumstances.

25           "Willful" means that the defendant actually intended

1    to kill the victim.  "Deliberate" means that the defendant was

2    conscious of the intent to kill.  "Premeditated" means that

3    the defendant thought about the killing and that there was

4    enough time before the killing, though it may only have been

5    brief, for the defendant to consider the decision whether or

6    not to kill and enough time to weigh the reasons for and

7    against the choice.  The premeditated intent to kill must be

8    formed before the killing.

9            B, second degree murder is the killing of another

10   person with either the intent to kill or the intent to inflict

11   such serious bodily harm that death would be the likely

12   result.  Second degree murder does not require premeditation

13   or deliberation.  The elements of this offense are:  One, that

14   the defendant caused the death of the victim; and two, that

15   the defendant engaged in the deadly conduct either with the

16   intent to kill or with the intent to inflict such serious

17   bodily harm that death would be the likely result.

18           C, attempted first degree murder is a substantial

19   step, beyond mere preparation, towards the commission of

20   murder in the first degree.  The elements of this offense are:

21   One, that the defendant took a substantial step, beyond mere

22   preparation, toward the commission of murder in the first

23   degree; two, that the defendant had the apparent ability, at

24   that time, to commit the crime of murder in the first degree;

25   and three, that the defendant willfully, and with

1    premeditation and deliberation, intended to kill the victim.

2            D, attempted second degree murder is a substantial

3    step, beyond mere preparation, toward the commission of murder

4    in the second degree.  Second degree murder does not require

5    premeditation or deliberation.  The elements of this offense

6    are that:  One, the defendant took a substantial step, beyond

7    mere preparation, toward the commission of murder in the

8    second degree; two, that the defendant had the apparent

9    ability at that time, to commit the crime of murder in the

10    second degree; and three, that the defendant actually intended

11    to kill the victim.

12            F, robbery is the taking and carrying away of

13    property from someone else or from someone's presence and

14    control, by force or threat of force, with the intent to

15    deprive the victim of the property.  The elements of

16    robbery -- the elements of the offense are:  One, that the

17    defendant took the property from the victim or the victim's

18    presence and control; two, that the defendant took the

19    property by force or threat of force; and three, that the

20    defendant intended to deprive the victim of the property.

21            "Property" means anything of value.  "Deprive" means

22    to withhold property of another permanently, for such a period

23    as to appropriate a portion of its value, with the purpose of

24    restoring it only upon payment of a reward or other

25    compensation, or to dispose of the property and use or deal

1    with the property so as to make it unlikely that the owner

2    will recover it.

3            G, robbery with a dangerous weapon.  The elements of

4    the crime of robbery with a dangerous weapon are all of the

5    elements of robbery and that the defendant committed the

6    robbery by using a dangerous weapon.  A dangerous weapon is an

7    object that is capable of causing death or serious bodily

8    harm.

9            H, conspiracy to murder.  The elements of conspiracy

10   to commit murder are:  One, that the defendant agreed with at

11   least one other person to commit the crime of murder; and two,

12   that the defendant entered into the agreement with the intent

13   that the crime of murder be committed.

14           In order for the federal offenses of drug

15   trafficking, tampering with witnesses, and retaliating against

16   witnesses to be considered as racketeering acts, the

17   government must prove to you beyond a reasonable doubt that

18   the offenses were or were intended to be committed as part of

19   the conspiracy.  I will explain the elements of conspiracy to

20   traffic narcotics when I explain Count 2 of the indictment.

21           The elements of the federal offenses of drug

22   trafficking, tampering with witnesses, and retaliating against

23   witnesses are as follows:  A, the elements of possession with

24   intent to distribute a controlled substance, in violation of

25   21, United States Code, Section 841 are as follows:  One, that

1    the defendant possessed a controlled substance; two, that the

2    defendant knew he possessed a controlled substance; and three

3    that the defendant possessed the controlled substance with the

4    intent to distribute it.

5         The first element the government must prove beyond a

6    reasonable doubt is that the defendant possessed a controlled

7    substance.  The legal concept of possession may differ from

8    the every day usage of the term, so I will explain it in some

9    detail.  Actual possession is what most of us think of as

10   possession; that is, having physical custody or control of an

11   object.  For example, if you find that a defendant had the

12   drugs on his person, you may find that he had possession of

13   the drugs.

14        However, a person need not have actual physical

15   custody of an object in order to be in legal possession of it.

16   If an individual has the ability to exercise substantial

17   control over an object that he does not have in his physical

18   custody, then he's in possession of that item.  An example of

19   this is from everyday experience would be a person's

20   possession of items he keeps in the safe deposit box of his

21   bank.  Although the person does not have physical custody of

22   those items, he exercises substantial control over them and so

23   has what is known as constructive possession of them.

24        The law also recognizes that possession may be sole

25   or joint.  If one person alone possesses something, that is

1    sole possession.  However, it is possible that more than one

2    person may have the power and intention to exercise control

3    over the drugs.  This is called joint possession.  If you find

4    that the defendant had such power and intention, then he

5    possessed the drugs under the element even if he possessed the

6    drugs jointly with another.

7         Possession of the drugs cannot be found solely on

8    the ground that a defendant was near or close to the drugs.

9    Nor can it be found simply because a defendant was present at

10   a scene where drugs were involved, or solely because a

11   defendant associated with a person who does control the drugs

12   or the property or where they are found.  However, these

13   factors may be considered by you, in connection with all the

14   other evidence, in making your decision about whether a

15   defendant possessed drugs.

16        The second element the government must prove beyond

17   a reasonable doubt is that the defendant knew he possessed

18   drugs.  To establish this element, the government must prove

19   that the defendant knew that he possessed drugs and that his

20   possession was not due to carelessness, negligence, or

21   mistake.  If you find the defendant did not know that he had

22   drugs in his possession, or that he didn't know that what he

23   possessed was, in fact, drugs, then you must find the

24   defendant not guilty.

25        Although the defendant must prove the defendant --

1    although the government must prove that the defendant knew he

2    possessed drugs, the government does not have to prove the

3    defendant knew the exact nature of the drugs in his

4    possession.  It is enough that the government proves the

5    defendant knew he possessed some kind of drug.

6         The third element the government must prove is that

7    the defendant possessed drugs with the intent to distribute

8    them.  To prove the third element, the government must prove

9    beyond a reasonable doubt that the defendant had control over

10   the drugs with the state of mind or purpose to transfer them

11   to another person.

12        The same considerations that apply to your

13   determination whether the defendant knew he possessed drugs

14   apply to your decision concerning the defendant's intention to

15   distribute them.  Since you cannot read the defendant's mind,

16   you must make inferences from his behavior.  However, you may

17   not convict a defendant unless these inferences convince you

18   beyond a reasonable doubt that he intended to distribute the

19   drugs.

20        When I say that you must find the defendant intended

21   to distribute the drugs, this does not mean that you must find

22   that the defendant intended personally to distribute or

23   deliver the drugs.  It is sufficient if you find the defendant

24   intended to cause or assist the distribution of the drugs.

25        Basically, what you're determining is whether the

1    drugs in the defendant's possession were for his personal use

2    or for the purpose of distribution.  Often, it is possible to

3    make this determination from the quantity of drugs found in

4    the defendant's possession.  For example, it would be highly

5    unlikely that a person with 50,000 doses of amphetamine

6    possessed them all for personal consumption.

7          The possession of a large quantity of drugs does not

8    necessarily mean that the defendant intended to distribute

9    them.  On the other hand, a defendant may have bended to

10   distribute drugs even if he did not possess a large -- large

11   amounts of them.  Other physical evidence, such as

12   paraphernalia for the packaging or processing of drugs, can

13   show such an intent.  There might also be evidence of a plan

14   to distribute.  You should make your decision whether the

15   defendant intended to distribute the drugs in his possession

16   from all of the evidence presented.

17         The elements of distribution of a controlled

18   substance, in violation of 21, United States Code, Section 841

19   are as follows:  One, that the defendant distributed a

20   controlled substance; and two, that the defendant distributed

21   the controlled substance knowingly.

22         The word "distribute" means to deliver a drug.

23   "Deliver" is defined as the actual, constructive, or attempted

24   transfer of a drug.  Simply stated, the words "distribute" and

25   "deliver" mean to pass on or to hand over to another or to

1    cause to be passed on or handed over to another or to try to

2    pass on or hand over to another, drugs.  For example, if A

3    tells or orders B to hand over the drugs to C, then A has

4    caused the drugs to be handed over, and therefore, has

5    distributed them.

6            Distribution does not require a sale.  Activities in

7    furtherance of the ultimate sale, such as vouching for the

8    quality of the drugs, negotiating for or receiving the price,

9    and supplying or delivering the drugs, may constitute

10    distribution.  In short, distribution requires a concrete

11    involvement in the transfer of the drugs.

12            The elements of the charge of tampering with a

13    witness in violation of 18, United States Code, Section 1512

14    are:  One, that the defendant knowingly used physical force or

15    the threat of physical force against the victim, or attempted

16    to do so; and two, that the defendant acted knowingly and with

17    the intent to hinder, delay, or prevent the communication to a

18    law enforcement officer or judge of the United States of

19    information relating to the commission or possible commission

20    of a federal offense or a violation of conditions of

21    probation, supervised release, parole, or release pending a

22    federal judicial proceeding.

23            "Physical force" simply means physical action

24    against another, and includes confinement of a person against

25    his or her will.  If you find that defendant acted with the

1    intent to hinder or prevent communication by a victim to a

2    specific law enforcement officer or group of officers, this

3    element is satisfied, if that officer or one of the group of

4    officers is a federal law enforcement officer.  A federal law

5    enforcement officer is an officer or employee of the federal

6    government who is authorized to act on the behalf of the

7    federal government in the prevention, detection,

8    investigation, or prosecution of federal crimes, or a

9    probation or Pretrial Services officer.

10           The government is not required to prove that the

11   defendant knew that the officer was a federal law enforcement

12   officer.  On the other hand, if you find that the defendant

13   was not acting within the intent to prevent communication to a

14   particular officer or group of officers, then this element is

15   satisfied only if the government proves beyond a reasonable

16   doubt that there was a reasonable likelihood that had the

17   victim been able to communicate with law enforcement officers,

18   at least one relevant communication would have been made to a

19   federal law enforcement officer.

20           D, the elements of retaliating against a witness in

21   violation of 18, U.S.C., Section 1513 are -- I said U.S.C.,

22   that's United States Code, Section 1513, those elements are:

23   First, that the defendant knowingly engaged in the conduct

24   alleged in the indictment; two, that the defendant's conduct

25   caused bodily injury to the victim; and three, that the

1    defendant acted with the intent to retaliate against the

2    victim for information given relating to the commission of a

3    federal offense to a law enforcement officer.

4            "Bodily injury" means a cut, abrasion, bruise, burn,

5    or disfigurement, physical pain, illness, or the impairment of

6    the function of a bodily member, organ, or mental facility.

7    It includes any injury to the body no matter how temporary.

8    In this regard, it is not necessary that the defendant himself

9    caused the bodily injury.  It is sufficient if you find that

10   the defendant knowingly participated in some activity which

11   had the consequence or effect of injuring the victim, nor is

12   it necessary to prove that the victim was actually injured; it

13   is sufficient if the defendant knowingly threatened to cause

14   bodily injury to the victim.

15           A "threat" is simply the expression of an intention

16   to do harm.  A threat may be communicated by words as well as

17   gestures.  In order to find that the defendants threatened to

18   cause the victim bodily harm, you need not find that he

19   intended to carry out the threat.

20           A "law enforcement officer" means an officer or

21   employee of the federal government authorized to prevent,

22   investigate, or prosecute offenses, or who is serving as a

23   probation officer.  In this regard, the government must also

24   prove that the defendant knew that the witness was cooperating

25   with a federal law enforcement officer.  In order to satisfy

1    this element, it is not necessary for the government to prove

2    that the defendant knew he was breaking any particular law.

3           To conclude, I have now described for you the

4    elements of the racketeering acts listed in the indictment.

5    The government must prove that two of these acts were or were

6    intended to be committed as part of the conspiracy, although

7    it need not prove that a particular defendant committed or

8    agreed to commit any of these acts as long as the government

9    proves that defendant -- that a defendant participated in some

10   manner in the overall objective of the conspiracy.  The jury's

11   verdict must be unanimous as to which type or types of

12   predicate racketeering activity the defendant agreed would be

13   committed; for example, at least two acts of extortion or

14   robbery or drug trafficking or any combination thereof.

15          Ladies and gentlemen, I have now finished reading 81

16   pages of jury instructions to you.  There are 119 pages total.

17   We are going to stop at this point, just before I begin to

18   talk to you about Count 2.  I have just finished my discussion

19   of Count 1.  But it's 5:41 in the evening, and accordingly, it

20   is an appropriate time for us to stop.  Tomorrow morning at

21   9:30 you will reassemble and I will continue with the

22   instructions at the point where I have left off.

23          Ladies and gentlemen, during this overnight recess,

24   do not discuss this case with anyone.  Do not discuss it with

25   your fellow jurors.  Do not discuss it with any of your

1    friends or family.  Do not allow yourselves to be exposed to

2    any news articles or reports that touch upon this case or the

3    issues it presents or the participants in the trial.  Avoid

4    all contact of any kind with any of the participants in the

5    trial.  Do not make any independent investigation of the law

6    or the facts relevant to the case.  Do not conduct internet

7    searches with respect to the issues presented or the persons

8    participating in the trial.  Do not consult external sources

9    such as encyclopedias or dictionaries in reference to the

10   issues and terms that have been presented to you here.

11          Ladies and gentlemen, in a moment you will be taken

12   to the jury room.  There will be a brief delay before you are

13   permitted to leave the jury room for the day solely because

14   there has been another activity occurring in the courthouse

15   today involving another case that has nothing to do with us or

16   our proceeding that has involved the presence of a significant

17   number of people.  We're going to make sure those other

18   participants with respect to that other matter are clear of

19   the exit route so that your departure from the building is not

20   impeded in any way, that the elevators are free and so forth.

21   This happens sometimes when the courthouse gets busy and we

22   have multiple proceedings going on at the same time.  So you

23   will be held in the jury room until Ms. Powell tells you that

24   you are free to leave.  I suspect it will only be a matter of

25   a very few moments.  Please take the jury out.  You will

1    rejoin us at 9:30 tomorrow morning.

2                    (Jury left the courtroom.)

3                    THE COURT:  The defendants are remanded to the

4    custody of the Marshal and I'll ask the court security officer

5    to stand by the courtroom door.  No one will leave the

6    courtroom door until I authorize their departure.  Please take

7    the defendants out.

8                    (Pause in the proceedings.)

9                    THE COURT:  Be seated, please.  Ms. Powell, please

10   verify that all jurors and alternates have cleared the jury

11   room, cleared the vestibule, and the area on the third floor,

12   and that there is no one waiting for the elevators and report

13   back.

14                   All clear.  Thank you.  The court security officer

15   will permit those who wish to leave to depart.

16                   Mr. O'Toole, you wish to make a record with respect

17   to certain exhibits.  I understand that you and the government

18   have got an agreement with respect to certain matters.

19                   MR. O'TOOLE:  I think we have and we reduced the

20   number we had originally.  I think I told the Court 15, we've

21   reduced it in half.  They fall in two categories, one is, for

22   instance, when the government introduced social media and

23   introduced a large number of pictures and we introduced one of

24   those pictures, at, say, page 42.

25                   THE COURT:  A carve out.

1          MR. O'TOOLE:  A carve out.  There are a couple

2    others, ones that were not introduced at all by the government

3    but introduced by us.  The first one --

4          THE COURT:  So what I would like you to do is, to

5    first identify the item by the mistaken government exhibit

6    number, and one item at a time, "This was mistakenly labeled

7    as Government Exhibit 1A, I now request that it be labeled as

8    Johnson Exhibit 1A."

9          MR. O'TOOLE:  Fine.

10         THE COURT:  Okay.  Have you gone through this with

11   the government?

12         MR. O'TOOLE:  I don't think we have.  We've gone

13   through it with Mr. Martinez in general.

14         THE COURT:  All right.  We'll go one by one.

15         MR. O'TOOLE:  First one is mistakenly introduced as

16   Government Exhibit CP 2, page 1, and we wish to introduce that

17   as Johnson Defense Exhibit No. 6.

18         THE COURT:  Okay.  Stand by and wait to hear from

19   the clerk that she's got that correction made.  Mr. Martinez,

20   if you hear something you have an objection interpose it,

21   otherwise, I'm going to assume the government has no

22   objection.  Mr. Martinez.

23         MR. MARTINEZ:  Yes, I'm relying on Agent Christy to

24   let me know.

25         THE COURT:  Well --

1          THE CLERK:  So that was CP 2, page 1, is Johnson

2    6.

3          MR. O'TOOLE:  Correct.

4          THE CLERK:  Thank you.

5          MR. O'TOOLE:  I'm waiting for the Court.

6          THE COURT:  It could be a long wait, the way I'm

7    feeling at the moment.

8          MR. O'TOOLE:  You've been reading a long time.  The

9    next one is introduced as Government Exhibit SM 9 at page 13,

10   and it should be called now Johnson Defense Exhibit 6A.  With

11   the Court's permission, I'll go forward.

12         THE COURT:  As soon as the clerk verifies she has it

13   and there has been no objection, move on to the next one.

14         MR. O'TOOLE:  Next one is Government's Exhibit SM 9,

15   page 12, should be Johnson Defense 6B.  The next one is

16   Government SM 9, page 23, should be Defense Johnson 6-C.  The

17   next one is Government Exhibit SM 9, page 44, should be

18   Defense Exhibit -- Johnson Defense Exhibit 8-E, as in

19   Edward.

20         THE CLERK:  Yes, I'm sorry.

21         MR. O'TOOLE:  The penultimate one is Government

22   Exhibit PHI 20, should be Defense Johnson Exhibit No. 14.  And

23   finally, Government PHI 68 should be Defense Johnson 15.

24         THE CLERK:  Got it.

25         MR. MARTINEZ:  We have a problem.

1           THE COURT:  Off the record.

2           (Pause in the proceedings.)

3           Back on the record -- hold it, stay off the record.

4           (Pause in the proceedings.)

5           We're back on the record.  Mr. O'Toole.

6           MR. O'TOOLE:  Your Honor, thank you.  The very last

7    one that I mentioned should be changed from Johnson Exhibit

8    No. 15 to Johnson Exhibit -- Defense Exhibit No. 16.

9           THE COURT:  Okay.  So you're just switching the

10   numbering on your exhibits, this doesn't reference the

11   government.  You said Johnson Exhibit 15, to Johnson Exhibit

12   16.

13          MR. O'TOOLE:  Correct, because we already had a

14   15.

15          THE COURT:  Ms. Powell.

16          THE CLERK:  So -- okay.  I have 15 as PHI 68.

17   What's 16?

18          MR. O'TOOLE:  16 now is going to be PHI 68.  I'm

19   informed by the government that we already had labeled a

20   Johnson Exhibit 15 as something else.  I don't know what it is

21   we had it labeled as.

22          MR. MARTINEZ:  One of the Shoody on Duty exhibits,

23   that's what we have our description as, Shoody on Duty.

24          THE CLERK:  Okay.  What I was given by the defense

25   was that Shoody on Duty video is 10D.

1              THE COURT:  10D, as in dog.

2              MR. O'TOOLE:  And that's what I've got on my list as

3    well.

4              MR. MARTINEZ:  So we have that as 15.  We don't have

5    a 10D.

6              THE COURT:  Okay.  Well, you don't have a 10D.  All

7    right.  So Shoody on Duty will be 10D.

8              MR. MARTINEZ:  Okay.

9              THE COURT:  So that means there need be no change

10   made with respect to Johnson Exhibit 15, it remains Johnson

11   Exhibit 15.  And there is no Johnson Exhibit 16.

12             MR. O'TOOLE:  Correct.

13             THE COURT:  Agreed, government?

14             MR. MARTINEZ:  Yes.

15             THE COURT:  Off the record.

16             (Pause in the proceedings.)

17             THE COURT:  Back on the record.  I misspoke a second

18   ago when I indicated that when we left Johnson Exhibit 15

19   alone, the implication of that was that there is no Johnson

20   Exhibit 16.  In fact, there is a Johnson Exhibit 15, which is?

21             THE CLERK:  Government's PHI 68.

22             THE COURT:  And there is a Johnson Exhibit 16, a

23   record from Johns Hopkins Hospital, which was received in

24   evidence the last couple of days; is that correct,

25   Mr. O'Toole?

```
 1              MR. O'TOOLE:  Exactly.

 2              THE COURT:  Is that correct, Mr. Martinez?

 3              MR. MARTINEZ:  Yes.

 4              THE COURT:  So we have cleared up the issue of the

 5      misnumbering of exhibits.

 6              MS. HOFFMAN:  Not quite, Your Honor, I have two from

 7      the government's side I would like to correct.

 8              THE COURT:  Two on the government's side you'd like

 9      to correct.  Let's go off the record.

10              (Pause in the proceedings.)

11              THE COURT:  We're back on the record.  Ms. Hoffman,

12      do you have a request to amend the numbering labeling of

13      exhibits?

14              MS. HOFFMAN:  I do.  What the government identified

15      as Government's Exhibit SM 22 should be corrected to

16      Government's Exhibit SM 28.

17              THE COURT:  Hold on a second.  Let the clerk catch

18      up with you.

19              MS. HOFFMAN:  I'm sorry, what I identified yesterday

20      as SM Exhibit 22 should be corrected to Government's Exhibit

21      SM 28.

22              THE CLERK:  Thank you.  And could I have a

23      description of SM 28, please.

24              MS. HOFFMAN:  I believe it was a photograph of

25      Mr. Johnson's Facebook account of Mr. Johnson with Carrdai
```

```
 1    Butler.  I'm sorry, Mr. Johnson's Instagram account a photo of

 2    Mr. Johnson and Carrdai Butler.

 3               THE COURT:  And Ms. Powell, that is now marked and

 4    received as exhibit?

 5               THE CLERK:  SM 28.  It was brought in as 22

 6    yesterday, but now it's SM 28.

 7               MS. HOFFMAN:  That's right.

 8               THE COURT:  Okay.  Without objection from any

 9    defendant?

10               MR. O'TOOLE:  Correct, no objection.

11               MR. FRANCOMANO:  No objection.

12               THE COURT:  Next, Ms. Hoffman.

13               MS. HOFFMAN:  The next one is yesterday Detective

14    Hayden identified a recording of a jail call between Wesley

15    Brown and Marquise McCants on July 3rd of 2016.  We played

16    that recording, Detective Hayden identified it, I neglected to

17    give it an exhibit number.  It should be CD 18.

18               THE COURT:  Without objection, Mr. O'Toole?

19               MR. O'TOOLE:  No objection.

20               MR. BUSSARD:  No objection.

21               MR. FRANCOMANO:  No objection.

22               THE COURT:  It was received yesterday, it's now

23    marked as received Exhibit CD 18.

24               THE CLERK:  Okay.

25               THE COURT:  All right.  Any other issues with
```

1    respect to the labeling or numbering of exhibits?  I have some

2    more matters to address with respect to exhibits, but I want

3    to make sure that any errors, mistakes, clarifications have

4    been straightened out and we have no more concerns in that

5    regard.  First from the government.

6              MS. HOFFMAN:  Nothing else from the government.

7              THE COURT:  Mr. O'Toole.

8              MR. O'TOOLE:  Nothing from us.

9              THE COURT:  Mr. Bussard.

10             MR. BUSSARD:  Yes, Your Honor, I do.

11             THE COURT:  You have an exhibit issue.

12             MR. BUSSARD:  There were three exhibits that were

13   introduced as government's exhibits, when in fact they had not

14   been introduced by the government.  They were identified first

15   as Government's PHCS 2, page 3.  That should be marked Jones

16   14 D.

17             THE COURT:  Hold on a second, allow her to catch

18   up.

19             THE CLERK:  Okay.  Thank you.

20             MR. BUSSARD:  The next one is Government's PHCS 4,

21   page 1, should be marked Jones 14E.

22             THE CLERK:  PHCS 4, page 1, 14E.

23             MR. BUSSARD:  14E.

24             THE CLERK:  Thank you.

25             MR. BUSSARD:  And the last one is Government's PHI

1  50.

2          THE CLERK:  50; five, zero.

3          MR. BUSSARD:  Yes.  Should be Jones 14I.

4          THE COURT:  Without objection, Mr. Martinez?

5          MR. MARTINEZ:  Yes, Your Honor, no objection.

6          THE COURT:  Those changes will be made.  Those

7  exhibits were all previously received while evidence was still

8  open in the case.  They're simply being corrected in their

9  labeling and how they are marked and numbered.  Anything else,

10 Mr. Bussard?

11         MR. BUSSARD:  Nothing further.

12         THE COURT:  Mr. Francomano, any changes or

13 modifications?

14         MR. FRANCOMANO:  No, Your Honor.

15         THE COURT:  Now we turn to the larger question of

16 verifying the exhibits that have been received in the case.

17 In a complex trial like this, my practice is to ask the

18 courtroom deputy clerk to prepare the final record

19 electronically of the exhibits that have been received in

20 evidence and then print that document and enter it into the

21 record itself as a court exhibit.  I think in this case it's

22 Court Exhibit No. 1.

23         It will only be received by the Court after I have

24 received the agreement from all parties that it is in all

25 respects correct.  So that's the normal exhibit verification

process that has to happen.  That can happen tonight, right

now, or you can come in early tomorrow and accomplish it

before we're scheduled to start at 9:30  I would envision 8:50

to 9:00 o'clock, somewhere in that range.  I'm perfectly happy

to do it tonight if counsel are.  The reporter may strangle

me, but there's six feet and a substantial barrier separating

us, so I think I'm okay.

          MR. O'TOOLE:  If we're voting, I would vote to

receive the printout copy, meet up with Mr. Enzinna, and then

come in early tomorrow at 8:50 or whatever you want.

          THE COURT:  All right.  Well, that's perfectly fine.

If we have one objection, that's good enough for me.  So I'll

ask Ms. Powell to produce printed copies of what is

tentatively the official record of the exhibits that were

received in this case, provide a copy to each of the lawyers,

and then you can meet among yourselves and then perhaps you

could meet with each other even before court tomorrow.  But

let's say you'll plan to assemble here, let's say between 9:00

and 9:15, to -- unless you know of a big problem, which I

assume we're not going to have, between 9:00 and 9:15.

Ms. Powell will be here.  And you'll advise her of whether

you've got an issue that needs to be worked out and hopefully

you can come to some agreement on that.  Then the first order

of business on the record tomorrow will be to confirm the

status of exhibits so that we're smooth and ready to go with

1    respect to the jury once they retire.

2            The second thing that has to be resolved in that

3    connection is among those received exhibits, which are going

4    back to the jury room, obviously no guns, no ammo.  Spent

5    shell casings, that sort of thing, that's fine, that can go

6    back.  No live ammo, no controlled substances, and no gory

7    photos.  So how do you decide what's a gory photo or not?

8    Well, try to remember whether or not I gave a -- that

9    millennial term "trigger warning," is that the right word?

10   Whether I gave a trigger warning, which is what I was told by

11   my wife I was doing in this trial, if I give a trigger

12   warning, then that means that should not go back to the jury

13   room.  If they request to see it, probably we would let the

14   picture goes back.  If they request to see a firearm or

15   ammunition or a controlled substance, they can be brought back

16   into the courtroom and it can published to them by being

17   displayed in front of them, not passed among them.

18           MR. O'TOOLE:  Would be -- if I could inquire, would

19   that be each time you said we're about to see autopsy

20   pictures, would all those pictures then be triggers?

21           THE COURT:  Yes, basically any gory -- any autopsy

22   photo and any photo of someone, a person or a body qualifies.

23   Now, crime scenes like the Country crime scene with blood

24   spilling down the steps, no, that's fine, that goes back

25   without qualification.  I'm talking about actual bodies lying

1    there.  Okay.

2              MR. MARTINEZ:  Recordings, Your Honor?

3              THE COURT:  We have no capacity by which to play

4    recordings in the jury room.  So obviously, I mean, if you

5    want to, put the CDs in a box to show them so they can sit

6    there and be reminded by the fact, oh, yeah, there's a CD, I

7    don't have any problem there, but there isn't going to be any

8    way for them to play that in the jury room.  And if they come

9    back to us and say, hey, we've got these recordings, we want

10   to play them, you know, I'll consider the request.  I'm not

11   going to prejudge any jury question or its answer.  But in

12   general what my practice has been if they want to hear a

13   replay of jail calls or whatever, we bring them back in, we

14   queue it up without any comment, we play it, send them back

15   out.  We don't have the equipment and I already relayed to you

16   my anecdote to all of you about that.

17             MR. MARTINEZ:  Your Honor, my only question was so

18   long as they're aware that they're available to be played, in

19   the event that they want to hear something, whatever the Court

20   wants to do is fine.

21             THE COURT:  Yes, well, if the way you want to

22   emphasize that is by putting them in a box and having all your

23   CDs sitting there and have it go back to the jury room, I

24   don't have any problem with that.

25             MR. MARTINEZ:  Okay.

THE COURT:  Okay.  So what my goals are for tomorrow is to have all of these instruction issues straightened out and this court exhibit ready to be received as the official record of what was received in this case and what was -- will also show what was marked for identification but not received. And I don't remember any exhibits being -- were exhibits rejected, offered but refused?  I don't remember any, but it would reflect that as well.  And then the second thing I want to be ready for is, once the jury goes, a relatively fast process of pulling together those exhibits that are going to go into the jury room.  So that's another thing to be clear on hopefully before we start at 9:30 tomorrow.  Here's the cart, here's the stack of stuff.  So maybe you ought to be here at 9:00 o'clock, 9:00 o'clock to get all that accomplished.

Last thing I'll let you know is that I'm going to experiment with something I've never done in a trial before tomorrow, but everyone needs to come into the 21st century, even me, and that is, that it's always a challenge to explain a verdict form in a RICO case.  So what we're going to do is, that when it's time to go through the verdict form, Ms. Powell is going to move to the podium, throw it on the system, and the verdict form is going to be displayed on the system page by page as I go through it with them in the ordinary way that I would always do that.  I learned from my last RICO trial that, you know, this thing is very complex, I'm sitting here

1    pointing at this, it's -- why not take advantage of the

2    technology?  The point is for the Court to walk through the

3    verdict form with the jury, we're going to use the technology

4    to do it and see if that works.  All right.  That's

5    everything -- oh, I'll see counsel at the bench.

6              (Bench conference on the record.)

7              THE COURT:  We're back on the record, we're convened

8    at the bench.  I took the measures I took with respect to the

9    jury this evening out of an abundance of caution to make sure

10   that there wasn't any inappropriate intercepting of persons in

11   the vestibule or on the third floor of the building.  It's not

12   out of any specific particularized concern, it's just that the

13   trial has entered now a very critical phase and I want to make

14   sure that we're taking all reasonable steps to make sure that

15   we don't have any inappropriate contact.  So that's the

16   explanation for what happened.

17             Yes, the story about the other proceeding was

18   technically true in that there was another big case going on,

19   but I will own the fact that it was also a bit of a ruse and

20   that was designed to completely desensitize the jury to the

21   notion that something was being done for their protection so

22   as to not prejudice them.

23             Tomorrow my expectation is that the jury will be --

24   we will supply them with lunch, they'll stay in the jury room.

25   Beginning at -- when they begin to deliberate after that, they

1    will only be allowed out of the jury room into the hallways

2    outdoors to smoke or whatever in the company of a court

3    security officer.  They will not be free at lunch to walk

4    through the neighborhood or anything along those lines.  And

5    that's the procedure that we'll attain if this goes into, you

6    know, another day, multiple days of deliberation.  That's how

7    we'll do it.

8           The other thing is, that if they are excused at the

9    end of the day tomorrow without reaching a verdict, we will

10   follow the same measures that I have just described.  And I

11   will tell you that we have taken some other very subtle

12   security measures on the property of the courthouse and in the

13   surrounding neighborhood in terms of parking garages and so

14   forth.  Everyone that's involved in that is in plain clothes,

15   there's no obvious police presence, but we are taking some

16   measures in that regard, and we'll follow them again tomorrow

17   night.

18          If the jury is excused without reaching a verdict,

19   upon their actually reaching a verdict and the trial being

20   completely over and the jury having been discharged, we will

21   personally escort them to their vehicles, as they may request.

22   That's obviously a far less malignant situation in terms of

23   prejudice.  Anybody got any questions about the procedures

24   that the Court's following?

25          MR. O'TOOLE:  I do.

1          THE COURT:  Yes.

2          MR. O'TOOLE:  I'm curious if these measures you're

3    taking are because of anything the Court has heard because

4    of --

5          THE COURT:  Nothing more than the Court having dealt

6    with some feedback from jurors on prior occasions where they

7    expressed apprehension, particularly after the fact,

8    feedback's come back to the Court that, you know, they wanted

9    to know, well, were any measures being taken to look out for

10   us, whether we knew about them at the time and so forth.  It

11   occurred to myself and my colleagues that a matter of sort of

12   good customer service and prudent security and so forth,

13   provided we're not crossing any lines in terms of prejudice,

14   so the trick is put reasonable security measures in place, but

15   don't do it in such a way that it somehow suggests to the

16   jurors that they need them.  And so it's really no more than

17   that.

18         MR. O'TOOLE:  So there was nothing -- there's

19   nothing -- anything new since the last time you heard about

20   the jury about their own personal safety?

21         THE COURT:  There really isn't.  It's more

22   influenced by experiences and getting feedback that we see

23   after previous racketeering conspiracy -- murder and

24   racketeering conspiracy trial.

25         MR. O'TOOLE:  Thank you, Your Honor.

234

1          THE COURT:  Trying to, you know, strike the right

2     balance, hit that sweet spot, and you know, a lot of competing

3     interests.  Any questions?

4          MR. O'TOOLE:  No questions.

5          THE COURT:  Okay.  So 9:00 o'clock tomorrow to deal

6     with exhibits, 9:30 to continue with the jury charge.  We're

7     off the record.

8          (The proceedings were concluded.)

9

10          I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
      record of proceedings in the above-entitled matter.

11

12     _____/s/_____
                Christine T. Asif
               Official Court Reporter

13

14          .

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
10/26/17 90:13.
April 14th, 2016 89:22.
April 3rd, 2013 70:17.
August 15th, 2017 94:21.
August 19th, 2016 86:19.
February 19th, 2007 66:25.
February 19th, 2007, four 64:7.
February 25th 108:20.
February 2nd 28:12.
February 4th 105:4.
February 4th, 2017 132:18.
February 5th 104:21.
February 5th, 2017 104:18, 144:8.
February 7th, 2017 103:4.
February 8th 105:5.
February 9th 157:23.
February 9th, 2017 104:22.
January 2007 119:15.
January 2008 67:20.
January 2008, one 64:2.
January 23rd, 2018 1:19.
January 4th 68:7.
January 9th 68:8.
January 9th, 2007 63:8.
July 3rd 224:15.
July 4th, 2014 97:7.
June '07 34:8.

June 17th, 2015 87:17.
June 1st, 2016 87:15.
June 2011 8:3.
June 29th 75:16.
March 2nd, 2013 74:3.
March 3rd, 2007 67:25.
May 16th 86:14.
May 7th, 2013 71:14.
May 9th, 2008 94:14.
November 1st, 2017 86:21.
November 2015 8:20.
November 24th, 2017 87:24.
November 28th, 2017 132:21.
October 17th, 2010 92:1.
October 5th 76:13, 124:23.
September 2017 121:6, 121:16.
September 25th 146:15.
September 25th, 2015 91:1.
September 25th, 2017 135:13, 142:21.
$10,000 152:25.
$5,000 153:13.
$51,000 55:18.
$7,000 152:24.
'07 8:2, 8:18.
'10 112:21.
'12 112:21.
'17. 112:21.
(5) 198:21.
.22 60:11, 121:12.
.22. 71:7, 71:12.
.357 68:22, 71:7.
.38 68:1.
.380 71:7.
.40 157:20.

.45 125:15.
.
.
< 1 >.
1 5:8, 6:1, 37:16, 49:7, 49:15, 116:6, 116:15, 116:21, 116:24, 117:7, 127:18, 127:19, 153:4, 153:8, 153:16, 160:9, 189:11, 189:14, 190:6, 195:2, 195:8, 195:12, 197:12, 197:18, 200:8, 204:9, 219:16, 220:1, 225:21, 225:22.
1,191 108:24.
1. 116:1, 117:11, 142:15, 144:19, 145:12, 197:24, 216:19, 226:22.
10 25:19, 59:8, 78:1, 153:1.
100 18:6, 157:15.
100-gram 153:15.
101 1:48.
10:38 108:7.
10:50 108:9, 132:18.
10D 221:25, 222:1, 222:5, 222:6, 222:7.
11 131:19, 145:8.
11/15. 96:21.
119 216:16.
11:51 108:19.
11th 68:20, 87:22, 90:1.
12 46:3, 46:4, 46:10, 50:11, 59:8, 64:18, 83:12, 84:21, 90:22, 105:11, 112:1, 112:2, 139:17, 149:22, 156:18, 157:11, 220:15.

12-year 23:23,
   149:24.
12:06 108:20.
12:21 108:21.
13 50:11, 87:10,
   87:11, 88:22,
   220:9.
14 84:21, 99:21,
   139:20, 225:16.
14. 220:22.
148 108:23.
14E 225:21, 225:22,
   225:23.
14I 226:3.
15 27:17, 84:13,
   94:16, 218:20,
   220:23, 221:8,
   221:11, 221:14,
   221:16, 221:20,
   222:10, 222:18,
   222:20.
15. 139:20, 222:4,
   222:11.
1512 203:6, 205:9,
   213:13.
1513 203:8, 205:10,
   214:21, 214:22.
16 221:8, 221:12,
   221:17, 221:18,
   222:11, 222:22.
16. 222:20.
17 23:21, 62:7.
18 62:20, 83:10,
   83:19, 83:20,
   83:23, 83:25,
   84:1, 84:3, 84:8,
   93:25, 113:11,
   195:6, 195:7,
   195:10, 195:14,
   198:17, 198:21,
   199:5, 203:5,
   203:7, 205:8,
   205:10, 213:13,
   214:21, 224:17,
   224:23.
18. 84:6, 84:8,
   84:16, 113:12,
   147:14, 195:5.
18th 94:5, 94:7.
19 63:1, 89:24,

   112:24.
1961(1) 198:21.
1962(c 198:17.
1962(d 199:5.
1990s 146:17.
1A 219:7.
1A. 219:8.
.
.
< 2 >.
2 38:7, 49:8, 52:22,
   77:14, 148:9,
   152:10, 154:1,
   154:6, 155:24,
   156:12, 156:25,
   189:11, 190:6,
   195:2, 195:8,
   195:12, 208:20,
   219:16, 220:1,
   225:15.
2,500- 153:13.
2. 5:12, 38:6, 49:7,
   153:3, 153:8,
   153:16, 156:5,
   156:14, 189:14,
   216:18.
20 25:19, 73:7,
   114:9, 220:22.
2002 28:19.
2005 7:24, 46:3,
   50:10, 62:8,
   62:20, 63:1,
   83:12, 84:21,
   118:8, 148:20,
   186:14, 197:25.
2006 8:15, 88:22,
   89:4, 104:17,
   145:20.
2006. 88:22, 88:25,
   118:15.
2007 7:24, 50:13,
   52:14, 52:21,
   62:9, 62:21, 63:2,
   63:23, 68:8,
   88:20, 112:20,
   118:10, 118:21,
   126:12, 139:19.
2007. 6:22, 7:7,
   51:24, 84:21,
   118:8, 118:14,

   132:6, 138:23,
   145:20.
2008 90:20,
   112:20.
2008. 93:9, 119:6.
2010 88:20.
2010. 131:18,
   145:13, 145:23,
   147:11.
2011 6:24, 68:20.
2012 127:1.
2012. 31:13,
   145:22.
2013 8:5, 103:14,
   120:19, 122:10,
   123:2, 124:22,
   153:18.
2013. 96:2, 122:4,
   124:23, 127:1.
2015 8:21, 86:11,
   88:21, 119:19.
2015. 25:11,
   26:14.
2016 8:23, 86:16.
2016. 90:1, 148:20,
   224:15.
2017 50:11, 87:22,
   103:15.
2017. 83:12, 155:10,
   157:18, 186:15.
20th 186:15.
21 208:25, 212:18.
21201 1:49.
214 71:16, 130:23.
21st 230:17.
22 223:15, 223:20,
   224:5.
2200 138:19.
221 62:21, 63:9,
   63:20, 65:4,
   65:11, 65:18.
22nd 71:16, 77:9,
   77:15, 130:23.
23 25:24, 63:9,
   87:19, 220:16.
2400 118:13,
   138:19.
24th 23:2, 28:11,
   77:9, 77:14.
25 1:10, 95:21,

153:14.
25th 62:21, 63:9,
  63:20, 65:4,
  65:11, 65:18,
  118:15.
276 12:12, 12:16,
  13:1, 84:9, 84:11,
  131:10.
28 223:16, 223:21,
  223:23, 224:6.
28. 224:5.
280 153:8, 157:15.
280-gram 153:2.
29 73:20.
2:00. 114:10.
2:21 108:22.
2:36 108:23.
.
.
< 3 >.
3 5:8, 6:5, 36:4,
  36:5, 37:16,
  77:13, 142:6,
  189:11, 190:6,
  195:2.
3,000 16:8.
3. 189:15, 195:8,
  195:12, 225:15.
30 24:3, 25:19,
  42:17, 73:7.
30-year 25:24.
300 14:2.
.
.
< 4 >.
4 6:5, 36:4, 37:16,
  225:20, 225:22.
4. 5:8, 36:5,
  142:6.
40 24:3, 54:9,
  108:11, 108:12.
41 135:20.
42 218:24.
44 220:17.
4447 70:3.
45 114:7.
45-minute 114:6.
47 135:21.
49 25:25.
4th 1:48.

.
.
< 5 >.
5 25:19.
5'7" 77:2, 77:5,
  125:1.
5-7 131:5.
50 85:3, 226:1,
  226:2.
50,000 212:5.
500 85:4, 152:22.
51 153:16.
5617 106:21.
5:41 216:19.
.
.
< 6 >.
6 219:17, 220:2.
6'6" 14:2.
6-C 220:16.
6/1 87:15.
60 16:9.
600 42:10.
641 99:25, 100:3.
68 220:23, 222:21.
68. 221:16,
  221:18.
6A 220:10.
6B 220:15.
6th 103:10.
.
.
< 7 >.
70. 16:9.
700 42:11.
72 26:1.
78 77:22.
7th 103:10.
.
.
< 8 >.
8 77:20, 158:4.
8-E 220:18.
8/15 94:21.
81 216:15.
841 208:25,
  212:18.
8:50 227:3,
  227:10.
.

.
< 9 >.
9 220:9, 220:14,
  220:16, 220:17.
900 68:20.
911 47:21.
911. 47:21.
9:00 227:4, 227:18,
  227:20, 230:14,
  234:5.
9:15 227:19.
9:15. 227:20.
9:30 216:21, 218:1,
  227:3, 230:12,
  234:6.
9mm 68:2.
_____/s/_____
  _____ 234:14.
.
.
< A >.
A. 1:27.
a.m. 108:20, 108:21,
  108:22, 108:23.
a/k/a 198:3, 198:4,
  198:5, 198:6,
  198:7, 198:8,
  198:9, 198:10.
ability 160:21,
  175:4, 179:24,
  206:23, 207:9,
  209:16.
able 34:24, 46:7,
  57:2, 76:22, 87:5,
  87:6, 124:14,
  178:6, 214:17.
above 72:7, 202:5.
above-entitled
  234:12.
abrasion 215:4.
absence 170:15,
  189:9, 196:22.
absolutely 92:20,
  94:12.
abstract 152:2.
absurdity 65:14.
abundance 231:9.
abundant 148:13.
accept 104:13,
  169:17, 175:22,

176:2, 178:11,
180:1, 185:2.
acceptable 114:13.
access 92:18.
accident 122:19,
127:11, 127:13,
186:24, 187:18.
accompanied
114:15.
accomplice 177:4,
177:9, 178:15.
accomplices 176:23,
177:6, 177:17,
177:19.
accomplish 189:21,
190:25, 191:14,
196:6, 227:2.
accomplished 190:23,
230:14.
accomplishment
194:11.
accordance 170:20.
accorded 164:18.
According 50:20,
65:16, 122:6,
128:18, 140:12.
Accordingly 57:25,
67:4, 188:8,
188:18, 196:9,
216:19.
account 46:13,
46:14, 46:16,
46:25, 77:14,
77:17, 77:21,
78:2, 120:5,
120:21, 174:25,
223:25, 224:1.
accountable 161:3.
accountants 43:16.
accounts 20:5,
46:24, 77:25.
accuracy 107:24,
108:2, 108:5,
108:6, 108:16,
108:18, 109:13.
accurate 107:25,
108:14, 118:2,
122:22, 129:10,
132:10, 174:25.
accurately 174:17.

accusation 168:13.
accusations 75:15.
accused 26:22,
189:12.
accuses 3:8.
achieve 200:14,
200:18.
achieved 202:20.
acknowledge 116:5.
acknowledged 50:14,
134:17, 149:2.
acquiescence 80:19,
194:3.
acquit 45:13,
169:3.
across 93:7.
Act 39:24, 49:17,
62:7, 62:20, 63:1,
63:9, 83:23,
85:21, 128:8,
142:24, 186:7,
187:5, 187:23,
188:15, 188:16,
188:17, 191:1,
191:13, 191:14,
193:15, 196:6,
197:14, 197:15,
199:24, 200:20,
214:6.
acted 38:19, 143:15,
186:21, 186:25,
187:5, 187:12,
187:14, 187:15,
213:16, 213:25,
215:1.
acting 36:13,
214:13.
action 65:22, 158:8,
213:23.
actions 111:19,
188:13, 191:9,
191:11.
actively 54:23.
Activities 51:12,
193:2, 198:13,
199:11, 200:21,
202:7, 213:6.
Actual 185:12,
189:24, 209:9,
209:14, 212:23,

228:25.
ad 50:2, 66:18.
add 30:4, 67:20,
69:14, 186:1.
added 69:24.
addition 132:1,
167:18, 201:2.
additional 150:22,
151:1, 151:6.
address 57:21,
136:24, 162:10,
225:2.
adds 64:4, 67:23.
admissibility
167:13.
admissible 167:8.
admissions 120:7,
129:25.
admit 92:25, 95:9,
95:16, 107:9,
152:19, 167:17.
admits 97:10.
adult 148:12.
advance 29:14,
43:24.
advantage 231:1.
advertisements
134:12, 134:13.
advise 67:4,
227:21.
advised 181:20,
194:22.
affairs 6:4, 197:16,
198:19, 199:14.
affect 49:19,
170:16, 174:20,
199:12, 200:2,
200:11, 200:21,
202:10.
affected 108:18,
198:13, 202:7,
202:9, 202:12,
202:18, 202:20.
affecting 202:15.
affidavit 120:11,
120:13.
affiliation 104:5.
affirmative 7:17.
affirmed 83:21,
84:4.

affirming 83:24.
affirms 195:10.
afraid 110:8.
afternoon 54:2,
    82:21, 82:22,
    114:14, 114:15,
    115:4, 115:5.
age 83:15, 83:19,
    83:20, 84:1,
    93:25, 165:1,
    195:4, 195:6,
    195:7, 195:10,
    195:14.
agencies 149:21.
Agent 12:7, 16:22,
    17:3, 17:7, 18:9,
    32:2, 47:12,
    196:7, 219:23.
agents 111:24,
    121:23.
ago 4:12, 46:3,
    46:4, 46:20,
    50:11, 59:8,
    69:20, 85:14,
    96:10, 112:7,
    116:23, 118:9,
    119:16, 192:11,
    222:18.
agree 54:3, 94:11,
    159:22, 198:17.
Agreed 8:11, 49:23,
    117:4, 148:1,
    152:11, 155:25,
    160:17, 166:14,
    168:10, 195:19,
    200:6, 204:11,
    204:21, 204:23,
    204:24, 208:10,
    216:8, 216:12,
    222:13.
agreements 54:3,
    125:21, 176:20.
ahead 141:23.
aid 5:10, 5:11,
    181:17.
aiding 161:2,
    194:10.
aims 80:13, 192:16,
    193:24.
ain't 11:23, 22:25,

99:11, 125:5,
    125:6, 135:24,
    151:20, 151:21,
    151:22.
air 40:24, 100:24.
airtight 109:10,
    109:15.
al 1:10.
Alan 1:37.
Albert 198:5.
alerted 105:23.
Alford 95:7, 95:19,
    95:22.
alive 64:21,
    68:18.
allegations 62:5.
alleged 7:22, 7:24,
    8:1, 8:3, 8:5,
    8:8, 8:10, 8:12,
    8:14, 33:23,
    33:25, 34:2, 34:4,
    38:7, 80:17,
    176:18, 185:9,
    186:9, 186:11,
    186:16, 186:19,
    190:17, 190:19,
    192:20, 193:18,
    214:24.
Allegedly 19:9,
    49:1, 50:22,
    56:24, 61:9,
    61:16, 96:11.
alleges 9:5, 63:9,
    83:11, 186:13,
    197:21, 202:24,
    205:2.
alleyway 70:2,
    70:15.
alleyways 149:9.
alligator 48:3.
allow 40:5, 81:14,
    113:21, 115:13,
    161:21, 165:4,
    217:1, 225:17.
allowed 55:13,
    55:20, 141:23,
    177:4, 184:14,
    232:1.
allowing 196:1.
alludes 64:11.

almost 12:22,
    56:5.
alone 45:12, 69:13,
    82:14, 163:16,
    165:13, 169:2,
    173:3, 180:16,
    181:21, 183:8,
    184:8, 185:21,
    209:25, 222:19.
already 26:7, 32:19,
    32:20, 36:13,
    38:13, 56:2,
    57:24, 63:25,
    78:6, 87:24,
    91:13, 135:12,
    140:1, 145:2,
    152:7, 200:13,
    204:7, 221:13,
    221:19, 229:15.
altercation 137:4.
alternate 101:7,
    144:23, 144:25.
alternates 218:10.
alternative
    144:23.
Although 48:18,
    61:24, 168:11,
    202:9, 204:23,
    209:21, 210:25,
    211:1, 216:6.
amazing 133:25.
ambit 193:16.
amend 223:12.
America 1:5,
    164:17.
ammo 228:4, 228:6.
ammunition 5:16,
    8:23, 60:8,
    228:15.
among 40:5, 81:14,
    113:21, 122:7,
    160:17, 161:21,
    166:13, 168:9,
    200:1, 200:10,
    200:14, 227:16,
    228:3, 228:17.
amount 45:9,
    203:19.
amounts 212:11.
amphetamine 212:5.

analogy 150:2.
analyzing 168:6.
anecdote 229:16.
angel 13:18, 13:20,
   13:22.
angry 20:19.
Answer 57:19, 57:23,
   58:12, 94:24,
   117:24, 123:23,
   133:21, 229:11.
answered 57:25,
   58:17, 141:21.
answers 57:22,
   166:11, 167:4.
Antonio 61:11,
   66:19, 68:6,
   118:19.
Anybody 11:14, 12:8,
   51:14, 52:3, 55:2,
   59:4, 62:18, 73:6,
   78:7, 99:6, 136:3,
   232:23.
anyplace 15:19.
Anyway 159:22.
apart 77:10.
apartment 128:11,
   145:21.
Apes 130:11.
apologize 13:10,
   43:24, 49:4.
apparent 206:23,
   207:8.
Apparently 55:15,
   132:21.
appealed 179:5.
appear 174:15,
   184:1.
appeared 88:6,
   181:23.
appears 181:15,
   181:21.
applicable 162:19.
applies 39:24,
   163:7.
apply 141:20, 163:9,
   184:23, 211:12,
   211:14.
appreciate 82:14.
apprehension
   233:7.

apprised 193:2.
approach 66:1.
appropriate 67:12,
   207:23, 216:20.
approximately 62:8,
   62:20, 63:1.
April 8:6, 68:20,
   87:22.
apt 2:24.
area 42:18, 43:3,
   43:4, 43:6, 50:12,
   56:11, 56:19,
   63:14, 65:17,
   109:2, 109:5,
   111:22, 218:11.
arguably 12:14,
   17:1.
argue 15:12, 67:6,
   178:17.
argued 14:16,
   114:23, 142:8,
   148:14.
argues 9:8, 20:5,
   22:19, 176:25,
   177:1.
arguing 18:12,
   18:14.
argument 2:11, 7:7,
   9:12, 32:24,
   41:20, 45:22,
   66:13, 66:14,
   82:17, 114:22,
   114:25, 123:13,
   136:2, 140:8,
   140:16, 143:9,
   144:21, 148:16.
arguments 114:20,
   115:10, 115:14,
   115:20, 116:7,
   137:15, 139:15,
   143:5, 143:11,
   149:11, 149:13,
   149:18, 150:4,
   150:16, 157:19,
   166:1, 172:18,
   177:15.
arm 58:11.
armed 25:16,
   25:24.
arms 15:17, 48:4,

73:22, 86:8,
   93:7.
army 9:21.
around 9:19, 9:20,
   10:3, 11:14,
   19:16, 35:12,
   42:12, 43:15,
   44:23, 45:18,
   50:13, 51:24,
   53:7, 56:10,
   56:22, 63:14,
   65:13, 69:3,
   72:13, 73:22,
   74:5, 76:14,
   99:13, 106:18,
   118:24, 126:12,
   133:2, 145:3,
   160:4.
arranged 180:10.
arrangements
   121:12.
array 32:25, 36:15,
   67:21, 67:23.
arrest 104:18,
   132:5, 144:2,
   182:19.
arrested 8:23, 29:1,
   42:25, 43:1,
   53:16, 63:24,
   68:12, 68:14,
   69:6, 69:12,
   72:24, 103:7,
   103:9, 105:19,
   155:9, 158:18.
arrests 112:2.
arrive 165:18.
Artez 126:25,
   128:5.
articles 40:6,
   81:15, 113:22,
   113:23, 161:22,
   161:23, 217:2.
As-salaam-alaikum
   98:19.
Aside 53:6, 79:18,
   137:6.
Asif 1:46, 234:10,
   234:15.
asks 19:24, 52:4,
   173:1, 173:2.

asleep 119:20.
aspect 81:8.
Ass 132:15, 135:17,
  137:12.
assault 5:1, 5:2,
  8:17, 8:22, 27:17,
  39:16, 94:15,
  94:17, 95:5.
assaulted 25:18.
assemble 227:18.
assembled 80:13,
  193:24.
assertions 63:10.
assist 181:17,
  184:18, 211:24.
assistance 168:6.
assisted 62:12,
  108:13, 194:22.
associate 80:10,
  192:2.
associated 6:10,
  80:9, 102:17,
  198:11, 199:11,
  200:25, 210:11.
associates 144:5,
  201:14.
association 193:20,
  204:2.
associations 150:24,
  151:15.
Assume 171:16,
  171:17, 172:2,
  219:21, 227:20.
assumed 166:22,
  166:25.
ATF 149:17.
attached 183:12.
attack 42:23.
attacks 115:8,
  126:6, 126:7,
  149:15.
attain 232:5.
attempted 8:16,
  23:23, 28:20,
  56:17, 82:25,
  127:22, 140:8,
  144:3, 147:17,
  206:18, 207:2,
  212:23, 213:15.
attend 41:16.

attention 3:18,
  56:13, 65:5,
  65:10, 80:25,
  162:17, 186:4.
attitude 28:13,
  28:17, 164:11.
attorney 67:15,
  163:12, 167:5,
  167:7, 167:12.
attorneys 67:10,
  167:8, 172:17.
August 8:10.
AUSA 1:25, 1:27.
authorities 182:19,
  182:25.
authorization
  181:9.
authorize 151:3,
  218:6.
authorized 6:19,
  8:2, 34:3, 138:11,
  214:6, 215:21.
automatically 96:5,
  98:11, 193:21.
autopsy 228:19,
  228:21.
available 75:4,
  166:9, 188:11,
  229:18.
Avenue 51:6, 52:10,
  68:21, 118:8,
  118:13, 129:2,
  138:20, 138:21,
  141:6, 145:21,
  148:19, 197:22,
  201:12.
Avoid 24:11, 40:7,
  81:16, 113:24,
  161:24, 167:19,
  217:3.
awaiting 26:22,
  27:8, 27:12.
aware 229:18.
awareness 192:15.
away 3:2, 23:25,
  55:17, 56:13,
  57:8, 64:11,
  64:12, 71:4,
  76:21, 94:19,
  108:8, 121:24,

128:18, 207:12.
awful 109:25, 129:7,
  134:8.
.
.
< B >.
B. 1:33.
baby 133:9.
backpack 155:10,
  155:14.
backwards 18:7.
bad 83:5, 117:1,
  142:17, 187:7.
Badgujar 60:22,
  70:1, 70:4, 70:8,
  70:12, 78:6,
  78:10.
bag 106:17.
bail 55:16.
balance 234:2.
ball 57:6, 115:14,
  150:3, 150:10.
ballistic 68:3,
  74:25.
ballistics 89:1,
  107:11.
Baltimore 1:20,
  1:49, 43:4, 89:16,
  97:1, 108:4,
  111:16, 145:20,
  149:16.
bandana 14:17,
  14:19, 14:23,
  14:24, 15:4, 15:7,
  15:8, 15:9.
bandanas 15:10,
  15:11, 37:23.
Bank 14:22, 14:23,
  14:25, 209:21.
bar 164:21.
Barclay 23:2, 24:23,
  26:9, 34:8, 61:13,
  77:9, 77:15, 93:5,
  131:11, 138:20.
barricaded 155:13.
barrier 227:6.
base 8:18, 45:21,
  62:10, 163:22.
based 10:18, 48:18,
  68:4, 106:5,

107:24, 124:12,
167:22, 167:25,
168:4, 170:18,
173:15, 179:7,
181:22, 185:19.
basement 155:20.
basic 192:15.
Basically 31:7,
122:7, 137:17,
151:22, 156:8,
211:25, 228:21.
basis 66:11, 137:21,
156:18, 165:15,
172:7, 172:19,
172:23, 180:15,
183:7.
basketball 93:22.
bathroom 119:24,
155:11, 155:14,
157:21.
battle 21:20.
BCDC 146:12.
bear 178:3,
185:17.
bearing 175:25,
189:10, 193:9.
became 6:2, 6:22,
43:11, 49:21,
53:2, 58:21,
83:18, 83:19,
138:22, 142:22,
191:17, 195:4,
195:5, 200:5,
204:6.
become 24:4, 43:15,
46:9, 111:11,
192:25.
becomes 58:7,
194:23, 196:6.
becoming 4:19,
4:20.
beef 127:3.
began 134:16,
138:15, 169:9,
186:13, 186:19.
begin 162:20, 163:5,
169:1, 216:17,
231:25.
Beginning 21:1,
44:5, 50:6, 50:10,

55:24, 62:8, 63:1,
68:23, 99:9,
142:11, 152:14,
197:25, 231:25.
begins 44:24.
behalf 2:17, 41:18,
42:9, 72:5, 82:16,
182:7, 214:6.
behavior 177:3,
211:16.
behind 21:25, 72:7,
72:8, 124:15,
140:19, 157:21.
behold 71:6.
believable 101:1,
179:23.
believe. 99:12.
believed 177:21,
183:6, 183:11.
believes 167:7.
believing 133:19.
belong 14:5.
belonging 106:1,
106:2.
belongs 92:22.
below 7:19, 9:7.
Ben 27:19, 27:22,
27:24, 47:7,
48:24, 54:23,
54:25, 61:22,
72:3, 72:4, 73:10,
73:11, 73:12,
73:14, 123:3,
123:7, 123:11,
123:15, 123:21,
123:25, 124:1.
Bench 66:2, 167:9,
231:5, 231:6,
231:8.
bended 212:9.
benefit 50:21,
53:22, 177:19.
benefited 50:21.
benefits 53:23.
Bess 94:1, 94:3,
102:16, 102:17,
102:18, 102:19,
104:5, 104:10,
106:22, 108:9,
108:10, 109:6,

109:7, 132:18,
143:6, 143:22,
144:14, 144:17,
145:1, 147:18,
157:20, 158:13,
158:17.
best 27:1, 54:11,
73:24, 73:25,
159:17, 177:23.
bet 103:7, 103:8.
better 32:18, 32:22,
33:11, 59:4,
110:17, 132:25,
167:21.
bias 164:10, 165:16,
174:23.
biased 28:5,
174:19.
Big 15:11, 21:25,
32:23, 33:3,
55:10, 85:20,
90:11, 101:4,
110:9, 110:21,
128:21, 157:24,
159:2, 198:6,
227:19, 231:18.
bike 102:13,
102:14.
bikes 35:11.
biological 42:19.
birthday 94:5,
94:7.
bit 5:24, 21:4,
43:12, 43:16,
47:18, 53:18,
54:4, 55:14,
57:16, 59:21,
61:24, 62:3, 64:4,
64:5, 64:9, 64:23,
69:14, 72:7,
72:23, 78:22,
137:15, 231:19.
bitch 159:17,
159:23.
Blake 40:18.
blank 26:17.
blickety 102:3.
blinds 104:24,
155:17, 155:22.
block 68:21, 72:11,

118:13.
blocks 77:10, 108:8,
 138:20, 138:21,
 156:21, 157:10.
Blood 27:2, 32:21,
 76:22, 131:3,
 131:8, 137:5,
 228:23.
Bloods 30:25, 98:16,
 98:17, 98:25,
 113:6, 113:8.
blow 72:22.
blowing 131:12.
blown 48:8.
blue 7:21, 15:23,
 125:14, 132:7.
Blueberry 97:12,
 154:20.
blurted 69:15.
Bms 136:13.
boarding 65:11.
bodies 228:25.
Bodily 206:11,
 206:17, 208:7,
 214:25, 215:4,
 215:6, 215:9,
 215:14, 215:18.
body 12:25, 58:6,
 84:11, 215:7,
 228:22.
Bohlen 68:2, 68:3,
 79:10, 118:21,
 124:16.
bolster 56:17.
Bonds 43:21, 59:23,
 62:11, 62:23,
 63:3, 198:8.
Bones 104:10,
 104:11.
book 11:5, 30:16,
 30:17, 88:1, 88:3,
 88:4, 88:5, 88:6,
 88:8, 88:10,
 88:12.
boost 22:20, 23:8.
boosting 23:11.
bore 43:5.
borne 3:11.
borrow 30:20.
bother 18:25,

19:4.
bottle 21:14, 82:13,
 131:6, 131:7.
bottles 72:9, 72:11,
 72:14, 72:17,
 130:24.
bottom 67:24, 131:8,
 158:12.
bottoms 22:11,
 22:17.
boundary 117:10.
bow 59:5.
box 9:1, 9:2, 78:23,
 127:19, 209:20,
 229:5, 229:22.
boxes 7:20, 7:21,
 8:13, 8:25.
Boy 100:7, 103:2.
boy. 140:12.
Boyce 105:15,
 105:20.
BPD 17:21.
Bradley 71:3.
bragged 150:25,
 151:5.
brains 21:6.
break 81:24, 113:19,
 182:1.
breaking 216:2.
Bredar 1:18, 44:21,
 45:2, 45:5, 49:6,
 49:10, 49:24,
 52:11, 53:3, 54:1,
 79:23, 80:6,
 80:22, 83:13,
 150:4.
Brentwood 118:13,
 143:24.
Breonna 75:9.
Brian 25:15, 50:9,
 63:5, 85:8,
 126:11.
Brice 94:15, 94:18,
 94:24.
brief 62:6, 81:12,
 206:5, 217:12.
briefly 47:9,
 64:25.
Bring 2:5, 33:12,
 37:2, 41:8, 82:4,

82:6, 86:12,
 86:15, 162:14,
 229:13.
brings 27:25, 46:22,
 122:23, 146:21.
Bro 100:1, 128:21.
bro. 100:12.
broader 143:19.
broke 4:25,
 109:21.
broker 38:20.
Broski 16:21.
brother 26:15, 27:2,
 132:13, 137:10,
 141:19.
brothers 11:17.
brought 23:18,
 36:24, 51:16,
 79:13, 86:1,
 90:13, 94:14,
 112:9, 112:10,
 136:12, 140:21,
 154:13, 164:16,
 224:5, 228:15.
bruise 215:4.
brutal 118:2,
 160:25.
Bubba 61:12, 64:15,
 65:21, 66:20,
 66:22, 118:19.
bubble 136:16.
bucked. 24:5.
bucking 24:7.
Buffy 75:9.
bug 134:22, 135:13,
 145:7, 146:15.
bugged 31:20.
building 31:9,
 31:11, 128:11,
 145:21, 217:19,
 231:11.
buildings 108:18.
built-in 115:13.
Bull 20:12.
bullets 78:19,
 106:16, 161:2.
bunch 9:16, 9:18,
 10:3, 34:18,
 35:10, 50:3,
 84:19.

burden 3:6, 12:24,
  80:1, 114:21,
  164:24, 165:2,
  165:22, 168:14,
  168:16, 168:18,
  169:7, 170:3,
  185:15, 186:20,
  187:4, 190:5.
burn 215:4.
Burris 56:8, 56:9,
  99:8, 99:9, 99:20,
  136:11, 136:13,
  136:16.
bushes 131:17.
bushmen 128:6.
business 55:20,
  156:6, 192:1,
  227:24.
busy 107:25,
  217:21.
butcher 12:2.
Butler 224:1,
  224:2.
buy 60:4, 60:7,
  131:23, 131:24,
  145:10.
buyer-seller
  194:12.
buying 60:5.
.
.
< C >.
c-line 155:2.
C. 135:23, 155:7.
Cakes 11:15, 61:4.
calf 69:3.
caliber 68:1,
  121:12, 125:15,
  157:20.
calling 20:14,
  22:14, 22:17,
  47:24, 168:18,
  169:23, 179:17.
camera 22:24, 57:1,
  109:1, 143:13,
  155:18.
cameras 63:14,
  104:7, 109:3,
  109:4.
candid 174:8.

candidly 141:5,
  149:2.
candor 82:14.
capable 188:10,
  208:7.
capacity 229:3.
capital 13:14,
  13:15.
caps 106:19.
captured 129:3.
car 31:20, 60:20,
  64:11, 64:13,
  70:25, 105:21,
  105:22, 105:23,
  105:24, 105:25,
  106:1, 106:2,
  106:3, 106:7,
  106:9, 106:10,
  106:11, 106:13,
  125:13, 132:12,
  158:25, 160:2.
car. 160:1.
care 23:24, 51:18,
  177:11, 178:10,
  180:20.
career 26:23,
  27:13.
careful 169:5.
carefully 3:25,
  14:10, 39:19,
  39:21, 39:22,
  174:2, 181:20.
carelessness 186:24,
  210:20.
Carrdai 11:15,
  88:21, 89:6,
  90:10, 95:2,
  223:25, 224:2.
carried 28:22,
  29:25, 111:19,
  138:12, 188:25.
Carroll 60:25, 78:9,
  95:2.
carry 215:19.
carrying 106:18,
  131:14, 176:18,
  196:7, 207:12.
cart 230:12.
carve 139:12,
  218:25, 219:1.

cases 12:20, 42:15,
  149:25, 191:9.
cash 100:15.
casings 63:15, 68:6,
  75:24, 75:25,
  76:7, 78:19, 89:2,
  228:5.
cast 112:24.
catch 223:17,
  225:17.
categories 10:18,
  218:21.
category 10:21,
  16:2.
caught 104:8,
  111:21, 143:13,
  146:12, 146:14,
  147:15.
cause 48:13, 48:14,
  174:22, 175:7,
  177:25, 178:1,
  211:24, 213:1,
  215:13, 215:18.
caused 174:24,
  205:20, 206:14,
  213:4, 214:25,
  215:9.
causing 208:7.
caution 177:11,
  178:10, 193:17,
  194:2, 231:9.
cautioned 182:18.
CCTV 63:13, 104:7,
  104:8, 109:1.
CD 224:17, 224:23,
  229:6.
CDF 133:4, 135:13,
  145:7, 146:13,
  146:16, 154:9.
Cds 229:5, 229:23.
Cecil 95:6, 95:11,
  95:20, 131:16,
  143:7, 145:13,
  145:23, 146:2,
  147:14.
cell 16:3, 16:4,
  16:5, 16:13,
  17:18, 19:12,
  37:11, 45:24,
  46:7, 53:14,

71:19, 93:13,
93:14, 96:23,
107:23, 107:25,
108:3, 108:14,
122:17, 124:7,
131:20, 133:4,
146:12, 149:1,
152:18, 153:11.
Center 5:21, 36:1,
36:2, 67:24,
89:16, 97:1,
111:16.
centerpiece 23:13,
29:6, 94:10.
century 230:17.
certain 10:23,
16:10, 58:20,
79:9, 79:10,
150:1, 166:14,
166:22, 168:9,
170:24, 182:13,
182:14, 182:24,
183:17, 184:13,
186:5, 188:14,
189:13, 199:16,
218:17, 218:18.
certainly 17:11,
142:2.
certainty 68:3,
118:22, 124:17,
186:6.
certify 234:10.
cetera 13:2.
chain 128:20,
138:14, 138:15.
chains 15:24.
challenge 45:18,
230:18.
challenging 81:8.
chance 72:20.
change 28:14, 28:17,
30:5, 42:5, 149:6,
155:3, 222:9.
changed 27:20,
123:14, 123:16,
124:5, 221:7.
changes 226:6,
226:12.
changing 64:3,
91:4.

character 194:21.
characteristics
203:24.
characterized 191:5,
201:15.
characters 112:25.
charge 5:12, 5:15,
5:18, 5:20, 31:4,
31:6, 32:5, 32:10,
39:17, 48:25,
116:6, 126:22,
128:22, 139:8,
139:9, 191:19,
197:19, 213:12,
234:6.
charges 5:21, 5:22,
39:16, 144:5,
144:15, 158:4,
168:21, 176:9,
176:12, 186:5,
195:23, 197:13.
charging 132:21,
132:24, 145:5,
185:12, 197:18.
charismatic 14:3.
Charles 62:1, 64:7,
66:6, 66:7,
66:25.
chart 7:3, 7:4,
10:7, 51:20,
52:9.
charts 51:19, 51:20,
52:8, 167:17,
167:20, 167:24,
168:1, 168:4.
chased 131:17.
check 153:8.
checked 12:7.
chef 42:21.
Chesapeake 109:16,
121:5.
chest 93:8,
143:14.
chewed 48:9.
chief 132:22.
child 87:10.
childhood 43:13,
44:4, 50:3,
73:24.
children 57:6,

98:7.
choice 206:7.
chooses 182:6.
Chop 77:14, 77:16,
77:24, 88:14,
99:20, 122:6,
122:23, 123:1,
123:11, 123:13,
123:15, 123:17,
123:20, 124:3,
124:6, 124:9,
124:19, 124:21,
124:24, 124:25,
125:2, 125:9,
125:17, 125:18,
134:22, 134:23,
135:17, 136:17,
136:18, 136:19,
161:6.
choreographed
22:23.
chosen 3:22.
Chris 118:14,
118:17, 119:3.
Chrisha 16:15,
16:16.
Christina 1:27.
Christine 1:46,
234:10, 234:15.
Christy 219:23.
cigarette 109:8.
cigarettes 35:22.
circle 138:5.
circuit 42:11.
circumstance
189:9.
circumstances 61:18,
174:3, 187:1,
187:22, 187:24,
188:20, 191:6,
205:24.
Circumstantial
171:13, 171:15,
172:6, 172:11,
172:13, 172:25,
173:9, 173:16.
citizens 3:4, 42:13,
54:20.
City 24:14, 43:4,
50:20, 56:18,

89:16, 97:1,
108:4, 108:17,
111:16, 135:6,
138:21, 156:21,
157:10.
citywide 24:2.
civilian 86:2.
civilians 117:14,
117:15.
claim 6:22,
141:13.
claimed 121:1,
182:25.
claiming 48:21.
claims 4:23, 182:14,
183:2.
clarifications
225:3.
clarifying 116:2.
Clark 105:1, 105:2,
105:3, 108:3,
108:4.
clean 169:1.
clear 24:10, 60:8,
67:3, 82:24,
92:20, 122:11,
217:18, 218:14,
230:11.
cleared 218:10,
218:11, 223:4.
clearly 18:16,
158:6, 158:7,
188:16.
CLERK 219:19, 220:1,
220:4, 220:12,
220:20, 220:24,
221:16, 221:24,
222:21, 223:17,
223:22, 224:5,
224:24, 225:19,
225:22, 225:24,
226:2, 226:18.
client 2:18, 2:25,
167:12.
clients 139:13.
close 47:4, 210:8.
closely 180:21.
closest 10:25,
16:12, 17:1.
closing 2:11, 9:11,

32:24, 41:19,
82:17, 82:24,
83:13, 114:19,
128:1, 136:1,
144:21, 159:2.
clothes 93:9, 93:20,
105:20, 129:4,
232:14.
clothing 106:1.
club 137:18.
clutching 102:1.
co-conspirator
196:24.
co-conspirators
148:2, 154:4,
192:21, 195:20,
195:25.
co-defendant
170:15.
co-defendants
170:11, 170:13,
170:14.
Coast 198:4.
Coasta 198:5.
coat 17:13, 160:6.
cocaine 8:6, 8:18,
8:20, 62:10,
100:17, 100:18,
100:20, 100:21,
100:23, 118:13,
153:1.
cocaine-related
155:4.
Code 59:2, 198:18,
198:21, 199:5,
203:6, 203:7,
205:8, 205:10,
208:25, 212:18,
213:13, 214:22.
coin 127:7.
coincidence 122:20,
127:12, 127:13.
coincides 186:16.
coins 100:15.
Cokesbury 141:6,
141:9.
cold 27:2, 35:3.
Colin 72:5, 111:1.
colleague 2:18.
colleagues 115:16,

157:23, 233:11.
collected 149:22.
collection 199:15.
college 60:12,
70:24.
color 155:3,
178:2.
colored 7:20,
180:22.
colors 7:21.
Columbia 202:2.
combination 172:1,
189:20, 216:14.
combine 198:16.
combined 47:14,
108:14.
comes 54:14, 64:1.
comfortable
133:19.
coming 101:10,
103:23, 105:8,
105:16, 107:24,
140:12, 140:18,
141:1, 172:2,
172:3.
command 128:20,
138:14, 138:15.
commands 69:2.
comment 35:1,
229:14.
comments 69:11,
69:19.
commerce 6:13,
10:10, 49:19,
198:14, 199:12,
200:3, 200:11,
200:22, 201:25,
202:6, 202:7,
202:9, 202:10,
202:13, 202:15,
202:18, 202:21.
commissary 103:13.
commission 202:23,
203:23, 204:20,
206:19, 206:22,
207:3, 207:7,
213:19, 215:2.
commit 5:10, 49:23,
117:5, 128:7,
144:3, 146:5,

147:4, 190:2,
200:6, 204:11,
204:16, 204:21,
204:25, 206:24,
207:9, 208:10,
208:11, 216:8.
commits 143:13.
committing 87:8,
95:16, 139:5.
communicate
214:17.
communicated
215:16.
communication
213:17, 214:1,
214:13, 214:18.
communications 92:3,
92:20.
community 42:14,
54:21, 164:14.
company 130:6,
232:2.
compare 174:12.
compares 20:12.
comparison 136:25.
compensation
207:25.
competent 79:25.
competing 234:2.
complete 127:19,
162:21, 164:11.
completed 32:25,
97:13, 114:20.
completely 174:25,
180:7, 231:20,
232:20.
completes 67:21.
complex 226:17,
230:25.
complicated 4:3.
comply 163:9.
comrades 11:17,
26:22, 135:23.
conceded 118:16,
134:22.
concept 209:7.
concepts 44:6, 80:3,
80:24.
concern 150:7,
164:13, 183:23,

231:12.
concerned 117:7,
163:19, 170:13.
concerning 211:14.
concerns 179:3,
225:4.
conclude 172:4,
172:22, 204:23,
216:3.
concluded 63:16.
concluded. 234:8.
conclusion 173:6.
conclusions 45:20,
176:10.
conclusively
188:16.
concrete 213:10.
conditions 213:20.
conducted 52:6.
confederate
198:16.
confederates
195:25.
conference 66:2,
167:14, 231:6.
conferences 167:9.
confess 73:3,
73:8.
confessed 128:16,
147:16.
confessions 22:5.
confident 52:15,
79:3, 79:9.
confinement
213:24.
confirm 76:23,
134:22, 135:17,
135:18, 152:7,
227:24.
confirmed 120:20,
121:8, 121:9,
121:11.
conflicts 164:3,
178:22.
confronted 8:9,
180:24.
Congress 199:20.
connect 137:25.
connected 20:6,
33:23, 106:9,

143:10.
connecting 106:9.
connection 109:11,
111:15, 142:23,
144:2, 145:11,
148:15, 192:24,
210:13, 228:3.
connects 29:9.
conscious 187:17,
206:2.
consciously
174:24.
consequence
215:11.
consequences
188:3.
conservatively
152:25.
consideration 55:19,
164:17, 164:20,
167:24, 169:5,
175:2, 175:19.
considerations
177:13, 184:23,
185:24, 211:12.
considered 13:21,
86:9, 137:16,
166:2, 166:7,
166:8, 175:25,
182:20, 196:20,
197:5, 205:13,
208:16, 210:13.
considering 28:1,
173:11, 180:2.
consisted 35:10,
156:20, 198:22.
consistent 117:22,
117:23, 120:6,
120:22, 124:19,
126:10, 126:22,
127:13, 130:3,
137:19, 138:16,
143:18, 145:24,
160:11, 174:13,
183:1.
consistently
75:25.
consists 43:6,
166:3.
conspiracies 83:17,

195:2.
conspirator 192:12,
193:9, 194:25.
conspiratorial
194:15, 200:15.
conspirators 190:19,
193:13, 196:7.
conspire 38:10,
38:13, 38:14,
49:16, 198:16,
199:7.
conspired 38:17,
38:22, 199:22.
constitute 203:16,
203:18, 213:9.
constituted
203:10.
constitutes
201:14.
constitution 3:3.
constructive 209:23,
212:23.
consult 40:10,
81:20, 114:3,
162:3, 217:8.
consumption 212:6.
contact 16:13, 17:2,
40:7, 57:23,
81:16, 113:24,
161:25, 217:4,
231:15.
contacted 16:25.
contacts 16:6, 16:8,
16:12, 16:24,
17:4, 37:24.
contained 167:2,
168:3.
containing 155:11,
181:14.
contends 91:24.
context 103:18,
146:24, 150:23,
151:2, 151:6,
151:11, 152:4,
155:1, 159:21,
191:8.
continue 30:12,
67:18, 169:10,
216:21, 234:6.
continued 138:25,

147:13, 186:14,
201:20, 203:13,
203:19, 204:1.
continuing 50:11,
62:8, 63:2,
158:19, 194:16,
197:25, 201:5,
201:17.
contraband 146:11.
contradict 46:2,
174:14.
Contradicted 101:9,
144:25, 145:2,
145:6, 145:9,
169:18.
contradicting
129:14.
contrary 92:23.
contrast 2:23.
Control 21:17,
22:20, 23:8, 42:4,
50:17, 52:11,
53:4, 65:14, 67:5,
71:23, 75:3,
120:1, 126:13,
126:16, 149:9,
158:19, 185:23,
207:14, 207:18,
209:10, 209:17,
209:22, 210:2,
210:11, 211:9.
controlled 5:14,
52:23, 53:1,
53:13, 143:25,
194:13, 198:24,
198:25, 199:1,
203:3, 203:4,
205:6, 205:7,
208:24, 209:1,
209:2, 209:3,
209:6, 212:17,
212:20, 212:21,
228:6, 228:15.
controlling 156:7,
181:24.
controls 67:14.
convened 231:7.
conversation 31:25,
56:7, 75:14, 76:5,
99:14, 103:11,

121:4, 121:6,
121:16, 135:10,
135:12, 135:14,
135:21, 136:4,
136:16, 136:20,
142:20, 154:8.
conversations 31:23,
36:14, 60:22,
120:20, 120:24,
133:7, 136:3,
136:9, 181:7.
converted 158:8.
convict 150:13,
173:19, 180:15,
211:17.
convicted 5:2, 8:17,
26:13, 32:20,
68:23.
convicting 172:14.
conviction 25:16,
136:8, 177:7,
194:13.
convictions 27:12,
91:14.
convince 211:17.
convinced 45:14,
169:4, 169:11.
Cool 9:20, 9:22,
92:8.
cooperate 32:17,
32:19, 54:3,
190:25.
cooperated 121:25.
cooperating 25:11,
27:10, 27:14,
33:13, 33:18,
53:20, 57:22,
215:24.
cooperators 117:15,
129:19.
copies 227:13.
cops 9:21.
copy 11:3, 163:3,
186:1, 227:9,
227:15.
core 138:21, 139:6,
156:6, 201:23.
corner 9:1, 55:12.
corners 149:9.
Cornish 20:11,

20:17, 20:18,
20:19, 20:20,
22:9, 60:13, 85:1,
121:10, 161:5.
Corporal 95:11,
131:16, 146:3,
146:4, 146:6.
corporation 201:7.
Correct 116:9,
123:12, 125:2,
139:14, 144:20,
146:3, 146:23,
220:3, 221:13,
222:12, 222:24,
223:2, 223:7,
223:9, 224:10,
226:25, 234:11.
corrected 223:15,
223:20, 226:8.
correction 219:19.
correctional
146:11.
Corrections 72:25,
146:18.
correctly 141:2,
168:2.
corridor 148:20.
corroborated 37:7,
118:11, 120:6,
121:3, 122:15,
122:16, 123:5,
123:9, 124:11,
129:24, 140:3,
160:11.
corroborates 73:16,
119:1.
corroboration
122:19.
Corrupt 49:17,
197:14, 199:23.
cost 3:11.
costs 3:10, 3:12.
counsel 2:10, 58:23,
116:4, 116:5,
117:12, 119:2,
139:11, 166:1,
176:23, 178:17,
227:5, 231:5.
counterfeit 18:5,
18:7, 18:10.

counting 153:10,
153:16.
Country 2:19, 27:20,
27:23, 30:19,
30:20, 30:21,
71:15, 122:4,
122:6, 122:12,
123:2, 123:4,
123:14, 123:16,
123:22, 123:25,
124:1, 124:17,
130:23, 131:3,
140:15, 228:23.
countryside 42:12.
Counts 5:6, 5:8,
6:5, 6:7, 36:4,
36:5, 37:15, 49:7,
49:9, 49:10, 84:3,
142:6, 153:8,
153:16, 189:11,
189:14, 190:5,
195:2, 195:8,
195:12, 197:12.
County 95:6, 95:11,
95:20, 102:7,
131:16, 143:7,
145:13, 145:23,
146:2, 147:14.
couple 42:2, 44:11,
58:23, 60:18,
65:2, 66:6, 66:10,
75:16, 75:22,
76:9, 76:25,
115:6, 118:9,
119:16, 124:25,
134:24, 219:1,
222:24.
coupled 194:18.
courage 23:15,
23:18.
course 13:19, 14:15,
25:8, 37:19,
41:17, 137:10,
151:15, 182:6,
191:2, 197:10,
201:1.
court. 67:8.
courtesy 42:8.
courthouse 171:16,
217:14, 217:21,

232:12.
Courtney 60:25,
78:8.
courtroom 40:18,
41:17, 46:12,
49:3, 59:4, 75:6,
78:13, 79:12,
88:7, 166:17,
166:20, 171:18,
171:21, 171:24,
182:24, 199:18,
218:5, 218:6,
226:18, 228:16.
courtroom. 2:6,
40:12, 41:13,
81:22, 82:15,
114:8, 114:12,
114:18, 162:5,
162:15, 218:2.
courts 93:22,
177:5.
cousin 60:24.
cover 14:19, 15:1,
48:8, 72:22.
covered 13:1,
160:8.
cow 21:17.
cowboys 9:21.
CP 73:20, 219:16,
220:1.
crack 118:7, 118:10,
118:12, 137:20,
137:24, 149:10,
152:12, 152:15,
152:19, 152:22,
153:1, 153:9,
156:19, 157:16.
cracked 107:13.
Cracker 78:23.
Craig 6:20, 8:2.
create 15:3.
created 51:3,
56:19.
credence 178:14.
credibility 85:19,
104:12, 115:8,
117:13, 132:3,
159:3, 164:2,
170:2, 173:21,
176:1, 176:6,

177:14.
credible 28:2,
    74:23, 79:25,
    113:10, 133:20,
    137:7, 160:11,
    169:19.
credit 130:1.
CRIMINAL 1:9, 20:22,
    22:6, 30:16,
    30:18, 35:14,
    39:13, 39:15,
    52:5, 52:7, 54:6,
    55:9, 80:8, 85:5,
    86:2, 86:3,
    164:13, 168:18,
    176:9, 176:12,
    177:2, 177:3,
    180:8, 181:1,
    182:4, 189:19,
    193:22, 203:13,
    204:3, 204:16.
criminals 53:20,
    53:21, 53:22.
Crips 98:25.
criteria 170:1.
critical 39:8,
    231:13.
cross 12:13, 58:18,
    126:20.
cross-examination
    56:16, 75:12,
    85:23, 89:6,
    94:17, 94:22,
    95:16, 105:8,
    119:16, 123:18,
    141:8, 159:1,
    166:21, 174:13.
cross-examine
    51:8.
cross-examined
    28:16, 59:9.
cross-examining
    141:17.
crossed 15:17,
    15:24, 86:8,
    102:17.
crosses 98:1.
crossing 233:13.
crucial 165:9.
CSI 149:23.

CSO 82:6.
cunning 32:15,
    35:14.
curious 233:2.
currently 25:15.
cursory 78:22.
custody 66:18,
    159:13, 209:10,
    209:15, 209:18,
    209:21, 218:4.
customer 233:12.
customers 148:19,
    149:5.
Cut 69:2, 106:23,
    146:17, 215:4.
Cypress 60:16,
    60:21, 60:23,
    78:8, 125:12.
.
.
< D >.
dad 132:20, 132:24,
    145:4.
daily 137:21,
    156:18.
damaged 132:3.
Damn 92:15.
dangerous 208:3,
    208:4, 208:6.
dash 17:2.
data 108:5, 108:17,
    122:17.
date 76:9, 92:1,
    93:9, 96:20,
    147:3, 186:6,
    186:9, 186:10,
    186:11, 186:14,
    186:16, 186:18,
    198:1.
dates 186:5,
    186:9.
Dave 130:15, 138:1,
    138:24, 198:5,
    198:6.
David 31:14, 32:4,
    32:9, 48:23, 61:8,
    61:9, 128:15,
    128:24, 128:25,
    129:8, 130:19,
    198:5.

Davis 27:8, 29:22,
    31:7, 54:9, 55:7,
    63:6, 85:12,
    127:3, 134:6.
days 52:14, 52:21,
    75:7, 76:4, 76:25,
    96:10, 106:21,
    109:14, 112:5,
    124:25, 222:24,
    232:6.
DEA 25:23.
dead 64:17, 64:18,
    99:16, 99:17,
    125:7.
deadly 23:22, 35:14,
    206:15.
deal 32:18, 33:3,
    45:8, 54:18,
    97:18, 110:21,
    154:10, 154:11,
    155:25, 157:24,
    176:22, 207:25,
    234:5.
dealer 4:22, 39:11,
    39:12, 100:20,
    100:21, 100:23.
dealers 148:18.
dealing 39:16,
    91:12, 111:4,
    116:5, 116:14,
    116:17, 117:2,
    143:9, 148:7,
    148:10, 148:15,
    148:21, 149:3,
    152:9, 153:5,
    155:1, 156:5.
dealt 45:23, 137:20,
    233:5.
Deandre 101:12,
    101:13, 144:11,
    159:15.
death 13:18, 13:20,
    13:21, 47:10,
    65:18, 110:22,
    123:4, 126:2,
    161:11, 205:21,
    206:11, 206:14,
    206:17, 208:7.
debt 199:15.
December 8:15.

decide 13:17, 23:18,
  25:13, 35:15,
  38:2, 44:11,
  116:3, 133:14,
  163:8, 163:24,
  164:5, 165:13,
  168:1, 169:19,
  169:22, 170:7,
  173:3, 173:22,
  174:5, 176:2,
  177:11, 178:11,
  178:20, 180:1,
  183:13, 184:11,
  188:4, 188:8,
  228:7.
decided 34:20, 65:2,
  132:23, 167:11,
  167:17, 182:8.
decides 67:20,
  69:14, 73:2,
  77:7.
deciding 163:8,
  171:5, 174:1,
  178:14, 178:23,
  184:23, 191:21,
  196:24.
decision 45:1,
  45:21, 104:13,
  164:23, 172:22,
  175:21, 176:13,
  184:19, 185:23,
  206:5, 210:14,
  211:14, 212:14.
decision-making
  165:6.
decisions 3:23.
declaration
  196:10.
declarations
  196:14.
deduction 173:6.
deemed 192:4,
  196:12.
defender 95:21.
Defense 56:16,
  59:17, 81:8,
  116:4, 136:16,
  139:11, 146:24,
  147:12, 149:4,
  154:14, 173:2,

219:17, 220:10,
  220:15, 220:16,
  220:18, 220:22,
  220:23, 221:8,
  221:24.
defiant 58:7.
defies 65:14.
define 200:7,
  200:23.
defined 138:19,
  138:23, 198:20,
  212:23.
definition 158:6.
definitions
  109:15.
deflect 56:13.
degree 37:17, 68:3,
  95:6, 115:17,
  118:22, 124:16,
  125:16, 205:18,
  206:9, 206:12,
  206:18, 206:20,
  206:23, 206:24,
  207:2, 207:4,
  207:8, 207:10.
delay 213:17,
  217:12.
deleted 19:23,
  19:25, 20:6.
Deliberate 3:21,
  3:24, 39:19,
  39:21, 44:25,
  45:1, 83:8, 83:9,
  131:4, 148:9,
  163:18, 205:22,
  206:1, 231:25.
deliberate. 3:22.
deliberately 3:23,
  18:15, 32:13,
  187:15.
deliberating 57:3,
  80:23.
deliberation 205:19,
  206:13, 207:1,
  207:5, 232:6.
Deliberations 39:1,
  44:22, 44:23,
  44:25, 163:4,
  168:23, 169:10,
  171:1, 177:17,

186:2.
Deliver 39:25,
  41:19, 211:23,
  212:22, 212:23,
  212:25.
delivered 162:23,
  162:24.
delivering 213:9.
demeanor 174:7.
demonstrates
  139:3.
denies 166:24.
deny 72:15, 72:18,
  134:1.
depart 40:23,
  218:15.
Department 149:17.
departure 217:19,
  218:6.
depending 151:12.
depicted 128:18,
  130:10.
deposit 209:20.
Deprive 207:15,
  207:20, 207:21.
deputy 226:18.
Dequan 97:3.
describe 199:21.
described 30:15,
  203:16, 216:3,
  232:10.
description 77:1,
  77:2, 221:23,
  223:23.
desensitize
  231:20.
deserve 182:16.
deserves 104:15,
  175:24, 176:7,
  178:12, 180:4,
  181:5, 185:1.
deserving 175:19.
design 191:13.
designed 158:7,
  231:20.
desperate 32:16.
despite 133:25.
destroyed 149:14.
detail 23:17, 28:8,
  28:12, 31:3, 31:8,

120:8, 175:13,
179:4, 190:21,
209:9.
detailed 77:1.
details 77:3,
129:22, 142:21,
193:4.
detect 183:18.
detection 214:7.
Detectives 65:7,
78:16, 124:21.
Detention 89:16,
97:1, 109:17,
111:16, 121:5.
determination
117:19, 178:25,
185:5, 199:19,
211:13, 212:3.
determine 3:5,
18:24, 39:1,
116:11, 116:13,
116:18, 117:17,
118:22, 124:14,
147:24, 148:9,
164:2, 179:8,
180:22, 184:8,
196:25, 201:20.
determined 164:5,
184:10.
determining 154:2,
179:11, 191:10,
192:9, 211:25.
developed 69:23.
devised 188:9.
dice 102:7,
131:16.
dictionaries
217:9.
dictionary 40:11,
81:20, 114:4,
162:3.
died 23:24, 42:22,
47:15.
differ 209:7.
difference 113:1.
different 7:20,
7:21, 10:2, 14:10,
30:5, 48:20, 54:4,
55:6, 62:5, 99:13,
100:3, 109:14,

119:25, 127:6,
127:20, 128:11,
130:20, 130:24,
133:7, 135:3,
140:3, 159:19,
163:6, 163:13,
172:24, 175:6,
178:5, 193:12.
differently 34:21,
175:9, 181:23.
difficult 183:18.
dig 154:10.
Direct 27:24, 28:14,
85:22, 111:15,
146:5, 171:7,
171:8, 171:12,
172:1, 172:12,
172:13, 172:25,
173:8, 173:16,
174:11, 188:11,
191:4.
directed 34:4,
35:19.
directly 57:19,
180:10, 187:19,
198:18, 199:13.
dirt 102:12, 102:13,
102:14.
dirty 141:11.
disappeared 19:20.
disassembled
157:22.
discharged 232:20.
disciplined 104:1,
109:21.
disconnected 203:16,
203:17.
discovered 150:9.
discovering
120:10.
discredit 140:8,
175:7.
discrepancies
175:5.
discrepancy 175:11,
175:13.
discuss 40:4, 40:5,
81:13, 83:8,
83:10, 103:24,
103:25, 109:19,

113:20, 161:20,
165:3, 170:1,
185:7, 216:24,
216:25.
discussed 80:13,
142:21, 182:20,
193:24.
discusses 83:15.
discussing 99:20.
discussion 154:20,
216:18.
discussions 61:25.
disfigurement
215:5.
disobey 187:8,
191:3.
display 109:25.
displayed 228:17,
230:22.
dispose 148:16,
207:25.
disposed 149:25.
dispute 67:10.
disputed 171:14,
172:22.
disregard 164:8,
166:10, 187:8,
191:3.
disregarded
166:18.
disrespected 104:3,
109:23.
distance 137:11.
distant 188:10.
distinct 189:23,
193:12.
distinction
172:13.
distinguishing
203:24.
distract 115:10,
149:19, 149:20.
distraction 55:1.
distributed 8:18,
8:20, 149:6,
152:22, 154:4,
157:4, 157:5,
212:19, 212:20,
213:5.
distributing 17:16,

62:12.
Distribution 17:14,
    62:9, 154:14,
    198:24, 203:4,
    205:7, 211:24,
    212:2, 212:17,
    213:6, 213:10.
District 1:1, 1:2,
    198:2, 202:2.
disturbing 3:16.
ditch 132:24.
divert 183:5.
DNA 106:4, 106:10,
    106:15, 106:17,
    106:18, 107:8,
    107:9, 107:10,
    109:11, 112:6,
    112:8, 149:13.
doctors 43:16.
document 59:14,
    59:17, 155:18,
    226:20.
documentaries 22:3,
    22:4.
documentation
    108:1.
documents 3:15,
    167:19, 167:21,
    181:14, 181:16.
Dog 105:22, 105:23,
    129:18, 132:15,
    137:12, 222:1.
doing 21:23, 28:23,
    51:11, 61:9, 72:2,
    74:16, 76:23,
    97:25, 119:17,
    133:4, 146:16,
    146:17, 228:11.
dominant 48:7.
dominion 158:19.
Don 132:15, 137:12,
    138:2.
Donatello 24:25,
    61:22, 65:21,
    67:20, 119:5.
done 8:14, 15:2,
    15:14, 44:6,
    46:23, 48:10,
    48:11, 81:4,
    115:21, 121:10,

123:17, 142:22,
    150:1, 150:8,
    153:9, 164:6,
    187:23, 188:3,
    188:15, 196:11,
    196:17, 196:21,
    197:2, 197:4,
    230:16, 231:21.
door 104:25, 218:5,
    218:6.
dorm 60:11, 71:6,
    71:12.
Dorsey 101:12,
    101:13, 101:14,
    101:16, 101:21,
    101:23, 104:17,
    132:19, 132:24,
    133:4, 144:11,
    155:2, 159:15,
    159:24.
doses 212:5.
double 107:15.
down 2:23, 7:14,
    9:7, 43:10, 45:12,
    50:24, 52:2, 54:1,
    69:3, 71:1, 72:11,
    77:16, 81:1,
    109:7, 126:13,
    126:19, 129:1,
    138:14, 140:11,
    148:8, 155:15,
    161:10, 228:24.
dozen 156:21.
dozens 3:14,
    149:24.
dragon 12:13.
dramatic 58:13,
    159:2.
draw 65:5, 65:9,
    164:4, 164:5,
    170:22, 173:1,
    173:2, 173:4,
    173:7, 173:12,
    176:10, 186:4,
    188:1, 193:16.
drawing 45:20,
    169:21, 173:4,
    173:9.
drawn 66:14, 104:24,
    155:17, 172:25,

173:17, 188:22,
    192:22.
dreams 4:19.
dress 59:2.
dressed 59:4.
drinking 72:13.
dripping 171:21,
    171:23.
Drive 102:21,
    104:20, 106:21,
    132:12, 137:2,
    155:9, 155:21,
    157:18.
driver 124:8.
driveway 105:21.
driving 106:11.
drug-related 127:23,
    155:3, 155:15.
ducking 144:2.
due 187:9, 210:20.
dues 10:9, 50:23,
    50:24, 91:17,
    97:22, 103:25,
    109:20.
Dupree 95:3,
    130:8.
duration 193:10.
Dutch 55:4,
    145:19.
duties 55:12.
Duty 130:17, 163:6,
    163:8, 163:22,
    163:24, 164:9,
    164:11, 167:5,
    167:8, 168:18,
    179:7, 221:22,
    221:23, 221:25,
    222:7.
.
.
< E >.
e-mail 108:9,
    108:22.
e-mails 108:19.
e-pill 90:21,
    139:17.
earlier 43:25,
    47:18, 48:21,
    64:15, 178:17,
    178:22.

early 6:21, 43:13,
   51:24, 62:9,
   62:20, 63:2,
   127:1, 227:2,
   227:10.
earnest 55:22.
easier 27:5.
East 62:21, 63:9,
   63:20, 65:4,
   65:11, 65:18,
   68:21, 71:16,
   130:23.
easy 44:18.
echoing 2:16.
economies 156:7.
economy 160:24.
ecstasy 118:11,
   137:21.
ECU 75:3, 78:12,
   78:13, 79:13.
Edward 220:19.
effect 6:13, 10:10,
   10:11, 46:6,
   140:11, 159:25,
   175:11, 179:24,
   202:14, 215:11.
effort 7:17,
   25:11.
eight 85:6, 86:10.
eight-year 23:21.
either 22:4, 44:12,
   67:15, 74:23,
   83:18, 91:12,
   97:14, 99:18,
   105:4, 125:2,
   126:19, 134:9,
   149:14, 156:23,
   173:8, 190:24,
   201:3, 204:21,
   206:10, 206:15.
elect 114:22.
electronically
   226:19.
element 189:1,
   190:12, 190:16,
   191:15, 200:8,
   202:11, 202:16,
   204:4, 204:9,
   204:13, 209:5,
   210:5, 210:16,

   210:18, 211:6,
   211:8, 214:3,
   214:14, 216:1.
elements 190:7,
   199:25, 205:17,
   205:20, 206:13,
   206:20, 207:5,
   207:15, 207:16,
   208:3, 208:5,
   208:9, 208:19,
   208:21, 208:23,
   212:17, 213:12,
   214:20, 214:22,
   216:4.
elevators 217:20,
   218:12.
Elkton 95:12.
Elliott 120:12.
elsewhere 49:4,
   198:2.
emblematic 14:1.
emojis 20:12.
emotion 45:22.
emotions 57:12.
emphasize 125:20,
   154:1, 229:22.
emphasized 119:3,
   130:25, 146:22,
   147:10.
employed 175:16,
   198:11, 199:10.
employee 214:5,
   215:21.
encyclopedia 40:11,
   81:20, 114:3,
   162:3.
encyclopedias
   217:9.
end 13:11, 13:12,
   25:5, 47:8, 58:9,
   72:11, 80:25,
   86:23, 136:1,
   154:21, 161:12,
   162:11, 232:9.
ends 194:11.
engage 152:8,
   204:15.
engaged 143:20,
   147:6, 147:16,
   194:22, 198:12,

   199:11, 202:6,
   206:15, 214:23.
engaging 147:19,
   201:1.
English 152:3.
enjoy 2:20.
enough 15:15, 52:20,
   67:3, 78:25, 79:3,
   95:9, 150:13,
   177:6, 206:4,
   206:6, 211:4,
   227:12.
enter 38:11, 54:3,
   176:21, 196:5,
   226:20.
entered 2:6, 41:13,
   52:24, 82:15,
   85:4, 93:12,
   93:14, 114:12,
   114:18, 162:15,
   176:20, 178:4,
   190:8, 190:14,
   190:18, 200:16,
   208:12, 231:13.
entertaining
   102:24.
entertains 22:1.
entire 84:24, 86:15,
   87:11, 105:14,
   111:2, 111:3,
   201:21.
entirely 124:18,
   126:10, 145:24,
   166:18, 188:4.
entitled 164:19,
   165:1, 167:23,
   168:4, 180:13,
   181:11.
entitles 164:17.
entity 201:6.
entry 124:13.
envelope 78:21,
   78:25, 137:1.
envelopes 78:16.
envision 227:3.
episodes 128:3.
equal 193:14.
Equally 164:14,
   165:4.
equals 164:21.

equipment 229:15.
error 175:14.
errors 225:3.
Escapes 131:6.
escort 232:21.
Especially 25:4,
    83:6, 146:24,
    156:17, 194:18.
Esquire 1:31, 1:33,
    1:37, 1:41.
essential 2:23,
    190:7, 192:7.
essentially
    201:21.
establish 80:14,
    83:17, 186:6,
    188:11, 189:3,
    189:4, 190:6,
    190:13, 191:16,
    193:25, 195:3,
    199:24, 200:9,
    204:1, 210:18.
established 172:8,
    172:20, 173:8,
    186:11, 188:19,
    191:3, 192:19.
establishes 144:16,
    177:7, 186:8.
et 1:10, 13:2.
ethnic 165:1.
Europe 42:11.
Eusi 12:2, 96:4,
    134:16, 134:17.
evaluate 54:2,
    152:1, 182:9.
evaluating 54:4,
    170:2.
Evans 128:5, 132:19,
    145:4.
evasive 174:10.
evening 162:23,
    216:19, 231:9.
event 48:17, 141:25,
    229:19.
events 7:19, 56:6,
    59:7, 120:19,
    179:15, 179:17,
    179:22, 179:25,
    188:14, 188:21,
    203:24.

everybody 4:17,
    14:4, 19:17,
    20:15, 21:4,
    24:13, 25:22,
    30:13, 32:23,
    43:13, 78:7,
    93:10, 110:16,
    135:16.
everyday 156:5,
    209:19.
Everyone 110:15,
    201:22, 230:17,
    232:14.
Everything 18:20,
    90:19, 126:1,
    133:13, 147:21,
    157:25, 159:24,
    231:5.
everywhere 75:18.
evoke 57:11.
ex-girlfriend
    119:21.
exact 186:6,
    211:3.
Exactly 7:11, 19:2,
    21:12, 22:4, 23:9,
    37:3, 37:4, 116:2,
    133:3, 134:23,
    141:16, 141:24,
    163:12, 223:1.
exaggerate 110:15.
examination 146:5,
    174:11.
Examine 79:15,
    79:16, 178:9,
    182:8.
examined 63:13,
    70:10, 70:18,
    179:19, 180:20.
examiner 79:2,
    118:21, 124:15.
examining 80:4,
    169:22.
example 18:22,
    21:13, 55:10,
    102:11, 126:8,
    143:5, 171:15,
    209:11, 209:18,
    212:4, 213:2,
    216:13.

examples 131:25,
    132:1, 161:6.
excellent 3:18.
Except 39:16, 52:13,
    52:21, 63:20,
    68:10, 116:9,
    159:25.
excerpt 23:7,
    135:20, 158:19.
exchange 99:19,
    180:6.
exclusive 164:1.
exclusively 179:7.
exculpated 183:3.
excuse 84:23, 95:2,
    104:16, 107:22,
    123:7.
excused 40:17, 41:5,
    41:10, 41:16,
    114:14, 162:12,
    176:14, 232:8,
    232:18.
executed 53:9,
    111:23.
execution 184:6.
exemplars 96:14.
exercise 173:10,
    209:16, 210:2.
exercises 209:22.
exert 22:20.
Exhibits 162:10,
    166:4, 166:6,
    166:8, 166:9,
    167:16, 168:3,
    184:3, 186:12,
    218:17, 221:10,
    221:22, 223:5,
    223:13, 225:1,
    225:2, 225:12,
    225:13, 226:7,
    226:16, 226:19,
    227:14, 227:25,
    228:3, 230:6,
    230:10, 234:6.
exist 30:12, 88:11,
    121:14, 142:15.
existed 117:1,
    191:11, 191:13,
    191:20, 201:18,
    201:19.

existence 80:15,
  172:9, 172:20,
  191:2, 191:6,
  194:1, 197:1.
exists 88:8, 172:23,
  194:16, 204:2.
exit 124:13,
  217:19.
exonerated 183:3.
expectation
  231:23.
expel 158:8.
expensive 160:6.
experience 169:22,
  172:7, 172:19,
  173:14, 175:10,
  209:19.
experienced 32:17,
  184:17.
experiences
  233:22.
experiment 230:16.
Expert 96:13,
  107:11, 151:15,
  184:14, 184:16,
  184:20, 184:21,
  184:25, 185:3.
expertise 68:4,
  118:23, 124:17,
  125:17.
explain 189:16,
  189:17, 208:19,
  208:20, 209:8,
  230:18.
explained 4:16,
  13:22, 15:24,
  21:8, 21:12,
  45:19, 49:24,
  85:19, 95:6,
  98:16, 98:17,
  100:4, 102:4,
  102:22, 102:24,
  102:25, 103:17,
  113:1, 125:2,
  137:7, 160:9,
  160:10, 160:12,
  160:15, 160:17,
  200:13.
explainer. 132:9.
explaining 98:21,

  103:2, 160:4,
  163:5.
explanation 101:7,
  125:3, 145:6,
  145:10, 179:4,
  179:5, 231:16.
explanations 101:8,
  101:9, 115:7,
  130:3, 144:23,
  144:25, 188:17.
explicitly 200:17.
explosive 158:9.
exposed 40:6, 81:15,
  113:21, 161:22,
  217:1.
express 175:4,
  184:15, 190:18.
expressed 233:7.
expression 164:6,
  215:15.
extends 42:10.
extensively
  134:11.
extent 153:5, 193:8,
  193:10.
external 217:8.
extortion 25:18,
  216:13.
extracted 16:4.
extrapolate 66:13.
extremely 183:18.
eye 57:22, 150:10.
eyes 115:14.
eyewitnesses 56:5,
  71:17, 75:23.
.
.
< F >.
f'ing 105:2, 105:13,
  105:15.
F. 1:31.
face 21:25, 51:20,
  70:12, 86:20,
  86:23, 88:12,
  161:8.
Facebook 9:3, 18:23,
  19:21, 30:14,
  30:15, 45:24,
  46:4, 46:13,
  46:16, 46:18,

  46:23, 46:25,
  61:4, 77:14,
  77:17, 77:21,
  77:25, 78:2,
  91:24, 91:25,
  92:19, 92:20,
  93:10, 151:13,
  223:25.
faces 51:19.
facilities 146:11.
Facility 72:25,
  109:17, 121:6,
  215:6.
facing 32:16.
factor 192:8.
factors 175:25,
  210:13.
factual 66:11,
  163:24, 164:8.
failed 108:20,
  108:21, 108:22.
fails 169:6.
failure 175:10.
fair 161:14.
fairness 164:11.
Faison 61:1, 62:11,
  62:22, 63:3,
  198:8.
fall 8:21, 72:14,
  218:21.
falls 185:20.
false 179:1, 183:3,
  183:4.
falsehood 175:14.
falsely 28:5,
  177:22, 178:9.
falsify 181:1.
familiar 21:5.
families 115:16.
famous 4:20, 13:23,
  17:24.
far 94:19, 232:22.
fashioned 48:25,
  115:18, 115:19,
  130:3, 133:21.
fast 230:9.
Father 26:15, 26:16,
  26:17, 42:19,
  98:7.
fathoming 187:20.

Fats 137:25.
favor 169:15.
favorable 170:22,
  177:21, 178:8.
FBI 149:17.
FCRR 1:46, 234:10.
fear 55:9, 56:20,
  57:9, 161:2,
  165:16.
February 155:10,
  157:18.
Federal 1:47, 86:14,
  135:3, 158:7,
  158:14, 175:17,
  177:5, 189:13,
  189:22, 189:24,
  203:5, 205:7,
  208:14, 208:21,
  213:20, 213:22,
  214:4, 214:5,
  214:7, 214:8,
  214:11, 214:19,
  215:3, 215:21,
  215:25.
feds 64:1.
feedback 233:6,
  233:8, 233:22.
feel 13:2, 22:13,
  171:12, 182:16.
feeling 220:7.
feelings 164:24,
  165:5.
feet 227:6.
fellow 26:22, 147:3,
  216:25.
Felon 5:15, 68:24,
  68:25, 83:2,
  112:3, 113:17,
  158:4.
felony 55:18.
Fenner 24:25, 61:23,
  64:9, 64:10,
  64:14, 64:16,
  64:17, 65:21,
  67:20, 67:23,
  67:25, 68:5,
  68:11, 68:12,
  68:13, 68:15,
  68:16, 79:11,
  79:12, 119:5.

Ferdinand 118:12,
  148:22.
Few 41:16, 45:2,
  46:9, 52:14,
  52:21, 56:1,
  56:25, 60:10,
  61:6, 66:20,
  71:14, 75:7,
  79:24, 135:1,
  156:21, 177:16,
  217:25.
fewer 169:25.
fiction 122:1.
field 117:10,
  118:23, 124:17,
  125:16, 184:18.
fight 98:21.
figure 39:2, 133:2,
  160:6.
figured 158:1.
fill 127:16.
film 22:4, 22:24.
final 164:11,
  226:18.
Finally 5:14, 8:10,
  8:22, 38:6, 70:9,
  80:19, 82:23,
  88:16, 108:23,
  112:18, 156:25,
  158:24, 202:14,
  204:9, 220:23.
finances 42:19,
  55:15, 58:14,
  72:23.
financial 55:19,
  192:6.
Finch 95:11, 131:16,
  146:3, 146:4,
  146:6.
finding 84:2, 164:9,
  194:17, 195:8.
finds 177:1,
  177:7.
Fine 41:11, 162:13,
  219:9, 227:11,
  228:5, 228:24,
  229:20.
finger 23:4, 64:19,
  68:17.
fingerprint 107:19,

112:8, 131:6.
fingerprints 72:10,
  72:12, 74:6, 74:8,
  74:11, 74:12,
  106:4, 106:10,
  106:15, 106:16,
  106:18, 107:8,
  107:20, 109:11,
  112:6, 130:24,
  131:1, 149:12.
finished 150:4,
  216:15, 216:18.
fire 107:13, 107:14,
  107:15, 107:16.
firearm 5:15, 5:18,
  28:22, 30:1,
  68:22, 68:24,
  69:5, 70:3, 71:10,
  75:1, 78:10,
  112:3, 112:5,
  158:6, 158:14,
  158:19, 159:18,
  159:23, 228:14.
firearms 68:14,
  75:2, 79:2, 79:10,
  107:4, 118:21,
  124:15, 149:14.
fired 68:5, 107:2,
  107:5, 158:13.
first. 69:15.
fishing 145:3.
fit 59:12.
fits 133:15.
Five 5:6, 10:15,
  10:18, 16:11,
  40:3, 40:13,
  46:20, 59:2, 76:4,
  81:2, 81:3, 81:21,
  81:23, 85:16,
  85:17, 86:16,
  88:16, 93:13,
  93:15, 106:21,
  112:5, 112:10,
  226:2.
fix 100:12.
flamboyant 39:12.
flawed 56:4.
flee 144:5.
fleeing 144:15.
flees 64:11.

flinching 126:4.
flip 111:9.
floating 99:13.
Floor 1:48, 218:11,
    231:11.
floorboards
    106:24.
flush 155:15.
Focus 42:6, 42:7,
    150:10, 150:11,
    204:13.
focused 56:23.
folks 16:15.
follow 44:10, 49:11,
    74:17, 76:22,
    80:23, 126:20,
    163:11, 163:15,
    232:10, 232:16.
followed 57:12,
    95:14.
following 67:8,
    132:5, 190:7,
    199:25, 202:24,
    205:2, 232:24.
follows 199:6,
    199:10, 205:17,
    208:23, 208:25,
    212:19.
Foo 24:22, 29:19,
    34:8, 62:1, 64:18,
    65:20, 138:1,
    138:12.
fooled 47:16.
fools 57:8.
forbids 187:7.
force 207:14,
    207:19, 213:14,
    213:15, 213:23.
forearm 11:25.
foregoing 234:11.
foreign 198:13,
    199:12, 202:4.
forensic 150:9.
foreseeability
    157:1, 195:19.
foreseeable 53:12,
    79:19, 127:21,
    128:7, 128:9,
    128:13, 129:9,
    142:24, 143:1,

148:2, 148:10,
    153:6, 154:4,
    157:6, 157:13,
    196:9, 196:17.
forget 66:18.
forgot 136:10.
form 8:6, 153:3,
    153:16, 160:19,
    167:16, 181:6,
    201:21, 230:19,
    230:20, 230:22,
    231:3.
formal 6:11, 180:9,
    190:18, 197:19,
    201:4, 201:16.
formation 200:20.
formed 206:8.
formerly 116:25,
    133:24, 160:14,
    197:23, 201:12.
forms 127:17.
formula 116:23.
forth 17:10, 30:19,
    35:12, 155:11,
    217:20, 232:14,
    233:10, 233:12.
forthright 174:9.
forward 23:15,
    109:5, 220:11.
foundation 45:4.
founder 14:15.
founding 86:6.
Four 26:17, 27:3,
    51:8, 51:10,
    51:16, 51:24,
    52:17, 53:18,
    58:2, 59:2, 76:4,
    76:25, 80:3,
    87:21, 91:7,
    95:13, 102:20,
    109:14, 119:25,
    205:23.
fourth 45:11.
fraction 19:11.
frame 18:15, 32:14,
    107:12.
framework 9:10.
framing 18:13.
FRANCOMANO 1:41,
    81:24, 82:2, 82:3,

82:16, 82:18,
    82:20, 82:23,
    113:18, 136:2,
    136:10, 139:16,
    142:7, 144:21,
    144:22, 146:4,
    147:21, 148:3,
    154:10, 155:16,
    157:19, 157:24,
    158:11, 158:25,
    159:9, 224:11,
    224:21, 226:12,
    226:14.
frank 174:8.
free 67:6, 130:14,
    130:15, 217:20,
    217:24, 232:3.
freedom 2:21, 3:2,
    178:7.
freestyle 23:3.
French 123:7.
fresh 32:21.
friction 77:12.
friend 20:20, 27:1,
    35:5, 54:11,
    73:25, 93:21,
    103:7, 110:23,
    122:8.
friendly 193:22.
friends 33:21,
    43:11, 43:13,
    43:14, 43:17,
    43:18, 43:19,
    43:23, 44:3, 44:4,
    46:21, 50:3, 57:1,
    68:11, 74:2,
    76:14, 78:3,
    93:17, 98:12,
    113:5, 113:6,
    113:7, 115:17,
    122:11, 131:13,
    144:10, 144:14,
    217:1.
frightening 3:16.
front 14:13, 14:14,
    37:24, 51:25,
    71:15, 124:10,
    130:13, 228:17.
fronting 154:19.
fuck 154:22.

full 57:2, 57:3.
fully 180:7,
  193:3.
function 6:12,
  201:4, 215:6.
functioned 201:17.
funny 12:21,
  64:24.
furtherance 128:9,
  142:25, 143:15,
  144:18, 146:20,
  147:4, 147:21,
  148:7, 149:10,
  152:9, 160:13,
  196:11, 196:18,
  197:1, 197:5,
  213:7.
furthering 97:20,
  192:1, 194:23.
future 125:22.
.
.
< G >.
gain 125:25,
  177:25.
gallantry 47:16.
game 131:16.
gangs 98:25, 113:7,
  113:8.
gangster 4:23.
garages 232:13.
gas 76:15, 76:18,
  76:20.
Gaskins 76:16,
  76:23.
gather 181:10.
gathered 42:12.
gathering 57:1.
Gauze 104:9,
  109:6.
gave 31:12, 51:1,
  51:2, 51:17, 77:1,
  78:22, 111:6,
  118:2, 123:25,
  124:1, 129:10,
  129:22, 132:10,
  142:5, 144:22,
  146:13, 183:4,
  228:8, 228:10.
Gayedi 12:2, 96:4.

geeking 136:5.
gel 106:19.
general 172:12,
  177:13, 219:13,
  229:12.
generally 50:1,
  52:24, 150:16.
genie 82:13.
genre 21:5, 21:9,
  21:22.
gentleman 15:22,
  60:22, 63:7,
  63:20, 73:21.
geography 43:7.
George 11:3, 12:12,
  12:16, 13:1,
  14:14, 14:15,
  26:14, 27:6,
  37:24, 84:10,
  84:12, 130:12.
gestures 215:17.
gets 22:1, 33:19,
  63:23, 64:9,
  72:24, 108:9,
  150:25, 151:9,
  217:21.
getting 50:25,
  55:19, 58:3, 58:4,
  58:5, 58:6, 59:6,
  77:6, 97:15,
  100:11, 118:24,
  128:6, 137:4,
  146:15, 233:22.
girlfriend 36:20,
  92:12, 93:18,
  96:11, 103:1,
  120:14, 131:22,
  133:1, 159:14.
give 35:20, 44:21,
  56:1, 87:5, 87:6,
  104:14, 151:20,
  163:12, 163:23,
  167:23, 167:24,
  171:14, 174:24,
  175:23, 176:5,
  178:12, 178:15,
  180:3, 181:4,
  182:15, 184:24,
  224:17, 228:11.
Given 50:22, 80:5,

97:14, 101:8,
  122:13, 140:25,
  157:8, 173:23,
  177:13, 179:10,
  180:14, 181:17,
  215:2, 221:24.
gives 45:8, 99:10,
  141:22.
giving 45:3, 51:14,
  101:22, 159:15,
  178:8.
glass 119:14.
glasses 21:14.
GMB 93:3, 93:4.
goal 117:9, 142:13,
  161:1.
goals 137:18,
  137:20, 230:1.
golf 150:2.
goodness 46:19,
  54:20.
goods 202:1.
gorilla 12:12,
  13:25, 14:7, 14:8,
  15:3, 84:10,
  84:12, 130:7,
  134:20.
gorillas 13:2,
  134:19.
gory 228:6, 228:7,
  228:21.
gossip 98:13,
  103:21.
gotten 132:16.
Gotti 59:24,
  198:9.
govern 56:5, 75:12,
  185:8.
governments
  129:17.
GPS 107:23, 108:3,
  108:13, 108:14,
  108:19, 108:20,
  108:21, 109:13.
grabbed 48:6, 48:9,
  61:16.
graduated 6:20.
grams 152:22, 153:8,
  153:14, 153:17,
  157:15.

grand 27:21, 27:22,
   67:1, 90:3,
   123:15, 123:21,
   156:3, 198:15.
grant 42:8.
great 2:19, 176:22,
   177:11, 178:10.
greater 164:17,
   167:23, 175:20,
   179:20, 180:20.
green 30:25, 36:12,
   37:20, 56:22,
   104:4, 120:16,
   136:4, 136:5,
   140:24, 141:14,
   142:1.
green-lighted 6:25,
   8:7, 24:3, 29:8,
   30:22, 31:24,
   36:9, 36:18, 37:1,
   119:4, 119:7,
   119:8, 140:1,
   141:14.
green-lighting
   120:9.
greeting 86:9.
Gregg 48:24, 54:24,
   61:23, 73:12,
   73:14, 93:14,
   93:15, 93:21,
   97:9, 97:11,
   97:13, 97:25,
   110:22, 147:17,
   154:8, 154:10,
   154:12, 154:17,
   154:18, 154:21,
   154:24.
grew 9:17, 42:17,
   43:9, 43:22, 44:4,
   98:23.
ground 160:8,
   210:8.
group 6:10, 24:23,
   26:25, 46:20,
   50:2, 50:10,
   50:14, 50:15,
   90:6, 90:7, 90:8,
   90:10, 102:6,
   200:25, 201:2,
   201:5, 201:7,

   201:15, 214:2,
   214:3, 214:14.
grouped 5:7.
groups 84:8.
Guess 135:11, 161:8,
   172:21.
guessed 36:16.
guessing 33:2.
guesswork 173:5.
guide 107:12,
   107:14, 181:17.
guided 165:8.
guideline 45:7.
guidelines 47:5.
Guilford 77:9,
   77:16, 131:11,
   138:20.
guilt 45:16, 84:2,
   147:24, 153:25,
   165:11, 165:20,
   165:23, 168:15,
   169:4, 169:12,
   170:8, 170:21,
   172:15, 173:18,
   176:11, 176:14,
   177:8, 180:23,
   183:1, 185:17,
   189:3, 189:6,
   193:9, 195:8,
   195:16, 196:25,
   199:19.
gun. 105:2, 105:13,
   105:15, 124:2.
guns 21:6, 60:8,
   64:13, 64:14,
   64:17, 68:4,
   79:11, 89:2,
   102:4, 102:6,
   106:3, 106:4,
   106:6, 106:13,
   109:24, 110:6,
   157:18, 158:24,
   158:25, 159:7,
   159:10, 228:4.
gunshot 71:17,
   105:19, 109:12,
   124:13.
gutter 131:1.
guy 17:23, 22:24,
   23:24, 32:19,

   32:20, 32:23,
   33:12, 33:17,
   61:16, 74:20,
   88:22, 125:12,
   139:8, 145:8.
Guyedi 134:16,
   134:18.
guys 11:17, 21:20,
   29:11, 33:12,
   35:10, 51:12,
   57:7, 65:20,
   73:17.
Gwaltney 27:11,
   29:23, 31:11,
   50:10, 54:12,
   63:5, 85:6, 127:5,
   127:6, 127:8,
   127:13, 134:6,
   145:14, 145:20,
   146:13, 148:22,
   152:17.
.
.
< H >.
hack 124:8.
Hair 21:14, 77:3,
   77:6, 100:22,
   102:25, 119:22,
   125:2.
half 27:9, 152:22,
   218:21.
Hall 47:1, 61:3,
   61:5.
hallway 73:2.
hallways 232:1.
hammer 18:18.
hand 35:21, 165:21,
   179:19, 181:13,
   212:9, 212:25,
   213:2, 213:3,
   214:12.
handed 35:20, 70:14,
   161:10, 213:1,
   213:4.
handgun 63:24, 68:2,
   83:3.
handle 52:12.
handlers 30:2.
hands 105:20, 132:8,
   141:19.

handwriting 96:13,
96:14, 96:17.
Handy 11:19, 16:16,
33:4, 33:6, 61:5,
61:6, 74:8, 74:15,
74:19, 75:18,
76:2, 109:18,
110:9, 121:5,
121:7, 121:9,
122:10, 123:6,
123:7, 123:9,
131:19, 136:20,
139:24, 142:20,
145:7, 146:14,
152:16, 154:8,
198:9.
hang 100:9,
112:22.
Hanging 22:23,
35:10, 56:22,
113:2, 113:4.
happen 37:19, 99:12,
110:1, 110:3,
141:3, 194:5,
227:1.
happening 22:5,
58:19, 58:20,
59:8, 101:24,
147:3.
happens 42:5, 132:9,
217:21.
happy 227:4.
harassed 75:11,
95:20.
hard 20:11, 44:24,
52:20.
harm 22:16, 206:11,
206:17, 208:8,
215:16, 215:18.
harmed 75:14.
Harris 100:14,
100:17, 127:1,
128:5.
Harry 28:18, 47:12,
47:16, 48:1, 48:2,
48:6, 48:7, 48:13,
55:10, 72:19,
85:9, 85:10,
117:21, 120:8,
120:17, 120:22,

120:23, 122:2,
122:4, 122:14,
122:20, 125:23,
140:2, 140:7,
140:8, 140:20,
140:25, 141:9,
141:16.
Harvey 11:20, 75:18,
76:2, 76:4, 76:8,
76:9, 122:10,
123:6, 123:9,
152:16, 198:6.
hat 15:11, 15:23,
100:9.
hate 48:2.
Hayden 12:7, 16:22,
17:3, 17:8, 18:9,
18:22, 60:2,
70:18, 224:14,
224:16.
Head 14:24, 15:4,
15:10, 26:17,
27:3, 57:20, 58:9,
58:10, 88:8,
198:7.
hearing 167:10,
167:14.
hears 171:12.
heart 42:23.
hearts 54:20.
heat 140:17.
heavy 99:2.
held 63:3, 161:3,
161:9, 217:23.
help 25:12, 32:18,
36:21, 47:22,
116:18, 127:9,
127:10, 144:4,
147:24, 174:4.
helping 144:5,
178:20.
Henry 6:24, 8:4,
33:24, 35:6, 47:6,
57:12, 128:3,
128:16, 129:1,
129:5, 129:7,
129:8, 130:18,
130:20.
hereby 184:7,
234:10.

hero 25:13, 26:2.
heroes 23:16,
23:19.
heroin 62:10,
137:20, 137:25,
152:13, 153:12,
153:14, 153:18,
156:19, 157:15.
heroin-related
153:19.
herring 149:19.
herself 174:14,
175:4.
hesitancy 58:5.
hesitate 122:1,
151:3, 165:20,
165:24.
hid 102:23,
102:24.
hide 144:3.
hiding 58:9, 131:17,
174:10.
high 89:6.
higher 31:19,
153:12.
highest 86:6.
highlighted 93:4.
highly 212:4.
hinder 213:17,
214:1.
hip 21:9.
history 46:2, 75:21,
126:9.
hit 78:6, 145:17,
145:24, 234:2.
Hitchens 61:7, 74:9,
74:16, 74:18,
152:17.
hits 24:3, 25:18.
hitter 132:16.
Hodari 24:2, 24:14,
86:7.
HOFFMAN 1:27, 2:17,
5:24, 10:22, 17:4,
23:14, 24:18,
25:1, 29:5, 32:24,
45:19, 68:19,
115:21, 120:3,
122:18, 124:10,
133:10, 134:10,

137:2, 139:2,
157:2, 223:6,
223:11, 223:14,
223:19, 223:24,
224:7, 224:12,
224:13, 225:6.
Hold 58:11, 76:19,
82:6, 221:3,
223:17, 225:17.
Holding 21:14,
93:19.
hole 112:22,
157:21.
holidays 42:2.
holy 21:17.
Home 19:15, 22:8,
22:21, 42:20,
95:12, 103:23,
106:16, 109:14,
115:15, 131:17,
145:22, 151:19.
homeless 65:16.
homes 111:23.
Honda 125:14, 132:7,
159:7, 159:10,
159:12.
Honor 2:4, 2:12,
40:16, 40:17,
41:11, 41:21,
66:4, 82:3, 82:5,
82:9, 82:18,
115:1, 162:9,
221:6, 223:6,
225:10, 226:5,
226:14, 229:2,
229:17, 233:25.
Honorable 1:18.
Hood 27:19, 27:22,
48:24, 54:25,
55:1, 61:23, 71:3,
90:9.
hop 21:9.
hope 53:24,
125:22.
hoped 177:21.
hopefully 227:22,
230:12.
hopes 177:24.
Hopkins 222:23.
horrible 57:13,

61:17, 63:8.
Hospital 222:23.
hostility 174:23.
hour 42:7, 44:16,
162:25.
hours 35:12, 115:6,
171:20.
house. 8:1.
housed 66:19.
houses 53:10,
137:23.
huge 45:9.
human 187:21.
humorous 48:3.
hundreds 3:15.
hung 84:20.
hunt 129:18.
Hunter 31:14, 32:4,
32:9, 35:19,
35:21, 48:23,
56:24, 61:8,
61:10, 62:12,
63:3, 128:15,
128:16, 128:17,
128:19, 128:20,
128:24, 128:25,
129:4, 129:8,
130:19, 198:5.
husband 46:8.
.
.
.
< I >.
ID 136:25.
idea 85:15, 85:17,
89:18, 96:3,
109:17, 118:21.
identification
67:24, 79:5, 79:8,
166:6, 230:5.
identified 19:2,
33:1, 104:8,
109:4, 223:14,
223:19, 224:14,
224:16, 225:14.
identify 78:18,
89:23, 91:19,
219:5.
identities 193:1.
ignorance 186:24.
ii 199:2.

III 1:41.
illegal 160:24,
183:16, 194:23.
illness 215:5.
imagine 109:10.
immaterial 189:7.
immunity 180:9.
impairment 215:5.
impartial 3:4,
161:15, 169:5.
impartiality
164:12.
impeached 169:18.
impeded 217:20.
implication
222:19.
implications
199:16.
implicitly 200:18.
importance 174:5,
175:12.
important 2:21,
18:1, 26:4, 27:25,
28:19, 29:4, 29:7,
42:13, 42:15,
42:16, 62:7,
63:17, 69:17,
81:5, 81:6, 81:9,
85:21, 85:25,
103:24, 105:9,
123:12, 139:21,
148:6, 151:14,
158:3, 161:1,
164:12, 164:14,
179:3, 192:17,
192:18.
importantly 112:18,
145:16.
imposes 3:10,
168:17.
impossible 156:8.
improper 164:22,
165:4, 165:7,
179:16, 183:16.
in. 2:5, 41:8,
101:10, 110:6.
inadvertence
187:10.
inappropriate
231:10, 231:15.

incarcerated 25:15, 146:16.
incentive 174:21.
incident 66:9, 69:19, 70:11, 70:21, 95:11, 175:8.
include 34:11, 127:25, 128:3, 139:10.
included 127:23, 157:14.
includes 157:9, 200:25, 201:25, 213:24, 215:7.
including 4:25, 31:18, 62:11, 62:22, 63:3, 66:20, 109:6, 118:7, 122:16, 125:12, 126:11, 127:4, 148:18, 149:14, 152:12, 152:15, 152:23, 166:17, 201:13.
incomplete 149:17.
Inconsistencies 175:5.
inconsistency 179:2, 179:5.
inconsistent 23:10, 119:12, 178:18, 178:19, 179:9, 179:10.
inconvenience 167:20.
incorporated 12:6, 12:8, 166:22.
increase 6:6.
incredible 115:9.
independent 40:8, 81:17, 114:1, 162:1, 167:22, 184:19, 189:23, 192:19, 217:5.
indicate 60:3, 164:7, 187:25.
indicated 222:18.
indicating 129:6.
indictable 203:5,

205:8.
indicted 168:12, 170:25.
indirectly 198:19, 199:13.
individual 10:2, 34:18, 61:11, 61:15, 61:20, 73:23, 98:22, 100:13, 185:18, 189:17, 204:16, 209:16.
individualized 116:8.
individuals 51:16, 51:24, 52:17, 54:6, 54:15, 54:17, 61:21, 74:15, 74:21, 90:8, 149:7, 156:2, 164:21, 202:1.
indulge 71:14.
infer 80:7, 172:7, 172:19, 183:6, 183:7, 187:21, 191:5.
inference 66:14, 170:22, 172:18, 172:21, 173:6, 192:23, 193:5.
inferences 164:4, 172:24, 173:2, 173:3, 173:4, 173:9, 173:13, 173:17, 176:10, 188:2, 188:22, 192:21, 211:16, 211:17.
inferred 188:12, 188:23.
infinite 17:4.
inflammatory 69:21.
inflict 206:10, 206:16.
Influence 49:17, 170:16.
Influenced 197:14, 199:23, 233:22.

info 92:8.
informal 6:12, 201:4, 201:16.
informant 25:23, 28:21, 30:1, 31:17, 36:14, 47:22, 55:11, 55:12, 72:20, 199:2, 203:7, 205:10.
informants 183:14, 183:19, 199:3, 203:9, 205:11.
information 31:13, 45:8, 87:6, 87:7, 122:18, 147:7, 151:14, 166:19, 168:2, 213:19, 215:2.
informed 193:3, 221:19.
injured 215:12.
injuring 215:11.
injury 214:25, 215:4, 215:7, 215:9, 215:14.
inmate 23:24, 136:25.
inmates 25:19.
inner 104:2, 109:22.
innocence 45:6, 45:12, 45:13, 79:24, 80:2, 95:8, 165:2, 169:2, 183:1.
innocent 113:14, 168:20, 168:22, 170:6, 175:9, 175:14, 179:2, 189:5.
inquire 228:18.
insert 55:25.
inside 11:3, 11:5, 36:8, 154:9, 155:13, 155:16, 156:6.
insider 142:21.
insight 99:10.
Instagram 9:2, 9:3,

46:5, 46:14,
46:18, 93:10,
151:13, 224:1.
instance 57:17,
111:6, 218:22.
instances 66:6.
Instead 42:5, 58:3,
116:14, 130:5,
130:10, 130:16,
130:20, 131:11,
143:15, 150:10,
197:20.
instruct 54:1,
67:17, 150:5,
162:18, 163:7,
164:8, 165:16,
168:21, 179:16,
182:15, 192:24.
instructed 176:9,
180:14, 183:20,
184:7, 187:3,
192:6, 204:7.
instruction 163:16,
230:2.
instructions 44:21,
45:2, 49:5, 49:12,
52:11, 53:4, 80:5,
83:14, 161:14,
162:21, 162:23,
163:3, 163:14,
163:17, 170:20,
185:11, 186:1,
197:9, 216:16,
216:22.
instrument 185:12,
188:9.
insufficient
194:12.
intended 202:25,
205:3, 205:15,
205:25, 207:1,
207:10, 207:20,
208:18, 211:18,
211:20, 211:22,
211:24, 212:8,
212:15, 215:19,
216:6.
intends 188:2.
Intent 5:14, 26:13,
52:23, 52:25,

111:13, 187:6,
187:19, 187:22,
188:6, 188:15,
188:18, 188:23,
189:10, 206:2,
206:7, 206:10,
206:16, 207:14,
208:12, 208:24,
209:4, 211:7,
212:13, 213:17,
214:1, 214:13,
215:1.
intention 192:1,
194:10, 210:2,
210:4, 211:14,
215:15.
intentional 175:14,
205:18.
intentionally
186:22, 186:23,
187:12, 187:14,
194:21, 198:16.
intents 138:17.
interactions 31:21,
115:17.
intercepted
159:13.
intercepting
231:10.
interest 33:20,
80:14, 178:5,
182:10, 192:6,
192:8.
interesting 3:21,
19:7, 32:3,
69:23.
interests 29:14,
177:23, 180:24,
193:25, 234:3.
interfere 165:6,
165:17.
internet 40:10,
81:20, 114:3,
162:2, 217:6.
interpose 219:20.
interpretation
181:15, 181:21.
interpreted 101:5.
interrelated
203:23.

interrogation
25:2.
intersection
143:24.
Interstate 6:13,
10:10, 49:19,
198:13, 199:12,
200:3, 200:11,
200:21, 201:25,
202:6, 202:7,
202:9, 202:10,
202:12, 202:15,
202:18, 202:20.
interview 25:5,
25:6, 29:18, 78:7,
86:23, 90:17,
119:6, 119:8.
interviewed 63:12,
65:8, 76:24,
146:6.
intimidate 20:14,
20:22, 22:7.
intimidated 22:15,
57:11, 161:6.
intimidating
22:18.
intimidation 116:18,
127:24.
introduce 219:16.
introduced 11:18,
14:21, 89:3,
169:14, 179:13,
218:22, 218:23,
219:2, 219:3,
219:15, 220:9,
225:13, 225:14.
invasion 131:18,
145:23.
invented 10:8.
invested 53:18.
investigate 76:12,
183:15, 215:22.
investigated
63:12.
investigating
71:19.
investigation 12:9,
16:22, 40:9,
76:11, 76:17,
81:18, 114:1,

149:16, 162:1,
214:8, 217:5.
investigative 150:6,
183:21.
investigators 135:1,
135:8.
involve 8:14,
188:6.
involved 31:6, 36:5,
36:16, 39:2, 39:3,
39:5, 59:2, 65:20,
70:21, 102:18,
146:7, 153:7,
176:18, 184:1,
191:7, 201:23,
204:19, 210:10,
217:16, 232:14.
involvement 26:6,
68:15, 73:16,
213:11.
involving 91:9,
198:23, 198:24,
203:1, 203:3,
205:4, 205:5,
217:15.
irregular 188:24.
isolated 203:24.
issue 67:4, 85:20,
123:8, 184:2,
193:9, 194:15,
196:24, 223:4,
225:11, 227:22.
issued 126:19,
126:20, 126:21,
144:2.
issues 40:7, 81:16,
113:23, 161:23,
163:25, 217:3,
217:7, 217:10,
224:25, 230:2.
item 209:18, 219:5,
219:6.
items 106:14,
209:20, 209:22.
itself 31:7, 80:17,
84:2, 120:10,
138:12, 177:6,
188:16, 193:19,
195:8, 226:21.
.

.
< J >.
J-a-m-a 19:23.
J. 1:25, 135:24.
Ja 13:23.
jacket 21:15,
102:12, 159:25,
160:5.
Jacks 78:23,
153:11.
Jackson 11:3, 12:12,
12:16, 13:1,
14:14, 14:15,
37:24, 71:18,
71:22, 84:10,
84:12, 130:12.
jails 146:19,
156:7.
jam 112:21.
Jama 19:23, 19:25,
20:7.
Jamaa 11:25, 12:2,
12:4, 12:15, 13:7,
13:12, 17:11,
96:4, 130:4,
134:16, 134:18,
134:19.
Jamaaville 14:20,
17:9, 130:6.
Jamal 13:15,
198:4.
James 1:18, 20:17,
22:9, 60:13,
92:16, 100:14,
107:11, 121:9,
125:15, 161:5.
January 8:2.
jarring 21:4.
Jeffrey 1:33.
Jerel 59:24, 70:20,
71:11.
Jerome 94:15.
jimmyrod 102:3.
jimmyrods 102:5.
JKB-16-0363 1:9.
job 3:18, 3:20,
42:24, 44:18,
45:17, 81:5,
85:21, 117:17.
Joe 54:9, 59:23,

90:11, 138:1,
138:24, 198:8.
John 1:41.
Johns 222:23.
join 7:18, 10:14,
15:16, 30:7,
117:4, 142:16,
148:1, 189:20.
joined 6:3, 7:14,
10:19, 27:17,
87:7, 147:25,
190:10, 191:24,
192:13, 192:14,
193:6, 195:18.
joining 30:9,
83:4.
joint 209:25,
210:3.
jointly 210:6.
Joseph 27:8, 43:20,
55:7, 59:23, 63:6,
85:12, 127:3,
198:8.
Joshua 95:1, 95:2.
Judge 2:22, 28:3,
28:4, 40:18,
44:21, 45:2, 45:5,
49:6, 49:10,
49:24, 52:11,
53:3, 54:1, 79:23,
80:5, 80:22,
83:13, 104:11,
150:4, 161:14,
163:6, 213:18.
judged 45:25.
judges 42:11, 164:1,
173:20, 173:21,
181:25.
judgment 80:1,
179:8, 185:4.
judicial 213:22.
July 8:15.
June 8:22, 63:23,
122:10, 147:11,
153:17.
JURORS 2:8, 2:15,
41:25, 42:14,
82:22, 115:5,
165:7, 169:3,
173:20, 216:25,

218:10, 233:6,
233:16.
justice 45:4,
   160:25, 161:3,
   161:10, 164:21.
justified 173:14,
   205:23.
justify 66:13,
   193:5.
juvenile 91:7,
   147:10, 147:22,
   147:23, 148:11,
   153:23, 153:24,
   154:6.
.
.
< K >.
K-9 105:16,
   159:12.
K-slay 198:7.
K. 1:18.
Kazmarek 74:5,
   74:14, 74:21,
   124:12.
Keep 34:20, 34:21,
   44:5, 44:6, 44:7,
   47:5, 55:13,
   55:20, 113:3,
   114:5, 115:13,
   116:15, 117:10,
   119:10, 121:8,
   132:1, 150:10,
   156:4, 158:3,
   160:1, 160:21,
   170:3, 185:25.
keeping 55:15.
keeps 30:16,
   209:20.
Kellam 26:12, 26:16,
   26:24, 29:21,
   30:13, 31:13,
   32:3, 50:9, 54:11,
   63:5, 87:14,
   88:12, 128:14,
   128:18, 128:23,
   129:1, 129:10,
   134:5, 134:6,
   134:25, 135:3,
   137:6, 145:15.
Kennethfer 85:11,

134:7, 148:24,
   152:17.
kept 28:22, 29:25,
   47:24, 94:19,
   102:23.
Kesharna 159:14.
key 6:7, 125:19,
   192:13.
Keyshay 92:6, 92:16,
   92:21, 92:23,
   136:22.
keyword 17:8,
   17:12.
kids 9:16, 9:18,
   9:19, 9:20,
   9:23.
kill 22:16, 27:1,
   27:6, 29:19, 31:1,
   34:17, 34:22,
   34:24, 36:12,
   54:25, 55:2, 65:4,
   65:9, 65:12,
   65:23, 73:25,
   110:20, 123:22,
   123:25, 127:8,
   127:10, 128:19,
   142:4, 206:1,
   206:2, 206:6,
   206:7, 206:10,
   206:16, 207:1,
   207:11.
killer 34:4,
   35:16.
killing 28:25, 34:5,
   54:11, 66:25,
   205:18, 205:21,
   205:22, 206:3,
   206:4, 206:8,
   206:9.
killings 39:17.
kills 48:24.
kilogram 152:22.
Kim 30:7.
kind 4:23, 23:16,
   24:15, 28:12,
   31:7, 35:3, 38:19,
   46:4, 46:18,
   54:25, 64:11,
   77:3, 96:8,
   115:18, 142:17,

150:1, 166:18,
   176:10, 176:21,
   189:19, 211:5,
   217:4.
kinds 10:16, 15:11,
   61:4, 71:25,
   75:19, 117:1,
   180:12.
Knight 72:5,
   111:1.
Knowing 79:20, 83:5,
   113:2, 117:5,
   142:17, 156:9,
   194:24.
knowingly 6:2, 6:3,
   38:12, 49:21,
   53:2, 112:4,
   186:21, 186:22,
   186:25, 188:3,
   190:10, 191:17,
   191:23, 192:13,
   198:15, 200:4,
   204:5, 212:21,
   213:14, 213:16,
   214:23, 215:10,
   215:13.
Knowledge 68:15,
   80:19, 87:2,
   91:15, 104:22,
   122:7, 171:11,
   174:17, 177:3,
   179:18, 181:8,
   184:2, 184:16,
   187:6, 188:6,
   188:19, 188:23,
   191:25, 192:23,
   193:5, 194:2,
   194:5, 194:9,
   196:22.
known 6:19, 48:24,
   60:13, 61:1, 62:1,
   62:2, 66:19,
   71:15, 77:24,
   111:2, 116:25,
   129:20, 133:24,
   145:18, 156:2,
   156:24, 160:14,
   171:10, 193:1,
   197:22, 197:23,
   198:11, 198:15,

201:11, 201:12,
209:23.
knows 14:4, 32:23,
60:20, 72:2, 93:5,
98:23, 98:24,
99:15, 109:18.
Kush 97:12,
154:20.
.
.
< L >.
lab 107:19.
label 12:5, 12:8,
12:9, 131:8.
labeled 219:6,
219:7, 221:19,
221:21.
labeling 223:12,
225:1, 226:9.
laboratory 107:8.
lack 31:3, 170:19,
185:21, 189:4.
Lamont 77:24.
Lamontae 11:12,
11:13, 27:15,
30:2, 54:21, 58:8,
73:13, 76:13,
77:11, 77:17,
77:22, 77:24,
88:14, 117:21,
122:6, 122:23,
134:4, 137:6,
145:14, 148:23,
153:10.
Landsman 101:13,
103:4, 104:16,
104:23, 105:13,
105:21, 106:2,
106:23, 107:23,
124:22, 155:19,
155:20, 157:22,
157:25, 159:1,
159:5, 159:8,
160:2.
language 58:6,
197:18, 197:24.
Lanvale 24:23, 26:9,
29:18, 34:8,
61:13.
lap 18:3.

large 14:2, 108:18,
118:7, 152:12,
212:7, 212:10,
218:23.
larger 226:15.
laser 79:5, 79:8.
Last 44:15, 46:10,
50:25, 97:22,
157:17, 221:6,
222:24, 225:25,
230:15, 230:24,
233:19.
late 104:17,
127:1.
Later 5:20, 9:7,
9:10, 24:23,
26:10, 29:19,
34:12, 45:3,
63:23, 64:2, 64:9,
64:19, 65:22,
67:19, 68:17,
69:13, 70:6, 71:5,
76:4, 81:1,
109:14, 129:3,
135:19, 136:21,
144:4, 148:3,
159:23, 171:20.
latter 148:4.
Lavon 60:16,
125:12.
lawful 181:11,
201:8.
Lawrence 198:8.
laws 4:25, 5:1,
164:13, 189:13,
189:24.
lawyer 151:15,
152:3, 166:21,
167:2.
lawyers 227:15.
laying 131:7.
lead 125:14,
125:15.
leader 24:2, 24:12,
24:13, 24:14,
24:15, 24:16,
29:17, 50:14,
50:15, 50:25,
51:2.
leadership 201:13.

leads 63:16,
71:19.
learned 121:17,
132:11, 132:16,
230:24.
learning 123:21.
least 16:8, 27:24,
118:10, 134:13,
136:12, 156:25,
192:15, 194:9,
194:14, 208:11,
214:18, 216:13.
leather 21:15.
leave 13:17, 25:13,
69:13, 80:3,
82:13, 139:14,
142:7, 160:20,
217:13, 217:24,
218:5, 218:15.
leaving 27:23.
led 125:13,
125:15.
Lee 198:7.
left 14:11, 14:22,
15:7, 15:9, 15:22,
15:25, 17:20,
19:22, 40:12,
42:23, 77:14,
77:16, 81:22,
113:13, 114:8,
130:24, 131:3,
162:5, 216:22,
218:2, 222:18.
legal 64:19, 80:3,
161:10, 163:11,
163:13, 183:20,
184:11, 209:7,
209:15.
legality 184:9.
legally 201:6.
legitimate 126:7,
201:7.
length 197:20.
lengthy 67:13,
197:18.
leniency 26:24.
less 43:16, 65:22,
73:2, 89:4, 89:17,
164:19, 172:11,
175:19, 179:23,

232:22.
lesser 53:24,
  127:23, 175:20.
Lester 130:12.
letter 13:11, 96:1,
  96:7, 96:9, 96:10,
  96:15, 96:19,
  96:21, 96:22,
  96:23, 100:1,
  100:2, 100:8,
  134:15, 136:22,
  136:24, 137:1,
  137:3, 137:10,
  137:11.
letters 13:14,
  13:16.
level 28:8.
Lewis 75:9, 75:12.
Lexus 70:25.
liability 193:10.
liable 157:3.
liar 126:8.
liars 29:16, 77:2.
lick 145:24.
licks 145:17.
lid 70:13.
lie 26:24, 85:23,
  178:1.
lied 24:10, 26:21,
  27:15, 29:16,
  29:21, 30:2,
  72:22, 76:25,
  77:1, 87:13,
  117:16.
lies 150:3.
life 3:23, 26:19,
  27:3, 27:4, 27:5,
  27:9, 39:14,
  43:17, 93:4,
  103:24, 111:2,
  111:3, 121:25,
  134:11.
lifted 74:6.
light 30:25, 36:12,
  37:20, 104:4,
  120:16, 136:6,
  140:24, 141:14,
  142:1, 161:14,
  173:14, 180:2,
  182:16, 185:1.

lighter 178:7.
lights 136:4.
likelihood 214:16.
likely 20:8, 30:18,
  206:11, 206:17.
Lil 198:5, 198:9.
limit 166:19.
limited 178:20.
line 7:4, 45:11,
  99:22, 158:12.
lines 117:10, 232:4,
  233:13.
link 51:18, 69:18,
  71:10, 71:21,
  113:9.
links 113:10.
list 16:6, 130:2,
  222:2.
listed 91:25,
  216:4.
listen 42:4,
  181:20.
listened 39:19,
  98:6, 159:6.
listening 48:2,
  51:7, 99:23,
  116:6, 121:7,
  133:11, 133:12,
  181:18.
listens 57:7.
literal 151:10.
literally 131:2.
litigation 164:18.
live 16:18, 45:19,
  65:12, 228:6.
lived 8:16, 10:24,
  23:25, 42:18,
  77:15, 111:3.
lives 39:14, 65:6,
  65:9, 101:25,
  119:14.
living 56:20.
Lloyd 63:12, 63:17,
  119:4, 120:4.
LLTG 17:11.
lo 71:6.
local 175:17.
located 62:21,
  70:22.
location 62:25,

122:17, 124:13,
  143:18.
locations 76:19,
  137:23.
Lock 15:24, 103:12,
  141:8.
locked 92:11, 99:17,
  122:3, 142:8,
  146:22, 147:1,
  147:8.
log 92:1.
logical 88:12, 96:6,
  115:25, 172:4,
  172:22, 173:16.
Lombard 1:48.
long 42:1, 73:7,
  77:3, 77:5, 85:14,
  130:2, 135:21,
  155:12, 157:6,
  188:18, 202:13,
  202:18, 216:8,
  220:6, 220:8,
  229:18.
long-term 204:2.
longer 53:19.
looked 9:18, 17:9,
  18:21, 28:24,
  78:16, 78:24,
  129:7.
looking 21:16,
  44:11, 52:2,
  53:22, 56:1, 59:3,
  74:15, 78:20,
  79:6, 79:7, 79:8,
  95:21.
looks 18:18, 56:23,
  56:25, 57:10.
lose 75:5, 126:1.
lost 75:5, 95:14.
lots 115:10.
louder 191:9.
low-level 39:11.
lower 27:14, 54:16,
  69:3, 77:16,
  77:18.
loyalty 174:21.
LTC 135:22.
lucky 122:20.
lugging 155:10,
  155:14.

lunch 81:24, 113:19,
  114:6, 136:7,
  139:16, 231:24,
  232:3.
lunchtime 44:23.
lure 55:1, 128:10.
lying 18:13, 18:15,
  29:11, 32:13,
  88:13, 110:13,
  110:14, 129:17,
  133:11, 133:12,
  177:19, 228:25.
lyric 151:8, 151:19,
  151:21.
lyrics 18:24, 19:3,
  150:15, 150:16,
  150:19, 150:20,
  150:22, 152:1,
  152:5.
.
.
< M >.
ma'am 57:25, 58:1.
Mack 6:20, 8:2.
magical 88:1.
magnum 68:22.
mail 137:1.
mailed 96:2.
maintain 6:6.
major 45:23,
  193:13.
male 42:22.
malignant 232:22.
Malik 103:7, 103:10,
  158:21.
Mall 70:3.
Man 14:2, 14:3,
  29:13, 57:6,
  95:19, 98:21,
  99:10, 99:11,
  110:9, 139:8.
manifest 31:7.
manner 174:7,
  188:24, 204:18,
  216:10.
maps 43:5, 43:6.
marijuana 97:1,
  97:11, 97:14,
  97:15, 97:16,
  98:3, 102:23,

111:16, 118:10,
  137:21, 152:13,
  152:19, 154:13,
  154:18, 154:19.
marked 166:6, 224:3,
  224:23, 225:15,
  225:21, 226:9,
  230:5.
marking 79:5.
Marquise 1:39, 4:5,
  43:21, 78:1,
  83:16, 83:18,
  84:1, 85:11,
  85:12, 85:13,
  85:15, 85:17,
  86:12, 86:15,
  86:18, 86:19,
  86:22, 87:5,
  87:16, 87:21,
  87:22, 88:3,
  89:25, 90:2, 90:5,
  95:3, 142:25,
  147:12, 147:20,
  198:10, 224:15.
Marshal 218:4.
MARTINEZ 1:25,
  12:18, 18:11,
  32:11, 65:24,
  66:3, 66:4, 67:1,
  67:6, 82:7, 115:1,
  115:2, 115:3,
  115:6, 161:18,
  219:13, 219:19,
  219:22, 219:23,
  220:25, 221:22,
  222:4, 222:8,
  222:14, 223:2,
  223:3, 226:4,
  226:5, 229:2,
  229:17, 229:25.
Marty 103:1.
Maryland 1:2, 1:20,
  1:49, 24:1, 25:17,
  60:1, 60:7, 70:20,
  70:23, 70:25,
  72:25, 86:6,
  146:18, 198:2.
match 76:2.
matched 79:9.
matches 96:14.

matter 41:17, 62:19,
  146:13, 151:9,
  164:13, 173:5,
  174:4, 175:12,
  192:23, 202:7,
  215:7, 217:18,
  217:24, 233:11,
  234:12.
matters 117:9,
  141:18, 151:11,
  163:11, 164:8,
  175:3, 183:13,
  184:2, 184:15,
  218:18, 225:2.
Max 105:22.
Mcnair 95:3.
me. 33:3.
mean 7:21, 17:3,
  21:17, 28:9,
  32:12, 49:25,
  101:6, 142:2,
  159:20, 169:14,
  175:18, 201:22,
  211:21, 212:8,
  212:25, 229:4.
meaning 49:11,
  83:22, 112:19.
means 3:24, 12:1,
  12:2, 12:4, 12:15,
  13:16, 14:8,
  17:21, 25:25,
  29:14, 84:3, 84:7,
  100:17, 131:10,
  134:18, 139:19,
  148:6, 187:5,
  190:22, 197:15,
  205:25, 206:1,
  206:2, 207:21,
  212:22, 213:23,
  215:4, 215:20,
  222:9, 228:12.
meant 15:20, 15:25,
  69:20, 113:4.
measured 193:10.
measures 231:8,
  232:10, 232:12,
  232:16, 233:2,
  233:9, 233:14.
mechanism 115:13.
media 9:4, 9:5,

19:6, 20:4, 20:5,
93:6, 122:17,
130:8, 134:19,
149:1, 150:17,
151:10, 152:6,
166:17, 218:22.
Medical 188:9.
meet 227:9, 227:16,
227:17.
meeting 6:24, 8:4,
9:25, 10:5, 28:11,
34:18, 34:19,
35:8, 35:15,
52:15, 64:25,
86:21, 89:22,
89:23, 90:3,
91:16, 94:22,
94:23, 94:25,
97:22, 97:23,
112:14, 121:22,
126:25, 127:2,
128:4.
meetings 8:1, 9:24,
10:2, 34:15,
34:19, 50:4,
51:15, 58:19,
63:3, 65:1, 87:11,
91:8, 97:24,
138:10.
membership 9:9,
27:16, 30:3,
30:15, 50:7,
133:23, 134:12,
138:23, 204:7.
memories 11:3,
46:22.
memory 59:15, 59:18,
59:19, 123:20.
men 43:8, 44:12,
48:21, 57:14.
mental 215:6.
mentality 96:8.
mention 41:10, 51:9,
52:18, 69:9,
69:11, 90:25,
127:16, 135:4,
136:11.
mentioned 48:16,
48:21, 51:10,
53:7, 61:14, 64:6,

64:21, 66:5, 66:7,
66:10, 89:14,
90:16, 91:9,
91:10, 103:21,
122:19, 128:1,
135:10, 135:12,
141:17, 144:22,
176:1, 184:4,
192:11, 221:7.
mentioning 91:2.
mentions 107:1.
mentor 26:16.
Mere 80:12, 80:16,
80:19, 193:18,
193:19, 193:23,
194:2, 194:12,
206:19, 206:21,
207:3, 207:7.
merely 80:9, 185:2,
194:5.
merged 138:22.
merger 126:9.
mess 122:11.
message 100:1,
100:3, 100:10,
100:12, 101:5,
108:7, 154:24.
messages 9:2, 17:6,
17:10, 37:25,
60:6, 60:9, 61:5,
70:19, 97:9,
97:10, 97:19,
97:20, 97:21,
99:24, 99:25,
100:3, 101:3,
101:7, 103:14,
111:18, 121:11,
121:13, 134:21,
153:18, 154:8,
154:17, 155:6.
Met 3:6, 11:18,
11:19, 24:20,
31:15, 47:8, 80:1,
86:9, 86:10,
86:16, 87:17,
87:21, 90:1,
90:23, 94:20,
105:6, 135:1,
158:6, 165:22,
190:18.

meters 108:11,
108:12, 108:23,
108:24.
methods 203:22.
Michael 23:20,
27:11, 50:9,
50:13, 50:15,
50:21, 51:1, 51:2,
54:8, 54:12, 62:2,
63:4, 63:5, 85:6,
86:4, 88:8, 127:5,
152:17.
mid 50:13, 51:24,
146:17.
middle 13:6, 13:7,
73:21, 143:25.
Mike 62:2, 90:11,
90:12, 126:8,
126:24, 128:5,
136:14, 137:6,
145:14, 145:20,
146:13, 148:22,
152:17.
mile 108:25.
millennial 228:9.
Miller 47:7, 48:24,
54:23, 54:25,
55:1, 61:22, 72:3,
72:5, 72:6, 73:10,
73:11, 73:12,
73:14, 73:15,
123:3.
milling 10:3.
Mills 6:24, 8:4,
32:5, 33:24, 34:4,
35:6, 35:12, 47:7,
57:12, 128:3,
128:16, 129:1,
129:5, 129:7,
129:9, 130:19,
130:21.
mind 9:11, 39:21,
44:5, 44:6, 44:7,
47:5, 116:15,
117:10, 119:10,
132:1, 156:4,
158:3, 158:10,
170:3, 178:3,
185:17, 185:25,
187:21, 187:25,

188:7, 188:10,
188:12, 211:10,
211:15.
mine 164:6.
minimal 202:8.
minimum 156:24.
minister 136:16.
minor 193:13.
minute 7:12, 73:2,
148:14.
minutes 40:3, 40:13,
41:16, 46:9,
60:10, 79:24,
81:21, 81:23,
114:7, 135:20,
135:21, 162:3,
162:6.
Mirage 70:21.
mischievous 87:10.
miscommunication
47:13.
misdirection
155:23.
misnumbering
223:5.
misrecollection
175:9.
missed 47:12,
97:22.
misses 140:16.
missing 31:16,
37:23, 47:25,
107:12, 158:1,
158:5, 158:11.
mission 11:8, 11:10,
37:22.
missions 10:9.
misspelling 19:25,
20:7.
misspoke 222:17.
mistake 53:21, 54:8,
54:14, 136:23,
146:18, 156:12,
179:2, 186:24,
187:10, 187:18,
210:21.
mistaken 219:5.
mistakenly 219:6,
219:15.
mistakes 55:24,

225:3.
misunderstanding
12:22.
misunderstandings
12:20.
misunderstood
150:18.
mitigating 205:23.
mix 64:9, 67:21,
68:16, 77:7.
mixing 155:2.
MOD 136:14.
model 42:22,
156:6.
modifications
226:13.
modus 143:18.
mom 127:1.
moment 68:20,
116:10, 116:23,
140:18, 165:3,
170:1, 170:2,
192:11, 217:11,
220:7.
moments 61:6, 71:14,
217:25.
money 8:6, 18:3,
18:4, 18:5, 18:6,
18:7, 18:8, 18:10,
28:22, 29:25,
33:7, 34:4, 35:20,
35:22, 50:19,
50:22, 50:25,
55:17, 92:14,
97:13, 97:15,
102:9, 102:23,
103:12, 103:13,
103:25, 109:20,
111:7, 156:8,
202:1.
Money-making
77:23.
money. 154:22.
moniker 84:20.
monitor 58:10.
Montclair 160:6.
Montel 11:19, 11:20,
75:18, 122:10,
123:6, 152:16,
198:6.

month 29:22,
65:22.
months 3:13, 3:14,
4:12, 24:23,
26:10, 29:19,
34:12, 63:23,
64:2, 64:8, 75:16,
84:9, 94:6,
112:7.
Montray 95:3.
Mook 100:13,
155:6.
morning 2:2, 2:7,
2:8, 2:14, 2:15,
41:24, 41:25,
49:15, 54:12,
61:14, 81:3,
119:3, 123:13,
128:2, 136:1,
144:8, 148:4,
151:18, 154:10,
162:24, 171:17,
216:20, 218:1.
morphed 7:8.
moseyed 35:12.
mother 16:16, 42:20,
46:8, 92:21,
108:8.
mother. 92:10.
motherfuckin 123:7,
123:8.
mothers 43:10,
57:5.
motion 61:17.
motivated 177:24.
motivation 177:25,
178:2.
motive 28:5, 102:19,
174:22, 178:8,
181:1, 189:1,
189:3, 189:4,
189:7, 189:8,
189:9.
mouth 120:16.
mouths 21:16,
133:19, 151:1.
move 220:13,
230:21.
moved 16:10,
30:10.

movement 201:25.
movie 119:18.
moving 113:3,
   114:5.
MRDCC 72:25,
   122:3.
mull 45:18.
multi-defendant
   4:2.
Multiple 27:11,
   122:25, 138:10,
   146:25, 149:21,
   198:22, 199:1,
   203:1, 203:5,
   205:4, 205:8,
   217:22, 232:6.
Multiply 153:1,
   153:14.
Mund 130:18.
murdered 48:22,
   66:7, 73:12,
   90:15, 110:4,
   119:5, 122:4,
   129:5, 130:19,
   139:23, 139:24,
   142:9.
murdering 26:14,
   121:2, 122:8.
murders 33:22,
   33:23, 34:3,
   50:17, 54:9,
   56:12, 93:24,
   94:2, 116:4,
   116:16, 117:2,
   124:20, 126:15,
   127:25, 128:12,
   147:7, 147:16.
music 4:20, 21:3,
   21:9, 21:10.
Muslim 113:7,
   113:8.
Muslims 98:19,
   98:25.
Mustafa 29:23,
   29:24.
mutual 190:24.
myself 2:18, 151:24,
   233:11.
mystery 20:15.
.

.
< N >.
n-word 99:11,
   100:11, 130:15,
   135:24.
n-words 151:1,
   151:5.
nah 58:4.
nail 18:18.
name 12:4, 61:11,
   75:7, 75:8, 86:12,
   86:15, 86:24,
   87:12, 87:20,
   89:13, 89:14,
   90:10, 96:7,
   100:13, 136:24,
   164:16.
named 64:15, 87:19,
   89:11, 89:24,
   90:8, 90:11, 95:1,
   101:25, 104:10,
   120:14, 130:16,
   156:1, 170:24,
   189:11.
names 30:17, 43:22,
   87:20, 107:18.
narcotics 17:15,
   17:16, 156:11,
   208:20.
Nate 90:9.
nation 202:4.
national 164:25.
natural 188:2.
naturally 51:3.
nature 165:5,
   177:10, 191:5,
   196:2, 211:3.
nauseam 102:2.
Nealy 26:14, 26:15,
   26:16, 27:1, 27:7,
   29:21.
near 108:10, 143:23,
   186:9, 210:8.
Nearly 86:2.
necessarily 80:14,
   86:8, 169:15,
   175:19, 193:25,
   212:8.
necessary 29:15,
   69:17, 69:22,

   70:9, 141:15,
   189:1, 194:8,
   202:11, 215:8,
   215:12, 216:1.
needed 103:12,
   103:13.
needs 116:21,
   227:22, 230:17.
neglected 224:16.
negligence 187:10,
   210:20.
negotiating 213:8.
neighborhoods 9:21,
   55:6, 145:17.
Nevertheless 26:16,
   29:1, 33:10.
new 139:6, 233:19.
news 40:6, 81:15,
   113:22, 115:12,
   161:22, 217:2.
newspaper 166:17.
Next 14:23, 16:2,
   16:20, 18:3, 42:7,
   75:21, 76:25,
   80:12, 84:25,
   97:23, 110:17,
   131:2, 131:7,
   162:25, 185:6,
   191:20, 197:7,
   220:9, 220:13,
   220:14, 220:15,
   220:17, 224:12,
   224:13, 225:20.
nice 46:21,
   171:17.
nicer 53:20.
nickel 102:3.
nickname 102:16.
Nielson 19:1, 21:8,
   23:8.
night 37:10, 37:13,
   119:17, 119:22,
   123:8, 127:11,
   130:23, 140:14,
   141:5, 141:6,
   159:13, 232:17.
nightclub 70:21.
nine 30:11, 42:1,
   81:5.
Nique 35:6, 128:15,

128:19.
No. 1:9, 43:24,
  59:18, 95:17,
  133:22, 219:17,
  220:22, 221:8,
  226:22.
Nobody 11:10, 60:20,
  63:20, 97:8,
  99:15, 110:15,
  154:13.
Nod 60:13, 60:14,
  121:9, 135:15.
nods 60:16.
non 19:18, 141:15,
  141:20, 141:21,
  142:1.
None 36:14, 51:10,
  63:6, 111:14,
  125:20, 126:7,
  135:9, 163:19,
  176:3.
nonetheless 43:17.
nonexistence
  172:9.
nonexistent 130:6.
noni 92:11.
Noodles 89:11,
  89:13, 89:14,
  89:20.
Nor 125:14, 170:14,
  177:14, 184:2,
  185:3, 189:3,
  193:2, 203:18,
  210:9, 215:11.
Norm 198:9.
normal 226:25.
Norman 11:19, 16:16,
  33:4, 74:8, 74:15,
  74:19, 90:9, 95:2,
  121:5, 122:9,
  123:6, 131:19,
  135:14, 135:21,
  135:22, 135:24,
  136:5, 136:20,
  139:24, 142:20,
  145:7, 146:14,
  152:16, 154:8,
  198:9.
North 68:21,
  145:21.

NORTHERN 1:2.
nose 23:5.
note 192:17,
  192:18.
noted 202:5.
notes 3:18, 51:7,
  79:16.
notice 41:15,
  51:8.
notion 231:21.
Notwithstanding
  116:22, 140:5.
November 120:4.
number 17:4, 19:7,
  28:3, 48:12,
  53:23, 78:21,
  78:24, 79:6, 79:7,
  83:7, 83:14, 91:7,
  92:2, 92:17,
  93:12, 98:5,
  106:14, 109:2,
  136:25, 217:17,
  218:20, 218:23,
  219:6, 224:17.
numbered 226:9.
numbering 221:10,
  223:12, 225:1.
numerically 16:11.
numerous 50:17,
  54:13, 55:4.
Nut 90:11.
.
.
< O >.
o'clock 227:4,
  230:14, 234:5.
oath 11:8, 11:10,
  11:11, 11:16,
  11:19, 11:20,
  11:21, 37:22,
  49:4, 51:14,
  91:18, 91:19,
  98:15, 98:18,
  98:22, 98:23,
  98:24, 112:14,
  121:23, 151:23.
oath. 11:23, 23:1,
  151:20, 151:22.
oaths 10:9, 165:7.
Oatmeal 98:14,

98:20, 103:17.
obeyed 69:2.
object 167:6, 190:3,
  190:21, 190:22,
  200:15, 200:19,
  202:19, 208:7,
  209:11, 209:15,
  209:17.
objected 167:13.
Objection 65:24,
  219:20, 219:22,
  220:13, 224:8,
  224:10, 224:11,
  224:18, 224:19,
  224:20, 224:21,
  226:4, 226:5,
  227:12.
objectionable
  82:11.
objections 166:1.
objective 187:17,
  192:1, 204:14,
  204:18, 216:10.
objectives 97:21,
  193:7, 194:6,
  194:9.
objects 78:18.
observe 175:3.
observed 118:3,
  171:9, 179:15.
obtain 178:7.
obtained 70:6,
  70:10.
obvious 13:13,
  39:20, 53:23,
  93:1, 129:14,
  232:15.
Obviously 25:8,
  46:9, 93:18, 96:2,
  99:17, 151:8,
  228:4, 229:4,
  232:22.
occasion 152:21,
  178:17.
occasions 88:15,
  90:24, 149:12,
  233:6.
occurred 48:13,
  52:16, 94:15,
  138:6, 138:7,

186:5, 188:21,
233:11.
occurrence 188:14,
188:18.
occurring 217:14.
Oct 36:20, 36:23,
37:5, 120:14,
140:23.
October 124:22.
odd 13:15.
offender 26:23,
27:13.
offense 186:8,
189:23, 190:2,
190:13, 191:16,
200:1, 205:20,
206:13, 206:20,
207:5, 207:16,
213:20, 215:3.
offenses 127:23,
198:23, 203:2,
205:5, 205:12,
205:14, 205:17,
208:14, 208:18,
208:21, 215:22.
offer 170:5.
offered 8:22, 181:6,
230:7.
offering 169:16.
offers 167:6.
officers 53:9,
62:16, 104:12,
105:11, 121:20,
159:4, 214:2,
214:4, 214:14,
214:17.
offices 90:14.
Official 1:47, 69:7,
175:18, 227:14,
230:3, 234:16.
officials 175:16.
Often 150:18,
188:15, 191:9,
196:3, 212:2.
Okay 2:5, 11:16,
41:2, 41:5,
100:16, 100:17,
114:9, 162:14,
219:10, 219:18,
221:9, 221:16,

221:24, 222:6,
222:8, 224:8,
224:24, 225:19,
227:7, 229:1,
229:25, 230:1,
234:5.
Old 25:25, 42:17,
48:25, 75:20,
83:13, 83:23,
84:13, 88:23,
90:22, 94:16,
112:1, 112:2,
113:13, 115:18,
115:19, 130:3,
133:21, 139:17.
older 90:7, 90:10.
Oliver 61:12, 66:19,
68:6, 92:21,
92:23, 93:1,
118:19, 118:23.
omissions 196:10,
196:14.
omitted 187:23,
188:4.
Once 18:19, 31:15,
85:8, 85:10,
86:12, 86:15,
86:17, 87:12,
90:1, 90:25,
97:12, 100:15,
101:20, 103:20,
104:18, 109:18,
148:11, 228:1,
230:9.
one-upmanship
56:12.
one. 30:21, 32:3,
120:6.
one: 113:14.
ones 16:10, 127:21,
128:1, 128:3,
219:2.
ongoing 6:11, 6:12,
201:3, 201:16.
open 39:21, 44:6,
44:7, 67:8, 78:17,
78:21, 226:8.
opened 78:22.
opening 4:11, 4:24,
38:9, 47:9, 85:18,

112:7.
operandi 143:19.
operated 157:10.
operates 33:17,
160:23.
operating 8:3,
139:5.
operation 138:3,
153:22, 157:9.
operations 187:21.
operative 197:24.
opinion 163:20,
164:7, 184:15.
opinions 184:21.
opportunistic 25:22,
29:12, 32:15.
opportunity 175:2.
opposed 28:15,
54:5.
opposite 37:8.
orange 9:1.
orchestrated
57:21.
order 16:11, 66:13,
83:15, 128:19,
131:9, 138:14,
141:22, 141:23,
142:5, 167:19,
180:9, 180:23,
183:5, 186:17,
186:20, 187:3,
190:5, 190:16,
192:3, 193:4,
195:1, 199:22,
205:12, 208:14,
209:15, 215:17,
215:25, 227:23.
ordered 24:3, 24:4,
25:3, 25:7, 26:9,
26:11, 26:18,
29:18, 29:20,
34:12, 50:17,
105:21, 141:25,
159:12, 166:11.
orders 64:12,
213:3.
ordinarily 184:23,
187:19.
ordinary 54:5,
175:20, 178:6,

180:21, 230:23.
org 10:7.
organ 215:6.
organization 6:11,
  7:17, 10:6, 10:8,
  15:21, 30:18,
  35:14, 51:3,
  138:8, 197:21,
  198:11, 201:3,
  201:11, 201:16.
Organizations 49:17,
  197:14, 199:23.
organized 10:5,
  138:3, 201:7,
  201:8.
organizes 4:19.
origin 165:1.
original 13:13,
  24:1, 25:17,
  29:17, 146:10,
  149:15.
originally 146:9,
  218:20.
others 45:25, 47:8,
  63:11, 138:24,
  147:17, 160:18,
  177:3, 193:13,
  219:2.
otherwise 60:13,
  61:1, 62:1, 62:2,
  64:21, 121:25,
  203:23, 219:21.
ought 163:21,
  230:13.
ounces 152:25,
  153:1.
outcome 182:10,
  192:5, 192:7.
outdoors 34:17,
  232:2.
outed 140:22.
outgoing 14:4.
outside 10:11, 31:2,
  36:9, 93:21,
  106:10, 118:15,
  138:6, 145:17,
  145:23, 166:16,
  171:19, 171:24,
  172:5, 172:10,
  182:24.

oval 7:5.
ovals 7:5.
overall 204:18,
  216:10.
overarching
  160:25.
overcome 80:2.
overlord 4:23,
  20:22, 22:6,
  39:13.
overnight 216:23.
Overt 62:7, 62:20,
  63:1, 63:9.
overwhelming 115:11,
  149:20, 149:21,
  151:6.
owed 33:7, 103:25,
  109:19.
own 23:8, 29:14,
  30:3, 30:21,
  67:15, 98:18,
  98:19, 120:15,
  126:2, 129:25,
  141:19, 150:13,
  160:24, 169:21,
  171:10, 171:11,
  176:14, 178:7,
  179:8, 180:24,
  181:21, 182:7,
  182:20, 185:4,
  192:20, 231:19,
  233:20.
owned 110:13.
owner 149:15,
  208:1.
Oxycodone 152:13,
  152:20.
.
.
< P >.
p.m. 132:18.
Pace 62:1, 64:7,
  65:23, 66:6, 66:7,
  66:25.
package 62:23,
  65:3.
packaged 137:23,
  152:21.
packaging 146:12,
  212:12.

pact 200:17.
Page 8:25, 19:6,
  19:21, 32:24,
  77:14, 77:22,
  78:2, 78:3, 91:25,
  92:19, 92:21,
  92:22, 92:24,
  93:1, 218:24,
  219:16, 220:1,
  220:9, 220:15,
  220:16, 220:17,
  225:15, 225:21,
  225:22, 230:22,
  230:23.
pages 216:16.
paid 3:17, 8:5,
  72:20, 103:25,
  109:20.
pain 215:5.
painfully 93:1.
pair 118:14.
pajamas 22:11,
  22:17.
Pall 70:3.
pantomimed 130:18.
pants 53:16, 69:3,
  70:16.
paper 74:7.
papers 184:4.
paperwork 10:9,
  106:1.
parade 134:2.
paragraph 45:12.
paraphernalia 63:19,
  93:17, 106:19,
  106:20, 155:8,
  155:11, 212:12.
parcel 9:9.
Park 8:4, 10:3,
  35:8, 35:11,
  35:16, 56:22,
  130:18.
parking 232:13.
parole 213:21.
paroled 23:22.
participant 192:4,
  194:24.
participants 40:8,
  81:17, 81:19,
  113:24, 113:25,

114:3, 143:18,
156:14, 161:24,
161:25, 191:12,
203:22, 217:3,
217:4, 217:18.
participate 5:9,
6:4, 49:18,
116:19, 117:4,
138:25, 142:16,
147:13, 191:24,
197:16, 198:18,
199:13, 200:2,
200:10, 204:14,
204:23.
participated 7:25,
34:1, 34:2, 63:11,
156:23, 194:8,
204:17, 215:10,
216:9.
participating 54:23,
80:8, 217:8.
participation 80:20,
83:21, 143:2,
192:18, 193:8,
193:11, 194:3,
195:6, 195:15.
particular 5:5,
12:6, 54:22,
107:18, 116:8,
116:12, 116:13,
150:8, 150:9,
150:10, 176:3,
176:4, 177:11,
185:13, 191:22,
202:12, 214:14,
216:2, 216:7.
particularized
231:12.
particularly 4:3,
12:16, 233:7.
parties 4:18,
164:20, 166:13,
168:9, 191:7,
226:24.
partnership 189:19,
196:4, 201:6.
partnerships
196:5.
parts 135:6,
193:14.

party 77:17, 164:10,
164:18, 169:13,
169:23.
partying 77:18.
pass 73:1, 163:24,
164:1, 212:25,
213:2.
passed 138:14,
213:1, 228:17.
passes 60:16.
passive 42:3.
past 58:20, 114:9,
115:6, 188:11.
path 76:20.
patience 162:17.
Patriots 103:8.
pattern 49:20, 52:7,
69:23, 69:24,
143:19, 145:25,
197:17, 198:20,
198:21, 199:14,
200:3, 200:12,
200:22, 202:22,
203:10, 203:17,
203:18, 204:15.
Paul 1:31, 61:20.
Pause 182:2, 218:8,
221:2, 221:4,
222:16, 223:10.
pauses 58:5.
pay 35:16, 50:23,
154:21, 158:10.
paying 91:17,
97:22.
payment 207:24.
PDR 102:21.
PDR. 159:18.
peace 93:19,
93:22.
pedestal 47:17.
peers 3:5.
peg 112:21.
pending 213:21.
penultimate
220:21.
per 114:20.
perceive 179:24.
perception 28:6.
Percocets 38:21.
perfect 43:13.

perfectly 227:4,
227:11.
perform 11:8, 83:23,
164:9, 164:10,
193:11, 193:12.
performed 11:9,
17:8, 37:22,
109:13.
perhaps 161:1,
227:16.
period 143:10,
149:22, 149:25,
157:11, 201:2,
201:22, 207:22.
permanently
207:22.
permissible
148:11.
permission 220:11.
permit 218:15.
permitted 173:7,
173:12, 176:21,
176:25, 180:12,
181:13, 182:6,
217:13.
Perry 31:19, 31:20,
31:21.
personal 87:1, 87:6,
91:15, 164:24,
169:21, 176:13,
177:25, 179:18,
185:17, 212:1,
212:6, 233:20.
personality 39:12,
48:7.
personally 24:3,
91:22, 112:16,
127:2, 157:3,
211:22, 232:21.
personnel 6:12,
201:4, 201:17.
persons 165:1,
170:24, 170:25,
175:8, 183:25,
184:13, 189:20,
190:8, 190:14,
191:13, 195:23,
195:24, 196:18,
198:14, 200:2,
200:10, 200:14,

200:17, 217:7,
231:10.
persuade 122:13.
persuaded 169:23.
pertain 62:5.
pertains 175:12.
pertinent 32:8.
pervasive 56:19.
Peter 1:25.
phase 231:13.
PHCS 131:5, 225:15,
225:20, 225:22.
phenomenon 21:10.
PHI 220:22, 220:23,
221:16, 221:18,
222:21, 225:25.
phones 45:24, 46:7,
57:4, 93:13,
153:11.
photo 32:25, 36:15,
67:21, 67:23,
224:1, 228:7,
228:22.
photograph 11:1,
11:5, 223:24.
photographs 15:6,
19:11.
photos 155:21,
228:7.
phrase 12:1, 12:2,
13:20.
Physical 120:7,
129:25, 209:10,
209:14, 209:17,
209:21, 212:11,
213:14, 213:15,
213:23, 215:5.
picked 70:13,
99:25.
picks 67:22.
Picture 14:1, 14:10,
14:14, 14:18,
14:21, 14:22,
17:19, 20:9,
20:10, 32:25,
46:15, 47:2, 52:9,
67:24, 73:20,
74:1, 85:1, 86:19,
86:22, 87:22,
93:8, 93:11,

93:16, 93:18,
93:21, 93:23,
155:18, 228:14.
Pictures 19:7, 19:8,
19:19, 30:17,
46:18, 46:24,
61:18, 77:19,
88:10, 89:2,
92:24, 93:6,
93:10, 93:12,
93:13, 93:15,
97:24, 130:9,
155:16, 218:23,
218:24, 228:20.
piece 3:20, 15:17,
95:24, 110:3,
112:8, 118:25,
132:10, 150:22.
pieces 3:15, 85:4,
106:23, 106:25,
107:3, 107:5.
pile 18:3.
pills 155:5.
Pinchback 108:12.
Pinky 101:25.
Pioneer 102:21,
104:20, 106:21,
137:2, 155:9,
155:21, 157:18.
pipeline 128:19.
pipes 144:11.
pistol 68:2.
place 30:10, 55:1,
58:9, 73:5, 76:1,
83:12, 102:24,
115:15, 116:1,
119:25, 120:19,
120:25, 129:2,
154:11, 156:24,
167:18, 179:15,
180:23, 184:1,
188:21, 233:14.
placed 103:7,
111:14, 178:19.
places 10:24.
plain 157:10,
232:14.
Plaintiff 1:7,
1:23.
plan 34:16, 65:3,

80:20, 192:13,
194:3, 212:13,
227:18.
Planet 130:10,
130:11.
planned 138:11,
157:4, 157:5.
planning 100:20,
176:18.
plausible 25:4,
115:8.
play 9:21, 18:8,
21:2, 150:3,
171:1, 193:13,
229:3, 229:8,
229:10, 229:14.
played 43:9, 101:15,
103:9, 123:21,
132:14, 181:19,
224:15, 229:18.
playgrounds 43:9.
playing 57:6, 102:6,
119:22.
plea 54:3, 54:17,
54:22, 64:1, 95:7,
95:8, 95:19,
95:22, 125:21,
176:21, 178:4.
plead 95:22,
176:13.
pleaded 168:13.
pleading 53:24.
pleas 168:14.
Please 17:5, 40:11,
41:14, 82:4,
114:7, 162:3,
162:8, 162:16,
182:3, 217:25,
218:6, 218:9,
223:23.
Pled 25:10, 26:14,
28:19, 69:4, 95:5,
95:6, 95:18, 97:2,
176:9, 176:12,
176:19.
plenty 20:4, 23:9.
plot 127:7, 128:10,
128:12, 140:19.
plus 14:3, 139:6.
pocket 14:24, 14:25,

278

53:15.
podium 230:21.
point 12:24, 18:1,
26:17, 27:25,
39:18, 40:22,
50:5, 50:12, 59:1,
135:25, 146:3,
149:5, 152:3,
161:13, 197:20,
216:17, 216:22,
231:2.
point. 122:22,
123:12, 140:17,
146:21.
pointing 140:9,
231:1.
points 11:24, 64:19,
68:17, 92:23.
poo-pooed 134:10.
pop 46:18.
pops 133:5.
popular 21:10,
46:6.
Porky 17:20, 17:22,
127:2, 127:3,
127:4, 127:6,
127:7, 127:10,
127:12, 128:4,
128:6, 128:10,
145:21, 148:23.
portion 45:23,
207:23.
pose 203:12, 203:19,
203:25.
position 6:7, 25:7,
83:24, 136:15.
possess 5:13, 38:8,
52:22, 52:25,
212:10.
possessed 68:21,
111:16, 112:5,
158:16, 158:18,
209:1, 209:2,
209:3, 209:6,
210:5, 210:15,
210:17, 210:19,
210:23, 211:2,
211:5, 211:7,
211:13, 212:6.
possesses 209:25.

possible 62:7,
210:1, 212:2,
213:19.
possibly 77:6.
post 20:7, 20:21,
46:17, 84:8, 93:2,
151:9, 154:6.
post-18 154:7,
154:25.
posted 19:25.
poster 74:18,
74:19.
postings 134:18.
posts 9:2, 9:3,
18:23, 117:9,
122:18, 142:13.
pounding 143:13.
pounds 14:3.
Powell 217:23,
218:9, 221:15,
224:3, 227:13,
227:21, 230:20.
power 17:12, 50:16,
50:17, 210:2,
210:4.
powerful 118:25.
practical 49:25.
practice 226:17,
229:12.
precise 190:21.
predicate 127:20,
216:12.
prejudge 229:11.
prejudice 164:10,
165:16, 167:11,
174:23, 231:22,
232:23, 233:13.
prematurely 42:23.
Premeditated 205:22,
206:2, 206:7.
premeditation
205:19, 206:12,
207:1, 207:5.
prep 59:11.
preparation 206:19,
206:22, 207:3,
207:7.
prepare 226:18.
prepared 28:15,
57:19, 181:14.

presence 14:3,
19:14, 32:22,
80:16, 130:19,
189:9, 193:18,
207:13, 207:18,
217:16, 232:15.
present 168:2,
180:13, 183:25,
210:9.
presentation 48:19,
79:25, 81:7.
presented 53:19,
66:15, 67:7,
67:11, 73:18,
75:17, 88:23,
89:15, 100:6,
150:12, 167:16,
173:11, 184:17,
212:16, 217:7,
217:10.
presents 40:7,
81:16, 113:23,
161:23, 217:3.
presided 6:23,
8:4.
president 24:17.
pressured 120:14,
140:23.
presumably 79:13.
presumed 168:22,
170:5.
presumes 168:20.
Presumption 45:6,
45:12, 45:13,
79:24, 80:2,
165:2, 169:2,
169:8.
pretending 21:22.
Pretrial 214:9.
pretty 3:12, 12:16,
13:13, 13:23,
48:7, 68:15,
105:9, 116:23.
prevent 72:20,
213:17, 214:1,
214:13, 215:21.
preventable 47:10,
48:15.
prevention 214:7.
previous 123:8,

233:23.
previously 132:19,
  226:7.
price 154:19,
  213:8.
primary 156:7.
prime 164:13.
Prince 198:3.
principle 163:13.
print 226:20.
printed 227:13.
printout 227:9.
prior 83:20, 83:21,
  83:23, 84:1, 84:3,
  84:6, 84:8, 87:11,
  89:21, 90:20,
  91:4, 91:14,
  94:18, 106:5,
  106:7, 113:11,
  178:19, 179:9,
  195:5, 195:6,
  195:7, 195:14,
  195:16, 195:17,
  233:6.
prison 11:13, 23:22,
  23:24, 25:18,
  25:25, 26:21,
  27:4, 27:9, 27:13,
  27:17, 29:22,
  49:4, 51:11,
  51:12, 51:13,
  52:14, 53:14,
  56:18, 146:9,
  146:24.
probable 188:3.
probably 31:12,
  33:4, 43:10, 54:2,
  60:7, 61:13,
  65:19, 68:14,
  73:23, 81:1,
  127:15, 228:13.
probation 144:10,
  144:13, 213:21,
  214:9, 215:23.
probative 194:15.
problem 3:10, 101:4,
  120:1, 120:2,
  220:25, 227:19,
  229:7, 229:24.
procedure 181:10,

232:5.
procedures 232:23.
proceed 2:13, 41:22,
  82:19, 115:2.
proceeding 213:22,
  217:16, 231:17.
Proceedings 1:17,
  67:8, 217:22,
  234:8, 234:12.
proceedings. 182:2,
  218:8, 221:2,
  221:4, 222:16,
  223:10.
process 75:3, 165:6,
  173:4, 227:1,
  230:10.
processing 212:12.
proclaims 95:8.
produce 184:3,
  227:13.
produced 52:8, 75:2,
  78:11.
producing 168:19.
product 187:17,
  187:18.
professor 152:3.
proffer 121:18,
  121:20.
profits 55:13,
  55:16, 55:20.
progress 162:25.
projectile 158:8.
prolly 100:1.
promised 180:6,
  180:19.
promises 180:9,
  180:13, 180:14.
pronounce 62:10.
Proof 5:23, 6:1,
  6:5, 12:24, 59:22,
  66:14, 67:16,
  79:25, 80:2,
  80:14, 101:22,
  114:21, 164:24,
  165:3, 170:3,
  171:14, 185:21,
  186:6, 186:20,
  187:4, 188:11,
  189:1, 189:3,
  189:4, 190:5,

191:4, 191:12,
  192:6, 193:25,
  202:9, 204:24.
proper 115:15,
  185:24.
properly 167:7,
  171:5, 192:9.
Property 207:13,
  207:15, 207:17,
  207:19, 207:20,
  207:21, 207:22,
  207:25, 208:1,
  210:12, 232:12.
prosecute 215:22.
prosecuted 25:19,
  150:20.
prosecution 22:2,
  53:19, 55:10,
  95:9, 164:16,
  168:15, 176:12,
  178:8, 181:1,
  183:24, 184:3,
  214:8.
prosecutors 24:11,
  29:17, 29:23,
  32:13, 57:23,
  81:7, 87:13,
  88:13.
prostitution
  25:18.
Protect 2:20, 2:21,
  15:22, 15:23.
protection 47:13,
  231:21.
protective 66:18.
protector 78:14.
proud 94:7, 94:8.
proudly 134:13.
proved 116:22,
  172:25, 187:19,
  192:24.
proven 36:17, 45:15,
  96:12, 113:14,
  113:15, 165:11,
  165:14, 168:24,
  169:11, 170:8,
  170:10, 170:21,
  173:13, 185:9,
  186:25, 199:20.
proves 180:17,

202:18, 211:4,
214:15, 216:9.
provide 108:1,
185:25, 227:15.
provided 71:9,
108:5, 233:13.
provides 180:16,
199:9.
providing 119:12,
123:22.
proving 165:22,
166:25.
provisions 199:7.
prudent 233:12.
PTF 15:23.
public 35:11,
95:21.
publicity 166:17.
published 228:16.
pull 54:24, 76:18.
pulled 16:7, 16:8,
100:24, 139:25.
pulling 230:10.
pulls 57:1.
purchased 111:24,
118:12.
purple 7:4.
purpose 6:11,
178:20, 187:8,
189:21, 190:21,
190:22, 191:25,
194:22, 196:11,
201:1, 201:3,
201:8, 201:9,
201:15, 207:23,
211:10, 212:2.
purposefully
187:16.
purposely 179:1.
purposes 138:17,
146:10, 154:2,
158:3, 158:14,
192:16, 194:6,
194:9, 200:24,
203:22, 204:3,
205:1.
pursuant 125:21.
pushing 57:5.
puts 74:18, 137:8.
putting 92:24, 93:7,

137:5, 229:22.
.
.
.
< Q >.
Quail 95:14.
qualification
228:25.
qualifications
184:21.
qualified 184:14.
qualifies 228:22.
quality 75:3,
213:8.
quantities 62:9,
62:17, 118:7,
152:12, 153:7,
160:18.
quantity 153:12,
154:3, 194:19,
212:3, 212:7.
Question 4:21, 6:8,
9:13, 12:23, 15:9,
15:16, 29:11,
37:15, 37:18,
38:10, 39:7,
39:10, 59:11,
64:17, 78:17,
84:10, 123:24,
139:23, 140:1,
165:9, 166:12,
166:22, 167:2,
179:25, 188:21,
190:10, 192:14,
226:15, 229:11,
229:17.
questioned 59:6,
132:6, 133:6.
questioning 12:18,
75:2.
questions 28:16,
37:16, 57:19,
57:23, 57:24,
58:3, 58:12,
58:14, 58:17,
58:24, 88:16,
96:21, 117:25,
133:22, 167:3,
167:10, 232:23,
234:3, 234:4.
queue 229:14.

quick 47:22.
quickly 148:17.
quiet 23:6.
quite 48:4, 163:6,
223:6.
quote-unquote 6:22,
8:1, 8:7, 13:21,
20:21, 24:2, 24:5,
24:7.
quotes 30:14.
.
.
< R >.
R. 1:41.
race 164:25.
Racketeer 197:14,
199:23.
raids 62:15.
raincoat 171:22,
172:3, 172:8.
Rainey 25:15, 30:12,
32:1, 50:9, 63:5,
85:8, 126:11,
126:18, 134:6.
raining 171:25,
172:5, 172:9.
raised 42:20.
ran 6:25, 11:15,
61:16, 76:21.
range 26:17, 84:22,
158:14, 227:4.
ranked 33:2.
ranking 86:7, 142:2,
149:8.
rant 99:22.
ranting 99:20.
rap 9:7, 9:8, 11:22,
18:25, 19:3,
20:25, 21:9,
21:20, 21:23,
22:3, 150:15,
150:17, 150:18,
150:19, 150:22,
150:25, 151:8,
151:13, 152:1,
152:5.
rapped 151:4.
rapper 4:20, 13:24,
14:4, 17:24,
150:20.

rappers 21:25.
rapping 21:13,
  21:20.
Rarely 188:11.
rat 20:12, 135:17,
  136:19.
Rather 51:4, 127:10,
  133:8, 140:15,
  152:4, 160:10,
  186:18, 187:17.
ratification
  154:5.
ratified 83:21,
  83:24, 84:4,
  147:20, 148:12,
  153:24, 195:6.
ratifies 195:10,
  195:14.
rational 65:15.
Raven 141:8.
Ray 30:7.
re-emphasizing
  116:2.
reach 47:20, 48:4,
  161:14, 170:12.
reaching 164:23,
  171:2, 184:19,
  185:17, 232:9,
  232:18, 232:19.
read 20:11, 45:5,
  49:5, 60:5, 74:9,
  75:9, 80:22,
  83:13, 197:19,
  197:24, 211:15.
readers 70:23,
  71:1.
readily 158:8.
reading 216:15,
  220:8.
reads 49:10,
  199:6.
Ready 2:3, 2:9,
  40:15, 41:7,
  41:15, 82:2,
  114:9, 136:5,
  227:25, 230:3,
  230:9.
reaffirming
  140:19.
real 18:10, 43:10,

47:22, 75:15,
  134:11, 149:23,
  191:8.
real-time 120:19.
realities 118:3.
realization
  180:25.
realize 25:2, 33:20,
  52:20, 115:21.
realizes 77:6,
  178:6.
really 5:21, 13:5,
  18:7, 22:4, 37:16,
  39:10, 44:9, 45:7,
  46:6, 58:20, 60:8,
  98:3, 99:4, 99:10,
  99:22, 134:18,
  233:16, 233:21.
rear 107:12.
reason 25:13, 33:6,
  51:9, 63:18,
  64:21, 68:16,
  85:23, 95:22,
  116:15, 139:11,
  155:14, 159:11,
  165:20, 165:24,
  168:17, 172:7,
  172:19, 185:4,
  196:1.
reasonably 53:12,
  79:19, 186:9,
  196:9, 196:17.
reasoned 172:22.
reasons 170:14,
  177:4, 184:22,
  206:6.
reassemble 216:21.
rebuttal 67:7,
  81:25, 114:22,
  114:24.
recall 51:6, 53:3,
  55:14, 59:10,
  59:12, 69:10,
  70:2, 70:19,
  74:22, 75:13,
  76:16, 78:2,
  114:20, 123:21,
  195:21.
recall. 59:7.
receive 177:21,

178:7, 227:9.
received 23:21,
  56:24, 96:20,
  97:15, 104:9,
  166:4, 166:7,
  166:8, 181:3,
  181:16, 196:1,
  222:23, 224:4,
  224:22, 224:23,
  226:7, 226:16,
  226:19, 226:23,
  226:24, 227:15,
  228:3, 230:3,
  230:4, 230:5.
receiving 74:14,
  213:8.
recent 69:19.
recess 40:3, 40:4,
  40:14, 81:12,
  81:13, 82:1,
  114:6, 114:11,
  161:19, 161:20,
  162:7, 216:23.
recited 121:23.
recognize 18:23,
  86:20, 107:17,
  107:18.
recognized 145:18,
  201:6.
recognizes 209:24.
recoil 107:12,
  107:13.
recollection 56:4,
  67:3, 67:5, 67:14,
  67:16, 71:23,
  74:22, 75:12,
  79:16, 175:10.
recollections
  67:15.
recommend 54:15.
reconvene 162:24.
record. 66:2,
  231:6.
recorded 31:25,
  32:7, 109:17,
  136:3, 136:9,
  136:20.
recording 15:1,
  109:16, 134:22,
  135:13, 135:20,

146:15, 188:10,
224:14, 224:16.
Recordings 31:21,
181:7, 181:8,
181:11, 181:15,
229:2, 229:4,
229:9.
records 14:20,
70:17, 70:18,
85:5, 106:8,
120:23, 121:14,
122:17.
recover 70:5,
208:2.
recovered 10:23,
10:25, 63:15,
70:5, 70:7,
106:25, 107:1,
137:2, 150:11,
155:9, 157:18.
recovering 70:3.
red 15:8, 15:9,
16:1, 21:14,
149:19.
reduce 25:11,
26:1.
reduced 218:19,
218:21.
reducing 125:22.
Reed 120:12.
Reef 14:12,
130:11.
reenact 35:16.
reenacted 34:5,
129:6.
reenacting 35:23,
130:20.
refer 17:10, 185:10,
197:9.
reference 104:10,
130:5, 159:6,
159:23, 217:9,
221:10.
references 102:4,
111:17.
referred 136:14,
196:3, 199:9.
referring 130:16,
185:11, 197:10.
refers 189:25.

reflect 230:8.
reflected 160:18.
reflecting 20:23.
refresh 59:15,
59:17, 59:19,
123:20.
refused 26:19,
125:1, 230:7.
regard 163:10,
166:14, 168:10,
170:20, 191:10,
192:3, 215:8,
215:23, 225:5,
232:16.
regarded 199:18.
regarding 78:5,
126:9, 184:5.
Regardless 163:20.
Regime 6:9, 6:23,
37:18, 38:4, 51:6,
52:4, 52:10,
87:18, 87:19,
116:25, 121:4,
122:25, 133:24,
138:23, 139:4,
144:1, 148:16,
152:9, 156:16,
156:17, 157:9,
160:13, 197:23,
198:12, 201:12.
regimes 50:19.
registered 106:8.
rehashing 75:20.
rehearsed 57:21.
reject 115:20,
122:1, 143:11.
rejected 230:7.
rejoin 218:1.
relate 113:23,
161:24, 179:25.
related 81:19,
101:6, 114:2,
146:21, 203:12,
203:20.
relating 144:17,
164:7, 199:1,
203:6, 205:9,
213:19, 215:2.
relationship 5:23,
6:17, 28:24,

174:19, 194:12,
194:16.
relationships
194:16.
relatively 102:24,
230:9.
relayed 229:15.
release 28:20,
213:21.
relevant 182:14,
194:14, 214:18,
217:6.
relief 82:12.
religion 164:25.
Reloaded 14:20.
relying 219:23.
remain 43:13,
67:6.
remainder 162:24.
remained 36:8,
138:21, 138:25.
remaining 25:24.
remains 41:18,
45:14, 169:9,
222:10.
remanded 218:3.
remarks 47:4.
remember. 59:10.
remembered 26:10,
29:20, 34:13,
86:25.
remembers 88:2.
remind 67:13,
155:19, 157:1,
173:15, 185:25.
reminded 229:6.
remorse 24:8.
removed 85:2.
render 4:4, 4:6,
165:24, 186:17.
repeat 140:3,
177:14, 177:15.
repeated 194:17.
repeatedly 131:13.
repeating 43:24.
rephrase 101:19.
replay 229:13.
report 59:16, 69:7,
69:9, 69:16,
69:20, 69:25,

70:4, 70:6, 70:9,
74:7, 74:14,
76:10, 107:9,
174:17, 218:12.
Reporter 1:47,
227:5, 234:16.
reports 40:6, 81:15,
105:3, 113:22,
113:23, 161:22,
161:23, 217:2.
represent 167:19.
representing
93:20.
request 167:9,
219:7, 223:12,
228:13, 228:14,
229:10, 232:21.
require 5:23, 6:5,
143:12, 183:24,
184:3, 206:12,
207:4, 213:6.
required 30:25,
31:1, 80:23,
142:1, 142:4,
150:5, 154:16,
163:11, 170:4,
173:7, 173:23,
177:3, 182:5,
183:6, 194:7,
200:16, 202:14,
202:16, 204:21,
214:10.
requirement
183:20.
requirements 6:14,
52:24.
requires 3:3, 6:1,
172:14, 178:4,
186:10, 193:15,
202:22, 213:10.
residence 62:21,
65:7.
resident 65:8.
residents 65:12.
residue 105:19,
109:12.
resist 69:1.
resisted 30:9.
resolve 67:4,
164:3.

resolved 40:25,
228:2.
respect 15:1, 36:3,
51:10, 121:15,
128:10, 135:2,
141:19, 142:19,
143:22, 153:22,
154:1, 154:9,
155:24, 156:25,
158:15, 158:24,
170:17, 182:21,
217:7, 217:18,
218:16, 218:18,
222:10, 225:1,
225:2, 228:1,
231:8.
respected 42:13.
respectfully 38:4.
respective 163:5.
respects 226:25.
responded 95:12.
responding 94:20.
response 58:23.
responsibility
121:2, 184:8.
responsible 63:22,
66:24, 122:8,
124:19, 141:3,
160:16, 196:13.
rest 8:25, 9:11,
27:5, 36:2, 45:9,
118:1, 121:24.
restoring 207:24.
rests 185:5.
result 44:13, 44:19,
44:20, 82:12,
143:2, 168:14,
206:12, 206:17.
results 71:21,
175:13, 203:22.
resume 41:15.
retaliate 136:17,
215:1.
retaliated 123:3.
retaliating 199:3,
203:8, 205:11,
208:15, 208:22,
214:20.
retaliation 73:17.
retaliations 73:9.

retire 163:18,
228:1.
retrieval 78:5.
return 5:19, 116:7,
136:24.
returned 23:22,
149:15.
reveal 20:2, 151:14,
151:24.
revealed 120:11.
revealing 11:12.
reverse 121:18,
121:20.
review 166:9.
reviewed 63:13,
76:1, 125:19.
reviewing 175:22.
reward 144:12,
144:13, 207:24.
Ricky 128:5, 132:19,
145:4.
RICO 127:18, 142:10,
197:15, 199:24,
230:19, 230:24.
rid 121:12, 125:12,
127:2, 128:6,
144:4.
rider 158:11.
rifle 8:22, 12:13.
right. 99:22.
rights 2:20, 2:21.
risk 165:17.
rival 61:13, 61:14,
65:19.
rivalry 73:19.
Road 54:1, 70:3,
161:12.
rob 29:24, 33:4,
102:9, 127:7.
robbed 33:7, 55:4,
145:21.
robberies 27:18,
54:10, 55:7,
116:4, 116:17,
117:2, 126:15,
145:15, 145:17.
robbery 23:21,
25:16, 25:24,
27:12, 83:1,
90:22, 100:20,

100:21, 116:13,
127:23, 131:18,
139:18, 139:19,
143:7, 145:13,
145:23, 147:14,
198:23, 203:2,
205:5, 205:13,
207:12, 207:16,
208:3, 208:4,
208:5, 208:6,
216:14.
robbing 55:6,
100:23.
Robbo 135:22.
Roberson 159:14,
159:25, 160:3.
Robinson 62:2.
Rochester 6:19,
10:1, 24:21, 26:7,
29:19, 33:24,
34:3, 34:7, 34:16,
47:8, 63:11, 64:3,
65:2, 65:16,
65:17, 65:18,
68:7, 118:18,
118:23, 119:4,
119:5, 119:14,
119:18, 120:5,
128:2, 138:5,
138:9, 151:4.
rocking 151:21.
Roepcke 64:10,
64:12, 64:13,
68:1.
role 42:3, 42:22,
123:3, 123:22,
193:14.
roles 79:9, 163:5,
193:13.
Rondo 16:17,
110:5.
Ronnie 47:1, 61:3,
95:1, 95:2.
room 60:11, 71:6,
71:12, 163:3,
163:18, 217:12,
217:13, 217:23,
218:11, 228:4,
228:13, 229:4,
229:8, 229:23,

230:11, 231:24,
232:1.
Roscoe 29:23, 29:24,
61:1, 93:2, 93:3,
96:1, 96:3, 124:7,
124:9, 130:15,
134:15, 138:1,
138:24, 198:8.
roster 30:15.
roughly 152:25,
153:1, 153:13,
156:18.
round 112:21.
route 217:19.
row 73:22.
rows 52:2.
RPR 1:46, 234:10.
Ruger 107:14.
Rule 13:23, 109:21,
141:18, 141:20,
163:20, 172:12.
rules 10:9, 10:22,
10:23, 50:4,
125:5, 126:1,
126:20, 147:2,
160:22, 163:9,
166:20, 185:8.
ruling 167:15.
rulings 167:9.
rumors 44:1, 56:11,
56:12, 68:12,
71:24, 72:3, 72:4,
73:10.
run 55:25, 151:5.
running 21:16, 31:8,
35:7, 59:25,
92:24, 95:13,
128:18, 129:1,
151:1.
runs 48:11, 64:11,
71:4.
ruse 231:19.
.
.
< S >.
safe 75:4, 160:22,
209:20.
safety 233:20.
Sailor 69:1, 69:6,
69:10, 69:11,

69:12, 69:19,
69:24.
sale 213:6, 213:7.
sales 53:8, 62:15.
salutation 134:16.
Sammy 20:12.
Sandy 118:21,
124:16.
satisfied 168:24,
172:15, 173:18,
187:14, 191:19,
214:3, 214:15.
satisfy 190:5,
190:16, 202:11,
215:25.
sauce 35:1.
Sauer 68:2.
save 167:19.
saying 10:4, 18:17,
22:11, 24:15,
28:7, 29:17,
35:20, 46:24,
52:19, 56:18,
89:10, 98:19,
99:23, 100:2,
100:11, 110:18,
110:19, 111:9,
113:3, 130:15,
132:2, 132:25,
133:2, 137:11,
143:14, 144:10,
159:3.
sayings 113:13.
scan 105:21, 105:22,
159:12.
scared 22:15.
scary 21:18.
scene 35:14, 35:24,
47:12, 48:14,
63:13, 63:15,
63:18, 63:19,
68:6, 71:20, 74:4,
74:5, 74:6, 76:17,
78:20, 80:16,
105:11, 130:25,
141:11, 149:13,
150:9, 155:22,
193:18, 210:10,
228:23.
scenes 130:10,

228:23.
scheduled 227:3.
schedules 168:2,
  168:5.
scheme 190:20,
  190:21, 192:7,
  193:14, 197:2.
school 42:23, 43:11,
  98:8.
science 188:9.
scooter 57:7,
  57:9.
scope 116:18, 117:8,
  147:25, 154:2,
  193:4, 195:18.
score 103:11.
Scott 94:16.
screen 51:25, 83:14,
  84:22, 123:19,
  137:3.
script 111:9.
scrutinize 159:3,
  174:2, 180:21.
scrutinized
  177:10.
scrutinizing 178:11,
  187:20.
scrutiny 179:20.
se 114:20.
Seagram 131:5.
search 11:2, 17:12,
  18:24, 19:3, 36:7,
  53:9, 71:5, 71:6,
  104:22, 105:4,
  111:22, 120:10,
  140:21, 184:7,
  184:9.
searched 159:11,
  160:2.
searches 17:8,
  184:9, 184:10,
  217:7.
seat 124:9.
seated 41:14, 162:8,
  162:16, 182:3,
  218:9.
Secondly 83:9.
seconds 73:7, 129:2,
  135:20.
secrecy 191:5.

secretive 188:24.
Section 93:4,
  198:17, 199:4,
  199:5, 199:8,
  203:6, 203:8,
  205:9, 205:10,
  208:25, 212:18,
  213:13, 214:21,
  214:22.
sections 198:20.
security 218:4,
  218:14, 232:3,
  232:12, 233:12,
  233:14.
seeing 113:3,
  127:6.
seem 110:8, 164:7,
  174:9.
seems 60:3, 75:18.
sees 141:22,
  171:12.
seg 66:19.
seized 16:4, 153:17,
  184:6, 184:12.
self-serving
  130:2.
sell 8:22, 31:9,
  31:11, 60:6,
  131:13, 132:7,
  132:13, 149:10,
  154:18.
selling 4:17, 5:1,
  29:1, 38:22,
  55:11, 55:12,
  71:8, 72:22,
  90:23, 111:22,
  112:1, 118:10,
  133:8, 152:24,
  153:13.
sells 4:18.
send 100:2,
  229:14.
senior 126:12.
senses 171:11.
sensible 25:6.
sent 29:23, 33:2,
  33:4, 100:7,
  107:4, 107:19,
  108:7, 108:22,
  108:23, 121:11,

137:1, 154:24.
sentence 23:21,
  23:23, 25:11,
  25:24, 26:1, 27:9,
  27:14, 53:24,
  54:16, 178:7.
sentences 125:22,
  161:11.
sentencing 26:23,
  27:12, 54:14.
separate 4:6, 5:12,
  7:16, 23:11, 84:7,
  84:8, 90:24,
  108:4, 189:23,
  193:11.
separately 4:9,
  4:10, 10:17,
  185:15.
separating 227:6.
September 8:18,
  186:15.
Sergeant 101:13,
  104:16, 105:21,
  106:2, 107:22,
  155:18, 155:19,
  157:22, 157:24,
  158:25, 159:4,
  159:7, 160:1.
series 47:11, 70:19,
  70:22, 188:17,
  203:16, 203:17.
serious 3:1, 164:15,
  206:11, 206:16,
  208:7.
seriously 56:4.
serve 42:14.
served 69:1, 69:4,
  177:23.
service 2:17,
  233:12.
Services 202:1,
  214:9.
serving 215:22.
sessions 59:11.
set 50:19, 51:3,
  61:17, 134:24,
  173:1.
seven 69:5, 69:13,
  69:20, 113:1,
  152:25.

several 143:3.
sex 165:1.
shade 174:22.
shall 162:18, 185:6,
  185:7, 197:19,
  197:20, 197:24,
  199:6, 199:10.
shared 147:7.
Shareiff 95:3.
Sharieff 130:8.
sharing 124:7.
Shawn 48:24, 54:24,
  61:23, 73:12,
  73:14, 93:14,
  93:15, 93:21,
  97:9, 97:11,
  110:22, 147:17,
  154:8, 154:12,
  154:17, 154:18,
  154:24.
shell 63:15, 75:24,
  75:25, 76:7, 89:2,
  228:5.
Shelton 136:11,
  136:13.
Shields 97:4.
shifts 168:16.
Shike 198:4.
shining 171:17.
shirt 14:8, 37:24,
  56:22.
Shirts 13:25, 14:7,
  14:15, 93:16,
  98:1, 130:7,
  134:20.
shit 100:1, 134:21,
  135:17, 135:18.
shock 35:3.
shocking 3:16.
shoe 133:14.
Shoody 130:17,
  221:22, 221:23,
  221:25, 222:7.
shoot 8:16, 21:22,
  27:2, 33:4, 37:10,
  75:22, 76:10,
  102:19, 125:17,
  157:20, 158:12.
shooter 125:1,
  129:1, 130:15,

130:16.
shootings 34:2,
  39:17, 93:24,
  94:4, 116:4,
  116:16, 117:2,
  126:15.
shops 6:25, 31:5.
short 40:3, 167:3,
  213:10.
Shortly 8:8.
shouldn't 27:22,
  115:10, 122:1,
  131:24, 137:16,
  140:7, 149:19,
  149:20.
show 17:13, 17:15,
  18:2, 35:9, 47:2,
  52:8, 56:3, 56:21,
  75:6, 87:4, 88:6,
  89:3, 97:14,
  97:23, 116:24,
  117:1, 117:3,
  128:8, 129:1,
  155:17, 167:11,
  177:3, 183:11,
  200:15, 212:13,
  229:5, 230:5.
showed 3:17, 10:7,
  10:22, 12:20,
  17:7, 17:19,
  19:10, 21:19,
  39:23, 49:13,
  49:14, 59:16,
  64:15, 70:25,
  74:5, 93:2, 93:23,
  95:25, 97:24,
  106:5, 108:19,
  108:21, 155:16.
showing 67:22,
  77:25, 107:8,
  108:10, 151:2.
shown 86:19, 86:22,
  87:22, 110:2,
  148:17, 152:14,
  188:16, 189:6,
  189:8.
shows 7:9, 72:15,
  74:1, 74:25,
  93:11, 109:1,
  122:20, 137:19,

143:23, 158:16,
  158:17.
shrugged 58:22.
shut 2:23, 7:14,
  104:25, 126:12,
  126:19.
sic 100:14.
side 60:23, 67:15,
  127:8, 167:5,
  167:6, 169:15,
  169:25, 223:7,
  223:8.
side-by-side
  136:25.
sides 44:8, 127:6,
  177:15.
sideways 131:7.
sift 165:10.
sifters 106:19.
Sig 68:2.
sight 157:10.
sign 15:23, 93:19,
  93:22.
signed 126:2.
significance 183:12,
  184:11.
significant 3:12,
  151:2, 217:16.
signs 10:21, 37:23,
  64:1, 93:15,
  93:17, 93:18,
  93:19, 98:1.
silver 130:7,
  134:20.
similar 49:13,
  49:14, 96:17,
  203:22.
similarity 80:12,
  186:10, 193:23.
Similarly 190:19,
  193:19.
simple 39:10, 83:6,
  116:23, 168:17,
  171:15.
Simply 15:10, 20:23,
  53:12, 115:7,
  125:8, 129:18,
  130:3, 132:2,
  146:16, 150:22,
  151:16, 167:2,

172:14, 210:9,
212:24, 213:23,
215:15, 226:8.
sing 125:24.
singer 130:16.
single 32:7, 94:1,
99:14, 102:11,
112:11, 115:23,
150:14, 152:21,
163:16, 193:15.
sir 40:21, 58:1,
58:3, 58:4,
114:16.
Sister 30:7, 92:11,
98:7.
sit 42:3, 81:1,
148:8, 229:5.
site 122:17.
sitting 46:20, 48:4,
52:2, 71:15, 72:6,
171:20, 229:23,
230:25.
situation 232:22.
situations 150:2.
Six 24:23, 26:9,
29:19, 34:12,
63:23, 64:2, 69:5,
69:13, 69:20,
101:22, 227:6.
skilled 81:6.
slate 169:2.
sleep 159:18.
slide 49:13.
slides 75:22.
SM 77:13, 77:20,
78:1, 220:9,
220:14, 220:16,
220:17, 223:15,
223:16, 223:20,
223:21, 223:23,
224:5, 224:6.
smacks 132:16.
small 19:11, 156:20,
179:4.
smile 21:25.
smoke 131:12,
232:2.
smooth 227:25.
smuggling 146:10,
146:19.

snitch 20:14.
snitched 20:18.
snitched. 20:21.
snitches 151:3.
snitching 8:9, 21:6,
22:14.
snowstorms 42:2.
so-called 176:23,
177:18.
social 9:4, 19:6,
20:4, 20:5, 93:6,
115:16, 122:17,
130:8, 134:19,
149:1, 150:17,
151:9, 152:6,
218:22.
society 199:17.
soda 76:14.
sold 4:15, 28:21,
29:25, 38:10,
39:7, 90:23,
111:20, 118:7,
132:5, 137:22,
137:25, 152:19,
154:12, 156:19,
156:20.
sole 62:23, 164:1,
173:20, 173:21,
181:25, 209:24,
210:1.
solely 165:8,
165:15, 170:18,
185:5, 185:19,
210:7, 210:10,
217:13.
solemn 200:17.
somehow 143:10,
149:17, 159:5,
177:21, 233:15.
sometime 6:21,
8:21.
Sometimes 60:16,
72:14, 102:13,
104:11, 145:16,
151:12, 217:21.
somewhere 13:6,
227:4.
son 92:10, 92:14,
92:21.
song 18:25, 151:8.

Soo 98:18.
soon 23:22, 42:23,
48:10, 220:12.
sorry 6:3, 8:15,
9:3, 31:4, 220:20,
223:19, 224:1.
sort 13:12, 24:18,
162:25, 228:5,
233:11.
sound 56:16,
131:21.
sounds 10:3.
sources 217:8.
spaghetti 35:1.
Speaking 42:8, 50:1,
136:9.
special 49:11,
184:16.
specialized
115:18.
specific 12:14,
12:17, 77:4,
88:15, 111:6,
116:4, 116:16,
116:17, 129:22,
137:22, 150:6,
160:10, 183:21,
186:5, 186:7,
189:24, 191:25,
197:7, 197:12,
214:2, 231:12.
specifically 67:4,
88:2, 91:2, 107:1,
139:4.
specified 200:18.
speculate 58:25,
170:14.
speculation 45:22,
173:5.
spend 5:18.
Spent 27:9, 50:5,
94:5, 94:6, 113:4,
228:4.
spilling 228:24.
spit 11:16, 11:19,
11:20, 11:21,
11:23, 22:25,
151:20, 151:22.
spitting 151:23.
splattered 131:8.

split 77:8, 90:7.
spoke 87:18.
spoken 129:21,
  190:24.
sponsor 112:15.
sponsored 91:21.
sponsors 91:20.
spot 234:2.
spots 120:16,
  140:24.
spread 56:13.
spring 107:1,
  107:12, 107:14,
  158:1, 158:2,
  158:6, 158:11.
SQ. 100:2.
square 112:22.
squared 132:2.
squarely 122:22,
  143:24.
squeezed 77:7.
stabbed 23:23,
  25:19, 89:12,
  89:16, 89:17,
  89:19, 90:16,
  94:18, 94:23.
stabbing 89:11,
  147:15.
stabbings 147:7.
stack 230:13.
stake 133:12,
  133:13, 192:5.
stamp 96:20.
standard 54:4.
standing 14:22,
  21:25, 22:10,
  22:17, 22:21,
  23:8, 23:12,
  93:17, 150:13.
standoff 155:12.
stands 185:20.
start 2:9, 2:16,
  5:20, 23:20,
  44:23, 45:3, 57:3,
  58:2, 58:3, 58:4,
  58:5, 58:6, 116:1,
  116:2, 118:4,
  142:13, 150:18,
  227:3, 230:12.
started 18:19,

18:20, 46:2, 58:9,
  59:6, 76:17,
  87:25, 91:12,
  91:13, 145:4,
  172:5.
starters 143:12.
starting 42:11,
  186:15, 186:16,
  186:18.
starts 63:24, 64:3,
  74:15.
stash 8:1, 34:23,
  62:22, 102:22,
  103:2, 118:15,
  118:16, 137:23,
  138:6.
stashed 55:17.
state 42:25, 48:25,
  119:19, 121:10,
  132:4, 144:9,
  144:13, 157:22,
  163:9, 163:13,
  163:20, 175:17,
  187:25, 188:6,
  188:7, 188:11,
  188:12, 202:4,
  203:2, 205:4,
  205:5, 205:12,
  211:10.
stated 107:2,
  163:13, 190:20,
  212:24.
statement 105:6,
  106:12, 112:7,
  151:10, 151:18,
  166:22, 166:23,
  166:24, 178:17,
  178:19, 178:22,
  179:1, 179:9,
  179:10, 182:19,
  182:22, 183:5,
  187:23.
statements 69:11,
  94:18, 119:13,
  166:1, 180:19,
  180:25, 182:13,
  182:15, 182:24,
  183:2, 183:11,
  191:11, 192:20,
  195:22, 195:24,

196:10, 196:14,
  196:18, 196:21,
  196:23, 197:1,
  197:3.
States 1:1, 1:5,
  24:16, 164:16,
  190:2, 198:18,
  198:21, 199:5,
  202:1, 202:2,
  202:3, 203:6,
  203:7, 205:8,
  205:10, 208:25,
  212:18, 213:13,
  213:18, 214:22.
stating 163:17.
station 48:6, 76:15,
  76:18, 76:20.
status 149:8,
  195:11, 227:25.
statute 199:17,
  199:21.
stay 26:21, 29:22,
  64:12, 65:17,
  147:2, 221:3,
  231:24.
stayed 43:14,
  138:16.
stenographic
  234:11.
step 67:7, 206:19,
  206:21, 207:3,
  207:6.
stepfather 42:20,
  42:21.
steps 71:15, 72:6,
  72:7, 72:10,
  130:22, 131:2,
  228:24, 231:14.
Steve 100:2.
Stimey 14:11, 128:5,
  130:8, 130:11.
stipulation 74:9,
  166:13, 168:8.
stipulations
  166:5.
Stokes 8:21, 8:22,
  38:16, 38:17,
  38:18, 85:11,
  134:7, 148:24,
  152:17.

289

stolen 138:8.
stomach 13:24.
stones 119:12.
stood 4:11.
stop 52:18, 64:10,
  69:8, 98:11,
  147:1, 162:22,
  216:17, 216:20.
stopped 64:9, 67:25,
  69:8.
stops 53:8, 62:16.
store 36:20, 62:23,
  65:4.
stored 137:23.
stories 30:4, 30:5,
  31:3, 56:9, 77:11,
  99:11, 99:13.
story 28:15, 44:8,
  56:17, 60:24,
  63:25, 64:3,
  76:19, 132:24,
  140:13, 145:3,
  231:17.
straight 134:25.
straightened 225:4,
  230:2.
strange 73:4, 73:5,
  96:19.
strangle 227:5.
Street 1:48, 28:11,
  43:11, 56:6,
  62:13, 62:21,
  63:9, 63:20, 65:4,
  65:11, 65:18,
  71:16, 72:13,
  94:6, 98:14,
  99:12, 103:22,
  109:7, 113:3,
  118:15, 125:24,
  130:23, 138:1,
  138:20, 147:4,
  149:9.
streets 101:24,
  156:6, 160:23.
stretch 182:1.
stricken 166:11.
strike 174:16,
  234:1.
strolled 43:10.
strollers 57:5.

strong 57:12,
  68:13.
stronger 129:16.
strongly 118:25.
structure 10:6,
  84:17, 137:18,
  137:20, 138:13,
  160:22.
structured 51:17,
  138:3.
student 60:12,
  70:20, 70:24.
stuff 51:2, 73:5,
  230:13.
stumbled 55:14.
stunting 154:23.
stunting. 110:13.
Stymie 61:18.
subdued 71:5.
subject 147:2,
  165:15, 177:17,
  186:3.
subjects 12:9,
  16:22.
submit 3:3, 7:9,
  16:18, 38:4,
  79:21.
subordinate 142:3.
suboxone 146:13.
Subsection 199:7,
  199:9.
substance 53:13,
  203:4, 205:6,
  208:24, 209:1,
  209:2, 209:3,
  209:7, 212:18,
  212:20, 212:21,
  228:15.
substances 5:14,
  52:23, 53:1,
  194:14, 198:24,
  198:25, 199:1,
  203:4, 205:7,
  228:6.
substantial 110:7,
  186:10, 194:18,
  206:18, 206:21,
  207:2, 207:6,
  209:16, 209:22,
  227:6.

substantially
  201:21.
substantive 110:7,
  147:23, 153:25,
  189:25, 190:3,
  195:16.
substitute 185:3.
subtle 232:11.
successful 43:17,
  200:19.
sudden 47:2, 59:6,
  59:9, 88:2, 96:7,
  111:10.
suddenly 26:10,
  29:19, 33:15,
  34:12.
suffering 71:16.
sufficient 45:13,
  80:20, 169:2,
  186:7, 193:15,
  194:4, 202:10,
  203:13, 211:23,
  215:9, 215:13.
suggest 159:4.
suggested 123:15.
suggestion 37:7,
  121:25.
suggests 28:12,
  233:15.
sum 178:13,
  194:20.
summaries 167:17,
  167:18, 167:20,
  167:24, 168:2,
  168:5.
summarized 134:10.
summations 176:23.
summer 76:8.
sun 171:17.
Superbowl 103:5,
  103:9, 103:10.
Superseding 185:12,
  197:8, 197:11,
  198:1.
supervised 213:21.
supper 125:25.
supplied 7:24, 62:9,
  137:24, 148:18,
  152:15.
supply 8:11,

231:24.
supplying 213:9.
support 38:5, 73:11,
    76:6, 106:12,
    194:13, 194:17.
supported 65:15.
supporting 125:10.
supposed 9:9, 9:25,
    45:7, 78:13,
    125:5, 125:6,
    141:18.
supposedly 8:21,
    87:1, 106:17.
surely 60:5.
surliness 58:6.
surprised 110:24.
surrounding 135:23,
    187:1, 187:22,
    188:20, 232:13.
surveillance
    63:14.
surveilling
    104:17.
survives 4:16.
suspect 94:2, 94:3,
    174:10, 217:24.
suspected 105:18.
suspects 63:16.
suspicion 172:21,
    181:4, 183:5.
sustain 84:2, 169:6,
    186:20, 187:3,
    195:8.
sustained 164:24.
Swahili 12:1, 12:3,
    12:15.
Swan 60:17, 60:21,
    125:12, 132:7.
swayed 165:8.
sweet 234:2.
swing 71:4.
switching 221:9.
sword 12:13.
sworn 163:22,
    166:3.
symbol 14:18, 15:4,
    15:17, 15:19,
    16:1.
symbols 10:21.
sympathy 165:8,

165:17, 165:24.
system 45:4, 160:25,
    161:3, 161:10,
    230:21, 230:22.
.
.
< T >.
T-mobile 108:1,
    108:2, 108:6,
    108:10, 108:12.
T-shirt 16:1.
T-shirts 14:13,
    61:19, 130:12.
T. 1:46, 16:21,
    234:15.
table 48:5.
tag 70:23, 70:25,
    71:1.
tagged 46:19.
taken. 40:14, 82:1,
    114:11, 162:7.
talks 20:11, 22:8,
    22:9, 64:8, 69:7,
    102:21, 137:10.
tall 77:2.
tampering 117:3,
    127:24, 199:2,
    203:6, 205:9,
    208:15, 208:22,
    213:12.
Tangier 74:9, 74:16,
    74:18, 152:16.
tape 31:22,
    128:17.
taping 36:14.
tapped 31:20,
    144:11.
targeted 104:6.
taste 21:3.
tattoo 11:25, 13:7,
    13:9, 13:13,
    13:16, 13:19,
    13:22, 13:24,
    84:11, 84:12,
    130:4, 130:5,
    131:10.
tattooed 13:11.
tattoos 11:24,
    12:11, 12:14,
    12:16, 12:25,

13:1, 13:4, 37:23,
    45:24, 49:2, 84:9,
    84:10, 84:11,
    84:13, 84:15,
    113:10, 134:10,
    134:11.
Taurus 68:1,
    68:22.
Taylor 37:7, 47:19,
    120:18, 120:20,
    120:24, 122:15,
    140:9, 140:17,
    141:1.
TB 158:21.
team 151:6.
team. 126:17.
Tech 31:23, 31:24,
    31:25, 33:7, 36:7,
    36:8, 36:9, 36:19,
    36:23, 37:2, 37:3,
    37:4, 48:6, 48:11,
    61:16, 63:15,
    74:6, 140:21.
technically
    231:18.
technique 183:17,
    183:21.
techniques 79:3,
    150:6, 150:7,
    183:22.
technology 231:2,
    231:3.
techs 74:4.
Telephone 62:17,
    159:14, 198:6.
tell. 125:5.
tells 73:14, 87:25,
    89:10, 89:11,
    90:14, 109:9,
    110:16, 213:3,
    217:23.
Telly 90:9, 198:6.
temporary 215:7.
Ten 64:18, 68:17,
    81:2, 81:4, 85:5,
    94:6, 129:19,
    162:3, 162:6,
    202:23.
ten-minute 161:19.
tends 171:13.

tentatively
    227:14.
tequila 21:14.
term 53:20, 60:14,
    104:4, 147:20,
    172:18, 199:17,
    199:20, 200:7,
    209:8, 228:9.
terminology
    150:17.
terms 49:25, 51:18,
    101:14, 101:16,
    115:25, 142:12,
    143:18, 159:20,
    200:23, 217:10,
    232:13, 232:22,
    233:13.
Terp 59:25.
territory 138:19,
    138:22, 143:25,
    202:3.
terrorize 161:7.
test 105:19, 107:5,
    109:12, 158:13.
tested 107:7, 107:9,
    107:10.
testers 8:16.
testifies 72:24,
    171:8, 171:10.
testifying 22:10,
    24:11, 25:12,
    26:1, 28:14,
    76:16, 91:1,
    121:9, 125:21,
    149:3, 155:19,
    159:1, 174:8,
    177:22, 177:23,
    179:22, 180:6,
    184:22.
testimonies 175:6.
testing 107:5,
    150:1.
tests 150:8.
texting 97:11.
texts 17:12,
    17:13.
Thabiti 47:7, 74:3,
    124:6, 124:17.
thanking 2:17.
thanks 160:21.

themselves 9:18,
    9:23, 110:16,
    115:9, 154:17,
    160:17, 167:22,
    177:2, 181:19,
    181:20.
theory 55:25,
    100:23, 184:17.
thereby 194:23.
thereof 216:14.
they'll 231:24.
they've 46:9,
    80:1.
thin 77:2, 77:5.
thinking 77:4,
    115:24, 165:17.
thinks 93:3.
Third 36:15, 45:11,
    49:22, 66:5,
    80:16, 200:5,
    204:9, 211:6,
    211:8, 218:11,
    231:11.
Thomas 198:3.
though 57:1, 82:24,
    95:10, 102:4,
    135:25, 158:5,
    173:24, 190:3,
    206:4.
thousands 78:3.
threat 203:13,
    203:19, 203:25,
    207:14, 207:19,
    213:15, 215:15,
    215:16, 215:19.
threatened 57:11,
    75:10, 121:24,
    215:13, 215:17.
threatening 21:21.
threats 75:13,
    161:2.
three 4:3, 4:6,
    26:13, 31:12,
    33:23, 43:7,
    57:13, 76:24,
    77:10, 108:8,
    117:12, 118:6,
    122:24, 125:19,
    128:5, 129:12,
    139:11, 155:25,

    157:13, 182:7,
    201:16, 205:22,
    206:25, 207:10,
    207:19, 209:2,
    214:25, 225:12.
three-quarters
    108:24.
three-way 158:21.
three: 128:2.
threshold 153:2,
    153:15.
threw 132:8.
thrived 50:16.
throughout 92:4,
    138:17, 139:3,
    139:7, 148:19,
    162:18, 168:22,
    201:24.
throw 77:2, 77:3,
    77:7, 230:21.
throwing 93:22,
    119:11.
thrown 64:9.
thrust 149:15.
thug 48:1.
tickets 105:24.
tied 21:14.
ties 59:5.
timeline 7:19,
    93:23.
tip 104:9.
tired 27:13.
Title 115:17,
    198:17, 198:21,
    199:5.
to. 92:7.
today 5:19, 21:11,
    41:2, 41:3, 43:18,
    44:23, 81:1,
    114:6, 116:25,
    197:22, 198:11,
    201:11, 217:15.
together 22:2,
    42:14, 43:9,
    43:11, 43:23,
    44:4, 50:3, 50:5,
    80:13, 104:19,
    107:4, 108:14,
    189:21, 190:18,
    191:14, 193:24,

198:14, 200:25,
230:10.
toilet 155:15.
token 164:19,
169:16.
Tomorrow 81:3,
162:24, 216:20,
218:1, 227:2,
227:10, 227:17,
227:24, 230:1,
230:12, 230:17,
231:23, 232:9,
232:16, 234:5.
tonight 227:1,
227:5.
took 3:18, 11:10,
37:22, 49:3,
70:10, 70:11,
76:1, 83:12,
95:22, 111:7,
117:15, 119:24,
120:12, 126:3,
129:2, 132:23,
134:14, 154:11,
179:15, 188:21,
206:21, 207:6,
207:17, 207:18,
231:8.
top 5:7, 7:4, 9:1,
16:10, 16:11,
16:24, 78:21,
136:13.
topic 119:13,
149:11.
total 216:16.
totally 23:10,
108:3.
touch 38:21, 40:6,
81:15, 113:22,
161:22, 217:2.
touched 64:25,
72:17.
touches 171:12.
tough 42:19, 99:6,
131:21.
toward 136:1,
206:22, 207:3,
207:7.
towards 170:23,
206:19.

tower 107:25,
108:14.
towers 107:23,
108:3.
trade 132:24.
tradition 42:10.
Tradon 132:13,
132:15, 137:10,
137:12.
traffic 53:8, 62:16,
64:10, 208:20.
trafficking 147:6,
198:24, 208:15,
208:22, 216:14.
tragedy 47:6,
48:13.
tragic 47:8.
trail 76:22,
131:3.
trained 59:5.
training 115:18,
184:16.
transaction 97:13,
175:8, 188:24.
transactions 38:24,
194:17.
Transcript 1:17,
123:19, 181:23,
234:11.
transcripts 181:14,
181:17.
transfer 91:6,
211:10, 212:24,
213:11.
transition 50:8,
50:13, 51:23,
52:14.
transitioned 6:20,
139:1.
trash 70:13.
travel 42:12.
treatment 177:22.
tree 35:10.
Trevon 47:7, 71:14,
75:1, 75:7, 75:17,
122:4.
trials 91:8.
tribute 8:5.
Trick 100:7, 103:1,
233:14.

trickle 50:24.
trickled 50:24.
tried 76:9, 137:11,
141:13, 159:4.
tries 39:14.
trigger 54:24,
139:25, 228:9,
228:10, 228:11.
triggers 228:20.
Trooper 105:15,
105:20.
trouble 20:1, 60:1,
103:23.
Troy 26:12, 26:24,
29:21, 50:9,
54:11, 63:5,
87:14, 128:14,
128:25, 129:10,
137:6, 145:15.
true 33:5, 84:15,
137:14, 143:20,
147:11, 151:8,
151:11, 153:12,
156:15, 156:17,
165:18, 166:14,
166:15, 166:23,
166:24, 167:1,
168:9, 168:10,
169:20, 231:18.
trunk 8:24.
trust 94:8, 99:5.
trusted 140:7.
truth 28:13, 91:5,
110:16, 117:18,
125:18, 151:10,
154:24, 166:24,
174:5, 174:22,
177:20, 178:1.
truthful 132:12.
truthfully 177:23,
180:6.
try 47:19, 62:3,
62:6, 99:7, 102:9,
122:13, 213:1,
228:8.
Trying 13:14, 20:13,
20:22, 22:6, 23:7,
32:14, 48:3,
58:11, 60:4, 60:6,
60:7, 64:24,

103:18, 110:16,
112:21, 127:9,
127:10, 128:21,
132:7, 139:12,
174:16, 234:1.
tucked 11:2.
Tudda 16:21.
Tuesday 1:19.
turn 2:10, 3:20,
38:6, 57:20,
62:12, 197:12,
226:15.
turned 47:23, 83:10,
113:12, 147:14.
turning 83:23,
113:11.
turns 82:10, 83:25,
100:13.
twice 88:17.
Twin 61:20.
twitching 131:21.
two-wheel 57:9.
two. 99:25.
type 21:10, 98:18,
98:19, 143:1,
153:6, 171:7,
216:11.
typed 181:13.
types 62:17, 117:6,
127:20, 171:4,
183:17, 196:4,
216:11.
Tyra 119:21.
Tyrone 198:9.
.
.
< U >.
ultimate 213:7.
ultimately 67:13.
ultimatum 126:19,
126:20, 126:21.
umbrella 171:21,
172:3, 172:8.
unanimous 216:11.
unanimously 169:3.
uncertain 94:23.
uncertainty 108:22,
108:24.
unchanged 201:21.
Uncle 30:7, 31:18,

31:20, 31:21.
uncommon 175:10.
uncontradicted
52:13, 100:15,
101:20, 173:25.
uncredible 159:5.
undercover 8:19,
29:2, 32:1, 53:8,
62:16, 111:24.
underlying 167:18.
underneath 20:10.
understand 142:10,
218:17.
understanding 31:10,
168:6, 184:18,
190:24, 194:20,
200:18.
understood 141:2.
undertaken 195:9,
195:13.
undertaking
194:23.
undisputed 84:14.
unfamiliar 21:11.
unfavorable 170:23,
176:15.
unfortunate 47:11.
unfortunately 3:11,
42:21, 48:12,
61:21.
unimportant
175:13.
Unit 6:12, 75:4,
107:4, 107:5,
201:5, 201:17.
United 1:1, 1:5,
24:16, 164:16,
190:2, 198:17,
198:21, 199:5,
202:3, 203:6,
203:7, 205:8,
205:10, 208:25,
212:18, 213:13,
213:18, 214:22.
University 60:1,
60:7, 70:20,
70:23, 70:24.
unknown 156:2,
198:15.
unlawful 38:11,

52:25, 80:20,
187:6, 189:21,
190:9, 190:11,
190:14, 191:1,
191:14, 191:25,
192:13, 192:16,
193:7, 194:3,
194:11, 194:21,
194:24, 196:6,
197:2, 199:6,
199:10, 199:15,
200:14, 200:19,
200:20, 201:8.
unlawfully 68:21,
198:16.
unless 41:10, 45:14,
121:25, 169:3,
169:10, 211:17,
227:19.
unlikely 162:20,
208:1, 212:5.
unnecessary
167:20.
unreasonable
156:21.
unspoken 190:24.
until 25:25, 44:7,
45:14, 62:8, 63:2,
105:6, 113:14,
119:5, 119:7,
134:13, 147:10,
168:23, 169:11,
186:14, 197:25,
217:23, 218:6.
untrustworthy
149:18.
untruthfully
132:4.
unusual 3:13,
98:8.
upbringing 99:1.
update 159:15.
upload 151:13.
uploaded 151:9.
upset 28:25.
upshot 122:9.
upstanding 54:20.
usage 209:8.
user 19:23.
users 118:15, 138:6,

138:7.
using 27:18, 98:20,
  101:14, 119:24,
  149:8, 179:14,
  179:15, 179:21,
  179:22, 183:17,
  208:6.
uttered 103:15,
  103:16, 188:18.
.
.
< V >.
vague 58:18.
valid 184:11.
validity 184:8.
value 69:22, 70:12,
  172:11, 207:21,
  207:23.
vast 18:12, 32:12,
  44:8.
vehicle 74:13.
vehicles 232:21.
Veney 124:21.
venture 192:5.
verdict 4:5, 4:7,
  4:8, 39:25,
  127:17, 153:3,
  153:16, 160:19,
  161:15, 161:16,
  163:22, 165:18,
  165:21, 165:25,
  170:16, 171:2,
  185:17, 185:18,
  185:22, 186:17,
  216:11, 230:19,
  230:20, 230:22,
  231:3, 232:9,
  232:18, 232:19.
verdicts 4:6, 116:8,
  170:12, 170:18.
verification
  226:25.
verified 109:13.
verifies 220:12.
verify 108:5, 108:6,
  108:16, 218:10.
verifying 226:16.
version 6:15, 6:16,
  120:1.
versions 119:25.

versus 85:22.
vestibule 218:11,
  231:11.
vice 24:16.
victim 74:11, 111:8,
  111:10, 124:10,
  128:11, 131:20,
  199:2, 203:7,
  205:9, 205:21,
  206:1, 206:14,
  207:1, 207:11,
  207:15, 207:17,
  207:20, 213:15,
  214:1, 214:17,
  214:25, 215:2,
  215:11, 215:12,
  215:14, 215:18.
victims 145:18,
  161:11, 199:3,
  203:8, 203:22,
  205:11.
video 11:22, 18:3,
  19:15, 21:13,
  21:18, 21:19,
  21:23, 21:24,
  22:8, 22:22, 23:3,
  35:7, 35:8, 35:9,
  35:18, 46:12,
  56:21, 57:2, 57:3,
  57:11, 128:17,
  128:24, 129:3,
  129:6, 150:25,
  151:19, 221:25.
videos 9:7, 9:8,
  18:8, 19:15,
  20:25, 21:2, 21:3,
  21:12, 22:3,
  22:20, 23:9,
  45:24, 46:11,
  104:8, 129:8,
  150:17, 151:13.
videotapes 76:18.
view 12:24, 152:3,
  163:22.
viewed 177:11.
Village 55:5,
  145:19.
violate 49:16,
  163:22, 189:12,
  189:22, 197:13,

198:17, 199:7,
  199:23.
violating 199:4.
violation 144:10,
  144:13, 189:24,
  208:24, 212:18,
  213:13, 213:20,
  214:21.
violence 54:13,
  151:3, 152:8.
virtually 71:9,
  117:14.
virtue 171:11.
visual 48:1.
voice 60:17.
Volume 1:10.
voluntarily 186:22,
  186:23, 191:17.
volunteered 127:2.
vote 44:20, 227:8.
voting 227:8.
vouching 213:7.
vs 1:8.
.
.
< W >.
W. 1:48.
Wagster 79:2,
  107:11, 107:17,
  125:16, 158:9,
  158:13.
wait 219:18,
  220:6.
waiting 218:12,
  220:5.
wake 81:3.
walk 76:20, 231:2,
  232:3.
walked 35:11, 36:7,
  49:3, 63:14, 74:5,
  79:12, 125:23,
  171:21, 171:22.
walking 57:4, 72:13,
  76:14, 76:17,
  109:7.
wall 106:24,
  157:21.
wandered 11:14.
wanted 9:23, 19:16,
  24:11, 25:2,

50:16, 65:19,
71:1, 74:18,
74:19, 82:9, 99:4,
99:5, 102:7,
102:8, 110:8,
125:4, 126:12,
136:17, 163:2,
233:8.
wants 10:17, 15:12,
16:3, 22:2,
101:12, 102:10,
140:5, 229:20.
warn 47:19.
warning 23:6, 228:9,
228:10, 228:12.
warrant 36:7, 48:4,
48:9, 61:16, 71:5,
104:22, 120:11,
140:21, 144:2,
144:9.
warrants 53:9,
105:4, 111:22,
126:2, 133:9,
184:7, 184:9.
watch 125:13,
125:15.
watching 104:20,
119:18, 141:11.
ways 2:20, 2:21,
4:16, 4:20, 28:3,
44:11, 56:1,
132:3, 140:3.
weapon 23:22, 60:4,
74:25, 123:22,
142:23, 208:3,
208:4, 208:6.
weapons 22:5, 60:5,
68:5.
wear 15:11.
wearing 14:19,
15:22, 93:20,
129:4, 129:5,
130:8, 130:11.
website 19:2,
19:21.
websites 20:4.
weed 97:7, 146:8,
146:12, 146:15,
147:15, 154:9.
week 97:23.

weeks 42:1, 48:17,
50:5, 81:5, 91:12,
118:9, 119:16,
124:25.
weigh 133:16,
178:10, 206:6.
weighing 175:11,
184:20.
weight 39:3, 104:14,
164:2, 173:22,
175:20, 175:24,
176:6, 178:12,
178:14, 179:10,
180:3, 181:4,
182:16, 184:25.
weirdo 22:18.
Welcome 19:15, 22:8,
22:21, 151:19.
Wes 43:21, 90:9,
98:6, 98:8, 98:10,
121:8, 121:10,
121:11, 121:14,
142:22, 153:11,
198:4.
Wesley 8:11, 11:2,
46:25, 48:23,
59:24, 70:19,
71:11, 73:15,
77:13, 95:1, 95:2,
121:1, 139:25,
140:14, 141:11,
142:5, 153:17,
198:3, 224:14.
West 16:15, 16:16,
145:19, 198:4.
wet 171:22, 171:23,
172:2, 172:3,
172:8.
whatever 9:22,
24:15, 29:13,
38:21, 48:10,
58:23, 58:24,
69:22, 75:11,
78:25, 104:14,
141:23, 158:11,
164:4, 175:23,
178:12, 180:3,
184:25, 227:10,
229:13, 229:19,
232:2.

whatsoever 88:23,
93:20, 100:21,
103:19, 104:5,
106:12, 109:12,
112:6.
Wheeler 47:7, 74:3,
124:6, 124:9,
124:10, 124:13,
124:14, 124:18.
wheels 57:7, 57:8.
Whenever 185:10,
197:9.
whip 125:12.
White 15:7, 15:8,
47:7, 71:15, 72:7,
72:8, 73:16,
73:21, 73:24,
74:2, 75:1, 75:7,
75:17, 122:4,
141:22, 198:4.
whole 18:18, 42:4,
77:2, 151:20,
163:18.
whom 38:12, 137:7,
180:14, 197:3.
wife 46:8, 228:11.
wig 103:1.
Willful 79:21,
187:9, 188:23,
205:21, 205:25.
Willfully 6:2, 6:3,
38:12, 49:21,
53:2, 187:5,
190:10, 191:17,
191:24, 200:4,
204:6, 206:25.
willfulness 188:6,
188:19, 205:19.
willing 131:13,
194:24.
willingly 15:16.
willow 102:22.
Wilson 61:20.
wind 125:7.
window 155:20,
155:22, 186:19.
windows 171:18.
wire 144:7.
wiretap 101:14,
155:1, 159:8,

159:9, 159:20,
160:1.
wisdom 163:19.
wish 2:11, 41:19,
82:17, 114:24,
218:15, 218:16,
219:16.
withhold 207:22.
within 108:11,
108:12, 143:24,
179:17, 193:16,
202:23, 214:13.
Without 30:1, 55:9,
56:15, 80:20,
101:22, 104:22,
107:5, 126:4,
156:9, 161:7,
163:10, 164:10,
170:20, 181:8,
183:18, 193:22,
194:3, 194:5,
196:22, 224:8,
224:18, 226:4,
228:25, 229:14,
232:9, 232:18.
witnessed 94:17.
witnessing 175:8.
woman 120:14.
women 103:22.
wonderful 3:10.
Woo 98:18.
Woodley 35:3,
119:21.
woods 95:15.
word 2:24, 3:21,
11:25, 12:1, 12:4,
12:15, 19:25,
49:10, 56:6, 85:7,
85:9, 85:11,
87:16, 89:25,
98:14, 98:20,
102:11, 103:16,
121:21, 125:9,
199:16, 199:20,
212:22, 228:9.
words 45:5, 80:21,
96:4, 125:6,
150:16, 171:9,
176:5, 188:13,
188:17, 190:20,

191:9, 212:24,
215:16.
wore 14:17, 15:10,
15:11, 134:13.
work 44:24, 73:6,
74:19, 99:21,
115:16, 136:17,
141:12, 161:9.
work-a-day 42:21.
worked 28:20, 31:18,
158:12, 158:13,
227:22.
worker 192:2.
workers 2:23.
working 28:21,
31:19, 43:1,
51:4.
workings 104:2,
109:22.
works 99:10, 142:10,
231:4.
world 18:18, 21:10,
73:4, 73:6, 99:10,
136:8, 149:23.
worlds 77:10.
worldwide 21:9.
worried 128:17,
128:24.
worry 82:7, 150:8.
worth 26:20, 27:4,
152:24, 152:25,
153:13.
wounds 71:17,
124:13, 124:14.
wrap 157:17.
write 96:6, 96:12.
writes 69:6.
writing 93:3, 96:17,
190:20.
written 70:4, 96:1,
96:3, 105:3.
wrongdoing 80:10,
80:11.
wrote 33:1, 96:13,
96:15, 136:23,
137:9.
.
.
< Y >.
Yeah. 123:23.

year 8:10, 55:18,
64:2, 64:6, 67:19,
88:3, 88:19,
89:18, 136:20.
yell 105:1.
yelling 21:21, 69:8,
105:13.
yellow 8:13.
yielded 71:21.
Yo 92:15, 100:11,
135:17, 135:22,
198:9.
Young 6:18, 6:21,
7:8, 7:10, 9:14,
24:4, 43:7, 43:10,
44:12, 46:3,
48:21, 57:6,
57:14, 197:23,
201:12.
younger 90:6, 90:7,
90:8, 122:7,
139:6.
yourself 28:2,
56:14, 117:20,
175:11.
yourselves 3:4,
38:23, 39:4, 40:5,
81:14, 113:21,
121:14, 133:18,
133:20, 161:21,
165:10, 177:18,
191:20, 217:1,
227:16.
.
.
< Z >.
zero 226:2.